```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3     UNITED STATES OF AMERICA,

 4                   Plaintiff,          Case No. 11-20129
                                         Case No. 11-20066
 5        -v-

 6     SCOTT WILLIAM SUTHERLAND, D-1,
       PATRICK MICHAEL MCKEOUN, D-4,
 7     JEFF GARVIN SMITH, D-5/D-1,
       PAUL ANTHONY DARRAH, D-6/D-2,
 8     CARY DALE VANDIVER, D-7/D-5,
       VINCENT WITORT, D-8,
 9     DAVID RANDY DROZDOWSKI, D-17,

10                   Defendants.
       _____/
11
                      EXCERPT OF JURY TRIAL, VOLUME I
12
                 BEFORE THE HONORABLE ROBERT H. CLELAND
13                   United States District Judge
                 Theodore Levin United States Courthouse
14                   231 West Lafayette Boulevard
                           Detroit, Michigan
15                   Wednesday, October 15, 2014
       APPEARANCES:
16
       FOR THE PLAINTIFF:   SAIMA MOHSIN
17                          ERIC STRAUS
                            U.S. Attorney's Office
18                          211 W. Fort StreetSuite 2000
                            Detroit, MI  48226
19
                            JEROME MAIATICO
20                          United States Department of Justice
                            1301 New York Avenue, NW
21                          Washington, DC 20005

22     FOR THE DEFENDANT:   CRAIG A. DALY
                            (Sutherland, D-1)
23                          615 Ford Building
                            Suite 820
24                          Detroit, MI 48226

25
```

```
 1    APPEARANCES:              (Continued)

 2    FOR THE DEFENDANT:    SIDNEY KRAIZMAN
                            (McKeoun, D-4)
 3                          1616 Ford Building
                            Detroit, MI 48226
 4
                            JEROME SABBOTA
 5                          (Smith, D-5/D-1)
                            26862 Woodward Avenue
 6                          Suite 200
                            Royal Oak, MI 48067
 7

 8                          PATRICIA A. MACERONI
                            (Darrah, D-6/D-2)
 9                          26611 Woodward Avenue
                            Huntington Woods, MI 48070
10
                            MARK A. SATAWA
11                          (Vandiver, D-7/D-5)
                            3000 Town Center, Suite 1800
12                          Southfield, MI 48075

13                          KIMBERLY W. STOUT
                            (Witort, D-8)
14                          370 East Maple Road, Third Floor
                            Birmingham, MI 48009
15
                            BYRON H. PITTS
16                          535 Griswold, Suite 1630
                            Detroit, MI 48226-4218
17
                            PHILLIP D. COMORSKI
18                          535 Griswold
                            2632 Buhl Building
19                          Detroit, MI 48226

20                          RYAN H. MACHASIC
                            134 Market Street
21                          Mount Clemens, MI 48043

22

23           To Obtain a Certified Transcript Contact:
                         Christin E. Russell
24           RMR, FCRR, CRR, CSR - (248) 420-2720
             Proceedings produced by mechanical stenography.
25        Transcript produced by computer-aided Transcription.
```

```
 1                        I N D E X

 2
         JURY TRIAL, VOLUME I:                    PAGE
 3
         WITNESSES FOR THE GOVERNMENT:
 4       WILLIAM FLEMING
           Direct Examination by Ms. Mohsin        5
 5

 6                      E X H I B I T S

 7       Government Exhibit                        Page
         Exhibit 20-13, 20-15, 20-22, 20-18, 20-21   13
 8       Exhibit 63-9, 63-19, 64-33, 64-39          15
         Exhibit 63-9, 63-19, 64-33, 64-39          16
 9       Exhibit 21-2, 21-5, 21-9                   25
         Exhibit 22-2, 22-3                         31
10       Exhibit 24-23, 24-26, 23-1, 23-3          37

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    CERTIFICATE OF REPORTER                      43
```

1   Detroit, Michigan

2   September 18, 2013

3   3:56 p.m.

4                          *      *      *

5          MS. MOHSIN:  Your Honor, the Government would call

6   Special Agent William Fleming.

7          (Witness is sworn.)

8          THE COURT:  Have a seat right here.

9          MS. MOHSIN:  Your Honor, I would like to advise the

10  Court that I have already advised the defense that this will be

11  one of many times that we call Special Agent Fleming to the

12  stand.

13         THE COURT:  Understood.

14         MS. MOHSIN:  Thank you.

15         THE COURT:  You may want to re-aim the microphone so

16  it's more towards you than sideways.

17         MS. MOHSIN:  Thank you, your Honor.

18         MS. MACERONI:  Your Honor, I don't want to interrupt,

19  but I don't know what that screen is right there, but I can't

20  see Mr. Fleming's face.

21         THE COURT:  Well, it's a monitor equivalent to that.

22  And that's what I have for the bench, as well.  And if you want

23  to reposition yourself temporarily, see if we can do something

24  about it later.  But we're going to proceed right now.  Go

25  ahead, Ms. Mohsin.

1        MS. MOHSIN:  Your Honor, I've been advised to turn the

2    machine on, which if I could have a moment.

3            (Mr. Satawa present, 3:57 p.m.)

4        MS. MOHSIN:  May I, your Honor?

5        THE COURT:  Please.

6                        WILLIAM FLEMING

7      called as a witness at 3:56 p.m., testified as follows:

8                      DIRECT EXAMINATION

9    BY MS. MOHSIN:

10   Q.  Good afternoon.

11   A.  Hello.

12   Q.  Could you please tell the members of the jury your full

13   name, spell your last name, and tell them by whom you are

14   employed.

15   A.  It's William Fleming, F-L-E-M-I-N-G.  And I'm an agent with

16   the FBI.  And I'm currently assigned to the Macomb County

17   office.

18   Q.  And is your title special agent?

19   A.  It is.  That's an administrative title that defines our

20   position.

21   Q.  Special Agent Fleming, how long have you been employed by

22   the Federal Bureau of Investigation?

23   A.  A little over 27 years.

24   Q.  And during that time, how long were you employed or working

25   at the Macomb County office?

1   A.   I think I've been there now about 17 years.

2   Q.   Do you have a particular area that you are assigned to?

3   Any particular type of work that you do at the Macomb office?

4   A.   Pretty much my entire career, I've worked gang

5   investigations.

6   Q.   And I want to direct your attention a moment to the time

7   before you became a Federal agent.  What is your educational

8   background?  Could you please tell the members of the jury?

9   A.   I have a law degree.  And while I was in law school, I

10   worked as a police officer for a short period of time.

11   Q.   And when you say you have a law degree, you graduated from

12   law school?

13   A.   I did.

14   Q.   And what year was that?

15   A.   You're really testing my memory.  '83.  1983.

16   Q.   Okay.  Special Agent --

17   A.   No.  I'm sorry.  1987.

18   Q.   Okay.  Special Agent Fleming, during your time working with

19   the FBI, have you had occasion to participate in investigations

20   involving gangs that included, in other words, a number of

21   different types of gangs?

22   A.   I have.  I've been in two different field offices, and I've

23   worked all sorts of gang investigations, from Russian gangs to

24   Asian gangs, to your typical inner city gangs, and also

25   motorcycle clubs.

1  Q.  And when you say that you have investigated gang activity,

2  are there different types of activities that you have some

3  experience with?  For instance, does that activity include

4  violence and guns and drugs?

5  A.  Correct.  That's the main focus, is on those three areas.

6  Q.  During the course of your experience, as an agent and also

7  when you were a police officer, did you have occasion to ever

8  interview individuals who were involved in this type of

9  activity?

10  A.  I have.

11  Q.  And if you had to say, you know, or if you had to

12  approximate the number of people that you've talked to that

13  have been involved in this type of activity, how would you

14  approximate that?  Would it be in the dozens?  The hundreds?

15  A.  It would probably be in the thousands, would be my educated

16  guess.

17  Q.  I want to direct your attention now to an organization

18  called the Devils Diciples.  Are you familiar with that

19  organization?

20  A.  I am.

21  Q.  And I want to direct your attention to the time that you

22  were assigned to the Macomb County office.  Is that when you

23  became aware of the Devils Diciples?

24  A.  That's correct.

25  Q.  Tell the members of the jury, very briefly, some of your

1   earlier -- some instances, you know, earlier in time where you

2   became aware of the Devils Diciples and some of the things that

3   brought them to your attention.

4   A.  Well, there had been an earlier investigation in

5   approximately 2004 that was conducted primarily by the ATF that

6   I was vaguely familiar with, although I didn't work on that

7   case at all.

8          In the same token, I also had some confidential

9   informants who were regularly providing me information on the

10  activities, at that time, of the Devils Diciples up in the Port

11  Huron area, and then down in what they called, it's, it's in

12  Clinton Township actually, but it's often called Mount Clemens.

13  Q.  Now, can you give us roughly a date when you first became

14  aware of the activities of the Devils Diciples, roughly what

15  year that was?

16  A.  It would have been late in 2004, probably September or

17  October of 2004.

18  Q.  And you indicated that there had been an earlier

19  investigation that involved the ATF; is that correct?

20  A.  That's correct.

21  Q.  And that's the -- what does ATF stand for?

22  A.  I'm sorry.  It's the Bureau of Alcohol, Tobacco and

23  Firearms.  It's another Federal law enforcement agency.

24  Q.  Were you personally involved in that investigation in any

25  way?

1  A.  I didn't -- no, I was not.

2  Q.  Was the FBI involved in that investigation?

3  A.  They were.  It was a joint investigation that ran out of

4  our office in Downtown Detroit.

5  Q.  So is that office a different office than your office in

6  Macomb County?

7  A.  That's correct.

8  Q.  So if -- so that we're perfectly clear, there is an FBI

9  office in Macomb County; is that accurate?

10  A.  That's correct.  And we cover Macomb, St. Clair, and

11  Sanilac County, and investigations in that area.  Our office in

12  Detroit covers Wayne County.

13  Q.  And is the Detroit office considered the headquarters for

14  this region?

15  A.  It is.

16  Q.  Now, I want to direct your attention to an individual by

17  the name of Victor Castano.  Are you familiar with that

18  individual?

19  A.  I am.

20  Q.  How did you become familiar with Victor Castano?

21  A.  Back in late 2004, I would frequently work with the St.

22  Clair County Drug Task Force.  And they made mention to me that

23  they had made an arrest of Mr. Castano and his girlfriend at

24  the time, Melissa Gordon; that they had seized a large amount

25  of marijuana, a firearm; and that their investigation showed

2:11-cr-20129-RHC-MAR   Doc # 1054   Filed 10/23/14   Pg 10 of 43   Pg ID 5174
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

10

 1   that Mr. Castano was a member of the Devils Diciples.

 2   Q.  Now, once you received this information, what did you do

 3   with the information?  What was your next step?

 4   A.  Well, I talked to the local police and asked if they would

 5   mind if we adopted the case federally, which basically says we

 6   take their case and it becomes a federal prosecution in the

 7   hopes of combining that with the information I was receiving

 8   through sources, to see if, if there was a larger investigation

 9   there related to the Devils Diciples.

10   Q.  Did that occur?

11   A.  Yes.  They turned the case over to us for federal

12   prosecution.  And that case went forward in early 2006.

13   Q.  Do you recall approximately when the Castano arrest

14   occurred by the local police?

15   A.  It was, I want to say some time in late September of 2004.

16   Q.  Okay.  And would something refresh your recollection

17   regarding when that would have, the arrest by the local police

18   would have occurred?

19   A.  It would.  A copy of the police report.  When I think about

20   it now, it may have actually been June or July of that year.

21   Q.  So would it be fair to say it was, as you sit here today,

22   not having recently reviewed the police report, sometime in

23   that time period, June, July?

24   A.  Earlier, that's correct.

25   Q.  2004?

1   A.  Correct.

2   Q.  And did the evidence that was seized in that case, what

3   happened to that evidence?  Withdrawn.

4           The evidence that the local police seized in that

5   case, what happened to that evidence?

6   A.  It was turned over to the FBI.

7   Q.  And did it eventually get turned over to your custody?

8   A.  It did.  Yes.

9   Q.  What did you do with that evidence?

10  A.  Well, the evidence was stored in our evidence room.  It had

11  already been analyzed and it just became FBI evidence.

12  Q.  And where is that evidence today?

13  A.  The evidence is in the FBI office in Detroit.

14  Q.  So it's still in the custody of the FBI; is that statement

15  correct?

16  A.  That's correct.

17  Q.  Now, specifically, a number of items were seized; is that

18  accurate?

19  A.  That's correct.

20  Q.  Did the local police also provide you with any photographs?

21  A.  They did.  They provided photographs.  The arrest occurred

22  during a traffic stop of a pickup truck that was being driven

23  by Mr. Castano.  They provided me photos of immediately after

24  the arrest.

25  Q.  And have you had an opportunity to review those photos

2:11-cr-20129-RHC-MAR Doc # 1054 Filed 10/23/14 Pg 12 of 43 Pg ID 5176
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

12

1  before you came here to court today?

2  A.  I have, yes.

3  Q.  And the photos that, that you had an opportunity to review,

4  can you just generally describe what types of photos they are?

5  A.  They show a black pickup truck with a large box in the

6  back.  It's actually a box for a grill.  They then show items

7  removed from that grill box, which turned out to be various

8  packaging of marijuana in one-pound packages.  And then it also

9  showed the interior of the pickup truck where a firearm was

10  located in the center console between the passenger and

11  driver's seat.

12  Q.  Okay.

13          THE COURT:  You've circulated these previously?

14          MS. MOHSIN:  They have been provided, your Honor.

15          THE COURT:  You're going to be moving these?  We can't

16  do this with every exhibit.  Why don't you identify these.  Are

17  you going to seek to identify these and admit them?

18          MS. MOHSIN:  I am going to seek to identify and admit

19  them, your Honor.

20          THE COURT:  What are the numbers?

21          MS. MOHSIN:  These are Exhibits 20-13, 20-15, 20-22,

22  20-18, 20-21.

23          THE COURT:  They've all been previously supplied to

24  counsel?

25          MS. MOHSIN:  Correct.

1    THE COURT:  Any objection?  Hearing none --

2    MS. STOUT:  No objection.

3    THE COURT:  -- admitted.  Okay.  Thank you.

4    The advantage of pre-circulating is we don't have to

5    do this every time one of these 10,000 exhibits is going to be

6    discussed or offered.

7    All right.  Go ahead.

8    BY MS. MOHSIN:

9    Q.  Special Agent Fleming, are those exhibits among the

10   photographs that you were provided by the local police?

11   A.  They are.

12   MS. MOHSIN:  Your Honor, the Government offers those

13   exhibits into evidence, 20-13, 15, 22, 18, and 21.

14   THE COURT:  Hearing no objection?

15   MS. STOUT:  No objection.

16   THE COURT:  I hear none.  They are each received.

17   (Exhibit 20-13, 20-15, 20-22, 20-18, 20-21 received,

18   4:08 p.m.)

19   BY MS. MOHSIN:

20   Q.  I'm going to direct your attention and the attention of the

21   jury to the screen.  Exhibit 20-13.

22   MS. MOHSIN:  We appear to be having a little -- there

23   we go.

24   BY MS. MOHSIN:

25   Q.  Can you please describe what is depicted in photograph

1 20-13?

2 A. Sure.  Government Exhibit 20-13 is the rear of the pickup

3 truck that Mr. Castano and Ms. Gordon were driving in.  You see

4 a white and red grill box.  And contained inside that was

5 approximately 50 pounds of marijuana.

6    MS. MOHSIN:  20-15.

7 BY MS. MOHSIN:

8 Q. Please describe that as well.

9 A. Sure.  20-15 just shows the box, the grill box when it's

10 opened.  You see individual 1-pound Glad sandwich bags filled

11 with marijuana, and then a silver package of compressed

12 marijuana, which was about 14 pounds.

13 Q. 20-22?

14 A. 20-22 is just the evidence laid out, and a picture was

15 taken following the arrest.

16 Q. 20-18?

17 A. 20-18 is the center console of the car and a picture of the

18 firearm that was seized from the center console.

19 Q. What type of firearm is that?

20 A. It's a revolver.

21 Q. Okay.  And 20-21.

22 A. 20-21 is just a photo of a Devils Diciple, what we would

23 call a patch or an emblem hanging from the rearview mirror.

24 Q. Okay.  Thank you.

25    MS. MOHSIN:  Can you leave that up?

1   BY MS. MOHSIN:

2   Q.  Now, when you talk about an emblem, can you describe what

3   the emblem is?

4   A.  Sure.  It is a spoked wheel with two crossed tridents or

5   pitchforks, or whatever you'd like to call them.

6   Q.  Was the individual, Victor Castano, based on your

7   investigation, determined to be a member of the Devils Diciples

8   Motorcycle Club?

9   A.  He was, yes.

10          MS. MOHSIN:  You can take that photograph down.

11  BY MS. MOHSIN:

12  Q.  I'm going to show you 63-9, 63-19, 64-33 and 64-39.

13          Can you please identify what those photos are, based

14  upon their number?

15  A.  Sure.  63-9 is a photograph of Victor Castano.  63-19 is a

16  photograph of Vern Rich.  64-33 is a photograph of William

17  Lonsby.  And 64-39 is a photograph of Keith McFadden.

18          MS. MOHSIN:  Okay.  I offer these exhibits in

19  evidence, your Honor.

20          THE COURT:  Hearing -- I hear no objection.  There is

21  none.  They are received.

22      (Exhibit 63-9, 63-19, 64-33, 64-39 received, 4:12 p.m.)

23          MR. KRAIZMAN:  We don't have them.  I've got a disk,

24  Judge, with the exhibits on it.  It only goes to 63 dash

25  something.

 1            THE COURT:  Well, they are proffered to be --

 2            MR. KRAIZMAN:  62 dash something.

 3            THE COURT:  Sorry.  That may need to be repaired.  But

 4    for the moment, is there any actual objection to these facial

 5    photographs?  You just want to see them?

 6            MR. DALY:  Yeah.  We'd like to see them.

 7            THE COURT:  Hold them up.

 8            (Ms. Mohsin handing documents to defense counsel.)

 9            (Brief pause.)

10            MR. MACHASIC:  No objection on behalf of Mr.

11    Drozdowski.

12            THE COURT:  Right.

13            MS. STOUT:  No objection, your Honor.

14            MR. SABBOTA:  No objection.

15            THE COURT:  Thank you.  Actually, I think it would be

16    more efficient to sound off in the event that there actually is

17    an objection, rather than having seven or eight no objections

18    stated at each such juncture.  I hear no objection and they are

19    received.

20        (Exhibit 63-9, 63-19, 64-33, 64-39 received, 4:13 p.m.)

21            MS. MOHSIN:  Thank you, your Honor.

22            Could you please publish 63-9?

23            THE COURT:  It's up on the screen, in other words,

24    right?

25            MS. MOHSIN:  Yes.  I will have to publish it, your

 1   Honor.

 2           THE COURT:  All right.  You know, you could do it the

 3   old-fashioned way, just hold it up.  We have a little technical

 4   issue?  We have technical issues?

 5           MS. MOHSIN:  I will have to do that, but I'm not

 6   sure --

 7           MS. VAINIO:  The power button on the side of the ELMO.

 8   There you go.

 9           MS. MOHSIN:  Thank you.  I'll get it figured out.

10   BY MS. MOHSIN:

11   Q.  Can you please tell the members of the jury the individual

12   that's depicted in this photo?

13   A.  Sure.  That's Victor Castano.

14   Q.  Okay.  That was 63-9.

15           63-19?

16   A.  That's Vern Rich.  Williams Lonsby.

17   Q.  That's 63-33.

18   A.  And that's Keith McFadden.

19   Q.  Now, which individual was the one that was in the vehicle?

20   A.  Mr. Castano, the very first picture that you showed.

21   Q.  And there was a trial in this case; is that correct?

22   A.  That's correct.

23   Q.  Where was that trial?

24   A.  It was in the federal court up in Port Huron, Michigan.

25   Q.  Who was the judge?

1   A.   Judge Zatkoff.

2   Q.   And were you involved in that trial?

3   A.   I was, yes.

4   Q.   Were you the case agent for that case?

5   A.   I was.

6   Q.   So when someone is a case agent, what does that mean?

7   A.   The case agent is in charge of the investigation,

8   responsible for, if it goes to trial, helping the prosecution

9   handling whatever issues come up.

10  Q.   So when this case went to trial involving the evidence that

11  we showed earlier, the firearm and the drugs, did any of these

12  individuals testify?

13  A.   Of the pictures that you showed me, yes, Vern Rich

14  testified and William Lonsby.

15  Q.   Testified?

16  A.   Both testified.

17  Q.   And what about Mr. McFadden?

18  A.   And, I'm sorry, Mr. McFadden, too.

19  Q.   Now, there was a fourth individual as well.  Wasn't there a

20  female?

21  A.   There -- who testified?

22  Q.   Who testified.

23  A.   Yes.  Stella Herron.

24  Q.   Okay.  Her photo has not been displayed?

25  A.   It has not.

1   Q.   Okay.  And were you present during that trial?

2   A.   I was.

3   Q.   After you took the evidence, the drugs and the gun and

4   whatever else was provided, did you conduct any other

5   investigation in that case?

6   A.   We did.  Yes.

7   Q.   And did that investigation involve talking to people?

8   A.   It did.

9   Q.   Did, did individuals that you talked to include Keith

10  McFadden?

11  A.   It did eventually, yes.

12  Q.   Okay.  But not initially?

13  A.   Not initially, no.

14  Q.   So did you initially speak with who in the case?

15  A.   I spoke with Mr. Lonsby, Mr. Rich in attempting to

16  determine exactly the ownership of the truck and who had

17  provided the truck to Mr. Castano.

18  Q.   And eventually, you said you talked to Mr. McFadden.  How

19  did that come about, briefly?

20  A.   The defense advised us that Mr. McFadden was going to be a

21  defense witness during the trial.

22  Q.   And so you interviewed him in connection with that; is that

23  a fair statement?

24  A.   That's correct.

25  Q.   And did you also talk with Stella Herron?

1   A.   We talked to both of them.  Yes.

2   Q.   Okay.  Now, there was a trial in that case; is that right?

3   A.   There was.

4   Q.   What happened in that trial?  Was there a verdict?

5   A.   There was.

6   Q.   What was the jury's verdict in that case?

7   A.   The jury verdict -- Mr. Castano pled guilty to marijuana

8   charges before the trial, went to trial on the gun charges, and

9   was convicted.

10  Q.   He was convicted of what specifically?

11  A.   Use of a firearm during a drug trafficking crime.

12  Q.   Okay.  And how about, was there an additional charge

13  related to possession of firearms?

14  A.   Felon in possession of a firearm.

15  Q.   Okay.  Now, that case in 2004, how is that important in

16  this case, from the scheme of things of providing a historical

17  perspective of the case?

18  A.   Well, two ways.  First off, it gave us insight into the

19  involvement of the Devils Diciple inactivity up in Port Huron.

20          Secondly, we found out later on that there had been a

21  concerted effort to try and influence that case while it was in

22  trial by putting perjured testimony on the stand.

23  Q.   And did that occur, that determination or that information,

24  did that come much later?

25  A.   It did.  Three or four, maybe even five years later.

2:11-cr-20129-RHC-MAR  Doc # 1054  Filed 10/23/14  Pg 21 of 43  Pg ID 5185
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

21

1    Q.  Okay.  So as of 2004 when Mr. Castano is arrested, that's

2    roughly when you first have an investigation involving a member

3    of the Devils Diciples; is that a fair statement?

4    A.  That's correct.

5    Q.  What happens next after that initial case?  Do you develop

6    any other cases involving members of the Devils Diciples?

7    A.  Shortly after the Castano case finished trial, I received

8    some information from my sources that members of the Devils

9    Diciples and some, what we would call "citizens," people who

10   aren't in the club, were involved in meth production in the New

11   Haven, Michigan area.

12   Q.  Now, I want to stop for a moment.  Did you have a RICO

13   investigation pending at that time?

14   A.  No.

15   Q.  Okay.  So this was just investigation into conduct of

16   various criminal activities; is that an accurate statement?

17   A.  That's correct.

18   Q.  And activities of individuals who happen to be involved in

19   this club?

20   A.  That's correct.

21   Q.  So you receive information.  And what do you do about it?

22   A.  We worked a lot of our cases jointly with the Michigan

23   State Police.  And we conducted a joint investigation with

24   their task force that's called COMET, which ultimately led to a

25   series of search warrants.

1  Q.  Now, what is COMET?  What is that an acronym for, if

2  anything?

3  A.  It's the County of Macomb Enforcement Team.  It's a drug

4  task force, basically.

5  Q.  Now, COMET and the Michigan State Police are working

6  together with you?

7  A.  That's correct.

8  Q.  And you indicated that search warrants were executed?

9  A.  They were.

10  Q.  How does one obtain a search warrant?

11  A.  A search warrant is obtained, after it's drafted and

12  approved by a prosecutor, it is taken to a judge.  And the

13  judge has to indicate that he believes there's probable cause

14  and authorize the warrant.

15  Q.  Probable cause in general, or specifically related to

16  something?

17  A.  Specifically related to the location where you want to

18  search, whether it's a car or a house or a person.

19  Q.  So if, if a special agent such as yourself were to seek a

20  search warrant before a judge, could it be any judge or a

21  particular judge?

22  A.  Well, it has to be related to, if it's a federal case that

23  I'm working on, it would have to go to a federal judge.  If it

24  was a state case, it would go to a state judge in the district

25  where you want to search.

JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

1  Q.  And if it's an overlapping jurisdiction, could it go to

2  either?

3  A.  It could.

4  Q.  Now, in this case, a series of search warrants were

5  obtained; is that correct?

6  A.  A series of state search warrants, that's correct.

7  Q.  And those were sworn to by which type of officers?

8  A.  By a lieutenant from the Michigan State Police.

9  Q.  And so they were authorized by a state judge or judges?

10  A.  That's correct.

11  Q.  What types of locations did those warrants authorize the

12  search of?

13  A.  There were several houses that were searched.  There was

14  also two, what I'd call business or industrial-type locations.

15  And then after we had done the initial set of searches, it led

16  to search warrant back at the Devils Diciple clubhouse, again,

17  in Mount Clemens or Detroit, whichever you want to call it.

18  Q.  Let's start with the two industrial locations.  Did you

19  participate in the execution of those warrants?

20  A.  Not both of them, no.

21  Q.  Did you participate in the execution of any of those

22  warrants?

23  A.  I did at the one at the location, what we call the Lenfesty

24  location, which was in Harrison Township.

25  Q.  So that was one of the business locations you described?

1   A.   That's correct.

2   Q.   Okay.  And were you a part of that larger investigation

3   into these various locations that, that the Michigan State

4   Police had sought search warrants for?

5   A.   I was, yes.

6   Q.   When, when you say that there were several locations and

7   two were at industrial buildings, describe for me the one at

8   Lenfesty.  What type of building was it and what were you

9   searching for?

10   A.   It was a storefront inside an industrial complex, a series

11   of individual offices, for lack of a better word.  And the

12   information was that a meth lab was located in the location

13   that was owned and used by Mike Mastromatteo, who I knew was a

14   member of the Devils Diciples, who went by "Iron Mike."

15   Q.   And so his nickname was "Iron Mike"; is that correct?

16   A.   Correct.

17   Q.   And this shop, what was his relationship to it?

18   A.   He owned it and he repaired motorcycles and did other odd

19   mechanic work out of that location.

20   Q.   When you participated in the search warrant of this

21   location to search for a meth lab, did you find one?

22   A.   We did.  There was a meth lab that was up and actively

23   cooking meth at the time that we executed the search warrant.

24   Q.   Now, were photographs taken of that particular location?

25   A.   There were.

```
 1   Q.  And have you had an opportunity to examine some of those

 2   photos before you testified here today?

 3   A.  Yes, I have.

 4   Q.  I'm going to direct your attention to Government Exhibit

 5   21-2, 21-5 and 21-9.  Are those the photographs that you're

 6   familiar with from that Lenfesty location?

 7   A.  That's correct.  21-2, 21-5 and 21-9 are all photos of the

 8   search warrant at Lenfesty.

 9          MS. MOHSIN:  Your Honor, I would offer these for

10   admission.

11          THE COURT:  Do I hear any objection?  I hear none.

12   All right.  Each is received.

13      (Exhibit 21-2, 21-5, 21-9 received 4:23 p.m.)

14          MS. MOHSIN:  Thank you, your Honor.

15          Would you please publish 21-2?

16   BY MS. MOHSIN:

17   Q.  Would you please describe for the jury what's depicted in

18   this photograph.

19   A.  Sure.  21-2 is what's commonly referred to as a red P or a

20   red phosphorus meth lab.  It occupies the blue container, the

21   blue top container, with the gassing tubing running down to the

22   beaker that's inside a metal sink.

23   Q.  So the blue rubber container that's got the closed top on

24   top of it and the tube connected to it is what you're referring

25   to in that photograph?
```

2:11-cr-20129-RHC-MAR  Doc # 1054  Filed 10/23/14  Pg 26 of 43  Pg ID 5190
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

26

1  A.  That's correct.

2  Q.  And the beaker that you're referring to is what's connected

3  to the hose?

4  A.  That's correct.  It's got a silver top to it.

5  Q.  Is that how it appeared when it was found inside of the

6  Lenfesty location?

7  A.  Yes.

8  Q.  And so was that photograph taken before anything was done

9  to dismantle that?

10 A.  That's correct.

11 Q.  What was determined to be inside of the beaker or the tub?

12 A.  Well, this was the components necessary to make meth using

13 the red phosphorus method.  And the beaker was tested and

14 contained red phosphorus.

15 Q.  Okay.  21-5.  Can you describe what's contained in that

16 photo?

17 A.  21-5, again, is the beaker that was inside the metal sink.

18 And it's on a hot pad or a hot, yeah, a hot pad.

19 Q.  A heating unit of some kind?

20 A.  There we go.  Yes.

21 Q.  Okay.  And again, is this a photograph taken before it's

22 dismantled?  In other words, as it appeared when you conducted

23 the search, or had something else been done before that photo

24 was taken?

25 A.  That's correct.  The photo was taken before the lab was

2:11-cr-20129-RHC-MAR   Doc # 1054   Filed 10/23/14   Pg 27 of 43   Pg ID 5191
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

27

1    taken down.

2    Q.  And is that a close-up of the previous photo?

3    A.  It is, yes.

4    Q.  21-9.  Can you please describe for the members of the jury

5    what is depicted in this photo?

6    A.  21-9 is basically a Pyrex dish with a white powder

7    substance on it and a, some sort of scraping tool.

8    Q.  Okay.  And it's your understanding that that, too, is used in

9    the production of meth; is that an accurate statement?

10   A.  That's correct.

11   Q.  Okay.  You can take that down.

12        Now, you mentioned that this was on an address in

13   Lenfesty associated with "Iron Mike's" shop.  Were there a

14   number of other items also seized at that location?

15   A.  There were.

16   Q.  Okay.  Moving to continue with this somewhat bird's eye

17   view of this investigation, where was the other commercial

18   business located?

19   A.  It was, I believe it was on 26 Mile in New Haven.  It was a

20   business location that was rented by a Demetrius Meffer, who

21   went by "Demi."

22   Q.  And when you say that it was a commercial property, can you

23   roughly describe what it looked like?

24   A.  It was probably a building about half the size of this

25   courtroom.  It was an industrial, just an industrial building

1    with tools and machinery inside.

2    Q.   And were items related to meth manufacturing found inside

3    of that property as well?

4    A.   Meth precursors were found in that, inside that location.

5    Q.   You indicated that there were some homes searched as well.

6    Among those homes, were there any homes of a member of the

7    Devils Diciples?

8    A.   The clubhouse eventually was searched, but no other members

9    of the Devils Diciples house was searched.

10   Q.   Was there a search conducted at 8674 Anchor Bay Drive in

11   Algonac?

12   A.   There was at a later, later point in time.

13   Q.   Okay.   So not in connection with these original category of

14   searches?

15   A.   No, not originally.

16   Q.   All right.   What were the other locations that were

17   searched in that original category of searches?

18   A.   There were other locations that occupied or we had

19   information where meth manufacturing was being made.

20   Q.   And did you find meth labs?

21   A.   We found one other meth lab in a house on Twenty-four Mile

22   Road and we found items used to cook meth at all the other

23   locations.

24   Q.   Now, these other individuals, were they members of the

25   motorcycle club, the Devils Diciples, or were they associates

1   or other people?

2   A.   They were other people at that time that, as far as we

3   knew, did not have a connection to the club.

4   Q.   Did that change over time?

5   A.   It did.

6   Q.   Okay.  Now, were there prosecutions based upon these

7   initial search warrants?

8   A.   There were.

9   Q.   Okay.  And did they involve RICO?

10  A.   It did not, no.

11  Q.   What type of prosecutions were they?

12  A.   There were prosecutions based on meth-related charges.

13  There were also some firearms charges.

14  Q.   Okay.  I want to direct your attention to a search warrant

15  that was conducted on 8674 Anchor Bay Drive.  You mentioned

16  that that occurred a little later.  Is that --

17  A.   Correct.

18  Q.   Okay.  Who was the member whose house that was, that was

19  searched?

20  A.   That was a member, Gregory Schoeninger, who was known by

21  the club name of "Breakdown."

22  Q.   And Gregory Schoeninger's house was searched.  Did you

23  participate in that search?

24  A.   Not that particular search, no.

25  Q.   Okay.  Did there come a time where you did participate in a

1  search of his home?

2  A.  There did, yes.

3  Q.  And when did that occur?

4  A.  In April of 2006.

5  Q.  All right.  So this was before April of 2006; is that

6  right?

7  A.  Correct.

8  Q.  Did you, did you take into custody evidence that was seized

9  from the earlier search warrant?  In other words --

10  A.  Eventually, it was turned over to us by the St. Clair

11  County Sheriff's Department, yes.

12  Q.  Okay.  And among the items that were seized, was there a

13  firearm?

14  A.  There was a firearm and other meth precursors.

15  Q.  Specifically, was there a meth precursor related to, or

16  items related to the manufacture of the red P method?

17  A.  There was.  There was a large tub filled with wooden stick

18  matches or -- that are commonly used in meth production.

19  Q.  Okay.  I'm going to show you an exhibit, 22-3.  Actually,

20  22-2 and 22-3.

21          MS. STOUT:  22-2 and 3, did you say?

22          MS. MOHSIN:  2 and 3.

23          MS. STOUT:  Thank you.

24  BY MS. MOHSIN:

25  Q.  Do you recognize those photos?

1   A.  I do.

2   Q.  What do they depict?

3   A.  22-2 was the firearm that was recovered from Mr.

4   Schoeninger's house.  And 22-3 is the large, looks like about

5   20 packages of matches, wood stick matches.

6          MS. MOHSIN:  Would you please -- excuse me.  I would

7   offer these in evidence, your Honor.

8          THE COURT:  Give me the numbers, please, again.

9          MS. MOHSIN:  22-2 and 22-3.

10         THE COURT:  Do I hear any objection?  I hear none.

11  22-2 and 22-3 are received.

12      (Exhibit 22-2, 22-3 received, 4:30 p.m.)

13         MS. MOHSIN:  Thank you, your Honor.

14         Could you please publish 22-2?

15  BY MS. MOHSIN:

16  Q.  Would you please describe what is depicted in that photo.

17  A.  That is the firearm that was located in Mr. Schoeninger's

18  house.

19  Q.  And do you know if that photograph was taken at the time

20  when the firearm was found?

21  A.  It was, yes.

22  Q.  What type of firearm is that?

23  A.  It's a revolver.  It was a .41 caliber.

24  Q.  Okay.

25         MS. MOHSIN:  Could you please publish 22-3?

```
 1   BY MS. MOHSIN:
 2   Q.  Could you please describe what's depicted in that photo?
 3   A.  Sure.  22-3 is the tub of matches that we located.
 4   Q.  Now, I want to pause for a moment and ask you what
 5   significance those matches have.  But before I do that, I would
 6   like to ask you some questions about your experience with
 7   methamphetamine-related investigations.
 8   A.  Sure.
 9   Q.  Have you participated in investigations involving
10   methamphetamine?
11   A.  I have.
12   Q.  Have you received training about the methods that are used
13   in methamphetamine manufacturing?
14   A.  Generally, yes.
15   Q.  And as, as part of your training, have you learned to look
16   for certain things that are used in the manufacture of meth?
17   A.  Right.  We call them precursors.
18   Q.  So what is your understanding about the value of matches or
19   the use of matches when they are found in a bulk capacity, such
20   as this?
21   A.  These items are commonly used -- there are different ways
22   to produce meth.  These, the matchboxes with the strips on
23   them, that you strike the match on, those strips are valuable
24   in the red phosphorus method.
25   Q.  So your understanding is what, about those strips?
```

2:11-cr-20129-RHC-MAR   Doc # 1054   Filed 10/23/14   Pg 33 of 43   Pg ID 5197
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

33

1   A.   That they are used in the method, the red P or red

2   phosphorus method of cooking meth.

3   Q.   And how is that done?  Are they physically removed from the

4   matches themselves?

5   A.   They are, yes.

6   Q.   Okay.  Thank you.

7         Now, around this same time, and I'm now focused around

8   the time of this search warrant, which was in approximately

9   what time frame, could you please tell the jury?

10  A.   I don't recall off the top of my head when exactly that

11  search warrant was done.

12  Q.   Okay.  It was prior to April of 2006?

13  A.   It was, yes.

14  Q.   And after March of 2005?

15  A.   It was.

16  Q.   Okay.  So during that time period, did you become aware of

17  additional activities by state and local police or others

18  involving members of the Devils Diciples?

19  A.   Well, at this point in time, we had started to see an

20  influx of information related to the Devils Diciples.  So we

21  started to do background investigation into identifying what

22  members were in the Devils Diciples, what their criminal

23  histories were, pulling police reports to see associations.

24  Kind of all the basic stuff we do at the beginning of an

25  investigation.

1    Q.  And when you indicate that other information was coming in,

2    did you get information about search warrants that had been

3    conducted at the -- at other members' homes?

4    A.  We did, yes.

5    Q.  Can you tell the jury a little bit about that?

6    A.  In regards to what time period?

7    Q.  March 11th of 2005 at Lapeer Road in Clyde Township.

8    A.  Okay.  This was a search warrant that was done a day after

9    the other search warrants, but it was unrelated to the COMET

10   investigation.

11        The St. Clair County Police -- Sheriff's Department

12   did a search warrant regarding stolen vehicles at the home of

13   Vern Rich, who was a member of the Devils Diciples.

14   Q.  Okay.  So you had earlier commented upon a series of search

15   warrants that you, yourself, participated in with the Michigan

16   State Police and COMET; is that correct?

17   A.  Correct.

18   Q.  This was not one of those search warrants?

19   A.  No.  Although it was the next day, it was completely

20   unrelated.

21   Q.  But it came to your attention?

22   A.  They had called me and said that they were going to execute

23   a search warrant and asked if I would come along.

24   Q.  So were you present when that warrant was executed?

25   A.  I was.

1  Q.  And it was at the home of a member of the Devils Diciples?

2  A.  Vern Rich, who was a member, at that time was the president

3  of the Port Huron chapter.

4  Q.  Now, you previously testified a short time ago and

5  identified a photograph of Vern Rich.  Is that the same Vern

6  Rich whose house was searched?

7  A.  That's correct.

8  Q.  And so at the time that the search warrant -- withdrawn.

9       Around that same time, you also said that a search of

10  the clubhouse occurred?

11  A.  Early, on the morning of March 11th, based upon information

12  that had been recovered in the other COMET searches, another

13  search warrant was obtained for the clubhouse, the Devils

14  Diciples clubhouse.

15  Q.  Let's talk about that a little bit.  Where is that

16  clubhouse located?

17  A.  It's located on Gratiot, south of Hall Road on the west

18  side.  It's a large blue framed house, back off the road.

19  Q.  And when you say on Gratiot, south of Hall Road, what, what

20  locality is that?  What --

21  A.  It's Clinton Township.

22  Q.  So it's physically located in Clinton Township?

23  A.  Correct.

24  Q.  And it's called the Mount Clemens clubhouse?

25  A.  It's called, yeah, Mount Clemens or Detroit.  They are

1    pretty much interchangable.

2    Q.  And what's the basis of that?  How do you know that?

3    A.  Interviews with various people affiliated with the Devils

4    Diciples.

5    Q.  So based upon the results of the search warrants that you

6    had -- that had been conducted earlier, a search warrant was

7    executed at the Mount Clemens clubhouse; is that accurate?

8    A.  That's correct.

9    Q.  Okay.  Have you had an opportunity to examine the

10   photographs or -- I should withdraw it.

11           Were photographs taken of both the Vern Rich and the

12   Mount Clemens clubhouse search warrants on March 11th of 2005?

13   A.  There were, yes.

14   Q.  Okay.  And have you had an opportunity to examine those

15   photographs?

16   A.  Yes, I have.

17   Q.  All right.  I'm going to show you some additional

18   photographs.  24-23, 24-26, 23 -- excuse me.  23-1 and 23-3.

19           MS. STOUT:  23-1?

20           MS. MOHSIN:  And 23-3.

21           MS. STOUT:  23-3 and 24?

22           MR. SATAWA:  23 and 26.

23           MS. STOUT:  Thank you.

24   BY MS. MOHSIN:

25   Q.  Would you please identify what's contained in each of those

2:11-cr-20129-RHC-MAR  Doc # 1054  Filed 10/23/14  Pg 37 of 43  Pg ID 5201
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

37

1  photographs by, and refer to them by exhibit number?

2  A.  Sure.  24-23 is a photo of a firearm that was found at Vern

3  Rich's house.  24-26 is a photo of marijuana that was found at

4  Vern Rich's house.  23-1 is a photo of the bar area of the club

5  -- Devils Diciples clubhouse on Gratiot.  And 23-3 is a

6  photograph of two firearms that were found underneath the bar

7  at the Devils Diciples clubhouse.

8         MS. MOHSIN:  Your Honor, I offer these exhibits in

9  evidence, 24-23, 24-26, 23-1 and 23-3.

10         THE COURT:  Do I hear any objection?

11         I do not.  And each is received.

12     (Exhibit 24-23, 24-26, 23-1, 23-3 received, 4:38 p.m.)

13         THE COURT:  Go ahead.

14         MS. MOHSIN:  Would you please publish 24-23?

15  BY MS. MOHSIN:

16  Q.  Would you please describe what is depicted in that photo

17  for the benefit of the jury?

18  A.  Sure.  That is the photo of one of the firearms recovered

19  at Vern Rich's house, along with some ammunition.

20  Q.  You said one of the photos -- "one of the firearms."  Were

21  there, in fact, additional firearms found?

22  A.  There were long guns, rifles or shotguns.

23         MS. MOHSIN:  Okay.  Would you please show 24-26?

24  BY MS. MOHSIN:

25  Q.  Could you please describe that?

1   A.   Sure.  That's some marijuana that was found at Vern Rich's

2   house.

3           MS. MOHSIN:  Okay.  23-21.  Would you please publish?

4           THE COURT:  23-1?

5           MS. MOHSIN:  I apologize.  23-1.  I misstated the

6   number.  Thank you, your Honor.

7   BY MS. MOHSIN:

8   Q.   Would you please describe what's depicted in that photo?

9   A.   Sure.  That's a photo of the bar area of the Detroit or

10  Mount Clemens clubhouse for the Devils Diciples.

11  Q.   And can you be specific as to what is depicted, you know,

12  in various areas of that photo?

13  A.   Well, you've got the bar area.  And in the back of the

14  photo, you have various slot machines, a money bill changer,

15  and then different memorabilia, Devils Diciple memorabilia.

16  Q.   On the bar itself, are there leather vests depicted?

17  A.   There are.

18  Q.   And what, what are those commonly referred to?

19  A.   Colors.

20  Q.   And when you say they are referred to colors, what are they

21  referring -- when you say "colors," what are you referring to

22  specifically?  Is it the vest or the items on it?

23  A.   It is the vest that is worn by members of a particular

24  motorcycle club, they are called "colors."

25  Q.   And is there specific patches that are contained on those

2:11-cr-20129-RHC-MAR  Doc # 1054  Filed 10/23/14  Pg 39 of 43  Pg ID 5203
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

39

1  vests?

2  A.  Each club has got their own patches or designs that they

3  wear on the vest, and then various other patches for attending

4  various functions.

5  Q.  Is the vest that's depicted here in this photograph one of

6  the colors of the Devils Diciples?

7  A.  It is.  It looks like it's a prospect vest.  It does not

8  have the full colors on it yet.  You don't get those until

9  you're a full member.

10  Q.  Okay.  And we'll talk a little bit more about that later.

11      Now, you indicated that, as a result of these search

12  warrants and other information you had received, you commenced

13  an investigation; is that a fair statement?

14  A.  Yes.

15  Q.  What occurred next?  After all of this evidence was seized,

16  were there additional prosecutions of members, such as

17  Schoeninger?

18  A.  There were.  There -- both Gregory Schoeninger, who went by

19  "Breakdown" and Michael Mastromatteo, who went by "Iron Mike"

20  were prosecuted along with other people on various federal drug

21  or firearms charges.

22  Q.  And when you talk about Gregory Schoeninger, what was he

23  charged with?  Was he charged with RICO?

24  A.  He was not.  He was charged as a felon in possession of a

25  firearm and then possession of methamphetamine.

1   Q.  When you would talk about the felon in possession of

2   firearms, are you referring to the firearm that was depicted in

3   the photograph that we showed to the jury a short time ago,

4   Exhibit 22-2?

5   A.  That's correct.  The silver revolver.

6   Q.  And was there a jury trial in that case?

7   A.  There was.

8   Q.  And was that jury trial in federal court?

9   A.  It was.

10  Q.  And where was that?

11  A.  Here in this building.

12  Q.  Here in this building.  Did that result in a verdict?

13  A.  It did.

14  Q.  Okay.  And what happened in that case?

15  A.  He was found guilty of the charges.

16  Q.  And during the course of that investigation and that trial,

17  did you investigate any obstruction of justice charges?

18  A.  We did.  It came to our attention that a threat had been

19  made against one of our -- one of the witnesses in the case,

20  and that also an attempt was made to obtain perjured testimony

21  from a potential witness.

22  Q.  Okay.  Now, you had mentioned Michael Mastromatteo, "Iron

23  Mike."  We had showed photos of that Lenfesty shop.  Was that

24  his shop?

25  A.  It was.

2:11-cr-20129-RHC-MAR   Doc # 1054   Filed 10/23/14   Pg 41 of 43   Pg ID 5205
JURY TRIAL, VOLUME I - 10/15/2014
WILLIAM FLEMING - DIRECT

41

```
 1    Q.  And you indicated he had been prosecuted.  Was he convicted

 2    also after that prosecution?

 3    A.  He was.

 4    Q.  Okay.

 5          THE COURT:  We're ready to recess, if you want to wrap

 6    up any particular topic in a minute or so.

 7          MS. MOHSIN:  Thank you, your Honor.  Just a few more

 8    follow-up questions.

 9          THE COURT:  Okay.

10    BY MS. MOHSIN:

11    Q.  Mr. Mastromatteo, when you say that, that he was convicted

12    as well, was that for RICO or for something else?

13    A.  No.  It was on meth production and manufacturing charges.

14    Q.  All right.

15          MS. MOHSIN:  Your Honor, I think this would be a good

16    place to stop.

17          THE COURT:  May I note to the -- thank you.

18          May I note to the jury there is a chart containing a

19    large number of possible exhibits, some of which are going to

20    be introduced.  I imagine, if this trial is like every other

21    trial I've seen, some of them will be introduced, some of them

22    will not.

23          My expectation is that a pared-down chart of the

24    admitted exhibits will be created and made available for

25    counsel and for the jury near the conclusion of the case?
```

1           MS. MOHSIN:  Yes, your Honor.

2           THE COURT:  And so you'll -- the numbers and so forth,

3    you might be jotting down if you wish to reference them later.

4    Ladies and gentlemen, we don't have a chart for you just yet,

5    the Government doesn't, but something like that will be

6    produced later.

7           We have nothing else to do in court this afternoon.

8    And I will release you in just a few moments to go back into

9    the jury room, to be escorted off the floor, as you were

10   yesterday.  And we'll have you line up tomorrow reporting to --

11   well, through the ordinary administrative procedure, whatever

12   it is you've been told to do, do it again, this morning.

13          And We'll be ready to go, parties and witnesses and so

14   forth here, ready to open court, my plan is, 9 a.m.  And we'll

15   proceed then tomorrow on a partial day tomorrow, I believe,

16   ending at about one, perhaps 1:15.  And have a pleasant

17   evening.  And no discussion of the case, as before, a constant

18   reminder that I'll give you.  Thank you for your attention

19   today.  You may rise and be excused.  Go ahead.

20       (Jury out, 4:45 p.m.)

21

22                *              *              *

23

24

25

1          **CERTIFICATE OF REPORTER**

2

3          As a Federal Official Court Reporter for the United

4    States District Court, appointed pursuant to provisions

5    of Title 28, United States Code, Section 753, I do hereby

6    certify that the foregoing is a correct transcript of

7    the proceedings in the above-entitled cause on the date

8    hereinbefore set forth.

9

10

11                    Dated this <u>15th</u> day of <u>October, 2014</u>.

12

13                    <u>s/ Christin E. Russell</u>
                     Christin E. Russell
14                   RMR, CRR, FCRR, CSR
                     Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25