```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                    SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,

 4                 Plaintiff,        Case No. 11-20129
                                     Case No. 11-20066
 5      -v-

 6    SCOTT WILLIAM SUTHERLAND, D-1,
      PATRICK MICHAEL MCKEOUN, D-4,
 7    JEFF GARVIN SMITH, D-5/D-1,
      PAUL ANTHONY DARRAH, D-6/D-2,
 8    CARY DALE VANDIVER, D-7/D-5,
      VINCENT WITORT, D-8,
 9    DAVID RANDY DROZDOWSKI, D-17,

10                 Defendants.
      _____/
11
                 EXCERPT OF JURY TRIAL, VOLUME II
12
             BEFORE THE HONORABLE ROBERT H. CLELAND
13                United States District Judge
            Theodore Levin United States Courthouse
14               231 West Lafayette Boulevard
                      Detroit, Michigan
15              Thursday, October 16, 2014
      APPEARANCES:
16
      FOR THE PLAINTIFF:   SAIMA MOHSIN
17                         ERIC STRAUS
                           U.S. Attorney's Office
18                         211 W. Fort Street, Suite 2000
                           Detroit, MI  48226
19
                           JEROME MAIATICO
20                         United States Department of Justice
                           1301 New York Avenue, NW
21                         Washington, DC 20005

22    FOR THE DEFENDANT:   CRAIG A. DALY
                           (Sutherland, D-1)
23                         615 Ford Building
                           Suite 820
24                         Detroit, MI 48226

25
```

```
 1    APPEARANCES:           (Continued)

 2    FOR THE DEFENDANT:     SIDNEY KRAIZMAN
                             (McKeoun, D-4)
 3                           1616 Ford Building
                             Detroit, MI 48226
 4
                             JEROME SABBOTA
 5                           (Smith, D-5/D-1)
                             26862 Woodward Avenue
 6                           Suite 200
                             Royal Oak, MI 48067
 7

 8                           PATRICIA A. MACERONI
                             (Darrah, D-6/D-2)
 9                           26611 Woodward Avenue
                             Huntington Woods, MI 48070
10
                             MARK A. SATAWA
11                           (Vandiver, D-7/D-5)
                             3000 Town Center, Suite 1800
12                           Southfield, MI 48075

13                           KIMBERLY W. STOUT
                             (Witort, D-8)
14                           370 East Maple Road, Third Floor
                             Birmingham, MI 48009
15
                             BYRON H. PITTS
16                           535 Griswold, Suite 1630
                             Detroit, MI 48226-4218
17
                             PHILLIP D. COMORSKI
18                           535 Griswold
                             2632 Buhl Building
19                           Detroit, MI 48226

20                           RYAN H. MACHASIC
                             134 Market Street
21                           Mount Clemens, MI 48043

22

23         To Obtain a Certified Transcript Contact:
                        Christin E. Russell
24          RMR, FCRR, CRR, CSR - (248) 420-2720
           Proceedings produced by mechanical stenography.
25       Transcript produced by computer-aided Transcription.
```

1

I N D E X

2

JURY TRIAL, VOLUME II                                    PAGE

3

WITNESSES FOR THE GOVERNMENT:

4       AGENT WILLIAM FLEMING
          Direct Examination (Cont'd) By Ms. Mohsin          4

5

        KAREN CASEY

6         Direct Examination By Ms. Mohsin                   81

7

E X H I B I T S

8

        Government's Exhibits                               Page

9       64-36, 25-20, 25-22, 25-24, 25-26, 25-28,            7
        25-31, 25-36

10      3-1 - 3-15                                          26
        12-21, 12-22, 13-16                                 52

11      13-1, 13-2, 13-3, 13-5, 13-121                      58
        62-7 through 62-13                                  75

12      62-5                                                79
        13-54, 13-59, 13-71, 13-73, 13-77, 13-78,          151

13      13-79, 13-99, 13-100, 13-112

14

15

16

17

18

19

20

21

22

23

24

25      CERTIFICATE OF REPORTER                             174

JURY TRIAL, VOLUME II – 10/16/2014
WILLIAM FLEMING – DIRECT
4

1   Detroit, Michigan

2   October 16, 2014

3   9:23 a.m.

4                    *              *              *

5           THE COURT:  All right.  Good morning, ladies and

6   gentlemen.  Be seated, all.  We have been, the Court has been

7   convened, ladies and gentlemen, at nine a.m.  We have been

8   working.  Thank you for your patience.  We are here to proceed

9   with continued testimony of Agent Fleming.

10          If you would take the stand, please.

11          Again, the record should reflect the presence of all

12  attorneys and all defendants.

13          And, Ms. Mohsin, you have your witness on the stand.

14          Your oath continues, sir.  And you may proceed.  Go

15  ahead.

16          MS. MOHSIN:  Thank you, your Honor.

17                      DIRECT EXAMINATION

18  BY MS. MOHSIN (continuing):

19  Q.  Good morning.

20  A.  Good morning.

21  Q.  Special Agent Fleming, yesterday we were talking towards

22  the end of the day about some of the search warrants that had

23  come to your attention and some that you had participated in,

24  in approximately March of 2005.  So I direct your attention now

25  to that time period.

1    A.  Okay.

2    Q.  When you testified about all of those various search

3    warrants, had you, yourself, sought a federal search warrant at

4    that point for any of the Devils Diciples-related locations

5    that you testified about?

6    A.  Not at that point, no.

7    Q.  Did that occur some time in 2005?  Did you seek a search

8    warrant in federal court?

9    A.  We did, yes.

10   Q.  And can you tell the members of the jury about that, just

11   briefly?

12   A.  In June of -- June 28th of 2005, we obtained a federal

13   search warrant for the home of Mike Mastromatteo, a/k/a "Iron

14   Mike."

15   Q.  And that search warrant was for what?  His residence?

16   A.  For his residence on Parkview in Mount Clemens.

17   Q.  When you conducted that search warrant at his residence,

18   did you find any evidence relating to methamphetamines,

19   trafficking, drugs, et cetera?

20   A.  We did, yes.

21   Q.  Generally speaking, and we're going to get into this at a

22   later date, what types of evidence did you find at that

23   location?

24   A.  Meth precursors, the items necessary to cook meth, the

25   glassware necessary to cook meth, instructions on how to cook

2:11-cr-20129-RHC-MAR  Doc # 1070  Filed 11/01/14  Pg 6 of 174  Pg ID 5246
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

6

1   meth, and pseudoephedrine, cold medicine, which is used in the

2   process of cooking meth.

3   Q.  And what about firearms?  Were any firearms also found at

4   that time?

5   A.  There were, yes.

6   Q.  I would like to direct your attention to some exhibits at

7   this point.  Were photographs taken of some of the items that

8   you've referenced?

9   A.  They were, yes.

10  Q.  I am going to show you what has been marked Exhibit 64-36,

11  25-20, 25-24, 25-22, 25-26, 25-28, 25-30, and 25-36.

12          Could you please describe for the jury, using the

13  exhibit number as a reference, what's depicted in each of those

14  photographs?

15  A.  Sure.  64-36 is a picture of Mr. Mastromatteo.  The rest of

16  the photos, 25-20 is a picture of a MAC-11 firearm.  25-24 is a

17  photograph of an AR-15 assault rifle and clips.  25-21, 22 are

18  photos of various ammunition that were taken and recovered

19  during the search.  25-26 is a photograph of a scale, as is

20  25-28.  25-31 is a photograph of glassware, chemistry glassware

21  that's used in the cooking of methamphetamine.  And 25-36 is a

22  pseudoephedrine cold medicine that's used in the cooking of

23  methamphetamine.

24          MS. MOHSIN:  Your Honor, the Government would offer

25  these exhibits into evidence.

JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

7

```
 1          THE COURT:  And I hear no objections.  I confirm that.
 2   Each of these is received.
 3          Give me the numbers again, please?
 4          MS. MOHSIN:  Your Honor, 64-36, 25-20, 25-22, 25-24,
 5   25-26, 25-28, 25-31, and 25-36.
 6       (Exhibit 64-36, 25-20, 25-22, 25-24, 25-26, 25-28, 25-31,
 7       25-36 received, 9:29 a.m.)
 8          THE COURT:  Thank you.
 9          MS. MOHSIN:  We appear to have additional technical
10   problems.  I'm going to use the ELMO.
11          THE COURT:  All right.
12   BY MS. MOHSIN:
13   Q.  Could you please tell the members of the jury what's
14   depicted in this exhibit, 64-36?
15   A.  That's a photograph of Mike Mastromatteo.
16   Q.  And did he have -- was he a member of the Devils Diciples?
17   A.  He was, yes.
18   Q.  What was his nickname, if you know?
19   A.  He went by "Iron Mike."
20   Q.  25-20.
21   A.  That's a photograph of a MAC-11 machine pistol that was
22   seized during the search.
23   Q.  And what is the item at the bottom of the picture?
24   A.  That's the clip or the magazine that feeds the bullets into
25   the firearm.
```

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 8 of 174   Pg ID 5248
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

8

1   Q.   25-24?

2   A.   That is a photograph of the AR-15 rifle.  And the items

3   above it are ammunition and clips that feed the ammunition into

4   the rifle.

5   Q.   25-21?

6   A.   Various ammunition that was seized during the search.

7   Q.   Are all of the boxes that are depicted in that photo, boxes

8   of ammunition, in other words, individual boxes of ammunition?

9   A.   They are, yes.

10  Q.   Okay.  25-22?

11  A.   Is just the various boxes that were shown in the picture

12  before taken out of the container they were in.

13  Q.   And when you say "boxes," are you referring to ammunition?

14  A.   I am, yes.

15  Q.   25-26?

16  A.   A scale that was recovered during the search.

17  Q.   25-28?

18  A.   Another scale that was recovered during the search.

19  Q.   25-31?

20  A.   Chemistry glassware that was recovered and is frequently

21  used in the production of methamphetamine.

22  Q.   25-36?

23  A.   Pseudoephedrine cold medications, again, that's used in the

24  production of methamphetamine.

25  Q.   Thank you.

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 9 of 174   Pg ID 5249
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

9

1                 Now, you had indicated that, again, during this period

2    of time, March, June of 2005, there were a lot of different

3    types of search warrants; is that accurate?

4    A.   Correct.

5    Q.   And there were some that were done by Michigan State

6    Police, and some that were done by other local law enforcement?

7    A.   Correct.

8    Q.   You also had testified yesterday about an individual by the

9    name of Gregory Schoeninger.

10   A.   That's right.

11   Q.   And was he a member of the Devils Diciples?

12   A.   He was.  He went by "Breakdown."

13   Q.   You indicated also that a state search warrant had been

14   executed in March of 2005 at his residence.

15   A.   That's correct.

16   Q.   And that charges arose from that?

17   A.   They did.  Federal charges related to a firearm that was

18   found and some methamphetamine.

19   Q.   Did there come a time where you executed a federal search

20   warrant at the residence of Gregory Schoeninger?

21   A.   We did, in April of 2006.

22   Q.   And did you participate in the execution of that warrant?

23   A.   I did.

24   Q.   Could you generally describe, again something we're going

25   to get into later, some of the types of things that were found

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 10 of 174   Pg ID 5250
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

10

1    during the execution of that search warrant at Gregory

2    Schoeninger's house?

3    A.   Sure.  We found documentation related to a former member of

4    the Devils Diciples, Mark Berman, who went by "Monkey" and who

5    had been a witness --

6         MR. DALY:  Well, I would -- Judge, this is -- this

7    will be a -- is the subject of a motion that's pending, Judge.

8         THE COURT:  Please reserve this particular inquiry --

9         MS. MOHSIN:  I will.

10        THE COURT:  -- until we have a break and we can

11   discuss this when the jury is in the jury room.

12        MS. MOHSIN:  Thank you, your Honor.

13        THE COURT:  Thank you.

14   BY MS. MOHSIN:

15   Q.   Would it be accurate to say you, you found documents?

16   A.   We did.  Yes.

17   Q.   After this period of time, again April of 2006, did you

18   pursue a RICO case?

19   A.   No.

20   Q.   What happened next?  What happened after April of 2006 in

21   your investigation?

22   A.   Well, again, at that point in time, we were identifying

23   members of the Devils Diciples.  We were also pulling police

24   reports and agency reports on previous incidents involving the

25   Devils Diciples, not just in Michigan but throughout the United

1    States, predominantly in the states where they had chapters or

2    clubhouses.

3    Q.  And what were some of the states that your investigation

4    had showed they had chapters and clubhouses?

5    A.  California, Arizona, Indiana, Ohio, Alabama, Michigan, and

6    a little bit in Illinois.

7    Q.  Did you have occasion around this time period to obtain

8    information about something that had transpired in Arizona?

9    A.  We did.

10   Q.  Can you tell the members of the jury a little bit about how

11   you became aware of this?

12   A.  We became aware that Alcohol, Tobacco & Firearms had done

13   some search warrants back in --

14            MS. STOUT:  I'm going to object to hearsay.  I think

15   he's a fact witness who can testify to what he did, but not

16   what he heard from other people or agencies.

17            THE COURT:  Well, the question is the purpose of, of

18   the inquiry.  The purpose is to prove the truth of the matter

19   asserted?  Or simply to --

20            MS. MOHSIN:  It's not.

21            THE COURT:  -- provide background?

22            MS. MOHSIN:  It is to provide background, your Honor.

23   There will be many witnesses later in the trial that will

24   testify directly as to the nature of this, but at this point we

25   think it's important to explain just the overview and a bird's

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 12 of 174   Pg ID 5252
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

12

 1    eye view in the case.

 2            THE COURT:  With that in mind, I will overrule the

 3    objection.

 4            MS. MOHSIN:  Thank you, your Honor.

 5    BY MS. MOHSIN:

 6    Q.  Special Agent Fleming, without revealing any conversations

 7    you may have had -- well, did you have communications with the

 8    ATF?

 9    A.  I did.

10    Q.  And did they provide you with information regarding some

11    events that occurred in Arizona?

12    A.  They did, yes.

13    Q.  Okay.  And so what did you do?

14    A.  I spoke with law enforcement in Arizona, the FBI in

15    Arizona, and eventually made a trip to Arizona.

16    Q.  And approximately when did that trip to Arizona occur?

17    A.  It was in February of 2007.

18    Q.  And what was the purpose of going to Arizona in February of

19    2007?

20    A.  To speak to local law enforcement who had worked on this

21    incident and to interview witnesses.

22    Q.  And who were the witnesses that, or some of the witnesses

23    that you were trying to or did, in fact, interview?

24    A.  The victims of an assault that had occurred at the Devils

25    Diciple clubhouse in Tucson, Arizona.

2:11-cr-20129-RHC-MAR  Doc # 1070  Filed 11/01/14  Pg 13 of 174  Pg ID 5253
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

13

1  Q.  What were the names of the individuals that you interviewed

2  or were interviewed during that trip either by yourself or

3  others that went with you?

4  A.  John Fortner, Michael Enriquez, Michael Towner.  I don't

5  recall the first name, the last name was McCoskey.  I believe

6  those were some of them.

7  Q.  Okay.  So I'm going to direct your attention to these

8  individuals just for a moment.  You indicated John Fournier?

9  A.  Correct.

10  Q.  Did he have a club -- a nickname?

11  A.  He went by "Golf Club."

12  Q.  John Fournier went by "Golf Club"?

13  A.  (No response.)

14  Q.  Would something refresh your memory about their nicknames?

15  A.  It would.

16  Q.  You look like you're struggling a little bit.

17  A.  Thank you.  I am.

18  Q.  Okay.  Just a moment.

19        (Brief pause.)

20  BY MS. MOHSIN:

21  Q.  I've provided you with a document that's marked 68-1 for

22  identification only.  If you could review that document.

23  A.  Sure.  I've got it.  Johnnie Fournier was "Johnnie Old

24  School."

25  Q.  And who was -- was he a member of the Devils Diciples

```
 1   Motorcycle Club?
 2           MR. SATAWA:  Your Honor, there's a foundational issue
 3   with continuing to ask this witness who is and who is not a
 4   member of the Devils Diciples.  I mean, unless he was a member
 5   of the Devils Diciples and somehow, some way has personal
 6   knowledge of who was and who was not, this idea that asking
 7   this witness --
 8           THE COURT:  What's your objection, please?  What's
 9   your objection?
10           MR. SATAWA:  I believe I said my objection was with
11   the foundation of asking personal knowledge.
12           THE COURT:  That's all I need.  Thank you.  That's all
13   I need.  Foundation.
14           MR. SATAWA:  Personal knowledge.
15           THE COURT:  Well, it's the same thing.
16           MS. MOHSIN:  I can establish a foundation.
17           THE COURT:  Go ahead.
18   BY MS. MOHSIN:
19   Q.  Have you had an opportunity to speak --
20           THE COURT:  And, this is an illustration of the kind
21   of objection that I do not want:  Speaking objections,
22   argumentative objections.  If you have an objection as to
23   foundation, you can state it just that way.  This is true for
24   anybody, Government's side, defense side.
25           If the objection is to foundation, so state I have an
```

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 15 of 174   Pg ID 5255
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

15

```
 1   objection to foundation, your Honor, and it's going to be
 2   addressed.  I don't need the editorial.
 3            Thank you.  Go ahead.
 4            And with respect, Mr. Satawa.  This is the first time
 5   it's arisen, but it's a comment from the bench to every
 6   attorney who is going to be handling witnesses here.
 7            Thank you.  Go ahead.
 8   BY MS. MOHSIN:
 9   Q.  Did you have a conversation with Mr. Fournier?
10   A.  I did.
11   Q.  Based on your conversation with Mr. Fournier, what was your
12   understanding about his relationship to the Devils Diciples
13   Motorcycle Club?
14   A.  He was a member of the Tucson chapter, who went by "Johnnie
15   Old School."
16   Q.  Did you interview any other witnesses while you were in
17   Arizona?
18   A.  We interviewed victims and witnesses, yes.
19   Q.  And those individuals, did you have opportunities to speak
20   with them, both in Arizona and at a later date?
21   A.  I did, yes.
22   Q.  I want to direct your attention to an individual by the
23   name of Charles Higgins.  Was that one of the individuals that
24   was involved in this investigation regarding Arizona?
25   A.  It was.
```

1  Q.  And did you have an opportunity to speak with him directly?

2  A.  I did.

3  Q.  Based upon your conversation with Mr. Higgins, what was

4  your understanding about his relationship to the Devils

5  Diciples?

6  A.  He, again, was a member of the Tucson chapter who went by

7  the club name of "Big Riggs."

8  Q.  And did you have a conversation with an individual by the

9  name of Raymond McCoskey?

10  A.  I did, yes.

11  Q.  And what was his relationship to -- what was your

12  understanding of his relationship to the Devils Diciples

13  Motorcycle Club?

14  A.  He was also a member of the Tucson chapter, who went by

15  "Golf Club."

16  Q.  And did you have a conversation with an individual by the

17  name of Michael Towner?

18  A.  I did.

19  Q.  And did you have an understanding of his relationship with

20  the Devils Diciples Motorcycle Club?

21  A.  He was a patched member from the Tucson chapter, who went

22  by "Two Dogs."

23  Q.  And did you have a conversation with an individual by the

24  name of Michael Enriquez?

25  A.  I don't believe at that time we actually spoke with Michael

1    Enriquez, but we interviewed other people who provided

2    information on him.

3    Q.  Did you speak with him at a later date?

4    A.  We did, yes.

5    Q.  And based upon your conversations with him at the later

6    date, did you have an understanding about what his relationship

7    was to the Devils Diciples?

8    A.  He was also a member of the Tucson chapter, and he went by

9    "Panhead Mike."

10   Q.  And so the, the purpose of going to Arizona in 2007 was --

11   I should ask it more artfully.

12            What was the purpose of going in 2007?

13   A.  To conduct investigation into an incident that was called

14   the Box Canyon.

15   Q.  Okay.  And did you have -- you also mentioned that you had

16   occasion to speak with local law enforcement in Arizona.

17   A.  That's correct.

18   Q.  Was there someone in charge that you spoke with in local

19   law enforcement that related to this Box Canyon incident?

20   A.  A detective from the Pima County Sheriff's Department named

21   Lillian George.

22   Q.  So did you have occasion to meet with Lillian George?

23   A.  I did.

24   Q.  And did Lillian George provide you with evidence in the

25   case?

1  A.  Evidence, police reports, crime scene photographs, yes.

2  Q.  And so were those items that were in the custody of the

3  Sheriff's Department?

4  A.  They were, yes.

5  Q.  Who was Lillian George employed by?  I'm not sure we got

6  that out.

7  A.  The Pima County Sheriff's Department.

8  Q.  That's Pima County, Arizona?

9  A.  That's correct.

10  Q.  So what was your understanding about the Box Canyon

11  incident?  And by that, I mean had the Pima County Sheriff's

12  Department conducted an investigation?

13  A.  They had.

14  Q.  And had they executed any search warrants?

15  A.  They had executed search warrants.

16  Q.  And was evidence from those search warrants seized?

17  A.  It was.

18  Q.  Were there -- was the evidence that was seized ever put

19  into your custody?

20  A.  The evidence from two search warrants ultimately was turned

21  over to the FBI.

22  Q.  And when it was turned over to the FBI, was it placed

23  within the FBI's evidence vault?

24  A.  It was, yes.

25  Q.  And have you had an opportunity to review that evidence and

1   the reports and things that were related to that incident?

2   A.  I have.

3   Q.  Okay.  Now, you've talked about events that occurred in

4   '05, '06, and now this is February of '07.

5           Can you tell the jury a little bit about information

6   that you testified about earlier, regarding ATF's activity,

7   earlier in 2004?

8   A.  ATF had conducted a series of search warrants against

9   members of the Devils Diciples in a case they had going back in

10  2004.

11  Q.  And did ATF -- did you contact ATF about those search

12  warrants?

13  A.  I did, yes.

14  Q.  And did they provide you with any evidence that they had

15  seized?

16  A.  They turned over the evidence from all of the searches that

17  they had done in 2004 to the FBI.

18  Q.  And have you had an opportunity to review all of that

19  evidence?

20  A.  I have.

21  Q.  Okay.  Is that evidence now in FBI custody?

22  A.  It is.

23  Q.  And it has been since they turned it over; is that an

24  accurate statement?

25  A.  That's correct.

1    Q.   Okay.  So I want to direct your attention now to the early

2    part of 2007.  Was the ATF, at that time, pursuing any cases

3    involving members of the Devils Diciples?  By that, I mean

4    federal prosecutions.

5    A.   Not at that time, no.

6    Q.   Did there come a time where they were prosecuting or moving

7    forward with, with cases involving some of the members of the

8    Devils Diciples based on the search warrants that had been

9    executed in 2004?

10   A.   Later, in 2007, yes.

11   Q.   Okay.  And so can you tell the members of the jury whether

12   any of those individuals that were being prosecuted, you know,

13   whether you came into contact with those individuals?

14   A.   There were two individuals that were prosecuted in those

15   cases that we had contact with, a John Pizzuti who went by the

16   club name of "JP" and a second gentleman we also spoke with.

17   Q.   And was that second gentleman Ronald Preletz?

18   A.   It was, who went by the name of "Polar Bear."

19   Q.   So was it your understanding in 2007 that these two

20   individuals had federal indictments pending against them?

21   A.   That's correct.

22   Q.   And what was your understanding or how did you come to

23   speak to them?  How did that happen?

24   A.   We approached them about cooperating in our investigation.

25   And they agreed to cooperate.

1  Q.  And so I want to direct your attention now to Mr. Preletz

2  first.  Did you indicate whether he went by a club nickname?

3  A.  "Polar Bear."

4  Q.  And did you have conversations with Mr. Preletz?

5  A.  I did.

6  Q.  And based upon those conversations, did you have an

7  understanding about what his role was within the Devils

8  Diciples Motorcycle Club?

9  A.  I did, yes.

10        MR. SABBOTA:  Objection, your Honor.  That's hearsay.

11        THE COURT:  There hasn't been a question -- that

12  question he just answered is not hearsay.  Overruled.

13  BY MS. MOHSIN:

14  Q.  What was your understanding about what role he played in

15  the Devils Diciples Motorcycle Club?

16  A.  He had been the national treasurer and was basically a

17  member of the Mount Clemens chapter, also.

18  Q.  Now, I want to direct your attention to John Pizzuti.  What

19  was your understanding about his role in the Devils Diciples,

20  based upon your conversations with him?

21  A.  He had been a member in the Utica chapter of the Devils

22  Diciples.

23  Q.  Did Mr. Pizzuti agree to perform any acts on behalf of the

24  Government?

25  A.  He did.  He agreed to wear a recording device and record

```
 1   conversations with members of the Devils Diciples, and also to
 2   make controlled purchases of methamphetamine from members of
 3   the Devils Diciples.
 4   Q.  Now, I want to direct your attention to the word
 5   "controlled purchases."  What does that mean for, for the
 6   people on the jury who may not have heard that term?
 7   A.  Sure.  It's when we use a person like Mr. Pizzuti, who is
 8   cooperating with the FBI, to make purchases of evidence, or in
 9   this particular case, methamphetamine while wearing a recording
10   device.
11          We have certain procedures that we follow in regards
12   to searching them beforehand, searching them afterwards,
13   recording the serial numbers of the money.  So as much as we
14   can, we control certain aspects of it.
15   Q.  So when you say the word "control," you're referring to the
16   conduct of law enforcement?
17   A.  That's correct.
18   Q.  And when you say "purchase," is that referred to the
19   conduct of the person who is buying the item?
20   A.  That's correct.
21   Q.  So Mr. Pizzuti agreed that he would make recorded
22   conversations and make these purchases?
23   A.  Correct.
24   Q.  And did that occur?
25   A.  It did.  Yes.
```

1  Q.  And approximately what time frame did those purchases take

2  place?

3  A.  It started in the late summer of 2007, and I believe the

4  last purchase was in late September or early October.

5  Q.  Now, based upon those controlled purchases, which -- strike

6  that.  Let me back up.

7      Did you participate in any of those controlled

8  purchases?  Were you involved in that part of the

9  investigation?

10  A.  I was, yes.

11  Q.  And I want to introduce -- I want you to introduce whether

12  there was another agent that was working with you at the time.

13  A.  My partner, Agent Opperman, Dave Opperman.

14  Q.  Was he also participating at that time?

15  A.  He was, yes.

16  Q.  Now, after those controlled purchases, what happened next

17  in the investigation?  Again, a bird's eye view.

18  A.  Based upon the controlled purchases of methamphetamine, we

19  made an application for a Title III, which is a court-ordered

20  wiretap of the phone of Devils Diciple member Vern Rich.

21  Q.  Does he have a nickname?

22  A.  "Vern."

23  Q.  Now, Vern Rich, had he been the subject of previous search

24  warrants that you testified about earlier yesterday and today?

25  A.  He had been, yes.

1    Q.  All right.  And approximately how long were the -- well,

2    withdrawn.

3            Was that application for a wire interception

4    authorized?

5    A.  Sure.  It was reviewed by a district court judge, a federal

6    district court judge, who then authorized it for a 30-day

7    period.  We then asked for a 30-day extension, and that was

8    granted, too.

9    Q.  So the wiretap that you're referring to, did that occur in

10   late 2007?

11   A.  From late September of 2007 till, I believe, sometime in

12   November of 2007.

13   Q.  What happened next, investigatively?  Again, a bird's eye

14   view.

15   A.  During our -- at the end of the Title III, we conducted

16   search warrants at various locations related to information

17   that we had developed from the wiretap.

18   Q.  Could you just describe briefly some of the locations for

19   the members of the jury?

20   A.  Sure.  The search warrants were based on overhears from the

21   Title III regarding gambling.

22           We conducted search warrants at the Detroit or Mount

23   Clemens clubhouse, the Port Huron clubhouse, and the Blue Water

24   Clubhouse, in addition to Mr. Rich's house and another member

25   of the Devils Diciples, John Riede, who went by "Bear."

2:11-cr-20129-RHC-MAR  Doc # 1070  Filed 11/01/14  Pg 25 of 174  Pg ID 5265
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

25

```
 1   Q.  Now, thus far in your testimony, you've talked about the

 2   Mount Clemens clubhouse.  Is there a difference between a

 3   chapter and a clubhouse, based on your investigation?

 4   A.  Well, some chapters have clubhouses; some don't.  A chapter

 5   is a group of individuals.  Mostly, if you're in the Mount

 6   Clemens chapter, you would attend meetings at the Mount Clemens

 7   clubhouse.

 8   Q.  Do all of the Michigan chapters of the Devils Diciples, to

 9   your knowledge, have physical clubhouses that they use?

10   A.  They did, yes.

11   Q.  And are these some sort of commercial properties or could

12   you describe generally what, what these clubhouses look like?

13   A.  They are generally houses that have, that have been rented

14   or purchased that are then converted into clubhouses.

15   Q.  Okay.  Now, you had talked about gambling.  When you

16   executed some of the search warrants at the locations that you

17   described above, did you find any machines, gambling machines?

18   A.  We found gambling machines, slot machines, and poker

19   machines at all of the clubhouses, and at Mr. Rich's house.

20   Q.  And did you photograph those machines?

21   A.  We photographed them and seized them.  Yes.

22   Q.  Okay.  I'm going to show you now Exhibits 31 -- 3-1, excuse

23   me, all the way through 3-15.

24        Do you recognize those photos?

25   A.  I do.
```

1   Q.  Did you take those photos?

2   A.  I did.

3           MS. MOHSIN:  Your Honor, the Government offers

4   Exhibits 3-1 through 3-15 into evidence.

5           MS. STOUT:  No objection.

6           THE COURT:  Hearing no objections, 3-1 through 3-15

7   are received.

8       (Exhibit 3-1 - 3-15 received, 9:54 a.m.)

9           MS. MOHSIN:  Thank you, your Honor.

10  BY MS. MOHSIN:

11  Q.  Special Agent Fleming, I'm going to show you what's been

12  marked 3-1.

13  A.  That is a photograph of one of the slot machines that was

14  seized during the searches.

15  Q.  Okay.  3-2?

16  A.  Is, again, one of the slot machines that pays out money

17  that was taken during the search.

18  Q.  3-3?

19  A.  Is a video poker machine that was seized during the search.

20  Q.  Is there a difference between a video poker and a slot

21  machine?

22  A.  It's just a different game.

23  Q.  Okay.  3-4?

24  A.  Is another slot machine that was taken during the searches.

25  Q.  3-5?

JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

1   A.   Is a video poker machine that was taken during one of the

2   searches.

3   Q.   3-6?

4   A.   Another poker machine.

5   Q.   3-7?

6   A.   Is another photograph of a slot machine taken during the

7   search.

8   Q.   3-8?

9   A.   3-8 is another slot machine taken during the searches.

10  Q.   Now I want to direct your attention to 3-9.  Can you

11  describe this one?

12  A.   3-9 is just a photograph of the slot portion of the machine

13  that had been -- the triple 7's or the big winner has been

14  replaced by "Property of Devils Diciples" stickers.

15  Q.   Now, when you seized those machines, and that one in

16  particular, were those "Property of the Devils Diciples"

17  stickers, that are depicted in all three of the slots of the

18  slot machine, already there?

19  A.   They were, yes.

20  Q.   Okay.  3-10?

21  A.   Is just a far-away photograph of the 3-9 slot machine.

22  Q.   Are the "Property of" stickers depicted in this photograph

23  as well?

24  A.   They are, yes.

25  Q.   3-11?

JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

1   A.  Is another slot machine that was seized during the

2   searches.

3   Q.  3-12?

4   A.  Again, another slot machine taken during the searches.

5   Q.  3-13?

6   A.  Is another slot machine taken during the searches.

7   Q.  3-14?

8   A.  Was another slot machine taken during the searches.

9   Q.  And 3-15?

10  A.  Was the final slot machine taken during the searches.

11  Q.  Now, this 3-15, what is the name of this slot machine?

12  A.  It's called the Wild Rose.

13  Q.  And later on, were there other slot machines found at

14  another location?

15  A.  There were, yes.

16  Q.  And was there another Wild Rose?

17  A.  There was.

18  Q.  Okay.  After these November search warrants that you've

19  just described, did the FBI conduct any search warrants in

20  December?

21  A.  We did.  Yes.

22  Q.  Can you tell the jury, just very briefly, about that?

23  A.  Based upon, again, information that we had overheard on the

24  wiretap, we conducted search warrants of four members of the

25  Devils Diciples' houses related to methamphetamine.

1    Q.  Okay.  Now, after those search warrants were executed,

2    what's the status of your investigation?  How do you move

3    forward?

4    A.  In January of 2008, we requested authorization for a pen

5    register, which is a machine that gives you the phone numbers

6    called by a -- called, and the phone numbers coming in, to a

7    particular phone.

8    Q.  And was that pen register related to any of the defendants

9    in this case?

10   A.  It was related to Mr. Darrah's phone.

11   Q.  And Mr. Darrah, do you recognize him here in the courtroom

12   today?

13   A.  I do.

14   Q.  Could you identify him, please?

15          MS. MACERONI:  Your Honor, we would stipulate that

16   Paul Darrah is sitting behind me against the wall.

17          MS. MOHSIN:  Thank you.

18          THE COURT:  Correct?

19   BY MS. MOHSIN:

20   Q.  Is that accurate?

21   A.  That's correct.

22          THE COURT:  Go ahead.

23          MS. MOHSIN:  Thank you, your Honor.

24   BY MS. MOHSIN:

25   Q.  Did there come a time where a court-authorized electronic

2:11-cr-20129-RHC-MAR  Doc # 1070  Filed 11/01/14  Pg 30 of 174  Pg ID 5270
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

30

```
 1    surveillance or wiretap was sought in this case?
 2    A.   In --
 3    Q.   For Mr. Darrah.
 4    A.   In, I'm sorry, February or March of 2008.
 5    Q.   And was the request granted?
 6    A.   It was.
 7    Q.   How did that happen?
 8    A.   Again, the application and affidavit are reviewed by a
 9    federal court judge in this building, and they were authorized
10    for an initial 30-day period and then reauthorized every 30
11    days.
12    Q.   Okay.  So for a period of time, would it be fair to say
13    that you were listening to wiretap calls related to
14    Mr. Darrah's telephone?
15    A.   Myself and other agents, yes.
16    Q.   When was -- was RICO contemplated at this time?  By that, I
17    mean did the FBI, at this point, initiate a RICO investigation?
18    A.   At this point, that was one of the authorizations for, or
19    the predications behind the wiretap on Mr. Darrah was the RICO.
20    Q.   So in March of 2008; is that a fair statement?
21    A.   That's correct.
22    Q.   Okay.  Now, during the course of this wiretap -- and I
23    should ask a question.  You indicated that you and others
24    listened to the phone; is that right?
25    A.   That's correct.
```

JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

1   Q.  You did not do that 24 hours a day?

2   A.  No, we did not.

3   Q.  Okay.  So there was a certain period of time that the phone

4   was being -- calls were being monitored?

5   A.  There were.

6   Q.  Have you, since then or even during that time period,

7   listened to all of the calls that were relevant in this case?

8   A.  I have, yes.

9   Q.  And were you, in fact, doing that while the wiretap was up

10  and running, so to speak?

11  A.  That's part of the process that we do, yes.

12  Q.  Okay.  So just describe briefly what the process is of the

13  actual monitoring.

14  A.  The phone is monitored by an agent.  It comes up on a

15  computer screen when either there's an incoming call or

16  Mr. Darrah makes an outgoing call.  It tells you what phone

17  number he's, he's calling or is calling him.  You then can

18  listen for an initial two-minute period.  If after two minutes,

19  you realize that the call is not related to criminal activity,

20  we hit a button that minimizes or turns off the recording that

21  we then can listen to.

22       If, after two minutes, we make a determination that

23  the call is criminal in nature, we can continue to listen for

24  the call -- to the call.  But if, later on in that call, it

25  becomes non-criminal, we then minimize it again, which does not

1  allow us to hear what's going on.

2  Q.  Okay.  So, are those instructions required to be followed?

3  A.  Those are the requirements of the law that allows us to

4  wiretap, yes.

5  Q.  Okay.  So you do not listen to each and every call that was

6  made?

7  A.  Absolutely not.

8  Q.  Okay.  Of the calls that you did listen to, have you had an

9  opportunity to review them, and also generate transcripts?

10  A.  Yes.

11  Q.  Okay.  Did certain activities occur during the course of

12  this wiretap that required further investigation by the FBI?

13  A.  There were a string of activities that occurred that

14  conduct -- resulted in further investigation.

15  Q.  I want you to -- again, this is a bird's eye view, because

16  we're going to go into this during the course of the trial, but

17  I want to direct your attention to an individual by the name of

18  Michelle Richards.  Are you familiar with that individual?

19  A.  I am.

20  Q.  Have you spoken to that individual?

21  A.  I have.

22  Q.  Okay.  Can you briefly describe who she is?

23  A.  At the time, in 2008, Ms. Richards was the girlfriend of

24  Devils Diciple manner -- member Danny Burby, who went by

25  "Thumbs."

1   Q.  And during the course of the wiretap, were there

2   conversations intercepted about this, this woman?

3   A.  There were.

4   Q.  And during the course of the wiretap, were there

5   conversations intercepted by other individuals, some of whom

6   are here in the courtroom today?

7   A.  That's correct.

8   Q.  Okay.  Did you intercept calls -- withdrawn.

9        You mentioned an individual named Danny Burby.  During

10  the course of the wiretap and during the course of your

11  investigation, did you become aware that there were threats

12  against Mr. Burby?

13  A.  I did, yes.

14  Q.  Was that something that led you to conduct a dissuasion

15  interview?

16  A.  That's correct.

17  Q.  Can you just describe what a dissuasion interview is?

18  A.  Sure.  If, during the course of listening to wiretapped

19  phone conversations, we become privy to the fact that a violent

20  act might occur against someone, we have an obligation to both

21  notify the victim of that possibility, and also speak with

22  anyone who might have knowledge of what might occur.

23  Q.  And did that occasion arise in this wiretap?

24  A.  It did.

25  Q.  Did you contact Mr. Burby?

1   A.   We did.

2   Q.   And what was the purpose of contacting him?

3   A.   To let him know that we had received information that he

4   might be the target of an assault.

5   Q.   And did you contact anyone with respect to who might have

6   -- be involved in that assault?

7   A.   We contacted Mr. Darrah and asked him to notify the rest of

8   the membership of the Devils Diciples of this information, of a

9   possible assault against Mr. Burby.

10  Q.   By whom?

11  A.   By members of the Devils Diciples.

12  Q.   Okay.  Now, did there come a time where you became aware

13  that Mr. Burby had been assaulted?

14  A.   There did, yes.

15  Q.   And how close in time, roughly, was that to the dissuasion

16  interview you described?

17  A.   Five days after our dissuasion interview.

18  Q.   And did you have occasion to investigate that particular

19  assault?

20  A.   We did.

21  Q.   Where did that particular assault occur?

22  A.   At a location called the Lighthouse Tavern or bar.

23  Q.   Okay.  Now, were there numerous other relevant and

24  important facts that you developed during the course of this

25  wiretap?

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 35 of 174   Pg ID 5275
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

35

1    A.   That's correct.

2    Q.   Did there come a time where additional search warrants,

3    federal search warrants were executed in this case?

4    A.   In September of, that late September of 2008, yes.

5    Q.   And could you just tell the jury what locations were

6    searched?

7    A.   The searches were related to the distribution of Vicodin.

8    And we searched Mr. Darrah's house; Gary Nelson, who was

9    another member of the Devils Diciples at the time, his house

10   was searched.

11   Q.   Was the home of Jeff Smith searched?

12   A.   It was, yes.

13   Q.   And is Jeff Smith an individual that you're familiar with?

14   A.   He is, yes.

15   Q.   What nickname does he go by?

16   A.   Mr. Smith goes by the name "Fat Dog."

17   Q.   Can you identify him in the courtroom here today?

18           MR. SABBOTA:   Your Honor, I'll stipulate that Mr.

19   Smith is behind me; that he can identify him.

20           MS. MOHSIN:   Thank you.

21           THE COURT:   All right.

22   BY MS. MOHSIN:

23   Q.   And there were other locations searched as well; is that

24   correct?

25   A.   That's correct.

1   Q.  In October of 2008, was another search warrant executed at

2   the home of a Devils Diciples member?

3   A.  It was, yes.

4   Q.  And to round out the information that you testified about

5   earlier, were there additional slot machines recovered?

6   A.  They were, from the home of Timmy Downs, who went by

7   "Space," who was a member of the Blue Water chapter of the

8   Devils Diciples.

9   Q.  Now, I want to direct your attention to what happened after

10  the conclusion of the Paul Darrah wiretap.  What steps

11  investigatively were taken at that time?

12  A.  After we did the search warrants, we prepared arrest

13  warrants for various people who were overheard during the Title

14  III on Mr. Darrah's phone.

15  Q.  And were these arrest warrants for a complaint or for an

16  indictment?

17  A.  They were for a complaint.

18  Q.  Is there a difference?

19  A.  There is.

20  Q.  Can you briefly describe them?

21  A.  A complaint is when we take a probable cause statement to a

22  federal magistrate who reviews it for probable cause.  And if

23  he finds probable, or he, he or she finds probable cause, they

24  approve it and issue an arrest warrant for that person.

25  Q.  And can a person -- or is a person who is indicted

1  different?

2  A.  They are, yes.

3  Q.  How?

4  A.  An indictment comes from a grand jury, which is a group of

5  between 16 and 23 people who listen to evidence, presented by

6  the prosecutor --

7          MS. STOUT:  I'm going to object to this, your Honor.

8  Relevance.  Vouching.

9          MS. MOHSIN:  I don't think it's vouching, Judge.  I

10  was just trying to lay out the background.

11          Okay.  We will move on.

12          THE COURT:  I think -- I don't think it needs

13  explanation.  I think I'll describe it in the event that it

14  needs to be described in my view.

15          Pass on to the next question, please.

16          MS. MOHSIN:  Okay.

17  BY MS. MOHSIN:

18  Q.  So what I'd like to ask, and the relevance of this question

19  is really what happened to those complaints?

20          THE COURT:  Let me just endeavor to describe that,

21  since we've discussed it and it's arisen in front of the jury

22  here.

23          A complaint is sworn by an investigator, as described.

24  An indictment is -- an indictment requires further review,

25  further examination of evidence and so forth and a more, more

 1   complex review of materials that have been gathered.  That's

 2   about the sum and the substance of it.

 3            Go ahead, Ms. Mohsin.

 4   BY MS. MOHSIN:

 5   Q.  Procedurally, when those complaints were issued, did they

 6   get dismissed?

 7   A.  Eventually they did, yes.

 8   Q.  And what was the purpose of requesting that they be

 9   dismissed?

10   A.  To continue further investigation and also to work with

11   some cooperating witnesses that had developed out of those

12   arrests.

13   Q.  So prior to seeking an indictment, you wanted to further

14   the investigation; is that an accurate statement?

15   A.  That's correct.

16   Q.  And were they dismissed at the request of the Government?

17   A.  They were.

18   Q.  Okay.  I want to direct your attention now to approximately

19   springtime, May of 2009.  Did you receive a telephone call from

20   someone you identified in this trial earlier as Keith McFadden?

21   A.  I did, yes.

22   Q.  Can you remind the jury who Keith McFadden was?

23   A.  Keith McFadden was a member of the Devils Diciples.  He

24   went by the nickname of "Gadget."

25   Q.  Did you have a conversation with him?

JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

1    A.  I did.

2    Q.  And pursuant to that conversation -- withdrawn.

3            Did you initiate that conversation or did he call you?

4    A.  No.  Mr. McFadden called my office, spoke to me.

5    Q.  And was this the first time that you had talked to Mr.

6    McFadden since the trial you testified about earlier, earlier

7    yesterday, the Victor Castano trial?

8    A.  That's correct.

9    Q.  So when you had this conversation with Mr. McFadden,

10   without going into the details of the conversation at this

11   point, what happened?  What did you do next?

12   A.  We began an investigation into crimes that might have been

13   committed during the Victor Castano trial.

14   Q.  And specifically, was that perjury?

15   A.  Perjury, yes.

16   Q.  Okay.  Did you have occasion to speak with Mr. McFadden?

17   A.  I did.

18   Q.  And did that occur on one occasion or multiple occasions?

19   A.  Multiple occasions.

20   Q.  Okay.  During this time period, we are now in approximately

21   spring of 2009, what other investigative steps are being taken

22   by you to further this, this case?  Again, generally.

23   A.  We're working, again, with cooperating witnesses that had

24   developed out of our arrests in April of 2009.

25   Q.  All right.  And are you also working on the investigation

1   you just described related to the perjury?

2   A.  We were, yes.

3   Q.  Okay.  And some of the charges that, that -- or rather, the

4   perjury you're referring to is part of this case; is that

5   correct?

6   A.  That's correct.

7   Q.  Can you tell the members of the jury what happens in

8   approximately of February of 2011 investigatively?

9   A.  In February of 2011, a grand jury indictment is -- a sealed

10  grand jury indictment is obtained.

11  Q.  I want to direct your attention to -- okay.  I'm sorry.  A

12  grand jury indictment is obtained.

13         I want to direct your attention, rather, to March of

14  2011.  And I want to direct your attention to a location called

15  Dresden in the city of Detroit.

16  A.  We received information from the Detroit Police Department

17  that they had made some arrests at an abandoned house in

18  Dresden of Ronald Roberts, who was a member of the Devils

19  Diciples who went by "Rockin' Ronnie" and Mr. Sutherland.

20  Q.  And when you say "Mr. Sutherland," what is his full name?

21  A.  Scott Sutherland.

22  Q.  And can you please identify him, if he is here in the

23  courtroom today?

24  A.  He is the bald-headed gentleman wearing the kind of green

25  shirt next to the right of Mr. Smith.

1          MS. MOHSIN:  Indicating the defendant, your Honor.

2          THE COURT:  So noted.  Go ahead.

3   BY MS. MOHSIN:

4   Q.  Now, based upon the information that you had received from

5   the Detroit Police Department, what did you do?

6   A.  We went to the house and searched the exterior of the house

7   and found the remnants of a meth lab in the garbage outside the

8   house.

9   Q.  So you went through the trash?

10  A.  Basically.

11  Q.  And you found certain items?

12  A.  Certain items that were used in the production of

13  methamphetamine.

14  Q.  What did you do with that information?

15  A.  We obtained a search warrant for the house and searched it

16  the next day.

17  Q.  And what did you find?

18  A.  We found more remnants of a meth lab and documents for the

19  people who were staying at this house.

20  Q.  And did there come a time where you contacted or had

21  communications with Detroit Police regarding the prosecution of

22  that case?

23  A.  Yes.

24  Q.  And what was the result?

25  A.  The result was that the prosecution was turned over to the

1    FBI.

2    Q.  When you say "the prosecution," did that include evidence?

3    A.  It did, yes.

4    Q.  And what types of evidence did they turn over for you?

5           So you've described evidence that you obtained from a

6    federal search warrant.  Was there other evidence that had been

7    obtained from Detroit Police?

8    A.  There were.  Mr. Sutherland had a gun on his person when he

9    was arrested; that was turned over to us.  A shotgun was found

10   inside the house; that was turned over to us.  And an assault

11   rifle was found in the trunk of Mr. Sutherland's car, and that

12   was turned over to us.

13   Q.  And that's part of the evidence in this case as well?

14   A.  That's correct.

15   Q.  Now, roughly -- withdrawn.

16          After March of 2011, when you became aware of this

17   Detroit Police seizure of firearms and other evidence at

18   Dresden, did you become aware of other information in

19   approximately the fall of 2011 as it relates to the Devils

20   Diciples?

21   A.  We did.  It was related to ongoing meth production by a

22   group of Devils Diciples.

23   Q.  And did you have --

24          MS. STOUT:  Objection.  Hearsay.

25          THE COURT:  Overruled.  Go ahead.

1    BY MS. MOHSIN:

2    Q.   Did you have occasion to conduct another search warrant?

3    A.   We did, yes.

4    Q.   Was that in October of 2011?  Or around that time?

5    A.   It was.

6    Q.   What was the location?

7    A.   Kathy Street in Roseville, Michigan.

8    Q.   And do you -- do you have an understanding about whose

9    residence that is?

10   A.   It was the residence of a David Roberts, who went by

11   "Detroit Dave."

12   Q.   Are you aware of any relationship between David Roberts and

13   Ronald Roberts?

14   A.   They are brothers.

15   Q.   Okay.  Now, you indicated you had a search warrant.  Did

16   you pull the trash at that location as well?

17   A.   We did, yes.

18   Q.   Was that before you asked for the search warrant?

19   A.   That's correct.

20   Q.   And what did you find?

21   A.   Again, remnants that a meth lab and meth was being cooked

22   at this location.

23          MS. STOUT:  Objection.  Conclusion.

24          THE COURT:  That bespeaks a lack of foundation.  Do

25   you want to lay foundation?

```
 1              MS. MOHSIN:  I can lay a further foundation.  I
 2    thought I had with other testimony, your Honor, when he
 3    testified about the meth lab, but I'll be happy to do it again.
 4    BY MS. MOHSIN:
 5    Q.  Special Agent Fleming, what types of materials did you find
 6    during the course of that trash pull?
 7    A.  There were cut-up batteries, empty cold packs, the kind
 8    that are used if you have a bump or a bruise, empty
 9    pseudoephedrine packages, tinfoil with burn marks on them,
10    which is typically used to smoke drugs and other items.
11    Q.  Now, you indicated earlier that you have probably talked to
12    hundreds, if not over a thousand individuals involved in
13    criminal activity.  Was that your testimony earlier?
14    A.  Yes.
15    Q.  Were any of those individuals involved in the manufacture
16    of methamphetamine?
17    A.  Yes.
18    Q.  Have you talked to roughly -- withdrawn.
19              Roughly how many people would you say you've talked to
20    that have been involved in the manufacture of methamphetamine?
21    A.  Probably over 100.
22    Q.  And your, your -- have you ever received any training
23    through the FBI, or otherwise, about the manufacture of
24    methamphetamine?
25    A.  Through the Michigan State Police, I attended a training
```

1    course.

2    Q.  And is it your understanding there are -- there is one way

3    to make meth or there is more than one way to make meth?

4    A.  There are several ways to make meth.

5    Q.  And are those ways different and unique?

6    A.  They are.

7    Q.  Based upon the conversations that you've had with the

8    individuals, you said over 100, were several different ways of

9    meth described to you during your conversations?

10   A.  They were, yes.

11   Q.  And the items that you observed at Dave Roberts' residence

12   in the trash, were they consistent with any of the types of

13   meth manufacturing that you have become aware of during the

14   course of your experience and training as a special agent of

15   the FBI?

16   A.  They were indicative of a method called the "shake and

17   bake" method.

18   Q.  And so have you ever executed other warrants where similar

19   items were found?

20   A.  Yes.

21   Q.  And what is it -- what is used in that shake and bake

22   method based upon your understanding?

23   A.  The --

24   Q.  Some of the ingredients.

25   A.  Pseudoephedrine that is abstracted from cold medicine,

2:11-cr-20129-RHC-MAR  Doc # 1070  Filed 11/01/14  Pg 46 of 174  Pg ID 5286
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

46

1    kosher salt.  There's a lot of different -- the lithium strips

2    inside batteries.  The --

3    Q.  So if you were to observe a cut-up battery and it's

4    emptied, what does that mean to you?

5    A.  That the lithium strip has been removed and used in meth

6    production.

7    Q.  And if you were to observe empty packages of

8    pseudoephedrine pills -- is that illegal, by the way?

9    A.  It's not illegal, but it is regulated how much you can

10   purchase at any given time.

11   Q.  So if you find empty blister packs of cold medicine, does

12   that have any significance to you?

13   A.  Again, it's one of the main ingredients in the shake and

14   bake method of making methamphetamine.

15   Q.  How about cold packs?

16   A.  Same with cold packs.  The small wide tablets inside cold

17   packs are used in this process.

18   Q.  Okay.  So when you see those items, and perhaps others, all

19   together in a trash bag, what conclusion are you drawing as a,

20   as a special agent of the FBI with your training and

21   experience?

22   A.  That meth is being cooked at that particular location.

23   Q.  Now, did you put those facts into your application for a

24   search warrant for that location?

25   A.  I did, yes.

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 47 of 174   Pg ID 5287
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

47

1   Q.   And was a search warrant authorized based upon this type of

2   information?

3   A.   It was.

4   Q.   And when you executed that search warrant, did you find

5   evidence of methamphetamine manufacturing inside the house?

6   A.   Both in the house and also inside the garage.

7   Q.   Okay.  So did this occur in approximately October of 2011?

8   A.   That's correct.

9   Q.   I want to direct your attention now to January of 2012.

10  Were you made aware of an assault that occurred on that date?

11  A.   I was, yes.

12  Q.   Did you have communication with local law enforcement about

13  that?

14  A.   Eventually I did, yes.

15  Q.   Could you tell the members of the jury how you became aware

16  and how that event is relevant here?

17  A.   Well, I had received information from a source that there

18  had been an assault that occurred at the New York New York

19  nightclub involving some members of the Devils Diciples.

20          I contacted the Chesterfield Police Department, and

21  they confirmed that there had been an assault.  And they

22  provided me with their report and photographs.

23  Q.   Did you have an opportunity to interview any of the

24  individuals that may or may not have been witnesses?

25  A.   I did.

1    Q.  And based upon your understanding of what occurred at that

2    location, did you seek any search warrants?

3    A.  I did, for two locations.

4    Q.  And what were those locations?

5    A.  The homes of Smiley Villa, who was a member of the Devils

6    Diciples and went by "Esse," and the homes of Mr., Mr.

7    Drozdowski's home, who went by the club name of "D."

8    Q.  And did you participate in the execution of those search

9    warrants?

10   A.  I did.  The locations were right across the street from

11   each other so we searched them at the same time.

12   Q.  And can you generally describe the types of evidence that

13   were found, particularly Mr. Drozdowski's residence?

14   A.  Mr. Drozdowski's house, we found firearms, ammunition for

15   two different types of firearm.  We found methamphetamine.  We

16   found what's called MSM, which is a joint medication that's

17   frequently used to cut or dilute methamphetamine.  We found a

18   mirror with methamphetamine residue on it.

19   Q.  Okay.  And when you said that you found firearms and

20   ammunition, did you find both or, or one?

21   A.  No.  Just ammunition.  Firearms ammunition.  Sorry.

22   Q.  I want to direct your attention now to Smiley Villa.  Did

23   you participate or see the evidence at that location?

24   A.  I did, yes.

25   Q.  And what types of, generally, evidence did you find there?

2:11-cr-20129-RHC-MAR  Doc # 1070  Filed 11/01/14  Pg 49 of 174  Pg ID 5289
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

49

1    A.  We found a scale that was commonly used in the weighing of

2    drugs.  We also found a vest and patches that had been taken

3    from the victim of the assault at New York New York.

4    Q.  Were those patches, do they have a name?  What do they say?

5    A.  They said "Black Label Society."

6    Q.  Okay.  Now, we've just gone through a period of time from

7    roughly the end of the wiretap in the Paul Darrah case until

8    approximately the spring of 2012.  Are you furthering the RICO

9    investigation during that time period?

10   A.  Yes.

11   Q.  Can you just generally describe some of the other things

12   that you were doing?

13   A.  We had identified other incidents that were -- had

14   occurred.  We were investigating them in tandem with whatever

15   ongoing investigation we were doing, like the New York New York

16   assault or the search warrants at the Roberts' houses.

17   Q.  Did you also obtain records from a database that monitors

18   or regulates pseudoephedrine purchases?

19   A.  We did.

20   Q.  Can you generally describe what that was about?

21   A.  It's a database that any time you purchase cold medication

22   that contains pseudoephedrine, you have to go to the pharmacy

23   and you have to present an ID.  That information is all

24   recorded and entered into a database that law enforcement can

25   search and determine how much pseudoephedrine a given person

1    has purchased during a specific time period.

2    Q.  And so did you engage in that type of activity as well,

3    obtaining those records?

4    A.  We did.

5    Q.  Would you please also identify "D," the person who you

6    referred to as the search warrant that you executed?

7           MR. MACHASIC:  Your Honor, I'm sorry, I will stipulate

8    to my client's identification behind me.  And that Agent

9    Fleming would be able to do so.

10          THE COURT:  So "D," the individual referred to as "D"

11   is Mr. Drozdowski?

12   BY MS. MOHSIN:

13   Q.  That's Mr. Drozdowski, Special Agent Fleming?

14   A.  That's correct.

15   Q.  Okay.

16          THE COURT:  Go ahead.

17   BY MS. MOHSIN:

18   Q.  At some point, did you seek and obtain an indictment in

19   this case and arrest individuals?

20   A.  Yes.

21   Q.  And at some point, did you conduct another search warrant

22   at the residence of another Devils Diciples member?

23   A.  We did.

24   Q.  I want to direct your attention to Jason Cook.  Are you

25   familiar with Jason Cook?

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 51 of 174   Pg ID 5291
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

51

```
 1    A.   I am.  He's a member of the Devils Diciples who goes by

 2    "Cookie."

 3    Q.   And was a search warrant executed at his home as well?

 4    A.   It was.

 5    Q.   And approximately when was that?

 6    A.   It was in, I believe, June of 2012.

 7    Q.   And generally speaking, what types of evidence did you find

 8    at that location?

 9    A.   We found, again, the remnants of a meth lab in his garage.

10    Q.   And was there also a firearm that was found?

11    A.   There was, yes.

12    Q.   In the course of this investigation, which we've just taken

13    a bird's eye view of, you've had an opportunity to examine all

14    of the evidence; is that correct?

15    A.   I have, yes.

16    Q.   And I'm going to show you two items that I would like you

17    to identify for the Court.

18              (Brief pause.)

19    BY MS. MOHSIN:

20    Q.   Would you please begin with one of those?  Identify the

21    exhibit number, please, first.

22    A.   Sure.  The Exhibit 12-21 is a Devils Diciple vest, normally

23    it's called "colors," that was seized during a search warrant.

24    Q.   Can you just give me the numbers first so I get them

25    admitted, please?
```

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 52 of 174   Pg ID 5292
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

52

1    A.  Yeah.  12-21.

2    Q.  And where was that seized?

3    A.  This particular vest was seized from the home of Michael

4    Mastromatteo, a/k/a "Iron Mike."

5    Q.  And could you move on to the other two exhibits, please?

6    A.  Sure.

7    Q.  Identify their numbers, and where they were seized.

8    A.  12-22 is what's called a "Property of" vest.  It's worn by

9    the wife or girlfriend of a Devils Diciple member.  This

10   particular vest was found at the home of Michael Mastromatteo.

11   Q.  And then the third item?

12   A.  The third item is 13-16.  It is a Devils Diciple vest that

13   was found at the home of Mr. Smith.

14          MS. MOHSIN:  Your Honor, the Government offers these

15   three exhibits into evidence.

16          THE COURT:  The numbers again?

17          MS. MOHSIN:  12-21, 12-22, 13-16.

18          MR. SABBOTA:  No objection.

19          MS. STOUT:  No objection.

20          MR. SABBOTA:  No objection.

21          THE COURT:  I hear no objection.  Each is received.

22      (Exhibit 12-21, 12-22, 13-16 received, 10:28 a.m.)

23          MS. MOHSIN:  Your Honor, with the Court's permission,

24   I would like Special Agent Fleming to hold up these vests in a

25   standing position so he can display them to the jury --

```
 1              THE COURT:  Go ahead.

 2              MS. MOHSIN:  -- and describe the various items on

 3    them.

 4              THE COURT:  Proceed.

 5              MS. MOHSIN:  Thank you.

 6    BY MS. MOHSIN:

 7    Q.  And to lay a proper foundation, Special Agent Fleming, I

 8    would like you to tell me, have you had conversations with

 9    members of the Devils Diciples?

10    A.  I have, yes.

11    Q.  And have you had conversations with more than one member?

12    In other words, approximately how many different members have

13    you talked to?

14    A.  Numerous members.

15    Q.  Have you, have you talked to members of other motorcycle

16    clubs?

17    A.  I have.

18    Q.  And have you had discussions about what the meaning of

19    these various things, what they mean, the various items on a

20    vest?

21    A.  I have, yes.

22    Q.  Okay.  Could you please describe while holding up -- that's

23    Exhibit 12-21?

24    A.  That's correct.

25    Q.  Could you just describe where it came from and what it is?
```

1   A.  This was from Michael Mastromatteo's house.  This is what

2   is traditionally known as the colors worn to identify a person

3   as a member of a particular club.  Each club has got their own

4   pattern and design.

5           The top part here where it says "Devils Diciple,"

6   that's called the top rocker.  Down here, which is Michigan,

7   usually identifies the state or the chapter that the person is

8   affiliated with.

9           This is their emblem or what they call their center

10  wheel on the back.

11  Q.  Can you describe that for the record what that is?

12  A.  Sure.  It's a spoked wheel with cross tridents.

13  Q.  And I want to ask you about an exhibit we showed very early

14  on in this case, a photograph of the inside of a vehicle driven

15  by Victor Castano.

16           Was that the same spoked wheel that you observed in

17  that photograph?

18  A.  That's correct.  The center patch is depicted on a lot of

19  stuff that they wear, jewelry, things like that.

20  Q.  I want to direct your attention now to the top right-hand

21  corner of the back of that vest and the letters "FTW."  What is

22  your understanding of those letters?

23  A.  It could stand for two different things:  "Forever Together

24  Wherever," or "Fuck The World."

25  Q.  And now I want to direct your attention -- and could you

1    just show the jury that while you're, while you're speaking?

2         Could you please describe what the "M.C." refers to

3    based on your understanding in your investigation?

4    A.  It just stands for motorcycle club.

5    Q.  Now, if someone is a member of the Devils Diciples

6    Motorcycle Club, is that the vest that they would wear?

7    A.  If they are of a full patched member, yes.

8    Q.  So if someone doesn't have all of those items on that, what

9    is your understanding about their relationship to the Devils

10   Diciples?  And by that, I mean a top rocker, a bottom rocker,

11   and a center wheel.

12   A.  They are a full patched member in the club.

13   Q.  And if any of those three things are missing, what's your

14   understanding about that individual's relationship to the club?

15   A.  Well, traditionally, a prospect will not have the center

16   wheel.

17   Q.  Okay.  Thank you.

18        Is there anything on the front that you wanted to

19   highlight for the jury so that they can understand what the

20   front patches are referring to?  Could you read them?

21   A.  Sure.  Normally, the front patches commemorate members who

22   have passed away, or parties or events that they have attended.

23        For this particular one, there's a patch related to

24   the Devils Diciple national party that occurred in 1996.  There

25   are patches that are in memory, this particular one is in

2:11-cr-20129-RHC-MAR  Doc # 1070  Filed 11/01/14  Pg 56 of 174  Pg ID 5296
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

56

1   memory of "Fangers." (Phonetic).  This particular one has the

2   names of members who passed away.

3           There are also commemorative, I guess you'd call that

4   jewelry, which is related to the 25th anniversary of the Devils

5   Diciple, meaning this person attended that party.

6   Q.  Okay.  I want to direct your attention now to 12-22.  Would

7   you please do the same?

8           MS. MOHSIN:  Your Honor, may I publish that to the

9   jury, that particular exhibit?

10          THE COURT:  Yes.

11          MS. MOHSIN:  Thank you.

12          THE WITNESS:  12-22 is what's called a "Property of"

13  vest.  It is worn by the girlfriend or wife of a full patched

14  member in the Devils Diciples.

15  BY MS. MOHSIN:

16  Q.  Now, can you describe for the record, there's a -- I forgot

17  what's that called.

18  A.  This top rocker.

19  Q.  Thank you.

20  A.  It says "Property of."  And the bottom rocker identifies

21  the club member.  In this particular case, it was "Iron Mike."

22  Q.  And so the word "Iron" is written on the bottom?

23  A.  That's correct.

24  Q.  And is this "Property of" patch missing anything, such as a

25  center wheel?

1   A.  Well, it -- there is never a center wheel on a "Property

2   of" patch.

3   Q.  Okay.  Is there anything on the front?

4   A.  There is not.

5   Q.  Okay.  Let me move on to the third exhibit, 13-16.  Could

6   you tell us where this was found?

7   A.  13-16 was found at the home of Mr. Smith.  And this is an

8   old vest for a member who belonged to the South California

9   chapter.

10  Q.  And again, does this particular vest have all of the

11  hallmarks of a full patched member?

12  A.  It does, yes.

13  Q.  So the top rocker, bottom rocker, center wheel?

14  A.  Correct.

15  Q.  And what is displayed at the top right corner of the back

16  of the vest?

17  A.  It's the initials "FTW," and down to the right of the

18  center wheel is the "MC."

19  Q.  Turning that around, is there any information on the front?

20  A.  Sure.  There are various patches.  This one says "In Memory

21  of Steve, December 18th, 1977."  This one is in memory of a

22  brother who died in June of 1980.  The patches over here are

23  for attending various Devils Diciple parties.

24  Q.  Okay.  Thank you.

25          (Brief pause.)

1   BY MS. MOHSIN:

2   Q.  I want to direct your attention now to something called

3   bylaws.  Are you familiar with bylaws?

4   A.  I am.

5   Q.  During the course of your review of the numerous search

6   warrants that you described, did you have occasion to find

7   and/or seize bylaws?

8   A.  Many of the locations that were searched, yes.

9   Q.  And did you find any at the home of Jeff Smith?

10  A.  We did, yes.

11  Q.  I want to address your attention now to Exhibits 13-1,

12  13-2, 13-3, 13-5, and 13-121.

13          MS. MOHSIN:  Your Honor, these are physical exhibits.

14  I'm just going to display them to the defense.

15          THE COURT:  Okay.

16          MR. SABBOTA:  No objection, your Honor.

17          THE COURT:  Okay.

18          MS. MOHSIN:  Can we admit them, your Honor?

19          THE COURT:  You want to admit them?  That's fine.

20      (Exhibit 13-1, 13-2, 13-3, 13-5, 13-121 received,

21      10:37 a.m.)

22          THE COURT:  The numbers again are?

23          MR. SABBOTA:  13-1, 13-2, 13-3, 13-5, and 13-121, your

24  Honor.

25          THE COURT:  Okay.

```
 1              MS. MOHSIN:  Thank you, your Honor.  I'm going to ask
 2    the witness to describe them as I display them and publish them
 3    to the jury.
 4              THE COURT:  That will be fine.
 5              MS. MOHSIN:  Thank you.
 6              THE COURT:  While you're preparing to do that, I'll
 7    note for the jury and for counsel and for the defendants and so
 8    forth that I intend to take a recess, a morning recess of about
 9    15, between 15 and 20 minutes, at five minutes to 11.  Just
10    about divide the time that we have today.
11              MS. MOHSIN:  We're almost through, your Honor.
12              THE COURT:  Okay.
13    BY MS. MOHSIN:
14    Q.  Directing your attention to 15-1, do you have a clear
15    picture of that over there?
16    A.  I do, yes.
17    Q.  Can you tell the members of the jury, again, generally what
18    this document is?
19    A.  It's a document that is entitled "National Directives."
20    And it describes certain philosophies or rules that the Devils
21    Diciples are going to abide by, or live with.
22    Q.  Okay.  Can you please read for the members of the jury the
23    first rule, please?
24    A.  I'm sorry.  Which number?
25    Q.  Number 1.
```

```
 1   A.   Okay.  We, as Devils Diciples, being a multi-chapter
 2   national motorcycle club, within the United States, declares
 3   this club independent and without undue influence from any
 4   outside source in which may cause us to change direction of our
 5   principles and goals.
 6   Q.   Continue to 2.
 7   A.   We will continue to pursue a peaceful coexistence with
 8   other clubs within the realm of bikers, and will attempt to
 9   pursue negotiations with other clubs in which we may find
10   ourselves in conflict or have any difference of opinion, but
11   will not be told what club we will or will not associate or
12   party with, or the manner in which we choose to conduct our own
13   affairs.
14   Q.   Number 3?
15   A.   As Devils Diciples, we will not involve ourselves in
16   differences between other clubs.  Their problems are their own
17   and we have no intention of forming any alliances for such a
18   purpose, as well as unduly influencing or forcing out our views
19   and ideals upon others.  Any affiliations with other clubs are
20   done so as friends with similar ideals, and not to be construed
21   in any form as a coalition.
22   Q.   Please continue to number 4.
23   A.   We reserve the right to peacefully exist, prosper, and grow
24   within the confines of our convictions.  If necessary, we will
25   vigorously defend to the man these rights and oppose any
```

1    outside influence to the contrary.

2    Q.   Five, please?

3    A.   Temporary non-affiliation and participation with other

4    clubs will strictly be in a defensive posture caused by others

5    unduly attempting to change our views, or applying pressure as

6    to a part of our coalition or other groups and affiliations

7    that try to impose their influence to chain our -- change our

8    policies.  We have no control of other clubs imposing on their

9    members a condition of non-affiliation with our club through

10   their attempt of intimidation or applying pressure to be part

11   of the federation of motorcycle clubs and controlled by a

12   select minority in which we emphatically decline participation.

13   Q.   Please continue.

14   A.   All clubs, bikers, and citizens are welcome at any of our

15   open parties and functions if their intentions are peaceful,

16   honorable, and conduct themselves in an acceptable manner.

17   Q.   Please continue.

18   A.   All chapters, while having the authority of functioning

19   within their own chapter bylaws, not being in conflict with the

20   national bylaws and the national directives, will coordinate

21   their efforts with other chapters and the elected national

22   officers to promote and support the growth and prosperity of

23   the Devils Diciples as a whole.

24   Q.   Number 8?

25   A.   All national bylaws are to be strictly enforced by each and

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 62 of 174   Pg ID 5302
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

62

1  all chapters.

2  Q.  Number 9?

3  A.  The host chapter will have the responsibility for security

4  issues at meetings, parties and club functions.  The chapter

5  warlord will head security at such events utilizing his

6  enforcers and such other security teams should -- it says

7  form -- guest chapters of the Devils Diciples as necessary.

8  The visiting warlords with their enforcers will, upon arrival,

9  promptly report for assignments.  Each member of the security

10 team will receive instructions of possible breaches of security

11 and existing issues prior to going on duty.

12          Sleeping and excessive consumption of alcohol or the

13 use of drugs on duty will not be permitted and will be subject

14 to disciplinary action.  Being informed and alert is a

15 paramount concern for the safety of our brothers and guests.

16 Q.  And the national directives you testified were found at

17 whose location?

18 A.  Mr. Smith's house.

19 Q.  Okay.  Exhibit 13-2.  Can you tell us what this is?  Let me

20 see if I can --

21 A.  13-2 is a copy of the national bylaws that were found

22 during the search of Mr. Smith's house.

23 Q.  Now, these are fairly easy to read.  I want to direct your

24 attention to a couple of these.  Can you please read number 1?

25 A.  One for all, all for one.

JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

1  Q.  Number 2?

2  A.  No Devils Diciple will mainline or freebase dope.

3  Q.  Number 3?

4  A.  Any disclosure of club business to anyone other than a

5  Devils Diciple is subject to loss of patch.

6  Q.  Number 4?

7  A.  All brothers will respect property of Devils Diciples.

8  Q.  Based upon your conversation with various members of the

9  Devils Diciples, does that extend to women?

10  A.  It does not.

11  Q.  Number 5?

12  A.  Brothers will be "86ed" for the benefit or safety of our

13  family.

14  Q.  What does the term "86ed" mean, based again on your

15  conversations with various members of bikers, biker clubs?

16  A.  Basically removed from the club.

17  Q.  So to be "86ed" means to be removed?

18  A.  Correct.

19  Q.  Number 8?

20  A.  Discharge of firearms at club function is subject to

21  disciplinary action.

22  Q.  Number 9?

23  A.  Every Devils Diciple who is insurable will have and

24  maintain a life insurance policy with a brother as a

25  beneficiary for a minimum of $10,000.  All others without

1    insurance will be required to pay into the funeral fund each

2    year.

3    Q.  Number 10.

4    A.  Club tattoo will require two years, and accompanied by two

5    tattooed brothers.

6    Q.  Number 13?

7    A.  No Devils Diciple will have any other complete club tattoo

8    on any part of his body.

9    Q.  Number 14 and 15?

10   A.  Any Devils Diciple wearing patch in or on moving vehicle

11   other than a motorcycle will receive a $25 fine.

12           Number 15, old ladies are permitted to wear "Property

13   of" patchwork only, and are subject to a $25 fine in or on

14   moving vehicle other than a motorcycle.

15   Q.  Number 16?

16   A.  No old lady can be present or participate in any form of

17   club business or have knowledge thereof.

18   Q.  Okay.  Number 19?

19   A.  All chapters are responsible for financial debts, and will

20   be paid in full by the 1st of January.

21   Q.  And Number 20?

22   A.  Eligibility for retirement.  Requirements:  To be in good

23   standing and at least ten years of service, subject to recall

24   in case of emergency.

25   Q.  Okay.  Thank you.

1                You testified earlier that the national bylaws were

2     found at a multitude of locations; is that correct?

3     A.   That's correct.

4     Q.   And the national bylaws that you found at a multitude of

5     locations, were they similar to Exhibit 13-2?

6     A.   They were, yes.

7     Q.   I want to direct your attention now to 13-3.  This is a

8     multi-page exhibit.

9                Again, just briefly, what does that depict?

10    A.   13-3 is a map of the United States, and depicts the

11    location of various chapters or members.

12    Q.   This is the second page of the same exhibit.  Let me remove

13    the first one, please.

14    A.   This is a map of Ohio, and lists the clubhouses in

15    Defiance, Ohio and Columbus, Ohio.

16    Q.   Is it your understanding there are clubhouses at those two

17    locations?

18    A.   Clubhouses or chapters, yes.

19    Q.   Okay.  The third page?

20    A.   This is a south Arizona, and lists the clubhouses and

21    chapter in Tucson, and also that there is nomad who lives in

22    Lake Havasu City.

23    Q.   Have you had occasion to discuss the term "nomad" with the

24    individuals that you've talked to about bikers?

25    A.   Yes.

1    Q.  What is your understanding of that term?

2    A.  A nomad is a full patched member of the Devils Diciples who

3    is not affiliated with a particular chapter.

4    Q.  So the reference here to "nomad west coast," what's your

5    understanding?  Is that a chapter or an individual?

6    A.  That's an individual.

7    Q.  The next page?

8    A.  This is a map of Indiana, and indicates that there is a

9    chapter and also a nomad in this general area.

10   Q.  There is a number "44" that is displayed in the center of

11   the wheel and trident.  Have you seen that before?

12   A.  I have.

13   Q.  Does that 44 appear prolifically in the evidence that

14   you've seen -- seized?

15   A.  It appears in the evidence that I've seen.  It's also a

16   symbol that members of the Devils Diciples use in photograph.

17   They use the two 4's.

18   Q.  And what is your understanding of what the two 4's refer

19   to?

20   A.  Four is -- the fourth letter of the alphabet is D.  44 is

21   DD, for Devils Diciples.

22   Q.  And is that your understanding of why the number 44 appears

23   so commonly in images such as this one?

24   A.  That's correct.

25   Q.  The next page?

1  A.  Is Georgia, and where the chapter is in Georgia.

2  Q.  The next page?

3  A.  Alabama, and the various chapters in Alabama.

4  Q.  There are four chapters, or five chapters depicted here.

5  Could you please reference them for the jury?

6  A.  Decatur, Sand Mountain, Birmingham, Anniston and Atmore.

7  Q.  Okay.  The next page?

8  A.  This is a list in California, Bakersfield, Hollywood,

9  Fontana, and the last one was cut off, Montclair.

10  Q.  Okay.  And finally, the last page of this exhibit.

11  A.  This is Michigan, and the various clubhouses and chapters

12  in Michigan.

13  Q.  And does the word "historical" appear on this exhibit?

14  A.  It does.

15  Q.  Is -- was there or is there a chapter in Cadillac?

16  A.  There was, but there is not now.

17  Q.  I want to direct your attention now to Exhibit 13-5.  Can

18  you tell the members of the jury what this is?

19  A.  13-5 is an address list that was found at the home of Mr.

20  Smith that lists the various chapters, their addresses, and

21  contact phone numbers.

22  Q.  And so in the previous exhibit, there were stars on the

23  maps depicting locations of where various chapters or

24  individuals resided.  Does this list correspond in general

25  with, with that information?

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 68 of 174   Pg ID 5308
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

68

1    A.   It does, yes.

2    Q.   And it's a two-page list.  Is it your understanding that

3    there is an international component to this case?

4    A.   There is.

5    Q.   Can you briefly describe that?

6    A.   There is a Devils Diciples Motorcycle Club in England that

7    is affiliated with the Devils Diciples here in the United

8    States.

9    Q.   Okay.  And have telephone, detailed telephone lists such as

10   Government's Exhibit 5 been found in other locations?

11   A.   They have, yes.

12   Q.   Government's Exhibits 13-2 and 13-5 are laminated.  Is this

13   how they were found?

14   A.   That's correct.

15   Q.   Have you found laminated versions of these documents at

16   other locations?

17   A.   We have.

18   Q.   On more than one occasion?

19   A.   Yes.

20   Q.   Okay.  I want to direct your attention to 13-121.  Can you

21   describe what that is?

22   A.   13-121 is an older copy of the national bylaws.

23   Q.   Okay.  I want you to read one or two of these.  Number 6,

24   please?

25   A.   If you can get two fingers under somebody's patch, you can

2:11-cr-20129-RHC-MAR  Doc # 1070  Filed 11/01/14  Pg 69 of 174  Pg ID 5309
JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

69

1    tear it off if you want.

2    Q.  Number 4, please.

3    A.  No old ladies can attend club meeting or know club

4    business, or have any form of club patch work.  Club business

5    told to outsiders will result in loss of patch, no exceptions.

6    Q.  Number 9, please.

7    A.  No cunts under 18 will be at any national functions, and

8    the chapter she is with is held responsible.

9    Q.  Number 15, please.

10   A.  All members will respect officers and members, or heavy

11   fines -- and members, or heavy fines will be imposed.

12   Q.  Number 18, please.

13   A.  Hand will be raised at all meetings unless open discussion,

14   or fines will be imposed.

15   Q.  And Number 20, please?

16   A.  Each chapter will decide what happens to a member who

17   quits.

18   Q.  Thank you.

19          After the arrests in this case, were additional search

20   warrants executed?

21   A.  They were, yes.

22          MS. MOHSIN:  I have nothing further for this witness

23   at this time.  We will be calling him at a later time.  Thank

24   you, your Honor.

25          THE COURT:  Thank you.

 1              This generally corresponds with the time that I would

 2    take a morning recess.  So about 20 minutes in the jury room.

 3    And then we'll resume and conclude for the day at approximately

 4    1:30, perhaps a little bit earlier than that.

 5              Morning recess, please.  You'll escort yourselves to

 6    the jury room, ladies and gentlemen.

 7              THE CLERK:  All rise.

 8         (Jury out, 10:54 a.m.)

 9              THE CLERK:  All rise.  Court is now in recess.

10         (Recess taken, 10:54 a.m. - 11:17 a.m.)

11              THE CLERK:  All rise.  Court is now in session.

12              THE COURT:  And we can bring the jury out.

13              MS. MOHSIN:  Judge, may I address a quick matter?

14              THE COURT:  Well, yes.  Yes.

15              MS. MOHSIN:  Judge --

16              THE COURT:  Hang on.

17              MS. MOHSIN:  It's housekeeping.  This equipment is not

18    working with our computer.  It was this morning.  Something

19    happened when they made the change.  Unfortunately, the way

20    that we've set up all of our exhibits is to introduce them, put

21    them away, and then put them up here.  I can't show exhibits

22    I've already introduced through the ELMO without this equipment

23    functioning.  So can we just have a few minutes or have her

24    work so that we can get that done before we bring the jury out?

25              THE COURT:  How much more time is likely needed?

```
 1              UNIDENTIFIED SPEAKER:  I'm going to try for five
 2    minutes, sir.
 3              THE COURT:  Let's, let's -- with permission of
 4    counsel, let's have the court security officer tell the jury
 5    that we have equipment issues that we're working with.  Is
 6    that, is that acceptable with everyone?
 7              ALL COUNSEL:  Yes, your Honor.
 8              THE COURT:  Just tell the jury we've got electronic
 9    equipment issues we're resolving.  Five more minutes.
10              COURT DEPUTY:  Yes, Judge.
11              THE COURT:  In the meanwhile, while we are on the
12    record and this repair work will continue, I'll -- let's -- I'd
13    like to acknowledge or have acknowledgements recorded that I
14    have passed out a copy of an e-mail that I sent to Mr. Pepper,
15    the attorney for the BOP in Kansas City, copied to the warden,
16    copied to Mr. Dunn locally at Milan concerning access to
17    computer equipment by detainees, review of discovery materials
18    and the like.  It's my effort to light a fire, so to speak, and
19    get things going.  A copy of that has been provided to each --
20              MS. STOUT:  Yes, your Honor.
21              MS. MOHSIN:  Yes, your Honor.
22              THE COURT:  -- each attorney and for the Government.
23    And hopefully this will get something additionally done.  So I
24    don't know if anybody wants me to docket this.  I'll be happy
25    to do it, but you all have a copy and I have a copy.
```

 1   Ungrammatical, though, portions of it are, since I was typing

 2   on the bench.  I've sent a small correction to Mr. Pepper just

 3   to fill in a blank that I left out about the transport of the

 4   detainees in a timely fashion.

 5          Well, let's --

 6          MS. MOHSIN:  Your Honor, we would just like to, I

 7   neglected to ask Special Agent Fleming additional questions if

 8   I could have that additional time?

 9          THE COURT:  You can do that.  We can stand by.

10          MS. STOUT:  Your Honor, does this request include the

11   three more terminals?  I'm not reading very quickly today, for

12   some reason.

13          THE COURT:  There may be a lack of clarity.  I, I

14   identified the presence of only three terminals for six

15   detainees as being a problem.  And he had earlier indicated to

16   me that they would do what it takes to get everybody access,

17   six hours a day, six days a week.  Now, that presumes we're not

18   in trial, of course.  But I'm interpreting that as weekend

19   availability as well.

20          MS. STOUT:  Okay.

21          THE COURT:  And I pointed out there, by the way,

22   particularly important perhaps for defendants here, that Mr.

23   Dunn told me that he was -- he thinks that they keep a roster

24   or a log of the occasions on which the opportunity is afforded

25   to come out, go to the computer terminals, review discovery.

1    And his understanding was that there were occasions in which

2    some, and perhaps maybe most of the defendants, from time to

3    time, were declining the opportunity to come out and review.

4          He wasn't sure about that.  And he wasn't sure about

5    the complexity of the log that is being kept, but he's going to

6    take a look into it.  As I stated in my e-mail to Mr. Pepper, I

7    haven't heard any resolution of that.  So he may not -- of

8    course, he may not be correct about his understanding.

9          MS. STOUT:  We're just acknowledging receipt, your

10   Honor, of a CD that was left.  My understanding from Mr.

11   Straus, these are consensual recordings between "Billy Wadd,"

12   or Billy -- or William Smith, and Dave Roberts.

13          Is that accurate, Mr. Straus?

14          MR. STRAUS:  That is correct.

15          THE COURT:  Okay.  On one point that was raised a

16   couple of times, hearsay objections to the agent's testimony,

17   U.S. v. Edwards, an unreported case, Sixth Circuit, 2012, 473

18   F. App'x 429, again, United States vs. Edwards from 2012.  The

19   Court of Appeals examined a very similar objection to a

20   detective being asked what his understanding was based upon

21   conversations that he had had from -- with individuals,

22   cooperating individuals and possible suspects and so forth.

23   And he was asked what his understanding was, sort of

24   synthesizing the conversations and so forth.

25          A hearsay objection was raised.  It was overruled.

1   And the Court of Appeals said that's correct, because

2   essentially the, the officer or detective's understanding is

3   not -- it's stage setting.  It's orientation.  It's background,

4   more so than the introduction of facts to prove the truth of

5   the matter asserted in the statements.  So it's either marginal

6   or simply doesn't qualify as hearsay.

7          MR. KRAIZMAN:  Judge, can I please have the cite

8   again?  I would like to read the case.

9          THE COURT:  Edwards.  It's a Federal Appendix.  It's

10  unreported.  March 30th, 2012.  It appears at 473 Fed. App'x

11  429.

12         MR. KRAIZMAN:  Thank you.

13         THE COURT:  You're welcome.

14         Of course, that can be carried too far as well.  And

15  is a -- a stage-setting can, can be transformed into something

16  more than that.  And a hearsay objection may arise legitimately

17  in such instances.

18         MS. STOUT:  Thank you, your Honor.

19         (Off the record discussion.)

20         THE COURT:  Rise for the jury, please.

21         Come to order.

22      (Jury in, 11:25 a.m.)

23         THE COURT:  All right.  The jury has assembled.  All

24  parties and attorneys are present, I note.  And the witness,

25  you needed some additional questions you neglected apparently?

```
 1              MS. MOHSIN:  I did, your Honor.  I beg your pardon.

 2              THE COURT:  I want to thank the jury for their

 3    patience as well.  The parties, something had come loose or was

 4    unplugged incorrectly, plugged in incorrectly.  So I think we

 5    got some new equipment in here and try to put it together,

 6    apparently put it together for today at least correctly.  So

 7    we'll see if it maintains itself.

 8              So go ahead.

 9    BY MS. MOHSIN:

10    Q.  Special Agent Fleming, I want to direct your attention now

11    to Exhibits 62-7, 8, 9, 10, 11, 12, and 13.  So that's 62, 7

12    through 13.

13              Special Agent Fleming, could you briefly describe what

14    is depicted in those exhibits?

15    A.  62-7 dash 62-13 are various colors of different motorcycle

16    clubs.

17    Q.  And are those photographs or digital images from what you

18    can tell?

19    A.  These are digital images from a computer.

20              MS. MOHSIN:  Your Honor, the Government would move to

21    have these exhibits, 62-7 through 62-13, admitted.

22              MS. STOUT:  No objection.

23              THE COURT:  I hear no objection.  Each is received.

24         (Exhibit 62-7 through 62-13 received, 11:27 a.m.)

25              THE COURT:  So it's 7 through?
```

JURY TRIAL, VOLUME II - 10/16/2014
WILLIAM FLEMING - DIRECT

76

1          MS. MOHSIN:  Thirteen.

2          THE COURT:  Thirteen.

3          MS. MOHSIN:  Correct, your Honor, of Exhibit No. 62.

4          THE COURT:  Okay.

5  BY MS. MOHSIN:

6  Q.  Directing your attention to Exhibit 62-7, could you briefly

7  describe what that is?

8  A.  Sure.  62-7 is what we showed earlier, the Devils Diciples

9  colors or emblem.

10  Q.  62-8?

11  A.  62-8 is the emblem of the Hells Angels Motorcycle Club.

12  Q.  And in this image, what is depicted?

13  A.  The -- it's the statement "Hells Angels" and a skull with

14  wings on it.

15  Q.  And so are those colors used by Hells Angels Nationwide,

16  based on your understanding?

17  A.  That's correct.  Their colors are red and white.

18  Q.  62-9?

19  A.  62-9 is the emblem for the Highwaymen Motorcycle Club.

20  Q.  Now, a moment ago, you said that the colors of the Hells

21  Angels are the red and white.  Has that something -- is that a

22  phrase that you've heard before, the red and white?

23  A.  Sure.

24  Q.  Does it have a significance, based on your understanding?

25  A.  In the motorcycle club world, it's indicative of someone,

1    you use the term "red and white," that they are a member of the

2    Hells Angels, just like the "blue and white" is a member of the

3    Devils Diciples.

4    Q.  What about the Highwaymen?  Do you have an understanding,

5    based upon, again, your experience about whether they go by

6    any, any type of title like that?

7    A.  The Highwaymen do not, no.

8    Q.  62-10?

9    A.  62-10 is an emblem of the Outlaws Motorcycle Gang, and they

10   go black and white.

11   Q.  Okay.  62-11?

12   A.  62-11 is the Black Pistons.  And they are what's called a

13   puppet club or a support club of the Outlaws.

14   Q.  62-12?

15   A.  Is the emblem of the Jokers Motorcycle Club.

16   Q.  And 62-13?

17   A.  62-13 is the emblem of the Black Label Society, which is a

18   heavy metal rock band.

19   Q.  Okay.  Thank you.  I want to direct your attention to one

20   additional exhibit.

21        Did you have an opportunity to speak with an

22   individual by the name of Charles Myatt?

23   A.  I did, yes.

24   Q.  And did he provide you with anything when you spoke to him?

25   A.  He provided me with a credo or a statement about the Devils

1    Diciples that he had received from another member.  Mr. Myatt

2    was a Devils Diciple member known as "Snot."

3    Q.  Okay.

4            MS. MOHSIN:  Just a moment, please, your Honor.

5    BY MS. MOHSIN:

6    Q.  Did I give that to you accidently?

7    A.  No, you did not.

8    Q.  I apologize.  I'm going to show you what's been marked

9    62-5.

10           What is that?

11   A.  62-5 is a document entitled "DD One-Percenter."  And it was

12   given to me by Charles Myatt who goes by "Snot."

13   Q.  And was that the document that was provided or is that a

14   photocopy?

15   A.  This is a photocopy of the document.

16   Q.  Okay.  Have you preserved the original?

17   A.  Yes.

18   Q.  Okay.

19           MS. MOHSIN:  Your Honor, we would offer 62-5 into

20   evidence.

21           MR. KRAIZMAN:  I object for reasons of relevance, and

22   for the earlier statement that I made, Judge.

23           THE COURT:  Relevance suggested is what?  Background

24   to -- well, go ahead.  You state the substance.

25           MS. MOHSIN:  Certainly.  Your Honor, this was a

```
 1    document that was provided by Mr. Myatt.  He is going to

 2    testify about the circumstances related to how he was -- how

 3    that document was provided to him and how it relates to this

 4    organization.

 5            THE COURT:  Subject to that testimony being provided

 6    later, I'll admit the exhibit.

 7            MS. MOHSIN:  Thank you, your Honor.

 8            MR. KRAIZMAN:  Very well.

 9            THE COURT:  And overrule the objection.

10            MS. MOHSIN:  Would you publish 62-5?

11        (Exhibit 62-5 received, 11:32 a.m.)

12    BY MS. MOHSIN:

13    Q.  And this is a document entitled what, Special Agent

14    Fleming?

15    A.  "DD," stands for Devils Diciples, "One-Percenter."

16    Q.  Okay.  Thank you.

17            MS. MOHSIN:  Thank you, your Honor.

18            MR. KRAIZMAN:  Judge, may I just state that my

19    objection is also as to the foundation.

20            THE COURT:  I can -- based on the information already

21    provided, I overrule that objection.

22            MR. KRAIZMAN:  Thank you.

23            THE COURT:  Without being subject to any later

24    showing.

25            MS. MOHSIN:  Thank you, your Honor.  We have nothing
```

```
 1   further for Special Agent Fleming at this time.

 2           THE COURT:  Is there any cross-examination on these

 3   matters raised in the direct?

 4           MS. STOUT:  No cross.

 5           THE COURT:  You don't have to say no.  Does anybody

 6   suggest any cross-examination on the matters presented thus

 7   far?

 8           I see no hands raised.  So, of course, the witness

 9   will be called back for other matters as earlier indicated.  It

10   appears that there is no cross-examination offered at this

11   time.  So on these matters, the witness may step down.

12       (Witness exits stand, 11:33 a.m.)

13       *              *              *

14       (Jury in, 11:46 a.m.)

15           THE COURT:  All right.  The jury is assembled.  Be

16   seated, please.  All attorneys and parties are present, I note.

17   And your next witness is?

18           MS. MOHSIN:  Karen Casey, your Honor.

19           THE COURT:  Raise your right hand, please.

20       (Witness is sworn.)

21           THE COURT:  Climb up in the chair here, the witness

22   box, please.  Push the microphone aside, as you sit down, if

23   you would, please.  And then make sure that it's aimed at you

24   when you get comfortable.  You might aim the microphone more at

25   you, please.
```

```
 1              All right.  Go ahead, Ms. Mohsin.

 2              MS. MOHSIN:  Thank you, your Honor.

 3                          KAREN CASEY

 4      called as a witness at 11:47 a.m., testified as follows:

 5                      DIRECT EXAMINATION

 6   BY MS. MOHSIN:

 7   Q.  Good morning.

 8   A.  Good morning.

 9   Q.  I'm going to ask you to keep your voice up so that everyone

10   can hear you.

11   A.  Okay.

12   Q.  Can you please tell the members of the jury your name.

13   A.  My name is Karen Casey.

14   Q.  Ms. Casey, how old are you?

15   A.  Forty-four.

16   Q.  How far did you go in school?

17   A.  I dropped out in 11th grade.

18   Q.  In 11th grade?

19   A.  Right.

20   Q.  How old were you then?

21   A.  Seventeen.

22   Q.  And where did you grow up?

23   A.  In Lancaster, Ohio.

24   Q.  What was the name of the street you grew up on?

25   A.  Washington Avenue.
```

1    Q.  And is that in Lancaster?

2    A.  Yes, it is.

3    Q.  Are you familiar with the Devils Diciples?

4    A.  Yes, I am.

5    Q.  When did you first become familiar with the Devils

6    Diciples?

7    A.  In 1983.

8    Q.  How old were you in 1983?

9    A.  Thirteen.

10   Q.  And were you in Lancaster, Ohio in 1983 when you were 13?

11   A.  Yes, I was.

12   Q.  Were you living on Washington Street at that time?

13   A.  Yes, I was.

14   Q.  Now, currently you have on an orange jumpsuit; is that

15   right?

16   A.  That is correct.

17   Q.  Where are you currently living right now, today?

18   A.  Topeka, Kansas.  Right now today?

19   Q.  Yeah.

20   A.  Midland County Jail.

21   Q.  In the Midland County Jail?

22   A.  Yeah.

23   Q.  And how did you get there?

24   A.  I was transported on a writ.

25   Q.  Okay.  So are you serving a sentence?

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 83 of 174   Pg ID 5323
JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

83

1   A.   For -- yes, I am.

2   Q.   And is that sentence a federal or a state sentence?

3   A.   It's a state.

4   Q.   From Kansas?

5   A.   Yes.

6   Q.   When are you scheduled to be released on that sentence?

7   A.   The 17th, tomorrow.

8   Q.   Tomorrow.

9   A.   Yes.

10  Q.   And so are you supposed to be released from, from that

11  sentence tomorrow in Kansas?

12  A.   I was scheduled to, but since I'm here, I'm being released

13  here.

14  Q.   You're going to be released here?

15  A.   Correct.

16  Q.   On the date that you were scheduled to be released; is that

17  accurate?

18  A.   Yes.

19  Q.   Okay.  And are you serving a sentence on a felony charge?

20  A.   Yes, I am.

21  Q.   Okay.  What's the nature of that charge?

22  A.   It had to do with methamphetamine, my original charge.

23  Q.   Okay.

24  A.   But I took a cell phone into a county jail, and that was

25  what they convicted me of.

1  Q.  Were you allowed to do that?

2  A.  No.

3  Q.  And did you know that?

4  A.  Yes, I did.

5  Q.  And what kind of a sentence did you get for that offense?

6  A.  Twenty-five months.

7  Q.  And so you're serving out -- or this is the end of that 25

8  months?

9  A.  Yes, it is.

10  Q.  Did you get any good time?

11  A.  Twenty percent.

12  Q.  Twenty percent of the 25 months is good time for you?

13  A.  Yes.

14  Q.  And when -- so you're scheduled for released tomorrow?

15  A.  That is correct.

16  Q.  And if you didn't have the good time, it would be at a

17  later date; is that right?

18  A.  Right.

19  Q.  I want to direct your attention to what you talked about a

20  few minutes ago, the time when you were 13.  When you were

21  living on Washington Street in Lancaster, were you living with

22  family?

23  A.  Yes, I was.  My mother and my step-dad.

24  Q.  And what was next door to your house?

25  A.  Property owned by the Devils Diciple.

 1   Q.   I'm sorry.  I didn't hear you.

 2   A.   Property owned by the Devils Diciple.

 3          MR. SABBOTA:  Excuse me, your Honor.  Could you have

 4   her bring the mic closer?  Because it's very hard to hear over

 5   here.

 6          THE COURT:  Just maybe bend it down a little bit.

 7          THE WITNESS:  Okay.

 8          THE COURT:  To the extent it can be bent.  Thank you.

 9          MR. SABBOTA:  Thank you.

10          THE COURT:  Go ahead.  I'll adjust the volume up as

11   well.  Go ahead, Ms. Mohsin.  It may be too loud for you, but.

12          MS. MOHSIN:  That's fine.

13   BY MS. MOHSIN:

14   Q.   Ms. Casey, could you please repeat your last answer?

15   A.   Next door to us was the Devils Diciple clubhouse.

16   Q.   And did you have occasion to interact with any of the

17   Devils Diciples when you were 13?

18   A.   Yes, I did.

19   Q.   Can you describe for the jury what happened?

20   A.   I was 13 years old.  It was in 1983.  And Bugs is -- who

21   was a Devils Diciple, came down in a, in a car, in a New

22   Yorker, Chrysler New Yorker.  And he picked me up, took me for

23   a ride.  And he -- I took two hits of acid that he had in his

24   hand, it was called purple microdot.  And then he took me to

25   his house, which was across town.  It wasn't at the clubhouse

1    at that time.  And that's where we had sex.

2    Q.  And when you had those two hits of acid, was that the first

3    time that you had ever had a drug like that?

4    A.  Yes, it was.

5    Q.  And did that begin a relationship between you and this

6    individual named Bugs?

7    A.  Yes, it did.

8    Q.  How long did that relationship go on?

9    A.  It's still going on today.

10   Q.  Did there come a time where you were married to him?

11   A.  I still am married to him, yes, ma'am.

12   Q.  Okay.  So from the time that you were 13 years old, until

13   today, you've been involved with this individual named Bugs?

14   A.  Yes, I have.

15   Q.  Now, is that a real name or a nickname?

16   A.  That's his nickname.

17   Q.  Do you know his real name?

18   A.  Charles Casey.

19   Q.  Charles Casey?

20        Did he live at the clubhouse in Lancaster, Ohio at any

21   time when you were a teenager?

22   A.  Yes.  He moved there shortly after I met him.

23   Q.  So how did that affect your relationship with him?

24   A.  I got to see him more.

25   Q.  And did there come a time where -- well, withdrawn.

```
 1              You testified that you had left school in the 11th
 2    grade.  What was the reason for that?
 3    A.  My mom gave me an ultimatum.  It was either I go with Bugs
 4    or I continue with school and continue to stay with her.
 5    Q.  And what choice did you make?
 6    A.  I went with Bugs.
 7    Q.  How old were you?
 8    A.  Seventeen.
 9    Q.  Did you marry him at that time?
10    A.  No, I didn't.
11    Q.  Where did you live at that time, when your mom said either
12    leave or go to -- leave with Bugs or go to school?
13    A.  I went -- we've lived above the, what he called the DD
14    manna.
15    Q.  Can you spell that, please?
16    A.  It's M-A-N-N-A.  It used to be a church.  And it was called
17    some kind of church, I can't remember the name of it.  But then
18    they scratched out everything and left the "DD" and then
19    "manna."
20    Q.  M-A-N-N-A?
21    A.  Yes, ma'am.
22    Q.  Was that prominently displayed anywhere on that building?
23    A.  It was on the front of the clubhouse, yes, in black and
24    white sign.
25    Q.  You were 17 when you moved into the DD club manna?
```

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1    A.  Yes, I was.

2    Q.  Now, when you were 17 years old, what was your relationship

3    to Bugs?  You said you were not married yet; is that right?

4    A.  No.

5    Q.  Did you have any sort of relationship with him or any

6    position within the club?

7    A.  I was his old lady.

8    Q.  Is that the term that was given to you?

9    A.  Yes.

10   Q.  Are you familiar with the term "property of"?

11   A.  Yes, I am.

12   Q.  What is your familiarity with that term?  How do you know

13   that term?

14   A.  Because I had a patch when I was 18.  I got my property

15   patch when I was 18.

16   Q.  Okay.  So who gave you a property patch?

17   A.  Fat Dog did.

18   Q.  Okay.  Now, do you know this person, Fat Dog?

19   A.  Yes, I do.

20   Q.  Who was he?

21   A.  He was the national president of the Devils Diciples.

22   Q.  Where were you when he gave you this patch?

23   A.  We was at the manna when I got, when I received my patch.

24   Q.  And when you say "we," who are you referring to?

25   A.  Actually, it was my 18th birthday that I received the, the

1    "Property of" patch.  And Fat Dog had actually gave me my first

2    pie in the eye, and we was above the manna, the DD manna in our

3    apartment.

4    Q.  Now, you're describing where you were when you received the

5    "Property of" patch?

6    A.  Yes.

7    Q.  What is a pie in the eye?

8    A.  It's what you get, it's your birthday.  It's an actual pie

9    and they put it in your face.

10   Q.  Okay.  So like pie thrown in your face?

11   A.  Yes.

12   Q.  And what did the "Property of" patch say?  Whose property

13   were you considered to be?

14   A.  It said "Property of," and then "Bugs."

15   Q.  Have you -- did you receive any other patches in connection

16   with that "Property of" patch?

17   A.  Yeah.  It was about, I think about a year later, I had --

18   I -- the term "DFC," which means "Dumb Fucking Cunt," I was

19   partial to that in the fact that I had my property patch.  And

20   I don't know, somebody, I think it was Fat Dog that gave --

21   that got it for me.  My old man was the one who presented it to

22   me.

23   Q.  So you were presented with a DFC patch?

24   A.  Right.

25   Q.  And you've just described what DFC stands for?

1    A.   Right.

2    Q.   And what were you supposed to do with that patch?

3    A.   It went on the front of my patch.

4    Q.   So we're using the word "patch" a lot.  When you say

5    "patch," are you referring to an article of clothing?

6    A.   Yes.  It's a leather.

7    Q.   It's a leather?

8    A.   A vest.

9    Q.   I'm having trouble hearing you.

10   A.   It's a leather vest.

11   Q.   Okay.  Thank you.

12        THE COURT:  Is it possible for you to move -- scoot

13   your chair up a little?

14        MS. MOHSIN:  Thank you.

15        THE COURT:  If the microphone is pointed as it is,

16   pretty much at your chin, that should be good.

17        THE WITNESS:  Okay.

18        THE COURT:  All right.

19        MS. MOHSIN:  Much better.  Thank you.

20   BY MS. MOHSIN:

21   Q.   Now, I want to take you back to when you're 17.  When is

22   the first time that you ever, in your life, tried

23   methamphetamine?

24   A.   It was at a wake in 1987.  It was not long after my -- no.

25   It was before my birthday.  Maybe it was May.  I can't remember

1    the exact date.  But it was a wake that we had for a brother

2    that had passed away.

3    Q.  And when you say "we," who are you referring to?

4    A.  It was the Devils Diciples.  It was the whole club.  I

5    mean, they came from out of state, from Indiana, Michigan.  I

6    can't remember who the, the funeral was for.

7    Q.  Okay.

8    A.  That was the first time I tried methamphetamine.

9    Q.  Now, prior to trying methamphetamine, you've described your

10   experience with the two purple dot pills, the LSD.  Did you

11   have any other experience with any illegal drugs, controlled

12   substances?

13   A.  Yeah.  Marijuana and, and alcohol.

14   Q.  And did that marijuana and alcohol use begin when you were

15   13 and after?  Or before?

16   A.  Right around then.

17   Q.  Right around then?

18   A.  Yeah.

19   Q.  Did you spend a lot of time between the time you were 13

20   and 17 at that clubhouse next door to your home?

21   A.  Yeah.  My husband -- well, at the time, he wasn't my

22   husband.  He had -- he sent -- he went to prison a couple times

23   and did a couple short bits.  But yes, I spent a lot of time

24   there.

25   Q.  Did you spent a lot of time there with him?

1    A.  Yes, I did.

2    Q.  And so at some point, when you're 17, you're at a funeral

3    and you try methamphetamine?

4    A.  Right.

5    Q.  Who provides you with the methamphetamine?

6    A.  I believe his name was Reverend.  That was the first time I

7    ever snorted methamphetamine was at that day, at that time.

8    Q.  His name was Reverend.  And did you know his real name?

9    A.  No, I do not.

10   Q.  Was he a member of the Devils Diciples?

11   A.  Yes, he was.

12   Q.  How do you know that?

13   A.  Because he had a patch.

14   Q.  Okay.  I am going to show you an exhibit, something that's

15   been introduced in evidence, and I'm going to ask you if you

16   recognize it.

17        This is Exhibit 12-22.  Can you look at this and tell

18   me if you recognize it?  What, what it is?

19   A.  This is a property patch.  This says "Property of Iron" on

20   it.

21   Q.  Is that property patch something that you've seen before,

22   or have -- have had given to you before, that type of a

23   property patch?

24   A.  Yeah.  Mine was just like this, but it says "Property of"

25   and it said "Bugs" at the bottom.  And on the front, I had a

1    DFC patch.

2    Q.  Okay.  I'm going to show you what's been previously

3    admitted as 12-21 and ask you to identify it.  Have you ever

4    seen it?

5    A.  Yes.  My husband wore one just like this.

6    Q.  Okay.  Thank you.  You can put that down.  I'll take it.

7            Now, you said that your husband had one just like it.

8    Do you know what a bottom rocker is?

9    A.  Yes, I do.

10   Q.  What was the bottom rocker that your husband's patch had?

11   A.  I believe it was Alabama.

12   Q.  Did there come a time where you became involved in drug

13   trafficking?

14   A.  Yes.

15   Q.  Did that time come before or after you married Bugs?

16   A.  Before.

17   Q.  Can you tell the members of the jury how you started

18   getting involved in drug trafficking and what type of drug you

19   were involved in trafficking?

20   A.  At first, it was trips back and forth from Ohio to

21   Michigan, and I was 18.  And I was transferring cocaine from

22   Michigan to Ohio.  That's what it started out with.

23   Q.  And was this cocaine that you had purchased?

24   A.  No.  My -- I was trafficking for my husband.  He was --

25   Q.  What does that mean, to traffic for someone?

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 94 of 174   Pg ID 5334
JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

94

1   A.  He would send me up with cash money, and I would come back

2   with the product.

3   Q.  What type of cocaine, what quantity of cocaine?  A small

4   quantity?  Medium?  Large?  Can you give me some ideas?

5   A.  It was, it was a nice size quantity of cocaine on several

6   different occasions.

7   Q.  What's, what's a nice size?  What's your understanding of a

8   nice size?

9   A.  Half pound to a pound.

10  Q.  Okay.  And was your husband giving you money to then bring

11  to Michigan, purchase cocaine, and return?

12  A.  Right.

13  Q.  Are you familiar with the term "fronting"?

14  A.  Yes, I am.

15  Q.  Can you tell the members of the jury what that word means?

16  A.  To front something would be to give it to somebody on a

17  front, without no money.  To trust the individual to bring you

18  your money after you sold the product.

19  Q.  So if someone were to front someone some drugs, what would

20  that look like?  Can you explain that to them?

21  A.  Well, it would -- what do you mean, what would it look

22  like?

23  Q.  Can you give me an example?  Have you ever had drugs

24  fronted to you?

25  A.  I'm sure my husband has.

1    Q.   Okay.  So to break it down, you would not be paying for the

2    drugs up front; is that what that means?

3    A.   Correct.

4    Q.   Okay.  Is there an obligation to pay that, that debt later?

5    A.   Later, yes.  You have to use -- got rid of the product,

6    that's when you pay for the front.

7    Q.   After it's been sold?

8    A.   Right.

9    Q.   Where in Michigan were you traveling to obtain the cocaine

10   that you just described?

11   A.   Roseville.

12   Q.   Roseville, Michigan?

13        And was the individual that you obtained the cocaine

14   from a member of the Devils Diciples?

15   A.   Yes, he was.

16   Q.   Okay.  Who was that person?

17   A.   His name is Hombre.

18   Q.   And when you transported it back to Ohio, who did you

19   deliver it to?

20   A.   To Bugs.

21   Q.   How long did that go on?

22   A.   For over a year.

23   Q.   Okay.  During that time, did you get married?

24   A.   No.

25   Q.   What happened next?  And I want you to focus on your

1  relationship with Bugs, and the drug trafficking that we've

2  started talking about.

3  A.  We moved.  We got our own house.  And we moved to a house.

4  I went to Alabama and picked his father up from the nursing

5  home.  And then that's when we started trafficking

6  methamphetamine.

7  Q.  Now, let's turn to trafficking in methamphetamine.  How did

8  that come about?

9  A.  You know, I really don't remember because I remember we was

10 really into -- we was really into doing good business with the

11 cocaine.  And I want to say it was at a toy run or something, I

12 can't remember.  It was some kind of run --

13 Q.  Okay.

14 A.  -- that was in Michigan that my husband went to.  And then

15 that's when we started with the methamphetamine.

16 Q.  Did your husband receive a quantity of methamphetamine,

17 that you're aware of, to sell?

18 A.  (No response.)

19 Q.  Or did he provide it?

20 A.  He always -- well, no.  He was always the money man.  He

21 always had the money to buy it.

22 Q.  Okay.

23 A.  He was never fronted a drug unless he just got out of

24 prison.  It was very rare for my old man not to have money.

25 Q.  Okay.  So in Michigan, at some point, you become aware that

1  he has methamphetamine for sale?

2  A.  No.  It was back in Ohio then.

3  Q.  Okay.  Describe that, how you became aware that he had

4  methamphetamine that he had obtained for the purposes of

5  selling it.

6  A.  I really don't remember how it came about.

7  Q.  Okay.

8  A.  I do remember one time, it was that he mixed a batch of

9  coke and a batch of meth together.  And it was, I mean --

10  Q.  Now, when did you begin to become involved in the

11  methamphetamine trafficking?

12  A.  Directly?

13  Q.  Yes.

14  A.  I'd say '90 -- in the '93, '94.

15  Q.  So in the early 1990s?

16  A.  Yeah.

17  Q.  Now, from the time that you're 17 in 1987, until the early

18  1990s when you would have been in your early 20's, did you

19  continue to use methamphetamine?

20  A.  Yes, I did.

21  Q.  Were you working during that time, earning a wage?

22  A.  No, I was not.

23  Q.  Who was financially supporting you?

24  A.  Bugs.

25  Q.  Had you gotten married during that time period?

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1    A.   I got -- I married him on -- in January of 1990.

2    Q.   Okay.  And when you -- you said Bugs was supplying you with

3    methamphetamine.  What kind of a habit did you have?  How much

4    would you use on any given day, week, month?

5    A.   The more I used, the more addicted I became.  And the more

6    you use, once you become addicted to it, you have to use larger

7    quantities in order to get.

8         So I was probably -- I don't know, he gave me a couple

9    grams, and that would last me two or three days.

10   Q.   Where did he obtain his meth, if you know, during this time

11   period before he was trafficking in it and you were trafficking

12   in it?

13   A.   I remember we went to Alabama a couple times, to get it

14   from down there.  And then we started going out to California.

15   Q.   When you say you went to Alabama, did you go to Alabama to

16   any Devils Diciples-related location?

17   A.   It was, it was the river, Trooper.

18   Q.   Okay.  Trooper is a location or an individual?

19   A.   That's a name.  It's an individual.

20   Q.   And do you know his real name?

21   A.   No, I do not.

22   Q.   Where was Trooper -- was he a member of the Devils

23   Diciples?

24   A.   Yes, he was.

25   Q.   Do you know what chapter?

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 99 of 174   Pg ID 5339
JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

99

1   A.   The Alabama.

2   Q.   And he was providing your husband with methamphetamine?

3   A.   Yes.  He did on a couple occasions.

4   Q.   Did he ever provide it to you?

5   A.   No.  My -- I always got my methamphetamine through Bugs.

6   Q.   Now, you indicated at some point, California became

7   involved in, in your and your husband's methamphetamine

8   relationship, let's call it that.

9        Tell the members of the jury how that came about,

10  first with your husband, and then you.

11  A.   It just kind of -- we went out together the first couple

12  times, and we drove out and then drove back.  And it just got

13  to be where it was a pain in the ass to do that, to drive all

14  that way, and it was quicker if I flew.

15       A couple times, they had another lady by the name of

16  Sherri, I don't know her last name.  She would bring in

17  methamphetamine for her, for us, for Bugs, but she always had

18  to have a ghost.  She always had to have a brother behind, you

19  know, on the same flight as her flying, whereas I didn't.  I

20  would fly to California, get the dope, and then fly back.

21  Q.   So initially, you indicated that you drove.

22  A.   Yes, we did.  That's how we started out.

23  Q.   You and Bugs together?

24  A.   Yes, and my daughter.

25  Q.   And your daughter.  Where did you go in California?

1  A.  We went to Holiday's.  It was -- they called it the Spa

2  Ranch.

3  Q.  And now, do you know Holiday's name?

4  A.  Vincent Winthorp, I believe.

5  Q.  And you went to his home; is that accurate?

6  A.  Yes.

7  Q.  Did he live there?

8  A.  Yes, he did.

9  Q.  What was the name of his home?

10  A.  The Spa Ranch.

11  Q.  And what would happen when you would get there?  What did

12  you do?  Did you stay?

13  A.  Well, we had a thing going on with the, the mini thins.

14  Q.  Okay.  Please describe that.  What is a mini thin?

15  A.  Mini thins is the ephedrine, which is the main ingredient

16  in crystal methamphetamine.  And they don't sell it anymore.

17       And back then, this is when it was first started to be

18  in -- the FDA started tracking it.  But we had a vendor's

19  license and we could get it really -- it was pretty cheap by

20  the case.

21       We was taking out the cases, the pills from the mini

22  thin bottles.  We would buy them a case at a time.  And then we

23  would cap them, take the pills out and dump them into a plastic

24  bag.  And then we would send the mini thins out to California

25  or we would take them.  If we drove, we would take them.  But 9

 1    times out of 10, we would send them by mail.

 2    Q.  All right.  I want to focus on some of the things that you

 3    just said.  You were talking about mini thins, and you

 4    described them as ephedrine?

 5    A.  Yes.

 6    Q.  Is that a tablet?

 7    A.  Yes, it is.

 8    Q.  And you indicated that you obtained it in a large quantity;

 9    is that a fair statement?

10    A.  Yeah.  We was buying 12 cases at a time.

11    Q.  Now, you said 12 cases of pills or 12 cases of bottles

12    containing pills or what?

13    A.  Twelve -- each box of mini thins contains 144 bottles of

14    mini thins.  And each bottle contains 60-milligram tablets.

15    And there are 60 tablets in a bottle.

16    Q.  And you would get 12 boxes containing 144 bottles

17    containing 60-milligram tablets of 60 pills, each?

18    A.  Yeah.

19    Q.  Is that accurate?

20    A.  Several times, I've gotten up to 18 cases.

21    Q.  And when you obtained these cases, where did you get them

22    from?

23    A.  From D & R Wholesale.

24    Q.  And was that a business?

25    A.  It was a wholesale, just like the name says.

1   Q.  Did you have to have some sort of a license to obtain those

2   pills?

3   A.  No.

4   Q.  How did you obtain them then?  You mentioned something

5   about a vendor's license?

6   A.  Yeah.  The gentleman that, that owned the store, he was an

7   older gentleman.  And I guess he liked young, young women.  And

8   I would always go in to flirt with him.  And I would do the

9   ordering of the case of the mini thins.

10  Q.  Now, once you obtained these cases of mini thins, you

11  indicated that you de-capped them.  What does that mean?

12  A.  I would take it and open up the cases of mini thins, and I

13  would take them out, per bottle.  And I would take a razor

14  blade knife and slice the bottom of them, of the pill bottle

15  open, and dump them into a gallon Ziploc baggie.

16  Q.  And then how did you package them for shipment to

17  California?

18  A.  Well, you would put them in a box.  Depending on how many

19  boxes -- or how many cases I could de-cap, you would put them

20  in the box.  And then I would put the spray foam in.

21          Normally I would put the box, and then put the spray

22  foam on the bottom.  And then you would start stacking the

23  pills.

24  Q.  Okay.

25  A.  Okay?  And the rule was, the rule of thumb was you only put

```
 1   one case in one, in one Ziploc baggie, so that way we have a

 2   count of the cases also.  Are you following me?

 3   Q.  Yes.

 4   A.  Okay.  And then once it got to the top, I would take the

 5   spray foam, which is an insulator that you use for your houses

 6   or whatever, and I would spray the top and then close it and

 7   seal it.

 8   Q.  After you sealed it, what did you do with it?

 9   A.  I mailed it out in the mail.

10   Q.  And did you address the label?

11   A.  Yes, I did.

12   Q.  Who did you address the label to?

13   A.  A lot of times, I would do the hokie-doke (phonetic), and I

14   would send it to either myself at a hotel in California and

15   leave from Columbus, Ohio and fly and arrive at LAX by the time

16   the package got there.  And there was a several times that we

17   sent it out to Holiday.

18   Q.  By name?

19   A.  Vincent Winthorp.

20   Q.  Okay.  And when you sent it out to Holiday or Vincent

21   Withorp (ph), did you put an address on it?

22   A.  Yes, I did.

23   Q.  And what was the address?  Do you recall the address now?

24   A.  It's 19009, I can't remember -- I can't remember.  It's

25   been so long.  No, I'm not going to say that I do.
```

1    Q.  Was the address that you provided on the label the same

2    address that you went to when you visited Holiday or Vincent

3    Withorp in California?

4    A.  Yes.

5    Q.  Okay.  How many times would you say you de-capped and

6    mailed cases or large quantities of these ephedrine pills to

7    California, to Vincent Withorp?

8    A.  Over a period of three years, a lot.

9    Q.  And does that include the times where you would mail it to

10   yourself at a hotel?

11   A.  Yes.

12   Q.  What did you do once the pills left your possession and

13   were on their way to California?

14   A.  If Bugs was there, which normally he was there, he would

15   take them to Holiday, and Holiday would take them to Mr. Bill.

16   Q.  Who is Mr. Bill?

17   A.  He was the methamphetamine cook in California.

18   Q.  Did you meet him?

19   A.  Couple times I did.

20   Q.  And what happened to those ephedrine pills?  Were they used

21   for the manufacture of meth, to your knowledge?

22   A.  Yeah.  They was cooked down and the ephedrine was boiled

23   down on them.  And then methamphetamine was made.

24   Q.  How much methamphetamine did you get from the pills that

25   you sent?  So, for example, if you know, 10 boxes or cases of

1  pills made how much methamphetamine?

2  A.  The way Bill made it, I'm pretty sure that I think it was,

3  like, for one, for one individual box of pills, which was one

4  Ziploc baggie, I think anywhere between 2 to 4 ounces.

5  Q.  So one Ziploc bag represented a certain quantity of pills

6  and it was 2 to 4 ounces of meth?

7  A.  If I'm correct, recalling correctly, yes.

8  Q.  What was the expectation from the 12 or 18 boxes that you

9  mailed out?  How much did you expect to be manufactured from

10 that quantity?

11 A.  At least a pound, if not over.

12 Q.  And when you say produced meth, and at least a pound, is

13 that pure methamphetamine, to your knowledge?

14 A.  Well, the drug was tested when, when my house got raided in

15 19 -- in December of 1996 from a package that came from

16 California.  The methamphetamine tested 99.9 percent pure.

17 Q.  So what happens with 99, for example, 9 percent pure

18 methamphetamine, if you're going to be using that for

19 distribution?  Do you sell it like that?

20 A.  No.

21 Q.  What do you do to it?

22 A.  You stomp it.

23 Q.  All right.  What does the word "stomp" mean?

24 A.  That means you put -- we used -- you can use niacin, B12,

25 all kinds of different cuts that you can use.  You can put a

2:11-cr-20129-RHC-MAR  Doc # 1070  Filed 11/01/14  Pg 106 of 174  Pg ID 5346
JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

106

1    one to one.  If you had 448 grams, you put 448 grams on for a

2    cut.  Because --

3    Q.  So you could convert 1 pound to 2 pounds?

4    A.  Correct.

5    Q.  And 50 percent of that would constitute the 99.9 percent

6    pure meth, and the other 50 percent would be a cut?

7    A.  Right.

8    Q.  And you, you indicated niacin or B12.  Are those vitamins?

9    A.  Yes.

10   Q.  So you can cut methamphetamine with vitamins?

11   A.  Yes.

12   Q.  And why would you do that?

13   A.  Money.  Profit.

14   Q.  Explain that.

15   A.  And also, a lot of people couldn't do that strong of dope,

16   because if they did that strong of a dope, they would be

17   outrageous.  Yeah.  It wouldn't be good.

18   Q.  So when you talk about one reason, it's perhaps a health

19   reason; is that an accurate statement?

20   A.  Right.

21   Q.  What about the profit reason?  Explain that.

22   A.  Well, any time you cut something down and you break it

23   down, you make one -- two pounds out of one, I mean, that's

24   $2,000 an ounce.  I mean, you do the math.

25   Q.  All right.  So it was selling for $2 ,000 an ounce after it

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1   was cut?  Or before it was cut?

2   A.   That was what we always sold it for.

3   Q.   After it was cut?

4   A.   It depends on who Bugs was dealing with, really.

5   Q.   And who Bugs was dealing with, meaning who his supplier

6   was?

7   A.   No.  Who he was supplying it to.

8   Q.   And what -- why would that matter?

9   A.   Well, because you just didn't give certain people dope that

10  you cut.

11  Q.   Okay.  Can you give the jury an example of the certain

12  people that he didn't give cut dope to?

13  A.   One of our regular customers was Tim Grandy in Lancaster.

14  He would never cut his dope.

15  Q.   All right.  Did, did your husband participate in these

16  travels to California and back?

17  A.   Yes.  Or he put me -- or I did.

18  Q.   So it was either one or both of you?

19  A.   It was either one or both.

20  Q.   Okay.  Can you give the jury an estimate of how many pounds

21  of methamphetamine during this 3-year period of time you were

22  bringing back and forth?

23  A.   Honestly, a true estimate, I mean, a bunch.  I can't --

24  Q.   Can you give specific examples that you do recall where you

25  either transported meth back or had it delivered in some other

1  way, that you can remember?

2  A.  I mean, I had three different identifications.  I mean, I

3  was flying pretty regular.

4  Q.  On an airplane?

5  A.  Yeah.

6  Q.  Were you using those identifications?

7  A.  Yes, I was.

8  Q.  So give me an example of one occasion where you went to

9  California and returned with methamphetamine.

10  A.  Well, my husband was out there with my daughter.  He was --

11  we was staying at the Spa Ranch.  We would go there in the

12  daytime at Spa Ranch, and then we stayed at a, at a motel that

13  was close by.  He sent me back to Ohio with a little over 2

14  pounds of dope.  And that's where I de-capped, I think it was

15  about 18 cases of mini thins.

16       And after I dropped the dope off to the person I was

17  dropping it off to, I went and capped -- I went and bought the

18  mini thins, took them back to my house.  I capped them, and

19  then sent them out in the mail and flew back out to California

20  that same day.

21  Q.  Okay.  And so you received -- you transported two pounds?

22  A.  Yes, I did.  It was over two pounds, actually.

23  Q.  Where did you transport it?

24  A.  From, it was Fontana, California where the belt was made

25  for me to wear, and I left from the LAX up there.  And I

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

```
 1   transported it back to Indianapolis, Indiana where a brother
 2   and an old lady picked me up and I went to his house.
 3   Q.  So a belt was made.  What's that?
 4   A.  It was a belt that carried the dope -- that I carried the
 5   dope in.
 6   Q.  Who made it?
 7   A.  Holiday did.
 8   Q.  What was it made out of?
 9   A.  Like blue jean material.
10   Q.  And how was it carried?
11   A.  Around my waist.
12   Q.  And was it -- did you tie it around your waste?
13   A.  No.  He -- it was -- I can't -- I don't remember exactly
14   what it was that he used, but it was some kind of fabric magic
15   or something.  I can't actually recall.
16           No.  It was -- he was the one that put it on me,
17   around my waist.  And I couldn't take it off.  It had to be cut
18   off, so they would know if it was tampered with when I got
19   back.
20   Q.  Was it affixed to your skin?
21   A.  No.
22   Q.  To your clothing?
23   A.  No.
24   Q.  How was it, how -- it was sealed up?
25   A.  Yes, it was.
```

1    Q.  With fabric magic?

2    A.  Yeah.  But it was the blue jeans.

3    Q.  Okay.

4    A.  And it had, like, pockets in it where you put the

5    methamphetamine.

6    Q.  And when you arrived in Indianapolis, you said?

7    A.  Yes.

8    Q.  Who met with you there?

9    A.  Donna.

10   Q.  Donna.  Do you remember her last name?

11   A.  I believe it's Reynolds.

12   Q.  Donna Reynolds.  Who is she?

13   A.  She was Hawk's old lady.

14   Q.  Hawk?

15   A.  Yeah.

16   Q.  Was he a member of the Devils Diciples?

17   A.  I don't think he was active at that time.  But yes.

18   Q.  He had been a member?

19   A.  Yes.

20   Q.  Did she pick you up by herself or did some other member of

21   the Devils Diciples also pick you up?

22   A.  No.  She picked me up by herself.

23   Q.  And where were you taken?

24   A.  To Lancaster, Ohio, to Hawk's chicken farm there.

25   Q.  And what happened then?  Did you remove the package or the

111

1    belt or was that removed by some other person?

2    A.   No.  Hawk did that.

3    Q.   So he removed it from your person?

4    A.   Yes.  He cut it off.

5    Q.   And did he open it in front of you?

6    A.   Yes.

7    Q.   And what was inside?

8    A.   Methamphetamine.

9    Q.   Okay.  Describe -- and then that same day, you purchased

10   more mini thins?

11   A.   Yes.

12   Q.   And you went back and did this cycle again; is that

13   accurate?

14   A.   Yes.  I mailed it out, I mailed the package out to the Spa

15   Ranch.  I got there before the package even arrives.  And --

16   Q.   The package of mini thins?

17   A.   Yes.

18   Q.   So you mailed out another shipment of mini thins, you flew

19   out to California, and your testimony is you arrived in

20   California before that package made it, the package of mini

21   thins?

22   A.   Correct.

23   Q.   What happened then?

24   A.   Well, I remember one particular time that I didn't wait for

25   the, for the insulin, or the isolation to, to dry and the

```
 1   package bulged at this particular time.  And my husband was

 2   very, very pissed off about that.  And I actually got my ass

 3   beat over that.

 4   Q.  So when you had put together the package, would that have

 5   been in Ohio?

 6   A.  Yeah.  It was at my house.

 7   Q.  And you're talking about the insulation material that you

 8   used to line the box that contained the mini thins?

 9   A.  Yeah.  The spray, it's spray foam.

10   Q.  The spray foam?

11        And tell the members of the jury what you did wrong.

12   A.  I didn't wait for it to dry.  And I put too much in there.

13   And I had too many, too many Ziploc baggies of the mini thins

14   in there from what we normally would have sent out.  Because my

15   husband was already out there also.  And I didn't wait for it

16   to dry.  I went ahead and packaged it up, put the tape on it.

17        And when it, when it, when it finally got to dry, the

18   package expanded and it just looked really, you know.

19   (Indicating).

20   Q.  What's wrong with that?

21   A.  It was a sure sign that something was wrong with the

22   package.

23   Q.  And so if there's a sure sign that something is wrong with

24   the package, how is that a problem?

25   A.  Because that's how you get busted.  That's how you get
```

1  raided.

2  Q.  So was that the concern?

3  A.  That was Bugs's concern, yeah.

4  Q.  Okay.  And as a result, he, you said that he beat you as a

5  result of that?

6  A.  Yeah.  He -- yeah.

7  Q.  How severely did he beat you?

8  A.  It depends.  Any ass-beating is serious, but I can't

9  recall.  I don't -- I just remember him beating my ass.

10  Q.  Did that happen often?

11  A.  Yeah.  Quite a few times.

12  Q.  Now, can you just tell the members of the jury around what

13  time period we're talking about?  I know we've gone over it

14  before, but just to -- this is the early 1990s; is that

15  accurate?

16  A.  Yes.

17  Q.  Did you ever receive methamphetamine in the mail?

18  A.  Yes.  A couple different times.

19  Q.  Can you tell the members of the jury about that?

20  A.  One time, I think we got, I think it was a pound.  And it

21  was packaged in Christmas bulbs that was came from California.

22  And the next package that came from California was the package

23  that got my house raided.

24  Q.  So before we talk about the raid, you said that there was

25  methamphetamine.  You said how much?

1    A.  I believe it was a pound.

2    Q.  And it was packaged in Christmas decorations?

3    A.  Christmas lights.  Yeah, Christmas bulbs.

4    Q.  And where did that package come from?

5    A.  I know it came from Holiday and the Spa Ranch.  We didn't

6    have their address on the outside of the box, though.

7    Q.  Okay.  During --

8         MR. PITTS:  I'm going to object, your Honor.

9    Foundation as it relates to that last bit of testimony.

10        THE COURT:  Foundation.  You can --

11   BY MS. MOHSIN:

12   Q.  How do you know that it came from California?

13        MS. MOHSIN:  Thank you, your Honor.

14        THE WITNESS:  How do I know it came from California?

15   BY MS. MOHSIN:

16   Q.  Yes.

17   A.  Because my old man was talking about it on the phone.

18   Q.  And who was he talking with?

19   A.  Holiday.

20   Q.  What, what did -- what did he tell you?

21   A.  That just he --

22        MR. PITTS:  I'm going to object.  Objection.  Hearsay.

23        THE COURT:  Overruled.

24        THE WITNESS:  What do you mean?  I'm sorry.

25        THE COURT:  404(d)(2)(E).

1              Go ahead, Ms. Mohsin.

2              MS. MOHSIN:  Thank you.

3              THE COURT:  You can go ahead and answer.

4    BY MS. MOHSIN:

5    Q.  What was he talking to Holiday about?  How did he know the

6    meth was coming?

7    A.  He told me it was coming.  I was the one that always picked

8    up the package.

9    Q.  And so this was not the first time you received a package?

10   A.  No.

11   Q.  And how many times would you say you picked up a package,

12   roughly?

13   A.  From -- about three.  Three for sure.

14   Q.  And where would you go to pick up the package?

15   A.  The first time, it came to our house.  The second two

16   times, it came to our neighbor's house.

17   Q.  And when it was being shipped to you, did it ever have Mr.

18   Holiday's name on it or his real name on it?

19   A.  No, it did not.

20   Q.  But you knew that it came from him?

21   A.  Yes, I do.

22   Q.  Was your husband -- did your husband send you to pick up

23   the package whenever it was due to be delivered?

24   A.  Yes.

25   Q.  And on each of those instances, did he say that he was

1    expecting a package from Holiday?

2    A.  Yes.

3    Q.  And did he tell you to look for a package with a different

4    name?

5    A.  It would come at a specific time.  And they would always

6    have a tracking number that I would call UPS and check to see

7    when the box was coming or when it was going to arrive so I

8    could be there.  He was always on the, on the time.

9    Q.  Did there ever come a time where a package was late?

10   A.  Yes.

11   Q.  If a package was late, what did you guys do?

12   A.  Normally, well, when the package was late, I called UPS.

13   And that's when they told me that it was a delay in it.  They

14   didn't give me a reason why, but just that it was delayed.  And

15   then that's when they raided my house.

16   Q.  Okay.  So, and before we get to the raid, if a package was

17   going to be late, did that, did that make you or your husband

18   contact anyone to find out what happened, meaning not, not UPS,

19   but the person who sent the package?

20   A.  No.  My husband, on this particular batch of dope that got

21   caught, that when my house was raided, he set up two-way

22   radios --

23   Q.  Tell us about that.

24   A.  -- on that particular day.  And I took one and he had one.

25   And he was listening to the scanner the whole time when I went

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1    to pick up the package.

2    Q.  What's a scanner?

3    A.  A police scanner.

4    Q.  So your husband had a police scanner?

5    A.  Yes.

6    Q.  And what, what did he do with this police scanner?

7    A.  He listened for either our addresses or blips in the radio.

8    Q.  So, to see if someone was coming?

9    A.  Right.

10   Q.  And now you've talked a couple times, or at least mentioned

11   a couple times that your house was raided.

12   A.  Yes.

13   Q.  And on this occasion with the two-way radio, the package is

14   late; is that right?

15   A.  The package is late.

16   Q.  Does there come a time where it is delivered?

17   A.  Yes.

18   Q.  But late?

19   A.  It was late, yes.

20   Q.  Tell the members of the jury what happened on that

21   occasion.

22   A.  It was December 16th, 1996.  I was addressing Christmas

23   cards and waiting on the package to arrive UPS.  And my two-way

24   radio, my batteries went dead.  I didn't think nothing about

25   it.  I went ahead and was addressing my Christmas cards in my

1    van waiting on this package.

2         And when the UPS van drove up, I had a funny feeling

3    about it.  So I walked over to the door, to my neighbor's

4    house, Troy Harden's.  And I signed for the package, I opened

5    up the door and I threw it in his house.

6    Q.  And why did you throw it?

7    A.  I had a bad feeling.

8    Q.  So what happened then?

9    A.  I had cops coming for me from all different directions.

10   Q.  Did you get arrested?

11   A.  Yes, I did.

12   Q.  What was in the package?

13   A.  Methamphetamine.

14   Q.  About how much; do you know?

15   A.  It was a pound.

16   Q.  And where did you -- where did you expect it was coming

17   from?

18   A.  California.

19   Q.  Did anybody else get arrested, like your husband, at the

20   time?

21   A.  No.  See, my -- that's the thing.  My old man, with the

22   scanner, when he heard -- he, he heard the words, "she has the

23   package in her possession."

24        So he took my daughter and in a four-wheel-drive Jeep

25   and went out the back way of our house, because we lived in the

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1    country.  And he got away.

2    Q.  All right.  So you were arrested for that charge?

3    A.  Yes, I was.

4    Q.  Now, before we talk about what happens after you get

5    arrested, I want to spend a little time focusing on the time

6    before you got arrested.  You're getting these quantities,

7    these pound quantities of methamphetamine, you and your

8    husband.  What are you doing with them?

9    A.  We're selling them.

10   Q.  And who are you selling them to?  I want you to focus on

11   members of the Devils Diciples.  I'm sure you're selling them

12   to a lot of different people.  Who are you selling them to, any

13   members of the Devils Diciples?

14   A.  Yeah.  Lightning used to come down from -- he was part of

15   the Defiance, Ohio chapter.  Fat Dog used to come down from

16   Michigan.  I don't know, I think Hombre was in prison at that

17   time.  So just --

18   Q.  You're drawing a blank?

19   A.  Yeah.

20   Q.  Were there other members?

21   A.  Yeah.  You mean that picked up methamphetamine from my

22   husband?

23   Q.  Yes.

24   A.  Yes.

25   Q.  You mentioned Fat Dog.

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1   A.  Yes.

2   Q.  Is this the national president you had referred to earlier?

3   A.  Yes, it is.

4   Q.  At this time, I'm going to ask you to see if you recognize

5   Fat Dog in the courtroom here today.

6   A.  Okay.  Yes, I do.

7   Q.  Could you please point him out?

8   A.  He's in black and white shirt.

9       MS. MOHSIN:  Indicating the defendant, your Honor.

10      MR. SABBOTA:  No objection.

11      THE COURT:  Mr. Sabbota noted.  Mr. Smith?

12      MS. MOHSIN:  Mr. Smith.

13  BY MS. MOHSIN:

14  Q.  I would also like you to identify the individual, have you

15  seen him in the courtroom here today, the individual you've

16  talked about as Holiday?

17  A.  He's the first gentleman on the, on the row.

18      MS. MOHSIN:  Identifying the defendant, your Honor,

19  for the record.

20      THE COURT:  Noted.  That's Mr. Witort?

21      MS. MOHSIN:  That's Mr. Witort.

22      MR. PITTS:  Yes.  That's acknowledged, your Honor.

23      THE COURT:  Thank you.

24  BY MS. MOHSIN:

25  Q.  It's been some time since you've seen these two

1  individuals?

2  A.  Yes, it has.  Quite a few years.

3  Q.  Quite a few years.

4       Did they look any different when you, when you last

5  saw them?

6  A.  Oh, yeah.  They was definitely younger.

7  Q.  Okay.  And I'm going to show you some pictures in a few

8  moments.

9       When you say Fat Dog would get some of the meth that

10  you obtained from Holiday, can you tell the members of the jury

11  about that?  How did that work?

12  A.  He always would come down from Michigan.  Some of the time

13  we went to him, but it was very rare.

14  Q.  And did this occur once, or more than once?

15  A.  More than once.

16  Q.  Can you give any estimation of approximately how many times

17  you may have interacted with him for the purposes of exchanging

18  methamphetamine?

19  A.  That was part of the -- that's really hard to say, but

20  normally every time you talked dope, yes, we would usually see

21  him.

22  Q.  And you indicated on some occasions he came to you, and on

23  other occasions, what happened?

24  A.  We would come up to Michigan.

25  Q.  So what quantity of methamphetamine was provided to Mr.

1    Smith or Fat Dog during the interactions that you had?

2    A.   From my recollections, my memory, I remember weighing out

3    one time four ounces for him.  I weighed out two ounces before.

4    It just depended what we was working with.

5    Q.   Okay.  Four ounces or two ounces?

6    A.   Yeah.

7    Q.   And was that sort of a common or an average of the amount

8    that was routinely provided to Mr. Smith?

9    A.   I couldn't say for sure.  I just know what I've done.

10   Q.   So on the instances where you were asked to weigh out,

11   those were the measurements?

12   A.   Right.

13   Q.   How did you weigh it out?

14   A.   On digital -- or we started out on triple beams.

15   Q.   A triple beam, what, scale?

16   A.   Scale, yeah.

17   Q.   And at some point, that changed?

18   A.   To digital, yeah.

19   Q.   Okay.  On the occasions that you weighed it out, were you

20   asked to do that?

21   A.   Yes, I was.

22   Q.   And how much did you charge Fat Dog for those quantities?

23   A.   You know, I really can't say because I don't know.  He was

24   the national president, so I know a lot of times my old man

25   would either give it to him or front it to him.

1   Q.  Okay.  So you never took any money from him?

2   A.  No.  I used to send money, federal -- or Western Union.

3   Q.  All right.  And we should talk about that in a moment.

4           But with respect to, to Fat Dog, did you -- you never,

5   yourself, took money from him; is that a fair statement?

6   A.  That's -- yes.

7   Q.  Were there other occasions where you were aware that your

8   husband was providing him with methamphetamine?

9   A.  Well, yeah.  Because 9 times out of 10 I had

10  methamphetamine on me.

11  Q.  What does that mean?  Can you explain that to the jury?

12  Why would you have it on you, and he was giving it to Mr. Smith

13  or "Fat Dog"?

14  A.  Because if we got caught up in between point A and point B,

15  and I would be the one going to jail, not him.

16  Q.  Why was that?

17  A.  Because he's been in jail several times, in prison several

18  times.  And the next time he got busted, he was looking at a

19  really long time.

20  Q.  So did he ask you or did you volunteer to be arrested and

21  go to jail if you were caught?

22  A.  It was just something I did.

23  Q.  Okay.  So you had the meth on you?

24  A.  Right.

25  Q.  What type of quantities would you be holding at one, any

2:11-cr-20129-RHC-MAR  Doc # 1070  Filed 11/01/14  Pg 124 of 174  Pg ID 5364
JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

124

```
 1   given time when Fat Dog was going to receive some?
 2   A.   Normally, if, if they was coming there, I would just weigh
 3   out what they wanted, either give it to Bugs, take it out to
 4   the garage, or whatever.
 5   Q.   And if you were traveling to Michigan?
 6   A.   And we kept everything together.
 7   Q.   So what type of quantities?  Ounces?
 8   A.   Ounces, yeah.  Because that's -- he's not the only one we
 9   had in Michigan that we would stop and see.
10   Q.   Were there other members of the Devils Diciples that you
11   stopped to see?
12   A.   There was -- well, yeah, one of them particular, yes.
13   Q.   Who?
14   A.   That would be Hombre.
15   Q.   Hombre was another one you were delivering methamphetamine
16   to?
17   A.   Yeah.
18   Q.   Now, you had mentioned earlier an individual by the name of
19   Sherri?
20   A.   Yes.
21   Q.   And you had said something about her needing a ghost?
22   A.   Yeah.
23   Q.   Can you tell the members of the jury a little bit about
24   what you were referring to?
25   A.   Well, when they -- when Bugs would send people out to
```

2:11-cr-20129-RHC-MAR  Doc # 1070  Filed 11/01/14  Pg 125 of 174  Pg ID 5365
JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

125

1    California to get dope, if it wasn't me or it wasn't him, they

2    had what they called a drug mule, which was Sherri.  And since

3    she was flying with a pound of dope, I mean, if you add up how

4    much money that is, that's quite a few bucks.

5    Q.  How much is it?

6    A.  Gee, I don't know.  Like, 32,000.

7    Q.  Okay.  So a pound of dope is 32,000.  Is that before cut is

8    put on it if you're going to put cut on it?

9    A.  That's before cut is put on it, yes.

10   Q.  So potentially, if you put a 50 percent cut on it, it's

11   worth at least $64,000?

12   A.  At least.

13   Q.  Okay.  So she was one of the individuals that was muling?

14   A.  Yes.

15   Q.  Is that the term?

16   A.  Yes.

17   Q.  And how do you know that?

18   A.  Because I would like -- I'll speak on one occasion.  When I

19   got put up bond and got out of jail in 1997, this was after my

20   house was raided in '96, my husband posted a thousand --

21   100,000 bond for me.  And it took him a couple months to get

22   the money together, but he finally did it.

23          The night I bonded out of jail, we went to the

24   airport, the Columbus airport, driving two different vehicles.

25   I picked up Jungle Man, and my husband picked up Sherri.  She

1  was bringing in the dope.  Jungle Man was the one that was

2  ghosting her.

3  Q.  So he was following her?

4  A.  Right.

5  Q.  And is Jungle Man someone you know?

6  A.  He's also a Devils Diciples.

7  Q.  Do you know what chapter he's a member of?

8  A.  I want to say he's from Florida, but I'm not for sure.

9  Q.  Okay.  And so you and your husband traveled to the airport?

10  A.  Right.

11  Q.  And why did you travel in two cars?

12  A.  Because we was picking up two individuals at two

13  different -- at the same time, but --

14  Q.  From the same flight?

15  A.  From the same flight, but we just didn't want to be

16  together.

17  Q.  Why didn't you want to be together?

18  A.  She was bringing in the dope, and I was picking up Jungle

19  Man.

20  Q.  And what did you guys do after you picked up Jungle Man and

21  Sherri?

22  A.  Bugs took Sherri to a motel room and signed her in there

23  and got the dope.  And then he met me and Jungle Man up at the

24  house.

25  Q.  Did you see the dope?

1    A.  Yeah.

2    Q.  How much dope was it?

3    A.  It was, it was a pound.  Definitely.

4    Q.  And did you know where it came from?

5    A.  Yes, of course I did.

6    Q.  Where it did come from?

7    A.  It come from California.

8    Q.  Where in California?

9    A.  It come --

10          MR. PITTS:  Objection.  Foundation.

11          MS. MOHSIN:  I can lay the foundation, Judge.

12          THE COURT:  Go ahead.

13   BY MS. MOHSIN:

14   Q.  Where did it come from?

15   A.  It came from Holiday's.

16   Q.  How do you know that?

17   A.  Because that's where the -- that's where Bugs had sent the

18   money to.

19   Q.  And how did the money get sent to California?

20   A.  I believe Western Union.

21   Q.  And who delivered that Western Union?

22   A.  I delivered -- I -- Western Union, like, two or three days

23   later.  I don't remember how much it was, but it was quite a

24   bit of money.

25   Q.  So the dope arrived first?

1    A.  Right.

2    Q.  And then were you asked to deliver or send the money,

3    Western Union, to Holiday?

4    A.  A couple days later, because there was still money owed on

5    the package.

6    Q.  All right.  So that's how you knew that it came from

7    Holiday?

8    A.  Yes.

9    Q.  And you don't recall how much money it was?

10   A.  No.  It was, it was a few grand, though.

11   Q.  Okay.  You indicated earlier that you did not need a ghost.

12   A.  No, I did not.

13   Q.  Why is that?

14   A.  Because I was trusted.  My old man trusted me.

15   Q.  You mentioned that you sent money via Western Union.

16   That's not the first time that you had done that?

17   A.  No.  I used to send money Western Union all the time.

18   Q.  And what type of quantities of money did you send, do you

19   remember?

20   A.  Thousands.

21   Q.  Thousands at one time or in total?

22   A.  In total, I mean, thousands, yeah.  It was always big money

23   I sent.  It wasn't never 400 or $500, no.  It was never that.

24   Q.  So in each instance of Western Union, I keep wanting to say

25   telegram, but it's a money gram, you sent a certain quantity of

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1    money that was in the thousands each time?

2    A.  Yes.

3    Q.  And who did you send that money to?

4    A.  I sent money to all the different kinds of people.

5    Q.  Okay.  Did you send any to Holiday?

6    A.  I sent money to Holiday, I sent money to Fat Dog.  I sent

7    money to his wife, Gail, or his girlfriend, Gail.

8    Q.  Whose girlfriend, please?

9    A.  Fat Dog's.

10   Q.  Okay.  Did you know her?

11   A.  Yes.  I've met her, yes.

12   Q.  What was her name?

13   A.  Gail Sweeney.

14   Q.  Okay.  Who else?

15   A.  They used to have the records.  I mean, it's --

16   Q.  You can't recall?  If you can't recall, you can't recall.

17   A.  No, I can't.  I mean, I remember Magoo a couple times.

18   California, we sent money out there.

19   Q.  Now, you just mentioned an individual by the name of Magoo.

20   Who is that?

21   A.  Patrick McCormick.

22   Q.  And is Magoo a nickname?

23   A.  Yes, it is.

24   Q.  Do you recognize him in the courtroom here today?

25   A.  Yeah.  Actually, he's sitting over there.

1    Q.   Okay.  Can you point him out, please?

2    A.   He's in the gray shirt.

3         MS. MOHSIN:  Indicating the defendant, your Honor.

4         MR. KRAIZMAN:  We so acknowledge.

5         THE COURT:  So noted.

6    BY MS. MOHSIN:

7    Q.   So on occasions, you sent him money?

8    A.   Yes.

9    Q.   Now, still again, before the raid at your house, did you,

10   did you have any methamphetamine-related interactions with

11   Magoo?

12   A.   Yeah.  We did.

13   Q.   Can you tell the members of the jury about that?

14   A.   He, he came down, he stayed with us for a while, Magoo did.

15   And he brought his girlfriend down, Penny.  And he was cooking

16   methamphetamine in a burned-out house that was in front of our

17   trailer.  And I know it used to frustrate my old man, because

18   nothing ever good came from the cooks.  I mean, the dope that

19   Magoo was cooking was not good.

20   Q.   When you say it was not good, it was not of good quality?

21   A.   Right.  It didn't have no legs on it.  It wasn't, it wasn't

22   what people wanted to buy.

23   Q.   So I want to direct your attention now to what you just

24   described as your -- the property that you lived on.  Is this

25   where you lived with Bugs, in Ohio?

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

131

1    A.  One of the houses, yeah.

2    Q.  Did you own more than one house?

3    A.  We owned that house.  No, we didn't own that -- more than

4    one.

5    Q.  Was there more than one house on that property?

6    A.  Yes.  There was a trailer and then there's a house that got

7    burned up.

8    Q.  And the house that got burned up, was it still able to be

9    occupied in some capacity?

10   A.  Yeah.  I mean, he had a garage and his motorcycles in the

11   downstairs part of it.

12   Q.  "He" who?

13   A.  Bugs.

14   Q.  Bugs did.  Okay.  So in this house that was burned out or

15   partially burned out as you've described, you said that Magoo

16   was cooking there?

17   A.  Yes.

18   Q.  Can you describe that with a little more detail for the

19   jury, please?

20   A.  Well, it was, it was an upstairs bedroom.  And it had fans

21   in the window.  And he just had it -- he had a lab there.  He

22   had the beakers and mini thins and hot plate, and the tubing.

23   Q.  Why was he cooking meth on Bugs' property?

24   A.  Because Bugs -- I don't know how that came about with him

25   and Magoo.

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1   Q.  Okay.

2   A.  But obviously, he was supposed to have cooking some good

3   dope.  I've never done any of the dope that was good.

4   Q.  So it was your understanding that he had a reputation for

5   cooking good dope?

6   A.  Yeah.

7           MR. KRAIZMAN:  Objection.  Leading.

8           THE COURT:  Overruled.

9   BY MS. MOHSIN:

10  Q.  And you had, you had tried the dope he produced?

11  A.  Yes, I have.

12  Q.  And your conclusion was what?

13  A.  It was -- it didn't have legs.  It didn't have -- like, you

14  could do the methamphetamine that was coming out of California,

15  you would do a line and be up for a day and a half, two days.

16  You would do a line of the dope that Magoo did and it just

17  wouldn't -- the buzz wasn't there.

18  Q.  So it was different in quality from the methamphetamine

19  that was being sent from California?

20  A.  Yes.

21  Q.  Where were the pills that you described, the mini thins

22  that you described coming from -- for Magoo to manufacture that

23  meth?

24  A.  D & R Wholesale.

25  Q.  Did you supply him with any of those pills?

 1   A.  Yes, I did.  And there was one time that I took Magoo out

 2   there that I remember.

 3   Q.  Okay.  To the wholesale place?

 4   A.  To D & R Wholesale, yeah.

 5   Q.  For what purpose?

 6   A.  To get the pills.

 7   Q.  So the pills that were provided, were they in similar

 8   quantities to the multiple cases, the 12 and 18 cases you

 9   identified earlier?

10   A.  Same quantities.

11   Q.  And how long did Magoo manufacture meth inside that lab on

12   the property?

13   A.  He tried it two or three times.  And it just wasn't -- it

14   would piss my old man off.  And that's when he started back out

15   west again.

16   Q.  So it was a short-term thing?

17   A.  Yeah.  A couple months.

18   Q.  Now, you described a short time ago the occasion when your

19   house was raided.  And you indicated no one else was arrested?

20   A.  Correct.

21   Q.  What did you do after your house was raided and you were

22   arrested?

23   A.  I went to jail.

24   Q.  You went to jail.

25        And what happened next?  Did you have a plea of

1    guilty?  Did you -- were you released on bond?  What happened?

2    A.   No.  I was released on bond.

3    Q.   And you testified earlier that your husband posted the

4    bond; is that accurate?

5    A.   Correct.

6    Q.   And so what happened while you were on bond?

7    A.   I went, we was going to have a jury trial and I ran from

8    the jury trial.

9    Q.   So you fled?

10   A.   I fled, yes.

11   Q.   Okay.  Why did you flee from the jury trial?

12   A.   Because it took them a long time to carry in the evidence.

13   The elevator was broke down at this particular time.  And it

14   was on the 2nd floor of the Perry County Courthouse in Ohio.

15   And when we broke for lunch, my husband was in jail actually

16   next door in Perry County.

17   Q.   For the same or a different offense?

18   A.   For a different offense.  And I was scared.  So I asked

19   him, I said, you know, they've got a lot of evidence against

20   me, Bugs.  I was looking at a lot of time.  I was the first lab

21   in Ohio to be busted and they was using me as an example.

22           And he told me to take the money and run.  He told me

23   where to find out -- where I could find the money at in the

24   van, and I went and got the money and I ran.

25   Q.   And when you say "take the money and run," did you visit

1    him in jail?  Where is this conversation taking place?

2    A.  No.  The conversation is taking place in between the jail

3    and the courthouse in the hallway that went down.

4    Q.  So --

5    A.  Actually, the -- they had windows with bars on it, that in

6    the summertime, you can see in and they could see out.  And but

7    it was coming, it was coming winter.  I can't remember when it

8    was exactly.  But, you know, the conversation was held outside

9    of a building.  I was on the outside; Bugs was on the inside.

10   Q.  And what type of money did he tell you to take?

11   A.  I believe it was, it was over $15,000.

12   Q.  Okay.  And you said that it was, it was hidden.

13   A.  Yeah.  It was hidden.

14   Q.  Did you know that there had been money hidden?

15   A.  No.  I had no idea when he was arrested that there was even

16   money there.

17   Q.  So did you find it?

18   A.  Yes, I did.

19   Q.  What did you do?

20   A.  I left.  I ran.

21   Q.  Where did you go?

22   A.  I went to Defiance, Ohio.  I went --

23   Q.  Where in Defiance, Ohio?

24   A.  I went to Lightning's house.

25   Q.  A member of the Devils Diciples?

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

136

1    A.   Yeah.

2    Q.   Okay.

3    A.   And Kim, his old lady -- Lightening turned himself in.

4    He had a jail sentence to do at this time.  And his old lady,

5    Kim, hooked me up with a trailer one of her girlfriends was

6    moving out of.  And I took over payments of this trailer and I

7    lived there for about eight months.

8    Q.   All right.  And then did you have your daughter with you?

9    A.   Yes, I did.

10   Q.   What did you do after that?  Why did you leave?

11   A.   Because I messed up and I sent my telephone number to a

12   brother that was in Ohio penitentiary that we had been taking

13   care of, and is also a member of the Devils Diciples.  I sent

14   him the phone number.

15        And the day he called me, Bugs called me from

16   Cassopolis, Michigan, from that jail right after Lou just

17   called me.  And he said, honey, he says, you can't do that.  He

18   says now you got to go, you got to leave, you got to leave now.

19   So I packed up and I left.

20   Q.   Where did you go next?

21   A.   I headed out towards California.

22   Q.   And where was your destination in California?

23   A.   At that particular time, I didn't have one till Bugs told

24   me to go to Holiday's.

25   Q.   So you had a conversation with Bugs?

1   A.  Wait.  I'm sorry.  That is not correct.

2   Q.  Please correct.

3   A.  I was in Georgia.

4   Q.  Why did you go to Georgia?

5   A.  Because I dropped my daughter off there.

6   Q.  Where did you drop your daughter off?

7   A.  At my sister's house.

8   Q.  All right.  And why did you do that?

9   A.  Because Bugs wanted me to go to California, and that's when

10  I made a move.

11  Q.  And describe that for the jury, what that conversation, you

12  know, what that conversation was about.  Why you went to

13  California, what -- how you got there.

14  A.  Bugs told me we were running out of money, our money was

15  running low.  And what I needed to do was collect the money

16  that -- I can't remember where I collected the money from.  I

17  remember Sam Grandy sent me money western Union, a couple other

18  people.  I got my money together, I went to Georgia.  That's

19  when I flew out from Georgia to California.

20  Q.  On an airplane?

21  A.  Yes.

22  Q.  And when you got to California, what did you do there?

23  A.  I went and seen Holiday.

24  Q.  Holiday, the defendant who is seated here in the courtroom?

25  A.  Yes.

 1   Q.  And what did you do then?

 2   A.  I gave him the money.

 3   Q.  How much?

 4   A.  I think it was 20, 20 or $25,000.

 5   Q.  For what purpose?

 6   A.  Methamphetamine.

 7   Q.  And did you -- did he give you any?

 8   A.  No.

 9   Q.  Why not?

10   A.  Well, my old man was in jail.  I'm a girl.  I'm not for

11   sure of the reason.

12           MR. PITTS:  Objection.  Speculation.

13   BY MS. MOHSIN:

14   Q.  What was your understanding of why?

15           THE COURT:  Foundation would be appropriate.

16           MS. MOHSIN:  Okay.

17           THE WITNESS:  I can't remember if that was the time

18   Bill's house burnt down.  I really can't remember.  But I

19   didn't go away.

20   BY MS. MOHSIN:

21   Q.  So you gave him money, and he did not give you any meth?

22   A.  Correct.

23   Q.  Did you ask him why not?

24   A.  I, yeah, I did.

25   Q.  Did he answer?

1  A.  There was something going on with the pills or something.

2  Something that wasn't, that wasn't right.  So I went to Johnnie

3  Rotten.

4  Q.  Now, Johnnie Rotten, is that another member of the Devils

5  Diciples?

6  A.  Yes, it is.

7  Q.  And was he a member?  Do you know where he was a member?

8  A.  California.

9  Q.  All right.  Why did you go to Johnnie Rotten?

10  A.  I believe that's where Bugs told me to go.  And I believe

11  he was also the president of the chapter out there.

12  Q.  And what was the purpose of visiting him?

13  A.  To get my money right.  To get this situation with the dope

14  and money correct, so I could be on my way.

15  Q.  What did Johnnie Rotten do, if anything?

16  A.  Him and Uncle Ricky, which is also a brother, had a talk.

17  I stayed at Johnnie's from that day on, for about four to six

18  weeks.  It was a long time.

19  Q.  Did you ever get the meth for the money that you had paid?

20  A.  Yes.  Eventually.

21  Q.  Okay.  I want to show you a couple of photos.

22       Let me follow up with that.  How much meth did you get

23  for the $25,000?

24  A.  I want to say it was over a pound.  It was, it was quite --

25  it was probably 20 ounces.

1   Q.  Who gave it to you?

2   A.  Holiday did.

3   Q.  And after you got it, what did you do with it?

4   A.  I packaged it up and I flew back to Ohio.

5   Q.  And when you say that you packaged it up, you put it on

6   your body or in some other location?

7   A.  No.  I always, I always flew with dope on my body.  If it

8   wasn't on you, you couldn't do nothing with it.

9   Q.  Okay.  I'm going to show you some photographs and ask you

10  if you recognize them.

11       You saw some photographs before you came to testify

12  here today; is that a correct statement?

13  A.  Yes.  That's correct.

14  Q.  Okay.

15       MS. MOHSIN:  There's no objection, your Honor.  I've

16  shown these to the defense, I've shown them to the witness.

17  Can we just expedite and move them into evidence?

18       THE COURT:  No objection?

19       MS. STOUT:  No objection.

20       MR. SABBOTA:  No objection.

21       THE COURT:  And I hear none.  Thank you.

22       MS. MOHSIN:  13-55.

23       THE COURT:  13-55?

24       MS. MOHSIN:  13-55.  11-247.  Try to put them in

25  order, Judge.

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 141 of 174   Pg ID 5381
JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

141

```
 1              THE COURT:  And are these admitted or to be admitted?
 2              MS. MOHSIN:  They -- there's no objection to their
 3    admission, so I was going to move to admit them.
 4              THE COURT:  And then, and then display them?
 5              MS. MOHSIN:  And then display them.
 6              THE COURT:  All right.  This is what you circulated,
 7    actually, just as the jury was preparing to come out, I think.
 8              MS. MOHSIN:  Yes, your Honor.
 9              THE COURT:  All right.
10              MS. MOHSIN:  They are kind of out of order, so I
11    apologize.  13-54, 13-71, 13-73, 13-112, 13-77, 13-78, 13-79,
12    13-99, 13-59, 13-100 and 12-35.
13    BY MS. MOHSIN:
14    Q.  Would you please --
15    A.  13-55 is Holiday, and he is with Fangers.
16    Q.  And which one is Holiday?
17    A.  Holiday is the one on the left.
18    Q.  Okay.  And is that, that photograph, is that what he looked
19    like when you were dealing with him?
20    A.  Yeah.
21    Q.  Okay.  Next one, please, if you'll identify it.
22    A.  I see Holiday standing the third person in.
23    Q.  What number is that?
24    A.  He's number 3.
25              THE COURT:  The number of the exhibit.
```

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1    BY MS. MOHSIN:

2    Q.  Of the exhibit.

3    A.  Oh, I'm sorry.  It's 11-247.

4           I see, I think PF is in there.

5    Q.  So Holiday you've identified as the third person from the

6    left side of the picture --

7    A.  Right.

8    Q.  -- the one --

9    A.  Standing in front of the Devils Diciple.

10   Q.  Does he have the sunglasses on?

11   A.  Yes, he does.

12   Q.  And his head is bent forward?

13   A.  Yes.

14   Q.  Can you go to the next photo?  What number is that, exhibit

15   number?

16   A.  13-54.  The third person is Holiday.  The fourth person --

17   Q.  From the left?  The third person from the left?

18   A.  From the left.

19   Q.  From the left.  Okay.

20   A.  -- is Holiday.  And then behind that is Little Dog.

21   Q.  And do you recognize anyone else in the photo?

22   A.  Yeah.  The one with the "44", I think that's Sonny.  And

23   then Fat Dog has the "Support Your Local Devils Diciples" shirt

24   on.

25   Q.  Okay.  Moving on to the next one.  Can you identify the

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1    number?

2    A.   13-71.

3    Q.   Yes.

4    A.   It goes Fat Dog, he's on the left.  Slick is in the middle.

5    Little Dog is in the -- at the far end.

6    Q.   Now, I want to talk about Slick and Little Dog for a

7    moment.  You had a blank earlier when we were talking about

8    methamphetamine selling.  As you look at these photographs, if

9    you recollect any additional information, I would ask you to

10   point it out.

11   A.   Yeah.  Fat Dog and Little Dog used to travel together a

12   lot.  And with Loose Bruce.

13   Q.   For what purpose?

14   A.   Well, when they would come to our house for

15   methamphetamine.

16   Q.   Was Little Dog one of the individuals who was also

17   purchasing methamphetamine or obtaining it from your husband?

18   A.   No.  I believe it was Fat Dog.

19   Q.   Okay.  And the individual in the middle of the top

20   photograph with a beard, do you know who that person is?

21   A.   Yes.  Slick.

22   Q.   All right.  And did he have any interaction with you or

23   your husband as it relates to the methamphetamine we've been

24   talking about?

25   A.   Yeah.  There's a couple occasions that I can remember him

1   coming down from Columbus.  He was an Ohio brother.  And he

2   would come to our farm and get the methamphetamine and take it

3   to Fat Dog in Michigan.

4   Q.  In the photo, on the bottom photo, there's two photos

5   depicted in this exhibit.  Can you identify the two individuals

6   from the furthest right and the one next to him?

7   A.  The furthest --

8   Q.  The one wearing the hat, the white baseball hat on the

9   right.

10  A.  That's Fat Dog.

11  Q.  And the one next to him to his left?

12  A.  Is Slick.

13  Q.  Anyone else that you recognize in that picture?

14  A.  Yeah.  Grog is the one with the blue jeans, with the blue

15  jean shirt on.

16  Q.  And the one whose hand is extended towards Fat Dog's hand?

17  A.  Yeah.

18  Q.  And do you know anything about Grog?  Is he a member of the

19  Devils Diciples?

20  A.  Yes, he is.

21  Q.  And have you had any interactions with him?

22  A.  No.  I can't say that I have.

23  Q.  Moving on to the next one.

24          What exhibit number is this?

25  A.  13-73.

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 145 of 174   Pg ID 5385
JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

145

1    Q.  Have you ever had any interactions with the Hells Angels?

2    A.  Yes, I have.

3    Q.  And I know we're going to talk about that at a later time,

4    but can you tell me what's depicted in this picture?

5    A.  You got two Devils Diciples patches.  One is from Michigan

6    and you got Ohio on this side.  And then in the middle is a

7    Hells Angels patch.

8    Q.  And do you know, can you tell any of these people?  Do you

9    know who any of these are?

10   A.  No.  I think Fat Dog is the, is the one that's got Ohio on.

11   Q.  All right.  Moving on to the next picture.

12          Now, this is four photographs depicted in a frame.

13   Can you recognize anyone in the top left corner?

14   A.  Yeah.  Holiday is sitting on the bike.

15   Q.  Okay.  Does he have his arms crossed?

16   A.  Yes.

17   Q.  Okay.  Moving to the right of that photograph.

18   A.  No.  That, no, I don't.

19   Q.  All right.  Anyone else that you recognize?

20   A.  In that picture?

21   Q.  Yes.

22   A.  No.

23   Q.  Okay.  In any of the other pictures depicted?

24   A.  (No response.)

25   Q.  They are not of the best quality, but --

1   A.  Yeah.  No.  The second picture I see Holiday standing with

2   his arms crossed.  And I can see Fat Dog.

3   Q.  So in the picture to the right of the top of that photo,

4   you have seen Holiday again with his arms crossed, and you've

5   identified Fat Dog as well.  And where is he standing?

6   A.  He's standing, he's right there with the blue shirt on.

7   Q.  Okay.

8   A.  His hands --

9   Q.  With the lower neck line?

10  A.  Yeah.  Has his hands in front of him.

11          MS. STOUT:  Ms. Mohsin, could you tell me which number

12  that was?  I'm sorry.

13          MS. MOHSIN:  Yes.

14          THE WITNESS:  13-111.

15  BY MS. MOHSIN:

16  Q.  The previous one.

17  A.  The previous one?  No.  I'm still --

18  Q.  Yeah, it's this one.  What number is that?

19  A.  13-11.

20          MS. MOHSIN:  13-11.

21          MS. STOUT:  Thank you.

22          THE WITNESS:  13-112.  Sorry.

23  BY MS. MOHSIN:

24  Q.  Can you go back to that photo, please, 112?

25          MS. STOUT:  Thank you.

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1   BY MS. MOHSIN:

2   Q.  Directing your attention to the bottom left photograph of

3   the four that are depicted.

4   A.  Yes.  Hawk is standing with Fat Dog.  Hawk is on the far

5   right side and then it's Fat Dog.

6   Q.  When you say "on the far right side," which photograph are

7   you looking at?  The one on the bottom right corner or the --

8   A.  The bottom right corner.

9   Q.  In the bottom right corner?

10  A.  The bottom right.

11  Q.  Right.  There are three individuals depicted.  One is Fat

12  Dog.  He has on what color shirt?

13  A.  Blue.

14  Q.  And which one is Hawk?

15  A.  Hawk is the one standing next to him.

16  Q.  Okay.  The one that he has his arm around?

17  A.  Right.  He's in brown.

18  Q.  All right.  And now, the final picture, which is on the

19  bottom left-hand portion of that screen.

20  A.  Okay.

21  Q.  Do you recognize anyone there?

22  A.  I recognize Fat Dog, and I believe that's Little Dog.  And

23  that's hugging the other one.

24  Q.  Thank you.

25          MS. MOHSIN:  Can we move on to the next picture?

```
 1   BY MS. MOHSIN:

 2   Q.  Do you recognize anyone in this picture?

 3   A.  The --

 4   Q.  What's the number, I'm sorry, the exhibit number?

 5   A.  13-77.

 6   Q.  Okay.

 7   A.  The lower, the gentleman in the hot tub, the one on the

 8   left is Fat Dog.  The one sitting next to him is Little Dog.

 9   Q.  Okay.  And --

10   A.  And the only other brother I recognize in that picture is

11   Fangers, which is standing up with his shirt off.

12   Q.  Okay.  Thank you.  Next photo?

13   A.  13-78.

14   Q.  Thank you.

15   A.  Fat Dog is on the left.  Little Dog is on the right.

16   Q.  Next one, please?

17   A.  13-79?

18   Q.  Yes.  Can you tell the members of the jury what's depicted

19   in 13-79?

20   A.  Yeah.  You got Fat Dog that's standing in front.  And then

21   from the left-hand side going to right, I don't know who the

22   second brother is.  The third brother is Johnnie Rotten.  And

23   then Holiday is standing with his camera to the back.

24   Q.  With his back to the camera?

25   A.  Yeah.  With his back to the camera.
```

1   Q.  Okay.  The next one, please.

2   A.  Is -- the next one, from the left over is Magoo and then

3   Fat Dog.  And I don't know who the brother in the middle was.

4   Q.  What's that exhibit number?

5   A.  13-99.

6   Q.  Thank you, Ms. Casey.

7           What's the next exhibit then, please?

8   A.  13-59.

9   Q.  Okay.  Can you tell us who is depicted in these photos?

10  A.  In the middle is Magoo.  And on the end, on the right is

11  Fat Dog.

12  Q.  And you don't know the other individual?

13  A.  I recognize him, but I can't tell you his name.  It's been

14  a long time.

15  Q.  Okay.  Moving on to the next exhibit, the number, please?

16  A.  Okay.  I'll start out on the left-hand side.  The first

17  brother I do not know.  The second brother is Fat Dog.  The

18  third brother, I do not know, nor the fourth.  And the one

19  sitting down on the stove is Fat Dog -- or I'm sorry, scratch

20  that -- is Magoo.

21  Q.  Okay.  Thank you.

22          Next one, by exhibit number, please?

23  A.  12-35.  No.  I cannot say.

24  Q.  Okay.  Thank you.

25          MS. MOHSIN:  Your Honor, did you want us to continue

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 150 of 174   Pg ID 5390
JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

150

1   at this point?

2          THE COURT:  Yeah.  We have another 20 minutes we could

3   fill.

4          MS. MOHSIN:  Okay.

5          THE COURT:  Do you have more examination?

6          MS. MOHSIN:  I will continue.

7          MS. STOUT:  It's my understanding she's not clear on

8   the last one, 12?

9          MS. MOHSIN:  Yes.

10         MS. STOUT:  So that won't be admitted at this point.

11  Not that it's important I realize, but --

12         MS. MOHSIN:  For the record, that was 12-35.

13         MS. STOUT:  Thank you.

14         THE COURT:  So you proffer, I think you did earlier,

15  for admission those with the exception of that last one that

16  was not identifiable?

17         MS. MOHSIN:  It was not identifiable by this witness.

18  That's correct, your Honor.

19         THE COURT:  Right.

20         MS. MOHSIN:  Thank you.

21         THE COURT:  So the others, without objection, do I

22  understand that correctly?

23         MS. STOUT:  Yes.

24         THE COURT:  No objection.  I hear no objection.  So

25  the others are received.  And they've been previously listed.

```
 1        (Exhibit 13-54, 13-59, 13-71, 13-73, 13-77, 13-78, 13-79,

 2        13-99, 13-100, 13-112 received, 1:06 p.m.)

 3            MS. MOHSIN:  Thank you, your Honor.

 4   BY MS. MOHSIN:

 5   Q.  All right.  So you -- we were talking about you're in

 6   California and you have been provided with a quantity of meth,

 7   approximately a pound.  You traveled back from California to

 8   Ohio is it?

 9   A.  Yes.

10   Q.  Directly on the airplane or through some other city?

11   A.  No.  I went through Indianapolis, Indiana.  That's where I

12   was picked up at.

13   Q.  And so when you were picked up in Indianapolis, Indiana,

14   did you have that methamphetamine, that pound or so, on your

15   person?

16   A.  Yes, I did.

17   Q.  And what happened?  Did somebody pick you up?

18   A.  Yes.  Donna Reynolds picked me up, and we drove from

19   Indiana back to Ohio.

20   Q.  And where was your destination?  Or what was your

21   destination?

22   A.  Hawk's.

23   Q.  Hawk, one of the individuals you identified in the photos

24   earlier?

25   A.  Correct.
```

1    Q.  And what was the purpose of meeting with Hawk?

2    A.  Was to drop off the methamphetamine.

3    Q.  And what was he supposed to do with it?

4    A.  Sell it.

5    Q.  And did he do that?

6    A.  My old man told me on the phone to drop off the

7    methamphetamine to different places, and which I did.  I

8    followed his instructions to a tee.  And yes, they sold it and

9    then the money was mailed to my husband in Cassopolis,

10   Michigan.

11   Q.  Okay.  Why -- what was the purpose of mailing it to him in

12   prison?

13   A.  So he could control the money that was spent and send me an

14   allotment every month.

15   Q.  Did he do that?

16   A.  Yes, he did.

17   Q.  After that shipment of meth was delivered, were you

18   still -- I should say were you still on the run?

19   A.  Yes.

20   Q.  So what did you do next?

21   A.  I went back to Georgia and picked up my daughter.  And I

22   want to say I went to -- I'm not sure.  I, I started to go to

23   Alabama, and I ended up back in California.

24   Q.  So you're not sure how you got back to California?

25   A.  I drove.  I remember that.

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1    Q.  Okay.  With your daughter?

2    A.  Right.

3    Q.  And what did you do in California?

4    A.  Gosh, I stayed at Nomad Ron's house.  I stayed --

5    Q.  Nomad Ron?

6    A.  Yeah.

7    Q.  Is he a member of the Devils Diciples?

8    A.  Yes, he is.

9    Q.  Do you know what chapter?

10   A.  California.

11   Q.  Okay.  You stayed at his house?

12   A.  Yeah.  He had a real small trailer, yeah.

13   Q.  All right.  And by the way, when you're staying at these

14   houses with various people, are you telling them that you're on

15   the run?

16   A.  Everybody -- it's common knowledge.

17   Q.  It was common knowledge that you were on the run?

18   A.  Yeah.

19   Q.  Okay.  And so they knew that, that you were wanted by the

20   police?

21   A.  Yes.

22   Q.  And they gave you a place to stay?

23   A.  Yes.

24   Q.  So what happened after you went to Big Ron's house?

25   A.  (No response.)

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1   Q.   Nomad Ron or Big Ron?

2   A.   Nomad Ron.

3   Q.   Which one?

4   A.   Nomad.

5   Q.   You stayed at his house?

6   A.   It wasn't very long.  I met some people in California

7   myself, I, that I stayed with on and off.  And then we had a

8   house fire that totally destroyed the house where me and my

9   daughter were staying at.  So then I stayed in motels for a

10  while.  And it just --

11  Q.   Did there come a time where your husband was released from

12  prison?

13  A.   Yes.

14  Q.   Were you still in California when that happened?

15  A.   Yes.

16  Q.   What did he do?

17  A.   He came out to California.

18  Q.   And for what purpose?

19  A.   To get me and my daughter.

20  Q.   And did he do that?

21  A.   Yeah.  He kidnapped my daughter.

22  Q.   Why did he do that?

23  A.   Because I was at somebody else's house.

24  Q.   And were you -- did you agree or disagree to go home with

25  him?

2:11-cr-20129-RHC-MAR  Doc # 1070  Filed 11/01/14  Pg 155 of 174  Pg ID 5395
JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

155

1   A.  I didn't want to go back to Ohio because I knew I was going

2   to be caught and be facing a lot of time in prison.

3   Q.  What kind of time were you facing did you think?

4   A.  Upwards of 11 years.

5   Q.  And so how many years now had you been on the run?

6   A.  I ran for two years.

7   Q.  And now your husband wanted you to return.  Did you, did

8   you tell him you didn't want to get arrested?

9   A.  I told him that I didn't want to come back to Ohio.  And he

10  wanted to come back to Michigan.  So he came out after sending

11  me money -- he sent me money a couple times through Western

12  Union and I still didn't go back.  I still didn't find my way

13  back to Ohio.  So he came out and he took my daughter out of

14  the yard when she was playing with the other children.

15  Q.  And what did he do with her?

16  A.  He put her -- he took her to Holiday's, to the Spa Ranch.

17  Q.  And where was he?  Did he stay there as well or do you

18  know?

19  A.  Bugs?  I didn't see him for almost a week, maybe two weeks.

20  Q.  And then what happened?

21  A.  I finally went back to Bugs.

22  Q.  And where was Bugs when you went back to him?

23  A.  He was staying at the Spa Ranch.

24  Q.  And that was Holiday's place?

25  A.  Yes.

2:11-cr-20129-RHC-MAR   Doc # 1070   Filed 11/01/14   Pg 156 of 174   Pg ID 5396
JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

156

```
1    Q.  Is that where your daughter was?

2    A.  Yes.

3    Q.  What was your understanding if you didn't return with him?

4    A.  I would never see Ellie again.

5    Q.  Is that what he said to you?

6    A.  Yes.

7    Q.  So what did you do?

8    A.  I went back.

9    Q.  And did you come back to Ohio?

10   A.  We started to come back to Michigan.  We got busted in

11   Lincoln, Kansas.

12   Q.  And when you got busted, did you have any dope on you?

13   A.  Yes, we did.

14   Q.  Tell me -- tell the jury about that, please.

15   A.  Actually, it took us a while.  This was when Bill's house

16   burnt down -- okay.  Now it's coming back to me.  Bill's house

17   caught on fire, and so it had been a minute, it took about a

18   month, maybe a month and a half, before any of the dope was

19   able to be gotten to bring back.

20   Q.  Now, you said Bill.  Who is Bill?

21   A.  Bill was the cook in California.

22   Q.  And so he was the cook who had been manufacturing the meth

23   from those mini packs or the mini thins you had been sending

24   out?

25   A.  Correct.
```

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1   Q.  And his house caught fire?

2   A.  Right.

3   Q.  Do you know how?

4   A.  No, I don't.  I don't recall.

5   Q.  So after his house catches fire, you indicated, what, that

6   there was no good dope?

7   A.  Yeah.  There was no dope or no doping quantities to get.

8   Q.  So what happened next?

9   A.  We was out there for a minute, for about a month maybe.

10  Q.  Where did you stay?

11  A.  Holiday's.  At the Spa Ranch.

12  Q.  What happened next?

13  A.  We finally got -- Bugs got four ounces of dope.  It was

14  about four ounces.  And when we got back, he bought a van.  I

15  want to think it was off of Magoo that he bought the van from.

16  And so Jungle Man, me and Bugs and my daughter started back to

17  Ohio.

18  Q.  And do you know where he got that four ounces of dope?

19  A.  It was from Holiday.

20  Q.  Okay.  And you got arrested?

21  A.  We got arrested in Lincoln, Kansas.

22  Q.  In Lincoln, Kansas.

23          And were you returned to Ohio where you were wanted?

24  A.  Yes.

25  Q.  What happened then?

1    A.  I went to trial.

2    Q.  And?

3    A.  I went to court.

4    Q.  You went to court.

5    A.  Right.

6    Q.  Now, ultimately did you plead guilty in that case?

7    A.  Yes.

8    Q.  And did you receive a sentence?

9    A.  Yes.

10   Q.  How much of a sentence did you receive?

11   A.  Four years.

12   Q.  Did you serve, was it four years or more than four years?

13   A.  I served four years and 11 months altogether.

14   Q.  All right.  So you were facing 11 years?

15   A.  Yes.

16   Q.  How did you get four years, 11 months?

17   A.  I turned state's evidence against my husband.

18   Q.  And so you cooperated?

19   A.  Yes.  That was on Bugs's word.  Bugs told me to just let

20   them know that he was the one behind the methamphetamine.

21   Q.  So with his consent, you testified or agreed to cooperate

22   against him?

23   A.  Yes.

24   Q.  And did you do that?

25   A.  Yeah.  I did.  But actually, they already knew a lot

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1    because they had files.  They had my file records from my

2    house.  They had everything.  They had my -- the D & R

3    Wholesale records, they had the Western Union receipts, they

4    had -- yeah, they had a lot.

5    Q.  So did he serve any time?

6    A.  Nine years.

7    Q.  Okay.  Now, the four years and 11 months that you served,

8    when did you get released from that sentence?

9    A.  May of 2002.

10   Q.  And up until that point, beginning from the time that

11   you're 17 until May of 2002 -- well, I should say until you're

12   arrested and serve that sentence, were you using meth that

13   entire time?

14   A.  Yeah.

15   Q.  Did you consider yourself to be an addict?

16   A.  Yes.  I do.

17   Q.  Now, what type of -- we talked about this earlier, about

18   the quantities that one might use for their personal use.  What

19   type of quantities would you expect to have if you were just

20   going to use meth, as opposed to if you were just going to sell

21   meth?  Do you understand my question?

22   A.  Yes.  As opposed to using and selling, I mean, anything

23   over a gram would be, I would imagine it would be used for

24   selling.  I mean, I never carried anything more than a gram on

25   me for personal use.

1    Q.   Does -- did you use a gram in one shot?

2    A.   No.

3    Q.   How much of a gram would you use for a hit of

4    methamphetamine?

5    A.   We lined it up on mirrors.  But it depended on whether I

6    was sharing it with other people or whether I was doing it by

7    myself.

8    Q.   So if you had a gram just to yourself, how long would it

9    take you or how many hits would you take of that before you had

10   used up the gram?

11   A.   By myself, if it was good dope, about a day and a half, two

12   days.

13   Q.   All right.  And how many hits would you take?

14   A.   About three.

15   Q.   Would you divide it up?

16   A.   About three or four, yeah.

17   Q.   Okay.  And was that when you were a heavy user or was that

18   early on when you first started?

19   A.   The longer it went on, the more I used.

20   Q.   So was that an approximation of later?

21   A.   Later I started smoking.

22   Q.   Okay.  So when you were -- when you talk about lines, how

23   is that ingested?

24   A.   You snort it through your nose.

25   Q.   You snort it through your nose.

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1              Now, there are other ways to use meth; is that a fair

2    statement?

3    A.  Yes, it is.

4    Q.  What are some of those other ways?

5    A.  In California, they do hot rails where you take glass

6    tubes, it's like a straw but it's glass, and you heat up one

7    end.  And you snort the methamphetamine up through your nose

8    and it goes in powder and comes out smoke.

9    Q.  Have you ever tried that method?

10   A.  Yes, I did.

11   Q.  What's the difference between that and snorting it, from

12   the effect?

13   A.  It's the rush that comes over you.  It's the feeling,

14   euphoria that you feel when you do it.

15   Q.  Is it a more rapid rush?  Is that the difference?

16   A.  Yeah.  Definitely.

17   Q.  You described euphoria.  How long does that last?

18   A.  Methamphetamine, you can stay high on methamphetamine for

19   days if it's good.

20   Q.  Now, when you say "stay high," does that also mean stay

21   awake?

22   A.  Yes.

23   Q.  What's the longest you've ever stayed awake for while using

24   meth?

25   A.  I'd say 11 days.

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1   Q.  Straight?

2   A.  Straight.

3   Q.  No sleeping?

4   A.  Well, eventually your body gives out and just -- and no

5   matter how much dope you put in, you still want to go to sleep.

6   Q.  Okay.  Does it give you a burst of energy?

7   A.  Yes.

8   Q.  You mentioned that you cooperated against your husband.

9   After you served your time, did you return to the use of drugs?

10  A.  Not for about ten years.

11  Q.  And what happened then?

12  A.  My husband got out of prison in 2008.  He came out to

13  Kansas to see me and my daughter.  And I fell off the wagon.  I

14  started using dope again.

15  Q.  Did he provide it to you?

16  A.  No.

17  Q.  Why did you start using it again?

18  A.  I don't know.  I guess it was the memories.  I don't know.

19  I just did.

20  Q.  And did you continue after that?

21  A.  Yeah.  I went on a spiral.

22  Q.  Did that have an effect on your ability to remain free from

23  arrest?

24  A.  Well, yeah.  Yes.  Because I couldn't support my habit.

25  Q.  Okay.  Now, you mentioned earlier today that you are

1    incarcerated right now for a case involving bringing a cell

2    phone in?

3    A.  To the county jail, yes.

4    Q.  To the county jail.

5          I want to bring you back a couple years to 2012.

6    Okay?  You testified before a grand jury at that time, didn't

7    you?

8    A.  Yes, I did.

9    Q.  Had you been arrested at that time, or were you

10   incarcerated at that time like you are now?

11   A.  I was arrested before that on a methamphetamine case.

12   Q.  Okay.  Was that case the same one that led to the current

13   result?  In other words, was there a relationship between that

14   arrest and the time that you're serving now?

15   A.  Yes.  It was during that arrest that I took the cell phone

16   into the county jail.

17   Q.  So did you testify in the grand jury in this case?

18   A.  Yes, I did.

19   Q.  Do you remember that?

20   A.  Yes, I do remember that.

21   Q.  That was in what month or year; do you remember?

22   A.  January 2012.

23   Q.  Now, at that time, when you came to Michigan to testify,

24   were you given any promises by the Government?

25   A.  No.

1    Q.   So did you get any kind of a benefit from the Government

2    for your testimony, in exchange for your testimony?

3    A.   No.

4    Q.   Did you -- were you told that, that you would get lesser

5    charges if you were to testify?

6    A.   No.

7    Q.   Were you told that you would get a break on whatever

8    sentence you were going to be facing if you were called to

9    testify?

10   A.   No.

11   Q.   Did anybody agree to call anyone on your behalf?

12   A.   No.

13   Q.   Did you get any money?

14   A.   No.

15   Q.   Did you get any benefit at all in exchange for your

16   agreement to testify?

17   A.   No.

18   Q.   And were you told that you would or would not be prosecuted

19   in connection with whatever charges you were testifying about?

20   A.   No.  I was not told that.

21   Q.   Now, have you ever been promised anything in connection

22   with your testimony here today?

23   A.   No.

24   Q.   Have you been given any benefits for your testimony here

25   today?

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1    A.   No.

2    Q.   You indicated that you're going to be released on parole on

3    the 17th of October.

4    A.   Correct.

5    Q.   And you indicated that you were brought here for the

6    purpose of testifying on a writ.

7    A.   Yes.  I was.

8    Q.   What's your understanding of that?  In other words, is that

9    something that you agreed to do, or that occurred -- how did

10   that happen?

11   A.   No.  They came and got me on August 13th and told me to

12   pack up from Kansas.

13   Q.   Did you know why?

14   A.   Not, not at that time I didn't know.

15   Q.   When you testified in front of the grand jury, did you know

16   that you might be brought into court for a trial at one time?

17   A.   Yes, I did.

18   Q.   Okay.  So when you were brought here, though, you didn't

19   know that; is that a fair statement?

20   A.   Well, I -- when they -- when that community corrections

21   picked me up from Kansas, I didn't get no paperwork until like

22   six or seven hours later.  It was quite a few hours later

23   before I got paperwork.

24   Q.   To come here?

25   A.   Right.

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1    Q.  All right.  So when you came here from Kansas, did you come

2    here with any clothing?

3    A.  No.  I came with state clothes on.

4    Q.  So the, the clothing that the facility had issued to you?

5    A.  Right.

6    Q.  Now, when you're released tomorrow, do you have any

7    expectation how you're going to dress yourself, or how you're

8    going to get back to where you came from?

9    A.  No.  I don't have any expectations, but --

10   Q.  All right.  Has any -- has anyone promised you, has anyone

11   promised to help you get back, in other words, to provide you

12   with any transportation so you can get back?

13   A.  Yeah.  Mr. Bill and you have.

14   Q.  All right.  So the agreement you have is that we will get

15   you back to Kansas; is that correct?

16   A.  Yes.  You will get me back to Kansas.

17   Q.  And provide you something to wear, correct?

18   A.  Yes.

19   Q.  But other than that, do you have any other agreement with

20   the Government?

21   A.  No.

22   Q.  All right.

23        (Brief pause.)

24        MS. MOHSIN:  Can I have a moment, please, your Honor?

25        THE COURT:  Yes, ma'am.

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1    BY MS. MOHSIN:

2    Q.  I'd like to bring you back for just a moment.  The Hells

3    Angels, a little while ago I said I was going to come back to

4    it and I neglected to do that.

5            Did you ever get meth from the Hells Angels?

6    A.  Well, when I was in California, when I was staying out

7    there, when I was on the run, I met up with Robbie.

8    Q.  Okay.  Who was Robbie?

9    A.  He was a Hells Angels.

10   Q.  And was he a manufacturer or supplier of meth?

11   A.  He was a manufacturer.

12   Q.  And what was the purpose of you getting meth from him?  In

13   other words, was that for you to use or for you to sell?

14   A.  No.  It was for me to use.

15   Q.  How often would you get meth from him?

16   A.  Every day.

17   Q.  Did you ever get meth for the purposes of selling, in other

18   words, those quantities that we talked about, from anybody else

19   in California other than Holiday?

20   A.  No.

21   Q.  All right.  And you talked about Holiday having Mr. Bill

22   manufacture meth.  Did he use other people to manufacture meth

23   as well?

24   A.  One time I remember Holiday cooking it, but I don't -- it

25   was kerosene, though.  It was washed in kerosene, I do remember

1    that.

2    Q.  What does that mean?

3    A.  It's the final process of the dope.

4    Q.  All right.  Kerosene dope, and you saw him manufacturing

5    it.  Describe the circumstances of that for the jury, please.

6    A.  It's been a long time.

7    Q.  Okay.  Describe what you can.  Was it at the certain

8    location?

9    A.  It was, it was at the Spa Ranch.  The Spa Ranch had

10   outbuildings.  And they was, like, really, really long.  And he

11   was in there.  I got sent out there for something, I can't

12   remember what.  Bugs sent me out there for something.  That's

13   when we was selling -- that's when we was bringing pills out.

14   And yeah, that was -- he was just there, he was cooking dope.

15   Q.  Were you watching?

16   A.  No.  But I seen when I walked in the beakers and the lines

17   going -- you know, the tubing going in and tubing coming out.

18   Q.  And did you see Holiday actually manipulating those, those

19   things, or was he standing near them?

20   A.  Well, he had a face mask on and gloves.

21   Q.  All right.  And he was standing over this, this makeshift

22   lab?

23   A.  Right.

24   Q.  All right.  And he -- what did he appear to be doing?

25   A.  Cooking meth.

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1   Q.  Okay.  Did there ever come a time where you paid the rent

2   at the Holiday ranch?

3   A.  Yeah.  Bugs did several times.  Helped him get caught up or

4   we pay late fees.  Because, yeah, I remember it was like $5,000

5   or something for rent.

6   Q.  Okay.  And so there were occasions where the money was

7   supplied, there was money supplied to Holiday to make those

8   payments?

9   A.  Right.

10  Q.  Do you remember how often that occurred?

11  A.  It happened a few times that I can remember.

12  Q.  Okay.  There's one other area that I wanted to go into with

13  you, as far as your involvement with the Devils Diciples.

14          When you were very, very young, did you have any

15  instruction or did you get any teaching on how to behave?

16  A.  Definitely.

17  Q.  Can you tell the jury about that, what teaching you had,

18  and who gave it to you?

19  A.  It was Bugs and Hombre was the one that did most of my

20  training.  Like, I wasn't allowed to tell him no.  If they ask

21  you a question, you know, per se, you wasn't allowed to tell

22  him directly no, that you wouldn't.  You would have to do it in

23  a roundabout way or, hey, maybe I better ask my husband, or not

24  right now.

25  Q.  When you say "they," who are you referring to?

1    A.   The Devils Diciples.

2    Q.   So are you talking about patched members of the Devils

3    Diciples?

4    A.   Yes.

5    Q.   So do these rules apply to your interactions with those

6    individuals?

7    A.   Yes, it did.

8    Q.   Did it apply to other individuals as well, or was it

9    limited to just the Devils Diciples patched members?

10   A.   It was limited to the patched members.

11   Q.   All right.  Please proceed.

12   A.   Yeah.  You just didn't tell him no.

13          MR. PITTS:  Your Honor, I object on the basis of

14   relevance.

15          THE COURT:  Overruled.  Go ahead.

16          THE WITNESS:  I lost my train of thought.  I'm sorry.

17   BY MS. MOHSIN:

18   Q.   What type of instruction did you receive about how to

19   behave with patched members of the Devils Diciples?

20   A.   As far as my training?  That, I went through the school of

21   hard knocks.  I learned my lessons the hard way with my

22   husband, Bugs.

23          And one of the other rules was if we got pulled over

24   in a car, you know, like, I would take all -- I would take

25   whatever they had that was illegal on them and put it on me.

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1  Q.  Did that ever happen?

2  A.  A couple times.

3  Q.  Describe those occasions.

4  A.  One time, we had some brother come down from Michigan,

5  Hombre was one of them and Bugs was there.  We went out to eat

6  and was coming back.  And Bugs failed to stop at a stop light

7  and they pulled him over.  And that's when I was being handed

8  guns, speed, marijuana.  Anything they had on that was illegal

9  came to me.

10  Q.  Did you hide it?

11  A.  Yes, I did.

12  Q.  Where did you hide it?

13  A.  On my body.

14  Q.  On your body.

15      Did anybody find it?

16  A.  No.

17  Q.  So was anyone arrested?

18  A.  No.

19  Q.  Okay.  And then tell me about your role as a female within

20  the club.  Do women have roles within the club?

21  A.  You're not allowed to know club business.  You're not

22  allowed around when they have church.  You're not allowed to

23  carry guns in the clubhouse.  I mean --

24  Q.  Were you ever -- when you wore the "Property of" patch,

25  what did that signify to the, to the world that you were living

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

 1   in?

 2   A.   That I was property of Bugs.

 3   Q.   And so what could people do or not do to you?

 4   A.   Nothing without Bugs being, being aware of it.

 5   Q.   And so could anyone ask you to do something for them

 6   without Bugs' agreement?

 7   A.   If they did, I would have to ask Bugs.

 8   Q.   So can you give an example of some of the things that you

 9   might have been asked to do that you would need his permission

10   before you could do?

11   A.   Like, snort a line of methamphetamine or anything.

12   Anything that happened within the clubhouse, I had to get

13   permission from Bugs.

14   Q.   And what happened if you didn't get permission from Bugs?

15   A.   I would get my ass beat.

16   Q.   And did that happen?  Did you get assaulted?

17   A.   I got -- Bugs assaulted me a lot throughout our

18   relationship.

19   Q.   Did other women have other roles within the club?

20   A.   Some of them, yeah.  I mean, there's different roles for

21   different people.  Bugs kept me away from -- I had my job.  My

22   job was to smuggle drugs.  And the other women have jobs as far

23   as bringing money in, prostitution, dancing, whatever.  I

24   don't -- whatever their choice was.

25   Q.   Did Bugs require you to engage in acts of prostitution for

1    money?

2    A.   No.

3    Q.   And did he, other than smuggling drugs, did he have other

4    roles for you to play?

5    A.   Besides taking care of house and him, no.

6    Q.   Okay.

7            MS. MOHSIN:  Your Honor, I think I have nothing

8    further for the witness.  Thank you very much.

9            Thank you, Ms. Casey.

10           (1:30 p.m.)

11

12                       *              *              *

13

14

15

16

17

18

19

20

21

22

23

24

25

JURY TRIAL, VOLUME II - 10/16/2014
KAREN CASEY - DIRECT

1

2                    **CERTIFICATE OF REPORTER**

3

4          As a Federal Official Court Reporter for the United

5    States District Court, appointed pursuant to provisions

6    of Title 28, United States Code, Section 753, I do hereby

7    certify that the foregoing is a correct transcript of

8    the proceedings in the above-entitled cause on the date

9    hereinbefore set forth.

10

11

12                         Dated this 16th day of October, 2014.

13

14            s/ Christin E. Russell
              Christin E. Russell
15            RMR, CRR, FCRR, CSR
              Federal Official Court Reporter
16

17

18

19

20

21

22

23

24

25