```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,

 4                    Plaintiff,          Case No. 11-20129
                                          Case No. 11-20066
 5       -v-

 6    SCOTT WILLIAM SUTHERLAND, D-1,
      PATRICK MICHAEL MCKEOUN, D-4,
 7    JEFF GARVIN SMITH, D-5/D-1,
      PAUL ANTHONY DARRAH, D-6/D-2,
 8    CARY DALE VANDIVER, D-7/D-5,
      VINCENT WITORT, D-8,
 9    DAVID RANDY DROZDOWSKI, D-17,

10                    Defendants.
      _____/
11
                      EXCERPT OF JURY TRIAL, VOLUME III
12
                  BEFORE THE HONORABLE ROBERT H. CLELAND
13                     United States District Judge
                  Theodore Levin United States Courthouse
14                     231 West Lafayette Boulevard
                            Detroit, Michigan
15                     Thursday, October 17, 2014
      APPEARANCES:
16
      FOR THE PLAINTIFF:   SAIMA MOHSIN
17                         ERIC STRAUS
                           U.S. Attorney's Office
18                         211 W. Fort StreetSuite 2000
                           Detroit, MI  48226
19
                           JEROME MAIATICO
20                         United States Department of Justice
                           1301 New York Avenue, NW
21                         Washington, DC 20005

22    FOR THE DEFENDANT:   CRAIG A. DALY
                           (Sutherland, D-1)
23                         615 Ford Building
                           Suite 820
24                         Detroit, MI 48226

25
```

```
 1    APPEARANCES:            (Continued)

 2    FOR THE DEFENDANT:      SIDNEY KRAIZMAN
                              (McKeoun, D-4)
 3                            1616 Ford Building
                              Detroit, MI 48226
 4
                              JEROME SABBOTA
 5                            (Smith, D-5/D-1)
                              26862 Woodward Avenue
 6                            Suite 200
                              Royal Oak, MI 48067
 7

 8                            PATRICIA A. MACERONI
                              (Darrah, D-6/D-2)
 9                            26611 Woodward Avenue
                              Huntington Woods, MI 48070
10
                              MARK A. SATAWA
11                            (Vandiver, D-7/D-5)
                              3000 Town Center, Suite 1800
12                            Southfield, MI 48075

13                            KIMBERLY W. STOUT
                              (Witort, D-8)
14                            370 East Maple Road, Third Floor
                              Birmingham, MI 48009
15
                              BYRON H. PITTS
16                            535 Griswold, Suite 1630
                              Detroit, MI 48226-4218
17
                              PHILLIP D. COMORSKI
18                            535 Griswold
                              2632 Buhl Building
19                            Detroit, MI 48226

20                            RYAN H. MACHASIC
                              134 Market Street
21                            Mount Clemens, MI 48043

22

23          To Obtain a Certified Transcript Contact:
                         Christin E. Russell
24          RMR, FCRR, CRR, CSR - (248) 420-2720
             Proceedings produced by mechanical stenography.
25       Transcript produced by computer-aided Transcription.
```

```
1                           I N D E X

2    JURY TRIAL, VOLUME III                              PAGE

3    WITNESSES FOR THE GOVERNMENT:
     KAREN CASEY
4      Cross-Examination By Mr. Pitts                        5
       Cross-Examination By Mr. Sabbota                     34
5      Cross-Examination By Mr. Kraizman                    48
       Redirect Examination By Ms. Mohsin                   56
6
     TONY SAUCEDO
7      Direct Examination By Mr. Straus                     71
       Cross-Examination By Ms. Stout                      125
8
     GERALD PETERS, JR.
9      Direct Examination By Mr. Maiatico                  137
       Cross-Examination By Ms. Stout                      172
10

11                        E X H I B I T S

12   Government's Exhibit:                                Page
     Exhibit 53-35 - 53-43 and 53-45 - 53-51             117
13   Exhibit 64-11                                       153
     Exhibit 64-61                                       157
14

15

16

17

18

19

20

21

22

23

24

25   CERTIFICATE OF REPORTER                             186
```

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. PITTS

 1   Detroit, Michigan

 2   October 17, 2014

 3   9:12 a.m.

 4                    *            *            *

 5           THE CLERK:  All rise.

 6       (Jury in, 9:12 a.m.)

 7           THE COURT:  All right.  The jury is assembled.  You

 8   may be seated.

 9           And I would note we are making steady progress, minute

10   by minute as the days go on here toward an on-time start.  The

11   lawyers were on time.  We just had business to discuss,

12   organizational business, which is, frankly, very common.  In

13   fact, I'm going to find ways of getting that done even more

14   expeditiously next week and the week after.

15           All right.  Your witness is here for additional

16   examination.  The witness can come forward.  Okay.

17           Ms. Casey, yes?

18           THE WITNESS:  Yes.

19           THE COURT:  You know how to have a seat here, please.

20   Move the microphone out of your way, and then back again when

21   you scoot the chair up, please.  And your oath continues, of

22   course, as is the case with all witnesses.  And the witness is

23   available for examination.

24           Mr. Pitts?

25           MR. PITTS:  May it please the Court, your Honor.

2:11-cr-20129-RHC-MAR   Doc # 1071   Filed 11/01/14   Pg 5 of 186   Pg ID 5419
JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. PITTS

5

 1                          KAREN CASEY

 2          Previously called as a witness testified as follows:

 3                       CROSS-EXAMINATION

 4   BY MR. PITTS:

 5   Q.  Good morning, Mrs. Casey.

 6   A.  Good morning.

 7   Q.  I am going to endeavor just to ask you a few questions.  If

 8   you don't understand my question, or have trouble hearing me,

 9   please let me know, or this honorable Court.  And certainly I

10   will rephrase it in a way that's understandable.  Okay?

11   A.  Yes, sir.

12   Q.  Okay.  I want to direct your attention, if I may, back to

13   February 1st of 2012.  Okay?  That was a date you came for the

14   grand jury.  Fair statement to make?

15   A.  Yeah.  I guess.

16   Q.  Okay.  You came before the grand jury in the year 2012,

17   correct?

18   A.  Correct.

19   Q.  Okay.  And in fact, you didn't appear voluntarily; you were

20   subpoenaed to appear, ordered to appear, correct?

21   A.  Correct.

22   Q.  And at the time you appeared before the grand jury, you

23   were on either probation or parole, correct?

24   A.  Probation, Community control.

25   Q.  But probation, fair statement to make?

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. PITTS

1    A.   Yeah.

2    Q.   Not only were you on probation, you also had a pending

3    separate case; isn't that also correct?

4    A.   Correct.

5    Q.   Okay.  Now, you understand that when you're on probation,

6    if you were to be charged with a separate case, you risk

7    violating that probation.  Fair statement to make?

8    A.   Yes.

9    Q.   Okay.  And in violating that probation -- just as a

10   backdrop, you were a free woman when you came to the -- you

11   were not under any sort of control or auspices of a

12   correctional facility, correct?

13   A.   No.

14   Q.   You walked in as a free woman, correct?

15   A.   Yes.

16   Q.   But a free woman who was on probation?

17   A.   Yes.

18   Q.   And it's a fair statement to make, is it not, that a

19   violation -- that if you were to be charged with a crime, you

20   might violate that probation, correct?

21   A.   Yeah.

22   Q.   What were you on probation for at that time?

23   A.   Possession of methamphetamine and possession of

24   paraphernalia.

25   Q.   Okay.  And you were facing new charges.  What were the new

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. PITTS

1   charges you were facing?  You had a pending case.  What was

2   that pending case you were charged with?

3   A.  My pending case was also the same.

4   Q.  Same thing?

5   A.  Yes, sir.

6   Q.  Okay.  Same set of acts, but you were on probation for --

7   your probation in one charge, and then you're facing a separate

8   charge for the same acts, dealing with methamphetamine,

9   correct?

10  A.  Correct.

11  Q.  And those are both in the state of Ohio, ma'am?

12  A.  No.

13  Q.  Which, what state were they in?

14  A.  Kansas.

15  Q.  They were in Kansas, I'm sorry.  Okay.

16          But those are state charges, correct?

17  A.  Yes.

18  Q.  And given your familiarity with the criminal justice

19  system, you understand there's a difference between being

20  charged by the -- in the state system, by a state prosecutor or

21  a county prosecutor, and being charged by the Federal

22  Government.  Those are two different things, you understand

23  that, correct?

24  A.  Yes.

25  Q.  Obvious.  And it's a fair statement to make, ma'am, that

1  your understanding that in certain circumstances the charges

2  with a -- a federal charges can sometimes be quite a bit more

3  severe.  You understand that, don't you?

4  A.  Yes.

5  Q.  And as a free woman, the last thing you want is to be

6  charged with a federal crime; fair statement to make?

7  A.  Yeah.

8  Q.  And one of the first -- and when you came into the grand

9  jury room, you saw some of the people who were sitting in this

10 particular table, correct?

11 A.  Yeah.

12 Q.  Okay.  And one of the first things that you were told was

13 that you were not a target of their investigation, correct?

14 A.  That's correct.

15 Q.  That has got to be a huge relief to you, correct?

16 A.  Well, yeah.

17 Q.  Because you know, because you understood it to mean that

18 being a target, you understood that to mean that they weren't

19 looking at you, correct?

20 A.  Because I wasn't doing nothing to be looked at.

21 Q.  That's fair enough.  But you knew, when they told you you

22 were not a target, you understood that to mean that you were

23 not the focus of their investigation, correct?

24 A.  Correct.

25 Q.  You understood that to mean that they weren't -- at least

1    at that time, you were not somebody they were looking to go

2    after, to charge, correct?

3    A.   That's correct.

4    Q.   And, ma'am, it's a fair statement to make that over the

5    years, you have been involved in several episodes of interstate

6    drug trafficking, correct?

7    A.   Over the, over the --

8    Q.   Over -- going back to the '80s and the '90s, you have been

9    involved in several acts of interstate drug trafficking,

10   haven't you?

11   A.   Yes, I have.

12   Q.   And you didn't want to be charged by the Federal Government

13   with said interstate drug trafficking, did you?

14   A.   (No response.)

15   Q.   Fair statement to make?  You don't want to be charged by

16   this Federal Government with interstate drug trafficking,

17   correct?

18   A.   Nobody wants to be charged.

19   Q.   And you included, correct?

20   A.   Correct.

21   Q.   So as I said before, it had to be relief, it had to be a

22   relief to you, that you were not, from the very beginning, the

23   Government told you, you were not the target of their

24   investigation, correct?

25   A.   I don't think it came about in those words per se that I

1   was not a target.

2   Q.  Ma'am, do you remember -- page 3 of the grand jury

3   transcript.

4        Ma'am, do you remember the -- being asked the

5   following question and giving the following answer?  I am

6   referencing pages 3 and 4 of the grand jury transcript, line

7   18:

8        "Question:  Also, to your right is the grand jury

9   reporter, who is making a written record of these proceedings.

10  I advise you, at this time, you are not a target of this

11  investigation.  I advise you that you do not have the right to

12  remain silent.  You are under a legal obligation to testify

13  truthfully and completely in answering questions put forward

14  either by myself, AUSA Straus, or members of the grand jury.

15  Do you understand that?

16       Answer:  Yes, I do."

17       Do you remember being asked that question and giving

18  that answer?

19  A.  Not specifically.  No.

20       MR. PITTS:  If I may, your Honor, ask the Court's

21  permission to approach?

22  BY MR. PITTS:

23  Q.  If I showed you the grand jury testimony, might that

24  refresh your memory?

25       THE COURT:  I think that actually has been explored.

```
 1   I think she has said she does not remember that, so let's move
 2   to the next point.
 3   BY MR. PITTS:
 4   Q.  And it's a fair statement to make, ma'am --
 5           THE COURT:  If you need to, without approaching the
 6   witness, or further exploring the state of her memory on this
 7   particular point, you could proffer that, that that's -- if you
 8   suggest the transcript says that, you can simply proffer that
 9   that's what it says.
10           MR. PITTS:  Can we enter into a stipulation that I've
11   accurately read the transcript?
12           MS. MOHSIN:  As to that, yes.
13           MR. PITTS:  Okay.  Very good.
14           THE COURT:  As to that point.  All right.  Go ahead.
15   Next point?
16   BY MR. PITTS:
17   Q.  And certainly you had to feel that, in light of your years
18   of interstate methamphetamine trafficking, you were receiving
19   quite a benefit from the Government that you were not the
20   target of their investigation; isn't that true?
21   A.  It was the 2000's.  My transactions occurred in the late
22   '80s and '90s.
23   Q.  I understand the years, ma'am.  But do you understand that
24   it was a benefit to you to not be charged for your earlier
25   narcotics activity in the '80s and the '90s?  Didn't you
```

1    consider that to be a benefit?

2    A.  But I was charged.

3    Q.  By the -- let me be more clear.

4         Weren't -- didn't you consider it a benefit to not be

5    charged by the Federal Government with your actions involving

6    methamphetamine trafficking in the '90s?  Didn't you feel that

7    to be a benefit?  Because you certainly didn't want to be

8    charged federally for that, those actions, did you?

9    A.  Well, no, but the state did discuss taking it federal.

10   Q.  Very good, ma'am.  But they didn't take it federal, did

11   they?

12   A.  No, they did not.

13   Q.  You're in front of the Federal Government with the grand

14   jury, are you not?

15   A.  Yes, I am.

16   Q.  They told you, you were not a target of their

17   investigation, correct?

18   A.  Correct.

19   Q.  That's a benefit to you, is it not?  You've got to believe

20   it's a benefit, because like you said, you certainly don't want

21   to face federal charges; isn't that true?

22        MS. MOHSIN:  Judge, I think we've been over this and

23   over this and over this.

24        MR. PITTS:  The question is whether it's a benefit,

25   your Honor, does she believe it to be.

1        THE COURT:  You can get a clarification on that and

2   then I think it's been explored.

3   BY MR. PITTS:

4   Q.  My last final question:  Ma'am, didn't you consider the

5   fact, didn't you consider it to be a -- the word I'm focusing

6   on is "benefit."  Didn't you consider it to be a benefit that

7   you were not being charged for your prior narcotics trafficking

8   by the Federal Government?  Yes or no?

9   A.  No.

10  Q.  Ma'am, I want to direct your attention back to some

11  testimony you gave yesterday regarding -- you said you were

12  going back and forth to California, correct?

13  A.  Yes.

14  Q.  Now, you've testified that in going back and forth to

15  California, you used at least three identifications, correct?

16  A.  Yes.

17  Q.  Those are identifications of other people, correct?

18  A.  Correct.

19  Q.  And in fact, in order to obtain the identifications of

20  other people, on at least one occasion, you acquired,

21  fraudulently acquired the Social Security numbers of an

22  individual, correct?

23  A.  Yes.

24  Q.  And you fraudulently -- after fraudulently acquiring the

25  Social Security numbers of -- does the name Victoria Converse

 1    ring a bell?

 2    A.   Yes.

 3    Q.   That's one of the names you used, correct?

 4    A.   Correct.

 5    Q.   And to acquire her name, you fraudulently got her Social

 6    Security number; fair statement?

 7    A.   Yes.

 8    Q.   And you got identification in her name, correct?

 9    A.   Yes.

10    Q.   And you went around signing her name, correct?

11    A.   Yes.

12    Q.   So you were not only involved with identity theft, you were

13    committing forgery, because you are not Victoria Converse,

14    correct?

15    A.   Yes.

16    Q.   And to the best of your knowledge, Victoria Converse is not

17    a, as you said yesterday, we've defined this, an old lady,

18    correct?

19    A.   Repeat that.

20    Q.   Let me just be more specific.  You've indicated that

21    girlfriends or wives of club members are known as old ladies?

22    A.   Correct.

23    Q.   Okay.  Victoria Converse wasn't an old lady, to the best of

24    your knowledge, was she?

25    A.   No.

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. PITTS

1   Q.  She wasn't affiliated with the club in any particular way,

2   to the best of your knowledge, was she?

3   A.  No.

4   Q.  She was just, to the best of your knowledge, an average,

5   run-of-the-mill citizen?

6   A.  Yes.

7   Q.  Who you took advantage of to further your narcotics

8   trafficking, correct?

9   A.  Yes.

10  Q.  Do you remember the names of any of the other

11  identifications you falsely acquired?

12  A.  My sister.

13  Q.  Your sister?  So you forged her name?  Correct?

14  A.  With her knowledge, yes.

15  Q.  Okay.  And her name is Catherine, is it not?

16  A.  Mh-hm.

17  Q.  Do you know what, if any, ramifications Victoria Converse

18  suffered by you fraudulently using her identity?

19  A.  No, I do not.

20  Q.  Okay.  You don't know if she had -- what, if any, problems

21  occurred to her particular credit as it relates to you

22  fraudulently using her identification to further your narcotics

23  trafficking?

24  A.  No.  I vaguely remember a hospital bill that was signed off

25  by the Fairfield County Sheriff's Department.

1   Q.  That would have been at Defiance Hospital, would it not,

2   ma'am?

3   A.  If you got it there, I'm pretty sure, yes.

4   Q.  Okay.  Other than your sister and Victoria Converse, do you

5   know the name of the other, I assume it's a woman, whose

6   identity you stole?

7   A.  It was McNutt something.

8   Q.  Okay.  Another person who was not affiliated, to the

9   best -- Ms. McNutt, another person who, to the best of your

10  knowledge, was not affiliated with the Devils Diciples in any

11  way, correct?

12  A.  No.

13  Q.  Wasn't a, would the proper term be "old lady"?

14  A.  Correct.

15  Q.  Of the Devils Diciples?

16          Wasn't a "property of"?  She didn't fall into that

17  category, did she?

18  A.  No.

19  Q.  Do you know what, if any, legal ramifications came to Ms.

20  McNutt as to you falsely using her identity?

21  A.  No, I do not.

22  Q.  Do you know if any ramifications came to her by you forging

23  her name, correct?

24  A.  No, I do not.

25  Q.  Okay.  So along with forgery and identity theft, ma'am, you

1   have been convicted of false reporting of a crime in 2009;

2   isn't that true?

3   A.  Yes, it is.

4   Q.  In fact, this is a crime -- these are -- forgery and

5   identity theft, false reporting of a crime, these deal with

6   issues of truth or dishonesty; isn't that a fair statement to

7   make?  Yes or no, ma'am?

8   A.  No, it's not.

9   Q.  Okay.

10  A.  You don't know the extenuating circumstances of --

11  Q.  I'm just asking you, ma'am, if you could just be responsive

12  to my question.

13          Forgery, identity theft, those deal with issues of

14  truth or dishonesty, do they not, ma'am?  In your estimation,

15  don't they?

16          MS. MOHSIN:  Asked and answered, your Honor.

17          MR. PITTS:  I didn't receive an answer, your Honor.

18          THE COURT:  You may have an answer.

19  BY MR. PITTS:

20  Q.  May I have an answer please, ma'am?

21  A.  Yes.

22  Q.  False reporting of a crime deals with issues of truth or

23  dishonesty, doesn't it, ma'am?

24  A.  Yes, it does.

25  Q.  Theft, which you were convicted of in 2009 and 2010, deals

1  with an issue of dishonesty, truth or dishonesty; isn't that
2  true, ma'am?
3  A.  Yes, it is.
4  Q.  To further your criminal activities over the years, you've
5  been involved in multiple episodes of truth or dishonesty,
6  multiple infractions involving truth or dishonesty, haven't
7  you?
8  A.  Yes.
9  Q.  You've hurt innocent people to help yourself, haven't you,
10  ma'am?
11  A.  Had good teachers.
12  Q.  Very well.  But you've hurt innocent people to help
13  yourself, haven't you, ma'am?  Yes or no?
14  A.  Yes.
15  Q.  And the manner in which you were helping yourself, and I
16  think we've established this, is the selling of narcotics,
17  correct?
18  A.  Yes.
19  Q.  You've been selling narcotics well before you had any
20  encounters with individuals, whoever they might be, in
21  California; isn't that a true statement?
22  A.  Yes.
23  Q.  Because when you first met Bugs -- and "Bugs," that's his
24  nickname within the, within the club, correct?
25  A.  Yes.

1    Q.   Is your husband.  You're still married, you said?

2    A.   Yes.

3    Q.   That's Mr. Charles Casey; fair statement?

4    A.   Yes.

5    Q.   Okay.  And with Charles Casey, you began selling cocaine in

6    the late '80s, correct?

7    A.   Yes.

8    Q.   Nothing to do with California; fair statement to make?

9    A.   Yes.

10   Q.   Okay.  You were going back and forth from Ohio to get the

11   cocaine; isn't that true?

12   A.   Yes.

13   Q.   In the late '80s, you were involved in dealing with crystal

14   meth, were you not?

15   A.   Yes.

16   Q.   Selling that, correct?

17   A.   My job --

18   Q.   Yes or --

19   A.   -- was trafficking.

20   Q.   -- no, ma'am?

21   A.   No.

22   Q.   You were trafficking in crystal meth, were you not, ma'am?

23   A.   Yes.  But it was not my job to sell it.

24   Q.   Okay.  But you were participating in the distribution of

25   the crystal meth, correct?

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. PITTS

1    A.  Yes.

2    Q.  Breaking the law; fair statement?

3    A.  Yes.

4    Q.  And you were doing -- right now I'm focusing on the crystal

5    meth selling, crystal meth trafficking, and the cocaine

6    trafficking.

7           You and Bugs, Mr. Casey, were doing this to benefit

8    yourself, correct?

9    A.  (No response.)

10   Q.  Put money in your pocket, correct?

11   A.  Yes.

12   Q.  It's a business; fair statement?

13   A.  Yeah.

14   Q.  And at a certain point, I think you said in the early '90s,

15   '93, '94, you began getting involved in the trafficking of

16   methamphetamine, correct?

17   A.  Yes.

18   Q.  And you testified yesterday that a pound of

19   methamphetamine, before it's stepped on, might be worth about

20   $32,000, correct?

21   A.  Yes.

22   Q.  And then once you step on it -- that means to, to put

23   additives on to the base product to make more of it, correct?

24   A.  Right.

25   Q.  Might be double or triple the $32,000 once you step on it

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. PITTS

1    once or twice or three times; fair statement?

2    A.   Yeah.

3    Q.   There's some good money to be made in meth; fair statement?

4    A.   Yeah.

5    Q.   And you were using that money, you and Mr. Casey, to

6    further your own, let's just call it a small business of drug

7    selling, correct?

8    A.   Yes.

9    Q.   Okay.  Putting that money, this sort of Casey family

10   enterprise, the selling of the meth was to further your own

11   financial ends, correct?

12   A.   Yes.

13   Q.   And then around 1990, you had a daughter, did you not?

14   A.   Yes, I did.

15   Q.   Okay.  Once you have a daughter, you have an extra mouth to

16   feed; fair statement?

17   A.   Yeah.

18   Q.   Okay.  So making money became even more important, because

19   not only did you have to take care of yourselves, that meaning

20   you and Mr. Casey, you had young Ella to take care of, correct?

21   A.   Right.

22   Q.   So the Casey family enterprise was designed to put food in

23   the mouths of not only you and your husband, but your young

24   child; fair statement?

25   A.   Fair.

1  Q.  It's also fair, is it not, ma'am, that we spent a lot of

2  time yesterday talking about your selling of methamphetamine to

3  members of the motorcycle club, correct?

4  A.  Yes.

5  Q.  But you didn't exclusively sell to the motorcycle club; you

6  sold to anybody who would buy it, correct?

7  A.  Like I said, that wasn't my position to sell the

8  methamphetamine.

9  Q.  I understand that, ma'am.  But my question is that you

10  would sell meth to anyone who would buy it; isn't that true?

11  A.  No.

12  Q.  You were in the business to make money; fair statement to

13  make?

14  A.  That is a fair statement to make.

15  Q.  And if people can't -- you're saying, and you're saying

16  under oath, that if people wanted to buy your meth who were not

17  Devils Diciple club members, you wouldn't sell it to them?

18  A.  Depending.

19  Q.  Depending.

20        So you would sell to people who were not in the Devils

21  Diciples Motorcycle Club, correct?

22  A.  My husband would, yes.

23  Q.  Okay.  Well, I mean -- and when I'm talking, I'll be more

24  specific.  You -- strike that.

25        Your husband, with your knowledge, would sell to

 1  members -- to people who were not members of this motorcycle

 2  club, correct?

 3  A.  Yes.

 4  Q.  In fact, your husband would sell to anybody -- he didn't

 5  want to get busted; fair statement to make?  Nobody does,

 6  correct?

 7  A.  Correct.

 8  Q.  He'd sell to anybody who he felt wouldn't cause him to get

 9  in trouble with the law; isn't that true?

10  A.  Okay.

11  Q.  Not okay.  Isn't that true, ma'am?  Yes or no?

12        MS. MOHSIN:  Your Honor, I'm going to object as to

13  what her husband would or would not think or do and the nature

14  of this question.

15        THE COURT:  Well, You might want to rephrase the

16  question.

17        MR. PITTS:  Okay.

18  BY MR. PITTS:

19  Q.  You are aware -- you and your husband are working together,

20  correct?

21  A.  Yes.

22  Q.  In the selling of methamphetamine, correct?

23  A.  Yes.

24  Q.  He trusted you, correct?

25  A.  Yes.

1    Q.   Confided in you?

2    A.   Yes.

3    Q.   You knew his business, and you -- and he knew your business

4    and you knew his as it relates to your, the Casey family

5    enterprise, correct?

6    A.   Yes.

7    Q.   And based upon your knowledge of the behavior of your

8    husband, you knew that he would sell to members -- he'd sell to

9    individuals who were not members of the motorcycle club, yes or

10   no?

11   A.   Yes.

12   Q.   And in terms of getting the product, getting the

13   methamphetamine, you dealt with people who were outside of the

14   motorcycle club; isn't that true?

15   A.   As far as getting?  Receiving?

16   Q.   Let me ask you this:  You received meth from an individual

17   by the name of Boris, correct?

18   A.   Yes.

19   Q.   Boris is not in the Devils Diciples, is he?

20   A.   No, he's not.

21   Q.   Ma'am, you received meth from an individual by the name of

22   Buddy Mahaffey, did you not?

23   A.   That name is not familiar to me.

24   Q.   That's not familiar to you?

25   A.   No.

1    Q.  You received meth from an individual -- from an individual

2    by the name of Bill Gallant; isn't that true?

3    A.  Affiliated with Devils Diciples, correct.

4    Q.  But he is not a club member, is he?

5    A.  No.

6    Q.  You also had interactions, you mentioned yesterday, you

7    interacted with a woman by the name of Sherri, correct, as it

8    relates to the distribution of methamphetamine; isn't that

9    true?

10   A.  I never picked her up, but yes.

11   Q.  I'm sorry.  What did you say?

12   A.  I never picked her up.

13   Q.  I didn't ask you did you pick her up.  I said did you

14   interact with a woman by the name of Sherri as it relates to

15   the distribution of methamphetamine, correct?

16   A.  Negative.  No.  Not myself personally.

17   Q.  Didn't you testify yesterday -- you were arrested in 1996,

18   were you not?

19   A.  Yes, I was.

20   Q.  When you -- and your husband got $100,000 together and

21   bailed you out of jail; isn't that true?

22   A.  Correct.

23   Q.  When he bailed you out of jail, the two of you took

24   separate cars and eventually went to a motel, correct?

25              COURT REPORTER:  Can you slow down just a little bit,

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. PITTS

1    please?

2          MR. PITTS:  Absolutely.

3          COURT REPORTER:  Thank you.

4    BY MR. PITTS:

5    Q.  When he bailed you out of jail, the two of you took

6    separate cars and eventually went to a motel, correct?

7    A.  No.

8    Q.  I'm going to get to the -- the two of you went to a motel,

9    did you not?

10   A.  We took two different vehicles --

11   Q.  There?

12   A.  -- to --

13   Q.  A motel, correct?

14          THE COURT:  No.  Mr. Pitts.

15          THE WITNESS:  No.  To the airport.

16          THE COURT:  You need to be careful to allow the

17   witness --

18          MR. PITTS:  Absolutely.

19          THE COURT:  -- to complete an answer before you begin

20   another one.

21          MR. PITTS:  Absolutely.

22          THE COURT:  Thank you.

23   BY MR. PITTS:

24   Q.  Did you eventually meet in a motel, ma'am?

25   A.  Yes.

1  Q.  When you were --

2  A.  No.  We went to my house.

3  Q.  Didn't you testify yesterday that after being bailed out,

4  maybe that day, or the next day, you met somebody named Hombre

5  and Sherri at a motel?

6  A.  No.  It was Jungle Man.

7  Q.  Jungle Man.  Jungle Man and Sherri, correct?

8  A.  Right.  We went to two different -- we had two different

9  vehicles, and we went to the airport in two different vehicles.

10 Q.  Thank you, ma'am.

11          But, and Sherri was one of the individuals who was --

12 who you dealt with as it relates to the supply of

13 methamphetamine, correct?

14 A.  That I never seen.  My husband picked her up.

15 Q.  Okay.  Weren't you all in the motel together?

16 A.  Negative.  No.

17 Q.  You were not?  But you do know, based upon your dealings

18 with your husband, that an individual by Sherri was involved in

19 the trafficking of methamphetamine with your family enterprise,

20 correct?

21 A.  Yes.

22 Q.  Whether or not you met her or not, you knew there was a

23 Sherri, correct?

24 A.  Yes.

25 Q.  And although you didn't meet her, would you know her by the

1    name of -- did you know her name was -- would you accept the

2    fact that her name was Sherri Knowles, was the individual who

3    your husband -- who helped to facilitate the selling of

4    methamphetamine?

5    A.  I don't know that name.

6    Q.  Okay.  To the best of your knowledge, Sherri is not an old

7    lady, correct?

8    A.  Not to my knowledge, no.

9    Q.  She's not affiliated with the Devils Diciples Motorcycle

10   Club, is she?

11   A.  Not to my knowledge.

12   Q.  Isn't it true also, ma'am, that an individual by the name

13   of Frank Sikovich helped to supply meth to you and your husband

14   for distribution?

15   A.  That name doesn't -- no.

16   Q.  That doesn't ring a bell?

17   A.  No.

18   Q.  Ma'am, who is Ricky Robinson?  Ricky Robinson was somebody

19   who was involved -- strike that.

20         Ricky Robinson was an individual who was involved in

21   the distribution of methamphetamine with you and your husband's

22   criminal enterprise, correct?

23   A.  Yeah, because -- yes.  I believe so.

24   Q.  Okay.  Ricky Robinson is not a member of the DDMC, is he?

25   A.  No.

1    Q.  Okay.  So, I guess what I'm getting to, is that you dealt,

2    in regards to furthering the criminal enterprise of selling

3    methamphetamine that you and your husband were involved in, you

4    dealt with several people who were not affiliated with the

5    Devils Diciples Motorcycle Club, correct?

6    A.  Yes.

7    Q.  From the years, you testified yesterday, starting in 1996,

8    you, to use a vernacular, caught a case, correct?  Were charged

9    with a crime, correct?

10   A.  Correct.

11   Q.  You were in court; fair statement?

12   A.  Yes.

13   Q.  You fled?

14   A.  Yes.

15   Q.  Fled with the help of your husband, correct?

16   A.  Yes.

17   Q.  You were on the run for two or three years; isn't that

18   true?

19   A.  Yes.

20   Q.  And other than the $15,000 supplied to you by your husband

21   to help in your absconding, you didn't have any other source of

22   money, did you?

23   A.  No.

24   Q.  And in the process of your fleeing the, fleeing the

25   Government, fleeing the court system, you originally, did you

1   say you went to Alabama, ma'am?

2   A.  I started to go there.  I don't think I actually went

3   there.

4   Q.  Okay.  Eventually, you went to, eventually you went to

5   California?

6   A.  Yes.

7   Q.  And when you were in California, you've testified that

8   Johnnie Rotten helped you, correct?

9   A.  Yes.

10  Q.  You were looking for help from people affiliated with the

11  Devils Diciples Motorcycle Club; isn't that true?

12  A.  Yes.

13  Q.  Vincent Witort didn't help you, did he?

14  A.  Yes, he did.

15  Q.  Vincent Witort put you up?

16  A.  No.

17  Q.  And you needed a place to stay, didn't you?

18  A.  I guess, yeah.

19  Q.  Okay.  Johnnie Rotten provided you with a place to stay,

20  but Mr. Witort did not provide you with a place to stay, did

21  he?

22  A.  No.

23  Q.  And that was a period of time in your life where you

24  needed, you needed help from as many people as you -- as who

25  you could get it from, correct?

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. PITTS

1    A.   Right.

2    Q.   In the course of the family enterprise, the Casey family

3    enterprise of selling methamphetamine, one of your roles was to

4    go back and forth to California, correct?

5    A.   Correct.

6    Q.   And sometimes, you would go by Rent-a-Car; isn't that true?

7    Strike that.

8         Sometimes you would go by car, correct?

9    A.   Yes.

10   Q.   Was that your vehicle or was it a Rent-a-Car?

11   A.   It wasn't a Rent-a-Car; it was our vehicle.

12   Q.   Okay.  No problem.  That's fair.

13        And sometimes you would fly out there, correct?

14   A.   Yes.

15   Q.   And since you've been cooperating with the Federal

16   Government, did you supply them with the names of the airline

17   that you took in going out to California?

18   A.   That was all established in Fairfield County.

19   Q.   Okay.  But my question to you is not as it relates to

20   Fairfield County, but the Federal Government, did you tell the

21   Federal Government the names, the name or names of the airlines

22   you used to travel to California?

23   A.   I'm sure the information is available to them.

24   Q.   Very good.

25        MR. PITTS:  Objection.  Could you instruct the witness

2:11-cr-20129-RHC-MAR   Doc # 1071   Filed 11/01/14   Pg 32 of 186   Pg ID 5446
JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. PITTS

32

1    to answer my question?

2            THE COURT:  I don't think that's necessary objection.

3            MR. PITTS:  Okay.

4    BY MR. PITTS:

5    Q.  It's a fair statement to make, while you might have

6    provided information to other sources, you never provided

7    information to the Federal Government about the airlines that

8    you took to travel out to California, correct?

9    A.  It was unnecessary to do so.

10   Q.  You've indicated that you stayed -- isn't it true that

11   sometimes you would stay at a motel or a place, a facility,

12   motel or a hotel with suites when you were in California?

13   A.  Yes.

14   Q.  Did you provide the name of that establishment to the

15   Federal Government?

16   A.  No.

17   Q.  You've indicated that you utilized United Parcel Service or

18   Federal Express in terms of transferring methamphetamine to and

19   from California, correct?

20   A.  Yes.

21   Q.  Did you provide receipts of any of those UPS transfers to

22   the Federal Government, ma'am?  Did you?

23   A.  No.

24   Q.  It's a true statement, ma'am, that Mr. Vincent Witort --

25   you know him as Holiday, correct?

1    A.   Correct.

2    Q.   Okay.  To the best of your memory, he lived at 19009 Santa

3    Ana, Bloomington, California; isn't that true?

4    A.   That sounds correct.

5    Q.   Sounds about right?

6    A.   It's been many years.

7    Q.   Okay.  In the mid '90s, 1994 to 1995, did you ever live in

8    California?

9    A.   We stayed there for a couple months.

10   Q.   Okay.  And by "there," let's be specific.  By "there," we

11   mean in California, correct?

12   A.   Yes.

13   Q.   And didn't you live with Mr. Witort?

14   A.   For, for a period of time, yes.

15   Q.   Okay.

16        MR. PITTS:  With the Court's permission?

17        (Brief pause.)

18   BY MR. PITTS:

19   Q.   Ma'am, you know the name Dennis Carey, do you not?

20   A.   That --

21   Q.   Dennis Cary is a deputy sheriff with the Fairfield County

22   Sheriff's Department, do you remember that?

23   A.   Yes.

24   Q.   Okay.  And you were in -- and you wrote several letters to

25   Deputy Sheriff Carey, did you not?

1   A.  Yes.

2   Q.  In fact, you wanted him to help you get your time reduced

3   as it relates to the sentence you were facing in Fairfield

4   County, Ohio, correct?

5   A.  Yes.

6   Q.  And you indicated in -- what I'm saying is that you have --

7   you asked him to do what he could to get you less time,

8   correct?

9   A.  Yes.

10  Q.  And it's a fair statement to make that, ma'am, in terms of

11  benefitting yourself, in the past, you've been willing to work

12  with law enforcement, haven't you?

13  A.  (No response.)

14  Q.  Isn't that true, ma'am?

15  A.  (No response.)

16  Q.  Yes or no?

17  A.  Yes.

18          MR. PITTS:  Nothing further.  Thank you.

19          THE COURT:  Other examination?

20          MR. SABBOTA:  Thanks.

21          THE COURT:  Mr. Sabbota?

22          MR. SABBOTA:  Thank you, your Honor.

23          THE COURT:  Go ahead.

24                  CROSS-EXAMINATION

25  BY MR. SABBOTA:

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. SABBOTA

1  Q.  Good morning, Ms. Casey.

2  A.  Good morning.

3  Q.  You told us yesterday that when you were 13 years old, I

4  guess you lived next door to the clubhouse of the Devils

5  Diciples?

6  A.  Yes.

7  Q.  And I guess you became enamored with a person by the name

8  of Bugs?

9  A.  Yes.

10  Q.  And you began a relationship with Bugs?

11  A.  Yes.

12  Q.  Now, this is a relationship which you began, which wasn't

13  forced?

14  A.  Fair enough.

15  Q.  Fair enough?  Well, you wanted to have a relationship with

16  him, didn't you?

17  A.  I was 13.

18  Q.  I understand that.  And you moved in with him when you were

19  17; am I right?

20  A.  Yes.

21  Q.  In fact, your mother gave you a choice, didn't she?

22  A.  Yes, she did.

23  Q.  She said I want you to go to school.  Am I right or wrong?

24  A.  Yeah.

25  Q.  Go to school, stay with me; am I right?

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. SABBOTA

1    A.  Yeah.

2    Q.  You chose voluntarily to move in with a guy by the name of

3    Bugs?

4    A.  Yes.

5    Q.  Okay.  And eventually you became I guess what they call his

6    old lady; am I right?

7    A.  Yes.

8    Q.  And this was something you wanted, yes?

9    A.  Yeah.

10   Q.  You wanted to have the patch that said you were the old

11   lady of Bugs?

12   A.  Yes.

13   Q.  And you were 17 or 18 when that happened?

14   A.  Yes.

15   Q.  And you claim or you tell us that Fat Dog is the one that

16   presented your patch?

17   A.  Yes.

18   Q.  Okay.  This was in the clubhouse in Ohio?

19   A.  Yes, it was.

20   Q.  Okay.  And you voluntarily took the patch?

21   A.  Yes, I did.

22   Q.  You put it on and you wore it proudly.  Yes?

23   A.  Yes.

24   Q.  Because you were going to participate with Mr. Casey as to

25   any endeavor that he wanted you to participate in; am I right?

1    A.  Yes.

2    Q.  That might have been a terrible question.

3           You were going to do whatever your husband wanted you

4    to do?

5    A.  Yeah.

6    Q.  Fair statement?

7    A.  Yes.

8    Q.  Okay.  And you were happy.  In fact, I guess there was a

9    birthday party, and at the party, you're saying that Fat Dog,

10   or Mr. Smith, put a pie in your face.  And that was a joke?

11   A.  Yes.

12   Q.  I mean, that's fun?  That's how some people celebrate their

13   birthday, yes?

14   A.  Yes.

15   Q.  That's how some people celebrate their wedding, they put

16   cake in their face, yes?

17          And initially, I guess you were living in the

18   clubhouse?

19   A.  Yes.

20   Q.  Okay.  But you wanted to better yourselves; am I right?

21   A.  Yeah.

22   Q.  And so the way you did that was you became involved in

23   selling cocaine?

24   A.  Yes.

25   Q.  Okay.  And you sold a lot of cocaine, keys of cocaine,

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. SABBOTA

1   didn't you?

2   A.  I don't know.

3   Q.  Okay.  How many pounds of cocaine did you sell in 1990?

4   A.  In '90?  I don't know.

5   Q.  How many in 1991?

6   A.  I don't know that either.  No.  '91?  I was not doing

7   nothing.

8   Q.  Okay.  How about in '89?

9   A.  '89, I don't know.

10  Q.  How about in '88?

11  A.  Don't know that either.

12  Q.  How about in '87?

13  A.  I was 17 in '87.

14  Q.  All right.  But the day-to-day business was a coke

15  business, wasn't it?

16  A.  Yes.

17  Q.  In fact, the coke business allowed you and your husband,

18  you told us yesterday, to buy yourselves a house?

19  A.  To move into a house.

20  Q.  I'm sorry.  To move into a house?

21  A.  Yes.

22  Q.  So the proceeds from that business allowed you to move into

23  a house, pay rent?

24  A.  Right.

25  Q.  Buy whatever you wanted to buy, yes?

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. SABBOTA

 1   A.   Right.

 2   Q.   And you knew this was an illegal business, yes?

 3   A.   Right.

 4   Q.   I mean, you were well aware that you don't sell cocaine.

 5   That would be a crime.  Am I right?

 6   A.   Right.

 7   Q.   All right.  And you really can't tell us over the years how

 8   much cocaine you, you distributed, can you?

 9   A.   No, I can't.

10   Q.   And you've never been prosecuted for any kind of cocaine

11   sales, have you?

12   A.   No.

13   Q.   And you told the Government all about your cocaine sales,

14   didn't you?  The Government, these people sitting here at the

15   table.

16   A.   Yes.

17   Q.   You told the people in, I guess, Fairfield County all about

18   the cocaine, didn't you?

19   A.   Yes.

20   Q.   Nobody ever prosecuted you for selling cocaine?

21   A.   No.

22   Q.   That was like a pass?

23   A.   Yeah.  It was in '88.

24   Q.   In '88.  But it was a pass, yes?

25   A.   Yes.

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. SABBOTA

1    Q.    And then I guess you become in the business of selling

2    meth.  But before we get to that, the cocaine sales themselves

3    that you and I guess Mr. Casey engaged in?  Yes?

4    A.    Okay.

5    Q.    Okay.  The selling, the money went to you and your husband?

6    A.    Correct.

7    Q.    That was his money?

8    A.    Correct.

9    Q.    He didn't share his money, did he?

10   A.    (No response.)

11   Q.    I mean, he had -- if he sold me a rock of cocaine, he would

12   keep the money?

13   A.    Yes.

14   Q.    If he sold me a pound of cocaine, he would keep the money?

15   A.    Yes.

16   Q.    If he sold me a kilo of cocaine, that was his money?

17   A.    Yes.

18   Q.    It wasn't anybody else's money?

19   A.    No.

20   Q.    And then what happens is I guess he becomes in this --

21   involved in the sale of methamphetamine; am I right?

22   A.    Right.

23   Q.    And when he becomes involved in the sale of

24   methamphetamine, that's really cheaper than cocaine, isn't it?

25   A.    Yes, it is.

1    Q.  It's a bigger profit margin for you, isn't it?

2    A.  Yes.

3    Q.  It's a better business?

4    A.  Yes.

5    Q.  Okay.  And that business, again, was your business with his

6    business; am I right?

7    A.  (No response.)

8    Q.  In other words, when he sold his meth, that's his money,

9    isn't it?

10   A.  Yes.

11   Q.  Okay.  That's what -- that's his earnings?

12   A.  Yes.

13   Q.  Yes?  That's the way he made a living?

14   A.  Yes.

15   Q.  How much meth do you think he has sold?

16   A.  Lots.

17   Q.  Lots?

18   A.  Don't know.

19   Q.  Enough to fill up the room?

20   A.  That's exaggerating a little bit, I would think.

21   Q.  It's a big room.

22   A.  Yeah.

23   Q.  Half the size of the room?

24   A.  Again, it's a big size.

25   Q.  Big size that he sold.

1   A.  Yeah.

2   Q.  Yes?

3   A.  It's not that big, though.

4   Q.  Well, would you say he sold pounds of meth?

5   A.  Probably, yes, over the years.

6   Q.  Okay.  Would you say he sold kilos of meth, over the years,

7   if you added it all up?

8   A.  Yes.

9   Q.  Large amounts of meth?

10  A.  Yes.

11  Q.  And he would sell meth to whenever he could sell meth?

12  A.  Yes.

13  Q.  And he would sell meth to people that were Devils Diciples?

14  A.  Yes.

15  Q.  He would sell meth to people that were not Devils Diciples?

16          THE COURT:  We have that information, that line of

17  questioning.  Next topic?

18  BY MR. SABBOTA:

19  Q.  Now, my understanding is that you claim that you gave Fat

20  Dog meth.

21  A.  No, not me directly.  I used to weigh it out.

22  Q.  You never saw anybody give Fat Dog meth, did you?

23  A.  There's been a couple occasions.

24  Q.  Did you see your husband give him meth?

25  A.  A couple occasions.

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. SABBOTA

1   Q.  Okay.  Tell me when.

2   A.  When he came to Rushville, Ohio, in the garage.

3   Q.  Tell me the date.

4   A.  I can't do that.

5   Q.  Tell me the day.

6   A.  I don't remember that either.

7   Q.  Tell me who was present.

8   A.  Fat Dog and Little Dog, and I think it was Magoo.

9   Q.  Okay.  How many times did you see Fat Dog take meth from

10  your husband?

11  A.  Probably once or twice.

12  Q.  Probably it was once or twice?

13  A.  Yes.

14  Q.  And Fat Dog paid your husband, didn't he?

15  A.  That, I don't know.

16  Q.  Okay.  Subsequent to being arrested -- before we get to

17  that, you told us yesterday you used to buy a lot of Sudafed?

18  A.  Yes.

19  Q.  And you did so under a company, Trial & True Antiques?

20  Some kind of company in Maine that you used as their vendor

21  name?

22  A.  No.

23  Q.  Well, would you buy Sudafed under an alias?

24  A.  No.  My husband did.  You're thinking -- you're not

25  thinking -- no, I didn't.

1  Q.  Your husband bought it, or the alias?

2  A.  They knew me, they knew me at D & R Wholesale as who I was.

3  Q.  All right.  Was there an alias company that was used?

4  A.  If my husband did, I don't -- Tried & True Antiques is a,

5  is a motorcycle repair shop.

6  Q.  All right.  You, you have used various aliases, haven't

7  you?

8  A.  Yes, I have.

9  Q.  Okay.  You used Catherine Kerns?

10  A.  Yes, I have.

11  Q.  You've used Ms. Evans, Mercury Evans?  Did you ever use

12  that name?

13  A.  No.

14  Q.  Rhonda Stahlin (ph)?

15  A.  No.  There was a package in her name.

16  Q.  Did the package in her name, did you create that package?

17  A.  Yes, I did.

18  Q.  All right.  So you created that package in her name so the

19  package wouldn't come back to you?

20  A.  No.  It was with her knowledge.

21  Q.  All right.  But you didn't put your name on the package?

22  A.  No.

23  Q.  Okay.  And the reason you didn't want to put your name on

24  the package is because you wanted to conceal your identity,

25  didn't you?

 1    A.  I wouldn't exactly say that.  But --

 2    Q.  When you took airplane tickets, did you conceal your

 3    identity?

 4    A.  Sometimes.

 5    Q.  Did you do that to disguise who you were?

 6    A.  So I wouldn't use my -- yes.

 7    Q.  Yeah.  And the reason you wanted to disguise who you were,

 8    because you wanted to deceive law enforcement; isn't that

 9    right?

10    A.  Yes.

11    Q.  You wanted to fool them?

12    A.  Yes.

13    Q.  You wanted to trick them?  Right?  Not want to get caught?

14    Am I right or wrong?

15    A.  Right.

16    Q.  Now, you told us today that you sat down with the State

17    when you got arrested, didn't you?

18    A.  Right.

19    Q.  And you told us today that the State talked to you about

20    Federal charges?

21    A.  Yes.

22    Q.  Did you have a lawyer at the time?

23    A.  Yes.

24    Q.  And so the lawyer also explained to you the nature of

25    Federal charges, didn't he?

1   A.  I don't, I don't recall.

2   Q.  Okay.  But you didn't want to face the Federal charges; am

3   I right?

4   A.  It was out of my control at that time.

5   Q.  Well, the state told you, you needed to cooperate, didn't

6   they?

7   A.  Yes.

8   Q.  And by needing to cooperate, you had to provide them

9   information in order to get the benefit of not having Federal

10  charges, didn't you?

11  A.  No.  That was never in the agreement.

12  Q.  There was never any agreement?

13  A.  No.

14  Q.  You've never been prosecuted federally for anything, have

15  you?

16  A.  No.

17  Q.  And you've never been charged with any meth crime federally

18  either, have you?

19  A.  No.

20  Q.  Yesterday, the Government showed you a series of

21  photographs that were on the wall.  Do you remember those

22  photographs?

23  A.  Yes, I remember.

24  Q.  You identified various people in those photographs?

25  A.  Yes.

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. SABBOTA

1   Q.  Can you tell me where those photographs were taken?

2   A.  No.

3   Q.  Can you tell me under what circumstances those photographs

4   were taken?

5   A.  No.

6   Q.  And you can't tell me where or when, can you?

7   A.  No.

8   Q.  All you can tell me is those are the various people that

9   you've identified in the photograph?

10  A.  Correct.

11  Q.  But you're telling us today that the business that you and

12  your husband had, was a business that basically was for you and

13  him to make money?

14  A.  Well, yeah.

15  Q.  Nobody else.  Am I right?

16  A.  No.  He did give money away, quite a bit of money.

17  Q.  Everybody gives money away.  But the drugs that he sold

18  were for you and him, weren't they?

19  A.  Yeah.

20      MR. SABBOTA:  Could I just have a minute, Judge?

21      THE COURT:  Yes, sir.

22      (Brief pause.)

23  BY MR. SABBOTA:

24  Q.  Being a member of the Devils Diciples, or old lady as to

25  Bugs, did you go to various parties that were for the benefit

1   of people?

2   A.  Yes.

3   Q.  Do you remember going to the Port Huron run?

4   A.  We've been to a lot of runs.

5   Q.  Okay.

6           MR. SABBOTA:  May I approach the witness a moment to

7   show her something, your Honor?

8           THE COURT:  Do you want to share that with Counsel?

9           MR. SABBOTA:  I believe the Government has already

10  seen it?

11          MS. MOHSIN:  Yes.  Thank you.

12  BY MR. SABBOTA:

13  Q.  Do you recall --

14          THE COURT:  You could, you could -- well, go ahead.

15  Go ahead.

16          MR. SABBOTA:  Is it all right?

17          THE COURT:  Yeah.  Go ahead.

18  BY MR. SABBOTA:

19  Q.  Do you recall being a part of this run for the benefit of

20  diabetes?

21  A.  No.

22          MR. SABBOTA:  No further questions, your Honor.

23          THE COURT:  Any further cross-examination?  Mr.

24  Kraizman?

25          MR. KRAIZMAN:  Yes.

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. KRAIZMAN

1                        CROSS-EXAMINATION

2   BY MR. KRAIZMAN:

3   Q.  Ms. Casey, I'm Sidney Kraizman and I am the attorney for

4   Mr. Patrick McKeoun.

5           Ms. Casey, as I understand from your testimony

6   yesterday, your husband hired Mr. McKeoun to cook meth for him;

7   am I correct about that?

8   A.  I don't know if "hire" would be the term we used.

9   Q.  In any event, he contracted with Mr. McKeoun to cook meth

10  in that burned, partly burned-out house that was on the

11  property; am I right about that?

12  A.  I don't know their agreements.

13  Q.  Okay.  All right.  But you do know that what Mr. McKeoun

14  produced was "no good"; am I correct?

15  A.  As far as my knowledge, yes.

16  Q.  Did it occur to you that Mr. McKeoun was scamming your

17  husband?

18  A.  Yeah.  Actually, it did.

19  Q.  Was there a point in time when Mr. McKeoun, during a

20  cross-country trip, took your husband's motorcycle and he sold

21  it to someone else?

22  A.  No.

23  Q.  Isn't it true that Mr., that Mr. McKeoun did something that

24  caused your family to suffer a substantial financial loss?

25  A.  I don't know what that would be.

1    Q.   Okay.   Perhaps I can refresh your memory.

2            This is the transcript of your statement that you gave

3    to Captain Dennis Carley.   You remember Captain Carley; am I

4    right?

5    A.   Yes.

6    Q.   And this is on June 4.   And it's at page -- on that

7    particular statement, it's page 60.   I'm sorry.   That page

8    number is incorrect.   It's page 108.

9            (Brief pause.)

10           MR. KRAIZMAN:   May I approach the witness, Judge?

11           THE COURT:   Yes.

12           MR. KRAIZMAN:   Okay.

13   BY MR. KRAIZMAN:

14   Q.   I would direct your attention, Ms. Casey, what I've

15   highlighted.   It's the bottom of page 108 and 109.   Would you

16   please read that?

17   A.   The whole thing or just what you highlighted?

18   Q.   Well, let me take a look at what I just gave you.

19           May I take back one of those?   Just the highlighted

20   portion, please.   Do you recall that now?

21           THE COURT:   Give her a chance to read it.

22           MR. KRAIZMAN:   Yes.

23           THE WITNESS:   Magoo -- Bugs's -- lost Bugs's respect

24   in more ways --

25           THE COURT:   Hang on.   The lawyer is not asking you to

1   read it out loud.  He's asking you to read the highlighted

2   material to determine if, having read it, your memory now is

3   refreshed about whatever it is that he's asking you.  That's,

4   that's the concept here.  So just read that material, and then

5   he'll ask you another question.  Okay?

6   BY MR. KRAIZMAN:

7   Q.  Okay, you read it.  Am I correct?

8   A.  Yes.

9   Q.  Did you tell Captain Carley that, "Magoo put us in debt; it

10  was quite a bit of money?"

11          THE COURT:  The question, actually, Mr. Kraizman --

12          MR. KRAIZMAN:  Yes.

13          THE COURT:  -- I think would be whether the witness's

14  memory now is refreshed as to that purported incident.

15          MR. KRAIZMAN:  Thank you.

16          THE COURT:  Right?

17          MR. KRAIZMAN:  Yes.  You're right.

18          THE COURT:  Okay.  Go ahead.

19  BY MR. KRAIZMAN:

20  Q.  Okay, Ms. Casey, does that refresh your memory?

21  A.  Somewhat, yes.

22  Q.  Okay.

23          THE COURT:  And then you would have a substantive

24  question to follow-up, right?

25          MR. KRAIZMAN:  Yes.

```
 1                    THE COURT:  So what's the substantive question?
 2   BY MR. KRAIZMAN:
 3   Q.   Do you remember now that Magoo put you and your husband in
 4   debt because he sold some property of Bugs' on the way back
 5   from a trip?
 6   A.   I don't remember what the property was.
 7   Q.   Okay.  But you remember that he, that he, that he put you
 8   and your husband in debt by selling some kind of property?
 9   A.   I remember that Bugs was not happy with Magoo, yes.
10   Q.   Okay.  I'll take that back now, please.
11             It was a loss of quite a lot of money; am I correct?
12   A.   I would imagine so.
13   Q.   Okay.  You testified that there were two Western Union
14   transfers of money to Magoo; am I correct about that?
15   A.   There was quite a few.
16   Q.   Well, specifically I'm talking about Magoo.  Didn't you say
17   that there were two to Magoo that were Western Union transfers
18   of money?
19   A.   I can remember a couple, but there's -- there was a lot of
20   Western Union transfers.  A lot.
21   Q.   I just want to talk about Magoo.  You didn't happen to keep
22   any record of the paperwork on the Western Union transfers to
23   Magoo, did you?
24   A.   I kept all paperwork.
25   Q.   Did you give it to the Government?
```

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. KRAIZMAN

```
 1   A.   No.   The Government seized it.

 2   Q.   So you're telling me that the Government has possession of

 3   what you think are, are Western Union records as to two

 4   transfers of money by Magoo?

 5   A.   The State has, yes.

 6   Q.   What was the date of those transfers?

 7   A.   I have no idea.

 8   Q.   Can you tell me the year?

 9   A.   It was probably '95, '96.

10   Q.   Which Western Union was it?

11   A.   Well, the Western Union I always used was out of a Kroger

12   in Lancaster.

13   Q.   It's in Lancaster.  And what did you say it was?

14   A.   At a Kroger.

15   Q.   Do you remember the particular Kroger?

16   A.   There was only two in Lancaster.

17   Q.   You testified that you were addicted to methamphetamine,

18   and that at one point, you were awake for 15 days straight?

19   A.   I don't remember --

20   Q.   Is that true?

21   A.   I don't remember saying 15 days, sir.

22   Q.   How many days do you remember saying on direct examination

23   yesterday, by Ms. Mohsin?

24   A.   Probably 10 or 11.  I don't remember, recall saying 15.

25   Q.   Okay.  And what you remember of those 15 days being -- 11
```

JURY TRIAL, VOLUME III
KAREN CASEY - CROSS BY MR. KRAIZMAN                                    54

1    days being awake, what effect did that have on your mind?

2    A.  Well, it has a lot of effect on your mind.

3    Q.  Go ahead.

4    A.  You see things.  I mean, there's a lot that happens.

5    Q.  Okay.  So you see things, hallucinating; am I correct about

6    that?

7    A.  Yes.

8    Q.  You suffered from a serious mental disorder?

9    A.  From a serious mental disorder?

10   Q.  Yes.

11   A.  Yes.  I have PTSD.

12   Q.  That's posttraumatic stress disorder?

13   A.  Yes.

14   Q.  You took lithium over there at the county jail in Ohio in

15   1990; am I correct about that?

16   A.  In 1990?

17   Q.  I'm sorry.  1999.

18   A.  Yes.

19   Q.  Okay.  And what condition was that for?

20   A.  I believe that was for bipolar.

21   Q.  So you've got PTSD, which is posttraumatic stress syndrome.

22   Bipolar.  Have you also been diagnosed as having schizophrenia?

23   A.  That's news to me, but.

24   Q.  I'm just asking you.  I'm not saying it's true.  It's a

25   question.

1   A.   No.

2   Q.   Okay.  In 1993, in Lancaster, Ohio, were you convicted of

3   the offense of presenting false identification to a police

4   officer, namely, trying to pretend that you were your sister

5   during an investigation by handing him your sister's

6   identification and claiming to be her?

7   A.   I had a driver's license in my sister's name.

8   Q.   Okay.  And you presented that to a police officer claiming

9   to be your sister; am I correct?

10  A.   Yes.

11  Q.   And that was the basis for that conviction of presenting

12  false identification to a police officer; am I correct about

13  that?

14  A.   I don't believe there was a conviction.

15  Q.   Okay.

16          MR. KRAIZMAN:  I have provided the Government with the

17  copy of that record of conviction.

18          Ms. Mohsin, will you stipulate to that?

19          (Brief pause.)

20          MS. MOHSIN:  I will not.

21          MR. KRAIZMAN:  Very well.

22          THE COURT:  Any other questions then?

23          MR. KRAIZMAN:  I do have just a couple more questions.

24          (Brief pause.)

25  BY MR. KRAIZMAN:

1    Q.   Ms. Casey, on direct examination, you testified that on

2    your most recent conviction, that you were going to get 20

3    percent off of the time for good time.

4    A.   Correct.

5    Q.   Is it true that while you've been incarcerated in the

6    Kansas correctional facility that you had approximately 12

7    violations of their disciplinary rules, including dangerous

8    contraband, less dangerous contraband, lying, theft, misusing

9    meds, others also?

10   A.   Yeah.

11        MR. KRAIZMAN:  I have no further questions.

12        THE COURT:  Any others?  Seeing none.  Any redirect

13   examination?

14        MS. MOHSIN:  Yes, your Honor.

15                    REDIRECT EXAMINATION

16   BY MS. MOHSIN:

17   Q.   Good morning, Ms. Casey.

18   A.   Good morning.

19   Q.   Ms. Casey, you testified yesterday that you were 13 when

20   you met Bugs and became affiliated with the Devils Diciples

21   club.  How old was Charles Casey when you met him?

22   A.   Thirty-three.

23   Q.   And how old was he when you married him?

24   A.   Forty.

25   Q.   Was this an equal partnership, this relationship?

1   A.   No.

2   Q.   Did he give you the proceeds from whatever drug activity he

3   was involved in?

4   A.   No.

5   Q.   Did he open up a bank account in your name?

6   A.   No.

7   Q.   Did he deposit money in your name for your share of the

8   proceeds of whatever activity he was involved in?

9   A.   No.

10  Q.   Did he tell you where he kept the proceeds of the money

11  from the drug trafficking activity that you participated in?

12  A.   No.

13  Q.   Did you ask for money from him any time you needed it?

14  A.   When I had to.  When I, when I needed it, yes.

15  Q.   So what type of a financial relationship did you have with

16  your husband?  In other words, was he paying the bills?

17  A.   Yes.

18  Q.   Was he providing food and shelter?

19  A.   Yes.

20  Q.   Was he giving you spending money to go and take care of

21  things that you needed to buy?

22  A.   As far as the house, yes.

23  Q.   Was he sharing in the proceeds of whatever drug activity he

24  had in any other way?

25  A.   Yeah.  He, he used to send money out.

JURY TRIAL, VOLUME III
KAREN CASEY – REDIRECT BY MS. MOHSIN

1    Q.  And who would he send it to?

2    A.  I guess to pay -- to Fat Dog.

3    Q.  How do you know that?

4    A.  Because it would be me that would send the money.

5    Q.  And how would you send that money out?

6    A.  Western Union.

7    Q.  And how often did you do that?

8    A.  Quite a bit.

9    Q.  Was it close in time to when a drug trafficking event would

10   occur?

11   A.  Yes, always.

12   Q.  How close in time?  What's your definition of "close in

13   time"?  Hours?  Days?  Weeks?

14   A.  Within days.

15   Q.  And did you act at the direction of your husband, Charles

16   Casey?

17   A.  Yes, I did.

18   Q.  Did you ever do something without his permission or

19   knowledge?

20   A.  No, I do not.

21   Q.  Did you ever do something that you were not supposed to do

22   and get in trouble for it?

23   A.  Yeah.

24   Q.  Can you give the jury some examples of what would happen if

25   you were to act on your own?

1    A.   I would get the tar knocked out of me.  He would beat me

2    up.

3    Q.   How severe were the beatings?  Can you give the jury a

4    sense of the injuries that you suffered?

5    A.   Yeah.  I can remember on one occasion I didn't go out of my

6    house for two weeks.

7    Q.   And what was the reason for that?

8    A.   Because I had black eyes.

9    Q.   And did he ever break any bones?

10   A.   No.

11   Q.   Did he ever do any other internal damage to your body?

12   A.   No.  Besides my, beat me around my head, no.

13   Q.   How often would you say that you had been beaten by him?

14   A.   Several.

15   Q.   Were you afraid of him?

16   A.   Yes.

17   Q.   I want to direct your attention now to some of the other

18   things that were brought up during your direct examination.

19         You testified before a federal grand jury in 2012,

20   correct?

21   A.   Correct.

22   Q.   Were you -- do you recall being advised that if a truthful

23   answer were to incriminate you, that you had an absolute right

24   not to answer that question?

25   A.   Yes.

JURY TRIAL, VOLUME III
KAREN CASEY - REDIRECT BY MS. MOHSIN                        60

1    Q.  And were you also told that if you were to make a false

2    statement or knowingly lie to the grand jury, that you could

3    subject yourself to additional criminal charges?

4    A.  Yes.  I remember that.

5    Q.  And do you recall being told that your testimony could be

6    used against you in any such prosecution?

7    A.  (No response.)

8    Q.  For lying and false statements?

9    A.  Oh, yes.

10   Q.  Now, you testified earlier that you served time for the

11   drug trafficking activity that you were involved in with your

12   husband as it relates to the methamphetamine; is that right?

13   A.  Yes.

14   Q.  And you also testified that you cooperated with law

15   enforcement; is that right?

16   A.  Yes.

17   Q.  When did all of that occur, the cooperation?

18   A.  When I was, when I -- the second time I was caught, when I

19   was caught in Kansas and brought back from Kansas to Ohio.

20   Q.  So that would have been after you had been a fugitive for a

21   few years?

22   A.  A couple, yes.

23   Q.  And when you were interviewed at that time, did they make

24   recorded interviews of what you had said?

25   A.  Yes, they did.

JURY TRIAL, VOLUME III
KAREN CASEY - REDIRECT BY MS. MOHSIN
61

1   Q.  Now, do you know, have you ever heard those interviews

2   since you -- since you made those recordings?

3   A.  No.

4   Q.  Do you know if they were ever transcribed?

5   A.  No, I don't.

6   Q.  Have you ever been shown any transcripts of what you said

7   in the past?

8   A.  That gentleman just showed me.

9   Q.  Okay.  Other than that, has anyone ever shown you any

10  transcript or report about statements you made in the 1990s, in

11  1998, about the events that occurred?

12  A.  No.

13  Q.  No one has shown them to you?

14  A.  No.

15  Q.  You testified before a grand jury.  Do you know if a

16  transcript was made?

17  A.  No, I don't.

18  Q.  Have you ever seen a transcript?

19  A.  No.

20  Q.  Has anyone ever shown it to you?

21  A.  No.

22  Q.  So prior to coming here and testifying both yesterday and

23  today, what type of preparation did you have?

24  A.  I met with you one time.

25  Q.  And for how long?

JURY TRIAL, VOLUME III
KAREN CASEY - REDIRECT BY MS. MOHSIN

62

1   A.   I don't recall.  It wasn't long.

2   Q.   What's your definition of "not long"?  A couple hours?

3   Couple days?

4   A.   It was about couple hours.

5   Q.   All right.  And did you meet with me before the grand jury

6   in 2012?

7   A.   Shortly.  Briefly.

8   Q.   How long?

9   A.   About an hour.  It wasn't long then either.

10  Q.   And what instructions were you given about what was

11  expected from you, both in the grand jury and here in the

12  courtroom?

13  A.   To tell the truth.

14  Q.   Okay.  And did anybody tell you anything different?

15  A.   No.

16  Q.   Did any promise of any kind -- was any promise of any kind

17  made to you about whether you were going to be prosecuted,

18  whether you weren't going to be prosecuted, or anything along

19  those lines?

20  A.   No.

21  Q.   Did you expect to get charged federally?

22  A.   No.

23  Q.   Did you get a promise that you would get some sort of other

24  leniency?

25  A.   No.

1  Q.  Now, you testified that when you were a fugitive, you were

2  looking for help from the Devils Diciples; is that right?

3  A.  Yes.

4  Q.  And that after you fled, you went to California, to

5  Holiday, correct?

6  A.  Yes.

7  Q.  What kind of help were you looking for, from Holiday?

8  A.  From what my old man -- I did what my old man told me to.

9  Q.  What did he tell you to do?

10 A.  To go there and get dope and bring it back to sell it.

11 Q.  And why did he want you to sell it?

12 A.  Because money was getting funny.  We was getting low on

13 funds.

14 Q.  Okay.  So were you acting at the direction of your husband

15 when you went to see Holiday?

16 A.  Yes.

17 Q.  Now, one of the attorneys asked you about an arrest that

18 occurred in 1993.  How old were you in 1993?

19 A.  Twenty-three.

20 Q.  And you indicated that that was not a conviction; is that

21 right?

22 A.  Correct.

23 Q.  Isn't that because those charges were dismissed by the

24 State?

25 A.  Yes.

1   Q.   Okay.  So you were never -- you were charged but you were

2   never convicted of that offense, correct?

3   A.   Right.

4   Q.   And I want to talk to you about PTSD.  When were you

5   diagnosed with PTSD?

6   A.   '80 -- scratch that.  I'm sorry.  '90s.  '98 I think.

7   Q.   And what symptoms did you have of PTSD that led you to --

8   that led to that diagnosis?

9   A.   Being around my husband.

10  Q.   When you say "being around your husband," can you be a

11  little more descriptive and specific?

12  A.   From the beatings.

13  Q.   So were these frequent beatings around that time?

14  A.   He beat me all the time.

15  Q.   And so as a result, did you seek medical attention?

16  A.   Once.

17  Q.   And is that when you were diagnosed with PTSD?

18  A.   Yes.

19  Q.   Do you still suffer from PTSD?

20  A.   Yes, I do.

21  Q.   Are you still with your husband?  Even though you're

22  married to him, are you together?

23  A.   No.  We're separated.

24  Q.   How long have you been separated?

25  A.   Since 1999.

```
 1   Q.  Since you were arrested the second time?

 2   A.  Yes.

 3   Q.  Would that have been after he had kidnapped your daughter?

 4   A.  Yes.

 5            MS. MOHSIN:  Nothing further.  Thank you, your Honor.

 6            THE COURT:  The witness may step down.  We're going to

 7   take a recess at this point, about 20 minutes, ladies and

 8   gentlemen, and you may escort yourselves to the jury rooms and

 9   remain there till you're called out.

10            Thank you.

11       (Jury out, 10:27 a.m.)

12            THE COURT:  The jury is absent.  Be seated, please.

13            I want to give a couple of practice observations.  And

14   Mr. Straus, you're going to be showing the video?

15            MR. STRAUS:  Yes, your Honor.

16            THE COURT:  This is the break in which you're going to

17   the video, then you're going to call the meth expert, right?

18            MR. STRAUS:  That's correct.  If it's acceptable to

19   defense.

20            THE COURT:  That assumes that video that you hadn't

21   earlier shown them.

22            A couple practice pointers.  First and foremost, my

23   standard practice is that counsel should not, in the hearing of

24   the jury, seek a stipulation.  Things can go off the rails.  It

25   could be potentially prejudicial or inject inadmissible
```

```
 1    evidence or comments.  So as a general matter, that should not
 2    be done.
 3           I invited Mr. Pitts to do that on the basis of a sort
 4    of practice exception that I would recognize, and that is where
 5    there's something such as a date that's in a transcript or in a
 6    police report that's, like, 99.9 percent uncontestable, you
 7    know that it's going to be agreed to.  So I invited Mr. Pitts
 8    to just say, well, what was that?  Some phrase in it or some,
 9    some phrase in the transcript?
10           MR. PITTS:  Whether or not, pursuant to the
11    questioning of Ms. Mohsin, she was a target.
12           THE COURT:  Oh, the phrase.  Yes, language used, you
13    were not a target of the investigation.  Right.  So there it is
14    in the transcript.  So I think 99 percent likelihood that she's
15    going to say, well, yeah, that's what it says in the
16    transcript.  So there's nothing problematic about that.
17           Now, Mr. Kraizman's proposed stipulation in the
18    hearing of the jury is really of a different quality.  There
19    was -- I would say that that did not have a 99 percent chance
20    of, of success.  Obviously, it was not successful.
21           That sort of seeking of a stipulation still can occur,
22    but it should be done quietly in sort of a whispered manner to
23    opposing counsel, generally speaking, out of the hearing of the
24    jury, are you going to go along with this, would you stipulate
25    to this.  If the answer is yes, then proceed.  If the answer is
```

```
 1    no, then you need to do something else.  So just, those are
 2    just practical comments, observations that may speed things
 3    along here or ease the process.
 4           We're going to recess now for 20 minutes.  You carry
 5    on with your video and we'll resume at ten minutes of the hour.
 6    Thank you.
 7           COURT REPORTER:  All rise.  Court is in recess.
 8        (Recess taken, 10:30 a.m. - 11:02 a.m.)
 9           THE CLERK:  All rise.  Court is back in session.
10           THE COURT:  Be seated, please.  The jury is being
11    prepared to come out.  What's your status, Mr. Straus?
12           MR. STRAUS:  Your Honor, we played the video for the
13    defense.  I believe they have an objection to relevance.  They
14    can correct me if I'm wrong.  There appears to be no objections
15    to 403 prejudice issue.  And I'll allow defense to make that
16    argument, I suppose.
17           THE COURT:  Who speaks to this?  Ms. Stout?
18           MS. STOUT:  Thank you, your Honor.  I did file the
19    motion on behalf of all my co-counsel and myself.  Your Honor,
20    our original objection was to this expert as a whole, as to his
21    relevance.  If the Court decides his testimony is relevant,
22    then we've come to an agreement on what Power Points can be
23    presented and we have no issues with that.
24           As far as the videos, and going back to the argument
25    as a whole, the reason we call experts is Rule 702.  It's very
```

```
 1   specific.  I'm not necessarily challenging this gentleman's
 2   experience and training.  I'm, I'm not sure that it's really a
 3   field of expertise, meth labs.  But nonetheless, if the
 4   expert's knowledge, one, will help the trier of fact to
 5   understand the evidence, or two, to determine a fact in issue.
 6            Let me go to number two, first.  There's no fact in
 7   issue that they were manufacturing meth, because I think the
 8   charge is distribution of meth.  Am I correct in that?
 9            MS. MOHSIN:  No.
10            MS. STOUT:  There is a manufacture?  Okay.
11            But there is no fact in issue that there is meth
12   sales.  We heard that from Ms. Casey.  It doesn't impart to the
13   guilt or innocence of meth sales how a meth lab is operated.
14   We -- the jury doesn't need to know that any more than they
15   need to know how, how someone shoots up heroin in a heroin
16   case.
17            As far as understanding the evidence, I, I realize
18   that the Government needs to show things that were found in
19   their searches are things that can be used in the production of
20   meth or a meth lab.  I certainly understand that.  But Agent
21   Fleming testified to that, so it's already out there and it's
22   clear for the jury to put that together.
23            I think it's irrelevant, unnecessary, and furthermore,
24   if it is relevant, 403 prejudice would outweigh it because it's
25   very inciteful to a jury, it's very inflammatory to, to -- meth
```

```
 1    has got -- it's like we talked about when I put my motion
 2    earlier, like the term "Nazi."  It just inflames people.  And
 3    to see the pictures and, and hear about all this methodology in
 4    making it is very inflammatory.
 5             Thank you.
 6             THE COURT:  All right.  Any brief counterpoint to that
 7    from the Government?
 8             MR. STRAUS:  All examples that were noted in Ms.
 9    Stout's motion in terms of to strike items out of the proposed
10    Power Point have been stricken.  In terms of the overall
11    presentation of this meth lab expert, your Honor, with the
12    Michigan State Police, it is relevant.  The Court has already
13    seen some of the items that have been seized during some of the
14    searches.  They are household items.  There was an objection to
15    Special Agent Fleming, or there was a request for foundation as
16    to some conclusions he had made as a law enforcement officer.
17             This testimony will assist the jury because they do
18    not have this specific knowledge on how to make meth, in terms
19    of determining whether the items it sees are, in fact, part of
20    an overall scheme to make meth.  And so it's highly relevant.
21    It adds understanding.
22             It also, in terms of the video, will also help
23    explain, help the, the witness explain his testimony.  It is in
24    the nature of a demonstrative evidence.  We can certainly admit
25    it, but I have no objection of it not going back into the jury
```

 1   room, either the Power Point or the video.  It's simply used as

 2   an aid to assist the expert in explaining the process of making

 3   meth.

 4        THE COURT:  The proffered evidence is relevant.  The

 5   indictment charges, among other things, conspiracy to

 6   manufacture controlled substances, specifically

 7   methamphetamine, which is an extraordinarily complex, and I

 8   might add, extraordinarily dangerous endeavor.  It is not

 9   within the common knowledge of the average person.

10        Also, contained in the indictment is a charge of

11   possession of methamphetamine precursors.  To know what that

12   amounts to and what the sign, symbols and signs and indicators

13   may be of what constitutes a precursor needs explanation as

14   well.  I have no difficulty in assessing that the evidence is

15   relevant and is of a kind that "will help the trier of fact to

16   understand the evidence."  There is no doubt that this evidence

17   will assist in that regard.

18        I take it on the Government's good-faith word that the

19   -- that there have been redactions of most, if not all, of the

20   allegedly inflammatory material.  It's a pared-down video

21   presentation and will help to assist the expert, or the opinion

22   witnesses's testimony.

23        Let's line the jury up, please, and bring them in.

24        Obviously -- the conclusion is, obviously, the

25   objection is overruled.

1                MS. STOUT:  Thank you, your Honor.

2                THE COURT:  Thank you.

3          (Jury in, 11:08 a.m.)

4                THE COURT:  Okay.  Thank you.  The jury is assembled.

5     All defendants and counsel are present.  And you may be seated,

6     please.  And Mr. Straus, you may continue.

7                MR. STRAUS:  Yes.  Thank you, your Honor.

8                At this time, the United States would call Detective

9     Lieutenant Tony Saucedo for the purposes of Counts 1 and 3 and

10    regarding the RICO conspiracy, meth conspiracy, and the charges

11    relating to the possession with intent to distribute

12    methamphetamine and possession of meth precursors.

13               THE COURT:  Very well.  This is, this is he?

14               MR. STRAUS:  Yes, your Honor.

15               THE COURT:  Step forward.  Raise your right hand, sir.

16          (Witness is sworn.)

17                          TONY SAUCEDO

18       called as a witness at 11:09 a.m., testified as follows:

19                         DIRECT EXAMINATION

20    BY MR. STRAUS:

21    Q.  Good morning.

22    A.  Good morning.

23    Q.  Could you state your name and spell your last name for the

24    record, please.

25    A.  Tony Saucedo, S-A-U-C-E-D-O.

JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

72

1   Q.   Where are you employed?

2   A.   I'm employed with the Michigan State Police.

3   Q.   And in what, what position?

4   A.   Currently I'm a detective lieutenant.  And I'm the unit

5   commander of the Southwest Enforcement Team which is

6   headquartered in Battle Creek, Michigan.

7   Q.   And how long have you been employed in that capacity?

8   A.   I've been employed, employed with the Michigan State Police

9   for a little over 26 years.  And I've been assigned to the

10  Southwest Enforcement Team for about two and a half, three

11  years.

12  Q.   All right.  And before that, where were you assigned within

13  the Michigan State Police?

14  A.   Prior to that assignment, for ten years, I was assigned out

15  of headquarters.  And I was in charge of the statewide

16  methamphetamine investigation team for the State of Michigan.

17  Q.   Okay.  And did you hold some prior positions before that

18  ten-year period?

19  A.   Yeah.  Prior to that, just like all troopers, you go

20  through recruit school.  After recruit school, I was assigned

21  as a regular road trooper at the South Haven post.  I was a

22  road trooper for about ten years.  And those duties, just like

23  any other police officer, handle complaints, traffic

24  enforcement, things of that nature.

25           I was then assigned as a detective trooper to the

1    Southwest Enforcement Team, west team, where I was an

2    undercover narcotics detective, did that for a year, at which

3    time I was promoted to a desk sergeant position at the Battle

4    Creek post.

5         I was there for a little over two years, and then took

6    a re-assignment to headquarters where I was promoted to the

7    unit commander of the methamphetamine investigation team.

8    Q.  Okay.  And prior to your employment with the Michigan State

9    Police, did you have any earlier law enforcement experience?

10   A.  No, I did not.

11   Q.  Okay.  And, sir, for the benefit of the jury, could you

12   disclose your formal education?

13   A.  High school graduate, some college courses but no degree.

14   And then again, attended the recruit school with the Michigan

15   State Police.

16   Q.  Let me direct your attention to the period of your

17   employment that you worked through for ten years.  You said the

18   methamphetamine investigation unit?

19   A.  Yes.

20   Q.  Can you broaden the knowledge of the jury and explain what

21   that entailed in a little more detail?

22   A.  Well, it was a new unit that was created within the

23   Department of State Police to handle the increase in

24   methamphetamine labs across the State of Michigan.

25        At first, it was just a five-man team that handled

1   meth lab response across the state, but then the department saw

2   the need for additional officers.

3            When I got into that position, basically it was

4   writing policy in charge of the training for the officers to be

5   able to respond to these types of complaints, for the sole

6   reason is that your typical law enforcement officer can't just

7   get out of his car and handle a meth lab.  There's a lot of

8   dangerous things that occur during that process.  And so the

9   law enforcement officers that respond to those types of scenes

10  have to have additional training.  They are basically trained

11  as a Hazmat tech level to deal and work in a Hazmat environment

12  scene.

13           So I was in charge of training the officers with that,

14  administering grants, not only pay for training, but also pay

15  for overtime for the responders to respond and as well as

16  respond to meth labs statewide.

17  Q.  Okay.  You used a couple of buzz words there.  And can you

18  explain to the jury, what is a Hazmat?

19  A.  Hazmat scene is considered where there could be chemicals

20  that could have health effects to you, on a person.  It

21  involves wearing specialized equipment to handle that stuff so

22  that you don't get affected by any of the stuff that's on the

23  scene.

24           There are different types of Hazmat scenes.  For

25  example, if you see a tanker overturned on the side of the road

1    and it spills a farm, a farm fertilizer called anhydrous

2    ammonia, or a gas tanker, that's considered a Hazmat scene

3    because of that specific chemical that that truck is hauling

4    has large quantities, could have some adverse health effects.

5    So again, a specialized team would go out to handle that type

6    of situation.

7    Q.  Okay.  And Hazmat, that's just short for hazardous

8    material, correct?

9    A.  That is correct.

10   Q.  You mentioned the term "grant."  Is that -- does that have

11   something to do with the federal government giving the state

12   money to do certain things?

13   A.  Yeah.  There's a lot of grants out there.  We had grants

14   for training, because it is expensive to train these officers

15   to handle these types of scenes, as well as pay for the

16   specialized equipment that's needed while they're responding to

17   those scenes.  So we get a lot of those types of Federal grants

18   to help out.

19   Q.  And this unit, this methamphetamine investigation unit, how

20   many, how many personnel were in this unit?

21   A.  Well, the way it was set up with the State Police, is that

22   we worked hand-in-hand with our local partners.  And so once,

23   whether it was a state trooper or a county sheriff's deputy or

24   local PD officer, once they were trained to handle these types

25   of calls whenever a response was needed, then you would call,

1    no matter which agency it was, you would just call the officers

2    that were certified in that area to respond.

3            So the State Police, there's probably 350 troopers

4    that are certified.  And for local officers in the state,

5    anywhere from 2 to 300 officers that are trained.

6    Q.  So it's kind of a task force of sorts?

7    A.  Yeah.  You could call it that.

8    Q.  Okay.  And did you have any leadership or supervisory role

9    in that unit?

10   A.  Most of the scenes, like I said, would respond with a

11   trooper or somebody within the Michigan State Police

12   department.

13           In my office in Lansing, we oversaw those types of

14   responses to include calling out those officers.  And then when

15   the reports were completed, they would be sent to my office for

16   review.  And we would make sure that all the necessary

17   paperwork was completed and completed properly for that

18   particular case.

19   Q.  Okay.  And in terms of this, this -- so you were a

20   coordinator of sorts, at some point?

21   A.  Yes.

22   Q.  And how, how long in that 10-year period were you a

23   coordinator?

24   A.  The full ten years.

25   Q.  Okay.  And that's, that's a chief or big chief, so to

```
 1   speak?
 2   A.  Sure.
 3        (Laughter in courtroom.)
 4   Q.  All right.  That's overly embellished.  You were, you were
 5   a supervisory person --
 6   A.  Yes.
 7   Q.  -- of some sorts?  Okay.
 8        And prior to at taking that position, did you receive
 9   any kind of specialized training in the area which you were
10   going to work?
11   A.  Yes.  As soon as I got assigned to the unit, then I was
12   scheduled to attend basic clan lab school, which basically is a
13   school where you go for a week to be trained on how to handle
14   those types of complaints.  That was conducted by the Drug
15   Enforcement Administration down in Fort Leonard Wood, Missouri.
16        I then attended a 3-day, 24-hour site safety class,
17   which then again allowed me to be a supervisor on those scenes,
18   which was conducted again by the Drug Enforcement
19   Administration in Fort Leonard Wood, Missouri.  And I had to
20   have those two classes before I could actually respond to meth
21   labs and help dismantle those.
22   Q.  Okay.  And then did you say that was put on by the Drug
23   Enforcement Administration?
24   A.  Yes.
25   Q.  DEA?  Any other training?
```

1  A.  Well, through the course of my career, when I became an

2  undercover narcotics detective, I had gone to basic and

3  advanced narcotics schools, which basically teaches you how to

4  be a narcotics officer, what to look for, surveillance, those

5  types of things that you would do during the course of that

6  work.  Reid Interview School, which, again, is a school that

7  helps law enforcement be able to be conduct interviews with

8  suspects.  And then again, the trooper recruit school.

9       Later on, once we had the meth team, we had a program

10  that's currently in existence in the State of Michigan called

11  the meth container program.  And that's where we store the

12  hazardous waste temporarily so it can be disposed of properly

13  by our hazardous waste contractor.

14       I also attended a three-day school to be able to not

15  only go and dismantle labs, but then package that stuff safely

16  and transport it to these hazardous waste pods until a

17  hazardous waste company can come and dispose of it properly.

18  Q.  To the extent you might not have said it, but you talked

19  about training that you have received.  Have you given training

20  to officers?

21  A.  Yeah.  During the course of that time that I was on the

22  meth team, I was also a contract instructor for a company out

23  of California, Network Environmental Systems, that conduct the

24  basic clan lab schools that I attended through the DEA.  And

25  I've trained officers in the state of Minnesota, Tennessee,

1    Iowa, Guam, not only in basic certification classes, but I've

2    also trained officers in tactical entries into meth labs

3    because of the potential of explosions and fires of those

4    scenes.

5            And then in, just in the State of Michigan, part of my

6    duties on the meth team was also to do training, not only for

7    law enforcement, but -- and first responders in the State of

8    Michigan, but also for the general public, to let them know

9    what the dangers are of methamphetamine.  And in the course of

10   that time, probably over 5,000 first responders that I've

11   trained in the state of Michigan.

12   Q.  Okay.  Beyond the training that you received, the training

13   you have given, let's talk about your work experience.

14           Have you had hands-on investigations or been involved

15   in investigations of meth labs?

16   A.  I have, yes, sir.

17   Q.  And how many meth labs investigations do you think you've

18   been involved with, either directly or indirectly?

19   A.  Rough estimate, I would say 400.  Again, where I've either

20   been hands-on responding to those scenes, have shown up as a

21   site supervisor, or have packaged it.

22           And in my current job, which is in the west side of

23   the state, it always appears to be, tends to be the hot spot

24   for meth labs.  So our units still respond to meth labs in that

25   area that I respond to, to help dismantle them and package the

1   stuff to, again, transport them to these hazardous waste pods.

2   Q.   Okay.  And when you respond to a meth lab, can you give the

3   jury a little idea of what would be a day in the life?  I mean,

4   what do you see, what do you hear and what are the types of

5   things you encounter when you do a meth lab investigation?

6   A.   Well, a meth lab investigation versus a meth lab response,

7   they are kind of two different things.  You could actually

8   start a meth lab investigation, and it would be no different

9   than a typical drug investigation, where at that point, you're

10  gathering facts, finding out who your suspects are, maybe doing

11  some surveillance.  And again, that's no different than a

12  typical narcotics investigation.

13       When you talk about responding to a meth lab, again,

14  that's when this extra training, the equipment comes into play.

15  When you show up to one of those scenes, again, typically one

16  of the first things you want to do is rope it off and not let

17  anybody come in and out of that scene that's not, number one,

18  properly trained to be in that environment, or has the proper

19  equipment to go in there.

20       Again, when I talk about proper equipment, I'm talking

21  about things like a respirator which, again, is a face mask

22  with either a cartridge that helps filter out some of the

23  things that may be in the environment, or a self-contained

24  breathing apparatus, which I'll refer to as a SCBA.  It's the

25  same things that the fire department wears where you have a

1    backpack that's got air in it, again, to help you breathe in

2    those environments.

3            It also includes wearing protective clothing, fire

4    retardant clothing, again, to help in the event something

5    catches on fire while you're working in that environment.

6    Usually, we have the fire department on scene with a charged

7    hose, again, because there's always that potential that a fire

8    could start.  Basically, you lock down that scene until you've

9    taken your photographs, collected all the evidence that you

10   needed to collect, sample what you need to sample, whether it's

11   liquids, to see if the presence of methamphetamine or, or

12   ephedrine or pseudoephedrine is in that solution, and then

13   package that stuff up, again, to remove it, to make that place

14   safe before anybody can enter again.

15   Q.  Okay.  You said the word "stuff" and you said the word

16   "evidence."

17   A.  Okay.

18   Q.  If we could get a little bit more detailed and granular,

19   and could you, having said what you said, can you talk about

20   specifically what are the types of things you see?

21   A.  Well, a lot of -- what's going to determine on what you're

22   going to see is the type of methamphetamine cook they may be

23   using to produce the methamphetamine.  In the State of

24   Michigan, we predominantly see three types of meth labs.

25   Q.  Let me, let me just stop you there.  First question is, you

1  have a slide show that you've prepared for this testimony?

2  A.  Yes, sir.

3  Q.  Okay.  And before we get to that, let me just ask you a few

4  more questions.  You've seen items that have appeared at

5  clandestine methamphetamine labs, correct?

6  A.  That is correct.

7  Q.  And would it be fair to say, to move things along, there's

8  a certain commonality in the items you find during those, those

9  searches?

10  A.  Well, I mean, a lot of the stuff that you find at a meth

11  lab, at least here in Michigan, are household common items,

12  things that you probably have, some of the things you have in

13  your own homes.

14       A lot of the stuff that's used to make methamphetamine

15  has other legitimate uses.  And you could go down to the store,

16  a Walmart, a Meijer's, party stores and buy almost everything

17  you need to manufacture methamphetamine, again, depending on

18  the style of cook that you're going to see.

19       Again, just because they have common uses, some of the

20  things we look for when we're at a meth lab is where these

21  things are stored, the amounts that they may have, again, is

22  what's going to lead us to believe whether they are making

23  methamphetamine or not.

24  Q.  Okay.  And so if I understand you correctly, you've been

25  involved in a number of investigations.  You've seen a number

1   of things in these investigations.  And you've received

2   training, you've performed training, specialized training.

3   You're familiar with what a meth lab looks, or at least the

4   wide variation, what meth labs look like?

5   A.  That is correct.

6   Q.  And have you testified before -- let me direct your

7   attention to this.  Have you testified with regard to meth labs

8   101, for lack of a better term?

9   A.  I have.

10  Q.  And where would that have been?

11  A.  That was in state court, in Eaton County.

12  Q.  And would that have been a criminal or civil case?

13  A.  Criminal case.

14  Q.  Okay.  In other words, someone who was on trial for

15  something?

16  A.  That is correct.

17  Q.  And in terms of federal court, have you had the opportunity

18  to testify in court, in terms of sentencing issues?

19  A.  Yes, sir.

20  Q.  And would that be something different than what you're

21  going to be talking about here today?

22  A.  Yes, sir.

23  Q.  And that would be kind of the hazardous components of meth?

24  A.  Yes.

25  Q.  Okay.  Any other testimony that you've given?

JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

1   A.   No.   That about covers it.

2   Q.   Detective Lieutenant Saucedo, within the last week or so,

3   you had an opportunity to meet with prosecutors and the FBI in

4   my offices?

5   A.   That is correct.

6   Q.   And as part of your training regimen, you brought with you

7   a hard drive?

8   A.   I did.

9   Q.   And did that contain a plethora of training materials and

10  videos and slide shows?

11  A.   Yes, sir.

12  Q.   And were you here early this morning at my offices?

13  A.   Yes, I was.

14  Q.   And did you have the opportunity to take a look at a, a

15  shortened-up Power Point that you were familiar with?

16  A.   Yes, sir.

17  Q.   And did you go through each and every slide?

18  A.   Yes, sir.

19  Q.   And to the extent it has now been marked as proposed

20  Government Exhibit No. 4-6, did that Power Point fairly and

21  accurately describe the things that you're going to be talking

22  about in a few moments?

23  A.   Yes, sir.

24  Q.   And in terms of your testimony, I take it, it's going to be

25  somewhat specialized?

1   A.   Yes.

2   Q.   And would that Power Point presentation, would that assist

3   you in explaining those specialized concepts to the jury?

4   A.   Yes, sir.

5        MR. STRAUS:  Your Honor, at this time, the United

6   States would ask to publish proposed Government's Exhibit 4-6

7   for identification only.

8        THE COURT:  That has been approved.  And you may

9   proceed, sir.

10       MR. STRAUS:  Thank you, your Honor.

11  BY MR. STRAUS:

12  Q.   And what I'd ask, sir, if you could, in going through your

13  explanation, to simply ask to go to the next slide.

14  A.   Okay.  You might want to go to the next slide.

15       Like I mentioned before, the three most common types

16  of meth labs that we see here in Michigan is the anhydrous

17  ammonia lithium metal method, the red phosphorus iodine method,

18  and what we call the one pot, which is a variation of the

19  anhydrous ammonia method.

20       The P2P method is the older method of making,

21  manufacturing methamphetamine.  We've never seen one of those

22  in Michigan.  Hopefully we never do.  But again, it's just

23  there, just to talk about there are other ways to make

24  methamphetamine.

25       Next slide, please?

1           So what is meth?  Next slide.

2           Powerful upper, psycho-stimulant that affects the

3    nervous central system --

4           COURT REPORTER:  Can you slow down, please?

5           THE WITNESS:  Okay.

6           It affects the nervous central system, increases your

7    heart rate, blood pressure.  Produces a euphoria unlike a lot

8    of the other drugs.  And they call it the poor man's cocaine

9    because you can make it fairly cheaply and make it yourself,

10   again, with a lot of common household items.  But it gives you

11   a high just as good, or if not better than cocaine.

12          Next slide, please.

13          And these are just some of the street names that meth

14   is referred to out on the street.

15   Q.  Let me ask you this, just stop you there.  You've talked --

16   both in terms of your investigations, have you talked to

17   suspects involved in either the consumption of meth or the

18   production of meth?

19   A.  Yes, sir.

20   Q.  And the names that you have listed up there, have some of

21   those come up during the course of your investigation?

22   A.  Yes.

23   Q.  All right.

24   A.  Next slide, please.

25          And then this picture, just to illustrate that

1    methamphetamine can be any color of the rainbow.  And the color

2    does not affect its purity or its potency.  Meth is meth.  Some

3    of the colors are determined because of the products that they

4    use in the manufacturing process.  But again, meth can be any

5    color.

6          The other thing I want to point out in this photograph

7    is that when you think about meth labs, or you hear the word

8    "lab," you want to get out of your head the vision of a high

9    school or a chemistry lab setting, because a lot of stuff that

10   they use is homemade, improvised stuff for their cooking

11   vessels.

12         As you see here in this picture, they use coffee

13   filters a lot to filter out the solids from the liquids.

14   They'll use Mason jars instead of reaction vessels to cook the

15   drug.  They'll also use those Mason jars to store solvents and

16   acids instead of their original containers.

17         Next slide, please.

18         And then how is it taken?  It's taken like a lot of

19   other drugs.  It can be orally ingested.  It can be snorted up

20   their nostrils.  It can be smoked.  It can be injected.

21         One of the things that I've seen every once in a while

22   here in the state of Michigan is that those coffee filters will

23   get saturated with the finished methamphetamine, or the raw

24   ephedrine or pseudoephedrine that's used to make

25   methamphetamine.  And so these folks will keep those coffee

1   filters and chew on them to get the methamphetamine that's in

2   the coffee filter.  I have seen these coffee filters soaking in

3   beverage bottles.

4        Again, methamphetamine is water soluble so it will

5   dissolve in those solutions.  So when they are drinking their

6   Mountain Dew, their iced tea, their lemonade, whatever their

7   drink of choice is, they would be getting meth in their system

8   from these used coffee filters.

9        Next slide, please.

10       And these are just some of the items that they would

11   use if they were smoking methamphetamine.  The aluminum foil

12   there that you see with the charred coloring on it, we call

13   those tinfoil squares.  Basically what they are doing there is

14   just putting a little bit of a methamphetamine on the aluminum

15   foil to heat it up.  And then when the vapors come off the

16   aluminum foil, they inhale it through glass pipes.

17       Lab locations, anywhere you can think of.  We've seen

18   some pretty large meth labs in the state of Michigan.  But

19   we've also seen small meth labs that will fit in a backpack, in

20   a baby's diaper bag.  We've seen it.

21       With this new style of methamphetamine cooking called

22   the one pot method, we've had them walking around with the

23   two-liter pop bottle with the reaction in their side cargo

24   pants.  So again, it's necessarily not going to be anything

25   massive.  It can be.  But again, it could be something as small

1   as something that fits in a backpack or a duffle bag.

2           Next slide, please.

3           And these are just some of the common things that they

4   could use.  Again, they don't need all of this stuff.  And

5   depending on the style of methamphetamine cook is going to

6   depend on some of these items, whether they are going to be at

7   a scene or not.

8           One of the things that they are going to have an

9   abundance of are solvents, because they have to use the

10  solvents in different phases of the meth production.  And they

11  can use any alcohol-based solvent out there.  Starting fluid,

12  which is ether.  One of the most common ones that we see on a

13  regular basis is Coleman fuel, denatured alcohol, HEET, which

14  is gasoline antifreeze.  Again, they can use any one of those.

15  They can use a combination of them, but, again, they don't need

16  all of those, all of those particular solvents.

17          Drano, lye.  In the one pot method and the red

18  phosphorus method, you will see lye.  In the anhydrous ammonia

19  method, you won't see lye at that type of cook.  And if they

20  are cooking anhydrous method or the one pot method, they are

21  not necessarily going to have red phosphorus or iodine, because

22  again, that's a different cooking style of manufacturing

23  methamphetamine.  So it's typically going to be one or the

24  other.

25          Acids are going to be at every meth lab scene.  When

1    they go through the cooking process, they get a substance or

2    they get meth oil, that's basically what they get, which is

3    dissolved in those solvents that they use.

4            Before they can ingest the methamphetamine, they'll

5    have to change it into the powder, the methamphetamine

6    hydrochloride.  And they do that by introducing hydrogen

7    chloride gas.  They make their own hydrogen chloride gas by

8    simply mixing an acid, sulfuric acid, which is basically a

9    strong drain cleaner, with regular table salt, or muriatic

10   acid, which is pool acid, with aluminum foil and that will

11   produce hydrogen chloride gas.

12           They'll bubble that into that meth oil, and the

13   crystals will form in that and they just let it dry.  Now they

14   have their finished meth to use.  So they are always going to

15   have acids at those cooks.

16           And then the last item there, the MSM, those are just

17   items that they'll use as a cut.  So basically, once they get

18   their finished meth, they'll add something like MSM in there,

19   which is just a supplement to now instead of having two grams

20   of meth, they could have four grams of meth.  That's always

21   just a additive, so.

22           Next slide, please.

23           And again, what makes these hazardous wastes, or

24   Hazmat scenes, is that these chemicals do react with each

25   other.  They could be harmful to you if they get in the air, if

2:11-cr-20129-RHC-MAR  Doc # 1071  Filed 11/01/14  Pg 91 of 186  Pg ID 5505
JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

91

 1    you inhale them.  Some of this stuff, like I said, if you spill

 2    it on you, the acids can burn you.

 3            Depending on the amount of chemicals, your

 4    environment, if you're in an enclosed setting, if that

 5    environment is filled with a lot of these different chemicals

 6    that are harmful, if you breathe enough of those, depending on

 7    what it is, it could hurt you pretty bad.  You could have some

 8    long-term life effects there.

 9            Next slide, please.

10            The main ingredient in methamphetamine, whether they

11    are cooking the anhydrous ammonia method, the one pot method,

12    or the red phosphorus method, is your ephedrine or

13    pseudoephedrine that's contained in your over-the-counter cold

14    medications or your decongestants.

15            Another product, as you see there, those are bottles

16    of Mini Thins, but they need that chemical to change that into

17    methamphetamine.  So you're going to see a lot of empty

18    containers, pill containers, empty blister backs, again, where

19    they've either purchased or have stolen those cold medications

20    or decongestants to get that ephedrine or pseudoephedrine.

21            Next slide, please.

22            This is actually a picture from one of the very first

23    labs I went to before I was ever meth trained back in 1999.

24    And you can see the amount of blister packs that this subject

25    had.  Again, we know we have the type of weather here where

2:11-cr-20129-RHC-MAR   Doc # 1071   Filed 11/01/14   Pg 92 of 186   Pg ID 5506

1   people get colds, but anybody that has that amount of ephedrine

2   or pseudoephedrine medications at their house, that could treat

3   probably the whole county.  That's a lot right there.

4         Next slide, please.

5         Again, we already kind of hit on the solvents.  They

6   don't need every one of these solvents.  They can pick and

7   choose which solvent they want to use.  And typically, it's

8   going to be whatever is the cheapest or the easiest to get.

9         Next slide, please.

10         If they are cooking the anhydrous ammonia method or

11   the one pot method, they have to use lithium or sodium metal.

12   Again, you could go to a chemical supply store and buy that

13   stuff, but it's going to be kind of expensive and people might

14   start asking questions when you go in there to buy the amount

15   that you're going to need.  So typically, the meth cookers will

16   get their lithium metal from batteries.

17         And so basically, what they'll do is that they'll get

18   a lithium battery, and it has to be a charged lithium battery.

19   They'll cut the metal casing off of it.  And the best way to

20   explain it, it looks like a fruit roll-up.  There's a couple

21   pieces of plastic in there, you pull that apart and there will

22   be a strip of shiny lithium metal.

23         And that's what they'll use to create their chemical

24   reaction with either anhydrous ammonia or a farm fertilizer

25   like ammonium nitrate or ammonium sulfate type fertilizers.

1    Again, what they are doing is creating a chemical reaction to

2    change that ephedrine or pseudoephedrine to methamphetamine.

3            The one thing that I want to mention about the lithium

4    metal, is that lithium metal is water reactive.  It can ignite

5    with just the moisture in the air.  So hence, you see here,

6    this particular meth lab, once the lithium strips were cut out

7    of the casings, the metal casings that they come in, they are

8    then wrapped in either a powder or they are kept in a solvent,

9    again, to keep water off of it, because they will ignite.

10           Next slide, please.

11           And then here is just again typical of what we see.

12   Again, with the anhydrous ammonia lab or the one pot meth labs,

13   we'll see a lot of these types of battery casings, again, where

14   they've cut them apart to remove the lithium metal.

15           Again, there's no legitimate reason, purpose to break

16   those casings open like that and, and remove that lithium

17   metal.  You're not going to be able to run your transistor

18   radio or your camera just with the lithium slips.

19           So next slide, please.

20           With the anhydrous ammonia method, anhydrous ammonia

21   is a farm fertilizer.  We have a lot of it here in the state of

22   Michigan.  And when I first started doing meth labs in the

23   early 2000s, this was predominantly the method of meth

24   production that we would see because we had a lot of anhydrous

25   ammonia available on your farm fields.  And they would steal

1    the anhydrous ammonia.  I've shown up at scenes where they have

2    stolen a whole nurse tank there, and that contains 1,000

3    gallons of anhydrous ammonia.  And that's a lot.

4           But they'll mix that with the lithium metal, again, to

5    create that chemical reaction to change the ephedrine or

6    pseudoephedrine into methamphetamine.

7           Next slide, please.

8           We used to run into a lot of propane tanks because the

9    anhydrous ammonia, you can't just go into a farm supply store

10   and say I need a cup of anhydrous ammonia.  They don't sell it

11   that way.

12          Again, you see that thousand-pound nurse tank.  They

13   can sell it in 100-pound cylinders.  Well, these meth cookers

14   would need to transport it somehow.  And so one of their

15   favorite ways to transport it, at least that we used to see

16   here in Michigan, is that they would store it in regular

17   propane tanks.

18          Once they did that, we could always tell because the

19   anhydrous ammonia would react with the fittings on these

20   propane tanks.  And so they would -- the fittings on these

21   propane tanks would turn this bluish-greenish color.

22          So even if it never have -- even if it didn't have

23   anhydrous ammonia in it anymore, we would show up on scene, we

24   knew that was used to transport anhydrous ammonia just by the

25   coloring on there.  And you could try to scrub that off and it

```
 1    will stay on there.  It kind of oxidizes the metal.

 2              Next slide, please.

 3              Anhydrous ammonia is also used as a refrigerant in

 4    some instances.  Your big motor homes will sometimes use

 5    anhydrous ammonia in their refrigerant lines as coolant.  And

 6    this just illustrates, you could see, that's a plastic gas can,

 7    and you can see the frost on the outside of it.  That's how

 8    cold anhydrous ammonia is.  It's very cold.

 9              Next slide, please.

10              Red phosphorus.  The other type of way of making

11    methamphetamine is a red phosphorus iodine method.  Again, one

12    of the legitimate purposes or uses for red phosphorus is

13    pyrotechnics, fireworks.  Because of meth labs, because it is

14    very flammable, it is a chemical that is watched on a watch

15    list.

16              So if you went into a chemical supply store and

17    ordered red phosphorus and they take your information, if

18    you're involved with fireworks, you have to be licensed to have

19    it.  So it's pretty hard to get the commercial grade red

20    phosphorus nowadays, but there's other ways to get it.  But

21    that's just some commercial grade red phosphorus.  Again, red

22    in color, friction sensitive.  It can start a fire.

23              And then when it's used in the cooking process in a

24    red P, red phosphorus meth lab, one of the by-products, it

25    produces phosphine gas, which is very deadly if you inhale it
```

1    in small quantities, which has led to some deaths, again, of

2    meth cookers that get overcome by those fumes in the cooking

3    process and has hurt some law enforcement officers, again,

4    because they've gotten exposed to that.

5    Q.  Sir, let me ask you one question.  What is another source

6    of red P or red phosphorus that one might be able to find

7    locally for a consumer?

8    A.  Typically, what we see here, and I've seen on meth labs, is

9    your matchbook striker plates, not the matches themselves, but

10   the striker plate on the side.  Depending on the manufacturer,

11   those strike plates could contain up to 40 percent red

12   phosphorus.  And so that's a source for your meth cookers, not

13   only nationally, but again in Michigan.

14           And we've seen it quite a bit where -- I've been on

15   scenes where you'll have a 30-gallon gas -- or a 30-gallon

16   trash can just filled to the top with just the ripped ends of

17   the striker plates, where they'll soak them in a solvent,

18   typically acetone.  And that helps dissolve the glue that holds

19   those striker plates on.  And then you'll have somebody just

20   scraping those striker plates and letting it dry.  Now I've got

21   my red phosphorus for my meth cooks.

22   Q.  Just so the jury knows, is the red P method a more

23   sophisticated or less sophisticated way of what you've been

24   describing as the one pot method?

25   A.  It's a little bit more sophisticated.  It takes more time.

```
1    The chemicals are harder to come by.  In the red phosphorus
2    method, you can cook larger quantities at one time.  You could,
3    with a red phosphorus cook, you could cook anywhere from 25 to
4    100 pounds at a time, which are considered super labs.  We've
5    never seen one of those in Michigan, hopefully we never do.
6    But those are the types of labs they find in California,
7    Nevada, Arizona, the country of Mexico, again, where they can
8    mass-produce quantities of methamphetamine using that method.
9         The one thing I want to make perfectly clear that with
10   any type of meth lab, it's just following a recipe.  Some of
11   those recipes are four or five steps.  If you could bake a cake
12   or bake cookies, you could cook meth.  There's a lot of things
13   that go wrong with the process.  But again, if you can follow a
14   recipe, you can do it.
15        Next slide, please.
16        Again, this is some commercial grade red phosphorus.
17   Again, one of the first labs that I had ever responded to in
18   the Van Buren County area.  This gentleman, again, because of
19   the restrictions on the red phosphorus had a friend who had a
20   license to buy it for fireworks, and again, that's how he was
21   obtaining a commercial grade.  But we rarely see the commercial
22   grade anymore.  It's typically from the striker plates.
23        Next slide, please.
24        Just like the anhydrous ammonia method or the one pot
25   method where you need to combine lithium metal with the
```

1    fertilizer to create the chemical reaction, in the red

2    phosphorus, you have to introduce iodine, which helps create

3    that chemical reaction in that type of cook.  And these are

4    iodine crystals that you could buy at tack and feed stores.

5    Again, it's a shiny piece of metal that is used to clean up

6    wounds or treat hooves disease in livestock.  So, again, you

7    will find these at tack and feed stores.

8         If they don't want to buy the tack from the tack and

9    feed stores, they can make their own iodine crystals by simply

10   mixing hydrogen peroxide and tincture of iodine, again, you can

11   buy at the stores.

12        Next slide, please.

13        And again, this is just illustrating some meth oil,

14   kind of some of the things that we look for.  As you see here,

15   there's nothing on that jar that marks it as meth oil.  The

16   meth oil could have a consistency and look like a regular

17   vegetable or canola oil, again, depending on the type of cook

18   and the type of solvents that they used.

19        Next slide.

20        Bilayer liquids.  Again, this is from an anhydrous

21   ammonia cook in the Eaton County/Grand Ledge area.  The bilayer

22   level here, the top layer is going to be your meth oil.  And

23   that bottom layer is going to be the by-products from your meth

24   cooks.

25        So what they want to do is separate that oil there

1   because that's what's going to contain the meth oil that's

2   dissolved in the solvent.  Like I mentioned earlier on, where

3   they introduced hydrogen chloride gas, this is kind of where

4   they would do that in that stage to produce the powdered

5   methamphetamine out of that top layer.

6           Next slide, please.

7           And again, this is just showing how they would produce

8   hydrogen chloride gas.  They typically mix, again, a regular --

9   a strong acid with either regular table salt or pool acid,

10  muriatic acid, with aluminum foil.

11          Here they are using a gas can.  Typically, we'll see

12  them in 20-ounce, 2-liter pop bottles with tubes sticking out

13  of the top, again, where they'll mix the acid and salt or

14  aluminum foil and it will produce a gas, hydrogen chloride gas

15  that they bubble in the oil.

16          Next slide, please.

17          And that's typical of what we call a gas generator.

18  And we find those at every lab scene that we go to.  Again,

19  that's the vessel that they'll put the acid and the salt to

20  produce hydrogen chloride gas.

21          Now, the one thing about those types of bottles there

22  is they could be sitting there for a couple weeks, and they'll

23  look very harmless.  But simply picking that up will re-agitate

24  that mixture and it will start producing hydrogen chloride gas.

25          I've responded to scenes where just innocent people

JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

1    will get exposed to this because they are trying to clean up

2    the trash or they think it's a bottle they can return and they

3    get overcome with the hydrogen chloride gas.  It's an upper

4    respiratory irritant.  It will sting a little bit, but you'll

5    be okay.  So you want to be careful if you come upon anything

6    like that.

7              Next slide, please.

8              And then with any of these meth cooks, there's a lot

9    of by-products, looks like trash, but again, this is the

10   remnants, the leftover stuff from a meth cook.  And again, we

11   can't just take that stuff and put it in a trash can and throw

12   it away, because, again, we're not sure what's been mixed that

13   could still create a chemical reaction.  If there's still

14   lithium metal in, wrapped in there, that could cause a fire

15   situation.  So this stuff has to be packaged and taken away and

16   disposed of by a hazardous waste contractor.

17             Next slide.

18   Q.  I believe that's it.  I have a couple of follow-up

19   questions.  You mentioned regulated items.  Is pseudoephedrine

20   regulated?

21   A.  It's, it's not regulated.  Again, you can buy it at your

22   pharmacies, your Walmarts.  There are some laws on the books

23   that are restricting how much you can purchase at a time, as

24   well as where those items are kept if you use that.  I know I

25   use it during the cold and flu season, you have to show your

1   driver's license, sign, and they'll give you the box from

2   behind the counter.  All that was put into law because of them

3   using this to make methamphetamine.

4   Q.  Okay.  And the second question is you used the term "one

5   pot method."  Are there any other terms, street terms used to

6   describe that method?

7   A.  Shake and bake, one pot, bucket method.  Again, it

8   really -- just kind of like there's different names that people

9   refer to methamphetamine, there are other names for the same

10  style of meth cook, just depending on who is using those terms

11  in that circle.

12  Q.  Detective Lieutenant, you've described pretty much the

13  after-the-fact by-products that you've seen in the course of

14  your experience working with the meth lab unit.  Are you

15  familiar, through your training and experience, on how to make

16  meth?

17  A.  Yes.  And I've actually made methamphetamine myself, in a

18  controlled environment.

19  Q.  All right.  And as part of that plethora of training

20  materials you brought over last week, did you have some videos

21  within that grouping of materials that explained at least two,

22  three types of, or two types of methamphetamine production?

23  A.  Yes, sir.

24  Q.  And would one type of methamphetamine production method

25  that you have video of, would that include the red P method?

JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

1   A.  Yes, sir.

2   Q.  And was that produced by some other outside law enforcement

3   agency?

4   A.  Yes, it was.

5   Q.  And are you familiar with that particular procedure?

6   A.  I am.

7   Q.  Is that part of your training as well?

8   A.  Yes.

9   Q.  And was there another video that had been, actually, that

10  you had some part in being there or producing, or being

11  involved in?

12  A.  That is correct.

13  Q.  And would that be the Michigan State Police?

14  A.  Yes.

15  Q.  Would that be the one pot method of meth production?

16  A.  Yes, sir.

17  Q.  And finally, is there a clip, was there some materials also

18  that showed how you cut a battery open to get at those valuable

19  lithium strips?

20  A.  Yes.

21  Q.  And when you were here this morning, did you have an

22  opportunity to look at a constructed 17-minute video that had

23  been pieced together with small pieces of your videos?

24  A.  Yes, sir.

25  Q.  And was that a fair and accurate representation of the

JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

```
 1   materials you were familiar with?

 2   A.  Yes.

 3   Q.  And in terms of your testimony that you're about to give in

 4   terms of how to make meth, would those video clips, that is,

 5   what has been marked as proposed Government Exhibit 4-6, or

 6   4-5, I'm sorry, would that substantially enhance your ability

 7   to explain the process to the jury?

 8   A.  Yes.

 9        MR. STRAUS:  Your Honor, at this time the Government

10   would like to publish to the jury, at this time, proposed

11   Government Exhibit 4-5 for identification only.

12        THE COURT:  And this has also been approved in earlier

13   discussion.  You may proceed.

14        MR. STRAUS:  Thank you, your Honor.

15      (Publishing GX 4-5, 11:54 a.m.)

16   BY MR. STRAUS:

17   Q.  And I'll ask you, as this, this video goes through, if you

18   could explain the process as it's unfolding.

19   A.  Again, this is going to be the red phosphorus method.  As

20   you'll see here, it's done in a lab setting.  But those same

21   type of chemicals is what typically you're going to see at a

22   meth lab.  There, you have your red phosphorus.  In the middle

23   you have your iodine.  And the last one had the ephedrine or

24   pseudoephedrine.

25        So the first step in a red P cook is to add water to a
```

JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

1    reaction vessel.  As you see here, they are using a beaker.

2    They are then adding the red phosphorus.  Then they are adding

3    the iodine crystals.

4         Now, when we talk about the different types of

5    chemical reactions and things that can go wrong, you'll see

6    here in this video, when you add iodine crystals to red

7    phosphorus, it creates a lot of heat.  And you'll see here that

8    it kind of boils over.  So they are going to want to add it

9    very slowly to the reaction vessel so, again, it doesn't heat

10   up as much.

11        Once they've added the water, the red phosphorus, the

12   iodine crystals, then they'll add the ephedrine or

13   pseudoephedrine pills, where they either grind them up, and

14   they'll use, typically use a coffee grinder or something like

15   that to make the pills into a powder.  They'll then add that to

16   that solution.

17   Q.  I have a question.  Is this process capable of performing

18   without red phosphorus?

19   A.  No.

20        And here, they are adding the ephedrine or

21   pseudoephedrine.

22        During the red phosphorus process, or manufacturing

23   method, you have to actually boil that solution, typically

24   about four hours to, again, at a high heat.  And that helps the

25   iodine and red phosphorus do their chemical reaction to change

1    that ephedrine or pseudoephedrine into methamphetamine.

2         Like I said, here you're seeing chemical commercial

3    grade glassware.  They'll typically use a Mason jar for their

4    reaction vessel.  Instead of that heating mantle, they'll use a

5    hot plate to heat it up.  I've seen them use pressure cookers

6    in cooking this style of methamphetamine.

7         So once they get this cooking for about 2 to 4 hours,

8    they then need to cool this down.  Again, it's pretty hot.  So

9    that's what they are doing here.

10   Q.  By the way, is all this fancy equipment required in a red P

11   cook?

12   A.  No, it's not.  Like I said, they'll typically use homemade

13   improvised items instead of the commercial grade, chemical

14   grade glassware.

15        Here, now they are filtering out the solution.  What

16   they are doing is capturing the red phosphorus and iodine in

17   the coffee filter.  And now you see that liquid there.  That

18   has methamphetamine oil dissolved in the water, or the solution

19   there.  And then they've captured the red phosphorus.

20   Q.  By the way, for recyclers, can that red phosphorus in the

21   coffee filter be re-used?

22   A.  Yes, it can.  But the more times they re-use it, that red

23   phosphorus becomes more and more sensitive, friction sensitive.

24   And, again, that could cause a fire.

25        Now, that meth oil, because of using the red

1  phosphorus iodine method, in this particular meth, type of a

2  meth cook, that meth oil is very acidic.  So they wouldn't be

3  able to change that into that powder at that time and use it

4  because it could have some pretty bad effects on the user.  So

5  at this point, what they want to do is bring that acidic meth

6  oil from an acid to a base.  That's the reason why they are

7  using the lye, sodium hydroxide, to do that.

8  Q.  Is that a type of drain cleaner?

9  A.  It is.  It is.  And in this case, just like when they add

10  the red phosphorus with iodine, it created a lot of heat.  When

11  you add the sodium hydroxide, it does the same thing.  So

12  that's the reason hence you saw them adding ice to keep it

13  cool.

14          So now they are adding the solvent.  Like I said, they

15  could use any solvent.  But typically, we see Coleman fuel.  I

16  don't know if it's just because it's easier to get, it's common

17  out there.  And what they are doing is capturing the meth oil

18  in this solvent here with the Coleman fuel.

19          So as you saw in the picture, you'll see a bilayer

20  liquid form.  You'll see the two liquids there.  The bottom

21  layer is going to be your water/sodium hydroxide mixture and

22  then that top solvent is where your meth oil is going to be

23  dissolved in.  So they need to separate that.  And hence is

24  what they are doing here is separating that bottom layer.

25          Again, in this particular situation, they are using a

1    separatory funnel, but your meth cookers out there will just

2    use a Dawn detergent bottle where they'll cut the top off, put

3    that bilayer solution in there, and just open the stopper to

4    drain that stuff out and then close it again to get the meth

5    oil.

6         So now, that solvent layer that he's pouring out there

7    in the beaker has the meth oil in it, and here's where they are

8    going to produce hydrogen chloride gas.  So again, they are

9    using just regular table salt.  And they are using a sulfuric

10   acid in this case, Rooto, which we see a lot at scenes.  And

11   it's just a, a strong industrial-type sulfuric acid that you

12   can buy at your hardware stores.  You can get it Walmart,

13   Meijer-type stores.

14        So once those two items are mixed, they are producing

15   hydrogen-colored gas that you see that's being bubbled into

16   that meth oil.  And the crystals will just form in that

17   solution.  You'll see it here in just a second start to get

18   real cloudy.  And in the bottom of that container is the

19   finished methamphetamine.

20        And there, you'll see finished methamphetamine on the

21   hose there, again, where it attached to the hydrogen chloride

22   gas.

23   Q.  Consistency-wise, is that a very fine powder?

24   A.  Yes.  And so here, they are now separating the liquid from

25   the finished methamphetamine, again, using coffee filters.

1          And then there's the finished methamphetamine.  Again,

2     it's going to be wet because it was just in that solution.  So

3     they'll have to dry it.  And they can do that by simply putting

4     it in front of a fan, putting the heat lamp on it and it will

5     dry, it will dry it into a powder and then it's ready to use.

6     Q.  Based on your training and experience, absent the moisture,

7     what is the purity level of, of meth at that point in the

8     process?

9     A.  Well, it really depends on your meth cooker.  They could

10    get methamphetamine that's 80 percent pure.  They could get

11    meth that's 70 percent pure.  It just really depends on, again,

12    how much of the stuff they mix, if they followed a certain

13    recipe.  It could be any purity.

14    Q.  Okay.  What is going on here?  Is this -- do you have some

15    familiarity with this cut of the tape?

16    A.  Yes.  This is a different style of methamphetamine cook.

17    This is the one pot method.

18          Back in 2005, the Michigan State Police, my office, as

19    well as the Drug Enforcement Administration, a couple of other

20    different police agencies from around the country, California,

21    Iowa -- Iowa, had come up.  And basically what we did was

22    manufacture methamphetamine in these one pot reaction vessels,

23    because we were seeing a lot of lab fires.

24          So we re-created these meth cooks with recipes that we

25    had obtained from meth cookers that we have arrested and then

1   put these one pots, these shake and bake meth labs together,

2   and videotaped them, to see if we could see any indication of

3   when they would catch on fire, how they were catching on fire,

4   as a training video for law enforcement.

5   Q.  Where is this taking place?  Is this in Lansing?

6   A.  This is actually down at Fabius Township Fire Department in

7   Three Rivers, Michigan, where, again, it was a controlled

8   setting at a fire department.  We had burn cells set up, again,

9   and we had the State Police, as well as Michigan HYTA, which

10  funds some of our training, brought a camera crew in as well,

11  again, to help us videotape this for a training video.

12  Q.  I see a number, an alphanumeric symbol on the outside of

13  what appears to be a 2-liter pop bottle.  Is that

14  representative of a recipe?

15  A.  Yeah.  We had a book full of different recipes.  And so we

16  were labeling our meth cooks with a number, A, B, C, D, so that

17  we could identify, okay, we used this particular recipe, we

18  used this style of bottle, because we did use other types of

19  bottles as well, plastic bottles, so again, that when you put

20  this together, we could say in this particular 2-liter pop

21  bottle or this 20-ounce pop bottle, it failed because of this

22  reason type situation.  So it was just an identifier of the

23  cooks.

24  Q.  Were there better recipes than others?

25  A.  They are all about the same.  What really, what was really

1    different between each cook was the bottle, the bottle style.

2    Some failed easier than others, again, because of how thick the

3    plastic was, et cetera.  And so that's what really determined

4    the effectiveness of the one pots.

5    Q.  Detective Lieutenant, I stopped the video.

6         Could you give us a snapshot of what is occurring

7    right now?

8    A.  In that bottle is where they are just mixing everything.

9    You'll see on the -- on my right side there a coffee grinder,

10   again, that we used to grind up the Sudafed pills.

11        In the container next to it, those are the lithium

12   strips that we had cut out of batteries and put under a solvent

13   so we could add it to it.

14        Then on the other side of the table there, you'll see

15   sodium hydroxide, which is used in the one pot method, as well

16   as Coleman fuel.  And then there's a bottle of water as well,

17   which is all needed in the one pot method.

18        THE COURT:  Before you start the video again, let's

19   take a, just a one-minute stretch break here.

20        MR. STRAUS:  Certainly, your Honor.

21        THE COURT:  Stand up, please.

22     (Recess taken, 12:06 p.m. - 12:07 p.m.)

23        THE COURT:  Let's come back to order.  Be seated,

24   please.  You may proceed.

25        MR. STRAUS:  Thank you, your Honor.

JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

1          Can we begin the video again?

2     BY MR. STRAUS:

3     Q.  Sir, if you could continue explaining the process that's

4     unfolding here?

5     A.  Yeah.  In that instance, they were just adding the solvent

6     to it.  So, as you can see in the bottle there, you have your

7     solvent.  Now they are getting ready to add the lithium metal.

8     When the lithium is in those casings, before they break it

9     apart, it's shiny.  As soon as it comes out of that casing, you

10    can see now it's pretty dark in color, because it's already

11    starting to oxidize with just the moisture in the air.

12          Again, if you have sweaty palms, sweaty hands, you get

13    a drip of, a bead of sweat from your forehead, if it lands on

14    that lithium metal, it will ignite it, catch it on fire.  So

15    again, that's another instance where something can go wrong in

16    a meth cook when they are adding the chemicals together.  And

17    something as simple as that happens, you could have a pretty

18    massive fire occur.

19    Q.  And is that something you see, you've seen in terms of your

20    investigations, fires, evidence of fires?

21    A.  Definitely.  We see either the remnants of stuff that's

22    been burned from a meth lab.  We get calls from the hospital

23    because a burn patient will end up there and their story

24    doesn't add up, and because they've been burned in a meth lab.

25    Once we go back to their house or location, we've seen

1   apartment buildings destroyed, houses destroyed, again, from a

2   meth lab.

3   Q.   Now, how many, just out of curiosity, how many of these

4   lithium strips are in one of those little, appears to be AA

5   batteries?

6   A.   There's just one lithium strip.  Again, once you unroll it,

7   it's probably about that long.

8   Q.   Okay.  Indicating for the record --

9   A.   About 12 inches.

10  Q.   -- a foot long?

11  A.   Yeah.  And then maybe 2 inches wide.  Very thin.  And

12  typically in a meth cook, they may use about two to three

13  lithium strips and a 2-liter pop bottle like you see here.

14  Q.   So the strip, when you say "strip," you're talking about

15  the 12-by-2-inch strip?

16  A.   Yes.

17  Q.   And what appears to be happening on the video is they are

18  tearing it?

19  A.   Correct.

20  Q.   Okay.

21  A.   Again, just to be able to fit it in the bottle better, and

22  helps with the reaction.  Because again, you'll see here when

23  they add all that stuff to the one pot, and then add, put the

24  cap on it, it will start creating a lot of pressure and it will

25  look like it's boiling.  Doesn't create heat, but that reaction

1    will look like it's boiling inside there.

2          And again, it's just because of the sodium hydroxide,

3    the ammonia-based fertilizer they use, as well as the lithium

4    metal during the chemical reaction in there.

5    Q.  We've heard the term "shake and bake."  Is it really

6    necessary to shake these things?

7    A.  It's not necessary.  And actually, one of the training

8    points that I give to law enforcement is that if you see these

9    bottles, don't pick them up and shake them.  Because that's one

10   of the things that we did find, is that what causes this fire,

11   as you saw there, they added a little bit of water to that

12   reaction vessel.  And like I mentioned before, water and

13   lithium don't like each other.

14   Q.  Now, what is --

15   A.  They'll ignite.

16   Q.  I'm sorry.  What is going on here?  It's a far-away shot.

17   Is there bubbling, gurgling going on?

18   A.  Yeah.  It's doing its chemical reaction.  You can actually

19   see the pieces of lithium going up and down in the bottle.

20   That's the actual chemical reaction occurring.

21          What will happen is that the reaction will stop,

22   because so much pressure builds up.  It could take a minute, it

23   could take two minutes, again, depending on how much head space

24   you have left in the bottle.

25          And this is in some cases where the meth cooker feels

2:11-cr-20129-RHC-MAR  Doc # 1071  Filed 11/01/14  Pg 114 of 186  Pg ID 5528
JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

114

1    they need to shake it to keep the reaction going, when in

2    reality, all they have to do is burp it.  If you relieve just a

3    little bit of the pressure, that chemical reaction will happen

4    again.

5    Q.   There's one last clip here.  Maybe we can explain what this

6    is all about?

7    A.   And again, this is just a training video during this same

8    time we were doing the meth cookers, that we're just showing

9    how easy it is to strip lithium metal out of a battery.  And

10   then we also ignite the lithium to show how easy it goes up.

11   Q.   What kind of tool is that, that's being used?

12   A.   It's just a pipe cutter that's being used and a pair of

13   vice grips to hold it, just going around to score and cut into

14   the metal casing.

15   Q.   Again, this is a AA lithium battery?

16   A.   AA lithium battery.

17   Q.   Those are the expensive kind?

18   A.   Yes.

19   Q.   All right.

20   A.   And then just pull the metal casing apart now that you've

21   scored.

22        And you'll see here once you pull it out, like I said,

23   the best way to explain it, it looks like a fruit roll-up.  You

24   just pull the two pieces of plastic and paper away from each

25   other, and there will be a strip of lithium metal inside there.

1   There it is.

2   Q.  What, which piece there?  What color?  Is that the --

3   A.  That real shiny.

4   Q.  -- tray?

5   A.  Yeah.  It's, again, they are all real shiny like that.  But

6   you saw how dark the ones we had in the container.  That was

7   just within an hour, because it starts to oxide.

8   Q.  Now, what's going on here?

9   A.  Again, we're just illustrating how it will ignite with just

10  a few spritz of water.

11  Q.  Okay.  That was the guy with the squirt gun?

12  A.  Yes.  We were also measuring the heat of the fire, because

13  we know that lithium burns hot and very rapid.  And so there

14  was a firefighter off the scene with a device to measure how

15  much heat was coming off there.

16  Q.  Okay.  Detective Lieutenant, based on your training and

17  experience and involvement in many, what sounds like many meth

18  lab investigations, you've come across many of these common

19  household goods that, that are used to make meth?

20  A.  That is correct.

21  Q.  And are you prepared to provide, to provide an opinion as

22  to certain items that may be found in the home or be found in a

23  search as to whether or not they were consistent or

24  inconsistent with the production of meth?

25  A.  Yes.

JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

1        MR. STRAUS:  Your Honor, approaching the witness?

2        THE COURT:  Yes, sir.

3        MR. STRAUS:  Let the record reflect that I've just

4   placed before the witness several one-page documents that are

5   marked as proposed Government Exhibits 53-35 through 53-43

6   inclusive.

7        MR. SATAWA:  I'm sorry.  Mr. Straus, can I get those

8   numbers again?

9        MR. STRAUS:  53-35 through 43.

10       MR. SATAWA:  Thank you.

11       MR. STRAUS:  And the second grouping, 53-45 through

12  53-51.  45 through 51.  Okay?

13       THE COURT:  Are these previously admitted or sought to

14  be?

15       MR. STRAUS:  I will.

16       THE COURT:  Sought for admission?

17       MR. STRAUS:  Yes, your Honor.

18       THE COURT:  Okay.

19  BY MR. STRAUS:

20  Q.  Sir, have you had an opportunity to take a look at those

21  documents?

22  A.  Yes, I have.

23  Q.  And in fact, you saw those in my office about a week or so

24  ago?

25  A.  Yes, sir.

1   Q.  And are you prepared to offer an opinion as to whether or

2   not those items are useful or consistent with the production of

3   meth, if found at a certain location?

4   A.  Yes.

5           MR. STRAUS:  Your Honor, at this time, subject to I

6   guess provisionally, we would move into evidence proposed

7   Government's Exhibit 53-35 through 53-43 inclusive and 53-45

8   through 53-51 inclusive, subject to tie-in later

9   foundationally.

10          THE COURT:  In terms of where such objects may have

11  been found or --

12          MR. STRAUS:  That's correct, your Honor.

13          THE COURT:  Hearing no objection --

14          MS. STOUT:  No objection.

15          MR. SABBOTA:  No objection.

16          MR. DALY:  No objection.

17          THE COURT:  I hear affirmatively no objection, indeed,

18  and they may be received on that basis.

19      (Exhibit 53-35 - 53-43 and 53-45 - 53-51 received,

20      12:16 p.m.)

21          MR. STRAUS:  Your Honor, at this time I'd ask the

22  paralegal to publish Government's Exhibit 53-35.

23  BY MR. STRAUS:

24  Q.  Again, was this an example of, and do you have an opinion

25  as to whether or not this is consistent with production at a

2:11-cr-20129-RHC-MAR  Doc # 1071  Filed 11/01/14  Pg 118 of 186  Pg ID 5532

118

JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

1   meth lab?

2   A.  Yes.  Yes, sir.  This is another style of Coleman fuel,

3   again, a solvent that's commonly used in your meth cooks.

4   Q.  And in fact, there's two types of containers that Coleman

5   fuel comes in?

6   A.  That is correct.  Your one-gallon size that pretty much

7   everybody is used to seeing is one type.  And then this is what

8   they consider premium Coleman fuel.  But again, it's Coleman

9   fuel all the same; a different color.  It's got kind of a

10  reddish-pinkish dye to it, added to it.

11  Q.  Okay.  Directing your attention to Government Exhibit

12  53-36.

13        And again, can you offer an opinion as to whether or

14  not that would be useful during a meth lab operation?

15  A.  Yup.  Sodium hydroxide, lye, again, is used in the red

16  phosphorus style of meth cook, as well as the one pot meth

17  cook.

18  Q.  And just so, just so that the jury knows, when we ended on

19  the second meth production method, the one pot method with the

20  two orange-suited gentlemen, there was a further step that

21  needed to be gone through, correct?

22  A.  That is correct.

23  Q.  And that's the gassing, that's the dropping of the

24  methamphetamine from the solvent liquid, correct?

25  A.  That is correct.  Again, whether it's the anhydrous ammonia

JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

1  method, the red phosphorus, or that one pot method, the last

2  stage is always going to be introducing the hydrogen chloride

3  gas to change that meth oil into the powdered methamphetamine.

4  Q.  Directing your attention to 53-37 Government Exhibit.

5  A.  The tubing, again as you saw in the pictures, the tubing is

6  typically used and found at scenes.  It's used in the gas

7  generator, the last stage, again, where they'll attach it to

8  the bottle that contains the acid and the salt.  So we

9  typically see this type of tubing at the lab scenes.

10  Q.  So it sounds, I think what the jury is hearing, there are

11  two stages, at least to the one pot method of meth production?

12  A.  Two stages?

13  Q.  Two stages.  There's the shake and bake in the 2-liter

14  bottle, and there's a later gassing-off, I think is the term

15  you used?

16  A.  And that will occur in all three cooks.

17  Q.  And in terms of the latter, the shake and bake, does that

18  have to happen, the second stage, immediately after the first,

19  or is there oftentimes a delay or other types of strategic

20  reasons why that would not happen immediately?

21  A.  They can do it immediately; they can do it hours later.  It

22  doesn't really make a difference.  Sometimes, and we have found

23  that they'll go through that cooking process and then transport

24  that meth oil to another location before they'll gas it off for

25  whatever reason.  So it doesn't have to be done immediately,

JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

1    but they do have to do that stage, again, to change it from the

2    meth oil to the powdered meth.

3    Q.  Directing your attention to Government's Exhibit 53-38.  Is

4    this an example of the cut-up batteries?

5    A.  Yes, sir.

6    Q.  Directing your attention to Government's Exhibit 53-39?

7    A.  Again, these are the insides of the battery.

8    Q.  What is the, what is the white material?  Is that a filler

9    of some sort?

10   A.  It's, it's just a type of paper that's in there.  It's not

11   the actual lithium strip, even though it kind of looks like it.

12   It's just the type of paper that it's wrapped in.

13   Q.  Okay.  And it acts as a separator or a insulator of sorts?

14   A.  Yes, sir.

15   Q.  Directing your attention to 53-40, blister packs you've

16   talked about already?

17   A.  Yes.  Typically found at meth labs, again, that contain the

18   over-the-counter cold decongestants medications that contain

19   ephedrine or pseudoephedrine in them.

20   Q.  Let me direct your attention to 53-41.  I don't know if we

21   talked about this, but is this, in your opinion, is this

22   something that is necessary or is it something that is

23   frequently found or never found at meth lab sites?

24   A.  It's found sometimes, but not necessarily all the time.

25   And it's not necessary.

JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

1  Q.  Is it advisable?

2  A.  This would only be for protection.  I know we would wear

3  the gloves when we're dismantling the labs.  So you may have

4  some folks that are producing meth that are trying to take some

5  precautions.  But it has -- it's not necessary for the meth

6  production.

7  Q.  Let me direct your attention to 53-42.  I don't know if we

8  covered this.  Do you recognize that package?

9  A.  I do.

10  Q.  What is that?

11  A.  That's the package from an instant cold compress.

12  Q.  Is that something you can buy at the pharmacy?

13  A.  You can buy it at a pharmacy.  You can buy it at Walmart,

14  Meijer's, sporting good stores.

15  Q.  And what is the thing of value that is sought in that

16  package?

17  A.  Just like there was so much attention with the red

18  phosphorus in limiting the how you can get that, similar things

19  occurred with the anhydrous ammonia.  Some laws were put into

20  place making it harder for the meth cooks to obtain anhydrous

21  ammonia.  So they've gone to this new style, the one pot

22  method.

23        And in the one pot method, they have to use an ammonia

24  source, either ammonium nitrate or an ammonium sulfate.  And

25  that comes in just regular plant fertilizers.  Your Jobe's tree

1   spikes is a source of ammonium nitrate.  But one of the most

2   favored ones we see quite often are these injury cold

3   compresses.  They contain two things in them.  They contain

4   ammonium nitrate and an ampule of water.  So when you break

5   that ampule of water and it saturates the ammonium nitrate, it

6   makes it instantly cold.

7           So these meth cookers either buy or steal these injury

8   cold packs, cut them open and just use the ammonium nitrate

9   that's in these cold packs for one pot meth cooks.

10  Q.  All right.  Directing your attention to Government Exhibit

11  53-43.

12  A.  Again, you saw it not only in the video but also the Power

13  Point, the regular table salt that's used to mix with the acid

14  to produce the hydrogen chloride gas.

15  Q.  Let me ask you this:  When you have encountered suspected

16  meth labs in the course of your duties, are there certain

17  quantities of these common household goods, or their placement

18  or their storage, that, that lend themselves more to a

19  conclusion that they are being used in a clandestine meth lab?

20  A.  Absolutely.

21  Q.  Can you explain that?

22  A.  Well, again, like I said, a lot of the stuff has legitimate

23  uses.  Like I said, you probably have half the stuff in your

24  own homes.  But when you go into a meth lab, some of the unique

25  things that we see, for example, muriatic acid typically is

1  used if you have a swimming pool.  But one of the first things
2  I look, if I find five or six gallons of muriatic acid is where
3  is the pool?  Because, again, there's no reason to have that
4  much of that muriatic acid.
5          I've seen solvents, i.e., your Coleman fuels, your
6  ethers that are taken out of the original containers, put in a
7  water bottle, a Mason jar, and stored in the refrigerator.
8  Again, nobody stores solvents in refrigerators.  And if they
9  are doing that, and I've seen that, I guarantee you the food is
10 going to be contaminated.
11         Same thing with the acids.  They'll take the acids out
12 of the original containers and put them in Mason jars, water
13 bottles, and store those in areas that you typically would not
14 see them.
15         The Sudafed pills, typically don't take them out of
16 the blister pack until you're going to take two pills for a
17 dosage.  Well, all the pills will be popped out of the blister
18 packs.  I've seen them store hundreds of pills in the food
19 pantry.  Again, not typical places that you would store that
20 type of stuff.  So that does play into the determinations that
21 we make during our investigations.
22 Q.  Let me direct your attention to 43-45.  I only have a few
23 more of these.  I think you mentioned this earlier, MSM.  This
24 has a legitimate use?
25 A.  Yeah.  It's, as you see, it's a nutritional supplement.

JURY TRIAL, VOLUME III - 10/17/2014
TONY SAUCEDO - DIRECT BY MR. STRAUS

1    And we see this a lot at meth labs.  Again, they use it as a

2    cut to put it in their finished meth.  Again, all it is, is to

3    make their two ounces or two grams of meth four grams of meth

4    type situation.  So that's all it's used for.

5    Q.  Direct your attention to 53-46.  This is the same thing.

6         This is an unopened, what appears to be the same thing

7    you talked about, the compress pack?

8    A.  Yup.  Injury cold pack, yup.

9    Q.  53-47, is this, is this an acidic or a base type of caustic

10   chemical?

11   A.  Acidic.  It's an acid, again, to use in the gas generator

12   with the salt.

13   Q.  Directing your attention to Government Exhibit 53-48.

14   A.  Coffee filters, again, as you saw on the video, they use in

15   different stages of meth cook to filter out solids from

16   liquids.  Again, used quite a bit.

17   Q.  Directing your attention to 53-49.

18   A.  This kind of goes along with the photograph of the gloves.

19   It's more or less used for protection.

20   Q.  How often do you see these masks?

21   A.  Actually, not very often.

22   Q.  All right.  I'm going to direct your attention to 53-50.

23        What's -- what, if anything, is unique about that and

24   how would that relate to the production of meth?

25   A.  Well, again, they'll use the funnels, especially if they

1   were adding the, I would call them ingredients, the different

2   items that they are mixing together to produce methamphetamine.

3   If they are adding them to a 2-liter pop bottle or other type

4   of reaction vessel they may use, again, they'll use the filters

5   to help pour that stuff in there.

6   Q.  Okay.  And we can end on 53-51.

7   A.  Same thing.

8   Q.  Okay.  Thank you.

9           MR. STRAUS:  Your Honor, at this time I have no

10  further questions of the witness.

11          THE COURT:  All right.  Are there additional

12  questions, cross-examination?

13          MS. STOUT:  Your Honor, I just have one quick

14  question.

15          THE COURT:  Go ahead.

16          MS. STOUT:  Thank you.

17                      CROSS-EXAMINATION

18  BY MS. STOUT:

19  Q.  Good afternoon, Lieutenant.  Just a quick question about

20  the drug itself, methamphetamine.

21  A.  Yes, ma'am.

22  Q.  It's a very addictive drug; is that true?

23  A.  Yes, ma'am.

24  Q.  So you could call it a seductive drug?

25  A.  True.

1    Q.  And becoming addicted to it is easy, correct?  It doesn't

2    take a lot of doses to get --

3    A.  Everybody is -- yup, everybody's body is different, react

4    differently.  But it would not be uncommon for somebody to be

5    addicted after their first use.

6    Q.  Okay.  And because it's so addictive or seductive, whatever

7    term you want to use, it can cause you to engage in behaviors

8    you wouldn't normally or necessarily want to behave in; is that

9    correct?

10   A.  That's correct.  That's a fair statement.

11   Q.  People will lie to get their drug, won't they?

12   A.  Yes.  They'll do just about anything.

13   Q.  Cheat?

14   A.  If they are addicted.

15   Q.  Cheat?  Steal?

16   A.  Sure.

17   Q.  Sell their mom's TV?

18   A.  Oh, yeah.

19            MR. STRAUS:  Judge --

20   BY MS. STOUT:

21   Q.  Prostitute their body?

22            MR. STRAUS:  There may be a foundational --

23            THE WITNESS:  Yes.

24            MR. STRAUS:  -- predicate to this.

25            THE COURT:  Possibly.  I'm not entirely sure that this

1  was raised on direct, particularly.  But you might want to --

2           MS. STOUT:  Sure.

3           THE COURT:  -- provide some additional foundation.

4  Also, you might want to lower the microphone, just a little bit

5  to yourself.

6           MS. STOUT:  Sure.

7           THE COURT:  Go ahead.

8  BY MS. STOUT:

9  Q.  You said you've talked to many people who work in meth

10 labs.  I'm assuming you've also talked to addicts?

11 A.  Yes.

12 Q.  In your investigation of methamphetamine distribution?

13 A.  Yes.

14 Q.  So you are familiar with things addicts do and feel; is

15 that accurate?

16 A.  That's a fair statement.

17 Q.  Okay.  So that's how, how you would know what they would do

18 to get their drug?

19 A.  From what they tell me, that's correct.

20 Q.  Okay.  And so they'd even prostitute themselves; is that

21 accurate?

22 A.  It's possible, yes.

23           MS. STOUT:  Thank you, sir.

24           THE COURT:  Any other proposed cross-examination?  I

25 see none.

UNITED STATES vs. SUTHERLAND, et al. - 11-20129; 11-20066

```
1              MR. SABBOTA:  None, your Honor.

2              THE COURT:  I see none.  And Mr. Straus, anything

3    else?

4              MR. STRAUS:  No, your Honor.

5              THE COURT:  The witness may be excused.

6              MR. STRAUS:  Thank you.

7         (Witness excused, 12:29 p.m.)

8              THE COURT:  Next?

9              MR. MAIATICO:  Your Honor, perhaps this is a good time

10   for a brief recess, so we can address some issues with the

11   Court?

12             THE COURT:  All right.  We have about one more hour of

13   work that we can do today.  I will recess you briefly, ladies

14   and gentlemen.  I think we'll prepare another witness here.

15             So escort yourselves, please, back to the jury rooms.

16        (Jury out, 12:29 p.m.)

17             THE COURT:  All right.  The jury is absent.  Be

18   seated.

19             Mr. Maiatico?  Mr. Maiatico?  Everybody else should be

20   seated.  Not you.  What do you have?

21             MR. MAIATICO:  So, your Honor, two things.  Number

22   one, we intend to call the next witness, Gerald Peters, to the

23   stand.  I was notified earlier that there may have been a

24   health issue.  There was a welfare check done by the U.S.

25   Marshals.  I've not gotten a report back about his condition,
```

```
 1    but I wanted to --
 2              THE COURT:  Is he in custody?
 3              MR. MAIATICO:  He is in custody right now.
 4              The other thing was it may take a little bit of time
 5    to bring him up from custody.  We were told this morning that
 6    that process should not take as long as it took yesterday.
 7    There were unique circumstances yesterday.
 8              THE COURT:  Okay.
 9              MR. MAIATICO:  It should be within 5 to 10 minutes.
10              THE COURT:  Five minutes is good.
11              MR. MAIATICO:  Okay.  And then the final issue is --
12              THE COURT:  Have you pushed the button yet?
13              MS. MOHSIN:  Yes.
14              MR. MAIATICO:  We have pushed the button.
15              THE COURT:  Thank you.
16              MR. MAIATICO:  The final thing is I spoke to Mr. Daly
17    this morning about the intention to call Gerald Peters.  And he
18    raised an issue of an outstanding motion that may be relevant
19    to this witness.  I wanted to make sure that that issue was
20    resolved before the witness takes the stand, if Mr. Daly
21    intends to raise that issue.
22              THE COURT:  What's the unresolved, possibly unresolved
23    motion?
24              MR. DALY:  This has to do with the disclosures of the
25    presentence investigation report to the Court in camera to view
```

1   it, to see if there's any *Brady* or *Giglio* materials in the

2   presentence report.

3            THE COURT:  Does it exist?

4            MR. DALY:  Yes.  The Government has, I believe, a copy

5   of that.  I'd ask that they turn it over for your review.  And

6   you --

7            THE COURT:  Do you have a copy?

8            MR. MAIATICO:  We do have a copy, your Honor.

9            THE COURT:  Do you want to tender it up here?

10           MR. DALY:  Thank you.

11           MR. MAIATICO:  Our view, your Honor, if I may?

12           THE COURT:  Yes.

13           MR. MAIATICO:  Is that it's up to the Government to

14  make these disclosures.  It's within our purview to review

15  these for the necessary disclosure obligations.

16           THE COURT:  True.

17           MR. MAIATICO:  We will have multiple witnesses that

18  have these PSR's.  In terms of setting a precedent, I want the

19  Court to be aware that there are more witnesses that have

20  presentence reports.  I'm happy to provide this copy to the

21  Court.

22           THE COURT:  Let me ask this.  If a presentence report

23  contains a statement that is directly attributed to a

24  defendant, irrespective of *Brady* and *Giglio* --

25           MR. MAIATICO:  Then that would be --

1          THE COURT:  -- wouldn't that -- do you think that
2   would be disclosable or not?
3          MR. MAIATICO:  Well, your Honor, if it's verbatim --
4          THE COURT:  It's what?
5          MR. MAIATICO:  If it's a verbatim description --
6          THE COURT:  Yeah, right, quote.  It starts with a
7   quotation mark.  The defendant presented this statement, this
8   statement and then quote.  And then goes on for three or four
9   lines.  Sometimes that's in reports and sometimes it's not.  If
10  it's in a report, I mean, is it disclosable irrespective of
11  *Brady* or *Giglio*?
12         MR. MAIATICO:  The Government did, or your Honor, the
13  Government believes that would then be Jencks material that
14  would be disclosable, if not disclosed in some other fashion.
15         THE COURT:  Is there any such thing in the instant
16  report?
17         MR. MAIATICO:  In terms of quotations, your Honor, I,
18  I don't want to represent to the Court that that's the case in
19  terms of quotes without looking at it very briefly.
20         THE COURT:  Okay.
21         MR. DALY:  Your Honor, and our position goes beyond
22  just what may be in quotations.  As long as it's attributed to
23  the person making the statement, it would be the same as a
24  police report.  We're also looking for other information
25  regarding drug use and criminal history, Judge, both.

1          THE COURT:  Well, as Mr. Maiatico said, it is the

2     Government's obligation, not the Court's.

3          MR. DALY:  Well, I've cited in the brief, there is

4     case law in the Sixth, I think it's the Sixth Circuit that,

5     that the appropriate procedure is for you to review it, Judge.

6          THE COURT:  Well, are there limits on that?  Do I --

7     does the judge have to sift through all of the 10,000 exhibits

8     to search for *Brady* or *Giglio* material?

9          MR. DALY:  No.  We're talking about one document.

10    We're talking about a presentence investigation report that

11    you --

12         THE COURT:  What is the principal dividing line

13    between that and all other forms of documents?

14         MR. DALY:  Well, the dividing line is that the

15    document is confidential.  I don't have access to it.  So it's

16    disclosed to you, and you make a determination that it is

17    information that the defense should know, then you would let us

18    know.  If not, you can seal it and we can deal with it later,

19    if necessary, on appeal.

20         THE COURT:  So what does your review reveal, Mr.

21    Maiatico?

22         MR. MAIATICO:  Your Honor, there's nothing in the

23    presentence report that contains quotations, direct statements

24    of Mr. Peters in this report.

25         THE COURT:  Okay.  What's your case citation?

1          MR. DALY:  Judge, I don't have the motion with me.

2          THE COURT:  Is it your No. 991?  Docket No. 991?

3     That's --

4          MR. DALY:  It may be.

5          THE COURT:  That's a motion to exclude, actually, not

6     to include information.

7          MR. MAIATICO:  And your Honor, the Government would

8     rely on, I don't have the citations here, but well-established

9     precedent under *Pennsylvania v. Richey* in Supreme Court and

10    *U.S. v. Presser* in the Sixth Circuit, in terms of the

11    obligation of the Government and for the Court not to intervene

12    in such --

13         THE COURT:  Those are fundamental, *Presser*, and the

14    other one was?

15         MR. MAIATICO:  *Pennsylvania vs. Richey*, Supreme Court.

16         THE COURT:  Says that, that *Brady* and *Giglio* are not

17    an invitation to expand discovery, right?

18         MR. MAIATICO:  It's, it's the -- I cite those two for

19    the precedent that it is the Government's responsibility, it's

20    our determination and the Court should not get involved unless

21    there's an issue which they can make a showing of.

22         THE COURT:  Jackie Presser, wasn't it?

23         MR. MAIATICO:  I'm sorry?

24         THE COURT:  Jackie Presser, Mr. Straus confirms.

25         MR. MAIATICO:  Yes, your Honor.

```
 1              THE COURT:  It's a name known in these environments,
 2   maybe not in yours.  Okay.
 3              MR. DALY:  So, Judge, this is a document that was
 4   prepared by the Probation Department for the Court.  It's
 5   confidential.  That takes it outside of the case law the
 6   Government just cited.  It's totally different.
 7              THE COURT:  And you don't, you don't have your --
 8              MR. DALY:  I'm sorry.
 9              THE COURT:  -- your motion or your case?
10              MR. DALY:  No.  The Government did not file a written
11   response to this, Judge.
12              THE COURT:  I thought that was just referred to,
13   relying on Presser and the other.  No, that's just as a
14   general?
15              MR. MAIATICO:  I'm providing that to you verbally
16   right now, your Honor.  We did not file a written response on
17   this.
18              THE COURT:  The fundamentals of this, this is what I'm
19   going to dispose of.  The witness is on his way.  Presumably
20   he's outside the door now, or should be, if he's not.  You've
21   already pushed the button ten minutes ago.  It's a five-minute
22   trip.  Okay.
23              I'm going to rely on the fundamentals of Brady and
24   Giglio jurisprudence, which says just as Mr. Maiatico suggests,
25   that it is the Government's obligation, and they proceed at
```

1    their peril if they fail to abide by the standards that *Brady*

2    and *Giglio* stand for.

3            So I'm going to hand that responsibility or maintain

4    that responsibility on the Government's side of the case.  And

5    I'm going to decline your invitation to review this, and

6    perhaps each and every other presentence report that may come

7    along to determine those things that you mentioned.  That's in

8    the absence of persuasive case law to the contrary that

9    suggests that I ought to be doing this.

10           Do we have the witness?

11           MR. MAIATICO:  We do, your Honor.

12           THE COURT:  Let's go.

13           MR. DALY:  Judge, then I'd ask that you provide some

14   procedure whereby the presentence reports that the Government

15   have, that they are placed under seal, Judge.

16           THE COURT:  That may be appropriate.  Now I've just

17   been handed a fresh printing of your --

18           MR. DALY:  Thank you.

19           THE COURT:  -- of your motion.  And perhaps I'll be

20   able to take a look at, locate the case you're citing and read

21   it and compare it with *Presser* and the other law.  And perhaps

22   there will be a different -- and perhaps a witness would have

23   to be called back to the stand for additional

24   cross-examination, so forth.  It's not an incurable situation.

25           But at the moment, we're going to proceed on the basis

```
 1    of regularly established law, which says -- which leads me to
 2    conclude that I'm not going to do this.
 3              Let's call the jury in.
 4              Why don't you stand, why don't you stand down.
 5              THE WITNESS:  Stand down here?
 6              THE COURT:  Yes.  Stand down by.
 7              Jury?
 8       (Jury in, 12:39 p.m.)
 9              THE COURT:  While the jury is being seated, I'll note
10    that there is not any Sixth Circuit authority.  That's what was
11    said in the motion.  No Sixth Circuit authority on this point.
12    But there's, there's a, what looks like an authority from
13    another circuit.  I'm going to pull those cases and take a
14    look, Mr. Daly.
15              MR. DALY:  Thank you.
16              THE COURT:  All right.  The jury has assembled and the
17    next witness has been produced.  And, Mr. Maiatico, this is
18    your witness?
19              MR. MAIATICO:  The Government calls to the stand Mr.
20    Gerald Peters.  His testimony will be relevant to Count 1, the
21    RICO conspiracy, and Count 3, the methamphetamine conspiracy.
22              THE COURT:  Raise your right hand, sir.
23       (Witness is sworn.)
24              THE COURT:  Have a seat.  Move that microphone out of
25    the way and get comfortable in the chair and pull the
```

137

1   microphone so it's pointing at you, please.  Okay.  That should

2   be good.

3              All right.  Go ahead.

4                         GERALD PETERS, JR.

5      called as a witness at 12:41 p.m., testified as follows:

6                         DIRECT EXAMINATION

7   BY MR. MAIATICO:

8   Q.  All right.  Good afternoon, Gerald.

9   A.  Good afternoon.

10  Q.  Mr. Peters.

11              Can you please state your full name for the record and

12  spell your last name?

13  A.  Gerald Dale Peters, P-E-T-E-R-S, Junior.

14  Q.  And Mr. Peters, how old are you?

15  A.  Forty-two.

16  Q.  And where did you grow up?

17  A.  Southwest Detroit.

18  Q.  Now, have you ever been a member of a motorcycle club?

19  A.  Detroit Highwaymen.

20  Q.  The Detroit Highwaymen.  The Detroit chapter of the

21  Highwaymen?

22  A.  It's the mother chapter, yes.

23  Q.  Is that the, is that the chapter that you were a part of?

24  A.  Yes.

25  Q.  And when did you join the Highwaymen Motorcycle Club?

1   A.   '98.

2   Q.   How old were you then?

3   A.   About 23, 24.

4   Q.   And why did you join the Highwaymen?

5   A.   Like a rite of passage.

6   Q.   A rite of passage?  Can you explain that to the jury?

7   A.   Well, just, it was join the Latin Counts or be a

8   Highwaymen.  That's all we seen in our neighbor.  So I joined

9   the Highwaymen instead.

10  Q.   So you said it's all you've seen in your neighborhood.

11  What was the reputation of the Highwaymen when you were growing

12  up?

13  A.   They were the baddest ones on the street.

14  Q.   And when you became a member, were they still the bad ones

15  on the street?

16  A.   Yes.

17  Q.   How long were a member of the Highwaymen?

18  A.   From '98 to 2009.

19  Q.   Is it customary for members of a motorcycle club to have a

20  nickname?

21  A.   Yes.

22  Q.   Or club name?

23       And what was your club name or nickname?

24  A.   "Byrd."

25  Q.   Byrd?

1   A.  Byrd.  Yup.  B-Y-R-D.

2   Q.  Now, were the Highwaymen involved in criminal activity?

3   A.  Yes.

4   Q.  Can you give us an example of the type of criminal

5   activities that the Highwaymen were involved in?

6   A.  Drug trafficking, auto theft, motorcycles.

7   Q.  Were the Highwaymen, and its members, ever involved in acts

8   of violence?

9   A.  Yes.

10  Q.  Assaults?

11  A.  Assaults, yes.

12  Q.  And did you hold any leadership roles in the Highwaymen

13  club?

14  A.  I was the president and the national boss of, of the mother

15  chapter.

16  Q.  Okay.  You said you were the national boss at one point.

17  When was that?

18  A.  2003 to 2004.

19  Q.  All right.  And as the national boss -- you mentioned the

20  Detroit chapter.  Are there other chapters of the Highwaymen?

21  A.  Yes, there's different branches.

22  Q.  Okay.  And where are some of those located?

23  A.  Kentucky, Florida, Tennessee, Cincinnati.  There's still

24  some -- there's more in the outskirts of Michigan, too.

25  Q.  All right.  Now, as the national boss, did you have

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1   authority over those other chapters?

2   A.  Yes.

3   Q.  Were members of the Highwaymen expected to follow orders

4   from you as the national president?

5   A.  Yes.

6   Q.  What kind of orders would you give?  What kind of orders

7   would you give to members that they would be expected to

8   follow?

9   A.  Anything that I said.

10  Q.  So it wouldn't matter what you said?

11  A.  No.

12  Q.  They would have to follow it?

13  A.  Correct.

14  Q.  Would that include criminal activities?

15  A.  Yes.

16  Q.  If you gave certain orders, what kind of -- I want to ask

17  you this:  What kind of orders then did you give?

18  A.  I had a clubhouse burned down on the Southfield Service

19  Drive as a national boss.

20  Q.  So you ordered certain members of the Highwaymen to do

21  that?

22  A.  Yes.

23  Q.  And do you remember what year that was?

24         MS. STOUT:  Your Honor?

25         THE WITNESS:  I believe it was 2004.

```
 1              MS. STOUT:  I'm going to object to relevance here,
 2   please.  Thank you.
 3              THE COURT:  Overruled.  Thank you.
 4   BY MR. MAIATICO:
 5   Q.  All right.  Now, you mentioned that you were a national
 6   boss, you were president of a chapter.  Were there any other
 7   roles that you had when you were in the Highwaymen club?
 8   A.  Yes.  I was a master sergeant, vice president.
 9   Q.  You were a master sergeant.  Was that one of your first
10   roles?
11   A.  Yes.
12   Q.  What did a master sergeant do?
13   A.  He took care of the inside.  It was like the police of the
14   club.
15   Q.  Why were you given the role as a master sergeant?
16   A.  Just how big I was.
17   Q.  The way you held yourself?
18   A.  Yeah.
19   Q.  Now, let me talk about the Highwaymen and the uniforms that
20   you would wear.  What -- or the clothing that you would wear.
21   What would a Highwaymen Motorcycle Club member wear?
22   A.  Black Levis, black vests, black T-shirt, and black boots.
23   Q.  Was there a vest or an emblem?
24   A.  Yes.  It was silver, painted on.
25   Q.  Okay.  Now, can you describe that in a little bit more
```

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1   detail in terms of the vest?  What material was it made of?

2   A.  You would have your emblem on the back.  The material was

3   leather.  You have your emblem on the back that said "Detroit

4   Highwaymen" on it.  Then on the front, you would have your

5   lightning rods, your name.  Most of the time you have "HFFH" on

6   the top.  That's "Highwaymen Forever, Forever Highwaymen."

7   Q.  "Highwaymen Forever, Forever Highwaymen"?

8   A.  Yup.

9   Q.  All right.  You also mentioned lightning rods you would

10  have on the front of that vest.  What would those mean?

11  A.  That means you put in work for the club.

12  Q.  What does "putting in work" mean?

13  A.  You hurt somebody.

14  Q.  That means you beat someone up?

15  A.  For club business, yes.

16  Q.  Now, I think that the jury might be able to see that you

17  have some tattoos on your body?

18  A.  Yes.

19  Q.  Are some of those tattoos related to your association with

20  the Highwaymen Motorcycle Club?

21  A.  Yes.

22  Q.  For example, could you show the jury one of those tattoos?

23  A.  I got the emblems here.

24  Q.  All right.  And --

25  A.  This says "Highwaymen" all the way down here.

1  Q.  So there's more -- you were showing the jury your left arm,

2  which is full of tattoos?

3  A.  Yeah.

4  Q.  Most of those tattoos relate to your association with the

5  club?

6  A.  Yes.

7  Q.  Now, I want to give the jury -- or I want you to give the

8  jury an understanding of the landscape of motorcycle clubs in

9  the Detroit area when you were a member of the Highwaymen

10  Motorcycle Club.  What were some of the other active motorcycle

11  clubs in the Detroit area?

12  A.  Devils Diciples, Jokers, Outlaws, Black Pistons, Broad

13  Jumpers.

14  Q.  All right.  And in terms of how these motorcycle clubs

15  interacted, were there some clubs that got along with each

16  other?

17  A.  Yes.

18  Q.  Were there some clubs that were -- you would describe as

19  maybe rivals or foes?

20  A.  Yes.

21  Q.  Now, for the Highwaymen, who were some of your friends?

22  A.  Devils Diciples.

23  Q.  Is "friends" the right word to use?

24  A.  Associates.

25  Q.  They were associates.

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1              Is it fair to say that when you say "associates,"

2    these are motorcycle clubs where there was no bad feelings

3    between you?

4    A.   Yes.

5    Q.   All right.  Now, what were some of the rival gangs of the

6    Highwaymen Motorcycle Club?

7    A.   Outlaws.

8    Q.   Were there other chapters or subchapters of the Outlaws

9    that you --

10   A.   Black Pistons.

11   Q.   You said the Black Pistons?

12   A.   Black Pistons, yes.

13   Q.   All right.  And now, you mentioned the Devils Diciples

14   Motorcycle Club.  You said that was one of your allies,

15   associates?

16   A.   Yes.

17   Q.   Now, the Devils Diciples, they also have friends and foes?

18   A.   Yes.  I'm not sure all of their friends, but they do hang

19   out with the Hells Angels, I know.

20   Q.   All right.  So the Devils Diciples and the Hells Angels

21   you've described as allies?

22   A.   Yes.

23   Q.   All right.  And what were some of the, the rivals of the

24   Devils Diciples?

25   A.   Outlaws.

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1  Q.  You mentioned the Black Pistons as a subchapter of the

2  Outlaws?

3  A.  Yeah.

4  Q.  Were they also a, a --

5  A.  Yes.

6  Q.  -- rival of the Devils Diciples?

7  A.  Yes.

8  Q.  I'm going to ask you to let me finish asking the question

9  before you answer, just so the record is clear.  All right, Mr.

10  Peters?

11       Sir, are you familiar with something called the

12  Federation?

13  A.  Yes.

14  Q.  Is it might also be referred to as the Confederation of

15  Clubs?

16  A.  Yes.

17  Q.  All right.  Can you tell the jury what the Confederation of

18  Clubs is?

19  A.  It's a combined effort of all the different clubs that are

20  together against certain clubs.  That's what the Federation is

21  about.  They protect each other against clubs like the

22  Highwaymen, Devils Diciples, and like that.

23  Q.  What motorcycle clubs in the Detroit area were part of this

24  Federation?

25  A.  The Outlaws ran the Federation.  At my time, they ran it.

1   Q.  Okay.

2   A.  You had the Jokers, Broad Jumpers.  There was a lot.

3   Q.  Were the Devils Diciples part of this Federation?

4   A.  No.

5   Q.  Okay.  Now, if a group or a motorcycle club wanted to move

6   into the area, open up a club, what would they need to do in

7   order to --

8   A.  Ask permission.

9   Q.  Who would they need to ask permission of?

10  A.  Detroit Highwaymen.

11  Q.  Now, you say they would just need to ask permission of the

12  Highwaymen.  Is that because you were the top dogs of the, I

13  think as you described earlier, the bad asses?

14  A.  Yes.

15  Q.  All right.  Would those newly formed clubs need to ask

16  anyone else's permission?

17  A.  Not that I'm aware of.

18  Q.  So, Mr. Peters, without telling us the specific facility

19  you're in, where do you currently reside?

20  A.  PA.

21  Q.  And what does that mean?

22  A.  Pennsylvania.

23  Q.  All right.  And what type of facility are you in?

24  A.  Prison.

25  Q.  All right.  I guess that's by a give-away, you're wearing

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1   your prison clothes today; is that right?

2   A.  Yes.  Well, these are county clothes.

3   Q.  Okay.  Are you serving a criminal sentence?

4   A.  Yes.

5   Q.  And what crime were you convicted of?

6   A.  RICO, act 1.

7   Q.  Okay.  Now, you say "RICO, act 1."  Do you know what "act

8   1" means?

9   A.  No, not really.

10  Q.  You're not an attorney?

11  A.  No.

12  Q.  Okay.  But do you understand what crimes you admitted to

13  when you were convicted of this crime?

14  A.  Yes.

15  Q.  I guess I should ask, did you plead guilty to the crime or

16  did you go to trial?

17  A.  I pled guilty.

18  Q.  Okay.  So what were the underlying crimes that you agreed

19  that you committed?

20  A.  Drug trafficking and arson.

21  Q.  Now, the arson I think you already spoke about.  Is that

22  the arson that you're --

23  A.  Yes.

24  Q.  -- talking about here?

25          And can you explain what that was again?

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1   A.  I, I made -- I asked two members to blow up a clubhouse for

2   me.

3   Q.  And you also said it was something related to narcotics?

4   A.  Well --

5   Q.  The other crime?

6   A.  Yeah, my other crime.  Yes.

7   Q.  And can you tell us what type of narcotics that was?

8   A.  Cocaine trafficking.

9   Q.  Okay.  So you trafficked cocaine?

10  A.  Yes.

11  Q.  And for how long did you do that?

12  A.  From '98 to 2007.

13  Q.  And this RICO charge, was this related to your membership

14  with the Highwaymen Motorcycle Club?

15  A.  Yes.

16  Q.  Now, when you were first arrested on that RICO case, did

17  you at some point begin cooperating with law enforcement?

18  A.  Yes.

19  Q.  And what year was that; if you remember?

20  A.  2009.

21  Q.  And when you began cooperating with law enforcement, you

22  provided information against other Highwaymen members; is that

23  correct?

24  A.  Correct.

25  Q.  Now, did you also meet with Agent Bill Fleming, do you see

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1   sitting here in the courtroom, regarding the Devils Diciples?

2   A.   Yes.

3   Q.   How many times did you meet with him?

4   A.   Once.

5   Q.   And as you were cooperating against the Highwaymen, did you

6   do any other sort of proactive cooperation?

7   A.   Yes.

8   Q.   And what type of cooperation did you do?

9   A.   I talked to Mr. Fleming about the Devils Diciples.

10  Q.   Okay.  And at any point, did you ever wear a wire?

11  A.   Yes.

12  Q.   Now, just so the record is clear, when you wore the wire,

13  what was that for?

14  A.   The Highwaymen.

15  Q.   Okay.  And were you provided with any sort of payments in

16  regards to your cooperation against the Highwaymen?

17  A.   No.

18  Q.   All right.  Now, at some point you were provided with money

19  to pay your bills; is that correct?

20  A.   Correct.

21  Q.   At any time, were you asked to relocate?

22  A.   Yes.

23  Q.   And why was that?

24  A.   Because there was fear for my safety.

25  Q.   And what -- is it because you feared for your safety?

1   A.   No.

2   Q.   Others feared for your safety?

3   A.   Others feared for my safety, yes.

4   Q.   You felt you could take care of yourself?

5   A.   Yes.

6   Q.   So when you were relocated, was your relocation paid for?

7   A.   Yes.

8   Q.   In terms of your cooperation against Highwaymen, did you

9   testify in any trials?

10  A.   Yes.

11  Q.   You testified against members of the Highwaymen?

12  A.   Yes.

13  Q.   How many, how many trials did you testify in?

14  A.   Three.

15  Q.   Now, before you testified, did the prosecutors in that case

16  make any promises to you?

17  A.   No.

18  Q.   Did they provide you with any benefits in exchange for your

19  testimony?

20  A.   No.

21  Q.   And at your sentencing, did the prosecutors recommend

22  anything in terms of your final sentence to the court?

23  A.   A downward departure.

24  Q.   So they recommended a lesser sentence?

25  A.   A lesser sentence.

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1    Q.  Do you know what they recommended to the Court?

2    A.  Five years.

3    Q.  That was up to the prosecutors to determine your sentence?

4    A.  No.

5    Q.  Who was it up to?

6    A.  The judge.

7    Q.  And what did the judge sentence you to?

8    A.  24 months, three years' supervised release.

9    Q.  Now, again, just so the record is clear, your cooperation

10   in that RICO case against the Highwaymen, that's separate from

11   the case that we're here for today; is that correct?

12   A.  Yes.

13        THE COURT:  Let's also point out it was a different

14   judge, shall we?

15   BY MR. MAIATICO:

16   Q.  It was a different judge?

17   A.  Yes.

18   Q.  It was different prosecutors?

19   A.  Yes.

20   Q.  Different federal agents?

21   A.  Yes.

22   Q.  And have you been made any promises or offered any benefits

23   from any of the prosecutors in this case --

24   A.  No.

25   Q.  -- in return for your testimony?

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

```
 1              MR. SATAWA:  Objection.  Your Honor, that would be
 2    misleading under 403.
 3              THE COURT:  I don't see why.  Overruled.
 4    BY MR. MAIATICO:
 5    Q.  Have you been offered any benefits or made any promises by
 6    the prosecutors on this case?
 7    A.  No.
 8    Q.  Have you been made any promises by the agents, the federal
 9    agents on this case?
10    A.  No.
11    Q.  Have you talked to the judge before in this case?
12    A.  No.
13    Q.  Why are you testifying here today?
14    A.  It's the right thing to do.
15    Q.  All right.  Well, let's, let's move on and talk about how
16    you know -- you mentioned the Devils Diciples Motorcycle Club.
17    Let's talk about how you know them.
18              When was the first time you started hanging out with
19    members of the Devils Diciples?
20    A.  I believe it was early 2000s.
21    Q.  Just about the same time you joined the Highwaymen?
22    A.  Yes.
23    Q.  And how were you introduced to these members of the Devils
24    Diciples?
25    A.  Anthony, Anthony Clark.
```

2:11-cr-20129-RHC-MAR  Doc # 1071  Filed 11/01/14  Pg 153 of 186  Pg ID 5567
JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

153

1  Q.  And who is Anthony Clark?

2  A.  At that time, he was -- he's a member of the Detroit

3  Highwaymen.

4  Q.  And did he, at some point, hold any leadership positions

5  with the Highwaymen?

6  A.  Yes.  He was the national boss.

7  Q.  I'd like to show you what's been marked as proposed

8  Government's Exhibit 64-11.

9        Mr. Peters, do you recognize that photograph?

10  A.  Yes.

11  Q.  Who is that a photograph of?

12  A.  Anthony Clark.

13  Q.  All right.

14        MR. MAIATICO:  Your Honor, I would ask that that photo

15  be admitted into evidence, and publish to the jury.

16        THE COURT:  Without objection?

17        MR. SABBOTA:  No objection, your Honor.

18        MR. SATAWA:  What was the number?

19        THE COURT:  Received, 64-11.

20    (Exhibit 64-11 received, 12:58 p.m.)

21        MR. MAIATICO:  All right.  64-11?  If I can get my

22  photograph back.

23        I'll publish it to the jury this way.

24        THE COURT:  That's fine.  The old-fashioned way.  All

25  right.

1    BY MR. MAIATICO:

2    Q.  All right.  So you said that through Mr. Clark you were

3    introduced to some of the Devils Diciples.  Where would you see

4    some of these members?

5    A.  At their clubhouse and ours.

6    Q.  And before, you said that the Devils Diciples and the

7    Highwaymen, you were associates, so you went to each other's

8    parties?

9    A.  Yes.

10   Q.  All right.  And what clubhouses of the Devils Diciples did

11   you go to?

12   A.  The one in Mount Clemens.

13   Q.  All right.  And that was for a party?

14   A.  Yes.

15   Q.  All right.  And would members of the Devils Diciples come

16   to the Highwaymen parties?

17   A.  Yes.

18   Q.  And where were those located?

19   A.  The various ones that we had in the mother chapter in

20   Detroit, or the east side.

21   Q.  Now, when you would -- can you give us a time frame of when

22   you would go to these parties?

23   A.  At nighttime usually.

24   Q.  All tight.  And in terms of the years, this is while you

25   were a member?

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1   A.  Yes.

2   Q.  So when you would go to the parties at the Devils Diciples,

3   would there be -- would you observe any controlled substances?

4   A.  Yes.

5   Q.  And what would you observe?

6   A.  Well, it was methamphetamine.

7   Q.  Now, you said you saw methamphetamine.  Was that at every

8   one of the parties that you went to with the Devils Diciples?

9   A.  Yes.

10  Q.  What would you say is the prevalence of methamphetamine

11  amongst members of the Devil Diciples?

12  A.  That's all they, that's all they used.

13  Q.  Did the Devils Diciples have a reputation in terms of this

14  controlled substance?

15  A.  Yes.

16  Q.  What was that reputation?

17  A.  I never seen it until them.

18          MR. DALY:  I'm going to object.  There's no foundation

19  for this and it's not relevant, both.

20          THE COURT:  I disagree.  I think the witness'

21  explanation and background is sufficient foundation.

22          Proceed.

23  BY MR. MAIATICO:

24  Q.  I think my question was, what was the reputation of Devils

25  Diciples in terms of controlled substance use.

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1   A.  They sold, they sold the methamphetamine.

2   Q.  First I said "use," and you're saying they sold

3   methamphetamine?

4   A.  Yeah.

5   Q.  So they not only used it, but they also distributed it; is

6   that correct?

7   A.  Yes.

8   Q.  Now, can you tell us about some of the names of the Devils

9   Diciples members that you knew, that you would see at parties?

10  A.  Yes.  Billy Wadd, Roach, Spike, Stevo.

11  Q.  All right.

12  A.  And Scotty Z.

13  Q.  Now, you mentioned the name Scotty Z.  Do you know Scotty

14  Z's real name?

15  A.  No.

16  Q.  I'm going to ask you to take a look around the courtroom.

17  Do you see the individual that you identify as Scotty Z in the

18  courtroom today?

19  A.  Yes.

20  Q.  And can you point him out?

21  A.  Right there.  (Pointing.)

22  Q.  And can you tell us what he's wearing?

23  A.  The black suit.

24  Q.  All right.

25         MR. MAIATICO:  For the record, your Honor, the witness

```
 1   has identified the defendant, Scott, known as Scotty Z to the

 2   witness.

 3             THE COURT:  Noted.  Go ahead.

 4   BY MR. MAIATICO:

 5   Q.  Sir, you also mentioned an individual by the name of Billy

 6   Wadd?

 7   A.  Yes.

 8   Q.  I'm going to show you Government's Exhibit 64-61, proposed

 9   government exhibit.

10             And do you recognize the individual in that

11   photograph?

12   A.  Yes.

13   Q.  And who is that?

14   A.  That's Billy Wadd.

15             MR. MAIATICO:  Your Honor, I ask that be received into

16   evidence and published to the jury.

17             THE COURT:  Without objection, received.

18       (Exhibit 64-61 received, 1:01 p.m.)

19             THE COURT:  Again, the number?

20             MR. MAIATICO:  That is Government Exhibit 64-61,

21   identified as Billy Wadd.

22   BY MR. MAIATICO:

23   Q.  All right.  And did there come a time, Mr. Peters, when the

24   Devils Diciples and the Highwaymen had a party at a -- had a

25   joint party or had a party together?
```

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1   A.   Yes.

2   Q.   How many times did you do that?

3   A.   My recollection is once.

4   Q.   Was there a name for that party?

5   A.   The black and blue party.

6   Q.   Do you remember when you had that black and blue party?

7   A.   Early 2000s.

8   Q.   When you say "black and blue," what does that refer to?

9   A.   That's the colors we wore.

10  Q.   So --

11  A.   Highwaymen was black, Devils Diciples wore blue.

12  Q.   So the Devils Diciples often referred to themselves --

13  refer to the color blue to associate with their club?

14  A.   Yes.

15  Q.   Now, you mentioned an individual by the name of Scotty Z

16  who you pointed out in the courtroom.  When did you first meet

17  Scotty Z?

18  A.   Early 2000's.

19  Q.   How were you introduced to him?

20  A.   By other members of the Highwaymen.

21  Q.   Did you know him to be a member of the Devils Diciples at

22  that time?

23  A.   At that time, yes.

24  Q.   All right.  Was he a member of other highway -- or I'm

25  sorry.  Was he a member of another motorcycle club at any point

1    in time?

2    A.   In '09 he was a member of the Highwaymen.

3    Q.   So in 2009, Scotty Z became a member of the Highwaymen?

4    A.   Yes.

5    Q.   But back when you were introduced to him, he was a member

6    of the Devils Diciples?

7    A.   Yes.

8    Q.   And did he hang out with other members of the Devils

9    Diciples?

10   A.   Yes.

11   Q.   Now, did there come a time when Scotty Z helped you out in

12   the early 2000s, late 1990, in an incident that you were

13   having?

14   A.   Yes.

15   Q.   Can you describe that incident?

16        MR. DALY:  Your Honor, I object.  This is outside the

17   allegations and scope in the indictment.  There's been no

18   404(b) notice.

19        MR. MAIATICO:  Your Honor, this is relevant to the

20   RICO enterprise.

21        MR. DALY:  I'm sorry.  It's not one of the overt acts,

22   Judge.

23        THE COURT:  I'm not sure that it has to be in order to

24   be relevant.

25        Overruled.  I'll receive the evidence.

```
 1   BY MR. MAIATICO:

 2   Q.  All right.  So at this time when Scotty Z helped you out

 3   with this incident, do you know him to be a member of or

 4   associating with Devils Diciples?

 5   A.  Yes.

 6   Q.  And can you describe that incident?

 7   A.  Yes.  He scared some -- some guy was messing with my

 8   girlfriend, and BJ said that Scotty Z would handle it.

 9               MR. DALY:  Objection.  Hearsay.

10               THE COURT:  I'm not hearing hearsay just yet, but you

11   should proceed with a question and answer.

12               MR. MAIATICO:  I will.  Thank you, your Honor.

13   BY MR. MAIATICO:

14   Q.  Let's break that down for a second.  So at first, you said

15   that someone was messing your girlfriend?

16   A.  Yes.

17   Q.  Is that correct?

18   A.  Yes.

19   Q.  What do you mean by "messing with your girlfriend"?

20   A.  Bust her windows out of her car and stuff.

21   Q.  Were you concerned about this?

22   A.  Yes.

23   Q.  And were you looking for someone to -- first of all, did

24   you take care of the situation yourself?

25   A.  No.  I used somebody outside.
```

1  Q.  Why did you do that?

2  A.  So it wouldn't bring the heat to the club, to our club.

3  Q.  All right.  And did someone suggest another person to help

4  you with the situation?

5  A.  Yes.

6  Q.  And who was that person?

7  A.  BJ.

8  Q.  All right.  And who did you suggest?

9  A.  Scotty Z.

10         MR. DALY:  Objection.  It's hearsay, Judge.

11         THE COURT:  No.  It isn't.  It's a verbal act.

12         Go ahead.  Overruled.

13  BY MR. MAIATICO:

14  Q.  All right.  So once this Scotty Z came to your attention,

15  was suggested to help you out with this incident, what

16  happened?

17  A.  Scotty Z took care of it.

18  Q.  Now, how do you know that he took care of it?

19  A.  He called me up and told me he did.

20  Q.  All right.  Now, when you say "took care of it," what does

21  that mean?

22         MR. DALY:  Objection.  Calls for speculation.

23         THE COURT:  It does not.  It is not objectionable.

24  Overruled.

25         Go ahead.

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1   BY MR. MAIATICO:

2   Q.  Can you answer the question?

3   A.  He said the guy wouldn't bother us no more.

4   Q.  All right.  Did Scotty Z tell you exactly what he did?

5   A.  He said he kicked the door in and scared the guy.

6   Q.  And in return for that -- first of all, why would Scotty Z

7   do this for you?

8   A.  Just from -- for drugs.

9   Q.  So did you make an offer to him, for drugs in return for

10  doing this?

11  A.  Yes.

12  Q.  All right.  And what did you provide him?

13  A.  Quarter ounce of cocaine.

14  Q.  Now, you said you were also friends with the Devils

15  Diciples as a Highwaymen.  Was that a reason Scotty Z would do

16  it for you?

17  A.  Yes.

18  Q.  And at this time, you weren't the national boss?

19  A.  No.

20  Q.  What was your role in the Highwaymen at that point?

21  A.  Just a regular member.

22  Q.  All right.  Moving on, I want to talk about an incident

23  that the Highwaymen had with the Jokers Motorcycle Club.  You

24  had mentioned before the Jokers Motorcycle Club, correct?

25  A.  Correct.

1    Q.  All right.  Now, sometime, calling your attention to a time

2    around 2002/2003, can you describe this incident that the

3    Highwaymen had with the Jokers?

4    A.  The Devils -- there was two members, one member of the

5    Highwaymen and one member of the Devils Diciples was partying

6    at the Jokers'.  And the Jokers bartender pulled a gun on him.

7    Q.  Okay.  And you said there was a member of the Devils

8    Diciples that was there.  Do you remember who that was?

9    A.  Stevo.

10   Q.  And who was the Highwaymen that was there?

11   A.  BJ.

12   Q.  So BJ and Stevo were at the Jokers Motorcycle Club?

13   A.  Yes.

14        MR. SATAWA:  I'm going to object if this witness

15   doesn't have personal knowledge of the incident.

16        THE COURT:  Well, I think that that invites you to lay

17   a foundation.

18   BY MR. MAIATICO:

19   Q.  All right.  Mr. Peters, how did you become aware of an

20   incident between -- with, with BJ and Stevo and the Jokers?

21   A.  BJ called me that night after they took the gun from the

22   guy.

23   Q.  Okay.  Now, when BJ called you, first of all, why would he

24   call you?

25   A.  Because I was vice president.

1   Q.  And as vice president, what would you do?

2   A.  I would give him an order what to do.

3   Q.  So as vice president, do you have authority over other

4   members?

5   A.  Yes.

6   Q.  Would they have to listen to what you said?

7   A.  Yes.

8   Q.  Okay.  And as a result of your conversation that you had

9   with BJ, what happened?

10  A.  I told BJ to just take the gun and leave; we'll handle it

11  on another time.

12  Q.  All right.  And did you handle it at another time?

13  A.  Yes.

14  Q.  What did you do?

15  A.  I got the guys together, and we met the Devils Diciples

16  there at the Jokers clubhouse.

17  Q.  All right.  So you immediately called the Devils Diciples.

18  Why did you do that?

19  A.  Because their member was involved in it.

20  Q.  And how many members of the Highwaymen then showed up at

21  the Jokers?

22  A.  I believe it was about 15 Highwaymen and maybe about 10

23  Devils Diciples.

24  Q.  Do you remember any of the names of the Devils Diciples

25  members who were there?

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1    A.   Billy Wadd was there, Stevo was there.  I'm not really sure

2    on the other guys.

3    Q.   All right.  So what happened once you, once you arrived?

4    A.   We went inside and talked to their president.

5    Q.   Did that resolve the issue?

6    A.   It did, for a minute.  But we didn't believe it did.

7    Q.   So what happened next?

8    A.   We went over to a bar looking for some Joker members, that

9    they hung out at a bar over there in Brightmoor.

10   Q.   When you say "we went over to a bar," do you mean members

11   of the Highwaymen and members of the Devils Diciples?

12   A.   Yes.

13   Q.   Do you remember what -- where this bar was located?

14   A.   Brightmoor.

15   Q.   Do you remember the name of the bar?

16   A.   No, I don't.

17   Q.   So you went to a bar in the Brightmoor section.  You said

18   that both members of the Highwaymen, Devils Diciples were

19   looking for members of the Jokers.  What was your intention?

20   A.   To beat them up.

21   Q.   And why were you going to beat them up?

22   A.   Because of the gun incident.

23   Q.   So what happens once you get to that bar in the Brightmoor

24   section?

25   A.   I found one Joker that was a friend of mine I went to

1   school with.  He was in plain clothes.  So I told him to leave.

2   Q.  What happened after that?

3   A.  Then a fight broke loose.

4   Q.  Who -- when the fight broke loose, who was the fight

5   between?

6   A.  A Devils Diciple and a Highwaymen was beating up a guy.

7   Q.  Now, were the Devils Diciples members also involved in

8   beating up a guy?

9   A.  Yes.

10  Q.  Do you remember who those individuals were, from the Devils

11  Diciples?

12  A.  Stevo and BJ was beating the guy up.

13  Q.  Now, were you right there when that was happening?

14  A.  Yes.

15  Q.  You were inside the bar?

16  A.  Yes.

17  Q.  Were you drinking at the time?

18  A.  Yes.

19  Q.  Were you on any other controlled substances at the time?

20  A.  Cocaine.

21  Q.  So your memory of this might be a little fuzzy; is that

22  correct?

23  A.  Correct.

24          MR. SATAWA:  Objection.  Leading.

25          THE COURT:  Overruled.

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1   BY MR. MAIATICO:

2   Q.  So once you see this assault happening, what happens next?

3   What do you do?

4   A.  The bartender pulled a gun on us, so I pulled my gun and

5   shot a few times in the air and everybody ran out of the bar.

6   Q.  Now, why would you shoot a few times in the air?

7   A.  To make him drop his gun.

8   Q.  So you had a gun.  Do you always carry a gun on you?

9   A.  Yes.

10  Q.  Or did you at that time?

11  A.  Yes.

12  Q.  And so firing the gun in the air, did that work to make

13  people leave the bar?

14  A.  Yes.

15  Q.  Did it break up the fight?

16  A.  Yes.

17  Q.  Okay.  Then what happened next?

18  A.  We went outside and Anthony Clark, as my national boss,

19  told me to shoot a few times in the back of the bar so nobody

20  would come out the back of the bar where we were at.

21  Q.  All right.  Did you do that?

22  A.  Yes.

23  Q.  You did that on Anthony Clark's direction?

24  A.  Yes.

25  Q.  Why?  Did you have to do that?

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1    A.   Yes.  Because he was the national president at that time.

2    Q.   So what happens next after you leave the bar?

3    A.   We all went over to the Copa bar.

4    Q.   All right.  You mentioned the Copa bar.  Is the Copa bar a,

5    a bar that's associated with another motorcycle club?

6    A.   Yeah.  Devils Diciples.

7    Q.   All right.  And are you aware of who owns the Copa?

8    A.   Yes.  Billy Wadd.

9    Q.   Now, as you said before, Billy Wadd is a Devils Diciples

10   member?

11   A.   Yes.

12   Q.   So you go to the Copa Lounge.  What happens then?

13   A.   I got drunk.  I was the last one to leave.  And then I

14   pulled out of the parking lot and they wrecked my car.  A guy

15   hit me in the back end.

16   Q.   And so you mentioned earlier that you were using alcohol;

17   is that correct?

18   A.   Yes.

19   Q.   And using cocaine?  So were you concerned when you got in

20   this accident?

21   A.   Yes.

22   Q.   And what happened after that?

23   A.   The Devils Diciples brought a sober man to sit in my car

24   while the police come to make a report.

25   Q.   So the Devils Diciples helped you out?

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1   A.  Yes.

2   Q.  Why would they do that?

3   A.  Because we was just friends at that time.

4   Q.  So, Mr. Peters, you talked a little bit about using alcohol

5   and using cocaine.  Can you talk a little bit more about some

6   of the substances that you've used during your time as a

7   Highwaymen member?

8   A.  I only use cocaine and alcohol.  That was it, myself.

9   Q.  And would you say that you've abused those substances?

10  A.  Yes.

11  Q.  For what period of time did you use cocaine?

12  A.  About 2000 to 2007.

13  Q.  And about how often would you use it?

14  A.  Every Wednesday and every Friday.

15  Q.  And what about alcohol?

16  A.  Alcohol, about four or five days a week.

17  Q.  All right.  So do you currently use cocaine?

18  A.  No.

19  Q.  Currently use alcohol?

20  A.  No.

21         MR. MAIATICO:  One moment, your Honor.

22         (Brief pause.)

23  BY MR. MAIATICO:

24  Q.  Just a few more questions, Mr. Peters.

25         You talked about some of the members of the Devils

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1   Diciples that you knew.  You mentioned a few names.  We've

2   talked about Scotty Z.  You talked about Billy Wadd.  You

3   mentioned an individual by the name of Rockin' Ronnie?

4   A.  Yes.  I know Rockin' Ronnie.

5   Q.  Who is he?

6   A.  He's a member of the Devils Diciples.

7   Q.  How did you know him?

8   A.  From the Devils Diciples.

9   Q.  Did he have any -- did he have a brother?

10  A.  Yeah.  Detroit Dave.

11  Q.  And do you know him as well?

12  A.  Yes.

13  Q.  And was he a member of the Devils Diciples?

14  A.  Yes.

15  Q.  Now, did you know anything further about their

16  participation, their membership in the Devils Diciples?

17  A.  No.

18  Q.  These were more people that you knew as members from

19  parties?

20  A.  Yes.

21  Q.  You also mentioned an individual named Roach, I believe?

22  A.  Yes.

23  Q.  And how did you know Roach?

24  A.  Coming to parties, seeing him all the time.

25  Q.  We're mentioning club nicknames.  Do you know any of these

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - DIRECT BY MR. MAIATICO

1   individuals' real names?

2   A.  No.

3   Q.  And finally, I think you talked about Stevo?

4   A.  Yes.

5   Q.  And who was Stevo?

6   A.  Stevo was a Devils Diciple.

7   Q.  Is this also someone you knew from the parties?

8   A.  Yes.

9   Q.  Do you know his real name?

10  A.  No.

11  Q.  Now, who was the national boss, as you understood it, of

12  the --

13  A.  Fat Dog.

14  Q.  -- Devils Diciples?  Fat Dog?

15  A.  Yeah.

16  Q.  And did you know Fat Dog's real name?

17  A.  No.

18  Q.  Did you see him at the parties?

19  A.  Not much.

20  Q.  Why was that?

21  A.  I don't know.

22  Q.  Now, I want you to take a look around the courtroom.  Do

23  you see an individual that you know by the name of Fat Dog in

24  the courtroom today?

25  A.  I couldn't point him out if I seen him, to be honest with

1   you.

2   Q.  Because you haven't seen him that much?

3   A.  Yeah.

4           MR. MAIATICO:  I have no further questions.

5           THE COURT:  Defense, cross-examination?

6           MS. STOUT:  Yes, please, your Honor.

7           THE COURT:  Ms. Stout.

8           MS. STOUT:  Thank you.

9           THE COURT:  You may proceed.  We have about 10 or 12

10  minutes here until 1:30.

11          MS. STOUT:  I should be done.

12          THE COURT:  All right.

13                          CROSS-EXAMINATION

14  BY MS. STOUT:

15  Q.  Good afternoon, sir.

16  A.  Good afternoon.

17  Q.  You indicated that you were involved as a cooperating

18  witness in the Highwaymen Motorcycle Club that was tried in

19  this courthouse, correct?

20  A.  Yes.

21  Q.  And you indicated that you pled guilty; is that correct?

22  A.  Yes.

23  Q.  And you pled guilty to a conspiracy RICO count or a

24  substantive RICO count, if you know?

25  A.  I don't know.  I'm not sure.

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - CROSS BY MS. STOUT

1   Q.  Okay.

2          MS. STOUT:  Can I ask the Government if they have that

3   indictment, your Honor?

4          Thank you.  I've got it.  Thank you.

5   BY MS. STOUT:

6   Q.  Now, when you made the decision to plead guilty, sir, you

7   entered into what's called a Rule 11 plea agreement with the

8   Prosecutor's Office; is that accurate?

9   A.  Yes.

10  Q.  And could you explain to the jury what a Rule 11 plea

11  agreement is, in your words?

12  A.  I was willing to testify against my own club.

13  Q.  Now, the Rule 11 plea agreement is quite lengthy; is that

14  true?

15  A.  Yes.

16  Q.  And it contains provisions that you're agreeing to in order

17  to make this deal, so to speak, correct?

18  A.  Yes.

19  Q.  Okay.  Now, one of the provisions is about your

20  cooperation; is that accurate?

21  A.  Yes.

22  Q.  So before the trial proceeded against the people that you

23  testified against, you discussed this Rule 11 plea agreement

24  with your lawyer; is that accurate?

25  A.  Yes.

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - CROSS BY MS. STOUT

174

1    Q.   As well as Government attorneys?

2    A.   Yes.

3    Q.   And you signed it; is that accurate?

4    A.   Yeah.

5    Q.   Okay.  One of the provisions in that Rule 11 plea agreement

6    is about what you are agreeing to cooperate to; is that

7    accurate?

8    A.   Yes.

9    Q.   Now, is it accurate to say that that paragraph was quite

10   lengthy, if you recall?

11   A.   I don't really recall.

12   Q.   Okay.  But you were asked to be completely truthful about

13   any criminal activity that anything you know about.

14   A.   Yes.

15   Q.   You're not allowed to, to omit anything or, or withhold

16   anything, correct?

17   A.   Correct.

18   Q.   And was it your understanding, too, that the more helpful

19   you are, the more credit the Government is going to give you --

20   is that -- credit the Government will give you; is that

21   accurate?

22   A.   No.  I wouldn't say that.

23   Q.   Well, is it true, sir, that the substantial assistance

24   determination is made by the Prosecutor's Office?  In other

25   words, they determine what break they are going to give you for

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - CROSS BY MS. STOUT

1   your cooperation or your assistance.  You don't determine it.

2   A.  No.  I don't determine it.  No.

3   Q.  Okay.  So it's your understanding, when you're in proffers

4   or these cooperation meetings, that the more information you

5   give, the better break you're going to get?

6   A.  They never offered me nothing.

7   Q.  Well, sir, you signed -- you said you signed a Rule 11 plea

8   agreement.

9   A.  Yes.

10  Q.  Is that accurate?

11         Now, in that Rule 11 plea agreement, based on your,

12  your substantial assistance to them, didn't they agree to

13  dismiss Counts 2 of the indictment?  Three?  I'm sorry, Counts

14  2, 13, 14, 17, 20, and 49; is that accurate?

15  A.  I'm not really sure on it.

16  Q.  Would it refresh your recollection to look at your Rule 11

17  plea agreement to see that language?

18  A.  Yes, actually.

19         MS. STOUT:  Okay.  May I approach, your Honor?

20         THE COURT:  Yes, you may.

21         MS. STOUT:  Thank you.

22  BY MS. STOUT:

23  Q.  Please read this to yourself, not out loud.  And just to

24  make it easier for everyone, I will direct your attention to

25  page 4 that talks about cooperation.

```
 1   A.  Okay.

 2   Q.  The nature of cooperation.  And then that's discussing --

 3   A.  Okay.

 4   Q.  Thank you, sir.  Take your time to read that.

 5           (Brief pause.)

 6   BY MS. STOUT:

 7   Q.  You read it?

 8   A.  Yes.

 9   Q.  Does that refresh your recollection, sir?

10   A.  Yes.

11   Q.  So the Government said, based upon your cooperation, your

12   assistance to them, they would consider dismissing Count 2,

13   correct?

14   A.  Yes.

15   Q.  And Count 2 was, that was a conspiracy to participate in

16   the affairs of an interstate enterprise through a pattern of

17   racketeering, correct?

18   A.  Yes.

19   Q.  So the conspiracy to commit RICO would be dismissed.

20   A.  Yes.

21   Q.  Correct?  Okay.

22           They also agreed to dismiss Count 13, correct?

23   A.  Yes.

24   Q.  And that was a conspiracy to commit a murder in the aid of

25   racketeering; is that accurate?
```

1    A.  I didn't have no murder on there.

2    Q.  Would it refresh your recollection to look at your

3    indictment?

4    A.  Yeah.

5    Q.  Okay.

6              MS. STOUT:  May I approach, your Honor?

7              THE COURT:  Yes.

8              MS. STOUT:  Thank you.

9    BY MS. STOUT:

10   Q.  Read it to yourself.

11   A.  On this page?

12   Q.  Count 13.

13   A.  It's on this one or another page?

14   Q.  Count 13 is on that page.

15   A.  Okay.

16   Q.  Does that refresh your recollection, sir?

17   A.  Yes.

18   Q.  Okay.  Could I?

19   A.  Oh, yeah.

20   Q.  Thank you, sir.

21            So is it true that they agreed to dismiss Count 1,

22   based upon your substantial assistance?

23   A.  Yes.

24   Q.  And that was the murder count?  Well, conspiracy to commit

25   a murder in the aid of racketeering?

1  A.  Yes.

2  Q.  And they also agreed to dismiss Count 14?

3  A.  Yes.

4  Q.  And that also was a conspiracy to commit murder in the aid

5  of racketeering; is that accurate?

6  A.  Yes.

7  Q.  Okay.  And they also agreed to dismiss Count 17, true?

8  A.  Yeah.

9  Q.  And that was a conspiracy to possess with intent to

10  distribute, and distribution of cocaine; is that accurate?

11  A.  Yes.

12  Q.  And they also agreed to dismiss Count 20?

13  A.  Yes.

14  Q.  And Count 20 was a conspiracy to possess with intent to

15  distribute and the distribution of cocaine, accurate?

16  A.  Yes.

17  Q.  Okay.  And finally, they agreed to dismiss Count 49, true?

18  A.  Yes.

19  Q.  And Count 49 was a forfeiture count.  Do you understand

20  what a forfeiture count is?

21  A.  No.  I don't understand.

22  Q.  Did you, at any time, realize that they would dismiss the

23  agreement to give up property of yours, if there was any to

24  give up?

25  A.  Yes.

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - CROSS BY MS. STOUT

1   Q.  Okay.  Thank you.

2          Now, in addition to dismissing one, two, three --

3   seven counts, they also said, based on their determination of

4   your substantial assistance, they would only hold you

5   accountable for particular acts of racketeering; is that

6   correct?

7   A.  Yes, I believe so.

8   Q.  Now, those acts agreed upon were acts 12 and 13 of that

9   count; is that accurate?

10  A.  I don't know which one they are.  If you could tell me, I

11  can say if they are or not.

12  Q.  Would it refresh your recollection to look at your Rule 11

13  plea agreement?

14         THE COURT:  If it's written down and you're looking at

15  it, why don't you just recite it.  Recite it and proceed by

16  leading.

17         MS. STOUT:  Thank you.

18  BY MS. STOUT:

19  Q.  It says in your --

20         THE COURT:  Unless you have some other reason to test

21  memory or something similar to that.  I don't know think

22  it's --

23         MS. STOUT:  I just was trying to follow the court

24  rules.  I'm sorry, your Honor.

25         THE COURT:  Thank you.

1    BY MS. STOUT:

2    Q.  So in other words, the racketeering acts that were -- that

3    you were not held accountable for, if you agreed to cooperate

4    and provide substantial assistance, numerous, numerous acts

5    would be dismissed and not counted against you, correct?

6    A.  Correct.

7    Q.  And that would include things like robbery and murder?

8    A.  No murder.

9    Q.  No murder?  Robbery?  Extortion?  Stolen vehicles?  Things

10   like that?

11   A.  Yes.

12   Q.  Distributing?  Okay.  Thank you.

13            Now, when you negotiated this Rule 11 plea agreement

14   with your lawyer and the Prosecutor's Office, you understood

15   there were sentencing guidelines?

16   A.  Yes.

17   Q.  Because when you're facing charges such as you were, you

18   could spend the rest of your life in prison; accurate?

19   A.  Yes.

20   Q.  Those sentencing guidelines are dependent upon your

21   offenses, correct?

22   A.  Correct.

23   Q.  All right.  So the guidelines were life?

24   A.  Yes.

25   Q.  Initially, before you decided to cooperate.

```
 1              Once you decided to cooperate, you understood that you

 2    could control the level of your offense in those guidelines by

 3    what you pled guilty to; is that accurate?

 4              I don't think you need to look at the prosecutor to

 5    answer that.

 6    A.  Well, no, I wouldn't say that.

 7    Q.  Oh, you wouldn't?

 8              So in other words, you were held responsible for

 9    racketeering act 9, which was cocaine distribution?

10    A.  Yes.

11    Q.  Now, during the time you were with the Highwaymen, you

12    indicated that you were involved with this cocaine?

13    A.  Yes.

14    Q.  Part of the distribution of it, too.

15    A.  Yes.

16    Q.  That was your thing.  And you said they were more meth, you

17    were more cocaine, or something to that effect?

18    A.  Yes.

19    Q.  Okay.  So what do you think, about how much cocaine were

20    you guys selling each week?

21    A.  I really don't know.

22    Q.  Well, two ounces?

23    A.  More than that.

24    Q.  Or pounds?  Yeah pounds, wouldn't you say?

25    A.  I would say so, yeah.
```

```
1    Q.  And how many pounds in a kilo?

2    A.  One.

3    Q.  There's one pound in a kilo or two point something in a

4    kilo?

5    A.  Two point something.  I'm sorry.  Yeah.

6    Q.  So over seven years would be a tremendous amount of pounds,

7    right, or kilos?

8    A.  Yes.  It would be.

9    Q.  Hundreds, thousands maybe?  At least hundreds.  Accurate?

10   A.  Yeah.  It would be -- that would be accurate.

11   Q.  Now, isn't it true, though, in your Rule 11 plea agreement,

12   in racketeering act 9 that you were held responsible for, you

13   only pled guilty or responsible for distributing 2 to 3.5

14   kilograms of cocaine; correct?

15   A.  Yes.

16   Q.  You weren't held responsible for everybody else's, whatever

17   they were dealing; you were just held responsible for 2 pounds,

18   2 to 3.5 kilos?

19   A.  Yes.

20   Q.  And you understood, because your lawyer explained to you,

21   that that brought your offense level down and your guidelines

22   down.

23   A.  Yes.

24   Q.  Okay.  Now, you also understood when you signed this Rule

25   11 plea agreement -- before you testified, correct?
```

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - CROSS BY MS. STOUT

183

1  A.  Yeah.

2  Q.  That the Government had already suggested what they might

3  do for you in this Rule 11 plea agreement, but they weren't

4  committed to it, though, accurate?

5  A.  Yes.

6  Q.  So because you brought the level of offense down, you

7  brought your guideline range down to 108 to 135 months instead

8  of life, right?

9  A.  Yes.

10  Q.  Okay.  So about ten years or something.

11       Now, they already agreed with you, before you

12  testified and before you, before you, you knew what you had to

13  do -- before you did what you knew what you had to do to get

14  this deal, that they would bring the guideline range down to 48

15  to 54 months.

16  A.  Yes.

17  Q.  So, in other words, more than 50 percent.  So from life to

18  ten years to less than five?

19  A.  Well, I didn't get to that until the end of it.

20  Q.  Correct.

21  A.  Yes.

22  Q.  You did not get it, because it depends on how you do

23  testifying, and if you're really cooperating, really helpful

24  providing "substantial assistance" is the term, right?

25  A.  Yes.

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - CROSS BY MS. STOUT                    184

1   Q.  Then it's determined what you're going to get.

2   A.  Yeah.

3   Q.  Correct?

4        Okay.  But you knew when you went into this that there

5   was some form of understanding, and that was 48 to 54 months.

6   It was in the agreement.  It's in writing.

7   A.  Yeah.

8   Q.  Okay.  There's a lot on the line?

9   A.  Yeah.

10  Q.  Thank you.

11       MS. STOUT:  I'll hurry up, your Honor.

12       THE COURT:  Well, you don't need to hurry.  I'm just

13  saying it's a little past 1:30.  You're certainly free to

14  continue on Monday.

15       MS. STOUT:  Thank you.

16       THE COURT:  Which do you wish to do?  If you can wrap

17  it up in a minute or so, that will be fine.

18       MS. STOUT:  It would be better to continue on Monday,

19  because I don't want to hold these poor people up.

20       THE COURT:  Or this, or --

21       MS. STOUT:  Or this judge or these poor people with my

22  mouth, yes.

23       THE COURT:  Okay.

24       MS. STOUT:  Thank you.

25       THE COURT:  All right.  We'll resume with this on

 1    Monday morning, ladies and gentlemen.  You'll be away for the

 2    weekend in just a few moments.

 3           Now, we're not -- we haven't recessed yet.  Have a

 4    seat.  Have a seat.  Have a seat.

 5           (Laughter in the courtroom.)

 6           THE COURT:  You'll be free for the weekend.  And so my

 7    suggestion is, again, that you put this basically off your

 8    minds and get a good rest.  Do something else other than think

 9    about trials over the weekend.

10           Don't do any research, reading, investigation,

11    writing, discussion, or anything of that sort concerning the

12    case or any people that are associated with it, names or

13    concepts or other things that you've heard about thus far.

14           Just put everything aside.  Put your books away and so

15    forth as you prepare to leave, and have a pleasant weekend.  We

16    shall see you on time Monday morning.  And thank you very much.

17    You may rise and leave.

18       (Jury out, 1:32 p.m.)

19           THE COURT:  Court stands in recess.  We're recessed.

20    That's all.

21       (Proceedings concluded, 1:33 p.m.)

22

23                          *      *      *

24

25

JURY TRIAL, VOLUME III - 10/17/2014
GERALD PETERS, JR. - CROSS BY MS. STOUT

1              **CERTIFICATE OF REPORTER**

2

3          As a Federal Official Court Reporter for the United

4    States District Court, appointed pursuant to provisions

5    of Title 28, United States Code, Section 753, I do hereby

6    certify that the foregoing is a correct transcript of

7    the proceedings in the above-entitled cause on the date

8    hereinbefore set forth.

9

10

11                      Dated this 18th day of October, 2014.

12

13                       s/ Christin E. Russell
                        Christin E. Russell
14                      RMR, CRR, FCRR, CSR
                        Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES vs. SUTHERLAND, et al. - 11-20129; 11-20066