```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,

 4                      Plaintiff,          Case No. 11-20129
                                            Case No. 11-20066
 5      -v-

 6   SCOTT WILLIAM SUTHERLAND, D-1,
     PATRICK MICHAEL MCKEOUN, D-4,
 7   JEFF GARVIN SMITH, D-5/D-1,
     PAUL ANTHONY DARRAH, D-6/D-2,
 8   CARY DALE VANDIVER, D-7/D-5,
     VINCENT WITORT, D-8,
 9   DAVID RANDY DROZDOWSKI, D-17,

10                     Defendants.
     _____/
11
                     EXCERPT OF JURY TRIAL, VOLUME IV
12
                 BEFORE THE HONORABLE ROBERT H. CLELAND
13                    United States District Judge
                 Theodore Levin United States Courthouse
14                    231 West Lafayette Boulevard
                          Detroit, Michigan
15                   Monday, October 20, 2014
     APPEARANCES:
16
     FOR THE PLAINTIFF:   SAIMA MOHSIN
17                        ERIC STRAUS
                          U.S. Attorney's Office
18                        211 W. Fort StreetSuite 2000
                          Detroit, MI  48226
19
                          JEROME MAIATICO
20                        United States Department of Justice
                          1301 New York Avenue, NW
21                        Washington, DC 20005

22   FOR THE DEFENDANT:   CRAIG A. DALY
                          (Sutherland, D-1)
23                        615 Ford Building
                          Suite 820
24                        Detroit, MI 48226

25
```

```
 1    APPEARANCES:            (Continued)

 2    FOR THE DEFENDANT:    SIDNEY KRAIZMAN
                            (McKeoun, D-4)
 3                          1616 Ford Building
                            Detroit, MI 48226
 4
                            JEROME SABBOTA
 5                          (Smith, D-5/D-1)
                            26862 Woodward Avenue
 6                          Suite 200
                            Royal Oak, MI 48067
 7

 8                          PATRICIA A. MACERONI
                            (Darrah, D-6/D-2)
 9                          26611 Woodward Avenue
                            Huntington Woods, MI 48070
10
                            MARK A. SATAWA
11                          (Vandiver, D-7/D-5)
                            3000 Town Center, Suite 1800
12                          Southfield, MI 48075

13                          KIMBERLY W. STOUT
                            (Witort, D-8)
14                          370 East Maple Road, Third Floor
                            Birmingham, MI 48009
15
                            BYRON H. PITTS
16                          535 Griswold, Suite 1630
                            Detroit, MI 48226-4218
17
                            PHILLIP D. COMORSKI
18                          535 Griswold
                            2632 Buhl Building
19                          Detroit, MI 48226

20                          RYAN H. MACHASIC
                            134 Market Street
21                          Mount Clemens, MI 48043

22

23          To Obtain a Certified Transcript Contact:
                        Christin E. Russell
24          RMR, FCRR, CRR, CSR - (248) 420-2720
             Proceedings produced by mechanical stenography.
25          Transcript produced by computer-aided Transcription.
```

```
 1                        I N D E X

 2     JURY TRIAL, VOLUME IV                          PAGE

 3     WITNESSES FOR THE GOVERNMENT:
       GERALD PETERS, JR.
 4       Cross-Examination By Ms. Stout                  9
         Cross-Examination By Mr. Daly                  14
 5       Cross-Examination By Ms. Maceroni             65
         Cross-Examination By Mr. Satawa               69
 6       Redirect Examination By Mr. Maiatico          75

 7     DAVID OPPERMAN
         Direct Examination By Ms. Mohsin              90
 8       Cross-Examination By Ms. Maceroni            171
         Redirect Examination By Ms. Mohsin           182
 9
       JOHN PIZZUTI
10       Direct Examination By Ms. Mohsin             184
         Cross-Examination By Mr. Sabbota             264
11

12                       E X H I B I T S

13     Exhibit                                        Page
       Exhibit R-1                                    108
14     Exhibit 27-1                                   122
       Exhibit 27-2, 27-3                             124
15     Exhibit R-3                                    130
       Exhibit 28-1                                   137
16     Exhibit 28-4, 28-5                             138
       Exhibit 63-15, 63-20                           156
17     Exhibit 13-91                                  201
       Exhibit 13-93                                  201
18     Exhibit 14-11                                  202
       Exhibit 14-13                                  203
19     Exhibit 14-14                                  203
       Exhibit 14-15                                  204
20     Exhibit 15-8                                   205
       Exhibit 18-61                                  206
21     Exhibit 29-3                                   249

22

23
       CERTIFICATE OF REPORTER                        296
24

25
```

```
 1    Detroit, Michigan
 2    October 20, 2014
 3    9:09 a.m.
 4                    *              *              *
 5        (Call to Order of the Court; all parties present.)
 6            THE CLERK:  Calling case Nos. 11-20129, and 11-20066,
 7    United States of America vs. Scott Sutherland and others.
 8            THE COURT:  Good morning.  The Court notes the
 9    presence of all attorneys and all defendants.  Be seated,
10    please.  We have a number of things to briefly, I hope, discuss
11    before the jury comes out.  The jury is waiting in the jury
12    room to begin this morning.
13            With respect to Mr. Darrah, I have on the bench, filed
14    on the 13th, emergency motion for bond in consideration of
15    medical status.  Subsequently, I told Ms. Maceroni that I would
16    seek a report from the medical staff at Wayne County Jail with
17    respect to Mr. Darrah's condition.  And that report has been
18    received by e-mail, and a copy of the relevant portion of the
19    e-mail and provided it to Ms. Maceroni.
20            And it appears to me from the substance of the e-mail,
21    produced by the doctor in charge, that the matter is under
22    review.  He's pending hematology reports, pending a
23    colonoscopy.  And the situation is, as far as I can tell, being
24    monitored, Ms. Maceroni.  I, I at this point, I do not see --
25    there's no particularly emergent situation.  As a matter of
```

1   fact, the doctor describes him as being in stable condition.

2          So if there's something you wanted to add to that now.

3          MS. MACERONI:  Your Honor, I would just point out, you

4   know, the doctor does say he's awaiting a hematology consult,

5   as well as a colonoscopy.  My concern is when is that going to

6   happen.

7          THE COURT:  Well, that's the question that only the

8   doctor can answer, I think.

9          MS. MACERONI:  And --

10          THE COURT:  There's no way for me to predict and

11   manage that from the bench.

12          MS. MACERONI:  I mean, if they are not scheduled --

13   they didn't even schedule him for the MRI until our break of

14   the first week of December.  So that's another five to six

15   weeks, where he's sitting here with an anemic condition.

16          THE COURT:  Okay.

17          MS. MACERONI:  And with a colonoscopy, the prep for

18   that is horrible.  So he's going do that at the trial or he's

19   going to do that at the jail?

20          THE COURT:  I don't know.  But I do know the doctor

21   says he's in stable condition.  He's pending various test

22   results and I do not see this as being an emergent situation.

23          MS. MACERONI:  With all due respect, Judge, I

24   disagree.

25          THE COURT:  Thank you, Miss Maceroni.  To be clear, to

1    the extent I haven't already ruled on it, the document No.

2    1037, emergency motion for bond, for release on bond, that is

3    denied without prejudice.

4         With respect to -- let's see, the Government presented

5    a memorandum of law regarding leading questions and refreshing

6    recollection.  Thank you for that.  I have that.  And I think I

7    understand the law in that regard.  And that's good.  The bench

8    brief of that sort is often helpful.

9         I have this morning, I don't know what document number

10   it is or if it's even been filed, but a motion by Ms. Stout

11   with respect to discovery and so forth.  I'm not sure what the

12   date of this is.  October 19th, it says.  So I've seen this

13   before, presumably.

14         MS. STOUT:  Your Honor, I tried to E-file it last

15   night.  I kept getting a message my password is invalid.  I

16   don't know why.

17         THE COURT:  With respect to filing, there's something

18   to be handled, I guess.  The question that you raise is with

19   respect to the status of discovery, the volume of discovery,

20   late-breaking discovery, and so forth.  Can we, can we handle

21   the continued examination of the witness that is on the bench

22   now, take these matters up?

23         MS. STOUT:  Of course, your Honor.

24         THE COURT:  Because your concern is an ongoing

25   concern.

1          MS. STOUT:  Of course, your Honor.

2          THE COURT:  It's been described earlier.  It's been

3   debated and discussed.  We've made a fairly extensive record in

4   that regard already.  So is there anything else that we need to

5   talk about before we bring the witness on the stand to

6   continue, and perhaps conclude his testimony?  I don't see

7   anything else.

8          Is the witness in the adjoining room perhaps?

9          MS. MOHSIN:  The witness is outside.  I'm told that he

10  had to use the restroom.  He may be back by now.

11         THE COURT:  Okay.  If you could check on that.  And

12  one of the CSO's could put the silence sign out in the hallway

13  where it normally goes, please.  It's in the courtroom, I see.

14         MS. MOHSIN:  He's ready, your Honor.

15         THE COURT:  Okay.  Let's assemble the jury, please.

16  The witness may come up here and stand by the witness stand

17  while the jury is being lined up.

18         The record should reflect that we've distributed the

19  consolidated, redacted indictment form to the jurors' chairs.

20  Counsel have a copy of that as well.  I'll mention that to the

21  jury.  I won't need to mention it because they won't be able to

22  sit down, actually, until they pick up the papers, so.

23         (Brief pause.)

24      (Jury in, 9:15 a.m.)

25         THE COURT:  Ms. Stout.  Is there any assistance you

1    want with respect to password?  Should we provide any

2    assistance in the meanwhile, IT people or something like that?

3          MS. STOUT:  No, thank you, your Honor.  There's an 800

4    number, but there's a specific time and I couldn't reach them

5    when I filed it or this morning.

6          THE COURT:  If you think we can help, let us know.

7          MS. STOUT:  Thank you.

8          THE COURT:  All right.  Ladies and gentlemen, the

9    papers -- good morning, first.  And the papers that you have

10   are the consolidated, redacted indictment.  I'll just tell you

11   about that in just a moment.

12         The jury is assembled.  All parties are here.  Please

13   be seated.  Witness, you can be seated in the witness box.

14         The papers you have I've had three hole punched so you

15   can put them in your binder.  This is, again, the language

16   indictment, which is the charging document, the document that

17   outlines the Government's charges against these, these

18   defendants, perhaps as well as some other defendants that may

19   be mentioned in the language of the indictment.

20         I'm providing these papers to you as a kind of an

21   outline of what we're here about, the charges brought by the

22   Government.

23         Now, again in passing these things out, I want to

24   remind you something I said to you during jury selection and in

25   my initial comments.  The indictment is the Government's

1  outline of the case.  It's not evidence in and of itself.  It

2  doesn't provide anything more than a road map to the case that

3  the Government is presenting and that the defendants are

4  responding to or reacting to.

5          So it is, it is a set of allegations, a set of claims,

6  and not anything more than that.  My hope is that for you, as

7  well as other jurors and the juries in the past, may find it

8  helpful to keep track of things, to make notes on it, for

9  whatever purpose, whatever help that may be.

10          Okay.  The witness is on the stand.  I think this is

11  Mr. Peters?

12          THE WITNESS:  Yes.

13          THE COURT:  Your oath continues, sir.  You understand

14  that?

15          THE WITNESS:  Yes.

16          THE COURT:  And so I think he was turned over to

17  cross-examination.

18          Ms. Stout, are you prepared?

19          MS. STOUT:  I am, sir.

20          THE COURT:  Go ahead.

21          MS. STOUT:  Thank you, your Honor.

22          (Gerald Peters, Jr., Witness previously sworn.)

23                      CROSS-EXAMINATION

24  BY MS. STOUT:

25  Q.  Good morning, Mr. Peters.

1  A.  Good morning.

2  Q.  Mr. Peters, you, you were not a Devils Diciple; is that

3  accurate?

4  A.  Yes.

5  Q.  You were never a Devils Diciple, correct?

6  A.  Correct.

7  Q.  And you certainly don't know all the members of the Devils

8  Diciples Motorcycle Club, do you?

9  A.  No.

10  Q.  Now, the Highwaymen, which is the organization you belong

11  to, correct?

12  A.  Yes.

13  Q.  They had what's called a constitution; is that accurate?

14  A.  Yes.

15  Q.  And that set forth rules that the club members should abide

16  by?

17  A.  Yes.

18  Q.  You didn't adopt the bylaws that the Devils Diciples used,

19  did you?

20  A.  No.

21  Q.  You created your own rules?

22  A.  Yes.

23  Q.  And you said, I think, and correct me if I'm wrong, on

24  Friday, that you joined for some protection or membership due

25  to the conflicts in southwest Detroit?

1   A.  It was just, you joined Highwaymen or Latin Counts.

2   Q.  Okay.  Now, you testified previously, I believe it was 2010

3   in another trial?

4   A.  Correct.

5   Q.  And that was the trial of the Highwaymen, accurate?

6   A.  Yes.

7   Q.  Now, I'm assuming at that time, you tried to make every

8   effort to tell the truth?

9   A.  Yes.

10  Q.  Now, you are no longer facing life for the RICO charge, is

11  that accurate, at the time of the trial?

12  A.  Yes.

13  Q.  However, you were still facing guidelines that were ten

14  years plus; is that accurate?

15  A.  Yes.

16  Q.  Because although the Government had told you they were

17  going to recommend a reduction if you substantially assisted,

18  you hadn't gotten that yet, correct?

19  A.  Correct.

20  Q.  So your testimony was still dependent upon your substantial

21  assistance?

22  A.  Yes.

23  Q.  Thank you.

24       Now, during that trial, you testified that the

25  Highwaymen itself is not an illegal entity, correct?

1   A.  Correct.

2   Q.  And you testified, rather, that just some members did some

3   illegal acts?

4   A.  Yes.

5   Q.  You also testified at that time that you're a big guy?

6   A.  Correct.  Yes.

7   Q.  I think you said you were 6'6"?

8   A.  Six five.

9   Q.  Are you exaggerating?

10  A.  No.

11  Q.  You're 6'5" and you weighed 335?

12  A.  Yes.  At that time, yes.

13  Q.  Prison has caused you to lose a little weight?

14  A.  A little bit.

15  Q.  Okay.  You said you could take care of yourself at that

16  trial.

17  A.  Yes.

18  Q.  You didn't need a club to take care of you?

19  A.  Correct.

20  Q.  That your problems were your problems?

21  A.  Yes.

22  Q.  Your debts were your debts?

23  A.  Yes.

24  Q.  Your business was your business?

25  A.  Yes.

1   Q.  Your income was your income?

2   A.  Yes.

3   Q.  Nothing to do, necessarily, with the club?

4   A.  Correct.

5   Q.  You also testified at that trial that you even ripped off

6   some of your own club members.

7   A.  Yes.

8   Q.  Accurate?

9           I think you said you stole some things?

10  A.  Yes.

11  Q.  From club members?

12          And you testified that, overall, you considered your

13  club membership a legal organization?

14  A.  Yes.

15  Q.  I won't keep you much longer, because it's my understanding

16  you're on your way to a halfway house; is that accurate?

17  A.  I don't know that, ma'am.

18  Q.  You're hopeful?

19  A.  I was hopeful, but I lost in August 5th I was supposed to

20  be at the halfway house.

21  Q.  So you completed your prison term and were supposed to be

22  released to what's called a residential reentry program?

23  A.  Yes.  But that didn't happen.

24  Q.  And because you're here, unfortunately?

25  A.  Yes.

 1   Q.  That might be delayed?  Or that is delayed?

 2   A.  Yes.

 3   Q.  You received a large amount of money, right, to assist you

 4   in this whole situation, correct?

 5   A.  Well --

 6   Q.  Relatively large?

 7   A.  Yeah.  Relatively large.

 8   Q.  10,700?

 9   A.  10,400.

10   Q.  $10,400?

11          And now, when you relocate, when you're done with

12   this, and you will be done today with this testimony, you,

13   you're going to start over.  Your life starts over, correct?

14   A.  Yes.

15   Q.  Your past sins are washed away?

16   A.  Yes.

17          MS. STOUT:  Thank you, sir.

18          THE WITNESS:  You're welcome.

19          THE COURT:  Others?

20          MR. DALY:  Thank you.

21          THE COURT:  Mr. Daly?

22                        CROSS-EXAMINATION

23   BY MR. DALY:

24   Q.  Mr. Peters, you told the jury back on Friday that you grew

25   up in southwest Detroit; is that correct?

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

1   A.   Yes.

2   Q.   And you believe that you had two choices when you were

3   growing up, right?

4   A.   Yes.

5   Q.   You would either join the Latin Counts or you would join

6   the Highwaymen, correct?

7   A.   Yes.

8   Q.   And you, excuse me, you chose the Highwaymen because you

9   believe that they were the baddest of the bad, right?

10  A.   Yes.

11  Q.   And nobody would mess with the Highwaymen, right?

12  A.   Yes.

13  Q.   Now, because you joined the Highwaymen, you wanted to be

14  bad, right?

15  A.   Yes.

16  Q.   You wanted the power?

17  A.   Yes.

18  Q.   You wanted to party?

19  A.   Yes.

20  Q.   You wanted fun?

21  A.   Yes.

22  Q.   You wanted drugs?

23  A.   Yes.

24  Q.   Now, when you joined the Highwaymen, that was a long time

25  ago, correct?

1    A.  Yes.

2    Q.  You can't remember exactly when you joined the Highwaymen,

3    right?

4    A.  '98.

5    Q.  You say it was in 1998, correct?

6    A.  Yeah.  '98 or '99.  I'm sorry.  One of the years.

7    Q.  One of the two; you're not certain, correct?

8    A.  Correct.

9    Q.  You joined when you were either 24 or 25; is that right?

10   A.  Yes.

11   Q.  And when you joined the Highwaymen, did you do that, Mr.

12   Peters, freely?

13   A.  Yes.

14   Q.  Voluntarily?

15   A.  Yes.

16   Q.  Did somebody put a gun to your head and say, well, you need

17   to join the Highwaymen?

18   A.  No.

19   Q.  Now, when you joined the Highwaymen, did you have a

20   criminal record?

21   A.  No.

22   Q.  And had you been involved in criminal activity before you

23   joined the Highwaymen?

24   A.  Yes, a little bit.

25   Q.  A little bit.  Like what?

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

1   A.  Selling drugs.

2   Q.  What kind of drugs were you selling before you joined the

3   Highwaymen?

4   A.  Marijuana.

5   Q.  And were you selling marijuana on a large scale or small

6   scale?

7   A.  Small scale.

8   Q.  To friends?

9   A.  Yeah.

10  Q.  To make some money?

11  A.  Yes.

12  Q.  Create some income?

13  A.  Yes.

14  Q.  All right.  So you consider that to be small-time criminal

15  activity, right?

16  A.  Yes.

17  Q.  And were you charged with your marijuana dealings before

18  you joined the Highwaymen?

19  A.  No.

20  Q.  So you told the jury that you voluntarily joined the

21  Highwaymen, correct?

22  A.  Yes.

23  Q.  And that was a choice that you made?

24  A.  Yes.

25  Q.  And you could have, if you decided to do so, further your

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

1   education, correct?

2   A.   Correct.

3   Q.   I mean, you could have gone to college, right?

4   A.   Yes.

5   Q.   Was there anything preventing you from going to college?

6   A.   No.

7   Q.   No.  You could have become a teacher?  Right?

8   A.   Right.

9   Q.   A lawyer?

10  A.   Yes.

11  Q.   Could have been sitting right here with the Government

12  lawyers, right?

13  A.   Yes.

14  Q.   Nothing that prevented you from doing that, right?

15  A.   Yes.

16  Q.   And before you joined the Highwaymen, did you have a job?

17  A.   Yeah.

18  Q.   And so you were working?

19  A.   Yes.

20  Q.   9 to 5?

21  A.   Yes.

22  Q.   Making money, right?

23  A.   Yes.

24  Q.   Supporting your family, right?

25  A.   Yes.

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

19

1   Q.  And you had, what, six kids?

2   A.  Not at that time.

3   Q.  How many kids did you have --

4   A.  One at that time.

5   Q.  -- at that time?  I'm sorry?

6   A.  One.

7   Q.  One.  How many do you have now?

8   A.  Six.

9   Q.  Six.  So you had a large family to support; is that

10  correct?

11  A.  Yes.

12  Q.  So before joining the Highwaymen, you had a legitimate job,

13  correct?

14  A.  Yes.

15  Q.  You could have gone straight?

16  A.  Yes.

17  Q.  But once you joined the Highwaymen, you lost your

18  legitimate job; is that correct?

19  A.  Yes.

20  Q.  And the reason why you lost the job is because you were

21  partying, excuse me, having fun with the Highwaymen

22  essentially, right?

23  A.  Yes.

24  Q.  I mean, going to the club whenever they wanted you to go,

25  correct?

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

1   A.  Yes.

2   Q.  Doing drugs?

3   A.  Yes.

4   Q.  Right?  Right?

5   A.  Yes.

6   Q.  Cocaine?

7   A.  Yes.

8   Q.  Marijuana?

9   A.  No.

10  Q.  Just cocaine?

11  A.  Just cocaine.

12  Q.  That was your drug of choice, correct?

13  A.  Yes.

14  Q.  Now, you told the jury on Friday that your nickname was

15  "Byrd," correct?

16  A.  Yes.

17  Q.  And you just told Ms. Stout -- this is Ms. Stout here, the

18  defense lawyer -- that back when you joined the Highwaymen, you

19  were a big guy?

20  A.  Yes.

21  Q.  Still a big guy, right?

22  A.  Yes.

23  Q.  6 foot 5, right?

24  A.  Yes.

25  Q.  You haven't shrunk since you've been in prison, have you?

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

1    A.  A little bit.  Not much.

2    Q.  A little bit.  How tall are you now?

3    A.  6'5".  I ain't shrunk not height-wise, weight-wise.

4    Q.  Okay.  Back then when you joined the Highwaymen, how much

5    did you weigh?

6    A.  About 340, 350.

7    Q.  340 or 350.  That's a big guy, right?

8    A.  Yes.

9    Q.  And how much do you weigh now?

10   A.  315.

11   Q.  Okay.  So I take it the food in prison is not real good,

12   huh?

13   A.  Correct.

14   Q.  Right.  And that's why you've lost some weight?

15   A.  Yes.

16   Q.  You went by the name "Byrd," right?

17   A.  Yes.

18   Q.  Is that short for, like, Big Bird, like, Sesame Street

19   Bird?

20   A.  No, just Byrd.

21   Q.  Just Byrd?

22   A.  Yeah.

23   Q.  You're sure now?

24   A.  Yes.

25   Q.  Now, not knowing exactly when you joined the Highwaymen, do

1  you know when you met individuals from the Devils Diciples?

2  A.  Yeah.  The early 2000s.

3  Q.  Early 2000s, which means it could be 2000?

4  A.  2000 is --

5  Q.  It could be --

6  A.  -- when I first met them.

7  Q.  I'm sorry.  One at a time.  Okay?

8  A.  I'm sorry.

9  Q.  That's fine.  We don't want to talk at the same time,

10  right?

11  A.  Yeah.

12  Q.  Okay.  Could be 2000, could be 2001, could be 2002, right?

13  A.  Yep.

14  Q.  Is that a yes?

15  A.  I met them, actually, in 2000.

16  Q.  That's to the best of your recollection, right?

17  A.  Yes.

18  Q.  But it could be even later, right?

19  A.  Maybe years, maybe a year later.

20  Q.  Maybe --

21  A.  Could be, but I -- yeah.  About maybe a year later.

22  Q.  Okay.  So either 2000 or 2001?

23  A.  Yes.

24  Q.  That you started meeting members of the Devils Diciples; is

25  that correct?

1    A.   Yes.

2    Q.   All right.  On last Friday when you testified, you

3    described an incident with a person that you identified as

4    Scotty Z; is that correct?

5    A.   Yes.

6    Q.   Now, that incident happened in the late 1990s; isn't that

7    correct?

8    A.   No.  2000, early 2000s.

9    Q.   Do you remember speaking to the Federal Government about

10   this particular incident and describing when it happened?

11   A.   No, not really.

12   Q.   Not really?

13        And as an offer of proof, on September 17th, 2014, in

14   speaking with Mr. Fleming, who is missing, all right, but in

15   any event, on September 17th, 2014, did you tell Mr. Fleming in

16   the presence of the Government lawyers who are sitting here,

17   meaning Ms. Mohsin, Ms. Maiatico, and Mr. Straus, did you tell

18   them --

19        MR. MAIATICO:  Objection, your Honor.  If the, if

20   counsel is attempting to refresh a recollection, he can show

21   him that document.

22        MR. DALY:  I can do it that way or I can just make a

23   proffer, Judge, whatever you prefer.

24        THE COURT:  Let's try to refresh recollection first in

25   showing the witness, showing him the document.

```
 1              MR. DALY:  Sure.  Certainly.

 2   BY MR. DALY:

 3   Q.  Do you remember speaking --

 4              THE COURT:  Just show him the document.  Show him the

 5   and ask him if it refreshes his recollection.  The Government

 6   knows what document you're referring to, I presume?

 7              MR. DALY:  Yes.

 8              THE COURT:  Go ahead.

 9              MR. DALY:  You have the document?

10              MR. MAIATICO:  Yes.

11              MR. DALY:  May I approach the witness?

12              THE COURT:  Yes.

13              MR. DALY:  Thank you.

14   BY MR. DALY:

15   Q.  I'm going to show you a copy of a report.  This is an FBI

16   official report of September 17th --

17              THE COURT:  Mr. Daly, let's just show him the

18   document.

19              MR. DALY:  Judge, I am.

20   BY MR. DALY:

21   Q.  And at the beginning, it talks about Scotty Z; is that

22   correct?

23   A.  Yeah, here.

24   Q.  Yes.  And in the beginning, you were talking about this

25   incident that we're going to get to in a moment and --
```

2:11-cr-20129-RHC-MAR  Doc # 1072  Filed 11/01/14  Pg 25 of 296  Pg ID 5625
JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

25

```
 1              THE COURT:  Here's the procedure.  Show him the
 2  document.  Ask him to read a portion of it.  Ask him if it
 3  refreshes his recollection.  And if it does, draw the testimony
 4  out.  This is more elaborate than it needs to be, I think,
 5  under these circumstances.
 6              Are you reading the parts?
 7              THE WITNESS:  Yes.  I remember it.  Yes.
 8              THE COURT:  Okay.  Now go ahead, Mr. Daly.
 9  BY MR. DALY:
10  Q.  Have you read that first portion of what you told them --
11  A.  Yeah.
12  Q.  -- at that time?
13  A.  In the late, in 90's, yes.
14  Q.  Okay.  So that refreshes your recollection that when you
15  spoke to the Government about this incident, you told them that
16  it happened in the late 1990s; is that correct?
17  A.  Yes.
18  Q.  And when you told him that, you told him the truth, right?
19  A.  Yes.
20  Q.  So it's still true today, isn't it?
21  A.  Yes.
22  Q.  All right.  So in this incident in the late 1990s, we're
23  talking over 15 years ago, correct?
24  A.  Yes.
25  Q.  And obviously, you don't know the exact date or month,
```

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

 1   correct, or the day of the week?

 2   A.   Yes.

 3   Q.   Other than it was in the late 1990s, correct?

 4   A.   Yes.

 5   Q.   And in this incident that you described last Friday, you

 6   had a personal problem, didn't you?

 7   A.   Yes.

 8   Q.   And the personal problem that you had was with an

 9   ex-boyfriend; is that correct?

10   A.   Yes.

11   Q.   And the ex-boyfriend of your current girlfriend in the late

12   1990s, over 15 years ago, was messing with your girlfriend,

13   right?

14   A.   Yes.

15   Q.   And what this ex-boyfriend was doing is that he was

16   harassing your current girlfriend, right?

17   A.   Yes.

18   Q.   And he was breaking out the windows of her vehicle; is that

19   correct?

20   A.   Yes.

21   Q.   And doing other things to harass her.  And you wanted the

22   ex-boyfriend to "move on."  Correct?

23   A.   Yes.

24   Q.   And you had a couple of choices to deal with the

25   ex-boyfriend, right?

1   A.  Yes.

2   Q.  One choice would be that you would have taken care of it

3   yourself.

4   A.  Yes.

5   Q.  Right?

6           And what was the ex-boyfriend's name?

7   A.  I don't know.  I don't remember.

8   Q.  You have no idea?

9   A.  No.

10  Q.  Do you know where he lived?

11  A.  Yeah, Warrendale.

12  Q.  On Warrendale?

13  A.  No.  In Warrendale.  I'm sorry.

14  Q.  I'm sorry.

15  A.  Warrendale is a little area of Detroit.

16  Q.  Okay.  Warrendale is an area in Detroit.  It is not a

17  street; is that correct?

18  A.  Correct.

19  Q.  So you didn't know exactly where he lived?

20  A.  At that time, I did.

21  Q.  You did.

22  A.  Yes.

23  Q.  What was the street that he lived at?

24  A.  It's been a long time.

25  Q.  You don't remember?

1   A.  I don't remember.

2   Q.  Now, this personal problem that you had with this

3   ex-boyfriend, that was not club business, was it?

4   A.  Correct.

5   Q.  So in this personal problem that you had back in the 1990s

6   when you were a Highwaymen, you were not the national boss at

7   that time; is that correct?

8   A.  Correct.

9   Q.  In fact, you were not the national boss until 2003 or 2004;

10  is that correct?

11  A.  2003 till 2004.

12  Q.  That's when you were the national boss?

13  A.  Yes.

14  Q.  Correct?  Okay.

15          So when you had this personal problem with this

16  ex-boyfriend, you didn't go to the national president of the

17  Devils Diciples to ask his permission for anything, did you?

18  A.  No.

19  Q.  You didn't ask for a club meeting among the Devils Diciples

20  or the Highwaymen for a meeting to deal with your personal

21  problem, did you?

22  A.  No.

23  Q.  You didn't go to Fat Dog, did you?

24  A.  No.

25  Q.  Now, you talked to a person that you said, back on Friday,

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

29

1   was a person that you identified as "BJ"; is that correct?

2   A.   Yes.

3   Q.   And you spoke with BJ about your personal problems,

4   correct?

5   A.   Yes.

6   Q.   And he made a suggestion to you that you testified to,

7   correct?

8   A.   Yes.

9   Q.   And BJ is dead, isn't he?

10  A.   Yes.

11  Q.   Died back in 2006?

12  A.   I believe so.

13  Q.   About ballpark?

14  A.   Yeah, I believe so.

15  Q.   Okay.  And BJ was a person who took a lot of drugs and

16  alcohol, right?

17  A.   Yes.

18  Q.   And so we can't bring BJ into court, unless we brought him

19  in a coffin to have him testify as to what that conversation

20  was about, right?

21  A.   Right.

22  Q.   So after talking with BJ, did you speak directly to Scotty

23  Z?

24  A.   Yes.

25  Q.   And did you ask him for help in your personal matter?

1    A.   Yes.

2    Q.   About the old boyfriend?  Right?

3    A.   Yes.

4    Q.   And this was like, more like man-to-man kind of

5    conversation, right?

6    A.   Correct.

7    Q.   Right.  You were asking him for, in essence, a favor,

8    right?

9    A.   Yes.

10   Q.   And do you remember the date or the day that you asked him

11   for this favor?

12   A.   No.

13   Q.   And who was present when you asked him for this personal

14   favor?

15   A.   It was over the phone.

16   Q.   Over the phone.

17           So the only people are you and Mr. Scotty Z, who are

18   speaking; is that correct?

19   A.   Yes.

20   Q.   And as far as you knew, this boyfriend and this personal

21   matter that you had did not know who Scotty Z was, right?

22   A.   Yes.

23   Q.   And quite frankly, this personal problem that you had was

24   really in the context of all the stuff that you told the jury

25   last Friday, this was really a little bit, right?

1   A.  Yes.

2   Q.  Not a big deal, right?

3   A.  Correct.

4   Q.  Not part of some big RICO conspiracy that the Government

5   has conjured up, right?

6   A.  Right.

7   Q.  You'd agree with that, right?

8   A.  Right.

9   Q.  All right.  Now, after you sent or asked Scotty Z to do

10  this personal favor for you, did you go with him?

11  A.  No.

12  Q.  Were you an eyewitness to what had happened or didn't

13  happen?

14  A.  No.  I took his word for it.

15  Q.  Okay.  So later on, you heard about it, right?

16  A.  Yes.

17  Q.  And you said that you heard about it from Scotty Z?

18  A.  Yes.

19  Q.  And you took his word for it, right?

20  A.  Yes.

21  Q.  But you know in the club business, that it's not uncommon

22  for people to say things that, quite frankly, aren't true,

23  right?

24  A.  Yes.  That's true.

25  Q.  And often in the club business, and I'm talking about the

1    motorcycle club business, people boast about things that they

2    do that they, in fact, don't do.  You know that to be true,

3    right?

4    A.  Yes.

5    Q.  That was pretty common back in those days, right?

6    A.  Yes.

7    Q.  People try to build themselves up, right?

8    A.  Yes.

9    Q.  So in fact, you have no personal first-hand knowledge that

10   Scotty Z did anything, right?

11   A.  No.

12   Q.  You're agreeing with me?

13   A.  Yes.

14   Q.  All right.  Now, back in the day when we're talking about,

15   were you using cocaine?

16   A.  Yes.

17   Q.  And did you know that Scotty Z also was using cocaine?

18   A.  Yes.

19   Q.  All right.  And that's why you gave Scotty Z a quarter

20   ounce of cocaine, right?

21   A.  Yes.

22   Q.  So the payment for this personal favor was a small amount

23   of cocaine for Scotty to use for himself, right?

24   A.  Yes.

25   Q.  All right.  Now, I take it, Mr. Peters, that in the scheme

1    of things, if you wanted to deal with a person who is giving

2    you a problem and you wanted to scare them, that was something

3    that normally you would do yourself, right?

4    A.  Correct.

5    Q.  You would take care of it yourself?

6    A.  Yes.

7    Q.  Being the fact that you were a big guy, right?

8    A.  Yes.

9    Q.  And you had been in plenty of fights, both before you were

10   a Highwaymen and during the time that you were a Highwaymen,

11   correct?

12   A.  Yes.

13   Q.  And I mean, that's part of the biker culture, to fight,

14   isn't it?

15   A.  Yes.

16   Q.  I mean, you guys would go out, you'd go to bars and you do

17   your cocaine, right?

18   A.  Yes.

19   Q.  Do your alcohol, right?

20   A.  Yes.

21   Q.  Get high?

22   A.  Yes.

23   Q.  Right?

24        Go to the bars and fight other clubs.  I mean, that's

25   just what you guys did, in part, right?

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

34

1    A.  Yes.  It happened sometimes.

2    Q.  Quite often, right?

3    A.  Well, I wouldn't say quite often, but sometimes.

4    Q.  Were you the type of person, Mr. Peters, that liked to

5    instill fear in other people?

6    A.  Yes.

7    Q.  All right.  And that was part of the power that you had as

8    a Highwaymen, right?

9    A.  Yes.

10   Q.  And in fact, when you joined the Highwaymen, you didn't

11   have to go through probation, did you?

12   A.  Correct.

13   Q.  And the reason why you didn't have to go through probation

14   is that because you were such a fighter, that they just wanted

15   you in the club.  Essentially, that's what happened, right?

16   A.  Correct.

17   Q.  And in fact, Scotty Z was a person who was, what, about

18   half your size, ballpark?

19   A.  Yes.

20   Q.  Yeah.  So it would take two Scotty Z's stacked on each

21   other to make one "big Byrd," right?

22   A.  Okay.  Yes.

23   Q.  I mean, that's, that's essentially what it was, right?

24        And so then, according to your story, that you can't

25   confirm, you sent Mr. Scotty Z to take care of your personal

1    problems, right?

2    A.  Yes.

3    Q.  I want to talk to you, Mr. Peters, about going to a

4    clubhouse in Mount Clemens that you testified about on Friday.

5    Do you remember that?

6    A.  Yes.

7    Q.  It was in Mount Clemens; is that correct?

8    A.  Yes, I believe so.

9    Q.  You're not certain about that?

10   A.  No.  I'm not sure where, exactly where their clubhouse is

11   exactly at.

12   Q.  You mean the exact location --

13   A.  Yeah.

14   Q.  -- or -- I'm sorry.  Go ahead.

15   A.  Exact location.

16   Q.  Okay.  Now, this was a party at the clubhouse; is that

17   correct?

18   A.  A steak fry they had.

19   Q.  A steak fry?

20   A.  Yeah.

21   Q.  And did you have to pay to get in the steak fry?

22   A.  Yeah.

23   Q.  What was it, $10 or --

24   A.  I think so, something like that.

25   Q.  That was pretty common practice; is that correct?

1    A.   Yes.

2    Q.   And members of the Devils Diciples were there?

3    A.   Yes.

4    Q.   Members of the Highwaymen were there?

5    A.   Yes.

6    Q.   People from outside were there?

7    A.   Yes.

8    Q.   And do you know how many people were there in this

9    particular instance that you described for the jury last

10   Friday?  Are we talking dozens?  Hundreds?

11   A.   I wouldn't say -- I don't really remember exactly.  It was

12   a lot of people, though.

13   Q.   Fifty, sixty?

14   A.   It's a big party.

15   Q.   I'm sorry?

16   A.   Probably over 100.

17   Q.   Over 100?

18   A.   Yeah.

19   Q.   And in the over 100 people, you told the jury last Friday

20   that there were drugs present, right?

21   A.   Correct.

22   Q.   That's not uncommon in itself, right?

23   A.   Yes.

24   Q.   So people would come to these parties to drink alcohol,

25   right?

1    A.  Yes.

2    Q.  To use drugs?

3    A.  Yes.

4    Q.  Correct?

5        And they would use cocaine, if it was available,

6    correct?

7    A.  Correct.

8    Q.  They would use meth, if it was available, correct?

9    A.  Correct.

10   Q.  Or marijuana, if it was available, correct?

11   A.  Yes.

12   Q.  Okay.  And that's how they got high and had a good time,

13   basically, right?

14   A.  Yes.

15   Q.  And, and that's something that you participated in, right?

16   A.  Yes.

17   Q.  And your drug of choice was cocaine?

18   A.  Yes.

19   Q.  Was it marijuana, as well?

20   A.  No.

21   Q.  So Mr. Peters, you did not engage in the use of meth, did

22   you?

23   A.  No, I didn't.

24   Q.  You didn't buy meth?

25   A.  No.

1   Q.  Didn't sell meth?

2   A.  No.

3   Q.  All right.  But you were a big-time cocaine dealer, weren't

4   you?

5   A.  Yes.

6   Q.  And starting back in 1999, all the way through 2007, you

7   dealt cocaine, didn't you?

8   A.  Yes.

9   Q.  So we're talking, what, about eight years at least of

10  cocaine dealing?

11  A.  Yes.

12  Q.  And did you deal in large quantities?

13  A.  Yes.

14  Q.  So are we talking more than 2 kilos?

15  A.  At a time, no.

16  Q.  If we're talking total, are we talking more than 2 keys?

17  A.  Yes.  More than two keys, yes.

18  Q.  Are we talking more than 3 or 3.5 kilos?

19  A.  In an eight-year span?  Yes.

20  Q.  Yes.

21  A.  Yes.

22  Q.  I'm sorry.  That's exactly what I'm asking you.

23          In an eight-year span, did you deal in more than 3.5

24  kilos of cocaine?

25  A.  Yes.

1   Q.  And your answer is yes, correct?

2   A.  Yes.  Correct.

3   Q.  Did you deal in more than 10 kilos?

4   A.  I wouldn't say that much, but it was a lot.

5   Q.  How about 100?

6   A.  No.

7   Q.  Maybe 50?

8   A.  No.

9   Q.  And your best guess is how many kilos of cocaine did you

10  deal in between 1999 and 2007, best, best guess?

11  A.  Maybe about 30.

12  Q.  About 30 kilos?

13  A.  Yes.

14  Q.  Directly that you dealt with, correct?

15  A.  Yeah.  That's a rough estimate.  That's about right.

16  Q.  Yeah.  And beyond the 30 kilos, did you also help other

17  people deal in kilos, too, where you were aiding and abetting?

18  A.  Yes.

19  Q.  So if we add the aiding and abetting kilos, how many total

20  were you involved in, would you say?  Does that get us up to 50

21  or 75?

22  A.  Maybe about 50, if that.

23  Q.  About 50?

24  A.  Yeah.

25  Q.  So you could be held personally responsible for about 50

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

1   kilos of cocaine between 1999 and 2007; is that correct?

2   A.  Yes.

3   Q.  And when you were dealing your cocaine between 1999 and

4   2007, Mr. Peters, was that your source of income?

5   A.  That and driving truck.

6   Q.  Okay.  So you had two sources.  One was legit, and one was

7   illegit, correct?

8   A.  Yes.

9   Q.  But the primary source of your income was your cocaine

10  dealing, right?

11  A.  Yes.

12  Q.  And that's how you supported yourself and your family at

13  that time, right?

14  A.  Correct.

15  Q.  And when you were dealing cocaine, you were an independent

16  drug dealer, right?

17  A.  Correct.

18  Q.  I mean, when you sold, even though you were a member of the

19  Highwaymen, you would sell cocaine and take the money for

20  yourself, right?

21  A.  Correct.

22  Q.  And you would keep it for yourself, right?

23  A.  Yes.

24  Q.  And you weren't taxed by the club, were you?

25  A.  Just club dues.

1    Q.   Okay.  No kickbacks, though?

2    A.   No.

3    Q.   Right?  Right?

4    A.   No.

5    Q.   No kickbacks.

6            So you kept that money essentially for yourself,

7    right?

8    A.   Yes.

9    Q.   Other than the dues that you paid to the club, right?

10   A.   Yes.

11   Q.   Now, Ms. Stout asked you whether or not being a member of

12   the club -- Ms. Stout is the defense lawyer who asked you

13   questions just before me -- she asked you if being a member of

14   the Highwaymen was a crime in itself.  And you said no, right?

15   A.   Correct.

16   Q.   Because the club itself was not illegal, right?

17   A.   Correct.

18   Q.   Being a member of the club was not illegal, right?

19   A.   Correct.

20   Q.   So in the Highwaymen, some individuals would commit

21   individual crimes, like you, right?

22   A.   Yes.

23   Q.   And sometimes, members of the Highwaymen would join for

24   other purposes, like social value, being involved in charity

25   runs, things of that sort, correct?

```
 1   A.  Yes.

 2   Q.  And in fact, in the Highwaymen, there were police officers

 3   who joined the Highwaymen, correct?

 4   A.  Yes.

 5   Q.  More than one, right?

 6   A.  Yes.

 7   Q.  Okay.  Now, Mr. Peters, I want to talk to you about an

 8   incident that you testified to Friday involving the Jokers

 9   Motorcycle Club.  Do you remember testifying about that on

10   Friday?

11   A.  Yes.

12   Q.  And that was an incident at a bar, correct?

13   A.  Correct.

14   Q.  And you were there, right?

15   A.  Yes.

16   Q.  And there were certain members of the Highwaymen that were

17   there?

18   A.  Yes.

19   Q.  And certain members of the Devils Diciples who were there?

20   A.  Yes.

21   Q.  But Scotty Z was not there, right?

22   A.  Correct.

23   Q.  He was not there?  All right.

24        And when you went inside the bar, it was your intent

25   to speak to the president of the Jokers Motorcycle Club; is
```

2:11-cr-20129-RHC-MAR  Doc # 1072  Filed 11/01/14  Pg 43 of 296  Pg ID 5643
JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

43

1    that correct?

2    A.   No.  I wasn't -- that was at the clubhouse we speak to the

3    president of the Jokers.

4    Q.   I'm sorry.  At a clubhouse --

5    A.   Yes.

6    Q.   -- you spoke to the president of the Jokers club?

7    A.   Yes.

8    Q.   What clubhouse was that?

9    A.   The Jokers' clubhouse.

10   Q.   And where was that?

11   A.   That's in Brightmoor.

12   Q.   Okay.  So nearby?

13   A.   Yes.

14   Q.   And the reason for the meeting is that you wanted to, in

15   effect, iron out a dispute, right?

16   A.   Correct.

17   Q.   And at the time that you spoke with the Jokers' bar --

18   excuse me, Jokers Motorcycle Club president, you were initially

19   able to resolve the problem, right?

20   A.   Yes.

21   Q.   That cooled things down, right?

22   A.   Yes.

23   Q.   And then after that meeting, you and other members go to

24   the bar, right?

25   A.   Yes.

1    Q.   And at the bar, a fight broke out, right?

2    A.   Correct.

3    Q.   And that was not unusual in the biker world, that in a bar,

4    with members of the different clubs, that a fight would break

5    out, pretty not that uncommon, right?

6    A.   Yes.

7    Q.   And were you involved in the fight?

8    A.   Yes.

9    Q.   And before you got involved in the fight, had you sort of

10   fueled yourself with alcohol?

11   A.   Yes.  I was, yes, I was drunk.

12   Q.   You were drunk?

13   A.   Yeah.

14   Q.   And had you also taken some cocaine?

15   A.   Yes.

16   Q.   And you used that to sort of get yourself up for this bar

17   fight, right?

18   A.   I wouldn't say that.  I was using it all day.

19   Q.   Okay.  So I mean, this was a regular thing that you did,

20   alcohol, cocaine, back in the days, right?

21   A.   Yeah.

22   Q.   And you were an addict at the time, right?

23   A.   Yes.

24   Q.   And because you were using so much cocaine and so much

25   alcohol, some of your memory is fuzzy about the dates and times

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

45

1   and what happened, right?

2   A.  Maybe a little bit.

3   Q.  A little bit.

4        Part of this bar fight stuff is really just an ego

5   thing among members, right?

6   A.  Yes.

7   Q.  I mean, some of it is like you trying to prove that you can

8   handle yourself in a bar, right?

9   A.  Yes.

10  Q.  And so you're involved in the fight.  Other people are

11  involved in the fight.  And the way that the fight ends is you

12  take out a pistol?

13  A.  Yes.

14  Q.  Fire it up into the ceiling?

15  A.  Yes.

16  Q.  Several times?

17  A.  Twice.

18  Q.  Twice.  Everybody runs?

19  A.  Correct.

20  Q.  Okay.  And that's the end of the fight?

21  A.  Yes.

22  Q.  Okay.  Pretty common.  Not that unusual, right?

23  A.  Yes.

24  Q.  Do you remember when that happened, what year?

25  A.  No, not exactly what year.

1  Q.  Okay.  So now, let's fast forward to May of 2009.

2  A.  Okay.

3  Q.  You find yourself in big trouble, don't you, Mr. Peters?

4  A.  Yes.

5  Q.  You have big trouble with the Federal Government, right?

6  A.  Yes.

7  Q.  And you are indicted on serious charges, are you not?

8  A.  Correct.

9  Q.  And back on Friday, you described to some extent what those

10 charges were, right?

11 A.  Yes.

12 Q.  Do you remember that?  They were RICO charges?

13 A.  Yes.

14 Q.  Correct?  They were both RICO substantive charges?  Do you

15 know what I mean by that?

16 A.  No, I don't.

17 Q.  Okay.  When I say "substantive," I mean that you and other

18 members of the Highwaymen actually committed certain crimes.

19 Do you understand that?

20 A.  Yeah.  I understand that.

21 Q.  Okay.  And then you were also charged with a RICO

22 conspiracy; is that right?

23 A.  Correct.

24 Q.  And that means that you agreed with other members of the

25 Highwaymen to commit certain serious crimes; is that correct?

1    A.  Correct.

2    Q.  And you said that on Friday, these were so serious that you

3    faced the rest of your life in prison, correct?

4    A.  Correct.

5    Q.  So in May of 2009, do you remember coming to court to be

6    arraigned on the charges?

7    A.  Yes.

8    Q.  Okay.  And when I say "arraigned," that's when the judge or

9    the magistrate tells you that you're being charged with certain

10   crimes and what those penalties are, right?

11   A.  Yes.

12   Q.  And you signed a piece of paper saying I know that I could

13   spend the rest of my life in prison, right?

14   A.  Yes.

15   Q.  And you're thinking about this, and you say to yourself, I

16   need to figure out a way to save myself, right?

17   A.  Yeah.

18   Q.  All right.  Because you're young, right?

19   A.  Yes.

20   Q.  Got a family, right?

21   A.  Yes.

22   Q.  And you don't want to spend the rest of your life in

23   prison, right?

24   A.  Correct.

25   Q.  And you basically say to yourself, the hell with these

1    other guys, I'm going to throw them under the bus, whatever I

2    need to do, to save myself, right?

3    A.   In a way, yes.

4    Q.   I mean, that's essentially what happened, right?

5    A.   Yes.

6    Q.   So your plan was you would help yourself with the

7    expectation that the Government, the lawyers, would

8    eventually -- not these lawyers here -- but they would

9    eventually help you out.  That was the idea, right?

10   A.   I was hoping, yes.

11   Q.   That's what you were hoping for, right?

12   A.   Yes.

13   Q.   Okay.  And in fact, the plan you devised to save yourself,

14   in fact, eventually worked, didn't it?

15   A.   With my lawyer's help, yes.

16   Q.   Okay.  So your lawyer was actually the go-between, between

17   you and the Government lawyers, that helped you work out your

18   plan?

19   A.   Yes.

20   Q.   And the plan being if you gave the Government information

21   that they wanted, in the end you would get what you wanted,

22   which is to save your life, right?

23   A.   Correct.

24   Q.   So in May of 2009 when you appeared and you were charged

25   with these serious drug, excuse me, serious crimes for which

 1  you could spend the rest of your life, one of your concerns was

 2  to get out immediately out on bond, right?

 3  A.  Yes.

 4  Q.  And the Government agreed that you could get out then,

 5  right?

 6  A.  Yes.

 7  Q.  And so working for the Government allowed you to get out,

 8  get your freedom, right?

 9  A.  Yes.

10  Q.  When you got out, and the Government agreed to let you out,

11  you had a problem in terms of creating income for yourself,

12  didn't you?

13  A.  Yes.

14  Q.  Because you couldn't go back to dealing drugs, could you?

15  A.  No.

16  Q.  So what you decided to do, with the help of the Government,

17  was to work for the Government, right?

18  A.  Correct.

19  Q.  And they would pay you, they would pay you for your work,

20  right?

21  A.  Yes.

22  Q.  So you wore a recorder?

23  A.  Yes.

24  Q.  And in exchange for wearing a recorder and speaking with

25  other people, they paid you money, right?

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

```
 1   A.  Correct.

 2   Q.  $2,500 a month?

 3   A.  I believe it was two grand a month.

 4   Q.  Two grand?

 5   A.  Yep.

 6   Q.  You're not certain about that, but --

 7   A.  I believe it was two grand.

 8   Q.  You wouldn't dispute the fact if I told you that previously

 9   you testified that you received 2,500?  You wouldn't dispute

10   that, right?

11   A.  No, I wouldn't.

12   Q.  Okay.  So it's either 2,000 or 2,500, right?

13   A.  Yes.

14   Q.  But in any event, what it did is it allowed you to get

15   money, income, to support yourself and your family while this

16   charge was going on, right?

17   A.  Correct.

18   Q.  And so what you did is you wore a recorder, correct?

19   A.  Yes.

20   Q.  You went back in to the club world, correct?

21   A.  Yes.

22   Q.  And you pretended to be somebody who was their friend, that

23   is, you're just an everyday guy who is out there being a club

24   member, right?

25   A.  Yes.
```

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

1  Q.  When, in fact, you were working for the Government, right?

2  A.  Correct.

3  Q.  So you were fooling those people, fooling all those people

4  that you were dealing with, right?

5  A.  Correct.

6  Q.  And in exchange for that, you got paid cash?

7  A.  Correct.

8  Q.  Or was it a check?

9  A.  Cash.

10  Q.  Cash.  All right.  And you did that for five months, didn't

11  you?

12  A.  Yes, I believe.

13  Q.  So that's a long time for you to pretend about being a

14  certain thing, certain person, right?

15  A.  Yes.

16  Q.  Five months?

17      And you got pretty good at it, right?

18  A.  I wouldn't say that, but yeah.

19  Q.  Well, I mean, you'd wear a wire, you'd go talk to other

20  people, pretend, fool people about who you are and what you

21  were up to, right?

22  A.  I never asked nobody about their crimes.  I wasn't allowed

23  to.

24  Q.  You weren't allowed to ask them about the crimes?

25  A.  No.

1   Q.  But you were trying to fool them about who you were,

2   weren't you?

3   A.  You could, yeah, you could say that.

4   Q.  Yeah.  I mean, you knew that, right?

5   A.  Yeah, I knew that.

6   Q.  You were, you were pretending, right?

7   A.  Yup.

8   Q.  Okay.  And the Government paid you that over, you said,

9   about five months; is that correct?

10  A.  Yes.

11  Q.  And so you were getting taxpayer money in cash, to help the

12  Government, right?

13  A.  Yes.

14  Q.  And did you file income tax returns in that year?

15  A.  No.

16  Q.  Now, you probably never filed income tax returns in your

17  whole life, have you?

18  A.  Yes, I have.

19  Q.  Way back when you had your legitimate job?

20  A.  Yes.  My trucks.

21  Q.  I'm sorry?

22  A.  With my truck company, I did.

23  Q.  And what year was that?

24  A.  '98 -- '97 was the last year.

25  Q.  So 1997 was the last time you filed income tax returns,

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

1    right?

2    A.   Yeah.

3    Q.   So in 2009, while you were working for the Government, you

4    got taxpayers' money, in cash, to work for the Government that

5    you never declared as income, right?

6    A.   Correct.

7    Q.   You ended up getting about $10,000 in cash for your work,

8    correct?

9    A.   That was to leave.

10   Q.   I'm sorry?

11   A.   That was to leave.

12   Q.   Well, you got two separate amounts?

13   A.   Yes.

14   Q.   One was -- I'm sorry?

15   A.   No.  Go ahead.

16   Q.   Okay.  You got about 2,000 or $2,500 a month for working

17   for the Government.  That was one set of money you got, right?

18   A.   Correct.

19   Q.   And then you got another $10,750 to relocate.  That was

20   separate, wasn't it?

21   A.   Yes.

22   Q.   Okay.  So you received a total amount of $20,750 of taxed

23   -- taxpayers' money, right?

24   A.   Yes.

25   Q.   And the reason why you relocated, you said last Friday, was

1   not because you were afraid, right?

2   A.   Correct.

3   Q.   But other people were concerned for your safety, right?

4   A.   Correct.

5   Q.   Okay.  Now, as part of your "cooperation," as the

6   Government likes to say, you were to tell on not only members

7   of the Highwaymen, but also members of the Devils Diciples; is

8   that correct?

9   A.   Well, yes.

10  Q.   Yeah.  I mean, didn't you talk to the Macomb County

11  prosecutors about your involvement with the Devils Diciples?

12  A.   Yes.

13  Q.   Yeah.  Right.  And you talked to the FBI out in Port Huron

14  about your involvement with the Devils Diciples?

15  A.   Port Huron?

16  Q.   Port -- well, whatever.  Mount Clemens, wherever those

17  folks hang out?

18  A.   I talked to them one time about them.  That was it.

19  Q.   You're saying here under oath that you only spoke to the

20  FBI once about your involvement with the Devils Diciples

21  Motorcycle Club?  Is that what you're saying here under oath?

22  A.   Back then, I did only talk to them one time about the

23  Devils Diciples.

24  Q.   How many times altogether?

25  A.   Now it's been like twice.

1    Q.  Two times total; is that what you're saying here?

2    A.  Correct.

3    Q.  Okay.  Mr. Peters, to go back for a moment to -- about

4    motorcycle culture, was it common for you, in your experience

5    in the club, in dealing with other clubs, that members often

6    talked, and I'll use this in quotes, "talked bullshit"?

7    A.  Correct.

8    Q.  And they would often exaggerate about what they had done

9    and what they hadn't done?

10   A.  Yes.

11   Q.  And would club members lie to each other about what was

12   going on?

13   A.  Yes.

14   Q.  And did club members lie on you?

15   A.  Yes.

16   Q.  And did you lie on other club members?

17   A.  I never lied on a club member.

18   Q.  Never?

19   A.  Never.

20   Q.  Have you ever lied to the FBI?

21   A.  No.

22   Q.  Are you sure about that?

23   A.  Yes.

24   Q.  Isn't it true that when the FBI first came to you back in

25   2006, at your house, they asked you about what position you

2:11-cr-20129-RHC-MAR   Doc # 1072   Filed 11/01/14   Pg 56 of 296   Pg ID 5656
JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. DALY

56

1   held with the club?

2   A.   Yes.

3   Q.   Yes.  And you told them that the only position that you

4   ever held was sergeant of arms?

5   A.   Correct.

6   Q.   And that was a lie?

7   A.   Yes.

8   Q.   And you knew it was a lie at the time?

9   A.   Yes.

10  Q.   And the reason why you lied and didn't tell them that you

11  were national president, vice president, and boss, is because

12  you were trying to benefit yourself, right?

13  A.   Yes.

14  Q.   Right.  And you thought that if you lied to the FBI, that

15  that would help you out, right?

16  A.   I don't know if it helped me out, but I did lie to them.

17  Q.   Well, that's what you were thinking at the time.  I mean,

18  you intentionally lied to the FBI, didn't you?

19  A.   Yes.

20  Q.   It wasn't a mistake, was it?

21  A.   No.

22  Q.   And the reason why you intentionally lied is you thought it

23  would help you out?

24  A.   At that time, yes.

25  Q.   Right.  You thought it would keep you out of trouble, you

 1   might not be charged, or that if the FBI thought that you only

 2   held a small position, you might not be charged, right?

 3   A.  Correct.

 4   Q.  So you do know how to lie?

 5   A.  Yes.  I know how to lie.

 6   Q.  You know how to lie to the FBI, right?

 7   A.  Yes.

 8   Q.  And when you lied to the FBI, you found out later that that

 9   was a crime, didn't you?

10   A.  Yes.

11   Q.  And were you charged with lying to the FBI?

12   A.  No.

13   Q.  So even though the Government knows that you lied to them,

14   they give you a free pass, don't they?

15   A.  Yeah.  I think so, yeah.

16   Q.  Yeah.  Right.

17           So not only are you a convicted felon, you are an

18   admitted liar, right?

19   A.  Yes.

20   Q.  Now, you told the jury back on Friday that you were charged

21   with a certain RICO charge with regards to the Highwaymen,

22   correct?

23   A.  Yes.

24   Q.  And there were a number of people charged as Highwaymen,

25   correct?

1   A.   Correct.

2   Q.   And you said that Scotty Z, at some point, became a

3   Highwaymen, correct?

4   A.   Correct.

5   Q.   And you know that Scotty Z was not charged in the RICO

6   conspiracy involving the Highwaymen; isn't that correct?

7   A.   Correct.

8   Q.   He was not charged?

9   A.   Correct.

10  Q.   So when you testified subsequently against the Highwaymen,

11  at that point in time, the Government had made no promises to

12  you, correct?

13  A.   Correct.

14  Q.   And you had not pled guilty, right?

15  A.   Right.

16  Q.   And so in front of the jury for the Highwaymen case, you

17  got on the witness stand and said the Government didn't promise

18  you anything, right?

19  A.   Correct.

20  Q.   And that was true at the time, right?

21  A.   Yes.

22  Q.   But then after you testified, then the Government came and

23  offered you a deal, right?

24  A.   Yes.

25  Q.   So the Government did come to your help, did come to your

1    assistance after you testified; isn't that right?

2    A.   Yes.

3    Q.   And what they did is they entered into what is called a

4    Rule 11 plea agreement; isn't that right?

5    A.   Correct.

6    Q.   And the Rule 11 plea agreement was important to you, was it

7    not?

8    A.   Yes.

9    Q.   Because the Rule 11 plea agreement allowed you, in effect,

10   or the Government to agree to lopping off from a life sentence,

11   all the way down to a guideline range of initially 108 to 135

12   months; is that correct?

13   A.   Yes.

14   Q.   Okay.  And that was significant and important for you,

15   right?

16   A.   Yes.

17   Q.   And not only did they agree to reduce your guidelines down,

18   but they agreed to dismiss certain charges, too, right?

19   A.   Correct.

20   Q.   And that was --

21        MR. MAIATICO:  Your Honor, objection.  This has been

22   asked and answered on Friday.

23        THE COURT:  You can recap briefly.

24        MR. DALY:  Thank you.

25        THE COURT:  Briefly.

```
 1              MR. DALY:  Thank you.
 2    BY MR. DALY:
 3    Q.  And the way that they came up with the guidelines, in part,
 4    had to do with the amount of cocaine that you supposedly were
 5    dealing with, correct?
 6    A.  Yes.
 7    Q.  And do you remember last Friday when Ms. Stout was asking
 8    you questions that the Government and you and your lawyer
 9    agreed to tell the judge that the total amount of cocaine was
10    between 2 and 3 and a half kilograms of cocaine, right?
11    A.  Correct.
12    Q.  And you already told the jury that you could have been held
13    responsible for up to 50 kilos of cocaine, right?
14    A.  Yes.
15    Q.  So this agreement was a fiction; it was a fiction
16    perpetrated on the court, wasn't it?
17    A.  I don't even know how to answer that.
18    Q.  Why not?  Because you knew that you had been dealing in 50
19    kilos of cocaine, and yet, you allowed the Government and your
20    lawyer to stand in front of the judge and misrepresent how
21    many -- how much drugs you were involved in.
22    A.  Correct.
23    Q.  You agreed to that.
24    A.  Yes.
25    Q.  But there was more to the deal than that, wasn't there?
```

1  Because in exchange for your testimony and your cooperation,

2  the Government said that they would make a recommendation that

3  you get no more than 48 to 54 months, right?

4  A.  Yes.

5  Q.  So you go all the way from a life sentence down to four

6  years, and what, four months, right?

7  A.  Yes.

8  Q.  Not a bad deal.

9  A.  No.

10  Q.  So then you show up on sentencing, right?

11  A.  Correct.

12  Q.  Didn't the Government recommend less than 48 to 54 months?

13  A.  Five years.

14  Q.  Well, wait a minute.  They recommended 48 to 54 months in

15  the agreement, right?

16  A.  Yes.

17  Q.  And the Government was, as far as you were concerned, that

18  they were bound by that agreement?

19  A.  Yes.

20  Q.  Are you saying that the Government reneged and came in and

21  asked for more?

22  A.  No.  The judge gave me my sentence.

23  Q.  Right.  My question to you, Mr. Peters, was didn't the

24  Government come in on the day of sentencing and recommend less

25  than 48 to 54 months?

1   A.  Not that I recollect.

2   Q.  Okay.  You just don't remember?

3   A.  I just don't remember.

4   Q.  In any event, the judge gave you less.

5   A.  Correct.

6   Q.  Twenty-four months.

7   A.  And three years' supervised release.

8   Q.  Twenty-four months in prison.

9   A.  Yes.

10  Q.  Two years, right?

11  A.  Yes.

12  Q.  All the way from life, down to two years.

13  A.  Yes.

14  Q.  So last Friday when you were in court under oath and Mr.

15  Maiatico asked you did they, meaning the prosecutors, provide

16  you with any benefits in exchange for your testimony, and you

17  answered no, that's not true, is it?

18  A.  They was all -- all mine was up to the judge.

19  Q.  All of it was up to the judge.  You just told the jury that

20  you cut a deal with the Government to get less than life.  It

21  wasn't all up to the judge, was it?

22  A.  Yes.  But my sentencing was.

23  Q.  Yeah.  Ultimately, the sentencing was.  But the Government

24  came in on the day of sentencing and went to bat for you,

25  right?

 1  A.  Yes.

 2  Q.  So the Government did provide you for benefits in exchange

 3  for your testimony, didn't they?

 4  A.  Yes.

 5  Q.  So when you answered "no" under oath in front of this jury

 6  Friday, that was not true, was it?

 7  A.  Correct.

 8          MR. MAIATICO:  Objection, your Honor.

 9          MR. DALY:  Wait.  Hold on.  Can we get the answer

10  first?

11          MR. MAIATICO:  Your Honor?

12          THE COURT:  No.  Actually, the procedure is to get the

13  objection first.

14          MR. DALY:  I'm sorry.

15          MR. MAIATICO:  Your Honor, we object.  He's

16  mischaracterizing the witness's testimony from Friday.

17          THE COURT:  I will allow that to, to be subject to

18  cross-examination, Mr. Maiatico.

19          MR. DALY:  Since the Government has said that I have

20  mischaracterized the testimony -- one minute.

21          (Brief pause.)

22          MR. DALY:  Judge, I'm going to read from the

23  transcript, the certified transcript of October 17th, before

24  this Court, Volume III.

25  BY MR. DALY:

1   Q.  This is page 150, lines 18 through 20.

2           Question by Mr. Maiatico:

3           "Question:  Did they provide you with any benefits in

4   exchange for your testimony?"

5           You answered:  "No."

6           Is that correct?

7   A.  Correct.

8   Q.  And that wasn't true, was it?  Because they did provide you

9   with benefits, right?

10  A.  Correct.

11  Q.  Okay.  So what you're telling the jury is that back on

12  Friday, when Mr. Maiatico asked you that question, in effect,

13  you lied or misled the jury, right?

14  A.  Right.

15  Q.  All right.  Now, the other thing that you said when Mr.

16  Maiatico asked you were you getting anything in exchange for

17  your testimony here, and why were you here, you said because

18  I'm doing the right thing.  I'm sort of paraphrasing.  Correct?

19  A.  Correct.

20  Q.  Now, that's exactly what you said when you testified before

21  the Highwaymen case, right?

22  A.  Correct.

23  Q.  Okay.  So here is the plan:  You come in.  You tell the

24  jury that you are doing the right thing.  You're not going to

25  get a benefit when, in fact, you expect that because you

```
 1   testified here, that the Government will come back and ask the

 2   judge to reduce your sentence one more time, right?

 3   A.  No.

 4   Q.  That's not what you expect?

 5   A.  No.

 6   Q.  You know that's a possibility?

 7   A.  It's a possibility, yes.  But no, I don't expect it.

 8   Q.  Okay.  That's a good place to stop then.

 9           MR. DALY:  Thank you.

10           THE COURT:  Any others?

11           MS. MACERONI:  I do.

12                           CROSS-EXAMINATION

13   BY MS. MACERONI:

14   Q.  Good morning, Mr. Peters.

15   A.  Good morning.

16   Q.  I just have a couple of questions to ask you about the

17   black and blue party that you spoke a little bit about on

18   Friday.

19   A.  Yes.

20   Q.  And that was a joint party between the Devils Diciples

21   Motorcycle Club and the Highwaymen's club, correct?

22   A.  Correct.

23   Q.  And I believe you testified that that occurred in about

24   2001?

25   A.  Something like that, yes.
```

1  Q.  Okay.  And you test -- or you talked a little bit with Mr.

2  Daly about the September -- September 2014 interview that you

3  gave with the FBI.  Do you recall an interview that you gave in

4  May of 2011?

5  A.  I think so, yes.

6  Q.  Okay.  And do you recall talking about the black and blue

7  party during that interview with the FBI?

8  A.  Yes.

9  Q.  Okay.  And do you recall also that Ms. Mohsin and Mr.

10  Straus were present during that interview --

11  A.  Yes.

12  Q.  -- correct?  All right.

13         And you indicated at the time that a leader of the

14  Highwaymen club was an individual by the name of Mad Anthony,

15  correct?

16  A.  Correct.

17  Q.  And that's true as you sit here today?

18  A.  Yes.

19  Q.  And Mad Anthony, his real name is Anthony Clark, correct?

20  A.  Yes.

21  Q.  And at the time, the DDMC was led by an individual by the

22  name of Bearfoot, correct?

23  A.  Yes.

24  Q.  And do you recall Bearfoot's legal name?

25  A.  No, I don't.

1  Q.  Bearfoot was the leader of the DDMC in Mount Clemens,

2  correct?  At that chapter house?

3  A.  Right.  Yes.

4  Q.  Now, do you recall also during this May 2011 interview

5  identifying several photographs of different DDMC members?

6  A.  Yes.

7  Q.  And do you recall identifying an individual by the name of

8  Roach?

9  A.  Yes.

10  Q.  And do you recall identifying an individual by the name of

11  Chico?

12  A.  I believe so, yes.

13  Q.  Spike?

14  A.  Yes.

15  Q.  Utica Mike?

16  A.  Yes.

17  Q.  And do you recall identifying an individual by the name of

18  JP?

19  A.  Yes.  Probably, yes.

20  Q.  Do you recall a specific incident that you talked to Ms.

21  Mohsin and Mr. Straus about concerning JP?

22  A.  I'd have to be recollected.  I don't remember.

23  Q.  If I showed you a copy of the report, would --

24  A.  Yes.

25  Q.  -- that refresh your recollection?

 1          MS. MACERONI:  Judge, may I approach?

 2          THE COURT:  Yes.

 3          THE WITNESS:  Yes.

 4   BY MS. MACERONI:

 5   Q.  Do you recall talking to the AUSA's about JP?  And

 6   specifically, what is it you told them about JP?

 7   A.  JP had -- kind of was hitting on one of our member's old

 8   ladies.  So John Creek, which was a member of the Highwaymen,

 9   took it up with their boss, the Devils Diciples.  And they,

10   they took care of it in the basement at their clubhouse.

11   Q.  Okay.  So let me go through that a little bit.

12          So the individual that you knew as JP, who was a

13   Devils Diciples Motorcycle Club member, correct?

14   A.  Correct.

15   Q.  Okay.  And he was acting inappropriately with a

16   Highwaymen's?

17   A.  Wife.

18   Q.  Wife.

19   A.  Yes.

20   Q.  And the Highwaymen's name was by the name of John Creek?

21   A.  Yeah.

22   Q.  Okay.  So Bearfoot, who was the leader of the DDMC at the

23   time?  Correct?

24   A.  Yes.

25   Q.  Okay.  Had told Mad Anthony that he would take care of it?

1    A.  Yes.

2    Q.  And to your knowledge, was that ever done?

3    A.  Yes.  Because John Creek was in present when that would

4    happened.

5    Q.  Again, did that take care of the bad blood between, or the

6    potential bad blood between the two clubs?

7    A.  Yes.

8    Q.  Were you present when this occurred with JP?

9    A.  No.

10   Q.  Thank you.  I don't --

11   A.  The first incident I was, though.

12   Q.  I'm sorry?

13   A.  The first incident.

14   Q.  So when JP was hitting on --

15   A.  Yes.

16   Q.  -- John Creek's wife, you saw that?

17   A.  Yes.

18   Q.  And was there a fight that broke out at that time?

19   A.  No.

20   Q.  All right.  It was taken care of later?

21   A.  Yeah.

22          MS. MACERONI:  Thank you.  I have nothing else.

23          THE COURT:  Others?  Mr. Satawa?

24                      CROSS-EXAMINATION

25   BY MR. SATAWA:

1  Q.  Good morning, Mr. Peters.

2  A.  Good morning.

3  Q.  Mr. Peters, I am going to remind you of the questions and

4  answers you've been asked already on cross-examination so as to

5  save ourselves some time in me having to go over ground that's

6  already been covered.

7  A.  Okay.

8  Q.  Fair enough?

9  A.  Yes.

10  Q.  If, however, in the course of my questioning you think that

11  there's something we need to discuss or you would like a

12  question repeated, just let me know and we'll go down that

13  road.  All right?

14  A.  All right.

15  Q.  Mr. Peters, I'm a little bit confused about one aspect

16  about your Rule 11 plea agreement and your cooperation

17  agreement with the Government.  And that's what I'm going to

18  focus on.  I want you to focus your attention on that.  All

19  right?

20  A.  (No response.)

21  Q.  All right?

22  A.  Yes.

23  Q.  You've got to answer verbally.

24  A.  Okay.

25  Q.  Because she's taking everything down that we say.  Okay?

2:11-cr-20129-RHC-MAR  Doc # 1072  Filed 11/01/14  Pg 71 of 296  Pg ID 5671
JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. SATAWA

71

1          Mr. Peters, you testified on Friday that, and you were

2    very clear, that you entered into a cooperation agreement in

3    the Highwaymen case, right?

4    A.   Yes.

5    Q.   Which is a case in front of a different judge?

6    A.   Yes.

7    Q.   In the same building, but a different judge?

8    A.   Yes.

9    Q.   And you even asked, were asked questions, I think, by the

10   Government on Friday that it was different prosecutors.

11   A.   Yes.

12   Q.   Different agent.

13   A.   Yes.

14   Q.   Different everybody.

15   A.   Yes.

16   Q.   And your testimony went something to the effect of you

17   entered into a cooperation agreement that affected your

18   sentence, something that's been amply covered by Mr. Daly

19   today, as it related to your involvement in the Highwaymen

20   case.  Do you remember that testimony to the Government on

21   Friday?

22   A.   Yes.

23   Q.   All right.  I was reviewing your Rule 11 plea agreement

24   over the weekend.  Do you remember the terms and what is in

25   this agreement?

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - CROSS BY MR. SATAWA

1   A.  Not everything in there.

2   Q.  All right.  Do you remember entering into this agreement?

3   A.  Yes.

4   Q.  And you entered into this agreement with the help of a

5   lawyer?

6   A.  Yes.

7   Q.  You were given a lawyer in the Highwaymen case?

8   A.  Yes.

9   Q.  And that lawyer and you discussed your legal options from

10  the day you were arrested in 2009?

11  A.  Correct.

12  Q.  You relatively quickly, after your arrest in 2009, agreed

13  to cooperate with the Government?

14  A.  Correct.

15  Q.  And that is a decision that you made?

16  A.  Yes.

17  Q.  And you made that decision with the help and legal advice

18  of an attorney?

19  A.  Yes.

20  Q.  A very good attorney?

21  A.  Yes.

22  Q.  He must be a darn good attorney, because as we've

23  discussed, you've gone from life down to two years.

24  A.  Yes.

25  Q.  You're satisfied with what he told you?

1   A.  Yes.  All he told me was not to lie.

2   Q.  Okay.  Well, he also told you that -- ultimately, you

3   discussed this agreement with him?

4   A.  Yes.

5   Q.  And he told you, based on this agreement, not to lie.

6   A.  Yes.

7   Q.  Mr. Daly and others have already discussed the fact that

8   apparently you decided not to follow his advice, because we

9   know you lied to this jury at least on a couple of points over

10  the last few days, right?

11  A.  Yes.

12  Q.  Okay.  This cooperation agreement, or excuse me, the Rule

13  11 plea agreement, to be accurate, contains a section about

14  your cooperation, right?

15  A.  Right.

16  Q.  That cooperation or that section on your cooperation starts

17  on page 6, and it's listed as section 4.  Do you remember this?

18  A.  Yes.

19  Q.  Do you remember what this cooperation agreement requires

20  you to do?

21  A.  Tell the truth.

22  Q.  All right.  What else does it require you to do?

23  A.  Testify.

24  Q.  Testify whenever the Government wants you to?

25  A.  Yes.

1    Q.  That obligation is not limited?

2    A.  Yes.

3    Q.  It is not limited to the Highwaymen case?

4    A.  Correct.

5    Q.  That obligation, you understand, continues to this case?

6    A.  Yes.

7    Q.  It is your obligation to come in here today or on Friday

8    and answer questions for this jury?

9    A.  Yes.

10   Q.  If the government asks you to testify, if the government

11   asks you to come into court, it is your obligation to come into

12   court and testify?

13   A.  Yes.

14   Q.  And if you do not testify when the Government asks you to

15   do so, you are in violation of this agreement?

16   A.  Correct.

17   Q.  This agreement, in essence, covers your testimony here,

18   Friday, and today?

19   A.  Yes.

20   Q.  In other words, if the Government says jump, your

21   obligation is to say how high?

22   A.  Yes.

23           MR. SATAWA:  No further questions.

24           THE COURT:  Others?

25           All right.  It's 10:30.  I think about a 15-minute

 1   recess is appropriate at this point.  We're going to recess for

 2   lunch just before one p.m.  Fifteen minutes in the jury room,

 3   ladies and gentlemen.  We stand in recess.

 4        (Jury out, 10:28 a.m.)

 5             COURT REPORTER:  All rise.  Court is in recess.

 6        (Recess taken, 10:29 a.m. - 10:49 a.m.)

 7             THE CLERK:  All rise.

 8        (Jury in, 10:50 a.m.)

 9             THE COURT:  All right.  The jury has assembled.  Be

10   seated.

11             The parties are all present.  Mr. Maiatico, do you

12   have redirect examination, perhaps?

13             MR. MAIATICO:  Yes, your Honor.  Thank you.

14                         REDIRECT EXAMINATION

15   BY MR. MAIATICO:

16   Q.  Good morning, Mr. Peters.

17   A.  Good morning.

18   Q.  I understand you weren't feeling that well last Friday when

19   you were testifying.  Do you feel better today?

20   A.  Correct.  A little bit better today, yes.

21   Q.  All right.  Good to hear.

22             MS. STOUT:  Objection.

23             MR. SATAWA:  Is the Government testifying, Judge, or?

24             THE COURT:  I beg your pardon?

25             MR. SATAWA:  I said is the Government testifying, your

 1   Honor?

 2          THE COURT:  Do you have an objection?

 3          MR. SATAWA:  I believe I do.  The Government was

 4   testifying.

 5          THE COURT:  And would you state the basis for the

 6   objection?

 7          MR. SATAWA:  The objection from my -- the objection,

 8   the basis for my objection is that the Government is testifying

 9   and assuming a fact not in evidence and is leading.

10          THE COURT:  Overruled.

11          MR. SATAWA:  So I have three objections.

12          THE COURT:  Overruled as to each.

13          MR. SATAWA:  As to all three.

14          THE COURT:  Overruled as to each.  Proceed.

15   BY MR. MAIATICO:

16   Q.  All right.  Mr. Peters, you were asked on cross-examination

17   about an incident with Scotty Z, correct?

18   A.  Yes.

19   Q.  And that was an incident where you had Scotty Z do you a

20   favor, correct?

21   A.  Yes.

22   Q.  Now, can you describe to the jury what that favor was,

23   again?

24          MR. DALY:  Objection.  Judge, I don't think we need to

25   go back through this again.  That's not the purpose of

1    redirect.  I object.

2          THE COURT:  Overruled.  The matter was extensively

3    gone into on your cross-examination.  Proceed.

4    BY MR. MAIATICO:

5    Q.  So what was that incident again?

6    A.  To make my girlfriend's ex-boyfriend leave her alone.

7    Q.  All right.  So did the, once Scotty Z intervenes in this

8    incident, did the ex-boyfriend leave your girlfriend alone?

9    A.  Yes.

10   Q.  All right.  And what was it you provided Scotty Z in return

11   for this favor?

12   A.  A quarter ounce of cocaine.

13   Q.  Okay.  Now, you testified earlier that you've distributed

14   cocaine in the past?

15   A.  Yes.

16   Q.  For many years?  For many years, correct?

17   A.  Yes.

18   Q.  What sort of quantities of cocaine would you consider user

19   quantities?

20   A.  Eight-balls, 16ths.

21   Q.  Okay.  And that's the type of quantities, that you would

22   sell to individuals, when you --

23   A.  Yes.

24   Q.  -- were a cocaine distributor?

25   A.  Yes.

1  Q.  How does that compare to the amount of cocaine that you

2  supplied to Scotty Z?

3  A.  To just a little bit more than usually what I'd give out.

4  Q.  And why would you do that?

5  A.  Because it was more money.

6  Q.  And did you expect Scotty Z to do anything with that

7  cocaine?

8  A.  No.

9  Q.  Did you expect him to distribute it to anyone?

10          MR. DALY:  Objection.

11          THE WITNESS:  No.

12          MR. DALY:  He just said the answer was no, and the

13  next question was leading.  I object.

14          THE COURT:  Overruled.  Proceed.

15  BY MR. MAIATICO:

16  Q.  So did you expect Scotty Z to distribute that cocaine to

17  anyone else?

18  A.  No.

19          MR. DALY:  Thank you.

20  BY MR. MAIATICO:

21  Q.  At the time of this incident with Scotty Z --

22          THE COURT:  Stop.  There is no need by anybody to

23  thank the Court for any ruling made.  I intend to rule

24  consistent with Rules of Evidence, as I understand them.  Let's

25  not have any "thank you" or anything else similar to that for

JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - REDIRECT BY MR. MAIATICO

79

 1   either side of the table, for either side of the courtroom.

 2          Proceed, sir.

 3   BY MR. MAIATICO:

 4   Q.  So Mr. Peters, at the time of this incident with Scotty Z,

 5   was, was Scotty Z associating with members of the Devils

 6   Diciples at that time?

 7   A.  Yes.

 8   Q.  And you testified earlier that the Devils Diciples and the

 9   Highwaymen were friendly?

10   A.  Yes.

11   Q.  How would you describe that association?

12   A.  Hung out together.

13   Q.  All right.  Now, why would Scotty Z help you out with this

14   favor?

15   A.  Just for -- just out of friendship.

16   Q.  Did you trust Scotty Z?

17   A.  Yes.

18   Q.  Why did you trust him?

19   A.  He's always been a man of his word.

20   Q.  All right.  What is Scotty Z's reputation?

21          MR. DALY:  Objection.  There's no foundation for that.

22   It's not relevant, both, Judge.

23          THE COURT:  The foundation can be laid in the course

24   of answering the question.  I believe that it is relevant,

25   particularly to, particularly to an aspect of cross-examination

1   by Mr. Daly.  And you may proceed.  The objection is overruled.

2   BY MR. MAIATICO:

3   Q.  So, Mr. Peters, what is Scotty Z's reputation?

4   A.  He's a man who does what he says he's going to do.

5   Q.  All right.  Have you ever observed Scotty Z carrying a ball

6   bat?

7           MR. DALY:  Objection.  That's not relevant.

8           THE COURT:  Again, I believe that it is.  And I will

9   make a note and amplify that at a later time.  Overruled.

10  BY MR. MAIATICO:

11  Q.  Mr. Peters, have you ever observed Scotty Z carrying a ball

12  bat?

13  A.  No, I haven't observed him carrying a ball bat before.

14  Q.  Have you ever observed Scotty Z carrying a gun?

15  A.  Yes.

16  Q.  How many times have you observed Scotty Z carry a gun?

17          MR. DALY:  Objection.  Relevancy.

18          THE COURT:  Overruled.  Let me explain at the side of

19  the bench.

20          Just take a standing stretch break for a moment,

21  ladies and gentlemen.

22      (Side bar discussion held with Mr. Maiatico, Mr. Pitts, Mr.

23      Daly, Mr. Satawa, Mr. Sabbota, Mr. Kraizman, Mr. Machasic,

24      outside the hearing of the jury at 10:55 a.m.)

25          THE COURT:  Can you hear okay?

1          All right.  Mr. Daly, good morning.

2          MR. DALY:  Yes.  Good morning.

3          THE COURT:  The explanation is that in

4   cross-examination, Mr. Daly particularly emphasized that Scotty

5   Z was half the size; it would take two Scotty Z's standing one

6   on top of the other to equal this guy, and thereby sought to

7   substantially diminish the significance of his physical

8   presence, et cetera, and to diminish the impression of his

9   threatening demeanor or things relatively similar to that.

10  This testimony is being brought out at least partly in response

11  to that, and I think very reasonably so.  It is relevant.  The

12  objection is overruled.

13          MR. DALY:  May I respond?

14          THE COURT:  You, you've already objected.

15          MR. DALY:  I'm just asking if I can respond, that's

16  all.

17          THE COURT:  Briefly.  Yes.

18          MR. DALY:  Okay.  The questions that I asked were

19  directed specifically to a specific instance that the

20  Government brought out, which is that this witness sought out

21  Scotty Z for a specific purpose when this witness has a

22  reputation, meaning Mr. Peters, of taking care of, I'm sorry,

23  of taking care of business himself.  This is all related to one

24  specific instance.  It doesn't open the door for the Government

25  to ask any question about what he may have done ever in his

2:11-cr-20129-RHC-MAR  Doc # 1072  Filed 11/01/14  Pg 82 of 296  Pg ID 5682
JURY TRIAL, VOLUME IV - 10/20/2014
GERALD PETERS, JR. - REDIRECT BY MR. MAIATICO

82

 1   life regarding a baseball bat or a gun.

 2              THE COURT:  Oh, I agree with that.  These questions,

 3   as I understand it, are, are directed, though, to that phase of

 4   the cross-examination.  And on that assumption, and with that,

 5   in that, in that vein, the objection is overruled.

 6              Let's go back.

 7              MR. DALY:  I disagree.

 8       (Sidebar concluded, 10:57 a.m.)

 9              THE COURT:  Let's come back to order, please.

10              Continue, sir.

11   BY MR. MAIATICO:

12   Q.  Mr. Peters, I believe the last question was:  Have you ever

13   seen Scotty Z carrying a gun?

14   A.  Yes.

15   Q.  And how many times have you seen him with a gun?

16   A.  Every time I ever met Scotty Z, he had one.

17   Q.  You always knew him to carry?

18   A.  Yes.

19   Q.  Have you ever known him to use a ball bat, even though you

20   haven't seen him use a ball bat?

21   A.  He's told me he has, but I never seen him use it.

22   Q.  All right.  Moving on, Mr. Peters, I want to clarify the

23   timing of your plea agreement in the Highwaymen case.

24              Did you enter into that plea agreement before or after

25   you testified at the trials in the Highwaymen?

1   A.  Before.

2   Q.  You entered into the agreement before you testified?

3   A.  Yes.

4   Q.  Were you told by prosecutors before you testified that you

5   would receive a, receive a break?

6   A.  I would receive a Rule 11.  It would still be up to the

7   judge --

8   Q.  Okay.

9   A.  -- on my sentencing.

10  Q.  So at the time that you testified, you were told that you

11  would receive a Rule 11 at some point in the future.

12  A.  Yeah.

13  Q.  Is that correct?

14          Now, at what point did you wear a wire against other

15  members of the Highwaymen?

16  A.  As soon as they let me out.

17  Q.  All right.  And that was --

18  A.  The whole time.

19  Q.  So that was after you were arrested, and you were let out

20  on bond?

21  A.  Yup, on bond, yes.

22  Q.  And that happened before you were -- you testified in those

23  trials, correct?

24  A.  Correct.

25  Q.  Now, how would you describe the danger involved in wearing

```
 1   a wire against other members of the motorcycle club?

 2   A.  I probably would have been killed if I would have got

 3   caught.

 4   Q.  Did you receive any threats to your safety?

 5   A.  No.

 6   Q.  But members of law enforcement believed there was a threat

 7   to your safety; is that correct?

 8   A.  Yes.  That was because of my ex-wife.

 9   Q.  And what happened with your ex-wife?

10   A.  She told the club that I was telling on them.

11   Q.  Was that the purpose, then, of your relocation then?

12   A.  Yes.

13   Q.  And when you testified in the Highwaymen case, what judge

14   was that in front of?

15   A.  Edmunds, Nancy Edmunds.

16   Q.  Judge Edmunds?

17   A.  Yeah.

18   Q.  Just to be clear, not this judge, correct?

19   A.  Correct.

20   Q.  And for each of the trials that you testified in, was this

21   in front of Judge Edmunds?

22   A.  Yes.

23   Q.  And was she aware that you wore a wire in this case?

24   A.  Yes.

25   Q.  And then who was the judge that sentenced you?
```

1  A.  Edmunds.

2  Q.  So that was the same judge that knew about you wearing a

3  wire, and also that you had testified in front in those trials,

4  correct?

5  A.  Yes.

6          MR. SATAWA:  Objection.  Asked and answered.

7          THE COURT:  Overruled.

8  BY MR. MAIATICO:

9  Q.  Now, Mr. Peters, counsel had read you a selected portion of

10  your testimony from last Friday.  You remember testifying last

11  Friday, correct?

12  A.  Yes.

13          MR. MAIATICO:  And your Honor, for the record, defense

14  counsel had read from page 150 in the jury trial transcript,

15  Volume III, dated 10/17/2014, from line 18.  I'm going to go

16  back to line 15.

17  BY MR. MAIATICO:

18  Q.  Do you remember me asking you, Mr. Peters:

19          "Now, before you testified, did the prosecutors in

20  that case," meaning the Highwaymen case, "make any promises to

21  you?"

22  A.  Yes.  I remember that.

23  Q.  And do you remember saying "no" to that?

24  A.  Yes.

25  Q.  Very next question:

```
 1            "Did they provide you with any benefits in exchange

 2      for your testimony?"

 3            Do you remember answering "no" to that?

 4      A.  Yes.

 5      Q.  So before you testified in the Highwaymen case, you were

 6      not made any promises, and you were not provided any benefits

 7      in exchange for your testimony; is that correct?

 8            MR. SATAWA:  Objection.  Leading.  611.

 9            THE COURT:  Overruled.

10            THE WITNESS:  Correct.

11      BY MR. MAIATICO:

12      Q.  Now, Mr. Peters, you talked about signing the Rule 11 plea

13      agreement.  What was your obligation under the Rule 11 plea

14      agreement in terms of providing information to the Government?

15      A.  The truth.

16      Q.  What would happen if you did not tell the truth?

17      A.  It would be no good then.

18      Q.  The Rule 11 plea agreement would be no good?

19      A.  Yes.

20      Q.  So are you telling the truth today?

21      A.  Yes.

22            MR. DALY:  Objection.  That's self-serving.  It's for

23      the jury to decide only.

24            THE COURT:  That's true.  Although, it's certainly

25      true in the ultimate analysis.  However, the same points were
```

 1    raised on cross-examination, almost exactly the same points.

 2            Overruled.

 3    BY MR. MAIATICO:

 4    Q.  So, Mr. Peters, are you telling the truth today?

 5    A.  Yes.

 6    Q.  Now, you talked about your prior cocaine distribution and

 7    your prior cocaine dealing, correct?

 8    A.  Yes.

 9    Q.  Was that profitable?

10    A.  Yes.

11    Q.  You said, you said to counsel on cross-examination that at

12    one point, that was your primary source of income, correct?

13    A.  Yes.

14    Q.  You also said that you paid dues to the Highwaymen club?

15    A.  Correct.

16    Q.  And where would that money come from to pay your dues?

17    A.  My drug money or if I made it trucking.

18    Q.  So either from trucking or the drug money would go to pay

19    your dues?

20    A.  Yes.

21    Q.  Now, what role did your membership in the Highwaymen club

22    play in your ability to, to sell cocaine?

23    A.  You got more customers.  The more higher ranked you are,

24    the more customers you get.

25    Q.  So it was the -- can you explain that to the jury?  It was

1    your ranking that determined the number of customers you would

2    get?

3    A.  Yeah.  My ranking helped me progress higher in selling

4    cocaine.

5    Q.  So you're talking about your ranking in the club, correct?

6    A.  Yes.

7    Q.  And what would happen if someone tried to rob you of your

8    drugs?

9    A.  (No response.)

10   Q.  Has that ever happened?

11   A.  No.

12   Q.  Okay.  Why do you think that never happened?

13   A.  It just never happened.

14   Q.  Let's talk about the -- well, strike that.

15          All right.  Mr. Peters, I want to talk to you a little

16   bit about the incident that you testified to with the Jokers

17   and the incident that occurred at the bar in the Brightmoor

18   section.

19   A.  Okay.  Yes.

20   Q.  All right.  Now, was that a public bar?

21   A.  Yes.

22   Q.  Was that a known hangout for any other motorcycle club

23   members?

24   A.  The Jokers.

25   Q.  Now, you testified, in fact, the Jokers clubhouse was close

1   by, correct?

2   A.   Correct.

3   Q.   Now, when you went to the bar the night of that incident,

4   you were not alone, correct?

5   A.   Correct.

6   Q.   You went with other motorcycle club members?

7   A.   Yes.

8   Q.   And from what motorcycle clubs?

9   A.   Devils Diciples and Detroit Highwaymen.

10  Q.   And what was the reason that you were going to that bar in

11  the Brightmoor section?

12  A.   To look for Jokers.

13  Q.   And what were you going to do when you found the Jokers?

14  A.   Probably beat them up.

15  Q.   Was there a reason that you carried a gun that night?

16  A.   No.  I always carry a gun.

17  Q.   Did that gun come in handy that night?

18  A.   Yes.

19          MR. MAIATICO:  I have no further questions.

20          THE COURT:  All right.  The witness may be excused.

21  And prepare to call your next, please.

22          MS. MOHSIN:  Your Honor, our next witness is here.

23  We're just going to wait for Mr. Peters, if that's okay.

24          THE COURT:  All right.

25      (Witness excused, 11:06 a.m.)

```
 1              THE COURT:  Is the next witness in custody or no?

 2              MS. MOHSIN:  No.  The Government calls Special Agent

 3   David Opperman.

 4       (Witness is sworn.)

 5              THE COURT:  Have a seat.

 6              MS. MOHSIN:  Your Honor, may I have one moment?

 7              THE COURT:  Yes.

 8                        DAVID OPPERMAN

 9       called as a witness at 11:06 a.m., testified as follows:

10                        DIRECT EXAMINATION

11   BY MS. MOHSIN:

12   Q.  Good morning.

13   A.  Good morning.

14   Q.  Would you please state your full name and tell the members

15   of the jury by whom you are employed.

16   A.  David Opperman.  I'm a special agent with the FBI.

17              MS. MOHSIN:  Your Honor, in accordance with the

18   Court's request, this agent's testimony relates to Count 1, the

19   RICO conspiracy; Count 2, the gambling conspiracy; Counts 3, 4,

20   5, 27, and 28, which all relate to drugs, and methamphetamine

21   in particular.

22              THE COURT:  All right.

23   BY MS. MOHSIN:

24   Q.  What is your title, sir?

25   A.  A special agent.
```

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   Q.  And with what agency?

2   A.  The FBI.

3   Q.  How long have you been so employed?

4   A.  Coming up on 13 years.

5   Q.  Prior to your employment with the FBI, who were you

6   employed by?

7   A.  I was a police officer in northwest Indiana.

8   Q.  And how long were you a police officer?

9   A.  Approximately six and a half years.

10  Q.  So in total, approximately how many years of law

11  enforcement experience do you have?

12  A.  Approximately 19.

13  Q.  In the last 10-plus years you've been with the FBI, have

14  those years been served here in Detroit, or the Detroit area?

15  A.  In the Detroit area.  I was assigned to the Macomb office,

16  the Macomb RA.

17  Q.  And is that in Macomb County?

18  A.  Yes, it is.

19  Q.  Do you work with Special Agent Bill Fleming?

20  A.  I do.

21  Q.  And have you worked many cases in conjunction with Special

22  Agent Fleming?

23  A.  Yes.

24  Q.  As a co-case agent?

25  A.  Yes.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   Q.  What are your current -- what's your current assignment?

2   A.  Currently assigned to the Macomb office as one of the

3   investigators.

4   Q.  Now, I want to talk a little bit about the types of cases

5   that you have worked on in the past.

6           Could you briefly describe for the jury the types of

7   crimes you've investigated and the types of matters you've

8   worked on?

9   A.  I've worked a lot of violent crime, for example, armed car

10  robberies, bank robberies, or drug investigations and gang

11  investigations, as well as child pornography investigations,

12  white collar investigations.

13  Q.  Have you done any public corruption cases?

14  A.  Yes, I have.

15  Q.  Okay.  Roughly how many investigations would you say that

16  you've personally been involved in?

17  A.  75 to 100.

18  Q.  Okay.  And during the course of those investigations that

19  you've personally been involved in, or investigations you may

20  have participated in, have you ever had occasion to interview

21  individuals who are involved in criminal activities?

22  A.  Yes.

23  Q.  And approximately how many people would you say you've

24  talked to that have been involved in criminal activities?

25  A.  Hundreds, if not a thousand.

1  Q.  Now, I want to direct your attention specifically to

2  approximately 2004 through 2008.  Did you work with Special

3  Agent Bill Fleming during those years on the Devils Diciples

4  case?

5  A.  Yes.

6  Q.  Now, at the time in 2004, what type of case was pending

7  with respect to the matters that are in trial here today?  I

8  think you understand my question.

9  A.  Correct.  Late 2004 and early 2005, we were working an

10  investigation related to methamphetamine production and

11  distribution.

12  Q.  Okay.  Now, were you fairly active in this investigation

13  during that time period?

14  A.  Yes.

15  Q.  And so I want to direct your testimony here today about

16  that particular time period.

17  A.  Okay.

18  Q.  Did you become familiar with an individual by the name of

19  John Pizzuti?

20  A.  Yes.

21  Q.  How did you become familiar with this individual?

22  A.  That was probably in January of 2007, for a time-wise.  It

23  was -- I believe there was charges pending, and there was a

24  proffer interview conducted, at which point we met.

25  Q.  Now, you indicated that there were charges pending.  Were

 1  those charges, to your knowledge, pending against Mr. Pizzuti?

 2  A.  I believe so.

 3  Q.  And was that an FBI investigation or an investigation by a

 4  different agency?

 5  A.  I believe it was an ATF investigation.

 6  Q.  And did it come to your attention that Mr. Pizzuti was

 7  interested in cooperating?

 8  A.  Yes.

 9       THE COURT:  I'm sorry to interrupt.  Do you have a

10  spelling for that last name?

11       MS. MOHSIN:  I do.  P-I-Z-Z-U-T-I.

12       THE COURT:  Thank you very much.

13  BY MS. MOHSIN:

14  Q.  Once it came to your attention that he was interested in

15  cooperating, were you asked to participate in the interview?

16  A.  Yes.

17  Q.  Could you describe just briefly what the word "proffer"

18  means?  I think that's a term the jury may be hearing quite

19  often in this case.

20  A.  Yeah.  Also referred to as having a *Kastigar* letter.  But

21  it's an agreement between the attorneys, the defendant, and the

22  investigator that an interview will be conducted.  And based

23  upon that interview, those words will not be used against the

24  individual as long as certain criteria are met, for example, as

25  long as the information provided is truthful and forthcoming.

1  Q.  So a proffer, is it your testimony, that that's basically

2  an interview under certain conditions?

3  A.  Yes.

4  Q.  And the conditions that you referenced include a *Kastigar*?

5  A.  Yes.

6  Q.  Is the *Kastigar* a letter agreement?

7  A.  Yes.

8  Q.  Have you had an occasion to review *Kastigar* agreements?

9  A.  Yes, I have.

10  Q.  And who prepares those?

11  A.  The AUSA assigned.

12  Q.  What is an AUSA?

13  A.  The Assistant United States Attorney assigned, like

14  yourself.

15  Q.  And is that an agreement between the Government and a

16  defendant regarding the terms of that interview?

17  A.  Yes, it is.

18  Q.  So when Mr. Pizzuti indicated that he wanted to proffer or

19  cooperate, did a *Kastigar* letter get contemplated or, you know,

20  was that addressed?

21  A.  To my recollection, it was.

22  Q.  Once you -- did you have occasion to sit down and talk with

23  Mr. Pizzuti?

24  A.  Yes.

25  Q.  And did you conduct a thorough interview of Mr. Pizzuti?

1    A.  There were a number of interviews conducted.

2    Q.  And so did you participate in any of those numerous

3    interviews?

4    A.  Yes.

5    Q.  And what is the purpose, from your perspective, of an

6    interview of someone who is interested in cooperating?  What

7    are you trying to achieve?

8    A.  It's, for lack of a better term, it's getting to know one

9    another, to understand what that individual can offer the

10   Government through their information:  What do they know, who

11   do they know, what have they been involved in.  It's an

12   information-gathering session.

13   Q.  And is it a passive information-gathering session?  Or is

14   there some active role that you play in receiving the

15   information?

16   A.  We take the information, and then, for example, if

17   information is provided, we'll elaborate to gain clarification,

18   to gain additional information.  And then we'll document it.

19   Q.  And after the information is obtained, do you conduct any

20   further investigation?

21   A.  Yes.

22   Q.  And what is the purpose of doing that?

23   A.  One, it could be used to corroborate the information

24   received, but two, it's used to further the investigation.

25   Q.  And what is the role of honesty in that agreement?

1  A.  My understanding is you have to be honest.  If you're not

2  honest within that agreement, then your words can be used

3  against you; that agreement becomes null and void.

4  Q.  Now, was that type of an agreement -- is that the type of

5  agreement that you're familiar with?

6  A.  Yes.

7  Q.  Is it fairly common?

8  A.  Yes.

9  Q.  So in January of 2007, or thereabouts, was that the

10  beginning of a relationship between the Government and Mr.

11  Pizzuti, to your knowledge?

12  A.  Yes.

13  Q.  And did you have a role in dealing with Mr. Pizzuti?  In

14  other words, once he had offered to cooperate, what was your

15  role with respect to Mr. Pizzuti?

16  A.  There are multiple agents assigned with cooperators, for

17  example.  I was the lead agent assigned.

18  Q.  So as the lead agent assigned to handle Mr. Pizzuti, what

19  did that mean for you?

20  A.  Well, just that I would be a primary point of contact to

21  receive information or to request information and then to

22  document.

23  Q.  Now, what were the different types of cooperation that an

24  individual like John Pizzuti can offer?

25          In other words, are there historical pieces of

1     information?  Current pieces of information?  What types of

2     information could someone like that offer the Government?

3     A.   Initially, it can be historical to start, the information

4     that surrounds the past, associations, events, things of that

5     nature.

6           It can move into the current time frame, what we refer

7     to as a "listening post."  By in current times listening, so

8     you can report on things that are upcoming or things that are

9     happening in current time.

10          It can also be proactive where we go out and use some

11    of that information and go on and, for example, do recordings

12    of meetings or phone calls, things of that nature.

13    Q.   Directing your attention to the term "historical," can you

14    be a little bit more descriptive about the types of information

15    that you would have sought for Mr., or did seek for Mr. Pizzuti

16    in this case?

17    A.   Beyond associations, specifically in here, with

18    associations with the Devils Diciples, members, chapters,

19    officers, activities that were ongoing within the Devils

20    Diciples.  I suppose I can give you an example?

21    Q.   Yes.

22    A.   I believe on one of the reportings, was back in 2004, Mr.

23    Pizzuti had reported that he was acquiring marijuana from a

24    member of the Devils Diciples for approximately $900 a pound.

25    That was historical, and it was specific information that we

1   would glean.

2   Q.  And what -- when you describe a listening post, can you be

3   a little bit more descriptive about what that entails?

4   A.  Yes.  Similar to what it sounds, basically being involved

5   as you overhear things, things that are upcoming.  Someone

6   discusses being engaged in a criminal act that's forthcoming,

7   you would be able to report that information because you've

8   heard it.

9            You're at a meeting and you overhear people

10  communicating about something, you're hearing that or acting as

11  the listening post, and you'll be able to report that

12  information.

13  Q.  And before we talk about the third category, did Mr.

14  Pizzuti provide information and was he a listening post?

15  A.  Yes.

16  Q.  So when he would provide you with information, can you

17  describe for the jury mechanically how that worked?

18  A.  Typically, I would take notes.  It would be a small

19  interview basically.  Mr. Pizzuti would contact me and provide

20  information.  I would take the information.  And then I would

21  elaborate on the information if it needed to be elaborated on,

22  more specifics about times or people involved, so I had a

23  better understanding, similar to an interview I would do with a

24  witness or somebody else.  I would then, within that day or a

25  few days, after document that in a report.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   Q.  So when you say that you would receive the information from

2   Mr. Pizzuti, was that done in person?  On the telephone?  In

3   some other way?

4   A.  Both.  Sometimes it would be on the telephone.  Sometimes

5   we would meet in person.

6   Q.  And when you would speak with him, whether in person or on

7   the telephone, and you indicated that you would elaborate, do

8   you mean that you would ask him further questions or ask him to

9   elaborate?

10  A.  Correct.  I would ask him further questions so that he

11  could elaborate on the information.

12  Q.  And once he provided you with information, what was your

13  next step?  Did you use that information?

14  A.  Yes.  And for an example, if it was for an upcoming

15  meeting, something that was relevant to an investigation we

16  were working on, we could make a decision on how we wanted to

17  respond, maybe to establish surveillance for that date and time

18  so we could identify people coming and going.

19  Q.  And over time, did those types of events occur?  In other

20  words, did you establish various surveillances or conduct other

21  follow-up?

22  A.  Yes.

23  Q.  And now I would like you to tell the jury what it means to

24  actively or proactively cooperate.

25  A.  Again, we covered historical and listening post, which is

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

```
 1  again providing information.  To be proactive, we would take it
 2  a step farther.
 3         So as a listening post, we would receive information
 4  that there was going to be a meeting in a week.  To be
 5  proactive, we would look to equip Mr. Pizzuti with a recording
 6  device so he would go in that meeting and record that meeting
 7  or record a meet with someone, or perhaps to purchase an item
 8  of evidence.
 9  Q.  And did he do that in this case?
10  A.  He did.
11  Q.  Did he record meetings?
12  A.  Yes.
13  Q.  And did he make purchases?
14  A.  Yes, he did.
15  Q.  And were you involved in most of those activities with him;
16  in other words, directing him?
17  A.  Yes.
18  Q.  Now, of those three types of cooperation, do all
19  cooperating defendants in your experience do all three?
20  A.  No.
21  Q.  And Mr. Pizzuti, was he able to successfully do all three?
22  A.  Yes.
23  Q.  Okay.  I want to direct your attention now about the
24  recordings that were made first.  You indicated that he made
25  several recordings; is that correct?
```

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

 1   A.  That's correct.

 2   Q.  And --

 3            MS. MOHSIN:  One moment, please, your Honor.

 4            (Brief pause.)

 5   BY MS. MOHSIN:

 6   Q.  Directing your attention to May the 15th of 2007.  Was a

 7   recording made on that date?

 8   A.  Yes.

 9   Q.  Can you briefly summarize the circumstances leading up to

10   that recording?

11   A.  If I recall, there was a pending case involving Mr.

12   Pizzuti, as we discussed earlier.  It was related to, I

13   believe, the February 19th, 2004 ATF searches amongst different

14   members of the Devils Diciples.

15            Leading up to that May 15th date, those associated

16   charges were being dismissed.  And Mr. Pizzuti was going to

17   travel with other members of the Devils Diciples to a service,

18   I believe a funeral service or wake.  We knew in advance that

19   they were going to get together around the time that these

20   charges were being dismissed.

21   Q.  And when you say he was going to get together, do you know

22   who he was supposed to get together with?

23   A.  Yes.

24   Q.  Who was that?

25   A.  It was Paul Darrah and Jeff Smith.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1    Q.   Were there others as well?

2    A.   Yes.   Previously, we didn't know who would be there.

3    Ultimately, it was Mr. Darrah and Mr. Smith and an individual

4    named "Rebel."

5    Q.   Is that a real name or nickname?

6    A.   I believe that was a nickname.

7    Q.   And how did you learn this meeting was going to occur?

8    A.   I believe Mr. Pizzuti had reported to me earlier that it

9    was going to occur; that he was going to be attending this.

10   Q.   And did it, in fact, occur?

11   A.   It did.

12   Q.   And did the FBI, and you in particular, take any steps in

13   anticipation of this meeting?

14   A.   Yes.

15   Q.   And what steps were taken, and why?

16   A.   We met with Mr. Pizzuti prior to, and were able to equip

17   him with a recording device that would record that meeting or

18   while they were traveling to that service.

19   Q.   I want to direct your attention for a moment on the

20   recording device.   Is that a device that Mr. Pizzuti had or is

21   that a device that was provided to him by the FBI?

22   A.   We provided the device.

23   Q.   And does he keep it or does he have to return it to you?

24   A.   He returns it.

25   Q.   Is the recording device something that's capable of being

1   turned on and off?

2   A.  It is, by us.  We do not show -- for example, I did not

3   show Mr. Pizzuti how to do that.  But yes, we can turn it on

4   and off.

5   Q.  And is it something that is difficult for him to be able to

6   do on his own?

7   A.  It's difficult for me sometimes, and I know how to do it.

8   Q.  Okay.  The recording device that you described, was that

9   provided to him prior to the meeting on May 15th?

10  A.  Yes.

11  Q.  And who turned it on, on that date?

12  A.  If I recall, I believe I did.

13  Q.  Okay.  Were you assisted or accompanied by other agents on

14  that occasion?

15  A.  Yes.  Any time we were going to go to a meeting or a

16  recording, there would be at least two agents.

17  Q.  And on that occasion, were you working with Special Agent

18  Fleming?

19  A.  I believe so, yes.

20  Q.  Prior to the meeting occurring, did you make special

21  arrangements to meet at a particular location with Mr. Pizzuti?

22  A.  Yes.

23  Q.  And tell the members of the jury about what procedure was

24  employed before he was sent to the meeting with the recording

25  device.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1    A.   Just general conversation.  I wanted Mr. Pizzuti to feel

2    comfortable.  One of the important things, provide him with a

3    recording device, discuss where it could be worn for best

4    reception, things of that nature, and then stress to Mr.

5    Pizzuti not to go beyond what would be normal.  For example, to

6    do something or to, that would be unusual, could draw

7    attention.  And from a safety standpoint, we didn't want to

8    draw attention.  Safety was more important.

9         So just to be normal, to be -- to conduct themselves

10   in a way that would be considered normal.  Nothing unusual.

11   Q.   Now, approximately how long was Mr. Pizzuti out of your

12   care, in other words, with this recording device?

13   A.   I don't recall the time frames.  It would have been

14   multiple hours.

15   Q.   So after you provided him with these instructions, do you

16   provide him with a recording device?

17   A.   Yes.

18   Q.   And then do you send him on his way?

19   A.   Yes.

20   Q.   What happens when he has completed this, this meeting or

21   trip that he was on?

22   A.   He would contact me by telephone and we would arrange to

23   meet again where we would collect the recorder, deactivate.

24   And then if there was time, we would debrief to gather

25   additional information about the recording.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1  Q.  And at some point, did you have an opportunity to review

2  the recording?

3  A.  I did.

4  Q.  And at some point, was a transcript prepared?

5  A.  Yes.

6  Q.  How many times would you say you've reviewed that

7  recording?

8  A.  Multiple times.  Two or three, maybe four.

9  Q.  Okay.  I want to direct your attention now to what's been

10  marked really as a Government's Exhibit R-1.

11       This is a CD containing multiple exhibits.  So I'm

12  going to ask you to keep it up there and identify one at a time

13  as we go through.

14  A.  Okay.

15  Q.  Are you familiar with what's been marked Government's

16  Exhibit R-1 through R-12?

17  A.  Yes.

18  Q.  And I want to direct your attention specifically to R-1

19  through R-6.  You had an opportunity to review the contents of

20  R-1 through R-6?

21  A.  Yes.

22  Q.  And are those recordings that were made during the course

23  of the investigation with John Pizzuti?

24  A.  They were.

25  Q.  And were transcripts prepared in connection with those six

1   recordings?

2   A.  Yes, they were.

3   Q.  And have you had an opportunity to review those

4   transcripts?

5   A.  I have.

6   Q.  Are they substantially accurate transcriptions of the

7   portions of the recordings that are at issue here?

8   A.  Yes.

9   Q.  Okay.

10          MS. MOHSIN:  Your Honor, the Government would offer

11   R-1 into evidence at this time.  And we would like to publish

12   it to the jury.

13          THE COURT:  Any additional questions that are sought

14   or any other matters?

15          Without any objection?  And I hear none, or do I?

16          MR. DALY:  Judge, we just have a standing objection

17   that we would --

18          THE COURT:  Standing, sure.  This is without waiving.

19          MR. DALY:  Yes.

20          THE COURT:  Many of these things have been earlier

21   discussed.

22          MR. DALY:  Right.

23          THE COURT:  Of course.

24          MR. DALY:  Thank you.

25          THE COURT:  And I don't mean to say anything to the

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

 1   contrary.

 2          MR. DALY:  Thank you.

 3          THE COURT:  With no present or new matters to be

 4   brought before the Courts -- Court, the exhibit is admissible,

 5   it is received in evidence.  And you may publish it to the

 6   jury.

 7      (Exhibit R-1 received, 11:27 a.m.)

 8          THE COURT:  With or without printed transcripts being

 9   proffered?

10          MS. MOHSIN:  It will be with the transcript.  I was

11   going to present that to him next.

12          THE COURT:  All right.

13          MS. MOHSIN:  Can I have a moment?  I want to make sure

14   our technical side is running.

15          THE COURT:  Why would you have a moment's doubt?

16          MS. MOHSIN:  I believe it is, your Honor.  I hope that

17   it is.

18   BY MS. MOHSIN:

19   Q.  I'm going to show you what's been marked Government's

20   Exhibit R-1A and ask you to identify it.

21          Tell the members of the jury what that is.

22   A.  It's a transcript of portions of that recording from

23   May 15th, 2007.

24   Q.  And again, is that a transcript that you have had an

25   opportunity to examine, if not prepare?

1    A.   Yes.  I've examined it.

2              MS. MOHSIN:  Your Honor, at this time we're going to

3    play this recording.

4              If there is a portion of the recording that we're

5    going to ask to pause, I may pause it during it and ask you for

6    further clarification.

7              THE COURT:  And you're going to display on the screen

8    the printed transcript?

9              MS. MOHSIN:  It will be a scrolling transcript with

10   the audio.

11             THE COURT:  Okay.  I'm going to need to tell the jury

12   how this works.

13             MS. MOHSIN:  Yes.

14             THE COURT:  Ladies and gentlemen, the way that these

15   things are received is as follows:

16             It is the recording itself that is the evidence, as

17   you hear it, as you interpret it.

18             A transcript that was produced, either by a law

19   enforcement officer or perhaps, perhaps secretarial or clerical

20   assistants in a law enforcement office or some other way, the

21   transcript is simply the product of somebody listening and

22   writing down what that person hears.

23             It is certainly to be made available to you.  It may

24   well assist you.  You may find it exactly spot on in every

25   respect.  On the other hand, there may be things that you hear

1    differently from time to time in various recordings.  And there

2    will be, I think, numerous recordings presented here.

3           My comments apply to all of them.  Whenever there is a

4    printed transcript offered, it is an aid to the jury.  It is

5    not evidence -- it is not the principal evidence in itself.

6    The recordings, what you decide is on the recording is the

7    evidence in the case.

8           Clearly understood?  All right.

9           Any additional comments you'd suggest I --

10          MS. MOHSIN:  Nothing.

11          THE COURT:  -- consider in that regard?

12          MS. MOHSIN:  No, your Honor.

13          THE COURT:  Or for anybody on the defense?  Have I

14   accurately stated the law properly?

15          I don't hear any additional suggestions.  So we'll

16   proceed on that basis.

17          Let's go ahead.

18          MS. MOHSIN:  Would you please publish R-1?

19      (11:30 a.m. - 11:31 a.m., publishing GX #R-1.)

20   BY MS. MOHSIN:

21   Q.  One thing we ought do is identify the speakers of this

22   call.  I think you talked about who he was going to speak to.

23          Can you please identify who is referred to in this

24   transcript, and by what initials?

25   A.  "JS" is Jeff Smith.  "PD" is Paul Darrah.

 1   Q.  And who is "CW"?

 2   A.  Cooperating witness, who is Mr. Pizzuti.

 3   Q.  And who is "R"?

 4   A.  "R" is Rebel.

 5   Q.  Okay.  Are there any others that are noted on that

 6   transcript?

 7   A.  I don't believe so.  I don't think so.

 8        MS. MOHSIN:  Okay.

 9      (11:32 a.m. - 11:34 a.m., publishing GX #R-1.)

10   BY MS. MOHSIN:

11   Q.  During that portion of the transcript, Special Agent

12   Opperman, do you have an opinion about what is being discussed,

13   the portion that was just played for the jury when the

14   individuals are talking about "Monkey"?  Do you know who that

15   person is?

16   A.  Yeah.  There's a former Devils Diciples member that went by

17   Monkey.  That was his club name.

18   Q.  And when they were talking about paperwork, do you have an

19   opinion about what is being referred to?

20   A.  Yeah.  Paperwork that identified him as cooperating at some

21   point during the investigation.

22   Q.  Okay.

23      (11:35 a.m., publishing GX #R-1.)

24   BY MS. MOHSIN:

25   Q.  After this recording, did the FBI record any other

1  communications?

2  A.  Yes.

3  Q.  I want to direct your attention now to August the 4th of

4  2007.  What occurred on that date?

5  A.  That was the Devils Diciples, I believe it was the steak

6  fry, one of their annual events at their Mount Clemens chapter

7  clubhouse.

8  Q.  And was something of significance going to occur with Mr.

9  Pizzuti on that date?

10  A.  Yes.

11  Q.  Can you tell the members of the jury what was planned for

12  that date, on the law enforcement end?

13  A.  It was planned that Mr. Pizzuti was going to approach a

14  Devils Diciple member, Vern Rich, club name "Vern," and attempt

15  to purchase methamphetamine from him.

16  Q.  Are you familiar with Vern Rich?

17  A.  I am.

18  Q.  Have you had opportunities to speak with him?

19  A.  Yes.

20       MS. MOHSIN:  Could you please publish 63-19 in

21  evidence?

22  BY MS. MOHSIN:

23  Q.  Can you identify the person in that photograph?

24  A.  It appears to be Vern Rich.

25  Q.  Okay.  Thank you.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1              And so the plan was to attempt to purchase drugs from

2    Vern Rich on that particular day?

3    A.   Yes.

4    Q.   Now, between May 15th of 2007 and August of 2007, is Mr.

5    Pizzuti still cooperating?

6    A.   Yes, he is.

7    Q.   Is he still providing information?

8    A.   Yes.

9    Q.   And is the information that he is providing, how does it

10   relate to Vern Rich?

11   A.   I don't recall if it was in that window, or if it was prior

12   to May, but it was during the time of cooperation, that Vern

13   Rich was a supplier or distributor of methamphetamine.

14   Q.   And that was the information that you were provided?

15   A.   Correct.

16   Q.   So what plan did you make with Mr. Pizzuti?

17   A.   That he was going to approach Vern Rich at this steak fry

18   or party and attempt to purchase methamphetamine for

19   approximately $500.

20   Q.   Was Mr. Pizzuti a user of methamphetamine, to your

21   knowledge?

22   A.   No.

23   Q.   Was he a drug user, to your knowledge?

24   A.   Yes.

25   Q.   Was it a drug other than methamphetamine?

1   A.  Yes.

2   Q.  So would it have been unusual for Mr. Pizzuti to request

3   meth from Vern Rich?

4   A.  Yes, it would.

5   Q.  Can you explain that to the jury?

6   A.  Explain how we handled that or --

7   Q.  How you handled that, yes.

8   A.  Yeah.  It would be unusual.  Again, we talked earlier that

9   Mr. Pizzuti, especially for his own safety, would have to act

10  normal; not to do anything that would be out of character.  He

11  advised he was not a methamphetamine user.  So we came up with

12  the idea that he was going to act as a middleman; that there

13  was a friend of his or an acquaintance he knew that was

14  attempting to purchase or acquire methamphetamine.  He was then

15  looking to acquire it for Mr. Rich so he could in turn sell it

16  to this other individual.

17  Q.  And in anticipation of purchasing the methamphetamine from

18  Mr. Rich, you indicated that you had a meeting with Mr.

19  Pizzuti; is that accurate?

20  A.  Correct.

21  Q.  What happened at that meeting?

22  A.  Prior to the purchase?

23  Q.  Yes.

24  A.  We went with Mr. Pizzuti and we covered these same facts,

25  the version of events he would use, what we call a "back

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN
115

```
 1   story."  We also provided him with money.  We provided him with

 2   $500 cash that he would use for the purchase of

 3   methamphetamine.

 4          We also provided him with a recording device.  We were

 5   able to activate that recording device and then provide it to

 6   him.

 7          In addition, during that meeting, we were able to

 8   search his person, and I believe it was his motorcycle, for any

 9   contraband prior to him leaving.

10   Q.  And did all of those things occur?

11   A.  They did.

12   Q.  And did you provide him with the money?

13   A.  Yes.

14   Q.  And what did he do after he received the money and the

15   recording device?

16   A.  He was on his way.

17   Q.  And did there come a time where he contacted you later?

18   A.  Yes.

19   Q.  And what, how did he contact you?  Was it on the telephone

20   or in person?

21   A.  He contacted me by telephone and advised that he did make

22   that methamphetamine purchase, and that we needed to get

23   together so we could secure it as evidence.

24   Q.  And did that occur?

25   A.  It did.
```

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

116

1   Q.  How did it occur?  Explain that to the jury, please.

2   A.  Mr. Pizzuti needed a reason to leave the function of the

3   party.  Again, it would be unusual to just up and leave.  I

4   believe the excuse he came up with was that he needed to get a

5   pack of cigarettes.

6           So when he departed the party to retrieve a pack of

7   cigarettes, we met with him very quickly.  He provided us a

8   Ziploc bag containing an off-white kind of a chunky substance

9   that he advised is what he secured.  We also secured the

10  recording device from him and secured that as well.  Very

11  quickly debriefed him, but it was quick because he had to get

12  back to the function.  He couldn't be away very long.  Searched

13  his person and bike and sent him on his way.

14  Q.  Now, I want to back up for a moment.  You indicated you

15  gave him $500 for the purchase of meth.

16  A.  Correct.

17  Q.  Did you give him money for any other purpose that day?

18  A.  Yes.

19  Q.  What was the, what was the amount of money and for what

20  purpose?

21  A.  We also gave him $100 cash.  We had information that there

22  would be the gambling machines at the clubhouse and that these

23  gambling machines accepted money and paid out money.  So he was

24  provided $100 to play the different gambling machines that

25  would be available at the party.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

117

1  Q.  And what was the purpose of having him play at the gambling

2  machines?

3  A.  Again, as part of the investigation into the illegal

4  gambling to show those machines actually did accept money and

5  take money from an individual; that they weren't just for

6  amusement.

7  Q.  In your career, have you come upon machines that were just

8  for amusement?

9  A.  Yeah.  I believe I have.  Yeah.

10  Q.  And so the purpose here was to see if the machines were not

11  for that purpose; is that correct?

12  A.  Correct.

13  Q.  Okay.  At some point, did you have a conversation with Mr.

14  Pizzuti about whether or not those funds, the $100, were

15  expended on those machines?

16  A.  Yes.

17  Q.  And did he indicate whether he had used them for that

18  purpose?

19  A.  Yes.  I believe he advised that there were four, maybe four

20  machines, two of which had bill acceptors, and the funds were

21  utilized on those machines.

22  Q.  The $100 you just referenced?

23  A.  Correct.

24  Q.  So after he meets with you to provide you with the drugs

25  and the recording device, you indicated that you secured the

1    recording device.

2         Did you do the same on the previous recording that we

3    talked about, R-1?  Was that also secured?

4    A.  It was, yes.

5    Q.  What's the procedure that you employ when you get a

6    recording device from a cooperator?

7    A.  Return it to the office in Macomb.  And we have a

8    designated computer system that we can download the recording

9    from the device onto CD's or computer disks.

10        We then take that computer disk and we forward it to

11   our ELSUR, which is electronic surveillance evidence in

12   Detroit, and they secure it there as evidence.  We are then

13   able to generate working copies that we can utilize during the

14   investigation.

15   Q.  And did that occur with all of the recordings in this case,

16   as they relate to Mr. Pizzuti?

17   A.  Yes.

18   Q.  And so when you met with Mr. Pizzuti and he gives you the

19   recording device and provides you with the meth that he had

20   purchased, did you listen to the recording right then and

21   there?

22   A.  No, not there in the vehicle.  No.

23   Q.  What did you do instead?

24   A.  Again, once we secure it, return it to the office, we have

25   to download the recorder.  So it's a process with the computer

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1  system to get a working copy that we can utilize.

2  Q.  But did you debrief Mr. Pizzuti at the time?  In other

3  words, when he hands you that recording device and he hands you

4  the drugs, do you have a conversation with him?

5  A.  We do, but very briefly.  Again, he was only supposed to be

6  out to get a pack of cigarettes.  He needed to get back to the

7  party.  An extended debrief would have been way longer than

8  what would have been required to obtain the cigarettes.  So we

9  were going to debrief a little bit later.

10  Q.  And did you debrief a little bit later about what had

11  occurred?

12  A.  Yes.

13  Q.  Was there -- did the plan go as planned?  Or was there

14  something that had happened during the course of this steak fry

15  that was different?

16  A.  No.  It went as planned, for the most part.

17  Q.  And what did he tell you about what occurred while he was

18  gone?

19  A.  That he had approached Vern Rich at the party, and he

20  relayed the information that he did have a friend that was

21  seeking methamphetamine and he wanted to purchase

22  methamphetamine.

23  Q.  And did he purchase the methamphetamine from Vern Rich or

24  from another person?

25  A.  Vern Rich directed him that an individual by the name of

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1  Gun Control would approach him and give him the methamphetamine

2  and then collect the money from him.

3  Q.  And did Mr. Pizzuti report that occurred?

4  A.  He did.

5  Q.  And did you have an opportunity to listen to a recording

6  later on?

7  A.  Yes.

8  Q.  And during the course of the recording, what did you learn

9  about how the transaction occurred?

10  A.  Um --

11  Q.  In other words, did he have a conversation with Vern Rich

12  on the recording?

13  A.  He did.

14  Q.  And did he also have a conversation with, with Gun Control,

15  or the person he identified as Gun Control?

16  A.  He did.

17  Q.  And was there conversation about the meth transaction

18  during both portions of -- you know, in other words, was there

19  conversation with Vern and with Gun Control about the

20  methamphetamine?

21  A.  There was a conversation with Vern Rich that was in regards

22  to the methamphetamine and the pricing.  The conversation that

23  occurred with Gun Control, there was no conversation regarding

24  meth.  The conversation, if I recall, was regarding a

25  motorcycle or brakes or something along those lines.

1   Q.  So how did you know that that was the conversation that

2   took place when the transaction occurred?

3   A.  During the debrief, without letting Mr. Pizzuti hear the

4   recording, we had asked him what was the conversation that you

5   had had, or that he had had with Gun Control at the time the

6   meth and money was exchanged.  And he advised that there was

7   something to do with oil and saddle bags and affecting the

8   brakes of Gun Control's motorcycle.  And we were able to

9   identify that portion within the recording.

10  Q.  So he told you that before listening to the recording?

11  A.  He, he advised that without listening to the recording.

12  Q.  And was that also before you listened to the recording?

13  A.  No.  I believe I listened to it all the way through at one

14  point and then was looking for clarification.

15  Q.  So you indicated that he provided you with a package

16  containing methamphetamine as well.  What did you do with the

17  methamphetamine?

18  A.  It was secured as evidence so that it could be later

19  processed by a laboratory.

20  Q.  Okay.  I'm going to show you what's been marked

21  Government's Exhibit 27-1.

22          Have you had an opportunity to look at the proposed

23  exhibit?

24  A.  Yes.

25  Q.  Can you tell me what that is?

1   A.   This is our packaging, the larger what we call a K-pack bag

2   with our FBI evidence seal.  On the evidence seal, it indicates

3   the date of seizure as August 4th of 2007.  My name is the

4   witnessing name and signature.  Agent Fleming is the sealing

5   name and signature.

6        Contained within the K-pack bag are two different

7   bags, the Ziploc plastic bag that the methamphetamine was

8   received in initially, and then a separate bag here, I believe

9   that after the lab had separated them out for testing purposes.

10  Q.   So based upon the markings on the proposed exhibit, are

11  those the drugs that Mr. Pizzuti provided to you on August the

12  4th of 2007?

13  A.   Yes.

14       MS. MOHSIN:  The Government offers Exhibit 27-1 into

15  evidence.

16       THE COURT:  Hearing no objections, 27-1 is received.

17       (Exhibit 27-1 received, 11:47 a.m.)

18  BY MS. MOHSIN:

19  Q.   You made a reference to the exhibit being sent to the lab.

20  Can you elaborate for the jury?

21  A.   Drug evidence is consistently sent to a laboratory for

22  analysis.  Though we believe it's methamphetamine when we

23  acquired it, again, we still rely on a laboratory to do the

24  analysis of that and provide a report.

25  Q.   And was that the case in this instance?  In other words,

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1  were those drugs submitted to a laboratory for testing?

2  A.  I believe so, yes.

3  Q.  Okay.  When you obtained Government's Exhibit 27-1 from Mr.

4  Pizzuti, did it look like that or was it different in some way?

5  Can you be specific and show that to the jury?

6  A.  Yeah.  It was just contained within a Ziploc sandwich

7  baggie, one you put your sandwich in.  And then it contained

8  the, like I said, the off-white chunky, crystal-type material.

9  Q.  I'm going to show you what's been previously marked as

10 proposed Exhibits 27-2 and 27-3.

11       Could you please describe what proposed Exhibits 27-2

12 and 27-3 depict?

13 A.  It's a photograph of the evidence we acquired that day.

14 It's a Ziploc sandwich-type bag with the off-white chunky

15 substance.

16       Above it is a placard, a piece of paper we'll write

17 the case number, the date, the buy number, and the recording

18 number.

19 Q.  Were those photographs taken after you seized the meth from

20 Mr. Pizzuti on the day that they were obtained?

21 A.  Yes.

22 Q.  So that was August the 4th of 2007?

23 A.  I believe so.  The photographs could have been taken the

24 following day.  The evidence can be secured in the safe, and

25 then prior to the lab, being sent to the lab for analysis.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1    Q.  Okay.

2         MS. MOHSIN:  The Government offers proposed exhibits

3    27-2 and 27-3 in evidence.

4         MS. STOUT:  No objection.

5         MS. MOHSIN:  Okay.  Would you --

6         THE COURT:  All right.  Proceed.

7       (Exhibit 27-2 and 27-3 received, 11:50 a.m.)

8         MS. MOHSIN:  Would you please publish 27-2?

9    BY MS. MOHSIN:

10   Q.  And could you just describe that for the jury so they can

11   understand?

12   A.  Again, it's the same photograph I have here.  It's a Ziploc

13   sandwich bag.  Contained in the bottom right-hand corner is

14   that off-white, kind of a crystal or chunky substance.  The

15   piece of paper I referenced is above the Ziploc bag.  It has

16   the case number, the date and a recording and a buy number.

17   Q.  And approximately how much methamphetamine was contemplated

18   for the $500 that was expended?

19   A.  It was approximately 9 grams.

20   Q.  And does that represent approximately 9 grams, to your

21   understanding?

22   A.  Yes.

23         MS. MOHSIN:  Would you please publish 27-3?

24   BY MS. MOHSIN:

25   Q.  Is that another photo of the same exhibit?

1  A.  Yes, it is.

2  Q.  Okay.  Thank you.

3       You indicated that this particular transaction was

4  recorded.  Have you had an opportunity to examine the

5  recording?

6  A.  I have.

7  Q.  And was a transcription prepared?

8  A.  Yes.

9  Q.  By you, or reviewed by you?

10  A.  I know I've reviewed it.  I may have prepared it.  I don't

11  recall.

12  Q.  Is the transcription that you've reviewed substantially

13  accurate?

14  A.  Yes.

15  Q.  I'm going to show you what's been marked as proposed

16  Exhibit R-2A.  If you can please describe what this is.

17  A.  This is a transcript of that event on August 4th, 2007.

18       MS. MOHSIN:  Your Honor, the Government would offer

19  the recording R-2, accompanied by a transcription that would be

20  played on the screen, similar to the last recording, in

21  evidence.

22       THE COURT:  As before, the recording is received.  The

23  transcript is advisory and you may proceed.

24       MS. MOHSIN:  Thank you, your Honor.

25       Would you please publish this?  And before you press

1    play, if you could put it up on the screen before you press

2    play?

3    BY MS. MOHSIN:

4    Q.  Who are the individual speakers in this particular call?

5    A.  In this meet?

6    Q.  This particular meeting, yes.

7    A.  "CW" is, again, a cooperating witness, which is Mr.

8    Pizzuti.  "VR" is Vernon Rich.  Those are the only initials I

9    see there.

10   Q.  Is there a "CV" in addition?

11   A.  At the top it does say "CV," Cary Vandiver.  And then "UF"

12   for unknown female.

13        MS. MOHSIN:  Okay.  Would you please play the

14   recording?

15        (11:53 a.m. - 11:56 a.m., publishing GX #R-2.)

16   BY MS. MOHSIN:

17   Q.  The first portion of that recording that was played, what

18   is your understanding about who the speakers are?

19   A.  Vern Rich, "VR" and John Pizzuti.

20   Q.  Now, at this portion of the recording, is this where Mr.

21   Pizzuti is no longer with Mr. Rich?

22   A.  At this part?

23   Q.  Yes.

24   A.  Correct.  At this part, I believe, I believe this is a

25   phone call that Mr. Pizzuti is making at this point.

1   Q.  All right.  And can you tell the jury a little bit about

2   that?

3   A.  I'd have to see it to review it.  I don't know if you want

4   me to --

5   Q.  Do you want to listen to it more?

6   A.  -- listen to it first?

7   Q.  Okay.

8   A.  Or I can view the transcript first.

9   Q.  Just let me know when to pause it.

10          (11:57 a.m., publishing GX #R-2.)

11  BY MS. MOHSIN:

12  Q.  Can you explain what's going on?

13  A.  Again, Mr. Pizzuti had acquired the methamphetamine at this

14  point.  He was calling me on the phone to let me know and

15  briefly describing the incident on the phone so we can make an

16  arrangement so we can secure that and the recording device from

17  him.

18  Q.  So this portion of the tape is him making a phone call to

19  you?

20  A.  Correct.

21  Q.  And on the other end of the line, do you have a

22  recollection of it being you who he's talking to?

23  A.  Yes.

24  Q.  Okay.

25          THE COURT:  Before you, before you hit the play

1    button, let's just take a 60-second stretch break.  Stretch

2    your legs, folks.

3            (Brief pause.)

4            THE COURT:  Back in session.  And proceed.

5            MS. MOHSIN:  Would you please continue the recording?

6            (11:59 a.m., GX #R-2 published to the jury.)

7    BY MS. MOHSIN:

8    Q.  So the first part of that recording, what did that

9    represent, so that the jury is clear?

10   A.  The first part between?

11   Q.  Vern Rich and the cooperating witness.

12   A.  It was the negotiation for the purchase of methamphetamine.

13   Q.  And after the, the negotiation is completed, is there a

14   portion of that, that reflects when he, when the cooperating

15   witness met with Gun Control?

16   A.  Not within that transcript, no.

17   Q.  And at the conclusion of it, is there a communication with

18   you about the purchase?

19   A.  Yes.

20   Q.  And what happens after that conversation that Mr. Pizzuti

21   has with you?

22   A.  We then arrange to meet, and things we discussed earlier.

23   We meet and I secure the methamphetamine from him, as well as

24   the recording device so they can both be secured into evidence.

25   Q.  Okay.  Did you have occasion to make a second purchase of

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   controlled substances?

2   A.  Yes.

3   Q.  And can you tell the members of the jury about that

4   particular purchase, the events leading up to it, in

5   particular?

6   A.  I believe it was September 1st of the same year, 2007, that

7   Mr. Pizzuti was at a service, I believe it was a memorial

8   service for another Devils Diciple member, when he had an

9   opportunity to speak with Mr. Rich and informed him that he was

10  looking to conduct a second transaction for possibly as much as

11  a thousand dollars.  They agreed they would talk later in the

12  week via telephone.  And I believe it was September 5th, in the

13  evening, 2007, that we made arrangements to place a telephone

14  call to Vern Rich from Mr. Pizzuti, and that we recorded that

15  telephone conversation.

16  Q.  And when that recording occurred, did that occur in your

17  presence?

18  A.  It did.

19  Q.  And was the recording device in your care and custody?

20  A.  It was.

21  Q.  And was that recording device, or that recording downloaded

22  as you described with the earlier recordings?

23  A.  Yes.

24  Q.  And was it also secured in evidence?

25  A.  It was.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

130

1   Q.  Have you had an opportunity to review that recording?

2   A.  I have.

3   Q.  And was a transcript prepared?

4   A.  It was.

5   Q.  Have you had an opportunity to review that transcript?

6   A.  Yes.

7   Q.  And is it substantially accurate?

8   A.  Yes.

9   Q.  Okay.  I'm going to identify for you what has been marked

10  as a proposed exhibit, R-3A.

11         Can you tell the members of the jury what R-3A is?

12  A.  It is a transcript related to the September 5th, 2007

13  telephone call between Mr. Pizzuti and Mr. Rich.

14  Q.  And does proposed Exhibit R-3A correspond to proposed

15  Exhibit R-3, which is the recording?

16  A.  Yes.

17  Q.  Okay.

18         MS. MOHSIN:  The Government would offer R-3 in

19  evidence.

20         THE COURT:  And I hear no additional comments or

21  objections.  As before, the transcript is advisory.  The

22  exhibit is received, R-3.

23     (Exhibit R-3 received, 12:03 p.m.)

24  BY MS. MOHSIN:

25  Q.  Special Agent Opperman, what's the purpose of this phone

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   call?

2   A.   Again, they had the discussion earlier in the week that

3   they would call later in the week to arrange a second purchase

4   of methamphetamine.  And this call was to make that

5   arrangement.

6   Q.   Who are the parties to this particular call?  Who is

7   talking in this communication?

8   A.   "VR" again, is Vern Rich.  "CW," cooperating witness, again

9   is John Pizzuti.

10  Q.   And who placed the call?

11  A.   John Pizzuti placed the call to Vern Rich.

12           MS. MOHSIN:  Okay.  Would you please publish R-3?

13       (12:04 p.m. - 12:08 p.m., GX #R-3 published to the jury.)

14  BY MS. MOHSIN:

15  Q.   Based upon this communication, what is your understanding

16  -- what is your understanding about what's going to occur after

17  this telephone call?

18  A.   The following day, they are supposed to have telephone

19  contact, at which point in time they'll arrange to meet, where

20  Vern Rich will provide $1,000 worth of methamphetamine to John

21  Pizzuti.

22  Q.   And does that occur?

23  A.   The methamphetamine is provided to John Pizzuti, but

24  indirectly.

25  Q.   Can you please explain that to the jury?

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   A.  Yes.  I was contacted the following day, I believe it was

2   September 6th, 2007, by Mr. Pizzuti.  We met.  He advised me he

3   received a telephone call that morning, approximately 9:30,

4   from Paul Darrah.

5        Paul Darrah advised Mr. Pizzuti that Vern Rich dropped

6   off the item that Mr. Pizzuti was looking for.  And Mr. Darrah

7   explained that they would get together that day and take care

8   of it.

9        At approximating five o'clock p.m. that evening, Mr.

10  Darrah, Jeff Smith, Cary Vandiver, and I believe two other

11  individuals traveled to John Pizzuti's shop.  I believe they

12  were going to work on a vehicle.

13  Q.  Now, Mr. Darrah, Mr. Smith, and you said Cary Vandiver?

14  A.  Yes.

15  Q.  Do you see them in the courtroom here today?

16  A.  Yes.

17  Q.  Can you identify them, please?

18  A.  I can.  Mr. Darrah is sitting on the far right with the

19  brown jacket.

20       Mr. Vandarrah, or Vandiver, is sitting second from the

21  left with the gray shirt.

22       Mr. Smith is sitting third from the left with a tan or

23  oatmeal-colored shirt.

24       MS. MOHSIN:  Identifying the defendants, your Honor,

25  for the record.

1    BY MS. MOHSIN:

2    Q.  You indicated that these individuals arrived at JP's shop

3    or John Pizzuti's shop.

4           By the way, does John Pizzuti have a nickname?

5    A.  Yes.  It's "JP."

6    Q.  Is that a name that's used in the Devils Diciples, to your

7    knowledge, to refer to him?

8    A.  Yes.

9    Q.  Okay.  So these individuals traveled to Mr. Pizzuti's house

10   or shop?  Where is that located?

11   A.  It's in, I believe it's Shelby.

12   Q.  Shelby Township?

13   A.  Shelby Township, yes.

14   Q.  Okay.  So after Mr. Pizzuti advises you that there's going

15   to be another party involved, what do you do?

16   A.  Well, again, we meet and we're being debriefed.  Mr.

17   Pizzuti was always advised that if something like this were to

18   occur, his response is simple:  I don't have the money with me.

19   I have to go and get the money.  Which would provide us time to

20   meet with him, to equip him with the recording device, as well

21   as to provide the money necessary.

22   Q.  So, "if something like this were to occur," what do you

23   mean by that?

24   A.  Meaning something unexpected.  You know, I don't believe we

25   anticipated this, Mr. Darrah calling, saying that he had the

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   methamphetamine that morning and he was going to provide it.

2   Q.  So on September the 6th of 2007, after you learned that Mr.

3   Darrah was going to be meeting with Mr. Pizzuti later that day,

4   did you have a meeting with Mr. Pizzuti to provide him with

5   money and other items?

6   A.  Yes.

7   Q.  Can you describe approximately how that meeting went down,

8   how it took place?

9   A.  Right.  We met with Mr. Pizzuti.  Again, we searched his

10  person and vehicle quickly for any kind of contraband, provided

11  him with $1,000, I believe it was, cash, for the purchase.  We

12  also supplied him with additional funds, I think it was $300

13  separate from the transaction that was supposed to be utilized

14  for club dues that were owed.

15          We equipped Mr. Pizzuti with a recording device placed

16  on his person, and then he traveled back to his residence or

17  shop.

18  Q.  Now, you indicated that you provided him with $1,000 and

19  that you also provided him with money for club dues.  What was

20  the total amount that you provided him with?

21  A.  $1,300.

22  Q.  And of that 1,300, you indicated that 300 was for club

23  dues.  Can you explain why he needed $300 for club dues?

24  A.  Yes.  Devils Diciples members pay club dues, I think it's

25  weekly dues, that are paid back to the organization.  Since Mr.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1    Pizzuti's cooperation began, I believe in January of '07, part

2    of that cooperation was contingent upon being a member for

3    access and things of that nature.  So those dues were adding up

4    and he was, I believe, in arrears with those dues.  So we

5    secured $300 to be used to pay those dues.

6    Q.   Okay.  Now, on September the 6th of 2007, after you provide

7    him with the money, did you also provide him with the recording

8    device?

9    A.   Yes.

10   Q.   And did you send him on his way?

11   A.   Yes.

12   Q.   What occurs after you send him on his way?  Did he contact

13   you?

14   A.   Yes.

15   Q.   And can you describe that for the jury?

16   A.   He contacts me and then we arrange to meet, as with the

17   first transaction.  We meet.  He then provides the

18   methamphetamine to me.  It was contained in a sandwich-type

19   bag, balled up, round up in a ball, placed in a Marlboro

20   cigarette box.  He also provided me with the recorder, which

21   was deactivated.  Both items were secured as for evidence and

22   he was debriefed.

23   Q.   And when you say that he provided you with the drugs on

24   that occasion, approximately how much in quantity of drugs-wise

25   would you estimate was contained in that second purchase?

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   A.  It was approximately 12 grams.

2   Q.  Okay.  And what did you do with the recording device and

3   the drugs?

4   A.  Secured them both for evidence.  The recording device, as

5   with the first recording, was taken back to the office,

6   downloaded, and secured a copy in ELSUR evidence, and created a

7   working copy.  The drugs were also secured as evidence, later

8   to be provided to a laboratory for analysis.

9   Q.  I'm going to show you a proposed Exhibit 28-1.  Do you

10  recognize this proposed exhibit?

11  A.  I do.

12  Q.  Can you tell the members of the jury what it is?

13  A.  Again, this is one of our packaging, we call them K-pack

14  bags.  It contains the FBI evidence sticker.  On the inside of

15  this bag has been resealed from the lab after analysis.  On the

16  sticker, it has the date of seizure, and sealing, sealing

17  officials, printed name, myself with the signature.  The

18  witnessing agent was Bill Fleming.  And again, it contains a

19  small Ziploc package inside containing an off-white colored

20  crystal-like substance.

21  Q.  And were those the -- or was that the package that was

22  provided to you by Mr. Pizzuti on September the 6th of 2007?

23  A.  Correct.  Contained within here -- again, there's multiple

24  bags returned from the lab -- it was a sandwich bag that was

25  balled up and placed in the box.  But this has the sticker and

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1    stuff.

2    Q.  And was that particular quantity of drugs contained inside

3    of anything on that particular day?  In other words, was it

4    packaged in another box?

5    A.  Correct.

6    Q.  What type of box was it?

7    A.  A Marlboro cigarette box.

8    Q.  Okay.  Is that Marlboro box contained in that exhibit?

9    A.  No.  I don't see it.

10   Q.  All right.

11          MS. MOHSIN:  The Government offers 28-1 into evidence.

12          THE COURT:  Without objection, the same is received.

13      (Exhibit 28-1 received, 12:16 p.m.)

14          THE COURT:  28-1, correct?

15          MS. MOHSIN:  Yes, your Honor.  28-1.

16   BY MS. MOHSIN:

17   Q.  I'm going to draw your attention to what has been

18   previously marked as proposed Government's Exhibits 28-4, 28-5,

19   and 28 -- I apologize.  28-4 and 28-5.

20          Would you please describe what's depicted in those two

21   proposed exhibits?

22   A.  The first, 28-4, there is a, it's a ball, balled up in a

23   plastic bag, appears to be twisted or knotted, that is the

24   methamphetamine.

25          To its left is a Marlboro cigarette box, which is what

1    that ball was placed in.  The paper underneath for photographic

2    purposes, you can see the date, September 6th, 2007.  William

3    Fleming's initials, and listed as buy number 2.

4              In the second photo, 28-5, it's a photograph of the

5    cigarette box, the other side of it.  And it does not contain

6    the methamphetamine in that photo.

7    Q.  And were those photographs taken before the drugs contained

8    in Government's Exhibit 28-1 were analyzed by the laboratory?

9    A.  Yes.

10   Q.  So is that what they looked like when Mr. Pizzuti provided

11   them to you?

12   A.  Yes.

13   Q.  On September, on September 6th?

14   A.  Yes.

15             MS. MOHSIN:  The Government offers 28-4 and 28-5 in

16   evidence.

17             MS. STOUT:  No objection.

18             THE COURT:  Without objection?  None is heard.  And

19   the items are received.

20        (Exhibit 28-4 and 28-5 received, 12:18 p.m.)

21             MS. MOHSIN:  Could you please publish 28-4?

22   BY MS. MOHSIN:

23   Q.  Okay.  Can you explain that for the jury, briefly?

24   A.  Yes.  That's the photograph.  You'll see to the right is

25   the methamphetamine.  It's about the size of a bouncing rubber

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1    ball.  It's in a plastic bag twisted to the top.  To its left

2    is the Marlboro cigarette box that that ball was contained in.

3    And you can see underneath is the piece of paper that I

4    described with the date, initials in the upper left-hand corner

5    indicating buy number 2.

6    Q.  Thank you.  28-5, please?

7    A.  This is the same cigarette box flipped over, the back side.

8    And again, this photograph doesn't contain the methamphetamine

9    in it.

10   Q.  Okay.  Thank you.

11        Now, you indicated that this particular buy on

12   September the 6th of 2007, that there was also a recording.

13   Have you had an opportunity to examine the recording?

14   A.  I have.

15   Q.  And was a transcript prepared and reviewed by you?

16   A.  Yes.

17   Q.  And have you had an opportunity -- withdrawn.

18        I'm going to show you what's been previously marked as

19   proposed Exhibit R-4A.  Would you please tell the Court what

20   that document is?

21   A.  It is a transcript dated September 6th, 2007.  It was the

22   meeting between Mr. Darrah and John Pizzuti.  The initials that

23   you'll see on the transcript are "PD" for Paul Darrah, "CW" for

24   cooperating witness, which is John Pizzuti.

25   Q.  Is that transcript substantially accurate?

1  A.  Yes.

2  Q.  Does that transcript correspond to proposed Exhibit R-4?

3  A.  It does.

4       MS. MOHSIN:  The Government offers R-4 in evidence to

5  be played in conjunction with R-4A, the transcript.

6       THE COURT:  And hearing no further comment or

7  objection, it is received.  And you may proceed.

8       MS. MOHSIN:  Thank you, your Honor.

9       Would you please publish R-4?

10     (12:20 p.m., GX #R-4 published to the jury.)

11 BY MS. MOHSIN:

12 Q.  After that recording was made and admitted into evidence,

13 were there additional recordings that occurred with Mr.

14 Pizzuti?

15 A.  Yes.

16 Q.  And did you participate in a third controlled buy?

17 A.  I did not.

18 Q.  I want to direct your attention, though, to additional

19 cooperation by Mr. Pizzuti.  To your knowledge, how many

20 controlled purchases did he make of methamphetamine on behalf

21 of this investigation?

22 A.  Three.

23 Q.  And other than those three controlled purchases, did he

24 continue to act as a listening post?

25 A.  He did.

2:11-cr-20129-RHC-MAR  Doc # 1072  Filed 11/01/14  Pg 141 of 296  Pg ID 5741
JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

141

1  Q.  And did he continue to cooperate?

2  A.  He did.

3  Q.  Did there come a time where Mr. Pizzuti advised you about

4  his Vicodin use?

5  A.  Yes.

6  Q.  Can you tell the members of the jury about that?

7  A.  I believe we understood that, that Mr. Pizzuti was possibly

8  obtaining Vicodin from Paul Darrah.

9  Q.  Okay.  And was he -- did he bring that to your attention

10  initially or is that something that you asked him about later?

11  A.  We asked him about it later.

12  Q.  Okay.  And can you tell the members of the jury about that?

13  How did that arise and why did you ask him about it later?

14  A.  Again, I believe it came to our attention that he was

15  possibly obtaining Vicodin from Paul Darrah.  It was an

16  associated investigation for him down the road at a later date.

17  And we broached it with Mr. Pizzuti and we asked him -- we

18  could not divulge how we had learned about it, we couldn't

19  reveal the sources of information.  And I think Mr. Pizzuti

20  initially denied that he obtained Vicodin, or at least

21  minimized his participation with that.

22  Q.  Okay.  And did that all occur after the third controlled

23  buy in this case?

24  A.  Yes.  It didn't occur until 2008.

25  Q.  So when was the third controlled buy, to your knowledge?

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1    A.  I believe it was October 26th of 2007.

2    Q.  Okay.  Now, in this particular case, were wires -- was

3    wiretap evidence used?

4    A.  Yes.

5    Q.  And was there a court-authorized wiretap on one phone or

6    more than one phone, to your knowledge?

7    A.  There were two phones.

8    Q.  Okay.  I want to direct your attention now to what the word

9    "wiretap" is.  Are you familiar with that term?

10   A.  I am.

11   Q.  Okay.  Does it go by another name as well in law

12   enforcement vernacular?

13   A.  We call it a Title III.

14   Q.  And what is a Title III or a wiretap?

15   A.  Simply, it's the court-ordered interception of telephone

16   communications in real time.

17   Q.  Have you, during your career, worked on investigations that

18   use wiretaps as an investigative tool?

19   A.  Yes.

20   Q.  Approximately how many times?

21   A.  To date, approximately four occasions.

22   Q.  Now, when someone's phone is being wiretapped in real time,

23   are there recordings that are made of the communications?

24   A.  There are.

25   Q.  And are those recordings that are made preserved in any

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   way?

2   A.   They are.

3   Q.   Okay.  We're going to talk a little bit about that, but

4   let's talk about how you get a wiretap in the first place.

5           If an agent wants, like yourself, wants to put a

6   wiretap on someone's phone, can you do that because you suspect

7   that person of committing a crime?

8   A.   No, we can't.

9   Q.   Okay.  What about a case?  Do you begin a case with a

10  wiretap?

11  A.   No.  It's more of the last investigative tool that we would

12  utilize.

13  Q.   Now, when you say that you would not just put a wiretap on

14  a phone, is there a procedure that you have to follow?

15  A.   Yes.

16  Q.   And are there certain steps that you have to take before

17  you can get a wiretap?

18  A.   Yes.

19  Q.   By the way, how does a wiretap get authorized?  Is that

20  something that is done within an agency or outside of that

21  agency?

22  A.   The ultimate authority?

23  Q.   Yes.

24  A.   Ultimately, it's a decision made by a federal judge.

25  Q.   Okay.  So prior to making or, or applying for a wiretap,

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   what type of things do you typically do, and, you know,

2   investigatively?

3   A.  We refer to them as less intrusive methods.  For example,

4   an investigation, we may start with reviewing police reports

5   about events that have occurred surrounding the investigation.

6           MS. STOUT:  I'm going to object to the relevance of

7   this, your Honor.

8           THE COURT:  I'm satisfied it is relevant.  Go ahead.

9           MS. MOHSIN:  Thank you, your Honor.

10          THE WITNESS:  In addition, we'll conduct telephone

11  analysis.  You know, if we have a target telephone that we

12  intend to seek a Title III for, we'll look at the analysis of

13  that phone, who is that phone in contact with, how often are

14  they in contact.  We'll conduct surveillance throughout the

15  investigation.  We'll look to develop informants or cooperating

16  witnesses that provide information.

17          We would then go and, of course, attempt to do

18  recordings, whether it's purchasing evidence, telephones,

19  meetings.  All this leading up to a potential Title III.

20  BY MS. MOHSIN:

21  Q.  And is a Title III or wiretap done in every case?

22  A.  No.

23  Q.  So you indicated that you've worked on four to date; is

24  that true?

25  A.  Correct.

1  Q.  And that includes the wiretaps in this particular case; is

2  that true?

3  A.  That's correct.

4  Q.  Okay.  Now, mechanically, when you, when you decide that

5  you want to obtain a wiretap, and you've gone through all of

6  these other avenues of investigation, how do you make a

7  presentation to a judge?

8          MS. STOUT:  Objection.  Relevance and 403, your Honor.

9          MR. DALY:  May I just join in, too, that this is not

10  an issue, Judge.  It is a legal matter.  I would object.

11          THE COURT:  It is.  But it seems to me it could be

12  explained by the Court; it could be explained by counsel.  I

13  think it is sufficiently relevant for background, for a citizen

14  jury's understanding of the Title III process, which is complex

15  to say the least.

16          Overruled.  Proceed.

17  BY MS. MOHSIN:

18  Q.  Does an agent such as yourself present an affidavit or an

19  application to a judge?

20  A.  Yes.

21  Q.  And is that provided to a judge, along with an affidavit?

22  A.  Yes.

23  Q.  And if the Court determines that a wiretap should be

24  authorized under the law, is an order issued?

25  A.  Yes, it is.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   Q.   And when you obtain an order for a wiretap, what do you do

2   with a document like that?

3   A.   If the order is approved and received, we work with our

4   technical agents at the FBI.  They would provide that order to

5   the associated cellular telephone company.  They would work

6   with that telephone company so that intercept could begin.

7   Q.   So there are a number of steps that you would have to take;

8   is that a fair statement?

9   A.   Yes.

10  Q.   I want to direct your attention to this particular case.

11  You indicated that you engaged in a number of different types

12  of activities.  Did you review police reports before any

13  wiretap applications were proposed to a federal judge in this

14  case?

15  A.   Myself or fellow agents, investigators, yes.

16  Q.   And did yourself and fellow agents conduct surveillances?

17  A.   Yes.

18  Q.   And did yourself and fellow agents interview witnesses or

19  cooperators?

20  A.   Yes.

21  Q.   Did yourself and fellow agents participate in the execution

22  of search warrants?

23  A.   Yes.

24  Q.   Did yourself and fellow agents, as you just testified, also

25  make controlled purchases?

1    A.  Yes.

2    Q.  Now, all of those things, did they occur before an

3    application was made for a wiretap in this particular case?

4    A.  They did.

5    Q.  Now, what was the first wiretap that was requested?  Whose

6    phone was that for?

7    A.  It was for Vern Rich.

8    Q.  And that was the individual that you have been testifying

9    about in some detail this morning?

10   A.  Yes.

11   Q.  Okay.  When you're talking about a wiretap for Vern Rich's

12   phone, are you talking about a wiretap for a telephone or some

13   other type of communication?

14   A.  It's a cellular telephone.

15   Q.  And are there wiretaps for other types of communications?

16   A.  Yes.

17   Q.  What types of communications could you do a wiretap on?

18   A.  I believe the key is real-time.  So for example, if you

19   could intercept real-time e-mails, or text messages, you could

20   real-time intercept communications in a room.

21   Q.  Okay.  But in this case, specifically when we're talking

22   about Vern Rich, we're talking about a telephone?

23   A.  Yes.

24   Q.  Not e-mails or texts, correct?

25   A.  Correct.  And this telephone, it also had the capability of

1   the walkie-talkie-type feature, push-to-talk.  It was a Sprint

2   Nextel phone that was popular in 2007.

3   Q.  Now, is a -- when a wiretap order is issued by a judge, are

4   there limitations on the way in which interceptions can occur,

5   in other words, what you can and cannot listen to?

6   A.  Yes.

7   Q.  And are there limitations on the parties that you can and

8   cannot listen to?

9   A.  There can be.  Yes.

10  Q.  Okay.  Are there limitations about the nature of the

11  conversations that you can and cannot listen to?

12  A.  Yes.

13  Q.  How long does a wiretap order or approval last?  In other

14  words, can you listen to the phone from the day that the order

15  is issued in perpetuity forever?

16  A.  No, ma'am.  It's typically good for a 30-day period.

17  Q.  What happens after that 30-day period?

18  A.  That intercept will expire unless we petition the Court for

19  an extension.

20  Q.  Now, if you petition a court for an extension, do you have

21  to follow that same process of preparing an application and

22  submitting an affidavit?

23  A.  Yes.

24  Q.  And does that require independent review, again, of that

25  particular request?

1    A.  It does.

2    Q.  And that is by the same judge; is that correct?

3    A.  It is.

4    Q.  Now, when you indicated that this was an extension, are

5    extensions for the same period of time, again, 30 days?  Or are

6    they for some other period of time?

7    A.  They are for 30 days again.

8    Q.  In the Vern Rich wire, did you or fellow agents request an

9    initial wiretap and an extension?

10   A.  Well, initially we requested the --

11        MR. SATAWA:  Objection, your Honor.  This has also

12   been covered during Agent Fleming's testimony.  Asked and

13   answered.

14        MS. MOHSIN:  Your Honor --

15        THE COURT:  On these very wiretaps?  On this --

16        MR. SATAWA:  No.

17        THE COURT:  -- same wiretap?  Has this been covered?

18        MS. MOHSIN:  Your Honor, we did a bird's eye view of

19   the investigation, but now we're seeking to introduce the

20   actual wiretaps in the case.  That was introductory testimony.

21   This is actually laying a foundation for the admission of the

22   wiretaps.

23        MR. SATAWA:  The wiretaps are admitted.  There's no,

24   there is no contesting the authenticity of the wiretaps.

25        THE COURT:  Briefly -- I'll conditionally overrule the

2:11-cr-20129-RHC-MAR  Doc # 1072  Filed 11/01/14  Pg 150 of 296  Pg ID 5750
JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

150

 1  objection.  Proceed rapidly through, perhaps with leading

 2  questions to set the stage.

 3           MS. MOHSIN:  Your Honor, I think our foundation is in

 4  response to the opening statement.

 5           THE COURT:  I see.  Well, the objection nonetheless is

 6  overruled.  So proceed.

 7           MS. MOHSIN:  Thank you, your Honor.

 8  BY MS. MOHSIN:

 9  Q.  So you indicated that there was an initial application, and

10  then later, there was a request for an extension?

11  A.  Yes.

12  Q.  For how long was the Vern Rich wire approved?

13  A.  The initial application, 30 days.  Then there was a 30-day

14  extension.  We received data from approximately September 6th,

15  2007, I believe, through November 23rd of 2007.

16  Q.  Now, after you obtained the Court authorization, you had

17  indicated earlier that there are limitations on who you can and

18  cannot listen to; is that correct?

19  A.  That's correct.

20  Q.  Can you describe for the jury what types of requirements

21  agents have with respect to what they can and cannot listen to

22  a wiretap?

23  A.  Yes.  First and foremost in the affidavit, we identify what

24  we call interceptees.  These are individuals we intend to

25  listen to conversations between.  So if they are a named

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

 1   interceptee and there's conversations between them, there's

 2   really no requirement to minimize and identify.

 3            If there's a phone conversation that occurs between

 4   the target telephone and someone who is not an interceptee,

 5   someone who hasn't been identified in the affidavit, then there

 6   are limitations.  We're only allowed to listen to that

 7   conversation if it's pertinent or relevant to the

 8   investigation.

 9   Q.  Is there something in the law that you're instructed about

10   when you go up on a wire that's called minimization?

11   A.  Yes.

12   Q.  Tell the members of the jury what your understanding is

13   about minimization.

14   A.  Minimization is a process during the Title III when you're

15   monitoring a call, if a determination is made that we don't

16   have the authorization or should not listen to that call, we

17   minimize it.  By minimizing it, it literally mutes the call.

18   We can no longer listen to what's going on.

19   Q.  And are there certain protocols that you follow with

20   respect to minimization for, in other words, when you're first

21   listening to a wiretapped communication between two parties and

22   you don't know if there's going to be any sort of pertinent

23   conversation?

24   A.  Yes.

25   Q.  Please describe that.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   A.   In referring to the monitors, there's a minimization

2   process and a memo and a briefing by the AUSA that's assigned.

3   But within that process, it's generally two-minute rule, that

4   within the first two minutes of a conversation, you can analyze

5   what that conversation is to make the determination on whether

6   it's relevant or pertinent, or not.

7   Q.   And what if a determination is made that it's not

8   pertinent?

9   A.   At that point in time, if it is not two named interceptees,

10  we would minimize that call.

11  Q.   And is there something called spot monitoring?

12  A.   Yes.

13  Q.   What is that?

14  A.   Once we minimize the call, again, kind of the rule of two,

15  we would go back during that conversation if it was still

16  ongoing.  After a brief minimization, we would spot check or we

17  would briefly listen to that call again to determine if the

18  conversation had changed.  Are they talking about the same

19  non-pertinent matter, or has it changed and now the

20  conversation is pertinent?  If it changes to something

21  pertinent, we would listen.  If it continues to be

22  non-pertinent or non-relevant, again, we would minimize.

23  Q.   Now, mechanically, what does it look like when you're

24  intercepting calls?  Is there always an agent present when a

25  call is being -- when a call is active?

1    A.  Yes.

2    Q.  So tell the members of the jury how you go about

3    intercepting communications.  What does it look like?

4    A.  The equipment is, like a typical computer, there's a

5    monitor and screen.  The agent or monitor has to go in and open

6    the investigation, select that phone number and start

7    monitoring.  It won't monitor without that action.

8            Once a call is received, a voice dialogue box opens on

9    the monitor.  And within that box, you have the ability to type

10   notes or summaries.

11           It also provides information such as the direction of

12   the call, whether it's incoming or outgoing.  It lists a date

13   and time, and also the associated phone number that's being

14   contacted or being called.

15   Q.  And the information that you just described about an

16   outgoing call or an incoming call, the date and the time and

17   the associated phone number, is that information that is

18   provided to you from the telephone company?

19   A.  Correct.

20   Q.  And is that pursuant to the Court's order, as well?

21   A.  Yes.

22   Q.  In other words, it's not provided from the agents; that's

23   information coming from the company?

24   A.  Correct, it's my understanding.

25   Q.  And when you say that the person who is monitoring that

1  particular shift has to activate the investigation, what does

2  that mean?

3  A.  That, again, without a monitor, we're not intercepting or

4  listening to calls.  That agent has to physically open up the

5  screen, open up the case, select the phone number, and

6  physically select with the use of a mouse to start monitoring.

7  Q.  Did you engage in that activity in the Vern Rich wire?

8  Were you one of the monitors?

9  A.  I did monitor some, yes.

10  Q.  And what happens after a call is monitored?  Are there

11  transcripts or preliminary notes that are taken?

12  A.  Correct.  The monitor, depending upon the amount of time

13  they have, will put a summary or some notes.  They can also

14  determine, and check the box if it was relevant or pertinent so

15  it could be followed up later.

16  Q.  Where are the recordings maintained?

17  A.  They are maintained within the computer.  It's what's

18  called an optical disk.  My understanding is that there are two

19  that sit side-by-side within the computer and they record all

20  the events of the Title III.

21  Q.  And what happens at the conclusion of a particular Title

22  III to the optical disks?

23  A.  The one optical disk is removed from the system, a sealment

24  order is generated and it is produced to a judge and sealed as

25  evidence.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   Q.   And is this optical disk accessible to the case agents

2   during the course of the wiretap?  In other words, is it

3   something that you can effect --

4   A.   No.

5   Q.   -- during the course of the interceptions?

6   A.   No, ma'am.

7   Q.   Who is responsible for maintaining it?

8   A.   In place?

9   Q.   In place, and afterwards.

10  A.   The technical agents would have to assist with its removal

11  so we could seal.

12  Q.   Okay.  Now, I want to direct your attention to the Vern

13  Rich wire.  You indicated that an application was made.  Who

14  were the interceptees on that particular wire?

15  A.   On the initial application, I believe there were five.  It

16  was Vern Rich, John Riede, Lauri Ledford, Paul Darrah and Jeff

17  Smith.

18  Q.   And for what type of crimes were requested?

19  A.   I believe it was for the distribution of narcotics, as well

20  as conspiracy to do so.  And I believe there was a telephone

21  count, use of a telephone communication to further the

22  conspiracy.

23  Q.   Now, you indicated two of the individuals that were

24  interceptees were Lauri Ledford and John Riede.  I'm going to

25  show you Exhibit 63-15 and 63-20 and ask you if you can

 1    identify them.

 2         Would you please describe?

 3    A.  63-15 appears to be a photograph of Lauri Ledford.

 4    Q.  And 63-20?

 5    A.  John Riede, a photograph of John.

 6         MS. MOHSIN:  Your Honor, the Government would move to

 7    admit 63-15 and 63-20 in evidence.

 8         MS. STOUT:  No objection.

 9         THE COURT:  No objection?  The same are received.

10       (Exhibit 63-15 and 63-20 received, 12:42 p.m.)

11         MS. MOHSIN:  Would you please publish 63 -- 63-15?

12    BY MS. MOHSIN:

13    Q.  Who is depicted in this photo, Special Agent Opperman?

14    A.  Appears to be Lauri Ledford.

15    Q.  And would you publish 63-20?

16    A.  A photograph of John Riede.

17    Q.  Okay.  Do you know whether John Riede has a nickname?

18    A.  He does.

19    Q.  What is it?

20    A.  It is "Bear."

21    Q.  Okay.  You indicated an extension was requested.  Were

22    there any additional interceptees that were added in the

23    extension?

24    A.  Yes, I believe there were.

25    Q.  Who were they?

1    A.   Ken Roll, Howard Quant and Dan Burby, I believe.

2    Q.   Now, after the Vern Rich wire -- or withdrawn.

3             During the course of the Vern Rich wire, were search

4    warrants executed in November of 2007?

5    A.   Yes.  I believe it was November 15th.

6    Q.   Of 2007?

7    A.   Yes.

8    Q.   Did there come a time where a request was made for a

9    wiretap for another phone?

10   A.   Yes.

11   Q.   Whose phone was that request made for?

12   A.   Paul Darrah's.

13   Q.   And when was that authorized by the Court?

14   A.   I believe it was March 20th of 2008.

15   Q.   Was the same approval process followed for that telephone,

16   as was for the Vern Rich phone?

17   A.   Yes.

18   Q.   Did you come to learn whether Mr. Darrah had obtained a

19   telephone number, or a different telephone number than the one

20   that he had been using throughout the investigation?

21   A.   Yes.

22   Q.   Can you tell the jury about that?

23   A.   Yes.  I believe the date was November 16th of 2007, the

24   date after the initial searches were conducted related to the

25   Vern Rich wire.  We learned that Mr. Darrah had obtained a new

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   cellular telephone number.

2   Q.  And with what company was that?

3   A.  It was MetroPCS.  I believe it was 586-222-1791.

4   Q.  Who were the named interceptees for the wire on the Paul

5   Darrah phone?

6   A.  On the initial application, there were two:  Paul Darrah

7   and Jeff Smith.

8   Q.  Okay.  And was this wiretap request for -- was this wiretap

9   looking for evidence involving RICO allegations?

10  A.  Yes.

11  Q.  Was that the first time that the RICO charge was

12  contemplated during the course of this investigation?

13  A.  To my knowledge.

14  Q.  Was that wiretap authorized?

15  A.  It was.

16  Q.  And were there extensions to that particular wiretap?

17  A.  Yes.  Six, I believe.

18  Q.  What was the duration of each of the extensions?

19  A.  Approximately 30 days.

20  Q.  So beginning when, until when, and ending on what date,

21  were wire interceptions conducted on Paul Darrah's phone?

22  A.  From March 20th, 2008, I believe until October 5th of 2008.

23  Q.  Roughly how many days would you, would you approximate that

24  is?

25  A.  Approximately 200 days.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1   Q.  Now, have you had occasion to determine how many of the

2   calls in that particular wire were completed, marked pertinent,

3   minimized, et cetera?

4   A.  Yes.

5   Q.  Could you provide some information to the jury about that?

6   How many were pertinent?

7   A.  For Mr. Darrah's phone?

8   Q.  Yes.

9   A.  Pertinent calls, I believe there were 1,395, I believe.

10  Q.  Okay.  Is that an approximation?

11  A.  Approximately.

12  Q.  Okay.  Do you remember how many were minimized?

13  A.  Number of calls minimized?

14  Q.  If you need to refresh your recollection, please let me

15  know and I'll provide you with a report.

16  A.  Yes.  There is a report generated that has all the -- I

17  just don't want to confuse the numbers.

18  Q.  Would your investigative file assist you?

19  A.  It is.

20  Q.  Okay.

21  A.  For Mr. Darrah's telephone?

22  Q.  Yes.

23  A.  Would you like me to just read the relevant numbers?

24          MS. MOHSIN:  If there's no objection.

25          THE COURT:  I see none?

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

```
 1            MS. MACERONI:  Well, I guess I'd like some context.
 2   Is he just going to start listing numbers or --
 3            MS. MOHSIN:  I can ask questions, your Honor.
 4            THE COURT:  Go ahead.
 5            MS. MOHSIN:  Sure.
 6   BY MS. MOHSIN:
 7   Q.  How many calls were completed?
 8   A.  The number of completed calls during that span were 18,467.
 9   Q.  And what is a completed call, as opposed to a different
10   type of call?
11   A.  My understanding is a call that was placed and answered or
12   received, where the connection was completed.
13   Q.  And so there may have been a larger number of calls that
14   were not completed?
15   A.  Yes.
16   Q.  How many of those completed calls were deemed pertinent?
17   A.  1,395.
18   Q.  And how many were minimized?
19   A.  784.
20   Q.  Were there a number of calls that exceeded the 2-minute
21   requirement requiring minimization?
22   A.  Yes.
23   Q.  Can you tell the jury about that?
24   A.  The number of calls that exceeded the 2-minute duration
25   were 1,904.
```

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

161

1   Q.  Okay.  Now, when you say 1,904 calls exceeded the two

2   minutes, those would have required some sort of determination

3   about minimization if they were not named interceptees?

4   A.  Correct.

5   Q.  What did you do with the optical disks in the Paul Darrah

6   wire?

7   A.  Again, they were removed from the system, presented to a

8   judge with a sealment order, sealed, and then forward to the

9   ELSUR evidence room in Detroit.

10  Q.  Okay.  And were efforts made to identify the callers on

11  both of these wires?

12  A.  Yes.

13  Q.  What type of identifications or what were the basis of

14  those identifications?

15  A.  First and foremost, as described earlier, prior to the

16  application process, there was an extensive amount of telephone

17  analysis that was done, calls that were frequently in contact

18  with.  So we obtained subscriber information for those phones

19  so we had an understanding of who was using them.

20       Once the Title III was ongoing, on a lot of the calls

21  that were completed, they'd identify themselves by name, which

22  was a second way.

23       And then thirdly, a number of the voices were familiar

24  from previous interviews or contacts.

25  Q.  Okay.  And then in some instances, did you obtain

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

 1   subscriber information or was that provided in due course with

 2   the court order?

 3   A.  A lot of it was provided prior to, or we obtained some for

 4   numbers that were unknown.

 5   Q.  Okay.  And to the best of your knowledge, were these

 6   conversations that were recorded made voluntarily by the

 7   speakers?

 8   A.  Yes.

 9   Q.  Now, I'm going to show you what's been previously marked as

10   a proposed Exhibit T-1 to T-333.

11         Tell the members of the jury what that is.

12   A.  It's a computer disk.  It contains telephone calls from the

13   two wire intercepts.

14   Q.  And does each number, T-1 through T-333, correspond to a

15   wire interception?

16   A.  Correct, to an individual call.

17   Q.  And have you had an opportunity to examine all, and listen

18   to all of the calls on that particular exhibit?

19   A.  Yes.

20   Q.  And were those calls that you examined and listened to

21   transcribed?

22   A.  Yes.

23   Q.  Were those transcripts examined by you or Special Agent

24   Fleming -- and Special Agent Fleming, I should say?

25   A.  Yes.

1   Q.  And was the purpose of that to determine if they were

2   substantially accurate transcriptions of the recordings?

3   A.  Correct.

4   Q.  Okay.

5          MS. MOHSIN:  Just one moment, please?

6          (Brief pause.)

7   BY MS. MOHSIN:

8   Q.  I'm going to show you what's been marked as proposed

9   Exhibit T.

10         Can you describe Government's proposed Exhibit T?

11  A.  It's a table which contains exhibit numbers, call numbers,

12  which identifies what call, the date, time, call data, parties

13  involved and duration from each of the calls that are listed

14  related to the CD.

15  Q.  Is Government's proposed Exhibit T a summary of that type

16  of information from Government's proposed Exhibit T-1 through

17  T-333?

18  A.  Yes.

19  Q.  And have you had an opportunity to review proposed Exhibit

20  T and compare it with the wire calls that are relevant in this

21  case, T-1 through T-333?

22  A.  Yes, I have.

23  Q.  And is it accurate?

24  A.  It is.

25         MS. MOHSIN:  Nothing further for the witness.  Thank

1  you, your Honor.

2          THE COURT:  Shall we have cross-examination after the

3  lunch hour?  We just have a few minutes here left to go.  The

4  jury can prepare to leave the courtroom here.  Prepare to put

5  your books aside.  Lunch either has been delivered or will be

6  delivered into your jury rooms.  We'll resume at two p.m.,

7  ladies and gentlemen, two p.m.  Please escort yourselves to the

8  jury room.

9      (Jury out, 12:53 p.m.)

10         THE COURT:  Unless there's any reason for a record

11  before we recess?  I don't see any suggestions to that effect.

12  So we will stand in recess.  Thank you.

13         MR. SATAWA:  Your Honor, may I ask an off-the-record

14  question?  May I approach?

15      (Off the record discussion at the side of the bench.)

16      (Recess taken, 12:54 p.m. - 2:06 p.m.)

17         THE CLERK:  All rise.  Court is back in session.

18         THE COURT:  Be seated, please.  The jury has been

19  notified that we're ready to proceed.  The witness is present,

20  I note, but I'm also told that counsel want to take up matters

21  outside the hearing of the jury first.

22         MS. STOUT:  If it please, your Honor.  And I know you

23  asked me to wait on this motion and I absolutely will, if

24  that's the Court's wishes, but I only wanted to put on the

25  record that the next witness being called --

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1          THE COURT:  Which is whom?

2          MS. STOUT:  Which is Mr. --

3          MS. MACERONI:  Pizzuti.

4          MS. STOUT:  -- Pizzuti, I apologize, Mr. Pizzuti is

5    impacted by this whole argument because Ms. Maceroni needs to

6    seriously cross this gentleman and it's hard to say how

7    prepared she could be.  I'm certainly not prepared for him,

8    because so much of the information was just recently received.

9          THE COURT:  Recently, meaning what?

10         MS. STOUT:  I tried to find where it was in my motion,

11   and you have to excuse me, because I'm tired.  But some of the

12   Pizzuti stuff, and maybe Patty can address it -- Ms. Maceroni

13   can address it better than I, was just recently received in the

14   2,200-some-odd pages in the several, many, many hours of

15   recordings we received.

16         Go ahead, Ms. Maceroni.

17         MS. MACERONI:  Thank you, Ms. Stout.

18         Yes, your Honor.  There was quite a bit of material

19   that was given last week, which I'm still in the process of

20   organizing and getting sequestered for this witness.  And

21   which, for the record, Mr. Darrah has not seen at all, other

22   than what I've been able to give him Thursday and Friday of

23   last week, because Mr. Naughton picked up the iPad from the

24   Wayne County Jail, loaded everything on over the weekend, since

25   Mr. Darrah does not have access to the iPad on the weekend, and

1   is actually going to hand deliver the iPad back to the Wayne

2   County Jail.

3          But more significantly, your Honor, is 51 pages of

4   agent notes that were e-mailed over the weekend, I got them

5   Sunday morning, dealing with Mr. Pizzuti's phone calls into

6   Agent Opperman and I believe Agent Fleming, although I haven't

7   had a chance to sit down and look at those in any in-depth

8   detail.

9          I have one or two agent notes concerning phone calls

10  that were received by Mr. Pizzuti from that Agent Opperman

11  authorized -- or authored -- that I got with Mr. Opperman's

12  information a month ago, but these are 51 additional new ones

13  that I have not had an opportunity to fully review.

14         More importantly, I have not had an opportunity to sit

15  down and discuss with Mr. Darrah.  So that really prejudices my

16  ability to be able to cross-examine this witness today, given

17  the fact that I just haven't had a chance to go through that

18  material and I certainly have not had chance to discuss it with

19  Paul.

20         THE COURT:  Right.  Would it not, then, be a suitable

21  pressure relief maneuver to pass on cross-examination of this

22  witness and require him to be brought back to have the topic

23  refreshed and then, at a later time, to cross-examine him once

24  having had the opportunity to review the materials in greater

25  detail?  I'll simply require him to be made available at your

 1    call at a later stage in the prosecution's case.

 2              MS. MACERONI:  If that's agreeable to the Court,

 3    then --

 4              THE COURT:  Well, I'm suggesting it as, as a fairly

 5    rudimentary way of handling an attorney who credibly says I'm

 6    not ready right now, and I can't be ready, because I've just

 7    gotten this material, and so on and so forth.

 8              Crediting everything that you're saying, including the

 9    inability, relative inability of your client to readily review

10    these things, why don't we just basically pass, pass on the

11    witness, but reserve the opportunity, which will be an option,

12    by the way, because I can imagine a circumstance in which,

13    later on, with full review of the information, defense counsel

14    might say, I don't want to see him again.  That happens from

15    time to time, in my experience.

16              So, but the option would be yours.  And the witness --

17    I have no idea, I don't even know where he's stationed, but

18    wherever it may be, he can be, he can be recalled.  Would that

19    work, do you think?

20              MS. MACERONI:  I believe so.

21              THE COURT:  It seems to address your concerns, most of

22    which are timing, not procedural, and timing in nature and not

23    so much substance.

24              What do you think, Ms. Mohsin?  Not the best of all

25    possible solutions, but workable?

 1          MS. MOHSIN:  Your Honor, I imagine it would be

 2     workable.  I guess our only concern is, you know, we have

 3     been readjusting witnesses to accommodate the defense.  If

 4     Mr. Pizzuti is to testify today, I don't -- we have very few

 5     witnesses left for today.  In other words, we were going to

 6     call Mr. Pizzuti, and then Special Agent Fleming to follow up

 7     on his testimony.

 8          THE COURT:  Okay.

 9          MS. MOHSIN:  I don't have any other witness today,

10     because my expectation was that we were going to use this time

11     to conduct that cross-examination.

12          THE COURT:  Of this witness?

13          MS. MOHSIN:  Of Mr. Pizzuti, who is after this

14     witness.

15          So my primary issue, your Honor, is that we've been

16     providing information to the defense on an ongoing basis about

17     what witnesses we're going to call, so that they can be

18     prepared and we have reshuffled several to accommodate them.

19     It just becomes difficult from a scheduling point of view, from

20     our end, to keep the courtroom flush with witnesses.

21          THE COURT:  Ms. Maceroni, are you talking about

22     cross-examining this witness, this FBI witness?  Are you

23     talking about cross-examining Mr. Pizzuti?  Or both?

24          MS. MACERONI:  No.  Based on his direct testimony

25     today, I'm fully prepared to go forward with Agent Opperman.

 1   My concern is John Pizzuti.

 2         THE COURT:  Ah.  How long is his direct testimony

 3   going to be?

 4         MS. MOHSIN:  I would expect perhaps half an hour to an

 5   hour, depending on -- he presents some other issues that's the

 6   subject of our memorandum.

 7         THE COURT:  All right.

 8         MS. MOHSIN:  He's undergone some significant treatment

 9   for cancer and as a consequence, it's had some ability -- it's

10   had some effect on his ability to communicate.  So I, I

11   anticipate that could -- may or may not have an impact on the

12   length of the testimony.

13         THE COURT:  Why don't we proceed, see what the

14   substance of the direct examination is.  That is going to feed

15   into this determination by defense counsel as to whether and

16   to what extent there may be any further need for delay or

17   reexamination of the discovery that's been provided.  I think

18   we should just proceed here, and we'll see where we are at the

19   conclusion of his direct.  Okay, Ms. Maceroni?

20         MS. STOUT:  Okay.  Thank you, Judge.

21         THE COURT:  All right.  Let's call the jury in.

22      (Jury in, 2:13 p.m.)

23         THE COURT:  All right.  Good afternoon, ladies and

24   gentlemen.  The jury has assembled.  For the record, the Court

25   recognizes the presence of all attorneys and all counsel.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - DIRECT BY MS. MOHSIN

1          Before we begin questioning, I made myself a note

2    unrelated to this witness's testimony, but related to the

3    testimony of the previous witness, Mr. Peters.

4          A number of times, the questioning from both sides

5    related to "the Rule 11" or "your Rule 11" or "were you offered

6    a Rule 11."  There was some discussion of that.  I just wanted

7    to clarify from, from the position of the Bench, the reference

8    to Rule 11 is one rule in the Federal Rules of Criminal

9    Procedure.  It describes, in some detail, plea agreements;

10   guilty plea agreements, what can be done, what can't be done,

11   how they are to be organized.

12         Some plea agreements are, are merely verbal and very

13   simple.  Others are more complicated.  Most of them that I've

14   seen, almost all, 90 or more percent are in writing in a

15   document that's quite complete and thorough and so forth.

16         So again, "Rule 11" refers to the rule that governs

17   guilty plea agreements between a defendant and the Government.

18   Very often, though, in conversation, when lawyers and

19   defendants refer to "the Rule 11," what they are referring to

20   probably is the document, the collection of papers that is

21   stapled together that, that describe the arrangements that

22   govern that particular guilty plea.

23         So I'll take that note and discard it.

24         And you may continue with your examination, whomever

25   that may be.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - CROSS BY MS. MACERONI

1          Ms. Maceroni?

2          MS. MACERONI:  Yes, sir.

3          THE COURT:  All right.  You may proceed.

4                    CROSS-EXAMINATION

5   BY MS. MACERONI:

6   Q.  Good afternoon, agent.

7   A.  Good afternoon, ma'am.

8   Q.  You testified quite a bit about the procedure that your

9   office goes through in obtaining a Title III wiretap order,

10  correct?  Do you recall that testimony?

11  A.  Correct.

12  Q.  And correct me if I'm wrong, sir, but when that decision is

13  made that, as you testified earlier, is after you've gone

14  through executed search warrants, reviewed other police

15  reports, interviewed certain witnesses, correct?

16  A.  We possibly did those other techniques, yes.

17  Q.  Well, you just -- you testified you just don't apply for a

18  Title III wiretap out of the blue, correct?

19  A.  Correct.

20  Q.  And in fact, you don't do it in every case?

21  A.  Correct.

22  Q.  Correct?  Okay.

23          So in this instance, in this investigation, you

24  testified that you had reviewed police reports, correct?

25  A.  Correct.

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - CROSS BY MS. MACERONI

172

1    Q.   There had been search warrants that had been executed?

2    A.   Correct.

3    Q.   And you talked to other witnesses, correct?

4    A.   Correct.

5    Q.   Okay.  And based on that then, you and Agent Fleming then

6    made the decision, it's time to go to a Title III; is that how

7    it works?

8    A.   I don't recall who made the decision, but we petitioned for

9    a Title III --

10   Q.   Okay.

11   A.   -- in the investigation.

12   Q.   And that's within your agency, the FBI?

13   A.   Working with the U.S. Attorney's Office.

14   Q.   Working with the Government?

15   A.   Correct.

16   Q.   Okay.  So it's a governmental decision?

17   A.   Correct.

18   Q.   And then once you come forward into court, the physical

19   mechanics of it, correct me if I'm wrong, you're asking the

20   District Court Judge for this Title III permission, based on

21   assertions you make on the record, correct?

22   A.   Within the affidavit, yes.

23   Q.   Within the affidavit.

24        And it's not subject to review by a third party,

25   correct?  It's just the information that you present to the

UNITED STATES vs. SUTHERLAND, et al. -11-20120; 11-20066

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - CROSS BY MS. MACERONI

1  judge?

2  A.  I don't know if I understand "third party."

3  Q.  Well --

4  A.  There's a review.  Many people review, so I'm not sure I

5  understand.

6  Q.  In the Government, they review it?

7  A.  Correct.

8  Q.  Correct?

9  A.  Correct.

10  Q.  Okay.  All right.  No defense attorney is --

11  A.  No, ma'am.

12  Q.  -- looking at any type of affidavit, correct?

13  A.  No, ma'am.

14  Q.  And it's not contested by any adverse party, correct?

15  A.  That's correct.

16  Q.  All right.  And in the Title III affidavit, you state, do

17  you not, that you believe that a Title III -- you have a

18  suspicion that a Title III may lead to information concerning

19  ongoing criminal activity?

20  A.  Correct.

21  Q.  It's a suspicion that you have as the law enforcement

22  agency, correct?

23  A.  Correct.

24  Q.  Now, you indicated when you were going through your report,

25  that in looking at the Title III's on the Paul Darrah cell

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - CROSS BY MS. MACERONI

1   phone, there were 18,467 calls?

2   A.  Completed calls.

3   Q.  Completed calls.  18,000?

4   A.  Correct.

5   Q.  And you minimize -- those 18,000, there were what you

6   deemed to be pertinent, 1,395?

7   A.  I believe that's the number, yes.

8   Q.  And you minimize 784?

9   A.  I believe that's the number, correct.

10  Q.  All right.  And you were working with Agent Fleming through

11  the course of this investigation, correct?

12  A.  Yes.

13  Q.  And at times, you were working with Agent Juan Herrera; is

14  that correct?

15  A.  Correct.

16  Q.  All right.  And when John Pizzuti came forward and became a

17  cooperating witness for you, you were his handler, primarily;

18  is that a correct statement?

19  A.  Correct.

20  Q.  And during the course of your interviewing with

21  Mr. Pizzuti, you indicated that he had problems with drug use,

22  correct?

23  A.  It's my understanding, yes.

24  Q.  Okay.  And he would call in and just report to you at

25  certain periods of time during the course of his working with

1   your agency; is that a correct statement?

2   A.  Correct.

3   Q.  Okay.  And at times, you would make summaries of some of

4   the phone calls that he would make to you concerning the

5   activities of the Devils Diciples Motorcycle Club; do you

6   recall those?

7   A.  Right.  If there was a reporting, we would generate a

8   report.

9   Q.  Okay.  And these reports were pretty brief?

10  A.  It depends on the substance of the conversation or the

11  meeting.

12  Q.  Do you recall a report that you made on June 19th, 2007?

13  A.  Off the top of my head, no.

14  Q.  If I show you a copy of what's been given to me dated

15  June 19th, 2007 entitled, Working Copy, would that refresh your

16  recollection?

17  A.  Possibly.

18      (Document tendered to witness.)

19  Q.  Just take a minute and read through that.

20  A.  (Witness reading.)  Yes.

21  Q.  Okay.  Now, does this detail a conversation that you had

22  with Mr. Pizzuti?

23  A.  Yes, it does.

24  Q.  Okay.  And his name is not mentioned in here, though, but

25  you're sure that this was him, correct?

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - CROSS BY MS. MACERONI

1    A.  Yes.

2    Q.  And in fact, this report was approved by Mark Daniel

3    Bolling.  Who is that?

4    A.  At the time, he was my supervisor.

5    Q.  Okay.  And when did Mr. Pizzuti call you concerning the

6    information in this report?

7    A.  I don't recall.

8         Again, I'm sorry, if you want me to memorize, or

9    remember specific dates --

10   Q.  Okay.

11   A.  I remember the substance of it.

12   Q.  Okay.

13   A.  June 18th, 2007.

14   Q.  Okay.  So on June 18th, 2007, you got a phone call from

15   Mr. Pizzuti, correct?

16   A.  I believe so.

17   Q.  Okay.  Well, this is concerning an investigation you had

18   with Mr. Pizzuti, right?

19   A.  Correct.  But I don't know if that's telephone, I don't

20   know if that's a meet.  It's information that was provided by

21   Mr. Pizzuti.

22   Q.  On June 18th, 2007?

23   A.  I believe so.

24   Q.  Okay.  And didn't he tell you, sir, that he had spoken with

25   Paul Darrah on June 7th, 2007?

1   A.   If that's in the report, yes.

2   Q.   Okay.  Well, I don't want to put words in your mouth.

3          THE COURT:  If a witness's present memory can be

4   refreshed by reference to a document other --

5          THE WITNESS:  Yes.

6          THE COURT:  -- or something similar, and has then a

7   present memory of the event, then the witness can answer that.

8   But if there's going to be past memory recorded that's going to

9   be introduced, then that's a different -- that's a somewhat

10  different procedure.

11         So back and forth to refresh -- I'm not, I'm not sure

12  what I'm seeing here is memory being refreshed.  I think I'm

13  seeing the details of a report just being introduced as past

14  memory.

15         Is that right or wrong, Counsel?  What do you --

16         MS. MACERONI:  I'm confused, Judge.  I'm sorry.

17         THE COURT:  There's a difference between memory --

18  present memory refreshed and past memory recorded.  It's just

19  two different procedures.

20         MS. MACERONI:  Okay.  I can clear it up, I think.

21         THE COURT:  Okay.

22  BY MS. MACERONI:

23  Q.   Agent, as you sit here today, do you have a memory of the

24  conversation that you had with Mr. Pizzuti, which is the basis

25  of this report?

1   A.   Yes.  Briefly.

2   Q.   Okay.  And in fact, didn't Mr. Pizzuti tell you that on

3   June 7th, 2007, he had contacted Paul Darrah?

4   A.   Yes.

5   Q.   Okay.  And he specifically asked Mr. Darrah if Mr. Darrah

6   knew anyone who was selling crank.  What is crank?

7   A.   I believe he was referring to methamphetamine.

8   Q.   Okay.  And in fact, in your report, you say, "or meth."

9   And Mr. Darrah informed the source that no one in the club was

10   selling meth; isn't that correct?

11   A.   I believe that's correct.

12   Q.   Okay.  Well, that's in your report, is it not?

13   A.   Yes.

14   Q.   And your report is what was told to you by Mr. Pizzuti on

15   or about June 18th, correct?

16   A.   Correct.

17   Q.   And "the club" specifically meant the Devils Diciples

18   Motorcycle Club?

19   A.   Yes.

20   Q.   Now, you testified a little bit on your direct that

21   Mr. Pizzuti had been known to use illegal substances,

22   controlled substances while he was in the club, correct?

23   A.   I don't know I testified that while he was in the club.

24   I believe I testified that he had used them in the past.

25   Q.   Okay.  And primarily cocaine was his drug of choice; isn't

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - CROSS BY MS. MACERONI

1   that correct?

2   A.  I believe so.

3   Q.  And you testified that you, yourself, had set up on him the

4   recording devices for the calls that were played for the jury

5   earlier today.  Do you recall that?

6   A.  Yes.

7   Q.  Okay.  Now, there were other times that Mr. Pizzuti was

8   given a tape recorder or a recording device that you weren't

9   specifically involved with; is that a fair statement?

10  A.  Yes.

11  Q.  Would you approximate how many times, based on your

12  knowledge of the investigation, Mr. Pizzuti was given a

13  recording device and sent off?

14  A.  Well, two different things, so if you can clarify?

15          Recording device for a telephone, no one sent off.

16  Recording device for meetings, there's separation, so.

17  Q.  Well, how many times was he given a recording device for

18  phone calls?

19  A.  I can tell you it was approximately 20 recordings, roughly.

20  How many of them were telephone, how many of them were

21  meetings, I'm not sure.

22  Q.  Okay.  And when he went into -- I want to go back to that

23  first phone call or that first recording that was played for

24  the jury today, you testified that you gave him $100 for slot

25  machine money, gambling money?

1   A.  I don't believe that was the first recording played.

2   Q.  Was it the second recording played?  My notes are bad?

3   A.  I believe it might be the second.

4   Q.  Okay.  So one of the times that he was given money to talk

5   to Vern Rich, you had given him extra money to play the slot

6   machines at the clubhouse; is that correct?

7   A.  Correct.

8   Q.  And you recall playing that recorded conversation for the

9   members of the jury today?

10  A.  Yes.

11  Q.  Now, there's nothing on that recording that indicates that

12  he was playing slot the machines, correct?

13  A.  On the recording played, no.

14  Q.  So there's no objective evidence that, in fact, that's what

15  he did with that $100, based on the recording; isn't that

16  correct?

17  A.  No, that's not correct.

18  Q.  On the recording that you played for the jury today,

19  detailing the incident where Mr. Pizzuti was given an extra

20  $100, there's nothing on that recording that was played in

21  court today that indicates that he used that $100 for gambling?

22  A.  That's correct.

23  Q.  Thank you.

24          Now, you testified in front of the grand jury

25  concerning this investigation, correct?

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - CROSS BY MS. MACERONI

1    A.  I believe so.

2    Q.  And Agent Fleming testified in front of the grand jury

3    concerning this investigation, correct?

4    A.  I believe he did.

5    Q.  Okay.  And were you aware that during the course of at

6    least one of the times that Mr. Pizzuti was wearing a recording

7    device, he was heard to use cocaine?

8    A.  I'm not aware of a specific drug at all, specifically.  I

9    do vaguely remember recording that something might have been

10   used, but I don't know if there were words.  I don't know if I

11   could say that that's what it was.

12   Q.  So if Agent Fleming testified in front of the grand jury

13   that he was heard on the recording device snorting a line of

14   cocaine --

15        MS. MOHSIN:  Objection, your Honor, as to what Agent

16   Fleming testified to with respect to this witness.  She can ask

17   that of Agent Fleming.

18        MS. MACERONI:  Well, I can ask him what he's aware of

19   during that investigation.

20        THE COURT:  If we want to go into officer's or agent's

21   understanding of the situation based upon their discussions

22   with other agents in the course of the investigation, is that

23   what you're suggesting?

24        MS. MACERONI:  Yes, sir.

25        THE COURT:  Ms. Mohsin, on that basis?

1          MS. MOHSIN:  On that basis, it's fine.

2          THE COURT:  All right.  Go ahead.

3          MS. MACERONI:  Thank you.

4    BY MS. MACERONI:

5    Q.  During the time that you were working with Agent Fleming on

6    Mr. Pizzuti's cooperation, did Agent Fleming ever inform you

7    that Mr. Pizzuti was heard on the recording device snorting a

8    line of cocaine?

9    A.  I believe my point is I'm not sure if I can be certain it

10   was cocaine.  I know there was a discussion about snorting a

11   narcotic of some sort.

12   Q.  Okay.  It could have been meth?

13   A.  I don't know what it was.

14          MS. MACERONI:  Judge, if I could have one minute?

15       (Brief pause.)

16          MS. MACERONI:  Thank you.  I don't have anything else.

17          THE COURT:  Other cross-examination?  None?

18          Ms. Mohsin, do you have any redirect for the witness?

19          MS. MOHSIN:  Thank you, your Honor.

20                     REDIRECT EXAMINATION

21   BY MS. MOHSIN:

22   Q.  What is your understanding of the standard for obtaining a

23   wiretap; is it suspicion or some other standard?

24   A.  The affidavit has to establish probable cause, and of

25   course, suspicion would be included in that, but the standard

JURY TRIAL, VOLUME IV - 10/20/2014
DAVID OPPERMAN - REDIRECT EXAMINATION BY MS. MOHSIN       183

```
 1    itself is higher.
 2    Q.  It's higher than suspicion.
 3    A.  Correct.
 4    Q.  Is that correct?  Okay.
 5            MS. MOHSIN:  Nothing further.  Thank you, your Honor.
 6            THE COURT:  All right.  The witness may step down.
 7            THE WITNESS:  Thank you.
 8        (Witness excused at 2:29 p.m.)
 9            THE COURT:  And no need to reserve or recall,
10    particularly?  Not, Ms. Maceroni, for example?
11            MS. MACERONI:  No.  No, your Honor.
12            THE COURT:  All right.
13            And your next witness will be whom?
14            MS. MOHSIN:  The Government's next witness is John
15    Pizzuti, and I know that he is on his way.  An agent has gone
16    to get him.
17            THE COURT:  Why don't you -- around the corner on this
18    floor?
19            MS. MOHSIN:  Yes.
20            THE COURT:  Okay.  We'll just wait, then.  Thank you.
21        (Brief pause.)
22            MS. MOHSIN:  Your Honor, the Government calls John
23    Pizzuti.
24            THE COURT:  All right.
25        (Witness is sworn.)
```

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

```
 1              THE COURT:  All right, sir.  Have a seat up here in
 2   this chair.
 3              Go ahead.
 4              MS. MOHSIN:  Thank you.
 5                            JOHN PIZZUTI
 6        called as a witness at 2:31 p.m. testified as follows:
 7                        DIRECT EXAMINATION
 8   BY MS. MOHSIN:
 9   Q.  Good afternoon.
10   A.  Hello.
11   Q.  Can you try to keep your voice up?
12              Please state your full name and spell your last name
13   for the jury.
14   A.  John Pizzuti.  P-I-Z-Z-U-T-I.
15   Q.  Mr. Pizzuti, how old are you?
16   A.  Forty-four.
17   Q.  And what's the highest level of education that you've
18   achieved?
19   A.  Twelfth grade.
20   Q.  When did you graduate 12th grade?
21   A.  '88.  1988.
22   Q.  Are you employed, sir?
23   A.  Yes.
24   Q.  By whom are you employed?
25   A.  JP Asphalt.
```

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    Q.   And when you say JP Asphalt, is that a company?

2    A.   Yes.

3    Q.   What type of work is it?

4    A.   Pave parking lots, asphalt parking lots.

5    Q.   And how long have you been employed by that company?

6    A.   Twenty years.

7    Q.   Is that a family business?

8    A.   Yes.

9    Q.   Do you also have any skills with respect to the maintenance

10   or repair of motorcycles?

11   A.   Yes, I do.

12   Q.   Can you tell the jury a little bit about that?

13   A.   Exactly what?

14   Q.   Do you have training, do you have experience in repairing

15   motorcycles?

16   A.   Yes, I do.

17   Q.   And how about in building motorcycles?

18   A.   In building motorcycles?  Yes.

19   Q.   How long have you had that sort of skill?

20   A.   Roughly '99, 1999.

21   Q.   Mr. Pizzuti, I want to ask you some questions regarding

22   your health.  Do you currently suffer from or have you recently

23   suffered from a serious health problem?

24   A.   Yes.

25   Q.   Can you tell the jury a little bit about what your health

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   problem is, when you were diagnosed and about the treatment?

2   A.   I had bone, bone and lung cancer.

3   Q.   And how serious was your bone and lung cancer?

4   A.   It was Stage 4.

5   Q.   When were you diagnosed with this, this disease?

6   A.   February 20th.

7   Q.   February 20th of what year?

8   A.   2012.

9   Q.   Okay.  Now, prior to testifying here today, did you have to

10  look at any records related to when your treatment was, so that

11  you can testify here today about your treatment?

12  A.   Yes, I did.  I had to write it down.

13  Q.   Okay.  So is that what you have in your hand?

14  A.   Yes.

15  Q.   What is it that you looked at before you came to testify,

16  what types of records?

17  A.   The records from all my -- from the hospital.

18  Q.   Okay.  So do you actually recall the dates that you were in

19  the hospital?

20  A.   No.  I don't remember them, no.

21  Q.   Okay.  So prior to coming here today, you made notes?

22  A.   Yes.

23  Q.   And those notes were about what specifically?  What type of

24  notes are they?

25  A.   Just notes in what, what therapies, what chemotherapy, what

 1  day, what hospital I was in, and how long, and what treatment.

 2  Q.  Okay.  So you were diagnosed in 2012; is that accurate?

 3  A.  Yes.

 4  Q.  And that's based on your notes?

 5  A.  Yes.

 6  Q.  What type of treatment did you receive?

 7  A.  I received chemotherapy on July 31st, 2012.  It was a week,

 8  it was once a week, I had to go and sit for five hours and get

 9  chemo.  And I had to do that two times.

10  Q.  And did you do that two times, meaning once a week, two

11  times or --

12  A.  I had to do it once a week for a month, but I had to do it

13  twice.  So I had to do it for two months.

14  Q.  Okay.  And after the chemotherapy, did you have radiation?

15  A.  Yes.  I had radiation.

16          MR. SATAWA:  Objection, your Honor.  401, 402 and 403.

17          MS. MOHSIN:  Your Honor, the Government is trying to

18  lay a foundation, as we discussed earlier.

19          THE COURT:  The Government provided a bench brief on

20  this and I presume circulated it to counsel.

21          MS. MOHSIN:  We did.

22          THE COURT:  Overruled for the reasons explained in the

23  bench brief.

24  BY MS. MOHSIN:

25  Q.  Did you receive radiation?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.  Yes.

2    Q.  Can you tell the jury about that?

3    A.  It was 8 to 10 times, once a week.

4    Q.  And did you also receive or were you a participant in a

5    program at the hospital, called an ICE program?

6    A.  Yes.

7    Q.  What was that?

8    A.  It was, I was there for three to four days and it was

9    chemotherapy 24 hours.

10   Q.  Over those days, the three or four days?

11   A.  Yes.

12   Q.  And then finally, did you receive a bone marrow transplant?

13   A.  Yes.

14   Q.  Can you tell the jury about that?

15   A.  I was there for a month, where they had to take my stem

16   cells.  And they took those out and they did, they did

17   something to them that -- they did something to them and then

18   when they put them back in, it cured my bone cancer.

19   Q.  So --

20   A.  Put it in remission.

21   Q.  It put it in remission.  And so how long have you been in

22   remission?

23   A.  Since, since 2000 -- since May 16th till now.

24   Q.  And would that have been May 16th of this year?

25   A.  Yes.

1   Q.  So 2014?

2   A.  Yeah.

3   Q.  Now, the treatments that you've described, generally, have

4   they had an effect on you, as far as your ability to focus?

5   A.  Yes.

6   Q.  Tell the jury about that.

7   A.  I can't remember days and dates and times.  Just have a

8   hard time remembering.

9   Q.  Okay.  And do you have, do you have other -- are there

10  other issues, in other words, regarding your ability to

11  concentrate for long periods of time?

12  A.  Yeah.  I can't -- I just can't concentrate on anything

13  for --

14  Q.  Prior to your testimony here today, had you had an

15  opportunity to meet with prosecutors, myself?

16  A.  Yes.

17  Q.  Okay.  And have you met with the Government to prepare for

18  your testimony here today?

19  A.  Yes.

20  Q.  So to the extent that you don't recall something, and

21  something might refresh your memory, did you receive

22  instructions about that?

23  A.  Yes.

24  Q.  Okay.  I want to direct your attention now to the Devils

25  Diciples Motorcycle Club.  Do you recall being -- whether you

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

 1  were ever a member of that organization?

 2  A.  Yes.

 3  Q.  Tell the jury when you became a member, and how you became

 4  a member.

 5  A.  I was -- I became a member in 1999.  They approached me and

 6  asked me to become a member.

 7  Q.  When you say "they," who are you referring to?

 8  A.  Fat Dog, Pauli, Mike, bunch of guys.

 9  Q.  Fat Dog, do you know his real name?

10  A.  No.  No, I can't remember.

11  Q.  And how about, did you know it at some time?

12  A.  Yeah, at some time I did.

13  Q.  But as you sit here today, do you recall his real name?

14  A.  No.

15  Q.  Pauli?

16  A.  Yes.

17  Q.  Do you know his real name?

18  A.  Yeah.

19  Q.  What is it?

20  A.  Paul Darrah.

21  Q.  And who else?  You said Mike?

22  A.  Mike.

23  Q.  Do you remember his real name or club name?

24  A.  No.  Palazzola.

25  Q.  Okay.  And were these three individuals members of the

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   Devils Diciples Motorcycle Club when they invited you to join?

2   A.  Mike wasn't.

3   Q.  But Fat Dog and Pauli were?

4   A.  You know, I might have made a mistake on that.

5          Can we back -- the people that invited me to -- okay.

6   Mike, Mike and Snot was the ones that invited me to sit down at

7   the house, to be, to be introduced to Pauli and Fat Dog to

8   join.

9   Q.  Now, when you say Mike and Snot, were they members of the

10  Devils Diciples Motorcycle Club?

11  A.  Snot was.

12  Q.  Snot was.  Do you know his real name?

13  A.  No.

14  Q.  And they invited you to sit down.  Where did they invite

15  you to sit down?

16  A.  At Mike's house.

17  Q.  And this would be Mike Palazzola?

18  A.  Yes.

19  Q.  At that point, did you meet anyone, such as the individuals

20  you referenced earlier --

21  A.  Yes.

22  Q.  -- Fat Dog or Pauli?  Yes?

23          And what was the purpose of meeting with them?

24  A.  I guess so they could check us -- check me out, see if they

25  wanted me to join their club.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    Q.  And did you receive an offer to join the club?

2    A.  Yes.

3    Q.  Who gave you that offer?

4    A.  Everybody in the room.

5    Q.  All right.  So no one in particular?

6    A.  Not really.

7    Q.  Did you receive colors at that time?

8    A.  No.  We received a T-shirt.

9    Q.  Okay.  Now, when you say "we," were other members also --

10   or were there other people who were also offered membership at

11   the same time?

12   A.  Yes.

13   Q.  And was Mike Palazzola one of them?

14   A.  Yes.

15   Q.  And were there others?

16   A.  Yes.

17   Q.  Do you remember any of them?

18   A.  I think Big Larry, I think was there.  Uhm, I'm having a

19   hard time.

20   Q.  Okay.  You're having a hard time.

21        Okay.  So what was the purpose of inviting all of you

22   to become members at the same time?

23   A.  You had to have so many people to start a new chapter.

24   Q.  Were they intending to start a new chapter?

25   A.  Yes.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   Q.  Was that going to be a chapter in Michigan?

2   A.  Yes.

3   Q.  What was the name of that chapter?

4   A.  Mount -- Utica.

5   Q.  So the Devils Diciples wanted to open a new chapter in

6   Utica, Michigan; is that a fair statement?

7   A.  Yes.

8   Q.  And you and others were invited to become members?

9   A.  Yes.

10  Q.  And for the purpose of opening that chapter?

11  A.  Yes.

12  Q.  Where was the chapter located, was there a clubhouse?

13  A.  No.

14  Q.  Where were you going to be operating out of?

15  A.  We operated out of whoever's house at the time was

16  available.

17  Q.  And did you ever operate out of your place?

18  A.  Yes.

19  Q.  And where was that?

20  A.  On Schoenherr, in between 23 and 24 Mile.

21  Q.  Now, at the time that you became a member -- and I should

22  ask, had you been a member of any other motorcycle club before

23  you were offered a position in the Devils Diciples?

24  A.  No.

25  Q.  Were you asked to prospect or become a probationary member

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   at any time?

2   A.  No.

3   Q.  Were you presented with any bylaws regarding the way that

4   the organization functioned?

5   A.  I was shown a set of bylaws.

6   Q.  And who showed them to you; do you recall?

7   A.  No.

8   Q.  Who gave you the colors that you ultimately received?

9   A.  Pauli, I think.

10  Q.  Okay.  Now, did you have to pay dues?

11  A.  Yes.

12  Q.  How much did you pay in dues?

13  A.  I think it was $20 a week.

14  Q.  Does the number "44" mean anything to you?

15  A.  Yes.

16  Q.  What does it mean?

17  A.  Devils Diciple.

18  Q.  So if you see the number 44, that means it refers to the

19  Devils Diciples?

20  A.  Yes.

21  Q.  Now, there's been some talk about the word, church, people

22  going to church, people attending church.  What does that word

23  mean to you?

24  A.  Meetings.

25  Q.  So when someone says that they -- and they are in a

1  motorcycle club, and they say they have to go to church, they

2  are not talking about a religious establishment?

3  A.  No.

4  Q.  Is that correct?  No?

5  A.  Correct.

6  Q.  What type of meetings are church meetings?

7  A.  Meetings to discuss future, future runs or future parties.

8  Q.  Are these meetings run by members of the Devils Diciples?

9  A.  Yes.

10 Q.  Are members of the public invited to these church meetings?

11 A.  No.

12 Q.  Are -- who can go to a church meeting?

13 A.  Just, just club representatives.

14 Q.  So they have to be members of, of the --

15 A.  Yes.

16 Q.  -- chapter or the club?

17 A.  Yup.

18 Q.  How about women?

19 A.  No.

20 Q.  Women are not permitted at these meetings?

21 A.  No.

22 Q.  When you joined the Devils Diciples Motorcycle Club, who

23 was the national president?

24 A.  Fat Dog.

25 Q.  And was there a national vice president at that time?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1  A.  Yeah.

2  Q.  Who was that?

3  A.  Spike.

4  Q.  Did you know Spike's real name?

5  A.  No.

6  Q.  And did Pauli hold a position in the organization at the

7  time?

8  A.  Yes.  I thought, I thought he was the -- what was the

9  second thing?  The vice, I thought he was vice president.

10  Q.  Okay.  What about Gun Control?  Did you know an individual

11  by the name of Gun Control?

12  A.  Yes.

13  Q.  And what was -- what did you know about him at that time

14  when you joined?

15  A.  What did I know about him?

16  Q.  Was he a member of the national leadership?

17  A.  Not, not that I know of.

18  Q.  Okay.  Now, do you know those four individuals that I've

19  just described to you?  Can you identify them in the courtroom

20  here today by where they are in the courtroom, if you see them?

21  A.  Yes.

22  Q.  Do you see Paul Darrah?

23  A.  Yes.

24  Q.  Can you identify where he is?

25  A.  Sitting over there.

 1              MS. MOHSIN:  All right.  Identifying the defendant,

 2    for the record.

 3    BY MS. MOHSIN:

 4    Q.  Do you see Jeff Smith?

 5    A.  Yes.

 6    Q.  What is he wearing?

 7    A.  White sweater.

 8              MS. MOHSIN:  Okay.  Identifying the defendant.

 9    BY MS. MOHSIN:

10    Q.  Do you see Gun Control?

11    A.  Yes.

12    Q.  Can you identify him for the record?

13    A.  Black sweater.

14              MS. MOHSIN:  Identifying the defendant, your Honor.

15    BY MS. MOHSIN:

16    Q.  Now, did there come a time where you became a member of the

17    management, so to speak, of the Utica chapter?  Did you rise in

18    the leadership?

19    A.  Yeah.  I was vice president.

20    Q.  Okay.  And when you are a member of the motorcycle club,

21    the Devils Diciples, are you required to attend certain events?

22    A.  Yes.

23    Q.  Like runs?

24    A.  Yes.

25    Q.  Can you tell the jury a little bit about what you're

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    required to attend?

2    A.  We're required to attend church and certain parties.

3    Q.  Okay.  In your years as a Devils Diciple -- withdrawn.

4         You indicated that you joined in about 1999; is that

5    correct?

6    A.  Yes.

7    Q.  Did you remain a member for a number of years?

8    A.  Yes.

9    Q.  Eventually, you were arrested in connection with a crime;

10   is that accurate?

11   A.  Yes.

12   Q.  Were you a member when you were arrested?

13   A.  Yes.

14   Q.  Was that in 2007?

15   A.  Yes.

16   Q.  Okay.  Or 2006?  Do you remember when it was?

17   A.  No.

18   Q.  Okay.  But would it be fair to say that you were, when you

19   were arrested, you were still a member of the Devils Diciples?

20   A.  Yes, I was.

21   Q.  During the years that you were a member of the Devils

22   Diciples, did you have occasion to travel to other clubhouses?

23   A.  Yes.

24   Q.  Did you travel to other clubhouses in Michigan?

25   A.  Yes.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    Q.   How about in other states?  In Alabama?

2    A.   Yes.

3    Q.   Arizona?

4    A.   Yes.

5    Q.   California?

6    A.   Yes.

7    Q.   And perhaps elsewhere?

8    A.   Where?

9    Q.   And maybe other places, as well, or is that it?

10   A.   Other places, probably.

11   Q.   Did you attend any national runs?

12   A.   Yes.

13   Q.   What is a national run?

14   A.   It's an event where everybody in the state shows up, in the

15   country.

16   Q.   And what's the point of having a national run?

17   A.   So we all get together.

18   Q.   Okay.  Is business discussed during these national runs?

19   A.   I was never -- I was never there, discussed any business.

20   Q.   So when there's a national run, are there meetings that

21   take place with some members, but not others?

22   A.   Yes.

23   Q.   And the meetings that take place with some members, what

24   type of members are part of those meetings?

25   A.   Presidents.

1   Q.  So leadership?

2   A.  Yeah.

3   Q.  And you were not a leader at the time?

4   A.  Well, I wasn't, I wasn't in none of those meetings.

5   Q.  So you were not invited to those meetings or you didn't

6   attend them?

7   A.  I just didn't attend them.

8   Q.  Okay.  Now, I want to direct your attention to some

9   photographs.  I'm going to show them to you and ask you if you

10  recognize any of the individuals.  Okay?

11  A.  Okay.

12          MS. STOUT:  Ms. Mohsin, what numbers do you have?

13          MS. MOHSIN:  Just a moment.

14          (Brief pause.)

15  BY MS. MOHSIN:

16  Q.  I'm going to show you what has been previously marked as

17  proposed Exhibits 13-91, 13-93, 14-11, 14-33, 14-14, 14-15,

18  14-16, 15-8, and 18-61.

19          I'm going to direct your attention first to 13-91,

20  proposed exhibit.  Do you recognize the individuals depicted in

21  that photograph?

22  A.  It's Spike and Polack.

23          MS. MOHSIN:  Okay.  The Government offers 13-91 in

24  evidence.

25          MR. SABBOTA:  No objection.

```
 1              THE COURT:  Without objection, received.
 2          (Exhibit 13-91 received 2:50 p.m.)
 3              MS. MOHSIN:  I'm going to publish it to the jury.
 4    BY MS. MOHSIN:
 5    Q.  Could you tell the jury which individual is Spike and which
 6    individual is Polack?
 7    A.  Spike is the one on the left.
 8    Q.  Okay.  And so Polack is the one on the right?
 9    A.  The right, yes.
10    Q.  Now, you testified a little while ago that Spike was the
11    national vice president --
12    A.  Yeah.
13    Q.  -- when you joined the club?
14    A.  Yeah.
15    Q.  Do you know where these two members are today?
16    A.  They are dead.
17    Q.  Both of them are deceased?
18    A.  Yes.
19    Q.  Okay.  Directing your attention to 13-93, would you look
20    at that proposed exhibit and tell me if you recognize the
21    individuals depicted?
22    A.  Cliff, Snot, and Mike.
23              MS. MOHSIN:  The Government offers 13-93.
24              THE COURT:  Without objection, it is received.
25          (Exhibit 13-93 received 2:51 p.m.)
```

1              MS. MOHSIN:  Would you please publish 13-93?

2    BY MS. MOHSIN:

3    Q.  Can you please tell the jury who is depicted in this photo?

4    A.  Cliff.  Cliff, Snot, and Mike.

5    Q.  So beginning on the left side?

6    A.  Would be Cliff, Snot in the middle, Mike on the right.

7    Q.  Okay.  Now, is this what the members looked like when you

8    were a member in the late '90s, early 2000s?

9    A.  Yes.

10   Q.  Okay.  Can you take a look at 14-11?  Do you recognize

11   anyone in that photo?

12   A.  Mike.

13             MS. MOHSIN:  All right.  The Government moves to admit

14   proposed Exhibit 14-11.

15             THE COURT:  Without objection, it is received.

16       (Exhibit 14-11 received 2:51 p.m.)

17             MS. MOHSIN:  Publish 14-11, please.

18   BY MS. MOHSIN:

19   Q.  Can you tell the jury who is depicted in that photo?

20   A.  Which one are we on?

21   Q.  This is 14-11.

22   A.  Mike on the right.

23   Q.  On the right-hand side?

24   A.  Yeah.

25   Q.  Is that Mike Palazzola who you have previously identified?

1    A.   Yes.

2    Q.   Okay.  14-13, proposed Exhibit, could you look at that one,

3    please?

4    A.   It's myself and Big Larry.

5            MS. MOHSIN:  All right.  Government moves to admit

6    14-13.

7            THE COURT:  Received without objection.

8        (Exhibit 14-13 received 2:52 p.m.)

9            MS. MOHSIN:  Please publish 14-13.

10   BY MS. MOHSIN:

11   Q.   And who is in that photo?

12   A.   Myself and Big Larry.

13   Q.   Okay.  14-14, proposed Exhibit.

14   A.   It's Snot in the background.  I can't remember the other

15   guy's name.

16           MS. MOHSIN:  Okay.  The Government moves to admit that

17   exhibit and would like to publish it.

18           THE COURT:  Received.  That's 14-33?

19           MS. MOHSIN:  14-14, your Honor.

20           THE COURT:  Received and published.

21       (Exhibit 14-14 received 2:53 p.m.)

22   BY MS. MOHSIN:

23   Q.   Now, you indicated that Snot is depicted in this photo?

24   A.   Yes.  In the background.

25   Q.   Is he in the front or the back; in the background?

1    A.  In the background.

2    Q.  And you don't know who the member is in the front?

3    A.  I can't remember his name.

4    Q.  Okay.  Would you please look at proposed Exhibit 14-15?

5    Yes?

6    A.  Sly and Barefoot.

7            MS. MOHSIN:  Okay.  Government moves to admit and

8    publish proposed Exhibit 14-15.

9            MS. STOUT:  No objection.

10           THE COURT:  No objection, and it is received.

11      (Exhibit 14-15 received 2:53 p.m.)

12           MS. MOHSIN:  Would you publish that, please?

13   BY MS. MOHSIN:

14   Q.  Which one is Sly?

15   A.  The one with the back to you.

16   Q.  The one whose back is facing the camera?

17   A.  Yes.

18   Q.  And can you identify Barefoot?

19   A.  The one on the right.

20   Q.  And is that the individual that's immediately to the right

21   of Sly?

22   A.  Yes.

23   Q.  And these are all members of the Devils Diciples?

24   A.  Yes.

25   Q.  By the way, where is the location where this photograph is

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    taken; do you recognize it?

2    A.   That's my shop.

3    Q.   Is this a church meeting or some other meeting that's

4    taking place?

5    A.   It might be.

6    Q.   Okay.  Directing your attention to 15-8.

7    A.   15 what?

8    Q.   15-8.

9    A.   Oh, okay.  It's Snot on the left, then Pauli, and then

10   Spike, Billy Wadd, and Sly.

11        MS. MOHSIN:  Government moves to admit 15-8 and asks

12   to publish.

13        THE COURT:  There are no objections received, and go

14   ahead.

15     (Exhibit 15-8 received 2:54 p.m.)

16   BY MS. MOHSIN:

17   Q.   So Snot is on the left, you indicated?

18   A.   Yes.

19   Q.   And next to him?

20   A.   Pauli.

21   Q.   And that's Paul Darrah?

22   A.   Yes.

23   Q.   Next to him?

24   A.   Spike.

25   Q.   Then next to him?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   A.  Then Billy Wadd, and then Sly.

2   Q.  And again, are these all members of the Devils Diciples at

3   that time?

4   A.  Yes.

5   Q.  And finally, proposed Exhibit 18-61, would you take a

6   moment to look at that?

7   A.  That's myself on the left, and then Pauli, and then Fat

8   Dog.  I don't know -- I can't remember the other gentleman's

9   name.

10  Q.  Okay.

11  A.  And then Gun Control.  And the other two, I don't remember.

12          MS. MOHSIN:  The Government offers to admit 18-61.

13          THE COURT:  Without objection, received.

14      (Exhibit 18-61, received 2:55 p.m.)

15          MS. MOHSIN:  Publish, please.

16  BY MS. MOHSIN:

17  Q.  Which one is you in that photograph?

18  A.  The one that starts on the left.

19  Q.  Standing?

20  A.  Yes.

21  Q.  And then next to you, seated without the shirt?

22  A.  It's Pauli.

23  Q.  The one next to him without the shirt?

24  A.  Fat Dog.

25  Q.  And then the one next to Fat Dog?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.  I don't remember his name.

2    Q.  Keep going.

3    A.  And then on the chair here is Gun Control, and then the

4    other two on the end here, I don't remember their names.

5    Q.  Where is this photograph taken?

6    A.  Looks like the clubhouse.

7    Q.  And do you know which one?

8    A.  Looks like it might be Port Huron.

9    Q.  Okay.  Thank you.

10        Mr. Pizzuti, do you have, or have you had in the past,

11   a problem abusing drugs?

12   A.  Yes.

13   Q.  Could you tell the jury about when you first started using

14   drugs?  How old were you?

15   A.  I was in high school.

16   Q.  And what type of drugs did you use in high school?

17   A.  Cocaine and marijuana.

18   Q.  And how frequently did you use cocaine and marijuana when

19   you were in high school?

20   A.  On the weekends.

21   Q.  Did you consider it to be a regular habit?

22   A.  Just on the weekends.

23   Q.  Was it a regular weekend habit?

24   A.  I guess, yeah.

25   Q.  Did there come a time where you stopped using cocaine?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.   No.

2    Q.   Did you ever use heroin?

3    A.   No.

4    Q.   Did you ever go into rehab for any type of heroin use?

5    A.   No.

6    Q.   Did you ever go into rehab for any type of drug use?

7    A.   No.

8    Q.   Have you ever used Vicodin --

9    A.   Yes.

10   Q.   -- without a prescription?

11   A.   Yes.

12   Q.   Now, did you use Vicodin with a prescription?

13   A.   Yes.

14   Q.   And did you develop a problem and abuse Vicodin?

15   A.   Yes.

16   Q.   When did that occur?

17   A.   The years of 2000 to 2007.

18   Q.   Okay.  Do you know that or are you guessing?

19   A.   I'm guessing.

20   Q.   Okay.  And how much Vicodin were you using?

21   A.   I was probably taking six pills or more a day.

22   Q.   Did you ever use methamphetamine?

23   A.   Tried it a few times.

24   Q.   Okay.  And did you ever develop a regular use of

25   methamphetamine?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.   No.

2    Q.   When you say that you tried it a few times, was it more

3    than twice, more than four times, more than six times?  Can you

4    give the jury an idea?

5    A.   Probably more than four times, maybe.

6    Q.   Okay.  Do you remember when the first time was that you

7    tried methamphetamine?

8    A.   No.

9    Q.   Did you try methamphetamine before you became a member of

10   the Devils Diciples?

11   A.   No.

12   Q.   So the first time that you used methamphetamine, was that

13   after you were a patched member of the Devils Diciples?

14   A.   Yes.

15   Q.   Do you remember where you got that methamphetamine from?

16   A.   No.

17   Q.   Do you remember any of the circumstances around where you

18   were when you first used it?

19   A.   I was probably at the clubhouse, at a party.

20   Q.   When you say probably, why do you say probably?

21   A.   Because it was probably during a party.

22   Q.   Was -- had you attended a lot of parties at, at the

23   clubhouse?

24   A.   Yes.

25   Q.   Now, what clubhouse are we talking about here?

1   A.  Mount Clemens.

2   Q.  Mount Clemens' clubhouse?

3   A.  Yes.

4   Q.  Did they have frequent parties there?

5   A.  Yes.

6   Q.  How often?

7   A.  Every other week.

8   Q.  And did you attend many of these parties?

9   A.  Yes, I did.

10  Q.  Was there meth available for use at these parties?

11  A.  I would imagine there was, yeah.

12  Q.  Did you ever obtain any meth at any of these parties for

13  use?

14  A.  A few times.

15  Q.  Who did you get it from?

16  A.  Iron Mike, one time.

17  Q.  Okay.  Do you remember any of the other times?

18  A.  No, I don't.

19  Q.  Was meth ever put out on display for people to use?

20  A.  No.

21  Q.  Okay.  Did you ever see meth in the basement of the

22  clubhouse?

23  A.  Yes.

24  Q.  Okay.  And how, how did you see it?  In other words, was it

25  hidden or was it --

JURY TRIAL, VOLUME IV – 10/20/2014
JOHN PIZZUTI – DIRECT BY MS. MOHSIN

1   A.  People were doing it.

2   Q.  People were using it?

3   A.  Yeah.

4   Q.  Okay.  Now, I want to direct your attention to 2004.  Were

5   you a member of the Devils Diciples in 2004?

6   A.  Yes.

7   Q.  Did you have a relationship with an individual by the name

8   of Vern Rich at that time?

9   A.  Who?

10  Q.  Vern Rich.  Vern.

11  A.  Yes.

12  Q.  Did you know a man named Vern to be a member of the Devils

13  Diciples?

14  A.  Yes.

15  Q.  And did you obtain marijuana from Vern Rich --

16  A.  Yes, I --

17  Q.  -- during that time?

18  A.  Yes, I did.

19  Q.  What type of quantities of marijuana did you get from Vern?

20  A.  I was getting pounds at a time.

21  Q.  And what were you doing with the marijuana that you got

22  from Vern Rich?

23  A.  I was selling it.

24  Q.  And do you remember how much you were selling it for?

25  A.  No, I don't remember.

1   Q.  Okay.  Now, in 2004, did your house, your residence, get

2   searched by law enforcement?

3   A.  Yes.

4   Q.  And were the officers or agents who searched your home at

5   that time members of the FBI or ATF or some other agency?

6   A.  Both, I believe.  FBI.

7   Q.  Okay.  Did you have possession of any firearms during that

8   time?

9   A.  Yes.

10  Q.  Were you permitted to possess firearms?  In other words,

11  did you have a legal right to possess firearms at the time?

12  A.  Yes.

13  Q.  Did you possess a silencer at the time?

14  A.  Yes, I did.

15  Q.  And was that silencer unregistered?

16  A.  Yes.

17  Q.  Did that unregistered silencer lead to a charge against

18  you?

19  A.  Yes.

20  Q.  Now, you had some other firearms in your home -- excuse me.

21          You had several firearms in your home at the time; is

22  that a fair statement?

23  A.  Yes.

24  Q.  Was one of the firearms that you had in your home a Ruger

25  .22 caliber?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.  Yes.

2    Q.  Where did you get that?

3    A.  From one of the club members.

4    Q.  Okay.  One of the members of the Devils Diciples?

5    A.  Yes.

6    Q.  Do you remember who that person was?

7    A.  Little Dog, I think.

8    Q.  Okay.  Where is Little Dog today?

9    A.  He's, he's dead.

10   Q.  Pardon?

11   A.  He's dead.

12   Q.  He's dead?  And Little Dog provided you with a firearm?

13   A.  Yes.

14   Q.  And where did you get the silencer?

15   A.  It was on the firearm.

16   Q.  At the time that you were arrested, or rather, that your

17   house was searched, did agents ask you any questions about this

18   firearm?

19   A.  Yes.

20   Q.  And did they ask you those questions after reading you your

21   rights?

22   A.  Yes.

23   Q.  Your right to remain silent?

24   A.  Yes.

25   Q.  And so forth?  Yes?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.   Yes.

2    Q.   And did you provide a statement about whether or not the

3    firearm and silencer that you possessed belonged to you?

4    A.   Yes.

5    Q.   Did you provide a statement?  Yes?

6    A.   Yes.

7    Q.   Was it a written statement or did you say it out loud?

8    A.   It was a written statement.

9    Q.   Now, prior to testifying here today, did you look at that

10   statement?

11   A.   Yes.

12   Q.   And as you read that statement, is it a truthful statement

13   or was it a false statement?

14   A.   It was a false statement.

15   Q.   How was it false?

16   A.   I lied.

17   Q.   And what did you lie about, specifically?  What did you

18   tell them and what was the lie?

19   A.   I lied about where I got the gun.

20   Q.   What did you say -- where did you say you got the gun?

21   A.   I got it in the city.

22   Q.   And in fact, that was not true?

23   A.   Yes.

24   Q.   And when you told them that, it was not true, you knew

25   that?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.  Yes.

2    Q.  Because, in fact, you got it from somebody else?

3    A.  Yes.

4    Q.  Who did you get it from?

5    A.  From Little Dog.

6    Q.  Okay.  In addition, did you tell law enforcement in

7    February of 2004 that you had never fired or used the firearm?

8    A.  Yes.

9    Q.  Was that an accurate statement?

10   A.  No.

11   Q.  What was the truth?

12   A.  I did fire the gun.

13   Q.  Okay.  And under what circumstances?

14   A.  Just at target.

15   Q.  At a target?

16   A.  Yeah.

17   Q.  Not at a person?

18   A.  No.

19   Q.  Now, eventually, the firearm silencer that you possessed,

20   was that the subject of a charge?

21   A.  Yes.

22   Q.  Were you indicted by a federal grand jury?

23   A.  No.  Yes.  I don't know.

24   Q.  Okay.  Do you know what an indictment is?

25   A.  (No response.)

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   Q.  Would something help refresh your memory?

2   A.  Yes.

3   Q.  If I were to show you an indictment, would that help

4   refresh your memory?

5   A.  Yeah.

6   Q.  Do you recognize that document?

7   A.  Yes.

8   Q.  What is that?

9   A.  It's the indictment for the firearm.

10  Q.  And so you were charged by that indictment; is that a fair

11  statement?

12  A.  Yes.

13  Q.  After you were charged, were you brought to court?

14  A.  Yes.

15  Q.  And were you told what the penalties were for -- if you

16  were to be convicted of that offense?

17  A.  Yes.

18  Q.  What could you --

19  A.  Ten years.

20  Q.  Ten years?

21          Did there come a time where you were released on bond?

22  A.  Yes.

23  Q.  Do you remember that?

24  A.  Yes.

25  Q.  Okay.  Now, after you're released on bond, did there come a

 1   time where you -- withdrawn.

 2          Did you have an attorney?

 3   A.  Yes.

 4   Q.  Okay.  Did you have communications with the Government

 5   about cooperating?

 6   A.  Yes.

 7   Q.  Why did you have those communications?

 8   A.  About cooperating?

 9   Q.  Yeah.

10   A.  I don't understand.

11   Q.  What would be the reason that you would want to cooperate

12   with the Government?

13   A.  So I could get out of trouble.

14   Q.  All right.  And so you wanted to communicate with the

15   Government so you could get out of trouble?

16   A.  Yes.

17   Q.  So what did you do?  Did you talk to your attorney?

18   A.  Yes.

19   Q.  And after you talked to your attorney, did you have a

20   meeting with the Government?

21   A.  Yes, I did.

22   Q.  When you had the meeting with the Government, do you

23   remember when that meeting took place?

24   A.  No.

25   Q.  Do you remember if you were provided with a letter

```
 1   agreement from the Government?

 2   A.  No.

 3   Q.  Would something help refresh your recollection?

 4   A.  Yes.

 5       (Document tendered to the witness.)

 6   Q.  Does that document help you remember whether or not you

 7   received a letter agreement?

 8   A.  Yes.

 9   Q.  Now, have you had an opportunity to review that document

10   before you testified here today?

11   A.  Yes.

12   Q.  Do you recall what your -- what that letter agreement or

13   what the purpose of that letter agreement was?

14   A.  For, I was to tell truth.

15   Q.  And you were to tell the truth about what?

16   A.  About everything I know.

17   Q.  Okay.  And what would happen if you didn't tell the truth?

18   A.  I could go to jail.

19   Q.  Okay.  After you had that letter agreement, did you have a

20   meeting with the prosecutors in the case?

21   A.  Yes.

22   Q.  And did you have a meeting with the FBI?

23   A.  Yes.

24   Q.  And what was the purpose of that meeting; do you remember?

25   A.  To, to help them.
```

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   Q.  All right.  To help them about -- with what?

2   A.  To help them buy drugs.

3   Q.  Okay.  So was your understanding that the purpose of the

4   meeting was to help buy drugs or do other things?  Could it --

5   did it involve other things?

6   A.  Yes.  To record conversations.

7   Q.  All right.  Now, was that something that came up

8   immediately or did that come up at a later time; the recording

9   conversations and buying drugs?

10          Do you understand the question?

11  A.  Not really.

12  Q.  All right.  The first time you met with the Government, the

13  very first time, did that come up during the first

14  conversation?

15  A.  No.

16  Q.  Okay.  Did it come up in a later conversation?

17  A.  Yes.

18  Q.  Okay.  Now, when you had this meeting with the Government,

19  did -- were you asked questions?

20  A.  Yes.

21  Q.  Pardon?

22  A.  Yes.

23  Q.  Were you asked questions?

24  A.  Yes.

25  Q.  Yes?  Okay.

 1             And did you, at some point, have a relationship with

 2    one of the agents that were from the FBI?

 3    A.   Yes.

 4    Q.   Do you remember who that agent was?

 5    A.   Dave.

 6    Q.   Dave?  You just pointed.  Is he in the courtroom?

 7    A.   Dave Opperman.

 8    Q.   All right.  And what was your relationship with him?  Were

 9    you supposed to have regular communications with him?

10    A.   Yes.

11    Q.   What type of communications were expected?  What were you

12    supposed to do?

13    A.   Tell him the truth about what I -- what was being done,

14    what was happening.

15    Q.   So did you continue to be a member of the Devils Diciples

16    after you agreed to cooperate?

17    A.   Yes.

18    Q.   And did you agree to act in somewhat of an undercover

19    capacity?

20    A.   Yes.

21    Q.   So after you began cooperating, did there come a time where

22    your attorney and you negotiated an agreement with the

23    Government to allow you to continue your cooperation?

24    A.   Yes.

25    Q.   And as part of that agreement, was there any discussion

1  about dismissing the silencer possession based indictment?  In

2  other words, did the Government say, we're going to dismiss

3  that indictment against you?

4  A.  Yes.

5  Q.  Now, you entered into a written agreement with the

6  Government, is that -- do you remember that?

7  A.  Yes.

8  Q.  And have you had an opportunity to look at that before you

9  testified here today?

10  A.  Yes.

11  Q.  What was your understanding about your agreement with the

12  Government?

13  A.  My understanding was that I was, I was to work with them,

14  and I wasn't promised anything as far as getting off on the --

15  of the case against me.

16  Q.  So you were told that -- you were told that the indictment

17  would be dismissed; is that right?

18  A.  Yes.

19  Q.  Were you told whether that indictment could be brought

20  back; in other words, that you could be charged again?

21  A.  Yes.

22  Q.  And were you told that -- did you agree to toll the statute

23  of limitations?  Have you ever heard that phrase?

24  A.  Yes.

25  Q.  What does that mean?

JURY TRIAL, VOLUME IV – 10/20/2014
JOHN PIZZUTI – DIRECT BY MS. MOHSIN

1   A.  That the statute of limitations, the crime that I committed

2   would be held -- I can't remember.

3   Q.  Okay.  Would something help you refresh your memory?

4   A.  Yes.

5   Q.  All right.  Would the agreement help?

6   A.  Yes.

7   Q.  I want to direct your attention to page 5 of 6, paragraph

8   3.

9           THE COURT:  While he reads that, let's take a

10  60-second stretch break.

11      (Brief pause.)

12          THE COURT:  Quick poll of the jury:  Should I do this

13  more often?  It's about once per hour, I've been doing. No,

14  we're still standing.

15          Think, chat about this, you.  You tell me later if I

16  should do this maybe more often, every 30 minutes instead of

17  every 60, for example.

18          JUROR NO. 5:  Yes.  Yes.

19      (Brief pause.)

20          THE COURT:  Let's come back to order.  Thank you.

21          Ms. Mohsin, go ahead.

22          MS. MOHSIN:  Thank you, your Honor.

23  BY MS. MOHSIN:

24  Q.  Mr. Pizzuti, did you have an understanding of what it meant

25  to toll or stop the statute of limitations?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.  Yes.

2    Q.  What's your understanding?

3    A.  (No response.)

4    Q.  In other words, could the charges be brought back to you --

5    A.  Yes.

6    Q.  -- at any time?

7    A.  Yes.

8    Q.  Okay.  To date, have those charges been brought back?

9    A.  No.

10   Q.  Now, at the time that you entered into that agreement, you

11   did not know what the Government would finally do; is that an

12   accurate statement?

13   A.  Yes.

14   Q.  Okay.  You indicated a little while ago that at some point

15   you had discussions about making recorded calls and also buying

16   drugs; is that a fair statement?

17   A.  Yes.

18   Q.  And did that happen?  Did you make recorded calls?

19   A.  Yes, I did.

20   Q.  Did you buy drugs?

21   A.  Yes, I did.

22   Q.  I want to direct your attention to -- and you may not, may

23   or may not know the dates -- May 15th of 2007.  Sometime after

24   you agreed to cooperate, did you make a recorded call on that

25   date?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   A.   Yes.

2   Q.   Now, before coming here to testify, did you have a chance

3   to look at some of the transcripts of recordings that you

4   participated in?

5   A.   Yes.

6   Q.   Have you listened to any of the audiotaped recordings?

7   A.   Yes.

8   Q.   When did you listen to them?

9   A.   That was a while ago.

10  Q.   Okay.  But not recently?

11  A.   No.

12  Q.   Okay.  But you did look at those transcripts?

13  A.   Yes.

14  Q.   Okay.  I want to direct your attention to the procedure

15  that you had when you were going to be making a recording.

16  Okay?

17        When, when you agreed that you would make a recording,

18  what was your understanding of how the procedure would work?

19  Would you pick up a recording device and put it on your person

20  and go talk to someone in a meeting or something along those

21  lines?

22  A.   No.  I would meet Dave in a parking lot and he would turn

23  on the recorder.  He would search my motorcycle.  He would

24  search my person.

25  Q.   Okay.  And what was your understanding about why he was

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   doing that?

2   A.   So I didn't have anything illegal on me.

3   Q.   And when you say that he would turn on the recorder, was

4   that something that you knew how to do?

5   A.   No.

6   Q.   And did you ever turn on or off any recorder that he gave

7   you to use during a recording?

8   A.   No.

9   Q.   Okay.  So I want to direct your attention now to May the

10  15th.  Did you, did you go on a car ride with some individuals

11  for some sort of a funeral around that time?

12  A.   Yes.

13  Q.   And did you make a recording of that conversation?

14  A.   Yes.

15  Q.   Now, was the procedure you just described, where you would

16  meet with Dave, he would give you a recording device and he

17  would search you and your vehicle, did that occur?

18  A.   Yes.

19  Q.   Prior to you having the meeting?

20  A.   Yes.

21  Q.   And then when he gave you the recorder, and you -- did you

22  take the recorder from him?

23  A.   No.

24  Q.   When he gave it to you, did you take it?

25  A.   Yes.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   Q.  Did you put it somewhere on your body?

2   A.  On my key chain.

3   Q.  On your key chain?

4   A.  Yeah.

5   Q.  And then after that, you would leave?  Did you leave Dave's

6   presence and go to the meeting?

7   A.  Yes.

8   Q.  During that particular meeting or that particular drive,

9   did you tamper with that recording device in any way?

10  A.  No.

11  Q.  Were there any drugs purchased during that particular

12  meeting?

13  A.  Not that I remember.

14  Q.  Did you ever purchase drugs with Dave?

15  A.  Yes.

16  Q.  I want to direct your attention to the first of the drug

17  purchases that you were involved in.  Do you remember the first

18  of those drug purchases?

19  A.  Yes.

20  Q.  Okay.  Can you tell the members of the jury who you were

21  going to be trying to buy drugs from?

22  A.  Vern.

23  Q.  Vern?

24  A.  Yes.

25  Q.  And when you say Vern, I want to direct your attention to

```
 1   an exhibit.
 2              One moment, please.  Would you please publish 63-19?
 3              Would you take a look at the monitor?  Do you
 4   recognize this person?
 5   A.  Yes.
 6   Q.  Who is that?
 7   A.  That's Vern.
 8   Q.  He was a member of the Devils Diciples?
 9   A.  Yes.
10   Q.  Thank you.
11              Why were you going to be trying to purchase drugs from
12   him?
13   A.  Because he was dealing with meth.
14   Q.  And how did you know that?
15   A.  Just from hanging around.
16   Q.  Hanging around in general or hanging around with the club?
17   A.  Hanging around with the club.
18   Q.  Was this information that he was dealing drugs what you
19   would call common knowledge or was it special knowledge?
20   A.  No.  It was common knowledge.
21   Q.  Okay.  Now, what was the plan, the first time that you went
22   to purchase drugs from, from Vern?
23              What was the plan with law enforcement; in other
24   words, with Dave?
25   A.  Okay.  I'd go meet, I'd go meet up with Dave, he would
```

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   search me, search my motorcycle.  He would give me a recording

2   device.  He would give me the money.  Then I would go to the

3   clubhouse and buy the drugs.

4   Q.  Now, you mentioned the clubhouse.  Which clubhouse?

5   A.  Mount Clemens.

6   Q.  Was there some special reason why you were going to go to

7   the clubhouse on this particular day?

8   A.  Yes.  We were having a party.

9   Q.  And do you remember what kind of party it was?

10  A.  It was called a steak fry.

11  Q.  So on this particular day, there was a steak fry.  Was that

12  an annual event, every year they had a steak fry?

13  A.  Yes.

14  Q.  So when you went to meet with Dave, how much money did he

15  give you for the purpose of buying drugs from Vern?

16  A.  Five hundred.

17  Q.  Five hundred dollars?  And did he give you any additional

18  money?

19  A.  Yes.  He gave me 100 to play slot machines.

20  Q.  Why did he give you 100 to play slot machines; do you know?

21  What did he ask you to do with the $100?

22  A.  To play slot machines.

23  Q.  So if -- did you, did you know that there were slot

24  machines in the clubhouse?

25  A.  Yes.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   Q.  All right.  And so he asked you to do that?

2   A.  Yes.

3   Q.  Did you do that?  Did you play the slot machines that were

4   in the clubhouse when you --

5   A.  Yes.

6   Q.  -- when you got that $100?

7        How many slot machines were in the clubhouse?

8   A.  Five, six.

9   Q.  And of those machines, how many did you play?

10  A.  Couple.

11  Q.  Okay.  Did you use all of the money that was given to you

12  to play the slot machines?

13  A.  Yes.

14  Q.  And did you report that back to Dave when you were done?

15  A.  Yes.

16  Q.  I want to direct your attention now to the $500 that you

17  were provided for the purpose of buying drugs.  What did you do

18  after you got the recording device and the $500 from Dave?

19  A.  I went to the clubhouse.

20  Q.  And when you arrived at the clubhouse, did you seek out

21  anyone?

22  A.  Yes.  Gun Control.

23  Q.  Okay.  Why did you seek out Gun Control?

24  A.  Because I was supposed to give Gun Control the money and

25  then Gun Control was supposed to give me the dope.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   Q.  And how did you know that you were supposed to give Gun

2   Control the money, and he was supposed to give you dope?

3   A.  Because I spoke with Vern earlier.

4   Q.  All right.  And did you speak to him before the party,

5   after the party, or during the party?

6   A.  Before the party.

7   Q.  And what did he tell you?

8   A.  Told me to see Gun Control.

9   Q.  Al right.  And where were you when you had this

10  conversation with Vern?

11  A.  I was in the driveway, in front of the clubhouse.

12          Oh, with Vern?

13  Q.  Yes.

14  A.  We were in the clubhouse.

15  Q.  You were inside of the clubhouse?  Once again, this is the

16  Mount Clemens clubhouse?

17  A.  Yes.

18  Q.  And when this party was taking place, and when these

19  conversations were taking place, were there a lot of people

20  there?

21  A.  Yes.

22  Q.  Okay.  After you had the conversation with Vern, did you

23  seek out Gun Control?

24  A.  Yes.

25  Q.  And did you find him?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   A.  Yes.

2   Q.  What happened when you found him?

3   A.  I gave, gave him the $500 and he slipped me the drugs.

4   Q.  Can you describe for the jury how you gave it to him; in

5   other words, was it out in the open, did you count the money,

6   or how?

7   A.  No.  I gave it to him in a closed fist.  He grabbed it.

8   Q.  So you just described for the record that your hand was

9   extended?

10  A.  Yes.

11  Q.  And in a closed fist?

12  A.  Yes.

13  Q.  And Gun Control grabbed it from you, from the closed fist?

14  A.  Yes.

15  Q.  So if someone were to pass by, would they have seen this

16  transaction?

17  A.  No.

18  Q.  To the best of your ability, you don't think they would

19  have seen this?

20  A.  No.

21  Q.  Were any words exchanged between you and Gun Control?

22  A.  Not really.  I don't think there were.

23  Q.  Now, when did you give him the money?

24  A.  I gave him the money at the clubhouse.

25  Q.  Okay.  Did you give it to him before he gave you the drugs

1    or after?

2    A.  I think I gave him the money before he gave me the drugs.

3    Q.  Okay.  And did you give him all of the money?

4    A.  Yes.

5    Q.  What did you do with the drugs after he gave them to you?

6    A.  I put them in my pocket.

7    Q.  And after you put them in your pocket, what did you do

8    next?

9    A.  I called Dave.

10   Q.  Okay.  And did you call him on the telephone or some other

11   way?

12   A.  No, my cell phone.

13   Q.  And what did you tell him?

14   A.  I told him I was done, I was ready to come see him.

15   Q.  And did you do that?

16   A.  Yes.

17   Q.  And how far away was Dave from where you were located?

18   A.  Maybe seven miles.

19   Q.  So after you left, did you meet with Dave?

20   A.  Yes.

21   Q.  And what did you do when you met with Dave?

22   A.  He searched me.  He searched my bike.  He took the

23   recording device; he shut it off.  He took the drugs.

24   Q.  Did you have a conversation with him at that time?

25   A.  A quick one.

1   Q.   And what did you do after that?

2   A.   Went back to the clubhouse.

3   Q.   All right.  And what did you do when you got back to the

4   clubhouse?

5   A.   Had a good time.

6   Q.   Okay.  And when you went to see Vern initially and had the

7   conversation with him about buying drugs, what, what did you

8   tell Vern about why you needed $500 in drugs?

9   A.   It was for a friend of mine.

10  Q.   And a friend of mine -- a friend of yours that you wanted

11  to give the drugs to, sell the drugs to?  What was the

12  conversation with Vern?

13  A.   That I had a friend of mine that wanted $500 worth of meth.

14  Q.   All right.  And so you were going to sell this, this meth

15  to this other person?

16  A.   Yes.

17  Q.   Did Vern -- did you tell Vern that that's what you were

18  going to do?

19  A.   Yes.

20  Q.   And so after you had this meeting with Special Agent

21  Opperman, or Dave, you went back to the clubhouse.  And had

22  you been missed?  Were you gone for a long time?

23  A.   No.

24  Q.   All right.  Did there come a time where you agreed to do

25  another controlled buy?

1    A.  Yes.

2           MS. MOHSIN:  Okay.  Just a moment, please.

3    BY MS. MOHSIN:

4    Q.  Do you remember the date of the first controlled buy?  You

5    said it was the steak fry?

6    A.  No, I don't remember the date.

7    Q.  Was it in 2007?

8    A.  I would -- yeah, could have been.

9    Q.  The meth that you -- or excuse me.

10          What type of drugs did you purchase from Vern?  What

11   was your understanding of the type of drug that you were

12   purchasing from him?

13   A.  It was meth.

14   Q.  After you obtained the meth from Gun Control, did you use

15   it?

16   A.  No.

17   Q.  Did you give any of it away?

18   A.  No.

19   Q.  Did you open the bag in any way?

20   A.  No.

21   Q.  Did you tamper with it in any way?

22   A.  No.

23   Q.  So after you got it from Gun Control, between the time you

24   got it from Gun Control and provided it to Special Agent Dave

25   Opperman, did you do anything at all with those drugs?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.  No.

2    Q.  Other than turn them over?

3    A.  Yes.

4    Q.  Similarly, did you tamper with the recording device in any

5    way?

6    A.  No.

7    Q.  I want to direct your attention now to the second time that

8    you were involved in purchasing drugs.

9          After the first time, which was, you described, you

10   know, the steak fry, how long after that did you begin to try

11   and purchase drugs the second time?

12   A.  I don't remember.  Maybe a month.

13   Q.  Okay.  And were you going to be purchasing from Vern again?

14   A.  Yes.

15   Q.  Can you describe whether you made any efforts to contact

16   Vern to set up a deal?

17   A.  Yes.

18   Q.  And what was the story as far as who you were going to be

19   giving this meth to?

20   A.  The story was for a friend of mine.

21   Q.  Now, is it the same friend or a different friend?

22   A.  Same, same friend.

23   Q.  Did you have a conversation with Vern that was recorded

24   prior to the second buy?

25   A.  Yes.

1    Q.  And what was the purpose of that conversation?

2    A.  So we could figure out where we wanted to meet to get the

3    drugs.

4    Q.  Okay.  Now, the conversation that you had with Vern, you

5    indicated that was recorded?

6    A.  Yes.

7    Q.  I'm going to play for you what's been admitted as R-3 and

8    ask you to listen to the conversation.  And at the conclusion

9    of it, I'm going to ask you some questions.  Okay?

10          MS. MOHSIN:  Please publish.

11       (Publishing Government Exhibit R-3, 3:27 p.m. - 3:32 p.m.)

12   BY MS. MOHSIN:

13   Q.  Mr. Pizzuti, during that conversation, Vern tells you that

14   he can leave it somewhere for you.  What is your understanding

15   of what he's talking about?

16   A.  He was going to leave it behind my house.

17   Q.  What specifically is "it"?

18   A.  The drugs.

19   Q.  Okay.  And you tell him that you don't want him to do that;

20   is that correct?

21   A.  Yes.

22   Q.  Now, at some point, you start asking him questions about

23   how much your friend can expect for a thousand, right?

24   A.  Right.

25   Q.  And during that conversation, there's a reference to Vern

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1  saying, "I don't -- you don't want me to answer that shit on

2  the, you know --"

3          And you say, "On the phone."

4          Do you remember that part of the call?

5          What is your understanding of, of that particular part

6  of the, of the conversation?

7          What is Vern saying to you?  What do you understand?

8  A.  He doesn't want to discuss details on the phone about a

9  drug buy.

10  Q.  And is that his way of telling you that he doesn't want to

11  talk about that on the phone?

12  A.  (Nodding head.)

13  Q.  Okay.  After you have this conversation with Vern, does a

14  transaction take place?

15  A.  Yes.

16  Q.  And when does that occur?  Does it occur the same day or on

17  a different day?

18  A.  Different day.

19  Q.  Do you remember how long after?

20  A.  No.

21  Q.  Now, the transaction that takes place, does it take place

22  with Vern or with someone else?

23  A.  With someone else.

24  Q.  Who is that person?

25  A.  Pauli.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1  Q.  And describe how that transaction takes place with Pauli.

2  In other words, where are you when it takes place?

3  A.  We were at my shop.

4  Q.  All right.  You were at your shop.

5       And do you know beforehand that Pauli is going to be

6  coming to meet with you to do the exchange?

7  A.  Yes.

8  Q.  And do you relay that information to the FBI?

9  A.  Yes.

10  Q.  And do they have time to respond, in other words, to get

11  you a recording device?

12  A.  Yes.

13  Q.  Tell the jury about that.

14  A.  I met with Dave.  He gave me -- he searched me, searched

15  the bike, or my vehicle at that time.  Turned on the recorder,

16  gave me the money.  I went back to the shop to receive the

17  drugs.

18  Q.  And how much money did he give you?

19  A.  He gave me, I think it was, 13 or 14.

20  Q.  14 what?

21  A.  Hundred.

22  Q.  Hundred dollars?

23  A.  Yes.

24  Q.  And how much of that money was designed for or was to be

25  used for the purchase of drugs?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.  A thousand.

2    Q.  Again, was this methamphetamine that we're talking about

3    here?

4    A.  Yes.

5    Q.  So the remaining three or four hundred dollars that you

6    referenced, what was the purpose of that money?

7    A.  I owed some money to, to the club.

8    Q.  You owed money to the club?

9    A.  Yes.

10   Q.  And what kind of money did you owe to the club?

11   A.  It was a few hundred dollars.  I can't remember exactly how

12   much.

13   Q.  And were the -- were these monies that were owed to the

14   club for a particular purpose or for a particular reason?

15   A.  For my dues.

16   Q.  The dues that you referenced earlier that you paid?

17   A.  (Nodding head.)

18   Q.  And did you, did you owe -- were you in arrears?  You

19   owed --

20   A.  Yes.

21   Q.  -- back dues?

22        So can you describe what happens after Special Agent

23   Opperman gives you the recording device and the $1,400 or

24   $1,300?

25   A.  I go back to the shop.  I wait for Pauli.  Pauli arrives.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   He hands me a cigarette pack.  I look inside.  The drugs are

2   inside.  I gave him the money.

3   Q.  And where does this occur, inside your shop or outside?

4   A.  No, outside.

5   Q.  Outside of the shop.  Why does it occur outside and not

6   inside?

7   A.  There was people in the shop.

8   Q.  Do you know who those people were?

9   A.  Not offhand.  I mean --

10  Q.  So there were people inside the shop?

11  A.  Yeah.  There were people in the shop.

12  Q.  And how much money do you give Pauli for the drugs?

13  A.  A thousand.

14  Q.  And did you give him any other money?

15  A.  I gave him, like, 300 or 400.  I can't remember exactly how

16  much it was.

17  Q.  And was that for the dues that you referenced earlier?

18  A.  Yes.

19  Q.  Now I'm going to play for you a call that's admitted.  This

20  is R-4.  I'll ask you to listen to it and we'll ask you some

21  follow-up questions.

22       MS. STOUT:  Your Honor, I'm going to object to wasting

23  time.  We've played all three, four of these tapes through

24  Opperman.  The jury has heard them.  They've seen the

25  transcripts.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

241

```
 1              THE COURT:  All right.  I overrule the objection.  The
 2    Government is not unnecessarily duplicating actions.
 3              Go ahead.
 4              MS. MOHSIN:  Okay.
 5       (Publishing Government Exhibit R-4, 3:36 p.m. - 3:39 p.m.)
 6    BY MS. MOHSIN:
 7    Q.  Mr. Pizzuti, is that you and Paul Darrah on this particular
 8    recording?
 9    A.  Yes.
10    Q.  And in this recording, in the beginning of the recording,
11    Darrah tells you -- withdrawn.
12              You tell Darrah, "What do you want me to do with this
13    guy?"
14              And he says, "Which one?"
15              You say, "Vern."
16              What are you talking about there?
17    A.  About having -- the fact to have Pauli coming deliver drugs
18    instead of Vern.
19    Q.  Why is that something that's noteworthy?
20    A.  It's just a pain in the ass, I guess.
21    Q.  It's what?
22    A.  It was just a pain in the ass at the time.
23    Q.  Why is that?
24    A.  Because it's not Pauli's -- it wasn't Pauli's
25    responsibility.
```

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1  Q.  And so you didn't like that fact; is that what it is?

2  A.  Yeah.

3  Q.  All right.  And what does, what does it mean when Pauli

4  says, "It doesn't matter to me."

5          And you tell him, "I'm just trying to make some money

6  off this," what does that mean?

7  A.  I don't know.

8  Q.  You don't understand the question?

9  A.  I don't -- I couldn't hear the tape.

10  Q.  I'm going to show you the transcript.  Perhaps that will

11  refresh your recollection.

12  A.  (Nodding head.)

13  Q.  When you tell Pauli, "I'm just trying to make some money

14  off of this," what are you saying to him?  What does that mean?

15  A.  It sounds like he's trying to make some money off of

16  delivering the drugs.

17  Q.  It sounds like he's trying to make money off of it, too; is

18  that what you're saying?  Okay.

19          Now, if he's going to make money off it, is that going

20  to cut into your profit?  Is that what you're concerned about?

21  A.  No.

22  Q.  All right.  Can I have the transcript?

23          Now, during the conversation, did you physically count

24  out the money when we hear you saying, "100, 200, 300,"

25  et cetera?

1    A.  Yes.

2    Q.  And did you pay him before he gave you the drugs?

3    A.  I can't remember if he paid me first or I got the drugs

4    first or --

5    Q.  Okay.  And in the end of the conversation, when you say,

6    "It's fucking good shit," what are you referring to?

7    A.  I'm saying?

8    Q.  Yeah.  What are you referring to?

9    A.  I don't know.

10   Q.  Are you talking about the meth?

11   A.  I guess.  Yeah.

12   Q.  Now, like the first time you purchased drugs from Gun

13   Control and Vern, after this one, did you meet with Special

14   Agent Opperman?

15   A.  Yes.

16   Q.  And when you met with Special Agent Opperman, did you give

17   him the drugs that you had purchased?

18   A.  Yes.

19   Q.  And did you do anything to those drugs --

20   A.  No.

21   Q.  -- before you gave it to him?

22   A.  No.

23   Q.  Did you use any of them?

24   A.  No.

25   Q.  Did you give any of them away?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.   No.

2    Q.   Did you open the package in any way?

3    A.   No.

4    Q.   Okay.  How about the recording device?

5    A.   No.

6    Q.   Did you do anything to tamper with it in any way?

7    A.   No.

8    Q.   Shut it off?

9    A.   No.

10   Q.   Okay.  After the second controlled buy, did there come a

11   time where you purchased drugs again?

12   A.   Yes.

13   Q.   And do you remember how much money you were going to use to

14   purchase drugs this time?

15   A.   2,000.

16   Q.   $2,000?

17   A.   Yes.

18   Q.   And on this occasion, when you were going to purchase

19   $2,000 worth of drugs, did you have communications with anyone

20   before that was set up; in other words, with Vern or some other

21   person?

22   A.   Yes.

23   Q.   Who did you talk to?  Did you talk to Vern?

24   A.   Yes.

25   Q.   And approximately when did that occur?  Do you remember

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   when you purchased drugs from Vern?

2   A.  I don't remember the date.

3   Q.  And was this Vern Rich on this third occasion?

4   A.  Yes.

5   Q.  Can you describe for the jury how you actually got drugs

6   from Vern on the third occasion?

7   A.  He came to my house.

8   Q.  Okay.

9   A.  And he, he came to my house, and I went out to his car and

10  he gave me the drugs and I gave him the money.

11  Q.  And how much drugs did he give you?  Dollar-wise, how much

12  did you pay?

13  A.  $2,000.

14  Q.  In exchange for a quantity of drugs, was this a larger

15  quantity than the previous two had been?

16  A.  Yes.

17  Q.  Was each time a larger quantity, in other words?

18  A.  Yes.

19  Q.  And you indicated that he came to your house.  How did he

20  get to your house?

21  A.  He was in a car.

22  Q.  Was it his car?

23  A.  Yes.

24  Q.  Did you know his car?

25  A.  Yes.

1    Q.  What kind of car was it?

2    A.  A black BMW.

3    Q.  And when he came to your house, did he come inside your

4    home or did you have the transaction somewhere else?

5    A.  In his car.

6    Q.  It was inside his car.  Did you get into his car?

7    A.  Yes.

8    Q.  Was he there for a long time or a short time?

9    A.  Short time.

10   Q.  And did you have a recording on that occasion?

11   A.  Yes.

12   Q.  I am going to -- and did you, did you provide -- withdrawn.

13          Did you meet with the FBI before this meeting?

14   A.  Yes.

15   Q.  And did you get a recording device?

16   A.  Yes.

17   Q.  And did you return the recording device after the meeting

18   to the FBI?

19   A.  Yes.

20          MS. MOHSIN:  Okay.  Your Honor, at this time I'm

21   going to provisionally offer R-6, which is a recording, into

22   evidence.  It will be -- further foundation will be laid

23   through Special Agent Fleming.

24          THE COURT:  Do you seek to publish now or --

25          MS. MOHSIN:  I do seek to publish now, your Honor.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1          THE COURT:  Go ahead.

2          MS. MOHSIN:  Okay.  Would you please play R-6?

3      (Publishing Government Exhibit R-6, 3:46 p.m. - 3:48 p.m.)

4  BY MS. MOHSIN:

5  Q.  Mr. Pizzuti, during this conversation, are you inside of

6  this vehicle that belongs to Vern Rich?

7  A.  Yes.

8  Q.  And when he's talking about the white, clear crystal

9  substance, what is he talking about?

10  A.  The meth.

11  Q.  The meth that you're purchasing?

12  A.  Yes.

13  Q.  And when you start counting, "100, 200," et cetera, are you

14  counting the money?

15  A.  Yes.

16  Q.  Now, he indicates to you that he is going to give you an

17  ounce of weed for free during this conversation.

18  A.  Yes.

19  Q.  Did he give you an ounce of weed for free after this

20  exchange?

21  A.  No.

22  Q.  At any time after this?

23  A.  No.

24  Q.  Okay.  I want to direct your attention to Government's

25  Exhibit 27-2 -- 27 -- I'm sorry, 27-2 -- one moment.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

```
 1              You can publish that.  It's admitted.
 2   BY MS. MOHSIN:
 3   Q.  Can you look on the screen?  Do you recognize that bag?
 4   A.  Yeah.
 5   Q.  What do you recognize that to be?
 6   A.  That's the drugs.
 7   Q.  Okay.  28-4, do you recognize that?
 8   A.  Yes.
 9   Q.  What is that?
10   A.  That's the drugs.
11   Q.  And I should ask, are these the drugs that you purchased?
12   A.  Yes.
13   Q.  And which, which time did you purchase the ones depicted
14   in 28-4?
15   A.  This is the second buy.
16   Q.  And the previous one, which was 27-2?
17   A.  First buy.
18   Q.  That was the first buy?
19   A.  Yes.
20   Q.  I'm going to show you what has been previously marked as
21   proposed Exhibit 29-3.  Do you recognize that photo?
22   A.  That's the third buy.
23   Q.  That, that's the third buy.  Is that the drugs?
24   A.  Yes.
25   Q.  A photo of the drugs?
```

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   A.  Yes.

2   Q.  From the third buy?

3        MS. MOHSIN:  Your Honor, the Government offers 29-3.

4   Is that 29-3?

5        THE WITNESS:  Yes.

6        MS. MOHSIN:  Into evidence.

7        THE COURT:  If there is no objection, received.

8     (Exhibit 29-3, received 3:50 p.m.)

9        MS. MOHSIN:  Would you publish it, please?

10  BY MS. MOHSIN:

11  Q.  Okay.  Is that the drugs that's displayed for the jury?

12  A.  Yes, it is.

13  Q.  Okay.  Now, Mr. Pizzuti, you testified earlier that you

14  made additional recordings, correct?

15  A.  Yes.

16  Q.  And did you follow the same procedure in all of those

17  recordings that we've been talking about over and over, about

18  how you set up, conducted a recording, and then returned the

19  recording device to law enforcement?

20  A.  Yes.

21  Q.  Okay.  And I should ask you, which I don't think I did,

22  with respect to the third buy that you made from Vern, did you

23  deliver that to the agents --

24  A.  Yes, I did.

25  Q.  -- after, after you purchased it?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.   (Nodding head.)

2    Q.   You have to answer verbally.

3    A.   Yes, I did.

4    Q.   And did you use any of that meth that you had obtained from

5    Vern Rich?

6    A.   No, I didn't.

7    Q.   Did you open that package?

8    A.   No, I didn't.

9    Q.   Did you tamper with the recording device in any way, shut

10   it on or shut it off?

11   A.   No, I didn't.

12   Q.   Okay.  Now, Mr. Pizzuti, I want to direct your attention to

13   some of the other information that you've provided to law

14   enforcement during the course of your cooperation.

15        Did you provide information about your involvement in

16   motorcycle -- stolen motorcycle parts and related -- stolen

17   motorcycles or stolen motorcycle parts?

18   A.   Yes.

19   Q.   Have you ever been involved in the theft of motorcycles?

20   A.   Yes.

21   Q.   Can you describe some instances that you can recall where

22   you were involved in the theft of motorcycles?

23   A.   I stole a motorcycle from a bar in Shelby Township.

24   Q.   And do you remember when that would have occurred?

25   A.   I don't remember the date.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1  Q.  And do you remember if that occurred while you were a

2  member of the Devils Diciples?

3  A.  Yes.

4  Q.  Do you remember who you stole that motorcycle from?

5  A.  Just some guy.

6  Q.  And what did you do with that motorcycle?

7  A.  Sold the parts.

8  Q.  Okay.  Would that have --

9  A.  Sold some of the parts, used some of the parts to build

10 other bikes.

11 Q.  So you stole the motorcycle.  Did you disassemble it?

12 A.  Yes.

13 Q.  And what was the purpose of disassembling it?

14 A.  Okay.  We disassemble the motorcycle to get rid of the VIN

15 numbers.  There's VIN numbers on the engine case, there's

16 VIN numbers on the transmission case, and on the frame.

17 Q.  And are you familiar with these VIN numbers and their

18 locations because of your experience as a motorcycle mechanic

19 and builder?

20 A.  Yes.

21 Q.  And so after you stole this motorcycle in Shelby Township,

22 do you recall what you did with the parts?

23         Did you disassemble the motorcycle, first of all?

24 A.  Yes.

25 Q.  What did you do with the parts?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.  Put some of them on my shelf and sold some of them.

2    Q.  And when you say "put them on your shelf," in your garage?

3    A.  Yes.

4    Q.  Did you store many motorcycle parts there?

5    A.  Yes.

6    Q.  Did people within the Devils Diciples know that if they

7    wanted motorcycle parts, they could come to you?

8    A.  Pretty much.

9    Q.  Did people bring you stolen motorcycle parts?

10   A.  Yes.  Yes, they did.

11   Q.  Why did you hesitate?

12   A.  Because I was trying to get out of bringing stolen bikes to

13   my -- stolen parts to my shop after a while.

14   Q.  So initially, this was something that you were involved in

15   fairly regularly?

16   A.  Yeah.

17   Q.  And then at some point, you did not want to be involved in

18   it any longer?

19   A.  Right.

20   Q.  Okay.  Did you have any contacts with individuals to obtain

21   stolen motorcycles or stolen motorcycle parts?

22   A.  Somewhat.

23   Q.  Who were some of those contacts?

24   A.  That was a guy in the -- from the Highwaymen.

25   Q.  Okay.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   A.  That I knew, I knew about.

2   Q.  Who was that?

3   A.  I don't remember his name.  I had to go through another guy

4   in the club.

5   Q.  And would they provide you with stolen motorcycle parts?

6   A.  Yes.

7   Q.  And did you use them in building motorcycles or replacing

8   other parts for other motorcycles?

9   A.  Yes.

10  Q.  Did you ever get involved in a scheme to defraud an

11  insurance company as it relates to a motorcycle?

12  A.  Yes.

13  Q.  Can you tell the jury about that?

14  A.  It was my motorcycle.

15  Q.  Did you own it?

16  A.  Yes.

17  Q.  Was it lawfully owned?

18  A.  Yes.

19  Q.  And titled?

20  A.  Yes.

21  Q.  And you had obtained it lawfully?

22  A.  Yes.

23  Q.  What did you do with that lawfully-owned motorcycle?

24  A.  I did an insurance job on it.

25  Q.  And what does that entail?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.   I claimed to insurance that it was stolen.

2    Q.   And what was the real story?

3    A.   I built another motorcycle for Pauli to ride.

4    Q.   And was this at Pauli's request?

5    A.   Yes.

6    Q.   What did he ask you to do?

7    A.   Build him a bike to ride.

8    Q.   And so who suggested, was it you or Pauli who suggested

9    doing the insurance job on your motorcycle?

10   A.   Pauli's.  Both of ours.

11   Q.   So it was something that you decided with Pauli?

12   A.   Yeah.

13   Q.   And just explain to the jury how this works, mechanically.

14   You have a motorcycle that you own.

15   A.   Okay.  You take a motorcycle that you own.  You tear it

16   apart and you get rid of those three items.  You get rid of the

17   engine case, the transmission case and the frame.

18        Then you go into a magazine, and you can buy a frame,

19   an engine case and a trans case that comes with papers of

20   origin.  And after you get those papers of origin, you can put

21   your bike together.  Then take all that paperwork down to the

22   Secretary of State.  And then they'll give you a new title with

23   all those numbers into one title.

24   Q.   So this is some information that you have because of your

25   experience with motorcycle repair; is that correct?

1    A.  Yes.

2    Q.  And in order for a motorcycle to be successfully rebuilt,

3    there has to be a new title?

4    A.  Yes.

5    Q.  And you can get that at the Secretary of State?

6    A.  Yes.

7    Q.  Does that have a name?

8    A.  It's an assembled title.

9    Q.  It's called an assembled title.

10           What about the insurance end of it?  You indicated

11   that you took your motorcycle and did this.  How does the

12   insurance company get involved to make a payment?  What has to

13   happen?  Does somebody have to report it stolen?

14   A.  Yes.  Yes.

15   Q.  Did that occur here?

16   A.  Yes.

17   Q.  How did that happen?  How did that come about?

18   A.  Pauli reported it stolen to the police.

19   Q.  And why would Pauli report it stolen, rather than you?

20   A.  Because I gave him most of the parts, or all the parts.

21   Q.  All right.  So the plan was that Pauli would report it

22   stolen.

23           And was the plan that he would say it was -- he was

24   using it or borrowing it or something along those lines?

25   A.  Yes.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    Q.  And to your knowledge, did he report it stolen?

2    A.  Yes.

3    Q.  Was a cash payment made to you from the insurance company?

4    A.  Yes.

5    Q.  Approximately how much money did you get?

6    A.  Don't remember.

7    Q.  Was it significant?

8    A.  Yeah.

9    Q.  Couple thousand dollars?  Several thousand dollars?

10   A.  Couple thousand.

11   Q.  And the motorcycle that was disassembled and those three

12   items that you referenced, they were taken apart, yes?

13   A.  Yes.

14   Q.  Did you then order parts from a motorcycle part magazine?

15   A.  Yes.  Either I did or he did.  I can't remember.

16   Q.  So at some point you obtained legitimate parts; is that a

17   fair statement?

18   A.  Yes.

19   Q.  And what happened to that motorcycle?  Was it given to Paul

20   Darrah?

21   A.  Yes.

22   Q.  And did he ride it?

23   A.  Yes.

24   Q.  Did you do anything along that, those lines or similar for

25   any other members of the Devils Diciples?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   A.  Yes, I did.

2   Q.  Who did you do it for?

3   A.  Fat Dog.

4   Q.  All right.  Tell the members of the jury about that.

5   A.  There were the parts from that previous bike I admitted to

6   stealing.

7   Q.  From Shelby?

8   A.  Yes.  Those, those parts were involved in putting Fat Dog's

9   bike together.

10  Q.  And why did you put a bike together for Fat Dog?

11  A.  Because he asked me to.

12  Q.  And he didn't have a bike to ride; is that correct?

13  A.  Yes.

14  Q.  Or he wanted another one?

15  A.  Yes.

16  Q.  Both?

17  A.  He wanted --

18  Q.  Did he want another one or --

19  A.  He needed a bike to ride.

20  Q.  He needed a bike to ride.

21       And so you used parts from the bike that you

22  personally had stolen from Shelby?

23  A.  (Nodding head.)

24  Q.  Okay.  And did you charge Fat Dog or Pauli any money for

25  recreating motorcycles for them in this fashion?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1    A.  No.

2    Q.  Did they give you any money for it?

3    A.  Not that I can remember.

4    Q.  All right.  Did you do this for any other members of the

5    Devils Diciples?

6    A.  Not that I can remember.

7    Q.  Is it possible that you did, but you don't recall?

8    A.  Yes.

9    Q.  And did you do it for members of other motorcycles clubs,

10   like the Highwaymen or others?

11   A.  Yes.

12   Q.  You did?

13   A.  Yes.

14        MS. STOUT:  Your Honor, I'm going to object to, is it

15   possible that you did it for others and you just don't recall.

16        THE WITNESS:  I recall now there was a Road King that

17   I did that with.

18        THE COURT:  Oh, there.

19   BY MS. MOHSIN:

20   Q.  Can you tell us about the Road King?

21   A.  I gave it to my father.

22   Q.  And where did you get that particular motorcycle?

23   A.  From Monkey.

24   Q.  Okay.  Who is Monkey?

25   A.  Monkey was a guy in our club.  I think he got that bike

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - DIRECT BY MS. MOHSIN

1   from the Highwaymen.

2   Q.  So Monkey got a motorcycle from a Highwayman?

3   A.  Yes.

4   Q.  Do you know Monkey's real name?

5   A.  No.

6   Q.  And did you ever meet Monkey?

7   A.  Yes.

8   Q.  Do you remember -- well, how did you get the motorcycle

9   from Monkey?

10  A.  I went to his shop and looked at it.

11  Q.  And how did he get it?  Did he steal it or did he obtain it

12  in some other fashion?

13  A.  He either stole it or he obtained it from the Highwaymen.

14  Q.  And he gave it to you?

15  A.  Yes.

16  Q.  For what purpose?

17  A.  So I could build the bike.

18  Q.  And were you in need of one or was he offering to sell it

19  to you?  What were the circumstances?

20  A.  I bought it for a thousand dollars.

21  Q.  All right.  So you paid Monkey a thousand dollars for this

22  motorcycle.

23       Did you know that it was stolen when you paid him?

24  A.  Yes.

25  Q.  And you, did you do the same thing, create an assembled

1    title for this with parts from a legitimate source?

2    A.   Yes.

3    Q.   And did you give that to your father?

4    A.   Yes.

5    Q.   Okay.  Is this an activity, this stolen motorcycle

6    parts-related activity, a common activity that you engaged in

7    for a period of time?  Did it happen a lot?

8    A.   Yes.

9    Q.   Okay.  Now, Mr. Pizzuti, did there ever come a time where

10   you were working on behalf of the FBI and you were using or

11   abusing a controlled substance or an illegal drug?

12   A.   Yes.

13   Q.   Okay.  Can you tell the jury about that?

14   A.   It was Vicodin.

15   Q.   All right.  You were using Vicodin?

16   A.   Yes.

17   Q.   And was this a substance that you were using without the

18   knowledge of the FBI?

19   A.   Yes.

20   Q.   How often were you using it?

21   A.   I was using it all along.

22   Q.   All right.  And did there come a time where you were

23   confronted about your use --

24   A.   Yes.

25   Q.   -- of this substance?

1   A.  Yes.

2   Q.  And who were you confronted by?

3   A.  Dave.

4   Q.  Dave, the Special Agent from the FBI that we've been

5   talking about?

6   A.  Yes.

7   Q.  And did you admit to him that you had held this information

8   back?

9   A.  Yes.

10  Q.  Why did you hold it back?

11  A.  Because I didn't want to lose out on any extra pills.

12  Q.  All right.  Were you addicted to Vicodin at this point?

13  A.  Yes.

14  Q.  Now, did you use cocaine, snorting or otherwise, during the

15  time that you were cooperating with law enforcement?

16  A.  Yes.

17  Q.  All right.  Tell the jury about that.

18  A.  I was just -- I would use cocaine on weekends.

19  Q.  And was the FBI aware that you were doing this?

20  A.  No.

21  Q.  Did you ever reveal that to them?

22  A.  No.

23  Q.  Were you ever asked about cocaine?

24  A.  No.

25  Q.  All right.  Now, I want to direct your attention to after

1   you made these recorded calls, purchased these drugs.  Did you

2   continue to provide information to the FBI?

3   A.  Yes.

4   Q.  And when you were asked questions, were you truthful in

5   your answers?

6   A.  Yes.

7   Q.  Okay.  Did you hold back any other information?

8   A.  No.

9        MS. MOHSIN:  I have nothing further, your Honor.

10  Thank you.

11       Thank you, Mr. Pizzuti.

12       THE COURT:  Let's take about ten minutes for a

13  restroom break and stretch of the legs, ladies and gentlemen.

14  We'll work for probably another 15 to 20 minutes today, and

15  then we're going to recess.

16       Escort yourselves to the jury room, please.  Ten

17  minutes.

18       COURT REPORTER:  Please rise.

19    (Recess taken, 4:05 p.m. - 4:15 p.m.)

20       THE CLERK:  All rise.

21       THE COURT:  Wait on the jury.  I said wait.  CSO,

22  wait.  That means wait.  Okay.  Thank you.  All right.  Thank

23  you.  Just wait.  Okay.  Thank you.

24       Okay.  Back on the record.  Sit down.  Please be

25  seated.

```
 1              Counsel are present.  Defendants are present.

 2              It occurred to me after I recessed and told the

 3    jury we had more work to do that you may want to reserve,

 4    Ms. Darrah -- Mr. Darrah's counsel.  Ms. Maceroni suggested

 5    earlier the possibility of reserving until later.

 6              Are there any who are prepared for cross-examination

 7    of the witness now, at least 15 minutes or so.

 8              MR. SABBOTA:  I can.  I didn't mean to interrupt you.

 9    I can start and do 15 minutes.

10              THE COURT:  Okay.  So we'll use some time and then

11    you can decide whether to reserve.  He'll be back presumably

12    on -- at some time, probably Wednesday, when we resume the

13    Court session.

14              So let's bring the jury in and we'll proceed on that

15    basis.

16         (Jury in, 4:16 p.m.)

17              THE COURT:  Okay.  The jury is assembled.  Be seated,

18    please.  Everyone is in place.

19              And we're going to work for not more than an

20    additional 20 minutes this afternoon, and then recess until

21    Wednesday, ladies and gentlemen, consistent with the printed

22    schedule.

23              So for cross-examination, Mr. Sabbota?

24              MR. SABBOTA:  Thank you, Judge.

25              THE COURT:  If you're ready, sir, you may proceed.
```

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1                        CROSS-EXAMINATION

2    BY MR. SABBOTA:

3    Q.  How are you?

4    A.  All right.

5    Q.  Okay.  Mr. Pizzuti, you told us that you joined the Devils

6    Diciples in about 1999; is that about right?

7    A.  Uh-huh.

8    Q.  You have to say yes or no.

9    A.  Yes.

10   Q.  Or answer me any way you want and verbalize it, because the

11   lovely court reporter has to take it down.

12   A.  Okay.

13          THE COURT:  Okay?  Thank you.

14          THE WITNESS:  Okay.

15   BY MR. SABBOTA:

16   Q.  All right.  You said you joined roughly in 1999.

17   A.  Yes.

18   Q.  And there were certain rules when you joined the club; am I

19   right?

20   A.  Yes.

21   Q.  One of the rules was, you had to go to church?

22   A.  Yes.

23   Q.  And what church really was, is a meeting that's held by the

24   members of the club?

25   A.  Right.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1    Q.   The only people that could come to the church meetings were

2    members of the club?

3    A.   Right.

4    Q.   Outsider couldn't come?

5    A.   Right.

6    Q.   You had to be a member of the club?

7    A.   Right.

8    Q.   Prospect couldn't be there?

9    A.   Right.

10   Q.   Had to be a member of the club?

11   A.   Yes.

12   Q.   And the club also went on what they called runs, didn't

13   they?

14   A.   Yes.

15   Q.   And when we talk about runs, we talk about riding our

16   motorcycle?

17   A.   Yes.

18   Q.   They would go on runs to different clubs?

19   A.   Yes.

20   Q.   They would go on runs to parties?

21   A.   Yes.

22   Q.   They would go on runs just to drive your motorcycle?

23   A.   Yes.

24   Q.   And they used to do a lot of charity runs, didn't they?

25   A.   Yes.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   Q.  They did charity runs for the Port Huron Hospital?

2   A.  Yes.

3   Q.  They did charity runs for diabetes?

4   A.  Yes.

5   Q.  They did charity runs for mentally-handicapped children?

6   A.  Yes.

7   Q.  They did charity runs for the severely-impaired kids?

8   A.  Yes.

9   Q.  They used to do that all the time, didn't they?

10  A.  Yes.

11  Q.  How many charity runs do you think you went on?

12  A.  Hundreds.

13  Q.  Hundreds, didn't you?  Is that a yes?

14  A.  Yes.

15  Q.  It was sort of like a monthly thing?

16  A.  Yes.

17  Q.  They were doing something, and you used to talk about that

18  at church, they were doing something to sort of give back to

19  the community?

20  A.  Yes.

21  Q.  Am I right?

22  A.  Yes.

23  Q.  And that went on the entire time you were a member of the

24  Devils Diciples, didn't it?

25  A.  Yes.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1    Q.  It hasn't stopped, has it?

2    A.  No.

3    Q.  And the other thing you have to do is you have to pay dues?

4    A.  Yes.

5    Q.  Like any other club; yes?

6    A.  Yes.

7    Q.  So if you join, like, a country club, you've got to pay

8    dues?

9    A.  Yes.

10   Q.  You join the Devils Diciples, you've got to pay dues?

11   A.  Yes.

12   Q.  Dues were paid or assessed on a weekly basis?

13   A.  Yes.

14   Q.  Generally, it was $20 a week for your dues for the club?

15   A.  Yes.

16   Q.  And the dues went for things like to pay for the club?

17   A.  Yes.

18   Q.  Dues went for things like to pay for the booze?

19   A.  Yes.

20   Q.  Or the alcohol?

21   A.  Yes.

22   Q.  Dues went for things to support the club itself?

23   A.  Yes.

24   Q.  Because it's a club among various members; am I right?

25   A.  Yes.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1    Q.  And in order to support the club, you've got to have some

2    money?

3    A.  Yes.

4    Q.  And those were dues from legitimate sources?

5    A.  Yes.

6    Q.  In fact, you owned a bike shop, so to speak?

7    A.  Yes.

8    Q.  You were very good in rebuilding bikes and cars?

9    A.  Yes.

10   Q.  That was a legitimate job?

11   A.  Yes.

12   Q.  Am I right?

13   A.  Yes.

14   Q.  That wasn't a job that was illegal?

15   A.  No.

16   Q.  That was something you were skilled in, wasn't it?

17   A.  Yes.

18   Q.  And you did that for years; am I right?

19   A.  Yes.

20   Q.  And you said at one time, I think you were vice president?

21   A.  Yes.

22   Q.  That's an elected position, isn't it?

23   A.  Yes.

24   Q.  So nobody appoints you vice president.  The members of the

25   club come to church; am I right?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   A.   Yes.

2   Q.   And then they vote for who they want to be president.

3   A.   Yes.

4   Q.   And if they like you the best, you get to be president.

5   A.   Yes.

6   Q.   And that was a normal occurrence, wasn't it?

7   A.   Yes.

8   Q.   Various times, people would run, and they would get elected

9   president?

10  A.   Right.

11  Q.   Or vice president?

12  A.   Yes.

13  Q.   And sometimes, they would lose their election and get

14  thrown out?

15  A.   Right.

16  Q.   Am I right?

17  A.   Yeah.

18  Q.   Sort of politics?

19  A.   Yeah.

20  Q.   Also, my understanding is that you guys used to have

21  parties?

22  A.   Pardon me?

23  Q.   Parties.

24  A.   Yes.

25  Q.   You guys, I mean it's a bunch of guys that would get

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   together, would go to the clubhouse, drink, and have a good

2   time; am I right?

3   A.  You are right.

4   Q.  And you used to have a pretty good time at those parties,

5   didn't you?

6   A.  Yeah.

7   Q.  And for a long time, you were a member of that club,

8   enjoying those parties?

9   A.  Yes.

10  Q.  Now, during the course that you were a member of the club,

11  you were using marijuana; am I right?

12  A.  Yes.

13  Q.  In fact, you became, for lack of a better word, addicted to

14  marijuana while you were in high school?

15  A.  Yes.

16  Q.  And you used to use cocaine?

17  A.  Yes.

18  Q.  How much marijuana did you use a week, if you remember?

19  A.  What?

20  Q.  How much marijuana did you use a week?

21  A.  A week?

22  Q.  Yeah, a week.

23  A.  Probably smoke a joint a day.

24  Q.  All right.  So you smoked at least one joint a day.  And

25  how big were your joints?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   A.  About the size of a cigarette.

2   Q.  About the size of a cigarette.  And it would be at least

3   one a day, yes?

4   A.  Yes.

5   Q.  And during the time, did you also drink?

6   A.  Yes.

7   Q.  And how much did you drink during the week?

8   A.  During the weekend?

9   Q.  During the weekend.

10  A.  About a half gallon.

11  Q.  Half gallon of what?

12  A.  Bacardi.

13  Q.  Bacardi, the white rum?

14  A.  Yeah.

15  Q.  Did you mix it?

16  A.  Yeah.

17  Q.  So did you -- you smoked the joint and you mixed the rum,

18  yes?

19  A.  Yeah.

20  Q.  So you were pretty buzzed on most of the weekends; would

21  that be a fair statement?

22  A.  Yes.

23  Q.  And you also used cocaine?

24  A.  Yes.

25  Q.  And how much cocaine did you use?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   A.   A teener.

2   Q.   Okay.  For the benefit of the jury, what's like a teener?

3   A.   It's a gram and three-quarters.

4   Q.   Okay.  A gram and three-quarters.

5   A.   Yeah.

6   Q.   And did you snort that?

7   A.   Yes.

8   Q.   Because sometimes you laced it with marijuana, right?

9   A.   No.

10  Q.   Okay.  But you would snort it?

11  A.   Yes.

12  Q.   So you would drink, yes?

13  A.   Yes.

14  Q.   You would smoke marijuana?

15  A.   Yes.

16  Q.   And you'd snort the cocaine?

17  A.   Yes.

18  Q.   How often?

19  A.   Every weekend.

20  Q.   Over, let's say, the last seven-year period?

21  A.   Every weekend.

22  Q.   Every weekend.  And during the week, you would do some?

23  A.   No.

24  Q.   No.  Did you ever use any heroin?

25  A.   Pardon me?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

273

1   Q.  Did you ever use heroin?  Heroin, did you --

2   A.  No.  No.

3   Q.  You're sure you never used heroin?

4   A.  Positive.

5   Q.  Positive.

6           Do you remember testifying before the grand jury back

7   on June 1st of 2011?  Remember, there was a proceeding that was

8   held with a bunch of people?  And Mr. Straus was there, and

9   Ms. Mohsin was there?

10  A.  Yeah.

11  Q.  Do you remember that?

12  A.  Uh-huh.

13  Q.  Do you remember being asked the question:

14          "Did there come a time when you were also using any

15  other illegal drugs like heroin?"

16  A.  No.

17  Q.  Do you remember answering:  "Yes, there was a short while

18  that I was using heroin"?

19  A.  No.  I don't remember.

20  Q.  You don't remember that?

21  A.  No.

22  Q.  Do you remember being asked the question:

23          "Do you remember when that would have been,

24  approximately what years that was?"

25  A.  No.

UNITED STATES vs. SUTHERLAND, et al. -11-20120; 11-20066

274

1   Q.  You said approximately 2007 to 2005.  Do you remember that?

2   A.  No.

3   Q.  Okay.  Do you remember being asked the question whether you

4   ever were in rehab for any type of addiction, and you said for

5   heroin?  Do you remember that?

6   A.  No.

7   Q.  Are you sure?

8   A.  Yeah.

9   Q.  Do you remember testifying before the grand jury?

10  A.  Yeah.

11  Q.  But you don't remember answering those questions?

12  A.  No, I don't.

13  Q.  If I were to approach you and you were to review it, would

14  it refresh your recollection?

15  A.  Probably.

16        MR. SABBOTA:  May I approach him, your Honor, please?

17        THE COURT:  Yes, you may.

18  BY MR. SABBOTA:

19  Q.  It's right there, sir.  Just take your time.

20  A.  That purple there?

21  Q.  The purple, to make it easy for you.

22  A.  Okay.  I said it.

23  Q.  You said it.

24  A.  Yup.

25  Q.  If you said it at the time, it would have been true, I

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   would think?

2   A.   Yes.

3   Q.   Yes?

4   A.   Yes.

5   Q.   Am I right?

6   A.   Yes.

7   Q.   All right.  You were under oath at the time, just like you

8   are today?

9   A.   Yup.

10  Q.   Am I right?

11  A.   Yup.

12  Q.   Before the jury?

13  A.   Yup.

14  Q.   So during the period of time, sir, from those dates, you

15  were also using heroin?

16  A.   Yup.

17  Q.   How much heroin were you using?

18  A.   I don't remember.

19  Q.   You don't remember?

20  A.   No.

21  Q.   Were you using it in combination with the cocaine?

22  A.   I don't remember.

23  Q.   Were you using it in combination with the marijuana?

24  A.   I don't remember.

25  Q.   Were you using it in combination with the alcohol?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1    A.  I don't remember.

2    Q.  And then there came a time that, I guess, you used to get

3    pounds of marijuana from Rich?

4    A.  Yes.

5    Q.  From Mr. Rich?  Is that a yes?

6    A.  Yes.

7    Q.  When did you begin getting pounds of marijuana?  When did

8    that begin?

9    A.  I don't remember.

10   Q.  Okay.  Did it happen in 2000?

11   A.  I don't remember.

12   Q.  How many times do you think you got pounds of marijuana?

13   A.  A few times.

14   Q.  A few times?

15   A.  I guess.

16   Q.  And the reason you got pounds of marijuana was to sell it,

17   I would think?

18   A.  Yes.

19   Q.  Because a pound of marijuana is a lot of marijuana for a

20   guy to use, isn't it?

21   A.  Yeah.

22   Q.  All right.  How much would you sell it for?

23   A.  The pound?

24   Q.  Yeah.

25   A.  A thousand.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   Q.  And you would, you would sell it by the pound?

2   A.  Yeah.

3   Q.  So you were a pound marijuana dealer?

4   A.  Yeah.

5   Q.  For how long were you a pound marijuana dealer?

6   A.  I only had -- I can't remember exactly.  I think it was

7   only three or four buys.

8   Q.  All right. So three or four times, at least, you sold

9   marijuana?

10  A.  Right.

11  Q.  And you sold marijuana to citizens, didn't you?

12  A.  Yeah.

13  Q.  Okay.  What I mean by "citizens," the marijuana that you

14  sold, it wasn't to guys that rode bikes?

15  A.  Yeah.

16  Q.  Right?

17  A.  No.

18  Q.  It wasn't to the Highwaymen?

19  A.  Went to a guy who rode a bike.

20  Q.  Okay.  But it wasn't to the Devils Diciples?

21  A.  No.

22  Q.  He was a citizen?

23  A.  Yes.

24  Q.  What I mean by a citizen was, he wasn't a member of the

25  club.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1    A.   No.

2    Q.   Am I right?

3    A.   Yes.

4    Q.   All right.  And then what happens in roughly 2006, the ATF

5    people come to your house; am I right?

6    A.   Uh-huh.

7    Q.   Is that a yes?

8    A.   Yes.

9    Q.   And when they come to your house, they search your house,

10   and they find a gun with a silencer on it.

11   A.   Yup.

12   Q.   Now, you knew it was illegal to have the silencer?

13   A.   Yeah.

14   Q.   You knew you were breaking the law by having the silencer.

15   A.   Yes.

16   Q.   And you were kind of upset that the ATF came and found this

17   silencer.

18   A.   Yeah.

19   Q.   And so the first thing that happened was, they took a

20   statement from you.

21   A.   Yup.

22   Q.   Do you remember that?

23   A.   Yup.

24   Q.   Ms. Mohsin said how you raised -- you didn't raise your

25   hand, but what you did was they advised you of your rights?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   A.   Yeah.

2   Q.   You had the right to have a lawyer, right?

3   A.   Yup.

4   Q.   Right to remain silent?

5   A.   Yup.

6   Q.   Right not to have anything used against you?

7   A.   Yeah.

8   Q.   Am I right?

9   A.   Yup.

10  Q.   And the first thing you did was lie to them.

11  A.   Yup.

12  Q.   And so we know what a lie is; that's like a

13  misrepresentation of the facts for one's benefit?

14  A.   Yup.

15  Q.   And the reason you lied was, hopefully, to protect

16  yourself, wasn't it?

17  A.   No.  I was afraid.

18  Q.   You were afraid.

19  A.   Yeah.

20  Q.   But you lied?

21  A.   Yeah.

22  Q.   And the lie was an intentional lie?

23  A.   No, it wasn't intentional.

24  Q.   It was not intentional?

25  A.   (Shaking head.)

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1  Q.  It was just a lie?

2  A.  Yeah.

3  Q.  All right.  You didn't decide to tell anybody the truth for

4  about a year; am I right?

5  A.  I don't remember.

6  Q.  Well, eventually, you have a conversation where you tell

7  them you bought the gun from a Little Dog, roughly in January

8  of 2007.  Do you remember that conversation?

9  A.  Yup.

10  Q.  And then you told them that you bought this gun from Little

11  Dog?

12  A.  Yup.

13  Q.  Am I right?

14  A.  If that's what this says.

15  Q.  And Little Dog, at the time, was dead?

16  A.  Pardon me?

17  Q.  Was Little Dog dead at the time?

18  A.  I don't remember.

19  Q.  All right.  But Little Dog has died?

20  A.  Yes.  He's dead.

21  Q.  All right.  So there's no way to verify that, other than we

22  have your word?

23  A.  Yup.

24  Q.  The first word you're telling us is a lie, the second time

25  you're telling us, it's the truth?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   A.  Right.

2   Q.  Let's talk about the steak fry where you made your first

3   purchase of meth, all right?

4   A.  Okay.

5   Q.  Because what happens is, you get jammed up with the

6   Government; am I right?

7   A.  Yeah.

8   Q.  You don't want to go to prison?

9   A.  Right.

10  Q.  You want to do whatever it takes to get you out --

11  A.  Yeah.

12  Q.  -- of a federal situation, don't you?

13  A.  Yeah.

14  Q.  Okay.  And you also wanted to benefit your father, didn't

15  you?

16  A.  Yeah.

17  Q.  Because your father got -- picked up a charge, too, didn't

18  he?

19  A.  Yeah.

20  Q.  And so one of the benefits that you have already received

21  is that your father hasn't been charged; isn't that right?

22  A.  Uh-huh.

23  Q.  Is that a yes?

24  A.  Yeah.

25  Q.  All right.  So you've got that benefit for your

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1    cooperation.  We're just waiting to see the entire benefit

2    you're going to get; am I right?

3    A.  Yeah.

4    Q.  And that's why it's dismissed; right now, the case is

5    pending on how you do?

6    A.  On how I do?

7    Q.  Yeah.  How you -- how well you come off in court, how you

8    testify.

9    A.  I'm just hoping not to go to jail.

10   Q.  I understand that.  But you're here to cooperate, hopefully

11   to get some kind of benefit, aren't you?

12   A.  I suppose.

13   Q.  Sure.  Well, you're not doing it out of the goodness of

14   your heart, are you?

15   A.  No.

16   Q.  All right.  And so let's talk about the steak fry, where

17   you say the first deal was made with Vern Rich.  You were wired

18   up, right?

19   A.  Pardon me?

20   Q.  The first deal that you made with Vern Rich.  We'll talk

21   about the steak fry.  Okay?

22   A.  Okay.

23   Q.  Now, the steak fry is something that's held all the time by

24   the club?

25   A.  Yeah.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   Q.   Am I right?

2   A.   Yup.

3   Q.   And what it is, is a big party?

4   A.   Yup.

5   Q.   How many people do you think were at the steak fry?

6   A.   A hundred.

7   Q.   At least a hundred, yes?

8   A.   Yeah.

9   Q.   And normally at these parties, there's alcohol?

10  A.   Yup.

11  Q.   There's marijuana?

12  A.   Yeah.

13  Q.   Marijuana brought by various people, so they can smoke

14  their marijuana?

15  A.   Right.

16  Q.   Just like you would bring your own marijuana and smoke it,

17  right?

18  A.   Yup.

19  Q.   Some people may have meth?

20  A.   Yup.

21  Q.   Some people may have cocaine?

22  A.   Uh-huh.

23  Q.   Yes?

24  A.   Yup.

25  Q.   Some people may have had pills?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   A.  Yup.

2   Q.  All kinds of stuff that an individual could use if they

3   wanted to?

4   A.  Yup.

5   Q.  Right?

6   A.  Yup.

7   Q.  And so you have to, to benefit yourself, make some kind of

8   meth buy for the FBI; am I right?

9   A.  Yeah.

10  Q.  Because that's what they want.  They want somebody -- they

11  want you to get them meth, yes?

12  A.  They want me what?

13  Q.  They want you to buy meth.

14  A.  Yeah.

15  Q.  They are trying to build a case, yes?

16  A.  Yes.

17  Q.  All right.  So what happens is they wire you up.  And when

18  they wire you up, you go in to buy some meth from Vern Rich?

19  A.  Yes.

20  Q.  Only you claim that Vern Rich doesn't give you the meth?

21  A.  Yeah.

22  Q.  That Gun Control gives you the meth?

23  A.  Yeah.

24  Q.  But he gives you the meth, as you described it, in a

25  certain way, doesn't he?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1    A.  Yeah.

2    Q.  What he does is, he puts it in his hand and he conceals it?

3    A.  Yeah.

4    Q.  So nobody else knows what you're doing.

5    A.  Right.

6    Q.  The reason he concealed it is so nobody could see that you,

7    in fact, were making a buy?

8    A.  Right.

9    Q.  So no other members of the club that could know or see that

10   there's any drug dealing going on, right?

11   A.  Right.

12   Q.  Isn't that why it was concealed?

13   A.  Yes.

14   Q.  And the way he concealed it in his hand, you then concealed

15   it, didn't you?

16   A.  Yes.

17   Q.  Because you wanted to make sure nobody saw what was going

18   on?

19   A.  Right.

20   Q.  Because this is a private kind of a sale, isn't it?

21   A.  Yes.

22   Q.  And after the private sale, you stick it in your pocket?

23   A.  Yeah.

24   Q.  Am I right?

25   A.  Yeah.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   Q.  You make some kind of excuse, I've got to get out of here?

2   A.  Yup.

3   Q.  For whatever reason?

4   A.  Yup.

5   Q.  And you leave.

6   A.  Yup.

7   Q.  All right.  Now, you leave and you say that there's $100

8   that's given to you to go back and play a slot machine; am I

9   right?

10  A.  Yup.

11  Q.  Now, those slot machines are there for the benefit of the

12  club, aren't they?

13  A.  Yup.

14  Q.  I mean, what they do is the guys that are members of this

15  club play the slot machine?

16  A.  Correct.

17  Q.  Sort of like pay-to-play poker in a house?

18  A.  Yeah.

19  Q.  And the money goes to the house?

20  A.  Yup.

21  Q.  So the slot machines are used to support the clubhouse

22  itself, aren't they?

23  A.  Yes.

24  Q.  And the guys that play the slot machines are members of the

25  DMC?

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   A.  Right.

2   Q.  They are the club members?

3   A.  Yes.

4   Q.  In their private club, they know they are playing this, so

5   the money goes to the house; am I right?

6   A.  Yes.

7   Q.  Let's talk about the second buy.  They wire you up to make

8   a second buy of meth.  This is the second one that you make.

9   And this is at your place of business; am I right?

10  A.  Yes.

11  Q.  Your place of business at the time was located on

12  Schoenherr Street?

13  A.  Yes.

14  Q.  Was it 23 Mile?

15  A.  Yes.

16  Q.  24 Mile?

17  A.  Yes.

18  Q.  And so the jury understands, it's like a big place, isn't

19  it?

20  A.  Yes.

21  Q.  Because you repair cars.  You're also really good at cars,

22  I hear, aren't you?

23  A.  Yes.

24  Q.  Where you can rebuild cars?

25  A.  Yes.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   Q.  Hot rods?

2   A.  Yes.

3   Q.  Customize them?

4   A.  Yes.

5   Q.  Put those fancy wheels on it?

6   A.  Yes.

7   Q.  And so you've got a real big place?

8   A.  Yes.

9   Q.  You do the same thing with motorcycles?

10  A.  Yes.

11  Q.  Because you're a pro at that kind of stuff, aren't you?

12  A.  Yeah.

13  Q.  In fact, you've got a reputation in the motorcycle

14  community for both people that are members of motorcycle clubs

15  and just civilians, if I wanted to have a bike made that's

16  custom, I ought to go see you?

17  A.  Yes.

18  Q.  Am I right or wrong?

19  A.  Right.

20  Q.  All right.  So what happens is there's going to be a second

21  buy that's, or a second sale that's going to be made over at

22  your place of business?

23  A.  Yes.

24  Q.  It's going to be made, I guess there's other people that

25  are inside where your place is; am I right?

UNITED STATES vs. SUTHERLAND, et al. -11-20120; 11-20066

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1    A.   Yes.

2    Q.   Okay.  And what I mean inside, they are not outside the

3    business, they are inside?

4    A.   Yes.

5    Q.   The deal that's being made is between you and Pauli?

6    A.   Yes.

7    Q.   Nobody else knows about it, do they?

8    A.   No.

9    Q.   Because you don't tell anybody about it, do you?

10   A.   No.

11   Q.   And what you do is you go outside of the business to make

12   the sale?

13   A.   Yes.

14   Q.   And you go outside of the business to make the sale, so

15   it's just between you and him?

16   A.   Yes.

17   Q.   It's concealed?

18   A.   Right.

19   Q.   Just like the time you made the first sale?

20   A.   Right.

21   Q.   It's concealed, just between you and him?

22   A.   Right.

23   Q.   So everybody that was there that was inside of your

24   business didn't know what was going on outside?

25   A.   Right.

UNITED STATES vs. SUTHERLAND, et al. -11-20120; 11-20066

1    Q.   And the meth that was handed to you, was meth -- was given

2    to you in a Marlboro box?

3    A.   Right.

4    Q.   Which was concealed in the box like a pack of cigarettes?

5    A.   Right.

6    Q.   Because the box closes and you can't see through it unless

7    you got x-ray eyes; am I right?

8    A.   Right.

9    Q.   So if I look at it, I'm going to see a box of cigarettes?

10   A.   Right.

11   Q.   A box of Marlboro Red, I think it was, wasn't it?

12   A.   Yeah.

13   Q.   Okay.  And then we got the third sale, which occurs later.

14   And this, again -- now, this sale is at your home?

15   A.   Yeah.

16   Q.   Am I right?

17   A.   Yup.

18   Q.   And you really have the same scenario.  The sale is

19   outside, in a car, which is private?

20   A.   Yeah.

21   Q.   Am I right?

22   A.   Yup.

23   Q.   Money and everything is transferred privately in the car?

24   A.   Yes.

25   Q.   Now, each one of those sales that was made to you, was an

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

 1   individual sale, wasn't it?

 2   A.  Yes.

 3   Q.  It was a sale that was being made on behalf of Vern Rich?

 4   A.  Yes.

 5   Q.  And Vern Rich was getting the money?

 6   A.  Yes.

 7   Q.  And what Vern Rich was doing with the money, you don't

 8   know?

 9   A.  No.

10   Q.  Right?  He wasn't giving you any of the money?

11   A.  No.

12   Q.  He wasn't giving me any of the money, right?

13   A.  Right.

14   Q.  He was earning for himself?

15   A.  Right.

16   Q.  Sort of like an independent guy earning a couple bucks?

17   A.  Right.

18   Q.  Am I right?

19   A.  Right.

20   Q.  That's how you were when you were selling the marijuana,

21   too, isn't it?

22   A.  Huh?

23   Q.  I'm sorry.  You were independent when you were selling the

24   marijuana; isn't that right?

25   A.  Yes.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1  Q.  You weren't selling the marijuana on behalf of anybody,

2  were you?

3  A.  Huh-huh.

4  Q.  Is that a no?

5  A.  No, I wasn't.

6  Q.  Okay.  You weren't sharing the money, were you?

7  A.  No.

8  Q.  The money was your money?

9  A.  Yes.

10  Q.  You take the risk, yes?

11  A.  Yes.

12  Q.  You make the sale?

13  A.  Yes.

14  Q.  You get to keep the proceeds?

15  A.  Yes.

16  Q.  That's how it works, isn't it?

17        Let's talk about now -- may I have just a second,

18  Judge?

19        THE COURT:  Yes.  One more minute and we're going to

20  recess, FYI.

21        MR. SABBOTA:  Do you want me to keep going?

22        THE COURT:  For one minute.

23        MR. SABBOTA:  Okay.

24  BY MR. SABBOTA:

25  Q.  Let's talk about the way you defraud when you sell bikes,

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1   all right?  Do you understand what I'm saying, by defraud?

2        You did an insurance job on your bike?

3   A.  Yes.

4   Q.  Okay.  An insurance job is a fraud, isn't it?

5   A.  Yes.

6   Q.  That's when you misrepresent to an insurance company facts

7   about your bike.

8   A.  Yes.

9   Q.  What it is, is another lie.

10  A.  Yes.

11  Q.  Okay.  You did that for an insurance scam; am I right?

12  A.  Yes.

13  Q.  And then based on this misrepresentation -- and you're

14  pretty good at doing it, aren't you?  You were back then.

15  Maybe not today, but back then, when you did that, you were

16  pretty good at it, weren't you?

17  A.  Yeah.

18  Q.  Sure.  And so what you do is, you have to misrepresent not

19  only to the public, you've got to misrepresent to the agency

20  known as the Secretary of State; yes?

21  A.  Explain that one again?

22  Q.  Sure.  When you go to the Secretary of State to register

23  the bike, you're not doing it honestly, are you?  You're

24  misrepresenting what the --

25  A.  By that time, you are.

JURY TRIAL, VOLUME IV - 10/20/2014
JOHN PIZZUTI - CROSS BY MR. SABBOTA

1    Q.  Well, after you break it down.

2    A.  No.  After it's already put back together, it's legal.

3    Q.  Okay.  Well, you make it legal after you have

4    misrepresented to the insurance company, right?

5    A.  Right.

6    Q.  And part of the misrepresentation is you get to get paid?

7    A.  I get what?

8    Q.  You get to get paid by the insurance company.  Don't they

9    pay you?

10   A.  Yeah.

11   Q.  All right.  And you used to do that a lot, didn't you?

12   A.  Yup.

13   Q.  How many times do you think, between 2000 and 2009, did you

14   pull an insurance fraud?

15   A.  Did I, my -- personally?

16   Q.  Yeah.  Or assist somebody else in pulling one.

17   A.  Or assist somebody?

18   Q.  Yeah.

19   A.  Just two.

20   Q.  Two?

21   A.  Two.

22   Q.  How many stolen bikes did you put together over the period

23   from 2000 to 2009?

24   A.  Four.

25   Q.  Four.

```
 1              THE COURT:  Okay.  We'll pick it up on Wednesday
 2    morning, Mr. Sabbota.
 3              MR. SABBOTA:  All right.  Thank you, Judge.
 4              THE COURT:  We'll recess in just a moment, ladies and
 5    gentlemen of the jury.
 6              You'll put your books away and we're having a
 7    pre-scheduled day of other activities tomorrow in court and
 8    with the attorneys and so forth with other obligations.
 9              We'll pick up Wednesday's session on the same schedule
10    as today.  It is an all-day session, as is Thursday's.  Friday,
11    I remind you, is a partial day session.  So otherwise, I
12    suppose thought of as an early start to the weekend.  But I
13    appreciate your attention and your attendance here today.  Put
14    the matter off your minds.  Again, no discussion, reading or
15    writing about the case while you're away from court, please.
16              You may rise and leave.  And we stand in recess.
17              COURT REPORTER:  All rise.
18        (Jury out, 4:41 p.m.)
19        (Proceedings concluded, 4:41 p.m.)
20
21                          *      *      *
22
23
24
25
```

1

2                        **CERTIFICATE OF REPORTER**

3

4              As a Federal Official Court Reporter for the United

5     States District Court, appointed pursuant to provisions

6     of Title 28, United States Code, Section 753, I do hereby

7     certify that the foregoing is a correct transcript of

8     the proceedings in the above-entitled cause on the date

9     hereinbefore set forth.

10

11

12                              Dated this 20th day of October.

13

14                               s/ Christin E. Russell
                                Christin E. Russell
15                              RMR, CRR, FCRR, CSR
                                Federal Official Court Reporter
16

17

18

19

20

21

22

23

24

25