```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,

 4                    Plaintiff,          Case No. 11-20129
                                          Case No. 11-20066
 5       -v-

 6    SCOTT WILLIAM SUTHERLAND, D-1,
      PATRICK MICHAEL MCKEOUN, D-4,
 7    JEFF GARVIN SMITH, D-5/D-1,
      PAUL ANTHONY DARRAH, D-6/D-2,
 8    CARY DALE VANDIVER, D-7/D-5,
      VINCENT WITORT, D-8,
 9    DAVID RANDY DROZDOWSKI, D-17,

10                    Defendants.
      _____/
11
                        JURY TRIAL, VOLUME V
12
              BEFORE THE HONORABLE ROBERT H. CLELAND
13                 United States District Judge
             Theodore Levin United States Courthouse
14                231 West Lafayette Boulevard
                       Detroit, Michigan
15                Wednesday, October 22, 2014
      APPEARANCES:
16
      FOR THE PLAINTIFF:   SAIMA MOHSIN
17                         ERIC STRAUS
                           U.S. Attorney's Office
18                         211 W. Fort Street, Suite 2000
                           Detroit, MI  48226
19
                           JEROME MAIATICO
20                         United States Department of Justice
                           1301 New York Avenue, NW
21                         Washington, DC 20005

22    FOR THE DEFENDANT:   CRAIG A. DALY
                           (Sutherland, D-1)
23                         615 Ford Building
                           Suite 820
24                         Detroit, MI 48226

25
```

```
 1    APPEARANCES:            (Continued)

 2    FOR THE DEFENDANT:      SIDNEY KRAIZMAN
                              (McKeoun, D-4)
 3                            1616 Ford Building
                              Detroit, MI 48226
 4
                              JEROME SABBOTA
 5                            (Smith, D-5/D-1)
                              26862 Woodward Avenue, Suite 200
 6                            Royal Oak, MI 48067

 7                            PATRICIA A. MACERONI
                              (Darrah, D-6/D-2)
 8                            26611 Woodward Avenue
                              Huntington Woods, MI 48070
 9
                              MARK A. SATAWA
10                            (Vandiver, D-7/D-5)
                              3000 Town Center, Suite 1800
11                            Southfield, MI 48075

12                            KIMBERLY W. STOUT
                              (Witort, D-8)
13                            370 East Maple Road, Third Floor
                              Birmingham, MI 48009
14
                              BYRON H. PITTS
15                            535 Griswold, Suite 1630
                              Detroit, MI 48226-4218
16
                              PHILLIP D. COMORSKI
17                            535 Griswold
                              2632 Buhl Building
18                            Detroit, MI 48226

19                            RYAN H. MACHASIC
                              (Drozdowski, D-17)
20                            134 Market Street
                              Mount Clemens, MI 48043
21
            To Obtain a Certified Transcript Contact:
22                     Christin E. Russell
              RMR, FCRR, CRR, CSR - (248) 420-2720
23          Proceedings produced by mechanical stenography.
           Transcript produced by computer-aided Transcription.
24

25
```

I N D E X

JURY TRIAL, VOLUME V                                    PAGE

WITNESSES FOR THE GOVERNMENT:

JOHN PIZZUTI
  Cross-Examination By Ms. Maceroni                       22
  Cross-Examination By Mr. Satawa                         38
  Cross-Examination By Ms. Stout                          52
  Redirect Examination By Ms. Mohsin                      57

WILLIAM FLEMING
  Direct Examination By Ms. Mohsin                        72
  Cross-Examination By Ms. Maceroni                      113
  Cross-Examination By Mr. Satawa                        121
  Redirect Examination By Ms. Mohsin                     130


ANTHONY CLARK
  Direct Examination By Mr. Straus                       144
  Cross-Examination By Mr. Pitts                         235
  Cross-Examination By Mr. Sabbota                       237
  Cross-Examination By Mr. Daly                          252

E X H I B I T S

Government's Exhibit                                    Page
Exhibit D-1                                              54
Exhibit D-2                                              57
Exhibit T, T-1 - T-333, T-1A - T-333A                   79
Exhibit R, R-1 - R-12, R-1A - R-12A                     79
Exhibit 29-1                                            110
Exhibit 15-2, 15-4 - 15-7, 15-9, 15-10                 229
Exhibit 56-8                                            233




CERTIFICATE OF REPORTER                                281

```
 1  Detroit, Michigan
 2  October 22, 2014
 3  9:03 a.m.
 4       (Call to Order of the Court; all parties present.)
 5              *              *              *
 6       THE CLERK:  Calling Case No. 11-20129 and 11-20066,
 7  United States of America vs. Scott Sutherland and others.
 8       THE COURT:  Thank you.
 9       The Court recognizes all counsel.  Defendants are all
10  present.  Good morning.
11       The jury has assembled.  Be seated, please.  The jury
12  has assembled.
13       As I understand it, the witness is parking his car,
14  Ms. Mohsin, is that right?
15       MS. MOHSIN:  Yes, your Honor.  My understanding, he
16  was delayed in traffic, but he is downtown, parking, and
17  hopefully should be here shortly.
18       THE COURT:  In the meanwhile, we have a government
19  motion in limine to exclude evidence involving an allegation of
20  witness wrongdoing.  That's focusing on Clark, right?
21       MS. MOHSIN:  Yes, your Honor.
22       THE COURT:  Ms. Stout has given you a response this
23  morning.  Do you want to discuss your motion and the outline of
24  the -- is that Mr. Maiatico's motion?
25       MR. MAIATICO:  Yes.  If I may, your Honor.  Yes.
```

1           The Government has filed this motion in limine with

2    regards to an upcoming witness, Mr. Clark.  There is an

3    allegation that he was involved in an ongoing -- an unsolved

4    murder, it's an ongoing investigation by the FBI, a murder from

5    14 years ago.

6           THE COURT:  And wait, there's an allegation that he's

7    involved in the investigation or --

8           MR. MAIATICO:  There is --

9           THE COURT:  -- or he is involved in the investigation?

10          MR. MAIATICO:  So, there's an allegation that he was

11   involved in the murder.  There is an individual from the

12   Highwaymen, as covered in our briefed, an individual by the

13   name of Daniel Sanchez who makes that allegation.  A report of

14   the proffer session where that allegation was made was provided

15   to the defense.

16          THE COURT:  And Clark, Clark alleges that Sanchez was

17   involved and that he was not?

18          MR. MAIATICO:  That's correct.  It's a he-said/he-said

19   at this point.  It's an ongoing murder investigation.

20          And, your Honor, I would just note for the Court that

21   Circuit after Circuit has said that an allegation of murder is

22   not probative of a witness's truthfulness.

23          THE COURT:  A conviction of murder is not probative of

24   truthfulness; in fact, conviction of an assault is not.  But

25   what about the -- what about cross-examination into a witness's

 1    motivation to curry favor, motivation to shade the truth,

 2    motivation to avoid further scrutiny or to alleviate charges

 3    and so forth, to avoid prosecution?  There's, there's something

 4    in that, that is probative of truthfulness or credibility,

 5    right?

 6         MR. MAIATICO:  Well, your Honor, even if it is

 7    probative, and we believe that's not probative of his motive to

 8    lie, we believe that Rule 403 balancing keeps this out.  This

 9    is --

10         THE COURT:  And would Rule 403's balancing be

11    satisfied if the specifics of the felony, felonious conduct

12    allegation, were omitted?

13         MR. MAIATICO:  If you could say that again?  If --

14         THE COURT:  Would 403's balancing and fairness

15    concerns be satisfied, that is, to avoid inflaming the jury

16    and misleading them and so forth, in the event that

17    cross-examination were permitted, but the specifics, the

18    specific nature of the allegations, the inflammatory nature of

19    the allegations, were omitted from the questioning?

20         MR. MAIATICO:  Well, your Honor, the Government's

21    position is it still doesn't -- it's still not probative of his

22    motive to lie.  And I want to point out for the Court, because

23    it's not discussed in our motion, but there is a cooperation

24    agreement with Mr. Clark.  And as part of that cooperation

25    agreement, there's a carve-out.  And defense counsel have a

1   copy of this.  I'm not sure if the Court does, but I'm happy to

2   provide it.  But in that carve-out --

3           THE COURT:  I'm pretty sure I don't.

4           MR. MAIATICO:  There is no expectation from Mr. Clark

5   of any sort of benefits that he's going to receive with regards

6   to this ongoing murder investigation.  I'll read the relevant

7   section here.

8           "The defendant," meaning Mr. Clark, "is aware of an

9   ongoing investigation being conducted by the Detroit Field

10  Office of the FBI involving the murder of --" of the victim.

11  "Defendant acknowledges there are no promises or other

12  agreements regarding the disposition of that matter by the

13  United States Attorney's Office."

14          So there is no motive to lie.  And even if there is a

15  motive to lie, there -- this is certainly a highly provocative

16  event.  It's a collateral matter.  It has nothing to do with

17  the Devils Diciples.

18          THE COURT:  Identify, what is the provocative nature

19  of the event?

20          MR. MAIATICO:  It's the fact that it's a, it's an

21  allegation of murder.

22          THE COURT:  And so let's circle back to my original

23  question to you about alleviating 403's concern by omitting any

24  mention or hint or suggestion about the nature of the, of the

25  events at issue.

1     MR. MAIATICO:  So if you're -- if I understand you

2  correctly, are you suggesting that a question might be proper

3  that would be:  Mr. Clark, are you involved or are you a

4  suspect in an ongoing criminal investigation?

5     THE COURT:  Isn't it true that you're, that yeah, that

6  an ongoing investigation, and you've spoken about it, in fact,

7  you've given information about it, but that it's still

8  uncertain about your possible involvement, there's some

9  allegation that you were involved.  And he would affirm, I

10  would imagine, that state of affairs and then some other

11  questions may be proffered with respect to his motivation to

12  avoid the spotlight or avoid being accused.  I don't know how

13  it would be phrased exactly, but that's -- that would be up to

14  the cross-examiner.

15     MR. MAIATICO:  The Government would still be opposed

16  to that, your Honor, because of, number one, the age of this

17  investigation and the age of the alleged crime.  The fact that

18  this is --

19     THE COURT:  Hang on.

20     MR. MAIATICO:  There's one allegation by one

21  individual --

22     THE COURT:  Hang on.  The age of it is current, isn't

23  it?

24     MR. MAIATICO:  Well, the crime -- it's been 14 years,

25  and no one has been charged with this crime.

1        THE COURT:  But the investigation is currently --

2        MR. MAIATICO:  The investigation is ongoing.

3        THE COURT:  Actively being pursued, not stuck away in

4   the cold case files.

5        MR. MAIATICO:  I am not privy to the -- I have not

6   talked to the agent on this case.  I have not talked to the

7   investigators.  I'm not aware of how active the investigation

8   is.  But I can tell you that this is -- the allegation was made

9   many, many years ago.  The denial happened in a proffer session

10  a few -- last month.  And so the, the status of the

11  investigation, all I can tell you is that it is ongoing.

12       THE COURT:  Okay.  Well, I think I have your position.

13       Ms. Stout, you filed the response.  If I were to

14  determine that no mention is to be made or hinted at in terms

15  of the nature of the investigation, how would you suggest that

16  any such questioning, if I were satisfied, in other words, that

17  Rule 403 were --

18       MS. STOUT:  Your Honor --

19       THE COURT:  -- taken into account reasonably by

20  avoiding mention of the specifics, and thus, not to mislead or

21  inflame the jury, on that assumption, what could you make of

22  this?  How would this conceivably relate to the witness's

23  credibility?

24       MS. STOUT:  Your Honor, this is a violation of the

25  right to confrontation.  I don't see how you temper --

1           THE COURT:  What is, what is a violation?

2           MS. STOUT:  By not having full cross-examination of

3    somebody's benefit or potential gain.

4           THE COURT:  Well, that avoids my question.  My

5    question is how, how would you tie -- if you start with that

6    assumption, how would this tie into a witness's believability

7    or credibility?  Or, or an alternative -- that's alternative A.

8    Alternative B, assume there were no restrictions at all.  What

9    does this have to do with his credibility?

10          MS. STOUT:  Because I think this is disingenuous, your

11   Honor.  It's my understanding, he's seeking a Rule 35 in this

12   matter.  That's not true that he's not going to benefit from

13   his testimony today.  This is an old case.  My client doesn't

14   have any records.  So talk about age, this goes back to the

15   early '90s.  I don't care how old this murder is.  These people

16   are all allegedly in a RICO, the witnesses and the defendants.

17          THE COURT:  I'm not hearing anything that suggests any

18   tie into the witness's credibility by examination --

19          MS. STOUT:  It's --

20          THE COURT:  -- by examination of this investigation.

21          MS. STOUT:  Because he does mean to curry favor, is my

22   argument.

23          THE COURT:  How would examining this witness on his --

24   on an allegation that he was involved in an event, whatever the

25   nature of the event may have been 14 years ago, how would

1    questioning him on that point, bringing out his denial and so

2    forth, how would that assist the jury in evaluating his

3    credibility?

4          MS. STOUT:  Because while he's testifying up there,

5    your Honor, it's my belief, as well as it was with Mr. Peters,

6    and I'm sure several other witnesses that will appear, that

7    they could all be charged.  The Government is suggesting that

8    maybe he's not even a suspect.  But there's allegations of

9    murder here that these men didn't commit, but just because they

10   belonged to the Devils Diciples, they are being aiders and

11   abettors, party co-conspirators.  The same applies to this

12   witness.

13         And so anytime someone gets up there with outstanding

14   allegations that put them in conspiracies, whether they are the

15   actual murderer, or torturer or raper, which we're going to

16   hear, this jury is going to be very inflamed, whether they are

17   actually involved or just in that organization that did it,

18   they are all just as liable.

19         And he is currying favor.  He's got a Rule 35 pending.

20   He's relocated.  He doesn't want to be charged with murder

21   by -- I don't know if they've even talked to state prosecutors.

22   I don't know what the FBI's investigation scope is.  He is

23   currying favor, and the jury needs to know that he has

24   something to gain by his exaggeration, miss -- anything that he

25   says.  They are the assessors of his credibility.

 1           THE COURT:  But that, that's not the point of this

 2    inquiry.  I haven't heard anything, I haven't heard any

 3    explanation as to how examining him on the nature of the -- of

 4    these, of this allegation by Sanchez would assist the jury in

 5    assessing his credibility.  There's no restriction suggested at

 6    all on --

 7           MS. STOUT:  Motive.

 8           THE COURT:  There's no suggestion that there be any

 9    restriction on cross-examination of his motivation to provide

10    testimony here and now against these individuals, whoever it

11    is that he says he knows or knows about.

12           He can, he can be fully cross-examined on that, under

13    Rule, Rule 35 treatment, Rule 11, whatever the suggestions have

14    been made, limitations, plea deals, cutting down the charges,

15    whatever the situation may be; relocation, payments,

16    compensation, all of that is fair game.

17           The only thing that is being focused on here is

18    whether there is anything that has to do with credibility of a

19    witness, vis-à-vis his alleged involvement in an assaultive

20    crime 14 years ago.  What, what does such an allegation or the

21    fact that he was confronted with that allegation and denied it,

22    what does that have to do with his believability here and now?

23           MS. STOUT:  Because it's an accumulation of what he's

24    potentially subject to be charged with or involved in that he's

25    trying to avoid.  And the jury --

1        THE COURT:  All right.

2        MS. STOUT:  That his testimony is based, in part, on

3    doing well for the Government, because I've been on both sides

4    of this many times.  His, his idea is to do well for the

5    Government so he can get a substantial assistance, his Rule 35,

6    whatever he's seeking, the lack of a charge.  It's cumulative.

7        THE COURT:  So you may want to suggest then, that he

8    can, by providing testimony, get out of liability for charged

9    offenses, but he can also perhaps avoid liability for charges

10   that are perhaps under investigation but yet to be, yet to be

11   formalized, something along those lines?

12       MS. STOUT:  Correct, your Honor.  It happens all the

13   time.  But maybe I should defer to my --

14       THE COURT:  All right.  Now, let me ask this.

15       MR. DALY:  No.

16       THE COURT:  Is there anything about, is there anything

17   about that, the substance of which you could not explore simply

18   by avoiding mention of the specifics of that charge and just

19   refer to it as allegations of additional serious felonious

20   behavior from dating back to 1999?

21       MS. STOUT:  I appreciate what the Court is saying in

22   trying to find a resolution here.  My problem is, murder is, is

23   very serious.  It's a life offense in the state without parole.

24       THE COURT:  And it has nothing to do with credibility,

25   according to almost every court that's reviewed the suggestion

```
 1    about, about cross-examining on convictions.  Assaultive crimes
 2    are not related to credibility.
 3              MS. STOUT:  Well, I did cite --
 4              THE COURT:  Just on that, I can almost put a full stop
 5    period --
 6              MS. STOUT:  Okay.
 7              THE COURT:  -- at the end of that statement.  I've not
 8    seen a case that says to the contrary.  Have you?
 9              MS. STOUT:  Yes, your Honor.
10              THE COURT:  You have?
11              MS. STOUT:  With all due respect, I mean, I understand
12    what you're saying.  I do, because we're not talking about
13    character for truthfulness.  That's, that's the straw man here.
14    We're talking about motive to exaggerate.
15              THE COURT:  Okay.
16              MS. STOUT:  To mislead.  It's a different animal.  And
17    that's what's disingenuous about their argument, with all due
18    respect to their hard work.  But the point is, this man has a
19    lot on the line here.  The jury needs to know that he could be
20    charged with murder.
21              I'm going to defer, because maybe I'm not clear.  I'm
22    going to let Mr. Daly, if it's okay with the Court.
23              THE COURT:  Okay.
24              MS. STOUT:  Because maybe I'm not all clear.  We're
25    all in this motion.
```

1          MR. DALY:  I wouldn't say that Ms. Stout is not clear,

2     but I think the defense collectively would agree that this is

3     not 609, so we can set that aside.

4          What this has to do with is a pending investigation

5     that the FBI is involved in that involves this witness on a

6     very serious crime, which is premeditated first-degree murder.

7          And the Government has -- what they've done is,

8     they've sort of excised that out of the case in terms of his

9     testimony, saying, whatever you tell us, it has nothing to do

10    with this murder, because this is an ongoing, pending

11    investigation.

12         So it does go to the witness's credibility and his

13    motive to testify, because the witness may very well say that

14    part of the cooperation is the expectation that this ongoing

15    investigation that may let -- end up putting him in prison for

16    the rest of his life, that the Government is going to back off

17    of that.  So that's the first part.  I don't think that there's

18    any real serious 403 problem.

19         THE COURT:  And that would be contrary to the express

20    understanding that he signed in his Rule 11, right?

21         MR. DALY:  It doesn't matter what he signs.  The

22    Government can try to shield themselves as much as they wish

23    with a written agreement.  That doesn't mean that the witness

24    himself may not have the subjective expectation that if he does

25    what the Government wants, that they are not going to pursue

 1    this murder investigation.  So that's the 403.

 2              THE COURT:  Okay.

 3              MR. DALY:  Now, in terms of what you asked Ms. Stout

 4    about how to resolve this, one possibility is that you allow

 5    the defense to ask him, the witness, whether or not there's a

 6    serious felony case that is being investigated against him by

 7    the FBI.  Don't let us ask that it's a murder, but let us ask

 8    that if he was convicted of that crime, he could face the rest

 9    of his life in prison.

10              Now, that allows us -- it deals with the Government's

11    concern about the murder, it allows us to impeach him, and the

12    jury now knows that the stakes for which he is testifying is he

13    could spend the rest of his life in prison if the Government

14    decides they want to pursue this murder case.  And that would

15    solve their concern, and would, in effect, allow us to exercise

16    our right to due process.

17              THE COURT:  You would agree that either side could

18    equally explore that, the Government on direct, the defense on

19    cross?

20              MR. DALY:  Yes.  Absolutely.

21              THE COURT:  So you're accepting the alteration that I

22    suggested both to Mr. Maiatico and Ms. Stout?

23              MR. DALY:  In the context of what I said, yes.  The

24    word "murder," the lawyers would --

25              MS. STOUT:  I agree.

```
 1              MR. DALY:  -- be precluded from saying the word
 2    "murder" --
 3              THE COURT:  Or homicide or assault or --
 4              MR. DALY:  Or homicide.  But we would be able to say
 5    to him, this is a serious crime that's pending against you for
 6    which you could spend the rest of your life --
 7              THE COURT:  Well, it is not pending against him.
 8              MR. DALY:  I'm sorry.
 9              THE COURT:  I think you need to be careful.
10              MR. DALY:  Yes.
11              THE COURT:  There's been an allegation.
12              MR. DALY:  I misspoke.  You're right.
13              THE COURT:  And here's what I understand the case to
14    be:  There's been an allegation by one individual of his
15    involvement.  He's denied it.  And, but the investigation is,
16    as yet, unresolved.
17              MR. DALY:  And he is -- I'm sorry.  He is a suspect in
18    the investigation.
19              THE COURT:  Well, he's, he's been named by -- he's
20    been accused by an individual or named by an individual,
21    according to the Government's brief, and has denied the
22    allegation.
23              MR. DALY:  Correct.  But that would allow us to place
24    before the jury the nature of the investigation, which I think
25    is important.  Not that it's a murder case, but what the
```

```
 1    possible penalty is, because that's the only way the jury can
 2    understand what is at stake for him testifying.
 3              THE COURT:  Okay.  We've had 20, 25 minutes on this.
 4              Mr. Maiatico?
 5              MR. MAIATICO:  Very briefly, just two points.  I would
 6    oppose any questioning regarding the length of the penalty.
 7    By calling this a serious felony where you can face life in
 8    prison, I mean, that then invites the jury just to speculate
 9    that it is, in fact, murder.  It's a life penalty.
10              THE COURT:  Or drug offense.  We've heard about life
11    penalties for drug offenses, have we not already, in the
12    evidence here?
13              MR. MAIATICO:  Well, we have, your Honor.  And I think
14    it's an invitation to speculate.  It's just as prejudicial, in
15    the Government's view to ask -- to include in the questioning
16    the possible life penalty for someone where there's an
17    allegation, he's not been charged.  And I just think that that
18    would be entirely prejudicial.
19              THE COURT:  Well, I don't think -- I think that some
20    cross-examination is due, frankly.
21              MR. MAIATICO:  All right.  And the second point, your
22    Honor, just to clarify, if you do believe this is probative,
23    you're going to allow questioning, limited questioning in that
24    regard, we would ask for the Court to limit that questioning.
25              Of course, under 608(b), no extrinsic evidence would
```

 1  be allowed in.  We would ask that no substance of the

 2  allegation by Mr. Sanchez --

 3          THE COURT:  I agree.

 4          MR. MAIATICO:  -- or additional witnesses.  And

 5  basically if the question is asked, whatever answer that the

 6  defense counsel get from the witness, they are stuck with that

 7  answer and can't inquire further.

 8          THE COURT:  That is exactly correct.

 9          MR. MAIATICO:  Okay.  Thank you, your Honor.

10          THE COURT:  Extrinsic evidence is not permitted on

11  that kind of cross, to prove the negative of that sort of

12  cross-examination.

13          Is your witness here?

14          MS. MOHSIN:  Yes.

15          THE COURT:  Who is it, by the way?

16          MS. MOHSIN:  Mr. Pizzuti, your Honor.

17          THE COURT:  I will -- are we going to have a break

18  between Pizzuti and this -- who is the witness we're talking

19  about here, by the way, Carter?

20          MS. MOHSIN:  Mr. Clark is going to come third.  It's

21  Mr. Pizzuti, then Special Agent Fleming, who is in the

22  courtroom.

23          THE COURT:  Okay.

24          MS. MOHSIN:  And then a break, if that's okay, your

25  Honor.

1          THE COURT:  We'll probably -- I'll be able to perhaps

2    more formalize or more specifically state the guideline with

3    respect to any possible cross-examination or direct

4    examination, for that matter, during his presentation by the

5    Government.

6          All right.  Let's round up the jury, please, and bring

7    them in.

8        (Jury in, 9:25 a.m.)

9          THE COURT:  The jury has assembled.  All attorneys

10   and defendants are present.  Thank you.  Be seated.

11         Ladies and gentlemen, good morning.  I assure you,

12   once again, we have been working for, now, 25 minutes.  It's

13   astounding how we can fill the time while you're waiting with

14   matters that have to be discussed.  These are issues that come

15   up from time to time.

16         Trials are a, trials are a dynamic process.  It's not

17   like a Broadway play, that's all been rehearsed and everybody

18   knows their lines and where they need to stand and what they

19   need to say and so forth.  Civil trials, criminal trials are

20   an evolving process, and issues relatively frequently do come

21   up in the afternoons or in the gaps between in-court

22   presentations.

23         Sometimes they are not so important, but sometimes

24   they are very important issues that need to be discussed with

25   the attorneys and need to be decided so the attorneys are

 1    guided by my rulings as to what is -- what path needs to be

 2    followed with respect to various kinds of evidence or testimony

 3    or presentation of documents, things of that sort.

 4          So we've had pretty consistent sessions, as you, of

 5    course, well know, while you've been waiting.  But I want to

 6    assure you that nobody, none of the attorneys or anybody was

 7    late or tardy or anything.  We're not just twiddling our

 8    thumbs.  We're actually working while you're were waiting.

 9          So thank you very much for your patience.  I say that

10    on behalf of myself as well as the attorneys, I'm sure.

11          All right.  The witness is here, and may be seated.

12          Mr. Pizzuti; is that right?

13          THE WITNESS:  Yes.

14          THE COURT:  You can be seated, sir.  And move the

15    chair up and adjust the microphone.

16          And who was examining?  I don't recollect.

17          MR. SABBOTA:  I was examining, your Honor.

18          THE COURT:  Mr. Sabbota, go ahead.

19          MR. SABBOTA:  Your Honor, I'm done with my

20    questioning.

21          THE COURT:  All right.  Is there any other

22    cross-examination?

23          MS. MACERONI:  Yes, your Honor.

24          THE COURT:  Ms. Maceroni.

25          (John Pizzuti previously sworn.)

```
1                        CROSS-EXAMINATION

2    BY MS. MACERONI:

3    Q.   Good morning, Mr. Pizzuti.

4    A.   Good morning.

5    Q.   Now, Mr. Pizzuti, you started working with the Federal

6    Government in January of 2007; is that right?

7    A.   That is -- I guess.

8    Q.   You were arrested in November of 2006.  And you, along with

9    your attorney, negotiated the agreement that led you to work

10   with Dave Opperman and with Bill Fleming, yes?

11   A.   Yes.

12   Q.   And during the course of the first initial meetings with

13   the Government, your attorney was with you; is that a fair

14   statement?

15   A.   Say that again.

16   Q.   During the first few meetings that you had, before you

17   started actively working with Dave Opperman and Bill Fleming,

18   your attorney was with you, correct?

19   A.   Yes.

20   Q.   And the first couple of times that you sat down with the

21   Government, there were Government attorneys there as well, yes?

22   A.   Yes.

23   Q.   And then you started working directly with Dave Opperman

24   and sometimes Bill Fleming, correct?

25   A.   Yes.
```

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MS. MACERONI

1   Q.  All right.  But Dave Opperman, I believe you testified, was

2   your handler?

3   A.  Yes.

4   Q.  He was the gentleman that you called in and reported to,

5   yes?

6   A.  Yes.

7   Q.  And you called in and reported to him quite a bit, fair

8   statement?

9   A.  Yes.

10  Q.  And you told him, I mean, not only did you talk about

11  the -- when you got wired up, for lack of a better term, but

12  you also informed him when there was ongoing club meetings,

13  yes?

14  A.  Yes.

15  Q.  And when there was going to be an out-of-state run, yes?

16  A.  Yes.

17  Q.  And who from the DDMC may be going to this out-of-state

18  run, yes?

19  A.  Yes.

20  Q.  You also told him about activities that you had, such as

21  passing out fliers for an upcoming steak fry or something, yes?

22  A.  Passing out -- yes.

23  Q.  Okay.  Do you recall that?

24  A.  Passing out fliers?

25  Q.  For steak fries?

1   A.  Not really, but probably.  Maybe, probably.

2   Q.  Any time that you had any contact with the Devils Diciples

3   Motorcycle Club, fair statement that you let Dave Opperman know

4   about it?

5   A.  Yeah.

6   Q.  Now, you initially contacted Vern Rich about buying meth in

7   August of 2007; do you recall that testimony?

8   A.  Yes.

9   Q.  All right.  Prior to that, though, you had reached out to

10  Paul Darrah, isn't that correct, in June of 2007?  Do you

11  recall that?

12  A.  Yes.

13  Q.  And in fact, you specifically asked Paul Darrah who in the

14  club was selling meth; do you recall that?

15  A.  Yeah.  Yes.

16  Q.  And in fact, Paul Darrah told you, did he not, that no one

17  in the club was selling meth, yes?

18  A.  Yes.

19  Q.  And in fact, you reported that to Dave Opperman as part of

20  your monthly call-ins, or whatever type of schedule you were

21  having with him, correct?

22  A.  Correct.

23  Q.  So in August of 2007, then you hook up with Vern, correct?

24  A.  Correct.

25  Q.  And Vern was the meth man; is that a fair statement?

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MS. MACERONI

1   A.  Yes.

2   Q.  And in fact, Vern came through for you in August of 2007,

3   yes?

4   A.  Yes.

5   Q.  And in fact, Vern then came through for you again, when you

6   went back to Vern to buy even more meth, as part of your

7   agreement with the Government?

8   A.  Yes.

9   Q.  Correct?

10  A.  Yes.

11  Q.  But the second buy that you talked about on Monday, Vern

12  was not present?

13  A.  Correct.

14  Q.  Right.  He was not there, correct?

15  A.  Yes.

16  Q.  And you were irritated that Vern was not there, correct?

17  A.  Yes.

18  Q.  Because it was not Pauli's responsibility, correct?  Wasn't

19  that your testimony?

20  A.  Yes.

21  Q.  Okay.  Vern was the meth guy?

22  A.  Yes.

23  Q.  Iron Mike was the meth guy?

24  A.  Yes.

25  Q.  Vern was also the marijuana guy, correct?

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MS. MACERONI

1  A.  Yes.

2  Q.  And in fact, you had bought pounds of marijuana from Vern

3  in the years before you became an informant for the Government,

4  correct?

5  A.  Yes.

6  Q.  And you sold that for your own benefit?

7  A.  Yes.

8  Q.  Now, as an informant for the Government, you have to follow

9  certain rules, yes?

10  A.  Yes.

11  Q.  And one of those rules is that you cannot engage in any

12  illegal activity without the permission of your handler, yes?

13  A.  Yes.

14  Q.  You didn't follow that rule, though, did you?

15  A.  What time?

16  Q.  Well, you continued to use illegal substances, yes?

17  A.  Yes.

18  Q.  You did not tell Dave Opperman when you were using illegal

19  substances?

20  A.  No.

21  Q.  No?  That's correct?

22  A.  No, I didn't tell him.

23  Q.  You didn't tell him?

24  A.  Uh-uh.

25  Q.  And in fact, at one point they found out that you were

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MS. MACERONI

27

1   using illegal substances, because they heard you snorting on

2   one of the wire recordings, correct?

3   A.  Okay.  Yeah.

4   Q.  Yeah?

5   A.  Yeah.  I don't remember, but if you say so, yeah.

6   Q.  Okay.  Well, do you recall a conversation with Bill Fleming

7   about the fact that you can't use illegal substances while

8   you're working for the Government?

9   A.  Yeah.

10  Q.  Now, you were also, prior to getting signed up as an

11  informant, you had to be honest with them about what your past

12  dealings were with various members of the club.  Do you recall

13  that?

14  A.  Mh-hm.

15  Q.  And in fact, you had a series of meetings with you and your

16  defense attorneys -- defense attorney and the Government

17  attorneys to kind of flesh out your prior actions with the

18  club; fair statement?

19  A.  Yes.

20  Q.  And do you recall meeting on May 25th, 2011, for one of

21  these meetings with the Government agents, the Government

22  attorneys, and Mr. Schulman?

23  A.  Yes.

24  Q.  And do you recall that you admitted that you had lied to

25  Dave Opperman and Bill Fleming about your sales of marijuana?

1   A.   Yes.

2   Q.   And you recall telling him -- telling them that even though

3   you had initially told them that you only bought for personal

4   use from Vern, in fact, you had bought pounds of marijuana from

5   Vern?

6   A.   Mh-hm.

7   Q.   And you felt that they should know that?

8   A.   Mh-hm.

9   Q.   Yes?

10   A.   (Nodding head.)

11   Q.   Yes?

12   A.   Yes.  Yes.

13   Q.   I'm not putting words in your mouth, right?  Okay.

14        THE COURT:  Did you want an answer for that?

15        MS. MACERONI:  I'm sorry?

16        THE COURT:  Did you want an answer?

17        I'm sorry, go ahead.  It seems like you're not

18   allowing the witness -- perhaps not allowing him to answer

19   before you have the next question.

20        MS. MACERONI:  Oh, I'm sorry, Judge.

21        THE COURT:  You might want to --

22        MS. MACERONI:  Slow down?

23        THE COURT:  Perhaps.  Perhaps.

24        MS. MACERONI:  Thank you.

25   BY MS. MACERONI:

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MS. MACERONI

1  Q.  So you lied to Bill Fleming and Dave Opperman about your

2  marijuana selling?

3  A.  Yes.

4  Q.  Yes.  And you had initially told them that you only bought

5  for personal use?

6  A.  Yes.

7  Q.  Correct?  Okay.

8       But in fact, you bought pounds from Vern Rich to sell

9  for your own financial gain, yes?

10  A.  Yes.

11  Q.  Now, do you also recall talking to the agents and the

12  Government's attorneys about this whole insurance fraud

13  situation that you discussed on Monday with the jury?

14  A.  Yes.

15  Q.  Okay.  And in fact, isn't it true that when you met with

16  the Government attorneys on March 12th, 2012, that you told

17  them that Mr. Darrah wanted a new bike from you, yes?

18  A.  Mh-hm.

19  Q.  And in fact, he had his old bike, a chopper, that he was

20  going to trade in for that new bike; do you recall that?

21  A.  Yes.

22  Q.  So Mr. Darrah gave you his old chopper, yes?

23  A.  Yes.

24  Q.  He gave you his old chopper and then you came up with this

25  insurance fraud scheme of reporting your bike stolen, yes?

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MS. MACERONI

1    A.   Yes.

2    Q.   So that was on you, correct?

3    A.   Yes.

4    Q.   And instead of just taking Mr. Darrah's bike and doing an

5    exchange, you came up with the insurance fraud scheme so that

6    you would get money from your insurance company, correct?

7    A.   Correct.

8    Q.   And that was money you kept, yes?

9    A.   Yes.

10   Q.   It wasn't money that you gave to the DDMC?

11   A.   Yes.

12   Q.   Correct?

13   A.   Correct.

14   Q.   And it wasn't money that you split with Paul Darrah.  You

15   kept that check?

16   A.   Yes.

17   Q.   Correct?

18        So when it came in the mail, you endorsed it, you

19   cashed it, you kept it?

20   A.   Yes.

21   Q.   And in fact, you got Paul Darrah's chopper on top of it,

22   correct?

23   A.   Yes.

24   Q.   Now, I want to get back to your grand jury testimony a

25   little bit.  Do you recall coming into this building on

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MS. MACERONI

31

1   June 1st, 2011, and testifying in front of the grand jury?

2   A.   Yes.

3   Q.   And you had your attorney with you, correct?  He wasn't in

4   the room, but he was --

5   A.   Yes.

6   Q.   -- he was in another conference room available, if you had

7   any questions?

8   A.   Yes.

9   Q.   And just so I'm clear, Mr. Pizzuti, you were initially

10   arrested or the Government initially found that illegal

11   silencer, the unregistered silencer, at your home in 2004,

12   correct?

13   A.   Yes.

14   Q.   Okay.  And it was in November of 2004, I believe, you made

15   the statement to the ATF agent, stating that you had bought

16   that unregistered silencer in Detroit?

17   A.   Yes.

18   Q.   Yes?

19   A.   Yes.

20   Q.   Now, in 2006, when the ATF agents came back to your house

21   to arrest you on that 2004 matter, they found additional

22   illegal firearms in your home, correct?

23   A.   No.

24   Q.   No?  Okay.  Did they find marijuana in your home in 2006,

25   when they came to execute that arrest warrant?

1    A.  I don't remember if they did or not.

2    Q.  Okay.  Do you remember this question that you received from

3    the Government's attorney at the grand jury --

4              MS. MOHSIN:  Can I have a page number, please?

5              MS. MACERONI:  Oh, yes.  I'm sorry.  Page 6.

6              MS. MOHSIN:  Thank you.

7              MS. MACERONI:  And that would be starting at line 13.

8              MS. MOHSIN:  Thank you.

9    BY MS. MACERONI:

10   Q.  "The Government is dismissing all charges and is not in

11   consideration of the defendant's cooperation in this case and

12   should not be considered by Mr. Pizzuti as a benefit to him."

13             Do you recall that statement?

14             "On the date of his arrest in the instant matter --"

15   now the instant matter would be the 2004 silencer, fair

16   statement?

17   A.  Yeah.

18   Q.  " -- the defendant was carrying a firearm in possession of

19   a personal use of marijuana and paraphernalia on his person."

20   A.  Yes.

21   Q.  Okay.  So that's a second criminal act that the Government

22   discovered you committed, yes?

23   A.  Yes.

24   Q.  Along with the illegal silencer, yes?

25   A.  On the second time they came to arrest me?

1    Q.   Yes.

2    A.   The silencer wasn't involved on the second time.

3    Q.   No.  That was the first time.

4    A.   Right.  Right.

5    Q.   So that's two.

6    A.   Okay.  Yeah.

7    Q.   Okay.  "The Government has not yet charged Mr. Pizzuti with

8    violation of 18 USC Section 922(g)(3), user in possession of a

9    firearm."

10            So that would have been the second charge, correct?

11   A.   Correct.

12   Q.   And in fact, you were never charged with user in possession

13   of a firearm, were you?

14   A.   No.

15   Q.   And in fact, the illegal silencer charge has been

16   dismissed, yes?

17   A.   Yes.

18   Q.   And your father's criminal conduct was dismissed as well?

19   A.   Yes.

20   Q.   Yes?

21            And in fact, you said back in January -- in June of

22   2011, that your understanding was that the United States would

23   dismiss all charges in exchange for your cooperation?

24   A.   Yes.

25   Q.   And that has, in fact, happened, correct?

1    A.  Yes.

2    Q.  Do you also recall during the course of the grand jury

3    testimony, page 8, that you were told by the Government that

4    you were not a target of this investigation?

5    A.  Pardon me?

6    Q.  Do you recall the question:  "You are advised that you are

7    not a target of the investigation; you are appearing here as a

8    witness."

9    A.  At the grand jury?

10   Q.  Yes.

11   A.  I don't remember it, but if that's -- I don't specifically

12   remember that, but if that's what happened.

13   Q.  Do you want me to show you the transcript?

14   A.  If it's on the transcript, I'll believe you.  Then yes.

15   Q.  All right.  Well, let me show you the transcript.

16          MS. MACERONI:  Judge, can I approach?

17          THE COURT:  Actually, I think you should accept his

18   concession.

19          MS. MACERONI:  Fine.

20          THE COURT:  Just to save a little time.

21          MS. MACERONI:  That's fine, Judge.  Okay.

22   BY MS. MACERONI:

23   Q.  So, and the investigation that you were testifying about

24   was the Devils Diciples Motorcycle Club, yes?

25   A.  Yes.

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MS. MACERONI

1   Q.  And they asked you a lot of the same questions that we've

2   gone over today and on Monday, yes?

3   A.  Yes.

4   Q.  But you had no criminal exposure on that investigation,

5   because you were told at the very beginning you are not a

6   target of this investigation, fair statement?

7   A.  I guess.  Yeah, I -- yeah.  Okay.

8   Q.  I mean, you're a witness.

9   A.  Right.

10  Q.  They just want to hear whatever it is you think you saw,

11  but you were not a target of the investigation, yes?

12  A.  Yes.

13  Q.  And in fact, you've never been named in the indictment that

14  we're here on today, yes?

15  A.  If you say so.

16  Q.  Well, have you been charged --

17  A.  No.

18  Q.  -- with the RICO conspiracy?

19  A.  No.

20  Q.  Have you been charged with any overt acts concerning the

21  RICO conspiracy --

22  A.  No.

23  Q.  -- which is the Devils Diciples Motorcycle Club?

24  A.  No.

25  Q.  So not to put words in your mouth then, Mr. Pizzuti, you

1    have not been a target of this investigation, correct?

2    A.   I agree.

3    Q.   Okay.  Now, you were a member of the DDMC from 1999 until

4    roughly what, 2007, 2008?

5    A.   Yes.

6    Q.   And you were an elected officer, yes?

7    A.   Yes.

8    Q.   You were an elected officer at the Utica chapter, yes?

9    A.   (Nodding head.)

10   Q.   You were an elected officer at the Mount Clemens chapter?

11   A.   No.

12   Q.   You were a member of the Mount Clemens chapter?

13   A.   Briefly.

14   Q.   So you belonged to two of the different chapter houses?

15   A.   Yes.

16   Q.   Yes?

17             You went to out-of-state events --

18   A.   Yes.

19   Q.   -- with different chapters, yes?

20   A.   Yes.

21   Q.   Okay.  You engaged in stolen motorcycle parts, and engaged

22   with other members of the DDMC with those motorcycle bikes,

23   yes?

24   A.   Yes.

25   Q.   You bought and sold marijuana from Vern Rich?

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MS. MACERONI

37

1    A.   Yes.

2    Q.   You bought and sold meth from Vern Rich?

3    A.   Yes.

4    Q.   You bought and sold, or at least you used meth from Iron

5    Mike?

6    A.   Yes.

7    Q.   Yet, you're not a target of this investigation, yes?

8    A.   Yes.

9    Q.   Because of your cooperation?

10   A.   Yes.

11   Q.   Huge benefit, yes?

12   A.   Yes.

13   Q.   Now, you also testified that your business for the

14   motorcycle parts and the auto repair, was that part of your

15   dad's business as the asphalt company?

16   A.   Uh-uh.

17   Q.   Did it share the same physical location?

18   A.   Yes.

19   Q.   Okay.  And in fact, your father's business, which is the

20   asphalt company, has its own pumps, its own gas pumps, correct?

21   A.   Yes.

22   Q.   Okay.  So you had in your shop, Devils Diciples parties, at

23   times?

24   A.   Yes.

25   Q.   Fair statement?

 1              And you had church meetings?

 2   A.   Yes.

 3   Q.   Fair statement?

 4              So you conducted DDMC business on your business

 5   property?

 6   A.   Yes.

 7   Q.   Okay.  And as you sit here today, the Government has not

 8   brought any type of forfeiture proceeding against you for that

 9   business, correct?

10   A.   No.

11   Q.   Is that a --

12   A.   No.

13   Q.   -- no.  So no criminal exposure in this indictment?

14   A.   No.

15   Q.   And no loss of any type of property assets, correct?

16   A.   Correct.

17              MS. MACERONI:  I've got nothing else, Judge.

18              THE COURT:  Any other cross-examination?

19              Mr. Satawa.

20              MR. SATAWA:  Thank you, your Honor.

21                        CROSS-EXAMINATION

22   BY MR. SATAWA:

23   Q.   Good morning, Mr. Pizzuti.

24   A.   Good morning.

25   Q.   Mr. Pizzuti, when we were last here on Monday, you

```
 1   testified about, I believe, three individual controlled buys
 2   of meth --
 3   A.   Mh-hm.  Yes.
 4   Q.   -- on direct with the Government asking you questions.  Do
 5   you remember that?
 6   A.   Yes.
 7   Q.   As you just testified to Ms. Maceroni, there was actually,
 8   prior to those three transactions, two other attempts, or one
 9   successful, one unsuccessful, to buy meth from members of the
10   Devils Diciples; is that correct?
11   A.   (No response.)
12   Q.   Let me ask the question more specifically.
13          You first attempted to buy meth from Paul Darrah, you
14   said, unsuccessfully; is that right?
15   A.   I don't remember that, but if it's --
16   Q.   Didn't you not just say that you attempted to buy meth;
17   Paul Darrah said no one sells meth; isn't that what you just
18   testified?
19   A.   Yes.  Yes.  Yes.
20          MS. MOHSIN:  Your Honor, actually, that assumes facts
21   not in evidence.  That's a mischaracterization of the
22   testimony.  That's -- that is a mischaracterization of the
23   question that was asked and answered.
24          MR. SATAWA:  Well, he did say -- his answer just now
25   was, "yes, that's what I said," so --
```

```
 1              THE COURT:  I think most -- well, I don't know how to
 2   resolve that.  I think cross-examination may be the appropriate
 3   resolution, Ms. Mohsin.
 4              MS. MOHSIN:  Thank you.
 5              THE COURT:  I can't independently -- the jury, you
 6   know, is the one that listens to the evidence and decides what
 7   has been said and what has not been said.  So I think that you
 8   should resolve, resolve that in cross, or I'm sorry, redirect.
 9              Go ahead, sir.
10              MR. SATAWA:  Thank you, your Honor.
11   BY MR. SATAWA:
12   Q.  Mr. Pizzuti, on Monday, you also testified that the first
13   time you bought meth was from Iron Mike; is that right?
14   A.  For the, for the FBI?
15   Q.  The FBI asked you to buy meth in 2007, I believe.
16   A.  From Iron Mike?
17   Q.  From Iron Mike; is that right?  Isn't that what your
18   testimony was on Monday?
19   A.  Yes.
20   Q.  Did you attempt to buy meth from Iron Mike?
21   A.  Yes.  I think so.
22   Q.  Did you buy meth from Iron Mike?
23   A.  I don't remember.  I don't think so.  All I remember is
24   buying the meth from Vern.
25   Q.  Okay.  All you remember is buying the meth from Vern?
```

1   A.  I mean, if it's recorded that I bought meth from Iron Mike,

2   then yeah, I did, but I don't remember specifically asking

3   Pauli if he sells meth or --

4   Q.  So is your testimony, if it's recorded, it happened, if it

5   isn't recorded, it didn't happen; is that what you're

6   testifying to this morning?

7   A.  No, I'm just saying I don't remember specific details.

8   That happened seven years ago.

9   Q.  Interestingly, on Monday, you didn't seem to have any

10  difficulty remembering it when it was the Government asking you

11  questions about the meth sales to Iron Mike.

12          THE COURT:  Mr. Satawa, that's not a question.  Do you

13  have a question?

14  BY MR. SATAWA:

15  Q.  Do you not remember your testimony on Monday, that you

16  purchased meth for the first time from Iron Mike?

17  A.  On Monday?  Yes.

18  Q.  That's what you said?

19  A.  Yes.

20  Q.  Was that true?

21  A.  Yes.

22  Q.  Okay.  By the way, is Iron Mike one of the seven

23  individuals sitting over there right now?

24  A.  No.

25  Q.  You testified just this morning to Ms. Maceroni that Iron

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MR. SATAWA

1   Mike was a meth guy; that was your testimony?

2   A.  Yes.

3   Q.  Known to sell meth?

4   A.  Yes.

5   Q.  That Vern Rich was a meth guy?

6   A.  Yes.

7   Q.  Known to sell meth?

8   A.  Yes.

9   Q.  In fact, you testified that your -- when you began your

10  cooperation with the FBI, one of the things the FBI asked you

11  to do, specifically, was attempt to buy meth; is that right?

12  A.  Yes.

13  Q.  All right.  And the person you called to buy meth was Vern

14  Rich?

15  A.  Yes.

16  Q.  And you attempted to call Vern Rich and buy meth from Vern

17  Rich because Vern Rich sold meth?

18  A.  Yes.

19  Q.  He was a -- the meth guy?

20  A.  Correct.

21  Q.  By the way, is Vern Rich sitting over there right now?

22  A.  No.

23  Q.  You testified as to three controlled purchases of, of meth

24  on Monday to the Government, right?

25  A.  Yes.

1    Q.  Yes?

2    A.  Yes.

3    Q.  The last one was the only one where you physically got the

4    meth from Vern Rich; is that right?

5    A.  Yes.

6    Q.  I want to talk to you about the first one.  You said that

7    in order to make that purchase of meth, you called Vern Rich?

8    A.  Mh-hm.  Yes.

9    Q.  Right?

10   A.  Yes.

11   Q.  Vern Rich, the meth dealer?

12   A.  Yes.

13   Q.  Vern Rich, the meth guy?

14   A.  Yes.

15   Q.  And you spoke to Vern Rich?

16   A.  Yes.

17   Q.  And Vern Rich said that he was going to go to a -- that you

18   would go to a party and that you would get some meth.

19   A.  Yes.

20   Q.  And that conversation we heard on a wire, it was recorded.

21   Do you remember that on Monday?

22   A.  Yes.

23   Q.  All right.  And Vern Rich told you that he was not going to

24   take the money from you; is that what your testimony was?

25   A.  Yes.

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MR. SATAWA

1   Q.  And that he was not going to hand you the meth.

2   A.  Right.

3   Q.  Right?

4   A.  Right.

5   Q.  He said that you were going to a party and you were going

6   to get the meth from someone else?

7   A.  Correct.

8   Q.  And that someone else, according to your testimony, was

9   Cary Vandiver?

10  A.  Who?

11  Q.  The individual sitting the second from the left.

12  A.  Yes.

13  Q.  Now, the conversation between you and Vern Rich about the

14  meth was recorded, yes?

15  A.  Yes.

16  Q.  Your handler, the FBI Agent Opperman who testified -- or

17  I'm sorry.  I don't know if you know whether he testified or

18  not.

19       But Agent Opperman, your handler, was the one helping

20  you record that phone conversation with Vern Rich?

21  A.  Yes.

22  Q.  The phone conversation about the meth?

23  A.  Yes.

24  Q.  And before you went to this party, that same FBI agent

25  again fitted you for a wire and had you wired when you went to

2:11-cr-20129-RHC-MAR  Doc # 1073  Filed 11/01/14  Pg 45 of 281  Pg ID 5941
JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MR. SATAWA

45

1   this party.

2   A.  Yes.

3   Q.  That, that, according to your testimony, you didn't know

4   how to turn that recording on; is that right?

5   A.  Right.

6   Q.  And you did not know how to turn that recording off; is

7   that right?

8   A.  Right.

9   Q.  So according to your testimony, when you were at the party,

10  as far as you knew, everything was being recorded as you were

11  walking around and talking?

12  A.  Yes.

13  Q.  And you said that once you got to the party, you were

14  approached by the individual sitting there second from the

15  left, the one I'm going to refer to as Mr. Vandiver.  Okay?

16  A.  Yes.

17  Q.  Mr. Vandiver just approached you out of the blue at the

18  party?

19  A.  Yes.

20  Q.  And he walked up to you?

21  A.  Yes.

22  Q.  And he handed you something?

23  A.  Yes.

24  Q.  And you handed him something?

25  A.  Yes.

 1  Q.  Not a single word was exchanged?

 2  A.  I don't remember if we talked or not, but yeah.

 3  Q.  You would agree with me that the Government didn't play a

 4  tape of this meth transaction between you and Mr. Vandiver when

 5  you testified on Monday?  You would agree with that?

 6  A.  That they did what?

 7  Q.  You were -- when you testified on Monday, the Government

 8  had some recordings that they played for you and showed you a

 9  transcript of; do you remember that?

10  A.  Yes.

11  Q.  For example, they played that recording of your phone

12  conversation with Vern Rich, the meth guy?

13  A.  Yes.

14  Q.  And as they played that conversation, there was a little

15  transcript that went up on your monitor and the two other

16  monitors that showed the Government's version of what was being

17  said.  Do you remember that?

18  A.  Yes.

19  Q.  All right.  And that was not the only conversation they

20  played.  There were other conversations that they played.  For

21  example, the one of the third transaction between you and Vern

22  Rich, where you guys were talking about various things, and you

23  started counting off money; do you remember that?

24  A.  Yes.

25  Q.  All right.  So we heard both an audiotape of that

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MR. SATAWA

1    conversation, yes?

2    A.   Yes.

3    Q.   As well as a transcript of that conversation, right?

4    A.   Right.

5    Q.   And you would agree with me that this meth that you say you

6    bought from Mr. Vandiver, we didn't hear an audiotape of that

7    transaction, did we?

8    A.   Of me buying it?

9    Q.   Yes.

10   A.   No, I guess you didn't hear it.

11   Q.   Okay.  And you didn't, you didn't see it as on a

12   transcript, right?

13   A.   No.

14   Q.   Okay.  You don't remember whether anything was said from

15   Mr. Vandiver or not, between you and Mr. Vandiver or not,

16   right?

17   A.   I don't know if it was "hi, how you doing," or "nice

18   party."  I don't remember if any conversation like that was

19   said.  No.

20   Q.   But you would agree with me, if a conversation like that

21   took place, we did not hear it on Monday?

22   A.   No.

23   Q.   We did not see it printed on a transcript on Monday?

24   A.   No.

25   Q.   The only person, the only thing we have to verify that Mr.

2:11-cr-20129-RHC-MAR   Doc # 1073   Filed 11/01/14   Pg 48 of 281   Pg ID 5944
JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MR. SATAWA

48

1  Vandiver handed you something, and you handed him money, is

2  your word?

3  A.  Yes.

4  Q.  By the way, let's talk about your word for one moment.

5          You testified on Monday about what were you told to do

6  during your cooperation with the Government; do you remember

7  that?

8  A.  Continue.

9  Q.  Okay.  Fair enough.  You were told, for example, that you

10  weren't supposed to break the law.

11  A.  Correct.

12  Q.  And we've already heard that you did.

13  A.  Yes.

14  Q.  You continued abusing Vicodin?

15  A.  Right.

16  Q.  And obtaining it illegally?

17  A.  Right.

18  Q.  You continued to purchase and use cocaine?

19  A.  Yes.

20  Q.  And use it illegally?

21  A.  Right.

22  Q.  So we know that you didn't live up to that part of the

23  bargain, right?

24  A.  I suppose, yeah.

25  Q.  And you were doing that without the knowledge of the agents

 1   or the Government lawyers --

 2   A.  Right.

 3   Q.  -- that were handling your cooperation?

 4   A.  Right.

 5   Q.  The other part that you told us that you did, or that

 6   you were supposed to do, excuse me, in exchange for all the

 7   charges against you being dismissed, was that you were supposed

 8   to tell the truth.  Do you remember that testimony that you

 9   gave on Monday?

10   A.  Yes.

11   Q.  That when you came to court, when you talked to them, you

12   were supposed to tell the truth.

13   A.  Right.

14   Q.  Now, we know you didn't follow the rule about not buying

15   drugs, right?

16   A.  Mh-hm.

17   Q.  Yes?

18   A.  Yes.

19   Q.  We know you didn't follow the rule about using drugs?

20   A.  Correct.

21   Q.  We know you didn't follow the rule about Vicodin?

22   A.  Right.

23   Q.  We know you didn't follow the rule about cocaine?

24   A.  Right.

25   Q.  Now, the rule about telling the truth, what is your

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MR. SATAWA

50

1   understanding about who gets to define whether you tell the

2   truth or not?

3   A.  Who gets to define that?

4   Q.  Yeah.  It's them, right?

5   A.  If you say so.

6   Q.  Isn't that what your cooperation agreement says?

7   A.  Okay.  Yeah.

8   Q.  That's what it says, right?

9   A.  I guess, yeah.

10  Q.  It says, if you tell the truth as we define it, this is --

11  you get the benefit, right?

12  A.  I get the benefit of telling the truth?

13  Q.  Well --

14  A.  Is that what you're saying?

15  Q.  -- you get the benefit of not facing RICO.

16  A.  Yeah.

17  Q.  You get the benefit of not facing a life offense for RICO.

18  A.  Right.

19  Q.  Okay.  You get all those benefits?

20  A.  Correct.

21  Q.  And who has to believe you tell the truth in order for you

22  to get this benefit?  Me?  Mr. Vandiver's lawyer?

23  A.  I don't know.

24  Q.  Do I get a say in it?

25  A.  You're saying something right now, I guess.

1   Q.  Well, I understand that.  But do I get to say whether -- do

2   you think my vote as to whether you tell the truth here today

3   enters into the equation as to whether or not you don't get

4   charged with a crime at all?

5   A.  I don't know.

6   Q.  Mr. Pizzuti, you know, don't you?  You know it's them who

7   defines what the truth is.

8           MS. MOHSIN:  Asked and answered, your Honor, over and

9   over again.  Asked and answered.  He's indicated he doesn't

10  know.

11          MR. SATAWA:  Is that a speaking objection, your Honor?

12          THE COURT:  You can -- it is.  And you may have an

13  answer to your question.

14          MR. SATAWA:  Thank you, your Honor.

15  BY MR. SATAWA

16  Q.  Would you like me to repeat it, sir?

17  A.  Yes.

18  Q.  You understand that it is the Government who decides

19  whether you abide by that condition of your agreement in terms

20  of whether you told the truth or not, right?

21  A.  Right.

22          MR. SATAWA:  Thank you.

23          THE COURT:  Any others?

24          MS. STOUT:  Your Honor, I just --

25          THE COURT:  Brief?

```
 1              MS. STOUT:  Very brief.

 2              THE COURT:  Ms. Stout.

 3              MS. STOUT:  Thank you.

 4                        CROSS-EXAMINATION

 5   BY MS. STOUT:

 6   Q.  Good morning, sir.

 7   A.  Good morning.

 8   Q.  Just briefly.  You testified, I think it was on Monday,

 9   that you did hundreds of runs with the --

10   A.  Yes.

11   Q.  -- Devils Diciples?  Okay.

12              You also testified that some of those runs were for

13   charity; is that correct?

14   A.  Yes.

15   Q.  Are you familiar with Charlie Brown?

16   A.  Yes.

17   Q.  And could you tell the jury what Charlie Brown is?

18   A.  Who he was?

19   Q.  What the Charlie Brown run was about?

20   A.  It was a diabetes run.

21   Q.  Could you further explain?  Were you raising money for

22   diabetes?

23   A.  Yes.

24   Q.  Is that accurate?

25   A.  Yes.
```

1    Q.   Would that have been for a hospital wing or?

2    A.   Yes, it was.

3    Q.   So was your club trying to raise money for the, was it the

4    Port Huron hospital wing?  I don't want to --

5    A.   Yes.

6    Q.   -- put words in your mouth.

7            And so you did runs for that?

8    A.   Yes.

9    Q.   I'm going to show you what's been marked as Defendant's

10   Exhibit D-1.

11           And before you say anything about it, sir, take a look

12   at that.  I've never talked to you about it before, so take a

13   look at that and see if you recognize those photographs or what

14   they depict and if they appear accurate to you.

15   A.   What the pictures --

16   Q.   Yeah.  Do you recognize those photos?

17   A.   Yes.

18   Q.   Were you there?

19   A.   No.

20   Q.   At that event?  Have you heard about --

21   A.   I wasn't, I wasn't here when they gave the check, no.

22   Q.   Were you familiar with that event taking place?

23   A.   Yes.  I was there.

24   Q.   Do those look like an accurate representation of your

25   fellow club members?

1    A.  Yes.

2    Q.  And that would be them providing a check to the diabetes --

3    A.  Yes.

4    Q.  -- research hospital?

5    A.  Yes.

6            MS. STOUT:  Okay.  I ask that that be admitted.

7            MS. MOHSIN:  No objection, your Honor.

8            THE COURT:  Received.

9        (Exhibit D-1 received 9:58 a.m.)

10           MS. STOUT:  Thank you.

11           THE COURT:  What's the number?

12           MS. STOUT:  D-1, your Honor.

13           THE COURT:  Very well.

14           MS. STOUT:  And I'm just going to have it published

15   quickly, your Honor.

16           Could you just throw that on there real quick?

17           MR. NAUGHTON:  Sure.

18           MS. STOUT:  And while he does that, I'll continue,

19   your Honor.

20   BY MS. STOUT:

21   Q.  That was the check that was given.

22           Now, is that Mr. Jeff Smith in the picture?

23   A.  Yes.

24   Q.  Okay.  And you call him "Fat Dog"?

25   A.  Yes.

2:11-cr-20129-RHC-MAR  Doc # 1073  Filed 11/01/14  Pg 55 of 281  Pg ID 5951
JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - CROSS BY MS. STOUT

55

1  Q.  And he's sitting on the bench over there?

2  A.  Yes.

3  Q.  Okay.  Thank you.

4        You also did runs for Meigs County Children; is that

5  accurate, sir?

6  A.  Yes.

7  Q.  And Meigs County is where?

8  A.  I don't know.

9  Q.  Is it in Ohio?  Does that sound accurate?

10  A.  Okay.  Yeah.

11  Q.  And those were for the children of Meigs.  Could you

12  explain what those runs were for?

13  A.  They were to make money for the hospitals.

14  Q.  The hospitals in Meigs County?

15  A.  Yes.

16  Q.  Okay.  Have you heard of God's Nest?

17  A.  No.

18  Q.  No?

19        Have you heard of Old Man Rivers of Wood County?

20  A.  No.

21  Q.  But the runs were for, to help others?

22  A.  Yes.

23  Q.  And those runs in, in Meigs County, you didn't just ride

24  just the Devils Diciples, correct?

25  A.  Right.

1    Q.  You rode with other clubs?

2    A.  Yes.

3    Q.  Is that accurate?

4    A.  Yes.

5    Q.  All right.  Was one of the other clubs the Christians

6    Motorcycle Club Association?

7    A.  Yes.

8    Q.  Was another one the Meigs County Biker Association?

9    A.  Yes.

10   Q.  You all rode together?

11   A.  Yes.

12   Q.  You all raised money.  Okay.

13           Final, final question, sir.  Do you recognize this?

14   A.  Yes.

15   Q.  What is this?

16   A.  It's a shirt you can buy at the run.  It's a shirt for the

17   diabetes run.

18   Q.  This goes back to the Charlie Brown run?

19   A.  Yes.

20   Q.  Okay.  So you buy this shirt to commemorate the event?

21   A.  Yes.

22   Q.  And raise funds?

23   A.  Yes.

24           MS. STOUT:  I'm going to Mark this D-2 and ask that it

25   be admitted.

  1              MS. MOHSIN:  I'm sorry?

  2              MS. STOUT:  I'm asking that this be admitted.  Any

  3    objection?

  4              MS. MOHSIN:  No objection.

  5              MS. STOUT:  Thank you.

  6              Thank you, sir.

  7              THE COURT:  Received.

  8         (Exhibit D-2 received 10:01 a.m.)

  9              THE COURT:  Anything else?

 10              Redirect?

 11                    REDIRECT EXAMINATION

 12    BY MS. MOHSIN:

 13    Q.  Mr. Pizzuti, you were asked a number of different questions

 14    on cross-examination.  And I would like to start with your

 15    agreement with the Government.

 16              You were -- when you were initially talked to by the

 17    ATF in 2004, do you remember that?

 18    A.  (No response.)

 19    Q.  Do you remember when you had your house searched?

 20    A.  Yes.

 21    Q.  And agents came to your home?

 22    A.  Yes.

 23    Q.  I want to direct your attention to that.

 24              What -- at that time, when they searched your home,

 25    did you possess a firearm and have marijuana?

1    A.  Yes.

2    Q.  And were you arrested on those charges relating to the

3    silencer at a later date?

4    A.  Was I arrested?

5    Q.  Yes.

6    A.  (No response.)

7    Q.  Okay.  Let me rephrase it.

8            In 2004, when law enforcement came to your home for

9    the purpose of executing a search warrant, did they arrest you?

10   A.  I didn't go to jail.

11   Q.  Okay.  So you didn't, you didn't go to jail.

12           Did you have any kind of a charge that was levied

13   against you, brought you any documents saying that you had been

14   charged with something at that time?

15   A.  I don't remember one.

16   Q.  Okay.  Did there come a time where you did get arrested?

17   A.  I don't remember being arrested.

18   Q.  You do remember that?

19   A.  I don't remember being arrested.

20   Q.  Okay.  So when law enforcement came to your house in 2004,

21   you don't remember being arrested at that time?

22   A.  No.

23   Q.  Did there come a time where there was a charge that was

24   brought?

25   A.  No.

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - REDIRECT EXAMINATION BY MS. MOHSIN

1   Q.  Well, did there come a time where you were indicted?

2   A.  No, I don't remember.

3   Q.  You don't remember?

4   A.  No.

5   Q.  Do you remember coming to court?

6   A.  No.

7   Q.  Do you remember signing an agreement with the Government?

8   A.  Yes.

9   Q.  And do you remember all of the terms of that agreement?

10  A.  I would be hard pressed to say I remember all the terms.

11  Q.  So in order for you to testify accurately, would it be

12  helpful if you had a copy of that agreement?

13  A.  Yes.

14  Q.  Would that help refresh your memory?

15  A.  Yes.

16          MS. MOHSIN:  Just a moment.

17      (Brief pause.)

18  BY MS. MOHSIN:

19  Q.  Mr. Pizzuti, I'm going to ask you to take a look at the

20  document I've placed in front of you.  Can you flip to the back

21  page, the very back page?

22  A.  Back, back?

23  Q.  Yes.  Does your signature appear on that document?

24  A.  Yes.

25  Q.  What is the date that appears next to your signature or

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - REDIRECT EXAMINATION BY MS. MOHSIN

1   near your signature, can you tell?

2   A.  4/24/07.

3   Q.  So April 24th of 2007?

4   A.  Yes.

5   Q.  And does your attorney's signature also appear on that

6   document?

7   A.  Yes.

8   Q.  So do you recall signing this agreement?

9   A.  Yes.

10  Q.  Now, do you remember all of the terms of this agreement, as

11  you sit here?

12  A.  I'd have to read it.

13  Q.  You have to read it.  Okay.

14         I want to direct your attention to a couple of the

15  terms of the agreement and see if you recall them.  I want to

16  direct your attention to the second page of the agreement.

17         What is your understanding about what information you

18  were required to provide?  And specifically, I direct your

19  attention to paragraph 1(a).  I'm sorry, paragraph 1.

20  A.  This one, cooperation?

21  Q.  Yes.

22  A.  (Witness reading document.)

23         Okay.  The question?

24  Q.  What was your understanding about what you were supposed to

25  do?

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - REDIRECT EXAMINATION BY MS. MOHSIN

1  A.  I was supposed to help them investigate criminal acts with

2  the Devils Diciples.

3  Q.  Okay.  And were you supposed to provide a certain type of

4  information; in other words, did the Government tell you what

5  to say?

6  A.  No.

7  Q.  Did the Government tell you what to do?

8  A.  No.

9  Q.  Did we say that you should tell us what we wanted to hear?

10  A.  No.

11  Q.  So what were you required to tell us?

12  A.  I was required to go and buy drugs.

13  Q.  Okay.  Were you required to tell the truth?

14  A.  Yes.

15  Q.  And what were the consequences for you, if you were found

16  to be lying?

17  A.  I'd be charged.

18  Q.  Okay.  And so did you understand the importance of telling

19  the truth?

20  A.  Yes.

21  Q.  Are you telling the truth here today?

22  A.  Yes.

23  Q.  Are you having difficulty remembering everything that

24  occurred in the past?

25  A.  Yes.

1   Q.  And what is the reason that you're having a difficulty?

2   A.  From me having the cancer, and all of the painkillers that

3   were -- I was having when I was in the hospital.

4   Q.  So is it, is it your testimony that you have difficulty

5   remembering everything because of those, your condition?

6   A.  Yes.

7   Q.  Now, you listened to recordings in the courtroom Monday,

8   right?

9   A.  Yes.

10  Q.  And when you listened to those recordings, and you reviewed

11  those transcripts, did that help you remember what had

12  occurred?

13  A.  Yes.

14  Q.  And did you rely only on the recordings, in other words,

15  for your memory, or did you have some recollection of the

16  events that occurred?

17  A.  I had some recollection of the events, but mostly relied on

18  the transcripts and recordings.

19  Q.  All right.  So when you were listening to the recordings,

20  and you heard your own voice, did that help you remember what

21  had occurred?

22  A.  Yes.

23  Q.  And when you read the transcripts, did it also help you

24  remember what occurred?

25  A.  Yes.

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - REDIRECT EXAMINATION BY MS. MOHSIN

1  Q.  But when you're not reviewing documents or listening to

2  recordings, does it become somewhat more difficult for you?

3  A.  Yes.

4  Q.  When you talked about the first time that you purchased

5  methamphetamine in a controlled buy, did you ever testify that

6  you, that you purchased or tried to purchase from Iron Mike?

7  A.  Yes.

8  Q.  You did?  Okay.  Do you have any recollection of that at

9  all?

10  A.  No.

11  Q.  So when you said that, what were you talking about?

12  A.  I was thinking about, when did I ask Iron Mike to buy meth.

13  Q.  And did -- do you remember it?

14  A.  No.

15  Q.  So you don't recall when you asked him to do it?

16  A.  No.

17  Q.  But you recall that you did ask him to buy meth?

18         In other words, you testified on cross-examination

19  that you asked or tried to buy meth from Iron Mike.  What did

20  you mean when you said you tried to buy meth from Iron Mike?

21  Did you go to him and say, I would like to buy meth?

22  A.  Yes.

23  Q.  Okay.  Do you remember that?

24  A.  No.

25  Q.  All right.  Do you remember that you testified about Vern

1   Rich?

2   A.   Yes.

3   Q.   And do you remember when you listened to the recording what

4   the events were that surrounded that first controlled buy; in

5   other words, what happened before, during and after?

6   A.   Yes.

7   Q.   And the defense attorney was asking you about Gun Control,

8   the individual who is in the courtroom.

9          Do you have a recollection of getting the meth from

10  him?

11  A.   Yes.

12  Q.   You do have a recollection of that?

13  A.   Yes.

14  Q.   Where were you when you actually got the meth from him?

15  A.   In the front of the clubhouse in the driveway.

16  Q.   Okay.  And was it nighttime, daytime?  What time of day was

17  it?

18  A.   Daytime.

19  Q.   Daytime?

20  A.   Yes.

21  Q.   And you said that this was a party?

22  A.   Yes.

23  Q.   Were there Devils Diciples members at this party?

24  A.   Yes.

25  Q.   Were there other members at this party?

1   A.  Yes.

2   Q.  Were there citizens at this party?

3   A.  Yes.

4   Q.  What is a citizen?

5   A.  Somebody that's not a club member.

6   Q.  So someone who is not a patched member of the Devils

7   Diciples?

8   A.  Yes.

9   Q.  Or affiliated with the club in any way?

10  A.  Right.

11  Q.  So are there women at this party?

12  A.  Yes.

13  Q.  Are there people from other organizations at this party?

14  A.  Yes.

15  Q.  And approximately how many people would you say would come

16  to a party like that?  Is it many, many people, hundreds of

17  people?

18  A.  Yeah.  Hundreds.

19  Q.  And so when you went to see Vern Rich, and then you went to

20  see Gun Control, were there other people around?

21  A.  Yes.  There might have been other people, like, standing

22  from here to you.

23  Q.  As far away as me?

24  A.  Yeah.

25  Q.  About 10, 15 feet?

1    A.   Yeah.

2    Q.   And so when you testified that you had to -- or that you

3    used a closed fist to make the trade of the drugs for the money

4    with Gun Control, do you recall if there were people close by

5    you --

6    A.   Yes.

7    Q.   -- when that occurred?

8              You do recall that?

9    A.   Yes.

10   Q.   Were you concerned that someone other than a Devils

11   Diciples might see you doing this activity?

12   A.   Yes.

13   Q.   Yes?

14   A.   Yes.

15   Q.   Is that why you didn't do it openly?

16   A.   Yes.

17   Q.   If there had been no other individuals around, meaning

18   no -- if there had been no people around who were citizens or

19   non-members, would you have been as concerned about disguising

20   the transaction?

21   A.   No.

22             MR. SATAWA:   Objection as to relevance and calls for

23   speculation.

24             THE COURT:   I disagree as to both.   Overruled.

25             Go ahead.

1           And, well, the witness answered and the answer stands.

2    Go ahead.

3    BY MS. MOHSIN:

4    Q.  Now, when you testified that you were at this party, and

5    you listened to recordings, do you remember the recording with

6    Vern Rich?

7    A.  Yes.

8    Q.  And do you remember him directing you specifically to Gun

9    Control to get the drugs and the money?

10   A.  Yes.

11   Q.  For the drugs and the money?

12           Now, I want to direct your attention to the second

13   controlled buy.  You testified on cross-examination that that

14   was with Pauli?

15   A.  Yes.

16   Q.  And that you were upset about Pauli being involved in that

17   transaction?

18   A.  Yes.

19   Q.  Do you know what deal Pauli had with Vern for the sale of

20   that meth to you?

21   A.  No.

22           MS. MACERONI:  Objection, Judge.  Calls for facts not

23   in evidence.

24           THE COURT:  No.  It just calls for his knowledge,

25   actually.  I disagree.  Overruled.

```
 1              Go ahead.

 2              The witness answered how?

 3              MR. SATAWA:  No.

 4              MS. MOHSIN:  No.  He answered no, your Honor.

 5              THE COURT:  Go ahead.

 6   BY MS. MOHSIN:

 7   Q.  So do you know if Pauli was making money from the sale of

 8   the meth to you that you had expected to receive from Vern?

 9   A.  Can you say that again?

10   Q.  Was Pauli getting any money from Vern?  Do you know whether

11   he was getting money?

12   A.  No.  I don't know if he was or not.

13   Q.  You don't know if he was or not?

14   A.  No.

15   Q.  You don't know what deal he had with Vern?

16   A.  No.

17   Q.  Correct?

18              I want to direct your attention to the slot machines

19   that we were talking about on direct examination and you were

20   asked some questions about it on cross-examination.

21              You indicated that you spend money on those machines?

22   A.  Yes.

23   Q.  Were those machines available for members of the Devils

24   Diciples to use?

25   A.  Yes.
```

JURY TRIAL, VOLUME V - 10/22/2014
JOHN PIZZUTI - REDIRECT EXAMINATION BY MS. MOHSIN

1   Q.  And play?

2   A.  Yes.

3   Q.  By using money and putting money inside of them?

4   A.  Yes.

5   Q.  Were they also available to people that would attend

6   parties at the clubhouse or, you know, one of these runs?

7   A.  Yes.

8   Q.  Do you know if citizens could play them whenever they

9   wanted?

10  A.  Yes.

11  Q.  Was it encouraged in any way by the club that the general

12  public, that would attend these meetings, could play those slot

13  machines?

14  A.  Nobody would say they couldn't.

15  Q.  Okay.  Have you seen citizens playing them?

16  A.  Yes.

17  Q.  So they were not just for members of the club; is that a

18  fair statement?

19  A.  Yes.

20  Q.  Do you know if methamphetamine, marijuana or other drugs

21  were available at this runs for people to obtain and use?

22  A.  Yes.

23  Q.  Yes, they were?

24  A.  Yes.

25  Q.  Okay.  And was that something that occurred at every run

1  that you ever attended?

2  A.  Yes.

3  Q.  Was that including the charity runs?

4  A.  Yes.

5  Q.  Okay.  And I just want to clear up something with respect

6  to your father.  Was your father ever charged with any criminal

7  activity?

8  A.  No.

9  Q.  Was your father ever -- did your father get in trouble with

10  law enforcement as a result of your arrest?

11  A.  No.

12  Q.  Okay.  Was he involved in removing firearms from your home

13  after your arrest in the case?

14  A.  Yes.

15  Q.  And so when the defense was asking you questions about your

16  father receiving a benefit, what's your understanding of the

17  benefit that your father received?

18  A.  He wasn't going to be in trouble for removing any firearms.

19  Q.  Why did he remove those firearms?

20  A.  Because they were his.

21  Q.  And so when -- to your knowledge, was he doing anything

22  wrong?

23  A.  No.

24  Q.  Thank you.

25  A.  Because, can I add?

1  Q.  Yes.  Yes.

2  A.  He was only removing the rifles.  The Judge, all the Judge

3  wanted was the handguns.

4  Q.  Okay.  So to your knowledge, he didn't do anything wrong?

5  A.  Right.

6  Q.  Okay.  So to your knowledge, there was no benefit to your

7  father?

8       MS. STOUT:  Objection to speculation, whether he was

9  doing anything wrong.

10       THE COURT:  Well, it asks for the witness's knowledge.

11  As to that, overruled.

12  BY MS. MOHSIN:

13  Q.  To your knowledge, he wasn't doing anything wrong?

14  A.  Right.

15       MS. MOHSIN:  Okay.  Thank you.  Nothing further, your

16  Honor.

17       THE COURT:  All right.  The witness may step down.

18  Thank you.

19     (Witness excused, 10:15 a.m.)

20       THE COURT:  And do you have another witness?

21       MS. MOHSIN:  I do.  It's Special Agent Fleming.

22       THE COURT:  All right.

23       For counsel's information, while we're waiting for the

24  witness, objections -- your oath continues.  You can be seated,

25  sir.

```
 1              For counsel's information, both the Government and

 2     for the defense, I've heard objections, asked and answered

 3     a couple of times.  In my view, that falls under Rule 403,

 4     delay, cumulative evidence, and things of that sort.  The

 5     standard for evaluating that sort of objection, I take under

 6     403.

 7              Your witness, Ms. Mohsin?

 8              MS. MOHSIN:  Thank you, your Honor.

 9              (William Fleming, previously sworn.)

10                         DIRECT EXAMINATION

11     BY MS. MOHSIN:

12     Q.  Special Agent Fleming, I would like to direct your

13     attention to your involvement with three controlled purchases

14     that occurred in approximately 2007.

15     A.  Okay.

16     Q.  Did you participate in the three controlled purchases of

17     methamphetamine in this case?

18     A.  I did, yes.

19     Q.  And again, are you the case agent that's responsible for

20     the overall investigation in this case?

21     A.  I am.

22     Q.  Have you been assisted by other agents?

23     A.  From time to time, yes.

24     Q.  But you are the primary agent responsible for this case; is

25     that a fair statement?
```

2:11-cr-20129-RHC-MAR  Doc # 1073  Filed 11/01/14  Pg 73 of 281  Pg ID 5969
JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT

73

1    A.   That's fair.

2    Q.   Okay.  Directing your attention to an individual named John

3    Pizzuti, you're familiar with him?

4    A.   I am.

5    Q.   And did you participate in obtaining recorded

6    conversations --

7            MS. STOUT:  Your Honor, with all due respect,

8    objection, 403.

9            THE COURT:  What component?

10           MS. STOUT:  Needless --

11           THE COURT:  Cumulative?

12           MS. STOUT:  It's cumulative.  Thank you, your Honor.

13           THE COURT:  Is this, is this new or this relates to?

14           MS. MOHSIN:  Your Honor, it's the Government's intent

15   to introduce all of this evidence through this witness, the

16   chain.  And so the foundation is to be established.  If there's

17   a stipulation to the wiretaps --

18           THE COURT:  Why don't we, why don't we pause and see

19   if there's a well-rounded stipulation.  The jury should be

20   allowed to stretch legs, in any event.

21           Go ahead and do what you want in that regard.

22      (Brief pause from 10:18 a.m. to 10:20 a.m.)

23           THE COURT:  Okay.  We're ready to come back to order,

24   please.

25           So you can proceed by stipulation and perhaps compress

2:11-cr-20129-RHC-MAR  Doc # 1073  Filed 11/01/14  Pg 74 of 281  Pg ID 5970
JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT

74

```
 1    the evidence.  Or if, in the absence of a well-rounded

 2    stipulation you may proceed with your questions, whichever you

 3    wish, whichever way you wish to proceed.

 4          MS. MOHSIN:  Thank you, your Honor.  The Government,

 5    at this time, based on the parties' agreement, would move to

 6    admit all of the exhibits contained in Exhibit R, which include

 7    audio recordings, R-1 through R-12.

 8          THE COURT:  R-1 through R-12.

 9          MS. MOHSIN:  The summary exhibit of all of the

10    recordings contained in R-1 through R-12, which is labeled

11    Exhibit R.

12          THE COURT:  Okay.

13          MS. MOHSIN:  We also move to admit all of the

14    wiretapped calls contained on an audio CD recordings entitled

15    T-1 through T-333.

16          THE COURT:  All right.

17          MS. MOHSIN:  And the summary exhibit of those

18    recordings, which is marked Exhibit T.

19          THE COURT:  That's a spread -- it's labeled a

20    spreadsheet here.

21          MS. MOHSIN:  Yes.  And the transcripts, as well.

22          MR. SATAWA:  You said the T's were numbered what?

23    What, excuse me?

24          MS. MOHSIN:  T-1 through T-333.

25          MR. SATAWA:  333.  Thank you.
```

```
 1              MS. MOHSIN:  Correct.  As well as the transcripts that
 2    correspond to all of the audio recordings in this case.
 3              THE COURT:  And those are, I think, labeled T-1A, for
 4    example, T-2A.
 5              MS. MOHSIN:  Yes, your Honor.
 6              THE COURT:  The "A" is the transcript that accompanies
 7    the tape recording.
 8              MS. MOHSIN:  That is correct, your Honor.
 9              THE COURT:  So each of those, moved to be received
10    without any further foundation, based upon the understanding of
11    all parties, right?
12              MS. MOHSIN:  Yes, your Honor.
13              THE COURT:  And the record should reflect and the jury
14    should be informed that these things have been traded and
15    provided not just here and now in court, but over the course of
16    preparing for trial; am I correct?
17              MS. MOHSIN:  Yes, your Honor.
18              THE COURT:  All right.
19              MS. MOHSIN:  Your Honor, there are also -- again, in
20    the interest of the stipulation, if I could have a moment --
21              THE COURT:  Yes.
22              MS. MOHSIN:  -- regarding the drugs in the case.
23              Is there a stipulation about that?  Yes?
24              MR. DALY:  Your Honor --
25              THE COURT:  If you need further time on that, you
```

```
 1    should take time without the jury present.
 2            MR. DALY:  Just on the transcripts, it's my
 3    understanding that the transcripts themselves will not be
 4    exhibits, that it would be advisory, as you said.
 5            THE COURT:  They are.  They are ordinarily not
 6    admitted as such --
 7            MR. DALY:  Right.
 8            THE COURT:  -- as exhibits.  But they should be marked
 9    for identification, received, received, in a sense, without
10    being -- they don't have the same character as an actual
11    exhibit.  You are correct about that.
12            MR. DALY:  Thank you.
13            THE COURT:  They still are going to -- however, it's
14    also true that they are, upon request, available to the jury
15    during deliberations, if the jury wants some particular
16    recording replayed, with assistance of the transcript, they
17    shall have access to that --
18            MR. DALY:  Which is -- I'm sorry.
19            THE COURT:  -- upon request.
20            MR. DALY:  Yes.  Which is separate from the
21    transcripts themselves being admitted as exhibits available
22    to the jury.  I think that that -- we're saying the same thing,
23    I believe.
24            THE COURT:  I think we are.
25            MR. DALY:  Yes.
```

2:11-cr-20129-RHC-MAR  Doc # 1073  Filed 11/01/14  Pg 77 of 281  Pg ID 5973
JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT

77

```
 1              THE COURT:  The transcripts are not -- as I have
 2    explained to the jury, the transcripts are not substantive
 3    exhibits.  They are designed to be aids in the understanding of
 4    the recorded conversations.  That's clear enough.  But, so they
 5    are marked for identification, they are received in the vein
 6    that we've discussed.
 7              MR. DALY:  Yes.
 8              THE COURT:  Not as substantive evidence, but as
 9    illustrative or as aids to the jury, as well as to counsel and
10    the Court, I suppose.
11              So all of those matters then are, by agreement,
12    received.
13              Let's be specific.  I think we should.
14              Ms. Stout, for your client, that's a correct
15    statement, offered by Ms. Mohsin, with respect to all these
16    various exhibits and the stipulation --
17              MS. STOUT:  That's correct.
18              THE COURT:  -- of the foundation?
19              MS. STOUT:  With the understanding that the tapes are
20    admitted, when they go to the jury room, if they go, the
21    transcripts -- the tapes go to be played.
22              THE WITNESS:  Ordinarily, if there is to be a replay,
23    I would, I would probably bring the jury out and do it on, on
24    the record.
25              MS. STOUT:  Very well.
```

1          THE COURT:  Ordinarily.  But there may -- who knows.

2          MS. STOUT:  Sure.

3          THE COURT:  By the time deliberations are here, there

4   may be other agreements that have been reached to do something

5   else to streamline things more.  I'm not sure.

6          Mr. Satawa, for your client, do you agree on the

7   premises?

8          MR. SATAWA:  Your Honor, yes.

9          THE COURT:  Mr. Sabbota?

10          MR. SABBOTA:  Yes, I do agree, your Honor.

11          THE COURT:  Mr. Daly?

12          MR. DALY:  The procedure we discussed, I agree to,

13   yes.

14          THE COURT:  Mr. Kraizman?

15          MR. KRAIZMAN:  Yes, on behalf of my client.

16          THE COURT:  Mr. Machasic?

17          MR. MACHASIC:  Yes, your Honor.

18          THE COURT:  And Ms. Maceroni?

19          MS. MACERONI:  Yes, your Honor.

20          THE COURT:  All right.  Each of these is received,

21   then.  Exhibit, and in order, as I have them on the sheet,

22   Exhibit T, Exhibit T-1 through T-333, Exhibit T-1A through

23   T-333A, the transcripts subject to the conditions we discussed.

24          Also Exhibit R, the spreadsheet, R-1 through R-12,

25   recordings, and R-1A through R-12A, which are transcripts,

     1   subject to the same cautions.  All of those things are

     2   received.

     3       (Exhibit T, T-1 - T-333, T-1A - T-333A received, 10:25

     4       a.m.)

     5       (Exhibit R, R-1 - R-12, R-1A - R-12A received, 10:25 a.m.)

     6           THE COURT:  And do you have anything else for the

     7   witness, then?

     8           MS. MOHSIN:  I do.

     9           THE COURT:  Go ahead.

    10   BY MS. MOHSIN:

    11   Q.  Special Agent Fleming, directing your attention to August

    12   4th of 2007 -- withdrawn.  I'm going to go back.

    13           Directing your attention to May of 2007, Mr. Pizzuti

    14   was involved in a recording on that date.

    15   A.  He was, yes.

    16   Q.  And what, what investigatively was occurring before, during

    17   and after that recording that was made?

    18   A.  Surveillance was conducted on Mr. Pizzuti and the people he

    19   was with.

    20   Q.  And when you say surveillance, what do you mean by that?

    21   Could you describe that for the jury?

    22   A.  Sure.  Surveillance is just FBI agents following.  In this

    23   particular case, they were in a car and went to a destination,

    24   following them to that destination, waiting and observing

    25   what's going on while they are at that destination, and then

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT

 1   following them back.

 2   Q.  And so that occurred prior to the recording, during the

 3   recording, and after the recording; is that a fair statement?

 4   A.  That's correct.

 5   Q.  And I am talking specifically about May the 15th of 2007.

 6   A.  Correct.

 7   Q.  Now, you heard that recording, R-1, played in the

 8   courtroom?

 9   A.  I did, yes.

10   Q.  And was it the entire recording that was played for the

11   jury or were there relevant portions that were played?

12   A.  Just relevant portions.

13   Q.  And are there additional relevant portions of that

14   recording, as well, that you're aware of?

15   A.  I am, yes.

16   Q.  And those have not yet been played for the jury; is that a

17   fair statement?

18   A.  That is correct.

19   Q.  Okay.  Those have been reserved for a future time?

20   A.  That's correct.

21   Q.  Directing your attention now to August 4th of 2007, the

22   controlled buy that occurred on that particular date, what

23   investigatively were you doing, and agents doing, with respect

24   to that controlled buy, before, during and after that event?

25   A.  In regards to that particular buy, we followed Mr. Pizzuti

```
 1    to the Devils Diciples clubhouse, observed him pull into the
 2    parking lot of the clubhouse.
 3              The way the clubhouse is situated, it's not really a
 4    location that you can sit, sit as -- sit and observe what's
 5    going on.
 6    Q.  Why is that?
 7    A.  It's on Gratiot.  The clubhouse is well back off the main
 8    road.  And directly across the street are businesses that,
 9    after hours, are closed.  So any cars sitting in there are
10    immediately suspicious.
11    Q.  When you say that it's on Gratiot, what, what city or
12    township is that?
13    A.  It's Clinton Township.
14    Q.  And when you say it's set off back from the road, is there
15    anything obstructing the view from Gratiot, the road?
16    A.  Well, there are numerous large trees that, depending on the
17    season, obstruct your view.
18    Q.  So on this particular date, August the 4th of 2007, you
19    observed Mr. Pizzuti from the time that he left your care and
20    custody, right, received the recording device?
21    A.  Correct.
22    Q.  Until when?
23    A.  Until he pulled into the parking lot of the Devils Diciples
24    clubhouse, we then continued on by and waited.
25    Q.  And when -- you waited for what?
```

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT

1  A.  Waited for Mr. Pizzuti to contact Agent Opperman, let him

2  know that he had made a purchase, and then to make arrangements

3  to meet him at some location afterwards.

4  Q.  And when he -- well, did he contact Agent Opperman?

5  A.  He did.

6  Q.  And then when he contacted him, did you pick him up on a

7  surveillance?

8  A.  We picked him up as he left the location, followed him to a

9  predetermined spot, where we were going to meet.  And at that

10  point in time, obtained the evidence, which was the

11  methamphetamine, and then also, the recording device.

12  Q.  Directing your attention now to the recording R-2, was that

13  the recording Mr. Pizzuti made during the August 4th, 2007

14  controlled buy?

15  A.  That's correct.

16  Q.  And you were here when that recording was played in court?

17  A.  I was.

18  Q.  Was that the entire recording that was played?

19  A.  No.  Just a short portion.

20  Q.  So are there portions of that recording that were not

21  played for the jury that you've listened to?

22  A.  There were.

23  Q.  And is there a portion of that recording that you have

24  listened to, in which you can hear Mr. Vandiver's voice?

25  A.  That's correct.

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT

1    Q.   Now, is there any communication about the drug transaction

2    that you can detect; in other words, conversations specifically

3    about the exchange of money for drugs?

4    A.   Not with Mr. Vandiver and Mr. Pizzuti.  No.

5    Q.   Now, after that recording was made, did you have a

6    conversation with Mr. Pizzuti about when that exchange took

7    place?

8    A.   We did.  When we met with him to obtain the methamphetamine

9    and the recording device, he very quickly briefed us on what

10   had occurred.

11   Q.   And did there come a time where you asked follow-up

12   questions so that you could determine where, on the tape, if

13   anywhere, you could connect the exchange with Mr. Vandiver?

14   A.   That's correct.

15   Q.   Explain that for the jury, please.

16   A.   There was a portion on the tape that Mr. Pizzuti advised

17   that during the time period that Mr. Vandiver handed him the

18   meth, and he handed Mr. Vandiver the money for the meth, they

19   had a brief conversation about brakes or having to do,

20   something to do with brakes.  We were able to locate that on

21   the recording.

22   Q.   And was there, in fact, a conversation about brakes or

23   something related to brakes on the recording?

24   A.   Yes.  A very short conversation.

25   Q.   And is that the portion that you just testified about,

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT

1   referring to where you could hear Mr. Vandiver's voice?

2   A.  That's correct.

3   Q.  Had Mr. Pizzuti had an opportunity to listen to that audio

4   recording before he answered the question for you?

5         In other words, did you play the call for him or the

6   recording for him before?

7   A.  Oh, no.  I don't believe we've ever played the tape for

8   him.

9   Q.  Okay.  Now, I want to direct your attention to the third

10  recording, which is R-3.

11        This, I want to direct your attention to September the

12  5th of 2007.

13  A.  Okay.

14  Q.  What type of recording was that one?

15  A.  It was a telephone recording, recording of a telephone

16  conversation.

17  Q.  And was Mr. Pizzuti present with agents when that telephone

18  conversation occurred?

19  A.  He was, yes.

20  Q.  So that recording did not occur outside of the presence of

21  agents?

22  A.  No, it did not.

23        MS. MOHSIN:  May I have one moment, your Honor?

24      (Brief pause.)

25  BY MS. MOHSIN:

1   Q.   Now, after the recording that we just talked about, which

2   was R-3 on September the 5th, there was a second controlled

3   buy?

4   A.   There was.

5   Q.   Was Mr. Pizzuti under surveillance during that second

6   controlled buy?

7   A.   A portion of it, yes.

8   Q.   Can you describe that for the jury, how it all came about?

9   A.   Sure.  Mr. Pizzuti notified us that he had received a phone

10  call from Mr. Darrah, and that Mr. Darrah had received

11  methamphetamine from Mr. Rich and he wanted to drop it off at

12  Mr. Pizzuti's business/home.

13          We weren't prepared at that time for that.  We didn't

14  have a recording device.  We had to get the money that we would

15  use to make that purchase.  So in talking with Mr. Pizzuti, we

16  put it off for later in the day.

17          When the time came for us to do that controlled buy,

18  we had agents, again, on surveillance at Mr. Darrah's house to

19  see if he was home.  And then myself and I believe Agent

20  Opperman were with Mr. Pizzuti, where we gave him the money,

21  searched him pursuant to our procedures, and the recording

22  device, and sent him out.

23  Q.   So based upon the testimony that you just gave, was it

24  unexpected that Mr. Darrah would be present on that day?

25  A.   That's correct.

1  Q.  And did you have to react quickly, in light of that fact?

2  A.  Well, we had, we had to put off.  We weren't ready to do

3  the buy right when Mr. Darrah called.  So we, we logically gave

4  Mr. Pizzuti a reason to put it off; that he didn't have the

5  money yet.  And did it later in the day.

6  Q.  So you were able to successfully both surveil and record

7  that particular controlled buy, despite the short notice?

8  A.  That's correct.

9  Q.  I want to direct your attention now to October the 3rd.

10  That's a recording that has been marked and admitted as R-5 in

11  this case.

12        Can you tell the members of the jury about the

13  circumstances leading up to that particular recording?

14  A.  Sure.  October 3rd was a church meeting, which is just

15  another word for the Devils Diciples to have a meeting, to get

16  together and have a meeting at the Detroit or Mount Clemens

17  clubhouse.

18        At the beginning or prior to the meeting, Mr. Rich and

19  Mr. Pizzuti met, discussed a purchase, a future purchase of

20  methamphetamine and what the price was going to be.  And then

21  Mr. Pizzuti went to the actual meeting that was run by Mr.

22  Smith and Mr. Darrah.

23  Q.  And where was the location where this meeting was to occur?

24  A.  It's the Detroit or Mount Clemens clubhouse on Gratiot, the

25  location we discussed earlier.

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT

1    Q.   The one that's difficult to see from the street?

2    A.   Correct.

3    Q.   So prior to this meeting -- withdrawn.

4         Mr. Pizzuti advised you that the meeting was going to

5    take place?

6    A.   He did, yes.

7    Q.   So how did you investigatively prepare for this meeting?

8    A.   (No response.)

9    Q.   Did you have a recording device prepared?

10   A.   Just like any other meeting, we prepared a recording

11   device.  We obtained the funds for the purchase of meth, if

12   there was going to be one, which I don't believe there wasn't

13   one that particular day.  Activated the recording device,

14   followed him to the location, watched him go in, and then drove

15   away.

16   Q.   And when you drove away, did there come a time where you

17   met up with him again?

18   A.   After he left at the conclusion of the meeting, yes.

19   Q.   And did you take the recording device at that time?

20   A.   We did.

21   Q.   And was he searched again?

22   A.   He was searched -- he's always searched at the beginning

23   and end.  And whenever he's driving, whether it's a car or a

24   motorcycle, is searched also.

25   Q.   What's the purpose of that?

1   A.   Number one, to make sure that he doesn't have any

2   contraband on him or weapons or anything of that sort.

3   Q.   Okay.  And none of that ever -- you never found any of that

4   sort of thing with Mr. Pizzuti in this case, did you?

5   A.   No.

6   Q.   Now, did you have an opportunity to listen to that

7   recording?

8   A.   I did.

9   Q.   And how long is it, roughly, if you can approximate?

10   A.   I want to say it's about an hour, maybe a little longer.

11   Q.   Okay.  And did you select a portion of that particular

12   transcript -- excuse me -- of that particular recording as

13   particularly relevant for the purposes of trial?

14   A.   There were, I believe, two portions.  There was the portion

15   where Mr. Rich and Mr. Pizzuti discuss the future purchase of

16   methamphetamine.  And then there was a portion of the meeting

17   with Mr. Smith, Mr. Darrah and other members of the Devils

18   Diciples.

19   Q.   Can you describe the future purchase, what specifically, so

20   when the jury hears the recording, they have an understanding?

21   And if you need the transcript, I can provide that to you.

22   A.   I would like that, please.

23   Q.   This is R-5A, exhibit number.

24        You indicated that there were two portions selected.

25   The first one relates to Vern Rich.  Can you tell the jury, is

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT

1   there something in particular that's being discussed?

2   A.   Well, there's two main things, both associated with the

3   purchase of methamphetamine.

4          First, Mr. Pizzuti is trying to determine if Mr. Rich

5   is ready, meaning does he have methamphetamine to purchase.

6          Mr. Rich says that he's low, but that he had just

7   given $60,000 to someone to re-up, which means to replenish his

8   supply of methamphetamine.

9   Q.   Is there a discussion about an exhaust pipe in that

10  particular portion of the conversation?

11  A.   There is, yes.

12  Q.   Does that exhaust pipe have any significance in the

13  investigation?

14  A.   It does.

15  Q.   Can you explain to the jury why that is of significance?

16  A.   Sure.  Mr. Rich, during this conversation with Mr. Pizzuti,

17  advised that he had a false tailpipe on his motorcycle that he

18  used to transport, in this particular case, money.

19          MS. STOUT:  Excuse me.  Objection.  To be honest with

20  you, I'm not sure the rule.  Why don't we play the tape.  I'm

21  confused why we're summarizing.

22          MS. MOHSIN:  Your Honor, I think that because of the

23  length of this particular recording, and the way in which the

24  recording is so rapid, to give context and make it less

25  confusing for the jury when they hear it.

1        We can play it and then perhaps summarize again at the

2   conclusion, if that's a better way for the -- in the court's --

3        THE COURT:  Well, it is true that the best evidence of

4   the matter is the recording.  Are you planning to do some -- to

5   replay it during the witness's testimony?

6        MS. MOHSIN:  I am planning to play the entire

7   recording.  The selected portions, rather, yes.

8        THE COURT:  The selected portions?

9        MS. MOHSIN:  Yes.

10        THE COURT:  So you're going to include that within the

11   witness's testimony, direct testimony?

12        MS. MOHSIN:  Yes.

13        THE COURT:  Well, I think that that, that's going to

14   be addressed then.  I think Ms. Stout's concern is going to be

15   addressed in the course of testimony.  You may proceed.

16        MS. MOHSIN:  Thank you.

17   BY MS. MOHSIN:

18   Q.  Now, did there come a time where a tailpipe or exhaust pipe

19   came of significance in this case?

20   A.  It did.

21   Q.  And by the way, was it seized as evidence at some later

22   date?

23   A.  It was.

24   Q.  And what's the significance of that tailpipe, based upon

25   the investigation?

1   A.  The significance was, it was used to transport large

2   amounts of money and large amounts of methamphetamine, as a way

3   to disguise it or to deter law enforcement from finding it.

4   Q.  Okay.  And there's conversation about that during this

5   recording?

6   A.  That's correct.

7   Q.  Now, the second portion that you indicated, or the second

8   part of the recording -- withdrawn.

9           In this first portion of the recording, who are the

10  individuals that are speaking?

11  A.  It's Vern Rich and Mr. Pizzuti.

12  Q.  And is Mr. Pizzuti identified as "CW"?

13  A.  On the transcript, yes.

14  Q.  And is Mr. Vern Rich identified in the transcript as "VR"?

15  A.  He is.

16  Q.  Okay.  Directing your attention to the second portion of

17  the recording, what is the context of that recording?  It takes

18  place at a different location or different time?

19  A.  It takes place at the same location.  It's the actual or a

20  portion of the meeting that Mr. Smith and Mr. Darrah had with

21  other members of the Devils Diciples inside the clubhouse.

22  Q.  And who are the speakers that are noted in the transcript

23  with respect to that second portion?

24  A.  JS "would" be Mr. Jeff Smith.  "PD" would be Mr. Pauli

25  Darrah.  Then there are some others.  "TD" is a person, Timmy

 1   Downs, who was a Devils Diciples member, who went by "Space."

 2   There are also what we categorize as unknown males, which is

 3   "UM."

 4   Q.  So whenever the acronym "UM" appears, it refers to unknown

 5   male?

 6   A.  That's correct.

 7   Q.  All right.  Now, is it your understanding that part of this

 8   conversation or part of this recording occurred outside and

 9   part of it occurred in an indoor setting?

10   A.  That's my understanding.  At least there were two separate

11   conversations held at two different locations.

12   Q.  But all within the Mount Clemens clubhouse locale?

13   A.  In that area, outside or inside.

14   Q.  So have you listened to this call repeatedly?

15   A.  The recording, yes.

16   Q.  Excuse me, the recording.  Thank you for clarifying.

17          You have listened to it several times?

18   A.  I have.

19          MS. MOHSIN:  Okay.  I would ask to publish this

20   recording, which is R-5, to the jury.

21          THE COURT:  Go ahead.

22     (GX #R-5 published to the jury, 10:43 a.m. - 10:45 a.m.)

23   BY MS. MOHSIN:

24   Q.  Special Agent Fleming, the portion of the recording that we

25   just heard had three speakers.  Were you able to identify the

1    third speaker?

2    A.  Yes.  It was Mr. Vandiver.

3    Q.  Mr. Vandiver is "CV"?

4    A.  Correct.

5    Q.  Now, did that portion of the recording conclude the first

6    part of the recording that you described earlier?

7    A.  Right.  That portion was the discussion between the three

8    of them of the purchase of methamphetamine.

9           MS. MOHSIN:  I want to direct your attention or ask

10   that we publish the second portion.

11          Thank you.

12     (GX #R-5 published to the jury, 10:46 a.m. - 10:59 a.m.)

13          THE COURT:  Suitable time for a pause?

14          MS. MOHSIN:  Certainly.

15          THE COURT:  Let's have a 15-minute recess in the jury

16   room, ladies and gentlemen.  Escort yourselves, please, at this

17   point.

18          And we're going to remain briefly on the record here,

19   to handle a matter.

20     (Jury out, 10:59 a.m.)

21          THE COURT:  All right.  The jury is absent.  Be

22   seated, please.

23          I have handed out, one to the defense and one to the

24   Government, a statement which I'm going to read into the

25   record.  This resolves the question of the cross-examination

1    or examination of the witness concerning the ongoing 1999

2    investigation.

3           The Court understands that an investigation is ongoing

4    into a homicide that occurred on or about 1999 and that there's

5    an allegation that the witness was involved, quote, unquote,

6    somehow.  The Court understands he has denied the allegation.

7           The Court finds that the indications of bias or

8    prejudice of the witness may arise vis-à-vis the investigation

9    and the allegation of his involvement and his understanding of

10   the position of the Government in that regard.  It may be that

11   he believes his testimony in the instant case may assist him in

12   the outcome of the 1999 investigation.

13          The witness, therefore, may properly be asked on

14   direct exam, cross-exam or both, concerning the investigation,

15   his place in it, and the implications of his testimony in the

16   instant case.  The Court restricts, however, all such

17   examinations to avoid misleading the jury or needlessly

18   injecting inflammatory and irrelevant material as follows:

19          One, there shall be no specification of or implication

20   as to the actual nature of the investigation.

21          Two, the investigation may be referred to only as "an

22   investigation into a serious criminal offense" or the

23   equivalent of that.

24          Three, the terms, homicide, murder, death, killing,

25   assault, and the like, are to be strictly avoided.

 1            Four, the witness's understanding of the implication

 2    of a person being culpably involved in such a crime may be

 3    stated to the witness or otherwise explored.  This may include

 4    a suggestion that the maximum penalty could be life

 5    imprisonment.

 6            Again, I have given that to you in writing, one copy

 7    for each table or each side, but that's the substance of what

 8    I've handed out.  And that will be the Court's ruling with

 9    respect to the Government's motion that we've earlier

10    discussed.

11            All right.  15-minute recess.  We'll resume.

12            MR. STRAUS:  Judge?  Judge?  One -- can I ask one

13    question, clarification?  On direct exam, can we be permitted

14    to lead then, then, to abide by this, these restrictions?

15            THE COURT:  Yes, sir.

16            MR. STRAUS:  Thank you.

17            THE COURT:  Thank you.

18            COURT REPORTER:  All rise.  Court is in recess.

19       (Recess taken, 11:03 a.m. - 11:25 a.m.)

20            THE CLERK:  All rise.

21            THE COURT:  Defendants are present.  Let's get the

22    jury out, please.

23       (Jury out, 11:26 a.m.)

24            THE COURT:  The jury is assembled.  All parties and

25    attorneys are present.

1          You may proceed.

2          Be seated, please.

3    BY MS. MOHSIN:

4    Q.  Special Agent Fleming, you indicated that in the recording

5    that the jury heard prior to the break, that there were several

6    speakers.  Can you identify again, so that they're clear, who

7    "JS" is?

8    A.  That's Mr. Smith.

9    Q.  During the course of that portion of the recording, there

10   were some references to Arizona and the desert.  Do you know

11   from the course of this investigation whether the Devils

12   Diciples Motorcycle Club has a chapter in Arizona?

13   A.  They do.  And they did at this time, in Tucson, Arizona.

14   Q.  And based upon your testimony, I believe it was last week,

15   you took a trip down there?

16   A.  That's correct.

17   Q.  And is there a desert area that is located within the

18   proximity of that clubhouse?

19   A.  It's called Box Canyon.

20   Q.  And is that, is that an actual desert area?

21   A.  It is.

22   Q.  Okay.  There was reference in this recording about an

23   individual by the name of "Swede."  Are you familiar with that

24   individual?

25   A.  I am.

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN

1    Q.  Can you tell the members of the jury what your familiarity

2    is, based on the investigation?

3    A.  He's a member of the Devils Diciples in Illinois.

4    Q.  And when the reference is made about taking someone's

5    center wheel, what do you understand that to be, based on the

6    investigation?

7    A.  The center wheel is an indication of full membership.

8    Oftentimes, if you're punished, your center wheel is taken, and

9    you become a prospect again.

10   Q.  Now, you indicated that this was a church meeting.  Based

11   upon your investigation, were there church meetings held

12   regularly?

13   A.  There were.

14   Q.  And were they done sort of on a monthly basis, or a yearly

15   basis, or something more regular than that?

16   A.  It would depend on each chapter or state unit.  Some would

17   happen once a week.  More would be a couple times a month.

18   Q.  And the occurrence of a meeting, or a run, or some of the

19   things that were talked about during the course of that

20   recording, is that some of the information that's provided from

21   a source or a cooperating witness to law enforcement?

22   A.  That's correct.

23   Q.  So leading up to this particular recording, was there

24   information from Mr. Pizzuti about these types of activities?

25   A.  That's correct.

2:11-cr-20129-RHC-MAR  Doc # 1073  Filed 11/01/14  Pg 98 of 281  Pg ID 5994
JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN

98

1  Q.  Now, this recording occurred on October the 3rd of 2007.

2  Was there a wiretap, a court-authorized wiretap up and running

3  by this point?

4  A.  There was, yes.

5  Q.  And whose phone was that for?

6  A.  It was on Vern Rich's phone.

7  Q.  I'm going to play some calls.  And we'll play the call and

8  then I'll ask you some follow-up questions with respect to your

9  understanding of those communications.

10       Specifically, I would like to direct your attention to

11  what's been admitted as Exhibit T-29 and I'm going to provide

12  you with a summary exhibit to aid you.

13  A.  Sure.  Thank you.

14  Q.  I want to direct your attention to what has been admitted

15  as T-29.  Could you tell the jury what the date of that call

16  was, who the parties were, and approximately what time the call

17  occurred?

18  A.  That is -- T-29 is a call of October 12th of 2007 at

19  approximately 4:37 p.m.  It's a conversation between Vern Rich

20  and his girlfriend at the time, Lauri Ledford.

21  Q.  And could you identify for the record the call number and

22  the type of call that was intercepted on that particular day?

23  A.  This was call 618 PTT, meaning it was a push-to-talk or the

24  walkie-talkie feature of his phone.  And it was an outgoing

25  call from Mr. Rich to Ms. Ledford.

1   Q.  Using that walkie-talkie feature?

2   A.  That's correct.

3          MS. MOHSIN:  Could you please publish call T-29?

4      (GX #T-29 published to the jury, 11:32 a.m. - 11:32 a.m.)

5   BY MS. MOHSIN:

6   Q.  And just so the record is clear, what was the telephone

7   number that Vern Rich was using during the course of the wire

8   interceptions in this case?

9   A.  His number, I don't recall off the top of my head,

10  Mr. Rich's number at the time.

11  Q.  Okay.  We can refresh your memory with something in a

12  moment.

13     (Brief pause at 11:33 a.m.)

14  BY MS. MOHSIN:

15  Q.  Would something refresh your memory?

16  A.  It would.

17          Okay.

18  Q.  Has your memory been refreshed?

19  A.  It has.  Mr. Rich's number was (810) 488-5384.

20  Q.  Now, I would like to direct your attention to call T-29 in

21  evidence.  That call is fairly self-explanatory.  Did this call

22  occur before the third controlled purchase in the case?

23  A.  It did.

24  Q.  Okay.  I would like to direct your attention to call T-32.

25  What was the date and time of that call?

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN

 1  A.  It was also on October 12th at 4:43 p.m.

 2  Q.  How long after the first call was this call placed?

 3  A.  About four minutes.

 4  Q.  Okay.  And could you tell us if it was a call that was made

 5  by Vern Rich or if it was received by Vern Rich?

 6  A.  It was an outgoing call made by Mr. Rich to Mr. Pizzuti.

 7  Q.  And is there a call number associated with that call?

 8  A.  The call number is 874.

 9          MS. MOHSIN:  Can we please publish T-32?

10      (GX #T-32 published to the jury, 11:35 a.m. - 11:35 a.m.)

11  BY MS. MOHSIN:

12  Q.  Based upon the context of the call, as well as the

13  investigation that was going on at that time, what did you

14  understand Mr. Rich to be referring to when he said, "it's here

15  now"?

16  A.  In my opinion, Mr. Rich is telling Mr. Pizzuti that he got

17  a new shipment of methamphetamine that he has, and is willing

18  to sell it.

19  Q.  And Mr. Pizzuti indicates that he's not available to do it

20  today.  What would -- do you have an understanding about what

21  your -- what his instructions were, if he was offered to make a

22  purchase right away?

23  A.  Well, number one, he wasn't authorized to make a purchase

24  without myself or Agent Opperman involved with a recording

25  device.  And so he was told he had to put off any -- anything;

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN

1   just like he did in this call, put Mr. Rich off.

2   Q.  Okay.  I want to direct your attention to call T-33 in

3   evidence.  Can you tell us the call number and some of the

4   important information about that call?

5   A.  It's call 878.  It's dated the same day, October 12th of

6   2007 at 5:42 p.m.  And it's an outgoing call from Vern Rich to

7   John Riede, who was a Devils Diciples, who went by the name of

8   "Bear."

9          MS. MOHSIN:  Okay.  Could you please publish this call

10  to the jury?

11     (GX #T-33 published to the jury, 11:37 a.m. - 11:38 a.m.)

12  BY MS. MOHSIN:

13  Q.  Special Agent Fleming, what is your opinion about the

14  significance of this particular call?

15  A.  This conversation, Mr. Rich is telling Mr. Riede that he's

16  trying to make a sale of methamphetamine and that he wants to

17  get the money to Mr. Riede before he leaves.

18  Q.  And I would like to direct your attention now to Exhibit

19  T-38.  Could you please provide some information about the

20  details of surrounding that call?

21  A.  Sure.  That's call number 917.  It happened on October 13th

22  of 2007 at 12:57 p.m., and it's an incoming call from Mr.

23  Darrah to Mr. Rich.

24  Q.  Okay.  And is this -- withdrawn.

25          MS. MOHSIN:  Could you please publish T-38?

```
 1        (GX #T-28 published to the jury, 11:39 a.m. - 11:41 a.m.)
 2   BY MS. MOHSIN:
 3   Q.  Special Agent Fleming, in this call, Mr. Darrah makes
 4   reference to Gail.  Do you have an understanding of who Gail
 5   is?
 6   A.  That's Gail Sweeney (phonetic), Mr. Smith's wife.
 7   Q.  And he also makes -- they have a discussion about getting
 8   money from JP and Vern owing -- withdrawn -- JP owing Vern some
 9   money shortly.
10        In the context of the investigation, what's your
11   opinion what they are talking about?
12   A.  What they are talking about is Mr. Darrah needs money or
13   would like some money.  Mr. Rich lets him know that he's about
14   to meet up with JP, clearly, to sell meth; and that some of
15   that money could go to Mr. Darrah for gas to -- I believe he
16   was going to a hospital to visit someone who was ill.
17   Q.  Okay.  Now, the calls we have played thus far, are they all
18   occurring before the third controlled buy in which Mr. Darrah
19   meets with JP?
20   A.  No.  Mr. Darrah -- not for the third controlled buy.
21   Q.  I'm sorry.  For the third controlled buy in which Mr.
22   Pizzuti meets with Mr. Rich?
23   A.  That's correct.
24   Q.  Okay.  Has Mr. Darrah already, as at this point in time,
25   has Mr. Darrah already engaged in a transaction with Mr.
```

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN

1    Pizzuti, to your knowledge?

2    A.   That's correct.  And he's aware Mr. Rich is selling meth to

3    Mr. Pizzuti.

4    Q.   I want to direct your attention now to what's been admitted

5    as T-39.  Could you please provide the relevant details

6    surrounding this particular call?

7    A.   This is call 974 on October 14th of 2007 at 3:23 p.m.  It's

8    an incoming call from Mr. Pizzuti to Mr. Rich.

9         MS. MOHSIN:  Okay.  Would you please publish that

10   call?

11      (GX #T-39 published to the jury at 11:43 a.m.)

12   BY MS. MOHSIN:

13   Q.   Special Agent Fleming, during the course of the wire

14   interceptions of the phone of Vern Rich, as well as Paul

15   Darrah, did you or members of your team tell Mr. Pizzuti that

16   there was a wiretap up on Mr. Rich's phone or Mr. Darrah's

17   phone?

18   A.   No.

19   Q.   Did you tell Mr. Pizzuti that there was a wiretap up on any

20   phone, at any time?

21   A.   No.

22   Q.   Why not?

23   A.   Number one, it's a security concern about protecting the

24   wire.  There would be no reason to share that with anybody

25   outside of the agents who were working on that case.

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN

1    Q.  So did you understand that you were prohibited from sharing

2    that information?

3    A.  That's correct.

4    Q.  And would there also have been a second reason that relates

5    to Mr. Pizzuti and your ability to assess his cooperation?

6    A.  Well, we wanted to always know exactly what was going on,

7    and have a way to see whether he was being honest and

8    forthright with us about when he was receiving calls.

9    Q.  So to your knowledge, was he aware that this phone

10   conversation or voicemail that was left in this call, T-39,

11   would he have known that from you, in other words, that his

12   voice was being recorded?

13   A.  No, absolutely not.

14   Q.  Okay.  I want to direct your attention now to Exhibit T-40

15   in evidence.  Could you please provide the details surrounding

16   that call?

17   A.  This is just a voicemail message, call number 983, also on

18   October 14th at 8:34 p.m.  And again, it's an incoming

19   voicemail left by Mr. Pizzuti telling Mr. Rich that he's

20   leaving.

21   Q.  Okay.  And this is shortly after, a couple hours after the

22   previous call we just played?

23   A.  It was, yes.

24          MS. MOHSIN:  Okay.  Could you please publish this

25   call?

```
 1         (GX #T-40 published to the jury at 11:45 a.m.)

 2    BY MS. MOHSIN:

 3    Q.  Similar question:  To your knowledge, would he have known

 4    about this recording being monitored --

 5    A.  No.

 6    Q.  -- Mr. Pizzuti?

 7         Okay.  I want to direct your attention now to October

 8    the 25th of 2007.  Can you please provide information regarding

 9    T-51?

10    A.  Sure.  T-51 is Call No. 1365.  It occurred on October 25th

11    of 2007 at 3:10 p.m.  It's an incoming call from John Riede,

12    known as "Bear," to Mr. Rich.

13         MS. MOHSIN:  Would you please publish T-30 -- T-51?

14    Excuse me.

15         (GX #T-51 published to the jury, 11:46 a.m. - 11:48 a.m.)

16    BY MS. MOHSIN:

17    Q.  Special Agent Fleming, I would like to ask you some

18    questions related to that particular call.  Would it aid you to

19    have a copy of the transcript?

20    A.  I think I'm okay for right now.

21    Q.  All right.  Please describe what is being discussed and

22    then I'll follow up.

23    A.  Sure.  Mr. Rich is telling Mr. Riede that he's got a lot

24    of money.  When he uses the term, he wants to get this out of

25    his pocket, he's got a lot of money that he wants to get to Mr.
```

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN                    106

1    Riede.  And in the same token, when he says he probably wants

2    to do that, do that again, meaning he needs to refresh his

3    supply of methamphetamine that he can get from Mr. Riede.

4           So he can kill two birds with one stone.  If they

5    meet, he can give him the money that he's got that he owes Mr.

6    Riede for methamphetamine.  In return, Mr. Riede can give him

7    additional methamphetamine.  Mr. Riede says, "things are real

8    right," meaning he's fresh with methamphetamine and they can

9    kill two birds with one stone.

10   Q.  And is that your opinion, based upon your investigation in

11   this case, and your review of all of the calls in this case?

12   A.  Based upon that and my experience working drug

13   investigations, yes.

14   Q.  Okay.  Now, at this point, October 25th of 2007, has the

15   third controlled buy occurred?

16   A.  It has not.

17   Q.  And when did the third controlled buy occur?

18   A.  It happened the next day.

19   Q.  Okay.  Now, before the next day, so staying on October the

20   25th of 2007, was there another call that's relevant for the

21   purposes of communications between Vern Rich and others related

22   to the controlled buy?

23   A.  There was a call between Mr. Pizzuti and Mr. Rich.

24   Q.  And when did that occur?

25   A.  On the 25th at 3:20.  It was an incoming call from

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN

1   Mr. Pizzuti to Mr. Rich.

2   Q.  And this is call, what number?

3   A.  I'm sorry.  1369.

4        MS. MOHSIN:  Okay.  Would you please publish 13 -- I'm

5   sorry, this is R-50 -- excuse me -- T-52.  Would you please

6   publish T-52?  Thank you.

7        (GX #T-52 published to the jury, 11:50 a.m. - 11:51 a.m.)

8   BY MS. MOHSIN:

9   Q.  What is your opinion about the purpose of that

10  communication between Mr. Rich and Mr. Pizzuti?

11  A.  Mr. Pizzuti was just telling Mr. Rich that he wasn't

12  available to do the deal that night.  And Mr. Rich lets him

13  know that he's going to see that other guy, meaning Mr. Riede,

14  and then after, any time after that they can get together and

15  do the deal.

16  Q.  Now, does the deal occur the following day?

17  A.  It does.

18  Q.  And Special Agent Opperman isn't part of that particular

19  deal; in other words, he's not with you that day?

20  A.  No, he's not.

21  Q.  Can you tell the members of the jury what occurs before,

22  during and after --

23  A.  Sure.

24  Q.  -- the controlled buy?

25  A.  Mr. Rich, and I can't remember who talked to who, but at

1    about 2:30, Mr. Rich -- there was conversation between the two

2    of them over the phone, where he was ready to do the deal right

3    then, but Mr. Pizzuti did not have the recording device, he

4    didn't have the money, so he had to put him off.

5         So he told him, well, how about five o'clock.  Mr.

6    Rich said, sure, he'd go back up, get showered, get changed,

7    come back down, they'd do the deal around five o'clock at Mr.

8    Pizzuti's house.

9    Q.  And in the meantime, did you receive communication, or

10   someone at the FBI, receive communication from Mr. Pizzuti that

11   the deal was about to take place that day?

12   A.  That's correct.

13   Q.  And so did you follow the same procedure that's been

14   described numerous times here in the courtroom, meeting with

15   Mr. Pizzuti, searching him, providing him with a recording

16   device, et cetera?

17   A.  Yes.

18   Q.  And were all those things actually -- did they occur?

19   A.  They did, yes.

20   Q.  And did you keep Mr. Pizzuti under surveillance on this

21   particular occasion after he left your custody?

22   A.  That's correct.

23   Q.  What happened?

24   A.  At approximately five o'clock, Mr. Rich showed up in a car

25   that we knew from previous surveillances he drove.  He got out

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN

1    of his car, and we were able to observe that it was Mr. Rich.

2    He got into a car that Mr. Pizzuti was sitting in.  He was

3    in there for a couple of minutes.  And then he got back,

4    Mr. Rich got back in his BMW and drove away.

5    Q.  And on this occasion, how much money was provided to

6    Mr. Pizzuti for the purchase of methamphetamine?

7    A.  $2,000.

8    Q.  And were there any additional funds provided on this

9    particular occasion, or was it just the $2,000?

10   A.  It was just the $2,000.

11   Q.  And was, was there a surveillance of the actual meeting

12   between Mr. Rich and Mr. Pizzuti?

13   A.  It was, yes.

14   Q.  And approximately how long did they meet to do the

15   exchange?

16   A.  It was very short.  Two to three minutes.

17   Q.  And after the exchange was completed, did you meet with Mr.

18   Pizzuti?

19   A.  We did.

20   Q.  And how long after the exchange?

21   A.  As soon as we were sure that Mr. Rich was out of the area

22   and wasn't going to double back, so maybe five to ten minutes

23   later, we had a prearranged meet spot.  We went there,

24   retrieved the methamphetamine and the recorder.

25   Q.  And I'm going to show you what's been provisionally --

2:11-cr-20129-RHC-MAR  Doc # 1073  Filed 11/01/14  Pg 110 of 281  Pg ID 6006
JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN

110

1   well, just a moment.

2           I'm going to show you what's been marked as proposed

3   Exhibit 29-1.  Do you recognize proposed Exhibit 29-1?

4   A.  I do.  29-1 is the methamphetamine that Mr. Pizzuti

5   purchased from Mr. Rich on October 26th of 2007.

6           MS. MOHSIN:  Your Honor, the Government would offer

7   29-1 in evidence.

8           MS. STOUT:  No objection.

9           THE COURT:  Without objection, it is received, 29-1.

10      (Exhibit 29-1 received, 11:55 a.m.)

11  BY MS. MOHSIN:

12  Q.  Now, what is your understanding of the approximate weight

13  of the particular substance that was purchased on that date?

14  A.  It's between 24 and 25 grams of methamphetamine.

15  Q.  I'm going to provide you with three exhibits related to the

16  three controlled purchases and ask you some follow-up

17  questions.

18  A.  Okay.

19  Q.  I'm going to provide you with Government's Exhibit 27-1,

20  28-1, and you have 29-1.

21          Did you submit these for laboratory analysis?

22  A.  We did, yes.

23  Q.  And at some point, you received those results; is that

24  correct?

25  A.  We did.

1  Q.  Now, are those three exhibits different in any way, just

2  from their appearance?

3  A.  The color is different.

4  Q.  Okay.

5  A.  The first two, 27-1 and 28-1, which are the purchases that

6  were made in August and September is a darker brown.  Well, I

7  shouldn't say -- it's not a dark brown, it's a lighter brown,

8  as compared to the methamphetamine purchased in October, which

9  is extremely white and much more crystalized.

10  Q.  Would you please publish 27-1 to the jury, by displaying

11  it, so they can see it?

12          And then the next exhibit, 28-1.

13          Turn it around as well.

14  A.  Oh, sorry.

15  Q.  And finally, the third exhibit, 29-1.  Both sides, please.

16          Okay.  Now, after the three controlled purchases, and

17  in particular this controlled purchase, was there an additional

18  intercepted communication between Mr. Rich and Mr. Riede?

19  A.  There was.

20  Q.  I want to direct your attention to Government's Exhibit

21  T-55.  Could you provide the jury a little bit of information

22  about the circumstances?

23  A.  Sure.  It's called No. 1474.  It's on October 26, 2007.

24  It's 7:57 p.m.  It's an outgoing call from Mr. Rich to

25  Mr. Riede.

1    Q.  Now, you indicated earlier that the third controlled buy

2    occurred some time in the afternoon.  Would this -- was this

3    call after that third controlled buy?

4    A.  I think that not -- I wouldn't call it afternoon.  I would

5    call it early evening, sometime after five o'clock.

6    Q.  So the third controlled buy occurred sometime after five

7    o'clock, and this call occurred approximately?

8    A.  Almost eight o'clock.

9    Q.  All right.  So just a few short hours later.

10            MS. MOHSIN:  Would you please publish T-55?

11       (GX #T-55 published to the jury, 11:58 a.m. - 12:00 p.m.)

12   BY MS. MOHSIN:

13   Q.  Special Agent Fleming, could you provide the jury with your

14   opinion about what is being discussed during this conversation?

15   A.  Sure.  Mr. Rich confirms that he did a meth deal; that he's

16   got a lot of money to give Mr. Riede, triple what he gave him

17   the day before.  And he believes that by the time he's done,

18   he'll have at least seven, meaning $7,000, to give to him.

19   Q.  And there's also some discussion about an individual by the

20   name of "Hombre."  Are you familiar with an individual by the

21   name of Hombre?

22   A.  I am.

23   Q.  Could you tell the jury what you know about this person?

24   A.  Sure.  Hombre is a Devils Diciples Allen Paille who has a

25   previous history of methamphetamine.

1   Q.  And Mr. Hombre, is he someone that you, based on your

2   investigation, know to be a long-time member of the Devils

3   Diciples?

4   A.  He's a long-time member of the Devils Diciples, and served

5   prison time for distributing methamphetamine.

6   Q.  I want to direct your attention now to -- I'm sorry.  I

7   lost my train of thought.  I apologize.

8           Mr. Riede, where does Mr. Riede reside?

9   A.  At the time, he was living in Bay City, Michigan.

10  Q.  And where does Mr. Rich reside?

11  A.  In the Port Huron area.

12          MS. MOHSIN:  Okay.  May I have a moment, please?

13      (Brief pause.)

14          MS. MOHSIN:  Thank you, your Honor.  We have nothing

15  further for Special Agent Fleming at this time.  We reserve the

16  right to call him again.

17          THE COURT:  All right.  On these matters, is there any

18  examination?

19          MS. MACERONI:  I have a couple.

20          THE COURT:  No further?  You do?

21          MS. MACERONI:  Yes, sir, I do.

22          THE COURT:  All right.  Ms. Maceroni.

23                          CROSS-EXAMINATION

24  BY MS. MACERONI:

25  Q.  Good morning, Mr. Fleming.

1   A.  Good morning.

2   Q.  How are you?

3   A.  Good.

4   Q.  I have a couple questions concerning John Pizzuti.

5            When he would call in to either you or Mr. Opperman,

6   you would write a report, correct, with the information that he

7   gave you over the phone?

8   A.  If he provided information relative to the ongoing

9   investigation.  If it was just an administrative type call, I'm

10  going to work today or something like that, no, we would not

11  write a report on that.

12  Q.  Okay.  But if he gave you some information that you deemed

13  to be pertinent to your investigation, you would write it down,

14  correct?

15  A.  Of course.

16  Q.  And you would write it down as close to the incoming phone

17  call as possible, fair to say, so that it was accurate?

18  A.  As quickly as we could write it down, we would.

19  Q.  Okay.  And the title of these documents, and correct me if

20  I'm wrong, is a Confidential Human Source, and then

21  parentheses, CHS, Reporting Document?

22  A.  That's one of the things it's called, yes.

23  Q.  Okay.  And it's something that you used in this case,

24  correct?

25  A.  That's correct.

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - CROSS BY MS. MACERONI                    115

1   Q.  And would you agree with me, Mr. Fleming, that it's very

2   important to be as specific as possible concerning the verbal

3   information that you get from your confidential source?

4   A.  Well, they are not verbatim reports.  We're not -- you

5   know, we don't record our phone calls and then transcribe them.

6   You know, we take notes generally what is said, and put it in a

7   summary report.

8   Q.  Okay.  So you take notes what your confidential source

9   said?

10  A.  Correct.

11  Q.  Would you agree with me, at least, that the information

12  that he gives you concerning illegal activity needs to be as

13  specific as possible?

14  A.  It needs to be as specific as, as the source can be.

15  Whatever the source is going to tell us, we're going to write

16  it down.

17  Q.  Okay.  Whatever the source is going to tell you, you're

18  going to write it down?

19  A.  Correct.

20  Q.  All right.  And do you recall doing a -- having a contact

21  with Mr. Pizzuti on September 6, 2007?

22  A.  I don't have an independent recollection of that, no.

23  Q.  Okay.  If I showed you a CHS, which the reporting date was

24  September 7th, 2007, indicating that you had an in-person

25  contact on September 6th of 2007, would that refresh your

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - CROSS BY MS. MACERONI

1    recollection?

2    A.  Sure.

3    Q.  Just the first paragraph, if you want to read.

4          Now, in this document that is --

5          MS. MOHSIN:  Let me see the document, please.

6          Thank you.

7          THE COURT:  So September 6, 2007, right?

8          MS. MACERONI:  Yes.  The contact date is September 6,

9    2007.  The reporting date is September 7th, 2007.

10         THE COURT:  Go ahead with your question.

11         MS. MACERONI:  Thank you.

12   BY MS. MACERONI:

13   Q.  This indicates that John Pizzuti talked to you, correct?

14   A.  He talked to Agent Opperman and I was present.  Yes.

15   Q.  Okay.  So, and on that date, on September 6th, 2007, Mr.

16   Pizzuti -- because that's the source we're talking about,

17   correct?

18   A.  Correct.

19   Q.  Okay.  Mr. Pizzuti told you that he received a telephone

20   call from Paul Darrah at about 9:30 a.m., yes?

21   A.  Correct.

22   Q.  And Mr. Darrah told John Pizzuti that Vern dropped off

23   whatever source -- and source, of course, is John Pizzuti --

24   A.  Correct.

25   Q.  -- wanted.

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - CROSS BY MS. MACERONI

 1            That's the information you received from Mr. Pizzuti,

 2    correct?

 3    A.   Correct.

 4    Q.   Okay.  At Mr. Darrah's residence?

 5    A.   That's correct.

 6    Q.   Okay.  John Pizzuti did not specifically state that Mr.

 7    Darrah said Vern dropped the meth off, correct?

 8    A.   I can't tell you that he didn't say that.  That's what the

 9    report says, that he dropped off something.

10    Q.   Okay.  He dropped off something.

11    A.   Correct.

12    Q.   And this report was made very close to the time that you

13    spoke with John Pizzuti; fair enough, Mr. Fleming?

14    A.   I can't tell you exactly when Mr. Opperman wrote it, other

15    than it appears that he wrote it the next day.

16    Q.   But you're not telling this jury that the information in

17    this report is incorrect, are you?

18    A.   I never said that.  I'm just trying to be accurate.

19    Q.   Okay.  Now, you also testified in front of the grand jury

20    concerning your history with Mr. Pizzuti during the course of

21    this investigation.  Do you recall that testimony?

22    A.   Yes.

23    Q.   And specifically, that was on June 1st, 2011.

24    A.   Correct.

25    Q.   And do you recall telling the grand jury or testifying

2:11-cr-20129-RHC-MAR  Doc # 1073  Filed 11/01/14  Pg 118 of 281  Pg ID 6014
JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - CROSS BY MS. MACERONI

118

1   about the fact that Mr. Pizzuti continued to use drugs during

2   the course of his cooperation?

3   A.  I don't believe that that's accurate.

4            MS. MACERONI:  Okay.  Page 13.

5            If I showed you --

6            MS. MOHSIN:  May I have the date?

7            MS. MACERONI:  Yes.  June 1st, 2011.

8   BY MS. MACERONI:

9   Q.  If I showed you -- well, let me do it this way:  Do you

10  recall having this question given to you by the U.S. Attorney?

11            "Would you tell the grand jury members a little bit

12  about his drug use and some of the concerns that came up?

13            Your answer:  "Sure.  During one of the times that he

14  was wearing a recording device, and I believe there were

15  probably about 20 times that he wore a recording device, we

16  overheard what appeared to be the sound of him snorting some

17  sort of drug during the course of it.  We confronted him after

18  the fact when we listened to the recording, and he, in fact,

19  confirmed that he had used cocaine at that time."

20            Do you recall that testimony?

21  A.  Well, that's correct.  But that's not what you asked me.

22  You asked me of his continued drug use, which was misleading.

23  Q.  Did you give him an admonition about the fact that he was

24  continuing to use?

25  A.  He was admonished -- always at the beginning of a

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - CROSS BY MS. MACERONI

1    relationship with a source, there are certain things we have to

2    admonish them.  When it came to our attention that he had used

3    drugs, he was admonished again.  Yes.

4    Q.  And so you did admonish him about whatever he was snorting

5    up his nose that day, correct?

6    A.  That's correct.

7    Q.  All right.  But he continued to use, did he not?

8    A.  Not that I know of, no.

9    Q.  Do you recall this question:

10            "Did there come a time later in his cooperation, or

11   during the time period that he was cooperating with the FBI,

12   that he again used a controlled substance?"

13            And your response was:  "He was using Vicodin."

14   A.  Yeah.  That was --

15   Q.  The question was --

16   A.  That was about a year later.

17   Q.  Excuse me.  I'm not through.

18            The question was:  "Did he have a prescription for the

19   Vicodin?"

20            Your answer was:  "He had a prescription for the

21   Vicodin, but he was getting Vicodin from other people besides

22   the prescription."

23            Later on, there was a question:  "Did he do that

24   without disclosing that to you initially?

25            That's correct."

UNITED STATES vs. SUTHERLAND, et al. - 11-20129; 11-20066

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - CROSS BY MS. MACERONI

1   A.  That's correct.

2   Q.  Do you recall that testimony?

3   A.  Yup.

4   Q.  Okay.  So at the beginning of the cooperation agreement

5   that he had with your office, he was snorting cocaine at some

6   function, fair enough?

7   A.  He, to our knowledge, snorted cocaine one time, correct.

8   Q.  All right.  To your knowledge, because you caught him on

9   tape?

10  A.  That's correct.

11  Q.  All right.  And then he continued to use controlled

12  substances, Vicodin, both with and without a prescription,

13  correct?

14  A.  I don't believe that's an accurate --

15  Q.  Agent, that's a yes or no answer.

16  A.  No.

17  Q.  No, he wasn't using Vicodin without a prescription?

18  A.  Your term was, "continued use of Vicodin."

19  Q.  Do you recall the question:  "Did there come a time when

20  you and other agents had a conversation with him about using

21  the Vicodin outside the confines of his prescription?"

22        And your answer was:  "We told him that he was not

23  allowed to engage in that type of activity and should stop."

24  A.  That's correct.

25  Q.  Those were the directions you gave him?

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - CROSS BY MR. SATAWA

1   A.  That's correct.

2          MS. MACERONI:  I have nothing further.

3          THE COURT:  Is there any other cross-examination?

4          Mr. Satawa.

5          MR. SATAWA:  Yes, your Honor.

6                          CROSS-EXAMINATION

7   BY MR. SATAWA:

8   Q.  Good morning, Agent Fleming.

9   A.  Good morning.

10  Q.  How are you today?

11  A.  Good.

12  Q.  Agent Fleming, you were in the courtroom this morning all

13  morning; is that right?

14  A.  I was not.

15  Q.  You were not.  Were you in the courtroom at all for the

16  testimony of Mr. Pizzuti?

17  A.  Mr. Pizzuti on cross-examination, no.

18  Q.  You were not?

19  A.  I was not.

20  Q.  Were you in the courtroom for his testimony on Monday?

21  A.  I was.

22  Q.  You are aware that he testified about, I don't know, three

23  or four different wiretaps that -- which include both speaking

24  to people live and on the phone during the course of his direct

25  testimony?

1   A.  I believe he spoke about recorded conversations, yes.

2   Q.  All right.  You were called this morning by the Government.

3   Ms. Mohsin asked you some questions.  The first questions you

4   were asked about were some of the -- some of those same

5   recordings.  Do you remember those questions this morning?

6   A.  Correct.

7   Q.  One of those series of questions involved the first

8   controlled buy of meth that Mr. Pizzuti was involved in.  Do

9   you remember that?

10  A.  I do.

11  Q.  And Ms. Mohsin asked you questions about your debriefing or

12  conversation with Mr. Pizzuti immediately after that recorded

13  conversation.  Do you remember those questions?

14  A.  Correct.

15  Q.  Ms. Mohsin asked you:  Did you talk to Mr. Pizzuti about

16  this alleged transaction of meth between himself and Mr.

17  Vandiver.  Do you remember those questions?

18  A.  We talked about that, yes.

19  Q.  All right.  And you said that Mr. Pizzuti referred you to a

20  conversation or a part of his conversation involving brakes or

21  something, that that indicated when this alleged drug

22  transaction went down?

23  A.  That's correct.

24  Q.  Ms. Mohsin asked you, is that when you somehow, some way,

25  were made informed or made aware when the drug transaction went

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - CROSS BY MR. SATAWA

1    down.  Do you remember that?

2    A.  That's correct.

3    Q.  Would you be able to tell the jury why that conversation

4    wasn't played for when Mr. Pizzuti was on the witness stand?

5    A.  I have no idea.

6    Q.  Me either.

7            Agent Fleming, you said that you never played that

8    tape for Mr. Pizzuti; is that your testimony?

9    A.  I never did.

10   Q.  You would certainly agree with me that there was no

11   conversation on that tape, having reviewed it, according to

12   your testimony, between Mr. Vandiver and Mr. Pizzuti involving

13   the purchase of meth?

14   A.  You mean a direct conversation, do you have meth for me,

15   and here's some money?  No.  There was nothing like that.

16   Q.  Okay.  Well, was there an indirect conversation?  Are you

17   suggesting that somehow, some way, your training and experience

18   as an FBI agent leads you to be able to tell these jurors that

19   when you talk about brakes, what you're really talking about is

20   meth?

21   A.  I never said that.

22   Q.  Okay.  Well, you said -- I asked you a question.  You said,

23   you mean any direct conversation?  I'm talking about any

24   conversation at all between Mr. Vandiver and Mr. Pizzuti about

25   the sale of meth.

1    A.   No.

2    Q.   Direct or indirect?

3    A.   No.

4    Q.   In fact --

5    A.   They talked about brakes while they were doing the drug

6    transaction.

7    Q.   Were you there?  You saw this drug transaction?

8    A.   I'm going off of what our debriefing said.

9    Q.   You're going off the word of Mr. Pizzuti?

10   A.   That's correct.

11   Q.   Who lied to you about using cocaine?

12   A.   He didn't lie about using cocaine.  Not to me.

13   Q.   Oh, he didn't?  He just kept it from you.  I guess that's

14   different in your mind.

15   A.   I'm not sure that that -- is that a question that you're

16   asking me?

17   Q.   It is.  Is that different, in your mind?

18   A.   I'm sorry, what's the question?

19   Q.   Would you like me to repeat it?

20   A.   Sure.

21   Q.   You understand -- you're an agent.  How long have you been

22   an agent?

23   A.   Twenty-seven years.

24   Q.   You understand how this process works:  I ask questions,

25   you give answers, right?

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - CROSS BY MR. SATAWA

1   A.  Sure.

2   Q.  Okay.  So my question again is:  Did you ask him that?

3   A.  Did I ask him what?

4   Q.  All right.  We can do this.  We can do this.

5           THE COURT:  Question, please.

6           MR. SATAWA:  Yes, your Honor.

7   BY MR. SATAWA:

8   Q.  Mr. Pizzuti never admitted to you about using cocaine until

9   you directly asked him, right?

10  A.  That's correct.

11  Q.  Yes.  And he knew, because you told him, he can't use

12  cocaine, right?

13  A.  That's correct.

14  Q.  You also told him, he can't break the law?

15  A.  Well, he could not break the law.  He was authorized to

16  do criminal activity, but only in the confines of making

17  controlled purchase of methamphetamine.

18  Q.  So, for example, the three controlled buys you talked

19  about?

20  A.  That's correct.

21  Q.  He wasn't authorized to fraudulently obtain Vicodin without

22  a prescription?

23  A.  No, he was not.

24  Q.  All right.  And he did that?

25  A.  That's what he said, yes.

1   Q.  Okay.  And he volunteered that information without being

2   caught; he just walked into a debriefing and said, you know

3   what, I've got to 'fess up.  You probably don't know anything

4   about this, but I obtained Vicodin without a prescription,

5   and I know I'm not supposed to, and my conscience is just

6   overwhelming me, so I just have to tell you about it.

7           Is that how he told you?

8   A.  No, that's not.

9   Q.  Okay.  He told you because he was caught doing it?

10  A.  Well, he was overheard on a wiretap.  Certainly, we

11  couldn't confront him directly with the fact that we heard him

12  on a wiretap.  But we confronted him, nonetheless, without

13  using the wiretap information.

14  Q.  And he then admitted it?

15  A.  He did.  He admitted that he had -- was overusing Vicodin

16  beyond the prescription that he had.  Correct.

17  Q.  In fact, Ms. Mohsin asked you a question about how only

18  selected parts of these conversations were played for the jury

19  this morning.  Do you remember those questions?

20  A.  Correct.

21  Q.  And your answer was, is that you helped the Government

22  select the portions of the tape that -- and the words you used,

23  I wrote down were -- that were particularly relevant.  Do you

24  remember that testimony?

25  A.  Correct.

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - CROSS BY MR. SATAWA

1  Q.  Would you agree with me if there was a conversation between

2  Mr. Vandiver and Mr. Pizzuti about the sale of meth, you would

3  find that particularly relevant?

4  A.  If there was a direct conversation, yes.

5  Q.  Or an indirect conversation, right?

6  A.  Well, I think if I can correct one of the things I said

7  earlier, I think we found out later on that there had been a

8  glitch in when we played the tape initially, or the way it had

9  been cut, at least that's what I was told, why that section

10  wasn't played yesterday.

11  Q.  Okay.  But my question to you, once again, is you would

12  agree with me, if there is a conversation of any kind, direct,

13  indirect, subliminal, smoke signal, Vulcan mind meld, about a

14  sale of meth between Mr. Vandiver and Mr. Pizzuti, you would

15  find that "particularly relevant" to what we're talking about

16  today?

17  A.  It should have been on there, yes.

18  Q.  You just played for the jury or discussed with the jury

19  your interpretation of several Title III wire intercepts and

20  the exhibits, the "T" series of exhibits, correct?

21  A.  Correct.

22  Q.  And that wiretap was a wiretap on Vern Rich; is that right?

23  A.  It was, yes.

24  Q.  And that wiretap was on Vern Rich.  One of the reasons for

25  the -- for that was because Vern Rich was suspected to be

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - CROSS BY MR. SATAWA

1    moving meth?

2    A.   That's correct.

3    Q.   And you were trying to get evidence of Vern Rich selling

4    and distributing meth?

5    A.   Correct.

6    Q.   You learned through these, these wiretaps that John Riede

7    or "Bear" became, from the wiretaps we heard this morning, it

8    appears that he is the source of meth for Vern Rich, or at

9    least a source of meth for Vern Rich?

10   A.   He was a source, yes.

11   Q.   So we have a, we have a Title III wiretap on the phone of

12   Vern Rich, yes?

13   A.   Correct.

14   Q.   We have heard several phone calls this morning involving

15   Vern Rich; is that right?

16   A.   Correct.

17   Q.   You've heard Vern Rich being described, at least by Mr.

18   Pizzuti, as a meth dealer, right?

19   A.   Correct.

20   Q.   And the meth guy, right?

21   A.   Yeah.  Yes.

22   Q.   And correct me if I'm wrong, Mr. Rich is not sitting over

23   here charged with these seven gentlemen facing charges for this

24   meth; is that right?

25            MS. MOHSIN:  I would object based upon some

1  preliminary instructions.  I can elaborate further.

2          THE COURT:  Well, it seems to me that it would be the

3  Court's responsibility to explain to the jury who is charged

4  with what.  So let's move to another question.

5          MR. SATAWA:  Your Honor, I didn't mean to suggest

6  Mr. Rich wasn't charged at all.  I'm just saying he's not on

7  trial with these individuals, and that's the Government's

8  choice as to who is sitting here today and who isn't.

9          THE COURT:  You are not correct about that, sir, at

10  least not entirely.

11          MR. SATAWA:  I absolutely am.

12          THE COURT:  You are not correct about that, sir, at

13  least not entirely.  Let's move to -- this is an irrelevancy.

14  Let's move to another point.  And I'll -- I may need to explain

15  this afternoon the significance of these comments to the jury.

16          Proceed.  Next question.

17  BY MR. SATAWA:

18  Q.  Was a wiretap ever sought for the phone of his source of

19  supply, "Bear," or Mr. Riede?

20  A.  No, it was not.

21  Q.  Was a wiretap ever sought for Mr. Vandiver's phone?

22  A.  No, it was not.

23  Q.  And is Mr. Riede going to be a witness in this trial?

24          MS. MOHSIN:  Your Honor --

25          MR. SATAWA:  Do you need the answer from them?

 1              MS. MOHSIN:  -- I object again as to the nature of the

 2     question to this particular witness.

 3              THE COURT:  I sustain the objection.

 4              Next point.  Any other questions?

 5     BY MR. SATAWA:

 6     Q.  Where is Mr. Riede today?

 7     A.  I believe he's still living in Bay City.

 8              MR. SATAWA:  No further questions.

 9              THE COURT:  Any other cross-examination?

10              Redirect examination, if any?

11                        REDIRECT EXAMINATION

12     BY MS. MOHSIN:

13     Q.  Special Agent Fleming, you testified on cross-examination

14     that the recording that has been referred to as R-2 in which

15     Mr. Pizzuti purchased a quantity of meth from Vern Rich,

16     through Vandiver, I want to direct your attention to that, that

17     there was a glitch.

18     A.  That's correct.

19     Q.  And that recording, a portion of that recording in which

20     there is some conversation was not played for the jury?

21     A.  That's correct.

22     Q.  Whose mistake was that?  Mine or the FBI's?

23     A.  Oh, I don't know.  There was a mistake in how it played

24     back yesterday.  It didn't work when we had Mr. Pizzuti on the

25     stand on direct.

JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - REDIRECT BY MS. MOHSIN                    131

1   Q.  Through no fault of your own?

2   A.  Correct.

3   Q.  Okay.  You had identified, is that correct, the portion of

4   that recording that was at issue during your cross-examination?

5   A.  That's correct.

6   Q.  If we were to play that communication, the entire call

7   right now or that, rather, that entire recording, would you be

8   able to identify for the jury the portion that is at issue here

9   where Mr. Vandiver is heard speaking to Mr. Pizzuti?

10  A.  That's correct.

11  Q.  Okay.

12        MS. MOHSIN:  Your Honor, we would like to play that

13  portion of the call, but it is not keyed up at the time.  I can

14  make an attempt to key it up and we can play it a little bit

15  later.  I don't want to waste the Court's time.

16        THE COURT:  My plan is to break for lunch at 12:30.

17  And so can you cue it up --

18        MS. MOHSIN:  Without wasting time --

19        THE COURT:  -- in that time?

20        MS. MOHSIN:  I can do it certainly between the lunch

21  hour, but I don't want to waste the Court's time cueing it up

22  now.

23        THE COURT:  Do you have any other redirect

24  examination?

25        MS. MOHSIN:  I don't believe that I do.

 1          THE COURT:  We'll take that point after the lunch

 2   hour.

 3          MS. MOHSIN:  Take that point?  Okay.  I don't have any

 4   other redirect examination, your Honor.

 5          THE COURT:  All right.  Then we'll recess momentarily

 6   for the lunch hour.

 7          Ladies and gentlemen, the 12:30 delivery time was

 8   established for your pre-ordered lunch.  And you'll have that

 9   in the jury rooms.  And I have no other instructions for you at

10   the moment.

11          We'll resume at 1:30, or as nearly close to 1:30 as we

12   are able to manage.  Please avoid discussing the case, of

13   course, as is your custom while you're away from court.

14          Have a pleasant break.  We'll see you at 1:30.  Thank

15   you.  Escort yourselves.

16      (Jury out, 12:25 p.m.)

17          MS. MOHSIN:  Your Honor, the Government would like to

18   be heard.

19          THE COURT:  Be seated.  Go ahead.

20          Well, not you.  Others, please.

21          MS. MOHSIN:  Your Honor, we believe that the jury

22   needs to be instructed.  I think there has been several times

23   during the course of this morning's proceedings where,

24   improperly, there has been a suggestion; in fact, I think that

25   the jury is, in fact, misled by this suggestion that Mr. Vern

2:11-cr-20129-RHC-MAR  Doc # 1073  Filed 11/01/14  Pg 133 of 281  Pg ID 6029
JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - REDIRECT BY MS. MOHSIN

133

1    Rich and Mr. John Riede are either not charged or possibly

2    cooperators or something along those lines.

3         In any case, what they don't realize is that both of

4    those individuals are defendants in this case.  They just are

5    not being tried with these defendants due to the, you know,

6    need to try them in smaller groups.  And I think that that

7    impression has been created for this jury.  I think an

8    instruction is required so that they are not misled.

9         THE COURT:  Is there any disagreement on that point?

10        MR. SATAWA:  Yes.

11        THE COURT:  Mr. Satawa, do you want to briefly express

12   your disagreement?

13        MR. SATAWA:  Your Honor, the Government chose who was

14   going to be in this group.  We were told it would be ten.

15   Three have dropped out.  We're now at seven.

16        THE COURT:  Here's the reason I said that you were not

17   entirely correct about that:  I confirmed.  The Government

18   suggested, but I decided.  And that's the reason that I said

19   that to you, as you were examining the witness.

20        This is a judicial decision as to who should be and

21   how many should be in each trial group.  So your attack on the

22   Government was without, probably without you realizing it, an

23   attack on the Court's discretionary confirmation of the

24   suggestion for the composition of the trial groups.

25        MR. SATAWA:  I certainly did not mean to suggest that

2:11-cr-20129-RHC-MAR  Doc # 1073  Filed 11/01/14  Pg 134 of 281  Pg ID 6030
JURY TRIAL, VOLUME V - 10/22/2014
WILLIAM FLEMING - REDIRECT BY MS. MOHSIN

134

1    the Court was involved in that at all.  And I --

2            THE COURT:  I said unintentional.  No doubt,

3    unintentional.

4            MR. SATAWA:  I understand, and I appreciate that, that

5    proviso to the Court's statement.

6            Your Honor, I think it is extraordinarily relevant

7    that one of the two people that have had wiretaps put on them,

8    the one person that we've heard more evidence about than all

9    seven of these people combined is not sitting here on trial

10   with the rest of them.  I believe that it is a strategic reason

11   by the Government.  I believe that it is relevant.  And I

12   believe that it is proper to ask witnesses, is Vern Rich

13   sitting over there, is Vern Rich -- I've never, as I said to

14   Mr. -- Agent Fleming, suggested that he isn't charged with a

15   crime at all.  He is charged with a crime.  And I consider that

16   to be even more relevant that he is not sitting here.

17           THE COURT:  If you have a case that you want to

18   suggest between now and a quarter past one that stands for

19   the proposition that alleged Government motivations of this

20   character are properly put before the jury, I will consider it,

21   and I'll consider altering what I intend to do otherwise.

22           It is my understanding, however, that suggestions of

23   strategic determinations of this kind, arguments that the

24   Government is trying to do this or strategically trying to

25   avoid that are not appropriate matters to be put before a trial

 1  jury.  Period.  I think that they are irrelevant, likely to

 2  mislead the jury, and should be avoided.

 3          Again, if you have a case that suggests to the

 4  contrary, I'll be happy to read it.  Without that information,

 5  however, I intend to instruct the jury, to tell them what they

 6  obviously already know, that Rich and numerous, numerous other

 7  people who are charged in this indictment are not on trial,

 8  because we have a courtroom that's of limited size.  If we had

 9  an auditorium to work with, we might have more Defendants on

10  trial in this group.  But it's my decision, and I'm going to

11  tell the jury that.  But, and it has absolutely no bearing on

12  their determination of the facts in this case in any way.

13          I don't -- I say that, however, I intend to say it

14  cautiously, because of the frank possibility that tomorrow,

15  Vern Rich could change his mind and agree to testify.  I don't

16  know that.  I don't know that you know that either.  So what

17  the future holds is behind the veil, so to speak.  But at the

18  moment, the simple fact of the matter is a limited number of

19  people can physically be put on trial in this courtroom, and

20  this, and this is the bunch.

21          MR. SATAWA:  Your Honor, just very briefly in response

22  to what your Honor just said, my understanding, when the

23  Government listed potential witnesses at the beginning of this

24  trial, Vern Rich was listed on there.

25          THE COURT:  Well, I don't know.

 1              MR. SATAWA:  That was a name they read.  It was on the

 2     list I was given.

 3              THE COURT:  Oh, of their verbal presentation in the

 4     jury selection?

 5              MR. SATAWA:  I don't know if it was --

 6              THE COURT:  That was a list of names -- the way we

 7     described that to the jury was names that may arise in the

 8     course of this proceeding.  Not -- this was not a witness -- it

 9     was not a witness list.  Names that may arise.

10              MS. MOHSIN:  Your Honor, I just want to follow up, if

11     I may?

12              THE COURT:  Yes.

13              MS. MOHSIN:  I think the jury has been misled into

14     believing that Mr. Riede and Mr. Rich have not been charged

15     and that is not correct.  That is not a fact.  We believe and

16     we ask that the Court advise the jury that, in fact, they have

17     been charged in this case.

18              I think that we can elicit that testimony through the

19     agent, certainly, on redirect when we return from lunch, if the

20     Court would allow that.  We didn't go into it at this point,

21     because we weren't sure how the Court's ruling was.  We didn't

22     think it was appropriate.

23              But I think it's important for them to know that they

24     were charged; that they are not left with an impression that we

25     were selective in who we did and didn't charge and we are

1     putting all this evidence on regarding someone who is not

2     charged.

3            MR. SATAWA:  I would, I would stipulate to that,

4     Judge.  I said to Agent Fleming, I didn't -- I never suggested

5     that he wasn't charged.  That was one of my questions.  I

6     would, I would gladly want the jury to know that both of them

7     have been charged.

8            THE COURT:  I will tell them that.

9            MS. MOHSIN:  Thank you, your Honor.

10           MR. MACHASIC:  Your Honor, on behalf of Mr.

11    Drozdowski, I would ask that the Court go no further than that

12    in terms of indicating to them that, because of limited space,

13    this was the first trial group or anything to that effect.

14           THE COURT:  I don't intend to use the phrase, "first

15    trial group," but limited space, I am going to talk about.  It

16    hardly needs to be explained; you who are sardine-canned

17    together here at these tables in full view of the jury.  The

18    jury certainly will understand that.  And it's not harmful,

19    it's not prejudicial in any fashion.  But I'm going to explain

20    those simple facts of life to the jury when we resume.

21           This afternoon's session may include a break, but

22    because there's been extraordinary difficulty in getting the

23    defendants down and back to do whatever they need to do during

24    a break, they will not be leaving the courtroom this afternoon.

25           So they should prepare for an afternoon courtroom in

1    which they'll have a standing break, a stretch break and so

2    forth, but no other recesses.  We cannot have -- we cannot have

3    a 15-minute recess declared by the Court, and it takes a half

4    an hour to get the defendants down and then reassembled and

5    back up here again.  It won't happen this afternoon.

6           We recess until 1:30.

7           COURT REPORTER:  All rise.  Court is in recess.

8       (Recess taken, 12:34 p.m. - 1:33 p.m.)

9           THE CLERK:  All rise.

10           THE COURT:  Court is in session.  Be seated.

11           I was told Mr. Pitts had something quickly for the

12    record while the jury is being assembled.

13           MR. PITTS:  I do.

14           THE COURT:  What is that?

15           MR. PITTS:  May it please the Court, your Honor.  On

16    behalf of Mr. Witort, we are respectfully objecting to the

17    continued testimony of Officer Fleming as it relates to his

18    giving his opinion after interpreting the phone calls.

19           Your Honor, there is a case we believe that is right

20    on point, Sixth Circuit case, *United States v. Marcus Freeman*.

21    I have a copy for the Court.

22           In that particular case, an agent was allowed to

23    interpret phone calls.  The -- and I have a copy for the

24    Government, if they would like.  The Sixth Circuit found that

25    that was impermissible; that the agent, that the FBI agent in

```
1    that case, his interpretation of the phone calls was contrary

2    to the -- to Rule 701 and that, I quote, "as several circuits

3    have recognized, there is a risk when an agent provides

4    interpretation of recorded conversations based on his knowledge

5    of the investigation, that is, he is testifying based upon

6    information not before the jury, including hearsay or at least

7    that the jury could think he has knowledge beyond what is

8    before them."

9              Your Honor, I have got the case if the Court would

10   like to take a look at that.

11             THE COURT:  I'll be glad to take a look at that.

12             MR. PITTS:  But we ask that respectfully on behalf of

13   Mr. Witort.

14             And also, if I may, one last thing?

15             THE COURT:  Why don't you bring the case up.

16             MS. MOHSIN:  Thank you.

17             MR. PITTS:  Also, your Honor, we respectfully submit

18   that Mr. Fleming has not been listed as an expert.  He's not

19   been qualified as an expert.

20             THE COURT:  It's not expert testimony.  It's 701

21   testimony, pretty clearly.

22             What's your pinpoint cite?  What's the pinpoint cite

23   within this case?

24             MR. PITTS:  By pinpoint cite, you mean the exact

25   language I'm relying upon or --
```

1           THE COURT:  The page and line.  I don't see.

2           MR. PITTS:  How about let's go to --

3           THE COURT:  It's 14 pages long.

4           MR. PITTS:  Yes.  Page 7, paragraph A.  And page 8,

5      the second paragraph down, your Honor.

6         (Brief pause.)

7           THE COURT:  You suggest that the agent is testifying

8      based upon information not before the jury?

9           MR. PITTS:  There is nothing before the jury about

10     Vern Rich providing meth to John Riede.  Your Honor, that is

11     his interpretation, we argue, of the phone calls.  And we, we

12     believe that that's impermissible.  It's his opinion as to --

13          THE COURT:  I'll, I'll consider this.  I don't know

14     if there's any other testimony of the, of the agent this

15     afternoon.  Is there?

16          MS. MOHSIN:  There is not, only as it relates to the

17     redirect.

18          THE COURT:  Well, you can --

19          MR. PITTS:  If I may just make this one quick point.

20     It seems like you've ruled.  But we just are asking that all of

21     that testimony as relates to his opinion, especially as it

22     relates to meth being distributed, be stricken.

23          THE COURT:  I have your position.  I'll take the

24     Government's position when they have had a chance to look at

25     the case that you've just now cited.  I note that there have

```
 1    been no previous objections in this regard.

 2            We are ready for the jury, as far as I'm concerned.

 3    For the Government?

 4            MS. MOHSIN:  Your Honor, we are ready.

 5            THE COURT:  Okay.  And you just have this portion of

 6    the tape to play; is that right?

 7            MS. MOHSIN:  Your Honor, that is correct.

 8            THE COURT:  All right.  Let's call the jury in.

 9        (Jury in, 1:38 p.m.)

10            THE COURT:  All right.  The jury has assembled.  All

11    parties and attorneys, including the defendants, are present.

12    The witness is in the box.

13            And you can conclude your -- you were going to cue up

14    your tape, I believe.

15            MS. MOHSIN:  Yes, your Honor.

16    BY MS. MOHSIN:

17    Q.  Special Agent Fleming, during the break, did you have an

18    opportunity to cue up, for lack of a better term, the portion

19    of the tape that we've been talking about or the recording that

20    we've been talking about?

21    A.  Yes, I have.

22    Q.  And so just so that the jury is clear, who are the speakers

23    that they are going to be listening to during this portion of

24    the tape?

25    A.  Mr. Pizzuti and Mr. Vandiver.
```

1    Q.  Okay.

2         MS. MOHSIN:  Could you please play this portion of

3    R-2?

4       (GX #R-2 published to the jury at 1:40 p.m.)

5    BY MS. MOHSIN:

6    Q.  Now, can you identify those voices?

7    A.  That's Mr. Pizzuti, and the gentleman with the southern

8    accent is Mr. Vandiver.

9         MS. MOHSIN:  Okay.  Please proceed.

10      (GX #R-2 published to the jury, 1:40 p.m. - 1:41 p.m.)

11   BY MS. MOHSIN:

12   Q.  Special Agent Fleming, was this the portion of the

13   recording that you went to look for after your conversation

14   with Mr. Pizzuti?

15   A.  That's correct.

16   Q.  So after he told you where to look, this is the portion

17   that you found?

18   A.  Well, after he told us what the content of his conversation

19   was with Mr. Vandiver, we reviewed the tape and found that

20   portion.

21   Q.  Again, you didn't play this tape for Mr. Pizzuti?

22   A.  We did not.

23         MS. MOHSIN:  Nothing further.  Thank you, your Honor.

24         THE COURT:  Any need for further examination on this

25   point after redirect?

1           I see none.  The witness may step down.

2      (Witness excused at 1:42 p.m.)

3           THE COURT:  And there was some discussion in Agent

4  Fleming's testimony, ladies and gentlemen, about Vernon Rich,

5  and Mr. Rich and Mr. Riede.  Some question was about raised

6  about they are not here, or confirm that they are not sitting

7  here as defendants.

8           The Court file clearly indicates that each of these

9  individuals is, in fact, charged in one or both of the

10  indictments that are at issue here.  They are not on trial in

11  this phase of the Court proceedings.  There are only a limited

12  number of people we can manage at any given moment in trial.

13          And the Court has ordered these, the larger group of

14  individuals broken up into smaller groups and we're segmenting

15  the proceedings here.  We'll have a series of trials, that's

16  the plan.  And that's what has to be done with a case that has

17  as many individuals implicated or charged as exists in this

18  case.

19          So to the extent that you received any other

20  impression, for example, the impression that the individuals,

21  Rich and Riede, are not, perhaps not charged at all or

22  something similar to that, that's, that's not the correct

23  impression.

24          Okay.  Move to the next witness, then.

25          MR. STRAUS:  Thank you, your Honor.  Your Honor, at

```
 1   this time, the United States would call Anthony Clark.

 2           This would be relevant to Counts 1, the RICO

 3   conspiracy, and Count 3, the meth distribution conspiracy.

 4           THE COURT:  Raise your right hand, sir.

 5       (Witness is sworn.)

 6           THE COURT:  Have a seat.  Scoot that chair comfortably

 7   forward and move the microphone so that it is pointing pretty

 8   much at your chin.

 9           All right.  Go ahead, sir.

10           MR. STRAUS:  Thank you, your Honor.

11                           ANTHONY CLARK

12       called as a witness at 1:44 p.m. testified as follows:

13                         DIRECT EXAMINATION

14   BY MR. STRAUS:

15   Q.  Sir, could you state your name for the record, please?

16   A.  Anthony Clark.

17   Q.  And sir, how old are you?

18   A.  Fifty-seven.

19   Q.  And where did you grow up; what general area?

20   A.  Southwest Detroit.

21   Q.  And are you familiar with an entity called the Highwaymen

22   Motorcycle Club?

23   A.  Yes, sir.

24   Q.  And how is it that you're familiar with that entity?

25   A.  Well, I've been a member almost 40 years now.
```

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  Q.  And when did you join the Highwaymen Motorcycle Club?

2  A.  '78.

3  Q.  And were you, were you sponsored in any way?

4  A.  Yes, sir.

5  Q.  And can you describe to the jury what the process was, in

6  joining the Highwaymen Motorcycle Club?

7  A.  We have to have three sponsors to basically back you up,

8  stating that you're solid, things of that nature.

9  Q.  Okay.  And throughout the years, did you remain a member of

10  the Highwaymen Motorcycle Club?

11  A.  Yes, sir.

12  Q.  Did there come a point in time where you held some offices

13  within the Highwaymen Motorcycle Club?

14  A.  Yes, sir.

15  Q.  And what offices did you hold over the years?

16  A.  I've been road captain; president, probably a dozen times;

17  national president once.

18  Q.  Okay.  What's the difference between president and national

19  president?

20  A.  National president is the president of all the chapters.

21  Q.  Okay.  And when you say president, were you a president of

22  a particular chapter?

23  A.  At one time I was president of Detroit Chapter.  And then

24  the national president, like I said, is president of all

25  chapters.

1  Q.  Okay.  Could you enlighten the jury on how many chapters

2  there are within the Highwaymen Motorcycle Club?

3  A.  I would say probably a dozen.

4  Q.  And are they -- is the Highwaymen Motorcycle Club, is that

5  situated just in Michigan or is it around the country?

6  A.  They are in Michigan, Kentucky, Tennessee, Alabama,

7  Florida.

8  Q.  But your primary membership was in the Michigan area?

9  A.  Our mother chapter is out of Detroit, Michigan.  That's

10  where I was out of mostly.  The mother chapter is always in

11  control.

12  Q.  Okay.  So when you say mother chapter, is that something

13  like the "mother ship" or the national headquarters, something

14  of that sort?

15  A.  Correct.

16  Q.  Okay.

17  A.  That's Detroit chapter.

18  Q.  And where, where was the mother chapter, that is, the

19  Detroit chapter, physically located?

20  A.  Southwest Detroit, Michigan and Clark.

21  Q.  And was that, was that mother chapter always in southwest

22  Detroit?

23  A.  Correct.

24  Q.  And in terms of, in terms of the Highwaymen Motorcycle

25  Club, did they have a certain geographical territory that they

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   considered their own or controlled or some other aspect in

2   their mind was their thing, their area?

3   A.  Southwest Detroit was our area.

4   Q.  Okay.

5   A.  And the Outlaws, they stayed like north of Eight Mile, and

6   we were on the other, south of Eight Mile.

7   Q.  And in terms of the Outlaws, are they a friend or a foe of

8   the Highwaymen?

9   A.  We hate each other.

10  Q.  Okay.  And that's a pretty strong word.  Did, over the

11  years, did you -- the word "hate" that seems to imply conflict

12  at times?

13  A.  Well, they killed one of our members back in the day and we

14  crippled a couple of theirs.

15  Q.  Okay.  Now, so we have, we have the Outlaws who are

16  supposed to stay north of Eight Mile?

17  A.  That was the unwritten rule back in the day.

18  Q.  Okay.

19  A.  But --

20  Q.  Can you share with the jury, what was kind of the lay of

21  the land in southwest Detroit?  Were, were there any other

22  clubs, other than the Highwaymen?

23  A.  You had the Iron Coffins, they've been there forever.  We'd

24  just go there late at night to get beers.  And they would give

25  us beer.  Instead of letting us in, they would give us a few

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    cases of beer not to bother them.  So that was the only other

2    club.

3    Q.   What about the Jokers?

4    A.   The Jokers, they weren't right in our neighborhood, but

5    they were within a few miles.  They've never been a threat, not

6    to us, anyway.  But the Devils Diciples had a little problem

7    with them.

8    Q.   Okay.  And we're going to talk about that in a second.

9         During the time you were with the -- by the way, when

10   did your membership end, if at all?

11   A.   In the Highwaymen?

12   Q.   Yes.

13   A.   The second I walked in that door.

14   Q.   Today?

15   A.   Yes, sir.  As soon as I got on this witness stand.

16   Q.   And during the period of time that you were a Highwaymen,

17   did you use drugs?

18   A.   Yes.

19   Q.   What kind of drugs?

20   A.   Mostly cocaine.

21   Q.   Were you a cocaine kind of guy?

22   A.   Yeah.  That's what our club did mostly, cocaine.

23   Q.   And is that something your club did?  Is that something in

24   the motorcycle club world that's known amongst clubs, what

25   clubs, their, their drug of choice?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   A.  Well, our club was cocaine our for drug of choice, but like

2   the Devils Diciples, they were meth.

3   Q.  Okay.  Let me -- you mentioned the Devils Diciples.  Where

4   along this continuum, during your membership, did you somehow

5   learn about the Devils Diciples?

6   A.  Well, in 2000, I was the national president at the time and

7   we ran into them, literally, face-to-face at a swap meet in

8   front of Chet Hall's booth.  He was a member of our club.

9   Q.  Can you say that name again?

10  A.  Chet Hall.

11  Q.  And when you say a "swap meet," what is a swap meet?

12  A.  Where they sell motorcycle parts.  It was on Eight Mile

13  back at the time.

14  Q.  Okay.  Is this something like what we see sometimes

15  advertised, this Gibraltar Trade Center, that type of thing?

16  A.  Yeah.  But this was at the State Fair Grounds.

17  Q.  Okay.  And what year was that?

18  A.  2000.

19  Q.  Prior to 2000, did you ever run across or meet any Devils

20  Diciples?

21  A.  No.

22  Q.  Not that you can recall?

23  A.  No, sir.

24  Q.  Okay.  So you're at the swap meet.  What do you see and

25  what do you hear?

1   A.  There's maybe 20 of us and there's a dozen or so of them.

2   And we literally bumped into each other in front of Chet Hall's

3   booth.  And Chet Hall knew them, and he introduced us.  So at

4   that time, they invited us to their steak fry.

5   Q.  Okay.  And in terms of the relationship that the Highwaymen

6   had with the Outlaws, historically, what kind of relationship,

7   if any, did the Highwaymen have with the Devils Diciples?  Or

8   was it non-existent until that point?

9   A.  Before that time, we had no relationship with them.

10  Q.  Okay.  So Chet Hall introduces you and other folks to

11  Devils Diciples?

12  A.  Yeah.  Chet Hall, he's -- he built motorcycles and sold

13  motorcycle parts.  That's how he knew them.

14  Q.  Okay.  And did you meet any of the Devils Diciples at that

15  swap meet or thereafter?

16  A.  Yes.

17  Q.  And where did you meet any Devils Diciples?

18  A.  Well, after Bear and I introduced ourselves and we talked

19  for a few minutes, then that's when they invited us to their

20  steak fry.

21  Q.  So you met Bear?

22  A.  Correct.

23  Q.  And do you know his real name?

24  A.  No.

25  Q.  All right.  Is he a younger guy, older guy?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   A.  He's my age.

2   Q.  All right.  I'm not going to touch that, but how old are

3   you, did you say?

4   A.  Fifty-seven.

5   Q.  While you were a member of the Highwaymen, did you own a

6   motorcycle?

7   A.  Yes, sir.

8   Q.  What kind of motorcycle did you have?

9   A.  I had one for every day of the week at one time.  All

10  Harleys.

11  Q.  All right.  Beyond, beyond Bear -- by the way, you

12  mentioned cocaine.  Did you ever, at any point in time, try

13  methamphetamines?

14  A.  Yes, sir.

15  Q.  And to you, do you call it by any other name?

16  A.  Meth.

17  Q.  All right.

18  A.  Crystal.

19  Q.  Okay.  Meth or crystal.

20          And when, when was the first time you tried meth?

21  A.  When I started partying with the Devils Diciples at their

22  steak fry.

23  Q.  Okay.  And did you say this was around 2000?

24  A.  Correct.

25  Q.  And where was this steak fry located?

1    A.  I get mixed up.  Mount Clemens or Port Huron, one of them.

2    I forgot which city it is.  It's on Gratiot.

3    Q.  Okay.

4    A.  Near 24 Mile.

5    Q.  And that location you get mixed up on, how many times over

6    the --

7    A.  On names.  I mean, I don't know if it's Port Huron or Mount

8    Clemens.

9    Q.  It's north of Detroit?

10   A.  Correct.

11   Q.  And how many times, just out of curiosity, were you ever at

12   that clubhouse?

13   A.  Probably a dozen times.

14   Q.  Okay.  Can you describe it?

15   A.  Yeah.  It's an old blue house.  It's set way back.  The

16   front yard is maybe 200 yards long.  It has an attached garage

17   with a breezeway.  The attached garage is to the left.

18   Q.  Okay.

19   A.  It's a nice spread.

20   Q.  This nice spread also apparently was host to a steak fry?

21   A.  Correct.

22   Q.  And you went to the steak fry?

23   A.  Yes, sir.

24   Q.  And who else from the Highwaymen, if anyone, went to the

25   steak fry?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   A.  I'd say about 50 of us went.

2   Q.  All right.  And at that point in time, could you remind the

3   jury what, what office did you hold within the Highwaymen?

4   A.  I was national president then.

5   Q.  And so you're traveling to another motorcycle club's

6   clubhouse, correct?

7   A.  Yes, sir.

8   Q.  Is there any kind of protocols in the motorcycle world or

9   as to the Highwaymen, uniquely or specifically to them, about

10  exercising caution when you go to another motorcycle club's

11  home base?

12  A.  Well, we always carry guns.  I mean, that was the first

13  time we were ever there, too.  So any time we're ever traveling

14  anywhere, we're usually pretty much strapped.

15  Q.  Okay.  And as national president, beyond guns, did you have

16  any other means of security?

17  A.  Yeah.  I always had a bodyguard.

18  Q.  And who was that?

19  A.  One was Daniel Sanchez.  And the other one, I can't think

20  of his name right at this second.  He just passed away a couple

21  years ago.

22  Q.  Would he have some initials?

23  A.  BJ.

24  Q.  All right.  And when you say bodyguards, did they -- what

25  was their task at these other, other motorcycle club meetings?

1    A.  Well, they weren't allowed to get high.  They just had to

2    watch my -- excuse me -- watch my back.

3    Q.  Okay.  Watch your rear end?

4    A.  Yes, sir.

5    Q.  And that was something they knew they had to do?

6    A.  Yes, sir.

7    Q.  When you were at the, I guess, big blue house, the Devils

8    Diciples' steak fry, how many Devils Diciples were there?

9    A.  Probably maybe 50, maybe more.

10   Q.  Now, the fact that the Highwaymen were there, did you see

11   whether or not they had any security arrangements themselves?

12   A.  Yeah.  You could tell they had security around the

13   perimeter.

14   Q.  And you use the term "security."  What kind of security?

15   A.  Well, we call them sergeant at arms.  They call them

16   enforcers.  They keep an eye on things.

17   Q.  Okay.  So you saw some enforcers?

18   A.  Correct.

19   Q.  Were they obviously enforcers?

20   A.  Yeah.  You could tell they were securing the place.

21   Q.  Okay.  What would you see to note that they are enforcers?

22   A.  Well, that they are watching the perimeter, they are

23   watching people, they are watching their bosses, things of that

24   nature.  Because they really didn't know us and we didn't know

25   them.  So it was kind of touchy at first.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

155

1    Q.   Okay.  And just so the jury understands, this is, this is a

2    party atmosphere, it's a steak fry?

3    A.   Yes, sir.

4    Q.   People drinking alcohol?

5    A.   Alcohol, drugs, you name it.

6    Q.   Okay.  And at this particular steak fry, do you know

7    whether or not methamphetamines were consumed?

8    A.   Yes, sir.

9    Q.   And how do you know that?

10   A.   Because I was doing them.

11   Q.   Okay.  Was that the first time you tried them?

12   A.   Actually, yes, sir, it was.

13   Q.   And who, who provided that to you; if you can remember?

14   A.   There was a few, a few of us partied.  I mean, everybody

15   had it.  I mean, it was not like one certain person.  I mean,

16   shit, it ran rampant over there.

17   Q.   "Rampant over there," meaning what, the Devils Diciples?

18   A.   Correct.

19   Q.   Do they have -- based on your being in the motorcycle club

20   world, does the Devils Diciples Motorcycle Club themselves,

21   amongst other motorcycle clubs, have a reputation for their

22   drug of choice?

23   A.   Yes, sir.

24        MR. DALY:  Objection.  There's no foundation for that,

25   Judge, and it's not relevant, both.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1           THE COURT:  I believe there is a foundation.

2           MR. STRAUS:  I believe that was the predicate.

3           THE COURT:  I overrule the objection.

4           MR. STRAUS:  Thank you, your Honor.

5    BY MR. STRAUS:

6    Q.  And ultimately you learned that to be true, correct?

7    A.  Correct.

8    Q.  After this -- and if I didn't ask it before, how many

9    Devils Diciples do you think were there?

10   A.  I didn't count them.  I'm guessing maybe about the same

11   amount we had, 50, or maybe they had a little more.

12   Q.  Any other clubs that were invited to this steak fry?

13   A.  Yes, sir.  We didn't know it until they came, the Outlaws.

14   Q.  Okay.  These are the hated guys?

15   A.  Yes, sir.

16   Q.  And tell us, tell the jury what happened when the Outlaws

17   arrived.

18   A.  Barefoot, he was in charge of that chapter there then.

19   And --

20   Q.  Let me just stop you there.  "Barefoot," meaning Devils

21   Diciple?

22   A.  Correct.  He was president of the Devils Diciples at the

23   time.

24           And they were on their motorcycles, they pulled up.

25   And they didn't get off their bikes.  So Barefoot walked up to

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    them and they told him, the president of the Outlaws told

2    Barefoot that we had to leave.  And he told them, you guys are

3    already on your bikes.

4          He said, either they leave or we leave.  And he told

5    them, you guys are already on your bikes, so they left.

6    Q.  Did he say it nicely or did he say it in some other

7    fashion?

8    A.  He was a smart ass about it.

9    Q.  All right.  And so after this steak fry, did a relationship

10   blossom between the Highwaymen and the Devils Diciples?

11   A.  I mean, I wouldn't use the word "blossom" but yeah, we

12   started getting along a little bit.  A few of them worked

13   for -- ended up working for me.  I own a transport company,

14   transporting cars.

15   Q.  Okay.  What word would you use to describe the relationship

16   between the DD, the Devils Diciples, and the Highwaymen?

17   A.  Well, we started partying a little bit together, things of

18   that nature, and doing a little business together.  A couple

19   little deals here and there.

20   Q.  Okay.  So, so it's both social and business?

21   A.  Correct.

22   Q.  And when you say deals, are you talking about legitimate

23   businesses or illegitimate, illegal businesses?

24   A.  Both.

25   Q.  Okay.  Directing your attention to illegal businesses, let

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

 1   the jury know what you're talking about in terms of deal,

 2   little deals here and there.

 3   A.  You know, like little drug deals, distributable amounts of

 4   meth to get high on, shit like that.

 5   Q.  Okay.

 6   A.  Plus, there was, there was one substantial deal I did.

 7   Q.  Okay.  We'll get to that.

 8            And so this, this relationship, social, business, how

 9   long does this last?

10   A.  A couple years.

11   Q.  What -- where would that put us?

12   A.  2002.

13   Q.  And throughout the period of 2000 to 2002, were you the

14   national president of the Highwaymen Motorcycle Club?

15   A.  Yes, sir.

16   Q.  And within the ranks, how would you describe the attitude

17   of other Highwaymen about the relationship of the Highwaymen

18   and the Devils Diciples?

19   A.  Most of my guys there, they didn't really hit it off too

20   good with them, to tell you the truth.

21   Q.  And why is that?  Can you explain kind of the culture or

22   the mindset of the Highwaymen?

23   A.  The Highwaymen are a Detroit-based club, and basically

24   inner city.  And their club is more, you know, like out in the

25   boonies.  And they are more -- our club, their cultures are

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

 1    totally different.

 2    Q.  Okay.

 3    A.  We are like water and oil.

 4    Q.  You seem like you're struggling for some words there.

 5         Are you familiar with the term "bug eater"?

 6    A.  Yeah.  That's what a lot of my crew used to call them.

 7    Q.  What are bug eaters?

 8    A.  Just guys that don't take a bath and don't -- you know,

 9    ride raggedy-ass motorcycles.  I mean, we had a certain

10    prestige about us, I would say.

11    Q.  And in terms of that prestige, just so for those of us who

12    are not motorcycle enthusiasts, what's the difference between a

13    prestige type of motorcycle, and I assume we're talking about a

14    Harley, and a "raggedy-ass Harley?"

15    A.  Well, we rode mostly custom motorcycles and, you know, we

16    had proper dress, you know, uniform motorcycle riding boots,

17    things of that nature.

18    Q.  Okay.  As, as distinguished from the Devils Diciples?

19    A.  Yeah.  They -- a lot of their bikes were junk.

20    Q.  All right.  So this is -- is this perception within the

21    Highwaymen Motorcycle Club, is this a source of friction at

22    some -- during the time there's this relationship going on?

23    A.  Well, after a couple years, I -- they opened up a Detroit

24    clubhouse.  I don't know if you want me to get into that or

25    not.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    Q.  All right.  Well, let me, let me just lay a little bit more

2    spade work here.

3          Did -- we talked about Highwaymen.  Were there any

4    other alliances going on between the Highwaymen and other

5    motorcycle clubs?

6    A.  You mean --

7    Q.  Or is that it?

8    A.  That was the only club.

9    Q.  Okay.  And then the hated Outlaws, that's a different

10   thing?

11   A.  Correct.

12   Q.  Do you know, based on your position, your being in the

13   motorcycle club world and interacting with the Devils Diciples,

14   do you know whether or not they had any alliances with other

15   motorcycle clubs?

16   A.  Well, one I can think of, which actually we did have an

17   alliance with was the Hells Angels.  But we didn't kick it with

18   them hardly at all.  I ran into some Hells Angels when we went

19   to Indiana with these guys on a swap meet.

20   Q.  Okay.

21   A.  Not swap meet.  On a run.

22   Q.  Okay.  And was this some kind of benefit run or just a run?

23   A.  No, it wasn't no benefit run.  It was just a poker run.

24   Q.  Okay.  And who was that group you were talking about?

25   A.  The Devils Diciples, I rode with them.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  Q.  And the group that, that you went to see on this poker run?

2  A.  Well, we went to Indiana, went to the Devils Diciples

3  clubhouse first and partied a little bit.  And on the poker run

4  was the Hells Angels clubhouse.

5  Q.  Okay.  And when you say that the Highwaymen didn't kick it

6  with the Hells Angels, for those of us in the room who are not

7  familiar with that term, what does "kick it" mean?

8  A.  Well, we respected them, they respected us.  They wanted us

9  to join at one time.  And we didn't want.  We just wanted to

10  stay Highwaymen.

11  Q.  Okay.  When you say join, is there a term out there called

12  "patching over"?

13  A.  Some clubs do that, do that.  They'll patch over to another

14  club.  And the other club will just consume them.  And the

15  other club will no longer exist, be able to exist.

16  Q.  Okay.  Kind of like a hostile takeover?

17  A.  Well, you -- depends on the club and the--

18         MS. STOUT:  Your Honor, I'm going to object to

19  leading.

20         THE COURT:  Overruled under the circumstances.  Go

21  ahead.

22         THE WITNESS:  Depends on the club and the existence.

23  BY MR. STRAUS:

24  Q.  Okay.  It works both ways.  It can be --

25  A.  Like I said, depends on the club.  Some clubs, like the

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  Outlaws, they'll take people and there won't be a hostile

2  takeover, but they give them the ultimatum, you know what I

3  mean?  Either you come with the big guys or you don't.

4  Q.  And in terms of the invitation from the Hells Angels to the

5  Highwaymen, was it that kind of invitation or was it something

6  more like, hey, would you like to patch over to us?

7  A.  No.  They asked us politely if we wanted to.  And we told

8  them no, maybe half a dozen times over the period of years I've

9  been in the club.

10  Q.  Okay.  And would that have any -- what, if anything, would

11  that have to do with the tension between the Highwaymen and the

12  Outlaws?

13  A.  Well, the Hells Angels would definitely want us, we would

14  be a plus.  But we didn't want to get in between their problems

15  because we had problems with the Outlaws of our own.  So we

16  chose to stay Highwaymen.

17  Q.  All right.  You mentioned earlier a west side chapter.  Was

18  there a west side chapter of the Devils Diciples Motorcycle

19  Club?

20  A.  Yes, sir.

21  Q.  I'm going to use "DD" for short.  Okay?

22  A.  No problem.

23  Q.  And do you know when, based on your association with the

24  Devils Diciples, when that west side chapter opened up?

25  A.  It opened up in 2000.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  Q.  And were you present for that or do you have some personal
2  knowledge about when that opened up or why that opened up?
3  A.  Well, yeah.  They came to us.  Barefoot came to me and told
4  me that they wanted to open up a clubhouse in Detroit and asked
5  me if it was -- had to ask if it was all right with us.  And we
6  told them no problem, because that appeared to be a thorn in
7  the Outlaws' side anyway.
8  Q.  And is that the normal protocol to -- or what is the normal
9  protocol if another motorcycle club wants to station a new
10  clubhouse in an area that is somewhat occupied by other
11  motorcycle clubs?
12  A.  They have to get permission.
13  Q.  And so I take it from your last answer, permission was
14  given?
15  A.  Yeah.  We actually helped them.
16  Q.  Okay.  And again, when you say "we," are you talking about
17  the entire Highwaymen club or is there a smaller universe of
18  Highwaymen that are more akin to kicking it with the Devils
19  Diciples, to use your term?
20  A.  Well, the officers, a few of us officers got together.  My
21  officers got together and we decided to let them go ahead and
22  open up in Detroit.  But they had a problem with the Jokers.
23  Q.  Okay.  And why would -- I don't want to jump ahead here,
24  but why would the Devils Diciples have a problem with the
25  Jokers?  If you've given -- if you, being the Highwaymen, have

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   given permission to -- for them to create a westside clubhouse,

2   what's the problem with the Jokers?

3   A.  I guess the Jokers didn't want to run.  I mean, truthfully,

4   what problem those two had, I don't know for sure, but I know

5   there was tension.

6   Q.  Okay.  And that tension, at some point in time, you're

7   going to talk about to the jury, you somehow get sucked into

8   that, correct?

9   A.  Yeah.  You could, you could use those words.

10  Q.  Or what -- actually, what would be better is what words

11  would you use?

12  A.  Well, I was -- we were put on the spot, but we handled it.

13  Q.  Okay.  Beyond Barefoot, what other Devils Diciples did you

14  end up meeting over that two-year period?

15  A.  I'm real bad on names, but I only got close with a few of

16  them, because even in my club, I don't associate with a lot of

17  my members.  I try to keep my crew pretty tight.

18           Well Scotty Z, of course, which he's a Highwaymen now.

19  Q.  Let me ask you this:  Do you see someone who just -- you've

20  just identified as Scotty Z in the courtroom?

21  A.  Yeah.  He's right -- he's right there grinning.

22  Q.  All right.

23  A.  With the bald head.

24  Q.  And what is he wearing?

25  A.  He's wearing a green shirt with an ugly tie.

```
 1              MR. STRAUS:  All right.  And your Honor, may the

 2   record reflect that the witness has identified Mr. Sutherland?

 3              THE COURT:  Yes.

 4              MR. DALY:  Judge, for the record, the tie is just

 5   black.

 6       (Laughter in the courtroom.)

 7              THE WITNESS:  That's merely opinion, sir.

 8              THE COURT:  You don't want a comment on that, do you,

 9   Mr. Daly?

10              MR. DALY:  That's the only comment I'd have at this

11   time.

12              THE COURT:  You don't want any judicial comment.

13       (Laughter in the courtroom.)

14              THE COURT:  All right.  Go ahead, Mr. Straus.

15   BY MR. STRAUS:

16   Q.  Okay.  So we have -- and are you, are you still involved, I

17   guess, socially and business wise, with the Devils Diciples

18   once they open a westside chapter?

19   A.  Yes, sir.  I had a transport company.  We transported cars

20   to Lansing from the -- from the whole State of Michigan to

21   Lansing, auto auction.

22   Q.  And was that anywhere near in location to where the Devils

23   Diciples had set up a place on the west side?

24   A.  Yeah.  My tow yard was maybe a while away on Warren.  But I

25   had four or five of them working for me.  And I kept my trucks
```

1    over there, their clubhouse, most of the time, and at Scotty

2    Z's house.

3    Q.  All right.  And during the time -- and so you had a

4    legitimate business as well?

5    A.  Yes, sir.

6    Q.  Was that, was that, was that usual, a usual characteristic

7    or was that an unusual type of thing for a member of the

8    Highwaymen to have their own -- to be employed?

9    A.  A lot of us had our own businesses, but some didn't, you

10   know.  Depends on the member.

11   Q.  All right.  And can you tell the jury when the westside

12   chapter opened up, where were they housed?

13   A.  On Chapel Street by -- in Brightmoor.  It's by 96 and Outer

14   Drive.

15   Q.  Okay.  Is Brightmoor an area of Detroit that refers to

16   itself as Brightmoor?

17   A.  Yes, sir.

18   Q.  And what was the actual physical structure, if anything, on

19   Chapel, when they first opened up?

20   A.  It was a house Billy Wadd owned.

21   Q.  Who is Billy Wadd?

22   A.  He was, he was a Devils Diciple.

23   Q.  And during the course of your relationship with the Devils

24   Diciples, did you get to know Billy Wadd?

25   A.  Unfortunately, yes.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    Q.  All right.  And why do you say unfortunately?

2    A.  Well, he had a bar over there called the Copa.  And we did

3    a few dealings over there and it was on camera.

4    Q.  Okay.  And would that be law enforcement camera?

5    A.  Correct.

6    Q.  And when you were dealing with Billy Wadd, what were the --

7    what was the nature of the deals; what were you doing?

8    A.  Buying meth off him.  I had, I had a go-between, I was

9    using BJ, because I didn't really trust him a whole a lot.  So

10   we were buying distributable amounts of drugs.

11   Q.  Okay.

12   A.  Meth.  Meth only.

13   Q.  All right.  And what kind of amounts are we talking about,

14   user amounts or distribution?

15   A.  Yeah.  User amounts, nothing big.  Eight ball, quarter.  I

16   mean, once in a while I bought an ounce or two off him.

17   Q.  And those ounce quantities, did you try to turn those

18   around for a profit or did you just consume those?

19   A.  I mean, I would sell it to people that I knew, to try to

20   get some of my money back, but we did it mostly -- I did it

21   mostly to keep my trucks on the road.

22   Q.  Can you explain that a little bit more?

23   A.  Well, we got -- I got in the habit of doing it, and we

24   would stay up three or four days at a time, driving those

25   trucks and doing the drugs.  Like I said, I had four of five of

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   their members working for me at the time.

2   Q.  During that two-year period of your association with the

3   Devils Diciples, can you describe to the jury the pattern of

4   use of methamphetamines during that period of time?

5   A.  We did it every day.  Stay up for the four or five days,

6   three or four days at a time.  I mean, I've only stayed up

7   maybe four, but I've heard of guys staying up 10 days on that

8   garbage.

9   Q.  And did that become an addiction?

10  A.  Yes.  It was a terrible addiction.

11  Q.  And did that addiction ever end?

12  A.  Yeah.  Finally.

13  Q.  And how is it that that addiction ended?

14  A.  I just quit.  Actually, I lost my transport company because

15  it was in my brother's name and he had a drunk driving, so I

16  lost the contract.  So I didn't hang over there as much, and I

17  didn't have the trucks to keep me on the road, so I cleaned up

18  my act.

19  Q.  Okay.  What, if anything, did your meth use have to do with

20  you losing the truck company?  Was that something just totally

21  different?

22  A.  I mean, I could blame it on that, but like I said, my

23  brother, he had had it in his name because I had to file

24  bankruptcy before that.  And we put the trucks in his name and

25  my brother and I were partners.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    Q.  Beyond going over to the Chapel, I'll use the term Chapel
2    westside house, did you continue to go to the big blue house
3    over in Mount Clemens or Detroit or Port Huron?
4    A.  Yeah.  But only went over there occasionally, maybe once
5    every six months or something.  It was mostly over there on the
6    west side of Detroit.
7    Q.  Okay.  And when you went to the northern clubhouse, did you
8    travel alone or did you have some folks with you?
9    A.  I would always go somebody with me.  I tried to, mostly,
10   but I got in a bad habit of going alone without my bodyguards.
11   Q.  Did that create some problems within the club?
12   A.  Actually, yes, sir, it did.  It got me impeached from -- as
13   national president of the Highwaymen.
14   Q.  Okay.  And when were you impeached?
15   A.  2002.
16   Q.  And the traveling alone to visit the Devils Diciples, was
17   that the sole reason or were there other reasons as well?
18   A.  No.  They could tell that I was hooked on meth, staying up
19   four or five days at a time.  I guess I was getting out of
20   hand.
21   Q.  And by the way, just out of curiosity, who were you
22   replaced by as national president?
23   A.  Byrd.
24   Q.  Okay.  Does he have a real name?
25   A.  I don't even know his name, and I've known him for 20 years

UNITED STATES vs. SUTHERLAND, et al. - 11-20129; 11-20066

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   now.

2   Q.  Are you familiar with the term, black and blue party?

3   A.  Yes, sir.

4   Q.  What is a black and blue party?

5   A.  It's just a Highwaymen and the Devils Diciples getting

6   together, partying, getting high.  Nothing big, just, just a

7   party.

8   Q.  And did you -- were you part of any of those parties?

9   A.  Yeah.  We had a couple of them.

10  Q.  Okay.  And where were those located?  West side or the more

11  northern clubhouse?

12  A.  Well, they had one at the west side before.  They had one

13  out there in Mount Clemens.  We had one in our clubhouse in

14  Detroit.

15  Q.  And to the extent I didn't ask it, this connection between

16  the Highwaymen and the Devils Diciples, how long does it carry

17  on?  Does it carry on beyond your impeachment?

18  A.  A little bit edgy.  Maybe a few members, but nothing like

19  it was.

20  Q.  Okay.  And I take it from your earlier answers, the

21  Highwaymen have a certain attitude about hanging out with other

22  clubs?

23  A.  We usually hung out with no clubs.

24  Q.  Okay.  And to the extent you elected to hang out with the

25  Devils Diciples, was there some kind of advantage to the

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  Highwaymen to hang out with these fellows?

2  A.  Not really.

3  Q.  Was there some perceived advantage other than socializing,

4  that type of thing?

5  A.  Oh, maybe you get in on the meth business, maybe, something

6  like that.

7  Q.  Okay.  And did you get into the meth business?

8  A.  If you want to call it that.

9  Q.  Okay.

10  A.  It was in and out.

11  Q.  Okay.  Tell us about that.  Did you, did you buy and sell

12  meth?

13  A.  I bought and sold a little, distributable amounts.

14  Nothing, you know, nothing huge, maybe up to an ounce or two.

15  But then one of my members came in the bar, which is Juan

16  Ortiz, he came in Leroy's Bar.  I was in there with Sly Dog.

17  It was about closing time.

18      And he told me he knew where I could get -- he could

19  get about -- he could get me a pound of meth, asked me if I

20  could flip it.  And I told him, yeah, I can move it.

21  Q.  Let me slow that picture down.  You mentioned a person

22  named Sly Dog.  Who is that?

23  A.  He's a Devils Diciple.

24  Q.  And where is Leroy's Bar?

25  A.  Leroy's Bar was right down the street from the Highwaymen

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    clubhouse on Michigan Avenue in Detroit.

2    Q.  Down by the ballpark?

3    A.  Towards the ballpark, yes, sir.

4    Q.  And so you're having, what, a couple beers there and

5    this -- you have this conversation?

6    A.  Yes, sir.

7    Q.  And who came in and talked to you and Sly Dog?

8    A.  Juan Ortiz.  He's a member of -- was a member of the

9    Highwaymen.

10   Q.  And at this point in time, had you been, had you been

11   selling small amounts of methamphetamines?

12   A.  Yes, sir.

13   Q.  And were you aware -- and where were you buying yours or

14   where were you getting your meth from, to sell?

15   A.  From the Devils Diciples.

16   Q.  And can you remember any of the names of the folks that you

17   got the meth from?

18   A.  I was getting it from TK, and Scotty Z a little bit,

19   nothing big.  I sold to Scotty Z because he drove one of my

20   trucks, just to get high.  It was a habit.

21   Q.  Okay.  TK, are we talking about capital "T," the letter,

22   and capital "K"?

23   A.  Yeah.  He was a Devils Diciple, too.

24   Q.  Okay.  Do you know whether or not he was a meth cook or was

25   he, to your knowledge, getting the meth from somewhere else?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   A.  I don't think he was the cook.  I think it was just drug

2   dealer.  He had -- he don't like ounces.

3   Q.  Let me throw some other names at you and see whether or not

4   you met -- first question is, did you ever meet them.

5           Beyond Sly Dog, Billy Wadd, and Scotty Z, did you ever

6   meet someone named Rockin' Ronnie?

7   A.  Yeah.  Rockin' Ronnie.

8   Q.  Was he a meth user?

9   A.  Yes, sir.

10  Q.  Did you ever supply meth to him or did he ever supply meth

11  to you?

12  A.  Yeah.  I bought and sold to him.  Actually, he worked for

13  me, him and his brother David.

14  Q.  And his brother David, does he go by any club names or

15  street names?

16  A.  Detroit Dave.

17  Q.  And are you familiar with an individual by the name of

18  Dino?

19  A.  Yes, sir.

20  Q.  Who is Dino?

21  A.  Dino was a member of the Devils Diciples.

22  Q.  Okay.  And did he ever change clubs at some point in time?

23  A.  No.

24  Q.  And Dino, what was his story?  Was he a meth user?

25  A.  Yes, sir.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   Q.  What, if anything, did he -- what, if any, involvement did

2   he have in the distribution of meth?

3   A.  Like I said, just small amounts, distributable amounts.

4   He worked for me, also, driving one of my rollbacks.

5   Q.  Did you ever meet someone named -- who went by the name of

6   Cookie?

7   A.  Yes, sir.  He was another one of my employees.

8   Q.  Who was Cookie a member of?

9   A.  He was a member of the Devils Diciples.

10  Q.  And who, if based on what you saw in your conversations --

11  you had conversations with Cookie?

12  A.  Yes, sir.

13  Q.  Beyond him working for you?

14  A.  Yeah.

15  Q.  And who was he closely associated with?

16  A.  He was Rockin' Ronnie and David's little flunky.

17  Q.  And when you say "flunky," can you explain what a flunky

18  is?

19  A.  Well, they would have him doing whatever they want him to

20  do.  Anything they asked or told him to do, he would do.

21  Q.  Okay.

22  A.  He was loyal to them.

23  Q.  All right.  If you had to describe Cookie, what kind of

24  person, how would you describe him?  Was he real quick on the

25  draw or did he have some other issues?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   A.  He was kind of slow in the head.

2   Q.  Okay.

3   A.  Good guy, but a little slow.

4   Q.  All right.  Do you know, did you have any dealings with him

5   with meth or did you ever use meth with Cookie?

6   A.  Yeah.  Of course.

7   Q.  Okay.  You say that pretty matter-of-factly.

8        Were all these individuals using meth?

9   A.  We all, we all did.  I mean, it was a part of life, you

10  know.  Just like they did meth like we did cocaine.  I mean,

11  I've been doing drugs so many years, it's just second nature,

12  you know what I mean?  It's --

13  Q.  Now, you described the Copa.  You said the Copa.  To the

14  extent it wasn't clear, is that a bar?

15  A.  Yeah.  It was a little bar on 96, on the service drive,

16  westbound, right before you -- on Outer Drive, between Outer

17  Drive and Telegraph.

18  Q.  Was this in the same Brightmoor area?

19  A.  Yeah.  Within three blocks of their westside clubhouse.

20  Q.  And again, who owned the Copa?

21  A.  Billy Wadd, which was their member.

22  Q.  And did Billy Wadd, to your knowledge, based on your

23  relationship that two years, did he hold any offices within the

24  Devils Diciples?

25  A.  Yeah.  He was an enforcer.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  Q.  Okay.  And of the people we've mentioned before, what about

2  Sly Dog?  Did you come to learn what his -- what position he

3  might have held?

4  A.  Sly Dog was an enforcer.

5  Q.  What about Scotty Z?

6  A.  Scotty Z was.

7  Q.  And how do you know that?

8  A.  Because I know him personally.  I've known him for, for

9  15 years.

10  Q.  And even though you're on the outside looking in, what's

11  your -- what's your view or what's -- what did you observe in

12  terms of the role of an enforcer for the Devils Diciples?

13  A.  Well, just like the Highwaymen, like we used to -- we had,

14  we had sergeant-at-arms we call them; if there's ever a

15  problem, they are the guys that handle it.

16  Q.  Okay.  Let's go back to, you mentioned Juan Ortiz.  You're

17  approached at the bar at Leroy's.  What happens after you're

18  approached about doing a drug deal?

19  A.  We left the bar right then and went and got it, went down

20  and drove to Tennessee.

21  Q.  Who is we?

22  A.  Me and Sly Dog and Juan.

23  Q.  And what time of night was this?

24  A.  One o'clock in the morning.

25  Q.  Can I ask, what was the -- what, if any, was the urgency

1   of leaving the bar at that point in time to go get meth?

2   A.  Well, he told me that -- Juan told me, that is, that there

3   was a member of my club, Bobby Burton was supposed to get a

4   pound off the same guy.

5   Q.  And who was --

6   A.  And he's --

7   Q.  I'm sorry.  Go ahead.

8   A.  He was planning on selling to the Devils Diciples.

9   Q.  Okay.  First question:  Who was this guy that you're going

10  down to see in Tennessee?

11  A.  Tito in our club, it was his brother.

12  Q.  Okay.  So Tito's brother?

13  A.  Yeah.  Tito in the Highwaymen, his brother is the one that

14  had the meth for sale.

15  Q.  Okay.  So you learned that another member of the Highwaymen

16  is also getting meth, too.

17  A.  Correct.

18  Q.  Same source?

19  A.  Correct.

20  Q.  What's the big deal?

21  A.  Well, Bobby and I had words, because that was supposed to

22  be my deal.

23  Q.  Okay.

24  A.  And he was basically going behind me, cutting my throat.

25  Q.  Okay.  And when you say "your deal," are you talking about

1  this was going to be your source exclusively?

2  A.  Yeah.  I was planning on hit and run, maybe get a few

3  pounds, and make some money and go about my business.

4  Q.  And the fact that Sly Dog was with you, what, if any, role

5  did he have in your plans to have this exclusive source?

6  A.  He said he could sell it.

7  Q.  Okay.  And what's the significance of that?

8  A.  Well, we got the -- we got the pound, drove all the way

9  back up to Michigan, stayed up for two days.  Went to some guy

10  named Demi's house, I don't know his last name.  Fronted him

11  half a pound.

12  Q.  Do you know his real name?

13  A.  No.  I couldn't tell you his real name to save my life.

14  Q.  In an earlier interview, did you describe him by some other

15  name?

16  A.  Pardon me?

17  Q.  Did you call him Dane or something like that?

18  A.  Dane or Demi.  I get Dane, Demi and Damien all mixed up.

19  There's three of them.

20  Q.  Describe Demi.

21  A.  Demi is the cement guy -- or Dane, or Dane, Demi, I call

22  him.  He had a beard, big guy.  He was a cement contractor.

23  Q.  Okay.  So you take the drugs over there.

24  A.  Correct.

25  Q.  Full pound?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    A.   Yeah.

2    Q.   All right.  What does Demi do with the full pound?

3    A.   Well, he wanted the whole thing on the credit.  He didn't

4    have no money.  I said, I'm not going to give this guy a pound

5    of meth on credit.  We just got it on credit.

6    Q.   How much is a pound of meth worth at that point in time?

7    A.   You mean what I paid for it or what I sold it?

8    Q.   What you promised to pay for it.

9    A.   We promised to pay 8,000 for it.

10   Q.   $8,000?

11   A.   Yeah.

12   Q.   And do you know whether or not Demi -- this was, this was

13   someone that Sly Dog knew?

14   A.   Yes, sir.

15   Q.   Was he a citizen.  Are you familiar with that term?

16   A.   Yeah.  He was a citizen.  He wasn't no Devils Diciple.

17   Q.   Okay.  And so you told him you're not going to front it.

18   What happens then?

19   A.   Well, I told him I wasn't going to front him a whole pound.

20   We fronted him a half a pound.  He ended up giving us checks

21   for, like, a thousand bucks a piece.  I fronted him a half a

22   pound for 8,000.

23   Q.   And those checks, what did you do with those checks?

24   A.   Well, at the time is when I owned my own transport company.

25   I knew a gentleman that owned a party store in Detroit and he

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   would cash any checks I had.  And he -- I had him cash them.

2   He cashed them all for me.

3   Q.  Okay.  And was that a successful endeavor, this cashing of

4   checks?

5   A.  It was a nightmare.  Every one of them bounced.

6   Q.  All right.  Now that you've got these bounced checks, what

7   did you -- armed with those, what did you do then?

8   A.  I got a hold of Sly Dog and I told him, we're going up

9   there to see your boy.  He's going to come up with our money or

10  he's going to have a serious problem.

11  Q.  And who do you mean by his boy?

12  A.  Demi or Damien -- not Damien, excuse me.  Dane, Demi.

13  Q.  Whatever his name is?

14  A.  Yeah.  I call him either name.

15  Q.  Okay.  The check guy?

16  A.  The bad check guy.

17  Q.  All right.  So you go see the bad check guy.  Tell the jury

18  what happened then.

19  A.  Well, I went to see him and he, he had enough nerve to want

20  the other half pound.  I said, no, we're not going to do that

21  with you.  I said, you're going to have to give me some

22  collateral.  So he tried to give me all his cement tools and

23  trucks and all that.  I said, man, I don't want all that

24  garbage.  He had an old Panhead motorcycle, I said, I'll take

25  that.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    Q.  What's a Panhead motorcycle?

2    A.  It's an old Harley.

3    Q.  What years?

4    A.  Tell you the truth, I forgot what year they even made

5    Panheads, but it's back in the 50's; 40's, 50's.

6    Q.  Is there a certain value assigned to a Panhead as opposed

7    to other types of Harleys?

8    A.  Yeah.  They are antique Harley Davidsons.  They are worth a

9    lot of money.

10   Q.  And he had one?

11   A.  Correct.

12   Q.  What happened to that Panhead?

13   A.  I rode it out of there.

14   Q.  Okay.  And this conversation you had, who else was there

15   for that?

16   A.  Me and Sly Dog.

17   Q.  And Sly Dog at that time had what role within the Devils

18   Diciples Motorcycle Club?

19   A.  He was an enforcer.

20   Q.  And this conversation with the bad check guy, was this a

21   happy, pleasant conversation or was there a little bit

22   different tone?

23   A.  No, it wasn't good.  We had a few words.  I told him I

24   wasn't leaving without the 8,000 or the motorcycle.

25   Q.  Okay.  Whatever happened to that motorcycle?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

182

1   A.  Well, he started it up for me, I rode it home.

2   Q.  All right.  And that other half pound of dope, did you end

3   up fronting it to him?

4   A.  No.  I just gave it to Sly Dog.  I said, man, you go ahead

5   and finish selling this shit.  I didn't want to get all -- I

6   just wanted to make some quick money.  I wanted to make a few

7   pound deals.  I didn't want to run around town collecting bad

8   checks.

9   Q.  Okay.  And in terms of those bad checks, did you ever get

10  payment back on those at any time from the bad check guy?

11  A.  Yeah.  He paid me about a week later and I gave him his

12  motorcycle back.

13  Q.  How much did you pay you?

14  A.  8,000 -- well 8,900.  I charged him 900.

15  Q.  Was that -- the 900, is that interest or something else?

16  A.  Yeah, you can call it interest, juice.  I mean, he put me

17  through a lot of heartache.

18  Q.  Now, the other -- so he has the half pound of the pound and

19  do you know what happens to that?

20  A.  You talking about Sly Dog?

21  Q.  No.  The bad check guy.

22  A.  Oh, he sold it amongst them, amongst the Devils Diciples,

23  sold it to people on the streets.  That's who they dealt with.

24  They dealt with them.

25  Q.  And how do you know that?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   A.  Because Sly brought him to me.  I never met the guy before

2   in my life.  And he told me, the guy told me, that's who he

3   sells to.  And I didn't want to go around selling ounces at a

4   time and quarter ounces.  I wanted to make some quick money and

5   I didn't want everybody to know what I was doing.

6   Q.  Let me ask you this:  Selling to members of a motorcycle

7   club is one thing.  Selling meth, drugs to citizens, is that

8   another thing?  Did you have -- did you have any feel for

9   whether or not that was a wise move?

10  A.  It's not wise to sell drugs to anybody, but I tried to keep

11  low key.  If I'm selling something like a pound, I don't want

12  to go selling little pieces.  So my plan was selling just to

13  get into the pounds.

14  Q.  Okay.  Let's talk about the other half pound.  You said you

15  gave that to Sly Dog?

16  A.  Yes, sir.

17  Q.  And based on any conversations you had with Sly Dog or

18  anything that you witnessed, do you know where that meth went

19  to?

20  A.  Yeah.  He said he was going to distribute it among his

21  people and collect the money.  I told him I didn't want nothing

22  with the distribution, nothing with collecting the money.  We

23  was splitting 50/50.  I kept my half of the 8,000.  He -- I

24  mean, excuse me.  I kept the 8,000.  And I told him this was

25  what we had to pay for the drugs with and the rest of the money

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    would be our profit.

2    Q.  Okay.  And do you know whether or not Sly Dog moved that

3    half pound of meth?

4    A.  Yeah.  He moved it, all right, but I don't know where he

5    moved it to.  Money never came, so we had a little pow-wow and

6    we decided we weren't going to pay for the drugs, either.

7    Q.  Okay.  So just so the jury understands, you've got your

8    $8,000 in your pocket for what you paid for the meth?

9    A.  Correct.

10   Q.  Or what you were supposed to pay for the meth.

11   A.  Correct.

12   Q.  Everything else is going to be profit?

13   A.  Correct.

14   Q.  You never saw any more of that profit?

15   A.  No.  We were supposed to make 4,000 a piece.

16   Q.  And do you know why you didn't see any of that profit?

17   A.  He fronted drugs to a few guys and his people and he

18   basically, basically, screwed the money up.

19   Q.  Okay.  And you said something about, you're not paying for,

20   for it from your end?

21   A.  Yeah.  Actually, beforehand, after we had that problem with

22   the other guy, I told him, I said, I'm not real crazy about

23   this big meth business here.  So I'm not even -- we're not even

24   going to pay the guy we got it from, because I heard he went to

25   jail after we got the drugs, within a week.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   Q.  Tito's brother?

2   A.  Correct.  So I told him, I told Sly to keep his half pound,

3   I'll keep my $8,000 and we parted ways.

4   Q.  Do you know beyond Sly Dog, were there any other Devils

5   Diciples that you remember that were dealing in quantities of

6   methamphetamines?

7   A.  Billy Wadd.

8   Q.  And --

9   A.  And TK.

10  Q.  Okay.

11  A.  I think I already mentioned TK.

12  Q.  What kind of quantities are we talking about?

13  A.  We're talking ounces.

14  Q.  And what's an ounce worth or what would you pay for an

15  ounce, back in the day?

16  A.  A thousand bucks.

17  Q.  Okay.  An ounce is not, I take it, is not something any one

18  person can consume in one sitting?

19  A.  No.  It would take you, it would take a week to do an ounce

20  with half a dozen Devils Diciples.

21  Q.  All right.  And did Billy Wadd, did he, did he deal any

22  other types of dope?

23  A.  He did a little bit, a little bit of cocaine.  Not a lot.

24  Q.  All right.  What about Bear?  Did you know, did you know

25  Bear from the Devils Diciples?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   A.  Yes, sir.

2   Q.  Do you know where he was from, where he was physically

3   located, or where he lived?

4   A.  He was from up in Blue Water, I think up that way.

5   Q.  Okay.  Way up there?

6   A.  Yes, sir.

7   Q.  And did you develop a friendship with Bear at any point in

8   time?

9   A.  Yeah.  At the steak fries, we partied together a couple

10  times.

11  Q.  Did you learn at some point in time -- or what is it you

12  learned about what Bear did in terms of illegal businesses, if

13  anything?

14  A.  He had a little bit -- I got a little bit of meth off him,

15  but I didn't buy it personally.  I had one of my, one of my

16  bodyguards purchased it, Daniel Sanchez.

17  Q.  Okay.  Why would that be?  Explain that to the jury.  Why

18  would you use somebody as a go-between?

19  A.  Well, I tried not to -- I didn't trust all them guys.  I

20  didn't trust my own people.  I mean, when I was selling drugs

21  back in the day, cocaine, I would go to my own clubhouse and

22  buy cocaine when I was selling cocaine and they didn't even

23  know it.

24  Q.  Now, you mentioned earlier -- oh, by the way, did you ever

25  meet a person by the name of Roach?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    A.   Yeah.  He's one of the ones that Sly Dog fronted him a few

2    ounces, too, and never got paid.

3    Q.   Fronted meaning, fronted to him?

4    A.   Gave him the drugs on the credit.

5    Q.   Okay.  To sell, not consume?

6    A.   Supposedly.

7    Q.   Okay.  You mentioned the Jokers and you mentioned -- I

8    think you alluded to an incident.  Was there some incident

9    involving the Jokers, the Devils Diciples, and the Highwaymen?

10   A.   Yeah.  That was at Vicki's Bar, if I recall the name

11   correct.

12   Q.   Do you remember what year that was?

13   A.   2000.

14   Q.   And tell us, tell us what you remember.

15   A.   Well, that was when the Devils Diciples came to Detroit

16   with our backing and Billy Wadd told me that the Jokers had a

17   problem with it.  So we went to the bar I just mentioned to

18   straighten it out.

19   Q.   Where is Vicki's located?

20   A.   It's located over there in Brightmoor area.

21   Q.   Okay.  So we have, we have the Copa Lounge, we have the

22   Chapel clubhouse, we have Vicki's Bar, right?

23   A.   Yes, sir.

24   Q.   Do the Jokers have a clubhouse in the area, also?

25   A.   Yes, sir.  They are right there in the neighborhood.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   Q.  Okay.  So kind of a crowded area?

2   A.  Yeah.  There's a lot of motorcycle clubs over there.  Up in

3   that Five Mile, over there, there was.

4   Q.  What else did Billy Wadd tell you when he told you there

5   was some issue with the Jokers?

6   A.  He told me they were going to straighten it out, so he

7   asked me if we would back them up and I said yeah.  That's when

8   I called Byrd and told him to get together a crew.  And we went

9   there that night.

10  Q.  In terms of what you remember about maybe not the words,

11  but in terms of the context of the conversation, do you recall

12  whether or not this, this problem that was going to be ironed

13  out, do you think, do you remember whether or not it was

14  personal or territorial?

15  A.  No.  It was over them moving into Detroit.

16  Q.  Territorial?

17  A.  Correct.

18  Q.  And having, having been approached by Billy Wadd, what did

19  you do?

20  A.  I told them, not a problem.  I said, we'll back you guys

21  up.  And we were, actually, weren't there to back them up.  We

22  wanted to see if they really had the balls.  Excuse me French.

23  Q.  And who --

24  A.  The nerve.

25  Q.  "Balls" meaning some courage, bravery?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  A.  Right.  Because we didn't know for sure if they could

2  handle their own situation.

3  Q.  "They," meaning?

4  A.  The Devils Diciples.

5  Q.  Not the Jokers?

6  A.  Correct.

7  Q.  So did you accompany the Devils Diciples to some location?

8  A.  Yeah.  That's when we went to that Vicki's Bar.

9  Q.  What do you remember happening that night?

10  A.  Well, we walked in.  And David and -- Detroit Dave and

11  Rockin' Ronnie, they are brothers, they jumped on -- started

12  jumping on one of the Jokers and started whooping his ass.

13  Excuse me.

14  Q.  Can you give us a little bit more context, so the jury will

15  get an idea?  How many Devils Diciples do you remember, not

16  precisely, but approximately, and how many Highwaymen?

17  A.  There was about six of each.  Six or eight of each.

18  Q.  And were these -- I'll use the term "bikers" for lack of a

19  better term -- were they inside the bar only, or inside and

20  outside the bar?

21  A.  We had people outside the bar, too.

22  Q.  We, meaning Highwaymen?

23  A.  The Highwaymen and the Devils Diciples had people outside.

24  Q.  Why is that?

25  A.  Just in case something happened inside the bar, coming out

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   if we had a problem, they would cover our backs.

2   Q.  Okay.  And is that something you set up or someone else set

3   up?

4   A.  We both set that up.  I set it up with Billy Wadd.

5   Q.  Okay.  Do you remember who the Highwaymen were, that were

6   there?

7   A.  There was Byrd, me, BJ, if I'm not mistaken, Sanchez might

8   have been there.

9   Q.  Daniel Sanchez?

10  A.  Yes, sir.  There's two Sanchezes.  Both Sanchezes were

11  there.

12  Q.  All right.  And so Rockin' Ronnie, Detroit Dave, they have

13  some kind of -- something happens with them in the bar?

14  A.  Correct.

15  Q.  What happens after that?

16  A.  Well, they jump on the guy and started beating on him

17  pretty good and the bartender pulled a shotgun out.

18  Q.  Okay.  And I take it that's kind of a party-pooper?

19  A.  Yeah.  When the bartender pulled the shotgun out, that's

20  when Byrd pulled a gun out and shot it.

21  Q.  How many times?

22  A.  Shot it up.  I don't know exactly how many rounds.  That

23  was quite a while ago.  Maybe a couple rounds, maybe one round.

24  I don't know exactly how many, to tell you the truth.

25  Q.  By the way, what was your state of sobriety at that point?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   Were you high?

2   A.  I was high, but I wasn't real high, because we were going

3   to take care of business.  So we're not supposed to get that

4   high when we take care of business.

5   Q.  Based on your observations and living life as you have, can

6   you tell the jury, what was the sobriety level, if you could

7   tell, of some of the Devils Diciples you saw?

8   A.  Yeah.  They had, I mean, they had a buzz.  They were, they

9   were taking care of business.  I mean, when you see -- when you

10  say sobriety, exactly what do you mean by that?

11  Q.  Were they high, drunk, twisted?

12  A.  Well, Dave and Rockin' Ronnie stayed high.  I mean, them

13  guys would stay up for five or six days.  Not all of them were

14  high.  Like Billy Wadd didn't stay high a lot.  That drug is --

15  it messes with your mind.

16  Q.  Okay.  So Byrd fires a shot or two.  What happens after he

17  fires the shot?

18  A.  He hollers at the -- the bartender, I hollered at the

19  bartender to put the gun down, because he started aiming the

20  shotgun at Rockin' Ronnie and Detroit Dave.  So I hollered at

21  the -- if I remember correctly, I hollered at the bartender, he

22  set the shotgun down.  Somebody jerked the -- took the shells

23  out of it and threw it back on the bar.

24  Q.  And did you stay or did you leave?

25  A.  We left.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   Q.  Again, are you a national president at this point?

2   A.  Correct.

3   Q.  And you put this team together?

4   A.  Yes, sir.  I wanted to see if they could handle their

5   business.

6   Q.  Okay.  Now, was there something ahead of this where -- is

7   this the normal type of business, where you just go in, cause a

8   ruckus and deal with the problem?  Or was there some attempt

9   before this between someone like you, a national president and

10  some kind of leadership person in the Jokers, to kind of

11  resolve this?

12  A.  Well, I guess Billy Wadd and them tried to iron it out and

13  tried to talk it out.  And I guess that didn't happen, and they

14  told them they weren't coming in the neighborhood, period, so.

15  Q.  Who said --

16  A.  The Jokers told them they weren't coming in.

17  Q.  "They," meaning the Devils Diciples?

18  A.  Correct.

19  Q.  So they threw that down?

20  A.  They were already in the neighborhood.  They weren't

21  leaving.

22  Q.  Okay.

23  A.  And they had our back.

24  Q.  Did -- and after this, to your knowledge, did this resolve

25  that particular dispute?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   A.  Most definitely.

2   Q.  You say most definitely.

3   A.  Yes, sir.

4   Q.  Did you have any further interactions with the Jokers after

5   that?

6   A.  No.

7   Q.  Let me -- let me switch gears.

8        Stolen motorcycles, were the Highwaymen involved in

9   stolen motorcycles, to your knowledge?

10  A.  Of course.

11  Q.  And you say "of course."  Was that, was that an occasional

12  thing or was that something that the Highwaymen did quite a

13  bit?

14  A.  Well, like I said, a lot of the guys are -- most of our

15  crew is inner city and that's what they do, they steal.  And

16  they stole a lot of motorcycles over the years.

17  Q.  Okay.  Is there a process beyond just stealing a motorcycle

18  to outfit it so that it's -- you can actually use it without

19  getting in trouble?

20  A.  Well, yeah.  We would get a stolen motorcycle, buy up frame

21  cases, motor, wheels, legal -- and excuse me -- you know,

22  legally from a motorcycle shop, and get a rebuilder's title.

23  Q.  And were you involved in that, as well?

24  A.  I mean, in and out.  I mean, it wasn't nothing I did to

25  make a living.  But over the years, I've owned a few rebuilt

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  motorcycles, maybe a dozen.

2  Q.  Were there other people in the club that were more into

3  that kind of action?

4  A.  Yeah, BJ.

5  Q.  Okay.  And in terms of BJ, did he have any outlets in terms

6  of getting rid of these parts, or reassembled bikes, or just

7  brand new hot bikes?

8  A.  He would sell them to TK, in the Devils Diciples.  And the

9  other guy was JP.

10  Q.  Okay.  Did you know JP's real name?

11  A.  No.  I didn't know TK's real name, either.

12  Q.  And JP, was a member of the westside chapter or was he a

13  member of some other Devils Diciples chapter?

14  A.  He's a member of the Gratiot chapter up there.

15  Q.  Okay.  And did you meet JP?

16  A.  Yeah.  I've been to his house a few times.

17  Q.  And do you know what JP did with these stolen motorcycles?

18  A.  He took the parts, sold the parts, or some -- maybe

19  rebuilt, you know, and registered them.  I mean, I didn't know.

20  I didn't really care.

21  Q.  Okay.

22  A.  As long as he paid cash.

23  Q.  Okay.  Did he have some specialized mechanical abilities

24  with regard to motorcycles?

25  A.  Yeah.  JP was -- he was a mechanic.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   Q.  Okay.  And you said you had been out to his place a couple

2   times?

3   A.  Yeah.  I've been out to his place three or four times.

4   Q.  Was that party functions or just hanging out?

5   A.  No.  It was business, sell stolen motorcycles.

6   Q.  Who were you accompanied by on those visits?

7   A.  BJ, because he was my bodyguard.  So once in a while I'd

8   help him run some of his errands.

9   Q.  But you're dealing with Devils Diciples.  They are friendly

10  to you.  Why do you have a bodyguard?

11  A.  That's -- I always had a bodyguard going around to other

12  clubs.  Especially then, we didn't know them that good at the

13  time.

14  Q.  Now, was there a -- let me again switch gears.  Was there

15  some incident involving another motorcycle, where you met some

16  Devils Diciples at the Hitching Post Bar?

17  A.  Yes, sir.

18  Q.  Why don't you tell the jury about that.

19  A.  Dino Mannarino worked for me back then.  He had an old

20  Harley and he quit their club, he'd been there maybe a year.

21  And he stayed working for me.  And he told me they wanted to

22  take his motorcycle, because that's what they did when you quit

23  their club, they take your motorcycle, and your motorcycle and

24  your title and that's it, so.

25  Q.  All right.  Let me, let me stop you there.  What about the

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    Highwaymen?  When you leave the club, what do you have to give

2    back, if anything?

3    A.  Nothing.

4    Q.  Do you get to keep your colors?

5    A.  Unless you testify, like I'm doing.

6    Q.  All right.  And so in this practice of the Devils Diciples,

7    you learn this from hanging out with them and talking to them?

8    A.  Yes, sir.

9    Q.  And you saw this in action at some point, I take it?

10   A.  Yes, sir.

11   Q.  Tell us about -- you're told by Dino Mannarino, is that how

12   you pronounce it?

13   A.  Yes, sir.

14   Q.  The Devils Diciples are looking to take his bike?

15   A.  Yes, sir.

16   Q.  What happened after he told you that?

17   A.  Well, he worked for me at the time at my car lot.  And I

18   told him, I said, I don't want them fuck -- excuse me.  I don't

19   want them effing guys over here, because they are bad for

20   business.  I wouldn't even allow my own club over at my car

21   lot, because they were bad for business.  So I told him to set

22   up a meeting.  So he set up a meeting and that's when I went

23   and met him.

24   Q.  And are you still national president at this point?

25   A.  Yes.  At that time, I was.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   Q.  And what was this meeting about?

2   A.  It was about the motorcycle that the Devils Diciples wanted

3   to take from Mannarino.

4   Q.  Okay.  So the jury understands, Dino Mannarino, he's --

5   he's not a member anymore of the Devils Diciples or he's about

6   to leave?

7   A.  They -- yeah, correct.  They voted him out.

8   Q.  Do you know why they voted him out?

9   A.  For non-participation, dues, probably hanging out with me.

10  Q.  All right.  And why would Dino Mannarino come to you to

11  complain about this, this practice of the Devils Diciples to

12  take his motorcycle?

13  A.  Because he said he wasn't going to give it up and he asked

14  me if I would help him.  I told him, yeah, I'll tell them you

15  owe me 4,500 bucks.  And the bike was only a $3,000 bike.  And

16  I said, if they give up the 4,500, then I'll take the 1,500 and

17  you get 3,000 for your bike.

18  Q.  And did you communicate this offer in some fashion to the

19  Devils Diciples?

20  A.  Yes, sir.

21  Q.  And who did you communicate that to?

22  A.  Dave was there, Rockin' Ronnie was there, I think even

23  Pauli was there.

24  Q.  Okay.  How many times did you meet Pauli over the course of

25  those years?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

 1   A.  I've met him a dozen times.

 2   Q.  Do you see the person you've identified or you call Pauli

 3   in the courtroom?

 4   A.  I can't see real good, man.  My glasses are old, man.

 5   Q.  Can you stand up?

 6   A.  I don't recognize him, man.  I think he's right there with

 7   his head sideways with the glasses.

 8   Q.  Okay.  Sitting down?

 9   A.  Yeah.

10   Q.  What color shirt is he wearing?

11   A.  A white shirt.

12        MR. STRAUS:  All right.  Your Honor, would the --

13   would the record reflect that the witness has identified Mr.

14   Darrah?

15        THE COURT:  It's noted.

16        MR. STRAUS:  Thank you.

17        THE WITNESS:  Like I said, I haven't seen him in

18   years.

19        MR. STRAUS:  Okay.

20   BY MR. STRAUS:

21   Q.  And any other people you met or talked to about this Dino

22   Mannarino bike problem?

23   A.  No.  That was just them guys I met at the Hitching Post.

24   Q.  And how long did that meeting last?

25   A.  About five minutes.

2:11-cr-20129-RHC-MAR   Doc # 1073   Filed 11/01/14   Pg 199 of 281   Pg ID 6095
JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

199

1    Q.   And the Hitching Post, based on your interaction with the

2    Devils Diciples, is that -- is that something associated with

3    the Devils Diciples or is that considered turf of some sort?

4    A.   Yeah.   That was their hangout.   It was on Eight Mile.

5    Q.   Okay.   When you went there, did you take anybody with you?

6    A.   Me and Dino Mannarino, and we both carried guns.

7    Q.   So you walk in the bar.   You're carrying guns.   Who do you

8    see?

9    A.   Rockin' Ronnie and Detroit Dave.

10   Q.   And at some point in time, did Pauli show up?

11   A.   Yeah.   He was there.

12   Q.   And this five-minute conversation, what did it entail?

13   A.   Well, I told them, they asked me what's up with the --

14   asked Dino what's up with the bike.   And that's when he told

15   them that he owed 4,500 bucks.   And they said, well, how come

16   -- we've got to have that bike.   And I said, well, ain't nobody

17   getting the bike unless I get my 4,500.

18   Q.   Okay.   And that was an offer of sorts, wasn't it?

19   A.   Yes.   So that, that was the end of that conversation.

20   Q.   Okay.   So your offer was rejected?

21   A.   Correct.

22   Q.   And was there anything more to that story after that?

23   A.   No.   We left the bar.

24   Q.   Okay.   And in terms of what you perceive going on, were

25   you, were you wearing your Anthony Clark personal hat or were

1  you wearing the hat of the -- as national president of the

2  Highwaymen?

3  A.  Of course, I used the national president of the Highwaymen.

4  Q.  Okay.  And why, why are you using that or throwing that

5  around?

6  A.  Because my club would back me with anything I did.

7  Q.  Okay.  So you were talking to them, members-to-members, as

8  opposed to friends-to-friends?

9  A.  Correct.  That was business there.

10  Q.  You said, you testified earlier you've known Scotty Z for a

11  number of years?

12  A.  Yes, sir.

13  Q.  And when did you first meet Scotty Z?

14  A.  I think he was a Zulu then, when I met him first.

15  Q.  Zulu, is that a motorcycle club?

16  A.  Yeah.  I think he was a Zulu, if I remember correctly, back

17  in the day.

18  Q.  And at some point in time --

19  A.  For a minute.

20  Q.  I'm sorry?

21  A.  For a minute.

22  Q.  And after that minute, did Scotty Z become a member of any

23  other clubs?

24  A.  Yeah.  The Devils Diciples.

25  Q.  Were you hanging out -- was this during the time period

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

 1  that you were associating yourself with the Devils Diciples?

 2  A.  Yeah.  When he became a member of the Devils Diciples.

 3  Q.  And how often did you interact during this period with

 4  Scotty Z?

 5  A.  Shit, every day.  He worked for me.

 6  Q.  Okay.

 7  A.  We hit it off pretty good.  Clicked pretty good and he

 8  worked for me.

 9  Q.  He cooked pretty good?

10  A.  We clicked pretty good.

11  Q.  Okay.  And beyond, other than your business relationship

12  with, did you interact with him at any of these locations on

13  the westside, the Copa or the Chapel clubhouse?

14  A.  Yeah.  Yeah.  We partied together.  We got high together.

15  Q.  Okay.  And you got to know Scotty Z pretty well?

16  A.  Yes, sir.

17  Q.  Do you know what role he had within the Devils Diciples?

18  A.  He was an enforcer.

19  Q.  Okay.  And did you ever see him in action or carrying out

20  that particular position?

21  A.  Well, what do you mean, like, see him in action?

22  Q.  You knew him to be an enforcer.  Did you ever see him

23  carrying out the duties of an enforcer?

24  A.  Yeah.  I mean, he handled their business whenever they had

25  problems of any kind or nature.  You could tell that he was the

1    man to go.

2    Q.  Okay.  Do you know whether or not he ever --

3          MR. DALY:  You know, Judge, he didn't answer the

4    question.  I would object.  The question was on a personal

5    basis, Judge.

6          THE COURT:  I think the question should be restated in

7    that vein.  I agree with Mr. Daly.

8    BY MR. STRAUS:

9    Q.  All right.  In terms of your interaction with Scotty Z, Mr.

10   Sutherland, in terms of what you saw, what you heard from

11   Scotty Z, are you able to tell the jury what types of things he

12   did as an enforcer?

13   A.  Well, as an enforcer, if there was a problem with other

14   clubs or with somebody amongst the club or between different

15   clubs or whatever, if there was a problem, the chain of command

16   told him to take care of it, he would take care of it.

17   Q.  Okay.  Did you see that ever happen?

18   A.  No, sir.

19   Q.  Okay.

20          MR. DALY:  So Judge, I ask that that be stricken.

21          THE COURT:  Overruled, because the matter has been

22   sufficiently clarified.

23          Go ahead, Mr. Straus.

24          MR. STRAUS:  Thank you.

25   BY MR. STRAUS:

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  Q.  Beyond being an enforcer, did you know Scotty Z ever to

2  provide security for drug transactions?

3  A.  Security for drug transactions?  Not that I know, sir.

4  Q.  All right.  Let me direct -- do you know an individual by

5  the name of Damien or did you ever meet an individual by the

6  name of Damien?

7  A.  Yes, sir.  He was a Devils Diciple.

8  Q.  And how well did you know Damien?

9  A.  I didn't know him that well.  I mean, Scotty knew him

10  pretty good.

11  Q.  And was there an incident involving his motorcycle?

12  A.  Yeah.  Actually, Scotty worked at my car lot.

13  Q.  And --

14  A.  And Damien came over, bitching that they were throwing him

15  out of the -- they threw him out of the club and they wanted

16  his motorcycle.

17  Q.  Okay.  He bitched to you?

18  A.  No, sir.  He bitched to Scotty.

19  Q.  Okay.  And how do you know this conversation took place?

20  A.  Because it was in my garage at my car lot.

21  Q.  So you overheard it?

22  A.  Correct.

23  Q.  And did you offer any advice in terms of this problem?

24  A.  Yeah.  I told Scotty, I said, hell, you might as well --

25  excuse me -- you might as well take it, you don't have a

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

 1   motorcycle.

 2   Q.  Okay.  And when you say take it, take Damien's motorcycle?

 3   A.  Yeah.  Damien gave it to him.  At that time, Scotty had

 4   quit the Devils Diciples.

 5   Q.  Okay.  Just so the jury understands, was this a friendly

 6   transaction between Damien and Scotty Z?

 7   A.  Yeah.  It was friendly between Damien and Scotty Z, because

 8   it solved Damien's problem.  He would rather give it to Scotty

 9   than have that club take it.

10   Q.  Okay.  Were those the only two incidents that you had some

11   involvement or you became aware of personally with this

12   returning of motorcycle thing; the Hitching Post incident and

13   the Damien incident?

14   A.  That's the only -- that's the only ones I can think of,

15   except the motorcycle return with the guy on the -- on the drug

16   deal.

17   Q.  Okay.  That would be the Panhead?

18   A.  Correct.

19   Q.  Did you, during this two-year period, did you go on any

20   runs with the Devils Diciples?

21   A.  Yeah.  I went to Indiana with them.

22   Q.  And what was that run?

23   A.  It was a poker run.

24   Q.  And for those of us in the courtroom who don't know what a

25   poker run is, does that have some relationship to the card game

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   of poker?

2   A.  Yeah.  You go different places and get a card from each

3   place, and whoever has the best hand at the end of the day,

4   maybe there's five or six stops.  And whoever has got the best

5   hand at the end of the day wins.

6   Q.  Okay.  And you said you went to Indiana?

7   A.  Yes, sir.

8   Q.  How many locations in Indiana did you go to?

9   A.  I went to one.

10  Q.  And what was that?

11  A.  Well, actually two.  I started at the clubhouse and from

12  there we -- at the Devils Diciples clubhouse.  From there we

13  went to the Hells Angels clubhouse and I stayed there and

14  partied for a couple hours.

15  Q.  Okay.  And in terms of what you saw and heard, you

16  observed, what was the relationship as far as you could tell

17  between the Devils Diciples and the Hells Angels?

18  A.  They got along good.  They respected each other.

19  Q.  Okay.  Could you tell whether or not they knew each other

20  or were at least familiar with each other?

21  A.  Yeah.  Definitely.  They were good friends with the Indiana

22  crew down there.

23  Q.  Let me ask you a question, maybe we covered it earlier.

24          Are you familiar with a motorcycle club called the

25  Black Pistons?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    A.  Yes, sir.

2    Q.  And who are the Black Pistons?

3    A.  They are what we call -- they are what we call a little

4    puppet club for the Outlaws.

5    Q.  Okay.  And a little puppet club, what, what does that mean?

6    A.  Well, actually they are not a little puppet club, they are

7    nationwide now.  They do what the Outlaws tell them to do.

8    They moved into our turf and we had a little problem over that

9    and their clubhouse got burned down.

10   Q.  Okay.  In terms of your mindset, the Highwaymen, if it's

11   Black Pistons, Outlaws, is that just the same thing?

12   A.  Correct.

13   Q.  I want to go back.  When you and Sly Dog rushed down to

14   Tennessee, the rush was to what, freeze out someone else?

15   A.  Yeah.  To beat Bobby, Bobby Burton.

16   Q.  Do you know who Bobby Burton was selling meth to, if at

17   all?

18   A.  No.  He was selling meth to somebody over there at the

19   Devils Diciples, but I don't know exactly who it was.  I know

20   it was a broad that was supplying him, because that's who Sly

21   was supposed to.

22   Q.  And in common parlance "broad," you're talking about a

23   female?

24   A.  Yeah.  Excuse me.  Yes, a female.

25   Q.  By the way, after you were impeached, did you, did you

```
 1    remain with the Highwaymen?

 2    A.   Yes, sir.

 3    Q.   Now, obviously you're wearing some, some orange-colored

 4    clothes.  Sir, are you, are you currently incarcerated?

 5    A.   Yes, sir.

 6    Q.   And are you -- have you been most recently convicted here

 7    in federal court?

 8    A.   Yeah.  Four and-a-half years ago.

 9    Q.   Tell the jury what you were convicted of.

10    A.   RICO conspiracy.

11    Q.   And the RICO conspiracy that was charged, those were

12    federal prosecutors who charged that case?

13    A.   Correct.

14    Q.   And are those federal prosecutors here in the courtroom?

15    A.   No.  I don't see them.

16    Q.   Okay.  Different ones, right?

17    A.   Correct.

18    Q.   And was that case in front of another judge?

19    A.   Yeah.  Judge Nancy Edmunds.

20    Q.   Okay.  And, and the RICO enterprise that was named in that

21    RICO conspiracy was what?

22    A.   The Highwaymen Motorcycle Club, HMC.

23    Q.   And you were obviously -- you have a conviction for a RICO

24    conspiracy?

25    A.   Correct.
```

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  Q.  And that conviction for RICO conspiracy, did you plead

2  guilty or did you go to trial?

3  A.  I went to trial.

4  Q.  And after exercising your right to go to trial, you were

5  convicted?

6  A.  Yes, sir.

7  Q.  And were you sentenced?

8  A.  Yes, sir.

9  Q.  And Judge Edmunds was the sentencing judge?

10  A.  Yes, sir.

11  Q.  And what did you receive as a result of that conviction?

12  A.  292 months.

13  Q.  And having received a sentence for 292 months, which is

14  what, about 24 years?

15  A.  Twenty-four years, four months.

16  Q.  Did you exercise your right to appeal that conviction?

17  A.  Yes, sir.

18  Q.  And the sentence?

19  A.  Yes, sir.

20  Q.  And you, you or through your attorney, I should say --

21  A.  Correct.

22  Q.  -- appealed that to the United States Court of Appeals for

23  the Sixth Circuit?

24  A.  Correct.

25  Q.  And how did that play out?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   A.   The conviction was upheld and the sentence was vacated,

2   because they gave me over 20 years without a special jury

3   verdict.   They went over the statutory maximum.

4   Q.   Okay.   So what you're -- I take it your sentence that Judge

5   Edmunds gave you was something in the range of your original

6   guideline sentence, guideline range?

7   A.   Yes, sir.   It was in the range of the guidelines for the

8   drug.

9   Q.   Now, your guideline range has changed because of the Court

10  of Appeals' decision?

11  A.   Correct.

12  Q.   And what, what in your mind, and what, what has your

13  attorney informed you about your guidelines now?

14  A.   My guidelines are, which are merely advisory, are 38 points

15  right now, which is 20 years.

16  Q.   Okay.

17  A.   Statutory maximum.

18  Q.   And so --

19  A.   For a RICO conspiracy.

20  Q.   I take it you have to be resentenced?

21  A.   Correct.

22  Q.   Have you been resentenced?

23  A.   No, sir.

24  Q.   And when Judge Edmunds gave you that sentence of 292

25  months, you hadn't testified like this at that point, did you?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  A.  I have never testified in a court of law my whole life.

2  This is my first time.

3  Q.  Did you ever wear a wire?

4  A.  No, sir.

5  Q.  Did you ever snitch on anybody?

6  A.  No, sir.

7  Q.  Did you ever testify anywhere, other than today being your

8  first time?

9  A.  I never even testified at my own trial.

10  Q.  At some point in time in the last couple years, did you

11  have occasion to meet with a member of the investigative team

12  in this case, investigating the Devils Diciples?

13  A.  Yes, sir.

14  Q.  How did that come about?

15  A.  I was in prison down in Pollack, Louisiana.  And SIS, we

16  call SIS in prison, Special Investigative Services called me

17  down to the office and asked me if I was willing to testify

18  against -- if I had any information regarding the Devils

19  Diciples Motorcycle Club, and if I was willing to tell them any

20  information, they would give me a Rule 35.

21  Q.  Okay.  And for those of us in the courtroom who don't know,

22  what does a Rule 35 mean to you?

23  A.  A Rule 35 is for a cooperating witness.  It's if you give

24  substantial evidence, then the Government may shorten your

25  sentence.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   Q.  Okay.

2   A.  May consider it.  That doesn't mean they will.

3   Q.  Okay.  So the Government, not would shorten your sentence,

4   but they would recommend to a federal judge that they -- the

5   judge shortens the sentence?

6   A.  Yes, sir.  They would recommend to a federal judge, and

7   then it's up to the judge to consider it.

8   Q.  Okay.

9   A.  Merely consider it.  Doesn't mean that it will happen.

10  Q.  By the way, just out of curiosity, the prosecutors in your

11  case, what did they recommend to Judge Edmunds that you get?

12  A.  Life.

13  Q.  And the Judge didn't go along with that, right?

14  A.  No, she didn't.  My points were 43 points, which was life.

15  She knocked it down to 40 and gave me 292.

16  Q.  After you were approached by SIS, did you have any other

17  contact with anybody about you possibly providing information

18  or testifying with regard to this investigation?

19  A.  No.

20  Q.  Did there come a point where you met with the FBI or

21  prosecutors in this particular case?

22  A.  Yes.

23  Q.  How did that come about?

24  A.  They transported me back to Milan, that was within a year

25  of my sentence, and probably maybe 11 months after I was

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   resentenced, 10 or 11 months.  They transported me to Milan

2   Detention Center.  I stayed there for about 14 months when they

3   were coming up and questioning me.

4   Q.  And "they," meaning?

5   A.  The FBI and yourself.

6   Q.  And do you remember what year that was?

7   A.  2012.

8   Q.  Okay.  And how many times did you end up meeting with

9   either myself or another prosecutor and the FBI?

10  A.  A half a dozen.

11  Q.  All right.  And during that period of time, did you make

12  a decision as to whether or not you would seek some kind of

13  Rule 35?

14  A.  Yes, sir.

15  Q.  And that was with the assistance of an attorney?

16  A.  Yes, sir.

17  Q.  And did you -- at some point in time, were you interviewed

18  by the FBI and the prosecutors?

19  A.  Yes, sir.

20  Q.  And did you sign a, what's called a *Kastigar* letter or

21  proffer letter?

22  A.  Yes, sir.

23  Q.  What's your understanding of that instrument?

24  A.  It says that anything -- that any statements that I make or

25  testimony, they will not use against me in a court of law.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  Q.  Okay.  And so is that so you can talk freely with the

2  prosecutors, agents, to let them know what you have?

3  A.  Correct.

4  Q.  And after meeting with the prosecutors, did you ultimately,

5  actually enter into an agreement with the Government?

6  A.  Yes, sir.  But beforehand, I asked if they could have my

7  family relocated.

8  Q.  Let's talk about that.  Prior to today, has the Government

9  given you any benefits?

10  A.  They gave my family $9,000 to help relocate.

11  Q.  Okay.  Would it refresh your recollection if it was

12  something more like $9,888.50?

13  A.  Tell you the truth, I didn't see a penny of it.  They used

14  it for relocating.

15  Q.  Why?  Why relocate?

16  A.  Because I told them I wouldn't testify if my family

17  wasn't -- if my family was still here, then there was no deal.

18  Q.  Okay.  And you've had some further conversations through

19  your attorney with myself or Ms. Mohsin about some additional

20  assistance for relocation; rent, that type of thing?

21  A.  Yes, sir.  Because at the time, they did it real quick and

22  they were under the assumption it was only one household and it

23  was two households.

24  Q.  Okay.  Now, after you were provided or your family was

25  provided those benefits, did you enter into a contract with the

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    United States?

2    A.  You mean an agreement?

3    Q.  Yes.

4    A.  Yes.

5    Q.  And this morning, did you sign a multi-page document

6    entitled Cooperation Agreement?

7    A.  Correct.

8    Q.  And did you do that upon advice of your attorney, with the

9    assistance of your attorney?

10   A.  Yes, sir.

11   Q.  And as to the Judge Edmunds case, what did you promise to

12   do?

13        Or as to this case and the Judge Edmunds case, what

14   did you promise to do?

15   A.  Well, I didn't promise anything on the Judge Edmunds case.

16   I mean --

17   Q.  It's over?

18   A.  Yeah.  My case is over.

19   Q.  All right.  In terms of this case, what did you promise to

20   do?

21   A.  I promised to tell truth.

22   Q.  And beyond that, mechanically, how to carry out that truth,

23   what else did you promise?  Testify, provide information?

24   A.  Yeah.  Provide information, and be truthful and testify,

25   like I'm doing here today.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   Q.  Okay.  In return for that, in terms of your Judge Edmunds

2   case, what did the Government promise you?

3   A.  The Government promised me nothing in terms of my Judge

4   Edmunds case.

5   Q.  Okay.  Did they promise you -- did they -- did they tell

6   you if, if you testify truthfully, that you would get any

7   particular number of years off?

8   A.  No.  They told me if I testified truthfully, they would

9   maybe, hopefully -- let me rephrase that.

10         They told me if I testified truthfully, and told the

11  truth, nothing but the truth, they would recommend a certain

12  time off, a time off, but not a certain amount.  So I don't

13  know if they are even -- I don't even know if I'll get a

14  recommendation, to tell you the truth.

15  Q.  Okay.  So just so the jury knows, you're looking at 20,

16  because that's your guidelines?

17  A.  Yes, sir.

18  Q.  That's a starting point --

19  A.  Right.

20  Q.  -- for the judge.

21         And you're hoping to get some recommendation from the

22  prosecutors in your old case, upon advice of, I take it, this

23  team possibly in the future, recommending to the Judge a lower

24  sentence of 20 years?

25  A.  Hopefully.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   Q.  All right.  As part of that cooperation agreement, and I'm

2   going to ask you some yes and no questions, was there another

3   component of that, that cooperation agreement?  Yes or no?

4   A.  No.

5   Q.  Well, is there some other -- is there some other area that

6   was covered by that cooperation agreement?

7   A.  Oh, you mean besides this case?

8   Q.  Yes.

9   A.  They --

10  Q.  Yes.

11  A.  They gave me a *Kastigar* on a murder.

12  Q.  Okay.  So the answer is yes?

13  A.  Yes, sir.

14  Q.  Is it true that in terms of that cooperation agreement,

15  you're aware of an ongoing investigation into a serious

16  criminal offense, which you are subject or a target of that

17  investigation?

18  A.  Correct.

19  Q.  And you've acknowledged in this document that there are no

20  promises or other agreements from the United States Attorney's

21  Office in regard to that other serious criminal offense

22  investigation?

23  A.  Correct.

24  Q.  Have you been interviewed in connection with that serious

25  criminal investigation?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    A.  Yes, sir.

2    Q.  Mr. Clark, a couple more questions.

3         You've been in custody how long?

4    A.  Almost four and-a-half years.

5    Q.  Without telling us the circumstances, did you have some

6    communication with Scotty Z in the last couple years?

7    A.  Yes.

8    Q.  What did he tell you?

9         MR. DALY:  Judge, I'm going to object.

10        THE COURT:  I would suggest that additional foundation

11   would be required:  Time, place, and so on.

12        Mr. Daly, do you want to think about your objection?

13        MR. DALY:  If they lay that foundation, it gets into a

14   legal matter, Judge.

15        MR. STRAUS:  I don't --

16        THE COURT:  Well, I don't have a basis for an

17   objection at this point.  I mean, I don't see anything wrong

18   with the question as it's presently been asked, on the

19   assumption that some, some additional foundation is either

20   agreed upon or stated.

21        MR. DALY:  My client was in custody at the time and

22   was charged, Judge.

23        THE COURT:  Well --

24        MR. DALY:  So that's foundation.  That's the problem.

25        THE COURT:  That's a, that's a foundation?

  1        MR. DALY:  It's a Sixth and Fifth Amendment right

  2   problem.

  3        MR. STRAUS:  I can lay a little more detail

  4   foundation.

  5        THE COURT:  Well, if you can try to do that without

  6   impinging on whatever it is Mr. Daly is --

  7        MR. STRAUS:  Okay.

  8        THE COURT:  -- concerned about, which I'm not entirely

  9   sure about.

 10   BY MR. STRAUS:

 11   Q.  Okay.  Mr. Clark, you ran into Scotty Z at some point in

 12   the last couple years?

 13   A.  Correct.

 14   Q.  And you knew him from a long time ago?

 15   A.  Yes, sir.

 16   Q.  Did you chat about your, your problems and his problems?

 17   A.  Yes, sir.

 18   Q.  And were you aware of a bust or an arrest on a street in

 19   Detroit called Dresden?

 20   A.  Yes, sir.

 21   Q.  And did Scotty Z tell you anything about his involvement in

 22   that?

 23        MR. DALY:  Same objection, Judge.

 24   BY MR. STRAUS:

 25   Q.  Let me ask one question:  This conversation you were

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   having, is this before you agreed to cooperate with the

2   Government?

3   A.  Yes, sir.

4   Q.  And were you doing this -- did you have this conversation

5   at the direction of any police officers, cops, federal agents?

6   A.  No.  No.  Not, not in any way, shape or form.

7   Q.  This was just idle chitchat?

8   A.  Right.

9   Q.  Were you shaking him down for information so you could

10  later provide it to the cops?

11  A.  No, sir.

12  Q.  All right.  What did Scotty Z tell you?

13  A.  He told me he met Rockin' Ronnie at some house, that house

14  over there on Dresden, or whatever the name of that street is.

15  And he was there on a complaint for, for, for having a gun.

16  And he told me he was carrying a gun for protection, because

17  him and Ronnie had words in the past over a motorcycle deal.

18  Q.  All right.  Let me ask you, you mentioned the name Billy

19  Wadd.  At some point in time, did you learn that he -- in the

20  motorcycle world, did you come to learn that Billy Wadd was

21  potentially a snitch?

22  A.  Yes, sir.

23  Q.  Was that big news around the motorcycle world?

24  A.  Yes, sir, you could say that.

25  Q.  Did the Highwaymen consider him a snitch?

1   A.  Yes.

2   Q.  And what was it that propelled or perpetuated this view

3   that he was a snitch?

4   A.  Well, they -- his nephew was another person that worked for

5   me that got out of jail, driving one of my trucks.  And they

6   robbed a jeweler and killed the family, his nephew did.  And

7   Billy Wadd told on him.

8   Q.  All right.  One last question.

9        On these, this run -- by the way, in the two years

10  that you were associated with the Devils Diciples in your

11  capacity with the Highwaymen, how many, how many charitable

12  runs did you go on with the Devils Diciples?

13  A.  None.

14  Q.  How many charitable runs were you aware of at that point

15  that the Devils Diciples were involved in?

16  A.  None.

17  Q.  On the run -- the poker run that you went down to Indiana,

18  was everyone sober or was everyone using drugs?

19  A.  It was, you know, business as usual.  Everybody was high

20  and drinking and doing drugs.

21  Q.  All right.

22  A.  I mean, it's part of everyday life.  That's what we did.

23        MR. STRAUS:  Your Honor, I have no further questions.

24        THE COURT:  The jury may be excused for a 15-minute

25  recess.  We'll resume at 3:30 and we'll carry on until 4:30 to

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    4:35, depending on the testimony at that time.

2          Please be excused.

3      (Jury out, 3:13 p.m.)

4      (Recess taken, 3:14 p.m. - 3:32 p.m.)

5      (Jury in, 3:32 p.m.)

6          THE COURT:  Be seated, please.

7          The record may reflect the presence of all defendants

8    and attorneys.

9          Mr. Straus, you said some few additional questions

10   about photographs?

11         MR. STRAUS:  Yes.  I'm sorry, Judge.  I forgot to go

12   through these in my case.

13         Approaching the witness, your Honor?

14         THE COURT:  Yes.

15   BY MR. STRAUS:

16   Q.  Mr. Clark, let the record reflect I've just placed before

17   you what have been previously marked as proposed Government

18   Exhibits 15-2; 15-4 through 15-7; actually, admitted Government

19   Exhibit 15-8; proposed Government Exhibits 15-9, 10, and 11.

20         I'd ask you, sir, to take a look at those proposed

21   exhibits and the one admitted exhibit, and directing your

22   attention to the first one, which I believe on the right-hand

23   corner has a small marker that indicates 15-2.

24         Mr. Clark, do you recognize any of the folks in that

25   photograph?

1   A.   Sly Dog.

2   Q.   All right.  So how many people are in that photograph, by

3   the way?

4   A.   It looks like five.

5   Q.   Okay.

6   A.   Three of them have our back -- like, have their backs

7   turned, so.

8   Q.   We'll go through these in a little bit more detail.

9          Let me direct your attention to proposed Government

10  Exhibit 15-4.  It's a little dark.  First of all, do you

11  recognize the place that that --

12  A.   Yeah.

13  Q.   -- purports to be a picture, appears to be?

14  A.   Yeah.  That's the Detroit clubhouse for the Devils Diciples

15  and that's their Detroit crew.

16  Q.   And when you say Detroit clubhouse, you mean westside?

17  A.   Yeah.  Westside.  I call it the Detroit clubhouse.  The

18  westside clubhouse on Chapel Street.

19  Q.   Do you recognize any of the individuals in that photograph?

20  A.   Yeah.  You have Billy Wadd in the center, Dino Mannarino.

21  They're pretty fuzzy.

22  Q.   All right.  Let me --

23  A.   Rockin' Ronnie.

24  Q.   Okay.  Let me direct your attention to the next photo.

25  A.   Their Detroit boss, I can't think of his name.  He's dead

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1    now.

2    Q.  Let me direct your attention to the next photo, which has

3    been marked proposed Government Exhibit 15-5.

4    A.  Okay.

5    Q.  First question:  Do you recognize where this photograph is

6    taken from?

7    A.  That's at the Devils Diciples clubhouse.

8    Q.  Is that the inside or the outside?

9    A.  That's the inside.

10   Q.  And does it depict any individuals in that photograph?

11   A.  Yeah.  I see Sly Dog on the right.  Damn, is that me in the

12   middle?  We've got our backs toward them.  I think that is me

13   in the middle.  I didn't even know they had this picture.

14   Q.  All right.

15   A.  And another Devils Diciples on the left, looks like it

16   might be Scotty Z from the back.  I can't tell.  All their

17   backs are turned towards -- away from the camera.

18   Q.  Mr. Clark, let me direct your attention to the next

19   photograph.  I think that's marked 15-6.  Do you recognize any

20   of the folks depicted in that photograph?

21   A.  Yeah.  You have Sly Dog on the left, Scotty Z in the

22   middle, and I don't know who that is on the right.

23   Q.  Do you know his club affiliation?

24   A.  Pardon?

25   Q.  The gentleman on the right, do you know his club

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  affiliation, or can you tell?

2  A.  No, I can't tell.

3  Q.  All right.  Let me direct your attention to proposed

4  Government Exhibit 15-7.  First of all, do you recognize the

5  place this photograph is taken?

6  A.  Yeah.  That's the clubhouse, also.  I should say their

7  clubhouse.

8  Q.  And do you recognize any of the individuals that are

9  depicted in that photograph?

10  A.  Yeah.  It's me and Sly Dog.

11  Q.  Are those sunglasses?

12  A.  Actually, they were prescription glasses, Oakleys.

13  Q.  Let me direct your attention to what has been marked as

14  Government Exhibit 15-8.  First off, do you recognize the

15  location?

16  A.  I can't find 15-8.

17  Q.  Oh, may I --

18  A.  I've got a 15-9.

19       MR. STRAUS:  All right.  May I ask that 15-8 be

20  digitally produced?

21  BY MR. STRAUS:

22  Q.  Mr. Clark, if I can direct your attention to the monitor to

23  your right, if that's on, or to the big screen behind you.

24  A.  Okay.

25  Q.  Do you recognize any of those individuals?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

```
 1   A.  Yeah.

 2   Q.  Going left to right, who do you, who do you recognize?

 3   A.  The first guy, I don't know who that is.  Second guy, looks

 4   like Pauli.  The one next to him is -- I can't think of his

 5   name.  He was the Detroit boss.  He's dead now.

 6   Q.  Fourth guy?

 7   A.  Pardon?  No, that's the third guy.

 8   Q.  And the fourth guy, do you recognize him?

 9   A.  Fourth guy is Billy Wadd.

10   Q.  And then the fifth guy is whom?

11   A.  Is Sly Dog.

12   Q.  Do you recognize where this picture was taken?

13   A.  If I'm not mistaken, it was taken, it was taken in their

14   clubhouse.

15   Q.  All right.

16   A.  Or maybe even a bar.  I can't tell.  It's dark in there.  I

17   see the lights from the bar.

18   Q.  Okay.

19   A.  I mean --

20   Q.  Some kind of tiled ceiling?

21   A.  I can't even see the ceiling.  It's too dark in there.

22   Q.  All right.  Let me direct your attention to proposed

23   Government Exhibit 15-9.

24   A.  Okay.

25   Q.  Do you recognize the -- first off, do you recognize where
```

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1  this photo is taken?  I know it's kind of dark.

2  A.  It looks like it might even be at our clubhouse, Highwaymen

3  clubhouse, but I can't really tell.  It's too dark in there.

4  Q.  Who is depicted in that particular photograph?

5  A.  You have Billy Wadd to the left, you've got Scotty Z in the

6  middle, and I don't know who the guy on the right is.

7  Q.  Okay.  Let me direct your attention to proposed Government

8  Exhibit No. 10.  Do you recognize the location that photograph

9  purports to be of?

10 A.  Yeah.  That's another one at their clubhouse.

11 Q.  And the three gentlemen there, do you recognize those three

12 gentlemen or two, two of the three or one of the three?

13 A.  You've got Billy Wadd on the left, I don't know who the guy

14 in the middle is, and Scotty Z on the right.

15 Q.  Okay.  And finally, proposed Government's Exhibit Number

16 15-11, do you recognize anyone in that particular photograph?

17 A.  Looks like Damien in the center, Scotty Z to the left of

18 him.

19 Q.  When you say Damien, are you talking about the guy with the

20 motorcycle that the DD were seeking to obtain?

21 A.  Correct.

22        MR. STRAUS:  All right.  Your Honor, at this time the

23 United States would move into evidence proposed Government

24 Exhibits 15-2, 15-4 through 15-7, and 15-9 through 15-11.

25        THE COURT:  And without objection?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1              MR. DALY:  Your Honor, unless the Government can lay a

2     foundation for the date and time of these photographs, I would

3     object.

4              THE COURT:  Do you want to question the witness about

5     approximate dates?

6              MR. STRAUS:  Yes.

7     BY MR. STRAUS:

8     Q.  These, Mr. Clark, these, these photographs that you've been

9     shown, in terms of the two years you were associated with the

10    Devils Diciples in your capacity with the Highwaymen, did this

11    occur before, during or after, if you know, can you tell when

12    these photographs were taken?

13    A.  They were taken -- well, I don't know about each and every

14    photograph, but if you want me to go through them, I can tell

15    you real quick when they were taken.

16    Q.  All right.  Let's --

17    A.  To the best of my knowledge.

18    Q.  Okay.  Directing your attention to 15 -- proposed

19    Government Exhibit 15-2.

20    A.  Now I've got to find it.  Give me a moment.

21              15-2, that's around 2000 to 2002.

22    Q.  15 -- proposed Government Exhibit 15-4?

23    A.  15-4 is definitely within that time frame, because that's

24    when they opened their clubhouse, and that's when they all took

25    a picture out front.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

228

1    Q.   15-5, proposed Government exhibit?

2    A.   That's definitely in that time frame.

3    Q.   Proposed Government Exhibit 15-6?

4    A.   Same thing; same time frame.

5    Q.   Proposed Government Exhibit 15-7?

6    A.   Same time frame.

7    Q.   That's a picture of you, right?

8    A.   Correct.  Me and Sly Dog.

9    Q.   15-9, proposed Government exhibit.

10   A.   That's the same time frame, because Billy Wadd was active

11   in their club at the time and he's in that picture.

12   Q.   And so the jury knows, he left at some point, right?

13   A.   Correct.

14   Q.   Proposed Government Exhibit 15-10?

15   A.   Same time frame.

16   Q.   Billy Wadd, because Billy Wadd is in the picture?

17   A.   Yes, sir.

18   Q.   And proposed Government Exhibit 15-10?

19   A.   This one looks old, man.  I couldn't tell about you this

20   one.

21   Q.   Okay.  And that's with -- that's with Billy Wadd and Scotty

22   Z?

23   A.   No.  Billy Wadd's not in this one.  I'm 15-11, I'm sorry.

24   You said 15-10?

25   Q.   Yes.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

 1  A.  That's within that time frame, 2000 to 2002.

 2  Q.  Okay.  And proposed Government Exhibit 15-11.

 3  A.  No, I couldn't tell you how old this one is.

 4        MR. STRAUS:  Okay.  Your Honor, at this time the

 5  Government would move into evidence 15 -- proposed Government

 6  Exhibit 15-2, 15-4 through 15-7, and 15-9 through -- and 15-10,

 7  excluding proposed Government Exhibit 15-11.

 8        THE COURT:  Each is received.

 9     (Exhibit 15-2, 15-4 - 15-7, 15-9, 15-10 received 3:45 p.m.)

10        MR. STRAUS:  Thank you, your Honor.

11        Your Honor, at this time I would like to publish

12  Government Exhibit 15-2.

13        THE COURT:  Go ahead.

14  BY MR. STRAUS:

15  Q.  And again, Mr. Clark, this scene depicts -- based on your

16  recollection, where do you think this scene took place?

17  A.  That's at the Devils Diciples clubhouse.

18  Q.  Okay.  I think you're going to have to move the microphone

19  a little closer, when you're looking at the --

20  A.  Looks like the Devils Diciples clubhouse.

21  Q.  Okay.  And the gentleman with the, with the blue shirt?

22  A.  Blue shirt with his back facing us is Sly Dog.

23  Q.  Okay.  Do you know the gentleman who is holding the plaque

24  or the card or something square?

25  A.  No.  I don't know who that is.

1   Q.  Directing your attention to -- could we publish 15-4?  It's

2   a dark picture.  Is this the picture you indicated was a

3   picture of the clubhouse?

4   A.  Correct.

5   Q.  Would this be the clubhouse on chapel?

6   A.  Yes, sir.  The westside clubhouse.

7   Q.  And depicted in the middle, who does that look like?

8   A.  I can look at this picture better than I can see that, if

9   that's okay.

10  Q.  Sure.

11  A.  In the middle is Billy Wadd.

12  Q.  Do you recognize anyone else in that photo?

13  A.  Yeah.  Right next to him to his left is Dino Mannarino.

14  Right next to Dino is their boss at the time.  I still can't

15  think of his name.  He was married -- not married -- he went

16  with David and Rockin' Ronnie's mother.  And Rockin' Ronnie is

17  right behind him.

18  Q.  All right.  Let me -- if I could publish 15-5, is this one

19  you had trouble seeing from behind?

20  A.  Yeah.

21  Q.  And do you recognize Sly Dog on the right?

22  A.  Yeah.  Sly Dog is on the right.  Looks like Scotty Z on the

23  left.  Looks like me in the middle.  We all have our backs with

24  our colors, so we --

25  Q.  By the way, is that a, is that a common picture?

1   A.  It's not common for Highwaymen to do that with other clubs.

2   It's common for other clubs to do it, but not Highwaymen.

3   Q.  Okay.

4   A.  We usually don't do that.

5   Q.  Again, this appears to be the clubhouse on Chapel?

6   A.  It is.

7   Q.  Publish 15-7 -- I'm sorry -- 15-6.  I jumped.

8        And again, do you recognize two of those fellows?

9   A.  Yes.  Scotty Z is in the middle with the pool stick, and

10  Sly Dog is next to him.

11  Q.  15 -- why don't we publish 15-8.

12       I'm sorry, 15-7.  I totally screwed up.

13       And who is the individual on the right?

14  A.  I'm on the right, Sly Dog is on the left.

15  Q.  15-9, publish.

16  A.  Left to right, you got Billy Wadd and Sly Dog in the

17  middle, and I don't know who that is on the right.

18  Q.  Sly Dog in the middle?

19  A.  I mean Scotty Z, I'm sorry.

20  Q.  All right.  15-10?

21  A.  Billy Wadd on the left, I don't know who that is in the

22  middle, and looks like Scotty Z on the right.

23  Q.  By the way, what, what is Scotty Z doing with his hand

24  there?

25  A.  He's holding up the four.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   Q.  And based on your interaction with the Devils Diciples

2   during that time period, the four, does that have some

3   significance?

4   A.  Yeah.  It's 44.

5   Q.  Okay.

6   A.  Represents Devils Diciples.

7   Q.  Fourth letter in the alphabet?

8   A.  Yeah.

9        MR. STRAUS:  I would like to publish at this time what

10  has been previously admitted as 63-20.

11  BY MR. STRAUS:

12  Q.  Do you recognize this gentleman?

13  A.  That is -- he's from out west.  Shit, I can't even think of

14  his name right now, man.

15  Q.  All right.  How about publish 64-61?

16  A.  I'll come up with it in a minute.

17        That's Billy Wadd.

18  Q.  Okay.

19        MR. STRAUS:  Approaching the witness, your Honor.

20        THE COURT:  Yes, sir.

21  BY MR. STRAUS:

22  Q.  Finally, Mr. Clark, let me show you what's been marked as

23  Government Exhibit -- proposed Government Exhibit 56-8.

24        Are you still looking at that?

25  A.  Yeah.  This is an old one.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

1   Q.  Do you recognize -- first of all, do you recognize where

2   that photograph, what purports to be a photograph was taken,

3   where that was taken?

4   A.  It's at the Detroit Highwaymen clubhouse on Michigan

5   Avenue, our mother chapter.

6   Q.  And is there -- do you recognize or does that refresh your

7   recollection as to any particular event or anything that was

8   occurring at that time?

9   A.  Yeah.  That was one of the parties we had, black and blue

10  party.

11  Q.  Okay.  Do you recognize some of the folks in that

12  particular photograph?

13  A.  Yes, sir.

14          MR. STRAUS:  All right.  Your Honor, at this time,

15  subject to chain of custody foundation, we would move into

16  evidence proposed Government Exhibit 56-8.

17          THE COURT:  Questions or objections?  Hearing none,

18  provisionally, admitted under that.

19      (Exhibit 56-8 received 3:51 p.m.)

20          MR. STRAUS:  Your Honor, at this time I would like to

21  publish what's been now admitted as Government Exhibit 56-8.

22  It's the old way.

23          THE COURT:  Actually, I have that as received on the

24  20th of October already, 56-8.

25          MR. STRAUS:  56-8?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - DIRECT BY MR. STRAUS

 1              THE COURT:  That's my note.

 2              MR. STRAUS:  We'll reexamine that and alter

 3    accordingly.

 4    BY MR. STRAUS:

 5    Q.  That's the photograph you were talking about?

 6    A.  Do you mean the one I just seen, you mean?  You talking to

 7    me?

 8    Q.  Yes.

 9    A.  Yes, sir.

10    Q.  And how is it that you can identify that as the Highwaymen

11    clubhouse?

12    A.  Because it has the Highwaymen emblem painted on the back of

13    the wall.

14    Q.  Okay.  Is that -- it's not clear, is that the arches that

15    are being revealed behind the top row of folks?

16    A.  Right.  They are like the part of the wings and the hat.

17    Q.  What color paint is that on the walls?

18    A.  Black.

19    Q.  Is there some significance of black to the Highwaymen?

20    A.  That was our colors, black and silver.

21    Q.  Okay.

22    A.  And the emblem is silver.

23    Q.  And do you recognize, is this a combination photo of both

24    Highwaymen and Devils Diciples?

25    A.  Yeah.  It's when we had a party at our clubhouse, black and

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. PITTS

235

1    blue party.

2              MR. STRAUS:  All right.  No further questions, your

3    Honor.

4              THE COURT:  Cross-examination?

5              MR. PITTS:  May it please the Court.

6              THE COURT:  Mr. Pitts.

7                         CROSS-EXAMINATION

8    BY MR. PITTS:

9    Q.  Good afternoon, Mr. Anthony -- strike that.

10             Mr. Clark, how are you?

11   A.  I'm okay.

12   Q.  Listen, I'm going to ask you just a few questions.

13             You were shown a series of photographs just a moment

14   ago, fair statement?

15   A.  Yes, sir.

16   Q.  And amongst the individuals in the photographs, you were

17   able to identify an individual by the name of Billy Wadd,

18   correct?

19   A.  Yes, sir.

20   Q.  And Wad, that's W-A-D, or may be D-D?

21   A.  It could have a couple D's.

22   Q.  Okay.  No problem.

23             And you've indicated that based upon your observations

24   and knowledge of Mr. Billy Wadd, he was a seller of meth,

25   methamphetamine?

UNITED STATES vs. SUTHERLAND - 11-20129; 11-20066

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. PITTS

1    A.  Yes, sir.  Yes, sir.

2    Q.  Okay.  And based upon your observations of Billy Wadd, he

3    was selling that meth for his own personal benefit, correct?

4    A.  No.  He sold it to make, sold it to make money for --

5    Q.  For himself, correct?

6    A.  Not just for himself.  For whatever.

7    Q.  Whatever.  Okay.

8           And you've indicated that Mr. Billy Wadd had a nephew,

9    correct?

10   A.  Yes, sir.

11   Q.  And that nephew worked for you?

12   A.  Very short period, maybe a week.

13   Q.  For a short period of time, he was your employee.

14          Is it a fair statement to make that you became aware

15   that Mr. Wadd's nephew was involved in the homicide of a

16   family; that was your testimony, correct?

17   A.  Correct.

18   Q.  Okay.  And are you aware as to whether -- you're aware that

19   Mr. Wadd had some participation in his brother's action as it

20   relates to the homicide of that family, correct?

21   A.  I don't know exactly the participation.  I mean, I wasn't

22   there.  I just know that he --

23   Q.  But based upon --

24          THE COURT:  Hang on.  The witness needs to be

25   permitted to answer the question.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. SABBOTA

```
 1            MR. PITTS:  Absolutely, your Honor.
 2            THE COURT:  Go ahead, sir.
 3            THE WITNESS:  I just know that he contacted the FBI
 4   and told them about it.  And he also told me, because they --
 5   the guy worked for me at the time.  The guy just came out of
 6   jail.  I didn't know the guy.
 7   BY MR. PITTS:
 8   Q.  Okay.
 9   A.  I gave the guy a job for Billy Wadd and that was it.
10            MR. PITTS:  That's it, your Honor.  I have nothing
11   further.
12            THE COURT:  All right.
13            MR. SABBOTA:  I have some questions, if I may, please.
14            THE COURT:  Mr. Sabbota.
15            MR. SABBOTA:  Thank you.
16                      CROSS-EXAMINATION
17   BY MR. SABBOTA:
18   Q.  Good afternoon, Mr. Clark.
19   A.  Hi.
20   Q.  If my math is right, you joined the Highwaymen when you
21   were about 17 years of age?
22   A.  I was 20 years old.  I joined 37 years ago; 1978, sir.
23   Q.  All right.  Because you said 40.
24   A.  I said approximately 40 years.
25   Q.  I'm not --
```

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. SABBOTA

1   A.  Okay.

2   Q.  So you were kind of young when you joined the Highwaymen,

3   were you not?

4   A.  Yeah.  You had to be 21 to join, I was 20.

5   Q.  And my understanding is, the Highwaymen is a, at that time,

6   was a pretty bad motorcycle gang in effect; am I right?  In

7   other words, they are -- they were the motorcycle gang?

8   A.  You could say that.

9   Q.  Well, I'm asking you, because you were a member.

10          Were you the biggest gang around in the Detroit area?

11  A.  Not in numbers, but maybe --

12  Q.  Power?

13  A.  Power, yes.

14  Q.  Power.  So you were the most powerful gang around, would it

15  be fair to say?

16  A.  Well, you have the Outlaws, too.  I mean, we always --

17  we've always went head to head with them.  So maybe they were,

18  depending on whose opinion.

19  Q.  All right.  But, so the biggest gangs that you -- or the

20  biggest clubs were the Outlaws and you in the Detroit area;

21  would that be a fair statement?

22  A.  That would be.

23  Q.  All right.  And you became president of the club, roughly,

24  you said, in 2000?

25  A.  No, sir.  I became president in my club, the first time in

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. SABBOTA

239

1  1982.

2  Q.  All right.  And then there was another time you became the

3  national president?

4  A.  That was in 2000.

5  Q.  All right.  That was in 2000.  I'm not trying to confuse

6  you.

7  A.  Okay.

8  Q.  That was in 2000.  And then what happens is, you go to a

9  swap meet, I guess at the State Fair?

10  A.  Correct.

11  Q.  And the State Fair is on Eight Mile Road and Woodward?

12  A.  Yes.

13  Q.  In Detroit?  Yes?

14  A.  Yes, sir.

15  Q.  And then what happens is you run into some guys that are

16  from the Devils Diciples.

17  A.  Correct.

18  Q.  That wasn't a planned meeting?

19  A.  No.

20  Q.  And the thing that is in common there, is that there's a

21  guy that does motorcycles; am I right?

22  A.  Yes, sir.

23  Q.  And he, I guess he's a custom motorcycle guy who was really

24  good what he does with his motorcycles?

25  A.  Correct.

1   Q.   All right.  So there's a -- there's a happenstance meeting

2   between the club.  And you've got how many people with you, if

3   you remember back then?

4   A.   I don't know, maybe 20 or 30.

5   Q.   And do you remember how many Highwaymen -- I'm sorry -- how

6   many Devils Diciples were there?

7   A.   About the same.

8   Q.   And what happens is you guys meet, you shake hands, and you

9   talk?

10  A.   We didn't meet, shake hands and talk.  We actually bumped

11  into each other in front of that booth.  The meeting wasn't set

12  up.

13  Q.   No.  I'm not saying the meeting was set up.

14  A.   Okay.

15  Q.   I said after you ran into each other, you started talking

16  to each other?

17  A.   Correct.

18  Q.   And you started talking, maybe you like the guy and maybe

19  somebody else liked a guy, you were just sort of kicking it, so

20  to speak?

21  A.   You could say that.

22  Q.   Am I right?

23  A.   Yeah.

24  Q.   All right.  And then the opinion that you had of the Devils

25  Diciples was not a great opinion, because I guess they were

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. SABBOTA                 241

1   more like hicks to you?

2   A.  I didn't say "hicks."  I mean, the opinion that I had of

3   them, they weren't the same as Highwaymen.  But I'm not saying

4   they weren't a club to be reckoned with, because they ran with

5   the Outlaws, so therefore, they are not your everyday hick

6   club, as you were trying to say.

7   Q.  Okay.  Maybe "hick" is the wrong word.  You had nicer bikes

8   than they had, that's what you said.  You had fancier bikes?

9   A.  Yeah.  Yes.

10  Q.  You sort of looked down on their bikes a little bit?

11  A.  Of their motorcycles, yeah, definitely.

12  Q.  Their motorcycles?

13  A.  Yes, sir.

14  Q.  And then what happens is your club gets invited to a steak

15  fry?

16  A.  Correct.

17  Q.  And so you really don't know about the Devils Diciples at

18  this point, but you're sort of testing the waters, you drive to

19  the steak fry?

20  A.  I know of the Devils Diciples because of the Outlaws and I

21  knew they ran with the Outlaws.

22  Q.  All right.  But you're going to the steak fry?

23  A.  Correct.

24  Q.  And so you're going to go over there with your group of

25  people?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. SABBOTA

1   A.  Correct.

2   Q.  And because this is after the meeting that you just had?

3   A.  Correct.

4   Q.  And you're sort of strapped?

5   A.  Pardon me, sir?

6   Q.  You're strapped, you said.  You had a gun?

7   A.  I don't remember saying I was strapped going --

8   Q.  Do you remember saying you were strapped when you went to

9   their clubhouse?

10  A.  Which time?  I mean, I've been to their clubhouse --

11  Q.  The time that you --

12  A.  -- a dozen times.

13  Q.  Okay.  The time you went for the steak fry.

14       THE COURT:  Be sure to allow the witness to conclude

15  his question [sic] before you start another one, sir.

16       MR. SABBOTA:  I'm sorry, Judge.

17       THE COURT:  Thank you, Mr. Sabbota.

18  BY MR. SABBOTA:

19  Q.  All right.  Do you remember saying you were strapped when

20  you went to their steak fry?

21  A.  I've been to three or four of their steak fries.

22  Q.  All right.  The first steak fry that you went to, were you

23  strapped?

24  A.  Me personally, I don't remember if I was strapped, but I

25  know a lot of my crew were.

1  Q.  All right.  And when you say you're strapped, that means

2  you're carrying a gun?

3  A.  Correct.

4  Q.  When you say a crew, is there a crew that surrounds you?

5  A.  Yeah, the, all the officers.

6  Q.  All right.  So you went with 50 people; am I right,

7  roughly?

8  A.  Roughly.

9  Q.  Okay.  How many officers surrounded you?

10  A.  I mean, they didn't surround me.

11  Q.  No.  But how many officers did you go with; that's what I'm

12  asking.

13  A.  Probably had maybe a dozen officers.

14  Q.  And they are there to protect you?

15  A.  Correct.

16  Q.  And you're worried; you don't want to get hurt because

17  you're the national president, so you basically have a

18  bodyguard situation?

19  A.  I only had two bodyguards.  When we have club functions,

20  then everybody, all the sergeant-at-arms, everybody, they

21  protect the whole club.  So they weren't there just to protect

22  me.

23  Q.  But you generally go with two bodyguards?

24  A.  No.  I don't generally go with two bodyguards.  I've been

25  to their clubhouse by myself, I mean, drunk over there for five

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. SABBOTA

1    days, sir.

2    Q.  All right.  But the first time you went to the steak fry,

3    did you take your bodyguards with you?

4    A.  Of course.

5    Q.  All right.  And then you began a relationship, you begin to

6    do business together, so to speak, yes?

7    A.  Yes.

8    Q.  And when you say you do business, you do business with

9    individual people, do you not?

10   A.  Yes.

11   Q.  And those are individual people that you would trust to do

12   the business with?

13   A.  No.  I would use one of my people to go between.  I didn't

14   trust -- I mean, I'm not going to do business with people I

15   don't even know.

16   Q.  I figured that.  What you would do was, you would use an

17   intermediary to conduct your business.

18   A.  Yes, sir.

19   Q.  And that intermediary would act as a buffer, so to speak?

20   A.  Not every single deal, I mean.

21   Q.  But at the beginning, I would think; yes or no?

22   A.  Yes, sir.

23   Q.  All right.  And what happens is, you then have a

24   relationship where you begin to buy meth from certain members

25   of the Devils Diciples?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. SABBOTA

1   A.  Yes, sir.

2   Q.  Now, you also had a legitimate business at the time?

3   A.  Yes, sir.

4   Q.  Sounds like you had a pretty good business?

5   A.  Yes, sir.

6   Q.  Big transport company?

7   A.  Not big.  I had four or five trucks.

8   Q.  Okay.  Did you -- what did you transport, just freight?

9   A.  No.  We transported cars.

10  Q.  All right.  So you had those big, those big trucks that put

11  the cars up on top of that stuff?

12  A.  I had rollbacks.  I had three rollbacks.  I had a one-ton

13  dually with a three-car hauler, and then I had a nine-car

14  hauler.

15  Q.  All right.  So you had a legitimate business?

16  A.  Yes.

17  Q.  You've also engaged in, as you already told us,

18  illegitimate activities, illegal activities?

19  A.  Yes, sir.

20  Q.  Now, when you made money from the sale of your drugs, did

21  you keep that money?

22  A.  I spent it.

23  Q.  Right.  But did you share the money with anybody?

24  A.  Yeah.  I shared it with -- I paid club dues with it.  I

25  spread the wealth.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. SABBOTA

```
 1   Q.  Okay.  So you paid your club dues with that?

 2   A.  Of course.

 3   Q.  All right.  Now, you told us that you went to buy some

 4   meth, I guess it was, in Tennessee?

 5   A.  Yes, sir.

 6   Q.  And when you went to buy the meth in Tennessee, there was a

 7   member of your club that also wanted to go to Tennessee to buy

 8   the meth?

 9   A.  Yes, sir.

10   Q.  And so what you did, even though you were brothers, is you

11   cut him out of the deal, so to speak?

12   A.  No, I didn't cut him out of the deal.  He, he went with me.

13   Q.  All right.  But wasn't there somebody else you testified to

14   that you cut the deal out, you beat to go there?

15   A.  That was Bobby Burton.

16   Q.  Who did Bobby Burton work for?

17   A.  Pardon me?

18   Q.  Who is Bobby Burton?

19   A.  Bobby Burton was a member of the Highwaymen.

20   Q.  Right.  So Bobby Burton was a member of your club?

21   A.  Correct.

22   Q.  Bobby Burton was one of your brothers, so to speak?

23   A.  We hated each other, hated each other's guts.  I wouldn't

24   call him my brother.

25   Q.  All right.  So even though you're in the motorcycle club of
```

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. SABBOTA

247

1   the Highwaymen with a person by the name of Bobby Burton, you

2   and him didn't get along?

3   A.  Correct.

4   Q.  And there were many people in your club that didn't get

5   along with each other; would that be a fair statement?

6   A.  Yes, sir.

7   Q.  And they didn't do business with each other; would that be

8   a fair statement?

9   A.  Well, you could not get along with somebody and do business

10  with them.

11  Q.  Right.  And --

12  A.  I mean --

13  Q.  But you have to trust the person you're going to deal with

14  before you do business, don't you?

15  A.  No.  You could do business, like you said, like I said,

16  with a buffer.  I mean, not every deal you do that with.  If

17  you know somebody, you know somebody.  If you don't, you don't.

18  Q.  All right.  So you can either use a buffer, right?

19  A.  Correct.

20  Q.  To do business, or you could do business yourself with

21  people you don't like, yes?

22  A.  Say again, please.

23  Q.  You just said you can do business with people you don't

24  like; am I right?

25  A.  Well, yeah.  Everybody has been known to do business with

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. SABBOTA

1    people they don't like.

2    Q.  But in this case, you didn't like Bobby Burton, so you cut

3    him out?

4    A.  No.  Bobby Burton cut me out.

5    Q.  All right.  And then --

6    A.  He tried to cut me out, is what he tried to do.

7    Q.  All right.  So you got the drugs and money instead of him,

8    so to speak?

9    A.  No.  He got drugs, also.  He got a pound and I got a pound.

10   Q.  I understand that.  All right.

11        The next question I have for you is, you told us that

12   the Devils Diciples has a rule where, if you leave the Devils

13   Diciples, you have to give up your stuff?

14   A.  Your motorcycle.

15   Q.  And also your colors?

16   A.  Yes.

17   Q.  The Highwaymen has a different rule, doesn't it?  In other

18   words, the Highwaymen, you don't give up your colors, do you?

19   A.  You don't give up your motorcycle.  You can give up --

20   depends on the case.  If you leave in good standing, you can

21   keep your colors.

22   Q.  So if you leave in good standing, you keep your colors?

23   A.  With the Highwaymen.

24   Q.  But in the Devils Diciples, their rules are different than

25   your rules?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. SABBOTA

1    A.  Correct.

2    Q.  Every club has their own rules, don't they?

3    A.  Yes, sir.

4    Q.  You have one set of rules, and the Devils Diciples, they

5    have another set of rules that you're aware of; am I right?

6    A.  Yes, sir.

7          MR. SABBOTA:  Can I just have one second?

8       (Brief pause.)

9    BY MR. SABBOTA:

10   Q.  Now, you told us there was an incident at a bar where you

11   went there to cover the backs of the Devils Diciples; do you

12   remember that?

13   A.  Yes, sir.

14   Q.  Okay.  And that was a planned event?

15   A.  Yes, sir.

16   Q.  You went to the bar, because the Devils Diciples were

17   having problems with the Jokers?

18   A.  Yeah.  The Jokers didn't want the Devils Diciples to move

19   into Detroit.

20   Q.  I see.

21   A.  So I went to the bar with the Devils Diciples to put the

22   Jokers in their place.

23   Q.  When you say --

24   A.  Billy Wadd asked me for a backup, so we gave him backup for

25   his club.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. SABBOTA

1   Q.  How many -- now, you said six of your guys went?

2   A.  Six to eight, if I remember correctly.  I don't know

3   exactly, but I think it was six to eight.

4   Q.  Did you give the order for those guys to go?

5   A.  My guys?

6   Q.  Yes.

7   A.  Yes, sir.

8   Q.  Okay.  And then there were people from the Devils Diciples

9   that were there, yes?

10  A.  Correct.

11  Q.  Okay.  So your whole club wasn't there, was it?

12  A.  No.

13  Q.  And the entire Devils Diciples Club wasn't there either,

14  was it?

15  A.  No.  I was there representing the Highwaymen and Billy Wadd

16  was there representing the Devils Diciples.

17  Q.  At that, and on that side of town; am I right?

18  A.  Yes, sir.

19  Q.  How much cocaine did you sell as your career over the --

20  when you were a Highwaymen?

21  A.  I wouldn't call it a career, sir.

22  Q.  How much cocaine did you sell in 2000?

23  A.  In 2000?

24  Q.  Yeah.

25  A.  Maybe a kilo, up to a kilo.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. SABBOTA

1  Q.  And how much did you sell in 2001?

2  A.  Probably none.

3  Q.  2002?

4  A.  None.

5  Q.  How much meth did you sell in 2000?

6  A.  Pardon?

7  Q.  How much meth did you sell in 2000?

8  A.  I don't remember the exact dates.  I mean, I didn't weigh

9  how much I sold.  We distributed maybe, counting the pound,

10  maybe two or three pounds altogether over -- from 2000 to 2002.

11  Q.  Okay.  So you did two or three pounds between 2000 and

12  2002, yes?

13  A.  Yes.

14  Q.  And you also engaged in stolen motorcycles?

15  A.  Yes.

16  Q.  And you would take those stolen motorcycles to JP's?

17  A.  To JP's or TK's.

18  Q.  How many motorcycles did you, yourself, take to JP's?

19  A.  I followed BJ.  BJ was the one that used to take them, take

20  them there.  Approximately about 20, over a couple years.

21  Q.  So you took approximately 20 motorcycles to JP's?

22  A.  To JP's and TK's.

23  Q.  Okay.  How many to JP's alone, if you can remember?

24  A.  I don't remember counting, sir.  I mean, I know it was way

25  up there.  If JP didn't buy it, then TK bought it.  So whoever

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1   was there with the money first is who got the motorcycle.

2   Q.  So when you say way up there, it would be more than 10; am

3   I right?

4   A.  Yes, sir.

5   Q.  More than 20?

6   A.  No.

7             MR. SABBOTA:  No further questions.

8             THE COURT:  Any other?

9             MR. DALY:  Yes.

10            THE COURT:  Mr. Daly.

11                     CROSS-EXAMINATION

12  BY MR. DALY:

13  Q.  Mr. Clark, good afternoon.

14  A.  Good afternoon, sir.

15  Q.  I represent the person that you have identified as

16  Scotty Z, okay?

17  A.  Okay.

18  Q.  As I understand it, Mr. Clark, essentially your contact

19  with the Devils Diciples was for a relatively limited period of

20  time, correct?

21  A.  Two years.

22  Q.  Two years.  From about 2000, maybe 2001 to 2002, correct?

23  A.  2000 to 2002, that was as far as the clubs go.  But they've

24  had contact at other times after that, because I owned a car

25  lot also.  And a few of them came by the car lot.

1  Q.  Okay.  But for club purposes, we're talking 2000 to 2002,

2  right?

3  A.  Till I was impeached.  But my club still hung with them,

4  but I didn't.  I was impeached, and at that time I lost my

5  towing company, so I really didn't hang out that much anymore

6  with them, with them, that club or my club.

7  Q.  And that would have been 2002?

8  A.  Correct.

9  Q.  Okay.  Now, so you first met members of the Devils Diciples

10  in 2000 or 2001, correct?

11  A.  2000.

12  Q.  2000.  Do you remember what month it was?

13  A.  No, sir.

14  Q.  Okay.

15  A.  It was at the swap meet, whatever month that is at the swap

16  meet.

17  Q.  Right.  We're talking a long time ago.  We're talking 14,

18  15 years ago, right?

19  A.  Yes.

20  Q.  It's hard to remember all the details, right, going all the

21  way back 14 years, right?

22  A.  All the details of what?

23  Q.  Everything that you've been telling us about, right?

24  A.  Depends on if you want to ask me specific questions, sir.

25  I mean, I can -- it would be easier to answer that way.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1   Q.  Certainly.  So what you do remember is that you met the

2   Devils Diciples at a swap meet, correct?

3   A.  Correct.

4   Q.  And you told Mr. Sabbota, who is this lawyer right here,

5   that that happened at State Fair, Eight Mile and Woodward,

6   right?

7   A.  It was at the swap meet.  I don't remember if it was at

8   Eight -- the swap meet closed on Eight Mile, so I don't know

9   what year they closed, but it was a swap meet there.  It was at

10  a regular swap meet.  So it might not have been exactly at

11  Eight Mile and Woodward, but it was the State Fair swap meet.

12  Q.  Okay.  So you're not certain even where the swap meet

13  happened right now, correct?

14  A.  Pardon me, sir?

15  Q.  You're not certain where the swap meet happened, as you're

16  testifying here right now, right?

17  A.  I'm certain it was the swap meet, sir.  And it happened.

18  Trust me, it happened.  If it wouldn't have happened, I

19  wouldn't be here.

20  Q.  Okay.  I'm just asking you about a location, Mr. Clark.

21      Do you remember the exact location?  Either you do or

22  you don't.

23  A.  I remember it was on Eight Mile, sir.  I remember that.

24  And I remember it was a swap meet.  And I think it's a trick

25  question, because you're trying to ask me when, when the

1    location was, because the swap meet closed down at State Fair.

2    Q.  Okay.

3    A.  If that's what you're asking me, I don't know what year the

4    swap meet closed down.

5    Q.  I see.  So you think I'm asking you trick questions; that's

6    what you think, right?  Is that what you said, Mr. Clark?

7    A.  Because this doesn't seem to have any relevance to this

8    case whatsoever.

9    Q.  That's what you believe, right?

10   A.  That particular small detail, yes.

11   Q.  Isn't that when you first met members of the Devils

12   Diciples --

13   A.  Yes, sir.

14   Q.  -- Motorcycle Club?

15   A.  Yes, sir.

16   Q.  And do you think that that's important?

17   A.  Pardon me, sir?

18   Q.  Don't you think that that's important, when you first met

19   them?

20   A.  It's important that it was at a swap meet and that's where

21   I met them.  It was in front of Chet Hall's booth.

22   Q.  Okay.  Now, when you say Chet Hall, is that a person?

23   A.  He's a member of the Highwaymen.  He was.  He's dead now.

24   Q.  Okay.  And he's the one who essentially introduced you,

25   correct, to the Devils Diciples?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1   A.  Yes, sir.  We were -- actually bumped into each other.

2   Q.  All right.  And do you remember who you met at that time

3   from the Devils Diciples?

4   A.  Barefoot.  He was the boss then.

5   Q.  Okay.  One person that you can recall, right?

6   A.  Well, there was probably a dozen of them.

7   Q.  Okay.

8   A.  Maybe more.  I don't know exactly who they were, but we

9   talked -- I was the officer of my club, the president of my

10  club.  He was the president of his club.

11  Q.  My question to you, Mr. Clark, is real specific, okay?

12          The question is:  Do you remember the names of the

13  members of the Devils Diciples when you first met them.  And

14  you said Barefoot, correct?  Is that correct?

15  A.  Yeah.  Barefoot was their president then.

16  Q.  All right.

17  A.  That's who I met.  That's who I spoke with.

18  Q.  Hold on.

19  A.  That was the first one I was introduced to, sir.

20  Q.  I'm just asking you one question, one question at a time.

21  A.  I'm trying to answer it proper.

22  Q.  I understand that that's what you're trying to do.

23          What other members, do you know their names, that you

24  met the first time?

25  A.  No.  I don't know all their names that I met the first

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1    time.  I'm bad at names.

2    Q.  Okay.

3    A.  Truthfully.

4    Q.  Did you meet Billy Wadd at this swap meet; yes or no?

5    A.  Yes.

6    Q.  Did you meet Rockin' Ronnie; yes or no?

7    A.  I don't remember if he was there or not.

8    Q.  How about David Roberts, his brother?

9    A.  I don't remember.  I don't recall if he was there either.

10   Q.  Okay.  When you came to this swap meet, were you carrying a

11   firearm?  Do you remember that?

12   A.  I don't remember.  I don't remember if I was or not, to

13   tell you the truth.

14   Q.  Did you usually, Mr. Clark, carry a firearm?

15   A.  No.

16   Q.  Okay.  Did you have other people who guarded you carry

17   firearms?

18   A.  Yes, sir.

19   Q.  And one of them was Mr. Sanchez; is that correct?

20   A.  Yes, sir.

21   Q.  And his first name is Daniel; is that right?

22   A.  Yes, sir.

23   Q.  And the reason why they carried weapons was to protect you,

24   essentially, correct?

25   A.  To protect the whole club.  When there's a whole club

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1   function, they are there to protect everybody at that time.

2   Q.  Including you, because you were part of the club?

3   A.  Including me.

4   Q.  So it wasn't unusual for a Highwayman to be, as you said,

5   strapped, right?

6   A.  When they are going to a function with every motorcycle

7   gang in the State of Michigan it's not unusual, no.

8   Q.  Okay.  And this, what we've been talking about, this swap

9   meet, was one of those instances, correct?

10  A.  Yes.

11  Q.  That they would be strapped, right?

12  A.  Yes, sir.

13  Q.  Okay.  Now, when Mr. Straus was asking you questions about

14  who the Highwaymen aligned with, and who were their enemies,

15  you said that the Outlaws were, to use your words, hated foes,

16  correct?

17  A.  I don't remember the word, foes.  I said we hated them.

18  Q.  Hated them.  Okay.  But you know what the word "foe" means,

19  right?  Opposition?

20  A.  No.  Actually, it's the first time I --

21  Q.  You have ever heard that word?

22  A.  Yes.

23  Q.  Okay.  In any event, they did something to the Highwaymen

24  that the Highwaymen didn't like, right?

25  A.  You're talking about the Outlaws?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1   Q.  Excuse me.  The Outlaws, yes.

2   A.  Yes, sir.

3   Q.  And then you said in return that the Outlaws, to use your

4   word, clipped them, correct?  Didn't you use the word, clipped?

5   A.  Pardon me, sir?

6   Q.  That you went back and clipped the Outlaws in retaliation?

7   A.  Clipped them?  I don't remember using that word.

8   Q.  Okay.  What was the word that you used, then, in

9   retaliation for what the Outlaws had done to you?

10  A.  I didn't say the Outlaws did anything to me.  I said they

11  did it to my club.  They killed one of my members back in the

12  day.

13  Q.  And then what did you do?  What did the club do in

14  retaliation?

15  A.  My club?

16  Q.  Yes.

17  A.  They crippled a couple of them.

18  Q.  "Crippled" was the word that you used?

19  A.  Yes, sir.

20  Q.  Okay.  And did you order that as the national boss?

21  A.  No, sir.  That was before I was national boss.

22  Q.  Somebody else did that, right?

23  A.  Yes, sir.

24  Q.  Okay.  Now, you told the jury that during the time that we

25  are talking about, 2000 to 2001, you were engaged in both

1    legitimate and illegitimate business, correct?

2    A.  2000 to 2002.

3    Q.  Oh, 2002, correct?

4    A.  From 2000 to 2002, yes, sir.

5    Q.  Okay.  And during that time period, you knew Scotty Z,

6    right?

7    A.  I knew Scotty Z from 2000 till today.  I mean, I've known

8    Scotty Z for a long time.

9    Q.  Right.  Well, that would be inclusive of 2000 to 2002, when

10   he was a member of the Devils Diciples, correct?

11   A.  Yeah.  I knew him when he was a member of the Devils

12   Diciples, yes.

13   Q.  And as far as you knew, that started in 2000, correct?

14   A.  What started?

15   Q.  His membership.  Scotty Z's membership in the Devils

16   Diciples started in about 2000?

17   A.  I don't know exactly what year his membership started.  I

18   mean, I couldn't truthfully give you that answer, the correct

19   answer.

20   Q.  Okay.  If I told you it was in the summer of 2000, would

21   you dispute that?

22   A.  I couldn't answer that either way.

23   Q.  All right.

24   A.  Truthfully, I don't know.

25   Q.  You don't know.  When you met him, do you know what year it

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1    was that you met him?

2    A.  I'm not good on years and dates, sir.

3    Q.  Okay.

4    A.  I mean, I met him when he -- before he was a Devils

5    Diciple, yes.

6    Q.  Yeah.  You said he was a Zulu for a minute, right?

7    A.  If I remember correctly.

8    Q.  Okay.  And a Zulu was a different motorcycle club, correct?

9    A.  Yes, sir.

10   Q.  And then he joined the Devils Diciples, correct?

11   A.  Yes, sir.

12   Q.  And that's when -- in 2000 is when you meet the Devils

13   Diciples, correct?

14   A.  Yes, sir.

15   Q.  And at that point in 2000, you knew that Scotty Z was a

16   member of the Devils Diciples, correct?

17   A.  At which point, sir?

18   Q.  In 2000, when you met the Devils Diciples.

19   A.  When I met the Devils Diciples at the swap meet, is that

20   what you're asking?

21   Q.  Yes.

22   A.  I don't know, I don't know if he was a member then or not.

23   Q.  It could have been later, correct?

24   A.  Correct.

25   Q.  Okay.  At some point, Scotty Z works for you in your towing

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1   business, correct?

2   A.   Yes.

3   Q.   And do you know what year that was?

4   A.   That was 2000.

5   Q.   Okay.

6   A.   2000 to 2000 --

7   Q.   2000 or?

8   A.   In it started in 2000.

9   Q.   And it continued --

10  A.   But then --

11  Q.   I'm sorry.  Go ahead.

12  A.   It started in 2000, but then he went to jail.  I don't know

13  what date he went to jail, but when he got out of jail, I still

14  gave him a job.  He worked in my car lot when he got out of

15  jail.

16  Q.   Okay.  If I told you that he was arrested and went to jail

17  in late 2001, November, does that sound about right?

18  A.   Like I said, I'm not good on dates.  But 2001, maybe closer

19  to 2002 could sound about right, yes.

20  Q.   Okay.  Either late 2001 or early 2002 is the best you can

21  do, right?

22  A.   Like I said, I'm not good on dates.  I don't know when --

23  Q.   I understand.  I'm asking you to do the best you can.

24  That's all I'm asking you, Mr. Clark.

25           Relax.  You know, we're just trying to get down to the

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

```
 1   basics.  Okay?
 2           So when he was working for you, you had the towing
 3   business, right?
 4   A.  He worked for me when I had my car lot, also.
 5   Q.  And your car lot, correct?
 6   A.  Correct.
 7   Q.  And this was a legitimate business, correct?
 8   A.  Yes, sir.
 9   Q.  And so you were paying him as an employee, right?
10   A.  Yes, sir.
11   Q.  And one of the things that you wanted to do in this
12   trucking transportation business is to keep the cars moving,
13   right?
14   A.  Yes, sir.
15   Q.  And one of the ways that you did that is, you took meth.
16   That was one of the ways that you kept things going, correct?
17   A.  Correct.
18   Q.  And other people, like Scotty Z, would use meth, too,
19   correct?
20   A.  Correct.
21   Q.  And sometimes you would give Scotty Z meth, correct?
22   A.  Yes, sir.
23   Q.  And sometimes he would give you meth?
24   A.  Yeah.  We would distribute it back and forth, sell small
25   amounts, nothing big.
```

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1   Q.  Yeah.  Each one of you would get small amounts, like party

2   thing kind of stuff together, right?

3   A.  Yeah.  Not just --

4   Q.  Not to sell out on the streets.

5   A.  Well, I don't know what he did with it when he got it.  I

6   mean, we would sell each other drugs, not nothing big.  I don't

7   know what he did with it.  I mean --

8   Q.  But you knew at the time --

9   A.  He got high with it, I got high, we all got high.

10  Q.  Right.  You knew he was a meth user, correct?

11  A.  Yes.

12  Q.  And you wanted him to use the meth so that he could work

13  for you, right?

14  A.  So he could drive the truck.  I mean --

15  Q.  Yeah.  And work for you.

16          THE COURT:  Mr. Daly?

17          MR. DALY:  I'm sorry.

18          THE COURT:  You need to allow the witness --

19          MR. DALY:  Yes.

20          THE COURT:  -- to conclude the answer before you ask a

21  second question.

22          MR. DALY:  That's correct.

23          THE COURT:  Start again.

24          MR. DALY:  Yes.

25  BY MR. DALY:

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1  Q.  You gave Scotty Z meth so that he could work for you, and

2  use the meth, correct?

3  A.  No, not just so he could work for me.  I mean, there's

4  different reasons people do drugs.  People do drugs because

5  they are addicted.  I sold him drugs, he sold me drugs, small

6  distributable amounts.  Nothing more, nothing less.  And

7  there --

8  Q.  Okay.  When you -- I'm sorry.  Go ahead.

9  A.  The reason why we sold each other drugs is so that we could

10  operate and go for three or four days at a time.  I mean,

11  that's just the way it is in the biker world.  That's what they

12  do.

13  Q.  Right.

14  A.  That's what we do.

15  Q.  Okay.  So you would, in effect, exchange meth so that you

16  could continue doing the work that you had for Scotty Z, right?

17  A.  Working, partying.  I mean, I didn't exchange meth for the

18  work.  I paid him for working.  He got paid for working.

19  Q.  Right.  Okay.  Do you remember when you ever gave meth, can

20  you tell us a date, a time or a place, that you gave meth to

21  Scotty Z?

22  A.  Which time?

23  Q.  Any time.

24  A.  Any?

25  Q.  Any date.

1   A.   Maybe a hundred occasions.

2   Q.   You gave him --

3   A.   I don't know how many occasions there was, sir.  I mean, I

4   can't give you a date and time.  I'm bad on dates and --

5   Q.   And when you --

6   A.   Like I said, I don't know.

7   Q.   Go ahead.

8        When you did that, were you and Scotty alone?  In

9   other words, were there other people present?

10  A.   We distributed drugs at their clubhouse in the open.  I

11  mean, their clubhouse, my clubhouse.

12  Q.   I'm not talking about the clubhouse.

13  A.   My clubhouse --

14  Q.   I asked you a very specific question.

15  A.   Sir, I'm trying to answer the question.

16  Q.   Excuse me.  That's not responsive.

17  A.   You're not asking me alone.  Which time?  I mean, you're --

18  seems like you're confusing me, sir.

19  Q.   It's not my intention to confuse you.  I'm asking you a

20  specific question.

21  A.   Okay.  Which time are you talking about?

22  Q.   All right.

23  A.   And which place?

24  Q.   Well, how long did Scotty Z work for you?  Let me ask you

25  that.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1   A.  Which company?

2   Q.  The first company.  The car company.  The car lot.

3   A.  Car lot was the second one.  The first one was the

4   transport company.

5   Q.  Okay.  When was that?

6   A.  The transport company or when -- how long did he work for

7   me?

8   Q.  The transportation company, Mr. Clark.

9   A.  He worked for me in my transportation company approximately

10  a year and-a-half, something like that, almost two years, till

11  he went to jail.

12  Q.  Okay.  And then he went to jail to what, about 2006,

13  ballpark; do you remember that?

14  A.  Sir, he went to jail somewhere around 2002, is exactly what

15  you told me.  I don't know exactly what date, but I know it

16  wasn't 2006.

17  Q.  No.  I didn't ask you that.  I said when he came out.

18  A.  Oh, I'm sorry.

19  Q.  Was it 2006?

20  A.  2005 or 2006, something like that.

21  Q.  And did he go back to work for you?

22  A.  Yes, sir.

23  Q.  During the time that Mister -- well, the person you

24  referred to as Scotty Z was in prison, he would be an inactive

25  member, essentially, correct?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1   A.  I don't know how their bylaws go as far as somebody being

2   in prison, but you can still be an active member in prison.

3   Q.  Well, when he was in prison, to your knowledge, would he be

4   able to attend meets, swap meets, runs, pay dues?

5   A.  He could surely pay dues, if he could afford to pay dues

6   from prison, yeah.

7   Q.  And how about, how about going to meets?

8   A.  He could go to a meet in the yard, other members.  I mean,

9   there's other members in prison.

10  Q.  All right.  Did you know whether or not there were specific

11  other members in prison with Scotty Z, when he was in prison?

12  A.  I don't know for --

13  Q.  You don't know?

14  A.  -- for sure.  No, sir.

15  Q.  You do know that when Scotty Z came out of prison and went

16  back to work for you, that he renounced his membership in the

17  Devils Diciples, correct?

18  A.  Yes, sir, he did do that.

19  Q.  And the reason why he did that is because there's supposed

20  to be a policy that when you're in prison, the club supports

21  you, right?  That was the Devils Diciples's policy, correct?

22  A.  I don't know their written policy.  But our policy in my

23  club is if it's club business and you go to jail, then the club

24  supports you.

25          But to answer your question properly, he didn't get

```
 1    any support from his club and that's why he quit.

 2    Q.  Okay.

 3    A.  He said he had more support from the Highwaymen than he did

 4    the Devils Diciples.

 5    Q.  So while he was in prison, your understanding was that the

 6    Devils Diciples did not support Scotty or his family, so when

 7    he came out, he became a Highwayman, correct?

 8    A.  Correct.

 9    Q.  Thank you.

10            Now, before you met the Highwaymen, had you been using

11    cocaine?

12    A.  Before I met the Highwaymen in 1978?

13    Q.  Excuse me.  That was --

14    A.  Yeah.  No, I wasn't.

15    Q.  You did not, correct?

16    A.  I did not do cocaine before I met the Highwaymen in 1978.

17    Q.  Once you became a Highwaymen, did you start using cocaine?

18    A.  Yes, sir.

19    Q.  All right.  And then eventually, when you went -- met the

20    Devils Diciples, you started using meth; is that correct?

21    A.  Correct.

22    Q.  And what you refer to as crystal, correct?

23    A.  Meth, crystal.

24    Q.  And you became heavily dependent on it, used it just about

25    every day?
```

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1    A.   Yes, sir.

2    Q.   Okay.  And did you become addicted to it?

3    A.   Yes, sir.

4    Q.   And did you blame the use of meth on the loss of your

5    business?

6    A.   No.

7    Q.   You didn't?  Didn't you just say that that was part of the

8    reason why you lost your company?

9    A.   The main reason why I lost my company -- I mean, that did

10   contribute to it, yes.  But the main reason why I lost my

11   company was because my brother had a drunk driving and we lost

12   the contract with the auto auction.

13   Q.   So there were two reasons:  Your meth use and then your

14   brother's problems, right?

15   A.   Well, the partying and the business problems, yes.

16   Q.   Both.  And did you blame the Devils Diciples for that, the

17   fact that you were a meth user?

18   A.   No.  I didn't blame them for it.  I was a grown man.  I

19   made my choice.

20   Q.   Okay.  Now, the people that you said in the Devils Diciples

21   that gave you meth, would have been Rockin' Ronnie, correct?

22   A.   You keep using the word "gave," sir.  We sold to each

23   other.  We didn't give it to each other.

24   Q.   I didn't ask you about selling to each other.  I asked you

25   a specific question.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

271

1    A.  There was never gifts.  Drugs were never given.

2    Q.  Well --

3    A.  They are not given.  So I can't answer, I can't answer the

4    question properly.

5    Q.  Did Rockin' Ronnie hand you meth?

6    A.  Yes, sir.  Several times.

7    Q.  Did you pay him directly?

8    A.  After I got to know him, yes.  But not at first, no.  He

9    worked for me, also.  He ended up working for me for a couple

10   years.  So no, I didn't use a buffer with him after I got to

11   know him.

12   Q.  Once you got to know him, though, you would give him the

13   money directly, correct?

14   A.  Yes.

15   Q.  And then what, he would put it in his pocket, correct?

16   A.  I don't remember where he put his money, sir.

17   Q.  You don't know what he did with the money after you gave it

18   to him, correct?

19   A.  He could have paid his club dues with it.  I would -- buy

20   drugs off him and sell him drugs right in his own clubhouse.

21   Q.  But you don't know what he did with the money, correct?

22   A.  He did with his money what he chose.

23   Q.  Right.

24        Mr. Straus asked you about a house in Detroit that was

25   connected to Rockin' Ronnie, do you remember that?  Where he

1    was making meth?

2    A.  Yes.

3    Q.  It was your understanding that it was Rockin' Ronnie that

4    was making meth there; is that correct?

5    A.  Yes.

6    Q.  And that was his location, where he was staying?

7    A.  Yes.

8    Q.  That was an abandoned house; is that correct?

9    A.  Pardon me?

10   Q.  That was an abandoned house; is that what you understood?

11   A.  It was a fire job that he was working on for a company.  It

12   wasn't an abandoned house.  He was working on it and living in

13   it.

14   Q.  And it was your understanding that it was Rockin' Ronnie's

15   house, not Scotty Z's house, correct?

16   A.  Correct.

17   Q.  That Scotty Z was not staying there, correct?

18   A.  Correct.

19   Q.  And that Ronnie was making meth at that house, correct?

20   A.  Yes.

21   Q.  Not Scotty Z; he was not making meth there, correct?

22   A.  I was never at the house and I was never told that -- or

23   not to my knowledge, Scotty Z never made any meth, period.

24   Q.  Never made any meth, period?

25   A.  Not even that house, anywhere.

273

1   Q.  Not that house or any other house, correct?

2   A.  Not to my knowledge.

3   Q.  Right.  And I think you said that Scotty Z was arrested at

4   the house.  Your understanding was that Scotty Z had a weapon

5   because he and Ronnie had a dispute, correct?

6   A.  Yeah.  He said Ronnie called him over there and wanted to

7   talk to him and he didn't tell him what it was about.  And he

8   said he, just to be on the safe side, he carried a gun.

9   Q.  So Scotty Z carried a gun on that day for his own

10  protection; that's your understanding?

11  A.  Correct.

12  Q.  Correct?

13  A.  Yes, sir.

14  Q.  The incident regarding the motorcycle and Damien, do you

15  remember testifying about that a minute ago?

16  A.  Yes, sir, the one at my car lot.

17  Q.  Right.  And you mentioned that Scotty Z was involved in

18  that, and you made a suggestion to him, correct?

19  A.  Yes.

20  Q.  And Scotty Z at that time was not a member of the Devils

21  Diciples, correct?

22  A.  No, sir, he wasn't a member of the Devils Diciples, period.

23  Q.  Thank you.

24       Now, in May of 2009, you found yourself charged in

25  federal court; is that correct, Mr. Clark?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1    A.  Yes, sir.

2    Q.  And you were charged with a serious offense; is that

3    correct?

4    A.  Yes, sir.

5    Q.  You were charged in Count 1 with a RICO, what we call a

6    substantive RICO charge; is that correct?

7    A.  It was charged with racketeering.

8    Q.  A racketeering --

9    A.  Racketeering was Count 1.  Count 2 was conspiracy to commit

10   racketeering.

11   Q.  Right.  And there were racketeering acts that you were

12   charged with; is that correct?

13   A.  Yes, sir.

14   Q.  And did that include a conspiracy to murder?

15   A.  Yes, sir.

16   Q.  And a conspiracy to distribute cocaine?

17   A.  Yes, sir.

18   Q.  Not meth, correct?

19   A.  No, sir.

20   Q.  You're agreeing with me?

21   A.  It was a conspiracy to distribute cocaine.

22   Q.  And then you were charged with a separate count of

23   conspiracy to possess with intent to deliver cocaine; is that

24   correct?

25   A.  Yes, sir.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

275

1  Q.  Now, you pled not guilty, right?

2  A.  Yes, sir.

3  Q.  And when Mr. Straus was asking you questions, you said you

4  went to trial, right?

5  A.  Yes, sir.

6  Q.  So you entered a plea of not guilty, right?

7  A.  Yes, sir.

8  Q.  Under the assumption that you were innocent, correct?

9  A.  Correct.

10  Q.  And you believed that you were falsely accused by the

11  Government at that time, is that correct?

12  A.  I don't remember, I don't recall saying that.

13  Q.  I didn't ask you if you said that.  I asked you if you

14  believed.

15  A.  Here's what I believe -- excuse me.

16  Q.  Let me finish.

17  A.  You want to ask me what I believe, I can answer that

18  properly.

19  Q.  Let me finish the question, Mr. Clark.  Okay?  Is that all

20  right?

21  A.  Not a problem.

22  Q.  Did you believe, at the time, that the Government had

23  falsely accused you in that case?

24  A.  No, sir.

25  Q.  You went to trial, correct?

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1   A.  Yes, sir.

2   Q.  You were convicted of the conspiracy, right?

3   A.  Which one?  I was charged with five.

4   Q.  The RICO conspiracy, right?

5   A.  Yes, sir.

6   Q.  Okay.  And were you upset at that conviction?

7   A.  Of course.

8   Q.  Right.  You were mad, right?

9   A.  I was shocked.

10  Q.  You were shocked.

11  A.  Yes, sir.

12  Q.  An innocent man convicted, right?

13  A.  I wasn't innocent, if that's what you're asking.

14  Q.  You were shocked that you got convicted.

15  A.  Of the RICO conspiracy, yes.

16        I was charged with racketeering, sir, that's acts.

17  And I was charged with conspiracies, which are mere

18  conspiracies.

19        Then I was charged with RICO conspiracy, which is

20  conspiracy to commit all the conspiracies in the whole case.

21        So I was found not guilty of the racketeering, which

22  was the Count 1, which is the actual act.  And then I was found

23  not guilty of the conspiracies, but I was found guilty of the

24  RICO conspiracy.

25  Q.  And did you feel that, in that charge, that the Government

1  had destroyed your life by charging you with those crimes?

2  A.  My life was definitely destroyed because I was found guilty

3  of those crimes, not because they charged me --

4  Q.  I didn't ask you that.

5  A.  -- with those crimes.  No.

6  Q.  Excuse me, sir.  I asked you --

7  A.  No.

8          MR. STRAUS:  Judge, objection.

9          MR. DALY:  He's being non-responsive.

10         MR. STRAUS:  Well, he can finish his answer.

11         THE COURT:  He should be permitted to finish his

12  answer.

13         MR. DALY:  Did you feel that -- I'm sorry, Judge.

14         THE COURT:  Go ahead.

15         MR. DALY:  May I continue?

16  BY MR. DALY:

17  Q.  Did you feel that because the Government had charged you,

18  that your life had been destroyed?

19         You lost your family, lost your business, sitting in

20  jail, right?

21  A.  My life was destroyed because of my actions.  That's why

22  I'm here today, because I was guilty of it.  And I was found

23  guilty of it by a jury of my peers, of the RICO conspiracy.

24  Q.  That's not how you felt at the time of sentencing, was it?

25  When you appeared before the Judge at the time of sentencing,

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1   you said you were shocked that you had been convicted; that

2   members of your own club had lied on you and you had nothing to

3   do with it.  Didn't you tell the Judge all that?

4   A.  No.  I don't remember telling the Judge that members of my

5   club -- I don't remember.  It was like four or five years ago.

6   I don't remember telling the Judge that members of my club lied

7   to me.

8   Q.  Didn't you tell the judge that you had nothing to do with

9   it?

10  A.  I don't remember exactly what I told the Judge, sir.  I

11  mean, if you want to bring the transcripts, I mean, you could

12  possibly do that, if you like.

13          THE COURT:  We're going to be more than a just a few

14  minutes here, Mr. Daly?

15          MR. DALY:  Yes.

16          THE COURT:  We're going to recess.

17          MR. DALY:  Thank you.

18          THE COURT:  Ladies and gentlemen, you can prepare to

19  put your books away, and let's just be seated, please.  We're

20  not recessed yet.

21          You can prepare to put your books away in the jury

22  room, and consistent with your regular schedule, be ready for

23  court tomorrow morning at nine a.m.

24          Avoid discussing, reading, writing, or researching

25  anything about the case, please, while you're away from court.

JURY TRIAL, VOLUME V - 10/22/2014
ANTHONY CLARK - CROSS BY MR. DALY

1  And have a pleasant evening.  We shall see you for one more

2  full day session tomorrow.  You're excused.

3       (Jury out, 4:37 p.m.)

4            THE COURT:  Okay.  Be seated, please.

5            Mr. Straus, you said you wanted a moment on the

6  record?

7            MR. STRAUS:  Yes, your Honor.  I, I sure hope Mr. Daly

8  has a good faith belief in the questions that he's just asked,

9  because we saw some pretty astounding questions this morning

10 that I don't believe were based on good faith.

11           In fact, I thought they were quite manufactured.

12 Specifically, the question where one of the attorneys asked one

13 of witnesses, JP, John Pizzuti, whether or not -- and led him

14 to believe that he had testified on direct, that he had gotten

15 cocaine or he bought cocaine or meth from Iron Mike.  I don't

16 think that was the case.  That was not anyone's recollection of

17 this.

18           And that kind of stuff, I think, is highly improper.

19 I think it's unethical, as a matter of fact.  So I hope Mr.

20 Daly has a transcript he can show this man, and that this

21 wasn't something that he just pulled out of thin air.

22           THE COURT:  Well, okay.  I take your comments, and you

23 can research the record, which is being produced every day,

24 with respect to your earlier comment.

25           I would note that sometimes people don't hear things

UNITED STATES vs. SUTHERLAND - 11-20129; 11-20066

1    quite in the same way.  Mr. Daly thought that the word

2    "crippled," for example, was "clipped."  I can understand the

3    difference.

4              MR. STRAUS:  That's fair.

5              THE COURT:  I understand the difference.  There's room

6    for interpretation short of inappropriate suggestions in that

7    regard.  But just -- let's just hold on and I'm not going to

8    ask for any sort of response or anything of that sort.  We'll

9    just resume tomorrow morning and pick up where we left off.

10   All right?

11             MR. STRAUS:  Thank you, your Honor.

12             THE COURT:  Is there anybody on the defense that needs

13   any record?

14             I hear none.  We stand adjourned.  Thank you.

15             COURT REPORTER:  All rise.

16       (Proceedings adjourned at 4:40 p.m.)

17

18                          *       *       *

19

20

21

22

23

24

25

1

2                    **CERTIFICATE OF REPORTER**

3

4          As a Federal Official Court Reporter for the United

5    States District Court, appointed pursuant to provisions

6    of Title 28, United States Code, Section 753, I do hereby

7    certify that the foregoing is a correct transcript of

8    the proceedings in the above-entitled cause on the date

9    hereinbefore set forth.

10

11

12                         Dated this 23rd day of October, 2014.

13

14                          s/ Christin E. Russell
                            Christin E. Russell
15                          RMR, CRR, FCRR, CSR
                            Federal Official Court Reporter
16

17

18

19

20

21

22

23

24

25