```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,

 4                   Plaintiff,        Case No. 11-20129
                                       Case No. 11-20066
 5      -v-

 6   SCOTT WILLIAM SUTHERLAND, D-1,
     PATRICK MICHAEL MCKEOUN, D-4,
 7   JEFF GARVIN SMITH, D-5/D-1,
     PAUL ANTHONY DARRAH, D-6/D-2,
 8   CARY DALE VANDIVER, D-7/D-5,
     VINCENT WITORT, D-8,
 9   DAVID RANDY DROZDOWSKI, D-17,

10                   Defendants.
     _____/
11
                     JURY TRIAL, VOLUME XI
12
             BEFORE THE HONORABLE ROBERT H. CLELAND
13               United States District Judge
              Theodore Levin United States Courthouse
14               231 West Lafayette Boulevard
                     Detroit, Michigan
15               Monday, November 3, 2014
     APPEARANCES:
16
     FOR THE PLAINTIFF:   SAIMA MOHSIN
17                        ERIC STRAUS
                          U.S. Attorney's Office
18                        211 W. Fort Street, Suite 2000
                          Detroit, MI  48226
19
                          JEROME MAIATICO
20                        United States Department of Justice
                          1301 New York Avenue, NW
21                        Washington, DC 20005

22   FOR THE DEFENDANT:   CRAIG A. DALY
                          (Sutherland, D-1)
23                        615 Ford Building
                          Suite 820
24                        Detroit, MI 48226

25
```

```
 1    APPEARANCES:              (Continued)

 2    FOR THE DEFENDANT:    SIDNEY KRAIZMAN
                            (McKeoun, D-4)
 3                          1616 Ford Building
                            Detroit, MI 48226
 4
                            JEROME SABBOTA
 5                          (Smith, D-5/D-1)
                            26862 Woodward Avenue
 6                          Suite 200
                            Royal Oak, MI 48067
 7
                            PATRICIA A. MACERONI
 8                          (Darrah, D-6/D-2)
                            26611 Woodward Avenue
 9                          Huntington Woods, MI 48070

10                          MARK A. SATAWA
                            (Vandiver, D-7/D-5)
11                          3000 Town Center, Suite 1800
                            Southfield, MI 48075
12
                            KIMBERLY W. STOUT
13                          (Witort, D-8)
                            370 East Maple Road, Third Floor
14                          Birmingham, MI 48009

15                          BYRON H. PITTS
                            535 Griswold, Suite 1630
16                          Detroit, MI 48226-4218

17                          PHILLIP D. COMORSKI
                            535 Griswold
18                          2632 Buhl Building
                            Detroit, MI 48226
19
                            RYAN H. MACHASIC
20                          (Drozdowski, D-17)
                            134 Market Street
21                          Mount Clemens, MI 48043

22          To Obtain a Certified Transcript Contact:
                        Christin E. Russell
23            RMR, FCRR, CRR, CSR - (248) 420-2720
           Proceedings produced by mechanical stenography.
24        Transcript produced by computer-aided Transcription.

25
```

```
1                           I N D E X

2     JURY TRIAL, VOLUME XI                          PAGE

3     WITNESSES FOR THE GOVERNMENT:
      DANNY BURBY, JR.
4       CROSS-EXAMINATION BY MS. STOUT (continuing)    18
        CROSS-EXAMINATION BY MR. DALY                  29
5       CROSS-EXAMINATION MR. SATAWA                   68
        CROSS-EXAMINATION BY MS. MACERONI              81
6       CROSS-EXAMINATION BY MR. SABBOTA              114
        CROSS-EXAMINATION BY MR. KRAIZMAN             115
7       REDIRECT EXAMINATION BY MS. MOHSIN            118

8     WILLIAM SCOTT LONSBY
        DIRECT EXAMINATION BY MS. MOHSIN             132
9       CROSS-EXAMINATION BY MR. SATAWA              193
        REDIRECT EXAMINATION BY MS. MOHSIN           208
10
      HOWARD JOSEPH QUANT
11      DIRECT EXAMINATION BY MR. MAIATICO           211
        CROSS-EXAMINATION BY MR. SABBOTA             261
12      CROSS-EXAMINATION BY MR. SATAWA              289
        REDIRECT EXAMINATION BY MR. MAIATICO         298
13
      WILLIAM FLEMING
14      DIRECT EXAMINATION BY MS. MOHSIN             300

15
                          E X H I B I T S
16
      Exhibits                                      Page
17    Government's Exhibit 11-247                      6
      Government's Exhibit 13-138                      7
18    Defense Exhibit 8                               91
      Government's Exhibit 20-8                      160
19    Government's Exhibit 20-12                     161
      Government's Exhibit 64-24                     179
20    Government's Exhibit 33-20, 33-29, 33-44,      251
      33-38, 33-39, 33-49
21    Government's Exhibit 35-12                     302

22

23

24

25    CERTIFICATE OF REPORTER                        310
```

4

| | |
|---|---|
| 1 | Detroit, Michigan |
| 2 | November 3, 2014 |
| 3 | 9:06 a.m. |
| 4 | *               *               * |
| 5 | (Call to Order of the Court; all parties present.) |
| 6 | THE CLERK:  Calling case Nos. 11-20129 and 11-20066, |
| 7 | the United States of America vs. Scott Sutherland and others. |
| 8 | THE COURT:  The Court recognizes all parties and |
| 9 | attorneys present.  You may be seated. |
| 10 | Let me just say as a matter of protocol, standing is a |
| 11 | good thing to do when the clerk opens court.  It's also a nice |
| 12 | idea to actually pay attention and stop whatever it is that's |
| 13 | going on, whatever conversations you may be having.  That |
| 14 | includes defendants, attorneys, spectators. |
| 15 | Thank you. |
| 16 | We have a cautionary instruction that I formulated and |
| 17 | discussed off the record and in chambers with Ms. Mohsin and |
| 18 | Ms. Stout.  It refers to Witness Burby and cross-examination. |
| 19 | I've circulated copies of that.  Ms. Mohsin and Ms. Stout have |
| 20 | both agreed that it is a, what I would cast as a moderate and |
| 21 | suitable cautionary instruction.  It's formulated to be as |
| 22 | non-accusatory as possible with respect to Ms. Stout whose |
| 23 | cross-examination continues. |
| 24 | I think Ms. Mohsin wanted to place on the record some |
| 25 | actual matters before we continue with that.  Ms. Stout should |

1  also have an opportunity to say for the record whatever it is

2  that she may wish to say.

3      Also, on a following page to that instruction, I

4  included a proposed clarifying set of comments about

5  sentencing, because we've had testimony about sentencing

6  guidelines, grids, sentencing possibilities and so on, so

7  forth.  I don't need to give that now.  I understand through

8  staff that there's some unease or some disagreement among

9  counsel about how any such thing should be stated.  We can take

10  that up later, as far as I'm concerned.  I don't need to

11  deliver that immediately.

12      And then somebody else had something administrative,

13  possibly on exhibits.

14      Ms. Mohsin, why don't you lead off, please.

15      MS. MOHSIN:  Your Honor, directing the Court's

16  attention first very briefly to the exhibits.  In examining

17  daily transcripts, it's come to our attention that a couple of

18  the exhibits, there was some -- I don't know if the word is

19  abnormality in the way in which the system produced them, but I

20  want the record to be clear that the Government did, in fact,

21  admit 11-247 and 13-55.

22      THE COURT:  One moment.  One moment.

23      MS. MOHSIN:  Yes.

24      THE COURT:  Let me look at my notes.  11-247.  I did

25  not have that checked off on my checklist, although I probably

```
 1    don't get all of these.
 2          Does anyone disagree that 11-247 should be deemed
 3    received?
 4          MR. KRAIZMAN:  What is 11-247?
 5          THE COURT:  It says photograph DDMC members, (Holiday
 6    and looks like Magoo in the back.)
 7          MS. MOHSIN:  I'm holding it up here.
 8          THE COURT:  The reference is F-14454.
 9          MR. SABBOTA:  Those were admitted.
10          THE COURT:  Any problem?
11          MR. SABBOTA:  No, your Honor.
12          THE COURT:  No problem?  All right.  It is received.
13       (Exhibit 11-247 received 9:09 a.m.)
14          THE COURT:  As of what date, do we know?
15          MS. MOHSIN:  It was Volume II, 10/16/2014.
16          THE COURT:  10/16?  16 October?
17          MS. MOHSIN:  Correct.
18          THE COURT:  All right.  And what else?
19          MS. MOHSIN:  On the same date, Exhibit 13-55, which
20    I'm holding up and displaying for counsel to see, the same
21    thing that it's mentioned inside the body of the transcript
22    itself, but it didn't make its way into the indexing system.
23    In speaking with the court reporter, that's --
24          THE COURT:  I have 13-55 received on the 16th of
25    October.
```

1          MS. MOHSIN:  That's correct, your Honor.

2          THE COURT:  My notes indicate that it was received.

3    Along with 13-54, actually, probably at the same time.

4          MS. MOHSIN:  Your Honor, and then there is one other

5    matter.  And that's in Volume VII, which is 13-138.  This was a

6    physical folder containing documents.  It was in a series with

7    Special Agent Fleming of documents that we had moved to

8    introduce from Jeff Smith's house.  I had introduced it.  I had

9    displayed it to the jury.  I thought I had said it was moved

10   for admission.  It's unclear from the transcript at this time,

11   so I wanted to make it clear, because I know we had published

12   it to the jury.

13         And when I just recited the numbers that were being

14   moved for admission, I think I left that number out, 13-138.

15   However, it was among the exhibits that was presented to

16   Special Agent Fleming, there was no objection, and it was

17   displayed to the jury.

18         THE COURT:  Any disagreement on that proposition?

19         Hearing none, I'll deem 13-138 received as of today.

20      (Exhibit 13-138 received 9:11 a.m.)

21         THE COURT:  I did not previously mark it either.

22         MR. KRAIZMAN:  What is 13-138?

23         THE COURT:  It says collection -- well, it's what Ms.

24   Mohsin was just talking about, collection of news articles.

25   That's the label, collection of news articles, 13-138.

 1              MR. DALY:  You know, Judge, we have a standing

 2    objection to all these items, so I don't want to keep repeating

 3    myself that we had previously objected to the hearsay content,

 4    the prejudicial effect, and the confrontational problem with

 5    these items.  So that even though, I mean, we are silent at

 6    this time, we don't want to keep jumping up and saying every

 7    time, "we object."

 8              THE COURT:  What I should have said is there's no

 9    further or --

10              MR. DALY:  Correct.

11              THE COURT:  -- particularized objection, there's a

12    general objection that stands --

13              MR. DALY:  Yeah.

14              THE COURT:  -- as to these matters.

15              MR. DALY:  Thank you very much.

16              THE COURT:  You're welcome.

17              I deem them to be not hearsay, because they are not

18    introduced for the purpose of attempting to prove the truth of

19    the matter asserted within them.  And in addition, with respect

20    to 403, undue prejudice outweighing prejudicial value, to the

21    extent that the standing objection relates to that, the matters

22    that I've reviewed do not substantially impact any Defendants's

23    rights in that regard, in other words, under 403 analysis.  But

24    I can only say that as a general matter.

25              Now, with specific particularized individual documents

1    or statements from within this collection, this large

2    collection of material that's coming up, I'm relying on counsel

3    to particularize an objection to that.   To -- as a general

4    matter, these things, I think, I have seen, to the extent that

5    I have seen them, do not fit in a 403 objection.   In other

6    words, whatever potentially prejudicial value that they have

7    does not substantially outweigh the probative nature of the

8    documents.   But I remain open to hear any very specific, more

9    specific objection as to some particular component.

10          Okay, Mr. Daly?

11          MR. DALY:   We're trying to stay on top of that.   There

12   are some written motions in limine regarding some of the

13   specific documents that the Government has singled out among

14   all of these documents, including items that have been found at

15   the different locations.

16          So as we go through this, some of this had been taken

17   under advisement.   Some of it, the Government has moved for

18   admission.   Some of it, Mr. Pitts, I believe, recently filed a

19   motion.   So we are attempting to keep track of a breakdown of

20   these individual items as we go through the case, that as you

21   said, to bring it to your attention that these are particular

22   items that we find to be particularly egregious in terms of our

23   objections.   And we will continue to bring those to the Court's

24   attention.

25          THE COURT:   Good.

1          MS. STOUT:  Which would also --

2          MR. DALY:  Thank you.

3          MS. STOUT:  Sorry.

4          Which would also include that Eleventh Circuit

5    opinion, especially since it talks about an anonymous jury.  I

6    haven't gotten a chance to go through it, the ten other cases

7    that are in that stack.  But I'm assuming Ms. Maceroni is

8    getting us a paralegal, and that will be really helpful.  And

9    I'll assign it to that person at that time.

10         THE COURT:  Okay.  This is in the category of those

11   that I, frankly, suggested, and I think it was to Mr. Daly,

12   that Government and Defense get their heads together and see if

13   some exemplar version of the -- of these few, I hope they are

14   few, specific documents that may contain perhaps problematic

15   passages, such as an explanation of what an anonymous jury is

16   and why it's empaneled.  I can understand that that should not

17   go into the jury room.  Though, I think it is highly unlikely,

18   in any event, that the jury would actually read an entire

19   Eleventh Circuit appellate opinion.

20         But it's in because it has highlighted portions and

21   notations and so forth.  And it may -- I am sure that there is

22   a way that the Government and the defense can come together to

23   identify the significant portions of documents such as that,

24   that can be introduced and leave out or redact other components

25   of the document and, therefore, avoid the 403 problem

1    essentially altogether.

2            What else, Ms. Stout?

3            MS. STOUT:  I'm glad you're optimistic, Judge.

4            THE COURT:  Hmm?

5            MS. STOUT:  I'm glad you're optimistic.  We were there

6    --

7            THE COURT:  I live my life that way, Ms. Stout.

8            MS. STOUT:  That's good.  That's important.

9            We were here Thursday, you know, after court, and we

10   never got a chance to talk further with the Government.  But

11   nonetheless, I just want to make it clear on the record that I

12   respect the Court's opinion in what I crossed the line on.  I

13   just want to make it clear, though, that I didn't agree to this

14   jury instruction.  I just respect the Court's opinion.

15           Thank you.

16           THE COURT:  Oh, well, the fact is I asked you if you

17   had any suggested alterations and so on.  And you really

18   didn't.  You presented a version -- you presented a handwritten

19   version of a proposed curative instruction.  The Government

20   presented a typed version that was, well, different.  And I

21   composed my own, which is -- has elements of both but which,

22   among other things took, took pains to say that I assume that

23   your misstatement of the phrase "slitting somebody's throat,"

24   which is not found, as I understand it, in the background

25   documents, was inadvertent and not intentional.  I, frankly,

 1    believe that it was inadvertent.  And I said so in this

 2    instruction.

 3             MS. STOUT:  Thank you.

 4             THE COURT:  But I also need to tell the jury to put

 5    this out of their minds because it is not -- for one thing,

 6    it's not fact, most importantly, I guess, most importantly it

 7    is not based in fact.

 8             MS. STOUT:  I think I would rather just the Court say

 9    that I inadvertently said that, and that's not totally accurate

10    and leave it at that.  Because I think the second paragraph

11    says a lot of things that I find problematic.  It looks to the

12    jury like -- it's going to prejudice my client's due process

13    rights when I get called out in front of the jury as if I'm

14    doing something.  They don't understand how deep this goes.

15    And it says it's simply wrong and misstated, even if

16    inadvertent, of a supposed event, they might just think I'm

17    just a liar.

18             THE COURT:  Well, that's why I said "misstated."

19             MS. STOUT:  Thank you.

20             THE COURT:  "Inadvertent misstatement."

21             Ms. Mohsin?

22             MS. MOHSIN:  Your Honor, I do need to make a record.

23    In examining the transcript, I realize that it's not thorough

24    from the Government's perspective.

25             First and foremost, to the issue of the need for the

1    instruction, I thank the Court for agreeing to provide the

2    instruction.  But factually speaking, the presentence report is

3    very clear that what occurred in 1995 was that the defendant

4    entered the home of an individual without permission and

5    assaulted him with intent to maim or disfigure by slitting

6    and/or mutilating the nose or lips.  There's no reference to a

7    throat.

8         In addition, it says that the defendant bit the

9    complainant, and so there is no reference to a knife.  So there

10   was reference by Ms. Stout to the slitting of a throat by a

11   knife, which is very inflammatory, which gave rise to our

12   concerns that the jury is left with that impression.  The

13   presentence report makes no reference to the slitting of the

14   throat by a knife; this was an actual fight.

15        So I think that's one component from the Government's

16   perspective that absolutely needs to be clear, because the jury

17   is actually left with incorrect information.  The defendant --

18   excuse me, the witness was not permitted to answer the question

19   after Ms. Stout asked it and it's hanging there.  So we do

20   appreciate the curative instruction.

21        I would also point out, your Honor, that with respect

22   to the issue of opening the door, and I think this is important

23   as we move forward with not just Mr. Burby but additional

24   witnesses, there was no basis for this question.  The question

25   was asked really to, to suggest that Mr. Burby is a fighter and

1    he was acting in conformity with that conduct, not as

2    impeachment, which would have been proper had he denied the

3    conduct, which we've established he did not do.

4         And I've looked through the transcript at the

5    Government's questions about his, his prior experience, and

6    they were very specific about his prior experience with the

7    Devils Diciples carrying firearms.  There was no discussion at

8    all anywhere in this transcript where he denied ever being

9    involved in fights or in any way opening the door.  So really,

10   the only question that came up was on cross-examination by Ms.

11   Stout.

12        He agreed that it was his life experience as well as

13   his experience with the Devils Diciples.  But my -- and he

14   agreed with that, therefore, not opening the door at that

15   moment.  But further back during the Government's direct

16   examination, there was absolutely no opening the door to this

17   type of testimony.  The Court has already ruled.

18        And we are concerned as we move forward there are

19   going to be other instances where the Court has ruled that

20   certain evidence is inadmissible.  And without sort of a side

21   bar or some sort of a warning that this type of information is

22   going to be elicited because of a perceived door opening, that

23   we are really at a disadvantage here.

24        I think in the Government's practice, when we are

25   faced with this quandary, the judge has ruled that there is no

1   door open -- you know, there is no open door and we feel that

2   there has been, in my practice, I've often gone to side bar and

3   said, Judge, we think the door is open and we want to go into

4   this area, and get the blessing of the Court before polluting

5   the jury with information that is either not permitted because

6   it's already been disallowed or perhaps maybe the door hasn't

7   been opened.  So we do have that concern that we wanted to

8   raise with the Court.

9           And then finally, Ms. Stout raised something in

10  chambers about the agreement between the Government and Mr.

11  Burby, specifically paragraph 5 of the Rule 11 agreement which

12  talks about the Defendant's agreement with the Government

13  regarding the scope of the agreement and other charges.  It is

14  standard language.  And so I would object to any opening the

15  door to other information about Mr. Burby's criminal history

16  based on paragraph 5.

17          Thank you.

18          THE COURT:  Mr. Sabbota, you have something?

19          MR. SABBOTA:  Your Honor, if I may.  I think she did

20  open the door.  If the Court looks at the transcript, which is

21  page 45, the question from the Government is:

22          "Now, you have, you have a prior criminal history; is

23  that a fair statement?

24          Yes, I do."

25          And then she asked specifically about the convictions.

```
 1   But I think the first question opens the door.
 2           On behalf of my client, Mr. Smith, I object to
 3   paragraph 2 that the Court has in this instruction.  I don't
 4   see a problem with the first paragraph and the last
 5   paragraph -- last two paragraphs.  But by placing this in front
 6   of the jury, I think it falls off or hits all of the defendants
 7   indicating that the credibility of defense counsel is going to
 8   be questioned.
 9           THE COURT:  Thank you, Mr. Sabbota.
10           MR. SABBOTA:  I have one other question.  May I ask
11   the Court?
12           The Court told us last week you were going to let us
13   know about the joinders.
14           THE COURT:  About what?
15           MR. SABBOTA:  Joinder, whether it was a written
16   motion?
17           THE COURT:  I assume joinder.
18           MR. DALY:  Thank you.
19           MR. SABBOTA:  Thank you.  I just want the record to be
20   clear.
21           THE COURT:  You're welcome.  Let's call the jury.
22           THE CLERK:  All rise.
23       (Jury in, 9:22 a.m.)
24           THE COURT:  Please be seated.  The jury has assembled.
25   Again, all parties and attorneys are present.  Good morning,
```

JURY TRIAL, VOLUME XI - 11/3/2014

17

1   ladies and gentlemen.  Everyone is present.  Welcome back.

2         We have been conducting some business while you've

3   been waiting, since nine a.m., in fact.  And I have, before the

4   cross-examination continues, a comment for you by way of

5   instruction with respect to some events of last week.

6         You recall from last week, Wednesday, when we were

7   last together, there was a question asked of this witness, Mr.

8   Burby, by the cross-examining attorney, Ms. Stout, about a

9   supposed 20-year-old event that allegedly involved a knife.

10   There was an immediate objection.  I ordered the question

11   stricken, because -- based upon the objection.  No answer was

12   given, or no answer was permitted to be given.  I'm not sure

13   you remember this precisely, but that did occur.

14         And I want to point out to you there were two

15   problems, at least two problems with the question.  And I need

16   to briefly explain this to you, as I said that I would from

17   time to time if I thought that it was helpful, it would be

18   helpful to you to explain rulings of the Court from time to

19   time.

20         First, the first of these two difficulties or problems

21   with this question, subject to some exceptions, attorneys

22   generally are not allowed to go so far back in time, 20 years

23   ago, in examining a witness about things that have to do with

24   this, possible convictions and so on.

25         Second, the second problem here is that in asking

 1    questions such as these, the attorney that is asking the

 2    question is expected to have a real factual basis for the

 3    question.  And here, upon further review that afternoon and

 4    even continuing till today, it is clear to the Court, as well

 5    as to Ms. Stout, that she was simply wrong about the facts and

 6    misstated the supposed facts.  Although, I assume that it was

 7    inadvertent.  It's for reasons such as these that judges

 8    instruct jurors that it is the answer of the witness, not the

 9    question asked by an attorney, that forms the evidence in the

10    case.

11         And I will simply end this comment by repeating what I

12    said to you last week, and that is to please do your best to

13    simply strike from your minds, to erase from your mind the

14    question that the attorney asked that was subject to that

15    objection.  Basically ignore it and treat it as though it did

16    not occur.

17         And you may continue with your examination, Ms. Stout.

18         MS. STOUT:  Thank you, your Honor.

19       (Witness previously sworn.)

20                         DANNY BURBY, JR.

21     called as a witness at 9:27 a.m., testified as follows:

22                       CROSS-EXAMINATION

23    BY MS. STOUT (continuing):

24    Q.  Good morning, Mr. Burby.

25    A.  Good morning.

1   Q.  Mr. Burby, please correct me if I'm wrong.  You indicated

2   on, I think it was Wednesday, that Mr. Smith, "Fat Dog," gave

3   you your colors in this club; is that accurate?

4   A.  Yes.

5   Q.  And you also indicated on Wednesday that you got a copy of

6   the bylaws.  I think you even said it was laminated?

7   A.  Yes.

8           THE COURT:  You need to get closer to the microphone,

9   if you would, sir.

10  BY MS. STOUT:

11  Q.  Now, you also indicated on Wednesday that you pretty

12  quickly, almost immediately got a tattoo, Devils Diciples

13  tattoo?

14  A.  Yes.

15  Q.  And I think you said something about a zipper scar on your

16  stomach, and so you made it into something?

17  A.  Yes.

18  Q.  Okay.  What did you -- a 44?

19  A.  Yes.

20  Q.  For "D" and "D"?

21  A.  Mh-hm.

22          MS. STOUT:  Could I ask Mr. Naughton put up the

23  bylaws?

24  BY MS. STOUT:

25  Q.  Now, in the national bylaws -- this one apparently doesn't

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. STOUT

1   have the numbers on it.

2          If you would put the arrow to "club tattoo would

3   require two years."  It's kind of -- keep going down, down,

4   down, down.  There you go.

5          "Club tattoo will require two years and you will be

6   accompanied by two tattooed brothers."

7          Is that what that says?  And that's a copy of the

8   bylaws you received?

9   A.  Yes.

10  Q.  You didn't wait two years, did you?

11  A.  No.

12  Q.  Did anyone give you a black eye for that?

13  A.  No.

14  Q.  You also indicated that you almost immediately became an

15  enforcer.

16  A.  Yes.

17  Q.  And you indicated that you didn't necessarily carry a

18  weapon, but firearms were always available to the enforcer.

19  A.  Yes.

20  Q.  Even though that would make you a felon in possession; is

21  that accurate?

22  A.  Yes.

23  Q.  That is one of your charges?  Or was, I should say?  It was

24  dismissed?

25  A.  I don't understand that question.  Could you say it one

1   more time?

2   Q.  You had a felon in possession of ammunition originally --

3   A.  Ammunition, yes.

4   Q.  -- in your indictment, and that was dismissed for the phone

5   charge, correct?

6   A.  Yes.

7   Q.  All right.  Thank you.

8           Now, you also said you remember the Blue Water

9   chapter?

10  A.  Yes.

11  Q.  And that's -- where is that located?

12  A.  In Fair Haven kind of, Ira Township.

13  Q.  You didn't start that chapter, though?

14  A.  No.

15  Q.  All right.  That's the chapter that you became a member of?

16  A.  Yes.

17  Q.  And you also indicated on Wednesday that you pretty quickly

18  became the president of that chapter.

19  A.  Yes.

20  Q.  Now, whose black eyes did you order?

21  A.  I don't recall.

22  Q.  You have no recollection of ordering somebody to get a

23  black eye?

24  A.  No.  I usually did it myself.

25  Q.  That was -- you took, you took the initiative to just punch

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. STOUT

22

1   people in the face?

2   A.   Yup.

3   Q.   All right.  Now, there was nowhere in the bylaws that you

4   just saw that to give someone a black eye, was there?

5   A.   I wasn't paying attention, no.

6   Q.   You never read the bylaws?

7   A.   Yes.

8   Q.   Do you want to look at them now?

9   A.   Sure.

10  Q.   Okay.

11        MS. STOUT:  Can I refresh his recollection, your

12  Honor?

13        THE COURT:  You can examine on this bylaw business.

14  BY MS. STOUT:

15  Q.   Just take a look at this to yourself.

16        THE COURT:  Go ahead with your questions.

17  BY MS. STOUT:

18  Q.   There's no bylaw about "black eye" policy, is there?

19  A.   No.

20  Q.   I'm just going to pick that up from you.  Thank you.

21        Now, you indicated that, on Wednesday, that you did

22  drugs for a long time?

23  A.   Yes.

24  Q.   Alcohol?

25  A.   Yes.

1   Q.  Pot?  Or marijuana?

2   A.  Yes.

3   Q.  Cocaine?

4   A.  Yes.

5   Q.  Methamphetamine?

6   A.  Yes.

7   Q.  Now, you indicated you did everything except

8   methamphetamine before you were a Devils Diciple?

9   A.  Yes.

10  Q.  And you did things after, as well?

11  A.  Yes.

12  Q.  And while you were a Devils Diciple, you said you got

13  methamphetamine from Vern Rich?

14  A.  Yes.

15  Q.  And you discussed something about him putting something in

16  a muffler.  Do you remember that testimony?

17  A.  Yes.

18  Q.  He had a brother who was a Hells Angel; is that accurate?

19  A.  No.

20  Q.  There was a question put to you Wednesday.

21      MS. STOUT:  Is it all right that I read the question,

22  your Honor?

23      THE COURT:  I'm sorry.  Go ahead.

24      MS. STOUT:  Should I refresh his recollection or can I

25  just read the question?

1          THE COURT:  I just suggest that you read it.

2          MS. STOUT:  Okay.

3    BY MS. STOUT:

4    Q.  The prosecutor asked you:  There was a time when Vern

5    showed you the meth that he brought back from California or

6    wherever, from Hells Angels out West?  And you said:  Yes.

7          Is that accurate testimony?

8    A.  He did, yes, did purchase it from the Hells Angels, but it

9    wasn't his brother.

10   Q.  Oh, okay.  So he purchased it from the Hells Angels?

11   A.  Yes.

12   Q.  All right.  And he brought it back.  And then he sold it

13   out here, in Michigan I presume, and wherever else?

14   A.  Assume, yes.

15   Q.  Okay.  Now, you bought some from him, both for your own use

16   and sale; is that accurate?

17   A.  Yes.

18   Q.  Okay.  And when you, when you got money from the sales, did

19   you pay your bills with that money?

20   A.  Possibly.

21   Q.  You have no recollection?

22   A.  I probably used it for my own use or consumption.

23   Q.  So you did that much meth that you had to keep buying it?

24   A.  Yeah.

25   Q.  You even said I think last Wednesday, and correct me if I'm

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. STOUT

25

1    wrong, that he fronted you drugs because you used so much, you

2    couldn't even cover the cost?

3    A.  Or I spent it.  Yeah, possibly spent it on other things.

4    Q.  All right.  Now, your members didn't give you money then?

5    A.  Pardon me?

6    Q.  Your members of the DDMC didn't give you money --

7    A.  No.

8    Q.  -- to buy it?

9    A.  No.

10   Q.  Even though you were president?

11   A.  Yes.

12   Q.  Okay.  And we talked about some of your interviews last

13   Wednesday.  And you testified the first time you were

14   interviewed was somewhere around the raid, or at least talked

15   to by the Special Agent Fleming, that would have been 2007;

16   does that sound right?

17   A.  2007.

18   Q.  The raid, there was a raid?  You had some words with

19   Special Agent Fleming?

20   A.  He -- yeah, I talked to him briefly.

21   Q.  And you lied to him --

22   A.  Yes.

23   Q.  -- at that point?  Okay.

24          And then, then he came back to see you to warn you to

25   watch your back or something to that effect; is that accurate?

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. STOUT

1   A.  Yes.

2   Q.  And you lied to him then, too, right?

3   A.  Yes.

4   Q.  And then I think it was April 2009, before you had an

5   attorney, I believe, you, you met with him again?

6   A.  In 2009?

7   Q.  I have a document that says April 2009.  So I'm assuming

8   the date on it is accurate.

9   A.  Okay.

10  Q.  And you testified that you weren't 100 percent truthful

11  then either, were you?

12  A.  I don't recall the meeting, though.  What was the meeting

13  about?

14  Q.  The prosecutor asked you:

15          "And were you 100 percent truthful with him at that

16  time?"

17          And you said, and you said:  "At that time, yes."

18          But at that time, you didn't tell him about the

19  motorcycle fraud, insurance fraud, correct?

20  A.  Correct.

21  Q.  Okay.  Now, then you were charged in about somewhere around

22  the end of '09, beginning of 2010, that's when you got an

23  attorney to represent you, correct?

24  A.  Yes.

25  Q.  And that's when you made the agreement with the Government

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. STOUT

1   that you would be a cooperator?

2   A.  Yes.

3   Q.  And then you gave many additional statements to Mr. Fleming

4   and the Government.

5   A.  Yes.

6   Q.  Is that true?

7          And you understood then, because you had an attorney,

8   that you had to substantially assist the Government in order to

9   get the reduction in your charges and the time that you wanted;

10  is that accurate?

11  A.  I don't know what kind of time I'm going to get.

12  Q.  Correct.  But you understand that you are required to give

13  substantial assistance; it's right in that agreement?

14  A.  Yes.

15  Q.  Okay.  Now, you were never charged with lying to a federal

16  agent, were you?

17  A.  No.

18  Q.  Based on the 2007 lies?

19  A.  No.

20  Q.  Or the one when Mr. -- Special Agent Fleming came to see

21  you, you weren't charged with those lies, were you?

22  A.  No.

23  Q.  And you weren't charged with lying to him or holding back

24  all of the truth, I think as you put it, in 2009, correct?

25  A.  I was not charged.  No.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. STOUT

1  Q.  And you testified last Wednesday that you stole -- you had

2  your motorcycle fraudulently -- you claimed to the insurance

3  company that your motorcycle was stolen, but it wasn't?

4  A.  Yes.

5  Q.  You were never charged with insurance fraud, were you?

6  A.  No.

7  Q.  Did you pay the insurance company restitution?

8  A.  No.

9  Q.  Did they sue you?

10  A.  No.

11  Q.  What did you do with that money?

12  A.  Paid bills.

13  Q.  Your own personal bills?

14  A.  Yes.

15  Q.  You weren't charged with a RICO; is that accurate?

16  A.  Yes.

17  Q.  And you are no longer charged with the 10-year mandatory

18  minimum drug offense; is that correct?

19  A.  That's correct.

20  Q.  You're charged with a four-year felony, correct?

21  A.  Yes.

22  Q.  With a motion, hopefully, that the Government is going to

23  file that you provided substantial assistance, so you'll get

24  less than four years, correct?

25  A.  Again, yes.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1   Q.  And you want the jury to believe you're telling the truth

2   today, right?  Even though you didn't tell the truth all those

3   other times?

4   A.  Yes.

5           MS. STOUT:  Thank you.

6           THE COURT:  Any other examination?

7           MR. DALY:  Yes.  Thank you.

8                   CROSS-EXAMINATION

9   BY MR. DALY:

10  Q.  Mr. Burby, without going back through what you said

11  Wednesday and today about your drug use, you would agree that

12  both your drug and alcohol use was extensive, right?

13  A.  Yes.

14  Q.  And that it covered a period beginning when you were a

15  teenager up until, say, about five years ago, approximately?

16  A.  Yes.

17  Q.  So we're talking about 20 years, ballpark, of drug and

18  alcohol abuse that you inflicted on yourself, right?

19  A.  Yes.

20  Q.  And you said Wednesday that during the time frame that

21  we're speaking about, that the drugs and alcohol affected your

22  personality, who you were, right?

23  A.  Yes.

24  Q.  And you were using marijuana, cocaine, and meth and a lot

25  of alcohol during the time period that we're speaking about,

```
 1   correct?

 2   A.  Yes.

 3   Q.  And one way that it affected your personality is that

 4   during that time period, you were unreliable, right?

 5   A.  I'm not understanding.  Unreliable in which matter?

 6   Q.  Well, in the sense that people couldn't trust you, people

 7   couldn't rely on you, because you were a drug addict and you

 8   were using a lot of alcohol, right?

 9   A.  I don't think that's accurate.

10   Q.  You don't think so?

11   A.  No.

12   Q.  You think that a person who is an addict and is using a lot

13   of alcohol is a reliable person?  That's what you're telling

14   the jury?

15   A.  Well, I got up and I went to work every day.  And, you

16   know, I had -- was -- yeah.  I don't think I had that much of a

17   problem with it.

18   Q.  So you're saying that during this time period when you're

19   using drugs and alcohol, people could trust you, believe what

20   you were saying, right?

21   A.  Yes.

22   Q.  Even though you were lying at that time, right?

23   A.  I don't know what I was lying about.

24   Q.  Well, you lied to the federal agents; we know that, right?

25   A.  Okay.  Yeah.
```

1 Q. Right?

2    And you know what an addict is, don't you?

3 A. Yes.

4 Q. Because you are an addict, right?

5 A. Yes.

6 Q. And if an addict came to you, would you trust an addict to

7 tell you the truth?

8 A. I don't know.

9 Q. Probably not, right?

10 A. I don't know.

11 Q. Okay.  Isn't an addict somebody who is untrustworthy, a

12 liar, a thief?

13 A. Well, I'm not a thief.  I have lied.

14 Q. Right.  And you knew addicts?

15 A. I don't consider myself untrusty -- untrustworthy.  I guess

16 it depends on the person.

17 Q. Okay.  But generally speaking, you were among other

18 addicts, right?

19 A. Yeah.

20 Q. And you knew that you wouldn't trust them, right?

21 A. That's not true.

22 Q. That's not true?  You, you personally will trust a person

23 who is an addict and uses a lot of alcohol; that's what you're

24 saying, right?

25 A. Given the right person, yeah.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1  Q.  When you developed these habits of using drugs and alcohol,

2  did you do that freely?

3  A.  Could you repeat that?

4  Q.  Did you consume drugs and alcohol on your own freely?

5  A.  Sure.

6  Q.  Voluntarily?

7  A.  Yes.

8  Q.  That was your choice, right?

9  A.  Yes.

10 Q.  Okay.  And isn't it true that, Mr. Burby, you were using

11 meth before you became a member of the Devils Diciples?

12 A.  Yes.

13 Q.  And last Wednesday, you told the jury that you stopped

14 using drugs about five years ago, in 2009, April of 2009 when

15 you were arrested; is that correct?

16 A.  Yes.

17 Q.  And in April of 2009, you were under arrest, weren't you?

18 A.  (No response.)

19 Q.  April 2nd, to be specific?

20 A.  Yes.

21 Q.  And you were bought -- brought into federal court, correct?

22 A.  Yes.

23 Q.  On a complaint, charging you with a federal offense, right?

24 A.  Yes.

25 Q.  And did the Government agree at that point to allow you to

1   be released on bond?

2   A.  Yes.

3   Q.  The Government could have said we want Mr. Burby detained

4   with no bond, but they didn't take that position, did they?

5   A.  They did not.

6   Q.  Okay.  And that was important to you, to be allowed to be

7   back out on bond; that was a benefit that the Government, in

8   essence, agreed to, right?

9   A.  Yes.

10  Q.  And when you had your bond and you were in court, the judge

11  told you at that point that you would be released on certain

12  conditions, correct?

13  A.  Yes.

14  Q.  And one of the conditions would be that you wouldn't

15  violate any state or federal law, right?

16  A.  Yes.

17  Q.  You wouldn't consume any drugs?

18  A.  Yes.

19  Q.  And were you sworn at that time to promise to abide by

20  those conditions; do you remember that?

21  A.  Yes.

22  Q.  And you broke your promise to the judge, didn't you?

23  A.  Elaborate, please?

24  Q.  Did you violate your conditions of bond?

25  A.  I don't know.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

34

1   Q.  Well, isn't it true that after you were placed on bond, and

2   under oath you promised not to violate the law, you continued

3   to use meth?

4   A.  No.

5   Q.  Didn't you tell Agent Fleming that while you were on bond,

6   that you tested positive for meth?

7   A.  I don't recall that.

8   Q.  Okay.  So if I told you that on a particular time you said

9   that, would that help you?

10  A.  It might.

11  Q.  On January 12th of 2010, with an interview with William

12  Fleming and David Opperman, did you say, "Burby stated that he

13  continued using meth until shortly before he was arrested by

14  the FBI in April of 2009.  Burby stated that he tested positive

15  for meth when he was tested by Pretrial Services."

16          You said that, didn't you?

17  A.  That was prior to the arrest.  That was the same time of

18  the arrest.

19  Q.  Well, you don't -- you're not placed on Pretrial Services

20  bond until after your arrest, correct?

21  A.  Correct.

22  Q.  And didn't you go into Pretrial Services and they checked

23  you for drugs?

24  A.  Yes.

25  Q.  And didn't you test positive for meth by Pretrial Services?

1    A.  Yes.

2    Q.  So in fact, after you were placed on bond, you were still

3    using meth, weren't you?

4    A.  No.

5    Q.  Oh, so they just tested you positive for meth, but you

6    weren't using meth, correct?

7    A.  Up until the 9th.  After that, no, I didn't use.

8    Q.  All right.

9    A.  They tested me the same day that I had to go to Pretrial

10   Services, which was the 9th.

11   Q.  And were you tested positive on any other date?

12   A.  No.

13   Q.  And you're certain about that?

14   A.  Yes.

15   Q.  Okay.  Now, besides the meth that we've been talking about,

16   you weren't supposed to commit any other crimes; we know that,

17   correct?

18   A.  Yes.

19   Q.  And we know that you violated that, because you were

20   charged with drunk driving, right?

21   A.  Yes.

22   Q.  That was a violation of your condition of bond?

23   A.  Yes.

24   Q.  And you were arrested with that -- on that charge?

25   A.  Yes.

1    Q.  And were you summoned to go to court on that charge?

2    A.  Yes.

3    Q.  Did the Government, when you were charged with a crime that

4    violated your bond, did they come to court and seek to revoke

5    your bond?

6    A.  No.

7    Q.  And so apparently the rules don't apply to you about

8    violating bond because you're on the Government's team, right?

9    That's how you see this, right?

10   A.  No, not really.

11   Q.  Not really?  Well, why shouldn't you be in jail now?

12   A.  I don't know.

13   Q.  You don't know?

14   A.  No.

15   Q.  You don't think it has anything to do with the fact that

16   you're cooperating with the Government, that you're still out

17   on bond?  You violate conditions of bond, and then you can walk

18   into court and walk right out.  You don't think that has

19   anything to do with the fact that you're on the Government's

20   team?

21   A.  I never really put thought into it.

22   Q.  Mr. Burby, do you remember in December of 2007 that a

23   search warrant by the Federal Government was executed at your

24   house?

25   A.  Yes.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1    Q.   And you were present?

2    A.   Yes.

3    Q.   And was Mr. Fleming one of the agents that was present at

4    the time?

5    A.   Yes.

6    Q.   And did he question you about certain things at the house

7    when you were there and they were executing the warrant?

8    A.   Yes.

9    Q.   Do you remember him telling you that they, meaning the

10   federal law enforcement officers who were present, were looking

11   for drugs or drug-related items?

12   A.   Yeah.

13   Q.   Okay.  And do you remember that you said to, to Mr. Fleming

14   that they would not find any drug-related items in your house?

15   That's what you said, right?

16   A.   Yes.

17   Q.   And that ended up not being true, right?

18   A.   Yes.

19   Q.   Because when they started searching your house, they found

20   components of a marijuana drug operation that you had been

21   conducting at your house; isn't that correct?

22   A.   Yes.

23   Q.   So now the Federal Government knew at that point that you

24   had been growing marijuana on your premises, right?

25   A.   Yes.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1    Q.   That you had lied to them about it, right?

2    A.   Yes.

3    Q.   Okay.  And the Federal Government never charged you for

4    either lying about that, or that the fact that you were growing

5    marijuana on your premises; you were never charged, correct?

6    A.   Yes.

7    Q.   And at that time, Mr. Fleming asks you whether or not you

8    had been a member of the Devils Diciples, correct?

9    A.   Yes.

10   Q.   And you told him another lie in saying to him at this time

11   you had only been a member for a few months; do you remember

12   that?

13   A.   Yes.

14   Q.   That was not true?

15   A.   Correct.

16   Q.   That was a fiction that you created to protect yourself,

17   right?

18   A.   Yeah.

19   Q.   All right.

20   A.   Yes.

21   Q.   Okay.  And you also, at the time when asked about dealing

22   in meth, said that you were not having any drug-dealing

23   relationship with Vern Rich, right?

24   A.   Yes.

25   Q.   You denied receiving meth from Rich, correct?

1   A.  Yes.

2   Q.  I mean, you looked, you looked this man right in the eye,

3   law enforcement, and was telling him what was going on in your

4   mind, right?

5   A.  (No response.)

6   Q.  Knowing that it was all a lie, right?

7   A.  Yes.

8   Q.  Knowing that he was a federal officer, right?

9   A.  Yes.

10  Q.  And you did that, you told this story because you didn't

11  want to be arrested, essentially?

12  A.  (No response.)

13  Q.  I mean, you wanted to protect yourself?

14  A.  Yeah.

15  Q.  Right.

16  A.  Yes.

17  Q.  Yeah.  You're lying to protect yourself by telling law

18  enforcement that you weren't involved in meth dealing, right?

19  Is that right?

20  A.  Yes.

21  Q.  And you lied even more than just how long you had been a

22  member, whether or not you were dealing meth.  You lied about

23  your position in the Blue Water chapter, right?

24  A.  Yes.

25  Q.  Because when Mr. Fleming asked you what your position was,

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

40

1   you said you weren't the vice president, right?

2   A.   Yes.

3   Q.   When, in fact, you were?

4   A.   Yes.

5   Q.   So you lied about a number of things, right?

6   A.   Yes.

7   Q.   All for your own benefit?

8   A.   Yes.

9   Q.   To help yourself, right?

10  A.   That's correct.

11  Q.   Just like your testimony here with this jury, all for your

12  benefit, all lies, right?

13  A.   No.   It's not all lies.

14  Q.   But for your benefit, for sure, right?

15  A.   Yes.

16  Q.   I mean, you're here for one person, and that one person is

17  Danny Burby, right?

18  A.   Yes.

19  Q.   When the Government came and executed this warrant in

20  December of 2007, were you a convicted felon?

21  A.   Yes.

22  Q.   You knew that the Government had been executing warrants at

23  different locations before they came to your house in December

24  of 2007, right?

25  A.   Yes.

1    Q.  And you had a weapon in your house before they came and

2    executed the search warrant, didn't you?

3    A.  Yes.

4    Q.  You had a shotgun, right?

5    A.  Yes.

6    Q.  And you knew that that shotgun should not be in your house,

7    because as a convicted felon, you are not allowed to possess a

8    firearm, correct?

9    A.  Yes.

10   Q.  And so you had the shotgun removed, out of your house,

11   before they came and executed the search warrant, correct?

12   A.  Yes.

13   Q.  And did you tell the Government about that weapon in your

14   house before they executed the search warrant?

15   A.  (No response.)

16   Q.  Do you remember telling them about that?

17   A.  I'm not understanding.

18   Q.  Okay.  When they came and executed the search warrant, they

19   were asking you about drugs and weapons on the premises, right?

20   A.  Mh-hm.

21   Q.  Is that a yes?

22   A.  Yes.

23   Q.  And one of the things that you said was, there used to be a

24   shotgun here, but I had it taken out of the house.  Do you

25   remember now telling them that?

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1   A.  Yes.

2   Q.  Okay.  And the reason why you got it out of the house is

3   that you thought that if the Feds came to your house and

4   executed a search warrant and found a weapon, you could be

5   charged with felon in possession, right?  Being a convicted

6   felon?

7   A.  Yeah.  I kept it over at my sister's house and my

8   brother-in-law's house.

9   Q.  But --

10  A.  It was deer-hunting -- it was around deer-hunting season.

11  You know, I went and got it, I deer-hunted, and then I took it

12  back to my sister's.

13  Q.  Well, you know as a felon, it doesn't matter whether you're

14  keeping it for hunting, protection, whatever.  As a convicted

15  felon, you cannot have a weapon, correct?

16  A.  Yes.

17  Q.  And you had a weapon at your house; you got rid of it

18  because you didn't want to be charged with being a felon in

19  possession if they executed a warrant at your house, correct?

20  A.  Yes.

21  Q.  The Government knew about that, because you told them,

22  correct?

23  A.  I don't recall.

24  Q.  Okay.  Have you ever been charged with being a felon in

25  possession?

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

43

1    A.   Yes.

2    Q.   You have?

3    A.   The possession of ammunition.

4    Q.   Okay.  But not the shotgun?

5    A.   No.

6    Q.   All right.  Let me draw your attention to February 2009 at

7    the Lighthouse bar.

8              You told the jury back on Wednesday that at that

9    point, you were no longer a member of the Devils Diciples,

10   correct?

11   A.   Correct.

12   Q.   And you were not an informant at that point?

13   A.   Yes.

14   Q.   You are now?

15   A.   Yes.

16   Q.   Back then, you were not a snitch?

17   A.   Correct.

18   Q.   Now you are?

19   A.   Correct.

20   Q.   In February 2009, there were rumors about you being a

21   snitch, right?

22   A.   Yes.

23   Q.   That were not true?

24   A.   Correct.

25   Q.   And you didn't like that in particular, did you?

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1   A.   No.

2   Q.   People in the Devils Diciples Motorcycle Club were

3   spreading, excuse me, rumors about you, right?

4   A.   Yes.

5   Q.   They were lying about you, correct?

6   A.   Correct.

7   Q.   And that's not uncommon in the biker world for people to

8   lie about what's going on among members, right?

9   A.   I guess.

10   Q.   I guess.  Well, you're one of those people in the club,

11   right?

12   A.   Yes.

13   Q.   And you lied when you were a member of the club, right?

14   A.   Yes.

15   Q.   And other people lied about you, too, right?

16   A.   Correct.

17   Q.   Okay.  Before the incident where there was this scuffle

18   outside, you had met with Rockin' Ronnie, right?

19   A.   Yes.

20   Q.   And the purpose of the meeting was to discuss this rumor,

21   in essence, about you leaving the club on bad terms and you

22   being a snitch.  Essentially that's what it was about, right?

23   A.   Yes.

24   Q.   You told the jury that when Rockin' Ronnie wanted to come

25   to you and talk to you about this, you, in effect, encouraged

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

45

1   the conversation, the confrontation, right?

2   A.  Yes.

3   Q.  Right.  You invited it, because you didn't want to back

4   down?

5   A.  Correct.

6   Q.  You didn't want to look like a "punk" or a sissy, so to

7   speak, when you were being accused of being a snitch, right?

8   A.  I guess, yes.

9   Q.  Right.  I mean, that's what you wanted to do.  You were not

10  intimidated by it?

11  A.  No.

12  Q.  You weren't scared by it?

13  A.  No.

14  Q.  So you and Ronnie are talking about this.  And Ronnie,

15  Rockin' Ronnie says, all right, I'm going to go back and get

16  some information, and we'll talk again.  Essentially, that's

17  what happened?

18  A.  Yes.

19  Q.  Then on February 14th, 2009, you're back at, at the bar.

20  This is a Friday now, right?

21  A.  Saturday.

22  Q.  Okay.  Well, the Friday before, you heard that Rockin'

23  Ronnie and his friends were up at the bar looking for you?

24  A.  Yes.

25  Q.  Right.  And you suspected that it had to do something with

1   the subject matter that you and Ronnie had been talking about

2   earlier, right?

3   A.  Correct.

4   Q.  Friday night, you're not at the bar?

5   A.  That's correct.

6   Q.  You hear that Ronnie and his friends were up there looking

7   for you, right?

8   A.  Yes.

9   Q.  And you decide that on the next day, Saturday, that you're

10  going to go back up at the bar and be there, right?

11  A.  Yes.

12  Q.  And one of the reasons that you're up there, is that you

13  expect that Ronnie and his buddies are coming back?

14  A.  I was going to go up there regardless, but, yeah.

15  Potentially, yes.

16  Q.  Okay.  So now, you're sitting up there not by yourself, but

17  two other guys at least?

18  A.  Yes.

19  Q.  And the reason why the other two guys are up there is that

20  you expect Ronnie and his buddies to come back to the bar?

21  A.  It was a possibility, yes.

22  Q.  Right.  And in fact, not only was it a possibility, it was

23  an expectation on your part because you stayed through the

24  night, late into the night waiting for them to show up.

25  A.  No.  I, I stayed there because that's where my girlfriend

1   worked and I was waiting for her to get off.

2   Q.  Okay.  Fair enough.

3         And in any event, you and your buddies are at the bar,

4   right?

5   A.  Yes.

6   Q.  You've heard that Ronnie and his friends are looking for

7   you, correct?

8   A.  Yes.

9   Q.  And then late at night, they show up, correct?

10  A.  Correct.

11  Q.  And when they walk in, it's Ronnie, Rockin' Ronnie, Randy,

12  Damien, and Wayne Werth; is that right?

13  A.  Correct.

14  Q.  And you referred to them, the group, as a group, as being a

15  scrawny group of guys, right?

16  A.  I don't recall that.

17  Q.  You don't remember that?

18  A.  No.  I don't recall that.

19  Q.  On Wednesday when you were testifying, were you asked these

20  questions and did you give these answers?

21         MS. MOHSIN:  Can I have a page number?

22         MR. DALY:  I'm sorry.  154.

23         MS. MOHSIN:  Thank you.

24  BY MR. DALY:

25  Q.  And this is line 6:

1      "Question:  And why did you assume that there was a

2  weapon?

3          Answer:  Well, I knew none of them were really going

4  to come at me and fight me one-on-one, face-to-face.

5          Question:  Why is that?

6          Answer:  Because they didn't pose a threat to me, I

7  didn't feel.  You know, and none of them were really of

8  anything.  They were all kind of scrawny.  They were all kind

9  of -- none of them were really much of anything."

10         Did you testify to that under oath last Wednesday?

11  A.  Yes.

12  Q.  Okay.  Now, you had been in bar fights before, I assume,

13  before this date?

14  A.  Yes.

15  Q.  And you can handle yourself, right?

16  A.  Yes.

17  Q.  I mean, you're sort of a beefy kind of guy, sort of thick?

18  A.  Yes.

19  Q.  And part of being a biker was being able to handle yourself

20  in a bar; mix it up, if necessary?

21  A.  I'm not really sure about that question.  I mean --

22  Q.  What is it that you're not sure -- I'm sorry.

23  A.  -- they had bikers that were scrawny and they had bikers

24  that were beefy.  They had bikers that were all different

25  sizes.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1  Q.  But we're talking about you being beefy and handling

2  yourself in a bar, right?

3  A.  Okay.

4  Q.  I mean, you thought back then you could handle yourself,

5  right?

6  A.  Yes.

7  Q.  And you weren't afraid of Ronnie and his buddies, other

8  than the fact that maybe one of them had a weapon, right?

9  A.  Correct.

10  Q.  And Ronnie, you said, Rockin' Ronnie was the "mouthpiece."

11  He was the one who was running his mouth?

12  A.  Correct.

13  Q.  He walks in, gets in your face and starts jaw-jacking with

14  you?

15  A.  Yes.

16  Q.  And you're yelling back at him, essentially?

17  A.  Essentially.

18  Q.  Right.  And it's the girls that come and break it up?

19  A.  Yes.

20  Q.  And when the girls come and break up this jaw-jacking

21  between you and Ronnie, then Randy, Damien, and Wayne Werth go

22  over to the pool table, right?

23  A.  Correct.

24  Q.  And they are shooting pool.

25  A.  That's correct.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1   Q.  Right?
2           And then you say that after this conversation, Ronnie
3   leaves out, by himself, out of the bar?
4   A.  Correct.
5   Q.  He goes out the back door by himself.
6   A.  Yes.
7   Q.  Right?
8           And you immediately followed, followed Ronnie out the
9   back door, right?
10  A.  Not immediately, but --
11  Q.  Very close?
12  A.  Yes.
13  Q.  And the reason why you went after Ronnie out the back door
14  is you wanted to catch him by himself, right?
15  A.  Correct.
16  Q.  So that you could confront Ronnie and fight him one-on-one,
17  right?
18  A.  Confront, yes.
19  Q.  And fight him, both.
20  A.  Confront, yes.
21  Q.  Well, you were the one who came outside following Ronnie
22  and you threw the first punch, correct?
23  A.  I don't recall.
24  Q.  On Wednesday, this is page 166, lines 12 and 13, were you
25  asked this question and did you give this answer:

1        "Question:  So what happens then?

2        Answer:  Well, I immediately went right at Rockin'

3  Ronnie and threw blows, punched.  He fought back a little bit,

4  and got a couple of more punches in.  And then Wayne Werth had

5  grabbed me.  And we both went up against the wall and kind of

6  fought for a little bit.  And other guys were getting into it,

7  you know.  Rockin' Ronnie was --"

8        And then the prosecutor asked another question.

9        Were you asked that question and did you give that

10 answer?

11 A.  Yes.

12 Q.  So you threw the punches first, according to your testimony

13 under oath Wednesday, correct?

14 A.  I don't recall that.  I recall going up to him first, but

15 it doesn't state whether or not I threw the first punch.  And

16 I --

17 Q.  I'll read it again.

18 A.  I don't really recall.  I said that I did throw blows, but

19 I don't recall if he threw blows first or I threw blows first.

20 Q.  Well, we're doing two different things here.  I'm asking

21 you did you say this under oath, and your answer is yes, right?

22 A.  Yes.

23 Q.  So you said, "Well, I immediately went right at Rockin'

24 Ronnie and threw blows and punched."

25        You said that under oath, correct?

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1   A.  Yes.

2   Q.  That was true then?

3   A.  Yes.

4   Q.  It's true today or are you going to change your testimony?

5   A.  No.

6   Q.  It's true still today?

7   A.  Yes.

8   Q.  So you threw the first punch, correct?

9   A.  I don't recall that.

10  Q.  All right.  Even though you testified to it under oath

11  yesterday and admit that it's true today, now you're saying you

12  don't recall, right?

13  A.  I don't recall who threw the first blow.

14  Q.  All right.  In any event, you and Ronnie are fighting,

15  fist-fighting, correct?

16  A.  Yes.

17  Q.  And are you hitting Ronnie?

18  A.  Yes.

19  Q.  Is Ronnie fighting back?

20  A.  Yes.

21  Q.  And in fact, you were never assaulted by Ronnie at that

22  point; it's just two guys fighting, right?

23  A.  Yes.

24  Q.  And while the two of you are fighting, then Wayne Werth

25  comes and he's involved in it, too, right?

1  A.  Yes.

2  Q.  He grabs you and pulls you up off of Ronnie, right?

3  A.  Yes.

4  Q.  Because you had fallen on the ice?

5  A.  That was after.

6  Q.  Oh, after.  I'm sorry.

7        But you get the best of Ronnie, you're on top of

8  Ronnie, right?

9  A.  It wasn't -- neither one of us were on the ground at this

10 time.  No.

11 Q.  Okay.

12 A.  We were up against the building.

13 Q.  So Ronnie, Rockin' Ronnie is smaller than you?

14 A.  Yes.

15 Q.  I mean, he's skinnier?

16 A.  Yes.

17 Q.  Scrawnier?

18 A.  (No response.)

19 Q.  Right?  I mean, you're tougher than Ronnie?

20 A.  I don't know.

21 Q.  What do you mean you don't know?  Come on.  You're the

22 tough guy.  You're the beefy guy.  You're in a fight that you

23 went out and picked with Ronnie.  You're the one who is beating

24 up Ronnie initially, right?

25 A.  No.  I didn't go there and pick a fight.  I was at the bar.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1   He came there.

2   Q.  No.  I'm talking about outside, you went out to pick the

3   fight with him?

4   A.  Oh.

5   Q.  Right?

6   A.  I didn't really go out there to pick a fight.  I went out

7   there to confront him.

8   Q.  Just to talk?

9   A.  Right.

10  Q.  Even though you go out to talk and you throw the first

11  punch.

12  A.  I didn't throw the first punch.  I don't recall who threw

13  the first punch.

14  Q.  You don't recall it, but you don't deny it; those are two

15  different things, aren't they?

16  A.  I don't recall.

17  Q.  Because you were drunk?

18  A.  Possibly, yes.

19  Q.  High on drugs?

20  A.  Possibly, yes.

21  Q.  Okay.  So now you and Ronnie are fighting.  Wayne Werth

22  pulls you off, right?

23  A.  Mh-hm.

24  Q.  Is that a yes?

25  A.  Yes.

1  Q.  And the reason why Wayne Werth is pulling you off is you're

2  getting the best of Ronnie, right?

3  A.  I don't know why.

4  Q.  You don't remember?

5  A.  No.

6  Q.  Too drunk?

7  A.  Possibly.

8  Q.  Then while Wayne Werth has you, you fall on the ice?

9  A.  Yes.

10 Q.  He didn't knock you down, did he?

11 A.  I don't recall.

12 Q.  What you do recall is you slipped on the ice, you fell with

13 Wayne Werth, correct?

14 A.  He never fell to the ground.

15 Q.  You did?

16 A.  I did.

17 Q.  Okay.  Then your friends that are in the bar, they come out

18 about then, right?

19 A.  I don't know when they came out.

20 Q.  But they do come out?

21 A.  They do come out.

22 Q.  And they get involved in this?

23 A.  One does, yes.

24 Q.  Okay.  So now basically, it's a free-for-all?  Right?

25 A.  What's a free-for-all?

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1   Q.  You got your guys fighting, you've got Ronnie and them guys

2   fighting.  Everybody is fighting, right?

3   A.  Yeah.  I don't know what's going on around me at this time.

4   Q.  But as far as you can tell, even though you're drunk or

5   high, this is basically a brawl outside of a bar, right?

6   A.  Yeah.

7   Q.  Okay.  And you said at one point Wayne pulled out a knife;

8   is that what you said?

9   A.  Yes.

10  Q.  Or was it a box cutter?

11  A.  Yes.

12  Q.  Or you don't know?

13  A.  A box cutter.

14  Q.  Well, which one is it?  Those are two different things.

15  A.  It was a box cutter.

16  Q.  Why did you tell the jury it was a knife?

17  A.  A knife is a knife.  If it cuts you, I think it's a knife.

18  Q.  But there's a difference between a knife and a box cutter,

19  right?

20  A.  (No response.)

21  Q.  Right?

22  A.  Yes.

23  Q.  Why did you tell the jury it was a knife when it wasn't?

24  A.  I think a box cutter is a knife.

25  Q.  So Wayne is swinging this box cutter or knife at you,

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

```
 1   right?

 2   A.  Yes.

 3   Q.  And you're so fast that he never cuts you, does he?

 4   A.  Well, I've got my feet up trying to, like, kick him away.

 5   Yeah.

 6   Q.  Well, did he cut your feet?

 7   A.  No.

 8   Q.  Cut your shoe?

 9   A.  No.  He was trying to cut me.

10   Q.  Did he cut your feet?

11   A.  No.

12   Q.  Did he cut your shoes?

13   A.  Not that I --

14   Q.  Did he cut your pants?

15   A.  No.

16   Q.  Did he cut your arm?

17   A.  No.

18   Q.  Did you even get a nick?

19   A.  No.

20   Q.  And then it was Wayne Werth that eventually goes over to

21   the vehicle, and then fires the shots in the air, right?

22   A.  Yes.

23   Q.  And that stops the fight?

24   A.  (No response.)

25   Q.  That's when people disperse, right?
```

 1  A.  Yes.

 2  Q.  That's the end of it?

 3  A.  It is.

 4  Q.  And because this was such a serious offense on you, you

 5  went and filed a police report immediately, right?

 6  A.  No.

 7  Q.  You never filed a police report, did you?

 8  A.  No.

 9  Q.  There was no reason to, was there?

10  A.  No.

11  Q.  You didn't feel like you had been assaulted, right?

12  A.  I had been assaulted, but I didn't feel it was an issue.

13  Q.  Well, who assaulted you?

14  A.  Rockin' Ronnie, Wayne Werth, both of them.

15  Q.  Okay.  Ronnie -- Rockin' Ronnie assaults you with his

16  mouth, running his mouth, right?

17  A.  That is an assault in one case.

18  Q.  That's an assault.  Yelling at you is an assault?

19  A.  Telling you're going to harm me in, in matters is an

20  assault, correct.  The battery part came after.

21  Q.  He threatened you?

22  A.  Correct.

23  Q.  But he didn't do anything to you, other than threaten you,

24  right?

25  A.  He punched back, yes.

59

1  Q.  He punched back at you?

2  A.  Yup.

3  Q.  Did you go to the police and say I got into a bar fight and

4  Rockin' Ronnie punched back at me?  Did you do that?

5  A.  No.  He came to me.

6  Q.  They came to you, meaning Mr. Fleming came to you, right?

7  A.  Yes.

8  Q.  So you get a little bump on your head in this fight, right,

9  for being hit?

10  A.  Yes.

11  Q.  You got a sore jaw, right?

12  A.  Beer bottle over the head, yes.

13  Q.  No medicals?  You didn't go to the doctor's, right?

14  A.  No.

15  Q.  And days after now, from out of nowhere, as far as you're

16  concerned, Mr. Fleming shows up at your door, right?

17  A.  Two days later, yes.

18  Q.  Two days.

19      What was the federal crime that was committed that Mr.

20  Fleming came to talk to you about?

21  A.  I'm not understanding.

22  Q.  What was the federal crime that Mr. Fleming was coming to

23  talk to you about in this bar fight?

24      MS. MOHSIN:  Objection.  He says he doesn't

25  understand.

1        MR. DALY:  That's why I repeated it and said it in a

2  different way.

3        THE COURT:  Assumes a fact in evidence.  Sustained.

4  BY MR. DALY:

5  Q.  Did you know why the FBI was coming to talk to you about a

6  bar fight?

7  A.  I assume because there was a weapon involved and they were

8  Devils Diciples and had already made threats on my life.

9  That's why.

10 Q.  That's what you assume?

11 A.  Yes.

12 Q.  Okay.  And when Mr. Fleming came and spoke to you, you have

13 already told the jury, this is the second time you talked to

14 him at this point?  The first time had to do with the poster,

15 right?

16 A.  Yes.

17 Q.  This is the second time?

18 A.  Yes.

19 Q.  And at that time, you lied to him again, yes?

20 A.  About?

21 Q.  About something, didn't you?

22 A.  I don't recall that meeting.  I don't know.

23 Q.  Did you tell Agent Fleming that you believed that the

24 confrontation was because you had left the DDMG in bad standing

25 and they believed you were an informant for the police?  Do you

1   remember saying that?

2   A.   Yes.

3   Q.   And then you said --

4   A.   That's the truth.

5   Q.   That's the truth.

6        And then you explained that recently your motorcycle

7   had been stolen.  You said that, too, didn't you?

8   A.   Yes.

9   Q.   And that was a lie?

10  A.   Yes.

11  Q.   Because it hadn't been stolen, right?

12  A.   Correct.

13  Q.   So this is the second time that you were speaking to Agent

14  Fleming and you were lying to him, right?

15  A.   Yes.

16  Q.   And when this stolen motorcycle incident happened, that was

17  something that you and Ms. Richards cooked up together, right?

18  A.   Yes.

19  Q.   All right.  We'll come back to that in a minute.

20        You also said that members of the Devils Diciples

21  could be disciplined for violating rules, right?

22  A.   Yes.

23  Q.   And when a rule was violated, depending on the nature of

24  the rule, you could either be fined or socked in the eye?

25  A.   You could be, yeah.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1    Q.  Right.  That, that might be your choice, right?

2    A.  Yes.

3    Q.  Pay a fine; get a punch in the eye, right?

4    A.  Yes.

5    Q.  Okay.  And when Ms. Stout, the lawyer before me, was asking

6    you questions, you said that you had either ordered or punched

7    somebody in the eye in the club before, right?

8    A.  Yes.

9    Q.  Do you know how many times you did that?

10   A.  No.

11   Q.  More than once?

12   A.  Yes.

13   Q.  Less than 10?

14   A.  Yes.

15   Q.  Okay.  And did you ever get punched in the eye?

16   A.  No.

17   Q.  The concept in this disciplinary part about getting punched

18   in the eye was that the members knew what the rules were.  If

19   you violated a rule, you're either fined or punched, right?

20   You said that, correct?

21   A.  Yes.  Correct.

22   Q.  And if you got punched, it was because the person who was

23   getting punched agreed to it, right?

24   A.  I don't know if they agreed to it.

25   Q.  Well, they could have paid the fine.  They could say I

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1    don't have the money, I'm not going to pay the fine, I'll take

2    the punch instead, right?

3    A.   No.   It wasn't like that.

4    Q.   Well, the idea about being punched is that you would stand

5    there as a member, and another member would punch you in the

6    eye and you wouldn't retaliate.   That's essentially what it is,

7    right?

8    A.   No, not necessarily.

9    Q.   That's not what it is?

10   A.   No.   No.   It was usually ordered from somebody high up.

11   Fat Dog or Pauli would say hey, you know, get a control of your

12   guy, take care of it however you got to do it, or you know,

13   he's acting like an ass.   He's not up -- you know, he's not

14   acting like he should be acting.

15   Q.   Okay.   So you're not familiar with what is commonly

16   referred to as the "black eye" policy of getting punched,

17   standing there and taking a punch?

18   A.   No.

19   Q.   You're not familiar with that?

20   A.   No.   I'm not familiar with that.

21   Q.   Okay.   Fair enough.

22        When you punched other members, did they go file

23   police reports against you, as far as you know?

24   A.   No.

25   Q.   No.   Because that was part of the agreement, right?

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

64

1  A.  I don't know what the agreement was.  I am not

2  understanding.  None of it is an agreement.

3  Q.  Well, the understanding was, is that if somebody was

4  disciplined, they wouldn't run off to the police department and

5  say Dan Burby beat me up?  I mean, that's essentially what the

6  understanding is, right?

7  A.  Yes.

8  Q.  Now, you said that your girlfriend, Michelle Richards, was

9  somebody who had caused you problems in the club, right?

10  A.  Yes.

11  Q.  And the problems that she caused, in part, had to do with

12  her drinking and being obnoxious.  Those are the words that you

13  used back on Wednesday, right?

14  A.  Yes.

15  Q.  And then you told the jury about an incident involving Fat

16  Dog, right?

17  A.  Yes.

18  Q.  That's not the only incident that you had with other club

19  members involving Michelle Richards, is it?

20  A.  Probably not.

21  Q.  Probably not.

22         Because on other occasions, in parties involving

23  Michelle Richards, other club members might touch her

24  inappropriately, as far as you were concerned?

25  A.  Yes.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

1    Q.   Yeah.   Like Clifford Rhodes?   Do you remember that?

2    A.   Yes.

3    Q.   You had a Halloween party.   And Clifford Rhodes, who was a

4    member of the Devils Diciples, right?

5    A.   Yes.

6    Q.   And he was touching her in a way that you didn't like?

7    A.   That's correct.

8    Q.   On her butt?

9    A.   That's correct.

10   Q.   And you told him to stop?

11   A.   Yes.

12   Q.   And he didn't?

13   A.   Yes.

14   Q.   And you beat him up?

15   A.   Yes.

16   Q.   You're fighting over a woman?

17   A.   Yes.

18   Q.   In the club?

19   A.   Yup.

20   Q.   When you left the club, Mr. Burby, you were not happy with

21   the club, were you?

22   A.   No.

23   Q.   You took your colors, your patch, put them out on the

24   porch.   Somebody, you don't even know who, came by and picked

25   them up?

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY
66

1    A.  Yes.

2    Q.  You didn't like the fact that they were spreading rumors

3    about you, right?

4    A.  That's correct.

5    Q.  There was bad blood between you and the club?

6    A.  Yes.

7    Q.  And at one point, you needed money because you were going

8    to go to jail?

9    A.  Yes.

10   Q.  So you and Michelle Richards devised a fraudulent scheme to

11   get money, the insurance fraud, right?

12   A.  Yes.

13   Q.  And did she call that in or did you call it in?

14   A.  I called it.

15   Q.  You picked up a phone, you talked to an insurance agent,

16   and made a false representation, right?

17   A.  I called the police department and reported the bike

18   stolen.  I believe she called the insurance company.

19   Q.  So both of you used the phone to make false

20   representations, one to the police department, one to the

21   insurance company?

22   A.  Yes.

23   Q.  And you know that that's wire fraud; that that's a federal

24   offense for which you can get up to 20 years in prison?

25   A.  I did not.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. DALY

67

1    Q.   Did not?  Did you tell the Government about this?  Do they

2    know all about this?

3    A.   (No response.)

4    Q.   Have you been charged with a 20-year offense involving wire

5    fraud?

6    A.   No.

7    Q.   No.  A free crime, right?

8            MS. MOHSIN:  Your Honor, he's already testified he

9    doesn't know.  This assumes facts not in evidence.

10           THE COURT:  Sustained.

11   BY MR. DALY:

12   Q.   What you were doing is not only filing a false report, but

13   you wanted to blame the club, too.  That was the other part of

14   the deal, right?  You lied about that?

15   A.   It wasn't to blame the club.  It was to -- they would

16   believe it probably more so.

17   Q.   Right.  But you are the one that filed a false police

18   report claiming that the glove -- the club had committed a

19   crime when they hadn't, right?

20   A.   Yes.

21   Q.   Just like you're blaming the club now for committing crimes

22   that they didn't commit, right?  Same thing?

23   A.   I don't understand that question.

24           MR. DALY:  Nothing further.

25           THE COURT:  Any others?  Examination on new matters.

2:11-cr-20129-RHC-MAR  Doc # 1092  Filed 11/16/14  Pg 68 of 310  Pg ID 7303
JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. SATAWA

68

1           Actually, while you're getting your papers in order,

2     let's let the jury stretch.

3        (Brief pause.)

4           THE COURT:  All right.  Let's come back to order,

5     please.  One of the jurors left?

6           JUROR NO. 10:  Bathroom break.

7           THE COURT:  Let's not do that again.  Jurors are not

8     free to come and go.  If there's an emergency, raise your hand.

9     Let me know about it.  Maybe you tried to, but let's not

10    just -- because we're taking a stretch break for one minute

11    doesn't mean you get to leave the room.  No harm done now, but

12    just keep that in mind, please, everybody.

13          Go ahead, Mr. Satawa.

14          MR. SATAWA:  Thank you, your Honor.

15                        CROSS-EXAMINATION

16    MR. SATAWA:

17    Q.  Good morning, sir.

18    A.  Good morning.

19    Q.  Sir, you testified -- and I'm going to try to summarize a

20    lot of this so we don't have to repeat any of the questions

21    from direct or the two previous cross-examinations, right?  All

22    right?

23    A.  Okay.

24    Q.  So we can kind of move this along.  However, if you need me

25    to clarify anything, just stop me and I'll clarify it for you.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. SATAWA

1   Fair enough?

2   A.  Fair enough.

3   Q.  All right.  Mr. Burby, you have testified now that in

4   addition to several other issues with law enforcement, you were

5   certainly involved in the distribution of meth?

6   A.  Yes.

7   Q.  The distribution of large quantities of meth?

8   A.  Yes.

9   Q.  And that on direct, the Government asked you who your

10  sources of meth were.

11  A.  Yes.

12  Q.  And you mentioned someone named Gary, right?

13  A.  Yes.

14  Q.  You mentioned someone named Roach, right?

15  A.  Yes.

16  Q.  Someone named Pockets?

17  A.  Yes.

18  Q.  Someone named Lauri?

19  A.  Yes.

20  Q.  Your testimony to Mr. Daly this morning was that once you

21  were arrested early in 2009, you stopped that?

22  A.  Stopped what?

23  Q.  Using meth?

24  A.  Yes.

25  Q.  And selling meth?

1   A.  Yes.

2   Q.  And that one of the reasons that happened was because you

3   had been arrested?

4   A.  Correct.

5   Q.  Your house had been raided?

6   A.  Yes.

7   Q.  And that led to the first of several interviews you had

8   with law enforcement?

9   A.  Yes.

10  Q.  In February 19th of 2009?

11  A.  What's the question?

12  Q.  I mean, the exact date isn't important.  Sometime around

13  February in 2009, you would agree with me, is the first time

14  you sat down and you spoke with Special Agent Fleming, sitting

15  here in the courtroom?

16  A.  Yes.

17  Q.  All right.  Now, when you sat down with Agent Fleming, you

18  understood that in addition to a lot of the other things

19  discussed with Mr. Daly and Ms. Stout this morning, you were

20  currently involved in the distribution of meth?

21  A.  Yes.

22  Q.  And Agent Fleming asked you a bunch of questions, focusing

23  on the incident at the Lighthouse bar; fair to say?

24  A.  I don't know.  I don't know if he was focusing on that.

25          On what date we're talking about?

1   Q.  February of 2009, the first time you sat down and talked to

2   him.

3           MS. MOHSIN:  Your Honor, I'm going to object.  The

4   record is very clear that that was not the first time that he

5   sat down and talked to Special Agent Fleming.  In fact, that

6   was the third time.

7           THE COURT:  Well, in any event, it seems to me that

8   the witness being questioned doesn't necessarily know what the

9   focus of the questioner may be.  You're asking something that

10  is generally outside of the witness's knowledge.

11          MR. SATAWA:  I was laying a foundation, your Honor,

12  anyway.  I can certainly move beyond that question.

13          THE COURT:  Good.  Good.

14          MR. SATAWA:  For purposes of efficiency.

15  BY MR. SATAWA:

16  Q.  You, you testified that once you started speaking with law

17  enforcement, I believe your testimony on Wednesday was you're

18  here because it's, it's time to stop lying?

19  A.  Yes.

20  Q.  It's time to come clean?

21  A.  Yes.

22  Q.  It's time to pay for past sins?

23  A.  Yes.

24  Q.  It's time to come in and tell the jury everything you did?

25  A.  Yes.

1   Q.  All right.  Now, your testimony on Wednesday was that this

2   epiphany, or this realization for you that it was time to stop

3   screwing around and just come clean with everything that you

4   had done, happened when?

5   A.  I don't recall.

6   Q.  All right.  Did it happen after you spoke with the FBI in

7   February of 2009?

8   A.  Yes.

9   Q.  It did.  But you lied to them anyway?

10  A.  I don't know what date exactly.  I don't recall.

11  Q.  I'm not asking about a specific date.  Did this, did this

12  realization that you just needed to come clean and stop lying

13  and protecting people --

14  A.  After that date, that was when I realized after that, I

15  needed to come clean.

16  Q.  Sometime in 2009?

17  A.  Sometime after that date.

18  Q.  Okay.  You would agree me that you spoke with the FBI a few

19  times in 2009?

20  A.  I don't recall how many times in 2009.

21  Q.  When did you leave the club?

22  A.  In 2008.

23  Q.  And your testimony was, is that your relationship with Vern

24  continued after you left the club?

25  A.  Yes.

1  Q.  "Your relationship," meaning your business relationship?

2  A.  No.

3  Q.  You no longer, you no longer distributed meth with Vern

4  after you left the club?

5  A.  After I left the club, no.  I don't recall.

6  Q.  Your testimony on Wednesday was not that you continued to

7  buy meth from Vern after you left the Devils Diciples?

8  A.  I don't recall.

9  Q.  Did you?

10  A.  No.

11  Q.  You did not?

12  A.  No.

13  Q.  Did you continue to sell meth after you left the Devils

14  Diciples?

15  A.  No.

16  Q.  You know, you know someone by the name of "Pockets"; is

17  that right?

18  A.  Yes.

19  Q.  And you started dating Pockets sometime in 2011?

20  A.  I started dating him?

21  Q.  I'm sorry.  I'm sorry.

22  A.  That's a real trick question.

23  Q.  I'm sorry.

24      (Laughter in the courtroom.)

25      You know someone named Deb.

1   A.  Yes.

2   Q.  Who was dating Pockets?  I apologize.

3   A.  Yes.

4   Q.  All right.  And you started dating Deb sometime in 2011?

5   A.  Yes.

6   Q.  And Deb was formally the girlfriend of Pockets?

7   A.  Yes.

8   Q.  I apologize about that.

9   A.  Okay.

10  Q.  Now, isn't it true that you and Deb were selling meth in

11  2011?

12  A.  No, not true at all.

13  Q.  Not true at all?

14  A.  No.

15  Q.  And you weren't still using meth in 2011 with Deb?

16  A.  No.

17  Q.  And you hadn't, because by 2011 you had gone through this

18  process of realizing that I needed to come clean and start

19  telling the truth?

20  A.  Yes.

21  Q.  Part of that had to be the talking about your own role in

22  distributing meth?

23  A.  Yes.

24  Q.  As well as a great number of other things?

25  A.  Yes.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. SATAWA

1  Q.  Now, you testified to Mr. Daly this morning that you had

2  the -- that once you were arrested, that you were then given an

3  attorney?

4  A.  Yes.

5  Q.  And you sat down with that attorney and you discussed the

6  charges against you?

7  A.  Correct.

8  Q.  And there were a few different charges against you?

9  A.  Yes.

10 Q.  And that attorney also explained that some of the people

11 involved were charged with things that you weren't currently

12 charged with, but he was concerned that you may become charged

13 with them further down the line?

14 A.  I don't recall that.

15 Q.  All right.  Did you discuss whether or not you were charged

16 with conspiracy to distribute meth?

17 A.  Yes.

18 Q.  Did you discuss the idea of whether you were charged with

19 conspiracy to distribute enough meth that the maximum penalty

20 would be life?

21 A.  Yes.

22 Q.  And the mandatory minimum, meaning the less the -- the

23 least amount of time the judge can give you, is ten years?

24 A.  I don't recall that.

25 Q.  Do you understand that?

1    A.  Yes.

2    Q.  As a mandatory minimum for that charge?

3    A.  Yes.

4    Q.  What is the most you can --

5            THE COURT:  Mr. Satawa, I hesitate to interrupt.  But

6    I think that these matters were all gone into in

7    cross-examination already.  I think we're plowing the same

8    ground again.

9            MR. SATAWA:  Well, your Honor, I'm, I am wrapping a

10   few things up as it relates to Mr. Vandiver.  I have one more

11   question as to this part of my cross-examination.

12           THE COURT:  Go ahead.  But I --

13           MR. SATAWA:  Thank you.

14           THE COURT:  We really need --

15   BY MR. SATAWA:

16   Q.  What is the most time, under your current plea bargain, the

17   statutory maximum you could get?  If the judge wanted to max

18   you out, what is the most time you could get as your sentence?

19   A.  Four years.

20   Q.  Four years?

21   A.  Mh-hm.

22   Q.  Now, that agreement that you now have, you would agree with

23   me, is the result of a few years' process of you cooperating

24   and speaking with the Government, with your lawyer?

25   A.  Yes.

1  Q.  Do you remember getting a -- I think we even discussed it a

2  little bit on Wednesday, this idea that you got a letter, a

3  letter that you signed that sort of started the process of this

4  cooperation formally with the Government?

5  A.  What kind of letter?  I'm not sure.

6  Q.  Do you remember that *Kastigar* letter --

7  A.  Yes.

8  Q.  -- that you were asked about on Wednesday?

9  A.  Yes.  Yes.

10  Q.  And I think you testified that you signed that *Kastigar*

11  letter on January the 11th of 2010?

12  A.  Yes.

13  Q.  And that *Kastigar* letter certainly puts on you the

14  obligation to tell the truth?

15  A.  Yes.

16  Q.  It says in fact, in that letter, if you don't tell the

17  truth, everything that we have agreed to, meaning you and your

18  lawyer, with the Government, goes out the window?

19  A.  I don't recall that in there.  But my lawyer worked it out,

20  yes.

21  Q.  All right.  Well, do you understand that if the Government

22  determines that -- well, let me phrase it this way.

23        That letter says to you that unless you do what the

24  Government asks you to do, which is provide substantial

25  assistance and tell them what they -- tell them the truth, that

1    whatever bargain you have goes out the window?

2    A.   Yes.   That you tell the truth.   You've got to tell truth.

3    Q.   So in January of 2010, did you then tell the Government the

4    entire truth?

5    A.   I told the truth everything except for the bike.

6    Q.   Okay.   Well, except the bike.

7    A.   Yes.

8    Q.   Now, you testified that you told the truth about the bike

9    within the last year or so.

10   A.   If that's what I testified to, yes.

11   Q.   Isn't that what you said on Wednesday?

12   A.   Yes.

13   Q.   Now, you would agree with me that after signing this

14   *Kastigar* letter, you did not tell the Government the truth

15   about the bike?

16   A.   Again, I just said that I did tell the truth about

17   everything except the bike.

18   Q.   In fact, you signed a Rule 11 plea agreement, did you not?

19   A.   Yes, I did.

20   Q.   Along with a cooperation agreement, did you not?

21   A.   Yes, I did.

22   Q.   Two separate legal documents?

23   A.   Yes.

24   Q.   And those two documents, what you were gone over thoroughly

25   with your attorney?

1    A.  Yes.

2    Q.  And these are the documents that ended up with you being

3    charged with a four-year maximum offense?

4    A.  Yes.

5    Q.  You understood the gravity or the seriousness of signing

6    those documents?

7    A.  Yes.

8    Q.  And the obligation that went along with those documents?

9    A.  Yes.

10   Q.  And when you -- you signed those two documents on

11   August 28th of 2014, right?

12   A.  What was the date?

13   Q.  August 28th, 2014, about two months ago.

14   A.  Okay.

15   Q.  Right?

16   A.  Yes.

17   Q.  By August 28th, 2014, you still had not told the Government

18   the truth about that motorcycle?

19   A.  I don't recall when the date was that I told them.

20   Q.  You would agree with me that you had not told the

21   Government the truth about the motorcycle when you came in and

22   pled guilty?

23   A.  I don't recall.

24   Q.  It wasn't until about a week after you pled guilty that you

25   finally told the Government that you lied about the motorcycle?

1    A.  Again, I don't recall the date or the events, how it played

2    out.

3    Q.  Do you not recall the date because your testimony on

4    Wednesday about having told the Government within the last year

5    was a lie?

6    A.  No.  I just don't recall the date.

7    Q.  So you recall the dates of all this other stuff, but you do

8    not remember when you finally came clean about that with the

9    Government, whether it was even at -- before or after you pled

10   guilty?

11   A.  Correct.

12   Q.  By the way, when you came clean about the motorcycle, did

13   the Government breach the agreement?

14   A.  No.

15   Q.  Did they pull it back?

16   A.  No.

17   Q.  Did they pull it back?

18   A.  No.

19   Q.  Did they say, oh, you know what?  You're going to go back

20   to being charged with the meth.  You're going to face a

21   mandatory 10 and a maximum of life?

22   A.  No.

23   Q.  Mr. Burby, when you testified on direct, you talked about

24   those sources of meth that you were buying from.  Do you

25   remember my question a few minutes ago?  Like Gary and --

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. SATAWA

1    A.  Yes.

2    Q.  -- Lauri and those other folks?

3    A.  Yes.

4    Q.  All right.  You described, fair to say, Mr. Vandiver, or

5    "Gun Control," as a user of meth?

6    A.  Yes.

7    Q.  All right.  And your -- you would agree with me that sort

8    of Vern Rich was known as a meth -- as the meth distributor?

9    A.  One of, yes.

10   Q.  Or the one that you worked with most, most frequently?

11   A.  Yes.

12   Q.  All right.  And that you testified on direct that Cary

13   Vandiver was a meth user, who shared what meth he had with you

14   on a couple of occasions; fair to say?

15   A.  Yes.  Yes.

16   Q.  All right.  Thank you.

17            MR. SATAWA:  No further questions, your Honor.

18            THE COURT:  Any others?

19            Ms. Maceroni?

20            MS. MACERONI:  Would we be able to take a bathroom

21   break right now, Judge?

22            THE COURT:  I'm just calculating that.  Why don't you

23   begin your examination.

24            MS. MACERONI:  Okay.  Thank you.

25                         CROSS-EXAMINATION

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. MACERONI

1   BY MS. MACERONI:

2   Q.  Good morning, Mr. Burby.

3   A.  Good morning.

4   Q.  You testified last Wednesday that you became a member of

5   the Devils Diciples on June 14th, 2007.  Do you recall that

6   testimony?

7   A.  Yes.

8   Q.  And you recall that day, because it was Harley day at

9   Freedom Hill?

10  A.  Harley Fest, yes.

11  Q.  Harley Fest.

12          And you did not have to prospect, correct?

13  A.  Correct.

14  Q.  You were just welcomed into the club with open arms,

15  correct?

16  A.  Correct.

17  Q.  And in fact, the next day, or within the next couple of

18  days, you were chosen to be the warlord of the Blue Water

19  clubhouse, correct?

20  A.  Right.

21          THE COURT:  That plows the same ground as we've

22  already had.  So I'll -- but I'll give you the break to

23  recalibrate your, your questions.

24          It is time, you are correct, it is time for a morning

25  recess, Ms. Maceroni.

1              So 20 minutes in the jury room, ladies and gentlemen.

2     We'll resume five minutes past whatever, five minutes past the

3     hour.

4              MS. MACERONI:  Thank you, Judge.

5              COURT REPORTER:  All rise.  Court is in recess.

6         (Jury out, 10:44 a.m.)

7         (Recess taken, 10:44 a.m. - 11:06 a.m.)

8              THE CLERK:  All rise.

9         (Jury in, 11:06 a.m.)

10             THE CLERK:  Court is back in session.

11             THE COURT:  All right.  The jury is assembled.  All

12    parties and attorneys are present.  Be seated, please.

13             And, Ms. Maceroni, you may continue.

14             MS. MACERONI:  Thank you, your Honor.

15    BY MS. MACERONI:

16    Q.  Mr. Burby, when you became president of the Blue Water

17    chapter, you were responsible for the Blue Water chapter house;

18    fair to say?

19    A.  Yes.

20    Q.  In fact, you had bills to pay, utility bills to pay; fair

21    statement?

22    A.  Yes.

23    Q.  And the actual clubhouse itself, the Blue Water clubhouse,

24    was a home that had been rented by Gary Nelson, correct?

25    A.  Assuming Gary and Pauli, yes.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. MACERONI

1   Q.   So you had rent to pay every month, correct?

2   A.   Yes.

3   Q.   And utility bills to pay?

4   A.   Yes.

5   Q.   Keep the bar stocked with beer?

6        And all of those financial responsibilities were yours

7   to make sure they were paid as president; fair statement?

8   A.   I don't really know so much as that.  I think we all just

9   kind of took care of that, you know.

10  Q.   Okay.  So the dues that you testified to about last week,

11  that went towards making sure the lights stayed on and the beer

12  stayed cold, correct?

13  A.   Sure.

14  Q.   Okay.  So as chapter president, were you familiar with an

15  individual by the name of Dusty?

16  A.   Yes.

17  Q.   And Dusty, in fact, for a while lived at the Blue Water

18  clubhouse, correct?

19  A.   Correct.

20  Q.   And there came a period of time in spring of 2008 where

21  Dusty kind of disappeared; do you recall that?

22  A.   Yes.  Yes.

23  Q.   And no one knew where he was, correct?

24  A.   Yes.

25  Q.   And in fact, his brother from Arizona, Grog, who was also a

```
 1   DDMC member, was calling, trying to find out where Dusty had
 2   gone.  Do you recall that --
 3   A.  Yes.
 4   Q.  -- event?
 5            All right.  So you were involved with trying to figure
 6   out what had happened with Dusty, correct?
 7   A.  Yeah.  We were -- we didn't know what happened to him.
 8   Yes.
 9   Q.  Okay.  Now, you're familiar, and you've testified to this
10   on cross and direct, and I don't -- I'm going to try and keep
11   this short, but you're very familiar with the national bylaws
12   of the DDMC, yes?
13   A.  Yes.
14   Q.  And there's also some other rules of the club that you're
15   familiar with, specifically dealing with snitching, yes?
16   A.  Yeah.
17   Q.  Okay.  And correct me if I'm wrong, but you testified that
18   being a snitch is probably one of the worst things you could do
19   to your brothers, correct?
20   A.  Yes.
21   Q.  And in fact, Pauli and Fat Dog were always concerned about
22   whether or not there was snitches in the organization, correct?
23   A.  Yes.
24   Q.  And on direct, last week, when you were asking questions by
25   the Government attorney, do you recall being asked this
```

```
 1   question:
 2           "So cooperating with law enforcement was frowned upon;
 3   is that your understanding?"
 4           Do you recall that?
 5           MS. MOHSIN:  May I have a page number, please?
 6           MS. MACERONI:  Oh, I'm sorry.  124.
 7           MS. MOHSIN:  Thank you.
 8   BY MS. MACERONI:
 9   Q.  Do you recall that question?
10   A.  Yes.
11   Q.  And do you recall your answer being, "for sure"?
12   A.  Yes.
13   Q.  And then there was another question that was given to you:
14           "And was it frowned upon for any reason or were there
15   only certain reasons; in other words, you could cooperate
16   and --"
17           And your answer was -- do you recall giving this
18   answer:
19           "For any reasons.  For any reasons.  If you were
20   talking to them, you were snitching."
21   A.  Correct.
22   Q.  And that's your understanding, correct?
23   A.  Yes.
24   Q.  And in fact, you followed that up later on by saying you
25   were a little nervous about going with Michelle to the police
```

1   department after the steak fry because you were afraid it was

2   going to get around that you were a snitch; you were siding

3   with the police, yes?

4   A.  I don't recall that one.

5   Q.  But in any event, cooperating with the cops in any way,

6   shape, or form was definitely frowned upon by the DDMC?

7   A.  Yes.

8   Q.  Okay.

9           MS. MACERONI:  Judge, at this time I would like to

10  introduce, it would be Defense Exhibit 8, a phone call.  The

11  phone call is No. 464.  It was recorded on March 31st, 2008, at

12  5:44 p.m.  And then there's also a transcript with this one, so

13  that would be 8A, to assist the jury.

14          THE COURT:  So is this something that was, that was

15  brought up on direct or is this a new introduction?

16          MS. MACERONI:  This goes towards his answers

17  concerning the snitching.

18          THE COURT:  This is a received exhibit, yes?

19          MS. MACERONI:  All the phone calls are in, as far as I

20  know.

21          MS. MOHSIN:  I'm not aware -- is this one of the

22  Government exhibits?

23          MS. MACERONI:  Yes.

24          MS. MOHSIN:  Because I'm not sure what transcript

25  you're referring to.  I have not been provided with one from

```
 1   you.

 2          MS. MACERONI:  Yeah.  It was one of theirs, because it

 3   has a transcript.

 4          THE COURT:  So which --

 5          MS. MOHSIN:  I'd like to inspect it.

 6          THE COURT:  Which exhibit number is it?  Which

 7   government exhibit number is it?

 8          MS. MACERONI:  It's call 464, Judge.  I'm not sure

 9   what Government exhibit it is.

10          MS. MOHSIN:  Your Honor, I believe I need to make a

11   record.

12          THE COURT:  Are you proceeding as though on direct

13   here, Ms. Maceroni?  New matters?

14          MS. MACERONI:  No, your Honor.  This is

15   cross-examining his statements about being a snitch and the

16   fact that you don't go to the police for any reason.  And in

17   this call --

18          THE COURT:  Is it not -- can you not examine with

19   specific -- I don't know if you have prior statements that

20   you're going to be focusing upon or what rule you're -- do you

21   have this cued up?  Are you asking the Government's help in

22   cuing it up?

23          MS. MACERONI:  No.  We have it cued up, Judge.

24          MS. MOHSIN:  I have an objection to the transcript,

25   your Honor.
```

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. MACERONI

1          MS. MACERONI:  It's their transcript, Judge.

2          MS. MOHSIN:  No, it is not.

3          THE COURT:  Well, I don't know any of this.  I just

4    know what counsel is saying.  Let's take it at the side bench.

5      (Side bar discussion held with Ms. Mohsin, Ms. Maceroni,

6       Ms. Stout, Mr. Sabbota, and Mr. Naughton outside the

7       hearing of the jury at 11:12 a.m.)

8          THE COURT:  What's the objection, Ms. Mohsin?

9          MS. MOHSIN:  Your Honor, from the screen, I see this

10   is a line sheet, which are the rough notes of the agents that

11   were provided as an aid to the defense in connection with

12   examining the wiretap.  These are not --

13         THE COURT:  This is not a transcript?

14         MS. MOHSIN:  This is not -- I don't know if this is a

15   full transcription, a partial transcription, what the accuracy

16   of it is or isn't.  And this was one of our objections when we

17   produced these materials to the defense, that these were not

18   going to be used at trial.  Finalized transcripts would be

19   used.  We haven't been provided with a finalized transcript

20   from the defense.

21         So I would object to this until I can at least

22   determine, you know, whether or not the agents are satisfied

23   that this -- that this line sheet, these rough notes are, in

24   fact, the transcription.

25         THE COURT:  I'm going to provisionally sustain the

 1    objection and move on to another matter.  And we'll take this

 2    later.

 3           MS. MACERONI:  Well, Judge, then I've got other calls

 4    for him.  I mean, those were the line sheets the Government

 5    gave us.  So I didn't think there would be any question about

 6    their accuracy or reliability.  I mean, they are the phone

 7    calls.

 8           MS. MOHSIN:  We made a representation when we did not

 9    want to produce these, because we indicated that these were not

10    final transcripts.

11           THE COURT:  I recollect that.

12           MS. MOHSIN:  And we made it very clear we were

13    concerned about the way in which they were going to be used at

14    trial.

15           MS. MACERONI:  Judge, I can play the call without it.

16    I mean, I did that before.

17           THE COURT:  The call is not objectionable?

18           MS. MACERONI:  Not at all.

19           THE COURT:  Proceed with the call.

20           MS. MACERONI:  Thanks, Judge.

21       (Side bar concluded at 11:14 a.m.)

22           THE COURT:  Let's come back to order, please.

23           Apparently, there's a difference between transcripts

24    and something else that's called sheets or note sheets or line

25    sheets, so you're going to proceed with the call.

1      MS. MACERONI:  Correct, Judge.  If the --

2      THE COURT:  Go ahead.

3      MS. MACERONI:  If the Government doesn't want to use

4  their own line sheets, we can proceed with the call.

5      MS. MOHSIN:  Your Honor, I'm going to object to that

6  statement, your Honor.

7      THE COURT:  Here's the explanation for the jury, as

8  delivered at the side of the bench.  There are preliminary

9  notes only that were produced.  They are called line sheets.

10  They haven't been vetted or finalized.  They haven't been

11  checked for intended accuracy.  They have not been converted

12  into transcripts.  There is no transcript in existence for many

13  of the calls that were recorded.

14      And I sustained the objection to the use of just

15  preliminary notes, and that's what Ms. Maceroni was referring

16  to.  There is no objection to playing the call itself, however.

17      And you may proceed with that, Ms. Maceroni.

18      MS. MACERONI:  Thank you, Judge.  And I would offer

19  this as Defense Exhibit 8.

20      THE COURT:  Received.

21      (Exhibit 8 received, 11:15 a.m.)

22      (Publishing DX #8, 11:15 a.m.)

23  BY MS. MACERONI:

24  Q.  Mr. Burby, do you recognize the person who said "hello"?

25  A.  Yeah.

1   Q.  And who is that?

2   A.  Pauli.

3   Q.  Okay.  And you were calling him, correct?  That was -- you

4   were the next person on that call?

5   A.  Yes.

6       (Publishing DX #8, 11:15 a.m.)

7   BY MS. MACERONI:

8   Q.  Now, do you recall what report Mr. Darrah was referencing?

9   A.  No, I don't.

10  Q.  Isn't it true, Mr. Burby, that he and Mr. Smith were on

11  their way to a police station to file a missing person's report

12  on Dusty?

13  A.  I don't recall.

14  Q.  Okay.

15      (Publishing DX #8, 11:16 a.m. - 11:17 a.m.).

16  BY MS. MACERONI:

17  Q.  Can you hear what's being said on this?

18  A.  Yes.

19  Q.  And it's true that they are talking about having Timmy

20  Downs go up to the clubhouse to wait for the mail to show up,

21  to see if Dusty's check came in, correct?

22  A.  I don't know what they were talking about exactly, that

23  part.

24  Q.  Okay.  What is your understanding what you just heard then?

25  You said you understood what was going on.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. MACERONI

1  A.  Well, I do recall something about them going to report

2  Dusty being missing.

3  Q.  To the police, correct?

4  A.  Yes.

5  Q.  Because they were worried about him?

6  A.  Yes.

7  Q.  You were worried about him?

8  A.  Yes.

9  Q.  He just disappeared?

10  A.  Yes.

11  Q.  Now, you talked a little bit last week, Mr. Burby, about

12  the fact that at one of the times that you met with Agent

13  Fleming, you were, you were listening to some tape recordings

14  of phone calls between you and Vern Rich, correct?

15  A.  Yes.

16  Q.  And that, I believe, was in April of 2009?

17  A.  Yes.

18  Q.  And prior to that, you did not know that Vern Rich's phone

19  had had a wiretap up and running on it, correct?

20  A.  Yes.

21  Q.  Until Mr. Fleming, and correct me if I'm wrong, until Mr.

22  Fleming said I want you to listen to these phone calls, you

23  were not aware that Mr. Rich's phone call had a wire on it,

24  yes?

25  A.  Yes.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. MACERONI
94

1   Q.  Okay.  Now, at that time, in April of 2009, did Mr. Fleming

2   tell you that there had also been a wire that was up and

3   running on Paul Darrah's phone from the spring of 2008 until

4   the fall of 2008?

5   A.  No.

6   Q.  So in April of 2009, you did not know that Mr. Darrah's

7   phone had been tapped?

8   A.  No.

9   Q.  And you certainly did not know that Mr. Darrah's phone had

10  been tapped in the spring, summer, and fall months of 2008,

11  correct?

12  A.  Correct.

13  Q.  You guys had no indication whatsoever that the phone was

14  tapped, correct?

15  A.  No.

16  Q.  All right.  So you were talking pretty freely back and

17  forth on the phone?

18  A.  Yes.

19  Q.  All right.

20      MS. MACERONI:  Judge, at this point in time, I would

21  like to play what would be Defense No. 9, phone call 617 from

22  April 1st, 2008.  And that was recorded about 2:08 p.m.

23      THE COURT:  Yes.  Proceed.

24      MS. MACERONI:  Okay.

25      (Publishing DX #9, 11:19 a.m. - 11:20 a.m.)

1   BY MS. MACERONI:

2   Q.   Now again, Mr. Burby, you're calling Mr. Darrah?

3   A.   Correct.

4   Q.   And he answers the phone and says hello?

5   A.   Yes.

6        (Publishing DX #9, 11:20 a.m.)

7   BY MS. MACERONI:

8   Q.   Now, when you're telling Mr. Darrah that, could you

9   explain to the jury what -- you're on probation, obviously,

10  right, in 2008?

11  A.   That's what it sounds like.

12  Q.   And you're faxing over your work reports?

13  A.   I don't know.  I don't recall that.

14  Q.   Okay.  In 2008, were you working, do you recall, in April

15  of 2008?

16  A.   I believe I was.

17  Q.   And that would have been as a tree cutter for Detroit

18  Edison?

19  A.   Tree trimmer, yes.

20  Q.   Tree trimmer, okay.

21        And was there occasions where you were very busy at

22  work?  You were working like, four tens or six tens, which

23  would be six days, ten hours a day?

24  A.   Yes.

25  Q.   So obviously that would be problematic if you had to report

 1   to a probation officer, correct?

 2   A.  Yes.

 3   Q.  Okay.  And during the course of your probation, at times,

 4   if you faxed in your worksheets or your work logs, would you be

 5   excused from showing up in person at the Probation Department?

 6   A.  I don't recall that.  I think I pretty much showed up every

 7   time.

 8   Q.  Okay.  But at some point in time, did you have to fax your

 9   work history over to --

10   A.  Maybe --

11   Q.  -- Probation?

12   A.  -- to skip a day or reschedule a date.  I don't really

13   recall exactly --

14   Q.  Okay.

15   A.  -- what that is talking about.

16        (Publishing DX #9, 11:21 a.m. - 11:21 a.m.)

17   BY MS. MACERONI:

18   Q.  Now, when you called in Mr. Green for whatever reason, do

19   you recall this conversation with the probation officer?

20   A.  Not really.

21   Q.  You don't recall your probation officer saying to you the

22   FBI called me up and wanted to know if you were out and in

23   Arizona selling meth on your bike?

24   A.  I remember something vaguely about it, but I don't recall

25   word for word.

```
1              MS. MACERONI:  Okay.

2         (Publishing DX #9, 11:22 a.m.)

3    BY MS. MACERONI:

4    Q.  Now, right there you say, "I've been working six tens."

5              Does that now refresh your recollection as to what the

6    phone call with your probation officer was?

7    A.  No, that doesn't.  I, obviously, I was working six tens,

8    but I don't recall what it -- what I was faxing him.

9    Q.  Okay.  Did you want to skip your meeting the following day

10   because you had been working so?  Isn't that what you just

11   said?

12   A.  I'm not sure.

13        (Publishing DX #9, 11:22 a.m. - 11:24 a.m.)

14   BY MS. MACERONI:

15   Q.  Now, Mr. Burby, during that call you didn't say, "Jeez,

16   they must have got me mixed up with Vern," correct?

17   A.  No.

18   Q.  Those words didn't come out of your mouth on the tape?

19   A.  No, they didn't.

20   Q.  It's not a trick question.

21   A.  No, they didn't.

22   Q.  Okay.  And you didn't -- you were shocked that the FBI had

23   contacted your probation officer; fair statement?

24   A.  Yes.

25   Q.  Because, in fact, you had been working all that time, and
```

```
1    you weren't anywhere near Arizona, correct?

2    A.  Correct.

3    Q.  And again, you didn't say, "Jeez, I'm glad they must have

4    got me mixed up with Vern"?  You were shocked?

5    A.  Correct.

6    Q.  Fair statement?

7    A.  Correct.

8    Q.  Okay.  All right.  And Mr. Darrah, by the same token,

9    didn't say, Jeez, that information may be correct, they just

10   got the wrong guy, correct?

11        Those words never came out of his mouth?

12   A.  Correct.

13   Q.  In fact, he said, "Maybe it will show him whoever is

14   talking to them is lying," yes?

15   A.  Yes.

16   Q.  In fact, he said it may be good for you in your standing

17   with your probation officer, yes?

18   A.  Yes.

19        MS. MACERONI:  Judge, one final call.  D-10, which is

20   833.

21        THE COURT:  Go ahead.

22        MS. MACERONI:  April 3rd, 2008, at 12:20.  But before

23   you play that.

24   BY MS. MACERONI:

25   Q.  Now, you've testified quite a bit about the search that was
```

```
 1   done at your house in December of 2007.

 2   A.  Yes.

 3   Q.  And one of the items that the FBI took was a computer, yes?

 4   A.  Yes.

 5   Q.  And it was Michelle's computer, yes?

 6   A.  Correct.

 7   Q.  And did you have a computer that they took as well?

 8   A.  No.

 9   Q.  Okay.  It was just her computer?

10   A.  Yes.

11        MS. MACERONI:  All right.  Go ahead.

12      (Publishing DX 10, 11:25 a.m. - 11:26 a.m.)

13   BY MS. MACERONI:

14   Q.  Now again, so the record is clear, you're calling

15   Mr. Darrah?

16   A.  Yes.

17   Q.  That's your voice on the tape and Mr. Darrah's voice on the

18   tape?

19   A.  Correct.

20        MS. MACERONI:  All right.

21      (Publishing, DX #10, 11:26 a.m.)

22   BY MS. MACERONI:

23   Q.  So that the record is clear, Mr. Burby, did you say, "My

24   old lady talked to the Feds about getting her computer back

25   today"?
```

```
 1   A.   Yes.

 2   Q.   And that old lady was Michelle?

 3   A.   Yes.

 4   Q.   And in fact, do you know, did she speak with Mr. Fleming or

 5   Mr. Oppenheimer (sic)?  Whom did she speak with?

 6   A.   Assuming Fleming.

 7   Q.   Okay.  And in fact, if it was Agent Fleming, he said you're

 8   not getting the computer back, correct?

 9   A.   Correct.

10        (Publishing DX #10, 11:26 a.m. - 11:27 a.m.)

11   BY MS. MACERONI:

12   Q.   And in fact, Mr. Darrah's computer had been taken as well,

13   correct, based on his statement there?

14   A.   Based on that statement, it sounds like it.  Yes.

15   Q.   Okay.

16        (Publishing DX #10, 11:27 a.m. - 11:28 a.m.)

17   BY MS. MACERONI:

18   Q.   When you said, "I guess my case is still open," were you

19   referring to the fact that your house had been searched in

20   December of 2007?

21   A.   I don't know what I was referring to, to be honest with

22   you.

23   Q.   Okay.

24        (Publishing DX #10, 11:28 a.m. - 11:30 a.m.)

25   BY MS. MACERONI:
```

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. MACERONI

1    Q.  Now, Mr. Burby, there are a couple things, additional

2    things that were going on in that phone call.  You finally

3    located Dusty, correct?

4    A.  So we thought.

5    Q.  Okay.  He was in a mental hospital?

6    A.  That's what --

7    Q.  Mr. Darrah believed?

8    A.  That's what they believed.

9    Q.  Okay.  And was he or was he not in a mental hospital?

10   A.  I don't recall.  I don't think he was.  I think he was -- I

11   heard he was down in Florida.  I heard a couple different

12   stories.  I don't really know where he was or what he did.  He

13   never came back.

14   Q.  He never came back to Michigan.  But he did reach out and

15   talk to Skudder, obviously, to let him know he was okay?

16   A.  I don't even recall that.  I didn't -- I don't recall that.

17   Q.  Okay.  Fair enough.

18           Now, this was in the summer of 2008, and you were

19   active in the DDMC all the way up until the steak fry in August

20   of 2008, correct?

21   A.  Correct.

22   Q.  All right.  And then the incident occurred at the steak fry

23   and that was it, you were done, yes?

24   A.  Correct.  Yes.

25   Q.  And there was no big confrontation about you handing in

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. MACERONI

102

1   your colors and your vest, correct?

2   A.   (No response.)

3   Q.   I mean, you testified that you spoke to a few guys.  You

4   told them that, you know, you were no longer in the club; you

5   had had it and you didn't appear at church, correct?

6   A.   Correct.

7   Q.   And you just bagged up your stuff and put it out on the

8   front porch, like you make a donation to Purple Heart and

9   somebody came and picked it up, yes?

10  A.   Yes.

11  Q.   All right.  So there was no confrontation verbally or

12  physically or anything about you leaving the club in August of

13  2008?

14  A.   There was problems with, and issues with a ring that I

15  hadn't returned, and there was, yeah, there was a few, you

16  know, episodes, I mean, threats and stuff.  And obviously,

17  that's probably why Rockin' Ronnie and them had came back.

18  Q.   Okay.  Well, you're jumping away ahead.  Rockin' Ronnie

19  didn't show up until February of 2009.

20       I'm focusing in on August and September of 2008.

21  A.   Okay.

22  Q.   Okay?

23  A.   Yeah.

24  Q.   So you bag up your stuff, you put it on the front porch.

25  And as far as you're concerned, your days with the Devils

1  Diciples are done, yes?

2  A.  Correct.

3  Q.  Okay.  And then the end of September, 2008, I believe it

4  was September 23rd, there were additional FBI search warrants

5  that were executed on certain DDMC members' homes; do you

6  recall that?

7  A.  Yes.

8  Q.  Okay.  So that happens in September.  You have October,

9  November, December.  And it's in January, roughly, end of

10  December, beginning of January, that you start hearing the word

11  on the street that you're a snitch, yes?

12  A.  Yes.

13  Q.  Okay.  And that made you angry, you testified, yes?

14  A.  Yes.

15  Q.  Okay.  I mean, here you had been the warlord.  You didn't

16  have to prospect.  You were welcomed into the club with open

17  arms.  Vice president and president of the Blue Water chapter.

18  And your former brothers are calling you a snitch in the

19  community.  It made you angry, didn't it?

20  A.  Yes.

21  Q.  Okay.  And when Paul --  or when Bill Fleming came to warn

22  you about this in February of 2009, you had -- you already knew

23  about it by then, didn't you?

24  A.  About what?

25  Q.  About the fact that there was a poster out there indicating

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. MACERONI

1   that -- with your photograph on it, and the word "snitch"

2   underneath it?

3   A.   I did know about the poster.  Yes.

4   Q.   Okay.  So you knew about the poster in the beginning of

5   February of 2009 when Mr. Fleming came to warn you, yes?

6   A.   Yes.

7   Q.   Okay.  And in fact, you told Agent Fleming that you had

8   called several DDMC members and told them to come to your house

9   and settle it like a man.  Do you recall telling that to Mr.

10  Fleming?

11  A.   No, I don't.

12  Q.   Do you recall calling the DDMC members and saying come over

13  here if you've got a problem with me?

14  A.   I don't really recall that.

15  Q.   So if it's in Agent Fleming's report, it would be wrong?

16  A.   I don't think so.  I don't know.

17  Q.   Okay.  So it's possible that you did; you just don't

18  remember, as you're sitting here today?

19  A.   Okay.  It's possible.

20  Q.   Okay.  Now, you also testified earlier with Rockin' Ronnie

21  that you felt that when he verbally threatened you or when he

22  verbally said he was going to kick your ass or whatever it was

23  he was saying to you, that you took that as an assault, yes?

24  A.   Yes.

25  Q.   Okay.  And isn't it true that you assaulted Paul Darrah in

2:11-cr-20129-RHC-MAR  Doc # 1092  Filed 11/16/14  Pg 105 of 310  Pg ID 7340
JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MS. MACERONI

105

1  February of 2009?

2  A.  No.

3  Q.  Isn't it true that you called up Paul Darrah after you had

4  been advised of the snitch poster and told Paul that you were

5  going to go over there and shove his trach tube up his ass?  Do

6  you recall that phone call?

7  A.  I don't really recall that.

8  Q.  So it's possible it might have happened?

9  A.  I don't recall.

10  Q.  If there's an FBI report indicating that it did happen,

11  would you agree or disagree with it?

12  A.  I would agree.

13  Q.  So you did, in fact, threaten Mr. Darrah?

14  A.  I said I don't recall.

15  Q.  But if the report indicates you did, you would agree with

16  the report?

17  A.  Again, yes.

18       THE COURT:  You have that answer.  Go ahead.

19       MS. MACERONI:  Thank you, Judge.

20  BY MS. MACERONI:

21  Q.  Now, when you met with Rockin' Ronnie on February 14th,

22  2009, that was actually the second time you had seen him that

23  month, correct?

24  A.  Yeah.  I don't know the exact month, if it's the second

25  time in that month, but yes, I did see him twice.

1    Q.  Okay.  And when he initially came up to you to discuss why

2    you left the club and whether or not you were in bad standing,

3    he wasn't wearing a DDMC vest, correct?

4    A.  I don't recall.

5    Q.  Okay.  In fact, isn't it true that Rockin' Ronnie had been

6    deactivated from the Devils Diciples for at least a year prior

7    to February of 2009?  Are you aware of that?

8    A.  I don't.

9    Q.  And he specifically said to you I want to check into this

10   and I'll get back to you, yes?

11   A.  Yes.

12   Q.  He didn't say, Fat Dog told me you said this or Pauli told

13   me you said this.  He said I want to check into this, and I'm

14   going to get back to you, yes?

15   A.  That's what he said.  Yes.

16   Q.  That's what he said.  Okay.

17        And in fact, when he showed up then two weeks later,

18   roughly on February 14th, 2009, again, he wasn't wearing his

19   DDMC colors, correct?

20   A.  I don't recall if he was wearing a shirt.  I don't recall

21   what he was wearing, to be honest with you.

22   Q.  Okay.  And he showed up with Wayne Werth, who was not a

23   Devils Diciple member, correct?

24   A.  I don't know what he is.  Again, that was after me.

25   Q.  Okay.

1   A.  I don't know if he was a member or not --

2   Q.  And Damien?

3   A.  -- at that time.

4   Q.  And Damien Cook was an NOK, correct?

5   A.  Again, I don't know what he was at that time.  I was

6   already out of the club.

7   Q.  Well, certainly, Mr. Burby, you'll agree with me that

8   neither Mr. Werth nor Mr. Cook were wearing DDMC colors,

9   correct?  Because if they had been, you could have said

10  absolutely, they were members of DDMC?

11  A.  Right.

12  Q.  And they weren't?

13  A.  They weren't, no.

14  Q.  Okay.

15  A.  But I don't recall what Rockin' Ronnie was wearing.

16  Q.  All right.  But you just testified Mr. Werth and Mr. Cook

17  were not DDMC members, yes?

18  A.  No.  I said they weren't wearing colors.  I don't know if

19  they were members or not.

20  Q.  All right.  They weren't wearing colors, and neither was

21  Rockin' Ronnie?

22  A.  I don't recall --

23  Q.  Fair enough.

24  A.  -- what Rockin' Ronnie was wearing.

25  Q.  And in fact, because you left the club six months earlier,

1    you had no idea who was an active member at that time or not,

2    yes?

3    A.   Correct.

4    Q.   All right.  Now, after the incident at the Lighthouse, you

5    again met with Mr. Fleming, correct?

6    A.   Yes.

7    Q.   And in fact, you spoke with him two days after, I believe

8    you said?

9    A.   Correct.

10   Q.   Concerning what had occurred at the Lighthouse?

11   A.   Yes.

12   Q.   And you told him you had no, no intention of filing a

13   police report, yes?

14   A.   Yes.

15   Q.   It was settled, it was done, you were over with it, yes?

16   A.   Yes.

17   Q.   Now, you testified earlier, I believe when Mr. Daly was

18   asking you questions, that you were going to be at the bar, you

19   were staying at the bar for a long period of time because your

20   girlfriend was working behind the bar and you were waiting for

21   her to get off of work.  Do you recall that testimony?

22   A.   Yes.

23   Q.   Okay.  But that's not what you told Mr. Fleming on February

24   19th, 2009.  Do you recall what you told him?

25   A.   No, I don't.

1    Q.  Didn't you tell Mr. Fleming that you had only intended to

2    stay at the bar for a short period of time, but then you

3    noticed a red pickup and a dark-colored car pull into the

4    parking lot as you were going inside?

5    A.  (No response.)

6    Q.  Did you tell Agent Fleming that?

7    A.  I don't recall.

8    Q.  But if you did, it would be a lie, yes?  Because you were

9    there at the bar for the long haul because your girlfriend was

10   working until closing, right?

11          MS. MOHSIN:  Objection, your Honor.  He's just

12   indicated he does not recall.

13          THE COURT:  You have your answer.

14          MS. MACERONI:  Thank you, Judge.

15          THE COURT:  No recollection.  Go ahead.  Next

16   question.

17   BY MS. MACERONI:

18   Q.  When you spoke with Agent Fleming in April of 2009, that

19   was the time that you first found out about the wiretap on Vern

20   Rich's phone; does that sound about right?

21   A.  Okay.

22   Q.  Okay.  And you indicated last week on your direct testimony

23   that you don't know why, but at some point in time during your

24   involvement with the DDMC, Vern Rich started to warm up to you,

25   trust you, and you approached him directly for buying meth.  Do

```
 1   you recall that testimony?

 2   A.  Yes.

 3   Q.  Okay.  In fact, Vern Rich respected you because of that

 4   Halloween party where you beat up Cliff Rhodes?

 5   A.  Yes.

 6   Q.  All right.  So Vern Rich actually approached you, said I

 7   like the way you handle yourself in a fight, and that's how

 8   your relationship began, yes?

 9   A.  I don't know if that's exactly how it began, no.  I don't

10   know how it, I don't know how it began.  It just began.

11   Q.  Okay.  Do you recall telling Mr. Fleming after this

12   incident, referring to the altercation with Mr. Rhodes, "Burby

13   was approached by DDMC member Vern Rich, who complimented Burby

14   for the way that he handled the incident with Cliff"?

15            Do you recall telling Mr. Fleming that?

16   A.  Yes.

17   Q.  Okay.  And in fact, Vern respected you and that's when your

18   relationship started?

19   A.  Again, I'm not sure when it started, but yeah, he did get a

20   little respect because of that.

21   Q.  Okay.  Now, I want to switch gears a little bit and talk

22   about the machines.  There were three machines, I believe you

23   testified about, three slot machines at the Blue Water chapter

24   house?

25   A.  Yes.
```

1  Q.  And those machines were, you testified, were owned by Gary

2  Nelson, who was -- now, was Mr. Nelson the president of the

3  Blue Water chapter when you first became a member?

4  A.  Which question do you want?  The question whose machines

5  they were?

6  Q.  Well, let's start with the last one first.

7          Was Mr. Nelson the president of the Blue Water chapter

8  when you first became a member?

9  A.  Yes.

10 Q.  Okay.  And did the three slot machines that were in the

11 Blue Water clubhouse belong to him and Timmy Downs?

12 A.  Yes.

13 Q.  And in fact, you testified that only Mr. Nelson and Mr.

14 Downs had keys to those machines, yes?

15 A.  Correct.

16 Q.  And they were the ones who made sure that there was money

17 in them or not, yes?

18 A.  Yes.

19 Q.  Okay.  And in fact, you testified that Gary Nelson kind of

20 used those machines as a personal ATM, yes?

21 A.  Yes.

22 Q.  All right.  And you were very active member in the Blue

23 Water chapter, correct?

24 A.  Was I very active member?

25 Q.  You were an active member of the Blue Water chapter, yes?

1    A.  Yes.

2    Q.  Okay.  You didn't have keys to those machines, did you?

3    A.  No.

4    Q.  And in fact, Timmy Downs and Gary Nelson were both

5    responsible for paying out winners if the machine was short; do

6    you recall that testimony?

7    A.  No, I don't.

8    Q.  Okay.  So you don't recall telling that to Agent Fleming?

9    A.  No.

10   Q.  And once you became president of the Blue Water chapter,

11   you didn't have the keys to that machine, correct?  It was

12   still Gary Nelson and/or Timmy Downs, yes?

13   A.  Correct.

14   Q.  Okay.  And Vern Rich actually was responsible for the

15   machines at the Port Huron clubhouse, I believe you testified

16   to?

17   A.  Yes.

18   Q.  As well as the Detroit clubhouse, yes?

19   A.  Yes.

20   Q.  All right.  And again, Vern Rich maintained the keys and he

21   was the one who maintained the maintenance on those machines,

22   yes?

23   A.  Yes.

24   Q.  And to your knowledge, again, like Mr. Nelson, he would use

25   those machines as a personal ATM at times?

```
 1   A.  I don't know about that.

 2   Q.  Okay.  You never saw him, anyways?

 3   A.  I never saw that.

 4   Q.  Okay.

 5   A.  I never testified to that.

 6           THE COURT:  Anything else?

 7   BY MS. MACERONI:

 8   Q.  Mr. Burby --

 9           MS. MACERONI:  Sorry, Judge.

10   BY MS. MACERONI:

11   Q.  Mr. Burby, when you started buying and selling

12   methamphetamines from Vern Rich, you would go to his house,

13   correct?

14   A.  Yes.

15   Q.  And you testified last week that Mr. Rich had the meth in

16   his garage, yes?

17   A.  In several spots, yes.

18   Q.  Several spots on his property, yes?

19   A.  Yes.

20   Q.  Okay.  You never knew exactly where it was; he had it

21   hidden throughout his property?

22   A.  Correct.

23   Q.  All right.  And that's where you would go to purchase and

24   at times use methamphetamines, yes?

25   A.  Yes.
```

```
 1              MS. MACERONI:  Thank you.  I have nothing further.

 2              MR. SABBOTA:  I have a couple, if I can, Judge?

 3              THE COURT:  All right, Mr. Sabbota.

 4                          CROSS-EXAMINATION

 5   BY MR. SABBOTA:

 6   Q.  Good morning, Mr. Burby.

 7   A.  How are you doing?

 8   Q.  I'm good.  How are you?

 9   A.  Great.

10   Q.  My understanding is --

11              THE COURT:  Okay.  Question.  Please, questions.

12   BY MR. SABBOTA:

13   Q.  My understanding is that you got hurt on the job and you

14   had a settlement?

15   A.  Yes.

16   Q.  And that settlement allowed you to buy a motorcycle?

17   A.  Yes.

18   Q.  I think you said it was, like, a Harley Glide or something?

19   A.  Street Glide, yes.

20   Q.  Street Glide.  So that was going to be your bike?

21   A.  It was my bike.  Yes.

22   Q.  I'm not saying it wasn't your bike.  You bought it with

23   your money?

24   A.  Right.

25   Q.  But you registered it to Michelle Richards?
```

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. KRAIZMAN

1   A.  Yes.

2   Q.  It was put in her name?

3   A.  Yes.

4   Q.  So anybody that was looking for the owner of the bike would

5   find Michelle Richards?

6   A.  Correct.

7   Q.  They wouldn't find you?

8   A.  Yes.

9          MR. SABBOTA:  No further questions.

10          THE COURT:  Any other proposed?  Mr. Kraizman.

11                    CROSS-EXAMINATION

12   BY MR. KRAIZMAN:

13   Q.  Mr. Burby, I represent Patrick McKeoun.  You knew him as

14   Magoo; am I correct about that?

15   A.  Yes.

16   Q.  Okay.  And your sponsor at the Devils Diciples motorcycle

17   club is Roach; am I correct about that?

18   A.  Yes.

19   Q.  His real name was Shannon McCarthy?

20   A.  Yes.

21   Q.  Is that correct?

22   A.  Yes.

23   Q.  All right.  And Shannon McCarthy, "Roach," was a very good

24   friend of Patrick McKeoun, known as "Magoo"?

25   A.  Yes.

1   Q.  Am I correct about that?

2           You were with the club for about 14 months, from your

3   birthday with the club, June 14, 2007, until the steak fry in

4   August 2008; am I correct about that?

5   A.  Yes.

6   Q.  And then after the steak fry and the incident with Michelle

7   Richards, you quit the club at that point?

8   A.  Yes.

9   Q.  You testified on direct examination that you knew that

10  Magoo lived in Alabama, but that he came into the Michigan area

11  for certain events while you were a member; am I correct about

12  that?

13  A.  Yes.

14  Q.  So there would have been a steak fry when you were a member

15  in August of 2007; am I correct?

16  A.  Yes.

17  Q.  And the steak fry is over there at what they call the

18  Detroit club located on Gratiot Road, which is really Clinton

19  Township; am I correct about that?

20  A.  Yes.

21  Q.  So you would have seen him on that occasion; am I correct?

22  A.  I don't recall the exact times that I saw him.

23  Q.  Okay.

24  A.  Or the dates.

25  Q.  All right.  Do you have a recall that you saw him on that

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - CROSS BY MR. KRAIZMAN

1   occasion of the steak fry, though, in 2007?

2   A.  No, I don't.

3   Q.  Okay.  There was an occasion when "Spike," whose real name

4   is Kenn Roll, died in December of 2007; am I correct about

5   that?

6   A.  There was one.  I don't know when he died, yes.

7   Q.  Okay.  Was it in that general time frame, if you don't --

8   even if you don't know the exact month?

9   A.  I don't know.  I don't.

10  Q.  All right.

11  A.  I don't know.

12  Q.  On that occasion, did Magoo come in from Alabama for the

13  funeral of Spike?

14  A.  Again, I really don't know when Magoo came in or the dates

15  or the time frame.  I met him a couple times through Roach.

16  And I don't know exactly which events he came in --

17  Q.  Okay.

18  A.  -- and did come to.  It could have been a funeral.  It

19  could have been a steak fry, it could have been.

20  Q.  All right.  In that event, on the couple occasions he came

21  in, he shared some methamphetamine with you and Roach; am I

22  correct about that?

23  A.  Yes.

24  Q.  Okay.  Did Roach also share some of his methamphetamine

25  with Magoo and you?  Or was it just Magoo was sharing?

1   A.  Both.

2   Q.  Okay.  And this was for free, am I correct?

3   A.  Yes.

4   Q.  And it was just three friends who were enjoying themselves,

5   having a party over the course of a couple occasions?

6   A.  Yes.

7   Q.  Okay.

8          MR. KRAIZMAN:  I have nothing further.

9          THE COURT:  Any redirect?

10                     REDIRECT EXAMINATION

11  BY MS. MOHSIN:

12  Q.  Mr. Burby, I want to review a couple items that came up

13  during cross-examination about the number of times you've been

14  interviewed by law enforcement.

15          In your mind, is there a dividing line between the

16  time when you considered yourself to be loyal to the Devils

17  Diciples, and therefore not a cooperator, and a time where you

18  considered yourself to no longer maintain that loyalty?

19  A.  Yes.

20  Q.  When did that occur?

21  A.  (No response.)

22  Q.  And if you don't have a date, what circumstances were

23  involved in that decision?

24  A.  I don't recall a date.  I don't even know how to answer it.

25  Q.  What -- was that decision one that you, you embarked on

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - REDIRECT BY MS. MOHSIN

1   after you had been assaulted at the Lighthouse bar?

2   A.  Yes.

3           MS. STOUT:  Objection to leading.

4           THE COURT:  Overruled.  I overruled the objection.

5   Proceed.

6           MS. MOHSIN:  Thank you.

7   BY MS. MOHSIN:

8   Q.  Mr. Burby, was that a decision that you embarked on after

9   you were assaulted at the Lighthouse bar?

10  A.  It wasn't long after that, yes.

11  Q.  Okay.  And in your mind, was it a process that you had to

12  go through before you made that decision?

13  A.  Yes.

14  Q.  And so prior to making that decision, where was your

15  loyalty?

16  A.  Where was my loyalty?  Let's see.  My loyalty was to my

17  family and everything else.  I just didn't -- you know, after a

18  while, this kept going on and going on.  And I was tired of

19  them coming at me and bothering me about everything.  And I

20  just -- I was more worried about my son and my family.  So my

21  loyalty was to my family and to stop the nonsense.

22  Q.  Now, you say that it's stopping the nonsense.

23          After the assault of Michelle Richards, your

24  girlfriend, in August of 2008.

25  A.  Yes.

1   Q.  What type of nonsense are you referring to?  Can you tell

2   the jury what you experienced from right after you pulled Fat

3   Dog off of Michelle Richards, until you were assaulted at the

4   Lighthouse?

5          MR. SATAWA:  Objection, your Honor.  The Court has

6   admonished us about speaking objections.  I would consider that

7   a speak -- the prosecutor testifying.  It's pulling --

8   Michelle, being pulled off, et cetera.  I do not believe that's

9   an appropriate question.  It's leading.

10         THE COURT:  Well, I do not believe that it's leading.

11  I do not think that it impermissibly suggests a particular

12  answer.  And I recollect that the witness described the events

13  in pretty much the way it was cast by counsel.

14         I overrule the objection.

15         MS. MOHSIN:  Thank you, your Honor.

16  BY MS. MOHSIN:

17  Q.  So from the time, beginning with when you pulled Fat Dog

18  off of Michelle Richards, until the assault at the Lighthouse

19  bar, what was the nonsense?  What are you referring to?

20  A.  Well, there was just, you know, different, different

21  instances.  There was different stuff that came up.

22  Q.  Did you receive phone calls?

23  A.  Just from Bill Fleming, about --

24  Q.  No.  I'm talking about from the club.  Did you receive

25  phone calls from the club during that time period, from members

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - REDIRECT BY MS. MOHSIN

```
1   of the club?
2              MS. STOUT:  Objection.  Leading.
3              THE COURT:  Overruled.  The answer can be either yes
4   or no.  It doesn't impermissibly suggest a particular answer.
5              Go ahead.
6   BY MS. MOHSIN:
7   Q.  Did you receive phone calls from members of the club after
8   Michelle -- after you pulled Fat Dog off of Michelle Richards?
9   I'm talking about that period of time in 2008.  Did you get
10  calls from members of the club?
11  A.  To return my stuff?
12  Q.  Any calls.
13  A.  Return -- yeah, just to return shirts and patch and wanting
14  to know where his ring was, Gary was.
15  Q.  Now, did you get one phone call or multiple phone calls?
16  A.  There was multiple phone calls.
17  Q.  And did there come a time where you heard that the Devils
18  Diciples believed that you were a snitch?
19  A.  Yes.
20  Q.  And so what did that do to your mental state, about what
21  you could expect from the club?
22  A.  It upset me, you know.
23  Q.  And it upset you, or did it raise any expectations?
24  A.  It raised an expectation that they could be coming after
25  me, they were going to kill me or, you know, harm me or --
```

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - REDIRECT BY MS. MOHSIN

122

1   Q.  Okay.  So after you heard that they believed you were a

2   snitch, you became concerned about what would happen next; is

3   that a fair statement?

4   A.  Yes.

5   Q.  Now, did that concern escalate over a period of time?

6   A.  Yes.

7   Q.  And when you saw the snitch poster, did, did that have an

8   effect on your mental state?

9   A.  Yes.

10  Q.  What was the effect that seeing that snitch poster had on

11  your mental state?

12  A.  It affected me mentally.  It upset me.

13  Q.  Did it give -- raise your concerns even more about what was

14  going to happen?

15  A.  Yeah.  Because obviously they weren't going to stop.

16  Q.  Okay.  So now a period of time has elapsed and the events

17  occur at the Lighthouse bar.  And there was a lot of

18  cross-examination about whether you threw the first punch or

19  whether Ronald Roberts threw the first punch.  So I want to

20  talk a little bit about that incident.

21  A.  Yes.

22  Q.  When, when you had the conversation with Ronald Roberts

23  before the Lighthouse bar, was it your understanding that he

24  was trying to resolve the situation, or was it your

25  understanding -- what was your understanding?  What was the

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - REDIRECT BY MS. MOHSIN

123

1    purpose of that communication with him?

2    A.  Well, I think it started out to be confrontational.  But,

3    you know, it just -- it didn't really go anywhere.  He -- I

4    don't know if it was embarrassment or trying to, you know, get

5    people that were there to believe that I was a snitch or -- I

6    really don't understand what his whole deal was other than --

7    Q.  So the first time when you met with him, was this a

8    confrontational meeting?

9    A.  Verbally.

10   Q.  All right.  And when you say "verbally confrontational,"

11   was it over the fact that you were perceived to be a snitch?

12   A.  Yes.

13   Q.  And again, you were not cooperating with law enforcement at

14   this time; is that true?

15   A.  Correct.

16   Q.  So when you had this conversation with him, was Wayne Werth

17   with him at that time?

18   A.  The first time, no.

19   Q.  Was Damien with him at that time?

20   A.  No.

21   Q.  Did you have concerns about people being armed at that

22   time?

23   A.  No.

24   Q.  And were you in an environment that you considered to be

25   fairly friendly or hostile when you had that first

1   conversation?

2   A.  Friendly.

3   Q.  And friendly in what way?

4   A.  I knew everybody that was there around, around me.

5   Q.  So when you say it was a verbal confrontation, do you have

6   an opinion about why it wasn't a physical confrontation at that

7   time?

8   A.  Well, we were at some friends' houses and stuff, and, you

9   know, we just -- I think we were respecting his house and, you

10  know, I didn't think continue on.

11          He didn't really approach me with anything, you know,

12  really confrontation.  Just he more or less was asking

13  questions, like what happened, you know, why did it happen like

14  that.  And then that was kind of how that went.  And later he

15  came back confrontational and more verbal, wanting to, what I

16  assume, fight.

17  Q.  Now, that was at the Lighthouse?

18  A.  Correct.

19  Q.  But now, at that first meeting, how much earlier had that

20  been?  Days or weeks?

21  A.  A couple weeks.

22  Q.  And at that first meeting, did you feel that the matter had

23  been resolved or that you had a problem with Mr. Roberts at the

24  conclusion of that first meeting?

25  A.  Oh, I knew he'd probably would be back.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - REDIRECT BY MS. MOHSIN

125

1  Q.  All right.  And so when you saw him at the Lighthouse bar,

2  what was your expectation about what you could expect from him

3  and the others that were with him?

4  A.  There was going to be a problem.

5  Q.  All right.  And now, I want to talk to you about the

6  confrontation that occurred.  You indicated that after it was

7  done, you believed that it was done; is that a fair statement?

8  In other words, that there would be no further action?

9  A.  What, what -- when was this?  I missed it.

10  Q.  So at the conclusion of the Lighthouse incident.

11  A.  Yeah.

12  Q.  You testified on cross-examination that you believed that

13  the matter was over.  Is that a fair statement or not a fair

14  statement?

15  A.  Yeah.

16  Q.  All right.  So what was your understanding about how things

17  were left with the Devils Diciples or Ronald Roberts at the

18  conclusion of, of the event?

19  A.  Well, I think that they felt like they got the best -- they

20  got their point across.  They came -- sent somebody that would

21  finally come to do something.  And I think that that was the

22  end of it.  That's what I thought.

23  Q.  Now, when they had come into the bar, there was a lot of

24  questions about whether they were wearing Devils Diciples'

25  colors or not.

1    A.   Mh-hm.

2    Q.   What was your understanding of Ronald Roberts' relationship

3    with the Devils Diciples on February the 14th of 2009?   In

4    other words, what did you believe on that date, that he was a

5    member or not?

6    A.   Yeah.  I heard that he was taking over.  I don't know if he

7    was the president or, you know, the warlord, but I heard that

8    he was definitely active in the Devils Diciples.

9    Q.   And what was your understanding of Wayne Werth?  Did he

10   have a relationship with the Devils Diciples?

11   A.   I assumed that he was prospecting.

12   Q.   And what was your understanding of Damien, the third person

13   that was with them that evening?

14   A.   He was the president at one time.  I thought he was just

15   back being an active member.

16   Q.   So even though they weren't wearing colors, your belief was

17   that they were all members of Devils Diciples or prospecting or

18   related to this club?

19   A.   Yes.

20   Q.   Now, at the conclusion of the Lighthouse event, did you get

21   assaulted again?

22   A.   Conclusion of the Light -- yes, I did.

23   Q.   Okay.  Tell the jury about that.

24   A.   I was in a bar, it was with a different club, but it all

25   kind of stemmed from the snitch poster deal, where they were

127

```
 1   going around to different clubs and, you know, trying to hang

 2   them up in their clubhouses.

 3          And an incident happened with a guy that I didn't

 4   know.  He was a Vigilante, which was NOK.  And that's where

 5   they were trying to hang their posters up.  And we had words,

 6   you know, with another guy.  And then he called, made a phone

 7   call.  And ten minutes later, there was, like, five or six guys

 8   coming up in the bar assaulting me.

 9   Q.  All right.  So let's back it up.  You said a lot there.

10          This is sometime after the Lighthouse event?

11   A.  Yes.

12   Q.  You were at another bar?

13   A.  Yes.

14   Q.  What was the name of that bar; do you remember?

15   A.  The Roadhouse.

16   Q.  The Roadhouse?

17   A.  Mh-hm.

18   Q.  Where is that located?

19   A.  In Algonac.

20   Q.  And when you were inside of this Roadhouse bar, you

21   indicated that you were involved in a verbal confrontation with

22   an individual that was a Vigilante?

23   A.  Correct.

24   Q.  And is that a motorcycle club?

25   A.  Yes.
```

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - REDIRECT BY MS. MOHSIN

1   Q.   And do you know members of that motorcycle club?

2   A.   Yes.

3   Q.   How did you know that this guy was a Vigilante?

4   A.   Because like I said, they were NOK's.  And people who were

5   the head of the Vigilantes now in Marine City or Algonac area

6   were Lurch and a couple other guys that used to run NOK.

7   Q.   So you're familiar with the members of the NOK or Next of

8   Kin club?

9   A.   Correct.

10  Q.   And that club was overtaken by the Vigilantes; is that your

11  understanding?

12  A.   Yes.

13  Q.   And so when you saw this individual, did you recognize him

14  to be a member of the Vigilantes?

15  A.   Yes.

16  Q.   And you indicated that he made a phone call; is that

17  correct?

18  A.   Yes.

19  Q.   Is that what you said?

20       And then shortly after that, what happened after the

21  phone call was made?

22  A.   Six, eight people stormed in there, and without any word or

23  any question, just started jumping on me.

24  Q.   Did they assault you?

25  A.   Yes.

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - REDIRECT BY MS. MOHSIN

129

1   Q.  Did they beat you up?

2   A.  So to speak, yes.

3   Q.  Okay.  And what was your opinion about why they did that?

4   A.  I thought it was over the snitch posters and the stuff in

5   the club.

6   Q.  And these were not Devils Diciples, right?

7   A.  No.

8   Q.  Okay.  So after the Vigilantes' incident, did you have

9   reason to believe that this matter was not done?

10  A.  Yeah.  I don't know.  It, it was a possibility that it was

11  going to continue.

12  Q.  Okay.  Now, you were asked questions relating to some

13  telephone communications.

14          Who is Dusty?  Was he a member of the Blue Water

15  chapter?

16  A.  Yes, he was.

17  Q.  Did he pay the bills at the Blue Water chapter?  What's

18  your understanding of his relationship to that chapter with

19  respect to payment of bills?

20  A.  We called him the bar-back.  He kind of took care of the

21  bar, you know, make sure that the beer was stocked and the pop

22  was stocked and, you know, kind of wrote out a list of what we

23  needed and stuff like that.

24  Q.  Were there any utilities in his name?

25  A.  I don't recall.

UNITED STATES vs. SUTHERLAND, et al - 11-20129; 11-20066

JURY TRIAL, VOLUME XI - 11/3/2014
DANNY BURBY, JR. - REDIRECT BY MS. MOHSIN

130

1    Q.  Okay.  Now, when he disappeared, there was talk about a

2    flier being posted; is that correct?

3    A.  Yes.

4    Q.  And was there talk about notifying the police that he, in

5    fact, had been a missing person?

6    A.  Yes.

7    Q.  Were there any concerns expressed that -- about, about the

8    police involvement in that investigation?  In other words, did

9    anybody express concerns to you about the police involvement in

10   that case; in other words, that it would be welcome or not

11   welcome?

12   A.  No.

13   Q.  Okay.  I want to talk to you about your deal.  After you

14   turned the corner and decided that you wanted to cooperate with

15   law enforcement, you indicated that you were truthful with law

16   enforcement at that point with one exception; is that correct?

17   A.  Yes.

18   Q.  And what is your understanding of how it is that you --

19   what it is you have to do before you're going to be getting

20   this deal?  In other words, what do you have to do here today

21   before you're going to be able to receive the benefit of any

22   deal with the Government?

23   A.  To be completely honest.  To tell the truth, the whole

24   truth, and nothing but the truth.

25   Q.  And have you done that here?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS .MOHSIN

```
 1   A.  Yes, I have.
 2             MS. MOHSIN:  Thank you, your Honor.
 3             THE COURT:  The witness may step down.
 4        (Witness excused, 12:04 p.m.)
 5             THE COURT:  We'll take a stretch break while you call
 6   your next witness.  Is the next witness readily available?
 7             MS. MOHSIN:  It is -- he is, your Honor.  Excuse me.
 8             THE COURT:  Stretch.
 9        (Brief pause.)
10             THE COURT:  Let's come back to order, please.  Be
11   seated.
12             Your next witness, please?
13             MS. MOHSIN:  Your Honor, the Government would call
14   William Scott Lonsby.
15        (Witness is sworn.)
16             THE COURT:  Have a seat up here in this chair.  Pull
17   your chair up reasonably close to the microphone.  All right.
18             All right.  Ms. Mohsin, go ahead.
19             MS. MOHSIN:  Your Honor, in accordance with the
20   Court's instructions, this testimony is relevant to, in part 1,
21   Counts 1, the RICO conspiracy; Count 2, the gambling
22   conspiracy; and Count 3, the meth conspiracy.
23             In addition, his testimony is relevant to part 2, all
24   three counts, conspiracy to suborn perjury, suborning perjury,
25   and obstruction of justice.
```

1          THE COURT:  Proceed.

2          MS. MOHSIN:  Thank you.

3                    WILLIAM SCOTT LONSBY

4    called as a witness at 12:06 p.m., testified as follows:

5                    DIRECT EXAMINATION

6  BY MS. MOHSIN:

7  Q.  Good morning.

8  A.  Good morning.

9  Q.  Could you place -- please state your full name and spell

10 your last name for the jury?

11 A.  William Scott Lonsby.  L-O-N-S-B-Y.

12 Q.  Mr. Lonsby, how old are you?

13 A.  Forty-nine.

14 Q.  And do you go by a nickname?

15 A.  "Buckwheat."

16 Q.  Sometimes do you go by the name "Buck" as well?

17 A.  Yeah.

18 Q.  Okay.  How far did you go in school, Mr. Lonsby?

19 A.  Ninth grade.

20 Q.  And what did you do in the 9th grade after you quit school?

21 A.  Went to work.

22 Q.  And what was the purpose of that?

23 A.  Paid bills.

24 Q.  Okay.  Do you read and write?

25 A.  No.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1   Q.  Were you ever a member of the Devils Diciples Motorcycle

2   Club?

3   A.  No.

4   Q.  Were -- did you have a relationship with the Devils

5   Diciples Motorcycle Club?

6   A.  Friends, partied with them.

7   Q.  Did you consider yourself to be a citizen?

8   A.  Yes.

9   Q.  Okay.  Are you familiar with that term?

10  A.  Yes.

11  Q.  Okay.  And could you tell the jury whether you've ever had

12  occasion to use illegal substances?

13  A.  Yes.

14  Q.  Have you ever used marijuana?

15  A.  Yes.

16  Q.  Have you ever used methamphetamine?

17  A.  Yes.

18  Q.  And were there other drugs that you had tried on other

19  occasions, such as cocaine and acid?

20  A.  Yes.

21  Q.  Did you continue to use cocaine or acid?

22  A.  No.

23  Q.  So what was your -- did you just try them and stop using

24  them; is that a correct statement?

25  A.  Yes.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1   Q.  Do you consume alcohol?

2   A.  Yes.

3   Q.  Okay.  Now, when did you first use methamphetamine or meth?

4   A.  When I was a teenager.

5   Q.  All right.  And did you use it regularly at that time, when

6   you first started --

7   A.  No.

8   Q.  -- using it?  No?

9   A.  No.

10  Q.  Did there come a time where you started using it regularly?

11  A.  Yes.

12  Q.  When did that occur?

13  A.  When I turned early 20's.

14  Q.  Okay.  Do you have a history of employment, sir?

15  A.  Yes.

16  Q.  Could you tell the jury the types of work that you've done?

17  A.  Roofing, painting, sandblasting.

18  Q.  Okay.

19  A.  Mechanic work.

20  Q.  And these type of jobs, were they full-time jobs or

21  part-time jobs or jobs that you could do when, when you had

22  them available?

23  A.  Depending on the weather.

24  Q.  Okay.  Did you ever work for a company called ABZ Steel?

25  A.  Yes.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1    Q.  And about how long did you work for ABZ Steel?

2    A.  A year and a half.

3    Q.  Okay.  I want to direct your attention to an individual by

4    the name of Vern Rich.  Do you know Vern Rich?

5    A.  Yes.

6    Q.  How do you know him?

7    A.  He was my best friend, and now he's my brother-in-law.

8    Q.  Okay.  So he's got a familial relationship to you?

9    A.  Yes.

10   Q.  What is that relationship?  How is he your brother-in-law?

11   A.  He's married to my sister.

12   Q.  All right.  And have you known him a long time?

13   A.  Yeah.

14   Q.  And you said he was your best friend.  He's no longer your

15   best friend?

16   A.  Well, now he's my brother-in-law.  I mean --

17   Q.  Okay.  So both?

18   A.  Yeah.

19   Q.  Now, I want to direct your attention to the mid-1990s.  Did

20   you become -- withdrawn.

21          Are you familiar with the Devils Diciples Motorcycle

22   Club?

23   A.  Yes.

24   Q.  How do you know about that club?

25   A.  It's been in Port Huron since I was a teenager.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

136

1   Q.   Okay.  And did there come a time where you started

2   attending Devils Diciples events?

3   A.   Yeah, after I turned 21.

4   Q.   All right.  And were you invited to attend these events or

5   were you free to attend them without being invited?

6   A.   No.  You had to be invited.  They come down to the bars and

7   invite, you know, open bar.

8   Q.   Okay.  And did you ever obtain methamphetamine while you

9   were at any of these Devils Diciples events around this time?

10  A.   Yeah.

11  Q.   Okay.  Now, were you ever invited to -- well, you said you

12  were invited to the Devils Diciples events.  Were they at

13  clubhouses?

14  A.   Yeah.

15  Q.   Which clubhouses were you invited to go to?

16  A.   Port Huron chapter.

17  Q.   Any others?

18  A.   Marine or Mount Clemens.

19  Q.   Now, when you would attend these events, did you have to

20  buy tickets?

21  A.   You didn't have to.

22  Q.   Okay.  Were you, were you permitted to buy tickets or

23  certain types of tickets?

24  A.   Raffle tickets, yeah.

25  Q.   Okay.  And what type of things did you know the Devils

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1    Diciples to raffle off?

2    A.   Leathers, chaps, helmets.

3    Q.   Did they ever raffle motorcycles?

4    A.   They were supposed to have one, that I know of.

5    Q.   All right.  And did you buy tickets for these various

6    raffles?

7    A.   Sometimes.

8    Q.   Did you ever win?

9    A.   No.

10   Q.   Now, you didn't become a member of this club.  Were you

11   ever asked?

12   A.   Yeah.  A couple times.

13   Q.   And did you refuse?

14   A.   Yes.

15   Q.   Why?

16   A.   Because my dad told me he would have my kahunas hanging on

17   his garage wall if I joined.

18   Q.   And you listened to your father, didn't you?

19   A.   Very well.

20   Q.   All right.  Now, I want to direct your attention to slot

21   machines or poker machines.

22        Did you ever see any slot or poker machines at any of

23   these clubhouses?

24   A.   Yes.

25   Q.   And did you ever play them?

```
 1    A.   Yes.

 2    Q.   Did you ever win money?

 3    A.   A couple times.

 4    Q.   Did it pay out money or did you have to go --

 5    A.   Quarters.

 6    Q.   -- get someone?  Quarters?

 7              Did you know what relationship Vern Rich had to the

 8    Devils Diciples?

 9    A.   Yeah.

10    Q.   Tell the jury about that.

11    A.   He was president.

12    Q.   Okay.

13    A.   Of the Port Huron chapter.

14    Q.   Of the Port Huron chapter?

15    A.   Yeah.

16    Q.   And did he tell you that?

17    A.   Yeah.

18    Q.   And did he take you to the Port Huron chapter or other

19    chapters with him?

20    A.   Yeah.

21    Q.   All right.  And during the times that he took you, did it

22    ever have anything to do with the slot machines?

23    A.   Just go in there and reset them.

24    Q.   Okay.  Did he empty change or put money in or out or do

25    anything along those lines?
```

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1   A.  Change.  Money, yeah.

2   Q.  Did he have keys?

3   A.  Yeah.

4   Q.  And did you see him using the keys to open the machines?

5   A.  Yeah.

6   Q.  Did you see him take money out?

7   A.  Yes.

8   Q.  Did you see him do other things to the machines, like

9   change settings?

10  A.  Reset them and stuff like that, yup.

11  Q.  Now, did there ever come a time where there were IOU's

12  contained inside those machines?

13  A.  Yup.

14  Q.  And what did he do when he saw an IOU?

15  A.  He would count out the money that the IOU slip was for, put

16  it in an envelope, and who's ever name was on the slip, he

17  wrote on the envelope.

18  Q.  Where did he leave it?

19  A.  Behind the bar.

20  Q.  At the clubhouse?

21  A.  Yup.

22  Q.  And had you seen him do this on one occasion, or more than

23  one occasion?

24  A.  More than one occasion.

25  Q.  Okay.  Now, did you know whether Vern Rich was involved in

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

140

1   the sale and manufacture and distribution of drugs?

2   A.  Yup.

3   Q.  Now, let's start with Vicodin.

4           Are you aware of Vern Rich ever trading Vicodin for

5   anything?

6   A.  No.

7   Q.  Do you know who a woman named Lexi May is?

8   A.  Yep.

9   Q.  Who is that?

10  A.  It was a friend of ours.

11  Q.  Okay.  Was she a friend or something else in addition to

12  that?  In other words, how did you know her?

13  A.  I just knew her from the bars.

14  Q.  Okay.  And did you ever accompany Mr. Rich when he met with

15  Ms. May?

16  A.  No.  She come out to his house.

17  Q.  Say that again.

18  A.  She would come out to his house.

19  Q.  Okay.  So maybe I should ask it, were you ever present

20  when --

21  A.  Yeah.

22  Q.  -- when Ms. May and Mr. Rich were together, or talking?

23  You know --

24  A.  I was outside, but yeah, I was on the premises.

25  Q.  All right.  Are you aware of whether Mr. Rich would trade

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

141

 1   methamphetamine with Ms. May in exchange for Vicodin?

 2   A.  Yes.

 3   Q.  All right.  Did that occur on, on multiple occasions or

 4   what?

 5   A.  A couple times that I know of.

 6   Q.  Okay.  Now, I want to talk about marijuana.  Do you know

 7   whether Mr. Rich was involved in marijuana trafficking?

 8   A.  Yes.

 9   Q.  I want to direct your attention specifically to a time --

10   well, I'm going to fast forward a little.

11          Did there come a time where someone named Victor

12   Castano went to trial?

13   A.  Yes.

14   Q.  And you know who that is, Victor Castano?

15   A.  Yes.

16   Q.  So I want to direct your attention to the time before Mr.

17   Castano was arrested.

18          You're familiar with Mr. Castano being arrested; is

19   that right?

20   A.  Yes.

21   Q.  Was that in June 2004?

22   A.  I think so.

23   Q.  You don't know the date?

24   A.  Yeah.  I don't -- I'm not familiar with the dates.

25   Q.  So prior to Mr. Castano being arrested, I want to focus you

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

142

1    on that period of time.

2    A.  Okay.

3    Q.  Were you aware of a relationship between Vern Rich and

4    Victor Castano as it relates to drugs?

5    A.  Yes.

6    Q.  What was that relationship?

7    A.  They were having a marijuana deal.

8    Q.  All right.  And did they ever ask you to participate in one

9    of these deals?

10   A.  Yes.  I was asked to take a ride.

11   Q.  And tell the jury what you were asked to do, and by whom

12   you were asked.

13   A.  Vern Rich asked me if I want to take a ride to Texas with

14   Gun Control, to pick up some marijuana.

15   Q.  And when you said "take a ride," what was your

16   understanding?  In what type of vehicle?

17   A.  A van.

18   Q.  And whose van was this?

19   A.  Vern Rich's.

20   Q.  And did you agree?

21   A.  Yup.

22   Q.  And about when did this happen?  I know you can't give an

23   exact date, but can you give a general time period?

24   A.  Ten years ago?  I don't know.  I'm guessing.

25   Q.  Was it before Victor Castano was arrested?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN
143

1  A.  Yes.

2  Q.  Now, when you got into this agreement, did you expect

3  anything in exchange for you driving to Texas with Gun Control?

4  A.  I was told I would get $300.

5  Q.  Okay.  Now, at the time, what was your relationship with

6  Vern Rich, specifically?  You had known him a long time.

7  A.  Best friends.

8  Q.  You were best friends.

9      Did you ever live with him on his property?

10  A.  I stayed with him, yes.

11  Q.  And did he ever give you things, such as drugs or money?

12  A.  Yes.

13  Q.  Did he ever feed you?

14  A.  Yes.

15  Q.  What did you do in exchange?

16  A.  Baby-sat.

17  Q.  Who did you baby-sit?

18  A.  His son.

19  Q.  And did you do that frequently?

20  A.  Yes.

21  Q.  Okay.  So when he asked you to go to Texas and you agreed,

22  your understanding was he would give you some money in

23  exchange?

24  A.  Right.

25  Q.  So did you, in fact, travel to Texas with Gun Control?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN                    144

1    A.  Yes.

2    Q.  Now, do you recognize anyone in the courtroom here today

3    that you went on that trip with?  Do you recognize Gun Control?

4    A.  I don't -- yup.  Over there.

5    Q.  All right.  Can you indicate what he's wearing?

6    A.  Looks like a gray shirt, with a white strip in his hair.

7            MS. MOHSIN:  Your Honor, identifying the defendant,

8    for the record.

9            THE COURT:  Noted.

10   BY MS. MOHSIN:

11   Q.  So you traveled to where in Texas; do you know?

12   A.  No.

13   Q.  Who was driving?

14   A.  Gun Control.

15   Q.  And when you arrived there, what did you do?

16   A.  We stayed in a camper and/or our trailer and put the weed

17   under the bed of the truck and -- Army van and came back home.

18   Q.  Now, did anybody else accompany you and Gun Control on this

19   trip to Texas?

20   A.  His girlfriend.

21   Q.  All right.  Whose girlfriend?

22   A.  Gun Control's.

23   Q.  And anybody else?  Did anyone --

24   A.  No.

25   Q.  -- else accompany you?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1         And when you got to Texas, what was your understanding

2    about where you were going; in other words, not the town or

3    location, but whose property were you going to?

4    A.  Victor's.

5    Q.  And when you say "Victor," what's Victor's last name; do

6    you know?

7    A.  Castile?  Cas --

8    Q.  So you don't know the last name?

9    A.  Right.

10   Q.  But you know his name was Victor?

11   A.  Right.

12   Q.  And what was Victor's relationship with Vern and Gun

13   Control?

14   A.  Club brother.

15   Q.  And when you say "club brother," a member of the Devils

16   Diciples --

17   A.  Right.

18   Q.  -- Motorcycle Club?

19   A.  Yes.

20   Q.  Okay.  So you were going to Victor Castano's property; is

21   that correct?

22   A.  Yes.

23   Q.  And where was this marijuana to be located?  In other

24   words, where were you --

25   A.  Shed.

1    Q.  I'm sorry?

2    A.  In a shed.

3    Q.  And so were you able to locate that shed?

4    A.  Yup.

5    Q.  And did you go inside the shed?

6    A.  Yup.

7    Q.  Did Gun Control accompany you?

8    A.  Yes.

9    Q.  And what did you find inside the shed?

10   A.  Two bundles of marijuana.

11   Q.  And could you describe how large these bundles of marijuana

12   were?

13   A.  Probably about yay long.  (Demonstrating).

14   Q.  Okay.

15   A.  About yay thick, probably about yay wide.  (Demonstrating).

16   Q.  So the record is clear, I'm holding my hands up --

17   A.  Right.

18   Q.  -- in a similar fashion?

19   A.  2 foot, by 2 foot, by 2 foot.

20   Q.  So like a square?

21   A.  Yeah.

22   Q.  2 foot, by 2 foot, by 2 foot.

23            And there were two of these?

24   A.  Yup.

25   Q.  And what were they packaged in?

1   A.  Plastic and brown paper.

2   Q.  All right.  And so when you, when you went into the shed,

3   did you immediately find them or did you have to hunt around?

4   A.  No.  They were sitting on the bench.

5   Q.  And where did you put them?

6   A.  Under the bed in the van.

7   Q.  So this was what type of a van?  Was this a minivan or some

8   other type of a an?

9   A.  Regular full-size van.

10  Q.  A full-size van.

11          It had some sort of bed in it?

12  A.  Yeah.  Just your standard, you know what I mean, bed.  It

13  folds, you know, up to a couch.

14  Q.  All right.

15  A.  Pulls down to a bed.  Like a back seat.

16  Q.  And did you hide the marijuana underneath that bed?

17  A.  Yeah.

18  Q.  What did you do next?

19  A.  Spent the night and come back home the next day.

20  Q.  And after you came back home the next day, where did you

21  go?  Whose home did you go to back in Michigan?

22  A.  Vern's.

23  Q.  And what did you do at that point?

24  A.  Dropped the van off.

25  Q.  And did you remove the bales of marijuana?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1    A.  No.  We just dropped the van off and then I left.

2    Q.  All right.  Now, I want to talk to you now about

3    methamphetamine.  During the same period of time, again, before

4    Victor Castano is arrested, okay?  Did you know whether or not

5    Vern was involved in the manufacture of methamphetamine?

6    A.  Before the weed or after the weed?

7    Q.  When?  When do you know?

8    A.  After the weed.

9    Q.  All right.  So after the weed was delivered.

10   A.  Right.

11   Q.  Okay.  Tell us what you know about Mr. Rich's involvement

12   in the manufacture of methamphetamine.

13   A.  I know he tried to make it a couple times and failed.

14   Q.  All right.  And now, how do you know that?  Did you have --

15   A.  Because he told me.

16   Q.  He told you.

17        And did he talk to you about how he had learned or how

18   he thought he had learned how to cook meth?

19   A.  Off the Internet.

20   Q.  Off the Internet?  What did he tell you?

21   A.  He just said he found how to make it on the Internet.

22   Q.  And then did he try to make it?

23   A.  Yup.  I'm assuming, yes.

24   Q.  You're assuming.  And are you assuming that because you had

25   a conversation with him about it?

1  A.  Yeah.  He told me he tried and failed.

2  Q.  All right.  Where was he living at the time where these

3  conversations occurred?  Do you know his address or, or city

4  that he was living in?

5  A.  Out there on Lapeer Road.

6  Q.  All right.  Lapeer Road?

7  A.  Yeah.

8  Q.  Okay.  And when you say that he was trying to make it, do

9  you know where at his, his place on Lapeer Road he was trying

10  to make meth?

11  A.  Upstairs in his garage.

12  Q.  So was this an attached garage or a detached garage from

13  his home?

14  A.  Detached.

15  Q.  And so it was a separate structure?

16  A.  Right.

17  Q.  And was it a one or a two-story structure?

18  A.  Two-story.

19  Q.  And did you have any understanding about where in this

20  two-story structure he was cooking the meth, or trying to?

21  A.  Upstairs.

22  Q.  Now, after he initially tried to cook and failed, did he

23  obtain any assistance in the manufacture process?

24  A.  Yes.

25  Q.  Tell the jury about that.

1  A.  He told me that him and Gun Control tried it.

2  Q.  All right.  And so when you say "Gun Control," this is the

3  same person we've been talking about --

4  A.  Yes.

5  Q.  -- as today.

6        Now, were you permitted to go into the second floor of

7  this detached garage?

8  A.  When they were making it?  No.

9  Q.  Were you ever permitted to go up there?

10 A.  When there was nobody home I could.

11 Q.  All right.  Now, did you have an understanding with Vern

12 about why he didn't want you to go up there at certain times?

13 A.  He just told me I didn't need to know nothing.

14 Q.  All right.  But when, when, when club brothers were there,

15 were you permitted to be present in that room upstairs?

16 A.  No.

17 Q.  And were you ever up there with Vern?

18 A.  Yup.

19 Q.  All right.  So you indicated that Gun Control had come and

20 they went upstairs to that room; is that correct?

21 A.  Yup.

22 Q.  Now, what were you doing when they were upstairs in that

23 room?

24 A.  Out back cutting wood.

25 Q.  And how many times did Gun Control come over to the house?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1    A.  He was staying there for a little while.

2    Q.  He was living at that place for a little while --

3    A.  Yeah, a couple weeks.

4    Q.  -- on Lapeer?

5            Did you know an individual by the name of Ray

6    Letourneau (phonetic)?

7    A.  Yup.

8    Q.  Who is Ray Letourneau?

9    A.  He was one of Vern's friends that was staying there before

10   Gun Control.

11   Q.  All right.  And do you have any understanding about what

12   Mr. Letourneau, whether he has any special skills as it relates

13   to meth?

14   A.  I found out recently that, yeah, he was a cook.

15   Q.  All right.  Did you know it at the time?

16   A.  No.

17   Q.  All right.  Was he also staying there?

18   A.  Yup.  He stayed there.

19   Q.  Now, was -- when you would be outside working, were you

20   told not to go up into that, into that room?

21   A.  Yes.

22   Q.  And could you smell any odors coming from that room when

23   they would all be up there?

24   A.  They was at night, so yeah, the odor kind of lingered.

25   Q.  What was that odor?

1   A.  Smelled like somebody dropped a battery.  You know what I

2   mean?  Like battery acid.

3   Q.  Now, did there come a time where Rich successfully produced

4   meth?

5   A.  I think so.

6   Q.  All right.  Was he providing you with meth to use during

7   this time period?

8   A.  Yes.

9   Q.  And was he providing it to you frequently?

10  A.  Yes.

11  Q.  And did there ever come a time where he would ask you to

12  test it out?

13  A.  Yes.

14  Q.  Okay.  Did there come a time where Rich advised you that he

15  needed you to repaint the garage area or that area upstairs

16  above the garage?

17  A.  Yes.

18  Q.  And why was that?

19  A.  He said they had a mishap.

20  Q.  And when he said they had a mishap, what was your

21  understanding about what that was?

22  A.  Something backfired on him.

23  Q.  Okay.  And what did it do to the room?

24  A.  It burnt the walls.

25  Q.  It burnt the walls.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1              And so did they ask you or did he ask you to paint the

2    room?

3    A.   Yes.

4    Q.   Did you?

5    A.   Yup.

6    Q.   Okay.  Now, did there come a time where you would attend --

7    well, withdrawn.

8              Did you continue to attend Devils Diciples events

9    during the time that you knew Vern Rich?

10   A.   Yeah.

11   Q.   Okay.  By the way, when is the last time you attended a

12   Devils Diciples' function?

13   A.   When I got my nose broke.

14   Q.   All right.  We'll get to that.  But was that in 2014?  '13?

15   Do you know what year that was?

16   A.   Last year, I believe.

17   Q.   All right.  So --

18   A.   Maybe two years ago.

19   Q.   So for the last several years, including the time before

20   Victor Castano was arrested, you continued to attend Devils

21   Diciples events?

22   A.   Yes.  I went to their parties and stuff.

23   Q.   All right.  Now, when you went to their parties during the

24   time that you were with Vern Rich, did you ever engage in

25   transactions, meth transactions, for Vern Rich?  In other

1   words, did you ever go as a middleman for him?

2   A.  Yes.

3   Q.  Okay.  And what did that look like?  In other words, how

4   would that work?  Explain that to the jury.

5   A.  He give me a couple quarters and somebody would go talk to

6   him and then they would come talk to me and I would give it to

7   them.

8   Q.  So when you say "quarters," you mean --

9   A.  $25 packs.

10  Q.  $25 packs of meth?

11  A.  Yeah.

12  Q.  And when, when someone would talk to him, was it your

13  understanding that someone would request the purchase of meth

14  from Vern Rich?

15  A.  Yeah.

16  Q.  And then he would ask you to deliver the methamphetamine?

17  A.  Yes.

18  Q.  And then did he collect the money or did you collect the

19  money?

20  A.  He did.

21  Q.  So he collected the money, and you delivered the meth; is

22  that correct?

23  A.  Yes.

24  Q.  And where did you do this?  Did you do this at club

25  functions?

1   A.  At the bars and stuff.

2   Q.  All right.  How about at club -- at the bars to citizens?

3   A.  Yes.

4   Q.  And did you do this at club functions as well, at Devils

5   Diciples' functions?

6   A.  No.

7   Q.  All right.  So this was to citizens; is that right?

8   A.  Yes.

9   Q.  You weren't dealing directly with --

10  A.  No club members.

11  Q.  No club members.

12  A.  No.

13  Q.  Right?  Okay.

14       And did, did Vern continue to provide for you?  In

15  other words, provide you with meth, money, a place to live, and

16  some of the things you talked about earlier?

17  A.  Yes.

18  Q.  Okay.  Now, did you have an agreement with him when it came

19  to his place of employment?  I'm talking about ABZ Steel.

20       Were there people at ABZ Steel that were purchasing

21  meth from Vern?

22  A.  Yes.

23  Q.  And how did -- did you -- were you involved in delivering

24  meth to those individuals?

25  A.  I would go to work with him.  He would give me a cigarette

1    pack and tell me to go put it in the grill, and I did.

2    Q.  All right.  Now, he would give you a cigarette pack?

3    A.  Right.

4    Q.  What was inside that cigarette pack?

5    A.  I never looked.  So I couldn't --

6    Q.  All right.  But what was your understanding?

7    A.  My understanding was methamphetamines.

8    Q.  All right.  And so he would tell you to put that cigarette

9    pack with what you thought was methamphetamine where?

10   A.  In a grill.

11   Q.  When you say "grill," like a barbecue grill?

12   A.  Barbecue grill.

13   Q.  Was this on the property of the employer?

14   A.  Out back at the shop.

15   Q.  All right.  And did you retrieve money in a -- or did you

16   retrieve money from the grill or some other way?

17   A.  No.

18   Q.  Okay.  Did there come a time where you got money or back in

19   payment for that methamphetamine?

20   A.  Yes.  There would be an extra check in an envelope.

21   Q.  Okay.  So let's talk about that.  You were working for ABZ

22   Steel?

23   A.  Right.

24   Q.  And you would receive a paycheck?

25   A.  Yes.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1   Q.  And was Vern also working there?

2   A.  Yes.

3   Q.  And did he receive a paycheck?

4   A.  Yes.

5   Q.  Now, you mentioned that there would be an extra check.

6   A.  Yes.

7   Q.  Would that be an extra check in your name or Vern's name?

8   A.  Vern's name.

9   Q.  All right.  And would there also be a check in your name

10  that was for Vern?  In other words, money --

11  A.  Yes.

12  Q.  -- that was for Vern --

13  A.  Yes.

14  Q.  -- but in your name?

15  A.  Yes.

16  Q.  And what was your -- did you keep that money in your name

17  or did you give it to Vern?

18  A.  I gave it to Vern.

19  Q.  And what was the -- what was that money supposed to be for?

20  In other words, what was your understanding about what that

21  other check was for?

22  A.  One check was mine, for working.  One check was his, for

23  working.  One check was for the methamphetamines.

24  Q.  All right.  And what did you do -- first of all, did you

25  collect these three checks or did Vern collect them or both?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1  A.  Both.

2  Q.  All right.  And so if you collected these three checks, did

3  you turn over Vern's check, the one named to him, to him?

4  A.  Yes.

5  Q.  And one that was named to you or addressed to you, did you

6  then sign that over to Vern?

7  A.  Yes.

8  Q.  Okay.

9  A.  I give Vern his two checks and then I had my paycheck.

10  Q.  Okay.

11  A.  So, just so we got it, you know what I mean?

12  Q.  So we're clear?

13  A.  Right.

14  Q.  Okay.  I want to direct your attention now to Victor

15  Castano.  We talked about him very early, but I want to get

16  back to that.  Now, did you, did you own or -- withdrawn.

17       Are you familiar with a black Dodge pickup truck?

18  A.  Yes.

19  Q.  Now, did you have a black Dodge pickup truck titled in your

20  name?

21  A.  Yes.

22  Q.  Did you purchase that truck?

23  A.  No.

24  Q.  Did you consider that truck to be your property?

25  A.  Only because it was in my name.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

159

1   Q.  Okay.

2   A.  As far as title-wise, it was registered to me, but it

3   belonged to Vern.

4   Q.  All right.  So it was registered to you, but it actually

5   belonged to Vern?

6   A.  Belonged to Vern, yes.

7   Q.  Did Vern keep that truck?

8   A.  Yes.

9   Q.  Did you, did you also share the truck or it just was Vern's

10  truck?

11  A.  It was Vern's truck.

12  Q.  All right.  I'm going to direct your attention to two

13  exhibits.

14          THE COURT:  I aim to break for lunch at 12:45 for one

15  hour.

16  BY MS. MOHSIN:

17  Q.  Mr. Lonsby, I'm going to show you proposed Government's

18  Exhibit 20-8 and 20-12.

19          Now, you indicated for the jury that you do not read

20  and write.  Do you have some capability of reading,

21  and specifically like your name and, and some other words?

22  A.  My names and stuff like that, yes.  I can --

23  Q.  Okay.

24  A.  I can write my name.

25  Q.  All right.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1   A.  Read my name.

2   Q.  I'm going to direct your attention first to Government's

3   Exhibit 20-8 and ask you if you recognize this.

4   A.  Yup.  That's the title to the Dodge truck.

5   Q.  Okay.  And before you came in here today, did you look at

6   that document with me?

7   A.  Yup.

8   Q.  All right.  That's your name that's on there?

9   A.  Yup.

10          MS. MOHSIN:  Your Honor, the Government at this time

11  offers proposed Exhibit 20-8 into evidence.

12          MS. STOUT:  No objection.

13          THE COURT:  Without objection, it is received.

14      (Exhibit 20-8 received, 12:33 p.m.)

15  BY MS. MOHSIN:

16  Q.  Take a moment to look at proposed Exhibit 20-12.

17          Is that a photograph?

18  A.  Yup.

19  Q.  Do you recognize it?

20  A.  Yup.  That's the black Dodge.

21  Q.  So that's the truck that, that you had titled to you; is

22  that a fair statement?

23  A.  Yes.

24  Q.  And again, you looked at this photo before you came here

25  today?

1    A.  Yes.

2         MS. MOHSIN:  Your Honor, at this time the Government

3    offers 20-12 into evidence.

4         THE COURT:  Received, with no objection.

5       (Exhibit 20-12 received, 12:33 p.m.)

6         MS. MOHSIN:  Could you please publish for the jury

7    20-8.

8    BY MS. MOHSIN:

9    Q.  And for the record, this was a 1995 Dodge pickup truck; is

10   that a fair statement?

11   A.  Yup.

12   Q.  Okay.  And this particular certificate of title was issued

13   on September 27th of 2004?

14   A.  Yup.  I believe so.

15   Q.  Now, when you registered, when you registered this truck,

16   did you provide the address 6144 Lapeer Road in Clyde,

17   Michigan?

18   A.  Yup.

19   Q.  Whose address was that?

20   A.  Vern's.

21   Q.  Okay.  Did you actually live with Vern at that time?

22   A.  Yes.

23   Q.  Okay.  I want to direct your attention to -- please publish

24   20-12.

25         And is this the truck that you had registered to you?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1   A.  Yup.

2   Q.  But that was owned by Vern?

3   A.  Yup.

4   Q.  Okay.  Now, in 2005, did you receive a telephone call from

5   Vern regarding Victor Castano and whether he had been arrested?

6   A.  Yes.

7   Q.  Okay.  Did you get a phone call from Vern Rich about --

8   A.  Telling me that Vern -- or that Victor got pulled over in

9   my truck with 50 pounds of weed.

10  Q.  All right.  So he told you that, all of that; is that a

11  fair statement?

12  A.  Yup.

13  Q.  And what was the purpose of him calling you to tell you

14  that Victor had been caught with 50 pounds of weed in your

15  truck?

16  A.  To let me know he got caught with the truck.

17  Q.  All right.  What were you expected to do?

18  A.  Figure out what happened.

19  Q.  All right.  So what did you do next?

20  A.  I created a lie.

21  Q.  All right.  And when you created the lie, what was the lie

22  that you created?

23  A.  I told the FBI that Victor picked the truck up from my

24  house.

25  Q.  So now did there -- I want to fast forward again and then

```
 1    we're going to rewind.
 2            Fast forward, did you testify at a trial later?
 3    A.  Yes.
 4    Q.  And when you testified at that trial, did you commit
 5    perjury?
 6    A.  Yes.
 7    Q.  Okay.  And was the entire testimony or most of that
 8    testimony fabricated based on this lie?
 9    A.  Yes.
10    Q.  All right.  So now let's rewind, okay?  You get a phone
11    call --
12    A.  Okay.
13    Q.  -- from Vern Rich.
14    A.  Okay.
15    Q.  And he tells you that Victor has been pulled over in your
16    truck.
17    A.  Yes.
18    Q.  Now, at that point in time, when you receive that phone
19    call, had you been in possession of that truck or had that
20    truck been in someone else's possession?
21    A.  It was in somebody else's possession.
22    Q.  And had it been in someone else's possession for a period
23    of time?  In other words, this wasn't something where you had
24    it sometimes and Vern had it?
25    A.  No.
```

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN                    164

1   Q.  Or somebody else had it?  No.

2          You had never been in possession of that truck; is

3   that correct?

4   A.  No.

5   Q.  That's not correct?

6   A.  Yeah.  I mean, that's correct.

7   Q.  Okay.  All right.

8   A.  I mean, no, I was never in possession of it, but --

9   Q.  Okay.  And were you living with Vern at that time when you

10  got this phone call about Victor Castano?

11  A.  Yes.

12  Q.  Okay.  So you were living -- were you living with Vern or

13  were you living on 17th Street?

14  A.  I was living at 17th.

15  Q.  And where was Vern living?

16  A.  Out there on Lapeer.

17  Q.  All right.  So you were not physically living at the same

18  location?

19  A.  Right.

20  Q.  All right.

21  A.  I was trying to get back with my girlfriend.

22  Q.  And did you have a conversation with Vern about what to

23  tell the police if they came calling to ask about this truck?

24  A.  Yes.

25  Q.  What was that conversation?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1   A.  He said just to tell him Victor borrowed it from me, from

2   my house, and I let him use it.

3   Q.  All right.  So he wanted you to say that to the police if

4   you were contacted?

5   A.  Right.

6   Q.  Now, were you interviewed by the FBI in June of 2005?

7   A.  (No response.)

8   Q.  Do you remember the date?  Don't remember the date?

9   A.  (No response.)

10  Q.  Okay.  Were you interviewed by the FBI?

11  A.  Yes.

12  Q.  Okay.

13  A.  That part, I can, I can remember that part.

14  Q.  Okay.

15  A.  The dates, I don't.

16  Q.  So after this conversation with Vern, did you get

17  interviewed by the FBI?

18  A.  Yes.

19  Q.  And did you tell them the truth?

20  A.  No.  I told them the lie.

21  Q.  All right.  And specifically, what did you tell them about

22  this particular truck?

23  A.  That Victor had borrowed it from me at my house.

24  Q.  Now --

25  A.  On Francis.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN                    166

 1   Q.  On Francis.

 2        Now, did Vern tell you that there had been a firearm

 3   found in that truck?

 4   A.  Later he did.

 5   Q.  When you were interviewed by the FBI, did you know that

 6   there had been a firearm found in that truck?

 7   A.  I can't remember if they said they found one or not.

 8   Q.  Okay.

 9   A.  You know what I mean?

10   Q.  All right.

11   A.  They just asked me how he had my truck, or why he had my

12   truck.

13   Q.  All right.  And what did you tell them?

14   A.  That I got a phone call and Victor wanted to know if he

15   could borrow it to move a motorcycle.

16   Q.  So you told --

17   A.  Which was a lie.

18   Q.  Okay.  So you told the FBI that Victor had called you.

19   A.  Right.

20   Q.  And the purpose of him calling you was to borrow your

21   truck?

22   A.  To move a motorcycle.

23   Q.  To move a motorcycle?

24   A.  Right.

25   Q.  And did you have any conversation with the FBI about taking

1   it to a car wash, to clean it before you gave it to Victor?

2   A.  Yes.

3   Q.  Tell the jury what you told the FBI regarding taking it to

4   the car wash to have it cleaned.

5   A.  That I vacuumed, washed, and made sure there was nothing in

6   it but the registration, proof of insurance.

7   Q.  And in other words, was this a question directed at whether

8   the firearm had been in the, in the vehicle?

9   A.  Yes.

10  Q.  And what did you tell them about that?

11  A.  I told them no, there was no firearm in it.

12  Q.  Now, all of that was a lie, right?

13  A.  Yes.

14  Q.  Because the vehicle had not been at your house?

15  A.  Right.

16  Q.  You had not cleaned it?

17  A.  Right.

18  Q.  You had not searched it?

19  A.  Right.

20  Q.  You did not receive a phone call from Victor Castano?

21  A.  No.

22  Q.  Okay.  Do you own a firearm?

23  A.  No.

24  Q.  Okay.  After you had this interview with the FBI, did you

25  report back to Vern?  Did you tell him what had happened?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1    A.  Yes.

2    Q.  What did you tell him?

3    A.  That I got questioned by the FBI.

4    Q.  Did you have a discussion about what you said?

5    A.  I told him what I said.

6    Q.  Okay.  And what happened next?  Did there come a time

7    where, where you were asked to take responsibility for the gun?

8    A.  He come home from a club meeting and told me that some of

9    the club members wanted me to take, you know, responsibility

10   for the gun.  And Vern told them no, that he wasn't going to

11   have that happen.

12   Q.  All right.  So let's slow that down.

13        "He," meaning Vern, went to a club meeting?

14   A.  Yes.

15   Q.  What kind of club meeting, did you know?

16   A.  Their, what they call church.

17   Q.  And when he returned from that meeting, he contacted you or

18   he saw you face-to-face?

19   A.  He contacted me.

20   Q.  All right.  And when he contacted you, he told you that

21   they wanted you to accept responsibility.  Who was he referring

22   to, "they"?  Did he tell you?

23   A.  He didn't tell me.

24   Q.  What was your understanding based on the conversation?

25   A.  That Victor or somebody wanted me to own up to having the

1    gun.

2    Q.  And why was that?

3    A.  Because obviously Victor didn't know the gun was there.

4    Q.  All right.  And is that what Vern told you?

5    A.  Yes.

6    Q.  And what did you say?

7    A.  I told him no, I wasn't 'fessing up to owning a gun.

8    Q.  Why was that?

9    A.  Because I ain't never owned a gun in my life.

10   Q.  All right.  It wasn't your gun?

11   A.  And it wasn't my gun.

12   Q.  And did Vern tell you he had, he had, he had said no about

13   this plan?

14   A.  Yes.

15   Q.  All right.  Did that issue come up again and again or was

16   that the only time it came up?

17   A.  That was the only time it came up.

18   Q.  All right.  Now, did there come a time where you found out

19   or you learned who that gun did belong to?

20   A.  Yup.

21   Q.  All right.  And what did you learn?

22   A.  That it was Gun Control's gun.

23   Q.  Now, did there come a time where you were interviewed again

24   by the FBI, this time before that trial occurred?

25   A.  I --

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1  Q.  Before the trial that you testified occurred with Victor

2  Castano, did you have another interview with the FBI?

3  A.  I think so.

4  Q.  All right.  And did you provide additional information to

5  the FBI about who you had lent the truck to?  In other words,

6  you had concocted this story initially.  Did you elaborate or

7  go farther on that story the second time you talked with the

8  FBI?

9  A.  I think I might have went further.

10  Q.  All right.  Well, let me refresh your recollection.  Did

11  you have a conversation about -- or rather, did you tell the

12  FBI that Gun Control had borrowed the truck?

13  A.  Yes.

14  Q.  Now, what was that based on?

15  A.  On a lie.

16  Q.  All right.  Had you seen Gun Control with the truck in the

17  days --

18  A.  I seen him drive it, yes.

19  Q.  And had you seen him drive it in the days leading up to

20  Victor having the truck?

21  A.  Yes.

22  Q.  All right.  So when you told the FBI that had you seen Gun

23  Control in the truck before Victor had it, were you telling the

24  truth?

25  A.  Yes.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN
171

1    Q.  But again, the whole big story is still a lie, right?

2    A.  Yeah.

3    Q.  Okay.  Now, did there come a time where you testified at

4    trial?

5    A.  (No response.)

6    Q.  Did you testify at trial?

7    A.  Yeah.

8    Q.  All right.  And did you testify consistent with the story

9    that you had concocted?

10   A.  Yes.

11   Q.  By the way, are you having conversations with Vern every

12   time someone contacts you, like the FBI about the facts of the

13   case?  Are you telling Vern about it?

14   A.  Do you mean this, this what we're going through now?

15   Q.  No, no, no.  At the time --

16   A.  At the time, the first trial?

17   Q.  Correct.

18   A.  Yeah.

19   Q.  All right.  So were you in constant communication with

20   Vern?

21   A.  Yeah.

22   Q.  All right.  And is Vern --

23   A.  Like I said, I baby-sat for him.  I was out to his house

24   every day, so.

25   Q.  All right.  You guys were still best friends?

1    A.  Yes.

2    Q.  Were you brother-in-laws yet?

3    A.  No.

4    Q.  And did you share with him the FBI's interest in this

5    particular case?

6    A.  Yeah, I would say.

7    Q.  All right.  And did you tell him all the things you had

8    been asked?

9    A.  Yup.

10   Q.  Did you tell him what you told them?

11   A.  Yup.

12   Q.  Did he give you information about what you should or

13   shouldn't say?

14   A.  No.  He just told me stick to my story.

15   Q.  All right.  So he wanted you to stick to your story?

16   A.  So I did.

17   Q.  Okay.  And you did it at trial, right?

18   A.  Yeah.

19   Q.  Now, when you went to testify at trial, you added another

20   fact, didn't you?

21   A.  (No response.)

22   Q.  Did you add another fact?

23   A.  (No response.)

24   Q.  I'm going to direct your attention to an individual by the

25   name of Gadget.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1   A.  I don't remember.

2   Q.  Okay.  But you've had an opportunity earlier today to

3   review that transcript?

4   A.  And I still --

5   Q.  Okay.

6   A.  I can't remember.  I don't want to say yes, I did, and I

7   don't want to say no, I didn't, because I can't remember.  I

8   mean, I know it's on paper that says I did.

9   Q.  Okay.  So you don't remember testifying that Gadget --

10  A.  Right.

11  Q.  -- and Star --

12  A.  See, I don't remember --

13  Q.  Let me finish my question.

14  A.  -- saying that.

15  Q.  You don't remember -- you don't remember being --

16  testifying about whether Gadget and Star also had access to

17  that car?

18  A.  Right.  See, I don't remember.

19  Q.  Okay.

20      THE COURT:  It is 12:45.  And we'll recess the case

21  for one hour, ladies and gentlemen.  Your lunch is provided as

22  usual.  Please retire to the jury room.  Be ready to be brought

23  back out in one hour.  Likewise for counsel and defendants.  We

24  stand in recess.

25      COURT REPORTER:  All rise.  Court is in recess.

UNITED STATES vs. SUTHERLAND, et al - 11-20129; 11-20066

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

```
 1        (Recess taken, 12:46 p.m. - 1:51 p.m.)
 2             THE CLERK:  All rise.  Court is back in session.
 3             THE COURT:  Be seated, please, at least for the
 4   moment.
 5             I was told Mr. Satawa had something briefly before we
 6   bring the jury out; is that correct?
 7             MR. SATAWA:  Your Honor, just very briefly.
 8             The couple of questions elicited by the Government of
 9   this witness, for example, asking:  Did you later learn whose
10   gun it was?  I believe his answer was something to the effect
11   of, I was told it was Cary, Gun Control's, or I don't remember
12   the exact --
13             THE COURT:  It was really -- it was a yes or no
14   question that was answered more completely.
15             MR. SATAWA:  Correct.  And because it was a yes or no
16   question that elicited a response, I didn't -- your Honor has
17   identified the issue, you know, and hitting the nail on the
18   head, proverbially.
19             I did not object and it was out.  I didn't want to
20   make a bigger deal of it than had already been made, but I
21   would certainly object to the witness's answer on the grounds
22   of hearsay as well as lack of personal knowledge.
23             THE COURT:  Okay.
24             MR. SATAWA:  And that's it, Judge.
25             THE COURT:  Any comment from you, Ms. Mohsin?
```

1          MS. MOHSIN:  Two comments, your Honor.  I think it's

2    not hearsay, because this is a witness who later conformed his

3    testimony to an ongoing -- in an ongoing conspiracy; in other

4    words, this is a co-conspirator statement under 801(d)(2)(E).

5          In addition, whether or not it was Gun Control's gun

6    or not is not the point.  The point is that his testimony was

7    conformed based upon some information that he had.

8          So I think that it's not offered for the truth, but

9    even if it were, there is a co-conspirator statement aspect to

10   this, that we think it would fall under that exception to the

11   hearsay rule.

12         THE COURT:  I think that's a pretty good response,

13   Mr. Satawa.

14         MR. SATAWA:  I harken back to the famous line from

15   "My Cousin Vinny" when the Judge says, that was a lucid,

16   you know, well-thought-out objection.  It's overruled.

17         Your Honor, while I understand, I understand the

18   Government's response, if that is, in fact, the case, your

19   Honor, I would suggest the first part of the response does not

20   make it relevant.

21         The second part of the response, I would suggest, is

22   more prejudicial than probative.  The fact that it's not --

23   it's not his gun may be relevant, but the fact that he is

24   saying, I heard it was Cary VanDiver's gun, without any

25   foundation, without any insight as to how he acquired this

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1    information or on what it is based, I would submit is both lack

2    of personal knowledge; number two, relevance; and number three,

3    403, prejudicial value.

4            THE COURT:  403, it does not make the 403 prejudice

5    standard.  It's not substantially more prejudicial than

6    probative, in light of the fact the Government's proffer here,

7    which is frankly illuminating, that it was the basis or one of

8    the motivating factors for the perjured testimony in the trial

9    yet to emerge in that regard.  It's a background fact, or

10   background purported fact, at least.

11           Whether it was, you know, objectively, provably true

12   in a sort of cosmic truth sense is not the point.  It was the

13   witness's understanding.  It was what he was told, in other

14   words, that it was Vandiver's gun, and then the next things

15   happened, which was preparing for perjured testimony at trial

16   and so forth, as the witness has already endeavored to explain.

17           The objection is overruled.

18           Let's call the jury in.

19           THE CLERK:  All rise.

20       (Jury in, 1:55 p.m.)

21           THE COURT:  All right.  The jury is assembled.  Good

22   afternoon.  All be seated, please.

23           The record should reflect the presence of all

24   attorneys and defendants.

25           Ms. Mohsin, your examination continues.

```
 1              MS. MOHSIN:  Thank you.
 2   BY MS. MOHSIN:
 3   Q.  Good afternoon, Mr. Lonsby.
 4              Mr. Lonsby, before the lunch break we were talking
 5   about when you testified at a trial involving Victor Castano,
 6   and you remembered that you testified at that trial; is that
 7   right?
 8   A.  Yes.
 9   Q.  Now, at that time were you familiar with a person by the
10   name of Keith McFadden, also known as Gadget?
11   A.  I had met him a few times.
12   Q.  And were you familiar with a woman that went by the name of
13   Star?
14   A.  I met her a couple times, too.
15   Q.  When you say that you met these two individuals, first of
16   all, did they have any particular relationship with one
17   another?
18   A.  As far as I know, they were boyfriend and girlfriend.
19   Q.  And when did you meet -- when did you meet them; was it
20   around the time of the Victor Castano trial or before?
21   A.  Before.
22   Q.  How much before did you meet them?
23   A.  I'm guessing six months, maybe a year.
24   Q.  And under what circumstances did you meet them?
25   A.  At a party.
```

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

178

1    Q.   And did you meet them at a party in Michigan?

2    A.   Yes.

3    Q.   And was that party a Devils Diciples function?

4    A.   Actually, I believe it was out at Vern's house.

5    Q.   And when you met them was there any talk about their

6    testifying at the Victor Castano trial?

7    A.   No.

8    Q.   When did you come to learn, if at all, that they were going

9    to testify at the Victor Castano trial?

10   A.   I didn't.

11   Q.   So you did not know they were going to be testifying?

12   A.   No.

13   Q.   I'm going to show you proposed Government's exhibits.

14           Well, one of them has been admitted, and that's

15   Government's Exhibit 64-39, and proposed Government's Exhibit

16   64-24, and I'm going to ask you if you recognize these two

17   exhibits.

18           Do you recognize 64-39?

19   A.   Yup.

20   Q.   What is it?

21   A.   That's this one.

22   Q.   Yes.  What is it?

23   A.   McFadden.

24   Q.   McFadden?

25   A.   Or however you say his name.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1  Q.  All right.  Did you know him?

2  A.  Just briefly.

3        MS. MOHSIN:  Could you please publish 64-39?

4  BY MS. MOHSIN:

5  Q.  Now, this individual, you knew him very briefly.  Is he the

6  one that you talked about meeting at a party six months to a

7  year before the trial?

8  A.  Yeah.

9  Q.  And did you know him by a nickname?

10 A.  Gadget.

11 Q.  What's that?

12 A.  Gadget.

13 Q.  Gadget.  Okay.

14        Directing your attention to 64-24, which is a proposed

15 exhibit, do you recognize that photo?

16 A.  Yeah.  That was his girlfriend.  I believe it was his

17 girlfriend.

18 Q.  And do you know her nickname?

19 A.  Star.

20        MS. MOHSIN:  All right.  Your Honor, the Government

21 would offer, at this time into evidence, proposed Exhibit

22 64-24.

23        THE COURT:  Without objection, 64-24 is received.

24     (Exhibit 64-24 received, 1:59 p.m.)

25        MS. MOHSIN:  Would you please publish 64-24?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

180

1   BY MS. MOHSIN:

2   Q.  And so this is the woman that was Gadget's girlfriend that

3   you met before the Victor Castano trial, six months to a year,

4   right?

5   A.  Yeah.

6   Q.  Now, you testified on direct that you don't remember

7   testifying about these two individuals during the Victor

8   Castano trial.

9   A.  True.

10  Q.  Now, you don't remember.  Does that mean that you did not

11  or that you perhaps did testify about it?

12  A.  I don't remember testifying about it, you know what I mean?

13  I could have.  I might have, but I just don't remember.

14  Q.  All right.  Now, at the time that you testified you were

15  not telling the truth, predominantly; is that correct?

16  A.  True.

17  Q.  So if the court reporter had taken some statements down of

18  yours, would you accept that you said them?

19  A.  Yup.  I would have to.  It's on black and white.

20  Q.  All right.  So you were asked the question:  "Did you loan

21  the car to Keith McFadden, also known as Gadget, and Stella

22  Herron, also known as Star?"

23          And you answered:  "Yes.  They borrowed it."

24          Do you accept that you gave that answer?

25  A.  Yup.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1  Q.  And then you were asked:  "When did they borrow it?"

2        And you gave the answer:  "Two days before Victor

3  did."

4        Do you accept that answer?

5  A.  Yup.

6  Q.  So that's what you would have testified to during that

7  trial; is that a fair statement?

8  A.  Yup.

9  Q.  Even though you don't recall it today.

10       And the circumstances, the rest of the circumstances

11 of what you testified to, you do recall, correct?

12 A.  Yup.

13 Q.  And you -- the circumstances that you did testify to during

14 that trial were that you had lent this truck, that Dodge, to

15 Victor to move his motorcycle, correct?

16 A.  Yup.

17 Q.  And so that prior to lending it to Victor, Gadget and Star

18 had borrowed it; that was your testimony?

19 A.  Yup.

20 Q.  All right.  Now, when you testified about these facts,

21 these false facts, did you have concerns about what would

22 happen if you had told the truth about what -- whose truck it

23 was and where it was parked?

24 A.  Yes.

25 Q.  What were those concerns?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1   A.  That I was going to get in trouble.

2   Q.  And what would you get in trouble for?

3   A.  Having somebody else's truck in my name.

4   Q.  All right.  And you knew that that was not something

5   that -- well, withdrawn.

6           Why was that a problem, to have somebody else's truck

7   in your name?

8   A.  Well, it just wouldn't be right.

9   Q.  Okay.

10  A.  I mean, why would somebody else have their vehicle in

11  somebody else's name if --

12  Q.  Were you also concerned because of the drug trafficking

13  that you had participated in?

14  A.  Yes.  Yes.

15  Q.  And were you concerned about the drug trafficking that

16  these other individuals, Victor Castano and Vern Rich, had

17  participated in?

18  A.  Yes.

19  Q.  Okay.  And so after you testified at the trial what

20  happened to Victor?

21  A.  What do you mean, what happened to him?

22  Q.  Was he convicted?

23  A.  He went to jail.

24  Q.  Was he convicted?

25  A.  Yeah.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

183

1    Q.  Okay.  And did you become aware of any problems that Victor

2    had with either you or Vern after that trial?

3    A.  No, not right away.

4    Q.  Did there come a time that you did become aware that there

5    was some problem?

6    A.  Yeah.  When Vern told me that Victor had sent a letter out

7    stating that he wanted Vern either beat up or shot.

8    Q.  So Vern told you that he had received a letter?

9    A.  That he seen a letter.

10   Q.  That he seen a letter.  And it was addressed to who?

11   A.  He didn't say.

12   Q.  All right.  And the letter talked about Victor wanting Vern

13   beat up or dead?

14   A.  Right.

15   Q.  And did Vern tell you why Victor wanted --

16   A.  No.

17   Q.  -- Vern beat up or dead?

18        Do you know if Vern testified at the Victor Castano

19   trial?

20   A.  Yes.

21   Q.  And did you see his testimony?

22   A.  No.

23   Q.  Did you talk about it before he testified?

24   A.  No.

25   Q.  Did you talk to him about it after he testified?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1   A.  I may have.

2   Q.  Okay.  And did you ever have a conversation with Vern about

3   what you were going to say and what he was going to say?

4   A.  No.

5   Q.  Okay.  Now I want to direct your attention to July of 2012,

6   years after the Victor Castano trial.

7        Did you attend a Devils Diciples funeral or memorial

8   service?

9   A.  I attended a couple of them.

10  Q.  Let's talk about the one with the broken nose.

11  A.  Okay.

12  Q.  Do you remember that one?

13  A.  I remember that one.

14  Q.  All right.  Can you tell the jury what happened on that

15  particular occasion?

16  A.  I got invited to a funeral and when we showed up I got my

17  nose broke and told to leave.

18  Q.  All right.  And how did that come about?  Can you slow it

19  down for the jury and tell them where you were and what

20  happened?

21  A.  We was in Port Huron.  I rode down with a friend of mine on

22  his bike, because he said that, you know, he had made a couple

23  phone calls and they said it was all right.

24  Q.  When you say that he had made a couple phone calls and they

25  said it was all right --

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1   A.   I don't know who he talked to.

2   Q.   But what was the purpose of that call?

3   A.   Just to make sure it was all right, you know what I mean.

4   Q.   What was all right?

5   A.   For me to show up.

6   Q.   Did you have concerns about you coming to this Devils

7   Diciples event without permission?

8   A.   I did, at first.

9   Q.   Why was that?

10  A.   Just because I -- you know, Vern and them were fighting, so

11  I didn't know, you know.

12  Q.   All right.  Vern and the Devils Diciples were fighting or

13  someone --

14  A.   Not really fighting, they were just on disagreements.

15  Q.   Okay.  And who are you, involved in all of this?  What's

16  your sort of allegiance or loyalty in all of this?

17  A.   I was a friend.  I thought I was a friend.

18  Q.   Of who?

19  A.   Some of the club members.

20  Q.   Okay.

21  A.   Like I said, Vern was my best friend, which is now my

22  brother-in-law.

23  Q.   Did everybody -- or to your knowledge, did people know that

24  you had this relationship with Vern?

25  A.   Yes.  They all knew.

1    Q.  Okay.  So you needed to have permission before you could

2    attend this event, this funeral?

3    A.  I thought so.

4    Q.  All right.  And were you under the belief that permission

5    had been granted for you to attend?

6    A.  Yes.

7    Q.  Whose funeral was it?

8    A.  Skudder's, I think.

9    Q.  Okay.  Skudder's or was there a guy named Geezer?

10   A.  That could have been.

11   Q.  All right.  So you went to this event with your friend?

12   A.  Right.

13   Q.  And then what happens next?

14   A.  We pulled in.  I was talking to another friend.  And

15   somebody come up and headbutted me and broke my nose, told me I

16   had to leave.

17   Q.  All right.  And was Victor Castano at this event?

18   A.  Yes.

19   Q.  And what were -- was Fat -- do you know who Fat Dog is?

20   A.  Yup.

21   Q.  How do you know Fat Dog?

22   A.  From parties.

23   Q.  All right.  Had you been introduced to him before?

24   A.  Oh, yeah.

25   Q.  Was he at this event?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1   A.  I think so.

2   Q.  Okay.  And what about Vern Rich, was he at this event?

3   A.  No.

4   Q.  No.  Who was the person that headbutted you?

5   A.  Iron Mike.

6   Q.  Now, do you know who Iron Mike is?

7   A.  I didn't at the time.

8   Q.  Okay.

9   A.  I mean, I still --

10  Q.  You have never had any conversation with Iron Mike?

11  A.  Just when we got arrested.

12  Q.  Okay.  So that would have been after the headbutting?

13  A.  Right.

14  Q.  So prior to the headbutting in July of 2012, Iron Mike had

15  approached you?

16  A.  Right.

17  Q.  And at that time you did not know who Iron Mike was?

18  A.  Nope.

19  Q.  And when he approached you what did he say to you?

20  A.  He just asked me if I was Buckwheat, Vern's friend.  And I

21  said yeah.  And he told me I had to leave, headbutted me, broke

22  my nose, and I left.

23  Q.  Okay.  And what is your understanding about why he

24  headbutted you and told you to leave?

25  A.  I didn't know.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1    Q.  Okay.  And did you draw any conclusions at all?

2    A.  I figured it had something to do with Vern.

3         MR. SABBOTA:  I'm going to object.  He said he didn't

4    know.

5         THE COURT:  Let's rewind and ask that question again.

6    I sustain that objection.

7         MS. MOHSIN:  Okay.

8    BY MS. MOHSIN:

9    Q.  Did Iron Mike tell you why he headbutted you?

10   A.  No.

11   Q.  And did you -- did you leave that event somewhat confused

12   by -- about why he had headbutted you?

13   A.  Yes.

14   Q.  And did you later think about it and draw any conclusions

15   about what that was about?

16        MR. SABBOTA:  Same objection, your Honor.  He said he

17   didn't know.

18        THE COURT:  No, this is a different -- same objection,

19   different question, though.  Overruled.

20        THE WITNESS:  What was the question?

21   BY MS. MOHSIN:

22   Q.  Did you later think about it and come to any conclusion

23   about why that had happened to you?

24   A.  I just figured it was something to do with Vern.

25   Q.  All right.  Why would you think that?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

189

1   A.   I don't know.   It was the first thought that came to my

2   mind.

3   Q.   Okay.   Now, why --

4   A.   I knew I didn't do nothing to make them guys mad at me.

5   Q.   Okay.   And after your nose was broken, did you seek any

6   medical attention?

7   A.   Nope.

8   Q.   All right.   Was it bleeding?

9   A.   Little bit.

10   Q.   All right.   And so how do you know it was broken?

11   A.   Because I can feel it and tell you it's broken.

12   Q.   Okay.   Now, did you tell Vern what had happened?

13   A.   Not that night.

14   Q.   Did there come a time where you told Vern what had

15   happened?

16   A.   Yes.   He called me the next day and asked me what happened.

17   Q.   So he already knew?

18   A.   He knew.

19   Q.   He had heard it from somewhere else?

20   A.   Yes.

21   Q.   And so he called you to ask you what had happened?

22   A.   Yes.

23   Q.   And what did you tell him?

24   A.   I just told him I got headbutted, and he asked me by who,

25   and I told him I didn't know.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1  Q.  Okay.

2  A.  Because I didn't, didn't know Iron Mike.

3  Q.  Okay.  And what did he say about that?

4  A.  He just said he would find out what happened.

5  Q.  All right.  Now, did there come a time after that

6  headbutting incident where you were arrested in connection with

7  this case?

8  A.  Yes.

9  Q.  How long after the headbutting?

10 A.  Couple days.

11 Q.  So a couple days later you're arrested.  Are other people

12 arrested, too?

13 A.  Yup.  A whole bunch of people.

14 Q.  Whole bunch of people.  Was Iron Mike one of the people

15 that was arrested?

16 A.  Yup.

17 Q.  Was Vern Rich one of the people that was arrested?

18 A.  Yup.

19 Q.  Was Victor Castano one of the people that was arrested?

20 A.  Yup.

21 Q.  Was Jeff Smith or Fat Dog one of the people that was

22 arrested?

23 A.  Yup.

24 Q.  And did you see Iron Mike after you were arrested?

25 A.  Yup.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1   Q.  And did he say something to you?

2   A.  Yup.

3   Q.  What did he say?

4   A.  He asked me if I went home and called the FBI.

5   Q.  About your nose bleed?

6   A.  About my nose broke.

7   Q.  About your nose broken, okay.

8          And, now, you were charged in this case, correct?

9   A.  Am I charged in this case?

10  Q.  Correct.  Were you charged?

11  A.  Oh, yeah.

12  Q.  You were charged in two different indictments, right?

13  A.  Right.

14  Q.  You were charged in two different types of cases; a meth

15  conspiracy, yes?

16  A.  Yes.

17  Q.  And you were charged in the marijuana conspiracy, yes?

18  A.  Yes.

19  Q.  You weren't charged with the perjury, correct?

20  A.  No.

21  Q.  You pled guilty; is that right?

22  A.  Yes.

23  Q.  And when you pled guilty, did you -- did you read all of

24  the documents that you had to sign in order to plead guilty?

25  A.  I can't read.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

192

1    Q.  All right.  So did someone --

2    A.  My wife and my lawyer read them to me.

3    Q.  Okay.  And so based upon the information that they read to

4    you, what is your understanding about what you are facing if

5    you're convicted -- or you are convicted, but, you know, at the

6    conclusion of the case, what are you facing?

7    A.  I believe it's eight and-a-half to ten.

8    Q.  Eight and-a-half --

9    A.  Something in that area.

10   Q.  All right.  So this is --

11   A.  I'm not sure, so.

12   Q.  There was some range that was --

13   A.  Yeah, there was.  Yeah, I was doing time.

14   Q.  All right.  And is it your understanding that that's a

15   sentencing range?

16   A.  Yes.

17   Q.  Who decides what your sentence -- what sentence you get?

18   A.  This gentleman right here (indicating).

19   Q.  Okay.  The Judge?

20   A.  Yeah.

21   Q.  Okay.  And when you -- when you negotiated this plea

22   agreement, did you do it by yourself or did you have some help?

23   A.  What do you --

24   Q.  Did you have a lawyer?

25   A.  Yeah.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - DIRECT BY MS. MOHSIN

1    Q.  Okay.  And so did your lawyer do that negotiating for you?

2    A.  As far as I know, he did.

3    Q.  Okay.

4    A.  At least I hope he did.

5    Q.  And when he did, did he also -- did you have discussions

6    with him about cooperating and testifying at trial?

7    A.  Yes.

8    Q.  And what was your understanding about how it is that you're

9    going to get a deal with the Government?  What do you have to

10   do here?

11   A.  Tell the truth.

12   Q.  Tell the truth.  Okay.  What happens if you lie?

13   A.  My deal goes out the window and I face ten to life.

14          MS. MOHSIN:  All right.  We have nothing further for

15   the witness, your Honor.  Thank you.

16          THE COURT:  Mr. Satawa.

17          MR. SATAWA:  Yes, your Honor.  One second.

18          THE WITNESS:  Hey, would you like these two pictures

19   back?

20          MS. MOHSIN:  Oh, yes.  Thank you.

21                      CROSS-EXAMINATION

22   BY MR. SATAWA:

23   Q.  Good afternoon, sir.

24   A.  Good afternoon.

25   Q.  Based on your testimony on direct would you agree with me

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - CROSS BY MR. SATAWA

1   that meth has played an important part of your life over a

2   certain period of your life?

3   A.   Yes.

4   Q.   You certainly don't deny that you used meth?

5   A.   No.

6   Q.   And you certainly don't deny that you became a meth addict?

7   A.   I wouldn't call myself a meth addict, but I indulge in it,

8   yes.

9   Q.   You still indulge in it?

10   A.   No.

11   Q.   You do not?

12   A.   No.

13   Q.   So --

14   A.   I ain't did no drugs in almost three years.

15   Q.   You haven't done drugs in three years?

16   A.   Nope.  Other than prescribed by my doctor.

17   Q.   Are you taking anything today prescribed by your doctor?

18   A.   Ibuprofen and Narcos for my hand.

19   Q.   Okay.

20   A.   Well, actually for my wrist, but --

21   Q.   Did you take any marijuana today?

22   A.   Nope.

23   Q.   Take any meth today?

24   A.   Nope.

25   Q.   Sir, your testimony was that you are -- well, first of all,

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - CROSS BY MR. SATAWA

1   you are not a member of the Devils Diciples; is that correct?

2   A.   True.

3   Q.   And you never were a member of the Devils Diciples?

4   A.   True.

5   Q.   And never prospected with the Devils Diciples?

6   A.   True.  Right.

7   Q.   So everything that you were doing was done on your own?

8   A.   Right.

9   Q.   It wasn't -- in other words, you weren't doing anything

10  to -- if you -- what you were doing was what was best for you?

11  A.   Right.

12  Q.   Whether or not it had anything to do with the Devils

13  Diciples, you did it because it was good for you?

14  A.   I would say, yeah.

15  Q.   You know and are now related through marriage to at least

16  one member of the Devils Diciples?

17  A.   True.

18  Q.   Vern Rich?

19  A.   Yes.

20  Q.   And Vern Rich is your best friend, you testified on direct?

21  A.   Yes.

22  Q.   And I believe I read somewhere that you have known him

23  since you were eight years old?

24  A.   Yeah, right around there.  We -- yeah.

25  Q.   You guys grew up together?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - CROSS BY MR. SATAWA

1   A.  Yeah.

2   Q.  Childhood friends?

3   A.  Yeah.  We started off enemies, but became friends.

4   Q.  When you were eight, in third grade?

5   A.  Yeah.  Throwing rocks at each other.  I mean, when we were

6   kids, you know, we were fighting and neighborhood little spats

7   and --

8   Q.  Despite that --

9   A.  -- we became good friends.

10  Q.  -- difficult beginning, you became good friends?

11  A.  Good friends, yes.

12  Q.  And in fact, at some point Vern Rich --

13  A.  Married my sister.

14  Q.  -- married your sister?

15  A.  Yes.

16  Q.  And when did that happen?

17  A.  Four years ago, three years ago.

18  Q.  So 2010, 2011?

19  A.  Yeah, somewhere right around there.

20  Q.  So that would have been after this trial you testified

21  about, is that --

22  A.  Yes.

23  Q.  Is that fair to say?

24  A.  Yes.

25  Q.  Now, let's talk for a moment about --

2:11-cr-20129-RHC-MAR  Doc # 1092  Filed 11/16/14  Pg 197 of 310  Pg ID 7432
JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - CROSS BY MR. SATAWA

197

1    A.   Oh.  Oh.

2    Q.   Are you okay?

3    A.   Yeah.  Just a burp.

4    Q.   You need some water?

5    A.   Chili dogs.  You asked.

6    Q.   Sir, you just testified to the Government about the deal

7    that you ultimately reached.  Do you remember that testimony?

8    A.   What is the question again?

9    Q.   You just testified when the -- just before the Prosecutor,

10   the Government was finished with their questioning, the last

11   topic they asked you about was the deal that you struck with

12   them.

13   A.   Yes.

14   Q.   And they asked you if you understood the basic terms of

15   that agreement.

16   A.   Yes.

17   Q.   And you testified something about, you hoped your lawyer

18   reviewed it.

19   A.   Right.

20   Q.   And you do have a lawyer?

21   A.   Yup.

22   Q.   And you have met with that lawyer?

23   A.   Yup.

24   Q.   And you discussed initially what you were charged with;

25   is that right?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - CROSS BY MR. SATAWA

1   A.  Yup.

2   Q.  And you testified that when you were initially charged,

3   you were facing a possible sentence of ten to life?

4   A.  Yup.

5   Q.  And that's because it's your understanding you were charged

6   with a conspiracy to distribute meth?

7   A.  Yup.

8   Q.  And the quantity of that meth made it such that there would

9   be a mandatory minimum that the Judge would have to sentence

10  you to a minimum of ten years, right?

11  A.  I think so, yeah.

12  Q.  Yeah.  And then a maximum the Judge could possibly sentence

13  you to of life?

14  A.  Right.

15  Q.  Now, in order to help yourself, you and your lawyer engaged

16  in conversations, negotiations, with the Government; is that

17  fair to say?

18  A.  Yup.

19  Q.  And I mean, that's why you did it, you're here because

20  you're trying to help yourself out?

21  A.  Right.

22  Q.  Right.  And during those negotiations you met with the

23  Government and had to go through an interview process,

24  sometimes called a proffer; do you remember that?

25  A.  I remember meeting with her a couple times, I mean.

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - CROSS BY MR. SATAWA

1   Q.  Okay.  And the Government's lawyer, Ms. Mohsin, made it

2   clear that you were -- that in order for you to get the benefit

3   of this agreement, that you had one job, and that was to tell

4   the truth?

5   A.  Right.

6   Q.  Now, you have signed a couple of different documents that

7   puts that obligation on you; is that fair to say?

8   A.  Yup.  I signed a few pieces of paper.

9   Q.  And those pieces of paper, you testified on direct, were

10  explained to you by your lawyer?

11  A.  Yes.

12  Q.  As well as your wife?

13  A.  Yup.

14  Q.  And as a result of that agreement a couple of things are

15  going to happen:  You have a range, a possible range for your

16  sentence that the Government asked you about, and you said you

17  believed it was something like eight and-a-half to ten.

18  A.  Something like that, yeah.

19  Q.  And the Government also asked you about -- well, then in

20  order to get that range you have testified that your part of

21  the -- of that agreement is so that you must come into court?

22  A.  Right.

23  Q.  And you must testify?

24  A.  Right.

25  Q.  And the Government was clear about asking you, when you say

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - CROSS BY MR. SATAWA

1   you come in to testify, you're supposed to tell the truth.

2   A.  Right.

3   Q.  Now, when you reviewed that agreement with your lawyer,

4   that agreement spells out who gets to decide whether you tell

5   the truth or not?

6   A.  I think so.

7   Q.  All right.  And it's the Government who decides whether you

8   have told the truth here today, correct?

9   A.  I'm assuming, yeah.

10  Q.  Well, it is, right?

11  A.  Right.

12  Q.  Right.

13  A.  I mean, I don't know who decides it, but yeah.  I mean, it

14  would make sense, yeah, it's the Government.

15  Q.  The Government is calling you here as a witness today?

16  A.  Right.

17  Q.  And it's not your brother-in-law, Vern Rich, that gets to

18  decide whether you're telling the truth?

19  A.  Right.

20  Q.  Now, Mr. Lonsby, the Government, the Government has brought

21  you into court to testify here today.  You have been in a

22  courtroom before?

23  A.  Oh, yeah.

24  Q.  In connection with these folks, with some -- that's a bad

25  question.  Let me say it this way:

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - CROSS BY MR. SATAWA

201

```
 1              First of all, your brother-in-law, Vern Rich, he is
 2    not one of the individuals sitting over there today, is he?
 3    A.  No.
 4    Q.  Victor Castano, he is not one of the individuals sitting
 5    over there today?
 6    A.  No.
 7    Q.  You testified that Vern Rich is a member of the Devils
 8    Diciples?
 9    A.  He was.
10    Q.  And you have testified that Victor Castano was a member of
11    the Devils Diciples?
12    A.  I believe him to be, yes.
13    Q.  All right.  And you were called as a witness in a trial
14    that involved Victor Castano?
15    A.  Yes.
16    Q.  Also involved by way of being a witness, Vern Rich, Vern
17    Rich testified at Victor's trial?
18    A.  Oh, yeah.
19    Q.  Keith McFadden testified at this trial?
20    A.  Yeah, I guess.
21    Q.  Stella Herron or Star testified at this trial?
22    A.  I guess.  I mean, not while I was there, but --
23    Q.  It's your understanding that all --
24    A.  Right, yeah.  My understanding, yes, they testified.
25    Q.  And Keith McFadden, did you know him to be a member of the
```

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - CROSS BY MR. SATAWA

202

1    Devils Diciples?

2    A.  I believe so.

3    Q.  And we certainly agree at the time, Vern Rich was a member

4    of the Devils Diciples?

5    A.  Yes.

6    Q.  You were not?

7    A.  No.

8    Q.  And you went into a courtroom?

9    A.  Yes.

10   Q.  A courtroom much like this.  I know it wasn't this

11   particular courtroom, but a courtroom like this one?

12   A.  Right.

13   Q.  In the Federal Courthouse?

14   A.  Yes.

15   Q.  And there was a jury sitting, much like these jurors are

16   sitting?

17   A.  Yes.

18   Q.  To decide the guilt or innocence of Victor Castano?

19   A.  Right.

20   Q.  And the subject matter of that trial was a gun?

21   A.  That was part of it.

22   Q.  Whether or not Victor Castano owned a gun was why you were

23   a witness at that trial; is that right?

24   A.  Right.

25   Q.  Whether or not the gun was Victor Castano's?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - CROSS BY MR. SATAWA

1    A.   Right.

2    Q.   And your testimony was, at that trial, Victor Castano was

3    convicted?

4    A.   Yup.

5    Q.   And he was convicted of possessing that gun?

6    A.   Not just the gun, but yeah.

7    Q.   Other things, but also including possessing that gun?

8    A.   Yeah.

9    Q.   And that gun was the gun that you went into court and gave

10   testimony, implying that it belonged to you?

11   A.   I implied that it belonged to me?  No.

12   Q.   All right.  You just came into court and said the truck

13   belonged to you?

14   A.   Right.

15   Q.   All right.  So you would agree with me that before you took

16   the stand that time --

17   A.   Right.

18   Q.   -- what was it, about seven years, eight years ago now,

19   several years ago?

20   A.   Closer to probably ten.

21   Q.   Ten years ago now?

22   A.   Eleven years ago, yeah.

23   Q.   All right.  When you came into the courthouse for that

24   trial --

25   A.   Right.

204

1    Q.   -- there was a set of Government lawyers, much like here

2    today?

3    A.   Right.

4    Q.   And you got on this witness stand, a witness stand?

5    A.   Right.

6    Q.   And you raised your right hand?

7    A.   Right.

8    Q.   And you swore to tell the truth?

9    A.   Right.

10   Q.   Nothing -- the whole truth?

11   A.   Nothing but the truth, yeah.

12   Q.   And nothing but the truth?

13   A.   Yes.

14   Q.   And you didn't do that?

15   A.   No.

16   Q.   You lied?

17   A.   Yes.

18   Q.   Now, when you did that, you would agree with me that in --

19   for at least the purpose of coming into court, that a lie

20   would be, I would define as something that is untrue and

21   intentionally telling something that is not true; would you

22   agree with that?

23   A.   Yes.

24   Q.   All right.  And you're intentionally saying something that

25   isn't true for either your benefit or for the benefit of

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - CROSS BY MR. SATAWA

205

1   someone else; would you agree with that?

2   A.   Yes.

3   Q.   And you were coming into court and saying that this gun --

4   or excuse me -- giving this testimony at Victor Castano's trial

5   to help Victor Castano?

6   A.   Yeah.

7   Q.   Or to help Vern?

8   A.   I don't understand what you mean.

9   Q.   Did you go into court because your intent was to help your

10  best friend, Vern, by testifying?

11  A.   No.  I went to court because I was called on to testify

12  about some gun.

13  Q.   Did you go to court and give false testimony in an attempt

14  to help your best friend, Vern?

15  A.   No.

16  Q.   Did you go to court and give -- knowingly give false

17  testimony to help Victor?

18  A.   No.

19  Q.   You went into court and gave false testimony for no reason

20  at all?

21  A.   To try to keep myself out of trouble.

22  Q.   To try to keep yourself out of trouble.

23         Fast forward here today and your motive testifying

24  here today is the same?

25  A.   Yes.

```
 1   Q.  You're here to talk to these jurors to keep yourself out of
 2   trouble?
 3   A.  Right.
 4   Q.  To minimize the damage?
 5   A.  Right.
 6   Q.  So you're not facing a mandatory ten years up to life?
 7   A.  Right.
 8           MR. SATAWA:  May I have one moment, your Honor,
 9   please?
10           THE COURT:  Yes, sir.
11       (Brief pause, 2:26 p.m.)
12   BY MR. SATAWA:
13   Q.  Now, you testified that your -- I guess the background or
14   the factual background for your being charged with the meth was
15   that you worked with Vern selling meth?
16   A.  Yes.
17   Q.  And you sold meth not at Devils Diciples functions?
18   A.  No.
19   Q.  Not to Devils Diciples members?
20   A.  No.
21   Q.  But to citizens?
22   A.  Yes.
23   Q.  Like you?
24   A.  Yes.
25   Q.  Who are not members of the Devils Diciples?
```

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM LONSBY - CROSS BY MR. SATAWA

1    A.  Right.

2    Q.  And again, this was for your financial gain?

3    A.  So I could get drunk, yeah.

4    Q.  For you -- for you to get money so you could get drunk?

5    A.  Right.

6    Q.  And get high?

7    A.  Right.

8    Q.  And you sold meth.  You sold meth?

9    A.  Yeah.

10   Q.  To non -- to citizens?

11   A.  Yeah.

12   Q.  A lot of meth?

13   A.  I wouldn't say a lot.

14   Q.  A lot of times?

15   A.  A few.

16   Q.  Well, by a few, do we mean over 25?

17   A.  Yeah.

18   Q.  Over 50?

19   A.  No.

20   Q.  Somewhere between 25 and 50?

21   A.  Right.

22          MR. SATAWA:  No further questions, your Honor.  Thank

23   you.

24          THE COURT:  Anyone else?

25          Any redirect?

```
 1                    REDIRECT EXAMINATION

 2   BY MS. MOHSIN:

 3   Q.  Mr. Lonsby, so that the jury is clear, when you engaged in

 4   the sale of meth, Vern told you who to give the meth to; is

 5   that right?

 6   A.  Sometimes.

 7   Q.  And who collected the money, you or Vern?

 8   A.  Vern did.

 9   Q.  So were you getting the money from the meth transactions

10   you were engaged in or did Vern pay you for that in a different

11   way?

12   A.  Vernor would give me a couple quarters, like when I

13   babysatted.

14   Q.  Okay.  Quarters of meth?

15   A.  I would do one.

16   Q.  Quarters of meth, right, meaning small --

17   A.  Right, $25 package of meth.

18   Q.  Okay.

19   A.  I would do one.

20   Q.  All right.

21   A.  I would go to the bar, somebody would come up and ask me,

22   you know, hey, you got somethin', somethin'.  And I -- well,

23   yeah, I'd take the money that I got from that one, and I would

24   get drunk on it.

25   Q.  All right.  And so that was one way that you did it.
```

2:11-cr-20129-RHC-MAR   Doc # 1092   Filed 11/16/14   Pg 209 of 310   Pg ID 7444

```
 1              Were there other times where you gave the meth and the

 2   money was given directly to Vern?

 3   A.  Right.

 4   Q.  And what -- how did he pay you?  He would pay you with

 5   these little packets of meth only?

 6   A.  Yeah.

 7   Q.  Did he ever give you any other things, like food and

 8   shelter?

 9   A.  Well, shelter.

10   Q.  He took care of you?

11   A.  Right.  He took care of me.

12   Q.  Okay.

13   A.  He give me a spot to, you know, sleep when I needed it, as

14   long as I babysatted for him.

15   Q.  So were you a good friend to him?

16   A.  Yes.

17   Q.  When Victor got in trouble in the truck registered in your

18   name, were you concerned about not just your own getting in

19   trouble, but also Vern and other people getting in trouble?

20   A.  Yes.

21   Q.  So when you testified and lied to the FBI and lied in

22   court, were you protecting yourself, were you protecting other

23   people, or both?

24   A.  Both.

25   Q.  Now, when you testified at that trial you never implied
```

1    that the gun belonged to you, you never testified to that, did

2    you?

3    A.  No.

4    Q.  Okay.

5    A.  I been saying all along, that gun was never mine.  I never

6    seen it before.

7                MS. MOHSIN:  All right.  Thank you.  Nothing further.

8                THE COURT:  Witness may step down.  Thank you.

9                Next?

10               MS. MOHSIN:  Your Honor, the Government's witness is

11   on his way down the hallway.

12               THE COURT:  Okay.  Counsel, I'm going to just mention

13   a little bit about Rule 11, given the discussion with this past

14   witness about negotiations, and this has been mentioned a few

15   times earlier and it will be mentioned a few times, more than

16   a few times, probably, in upcoming testimony as well.

17               I just want the jury to be clear, all these

18   discussions about who determines this and who makes

19   arrangements on these deals, Rule 11 deals, negotiations and so

20   forth, in the Federal Court system the Judges do not have any

21   role other than assessing sentence in the event a defendant is

22   convicted.

23               Arrangements, promises, commitments and so forth,

24   recommendations, those are all negotiated just between the

25   two sides.  The Judges don't get into negotiating or making

1    promises or anything of that sort.  It's not part of our role

2    under the Rules of Criminal Procedure.

3              All right.  Next?

4              MR. MAIATICO:  Your Honor, the Government calls Howard

5    Joseph Quant to the stand.

6              THE COURT:  Raise your right hand, sir.

7         (Witness sworn.)

8              THE COURT:  Have a seat up in this chair.

9                          HOWARD JOSEPH QUANT

10        called as a witness at 2:31 p.m. testified as follows:

11                          DIRECT EXAMINATION

12   BY MR. MAIATICO:

13   Q.  Good afternoon, Mr. Quant.

14   A.  Good afternoon.

15   Q.  Could you please state your name and spell your last name

16   for the court reporter, please?

17   A.  Howard Joseph Quant, Q-u-a-n-t.

18   Q.  I'm going to ask you just to move up a little bit and speak

19   into the microphone so everyone in the jury can hear you.

20   A.  Howard Joseph Quant, Q-u-a-n-t.

21   Q.  All right.  And how old are you, Mr. Quant?

22   A.  Fifty-eight.

23   Q.  Are you currently employed?

24   A.  Yes, sir.

25   Q.  And what do you do?

212

1   A.   I'm a painter.

2   Q.   All right.  And how far did you go in school?

3   A.   Twelfth grade.

4   Q.   Did you grow up in Michigan?

5   A.   Port Huron.

6   Q.   All right.  And were you ever a member of the Devils

7   Diciples Motorcycle Club?

8   A.   Yes, sir.

9   Q.   And when did you join the club?

10  A.   Year 2000.

11  Q.   What year did you leave?

12  A.   2007.  Just -- yeah, around 2007.

13  Q.   So you were a member for around seven years?

14  A.   Yeah.

15  Q.   I want to talk to you a little bit about your past drug

16  use.  Have you ever used illegal drugs?

17  A.   Yes.

18  Q.   What illegal drugs have you used?

19  A.   Meth.

20  Q.   Have you used crack?

21  A.   Crack, meth, weed.

22  Q.   Have you ever used cocaine?

23  A.   Cocaine, yes.

24  Q.   I want to talk a little bit about your crack use.  When did

25  you first start using crack?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1   A.  When I was about 24 years old, 25.

2   Q.  And how often would you use crack?

3   A.  Every day, if I could.

4   Q.  And how long did your use of crack last?

5   A.  About 25 years.

6   Q.  What about cocaine, how long did you use cocaine for?

7   A.  The same amount of time off and on.

8   Q.  Okay.  And meth?

9   A.  Just about -- when growing up, once in a while it was

10  around, but never really got into it until I got into the club.

11  Q.  Okay.  So when you started using meth more regularly with

12  the club, how often would you use meth?

13  A.  Whenever I'd get my hands on it.

14  Q.  Now, when was the last time that you used illegal drugs?

15  A.  Be two years in February.

16  Q.  Okay.  So you're clean now?

17  A.  Yes, sir.

18  Q.  And how did you become clean?

19  A.  I went to rehab through the services here at Pretrial

20  Services.

21  Q.  Okay.  You went to rehab?

22  A.  Yeah.  Ms. Lane helped me get there.

23  Q.  Okay.  I want to talk to you a little bit about your

24  membership in the Devils Diciples.  You said you joined in

25  2000.  Now, what is your club birthday?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO                    214

1   A.   My -- it's my same -- my Christian birthday.

2   Q.   Okay.  Now, when I say club birthday, what does that mean?

3   A.   That means I got my patch, the day I got my full patch.

4   It's the same day as my Christian birthday.

5   Q.   Okay.  Is that an important day in the club?

6   A.   Well, yeah.

7   Q.   What chapter did you join when you joined the club?

8   A.   Port Huron Chapter.

9   Q.   And did you have to prospect before you joined?

10  A.   Yeah.

11  Q.   What does it mean to prospect?

12  A.   You don't got a wheel on your back yet and you just got

13  your -- says Devils Diciples, and it says Port Huron, but you

14  ain't got no wheel.

15  Q.   Okay.  And how long did you have to prospect for before you

16  became a full patch member?

17  A.   Well, right around six months.

18  Q.   Okay.  Did you have a sponsor into the club?

19  A.   Yes.

20  Q.   Who was your sponsor?

21  A.   Vern Rich.

22  Q.   Okay.  Now let's talk a little bit about Vern Rich.  Did

23  you know Vern before you joined the club?

24  A.   Not really.

25  Q.   Okay.  How did you get to know him?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

215

1    A.   Through the club.  I got in a fight with his -- one of the

2    warlords and he brought me into the club, you know.  I was

3    doing drugs, on the street, and he give me a place to stay

4    and --

5    Q.   I want to stop you right there.  You said that you got into

6    a fight at a bar with one of the warlords.

7    A.   Right.

8    Q.   Who was the name of that individual you got into a fight

9    with?

10   A.   Squeak.

11   Q.   Okay.  And you said that happened at a bar.  What bar did

12   that happen at?

13   A.   Pete's Bar in Port Huron.

14   Q.   Okay.  And what were the circumstances of that fight, do

15   you remember?

16   A.   He slapped a friend of mine that had a back brace on and a

17   neck brace, and knocked him off his chair, and it went from

18   there.

19   Q.   Okay.  And you got involved into the fight.  Did you beat

20   him up?

21   A.   Yeah.

22   Q.   Okay.  Did you beat him up good?

23   A.   Yeah.  Pretty good.

24   Q.   Was he bruised, was he hurt?

25   A.   Yeah.  I closed both of his eyes.  He was pretty -- pretty

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1    bruised up.

2    Q.  You say you closed both of his eyes.  Were you injured in

3    any way in this fight?

4    A.  I had bumps and bruises, you know.  It was a bar fight.  It

5    happens.

6    Q.  Okay.  So after you closed the eyes of this warlord from

7    the Devils Diciples, did other members of the Devils Diciples

8    take notice of this?

9    A.  Yeah.

10   Q.  And what happened?  Who did you hear from?

11   A.  Well, they -- a bunch of them come into the bar and I

12   thought it was going to be a war, and Vern told me that he

13   wanted me to be his brother.

14   Q.  Okay.  And you say a bunch of them came into the bar.  Did

15   they come into the bar that night?

16   A.  The next day, I think, or the day after.  I ain't sure.

17   Q.  Okay.  And you mentioned Vern coming into the bar.  Did

18   anyone else come into the bar to talk to you about this fight?

19   A.  Fat Dog and Pauli, Biker Bob.  There was a few of them.  I

20   can't remember all of them.

21   Q.  You mentioned Fat Dog.  You mentioned Pauli.  Do you

22   understand what role Fat Dog had with the Devils Diciples?

23   A.  At that time, no.

24   Q.  Did you eventually learn?

25   A.  Yes.

1   Q.  And what did you learn his role was?

2   A.  The national war -- the national boss.

3   Q.  And what about Pauli, did you know his role at that time?

4   A.  He was the vice president.

5   Q.  Did you eventually learn that, that he was vice president?

6   A.  Yeah.  Yeah.

7   Q.  And why do you think -- what was your understanding of why

8   Vern, Fat Dog and Pauli invited you to be part of the Devils

9   Diciples?

10              MR. SABBOTA:  Objection, your Honor.  Assumes facts

11  not in evidence.  No evidence that Fat Dog or Pauli invited him

12  to do anything.

13              MR. MAIATICO:  I can rephrase the question.

14              THE COURT:  Go ahead.  Sustained.

15  BY MR. MAIATICO:

16  Q.  So when Fat Dog and Pauli came into the bar, did they say

17  anything to you that night?

18  A.  Not really.  It was mostly, I talked to Vern.

19  Q.  Okay.  And what did Vern say to you?  What was your

20  understanding of why he wanted you to join the Devils Diciples?

21  A.  Well, I beat up their warlord, and he is supposed to be the

22  one taking care of everything, you know, the tough guy, and

23  that was my understanding.

24  Q.  Okay.  So when you joined the Devils Diciples Port Huron

25  Chapter, did you take on any roles?

2:11-cr-20129-RHC-MAR   Doc # 1092   Filed 11/16/14   Pg 218 of 310   Pg ID 7453
JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

218

```
 1   A.   I was bar steward, road captain, then I became warlord.

 2   Q.   Okay.  So eventually you became the warlord yourself?

 3   A.   Right.

 4   Q.   How long did that take?

 5   A.   Couple years.

 6   Q.   Okay.  Now, are there other chapters besides Port Huron of

 7   the Devils Diciples in Michigan?

 8   A.   In Michigan?

 9   Q.   Are you aware of other chapters in Michigan for the Devils

10   Diciples?

11   A.   Yeah.  Yeah.  The Bluewater Chapter, Utica Chapter,

12   Mt. Clemens, Grand Rapids.

13   Q.   All right.  Are you aware of other chapters in other

14   states?

15   A.   Yes.

16   Q.   And have you traveled to those other chapters?

17   A.   Yes.

18   Q.   Where are some of the chapters that you traveled to?

19   A.   Alabama, California, Indiana, Illinois, Arizona.

20   Q.   Now, you mentioned that eventually you became the warlord

21   in the Port Huron Chapter.  Can you describe what that position

22   entails, what your role was as warlord?

23   A.   Yeah.  Take care of the security at parties and protect the

24   boss when you're at parties.

25   Q.   Now, you say protect the boss when you're at parties.
```

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1   You're talking about the chapter boss?

2   A.   Yeah.

3   Q.   Are you also talking about the national bosses?

4   A.   Yes.

5   Q.   Who was the chapter boss?  I don't know if I asked you

6   that, for Port Huron.

7   A.   Vern was.

8   Q.   Vern was?

9   A.   Right.

10  Q.   Okay.  Now, in your role as warlord did you ever have to

11  carry a gun?

12  A.   Yes.

13  Q.   And did you, in fact, carry a gun?

14  A.   Yes.

15  Q.   Were there weapons available when you were at these parties

16  inside the clubhouse or around the clubhouse?

17  A.   Yes.

18  Q.   Where, typically, would those weapons be?

19  A.   Either behind the bar or locked up.  Some of the guys used

20  to live at the clubhouses and so they was probably up in their

21  room.  I don't know exactly.

22  Q.   Okay.  I'm going to ask you to speak up a little bit.

23  A.   Behind the bar, they usually were.  And some of the guys

24  used to live at the clubhouses, so they had them in their rooms

25  or whatnot.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1   Q.  Now, you talked about being in charge of security at these

2   parties.  Were you -- would you be, as the warlord, the only

3   one in charge of security or would you divvy out those

4   responsibilities among the members?

5   A.  I would divvy out responsibilities.

6   Q.  Okay.  And so other people would be in charge of certain

7   security at the party.  What other roles did you divvy out?

8   A.  Well, you had the gate, worked the gate, and somebody was

9   like on dog duty, and other guys were, like, out back around

10  the back perimeters and stuff like that, you know, had certain

11  points set up.

12  Q.  What was the need for security at these parties?

13  A.  Just in case other clubs, you know, that we didn't get

14  along with coming in or -- and just keeping lookout for police

15  or whatever.

16  Q.  Now, you mentioned, I think, in the answer to the last

17  question something about dog duty.  What was dog duty?

18  A.  Just, you stayed with Fat Dog the whole time at the party,

19  you're with him.

20  Q.  And did you ever have dog duty at any of these parties?

21  A.  Yes.

22  Q.  All right.  And while you had dog duty would you carry a

23  gun?

24  A.  Yes.

25  Q.  Okay.  Was Fat Dog aware that you would be carrying a gun?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1   A.  Yes.

2   Q.  Now, have you observed other Devils Diciples members with

3   firearms besides yourself?

4   A.  Yes.

5   Q.  Are you familiar with an individual by the name of

6   Scotty Z?

7   A.  Yes.

8   Q.  Okay.  Was he a member of the Port Huron Chapter?

9   A.  I think he was Westside Detroit.

10  Q.  Okay.  And did you ever observe him with a firearm?

11  A.  Yes.

12  Q.  Are you familiar with an individual by the name of Gun

13  Control?

14  A.  Yes.

15  Q.  All right.  And do you know if he was a member of any

16  particular chapter?

17  A.  Alabama Chapter, I believe.

18  Q.  All right.  And have you ever observed him with a firearm?

19  A.  Yes.

20  Q.  Now, did you ever see -- what was the relationship between

21  Gun Control and Fat Dog, do you know?

22  A.  I ain't sure.  All I know is, they was together all the

23  time.

24  Q.  Would Gun Control ever have the dog duty that you talked

25  about?

```
 1   A.   Yes.

 2   Q.   And did you see that when you were at parties with the

 3   Devils Diciples?

 4   A.   Yes.

 5   Q.   Now, when you joined the Devils Diciples were you provided

 6   national bylaws?

 7   A.   Yeah.

 8   Q.   Were you provided chapter bylaws as well --

 9   A.   Yes.

10   Q.   -- to follow?

11        Do you remember who gave them to you?

12   A.   The president give them to you when you joined the club.

13   Q.   Okay.  And are you talking about the chapter president or

14   the national president?

15   A.   Chapter president.

16   Q.   Okay.  And as a member of the Port Huron chapter did you

17   have to pay any dues?

18   A.   Yes.

19   Q.   And what dues did you have to pay?

20   A.   I think it was like $40 a week, 25 a week, or something

21   like that.  I can't remember for sure.

22   Q.   And who would you pay that to?

23   A.   It would go to the treasurer.

24   Q.   Okay.  Who was the treasurer of the Port Huron Chapter at

25   the time?
```

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

223

1    A.  Reverend was, at the time.

2    Q.  You say Reverend?

3    A.  Reverend.

4    Q.  And do you know what happened to that money that you paid

5    your dues with?

6    A.  It went towards stocking the bar and for road trips and

7    stuff like that.

8    Q.  Now, did you become aware of what would happen if someone,

9    a member of the Devils Diciples, violated certain club rules or

10   bylaws?

11   A.  Yeah.

12   Q.  All right.  Are you familiar with something called the

13   black eye policy, or the term, black eye?

14   A.  Yes.

15   Q.  Can describe to the jury what that is?

16   A.  You're told to stand on the line and you get a black eye

17   or you give one.

18   Q.  All right.  Now, when would these black eyes typically

19   occur?

20   A.  At church.

21   Q.  Okay.  And what is church?

22   A.  Church is, once a week we would have a meeting at the

23   clubhouse, and that's what church is.

24   Q.  Now, who could order a black eye?

25   A.  The boss.

1    Q.  Could you, as a warlord?

2    A.  Yeah, I could, but I -- I wouldn't.

3    Q.  Okay.  So the boss could.  You're talking about the chapter

4    boss?

5    A.  Yes.  He had final say.

6    Q.  The chapter boss, who had the final say.  What about the

7    national boss?

8    A.  Oh, yes.

9    Q.  Okay.  National vice president?

10   A.  Yup.  They are the -- they are boss over everybody.

11   Q.  Now, did you ever receive a black eye during your time as

12   a member?

13   A.  Yes.

14   Q.  And who gave that order?

15   A.  Biker Bob did, I believe.

16   Q.  Okay.  And what role was Biker Bob at that time?

17   A.  He was the president at the time.

18   Q.  And do you remember who gave it to you?

19   A.  Yeah.  Ed Taylor.

20   Q.  And can you describe the circumstances surrounding you

21   receiving that black eye?

22   A.  Well, we was told not to be in the bars by ourself, and I

23   was, and got in a fight, and I got a black eye.  So when I went

24   to church, I got another one.

25   Q.  So you were in a bar by yourself.  Is that against rules of

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1  the Devils Diciples?

2  A.  Yeah.  Yeah.  Because there was other clubs in town or

3  something and we was told not to go by ourselves, but I did.

4  Q.  So you were supposed to travel as a group?

5  A.  Right.  I went anyway by myself.

6  Q.  Were there times that you actually provided or gave a

7  black eye to someone else?

8  A.  Yes.

9  Q.  And who gave that order?

10  A.  Vern.

11  Q.  And who did you give a black eye to?

12  A.  To Bummer.

13  Q.  And what were the circumstances surrounding that?

14  A.  He was stealing from Vern.  He was living at Vern's house

15  and he stole from him.

16  Q.  I want to talk to you a little bit about, you talked about

17  your methamphetamine use when you joined the Devils Diciples.

18  When you first joined the Devils Diciples, what was your living

19  situation; where did you live?

20  A.  I was living in the streets.

21  Q.  Okay.  And once you joined, did you eventually find a place

22  to live?

23  A.  Yeah.  Vern give me a place to live.

24  Q.  And where was that?

25  A.  At his house.  I was down in the basement.

1   Q.  So it was living in the basement.

2          Do you know the address of where that was located or

3   the street?

4   A.  Not -- it's off 20th Street; Catherine, maybe.  I'm not

5   sure.

6   Q.  Okay.  And what town was that in?

7   A.  Port Huron.

8   Q.  Now, did you become aware whether Vern was distributing

9   drugs?

10  A.  Did I become aware of it?

11  Q.  Yeah.  When you were living with Vern, did you become aware

12  whether he was distributing drugs?

13  A.  Yes.

14  Q.  What did you learn about his drug distribution?

15  A.  Just that he was -- you know, had it at parties all the

16  time and had it at the bar and --

17  Q.  Okay.  What type of drugs did he have?

18  A.  Meth.

19  Q.  All right.  So when you were at parties was Vern a person

20  that individuals would go to, to get meth?

21  A.  Yeah.

22  Q.  Okay.  When you were at club meetings was Vern an

23  individual that people would go to --

24  A.  Yes.

25  Q.  -- to get meth?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1    A.  Right.

2    Q.  And did there come a time when Vern asked for help in

3    selling meth or distributing meth?

4    A.  Well, yeah, at parties, at club parties.

5    Q.  About how long after you joined did Vern ask you for your

6    assistance in selling meth?

7    A.  Couple years.

8    Q.  You say a couple years?

9    A.  Yeah.  It was a couple years.

10   Q.  Why do you think it took that amount of time until he asked

11   you?

12   A.  Learned to trust me more, I guess.  I don't know.

13   Q.  So after a couple of years, you would earn Vern's trust?

14   A.  Right.

15   Q.  I want to talk to you a little bit about how you would sell

16   meth for Vern.  So what quantity of meth would you receive from

17   Vern to give to others?

18   A.  I would get a gram.

19   Q.  You said about a gram?

20   A.  A gram at a time.

21   Q.  Okay.  And then when you received that amount of meth did

22   he front that amount to you or did you have to pay for it?

23   A.  He give me -- he fronted it to me.  I would take a little

24   bit off the top for myself and make his money back and give it

25   to him.

1  Q.  You said you would take a little bit off the top for

2  yourself.  So during this time, were you -- you were using

3  meth?

4  A.  Yes.

5  Q.  You weren't taking it off the top to sell to others, but to

6  use for yourself?

7  A.  Right.  Exactly.

8  Q.  Were you using other drugs at this time?

9  A.  Yes.

10  Q.  What other drugs?

11  A.  Crack.

12  Q.  Okay.  So you would receive -- about what was the amount

13  you said, about how much?

14  A.  A gram.

15  Q.  You would receive about a gram, you would sell it to

16  others.  Who were the other people that you would sell it to?

17  A.  Club members or citizens at the bar.

18  Q.  Do you remember which club members you would sell the meth

19  to?

20  A.  Not exactly.  It was a lot of them.

21  Q.  Okay.  Would you do this --

22  A.  It was mostly out-of-towners that come to parties.

23  Q.  Okay.  And when you talk about selling at parties, are

24  these parties that are happening at the Port Huron clubhouse?

25  A.  Port Huron or Mt. Clemens or Bluewater, wherever we was at

1    the time.

2    Q.  Were most of these parties happening at clubhouses or were

3    there also parties happening outside of the clubhouses?

4    A.  At clubhouses.

5    Q.  And now, in addition to selling meth to Devils Diciples did

6    you provide the meth for free to any Devils Diciples members?

7    A.  No.

8    Q.  Okay.

9    A.  No, I didn't.

10   Q.  You would only sell it?

11   A.  Right.

12   Q.  And then what about to citizens that were at the parties?

13   A.  What?

14   Q.  Would you sell meth to citizens?

15   A.  Yeah, if I -- if I knew them, yes.

16   Q.  And how much would you sell the meth for?

17   A.  $100 a gram.

18   Q.  And would individuals, citizens, usually buy that quantity

19   from you at one time?

20   A.  No.  A lot of times they would buy just quarters.

21   Q.  And how much would a quarter be?

22   A.  Twenty-five.

23   Q.  And a quarter is about how much in terms of a quantity?

24   A.  One-fourth of a gram.

25   Q.  Now, how often would you sell meth for Vern at these

1    parties?

2    A.  Well, whenever we had it.

3    Q.  And how often would you have parties?

4    A.  I don't know, it's hard to say.  It varies.

5    Q.  Would you have one per month?

6    A.  Once a month, once every two months, something like that.

7    Q.  Okay.  And how -- about how long was the period of time

8    that you would do this at parties; was it over a course of a

9    couple years, couple months?

10   A.  About three, four years.

11   Q.  Now, in exchange for doing this meth selling for Vern, did

12   he provide you anything?

13        You talked about skimming some off the top, but did he

14   provide you money or any sort of reimbursement?

15   A.  He kept me high, my cigarettes, my drinks, gas for my bike,

16   stuff like that.

17   Q.  When you say --

18   A.  Give me a place to live, you know.

19   Q.  So when you say he kept you high, are you referring to

20   providing you additional meth?

21   A.  Yeah.

22   Q.  Now, was meth generally available at these parties other

23   than just from you?

24   A.  Yeah.  It was around.  It was other, other guys had it,

25   too, I think.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1   Q.   Okay.  In addition to receiving meth from Vern, did you

2   ever receive meth from other members of the Devils Diciples?

3   A.   A line or two here or there, but never nothing to sell or

4   nothing like that.

5   Q.   So you never received meth to sell from others, but in

6   terms of the line or two that you would receive from others --

7   A.   Right.

8   Q.   -- who would provide you with that line; who were some of

9   the other individuals?

10  A.   Got lines from Holiday.  I have had lines from Iron Mike.

11  Q.   Okay.  You mentioned an individual by the name of Holiday.

12  How do you know Holiday?

13  A.   Just from the club.

14  Q.   Okay.  Do you know where he was a member?

15  A.   California, I think.

16  Q.   Did you ever help Vern package any of the quantities of

17  meth?  I know you said you bought from him, but --

18  A.   Yes.

19  Q.   -- did you go a step further --

20  A.   Yes.

21  Q.   -- in the process and help him package things?

22  A.   Yes, I did.

23  Q.   How did you do that?  Can you describe to the jury how you

24  and Vern would package meth?

25  A.   He would weigh it, dump it in a baggie, and I would zip it

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

232

 1   up or tie it up or whatever.

 2   Q.   Okay.  And what tools would he use to put these together?

 3   A.   Little scales, a teaspoon.

 4   Q.   He would use a teaspoon?

 5   A.   Yeah.

 6   Q.   And little baggies?

 7   A.   Right.

 8   Q.   And then were those the baggies that you would use when you

 9   were reselling the meth to citizens and other DD members?

10   A.   Yeah.

11   Q.   Do you know what quantities those were in the baggies?

12   A.   Grams.

13   Q.   And where did you help Vern package those quantities of

14   meth?

15   A.   At his house.

16   Q.   It was at the house that you were staying at?

17   A.   Yeah.

18   Q.   In Port Huron?

19   A.   Yup.

20   Q.   Now, did there ever come a time when you observed Vern

21   manufacturing meth?

22   A.   Once I seen him, had a jar, and it was a quart jar, and

23   he was spinning it around.  He said it was making meth.

24   Q.   Okay.  Now this was during the period of time when you were

25   a Devils Diciples member?

1   A.   Yes.

2   Q.   This was during the time when you were living with Vern?

3   A.   No, I wasn't living with him at the time.

4   Q.   Okay.  So where, where was this occurring?

5   A.   This was on -- when he lived on Lapeer.

6   Q.   Okay.  So while he was living on Lapeer.  And where in the

7   house in Lapeer did you observe this?

8   A.   It was in the upstairs of his garage.

9   Q.   All right.  Now, you said you saw some jars with something

10  spinning.  Can you describe those jars?

11  A.   Well, they was Mason jars, like for canning.

12  Q.   About how large were the jars?

13  A.   Quart jars.

14  Q.   And did you see any other ingredients or supplies in that

15  upstairs garage area?

16  A.   Nah.  They used the nasal stuff or for sinus medicine.

17  Q.   Okay.  So you saw -- now, did you see the sinus medicine?

18  A.   Yeah.  I went with Gun Control and bought some at the

19  Family Dollar.

20  Q.   Okay.  So at one point you went with Gun Control to the

21  Family Dollar and who purchased the sinus medicine?

22  A.   Me and Gun Control went in there and got it.

23  Q.   Okay.  Did you -- who purchased the medication?

24  A.   Gun Control.

25  Q.   Okay.  And what did Gun Control do with that medication?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1   A.  Took it back to Vern's.

2   Q.  Okay.  Did Vern tell you what those -- what that sinus

3   medication was for?

4   A.  No.

5   Q.  Okay.  Did Gun Control say what that was for?

6   A.  Did what?

7   Q.  Did Gun Control tell you what that sinus medication was

8   for, why he was buying it?

9   A.  Yeah.  He said that's what -- that's how they was making

10  meth.

11  Q.  Okay.  So let me take a step back.  So when did you have

12  this conversation with Gun Control about --

13  A.  When we was at the store.

14  Q.  Okay.  And what did Gun Control tell you?

15  A.  Said that's what they make the meth out of.

16  Q.  And then you went back to Vern's house on Lapeer Road?

17  A.  Yeah.

18  Q.  And what did Gun Control do with that medication that he

19  picked up?

20  A.  I didn't see after that.  All I know is --

21  Q.  Okay.  I want to direct your attention to a period of time

22  around October 2007.  During that time, were you still selling

23  meth for Vern?

24  A.  I don't think so.  I was -- quit the club by that time, I'm

25  thinking.

1    Q.  Okay.  Well, let me ask you this:  Did you have phone

2    conversations with Vern about selling meth?

3    A.  Yes.  I asked him if he -- when we got back from

4    California --

5    Q.  I want to stop you right there, because I just want to kind

6    of lay a foundation here.

7           You had phone conversations with Vern about selling

8    meth, correct?

9    A.  Yes.

10   Q.  Okay.  And after you were arrested did you become aware

11   that some of your conversations were taped and that Vern Rich's

12   phone was tapped by law enforcement?

13   A.  Yes.

14   Q.  And before coming here today were you read portions of a

15   call transcript between you and Vern?

16   A.  Yes.

17   Q.  This was a transcript where you referred to something or

18   used the word, postcard?

19   A.  Yes.

20          MR. MAIATICO:  Your Honor, at this time I would like

21   to publish Government Exhibit T-16 and T-16A with the

22   transcript as an aid to the jury.

23          THE COURT:  Go ahead.

24      (Publishing Government Exhibit T-16/T-16A, 2:56 p.m.)

25          MR. MAIATICO:  Let me ask you to pause that for one

236

1    second.

2    BY MR. MAIATICO:

3    Q.  Now, did you have an opportunity to hear those voices on

4    the call?

5    A.  Right.

6    Q.  And do you recognize those voices?

7    A.  That's me and Vern, I think.

8    Q.  Okay.  And just so the record is clear, your initials are

9    HQ; is that correct?

10   A.  Yes.

11   Q.  And Vern Rich's initials are VR?

12   A.  Yes.

13        MR. MAIATICO:  All right.  Continue, please.

14     (Publishing Government Exhibit T-16/T-16A, 2:57 p.m. to

15     2:59 p.m.)

16   BY MR. MAIATICO:

17   Q.  So Mr. Quant, is that a conversation you had with Vern

18   where you mentioned methamphetamine?

19   A.  Yes.

20   Q.  Now, you didn't actually say the word, methamphetamine, in

21   that call?

22   A.  No.

23   Q.  But you mentioned a word, postcard.  What did you mean by,

24   "Hey, Vern, did you get that postcard yet?"

25   A.  I meant, did he get the meth yet.

1    Q.  Okay.  And was this meth that you were looking for, for

2    yourself or was this meth that you were looking to resell?

3    A.  For myself.

4    Q.  All right.  So at that time you were still using meth?

5    A.  Right.

6    Q.  Now, you also heard Vern mention that he was going to get

7    some quarters for a slot machine, correct?

8    A.  Right.

9    Q.  What is your understanding of what that meant, getting

10   quarters for the slot machine?

11   A.  Well, we would go to the car washes and get quarters out

12   of the car wash with bills to stock up the slot machines.

13   Q.  Okay.  So were there slot machines somewhere that you were

14   going to?

15   A.  At the clubhouse.

16   Q.  Okay.  And what clubhouse are you referring to?

17   A.  Port Huron.

18   Q.  Okay.  So have you ever seen the gambling machines, the

19   slot machines inside of the Port Huron clubhouse?

20   A.  Yes.

21   Q.  All right.  Have you seen them inside other Devils Diciples

22   clubhouses?

23   A.  Yes.

24   Q.  Which ones have you seen them inside of?

25   A.  Every one that I have ever been to.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO
238

1  Q.  Now, do you know who maintained the machines inside of the

2  Port Huron clubhouse?

3  A.  Used to be Iron Mike, then it was turned over to Vern.

4  Q.  So during the time of this call when he was talking about

5  the slot machines, was Vern Rich in charge of maintaining the

6  slot machines?

7  A.  Yes.  Yes.

8  Q.  All right.  And did you ever play those machines?

9  A.  Yes.

10  Q.  Did they accept money?

11  A.  Yup.

12  Q.  They accept quarters?

13  A.  Yes.

14  Q.  And if you won, did they pay out money?

15  A.  Yes.

16  Q.  Would they be available at parties?

17  A.  Yes.

18  Q.  And who were -- who could use these machines?

19  A.  Anybody.

20  Q.  Okay.  So citizens could use the machines?

21  A.  Yes.

22  Q.  Non-members?

23  A.  Right.

24  Q.  And members alike?

25  A.  Right.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1   Q.  Do you remember how many of those machines were inside the

2   Port Huron clubhouse?

3   A.  Three, I think.

4   Q.  I want to direct your attention now to the Devils Diciples

5   national party that happened in 2007.  Do you remember that

6   party?

7   A.  In California?

8   Q.  Is that where it occurred?

9   A.  Yes.

10  Q.  Okay.  And did you attend that party?

11  A.  Yes.

12  Q.  Now, did you go there from Michigan?

13  A.  Yes.

14  Q.  Okay.  Did you fly there or did you ride a motorcycle?

15  A.  No.  Me and Vern rode the bikes.

16  Q.  All right.  So when you left from Michigan for that party,

17  who did you ride with?

18  A.  Vern.

19  Q.  And I'm going to go and kind of ask you about each of your

20  stops along the way from Michigan to California.

21          Did you make a stop first in Michigan?

22  A.  Yes.  Went to Bay City first.

23  Q.  Okay.  And what was the purpose of you going to Bay City?

24  A.  To get a road sack.

25  Q.  Okay.  Now, what's a road sack?  Can you describe that to

1   the jury?

2   A.  That's some meth.  Traveling meth.

3   Q.  So it's traveling meth, but what would the quantity be of

4   traveling meth?

5   A.  I really ain't sure how much it was, but it was enough to

6   get us out west.

7   Q.  Okay.  And why would you use meth to get you out west; what

8   did it help you do?

9   A.  Helped stay awake and put on the miles.

10  Q.  Do you remember how long you stayed awake on this ride?

11  A.  Oh, no.  Not exactly how long.

12  Q.  Did you use meth on this ride?

13  A.  Yes.

14  Q.  Meth from the road sack?

15  A.  Yup.

16  Q.  And where in Bay City did you go to get this road sack?

17  A.  To Bear's house.

18  Q.  And who is Bear; do you know his real name?

19  A.  No.

20  Q.  Do you know if he is a Devils Diciples member?

21  A.  He was.

22  Q.  Okay.  And did you observe Vern and Bear do any sort of

23  transaction to get this meth?

24  A.  No.

25  Q.  Okay.  But when you left from Port Huron did you have meth?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1   A.   No.

2   Q.   When you left from Bay City did you have meth?

3   A.   Yes.

4   Q.   So from Bay City, where was your next stop?

5   A.   From what I remember, we run out in Flagstaff, Arizona.

6   Q.   Okay.  So when you're in Arizona, what's the purpose of

7   stopping in Arizona?

8   A.   We stopped to take a shower and was going to sleep the

9   night.  And Vern said, let's just go on to Phoenix to hook up

10  another road sack, and that's where we ended up.

11  Q.   Okay.  And when you go to Phoenix, do you meet up with

12  anybody?

13  A.   Yeah.  We went to -- he met up with his girlfriend.

14  Q.   Okay.  And what was her name?

15  A.   Lauri.

16  Q.   All right.  And did you meet up with anyone else in

17  Phoenix?

18  A.   We was at Lauri's brother's house.

19  Q.   Okay.  And do you remember his name?

20  A.   I ain't sure what his name was, but he was a Hells Angels

21  anyway.

22  Q.   Okay.  He was a member of a motorcycle club?

23  A.   Yes.

24  Q.   And you referred to that motorcycle club as what?

25  A.   The Hells Angels.

1    Q.  Okay.  Now, when you're in Phoenix did you -- you said you

2    were going to pick up some more road sacks?

3    A.  Right.

4    Q.  Did you do that?

5    A.  Yes.

6    Q.  Okay.  Did you use meth while you were in Phoenix?

7    A.  Yes.

8    Q.  And who did you use the meth with?

9    A.  Vern and Lauri.

10   Q.  And what about Lauri's brother, the member of the Hells

11   Angels?

12   A.  He smoked it, I believe.

13   Q.  You believe he smoked the meth?

14   A.  I didn't see him snort any.

15   Q.  Okay.  And then the next morning you leave Phoenix.  Where

16   do you head to?

17   A.  We went to California to the Hollywood clubhouse.

18   Q.  Okay.  And do you know anyone in the Hollywood clubhouse?

19   A.  Just Little John, is one of the guys I know.

20   Q.  Okay.  At that point do you go to the national party?

21   Is the national party at the Hollywood clubhouse or is it

22   somewhere else?

23   A.  No, no, it's up at this campground somewhere farther north.

24   I don't know exactly where.

25   Q.  Okay.  Now, at the national party is there meth available

1   for use?

2   A.   Yes.

3   Q.   Did you use meth there?

4   A.   Yes.

5   Q.   Do you remember who you got it from?

6   A.   Got it from Vern.

7   Q.   And then after the party, where do you head to?

8   A.   We went to Holiday's house.

9   Q.   Okay.

10  A.   Went to Hollywood clubhouse and then to Holiday's house,

11  spent the night, and left from there home, heading home.

12  Q.   Okay.  Now, you mentioned Holiday before.  Holiday, you

13  said, was a member of the California chapter?

14  A.   Yeah.

15  Q.   Do you remember which chapter in California?

16  A.   SoCal, I believe.

17  Q.   Now, when you're at Holiday's house, do you use meth?

18  A.   Yeah.

19  Q.   Who provides the meth?

20  A.   I believe it was still Vern.

21  Q.   Okay.  And who were the individuals that used meth with you

22  there?

23  A.   Me, Vern, Holiday, Lauri.  I don't know who else; can't

24  remember.

25  Q.   Okay.  After staying the night at Holiday's house in

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1   southern California, do you leave to go back to Michigan?

2   A.  We went back to Phoenix and dropped Lauri off to catch a

3   plane and then me and Vern headed out.

4   Q.  Okay.  And where do you and Vern head out to?

5   A.  Back to Michigan.

6   Q.  All right.  Do you make any stops on the way back to

7   Michigan?

8   A.  We stopped in New Mexico, spent the night.

9   Q.  Okay.  Now, when you're in New Mexico, did you run out of

10  your road sack?

11  A.  Yeah.

12  Q.  Okay.  But did you still have meth?

13  A.  Yeah.

14  Q.  At any point did Vern discuss with you the meth that he

15  had?

16  A.  He asked me to go out and I took his tailpipe off the bike.

17  Q.  Okay.  So you're at a hotel in New Mexico?

18  A.  Right.

19  Q.  And Vern asked you to go out to his motorcycle?

20  A.  Right.

21  Q.  Okay.  And he directs you to a tailpipe?

22  A.  Right.

23  Q.  How do you get this tailpipe off the motorcycle?

24  A.  Two bolts.

25  Q.  All right.  And does Vern tell you what's inside of that

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1    tailpipe?

2    A.   Yeah.

3    Q.   And what's he tell you?

4    A.   It was meth.

5    Q.   All right.  And what do you do with the tailpipe once you

6    unscrew the two screws?

7    A.   I brought it in to Vern.

8    Q.   All right.  When you bring it in to Vern, do you see him

9    take anything out of that tailpipe?

10   A.   Yes.  He took a baggie of meth out of it.

11   Q.   Okay.  And can you describe what that baggie looked like?

12   A.   It was about six inches long and about the size of -- about

13   the size of a quarter around.

14   Q.   Okay.  And was that the only meth that was inside that

15   tailpipe?

16   A.   As far as I know.

17   Q.   All right.  Could there have been more inside there?

18   A.   Yes.

19   Q.   Did you look inside the tailpipe?

20   A.   No.

21   Q.   Other than bringing that tailpipe in from the parking lot

22   did you do anything else with it?

23   A.   No.

24   Q.   Now I want to switch gears a little bit.

25          THE COURT:  Well, before you do that, we will take an

```
 1   afternoon recess, Mr. Maiatico.  Thank you.
 2           Twenty minutes in the jury room, ladies and gentlemen,
 3   the last recess of the day.  Please escort yourselves.
 4       (Jury out at 3:08 p.m.)
 5       (Recess taken at 3:08 p.m. until 3:29 p.m.)
 6           THE CLERK:  All rise.  Court is back in session.
 7       (Jury in, 3:29 p.m.)
 8           THE COURT:  Okay.  Ready, sir?
 9           MR. MAIATICO:  I am.
10           THE COURT:  All right, Mr. Maiatico.  Please proceed.
11           The Court recognizes the presence of all attorneys and
12   all defendants.  Go ahead.
13   BY MR. MAIATICO:
14   Q.  All right.  Mr. Quant, when we left off we were talking
15   about your trip back home from the DD national party in
16   California.  I want to switch gears and talk to you a little
17   bit more about Vern Rich and his drug distribution.
18           Did you become aware that Vern had large quantities of
19   other drugs besides meth at any point?
20   A.  Yes.
21   Q.  Okay.  And what other drug did you come to understand
22   that -- or come to observe that Vern had large quantities of?
23   A.  He had lots of weed up on top of his garage.
24   Q.  Okay.  When you say up on top of his garage, what residence
25   are you talking about?
```

247

1    A.   The place on Lapeer, where he lived on Lapeer, the garage,

2    there's like a little apartment up there.

3    Q.   Is this the same area where you talked about observing him

4    cook meth?

5    A.   Yes.

6    Q.   Okay.  And can you tell us about the time or the times that

7    you observed the weed in that a location?

8    A.   It was, it was in, inside the wall, like.  Like, had like a

9    compartment where it was walled up and that's where it was

10   stashed.

11   Q.   Now, did you actually see this, the weed behind the wall?

12   A.   Yes.

13   Q.   How was this weed packaged up behind the wall?

14   A.   In, in bricks, like.

15   Q.   Okay.  Do you remember the type of packaging that was used?

16   A.   No, I don't.

17   Q.   And when you say bricks, what does that mean?  Can you give

18   us a size?

19   A.   It was packed real tight together, and when you tried to

20   break it up, it was -- took a lot of effort.

21   Q.   Okay.  So it's packed really tight into a brick.  And when

22   you say brick, are you talking about the size of an average

23   brick?

24   A.   I don't know, a brick.  (Indicating).

25   Q.   Okay.  Now, it looks like you're showing about this, this,

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1  about two feet wide?

2  A.  Yeah.  About two feet by one foot or something like that.

3  I ain't sure how big they was.

4  Q.  Okay.  How many of these bricks did you see behind the

5  wall?

6  A.  I can't be sure to say.  There was lots.

7  Q.  Did you see more than one?

8  A.  Oh, yeah, there was more than one.

9  Q.  More than five?

10 A.  More than five, probably, yeah.

11 Q.  Okay.  More than ten?

12 A.  I ain't sure.

13 Q.  Okay.  Did you, did you know what Vern was doing with this

14 weed?

15 A.  Selling it.

16 Q.  All right.  Did you buy any of that weed from Vern?

17 A.  Yeah.

18 Q.  And was this something that Vern did alone or did he have

19 partners helping to sell weed?

20 A.  It was him and Victor were partners on it, as far as I

21 know.

22 Q.  Okay.  You mentioned Victor.  Who is Victor?

23 A.  He was another club brother.

24 Q.  Do you know Victor's last name?

25 A.  He was from Grand Rapids.  I don't know his last name, no.

2:11-cr-20129-RHC-MAR  Doc # 1092  Filed 11/16/14  Pg 249 of 310  Pg ID 7484
JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

249

1  Q.  Okay.  But Victor from Grand Rapids.  Okay.

2       And did you help Vern sell this weed?

3  A.  No.  I didn't help him sell it.

4  Q.  Now, during this period of time when you were selling meth

5  for Vern, did you ever see Vern giving money to the national

6  leaders?

7  A.  Yeah.  He, he was always giving them money, though.

8  Q.  Okay.

9  A.  Yeah.

10 Q.  Did you actually observe him giving money to the national

11 leaders?

12 A.  Not -- they never do it in my presence, but he would always

13 holler about, they are always wanting money.

14 Q.  So Vern would talk to you --

15 A.  Yeah.

16 Q.  -- about the national leaders wanting money?

17 A.  Right.

18 Q.  Who would this include?  Who were the --

19 A.  Fat Dog and Pauli.

20 Q.  Okay.  And what did Vern -- what was he hollering about?

21 What did he say about them wanting money?

22 A.  Always complained about how much money he'd give them.  You

23 know, I give them 2,500, give them this, give them that, you

24 know.

25 Q.  All right.  Do you know why the leaders were coming to Vern

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1   for that money?

2   A.   No.   I don't know why.

3   Q.   Did you give large quantities of money to the national

4   leaders?

5   A.   No.

6   Q.   So you talked a little bit about the Port Huron clubhouse.

7   That was the clubhouse where you were a member, correct?

8   A.   Yes.

9   Q.   All right.   And can you describe the property where the

10   clubhouse was on?

11   A.   There's a -- it's on Little Street.   And at the corner

12   there's a bar, then the clubhouse is right behind the bar.

13   And then Reverend's house is right behind the clubhouse.

14   Q.   Okay.   So on the property where the clubhouse was, it was

15   also a residence for Reverend?

16   A.   Yes.

17   Q.   Okay.   And then inside of the clubhouse, can you describe

18   the area inside?   You mentioned a bar.

19   A.   It had --

20   Q.   Were you talking about the bar inside the clubhouse when

21   you mentioned the bar?

22   A.   Yeah.

23   Q.   Okay.   Can you describe that area?

24   A.   It's just a bar, come out of a old bowling alley.

25          MR. MAIATICO:   Okay.   Your Honor, at this time I would

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1    like to admit into evidence -- I've shown pictures to defense

2    counsel.  There's no objection to these particular exhibits.

3    I'd like to admit them into evidence and then publish them to

4    the jury.  And I'll go through --

5              THE COURT:  The numbers are what?

6              MR. MAIATICO:  33-20, 33-29, 33-44, 33-38, 33-39, and

7    33-49.

8              THE COURT:  Okay.  Without objection?

9              MS. STOUT:  There was one objection.  I'm assuming you

10   excluded that?

11             MR. MAIATICO:  I excluded that.

12             MS. STOUT:  Thank you.

13             THE COURT:  So to these particular proposed

14   exhibits --

15             MS. STOUT:  No objection.

16             THE COURT:  -- there are no objections, I understand?

17   It appears that is the case.

18             All right.  Each of these is admitted:  20, 29, 44,

19   38, 39 and 49.

20        (Exhibit 33-20, 33-29, 33-44, 33-38, 33-39, 33-49

21         received 3:36 p.m.)

22             MR. MAIATICO:  Thank you.  I would like to publish

23   33-20.

24   BY MR. MAIATICO:

25   Q.  Now, Mr. Quant, do you recognize that building?

1   A.   Yeah.   That's Reverend's house.

2   Q.   And that's the house that's on the property where the

3   Port Huron clubhouse is?

4   A.   Right.

5   Q.   And you mentioned Reverend before.   Who is he?

6   A.   He was the treasurer in the Port Huron Chapter.

7   Q.   Did anyone else live in that house?

8   A.   Crow lived with him once.

9   Q.   And is Crow also a member of the Devils Diciples?

10  A.   Yes.

11  Q.   In the Port Huron Chapter?

12  A.   Yup.

13  Q.   All right.   Government Exhibit 33-29, and do you recognize

14  that photograph?

15  A.   That's Port Huron clubhouse.

16  Q.   All right.   Now, there's a "44" across the top of that

17  clubhouse.   Now, what is the significance of 44?

18  A.   DD, fourth letter of the alphabet, Devils Diciples.

19  Q.   Okay.   And I don't think I've asked you this before, but

20  were you provided a club nickname when you became a member?

21  A.   Yeah.

22  Q.   What is your club nickname?

23  A.   44.

24  Q.   Why was 44 chosen for you or why did you choose that?

25  A.   I got it on my 44th birthday.

1   Q.  Okay.

2   A.  I got my wheel, my patch.

3   Q.  And did other members of the Devils Diciples then call

4   you by "44"?

5   A.  Yes.

6        MR. MAIATICO:  All right.  33-34, please.

7   Government's Exhibit 33-34.

8   BY MR. MAIATICO:

9   Q.  Now, Mr. Quant, can you describe what that's a photograph

10  of?

11  A.  That's the bar in the clubhouse.

12  Q.  Okay.  That's inside of the clubhouse?

13  A.  Yes.

14  Q.  33-38.  Now, we talked a little bit about the slot machines

15  before.  Can you describe where these slot machines are

16  located?

17  A.  If you come in the side door, they are right to the left.

18  Q.  Okay.  And was this at the same level as where the bar is

19  at?

20  A.  Yeah.  The bar, it's all in one room.  It's like a pole

21  barn.

22  Q.  So when you were having parties, these were available to

23  anyone who was at the party?

24  A.  Right.

25  Q.  33-39.  And what is this a photograph of, Mr. Quant?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO                    254

1    A.   That's the clubhouse in Port Huron.

2    Q.   And are there additional slot machines there?

3    A.   Yeah.

4    Q.   And is this all in the same general area --

5    A.   Yes.

6    Q.   -- as the slot machines?

7    A.   Yes.

8    Q.   This is just another part of that corner?

9    A.   Yes.  They are all in the same area.

10   Q.   33-40.  And do you recognize this?

11   A.   It's behind the bar at the clubhouse.

12   Q.   Okay.  Now, behind the bar in the clubhouse, there's,

13   there's some trophies in this photograph.  And in front of

14   the trophies is, is a cylinder.  Do you know what that is?

15   A.   Yeah.  It's for drawing tickets.

16   Q.   Okay.

17   A.   For 50/50 tickets and stuff like that.

18   Q.   Let's talk a little bit about the 50/50 tickets.  How often

19   would the Devils Diciples do these raffles or 50/50 tickets?

20   A.   Whenever we had parties or whenever we had bar night, you

21   know, sometimes.

22   Q.   And would you be required to do anything with regards to

23   those raffles?  Would you have to sell tickets or were you part

24   of the raffle?

25   A.   Yeah.  You have to sell the tickets to get them, you know.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1   Q.  How many tickets would you have to sell?

2   A.  I don't know.  It varies.  You know, sometimes you get six

3   for $5 or something like that, a dollar a piece or whatever.

4   Q.  If you didn't sell all your tickets, would you have to buy

5   those tickets yourself?

6   A.  Not that I -- not that I recall.

7   Q.  Okay.  What type of things would you raffle off in these

8   50/50's?

9   A.  Half the money, T-shirts, stuff like that.

10  Q.  Okay.  Would you ever raffle off motorcycles?

11  A.  Not that I recall.

12  Q.  Okay.  33-49.  Mr. Quant, do you recognize this picture?

13  A.  Yes.

14  Q.  And do you recognize the individuals in the picture?

15  A.  Yes.

16  Q.  Who are they?

17  A.  Vern on the right, me, and Smokin' Joe.  He's passed away.

18  Q.  So in the middle, that's a picture of you?

19  A.  Yes.

20  Q.  And then the far right, you said, was Vern?

21  A.  Yes.

22  Q.  Now, is this a photograph that's in the Port Huron

23  clubhouse?

24  A.  Yes.

25  Q.  And what is -- so you mentioned the significance of 44.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

256

1    What about FTW?

2    A.   Forever Together Wherever.

3    Q.   Does that have any other meanings to you?

4    A.   No.

5    Q.   All right.  I want to talk to you a little bit about some

6    other Devils Diciples club members.

7         Are you familiar with an individual by the name of

8    "Gadget"?

9    A.   Yes.

10   Q.   And do you know Gadget's real name?

11   A.   Keith, I think.

12   Q.   Okay.  And was Keith a member of any particular chapter

13   that you remember?

14   A.   He was a Port Huron member for a while, then he went to

15   Alabama.

16   Q.   Okay.  So he's a Port Huron club member.  When he went to

17   Alabama, was he a member of the Devils Diciples in Alabama?

18   A.   Yes.

19   Q.   And during your -- the time that you were a member, do you

20   recall an incident where you were ordered to find Gadget?

21   A.   Yes.

22   Q.   Can you describe that to the jury?

23   A.   We went to Florida to find him.  We was told we had to go

24   there by Vern.  I don't know if he -- what he -- if he owed

25   Vern money or something or what.  I don't know what it was all

UNITED STATES vs. SUTHERLAND, et al - 11-20129; 11-20066

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1    about.

2    Q.  So you're not sure of the purpose, but you were ordered to

3    go find Gadget?

4    A.  Right.

5    Q.  And you were ordered by who?

6    A.  By Vern.

7    Q.  Okay.  You said that more than just you went down.  Who

8    were the other people that accompanied you?

9    A.  Me, Gun Control, Rockin' Ronnie and Victor.

10   Q.  And did you ultimately find Gadget?

11   A.  Yes.

12   Q.  And where did you find him?

13   A.  In Florida.

14   Q.  And where was it in Florida that you found him?

15   A.  At a strip bar.

16   Q.  Okay.

17   A.  His girlfriend was working.

18   Q.  Was the place where you found him a hangout for other

19   bikers?

20   A.  Yeah.  But I don't recall the name of the other club.

21   Q.  And when you went to find Gadget, did you tell him the

22   reason that you were there?

23   A.  Told him we was there to bring him back.

24   Q.  And did he put up a fight at all?

25   A.  Not at all.  He just -- he come with us.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

1    Q.  All right.  Mr. Quant, were you are charged with a crime in

2    this case?

3    A.  What's that?

4    Q.  Were you charged with a crime in connection with this case?

5    A.  Yes.

6    Q.  And what crime were you charged with?

7    A.  A drug charge, gambling charge, I believe, and possession

8    of a firearm.

9    Q.  Okay.  Now, if I said that the drug charge is a drug

10   conspiracy charge?

11   A.  Yes, I believe so.

12   Q.  And some of the other crimes that you talked about, might

13   those have been relevant conduct with regards to your drug

14   crime?

15   A.  I don't understand.

16   Q.  Okay.  You're not an attorney; is that correct?

17   A.  Right.

18   Q.  All right.  But you're represented by an attorney?

19   A.  Yes, sir.

20   Q.  All right.  And after talking with your attorney, did he

21   help describe the charges to you?

22   A.  Yes.

23   Q.  And did you agree to plead guilty to the drug conspiracy?

24   A.  Yes, sir.

25   Q.  Now, for several years have you been providing information

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - DIRECT BY MR. MAIATICO

```
 1   to the Government about the Devils Diciples Motorcycle Club?
 2   A.   Yes.
 3   Q.   And did you agree to cooperate with the Government and to
 4   testify in this case?
 5   A.   Yes.
 6   Q.   Were your agreements to plead guilty and to cooperate, were
 7   those contained in written agreements?
 8   A.   Yes.
 9   Q.   Written documents.  And did you go over those documents
10   with your attorney?
11   A.   Yes, I did.
12   Q.   Were there any promises made to you by the Government that
13   are not contained in those written documents?
14   A.   No.
15   Q.   And what is your obligation under the terms of the
16   cooperation agreement?
17   A.   To tell the truth.
18   Q.   And has the Government agreed to recommend a sentence
19   reduction if you cooperate and provide truthful information
20   about others?
21   A.   Yes.
22   Q.   And what is your understanding of what the Government has
23   agreed to recommend?
24   A.   Four years, nine months, to six years.
25   Q.   Now, who -- is it the Government that ultimately decides
```

1    your sentence?

2    A.   No.  The Judge does.  They just recommend.

3    Q.   Mr. Quant, are you nervous to testify today?

4    A.   Very.

5    Q.   Okay.  Why, why are you nervous?

6    A.   It ain't part of my nature to --

7    Q.   Is there a term that the Devils Diciples use to describe

8    someone who has cooperated with the Government?

9    A.   Oh, yeah.  I'm a snitch.

10   Q.   What's the term they use?

11   A.   Snitch.

12   Q.   And what is your understanding, based on your experience,

13   of what could happen to someone who is labeled a snitch by the

14   Devils Diciples?

15   A.   They can be took care of, beat up, whatever, you know.

16          MR. MAIATICO:  I have no further questions.

17          THE COURT:  Cross-examination?

18          Mr. Sabbota?

19          MR. SABBOTA:  Yes, your Honor.

20          THE COURT:  I was asked about tomorrow's schedule.

21   I, I now recollect three o'clock, we'll terminate at three

22   o'clock.  Apparently, I had mentioned that earlier and I didn't

23   recall it specifically.  Early, yes, I was thinking 3:30.

24   We'll terminate tomorrow at three.

25          We'll have sort of a compressed schedule, quasi,

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

1    somewhere between half day and full day.  We'll have somewhat

2    more abbreviated breaks, possibly abbreviated breaks and

3    earlier termination.

4            All right.  Go ahead, Mr. Sabbota.

5            MR. SABBOTA:  Thank you.

6                       CROSS-EXAMINATION

7    BY MR. SABBOTA:

8    Q.  Good afternoon.

9    A.  Good afternoon.

10   Q.  The Government just talked about your Rule 11 agreement; am

11   I right?

12   A.  Yes, I guess so.

13   Q.  Okay.  Could you speak up louder?

14   A.  Yes.

15   Q.  Okay.  And that Rule 11 agreement provided that you would

16   plead guilty to conspiracy to possess with intent to deliver

17   methamphetamine?

18   A.  Yes.

19   Q.  And you knew from talking to your lawyer that that carries

20   a ten-year mandatory minimum?

21   A.  Yes.

22   Q.  Which means it's ten years mandatory in prison?

23   A.  Yes.

24   Q.  The maximum penalty is life?

25   A.  Yes.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA                    262

1    Q.   Which means you could go away for the rest of your life?

2    A.   Yes.

3    Q.   I think you were also indicted for, and it was dismissed,

4    for felon in possession of a firearm?

5    A.   Yup.

6    Q.   And you were also indicted, and they dismissed the gambling

7    count?

8    A.   Yes.

9    Q.   And you weren't charged with racketeering?

10   A.   Right.

11   Q.   So the benefit that you're going to receive from the

12   Government, based on this Rule 11 agreement, is you plead

13   guilty to conspiracy to possess with intent to deliver

14   methamphetamine; am I right?

15   A.   Yup.

16   Q.   They are going to recommend four years and nine months?

17   A.   Yeah.

18   Q.   And they determine -- when I say "they," the Government

19   determines whether you're telling the truth?

20   A.   No.  Actually, the Judge does, I believe.

21   Q.   Well, the Government is the one that made the agreement; am

22   I right?

23   A.   Right.

24   Q.   The Government is the one that says you've helped us out

25   substantially, yes?

1   A.  Yeah.

2   Q.  If the Government says you helped them out substantially,

3   then -- and makes their recommendation of four years and nine

4   months, then the Judge gets to make the decision what to do?

5   A.  Right.

6   Q.  So it's a gamble on your part, in a sense?

7   A.  Yeah, it's a gamble.

8   Q.  And what you have to do is assist the Government and

9   testify; am I right?

10  A.  Yeah.  I just got to tell truth.

11  Q.  And tell the truth.

12          Now, my understanding is, so we're clear, you were

13  about 24 years old when you began to use crack cocaine?

14  A.  Around there.

15  Q.  Roughly then?

16  A.  Yup.

17  Q.  And can you remember what year it was when you were

18  24 years old?

19  A.  No, I can't.

20  Q.  And how old are you now?

21  A.  Fifty-eight.

22  Q.  All right.  So about 25 years ago, yes?

23  A.  Yeah.

24  Q.  And you began to use crack cocaine every day?

25  A.  Around 1983, something like that.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

1    Q.   1983, you started using crack?

2    A.   '84, I don't know.

3    Q.   Roughly 1983, 1984?

4    A.   I ain't that good at math.  My mind ain't working that

5    good.

6    Q.   All right.  Well, you were 24; you remember that, yes?

7    A.   No.

8    Q.   Well, you began to use crack --

9    A.   About 25 years ago, and I'm 58.  So 33, 33?

10   Q.   And you began to use crack cocaine?

11   A.   About 33 years ago.  I was 33 at the time.

12   Q.   All right.  And you said you used crack?

13   A.   Yeah.

14   Q.   That's what you started with?

15   A.   Yeah.

16   Q.   You used crack every day?

17   A.   If I could.

18   Q.   If you could.  If you had the money to buy it, you'd use it

19   every day?

20   A.   Yup.

21   Q.   Sell crack?

22   A.   No.

23   Q.   Just bought crack off the street?

24   A.   Just bought it and used it.

25   Q.   At the same time, I guess you were using marijuana?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

1    A.   Oh, yeah.

2    Q.   Did you start using marijuana before the crack?

3    A.   No.

4    Q.   You went from crack to marijuana?

5    A.   Right.

6    Q.   Okay.   That's remarkable.

7              How much marijuana did you use?

8    A.   I don't know.

9    Q.   As much as you could get?

10   A.   No.   Didn't really care that much for it.

11   Q.   You liked the crack better?

12   A.   Yeah.

13   Q.   Because you liked the high on the crack?

14   A.   Yeah.

15   Q.   And you'd rather stay high as much as you could on the

16   crack?

17   A.   Yeah.

18   Q.   And you also used cocaine?

19   A.   Yeah.

20   Q.   Now, did you use the same amount of cocaine back then as

21   you used crack?

22   A.   No.

23   Q.   Cocaine gave you -- cocaine didn't give you the high quick

24   enough, did it?

25   A.   No.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

1   Q.  Crack gave you the high fast enough, didn't it?

2   A.  Yes.

3   Q.  So you'd rather have the crack?

4   A.  Yes.

5   Q.  But if you couldn't -- cocaine, you would use cocaine, if

6   you couldn't get the crack, basically?  Yes?

7   A.  Yeah.

8   Q.  How much cocaine do you think you used?

9   A.  I don't -- didn't use it all that much.  I liked crack.

10  It's what I did.

11  Q.  All right.  You liked crack.

12  A.  Yeah.

13  Q.  And then there came a time when you were at a bar, and at

14  this bar you had got into a fight with a guy by the name of

15  "Squeak."

16  A.  Yup.

17  Q.  And you basically beat him up?

18  A.  Yup.

19  Q.  Cleaned his clock?

20  A.  Yup.

21  Q.  And you -- Mr. Rich really liked that?

22  A.  Yeah.

23  Q.  He was impressed?

24  A.  I guess.

25  Q.  Well, he was impressed enough to ask you to become a

1   prospect, wasn't he?

2   A.   Yeah.

3   Q.   And at the time, I think you said you were living on the

4   street?

5   A.   Yup.

6   Q.   You had no place to go?

7   A.   Right.

8   Q.   And Mr. Rich being the nice guy he was, took you into his

9   house?

10  A.   Oh, yeah.

11  Q.   Okay.  And did he take you into the house while you were a

12  prospect?

13  A.   Yup.

14  Q.   And he gave you a place to live?

15  A.   Yup.

16  Q.   And he also began to give you meth?

17  A.   Yup.

18  Q.   At the time he brought you in and gave you the place to

19  live and gave you meth, you weren't a member of the Devils

20  Diciples?

21  A.   I was a prospect.

22  Q.   Okay.  But you weren't a member at the point, were you?

23  A.   Right.

24  Q.   And part of a reason he gave you the meth was because you

25  were working for him, weren't you?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

1    A.   No.  I don't understand that.

2    Q.   Were you selling meth for him?

3    A.   No, not at that time.  I wasn't, no.

4    Q.   Okay.  How long after he began to give you meth did you

5    begin to work for him?

6    A.   A couple years.

7    Q.   So he gave you meth for about two years?

8    A.   Yeah.

9    Q.   Just gave it to you?

10   A.   Yeah.

11   Q.   Did you pay him for it?

12   A.   No.

13   Q.   He just gave you meth?

14   A.   Yeah.

15   Q.   You were his friend?

16   A.   We was friends.  Yeah.

17   Q.   You was friends.  And that's the same way that meth was

18   distributed at parties, wasn't it?

19   A.   What's that?

20   Q.   Let me --

21   A.   I don't understand.

22   Q.   When you went to parties.

23   A.   Yeah.

24   Q.   You said you did lines with meth with other Devils

25   Diciples.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

1   A.  Right.

2   Q.  What you're saying is, when you'd go to the parties, they

3   have alcohol?

4   A.  Yup.

5   Q.  People share alcohol together?

6   A.  Yup.

7   Q.  They have marijuana?

8   A.  Yup.

9   Q.  People share marijuana together?

10  A.  Right.

11  Q.  They have heroin?

12  A.  I don't know nothing about -- never seen none of that.

13  Q.  All right.  They have cocaine?

14  A.  Yeah.

15  Q.  People share cocaine?

16  A.  Yeah.

17  Q.  And they have meth?

18  A.  Yeah.

19  Q.  When you say you did lines of meth with various people,

20  what happens is, you go into a room, they put the meth out

21  there and you snort it?

22  A.  Right.

23  Q.  Don't pay anybody for it, right?

24  A.  Right.

25  Q.  You're just a bunch of guys sharing meth?

1    A.   Right, there.

2    Q.   And the meth is making you high?

3    A.   Yeah.

4    Q.   It makes you stay up late and feel good?

5    A.   Yup.

6    Q.   Now, eventually you become a warlord; am I right?

7    A.   Yup.

8    Q.   And the reason people have warlords or this club has

9    warlords, warlords, is to provide security?

10   A.   Yeah.

11   Q.   And what we mean by security is, when you would have a

12   party like a steak fry, you would have a lot of people?  Yes?

13   A.   Yeah.

14   Q.   Hundreds of people?

15   A.   Yeah.

16   Q.   Two hundreds of people?

17   A.   Yeah.

18   Q.   And it would be either at, like, the Mount Clemens place,

19   yes?

20   A.   Yes.

21   Q.   It might be over in Port Huron?

22   A.   Might be.

23   Q.   All right.  It might be at any club where there's a

24   clubhouse for Devils Diciples?

25   A.   Yes.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

271

1   Q.  And when you provided security, because there were drugs

2   being used and there was alcohol, you wanted to make sure that

3   people didn't get out of line?

4   A.  Yes.

5   Q.  That's what your job was; am I right?

6   A.  Yes.

7   Q.  If I got drunk and got too out of line, you would sit me

8   down, right?

9   A.  Yeah.  My job was protect the bosses and secure the

10  premises.

11  Q.  Okay.  When you say secure, also secure the premises?

12  A.  Make sure nobody gets out of line, true.

13  Q.  Make sure nobody is out of line, make sure there's no other

14  club or no other, in quotes, "enemy" of the club that wants to

15  harm people at the party?

16  A.  Right.

17  Q.  Am I right?

18  A.  Yup.

19  Q.  Now, when you say you protected or did -- I think you

20  called it a dog duty?

21  A.  Yup.

22  Q.  You were there basically to protect the national president?

23  A.  That's right.

24  Q.  Make sure nobody harmed him?

25  A.  Right.

UNITED STATES vs. SUTHERLAND, et al - 11-20129; 11-20066

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

272

1   Q.  Make sure nobody did him in?

2   A.  Right.

3   Q.  Now, you knew the national president was elected by popular

4   vote, right?

5   A.  Yeah.

6   Q.  The vice president was elected by popular vote; am I right?

7   A.  Yeah.

8   Q.  And in fact, the president of the club, when he was Vern

9   Rich, he was elected by popular vote?

10  A.  Right.

11  Q.  But you still needed to protect him from various members,

12  right?

13  A.  Right.

14  Q.  And you have to protect him also from members of the Devils

15  Diciples, don't you?

16  A.  Have to what?  I didn't hear that.

17  Q.  Have to protect him from members of the Devils Diciples,

18  didn't you?

19  A.  From members of Devils Diciples?

20  Q.  Yes.

21  A.  No.

22  Q.  Just the outside people?

23  A.  Yes.

24  Q.  You wanted to make sure there was no threat?

25  A.  Right.

1   Q.   So when you talk about dog duty, all you're really doing is

2   protecting the president and the national president from people

3   that want to harm them?

4   A.   Exactly.

5   Q.   That's all it really was; am I right?

6   A.   Yeah.

7   Q.   And when you talked about being a warlord and protecting

8   security, you really want to make sure nobody breaks up the

9   party; am I right?

10   A.   I don't understand what you mean, break up the party.

11   Q.   It's my fault.  What I mean, nobody comes in and causes

12   trouble or harms the people at the party?

13   A.   Oh, yes.

14   Q.   That's when we meant by "security."

15   A.   Yeah.

16   Q.   No more than a bouncer in a bar?

17   A.   Something like that, yeah.

18   Q.   Something like that, right?  If I go to the bar, I make

19   trouble, bouncer puts me out; fair statement?

20   A.   Yup.

21   Q.   And you also, you knew about the national bylaws; am I

22   right?

23   A.   Yeah.  I know about them, but I don't recall them.

24   Q.   Every chapter of the Devils Diciples had a clubhouse, did

25   they not?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

1   A.  Yes.

2   Q.  To have a clubhouse means you've got to pay rent.  You've

3   got to pay rent for the clubhouse?

4   A.  Yeah.  You have got to pay your dues.

5   Q.  Your dues.  And the dues went for the rent; do you know?

6   A.  I don't know.

7   Q.  Electricity?

8   A.  I never took part of that part of the business.

9   Q.  All right.  Booze?  You don't know?

10  A.  (No response.)

11  Q.  But everybody was required to pay dues --

12  A.  Yes.

13  Q.  -- to be a good standing member of the club?

14  A.  Right.

15  Q.  People that are members of a club pay dues?

16  A.  Right.

17  Q.  And there was also what they call a "black eye" policy --

18  A.  Yeah.

19  Q.  -- that was given by the -- you have to be a boss to give

20  that instruction?

21  A.  Right.

22  Q.  And what the "black eye" policy was, or the "black eye"

23  rule was, that's a disciplinary action which is taken against

24  members that get out of line?

25  A.  Right.

1    Q.  Am I right?

2    A.  Yeah.

3    Q.  They do something they really shouldn't have done?

4    A.  Yeah.

5    Q.  Embarrassed, maybe, people at a party?

6    A.  Say what, now?

7    Q.  Embarrass, maybe, people at the party?

8    A.  I don't know nothing about that.

9    Q.  All right.  But the only people that could tell you to do

10   that --

11   A.  Is the boss.

12   Q.  -- was a boss.  When we say "a boss," because boss could

13   be --

14   A.  And it's never done in front of citizens anyway.

15   Q.  No.  This is something that is private?

16   A.  Right.

17   Q.  This is something that is done at a church meeting?

18   A.  Right.

19   Q.  This is something that's done between members?

20   A.  Yup.

21   Q.  And when we talk about the boss, we not only talk about it

22   could be the national boss, we talk about it could be the boss

23   of the chapter?

24   A.  Right.

25   Q.  Doesn't have to go to the national boss; could be the

1    president?

2    A.   That's right.

3    Q.   The president of Port Huron?

4    A.   Right.

5    Q.   And the member that takes this punch, it's an acceptable

6    thing.  He agrees to take the punch, doesn't he?

7    A.   Yeah.  He stands there and takes it.

8    Q.   Takes it.  It's sort of consensual, isn't it?

9    A.   Well, he ain't got much choice.

10   Q.   Well, he could pay a fine, couldn't he?

11   A.   I don't know.

12   Q.   Okay.  You're aware that the black eye policy is, you can

13   take a punch or you can take a fine?

14   A.   I never heard that.

15   Q.   All right.  But you -- but the person takes the punch?

16   A.   Yeah.

17   Q.   And the person that takes the punch takes it voluntarily

18   inside the club?

19   A.   Yup.

20   Q.   It's like a club secret?

21   A.   Something like that.

22   Q.   Something like that.  Well --

23   A.   Ain't secret now, though.

24   Q.   Well, it's not secret now, because we're talking about it;

25   am I right?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

```
 1              (Laughter in the courtroom.)
 2    BY MR. SABBOTA:
 3    Q.  So the secret is out.
 4    A.  Right.
 5    Q.  Right or wrong?
 6    A.  Right.
 7    Q.  All right.  But back then, if we weren't talking about it,
 8    a citizen doesn't come to a club meeting?
 9    A.  No.
10    Q.  The only people that come to the club meetings are members
11    that are full-jacketed members, so to speak?
12    A.  Right.
13    Q.  A person with a wheel on the back?
14    A.  Yup.
15    Q.  The club, this is a private thing in the club; am I right?
16    A.  Yeah.
17    Q.  Now, my understanding is that Vern Rich was really the big
18    drug dealer; is that a fair statement?
19    A.  Yeah.
20    Q.  And Vern Rich was the one that was supplying meth to people
21    at the Devils Diciples?
22    A.  Right.
23    Q.  Vern Rich was also supplying meth to citizens?
24    A.  Yup.
25    Q.  I mean, a guy like me, if they knew me, would sell me meth?
```

1    A.  Yup.

2    Q.  And you were part and parcel of him selling the meth,

3    weren't you?

4    A.  Yes.

5    Q.  You engaged in selling meth for Vern Rich for how long?

6    A.  Three, four years.

7    Q.  Three or four years.  How many grams do you think you sold?

8    A.  I couldn't tell you.

9    Q.  How many grams do you think you sold a week?

10   A.  I couldn't tell you.

11   Q.  More than 500?

12   A.  Heck no.

13   Q.  Heck no.  Way less than 500, right?

14   A.  Yeah.  Like, maybe five a week.

15   Q.  Maybe five a week?

16   A.  Yeah.

17   Q.  In fact, your meth business was so good, that I guess on

18   that tape, you needed money for gas, right?

19   A.  Yeah.

20   Q.  And Vern Rich's meth business was so good, he needed money

21   for gas?

22   A.  Mh-hm.

23   Q.  Am I right?

24   A.  Yup.

25   Q.  You guys really didn't have a lot of money, did you?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

```
 1    A.   No.

 2    Q.   You're living from week to week?

 3    A.   I didn't say that.  I lived week to week.

 4    Q.   You lived week for week?

 5    A.   Right.

 6    Q.   You can't tell us how --

 7    A.   No.

 8    Q.   -- Vern Rich lived?

 9    A.   I can't.

10    Q.   But you, yourself, had a difficult time; am I right?

11    A.   Yup.

12    Q.   And before we get to your traveling, let's talk about the

13    slot machines for a second.

14              There were slot machines at the various clubhouses; am

15    I right?

16    A.   Yup.

17    Q.   You played the slot machines?

18    A.   Yes.

19    Q.   You put money in the slot machines?

20    A.   Yes.

21    Q.   If you won, you got paid?

22    A.   Yes.

23    Q.   If you didn't win, you didn't get paid?

24    A.   Right.

25    Q.   And you and Vern Rich used to go to gas stations to put
```

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

1   quarters in the slot machines?

2   A.   No.   We used to go to car washes.

3   Q.   Oh, I'm sorry.

4   A.   To get quarters out of the quarter machines.

5   Q.   I misunderstood.

6   A.   For the slot machines, yes.

7   Q.   That's my fault.   You went to the car wash?

8   A.   Yes.

9   Q.   They got those quarter things?

10  A.   Yeah.

11  Q.   Unload the quarters?

12  A.   Right.

13  Q.   Take them to the clubhouse and stick them in, yes?

14  A.   Yup.

15  Q.   Anybody that was at the clubhouse that was a person that

16  was invited, they can play the slot machines?

17  A.   Right.

18  Q.   Nobody forced them to play the slot machines?

19  A.   No.

20  Q.   Did you ever play poker at the clubhouse?

21  A.   No.

22  Q.   Ever do any other gambling at the clubhouse?

23  A.   No.

24  Q.   Do you know if other people did any gambling at the

25  clubhouse?

UNITED STATES vs. SUTHERLAND, et al - 11-20129; 11-20066

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

1   A.  Not that I'm aware of.

2   Q.  Not that you're aware of.

3           But the poker, the slot machines paid off?

4   A.  Right.

5   Q.  And then there came a time that you were going to the

6   national party, which was located in California.

7   A.  Right.

8   Q.  Right?

9   A.  Right.

10  Q.  And you were going, you told us, in 2007?

11  A.  Yeah.

12  Q.  And you were going to ride your motorcycle with Mr. Rich?

13  A.  We did.

14  Q.  You did.

15  A.  Yeah.

16  Q.  You left from Port Huron, you said, to go to Bay City?

17  A.  Right.

18  Q.  There was no meth in Port Huron?

19  A.  No.  He didn't have none at the time.

20  Q.  What I'm saying is, you didn't have any meth.

21  A.  No.

22  Q.  And Mr. Rich didn't have any meth.

23  A.  No.

24  Q.  But if you take the meth, the meth keeps you awake?

25  A.  Yup.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

1    Q.  And it lets you function?

2    A.  Yes.

3    Q.  Keeps you high?

4    A.  Yeah.

5    Q.  And back then, at least, you liked being high?

6    A.  Yup.

7    Q.  In fact, back then, you were probably high most of the

8    time, weren't you?

9    A.  Most of the time.

10   Q.  If you would be high like, say, during a week, five or six

11   days you would be high?

12   A.  No.

13   Q.  Three or four days?

14   A.  Couldn't afford it.

15   Q.  Couldn't afford it.  If you could have afforded it, you

16   would have been high every day?

17   A.  Yeah.

18   Q.  How many days during the week do you think you were high

19   back then?

20   A.  One or two.

21   Q.  And so what happens is, you have to drive to Bay City to

22   get meth?

23   A.  You're losing me.

24   Q.  Sorry.  When you left Port Huron --

25   A.  Right.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

1   Q.  -- to go to the national party in California --

2   A.  Right.

3   Q.  -- you left to go to Bay City?

4   A.  Right.

5   Q.  You went to Bay City to get meth.

6   A.  Right.

7   Q.  The reason you got meth is so you could stay up.

8   A.  Right.

9   Q.  You're not going to pull over every, every ten hours, and

10  take a nap?

11  A.  Right.

12  Q.  You wanted to go right through; am I right?

13  A.  Yup.

14  Q.  And then when you get to Arizona, which is a long way from

15  Bay City.

16  A.  Right.

17  Q.  You're running out of meth.

18  A.  We're out.

19  Q.  You're out.  So you've got to find more meth so you can

20  stay up to get to California; am I right?

21  A.  Yeah.

22  Q.  So you go down to Phoenix, I guess, where you picked up

23  some more meth?

24  A.  Vern did.

25  Q.  Vern did.  You didn't see him pick it up?

1   A.  No.

2   Q.  You just know that he gave it to you?

3   A.  Yeah.

4   Q.  Am I right?

5        And then from there, you went to California, where you

6   went to the party?

7   A.  Right.

8   Q.  And you got more meth in California; am I right?

9   A.  I believe so.

10  Q.  Okay.  You weren't the one that any meth was delivered to,

11  were you?

12  A.  No.

13  Q.  Now, you said that the national leaders, especially Fat Dog

14  and Pauli, received money from Vern Rich?

15  A.  Yeah.

16  Q.  You never saw that happen, did you?

17  A.  Never saw him hand it to them, but I heard Vern talk about

18  it all the time.  Right.

19  Q.  Vern talked about it?

20  A.  Yeah.

21  Q.  But you didn't see Vern hand it to them, did you?

22  A.  No.

23  Q.  And you don't know why the money was given to them, do you?

24  A.  No.

25  Q.  All you know is Vern Rich supposedly gave them money?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

1   A.   Yup.

2   Q.   And Vern Rich gave them -- strike that.

3            You also talked about the raffles.

4   A.   Yeah.

5   Q.   You would have parties at your clubhouses maybe once a

6   month, every couple months?

7   A.   Something like that, I guess.

8   Q.   And they were raffles that the members were required to

9   sell?

10   A.   I don't remember it ever being required.

11   Q.   Okay.  You were never required to sell tickets, were you?

12   A.   Not that I remember.

13   Q.   No.  They gave you tickets and if you wanted to sell them,

14   you would sell them, yes?

15   A.   I guess.

16   Q.   And those tickets, the money then would be turned into the

17   club to help support the party, yes?

18   A.   Yes.

19   Q.   Because these parties and things were expensive, weren't

20   they?

21   A.   Oh, yeah.  It cost money --

22   Q.   It cost money to --

23   A.   -- to run a party, yup.

24   Q.   It would cost money to invite 100 people over to your house

25   so they could drink beer, wouldn't it?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

```
1    A.   Mh-hm.

2    Q.   Is that a yes?

3    A.   Yes.  But they didn't get to drink beer free.

4    Q.   I'm not saying they got to drink beer free, okay.  They got

5    to pay for the beer?

6    A.   Right.

7    Q.   But it still cost money to have the food and everything

8    else at the party, doesn't it?

9    A.   Yes, sir.

10   Q.   It still costs money to run the club, does it not?

11   A.   Yup.

12        MR. SABBOTA:  May I just have a second, Judge?

13        THE COURT:  Yes.

14   BY MR. SABBOTA:

15   Q.   Oh, let's talk about Gadget.  There came a time that Vern

16   Rich -- and he was the one that was president of the Port Huron

17   club?

18   A.   Yup.

19   Q.   He told you he wanted you to go get Gadget?

20   A.   Yes.

21   Q.   And he sent you with who to go get Gadget?

22   A.   With Gun Control, Victor and Rockin' Ronnie.

23   Q.   Okay.  He wanted to talk to Gadget about something, didn't

24   he?

25   A.   Right.
```

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SABBOTA

1  Q.  And you went down to Florida to get him?

2  A.  We went down to Florida and got him.

3  Q.  Okay.  And did you go in the winter or summer?

4  A.  I can't remember.

5  Q.  All right.

6  A.  It was a lot of years ago.

7  Q.  All right.  I didn't mean to cut you off.

8         It was a lot of years ago?

9  A.  Yeah.

10  Q.  And you ran into Gadget at some bar?

11  A.  He -- his girlfriend was working in a strip bar.

12  Q.  Okay.  So there was -- she was an exotic dancer, so to

13  speak?

14  A.  Yes.

15  Q.  She's dancing at a strip bar?

16  A.  Yeah.

17  Q.  You go in and you run into Gadget?

18  A.  Yeah.

19  Q.  You tell Gadget, Vern wants you?  Yup?

20  A.  Something like that.

21  Q.  And Gadget goes back with you voluntarily?

22  A.  Yeah.  He come back voluntarily.

23  Q.  You didn't kidnap him, did you?

24  A.  No.

25  Q.  You didn't force him to go back with you?

1   A.  No.

2   Q.  You just said, we've been looking for you, man?

3   A.  Nope.  We said Vern wants you to come back, and you know, I

4   had the guys with me, and what's he going to say, no?

5   Q.  He didn't say no, did he?

6   A.  No, he didn't say no.  He come.

7   Q.  You didn't threaten him, did you?

8   A.  No.

9   Q.  He just came back with you?

10  A.  Did not.  I just told him Vern said to bring you back.

11  Q.  And he went back?

12  A.  And he went back.

13  Q.  And when he got back, nothing happened, did it?

14  A.  I don't know.

15  Q.  Basically you're telling us, you took orders from Vern; am

16  I right?

17  A.  Yeah.

18  Q.  Vern was your boss?

19  A.  Yes.

20  Q.  Vern was the one you listened to?

21  A.  Yes.

22          MR. SABBOTA:  No further questions.

23          THE COURT:  Other cross?

24          Mr. Satawa?

25          MR. SATAWA:  Thank you, your Honor.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SATAWA

```
 1                       CROSS-EXAMINATION
 2   BY MR. SATAWA
 3   Q.  Good afternoon, sir.
 4   A.  Good afternoon.
 5   Q.  So as to not repeat the questions that Mr. Sabbota or the
 6   Government asked you, I'm going to sort of summarize some
 7   things.  But if, if in any way you think I'm trying to confuse
 8   you or misstating something, just interrupt me and I'll re-ask
 9   the question.  Fair enough?
10   A.  Yup.
11   Q.  Sir, I wanted to clarify one thing.
12           In response to Mr. Sabbota's question about who
13   determines whether or not you provided substantial assistance
14   or whether or not you're telling the truth, you initially said
15   it was the Judge.  Do you remember that?
16   A.  Yeah.
17   Q.  All right.  Now, you're represented by a lawyer in this
18   case?
19   A.  Yes.
20   Q.  And you have met with that lawyer several times about your
21   case?
22   A.  Yes.
23   Q.  And you have been cooperating with the Government since
24   2009?
25   A.  Yup.
```

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SATAWA

1    Q.   For about five years?

2    A.   Yup.

3    Q.   And during the course of that cooperation, you've gotten,

4    I would think, the opportunity to meet and speak with your

5    lawyer about this case multiple times, lots of times?

6    A.   Right.

7    Q.   And the charge that you ultimately pled guilty to,

8    conspiracy to distribute meth?

9    A.   Right.

10   Q.   Your attorney explained to you that there are a couple of

11   different things that affect your sentencing in that case,

12   right?

13   A.   Yes.

14   Q.   Sentencing guidelines that are determined by a formula or

15   a book?

16   A.   Yeah, something like that.

17   Q.   Yeah.  I mean, I'm not saying you're an expert --

18   A.   I don't understand it at all.

19   Q.   -- in the sentencing guidelines.

20   A.   No, I'm not.

21   Q.   You've had a conversation with your lawyer about your

22   guidelines?

23   A.   Right.

24   Q.   And that the Judge sets your sentence within the guidelines

25   based on any number of factors, or at least that's a starting

1   point; that's what your lawyer explained to you?

2   A.  I don't understand what you're talking about.

3   Q.  Fair enough.  You were explained there was a statutory

4   maximum, a high point that the Judge can't go over, right?

5   In this case, that statutory maximum is life?

6   A.  Right.

7   Q.  Correct?

8   A.  Yes.

9   Q.  And you were also explained that in this case, there is

10  what is called a mandatory minimum, right?

11  A.  Right.

12  Q.  And that mandatory minimum says that even if the Judge

13  wanted to give you less than that mandatory minimum, the Judge

14  can't do that, because the statute says you must get at least

15  this much time, right?

16  A.  Yes.

17  Q.  And the mandatory minimum in this case is ten years,

18  correct?

19  A.  Yup.

20  Q.  So the Judge, even if the Judge wanted to, cannot give you

21  less than ten years.

22  A.  Right.

23  Q.  Except, it's been explained to you by your lawyer that if

24  the Government comes into a courtroom and says, Judge, we're

25  satisfied that Mr. Quant has provided substantial assistance,

1  they can recommend a departure below the guideline range,

2  right?

3  A.  Right.

4  Q.  And I believe the departure below the guideline range in

5  your case is 57 to 71 months, or, like you said, about four or

6  five years and change?

7  A.  Right.

8  Q.  Up to about six years, right?

9  A.  Yup.

10 Q.  But the Government can also come in and say, we're

11 satisfied that this person has given us substantial assistance,

12 so, Judge, we are asking you to sentence this individual below

13 the mandatory minimum, right?

14 A.  Yeah, I, I guess.

15 Q.  The Government must make that motion, right?

16 A.  Yeah.

17 Q.  And if the Government doesn't make that motion, the Judge

18 can't go below 120 months, ten years, right?

19 A.  Right.

20 Q.  And so the Government is who has to be satisfied for you to

21 get that motion to go below the mandatory minimum of ten years,

22 yes?

23 A.  I understand that the Judge makes the determination of

24 everything, so.

25 Q.  The Judge cannot --

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SATAWA

1   A.  I don't understand what you're trying to --

2   Q.  All right.  Well --

3   A.  -- say here, where you're trying to go with this.

4   Q.  I will -- I'm not trying to go anywhere.  I'm trying to get

5   to the truth.

6   A.  Me, too.

7   Q.  And the truth is, the truth is ultimately the Judge is the

8   one who orders what your sentence is going to be.

9   A.  Yes.

10  Q.  You and I will agree with that, right?

11  A.  Right.  Yes, we will.

12  Q.  And before the Government makes a motion for your

13  substantial assistance, your understanding is, is the Judge is

14  constrained, that means he can't go below ten years, even if

15  the Judge wants to, right?

16  A.  Right.

17  Q.  And once the Government decides that you, that you have

18  provided substantial assistance to their case, and they make

19  that motion, the Judge is then allowed to go below the ten

20  years if the Judge wants to?

21  A.  Yeah.

22  Q.  And the part -- and the deal is, is that once they make

23  that motion to go below the mandatory minimum of ten years,

24  they are going to -- they, meaning the Government, is going to

25  recommend 57 to 71 months, right?

1   A.  Yes.

2   Q.  And your lawyer has explained that the Judge can go between

3   57 to 71 months if the Judge wants to, right?

4   A.  Right.

5   Q.  The Judge can go above 71 months, if the Judge wants to?

6   A.  Right.

7   Q.  And the Judge can go below 57 months, if the Judge wants

8   to?

9   A.  Right.

10  Q.  It's ultimately, once the Government makes the motion to

11  go below the mandatory minimum of ten years, the Judge can

12  determine what that sentence is below ten years?

13  A.  Yes.

14  Q.  But the Judge cannot do that until the Government, and the

15  Government alone, makes that motion?

16  A.  I understand that.

17  Q.  You testified that your job as the warlord, a job you came

18  into because you got into a fight with someone named Swede; is

19  that correct?

20  A.  "Squeak."

21  Q.  Squeak.

22  A.  Yup.

23  Q.  Squeak, like a mouse?

24  A.  Yeah.

25  Q.  Squeak, squeak?

```
 1   A.  Squeak.

 2   Q.  You beat Squeak up?

 3   A.  Yup.

 4   Q.  And so they made you a warlord?

 5   A.  No, they --

 6   Q.  Vern did.

 7   A.  Vern brought me into the club.  I didn't get to be a

 8   warlord for a while.

 9   Q.  And you worked as Vern -- you worked with Vern?

10   A.  Yeah.

11   Q.  And is it fair to say that your job, in addition to being

12   the warlord for Vern, was that you were Vern's right-hand man?

13   A.  So to speak, yeah, I guess.

14   Q.  I mean, you --

15   A.  I lived with him, so I guess you're right there.

16   Q.  You lived with him.  You sold meth for him?

17   A.  Not for a few years after I moved in with him.

18   Q.  But, well, you eventually sold meth for him?

19   A.  Yeah, eventually.

20   Q.  And you assaulted people for Vern, beat people up for him?

21   A.  If I was told to, I did it.

22   Q.  And you did?

23   A.  Yeah.

24   Q.  In fact, you tried to blow up someone's Chevy Camaro?

25   A.  Yup.
```

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SATAWA

1   Q.  That person being Rod Wilkins; is that right?

2   A.  I ain't sure.

3   Q.  This is a person who got in a fight with Vern?

4   A.  Yeah.

5   Q.  And so --

6   A.  It was an M80.  It wasn't blown up or nothing.

7   Q.  Oh, an M80.  You mean a quarter stick of dynamite?

8   A.  No.  No.

9   Q.  It's what, an eighth of a stick of dynamite?

10  A.  No.  It was a firecracker thing, an M80

11  Q.  Oh, was it a firecracker or an M80?

12  A.  Well, you can -- I don't know what it was.  How is that?

13  Q.  Okay.  Well, you took an explosive device, we would agree

14  with that?

15  A.  Yeah.

16  Q.  You lit it on fire?

17  A.  Yes.

18  Q.  And you put it in the back of a, of a tailpipe?

19  A.  No, I did not.

20  Q.  What did you do with it?

21  A.  It was under the front of the motor.

22  Q.  Oh, so just under the front of the motor.

23  A.  And it didn't blow nothing up anyway.

24  Q.  It didn't blow nothing up anyway?

25  A.  No.

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - CROSS BY MR. SATAWA

1   Q.  So even though you tried your best --

2   A.  It wasn't --

3   Q.  -- you didn't blow it up?

4   A.  It was a joke.  Vern was trying to play a joke on the guy,

5   get back at him.

6   Q.  Oh, well, Vern, the meth dealer, was playing a joke or

7   trying to get back at him?

8   A.  (No response.)

9   Q.  Vern and this man, Rob -- or Rich, excuse me -- Rod

10  Wilkins, Vern and Rod Wilkins had a falling out, they got --

11  A.  I don't know no Rod Wilkins.

12  Q.  All right.  Well, the person who you put the M80 underneath

13  the engine and Vern got into a falling out; they got into a

14  fight?

15  A.  Okay.

16  Q.  Right?

17  A.  Yeah, I guess.

18  Q.  Well, Vern wanted to get back at him?

19  A.  (No response.)

20  Q.  Right?

21  A.  Yeah.  Vern had something against him.

22  Q.  So Vern wanted -- asked you to blow the guy's car up?

23  A.  Yup.

24  Q.  And you took some kind of explosive device, lit it on fire,

25  and put it underneath the engine?

JURY TRIAL, VOLUME XI - 11/3/2014
HOWARD QUANT - REDIRECT BY MR. MAIATICO

1    A.   Yup.

2    Q.   And it didn't work?

3    A.   No.

4         MR. SATAWA:  All right.  No further questions, your

5    Honor.

6         THE COURT:  Any other cross?

7         Any redirect?

8                        REDIRECT EXAMINATION

9    BY MR. MAIATICO:

10   Q.   Mr. Quant, you were asked some questions about the term,

11   "black eye," the black eye policy?

12   A.   Yes.

13   Q.   Now, you said that you were ordered to give a black eye by

14   Vern, by chapter presidents in the past, correct?

15   A.   Correct.

16   Q.   What would happen if you refused to give a black eye?

17   A.   You'd get the black eye.

18   Q.   Okay.  So did you ever refuse to give a black eye?

19   A.   No.

20   Q.   Okay.  Now, what would happen if an individual who was

21   ordered to receive a black eye refused to get up in front of

22   church and receive it?

23   A.   He'd get it anyway.

24   Q.   Okay.  And you were also asked some questions about whether

25   there are elections for national president, national vice

 1   president.

 2   A.   Yeah.

 3   Q.   How many times did you vote for national president or

 4   national vice president?

 5   A.   Never.

 6   Q.   You never voted?

 7   A.   Never got to vote.

 8   Q.   Where were the elections held?

 9   A.   (No response.)

10   Q.   When were they held?

11   A.   Usually on the national party, but like I said, I never got

12   to vote about nothing.

13   Q.   Do you know who voted?

14   A.   No.

15   Q.   Do you know how often the elections were held?

16   A.   No.

17   Q.   Are you still a member of the Devils Diciples?

18   A.   No.

19   Q.   Why did you leave the club?

20   A.   Tired of being used.  Tired of being the fall guy, like,

21   you know.  You're the one that's always taking the risks.

22   Q.   And by taking the risk, what does that mean?

23   A.   Selling the drugs.

24        MS. STOUT:  Objection.  Beyond the scope of cross.

25        THE COURT:  How is this tied to cross?

1          MR. MAIATICO:  Well, there were questions about him

2    being a prospect, about being a gopher.  This is just asking

3    him why he decided to leave.

4          THE COURT:  Conclude this and move along.

5          MR. MAIATICO:  All right.

6          THE COURT:  Overruled, provisionally.

7    BY MR. MAIATICO:

8    Q.  And so why did you leave?

9    A.  I just was tired of being, being felt like a gopher, like I

10   was being used all the time.

11         MR. MAIATICO:  I have no further questions.

12         THE COURT:  All right.  The witness may step down, be

13   excused.

14         THE WITNESS:  Thank you.

15      (Witness excused at 4:18 p.m.)

16         THE COURT:  Sir, we have time to fill.  Next witness?

17         MS. MOHSIN:  Your Honor, I will call Special Agent

18   Fleming.

19         THE COURT:  All right.

20         Do you understand your oath continues, sir?

21         THE WITNESS:  Yes, your Honor.

22         THE COURT:  Have a seat.

23                       WILLIAM FLEMING

24      called as a witness at 4:18 p.m. testified as follows:

25                      DIRECT EXAMINATION

1    BY MS. MOHSIN:

2    Q.  Special Agent Fleming, over the course of the last few

3    days of testimony, there has been some references made to a

4    tailpipe.

5    A.  Correct.

6    Q.  And during the course of your monitoring of the wiretap on

7    Vern Rich's phone, were there conversations intercepted about

8    that tailpipe?

9    A.  There were, after we conducted searches on November 15th of

10   2007.

11   Q.  Now, when you conducted searches on November 15th of 2007,

12   you did a search at Vern Rich's home, correct?

13   A.  That's correct.

14   Q.  And pursuant to that search, did you find a tailpipe?

15   A.  We did.

16           MS. MOHSIN:  Okay.  Just a moment.

17           (Brief pause.)

18   BY MS. MOHSIN:

19   Q.  I'm going to direct your attention to Government's

20   Exhibit 35-12.

21           Do you recognize 35-12, Special Agent Fleming?

22   A.  I do.  35-12 is the tailpipe that was removed from Vern

23   Rich's motorcycle and it also includes a plug that was found

24   inside the tailpipe.

25           MS. MOHSIN:  Your Honor, the Government offers 35-12

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN

302

```
 1    in evidence.

 2              THE COURT:  Without objection?

 3              MR. SABBOTA:  No objection.

 4              MS. STOUT:  No objection.

 5              THE COURT:  I see no objection.  It is received,

 6    35-12.

 7        (Exhibit 35-12 received, 4:20 p.m.)

 8    BY MS. MOHSIN:

 9    Q.  Now, Special Agent Fleming, how did you know that this was

10    a tailpipe that was a fake tailpipe?

11    A.  We had received information from sources that Mr. Rich was

12    using a fake tailpipe to transport money and meth.

13    Q.  And when you went to Vern Rich's home -- by the way, on

14    November 15th, where was he living?

15    A.  He was living on Flinchbaugh.

16    Q.  Okay.  Is that in Kimball Township?

17    A.  That's correct.

18    Q.  Now, on that date, did you observe a motorcycle?

19    A.  We did.

20    Q.  And did you observe this tailpipe, Government's Exhibit

21    35-12, on the motorcycle?

22    A.  This was one of the tailpipes on Vern Rich's motorcycle,

23    that's correct.

24    Q.  How did you determine that this was the fake one as opposed

25    to one that was actually functioning?
```

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN                    303

1   A.  Well, it had a plug inside of it that wouldn't have allowed

2   exhaust to run through it and probably would have been a

3   problem for the engine.  And since it was plugged and couldn't

4   operate as a tailpipe, the other one was open, we believe this

5   was the one that he was using.

6   Q.  And so did you remove it?

7   A.  We did.

8   Q.  Now, the Exhibit 35-12 has a little plastic baggie attached

9   with some sort of a zip tie; is that correct?

10  A.  That's correct.

11  Q.  What's contained inside of that plastic bag?

12  A.  This is the plug that was inside the tailpipe that wouldn't

13  allow it to function, basically protecting whatever was in the

14  tailpipe from the elements.

15  Q.  And did you, yourself, or members of your team remove that

16  plug from the tailpipe?

17  A.  We did.

18  Q.  Okay.  Now, I want to direct your attention to some

19  telephone calls that were intercepted that you referred to

20  earlier.

21          I want to direct your attention, first -- do you have

22  a copy of Government's Exhibit T?

23  A.  I do not, no.

24  Q.  Do you know where it is?

25  A.  It's in the three-ring binder on the floor right there.

1  Q.  I'm going to provide you with a copy of this, so that you

2  can direct your attention to certain calls.

3  A.  Sure.

4  Q.  I want to direct your attention to Government's Exhibit

5  T-95.  Could you please tell the jury the relevant information

6  surrounding the circumstances, in other words, the date and the

7  time and the session number of that call?

8  A.  This is a call that was intercepted on the Vern Rich wire.

9  It's call number 2429.  The date is 11/15 of 2007, which is the

10 date we did the search warrants.

11         At 12:17 p.m., it's between John Riede a/k/a Bear and

12 Vern Rich.

13         MS. MOHSIN:  Would you please publish call T-95 for

14 the jury, and the transcript, T-95A, as an aid?

15      (Publishing Government Exhibit T-95/95A, 4:23 p.m. -

16      4:27 p.m.)

17 BY MS. MOHSIN:

18 Q.  Special Agent Fleming, during the course of that call,

19 there's reference to Buck's motorcycle.  Do you have an

20 understanding of who Buck is?

21 A.  Yeah.  That's Mr. Lonsby.

22 Q.  And there's also reference to Little Joe's motorcycle.  Do

23 you have an understanding of who that is?

24 A.  Little Joe is another name used by Mr. Quant.

25 Q.  Okay.  I want to direct your attention now to Government's

1    Exhibit T-96.  Could you please describe the circumstances

2    surrounding this particular exhibit for the jury?

3    A.  Sure.  T-96 is call 2430.  It's also on November 15th

4    of 2007.  It occurred at 12:21, right after the call with

5    Mr. Riede.  It's a call between Mr. Darrah and Mr. Rich.

6    Q.  Now, you say it's a call right after the call with

7    Mr. Riede.  Is it -- how long after?

8    A.  Immediately.

9         MS. MOHSIN:  Okay.  Your Honor, at this time we would

10   publish T-96 and T-96A, the transcript, as an aid to the jury.

11       (Publishing T-96/T-96A, 4:28 p.m. - 4:32 p.m.)

12        THE COURT:  Perhaps another ten minutes.  Do you have

13   that examination?

14        MS. MOHSIN:  Yes, your Honor.

15        THE COURT:  Go ahead.

16   BY MS. MOHSIN:

17   Q.  Special Agent Fleming, immediately after this call, was

18   there another call that was intercepted?

19   A.  There was.

20   Q.  And was that related to the search warrants that had been

21   executed at the various locations?

22   A.  It was.

23   Q.  Can you direct the jury's attention to the next call, and

24   provide the information that's relevant to the circumstances

25   surrounding the call?

1  A.  It's a call that continues.  It's T-97 and T-98, 2432 and

2  2433, starts at 5:27.  It's between Mr. Rich, a female by the

3  name of Gina, and then Mr. Quant.  And then it continues onto

4  another call.  It's the same call that continues with Mr. Quant

5  and Mr. Rich.

6  Q.  Now, you said 5:27.  Is that 5:27 or 12:27?

7  A.  The time?

8  Q.  Yes.

9  A.  I'm sorry, 12:27.

10        MS. MOHSIN:  At this time, your Honor, the Government

11  would publish call T-97, with the transcript T-97A as an aid to

12  the jury, and then followed by T-98 and T-98A, the transcript.

13        THE COURT:  Proceed.

14        MS. MOHSIN:  Apparently we're not able to play T-97 at

15  this moment.  We're going to play T-98.

16    (Publishing Government Exhibit T-98/T-98A, 4:34 p.m. -

17    4:36 p.m.)

18  BY MS. MOHSIN:

19  Q.  Special Agent Fleming, the following day on November the

20  16th of 2007, at about 5:50 p.m., is there another call between

21  Howard Quant and Vern Rich?

22  A.  There is.  It's T-105, call number 2474.

23  Q.  Is there additional comments about this muffler?

24  A.  There are, yes.

25        MS. MOHSIN:  Your Honor, at this time we would publish

 1  T-105 and T-105A as an aid to the jury.

 2      (Publishing Government Exhibit T-105/T-105A, 4:37 p.m. -

 3      4:44 p.m.)

 4  BY MS. MOHSIN:

 5  Q.  Special Agent Fleming, the name "Yahoo" comes up during the

 6  course of this communication.  Do you have any understanding of

 7  who Yahoo is?

 8  A.  He's a member of the Devils Diciples from Michigan named

 9  Stephen Mazur.

10  Q.  And the number 33 comes up in connection with a search of a

11  motor home.  Now, was there a motor home that was searched at

12  any of the locations on November 15th of 2007?

13  A.  There was one at the Detroit clubhouse that was searched.

14  Q.  And when you say the Detroit clubhouse, that's the one in

15  Mount Clemens?

16  A.  It's actually in Clinton Township on Gratiot.

17  Q.  It's called Mount Clemens sometimes; is that right?

18  A.  Correct.

19  Q.  Now, do you have an understanding of who owns that

20  particular motor home?

21  A.  At the time of the search, it was owned by Al Addis.

22  Q.  And is that an attorney?

23  A.  That's correct.

24  Q.  And do you have any understanding of the number 33 and what

25  that numbers means in the context of that call, based upon your

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN                    308

 1  investigation and interviews with specific individuals in this

 2  case, many of whom have testified here already?

 3  A.  33 is --

 4       MR. PITTS:  Judge, I'm going to object to that.  I

 5  don't think the foundation has been laid.

 6       THE COURT:  I agree at this point.

 7  BY MS. MOHSIN:

 8  Q.  Okay.  Do you know who the number "33" is?

 9  A.  I do.

10  Q.  Who have you talked to, to identify who 33 is?

11  A.  Several cooperating witnesses in this case.

12  Q.  All right.  And have any of those individuals that you have

13  talked to said to you who "33" is?

14  A.  They have.

15  Q.  Who are some of those people?

16  A.  Well, several of them were confidential informants, and

17  then there were people who will or have testified, Mr. Quant,

18  and other people.

19  Q.  All right.  So when you say "33," is that a male or a

20  female?

21  A.  That's a female.

22  Q.  Have you ever talked to 33?

23  A.  I have not, no.

24  Q.  All right.  So your information is based on conversations

25  with a number of different people about the identity of 33?

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN

1  A.  That's correct.

2        MS. MOHSIN:  Okay.  I think -- no?

3        THE COURT:  I don't think that's a proper foundation.

4        MS. MOHSIN:  Okay.

5        THE COURT:  And I think you can mull that over in the

6  evening.  We're going to recess now, 4:45.

7        We will resume tomorrow morning at nine o'clock on the

8  regular schedule, a full day tomorrow.  Ladies and gentlemen,

9  have a pleasant evening.  Put the matter off your minds.  We'll

10  see you tomorrow.  Thank you.

11     (Jury out, 4:46 p.m.)

12        THE COURT:  The jury is absent.  Is there any more for

13  the record this afternoon for the Government?

14        MS. MOHSIN:  Nothing further from the Government.

15        THE COURT:  Anything for any defendant, for the

16  record?

17        MR. SATAWA:  No, your Honor.

18        MR. SABBOTA:  No, thank you.

19        THE COURT:  We'll resume tomorrow morning at nine

20  a.m., counsel.  Thank you.  Have a pleasant evening.

21     (Proceedings concluded, 4:48 p.m.)

22

23                        *       *       *

24

25

JURY TRIAL, VOLUME XI - 11/3/2014
WILLIAM FLEMING - DIRECT BY MS. MOHSIN

1

2                              **CERTIFICATE OF REPORTER**

3

4              As a Federal Official Court Reporter for the United

5     States District Court, appointed pursuant to provisions

6     of Title 28, United States Code, Section 753, I do hereby

7     certify that the foregoing is a correct transcript of

8     the proceedings in the above-entitled cause on the date

9     hereinbefore set forth.

10

11

12                              Dated this 4th day of November, 2014.

13

14                                s/ Christin E. Russell
                                  Christin E. Russell
15                                RMR, CRR, FCRR, CSR-5607
                                  Federal Official Court Reporter
16
                                  s/ Rene L. Twedt
17                                Rene L. Twedt
                                  CSR-2907, RPR, RMR, CRR
18                                Federal Official Court Reporter

19

20

21

22

23

24

25