```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,

 4                    Plaintiff,          Case No. 11-20129
                                          Case No. 11-20066
 5       -v-

 6    SCOTT WILLIAM SUTHERLAND, D-1,
      PATRICK MICHAEL MCKEOUN, D-4,
 7    JEFF GARVIN SMITH, D-5/D-1,
      PAUL ANTHONY DARRAH, D-6/D-2,
 8    CARY DALE VANDIVER, D-7/D-5,
      VINCENT WITORT, D-8,
 9    DAVID RANDY DROZDOWSKI, D-17,

10                    Defendants.
      _____/
11
                      JURY TRIAL, VOLUME XVIII
12
              BEFORE THE HONORABLE ROBERT H. CLELAND
13                 United States District Judge
             Theodore Levin United States Courthouse
14                231 West Lafayette Boulevard
                        Detroit, Michigan
15                Friday, November 14, 2014
      APPEARANCES:
16
      FOR THE PLAINTIFF:   SAIMA MOHSIN
17                         ERIC STRAUS
                           U.S. Attorney's Office
18                         211 W. Fort Street, Suite 2000
                           Detroit, MI  48226
19
                           JEROME MAIATICO
20                         United States Department of Justice
                           1301 New York Avenue, NW
21                         Washington, DC 20005

22    FOR THE DEFENDANT:   CRAIG A. DALY
                           (Sutherland, D-1)
23                         615 Ford Building
                           Suite 820
24                         Detroit, MI 48226

25
```

```
 1    APPEARANCES:           (Continued)

 2    FOR THE DEFENDANT:    SIDNEY KRAIZMAN
                            (McKeoun, D-4)
 3                          1616 Ford Building
                            Detroit, MI 48226
 4
                            JEROME SABBOTA
 5                          (Smith, D-5/D-1)
                            26862 Woodward Avenue
 6                          Suite 200
                            Royal Oak, MI 48067
 7

 8                          PATRICIA A. MACERONI
                            (Darrah, D-6/D-2)
 9                          26611 Woodward Avenue
                            Huntington Woods, MI 48070
10
                            MARK A. SATAWA
11                          (Vandiver, D-7/D-5)
                            3000 Town Center, Suite 1800
12                          Southfield, MI 48075

13                          KIMBERLY W. STOUT
                            (Witort, D-8)
14                          370 East Maple Road, Third Floor
                            Birmingham, MI 48009
15
                            BYRON H. PITTS
16                          535 Griswold, Suite 1630
                            Detroit, MI 48226-4218
17
                            PHILLIP D. COMORSKI
18                          535 Griswold
                            2632 Buhl Building
19                          Detroit, MI 48226

20                          RYAN H. MACHASIC
                            (Drozdowski, D-17)
21                          134 Market Street
                            Mount Clemens, MI 48043
22
             To Obtain a Certified Transcript Contact:
23                     Christin E. Russell
              RMR, FCRR, CRR, CSR - (248) 420-2720
24          Proceedings produced by mechanical stenography.
        Transcript produced by computer-aided Transcription.
25
```

```
1                         I N D E X

2
     JURY TRIAL, VOLUME XVIII                       PAGE
3
     WITNESSES FOR THE GOVERNMENT:
4    KEITH McFADDEN
       CROSS-EXAMINATION BY MS. MACERONI             21
5      CROSS-EXAMINATION BY MR. SATAWA                56
       CROSS-EXAMINATION BY MR. SABBOTA               93
6      CROSS-EXAMINATION BY MR. DALY                 114
       CROSS-EXAMINATION BY MR. KRAIZMAN             145
7      REDIRECT EXAMINATION BY MR. STRAUS            146

8    STELLA HERRON
       DIRECT EXAMINATION BY MR. MAIATICO            169
9

10                      E X H I B I T S

11
     (None received.)
12

13

14

15

16

17

18

19

20

21

22

23

24

25   CERTIFICATE OF REPORTER                        220
```

1   Detroit, Michigan

2   November 14, 2014

3   9:00 a.m.

4                    *              *              *

5        (Call to Order of the Court; all parties present.)

6        THE CLERK:  Calling Case Nos. 11-20129 and 11-20066,

7   the United States of America vs. Scott Sutherland, and others.

8        THE COURT:  And good morning, Counsel.  The parties

9   and spectators and attorneys may be seated.  All attorneys are

10  in attendance, I believe.  And the defendants are all here.

11       I am aware, from a brief off-the-record discussion

12  before we began this morning, that the court reporter recorded

13  what Ms. Stout thought that she saw and did see with the

14  witness, Mr. McFadden.

15       MS. STOUT:  Yes.  Mr. McFadden.

16       THE COURT:  Mr. McFadden.  Upon an objection being

17  raised to something about signing a Rule 11 agreement.  There

18  was the objection, there may have been the beginning of a, of a

19  response or a comment by me, and he apparently turned and said

20  something in the direction of the jury.  The court reporter

21  actually caught what he said.  I did not hear it.  I'm not sure

22  that Ms. Stout actually heard anything, or any attorney heard

23  anything, but saw him saying something in the direction of the

24  end of the jury box.

25       And the court reporter recorded it, and did you

1    memorize it?  Can you recite it, Christin?

2            COURT REPORTER:  He said, "That's not what -- "

3            THE COURT:  "That's not what."  And the objection that

4    preceded that was Ms. Stout saying something about the Rule 11?

5            COURT REPORTER:  Ms. Maceroni.

6            THE COURT:  Sorry, Ms. Maceroni.  Something about the

7    Rule 11, signing it or something of that sort.  Is that right?

8            COURT REPORTER:  Yes.

9            THE COURT:  So the objection was pointed to something

10   the witness had said, or not said perhaps.  And so the

11   questioning, apparently the questioning stopped.  I was about

12   to say something.  The witness, Mr. McFadden, apparently in

13   response to the objection, turned to the -- in the direction of

14   the jury, and I, I discerned that he was, he was in the process

15   of saying something like, "That's not what I said," or "That's

16   not what happened," or something along those lines.  At which

17   point Ms. Stout rose and said, "He's whispering to the jury."

18   He said, "I'm not whispering."  I heard, I heard that part.  I

19   didn't hear him say anything before that.

20           So that's a summary of what I learned off the record

21   with Mr. Straus, Ms. Maceroni, and Ms. Stout and the court

22   reporter just huddling and going over the transcript.  All of

23   this, I think Ms. Stout suggested, deserves elaboration on the

24   record, which now we've just done.  You can add to any of those

25   comments, if you wish.  That's pretty much all I know about it.

```
 1              An admonition is certainly appropriate to the witness,
 2     if he's going to be continuing his testimony, which I think he
 3     is, that if there's an objection, he needs to stop and there
 4     should be not any extraneous comments.  It points up the
 5     necessity of the formality of court proceedings and people not
 6     talking over each other, and there's a lesson in there
 7     somewhere for attorneys, I think, as well as witnesses.
 8              And I perhaps would also venture some sort of a
 9     comment to the jury, though I frankly don't think anything
10     particularly harmful was said, according to what the court
11     reporter recorded, but probably some sort of instruction or
12     comment, at least, from the bench to the jury would be
13     appropriate as well to the effect that whatever it is that was
14     said should be simply ignored, pay attention to the answers
15     that were given in response to direct questions, not comments
16     of a witness in response, or at least in apparent response to
17     an objection by an attorney.
18              Does that sound like a suitable rendition, Ms. Stout?
19              MS. STOUT:  Thank you, your Honor.  And I agree with
20     what the Court says.  And I just want to expand upon that.
21              What I saw is the witness turn his head toward the
22     jurors and the jurors listening to him, because their heads
23     were turned towards him and him making the comment.
24              It's my understanding from speaking to Christin
25     Russell --
```

1              THE COURT:  Our court reporter.

2              MS. STOUT:  -- our court reporter, who is doing an

3    amazing job, by the way, keeping up with this, that there was,

4    in fact, a comment that he was making toward the jury, and it

5    was not all heard.

6              Is that an accurate representation.

7              COURT REPORTER:  Correct.

8              MS. STOUT:  It was not all heard.  So we do not know

9    the whole sentence, if there were further words after, I didn't

10   say it, or however that -- those three words were.

11             THE COURT:  I think, I think the quote in the

12   transcript is, "That's not what -- "

13             MS. STOUT:  Yeah.

14             THE COURT:  And then --

15             MS. STOUT:  And then dot, dot, dot.

16             THE COURT:  -- an ellipsis.

17             MS. STOUT:  Because I think the comment went further.

18   So I'm not sure voir diring the jury is -- I believe the case

19   law would say that's the appropriate remedy.  I know the Court

20   doesn't want to stop now.  Perhaps we could do it at a time

21   that's more suitable.

22             But I definitely think this witness needs to be told

23   that he's not to fight with people, and he's certainly not to

24   testify on his own to the jury.  And the jury needs to know

25   that they are not to, to listen to unsolicited comment.

```
 1              THE COURT:  I will be happy to tell the jury that.
 2              And, Ms. Maceroni, do you want to add anything to
 3    the --
 4              MS. MACERONI:  No.  I think Ms. Stout has covered it
 5    admirably, Judge.
 6              THE COURT:  Mr. Daly?
 7              MR. DALY:  Yes, Judge.  Not only an admonishment to
 8    the witness, but we are specifically requesting that the jury
 9    be specifically voir dired on this issue, because we really
10    don't know at this point what exactly he said to them and what
11    they heard.  And I think that -- the only way we can find this
12    out is to ask the jurors.
13              THE COURT:  Let's bring them in and ask them then.
14              MR. DALY:  Absolutely.
15              THE COURT:  Okay.
16              MR. DALY:  That's what we're asking.
17              THE COURT:  Let's do that right now.
18              MR. DALY:  Thank you.
19              THE COURT:  Sure.  Let's bring in the jury.
20              MR. STRAUS:  Judge?  I'm sorry, we have one other
21    matter.
22              THE COURT:  One other?  Is there something else?
23              Hang on.  Tell them to hang on for the jury, please.
24    All right.  Be seated.
25              Mr. Straus, one other matter?
```

 1            MR. STRAUS:  I'm sorry, Judge.  I just want to make a

 2    record.  We didn't make a record yesterday concerning Joe

 3    Letherman.  And I want to update the status of him.  He was

 4    scheduled for cross-examination yesterday.

 5            THE COURT:  Optional cross-examination.

 6            MR. STRAUS:  Optional cross-examination.  I got a call

 7    early in the morning from him.  He indicated that he had lost

 8    control of his face, his, his eye doesn't blink.  He thought he

 9    had a mini stroke or something like that.  I, I directed him to

10    call 911, and apparently arrangements were made to go to the

11    hospital.

12            He has since been recovering in his hotel room.  We

13    put off cross-examination because of that.  Last night I

14    queried the defense attorneys.  Four of them got back to me,

15    said they would not be using -- they would not be

16    cross-examining him.  I think Mr. Kraizman said he would.

17            I'm trying to -- what I'd like to do, I guess I'm in

18    the position of being somewhat of a nickel doctor.  If I could

19    get an indication of whether or not there's going to be lengthy

20    cross-examination, I'd like to at least indicate to Mr.

21    Letherman whether or not he should come back in a couple weeks.

22    Or if it's just going to be, you know, "was my client there,"

23    we can either have him, if he's up to it, and I don't know if

24    he is, come in for short cross-examination or we're happy to

25    stipulate that none of these seven gentlemen were there in

 1    Indiana at the time.  If that's going to be the questioning,

 2    and so whatever, whatever the preference of the defense is, but

 3    I just, I don't want to, as an attorney, unnecessarily put his

 4    health in risk.  So I'm trying to get -- gather as much

 5    information as possible.

 6             MR. DALY:  Judge, we're prepared to stipulate that

 7    none of the defendants on trial knew about the incident he

 8    testified to and didn't conspire in those acts.  We're prepared

 9    to do that and have him sent back to wherever he needs to go.

10             MR. STRAUS:  That's --

11             THE COURT:  What does "knew about the acts" mean?

12             MR. DALY:  Well, that means that when these homicides

13    occurred in Indiana, the defendants who are here on trial did

14    not know about it in advance, did not conspire --

15             THE COURT:  "In advance" is what you mean --

16             MR. DALY:  Yes.

17             THE COURT:  -- by "know"?

18             MR. DALY:  Correct.

19             THE COURT:  They did know about it after the fact.

20             MR. DALY:  After the fact, yes.  We would consent to

21    the fact that they knew about it, and there are news articles

22    to that effect, but that they did not know, and the fact that

23    they did not know about it in advance means that they could not

24    conspire.  That's been our position from day one.  And we're

25    more than prepared to stipulate to that and send Mr. Letherman

 1    home.

 2          THE COURT:  I suspect, I suspect that the -- a

 3    stipulation would more properly focus on the witness's

 4    testimony and whatever cross-examination would be drawn from

 5    him to that effect.  And the stipulation -- if, if the

 6    stipulation would be formulated basically in terms of that this

 7    witness, Mr. Letherman, would provide no testimony to that

 8    effect, he has no information indicating anything to the effect

 9    that any of these individuals were, were present or

10    knowledgeable, and so forth.  I mean, focused on this witness.

11          MR. DALY:  Yes.

12          THE COURT:  It's not focused on the cosmic truth of

13    any particular proposition.  Who knows, there may be other

14    witnesses who say something differently, perhaps.  Right?  Or

15    other evidence?

16          MR. DALY:  Yes.

17          THE COURT:  But if -- so you would be -- something in

18    there might be the subject of a stipulation such as I'm

19    thinking here?

20          MR. DALY:  Correct.  I am agreeable with that.  I

21    believe the rest of the defense team is, as well.  I see them

22    all shaking their heads, so yes.

23          THE COURT:  They seem to be nodding.

24          MS. STOUT:  Yes, your Honor.

25          MR. KRAIZMAN:  I am agreeable, also, Judge.

```
 1            THE COURT:  Okay.  Mr. Kraizman says.  So it sounds as
 2    though he can be sent home, with some -- at least if you're on
 3    board with this --
 4            MR. STRAUS:  Well --
 5            THE COURT:  -- for the Government.
 6            MR. STRAUS:  I guess I --
 7            THE COURT:  Not sure?
 8            MR. STRAUS:  I think Ms. Mohsin is writing what I
 9    think I heard down.  I'm not quite sure that's accurate with
10    regard to Jeff Smith.  I think there's a -- it's a possible
11    felony murder; in other words, there is, there is this travel
12    allegedly by Clyde from Grand Rapids to Indiana to take, take
13    care of business.  There is a reasonable inference that he was
14    directed to do so by the leadership.  And I don't think --
15            THE COURT:  Per this witness, though?
16            MR. STRAUS:  Not per this witness.
17            THE COURT:  Well, that seems --
18            MR. DALY:  That's --
19            THE COURT:  I'm focusing on that this witness's
20    testimony would, on cross-examination, would, would reveal
21    nothing to the effect of whatever.  I mean, leaving alone the
22    possibility of other, other evidence pointing in that
23    direction.
24            MR. DALY:  And that's agreeable with the defense,
25    Judge.
```

1          THE COURT:  It may be a matter of getting the right

2    language.

3          MR. STRAUS:  We can work on it later, but let me take

4    at that crack at it here.  How about, "Mr. Letherman would not

5    testify as to his specific interaction or communication with

6    any of these defendants?"

7          MR. DALY:  Regarding the homicides that he testified

8    to, correct?

9          THE COURT:  Regarding, regarding the events in

10   Indiana.

11         MS. MOHSIN:  Yeah.  That's it.

12         THE COURT:  Right?

13         MS. MOHSIN:  Correct.

14         THE COURT:  Regarding the events in Indiana.  And it's

15   certainly clear from his testimony that there's no suggestion

16   that any individual on trial here was present.

17         MS. STOUT:  I think it should just say he has no

18   knowledge of.  The knowledge part is important.

19         THE COURT:  I think, I think you have -- I think

20   you're probably 85 percent of the way to a stipulation that

21   would not require him to appear for cross-examination.  In

22   other words, you can pin down by stipulation the things that

23   you would legitimately be able to pin down with, with

24   cross-examination of him.  Has he already gone back to his home

25   area?

 1              MR. STRAUS:  No.  He's in his hotel room suffering,

 2   so --

 3              THE COURT:  Oh, dear.  Well --

 4              MS. STOUT:  I suggest if we can't agree, we both

 5   submit our stip. to the Court and by Monday we'll have it

 6   resolved and he'll have to suffer this weekend.

 7              MR. STRAUS:  Well, I think, I think we have --

 8              THE COURT:  I don't want to keep him.

 9              MR. STRAUS:  I think we have an agreement.

10              THE COURT:  We don't want to lodge him in a hotel room

11   over the weekend just because you can't get a stipulation.

12              MR. DALY:  Judge, if I can speak on behalf of the

13   defense team, I think that we're close enough that he can be

14   sent home.  We can work out the details.  We're awful close.

15              MR. STRAUS:  I think we have the -- "does not have any

16   knowledge," I think, I think that will work right within this.

17   And we can work on this at the break.

18              THE COURT:  That's what I think you should do.  And I

19   think he should be on his way, driving, flying, or whatever,

20   whatever it is he needs to do.  Right?

21              MR. DALY:  Yes.

22              THE COURT:  I mean, there's maybe a 1 percent chance

23   that this isn't going to work and he'll have to come back.  But

24   if that's the case, well then, he'll come back.

25              MR. STRAUS:  Okay.

1         THE COURT:  All right?

2         MR. STRAUS:  All right.  Thank you, your Honor.

3         THE COURT:  Something else, Mr. Satawa?

4         MR. SATAWA:  On an unrelated note, your Honor.  Mr.

5    McFadden testified yesterday on direct about one of the

6    participants in this, in this homicide that he testified about,

7    as having passed a polygraph.  This has been the second --

8         THE COURT:  He did?

9         MR. SATAWA:  Yes.

10         THE COURT:  I didn't hear that.

11         MR. STRAUS:  Oh, I believe that was -- he was Victor

12    Castano.  I don't know if that's true or not, but --

13         MR. SATAWA:  Yeah.  He said Castano passed a

14    polygraph.  Oh, it wasn't about -- you are correct, Mr. Straus.

15    It wasn't about the homicide.  It was about the gun or the

16    drugs or something.

17         MS. STOUT:  The gun.

18         MR. SATAWA:  Yes.  Okay.

19         Your Honor, this is the second mention in the

20    Government's case by one of their witnesses of a polygraph

21    being taken.  And this time -- and I understand Mr. McFadden

22    seems to be a bit of a wild card and maybe not the most

23    controllable witness for either party asking questions.  He

24    seems to want to volunteer information, and we all have

25    experience with witnesses that maybe don't understand the rules

1    as well as others.

2          But this is becoming a concern to the defense, because

3    issues like whose marijuana was it, whose gun was it, these

4    are, these are critically important issues, and certainly

5    important issues to my client, Mr. Vandiver.  And the fact that

6    he just blurted out in front of the jury that the person who

7    was arrested for that gun, put on trial for that gun, and

8    convicted of possessing that gun passed a polygraph that it

9    wasn't his gun, I believe, is inappropriate.

10         And I would, I would again, I guess, be asking for two

11   things.  And I will admit that I have not spoken to Mr. Straus

12   yet or Ms. Mohsin about the language.  But number one, I would

13   be asking for a cautionary instruction in this regard.  And

14   number two, I'd ask the Court to please instruct the Government

15   that witnesses should not be coming into court talking about

16   people taking polygraphs, particularly people passing

17   polygraphs.

18         THE COURT:  They already know that, Mr. Satawa.  They,

19   they know that, I'm sure.  I am sure that with this raised to

20   their attention, they'll take additional pains to, to try to

21   caution witnesses in that regard, if that sort of information

22   is within the witness's repertoire.  In other words, if there's

23   something like that in the 302's and the earlier interviews,

24   earlier testimony and so forth, I'm quite confident that --

25         MR. SATAWA:  I didn't read any -- I didn't read

1    anything like that in his 302.  So it took me completely by

2    surprise.  It may have taken the Government by surprise.  And

3    as I said, your Honor, in my initial comments, I freely

4    acknowledge the guy is a bit of a wild card.  So I don't

5    attribute blame to the Government, but I also, also ask the

6    Court to understand that this -- that that is a 403 issue and

7    the kind of comment that would, would -- contains substantial

8    risk of prejudice, unfair prejudice, and obviously has no

9    probative value.

10           THE COURT:  If you want to get together with

11   Government counsel and try to propose some sort of comment for

12   me to make, some sort of caution for the jury, I'll be happy to

13   consider that.  But at this point, I'm not sure -- I don't hear

14   any such suggestion at the moment.

15           Any comment from you, Mr. Straus?

16           MR. STRAUS:  Judge, I was unaware that he was going to

17   say that.  And I don't know that I even knew that.  It struck

18   me as being particularly unhelpful to the Government.  And I

19   should say that for the record, because --

20           THE COURT:  Because --

21           MR. STRAUS:  -- because it appeared that somebody was

22   wrongfully convicted of possession of a gun.  So I thought it

23   cut the other way, and I certainly wasn't going to illuminate

24   on that.

25           THE COURT:  We can consider the possibility of

 1      cautionary instructions and so forth.

 2              MR. SATAWA:  Thank you, your Honor.

 3              THE COURT:  In the meanwhile, we'll call the jury out

 4      and see if any of them heard anything particularly interesting

 5      or intelligible from Mr. McFadden's whispered comment.  And

 6      let's call the jury in and we'll do that and continue with the

 7      witness.

 8              THE CLERK:  All rise.

 9          (Jury in, 9:18 a.m.)

10              THE COURT:  Good morning, ladies and gentlemen.  Be

11      seated, others.  Everyone is present.

12              Before we continue with the witness, ladies and

13      gentlemen, there was something about Mr. McFadden's appearance

14      on the stand yesterday.  He'll be coming back for additional

15      questioning.  Direct questioning or cross-examine?  I'm not

16      sure which.

17              MR. STRAUS:  Cross-examination, your Honor.

18              THE COURT:  Continued cross-examination of the

19      witness, who was on the stand yesterday.

20              There was a point, looking at the transcript, the

21      rough notes of the transcript and so forth, from yesterday,

22      there was a point at which he was being questioned I think by

23      Ms. Maceroni.  I think that's right.

24              MS. MACERONI:  Yes.

25              THE COURT:  And I think she objected.  There was some

```
 1    other commentary going on.  And apparently the witness turned

 2    in the direction of the end of the jury box here and said,

 3    according to the transcript of the court reporter's notes, said

 4    something like, "That's not what," "That's not what I," or,

 5    "That's not what," something or other.  And the question is

 6    whether anybody in the jury actually heard anything more than

 7    that little sort of introductory comment.

 8             Juror in seat No. 1, for example, did you hear any

 9    such thing particularly from the witness?

10             JUROR NO. 1:  I heard him mumble.  I didn't hear what

11    he said.

12             THE COURT:  Number 2?

13             Three?  Anything different than that?

14             JUROR NO. 3:  I heard him mumble.  He said, "That's

15    not what I said."

16             THE COURT:  "That's not what I said."

17             JUROR NO. 3:  Yeah.

18             THE COURT:  It sounded like that's what he was

19    beginning to say, sort of in response to the objection.

20             Same for you, ma'am, in the front row here?

21             JUROR NO. 11:  Yes.

22             THE COURT:  Well, that appears to be the situation,

23    which is some -- I would simply observe that some witnesses

24    don't -- are not -- some witnesses proceed in a more formal way

25    than others.  Some witnesses proceed very informally.  That's
```

1    true of some lawyers as well, frankly.  And some judges, I

2    suppose as well.  But the, but the -- and I'm not pointing at

3    anybody in this room when I say that in either respect.

4           The point is, though, that it's important, because

5    trial is a formalized way.  People should not be talking over

6    each other.  We've had some experience in that regard.  You may

7    note that we try to get things on the record so that one person

8    is talking, then another person is talking.  We proceed in this

9    very formal way.  And of course, it's not appropriate for a

10   witness to turn to the jury and provide additional information

11   and so forth.

12          So I would simply say let's, let us have an

13   instruction of this sort:

14          Please ignore what the witness said in that regard.

15   He will be reminded, I'm sure he has already been reminded,

16   that he shouldn't be doing that.  He should be responding to

17   the questions.  Of course, when he responds to the questions,

18   it's appropriate -- when any witness responds to a question,

19   it's entirely appropriate for him to turn to the jury and to

20   provide the answer, because the jury is the audience for this

21   information in the first instance.  There's nothing wrong with

22   that.  But the answer should be in response to a question.

23          There's no -- the witness has no business responding

24   to an objection or providing additional commentary in the

25   presence of an objection.  When there is an objection,

```
 1   witnesses should stop.  Not all of them do.  This one didn't.

 2   That was unfortunate.  So you'll simply ignore that.

 3            I don't think any particular significant impact was

 4   felt here, but that's my resolution of it.  And thank you for

 5   your information in that regard.

 6            Does anybody want to suggest anything further for the

 7   Court to do at this point?

 8            I don't see anything.  So let's call the witness,

 9   let's call the witness in, please, and we'll continue with

10   examination.

11      (Witness previously sworn.)

12            THE COURT:  Sir, just take -- you're still under oath,

13   sir.  Take your seat.  And was it you, Ms. Maceroni?

14            MS. MACERONI:  Yes, sir.

15                             KEITH McFADDEN

16      called as a witness at 9:22 a.m., testified as follows:

17                          CROSS-EXAMINATION

18   BY MS. MACERONI (continuing):

19   Q.  Good morning, Mr. McFadden.

20   A.  Good morning.

21   Q.  We left yesterday, I believe, you had gone down to

22   Anniston, Alabama, with Gun Control?

23   A.  Yes, ma'am.

24   Q.  How long were you in Anniston before you left for Bike Week

25   in Daytona?
```

1   A.  I don't recall.

2   Q.  Bike Week in Daytona, is that in the spring or the fall?

3   A.  It's in the, it's in the first week of March.

4   Q.  Okay.  And you had permission to leave the state of Alabama

5   to go to Bike Week, yes?

6   A.  Yes, ma'am.

7   Q.  You overstayed a little bit, though, right?

8   A.  Yes, ma'am.

9   Q.  Because you were having so much fun?

10  A.  That -- kind of.  Yes, ma'am.

11  Q.  In fact, do you recall telling the grand jury, "I was

12  having fun, you know.  I didn't care what was going on.  My old

13  lady was dancing in a titty bar making 400 or $500 a day.  What

14  do you do?  You're in Daytona.  There's beaches everywhere."

15          MR. STRAUS:  Judge, if this is refreshing a

16  recollection, that's fine, but I'm not sure his memory was

17  exhausted.  So I don't understand the purpose of this.

18          THE COURT:  Well, I agree.  Is there a suggestion that

19  the witness's memory about that was not sufficient?

20          MS. MACERONI:  I just asked him if he recalls telling

21  that to the grand jury, Judge.

22          THE COURT:  Are you testing -- so I think, I think it

23  was an inappropriately phrased question.  I don't think -- I

24  don't think there's a basis to read into the record earlier

25  testimony.  The witness should be asked about his present

2:11-cr-20129-RHC-MAR  Doc # 1098  Filed 11/16/14  Pg 23 of 220  Pg ID 8904
JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MS. MACERONI

23

```
 1   memory about his present state of affairs with respect to

 2   whatever substantive question you want to ask.

 3            MS. MACERONI:  Okay.

 4            THE COURT:  Let's stay away from earlier testimony,

 5   earlier statements and so forth, unless there's a basis to

 6   bring it in, which is either an alleged prior inconsistent

 7   statement or some allegation, substantial allegation of a

 8   failure -- present failure of memory.

 9            Proceed, please.

10            MS. MACERONI:  Thank you.

11   BY MS. MACERONI:

12   Q.  Do you recall testifying in front of the grand jury about

13   your time in Daytona?

14   A.  Yes, ma'am.

15   Q.  And do you recall telling them about what you were doing in

16   Daytona?

17            MR. STRAUS:  Same objection.  That's hearsay.

18            THE COURT:  That's exactly the same thing.  So let's

19   stay away from earlier testimony.  Let's get -- you can draw

20   the testimony out as to -- ask him whatever you want about

21   Daytona or the weekend or whatever it may be.  Just go ahead

22   and ask him.  And you don't need to -- I don't see a basis to

23   bring in any earlier recorded testimony at this point.

24            Go ahead.

25   BY MS. MACERONI:
```

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MS. MACERONI                    24

1  Q.  Did you spend time on the beaches when you were in Daytona,

2  Mr. McFadden?

3  A.  No, ma'am.

4  Q.  You didn't spend time on the beaches when you were in

5  Daytona?

6  A.  No, ma'am.

7  Q.  Did your girlfriend, Stella Herron, work in a titty bar

8  when you were in Daytona?

9  A.  Yes, ma'am.

10 Q.  And did your girlfriend, Stella, earn between 4 and $500 a

11 day while she was doing that?

12 A.  Yes, ma'am.

13 Q.  Did you work while you were in Daytona?

14 A.  Kind of.

15 Q.  Not anything full-time; fair statement?

16 A.  No, ma'am.

17 Q.  Now, while you were in Daytona, you ran into some Outlaws?

18 A.  Yes, ma'am.

19 Q.  And they asked you to come to their clubhouse, yes?

20 A.  Yes, ma'am.

21 Q.  And you went to the clubhouse only with Stella, yes?

22 A.  Yes, ma'am.

23 Q.  You didn't take any friends or anyone else with you for

24 backup?

25 A.  No, ma'am.

1  Q.  Were you armed?

2  A.  Yes, ma'am.

3  Q.  And you walked into the Outlaws clubhouse?

4  A.  Yes, ma'am.

5  Q.  Now, for a Devils Diciples member, that was a pretty gutsy

6  move; would you agree with me with that?

7  A.  Yes, ma'am.

8  Q.  Okay.  And you spoke -- how many Outlaws were standing

9  there when you walked into the clubhouse?

10  A.  I don't recall exactly how many there were.

11  Q.  More than five?

12  A.  I'm not sure.  I don't recall exactly how many that was

13  there.

14  Q.  More than two?

15  A.  Yes, ma'am.

16  Q.  And you talked to them, yes?

17  A.  Yes, ma'am.

18  Q.  And at some point in time, the president of the chapter, or

19  the gentleman who was running the meeting, told you to leave?

20  A.  Yes, ma'am.

21  Q.  And you could have just left at that point, yes?

22  A.  Yes, ma'am.

23  Q.  Instead, you stood up and said, "Sayonara, fuckers," yes?

24  A.  Yes.

25  Q.  And you knew that would get a response, didn't you?

1   A.   Not actually a response, no.

2   Q.   Why did you say, "Sayonara, fuckers"?

3   A.   It's just the way people say "bye" down there.

4   Q.   If you're an Outlaw, yes?

5   A.   I don't think you have to be an Outlaw.  I don't know.

6   Q.   Did you testify yesterday that you heard that statement as

7   a result of your time as a prospect --

8   A.   Yes, ma'am.

9   Q.   -- for the Outlaws?

10          Okay.  So you specifically chose that salutation as

11   you walked out the door?

12   A.   (No response.)

13   Q.   Yes or no?

14   A.   Yes, ma'am.

15   Q.   And that got a reaction, right?

16   A.   Yes, ma'am.

17   Q.   In fact, the president said, "Hang on"?

18   A.   Yes, ma'am.

19   Q.   And he had to make some calls to check up on you, yes?

20   A.   Yes, ma'am.

21   Q.   And at some point in time, while you're at Daytona having

22   fun, the Devils Diciples send four gentlemen down to get you

23   back to Alabama, yes?

24   A.   Yes, ma'am.

25   Q.   And Victor Castano was one of those four that came down to

1   get you?

2   A.  Yes, ma'am.

3   Q.  There was no love lost between you and Victor at this

4   point, correct?

5   A.  Meaning?

6   Q.  You weren't really close to him in a friendly way?

7   A.  No, ma'am.

8   Q.  You were friendly with Big Ron?

9   A.  Yes, ma'am.  He was not with them.

10  Q.  No.  He was still in, in Alabama or Georgia?

11  A.  Yes, ma'am.

12  Q.  And from the time that you left Michigan, and you were down

13  in Daytona when you saw Victor again, approximately how much

14  time had elapsed?

15  A.  I don't recall.

16  Q.  And you were taken back to Atlanta, Georgia first?

17  A.  Yes, ma'am.

18  Q.  And in Atlanta, Georgia, that's where this meeting was held

19  about what they were going to do with you, yes?

20  A.  Yes, ma'am.

21  Q.  And you still, as you sit here today, don't know why the

22  Michigan chapter was running you down the road, right?

23  A.  No, ma'am.

24  Q.  But they did?

25  A.  They were wanting to, yes, ma'am.

1  Q.  Now, was Victor Castano the gentleman that you fought with

2  when you were down in Alabama?

3  A.  Yes, ma'am.

4  Q.  So you and Victor went outside and settled it?

5  A.  Yes, ma'am.

6  Q.  And then you joined the Anniston clubhouse?

7  A.  Yes, ma'am.

8  Q.  And you stayed in Alabama from then until the time that

9  Victor was charged with the gun and marijuana, correct?

10  A.  On the federal level, yes.

11  Q.  And were you in Alabama, as well?  Because first he was

12  charged with the state crimes, yes?

13  A.  Correct.

14  Q.  That was dismissed.  And that entire time you were still in

15  Alabama?

16  A.  Yes, ma'am.

17  Q.  And it was Tatu who first approached you, I believe in the

18  fall of 2005, after Victor was charged federally?

19  A.  Yes, ma'am.

20  Q.  All right.  And what did Tatu say to you about testifying

21  for Victor?

22  A.  It would be better for me if I did.

23  Q.  Those were his exact words, "It would be better for you if

24  you did"?

25  A.  Yes, ma'am.

1    Q.   And you took that as a threat?

2    A.   Yes, ma'am.

3    Q.   Now, Mr. McFadden, in your years of association with the

4    Devils Diciples, even before you were a Devils Diciple, you

5    testified you smacked the national warlord in the mouth, yes?

6    A.   Yes, ma'am.

7    Q.   Splitting his lip?

8    A.   Yes, ma'am.

9    Q.   And you walked into the Devils Diciples clubhouse in Port

10   Huron to answer for that fact, yes?

11   A.   Yes, ma'am.

12   Q.   By yourself, again, armed, but still by yourself?

13   A.   Yes, ma'am.

14   Q.   You joined the Devils Diciples Motorcycle Club?

15   A.   Yes, ma'am.

16   Q.   And during your association with the Devils Diciples

17   Motorcycle Club up in Michigan, you got into scrapes at bars?

18   A.   Yes, ma'am.

19   Q.   You were subjected to disciplinary procedures by the club

20   because of your actions?

21   A.   Yes, ma'am.

22   Q.   You ignored directives from the leadership to stop selling

23   drugs?

24   A.   Yes, ma'am.

25   Q.   And continued to sell drugs?

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MS. MACERONI

30

1    A.  Yes, ma'am.

2    Q.  At some point in time, you were an intimidator during a

3    fellow brother's trial and sat in a state courthouse?

4    A.  Yes, ma'am.

5    Q.  And your words were you "eye fucked" the snitch witnesses

6    who were testifying against your brother?

7    A.  Yes, ma'am.

8    Q.  So you were intimidating those witnesses?

9    A.  Yes, ma'am.

10   Q.  Then you went down to Florida in known Outlaw territory?

11   A.  Yes, ma'am.

12   Q.  Wearing your Devils Diciples' club shirt?

13   A.  Yes, ma'am.

14   Q.  And went into the Outlaws chapter house?

15   A.  Yes, ma'am.

16   Q.  By yourself, except your girlfriend was with you, yes?

17   A.  Yes, ma'am.

18   Q.  And you stared them down, too, right?

19   A.  No, ma'am.

20   Q.  Well, you engage in a conversation with them, and

21   everything turned out well; is that --

22   A.  Yes, ma'am.

23   Q.  And it's a good thing it turned out well because it could

24   have turned out pretty horribly for you?

25   A.  Yes, ma'am.

1   Q.  And if you had been assaulted, God knows what would have

2   happened to Stella, yes?

3   A.  Yes, ma'am.

4   Q.  So you took a risk?

5   A.  Yes.

6   Q.  So that's your history of behavior while you've been with

7   the Devils Diciples Motorcycle Club.  And you're testifying

8   here today that Tatu telling you it would be better for you if

9   you did testify, you took as a threat?

10  A.  Yes, ma'am, I did.

11  Q.  So you go back up to Michigan, right?  Eventually?

12  A.  Yes, ma'am.

13  Q.  You took Stella with you?

14  A.  Yes, ma'am.

15  Q.  Stella didn't want to testify for Victor, did she?

16  A.  She never stated she didn't.

17  Q.  She never told you she didn't want to commit perjury in a

18  federal courtroom?

19  A.  No, ma'am.

20  Q.  Did you ever hit her to force her to testify --

21  A.  No.

22  Q.  -- in the Victor Castano trial?

23  A.  No, ma'am.

24  Q.  You had a financial arrangement with Victor, didn't you,

25  for your testimony?

1   A.  Yes, ma'am.

2   Q.  And you told Agent -- strike that.

3          Your arrangement with Victor was that he was going to

4   pay you $250 a day?

5   A.  He was going to match what Stella made per day.

6   Q.  And what -- how much was that?

7   A.  Anywhere from 300 and up.

8   Q.  Okay.  So he was going to match whatever she would have

9   made dancing down in Alabama or Florida?

10  A.  Pensacola.

11  Q.  Pensacola, okay.

12         So he was paying you for that.  Stella was with you,

13  as well?

14  A.  Yes, ma'am.

15  Q.  And he was also going to give you 5 pounds of marijuana,

16  yes?

17  A.  Yes, ma'am.

18  Q.  And at the time, marijuana was, what, between 800 and $900

19  a pound?

20  A.  Yes, ma'am.

21  Q.  So that was your financial arrangement with Victor to

22  testify in his trial?

23  A.  Yes, ma'am.

24  Q.  And you came up here.  You met with Victor's attorney?

25  A.  Yes, ma'am.

1    Q.  You met with Agent Fleming?

2    A.  Yes, ma'am.

3    Q.  You lied to Agent Fleming?

4    A.  Yes, I did.

5    Q.  And you knew it was a federal offense to lie to an FBI

6    agent, didn't you?

7    A.  Yes, ma'am.

8    Q.  You did it anyway?

9    A.  Yes, ma'am.

10   Q.  And then you went to trial?

11   A.  Yes, ma'am.

12   Q.  Now, on the day of the trial, did you and Stella drive up

13   there together?

14   A.  Yes, ma'am.

15   Q.  Was it her car?

16   A.  No, ma'am.

17   Q.  Whose car was it?

18   A.  I don't remember the feller's name it was in.

19   Q.  Did you drive with Victor or just the two of you?

20   A.  Just the two of us.

21   Q.  So Victor wouldn't have had any way to know whether or

22   not or when you got to the courthouse, yes?

23   A.  No.  We met there together.  We met there.

24   Q.  You met there.

25   A.  Yes, ma'am.

1    Q.  But you drove separately?

2    A.  Yes, ma'am.

3    Q.  Okay.

4    A.  Now -- I'm sorry.  Can you, can you ask that question

5    again?

6    Q.  Did you drive separately to the courthouse or did you drive

7    with Victor?

8    A.  (No response.)

9    Q.  If you can't remember, that's fine.

10   A.  Yeah.  I don't remember for sure.

11   Q.  Okay.

12   A.  There was a couple times we had to go to the courthouse, so

13   I don't remember.

14   Q.  Okay.  So you walked into the federal courthouse in Port

15   Huron?

16   A.  Yes, ma'am.

17   Q.  Walked into a courtroom bigger than this one, yes?

18   A.  I don't know if it was bigger or not, but I walked into a

19   courtroom.

20   Q.  Okay.  You stood in front of the judge?

21   A.  Yes, ma'am.

22   Q.  Judge was sitting at a bench, somewhat like that?

23   A.  Yes, ma'am.

24   Q.  Judge Zatkoff, you recall?

25   A.  I don't remember the judge's name.

1  Q.  And he asked you to raise your right hand?

2  A.  Yes, ma'am.

3  Q.  And what did you swear to do?

4  A.  Tell the truth.

5  Q.  Before God and country, right?

6  A.  Yes, ma'am.

7  Q.  And you didn't?

8  A.  No, ma'am.

9  Q.  In fact, you were being examined by Mr. Castano's attorney,

10  yes?  The Government wasn't asking you questions; it was Mr.

11  Castano's attorney first?

12  A.  I don't remember.  I don't know who asked the questions

13  first.

14  Q.  Okay.  Well, was it the attorney that you had met with

15  earlier, with Victor?

16  A.  Like I said, I don't remember.

17  Q.  Fair enough.

18       And now, before we get into your perjury, Mr.

19  McFadden, Vern Rich told you not to do this, yes?

20  A.  No, ma'am.

21  Q.  No?

22  A.  No, I don't remember.  I'm not -- I'm not sure.

23  Q.  Okay.  Do you recall testifying in front of the grand jury

24  on April 29th, 2010?

25  A.  Yes, ma'am.

1   Q.  Okay.  And do you recall the Government -- page 63.

2           MR. STRAUS:  Pardon?

3           MS. MACERONI:  Page 63.  Actually, bottom of page 62.

4   BY MS. MACERONI:

5   Q.  Do you recall a grand juror asking you this question:

6           "I had a question.  You said Vern was upset that you

7   were testifying?"

8           And your answer was, "Yes."

9   A.  Yes.  I do remember that.

10  Q.  Okay.  So Vern told you not to do this?

11  A.  I don't remember if he said not to do it, but I know he was

12  upset that I did.

13  Q.  Okay.  Upset that you were committing perjury; fair

14  statement?

15  A.  I reckon.

16  Q.  Okay.  All right.  And your perjury was not only on the

17  issue concerning whose gun was found in the car; it was also on

18  how the gun got in the car.  Do you recall that?

19  A.  Yes, ma'am.

20  Q.  So your testimony starts -- page 68 of the grand jury --

21  after you swear to tell the truth, the whole truth and nothing

22  but the truth, your testimony starts.  The attorney asks you

23  your name.  Do you recall that?

24  A.  Yes, ma'am.

25  Q.  Okay.  And he asks you how you know Vic Castano?

1    A.  Yes, ma'am.

2    Q.  And he asks you whether or not you're a member of a

3    motorcycle club?

4    A.  Yes, ma'am.

5    Q.  And you admit that you are, in fact, a member of the Devils

6    Diciples Motorcycle Club?

7    A.  Yes, ma'am.

8               MR. STRAUS:  What page?

9               MS. MACERONI:  66.  I'm on 67.

10   BY MS. MACERONI:

11   Q.  And during the course of your testimony --

12              MS. MACERONI:  One second, Judge, if I can?

13              THE COURT:  Yes.

14      (Brief pause.)

15   BY MS. MACERONI:

16   Q.  At some point during your testimony, the attorney who was

17   questioning you gave you the gun that was found, or showed you

18   the gun that was found in Victor's car.

19   A.  Yes, ma'am.

20   Q.  Okay.  And do you recall being asked:  "Have you seen that

21   item before?"

22   A.  Yes.

23   Q.  Referring to the gun?

24   A.  Yes, ma'am.

25   Q.  And what was your response?

 1   A.   I don't recall.

 2   Q.   Did you answer:  "Yes"?

 3   A.   Yes, ma'am, I did.

 4   Q.   Okay.  And do you recall the question:  "Where?"  Meaning

 5   where have you seen that gun?

 6   A.   I don't recall that question.

 7   Q.   Do you recall giving the answer:  "It belongs to my common

 8   law wife"?

 9   A.   Yes, ma'am.

10   Q.   Okay.  So you recall that series of questions?

11   A.   To some extent.

12   Q.   And your common law wife that you were referring to is

13   whom?

14   A.   Stella.

15   Q.   Stella Herron?

16   A.   Yes, ma'am.

17   Q.   Now, Stella wasn't in the courtroom while you were

18   testifying, correct?

19   A.   No, ma'am.

20   Q.   And those questions, the answers to those questions were

21   not true, correct?

22   A.   No, ma'am.

23   Q.   That gun did not belong to Stella?

24   A.   No, ma'am.

25   Q.   Now, do you recall the attorney asking you:  "That item,"

2:11-cr-20129-RHC-MAR   Doc # 1098   Filed 11/16/14   Pg 39 of 220   Pg ID 8920
JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MS. MACERONI

39

1   meaning the gun, "do you recognize it for certain?"

2   A.  Yes, ma'am.

3   Q.  And do you recall your answer:  "Yes, sir"?

4   A.  Yes, ma'am.

5   Q.  And do you recall the question:  "How is it that you know

6   that particular gun?"

7   A.  I don't remember exactly the question, but I remember

8   something along that lines.

9   Q.  Okay.  And do you recall your answer:  "I was with her when

10  she purchased it"?

11  A.  Yes, ma'am.

12  Q.  So this is the back-and-forth that you're giving in front

13  of Judge Zatkoff in Victor Castano's trial?

14  A.  Yes, ma'am.

15  Q.  Under oath, to tell the truth?

16  A.  Yes, ma'am.

17  Q.  And that was a lie?

18  A.  Yes, ma'am.

19  Q.  Because Stella Herron never purchased that gun, did she?

20  A.  No, ma'am.

21  Q.  You never purchased that gun?

22  A.  No, ma'am.

23  Q.  Okay.  Later on in the trial, you're asked:  "Now, do you

24  recall when that gun was purchased?"  Do you recall that

25  question?

1  A.  Yes, ma'am.

2  Q.  And your answer was:  "Yes, sir"?

3  A.  Yes, ma'am.

4  Q.  Okay.  And then the attorney asks you:  "Was it hers or was

5  it yours?"

6  A.  I believe I -- yes, ma'am.

7  Q.  Okay.  And your answer was:  "We both fired it.  It's her

8  gun, my gun.  We both have been in possession of it."

9  A.  Yes, ma'am.

10  Q.  That was your answer then?

11  A.  Yes, ma'am.

12  Q.  And that was a lie?

13  A.  Yes, ma'am.

14  Q.  You never fired that gun, did you?

15  A.  No, ma'am.

16  Q.  And Stella certainly never fired that gun?

17  A.  No, ma'am.

18  Q.  Now, along with who owned the gun, there was also a

19  question about how the gun got into the truck that Victor was

20  driving when he was pulled over by the police.  Do you recall

21  that?

22  A.  Yes, ma'am.

23  Q.  All right.  And Victor was arrested in May of 2004; will

24  you agree with me on that?  Does that sound about right?

25  A.  I'm not sure because the national run is not in May.

1    Q.  Okay.

2    A.  So --

3    Q.  That's fair.  That's fair.

4            Do you recall this question, then, during the trial:

5    "Did you have occasion to borrow it," meaning Victor's car, "in

6    May of 2004?"

7    A.  Yes, ma'am.

8    Q.  Okay.  And the question was:  "Why did you borrow it?"  Do

9    you recall that?

10   A.  Yes, ma'am.

11   Q.  All right.  And do you recall your answer being:  "I came

12   up, like I said" -- meaning to Michigan, yes?

13   A.  Yes.

14   Q.  -- "to see my kids and had some workers' comp. doctors

15   appointments.  And I blew the motor up in my truck.  I brought

16   my motorcycle and truck up and I needed to borrow it to take my

17   common law wife to a few job interviews and whatnot."

18   A.  Yes, ma'am.

19   Q.  Do you recall that answer?

20   A.  Yes, ma'am.

21   Q.  And that was a lie?

22   A.  To borrow a vehicle?

23   Q.  In May of 2004 in Michigan.

24   A.  I don't know if that was a lie or not, because I was taking

25   Stella -- no.  Yes, that was a lie.  I wasn't there.

1  Q.  When Victor Castano was arrested, you and Stella were still

2  in Alabama or Pensacola?

3  A.  We were on our way to Indiana.

4  Q.  Okay.  So you weren't even in Michigan?

5  A.  No, ma'am.

6  Q.  All right.  So that was a lie?

7  A.  Yes, ma'am.

8  Q.  Okay.  And further on in the testimony, and as you sit here

9  today, Mr. McFadden, do you know who, back in 2004, owned that

10  truck that Victor was arrested in?

11  A.  Yes, ma'am.

12  Q.  And who was that?

13  A.  Can you rephrase that question?

14  Q.  In 2004, who was the owner of the truck that Victor was

15  arrested in?

16  A.  Vern.

17  Q.  Vern?  That was your understanding?

18  A.  Yes, ma'am.

19  Q.  Okay.  Now, later on in the trial, you're asked by the

20  attorney:  "Now, what do you remember about the circumstances

21  of your borrowing the vehicle from Mr. Lonsby on that

22  occasion?"

23          Do you recall that question?

24  A.  Say that again, please?

25  Q.  "What do you remember about the circumstances of you

1  borrowing the vehicle from Mr. Lonsby on that occasion?"

2  A.  I don't remember the circumstances on that off the top of

3  my head.  You might have to refresh me.

4  Q.  Do you recall your answer to that question as being:  "I

5  don't understand that"?

6  A.  Yes.

7  Q.  Okay.  And then the next question is:  "How is it?  Did you

8  call him?  Did he call you?  Where did you pick it up?  When

9  did you pick it up?"

10  A.  That's asking four questions at one time.

11  Q.  That was confusing, right?

12          MR. STRAUS:  Judge, I'm not -- I'm not sure this is

13  technically refreshing memory.  It's essentially reading the

14  transcript.  We can put that into evidence.

15          THE COURT:  Well, I've already ruled on that.  Let me

16  just go over the testimony one more time.

17          MS. MACERONI:  Judge, this is the perjury.  It's a

18  little bit more than a refreshing a recollection.  I mean, this

19  is, this is his perjury.

20          THE COURT:  Okay.  So do you want -- let's cast a

21  question and see how it goes.

22          MS. MACERONI:  Okay.

23  BY MS. MACERONI:

24  Q.  Okay.  Do you recall testifying at the Victor Castano trial

25  that you picked up the vehicle that Mr. Castano was arrested in

1   from William Lonsby?

2           THE COURT:  So the question really is not whether he

3   recalls, but whether he testified to that effect, right?

4           MS. MACERONI:  Yes.  Well, no.

5           THE COURT:  You're not asking this question in order

6   to test memory.  You're trying to elaborate on the testimony

7   that was actually given?

8           MS. MACERONI:  Yes.  I guess refresh his recollection.

9           THE COURT:  So whether he remembers giving it or not

10  is not the issue.  The fact it was given is your issue, right?

11          MS. MACERONI:  Yes.

12          THE COURT:  So casting a question in terms of "do you

13  recall testifying," if the answer is no, what does that prove?

14  That he doesn't recall giving the testimony.

15          MS. MACERONI:  But, Judge, that's the evidence of his

16  perjury.  It needs to come into this record.

17          THE COURT:  Okay.  That, and that was brought up in

18  direct examination.

19          MS. MACERONI:  Yes.

20          THE COURT:  Okay.  So the issue again is not what he

21  recalls saying, but the fact of saying it.

22          MS. MACERONI:  Okay.

23          THE COURT:  All right?  Because when you cast a

24  question in terms of do you recall, that sounds like you're

25  simply testing memory of some event or something similar to

 1  that.

 2          MS. MACERONI:  I'll try again.

 3  BY MS. MACERONI:

 4  Q.  Isn't it true during the Victor Castano trial you testified

 5  that you picked up this truck from William Lonsby?

 6  A.  Yes, ma'am.

 7  Q.  And isn't it true that you testified that you picked it up

 8  on 18th Street?

 9  A.  I don't recall.

10  Q.  Do you recall anyone at that period of time living on 18th

11  Street, like William Lonsby?

12  A.  I don't recall what road he lived on.

13  Q.  Okay.  Do you recall giving this answer to the question in

14  the Victor Castano trial:  "I picked it up on 18th Street"?

15          And when you said that, you meant the truck, yes?

16  A.  I don't recall making where I picked it up at.  That's what

17  I'm saying.

18  Q.  But in any event, Mr. McFadden, you never picked up Victor

19  Castano's truck from William Lonsby in May of 2004?

20  A.  No, ma'am, I didn't.

21  Q.  That was perjury, yes?

22  A.  Yes, ma'am.

23  Q.  And did you tell the jury in the Victor Castano trial that

24  you picked up the truck from William Lonsby because you were in

25  town, and you needed a ride, and you were driving Stella back

1   and forth to different entertainment clubs to interview for

2   jobs?

3   A.  Yes, ma'am.  I do remember that.

4   Q.  And that was a lie?

5   A.  Yes, ma'am, it was.

6   Q.  In May of 2004, Stella Herron was not in Michigan looking

7   for jobs at different entertainment clubs, correct?

8   A.  No, ma'am.

9   Q.  And you were never out looking for a job with her in

10  Michigan during that period of time?

11  A.  No, ma'am.

12  Q.  And you testified that you were, in front of the jury, in

13  the Victor Castano trial, didn't you?

14  A.  Yes, ma'am.

15  Q.  Now, you also testified that Stella left the gun --

16  A.  (Witness coughing.)  Excuse me.

17  Q.  Do you have water up there?

18  A.  Yes.  Or is this someone else's?

19          (Laughter in courtroom.)

20          MR. STRAUS:  Better safe than sorry.

21          THE WITNESS:  Safe than sorry, yes.  Thank you.

22  BY MS. MACERONI:

23  Q.  Do you recall testifying in the Victor Castano trial that

24  Stella left the gun in the console of the truck?

25  A.  Yes, ma'am.

1   Q.  In fact, she left the gun in the console of the truck

2   because she couldn't take it into the clubs for which she was

3   interviewing, yes?

4   A.  Yes, ma'am.

5   Q.  Do you recall the defense attorney pinning you down on this

6   by asking you this question:  "There is no question in your

7   mind about that?"

8   A.  I don't recall that question.

9   Q.  But in any event, your testimony about that she took the

10  gun out of the bag and put it in the console before she went

11  into an interview was all false?

12  A.  Yes, ma'am.

13  Q.  It was --

14          MR. STRAUS:  Judge, I have another objection.  I don't

15  know if this has now morphed into past recollection recorded

16  and I don't think that's a sufficient foundation.  It's

17  refreshing.

18          THE COURT:  I think the substance of the witness's

19  testimony on direct was to describe the perjury that was given,

20  that was arranged, and he described all that.  AND I think

21  putting the specifics of it into evidence is appropriate.  This

22  isn't -- but I think your objection is well-taken with respect

23  to the phrasing the question, do you recall this, do you recall

24  that.  This isn't -- I mean, the object of this examination, it

25  seems to me, is to put in the substance of the perjured

1    testimony.

2            That's what you're, that's what you're about, I think?

3            MS. MACERONI:  Yes, sir.

4            THE COURT:  Elaborating on the substance of that

5    perjured testimony.

6            MS. MACERONI:  Yes, sir.

7            THE COURT:  That's not in the same category as the

8    subject of the objection.  So I overrule the objection.

9            But I do agree that the way in which the questions are

10   cast sound like it's doing nothing more than testing present

11   recollection of the details of the testimony given.

12           MS. MACERONI:  Okay, Judge.

13           THE COURT:  AND that's not what you're trying to do.

14           MS. MACERONI:  No.  Thank you.

15           THE COURT:  So do you have another -- are you --

16           MS. MACERONI:  Yes, I do.

17           THE COURT:  Go ahead.

18   BY MS. MACERONI:

19   Q.  Now, your testimony in the Victor Castano trial then

20   continued and you informed the jury as to what you and Stella

21   did after she had her job interviews; isn't that true?

22   A.  Can you rephrase that question?

23   Q.  Didn't you testify in the Victor Castano trial that after

24   she was through with her job interviews, that you met Victor at

25   a bar in Port Huron?

1   A.  I don't remember if that's the answer I gave.  I don't --

2   it's been 11 years.

3   Q.  Okay.

4   A.  Or better.

5   Q.  Do you recall telling the jury that Victor gave you his

6   motorcycle to use in exchange for the truck?

7   A.  Yes, ma'am, I do.

8   Q.  Okay.  And the two of you had met at a bar --

9   A.  Yes, ma'am.

10  Q.  -- with Stella?

11  A.  Yes, ma'am.

12  Q.  Sorry.  And Stella had a few beers?

13  A.  Yes, ma'am.

14  Q.  And you ended up driving the motorcycle back to Victor

15  Castano's wife, Sheila?

16  A.  I don't remember if that was the answer I gave.

17  Q.  In any event, all of that is fiction, yes?

18  A.  True.

19  Q.  It's all perjury?

20  A.  True.

21  Q.  And at the end of your testimony, Mr. McFadden, did the

22  attorney ask you:  "Would you claim ownership of that gun to

23  help Mr. Castano?"

24  A.  His attorney?

25  Q.  Yes.

1   A.  Or the prosecution?

2   Q.  I believe it was his attorney.

3   A.  And he said what?

4   Q.  "Would you claim ownership of that gun to help Mr.

5   Castano?"

6   A.  Yes.

7   Q.  And you said:  "Absolutely not.  No, if I didn't own it,"

8   didn't you?

9   A.  Correct.

10  Q.  And then the final question to you was:  "Is everything

11  that you have told this jury true," meaning the Victor Castano

12  jury?

13  A.  Yes, ma'am.

14  Q.  And you said:  "Yes, sir."

15  A.  Yes, ma'am.

16  Q.  And that was a lie?

17  A.  Yes, ma'am.

18  Q.  So after the trial, Victor is convicted?

19  A.  Yes, ma'am.

20  Q.  He's taken into custody?

21  A.  Yes, ma'am.

22  Q.  You go back down to his house, you take the weed that

23  you've been promised, yes?

24  A.  Yes, ma'am.

25  Q.  And you go to Port Huron, make some sales, and then shoot

1   from town?

2   A.  I didn't directly shoot from town, yes, but I left town.

3   Q.  And did you go back down to Alabama or did you go back down

4   to Florida?

5   A.  I headed to Pensacola.

6   Q.  So you're back in Pensacola.

7        And at some point in time after the Castano trial,

8   you're incarcerated, yes?

9   A.  Yes, ma'am.

10  Q.  And during this period of time, you find out that some

11  members of the Devils Diciples have come and taken your

12  patches?

13  A.  No, ma'am.

14  Q.  When did you find out about that?

15  A.  The day after I was released.  The day of my release.

16  Q.  Okay.  So you weren't incarcerated; you were out?

17  A.  Yes, ma'am.

18  Q.  And that upset you, yes?

19  A.  Yes.  Yes, ma'am.

20  Q.  And you also heard that Victor Castano was blaming you or

21  calling you a thief to other members of the club?

22  A.  Yes, ma'am.

23  Q.  And that made you very angry, didn't it?

24  A.  Not angry, no.

25  Q.  You weren't angry that a fellow brother was calling you a

 1  thief?

 2  A.  I was hurt.

 3  Q.  Upset?

 4  A.  No.  I said I was hurt.

 5  Q.  Okay.  In any event, you were done with the DDMC at that

 6  point in time?

 7  A.  As far as everything else went, yes.

 8  Q.  And a few years go by; does that sound about right?

 9  A.  Yes, ma'am.

10  Q.  And then Sheila Castano reaches out to you again?

11  A.  Yes, ma'am.

12  Q.  Are you in Florida at this time or back in Alabama?

13  A.  I was in Florida.

14  Q.  And Sheila Castano calls you and she says, you know, Victor

15  is on appeal.  He's been successful and we might need you to

16  testify again?

17  A.  Yes, ma'am.

18  Q.  Do you recall that conversation?

19  A.  Yes.

20  Q.  All right.  And you didn't say, Sheila, I'm sorry, I

21  committed perjury, I am never doing that again; I feel

22  horrible?  You didn't say that to her, did you?

23  A.  No, ma'am.

24  Q.  And you didn't say, screw Victor.  He hurt me.  He's saying

25  I'm a thief; I'm not going to help that SOB out again; you

1    didn't say that?

2    A.   No.

3    Q.   You started bartering with her, didn't you?

4    A.   Back up on that one.  Started doing what?

5    Q.   You asked her for $15,000?

6    A.   No.  I did not ask her for $15,000.

7    Q.   Didn't you testify yesterday that you said to her you

8    wanted $15,000 plus a new bike in order to testify again?

9    A.   That's not what I testified.  The wording I put was it's

10   going to cost him $15,000 and one of his motorcycles.  Her

11   bartering was nothing about it.

12   Q.   Okay.  She was the messenger?

13   A.   Right.

14   Q.   She was to tell Victor, 15 grand and a new bike, and I'm

15   there, yes?

16   A.   Yes, ma'am.

17   Q.   So you had no compunction about going into another

18   courthouse and committing perjury, did you?

19   A.   (No response.)

20   Q.   If the price was right?

21   A.   Yeah.

22   Q.   And Victor wouldn't agree to that, right?  You never got

23   that?

24   A.   I never got a confirmation whether he would or not.

25   Q.   All right.  But in any event, he didn't have another trial,

1  correct?

2  A.  Pardon me?

3  Q.  He didn't have another trial, to your knowledge, correct?

4  A.  He -- I don't know.

5  Q.  And you were angry about the fact that you were not going

6  to get any additional money from him?

7  A.  No.

8  Q.  Now, you testified yesterday that you reached out to Agent

9  Fleming because you got a threatening e-mail?

10  A.  A few of them.

11  Q.  And you were in Florida?

12  A.  Yes, ma'am.

13  Q.  And you got a threatening e-mail.  And with your history,

14  you were scared enough to call the agent?

15  A.  Yes, ma'am.

16  Q.  And do you recall telling Agent Fleming on June 17th,

17  2009 -- or I'm sorry, May 30th, 2009, that you felt that you

18  could not refuse the DDMC order to testify for Victor Castano?

19  A.  Say that again, please.

20  Q.  Do you recall telling Agent Fleming on May 30th, 2009, that

21  you felt that you could not refuse the DDMC order to testify

22  for Victor Castano?

23  A.  Correct.

24  Q.  All right.  The financial arrangement that you had to

25  testify in the Castano trial, though, was between you and

1   Victor, yes?

2   A.  Yes.

3   Q.  And of course, Mr. McFadden, you could have told the

4   Government attorney about the fact that he wanted you to commit

5   perjury, yes?  That could have been an option?

6   A.  The Government attorney, meaning Victor's attorney?

7   Q.  No.  Meaning the other attorney, the Government's attorney.

8   A.  I could have done -- say that again.

9   Q.  You could have told the Government's attorney that you were

10  committing perjury before you took the stand, yes?

11  A.  Not at that point.

12  Q.  You could have certainly told Agent Fleming when you talked

13  to him before the trial that this was not true?

14  A.  Are you talking about when I met Agent Fleming before the

15  trial?

16  Q.  Yes.

17  A.  No.  I couldn't tell him that wasn't true.

18  Q.  If you were truly scared and felt threatened by members of

19  the DDMC, you could have told Agent Fleming that this was a

20  lie, yes?

21  A.  No.

22  Q.  You could have asked for protective custody, yes?

23  A.  No.

24          MS. MACERONI:  Thank you, Judge.  I don't have

25  anything else.

```
 1              THE COURT:  Any other cross-examination?  Is there
 2  any -- Mr. Satawa.
 3                       CROSS-EXAMINATION
 4  BY MR. SATAWA:
 5  Q.  Good morning, sir.
 6  A.  Good morning, sir.
 7  Q.  So if I understand this correctly, by your own testimony
 8  yesterday and today, you're a liar?
 9  A.  I've lied in the past.
10  Q.  In court?
11  A.  Yes, sir.
12  Q.  So you're a perjurer?
13  A.  In the past.
14  Q.  And you committed perjury in the past, for money?
15  A.  Not just money.
16  Q.  Well, you would agree with me you've committed perjury in
17  the past, one of the reasons being for money?
18  A.  Yes, sir.
19  Q.  You've committed perjury in the past for drugs?
20  A.  Yes, sir.
21  Q.  For 5 pounds of marijuana?
22  A.  Yes, sir.
23  Q.  In 1-pound increments?
24  A.  Yes, sir.
25  Q.  You're a thief?
```

1   A.  Yes, sir.

2   Q.  Well, there's at least three times that we know of where

3   you're a thief, right?

4   A.  Yes, sir.

5   Q.  You're a guy who can handle himself?

6   A.  To some extent.

7   Q.  You split the lip of the Devils Diciples national warlord?

8   A.  National road king -- captain.

9   Q.  Road captain?

10  A.  Yes, sir.

11  Q.  Over a drug debt?

12  A.  No.  That's not what I testified.  There was an argument.

13  Q.  Okay.  Well, excuse me if I just don't take your word for

14  what your testimony is, given what you testified before in the

15  past.

16          THE COURT:  Mr. Satawa, previously I've admonished

17  counsel, including you, about editorial comments.  Please avoid

18  editorial comments and cast a question.

19          MR. SATAWA:  Yes, your Honor.

20          THE COURT:  You understand what I'm talking about?

21          MR. SATAWA:  I'm only responding to the witness's

22  editorial comments, your Honor.  But yes, I will ask a

23  question.

24          THE COURT:  The information comes from the witness.

25  And if there's something that's inappropriate about that that's

1   brought to my attention, I may have something to say to this,

2   or any other witness.  But attorneys should please avoid

3   editorial comments.  There will be plenty of time for argument

4   at the conclusion of the case.  You can present those things to

5   the jury at that time.

6            Proceed.

7   BY MR. SATAWA:

8   Q.  Sir, you were in a dispute over a drug debt with him,

9   right?

10  A.  Yes.

11  Q.  Okay.  And in connection with that dispute over a drug

12  debt, you got in a fight with him?

13  A.  No.

14  Q.  So you split his lip over something completely separate and

15  different from the drug debt he owed you?

16  A.  Yes.

17  Q.  You're certainly a guy who doesn't seem, by his actions or

18  his testimony yesterday and today, to be a guy who is easily

19  intimidated?

20  A.  Is that a question?

21  Q.  Yes.  Would you like me to repeat it?

22  A.  Please.

23  Q.  You don't seem to me, based on your testimony --

24            MR. STRAUS:  Judge, I have an objection.  That seems

25  to be a personal observation --

```
 1              THE COURT:  Well, it --

 2              MR. STRAUS:  -- embedded.

 3              THE COURT:  It may be cast that way, but it actually

 4  is in the form of a statement, as opposed to a question.  You

 5  can, you can appropriately rephrase the question, it seems to

 6  me, in the form of a question that calls for some information

 7  from the witness.

 8              Go ahead.

 9  BY MR. SATAWA:

10  Q.  Sir, based on your testimony yesterday and today.

11  A.  Yes, sir.

12  Q.  You, you appear to be a person who is not easily

13  intimidated; is that correct?

14  A.  Yes.

15  Q.  You appear to be a person who doesn't shrink in the

16  shadows?

17  A.  I don't know what that question means.

18  Q.  You walk right into an Outlaw biker bar in Daytona Beach,

19  Florida, right?

20  A.  Yes, I did.

21  Q.  You got in a fight with a national road captain of the

22  Devils Diciples?

23  A.  Yes, I did.

24  Q.  If you believe you're right, you are perfectly willing to

25  stand up for yourself?
```

1   A.   Yes, I am.

2   Q.   You're a drug dealer?

3   A.   Not anymore.

4   Q.   You were?

5   A.   Yes, sir.

6   Q.   You've sold meth?

7   A.   Yes, sir.

8   Q.   Before you joined the Devils Diciples?

9   A.   Yes, sir.

10   Q.   And after, afterwards?

11   A.   After.

12   Q.   Well --

13   A.   After joining or after leaving?

14   Q.   Well, both.

15   A.   Ask one question at a time.

16   Q.   Sure.  You were a drug dealer before you joined the Devils

17   Diciples?

18   A.   Yes, I was.

19   Q.   You were a drug dealer while you were a Devils Diciples?

20   A.   Yes, I was.

21   Q.   And you were a drug dealer after you left the Devils

22   Diciples?

23   A.   No, I was not.

24   Q.   Okay.  You sold meth?

25   A.   Yes, I did.

1   Q.  You sold cocaine?

2   A.  Yes, I did.

3   Q.  You sold marijuana?

4   A.  Yes, I did.

5   Q.  And in addition to all those things, you're a guy who told

6   us yesterday, carried four guns?

7   A.  At times, yes.

8   Q.  Now, given all of that history, your testimony yesterday

9   was when you were notified you were being charged in connection

10  with a crime in the United States District Court for the

11  Eastern District of Michigan, you thought you were being

12  charged with conspiracy to commit perjury; is that right?

13  Isn't that what you said yesterday?

14  A.  No.  I said I was being charged with perjury, I thought.

15  Not -- I didn't know of a conspiracy statement to that.

16  Q.  I'm sorry.  When you first heard you were being charged up

17  in Michigan in federal court, you thought you were going to be

18  charged with perjury.

19  A.  Yes, sir.

20  Q.  And when you got to Michigan, you learned you were actually

21  being charged with conspiracy to possess with intent to

22  distribute marijuana?

23  A.  I don't recall that being the exact statement on the

24  paperwork.

25  Q.  You're charged with marijuana?

1    A.  Yes.

2    Q.  You're charged with the distribution of marijuana?

3    A.  Conspiracy to be involved in a marijuana distribution ring,

4    I believe is how it reads.

5    Q.  You will agree with me that the basis, the base of the

6    charge is, is you're charged with helping to distribute

7    marijuana?

8    A.  No.  I'm not going to agree with you with that.

9    Q.  You don't have to look over there for the answers.

10   A.  I didn't have to look over there for that.  I said no.

11   Q.  Okay.  That is all you are charged with; is that right?

12   A.  Conspiracy to be involved.

13   Q.  In marijuana?

14   A.  Distribution ring.

15   Q.  Of marijuana?

16   A.  Yes.

17   Q.  Let's talk about what you're not charged with and what you

18   have not pled guilty to.  Okay?

19   A.  Correct.

20   Q.  You've not been -- you've not pled -- you've not pled

21   guilty to anything to do with meth?

22   A.  No.

23   Q.  You've not pled guilty to anything that has to do with

24   cocaine?

25   A.  No.

1   Q.  You've not pled guilty to obstruction of justice?

2   A.  No.

3   Q.  You've not pled guilty to committing perjury?

4   A.  No.

5   Q.  You've not pled guilty to lying to the FBI?

6   A.  No.

7   Q.  You've not pled guilty to stealing motorcycles?

8   A.  No.

9   Q.  You've not pled guilty to stealing motorcycle parts?

10  A.  No.

11  Q.  You've not pled guilty to conspiracy to steal, either

12  motorcycles or motorcycle parts?

13  A.  No.

14  Q.  You've not pled guilty to RICO?

15  A.  No.

16  Q.  You've not pled guilty to racketeering?

17  A.  No.

18  Q.  You've not pled guilty to the guns you possessed?

19  A.  (No response.)

20  Q.  Any of the four?

21  A.  Why would I have to?

22  Q.  Is it legal to carry a gun and sell marijuana in your mind?

23  A.  Did anybody charge me with selling marijuana?

24  Q.  Well, gee, you know, I'm -- it's my understanding that if

25  you're charged with conspiracy to distribute marijuana, you're

```
 1   charged with distributing marijuana.

 2   A.  Conspiracy is thinking about it, if you read right.

 3   Q.  Okay.  So you thought about --

 4   A.  Or knowing --

 5   Q.  -- distributing --

 6   A.  Or knowing of it is what it means.  It doesn't mean I was

 7   actually selling marijuana.

 8   Q.  So your testimony now is different than yesterday; that you

 9   were helping Victor Castano sell marijuana?

10   A.  Yes.

11   Q.  You were?

12   A.  I was.

13   Q.  Okay.  So when you were helping Victor Castano sell,

14   transport, and distribute marijuana, you would, on occasion,

15   have up to four guns on your person.

16   A.  Yes.

17   Q.  And you understand that's a federal crime?

18   A.  No.  I didn't know it was a federal crime.

19   Q.  You didn't understand that was the exact same federal crime

20   that Victor Castano was charged with?

21   A.  Victor Castano was not charged with a federal crime.  He

22   was started -- charged in a state court.

23   Q.  So your testimony now is that you came in and testified in

24   state court.

25   A.  That's not what I said.
```

1   Q.  Isn't that what you just said?

2   A.  No.  I said Victor Castano was charged in a state court.

3   Q.  And then dismissed and charged in federal court.

4   A.  Correct.

5   Q.  And you came into a federal court?

6   A.  Yes, I did.

7   Q.  And testified at a federal trial?

8   A.  Yes, I did.

9   Q.  And the federal trial you testified in, was Victor Castano

10  charged with marijuana?

11  A.  And possession of a gun.

12  Q.  And possession of a gun in connection to that marijuana?

13  A.  Yes.

14  Q.  So you're not telling me that you don't know that carrying

15  a gun while moving marijuana is not a federal crime, are you?

16  A.  Didn't know it at the time.

17  Q.  You know it now?

18  A.  Yes, sir, I do.

19  Q.  And a few minutes ago, I asked you:  "Are you being charged

20  with any of the four guns you possessed?"  Your answer was:  "I

21  didn't know it was a crime to carry a gun while I'm

22  distributing marijuana."

23  A.  Because I wasn't distributing marijuana when I got -- there

24  was never a gun charge on me.

25  Q.  Okay.  And that was exactly my point.

1   A.   All right.

2   Q.   You were never charged with a gun, right?

3   A.   Only on a state level.

4   Q.   So all of the activity you've discussed with this jury

5   yesterday and today, for you, boils down to a single marijuana

6   charge?

7   A.   No.

8   Q.   That's all you're charged with?

9   A.   A conspiracy charge.

10   Q.   Okay.  A single conspiracy to, to distribute marijuana

11   charge?

12   A.   Yes.

13           MR. STRAUS:  This has been asked and answered.

14           MR. SATAWA:  Well, Judge --

15           THE COURT:  Thank you, Mr. Straus.

16           Continue, Mr. Satawa.

17   BY MR. SATAWA:

18   Q.   The rest are freebies?

19   A.   Pardon me?

20   Q.   The rest of the things we discussed were freebies?

21   A.   I don't understand that.

22           THE COURT:  That's an argument, Mr. Satawa.  Reserve

23   argument for the conclusion of the case, please.

24   BY MR. SATAWA:

25   Q.   In exchange for your plea of guilty to this marijuana

```
 1    conspiracy charge --

 2    A.  Yes.

 3    Q.  -- your understanding is, is that you will not be charged

 4    with any of these other crimes that you and I just went

 5    through?

 6    A.  Yes.

 7    Q.  Your testimony yesterday to Mr. Straus was, in exchange for

 8    that, you signed not just a plea agreement that was discussed

 9    with Ms. Maceroni, but also a cooperation agreement?

10    A.  Yes.

11    Q.  There were two agreements you signed, you and your lawyer?

12    A.  Yes.

13    Q.  And that, that cooperation agreement requires you to do

14    certain things.

15    A.  Yes.

16    Q.  It mainly requires you to cooperate with the Government?

17    A.  Yes.

18    Q.  To come in for interviews when they want to talk to you?

19    A.  Yes.

20    Q.  To testify when they want you to testify?

21    A.  Yes.

22    Q.  And you made a big -- you made a big deal yesterday of this

23    idea that alls you were told is to tell the truth; do you

24    remember that?

25    A.  Yes.
```

 1   Q.  All right.  You would agree with me that it is the

 2   Government, and the Government alone, that determines whether

 3   or not you tell the truth in connection with this agreement?

 4   A.  I don't understand that question.

 5   Q.  Would you agree with me, sir, that the cooperation

 6   agreement you signed reads as follows:  "It is exclusive" --

 7   page 4.

 8          "It is exclusively within the Government's discretion

 9   to determine whether defendant has provided substantial

10   assistance."

11          That's what the agreement says, right?

12   A.  I don't have a copy of it in front of me.

13   Q.  Would you disagree with me that?  Does that sound correct?

14   A.  I'd like to have a copy in front of me.

15          THE COURT:  The Government can stipulate to the

16   language within it, I am sure.

17          MR. STRAUS:  That's correct, your Honor.

18          THE COURT:  Correctly stated, Mr. Satawa.  What's the

19   question then, sir?

20   BY MR. SATAWA:

21   Q.  The agreement also requires you, "upon Government's

22   determination that Defendant's cooperation amounts to

23   substantial assistance in the investigation or prosecution of

24   others, the Government will seek a downward departure at

25   sentencing under, either the sentencing guidelines or the

 1   Federal Rules of Criminal Procedure."

 2          That's your understanding?

 3   A.  Yes, sir.

 4   Q.  And that's why you're here?  You're here because you want

 5   the Government to file that motion and lower your sentence?

 6   A.  No.  I'm here to get this over with.

 7   Q.  And to get a lower sentence?

 8   A.  Yeah.  I don't want to go to prison for 40 years.

 9   Q.  I don't blame you.  I don't blame you.  But that's why

10   you're here, right?

11   A.  (No response.)

12   Q.  You're here to get a lower sentence?

13   A.  I reckon.

14   Q.  That agreement also tells you that you can't even speak to

15   a defense lawyer without their permission first, right?

16   A.  I don't recall.

17          MR. STRAUS:  Objection.  I'm going to object to that.

18   That --

19          MR. SATAWA:  I will --

20          MR. STRAUS:  That is misleading, 403.

21   BY MR. SATAWA:

22   Q.  What the agreement says is, sir, "if Defendant intends to

23   offer a statement or debriefing to other persons other than

24   Defendant's attorney" -- I'm sorry.  Wait.  "Defendant will

25   notify the U.S. Attorney in advance if defendant intends to

1  offer a statement or debriefing to other persons other than

2  defendant's attorney."

3  A.  Can you put that in layman's terms?

4          THE COURT:  And would you like to correct the first

5  misstatement that you made in rendering a summary of that

6  provision, the one to which Mr. Straus objected saying it was

7  misleading.

8          MR. SATAWA:  I'm reading right from the agreement,

9  your Honor.

10         THE COURT:  You originally introduced that with other

11 language, Mr. Satawa, in front of the jury.

12         MR. SATAWA:  I --

13         THE COURT:  I believe you did, at least.

14         MR. SATAWA:  Your Honor, I'm reading right from the

15 agreement.  I've read right from the agreement all trial.

16         THE COURT:  Is there something about "permission"?

17 What's the language that includes the word "permission" of the

18 Government?

19         MR. SATAWA:  "Defendant will notify the U.S. Attorney

20 in advance if defendant intends to offer a statement or

21 debriefing to other persons other than Defendant's attorney,

22 meaning his attorney.

23         THE COURT:  Right.  Notify.

24         MR. SATAWA:  Right.

25         THE COURT:  The way you asked that question in the

```
 1   first instance said that, that he's prohibited from speaking.
 2             MR. SATAWA:  Did I say "permission"?
 3             THE COURT:  You did indeed.
 4             MR. SATAWA:  All right.  I --
 5             THE COURT:  You did indeed.  And Mr. Straus
 6   immediately objected saying it was misleading, and I offer you
 7   the opportunity to correct that impression.
 8             MR. SATAWA:  I used the word "notify" -- I used the
 9   word "permission" when I should have used the word "notify,"
10   your Honor.
11   BY MR. SATAWA:
12   Q.  So you must tell the Government that you are even going to
13   speak to a lawyer for one of these defendants before you speak
14   to that lawyer?
15   A.  (No response.)
16   Q.  That's your understanding?
17   A.  Yes.
18   Q.  If you fail to do that, the Government consider -- can
19   consider the agreement breached, right?
20   A.  I don't know.
21   Q.  If the Government makes that motion and asks the Court to
22   lower your sentence -- let's talk about that for a moment
23   first, so I don't ask a compound question.
24             Sir, the Government can make a motion to ask the
25   Government -- the Court to lower your sentence below that 70-
```

1  to 87-month range, right?

2  A.  I hope so.

3  Q.  And there is also a part of what you're charged with that's

4  called a mandatory minimum, which means no matter where the

5  judge or the Court would want to sentence you to, the judge, by

6  law, is required to sentence you to at least 5 years or 60

7  months by statute.  You understand that?

8  A.  I believe so, yes.

9  Q.  All right.  But if the Government makes that motion and

10  asks the Court to go below 70 or 80 months, they can also ask

11  the Court to go below that mandatory minimum and go below five

12  years; that's your understanding?

13  A.  I'm hoping so.

14  Q.  And if your hope comes true, and the Government makes that

15  motion, the requirements of this agreement that you signed

16  state that you are -- or you or your lawyer, excuse me, are not

17  even allowed to ask the Court for a sentence below what the

18  Government asks the Court to give you.  Do you remember that

19  part of your agreement?

20  A.  No.  I have a reading disability.  Sometimes I don't

21  understand everything I read.

22  Q.  All right.  So you would certainly agree with me that given

23  the importance of this agreement to your presence here in court

24  today --

25  A.  Mh-hm.

1   Q.   -- that your lawyer explained to you --

2   A.   Yes, he did.

3   Q.   -- that if the Government makes this motion you're hoping

4   to get, we are not allowed to ask for a sentence below what the

5   judge -- what the Government asks the judge to give?

6   A.   (No response.)

7   Q.   In other words, let's just make up a number.  If you're 70

8   to 87 months, and the Court -- the Government comes into the

9   court and says we're asking you to give the defendant 24

10  months, two years, you can't ask for a sentence below that?

11  You have to take the Government's recommendation?

12  A.   Yes.

13  Q.   The Court may go above, below, or at that number, but you

14  can't ask for a number that is different than the number the

15  Government asks for?

16  A.   I'm at the mercy of the Court.

17  Q.   Okay.  Now, you have testified about your ownership or use

18  of a couple of different motorcycles; is that right?

19  A.   Yes.

20  Q.   And you said that before you joined the Devils Diciples,

21  you got into a motorcycle accident.

22  A.   Yes.

23  Q.   And you remember that motorcycle accident, or at least one

24  of the reasons you remember it is because there was meth in

25  your saddle bags?

1   A.  Never said that.

2   Q.  Was there meth in your saddle bags?

3   A.  No.

4   Q.  You weren't concerned about the police taking your

5   motorcycle?

6   A.  No.

7   Q.  Because there was meth in the saddle bags?

8   A.  No.

9   Q.  You've never been into an accident where you were concerned

10  about the police taking your motorcycle because there were

11  drugs in your saddle bags?

12  A.  No.

13  Q.  You said that the -- that you were in the hospital for some

14  period of time?

15  A.  A few hours, yes.

16  Q.  And that when you got out, you did not know where your

17  motorcycle was?

18  A.  I knew exactly where my motorcycle was.

19  Q.  It was at the Devils Diciples clubhouse?

20  A.  Not at that particular time.  It was being repaired at the

21  motorcycle shop that I worked at.

22  Q.  Okay.  And that the Devils Diciples got it repaired for

23  you?

24  A.  Yes, they did.

25  Q.  And paid the bill?

1  A.  I don't know, I don't know as if there was a bill or not.

2  Q.  You certainly didn't pay the bill?

3  A.  Wasn't never given a bill.

4  Q.  I'm not saying you were.  I'm just saying you didn't pay

5  for those repairs?

6  A.  No.

7  Q.  And you said that that act was one of the reasons why you

8  decided, you know what, maybe I'm going to join this group of

9  guys?

10  A.  That was, that was a contributing factor.  Yes.

11  Q.  Now, let's jump ahead to the time that you were arrested

12  when you were in Alabama.

13  A.  Yes, sir.

14  Q.  You said that you were -- you went to someplace in the

15  mountains or the hills of Alabama with a citizen.  You don't

16  remember the guy's name?

17  A.  No, sir, I don't.

18  Q.  All right.  But he had a bunch of stuff on him, and that

19  stuff caused you to get in some trouble?

20  A.  Yes, sir, it did.

21  Q.  And you were arrested?

22  A.  Yes, sir, I was.

23  Q.  You were charged with some state crimes?

24  A.  Yes, sir, I was.

25  Q.  And you had a bond or a bail set by the judge?

1   A.  No, sir, I didn't.  I had a 72-hour investigative hold.

2   Q.  Okay.  What happened after that 72 -- 72-hour investigative

3   hold?

4   A.  I was released from the county jail.

5   Q.  You weren't, you weren't on bond to the Court?

6   A.  After the 72 hours, yes.

7   Q.  Who posted the bond for you, the Devils Diciples?

8   A.  No.

9   Q.  Who?

10  A.  A feller by the name of "Big G."

11  Q.  And Big G wasn't a Devils Diciples member?

12  A.  No, sir.

13  Q.  So you were on bond to a court in Alabama when you went to

14  Florida?

15  A.  Yes, sir.

16  Q.  So the bond, you would agree with me that the bond in

17  Alabama said you could not leave the state of Alabama?

18  A.  Without permission.

19  Q.  And you got permission from your bond agent to go to Bike

20  Week in Daytona?

21  A.  Yes, I did.

22  Q.  And how long did your probation officer give you permission

23  to go to Bike Week in Daytona to leave the state of Alabama?

24  A.  I didn't have a probation officer.

25  Q.  Or a bond officer.

1    A.  He told me to go down there and check in with him while I

2    was down there.  I had a weekly call-in.

3    Q.  Just go down to Florida, you're on bond to this Court, but

4    go to Florida and have a good time, party it up at Bike Week?

5    A.  That was never mention of "party it up."

6    Q.  Did you tell him you were going to Bike Week?

7    A.  Told him I was going to pick up a motorcycle motor.

8    Q.  And he told you it was unlimited, you could leave the state

9    of Alabama as long as you wanted?

10   A.  No.  He told me I had to check in every week.  I was -- the

11   first -- I'll let you finish your question.

12   Q.  While you were down there, you said that you got a visit

13   from what you described as the "goon squad."  That was the term

14   you used, right?

15   A.  Yes.

16   Q.  And that goon squad included Ronnie, who I'm assuming is

17   Rockin' Ronnie?

18   A.  Yes.

19   Q.  Do you know his real name?

20   A.  Ronald Roberts.

21   Q.  And you said Gun Control?

22   A.  Yes, I do.

23   Q.  And a couple of other guys?

24   A.  Yes.

25   Q.  Now, after that, when you were asked about the interaction

 1  that you had with the goon squad, you said they were being

 2  really nice to you?

 3  A.  On the phone and when they met me, when Rockin' Ronnie and

 4  Cary Dale met me, yes.

 5  Q.  Yeah.  I mean, it was a friendly interaction you described?

 6  A.  With the first two of them.

 7  Q.  The next meeting was a meeting you describe did not have

 8  Gun Control present at it; is that fair to say?

 9  A.  No.

10  Q.  He was there?

11  A.  Yes.

12  Q.  All right.  So the first meeting, they came down here and

13  said, "Hey, what are you doing down here, we would like you to

14  come back"?

15  A.  No.  It wasn't stated that they liked me to come back.  I

16  was coming back.

17  Q.  Okay.

18  A.  There was no like about it.

19  Q.  That was how you described them being nice and friendly to

20  you?

21  A.  No.  That was not nice and friendly.  That was with the

22  four --

23  Q.  Okay.

24  A.  -- brothers together.

25  Q.  I'm talking about the first, I'm talking about the first

1    meeting first, when you described them as being nice and

2    friendly.

3    A.  Oh, with Cary Dale and Rockin' Ronnie?

4    Q.  Yes.

5    A.  Yeah.  They were my brothers looking out for me.

6    Q.  Yeah; what are you doing down here, you kind of need to

7    come back?

8    A.  Yeah.

9    Q.  In fact, I think you testified to, yesterday, the fact that

10   you said you didn't think -- I think Mr. Straus asked you,

11   "Could say no?"  Your answer was, "I didn't think I needed to

12   say no."

13        Was that the testimony you gave yesterday?

14   A.  To what question?

15   Q.  Mr. Straus asked, "Could you say no?"  And your answer was,

16   "I didn't think I needed to say no."

17   A.  Say no to what question?

18   Q.  Oh, I'm sorry, sir.  Coming back.  Didn't Mr. Straus -- Mr.

19   Straus asked you yesterday, "Could you say no to them wanting

20   you to come back to Alabama?"  Your answer was, "I didn't think

21   I needed to say no."

22        Was that your testimony yesterday?

23   A.  I don't recall if it was -- that I said I don't need it,

24   but I wasn't saying no, is what I believe I said.

25   Q.  You're certainly not telling me or the jury, excuse me,

1    you're certainly not testifying here today that you were forced

2    to come back?

3    A.  From Cary Dale and from Ronnie?  When they met me at the

4    house, no, I wasn't forced to come back then.  That's what I

5    said yesterday.

6    Q.  Let's talk about the theft of motorcycles.

7         You testified about the one involving -- the first one

8    you testified to was about the repo yard or place.

9    A.  Yes.

10   Q.  All right.  I want to focus first on the second one you

11   described, the one of the motorcycle shop.  Do you remember

12   that testimony?

13   A.  Yes.  Yes, I do.

14   Q.  All right.  You said this one was an insurance job?

15   A.  As far as I was told.

16   Q.  All right.  And that the owner of this bike shop was an

17   individual that you knew as "Slo"?

18   A.  Yes.

19   Q.  Do you know his real name is Joe Ausley?

20   A.  No, sir.  I didn't know his real name.

21   Q.  Are you aware that Slo didn't have insurance on the shop?

22   A.  No, sir.

23   Q.  You said a bunch of stuff was taken.

24   A.  (No response.)

25   Q.  Remember?

1  A.  Yes, sir.  Yes, sir.

2  Q.  Several bikes and some bike parts?

3  A.  Yes, sir.

4  Q.  Now, after your testimony at the Victor Castano trial, and

5  he was coming back for a second trial, you contacted the FBI

6  for the first time.

7  A.  Yes.

8  Q.  And again, I'm not worried about the exact date.  But would

9  June of 2009 sound about right for the first time you called

10  Agent Fleming or the FBI?

11  A.  It's been nine, ten years.  I don't know exactly what month

12  it was.

13          MR. STRAUS:  Judge, objection.  Misleading.

14          THE COURT:  How so?

15          MR. SATAWA:  The first 302 I have is dated June 17th,

16  2009.

17          THE COURT:  All right.

18  BY MR. SATAWA:

19  Q.  Sir, you would agree with me that you have given somewhere,

20  maybe, I count eight, but let's say seven, eight, nine, ten,

21  something about that, that's how many times you met with the

22  FBI in connection with the facts of this case?

23  A.  How many times did you say?

24  Q.  Around eight, give or take one or two.

25  A.  I don't know how many times I've met with them.

1  Q.  Several times?

2  A.  A few times, yes.

3  Q.  And you understand that each and every -- each and every

4  time you sit down and meet with them, you -- in speaking to the

5  FBI, it's a serious situation?

6  A.  Yes, sir.

7  Q.  In fact, you met with the FBI prior to the Victor Castano

8  trial, to get ready for that, when, when you were going to

9  testify on behalf of Victor Castano; is that right?

10  A.  Yes, sir.

11  Q.  And you actually lied to the FBI when you met with them

12  that time?

13  A.  Yes, I did.

14          THE COURT:  That's been amply, amply covered.

15  BY MR. SATAWA:

16  Q.  And when you went back to speak to the FBI after the Victor

17  Castano trial, your motivation, I guess, for lack of a better

18  word from your testimony yesterday, was is you wanted to set

19  the record straight and tell the FBI what was going on?

20  A.  No.

21  Q.  You were coming to the FBI because you were worried?

22  A.  Yes.

23  Q.  All right.  So you were going to talk to the FBI because

24  you were worried and you wanted them to help you?

25  A.  I was in fear, yes.  I wanted to come clean on it because I

 1   was in fear.

 2   Q.  And you're all about helping yourself?

 3   A.  No.

 4   Q.  So you met with the FBI and you understood that, okay, I'm

 5   in fear, I need them to help me, so I need to tell them

 6   something that's going to want to get them to help me.  You

 7   would agree with that?

 8   A.  No.

 9   Q.  Your motivation was to tell them the truth or to tell them

10   lies?

11   A.  My motivation was fear for myself and for my daughters.

12   Q.  Okay.  So that -- and so you went there in fear to tell

13   them the truth, or to continue lying to them?

14   A.  To tell them the truth.

15   Q.  All right.  And you were --

16   A.  Actually, no.  My reason I called Agent Fleming was to let

17   him know of the threats that were made to me.

18   Q.  Now, one of the things you've discussed with the FBI after

19   coming to them was that Tatu stole a motorcycle and other

20   belongings that belonged to you?

21   A.  Yes.

22   Q.  Now, was this your motorcycle?

23   A.  Yes.

24   Q.  You paid for it?

25   A.  Yes.

1    Q.  Did you ever bring it to a shop named Kenny's Cycle?

2    A.  Yes, I did.

3    Q.  Rolled up $3,000 in repairs?

4    A.  Yes, I did.

5    Q.  And not pay for them?

6    A.  I paid for some of them, and wrote it -- made a payment

7    arrangement with him to pay for the rest of them.

8    Q.  It was really Kenny who took the motorcycle back, because

9    you still owed him money for the repairs, right?

10   A.  No.

11   Q.  How much money did you still owe Kenny when that motorcycle

12   was --

13   A.  -- I don't, I don't --

14   Q.  -- taken back?

15   A.  I don't recall.  Oh, you mean taken back from Tatu or -- I

16   left --

17   Q.  Taken from you.

18   A.  Okay.

19   Q.  How much money did you still owe on the motorcycle when it

20   was taken from you?

21   A.  Maybe $1,500.  But I didn't owe it on the motorcycle.  I

22   owed it on my repairs.

23   Q.  In addition to the money, the $1,500 you're testifying you

24   owed on the repairs, you also owed the Anniston chapter of the

25   Alabama Devils Diciples for that motorcycle as well; isn't that

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. SATAWA

1    right?

2    A.  No, sir.

3    Q.  So you start meeting with the FBI and cooperating with the

4    FBI.  And you say you did that because you were concerned or in

5    fear.

6    A.  Yes.

7    Q.  Again, I'm not too worried about the exact dates, but it's

8    my understanding that you met with the FBI sometime in the

9    early part of 2010?

10   A.  If that's your understanding.

11   Q.  Okay.  There was several of these interviews that were

12   actually conducted telephonically where you would just call

13   Agent Fleming and discuss, excuse me, what was going on at a --

14   at any given time; is that right?

15   A.  Yes, sir.

16   Q.  All right.  And I believe, my understanding is, is that

17   during one of those, that one of those telephonic contacts with

18   Agent Fleming was in the early part, just after the first of

19   the year in 2010?

20   A.  I don't know.

21   Q.  You have no way of knowing one way or another, right?

22   A.  No.

23   Q.  All right.  In the course of -- in the course of that

24   interview, did you tell Agent Fleming that Tatu taking your

25   motorcycle and your property made you extremely upset?

1  A.  I don't remember what the exact wording was.

2  Q.  Okay.  Well, I'm not asking you if you used the words

3  "extremely upset."

4        But did you express the idea of being extremely upset

5  with the Devils Diciples?

6  A.  No.

7  Q.  You did not?

8  A.  I said I was bummed out that they took my stuff.  I wasn't

9  even on the street to stop it.

10  Q.  And that is the reason why you did not want to provide

11  further false testimony for Victor Castano, because you were

12  mad at him?

13  A.  No.

14  Q.  That's not why?

15  A.  No.

16  Q.  And you didn't tell that to the FBI?

17  A.  No.  I was threatened.

18  Q.  Did you also tell the FBI that you were willing to do

19  whatever is necessary to stay out of jail yourself?

20  A.  I don't recall that.

21  Q.  You don't recall it but it's true, or you don't recall and

22  it's false?

23  A.  I don't recall if that's what I said.

24  Q.  Could it have been something you said?

25  A.  I don't recall.  I don't know.

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. SATAWA

87

 1   Q.  Is the statement, whether you recall it or not, true that

 2   you were willing to do whatever was necessary to stay out of

 3   jail?

 4   A.  I don't recall that's what I said.  Do you have, do you

 5   have a transcript?

 6   Q.  Is whatever is necessary -- sir, I'm going to ask you a

 7   question:

 8        Why do you keep looking over here?  What's going on

 9   over here?

10   A.  Nothing is going on over there.  I just seen someone move.

11   Q.  Okay.

12   A.  I was just looking out of the corner of my eyes.

13   Q.  Okay.

14   A.  I like to keep my surroundings under control.

15   Q.  Because you're always under control?

16   A.  No.  I want to make sure everybody around me is under

17   control.  I get nervous.

18   Q.  I guess that's why you seek out hostile environments when

19   you're in Daytona Beach, right?

20   A.  I was told I had no choice to go -- but to go there.

21   Q.  Okay.

22   A.  What would you do?

23   Q.  Sir, would doing whatever is necessary to stay out of jail

24   come in -- include come into court and lie?

25   A.  No.

1    Q.  You'd never do that?

2    A.  No.

3    Q.  We know at least one time you did it?

4    A.  Yes, I did.

5    Q.  Okay.

6    A.  But my freedom wasn't in jeopardy.

7    Q.  But you wouldn't do it again?

8    A.  No.  I have no reason to.

9    Q.  Well, you got a big reason to, right?  You want to get

10   below 70 to 87 months?

11   A.  Yeah.  Who wants to do time?

12   Q.  That's -- you would agree with me then it's a really good

13   reason to come here and say things that may not be true?

14   A.  No.

15   Q.  Later, in 2010, it's my understanding that you had a

16   face-to-face meeting with Agent Fleming and Agent Herrera,

17   either in the Detroit or the Macomb County office of the FBI.

18   This one was in person.

19   A.  Okay.

20   Q.  Again, I'm not concerned so much about the date it

21   happened, just the fact that you sat down again with the FBI

22   and spoke with them.

23   A.  Yes, sir.

24   Q.  Did you tell them at that time about what you describe as

25   an insurance fraud involving a motorcycle shop in Huntsville,

1   Alabama?

2        MR. STRAUS:  Judge, this is again the same type of, I

3   think, improper -- he has not asked the predicate question,

4   isn't it true, et cetera, et cetera, and then impeach him if

5   that's what the report says.  He is simply reading from a

6   report without even any foundation that he's ever seen the

7   report.

8        MR. SATAWA:  I didn't read anything from the report

9   other than they sat and talked about an insurance job in

10  Huntsville, Alabama.

11       THE COURT:  I'm wondering if this came up in direct

12  examination.

13       MR. SATAWA:  He talked about three separate alleged

14  motorcycle thefts in Alabama, your Honor.

15       THE COURT:  Okay.  So what's, what's the question

16  about this one then?  Go ahead.

17  BY MR. SATAWA:

18  Q.  You described -- the question I was getting to, sir, was,

19  when you describe an insurance fraud in Huntsville, Alabama, so

20  we're clear, the one you're describing is the one from Slo's

21  shop, right?

22  A.  Yes, sir.

23  Q.  Those are one in the same?

24  A.  Yes, sir.

25  Q.  And yesterday, you said that two bike -- two motorcycles,

1    and two custom bikes that were being built were stolen?

2    A.  Correct.

3    Q.  And back in May of 2010, you said six motorcycles and parts

4    were stolen?

5    A.  I don't recall that.

6    Q.  You didn't say that?

7    A.  I don't recall that.

8    Q.  And, well, is the reason your testimony -- is the reason

9    the, the number of motorcycles changed when you came into court

10   yesterday because the Government told you --

11   A.  No.

12   Q.  -- that they needed you to say two instead of six?

13   A.  No.

14   Q.  By the way, this is -- this was the incident that you state

15   you went to the person's house with alcohol and meth, and

16   partied with them; is that right?

17   A.  Yes.

18   Q.  So we all know we're talking about the same incident.

19   A.  Yes.

20   Q.  You said some things about Gun Control.  And you know him,

21   his real name is Cary Vandiver?

22   A.  Yes, I do.

23   Q.  All right.  Would it be easier for me to refer to him as

24   Mr. Vandiver or Gun Control for these purposes?

25   A.  Doesn't matter to me.

1    Q.  Either way?

2    A.  Yes, sir.

3    Q.  So Mr. Vandiver, when Tatu -- when you were approached for

4    the first time about testifying in the Victor Castano trial,

5    the first time you testified, Cary Vandiver was living in

6    Michigan at that time; is that right?

7    A.  No, sir.

8    Q.  He was not living at Vern Rich's house?

9    A.  To my knowledge, no.

10   Q.  Above Vern Rich's garage?

11   A.  To my knowledge, I don't remember that.

12   Q.  So you -- your testimony was, is that Cary Vandiver has a

13   history with guns?

14   A.  Hence the name, Gun Control.

15   Q.  And everyone laughed, we all thought it was very witty.

16           In that comment, however, I'm curious as to where

17   you -- where you received your knowledge that he has experience

18   or a history with guns.

19   A.  How he has his knowledge?

20   Q.  Yeah.  Where did you get that information?

21   A.  Talking with Gun Control.  Talking to other brothers.

22   Q.  Okay.  What kind of history of guns?

23   A.  He's not afraid of them.  He's not afraid to take one out

24   of your hands.  The man, the man has no fear of firearms.

25   Q.  So that was what you meant when you say he has a history

1   with guns?

2   A.  Yes.

3   Q.  Do you know of any times Mr. Vandiver was arrested for

4   possessing a gun?

5   A.  I, I don't recall any.

6   Q.  Do you know any times when Mr. Vandiver was arrested for

7   using a gun?

8   A.  I have no recollection of that.

9   Q.  Do you know any times that Mr. Vandiver was convicted for

10  using a gun?

11  A.  No, sir.

12  Q.  Or even owning a gun?

13  A.  No, sir.

14  Q.  You have a fair amount of experience with guns yourself,

15  according to your testimony on direct?

16  A.  Yes, I do.

17  Q.  The gun that we're talking about in the Victor Castano

18  trial you know to be a nickel plated .44 -- Smith & Wesson .44

19  Magnum, right?

20  A.  Yes, sir.

21  Q.  A very nice gun?

22  A.  Yes, sir.

23  Q.  Expensive gun?

24  A.  I don't know what the price tag is on one, but probably a

25  pretty lucrative price.

1   Q.  Close to a thousand dollars?

2   A.  I'm not, I'm not a gun, a -- I don't own a gun store.

3   Q.  So your testimony is you would have no idea approximately

4   how much a gun like that would be worth?

5   A.  It can be expensive.  That's all I know.

6   Q.  All right.  You would agree with me it's worth a heck of a

7   lot more than $100?

8   A.  Oh, yes.

9          MR. SATAWA:  No further questions, your Honor.  Thank

10  you.

11         THE COURT:  All right.  Are there any others?

12         Mr. Sabbota.

13         MR. SABBOTA:  Thank you, Judge.

14                        CROSS-EXAMINATION

15  BY MR. SABBOTA:

16  Q.  Sir, you will agree with me that out of the many charges

17  that you could have been charged with, you weren't charged with

18  insurance fraud?

19  A.  Sorry?

20  Q.  You weren't charged with insurance fraud?

21  A.  No, I wasn't.

22  Q.  No.  And you know what insurance fraud means, don't you?

23  A.  Yes, sir, I do.

24  Q.  That means you deceive an insurance company for your own

25  benefit; am I right?

1   A.  Yes, sir.

2   Q.  And what insurance fraud really talks about is a lie; am I

3   right?

4   A.  Yes, sir.

5   Q.  You engaged in that in Alabama, didn't you?

6   A.  (No response.)

7   Q.  That's a terrible question.

8           You were part and parcel of a scheme for Mr. Ausley at

9   that time; am I right?

10  A.  Ausley, being "Slo"?

11  Q.  Yes.

12  A.  Yes, sir.  That was under my impression.

13  Q.  And you had no problem with participating in it either, did

14  you?

15  A.  No, sir.

16  Q.  All right.  And you've told us today that jail is not a

17  pleasant place?

18  A.  No, it's not.

19  Q.  You've been to jail?

20  A.  Yes, sir.

21  Q.  They tell you when to get up in jail?

22  A.  To some extent, yes, sir.

23  Q.  And tell you when you've got to go to bed?

24  A.  Yes, sir.

25  Q.  Give you food to eat?

1    A.  Yes, sir.

2    Q.  The food is not so great?

3    A.  No, sir.

4    Q.  And you would do what it takes not to go to jail, wouldn't

5    you?

6    A.  I've done what it takes in the past not to go to jail.

7    Q.  All right.  So you would agree that because it's not a

8    pleasant place, at least in the past, you've done what it takes

9    not to go to jail?

10   A.  Yes.

11   Q.  Ever been to prison?

12   A.  No, sir.

13   Q.  Prison is probably worse than jail?

14   A.  I don't know.

15   Q.  Okay.  Would you do what it takes not to go to prison?

16   A.  Can you --

17   Q.  Sure.

18   A.  -- explain what that --

19   Q.  Do you want to go to prison --

20           THE COURT:  You can get an answer to this and then

21   you'll move on to another topic.  This has been amply covered.

22           Go ahead and get an answer to this.

23           MR. SABBOTA:  I'm sorry.

24           THE COURT:  Go ahead.

25   BY MR. SABBOTA:

1   Q.  Would you do what it takes not to go to prison?

2   A.  Depending.

3         THE COURT:  Next topic, please.

4   BY MR. SABBOTA:

5   Q.  Now, my understanding is that you met with Mr. Fleming

6   numerous occasions, on many occasions?

7   A.  Correct.

8   Q.  And you had to give Mr. Fleming information in order for

9   you to be called a cooperator; am I right?

10  A.  Weren't these questions already asked?

11  Q.  I'll ask the question again.

12        Is the truthful answer that you had to give Mr.

13  Fleming information to be known as a cooperator?

14  A.  I was never called a cooperator, but I gave him

15  information, yes.

16  Q.  He would ask you questions about people?

17  A.  Correct.

18  Q.  And you would just give him the information about the

19  people that he was interested in?

20  A.  Yes, sir.

21  Q.  And by doing so, you became a cooperative witness, so to

22  speak?

23  A.  Yes, sir.

24  Q.  Now, you would agree with me that not all of the Devils

25  Diciples members engaged in illegal activity?

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. SABBOTA

1   A.   Pardon me?

2   Q.   Sure.  You would agree with me that not everybody that's a

3   member of the Devils Diciples engaged in illegal activity;

4   wouldn't you agree with that?

5   A.   Yes.

6   Q.   Some did and some didn't?

7   A.   Correct.

8   Q.   You were one of the participants that engaged in the

9   illegal activity?

10  A.   On occasion.

11  Q.   On occasion.

12           There were many occasions we just talked about; am I

13  right?

14  A.   Yes, sir.

15  Q.   How many times did you sell dope?

16  A.   I don't know.

17  Q.   How many times did you convey dope?

18  A.   I don't know.

19  Q.   How many times did you sell meth?

20  A.   I don't know.

21  Q.   How many times did you convey marijuana?

22  A.   I don't know.

23  Q.   How many times did you steal property?

24  A.   I don't know.

25  Q.   So you would agree that you engaged in more than a little

1    bit; there were probably many times you engaged in illegal

2    activity?

3    A.  Say that again.

4    Q.  Sure.  You committed crimes?

5    A.  Yes, I have.

6    Q.  You willfully committed crimes?

7    A.  Yes, I have.

8    Q.  Many crimes?

9         THE COURT:  And this has been dealt with many times in

10   cross-examination.  Do you have any other topics?

11        MR. SABBOTA:  Yes, I do.

12        THE COURT:  Go ahead.

13   BY MR. SABBOTA:

14   Q.  Okay.  You also were aware that the Devils Diciples went on

15   charity runs; am I right?

16   A.  Yes.

17   Q.  They went on the Charlie Brown run?

18   A.  Yes.

19   Q.  They went on a Sweet Tooth run?

20   A.  Yes.

21   Q.  What was Charlie Brown for?

22   A.  Diabetes run.

23   Q.  And what was Sweet Tooth for?

24   A.  Mercy Hospital has a Sweet Tooth program for people that

25   are diabetic, that become diabetic, to help them get on the

1    right track, to do right.

2    Q.   Salvation Army?

3    A.   Salvation Army run was Toys for Tots type things.

4    Q.   Homeless kids?

5    A.   Yes.

6    Q.   Every chapter would do at least two a year; am I right?

7    A.   Yes.

8    Q.   And that was for the benefit of the public; am I right?

9    A.   Okay.

10   Q.   Is that a yes?

11   A.   No.

12   Q.   No?

13   A.   It benefits everybody.

14   Q.   Well, it benefits both members of the club and the people

15   that --

16   A.   I agree.

17   Q.   -- are in need of the charity?

18   A.   I agree.

19   Q.   That's all I'm saying.

20   A.   I'll agree with that, yes.

21   Q.   You agree with that?

22          My understanding is also, you told us yesterday that

23   there were shotguns that were kept behind the bar?

24   A.   Yes, sir.

25   Q.   Those shotguns were for self-defense of the club, weren't

1   they?

2   A.   That's what I stated.

3   Q.   Right.  And that's the reason for having a shotgun behind

4   the bar?

5   A.   Yes.

6   Q.   And you're aware that most bars have shotguns behind them;

7   aren't you?

8   A.   I don't know about that.

9   Q.   But at least the Devils Diciples kept one for their own

10  self-protection?

11  A.   Correct.

12  Q.   And when you talked about Dog duty yesterday, I mean, Dog

13  duty was basically when you had these big parties, somebody

14  would protect the national officers?

15  A.   Correct.

16  Q.   Am I right?

17  A.   Correct.

18  Q.   Because you have other motorcycle clubs come?

19  A.   Yes, sir.

20  Q.   And you would have outsiders come?

21  A.   Yes, sir.

22  Q.   And you wanted to make sure nobody got hurt?

23  A.   Yes, sir.

24  Q.   And you wanted to make sure that there wasn't a problem?

25  A.   Yes, sir.

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. SABBOTA

1   Q.  So what we're really talking about is security, not from

2   the inside, but because of outside people that might be coming

3   to your clubs?

4   A.  Yes, sir.

5   Q.  And you did that?

6   A.  Yes, sir.

7   Q.  And other members did that?

8   A.  Yes, sir.

9   Q.  There's nothing wrong with that, is there?

10  A.  No.  No.

11  Q.  No.  In fact, that's probably a good thing to do, isn't it?

12  A.  Yes, sir.

13  Q.  And you also talked about the "black eye" policy; am I

14  right?

15  A.  Yes, I did.

16  Q.  And you said that you got disciplined for acting out?

17  A.  Yes, sir.

18  Q.  You got black eyes?

19  A.  Yes, sir.

20  Q.  And you agreed that you probably deserved those black eyes?

21  A.  I don't know I agreed with it.  I mean, I received them.

22  Q.  Okay.  You received them because, as you put it yesterday,

23  you messed up?

24  A.  On occasion.

25  Q.  On occasion.

1           You would go into bars?

2    A.  Yes, sir.

3    Q.  And you would be disruptive in the bar?

4    A.  No.  You guys said that.  I didn't.

5    Q.  No.  I'm asking you, would you be disruptive in the bar?

6    A.  On occasion.

7    Q.  On occasion.

8           And then you would get the black eye; am I right?

9    A.  Yes, sir.

10   Q.  All right.  You told us about a time that Fat Dog ordered

11   that you receive a black eye or pay a thousand dollars; am I

12   right?

13   A.  Yes, sir.

14   Q.  Okay.  You had the choice; am I right?

15   A.  No, no, no, no, no, no.  That's not what I said.

16   Q.  All right.  Well, you had to pay a thousand dollars to

17   avoid the black eye?

18   A.  No.  I had to pay a thousand dollars for being late for a

19   state meeting, for a state run.

20   Q.  Right.  And you were going to get a black eye; am I right?

21   A.  That's not what I said.

22           MR. STRAUS:  Objection.  Misleading, your Honor.

23           MR. SABBOTA:  I'm not trying to mislead.

24           THE COURT:  There's no way I can rule on that.

25           MR. STRAUS:  I understand.

1          THE COURT:  Just reserve that and direct you to

2     continue to examining.

3     BY MR. SABBOTA:

4     Q.  All right.  You indicated yesterday you had a conversation

5     with Pauli and Fat Dog about helping Victor Castano?

6     A.  Yes.

7     Q.  You were the only person that was there during that

8     so-called conversation; am I right?

9     A.  On one of those occasions.

10    Q.  Okay.  The first occasion, who was there?

11    A.  Stella and I.

12    Q.  So both you and Stella were there?

13    A.  Yes.

14    Q.  Okay.  And you were together when that conversation was

15    held?

16    A.  Yes.

17    Q.  And so we are going to have your word relative to that

18    conversation; am I right?

19    A.  Say that again.

20    Q.  We have your word that that conversation took place.

21    A.  Yes.

22    Q.  Am I right?

23          And my understanding also is that the first time that

24    you went to work for Victor Castano to help him, you received

25    compensation?

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. SABBOTA

1   A.  I was supposed to receive travel funds to get up there,

2   yes.

3   Q.  Did you get travel funds?

4   A.  No.

5   Q.  Did you get pounds of marijuana?

6   A.  I got a pound of marijuana.

7   Q.  Okay.  And there was an allegation that you took that, but

8   you were -- you were getting paid for your testimony?

9   A.  As long as I sold the marijuana, yeah.

10  Q.  Marijuana is not free, is it?

11  A.  No.  But you can't buy groceries with it.

12  Q.  No.  But you -- but you took marijuana; am I right or

13  wrong?

14  A.  Yes, I did.

15  Q.  All right.  And that was compensation for your, for your

16  testimony at the Castano trial; am I right?

17  A.  It was a start of what was supposed to be the compensation.

18  Q.  You were supposed to get a lot more, weren't you?

19  A.  Yes, I was.

20  Q.  You had no objection in receiving the funds to at least

21  tell your falsehood; am I right?

22  A.  Excuse me?

23  Q.  You had no problem in receiving money in compensation to

24  lie?

25  A.  No.

1   Q.   No?

2   A.   Needed to be -- I needed -- go ahead and ask the question.

3   Q.   You needed to be rewarded?

4   A.   No.

5   Q.   You needed to receive something for it, didn't you?

6   A.   I needed to have my living expenses paid for that I was

7   losing by being up here and lying and going to court for him.

8   Q.   All right.  And that was supposed to be the same amount of

9   money that your girlfriend was making --

10  A.   Yes.

11  Q.   -- am I right?

12          So you were receiving compensation for it, were you

13  not?

14  A.   Yeah.  But not the way it was supposed to be.

15  Q.   All right.  Well, you didn't like the way it turned out?

16  A.   No.  I didn't need to sell any pot.  I needed money.

17  Q.   All right.  And because you didn't get money, you took the

18  pot?

19  A.   It's the only option I had.

20  Q.   And the second time when you were called, you wanted a

21  little more compensation when you were called by Mr. -- Mrs.

22  Castano, Victor Castano's wife; right?

23  A.   Correct.

24  Q.   You wanted at least $15,000?

25  A.   Yes, I did.

1    Q.  And you wanted a new bike?

2    A.  Yes, I did.

3    Q.  Because you were -- you were not going to come forward and

4    lie again unless you were paid properly; am I right?

5    A.  Correct.

6    Q.  All right.  And so that's no different than receiving

7    compensation for your sentence, is it?

8    A.  Sir?

9    Q.  That's no different than receiving a reward for your

10   testimony today, is it?

11   A.  It's a big difference.

12   Q.  Big difference?

13   A.  Yes.

14   Q.  Either way, you're being paid, aren't you?

15   A.  No.  I'm not being paid.

16   Q.  You're not being paid for your sentence today -- for your

17   testimony today?

18   A.  No, sir.

19   Q.  You're not receiving a sentence benefit?

20   A.  No, sir.

21   Q.  You haven't been charged with RICO?

22   A.  Right.  Yeah.  I haven't been charged with a RICO.  No.

23   Q.  You haven't been charged with manufacturing

24   methamphetamine?

25   A.  I never manufactured methamphetamine.

1    Q.  You've never charged with --

2            THE COURT:  This topic has been covered.  Thank you,

3    Mr. Sabbota.  Next topic.

4    BY MR. SABBOTA:

5    Q.  Let's talk about Box Canyon.

6    A.  Okay.

7    Q.  You said you learned about an incident that occurred at Box

8    Canyon?

9    A.  Correct.

10   Q.  That incident involved members of the Devils Diciples

11   torturing a girl over a debt?

12   A.  Correct.

13   Q.  They raped the girl?

14   A.  Correct.

15   Q.  They used a cattle prod to hurt the girl?

16   A.  Correct.

17   Q.  And what happened was the Devils Diciples decided to take

18   care of it on their own?

19   A.  Correct.

20   Q.  And what Fat Dog basically said was anybody that does this,

21   or commits these kinds of acts is out of the club; isn't that

22   right?

23   A.  Correct.

24   Q.  He stressed that he wasn't going to tolerate that behavior,

25   didn't he?

1  A.  Correct.

2  Q.  In fact, he picked up a baseball bat and he threw it down

3  on a church meeting and said, "We will not engage in that kind

4  of behavior"?

5  A.  Correct.

6  Q.  You understood that, too, yes?

7  A.  Yeah.  You didn't mess up like that.  You don't do stuff

8  like that to people.

9  Q.  You don't do stuff like that to people?

10  A.  No.

11  Q.  That was not going to be tolerated by the group, was it?

12  A.  No.

13  Q.  And then you also told us that supposedly Fat Dog wanted

14  you to kill Billy Wadd?

15  A.  Yes, he did.

16  Q.  And who was present at that conversation?

17  A.  I don't recall everybody that was present.

18  Q.  Well, how many -- do you remember how many people were

19  there?

20  A.  Half a dozen.

21  Q.  Half a dozen people were there.

22       Can you tell me when it occurred?

23  A.  Sorry?

24  Q.  Can you tell me when it occurred?

25  A.  Date's fuzzy.

1    Q.  Date's fuzzy.

2            Can you tell me the day of the week?

3    A.  No, I can't.

4    Q.  Can you tell me the month?

5    A.  No, I can't.

6    Q.  You said there were many people that were there, yes?

7    A.  Pardon me?

8    Q.  How many people were there?

9    A.  Half a dozen.

10   Q.  Half a dozen.

11           Can you name me one?

12   A.  Rockin' Ronnie.

13   Q.  Who else was there?

14   A.  Fat Dog.

15   Q.  That's two.  Who else was there?

16   A.  I believe Cliff was there.  I believe Detroit Dave would

17   have been there.  There was -- it was a long time ago.

18   Q.  A long time ago.

19           So all these people could verify what you're telling

20   us?

21   A.  Pardon me?

22   Q.  Those people could corroborate what you're telling us?

23   They were there --

24   A.  Reckon so.

25   Q.  -- right?

1    A.  Reckon so.

2    Q.  You were so concerned and worried that Fat Dog was serious

3    about that, that you were going to take part -- you were going

4    to do this; am I right?

5    A.  No, sir.  I'm not going to murder my brother.

6    Q.  Right.  And so you weren't that worried that if you didn't

7    do it, anything would happen to you, were you?

8    A.  Well, yeah, I was.

9    Q.  Did anything happen to you?

10   A.  You want -- not at that time, no.

11   Q.  And --

12   A.  I went to go do what I was told to do.

13   Q.  You didn't do it, did you?

14   A.  No.

15   Q.  Did anything happen to you for not doing it?

16   A.  No, because he couldn't be found.

17          MR. SABBOTA:  No further questions.

18          THE COURT:  Any other cross-examination?

19          MR. DALY:  Yes.

20          THE COURT:  We'll take that after the morning recess.

21   Twenty minutes in the jury room, ladies and gentlemen.

22       (Jury out, 10:56 a.m.)

23          THE COURT:  As the jury was exiting, I did today, for

24   a little bit longer than I ordinarily would.  And I observe

25   there were audible conversations going on between Mr. Daly and

```
 1    his client as the jury was exiting.  I don't know if it was

 2    within the hearing of the jury.  But I would observe that it

 3    would be best if counsel for the government, counsel for the

 4    defense would remain essentially silent while the jury is

 5    exiting the courtroom in order to avoid problems.

 6            Thank you.  Twenty minutes.

 7       (Recess taken, 10:56 a.m. - 11:21 a.m.)

 8            THE CLERK:  All rise.  Court is back in session.

 9            THE COURT:  Be seated, please.  Thank you.

10            We're going to be preparing the jury for the afternoon

11    session.  I was told Mr. Machasic had something briefly for the

12    record before we bring the jury out?

13            MR. MACHASIC:  Yes, your Honor.  Mr. Maiatico,

14    Government counsel, has informed me that we may get to Donna

15    Cook's testimony today.

16            THE COURT:  Okay.

17            MR. MACHASIC:  During that testimony they would seek

18    to introduce the photos of my client with firearms, wielding

19    firearms.  So I wanted to put on the record I maintain my

20    objection.  I will not object specifically in front of the

21    jury, I'll be with that understanding.

22            THE COURT:  You've recorded your thoughts.  And I've

23    ruled on that, I think, probably in a written order as well,

24    have I not?

25            MR. MACHASIC:  I don't believe it was a written order.
```

```
 1              THE COURT:  It was on the record, possibly covered in
 2    a text order.
 3              MR. MACHASIC:  Yes, sir.
 4              THE COURT:  I've determined -- my summary of it, my
 5    recollection, at least, is that I determined that, that the
 6    probative value of the, of the photographs displaying the
 7    various things, him in possession of firearms, and wearing
 8    paraphernalia I think as well, looked like it was in a
 9    clubhouse, that the probative value is not substantially
10    outweighed by whatever prejudicial impact there may be thought
11    to exist.
12              Now, now, especially now at this stage of the trial, I
13    think that no one on the jury is likely to be shocked that a
14    member of the Devils Diciples Motorcycle Club is in possession
15    of or wielding or displaying a firearm.  There is essentially
16    no prejudicial impact to that, in light of the other
17    circumstances, it seems to me.  My ruling is not only affirmed,
18    it's reaffirmed.  Right?  Not that you --
19              MR. MACHASIC:  I don't agree, your Honor, but I
20    understand the Court's ruling.
21              THE COURT:  You don't have to agree, but that's my
22    feeling about it.  All right, sir.  Thank you.  Thanks for
23    stating that.
24              One other thing before the jury comes out.  Staff
25    tells me that a juror, somewhere in this near end, pointed out
```

```
 1    that one or more of the witnesses in starting to use the laser

 2    pointer was pointing it at himself, and that can be very

 3    dangerous, certainly.  And what I would suggest from that, is

 4    that anybody, chiefly it's going to be the Government, I know,

 5    but anybody who is going to be asking a witness, especially a

 6    lay witness, to use the laser pointer, you should instruct them

 7    first how it works and caution them and so forth.

 8              MS. MOHSIN:  May I see it, your Honor?  Because I've

 9    never used it.

10              THE COURT:  Yes.  It's not terribly obvious which end

11    is the business end, just from looking at it.  Don't you look

12    into it.

13              MS. MOHSIN:  Okay.

14              THE COURT:  All right?

15              MR. PITTS:  Judge, a moment --

16              THE COURT:  Same thing for the defense, if you're

17    going to be asking anybody.

18              MR. PITTS:  Judge, a moment ago you referred to the

19    afternoon session.

20              THE COURT:  Did I?

21              MR. PITTS:  Just a second ago.  There is no afternoon

22    session?

23              THE COURT:  The continued session on into the

24    afternoon that's going to begin as soon as everybody sits down.

25    All right?
```

```
 1              MS. STOUT:  Thank you.

 2              MS. MOHSIN:  Thank you, Judge.

 3              THE COURT:  All right.  Let's bring the jury in,

 4    please.

 5              THE CLERK:  All rise.

 6         (Jury in, 11:24 a.m.)

 7              THE COURT:  All right.  Be seated, please.  The jury

 8    is assembled.  All defendants and all attorneys are present.

 9    The witness may be seated.

10              Mr. Daly is approaching.

11              I forgot to mention -- you can be seated, sir.

12              I forgot to mention, one of you two gentlemen was

13    asking about the chair in the jury box and whether it was

14    firmly secured.  And we had it checked out early.  Maybe

15    somebody behind you was worried about it not being secured.

16              JUROR NO. 13:  I was worried about that.

17              THE COURT:  I'm not sure.  But there might be a little

18    bit of play in the connection.  They all have a little bit of

19    play in the connection, but it's firmly secured to the floor.

20    But we had a mechanic come up here and take a look at it.  So

21    that's handled.

22              Mr. Daly, proceed.

23              Mr. Daly, you may proceed.

24              MR. DALY:  Thank you.

25                             CROSS-EXAMINATION
```

1    BY MR. DALY:

2    Q.  Mr. McFadden, you recall yesterday that Mr. Straus asked

3    you about a term that he used, "black eye" policy.  Do you

4    remember that?

5    A.  Yes, sir.

6    Q.  Okay.  That is not a term that the Devils Diciples use.  In

7    other words, they didn't talk about a "black eye" policy, did

8    they?

9    A.  Yes.

10   Q.  Did they talk about it in terms of a policy?

11   A.  It's a disciplinary policy, yes.

12   Q.  Okay.  Was that written in some type of document?

13   A.  Not to my knowledge.

14   Q.  Not to -- okay.

15        And when they talked about "black eye," did they talk

16   about it in terms of some type of discipline, correct?

17   A.  Yes.

18   Q.  And they didn't consider it a "policy" of the club, did

19   they?

20   A.  It was, it was done.

21   Q.  It was something that was talked about, right?

22   A.  No.  It was done.

23   Q.  It was done.  Okay.

24        And according to you, you actually received a punch a

25   number of times, correct?

1   A.  Yes, sir.

2   Q.  Twice?

3   A.  More than that.

4   Q.  How many times?

5   A.  I lost count.

6   Q.  So you would have been somebody who messed up on a regular

7   occasion, correct?

8   A.  No.

9   Q.  No.  Well, you mean that they were just punching you

10  because they liked to punch you?

11  A.  Sometimes.

12  Q.  Sometimes.  So if they were just punching you for the sake

13  of punching you, it had nothing to do with this "black eye"

14  policy, right?

15  A.  Explain that.

16  Q.  Well, you said that sometimes you would get punched because

17  of the "policy."  Sometimes you would just get punched because

18  apparently people like to punch you.

19  A.  That doesn't make sense to me.

20  Q.  Well, I'm just repeating what you said, sir.

21  A.  It happened.

22  Q.  It happened?

23  A.  Okay.

24  Q.  When it happened to you, it happened because the chapter

25  warlord would hit you, right?

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

1    A.   Yes.

2    Q.   Not a prospect?

3    A.   No.

4    Q.   Prospects were not allowed to hit people for a black eye, a

5    punch, correct?

6    A.   Unless it was between prospect and prospect.

7    Q.   Okay.  And you were not a prospect when you got hit by

8    Squeak?

9    A.   No, sir.

10   Q.   You were not a prospect when you were hit by 44, correct?

11   A.   No, sir.

12   Q.   All right.  When you were hit, you did not retaliate, did

13   you?

14   A.   No, sir.

15   Q.   And you didn't run to other brothers in the club and say,

16   "I just got hit; that wasn't the right thing to do," did you?

17   A.   Sure I did.

18   Q.   You did?

19   A.   It's not the right thing to do.  Why do you want to hit a

20   brother?

21   Q.   Okay.  So, in other words, you would get hit, you would

22   agree to be hit because that was a rule, right?

23   A.   Yeah.  You stood there and took what you got.

24   Q.   Okay.  And did you retaliate because of that?

25   A.   Meaning fight back?

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

1   Q.  Yes.

2   A.  No.

3   Q.  You didn't retaliate.  Because that was the rule, right?

4   A.  Correct.

5   Q.  A rule that you agreed to?

6   A.  No, I didn't agree to it.

7   Q.  But you did it anyhow?

8   A.  Had no choice.

9   Q.  You had no choice.

10          So did you run to your mother and say, "Hey, a club

11  member hit me and I didn't like that"?

12  A.  No.

13  Q.  No.  Did you run to the police?

14  A.  No.

15  Q.  That would have been silly?

16  A.  Correct.

17  Q.  I mean, you wouldn't run to the police and say, "I'm a

18  member of a club, I agreed to get hit, but I want to file an

19  assault charge"; you didn't do that?

20  A.  I didn't agree to get hit and I didn't want to run to the

21  police, no.

22  Q.  Well, you were part of the group, you were part of the

23  membership, right?

24  A.  Correct.

25  Q.  And that was part of the rules; isn't that what you told

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

1  the jury?

2  A.  Yes.

3  Q.  Okay.  So part of the agreement was that you would take a

4  hit, right?

5  A.  It wasn't an agreement on paper, no.

6  Q.  I didn't say it was on paper.  What you agreed to was that

7  you would take a hit, right?

8  A.  I didn't have a choice.  It was you taking a swat.  I

9  didn't agree to it.

10  Q.  Well, you consented to it?

11  A.  No, I didn't consent to it.

12  Q.  Did you try to stop it?

13  A.  A couple times.

14  Q.  And what happened?

15  A.  I ducked my head down so he hit me in the forehead instead

16  of the eye.

17  Q.  Okay.  That's the best you could do?

18  A.  That's the only thing you could do.

19  Q.  Well, I thought you were armed.

20  A.  And I'm going to shoot somebody for punching me?

21  Q.  Right.

22  A.  Really?

23  Q.  So you've got four guns on you, and somebody says you're

24  supposed to get punched.  You take the punch, duck your head,

25  and that's about the end of it, right?

1   A.  Correct.

2   Q.  Not a really big deal?

3   A.  It was to me.  I didn't like it.

4   Q.  You didn't like it, but it wasn't a big deal?

5   A.  It was something you dealt with.

6   Q.  Okay.  As part of the club, right?

7   A.  Correct.

8   Q.  Not enough to send you to complain to the police?

9   A.  No.

10  Q.  I mean, that would be stupid, to go to the police and say,

11  I got hit in the head, right, and I want to file assault

12  charges?

13  A.  Yeah.

14  Q.  That would be pretty stupid, right?

15  A.  Correct.

16  Q.  You would expect that the police would tell you, get out of

17  here, right?

18  A.  Yes.

19  Q.  Not only were you a person that could take a punch, you

20  could give a punch, right?

21  A.  I reckon.

22  Q.  And we've heard about how you did that when you needed to,

23  right?

24  A.  What did you hear?

25  Q.  Well, and specifically with regards to Dancer, you told us

1    about that?

2    A.  I defended myself.  He hit me first.

3    Q.  So this was self-defense.  This is the first time we've

4    heard that --

5    A.  No, it wasn't.

6    Q.  Excuse me.  Let me finish my question.

7    A.  Yes, sir.

8    Q.  Okay?  This is the first time we've heard that when you

9    busted Dancer, you did it in self-defense; is that correct?

10   A.  No, sir.

11   Q.  You said that to the jury earlier?

12   A.  It was told yesterday.

13   Q.  Oh.  Yesterday, you said that you hit Dancer in

14   self-defense?

15   A.  I didn't use the word "self-defense."

16   Q.  What was the word that you used yesterday?

17   A.  He pushed me first.

18   Q.  Oh, he pushes you; that allows you to bust his lip, right?

19   A.  Yes.

20   Q.  Now, Mr. McFadden, you said that you became a member of the

21   Devils Diciples Christmas of 2001; is that correct?

22   A.  Yes, sir.  At the Christmas party.

23   Q.  I'm sorry?

24   A.  At the Christmas party, 2001.

25   Q.  All right.  And you've also told the jury that before you

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

1    became a member, that you were selling drugs, right?

2    A.   Yes, sir.

3    Q.   And that, you did on your own?

4    A.   Yes, sir.

5    Q.   And what type of drugs were you selling?

6    A.   Methamphetamine.

7    Q.   And how much drugs did you sell, just an approximation,

8    before you became a member of the Devils Diciples?

9    A.   An ounce or so a week.

10   Q.   For how many weeks?

11   A.   Maybe a year.

12   Q.   One year.

13          We take an ounce or so, one or two ounces a week, for

14   a year, quick and do the math.  How much meth did you sell?

15   A.   Depending on the week, I don't know.

16   Q.   All right.  Would you agree that it was a substantial

17   amount of meth that you sold before you became a Devils

18   Diciple?

19   A.   Not so much as a substantial amount, no.

20   Q.   Enough to get you into trouble?

21   A.   If I would have got caught.

22   Q.   Right.  You were evasive and didn't get caught --

23   A.   Correct.

24   Q.   -- while -- excuse me.  Let me finish.

25          While you were selling drugs before you became a

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

 1    Devils Diciple, correct?

 2    A.  Right.

 3    Q.  Would you agree that had you been caught before you were a

 4    Devils Diciple, that you faced some serious consequences?

 5    A.  Yes.

 6    Q.  And that you could have been put into prison for a long,

 7    long time?

 8    A.  Correct.

 9    Q.  But you were able to avoid law enforcement, correct?

10    A.  Yes.

11    Q.  You were able to avoid the state authorities?

12    A.  Yes.

13    Q.  Correct?

14    A.  Yes.

15    Q.  You were able to avoid the federal authorities, correct?

16    A.  Yes.

17    Q.  And now the federal authorities know that you did that,

18    because you told them, right?

19    A.  Yes.

20    Q.  And they never prosecuted you for all of the drugs that you

21    sold before you became a Devils Diciple, correct?

22            THE COURT:  That topic has been amply covered.

23            MR. DALY:  Can I get an answer to that, please?

24            THE COURT:  The answer repeatedly has been yes.  So

25    proceed, please, with the next topic.

1    BY MR. DALY:

2    Q.  Now, after you became a Devils Diciple, you continued to

3    sell drugs, correct?

4    A.  Correct.

5    Q.  And how old are you now?

6    A.  Fifty.

7    Q.  And if we took all of the drugs that you sold in your

8    lifetime, knowing that you are now 50, you would probably face

9    the rest of your life in prison if you were charged with

10   selling all of those drugs, right?

11   A.  I don't understand the question.

12   Q.  Okay.  You've been in trouble with the law before, correct?

13   A.  Yes.

14   Q.  You know what happens when you get in trouble with the law?

15   A.  Yes.

16   Q.  You know what type of penalties you're going to face

17   dealing in drugs?

18   A.  Yes.

19   Q.  Again, the question is, given all the drugs that you've

20   dealt with, that you have either personally or with other

21   people have dealt, you would agree that you probably would face

22   the rest of your life in prison; isn't that true?

23   A.  No.

24   Q.  You think you get a slap on the wrist for all of that?

25   A.  Not necessarily a slap on the wrist, no.

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

125

1    Q.  But a long time in prison, correct?

2    A.  No.

3    Q.  No what?  Probation?

4    A.  First time offense?  That's what I'm asking.

5    Q.  How many years did you deal drugs?

6    A.  On and off?

7         THE COURT:  Mr. Daly, I must say, I think that, think

8    that this has been covered in each of the, in one way or

9    another, each of the preceding cross-examinations.

10        MR. DALY:  I understand, Judge, but this is in a

11   different vein, Judge, if I may.

12        THE COURT:  It needs to be differentiated in order to

13   avoid being repetitive.

14        MR. DALY:  I'm not trying to be repetitive.

15        THE COURT:  It needs to be clearly differentiated, in

16   my view, in order to avoid being unnecessarily repetitious.  Go

17   ahead.

18        MR. DALY:  I don't think any lawyer has asked how many

19   years he's been dealing drugs, Judge.  If I may?

20        THE COURT:  Go ahead.

21   BY MR. DALY:

22   Q.  How many years have you been dealing drugs?

23   A.  Six.

24   Q.  Six years of dealing marijuana?

25   A.  Yes.

1   Q.  Right?  You have to answer yes or no.

2   A.  I said yes.

3   Q.  Meth?

4   A.  Yes.

5   Q.  What other drugs?

6   A.  Cocaine.

7   Q.  Cocaine.  And has the Government, meaning the Federal

8   Government, avoided you being charged with dealing drugs for

9   six years, based on your agreement to testify here in court?

10  A.  No.  They never caught me.

11  Q.  Have you been charged with any of the six years of dealing

12  in that sense?

13  A.  I've never been arrested for that, no.

14  Q.  Okay.  Did you tell the Government that you had been

15  dealing drugs for six years?

16  A.  The question was never asked.

17  Q.  Did you tell them -- I didn't ask you if they asked.  I

18  asked you, did you tell them.

19  A.  No.

20  Q.  You mean they don't know that you've been dealing drugs for

21  six years?

22  A.  I don't know what they know.

23  Q.  Did you tell Mr. Fleming in the interviews that you had

24  been dealing drugs?

25  A.  Yes.

1   Q.  Did you tell him that you had been dealing meth?

2   A.  I don't recall.

3   Q.  Why don't you recall whether or not you told him he was

4   dealing in meth --

5   A.  I --

6   Q.  -- you were dealing in meth?

7   A.  I've had numerous interviews with Agent Fleming.

8   Q.  Are you saying that during all of the times that you spoke

9   with Mr. Fleming, you cannot now, here before this jury, recall

10  telling him that you dealt in meth?

11  A.  No, I can't recall.

12  Q.  How about cocaine?

13  A.  Can't recall.

14  Q.  How about marijuana?

15  A.  Maybe.

16  Q.  That all -- except marijuana, you think all of that now

17  escapes your memory somehow?

18  A.  It's been a long time.

19  Q.  Do you remember Mr. Straus -- you know who Mr. Straus is?

20  A.  Yes.

21  Q.  The gentleman sitting right here?

22  A.  Yes, sir.

23  Q.  Do you remember him asking you about firearms and the

24  Devils Diciples?

25  A.  Yes.

1    Q.  And he asked you whether or not there was a policy about

2    carrying weapons; do you remember that yesterday?

3    A.  Yes, I do.

4    Q.  Do you recall saying that there was no policy about whether

5    or not members should or should not carry weapons, correct?

6    A.  I don't believe that's the way it was worded.

7    Q.  On November 13th, 2014, were you asked this question and

8    did you give this answer:  Question --

9              MR. STRAUS:  Page number?

10             MR. DALY:  143, I'm sorry, line 24.

11   BY MR. SATAWA:

12   Q.  "Question:  Okay.  Let's talk about that.  What was the

13   policy, if any, in the Devils Diciples about firearms?

14             And you said, answer:  "A caliber of .38 or better."

15             Do you remember saying that?

16   A.  Yes, I do.

17   Q.  And then on page 145, you were asked, line 2:

18             "Question:  How many pistols did you carry?

19             Answer:  Up to four."

20             Is that what you said?

21   A.  Yes, sir.

22   Q.  And then the next question:

23             "And was there a policy about carrying them?  Against

24   carrying them?"

25             And your answer was:  "No."

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

```
 1              Do you remember saying that?
 2   A.  Yes, I do.
 3   Q.  Did you say that under oath?
 4   A.  Yes, I did.
 5   Q.  Was it true then?
 6   A.  Yes, sir.
 7   Q.  Is it still true today?
 8   A.  Yes, sir.
 9   Q.  Okay.  So there was no policy about Devils Diciples
10   carrying weapons one way or the other, correct?
11   A.  (No response.)
12   Q.  Correct?
13   A.  I don't understand the question.  That's, that's not what
14   was -- there wasn't a policy, no, as far as --
15   Q.  There was no policy, correct?
16   A.  I don't call it a policy.
17   Q.  Right.  Now, Mr. McFadden, you said that you were initially
18   a member of the Port Huron chapter; is that correct?
19   A.  Yes, sir.
20   Q.  And at some point, you met members of the west side
21   chapter?
22   A.  Yes, sir.
23   Q.  You liked the people on the west side chapter?
24   A.  Yes, sir.
25   Q.  For the most part, correct?
```

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

1   A.  Yes, sir.

2   Q.  You considered them to be, to use your own terms, "solid

3   brothers."

4   A.  Yes, sir.

5   Q.  Correct?

6        These were people that were good guys?

7   A.  Yes, sir.

8   Q.  That you could count on?

9   A.  Yes, sir.

10  Q.  That watch your back?

11  A.  Yes, sir.

12  Q.  That you can trust?

13  A.  Yes, sir.

14  Q.  No BS?

15  A.  No BS.

16  Q.  And that included Scotty Z?

17  A.  Correct.

18  Q.  You said that Scotty Z was a good guy?

19  A.  Yes, sir.

20  Q.  Somebody you could count on?

21  A.  Yes, sir.

22  Q.  And because of that, you wanted to be part of the west side

23  chapter?

24  A.  Him and others.

25  Q.  Not just Scotty Z but other members, too?

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

1   A.  Correct.

2   Q.  And you communicated that to members of the west side

3   chapter?

4   A.  Yes, I did.

5   Q.  Including Billy Wadd?

6   A.  Yes, sir.

7   Q.  Stevo?

8   A.  Yes, sir.

9   Q.  Spike?

10  A.  Yes, sir.

11  Q.  Okay.  Even though you were a wannabe, that didn't happen,

12  right?

13  A.  A what?

14  Q.  A wannabe.  I "wannabe" part of the west side chapter.

15  A.  I don't call it being a wannabe.

16  Q.  You wouldn't?

17  A.  No.  I call it --

18  Q.  Did you want to be a west side chapter?

19  A.  I wanted to transfer a chapter.

20  Q.  You call it a transfer, right?

21  A.  Correct.

22  Q.  But that didn't happen, right?

23  A.  No.  Not at that time.

24  Q.  Okay.  Now, you became familiar with the west side chapter

25  because you would go to the Copa Lounge, excuse me, right?

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

1   A.  Yes, sir.

2   Q.  And it was at the Copa Lounge that you met members of the

3   west side chapter?

4   A.  No, sir.

5   Q.  No?  There were no members at the Copa Lounge?

6   A.  It's not how I met -- that's not how I met the members of

7   the west side chapter.

8   Q.  You met them before that?

9   A.  Correct.

10  Q.  One of the places that you met members of the west side

11  chapter was at the Copa Lounge, correct?

12  A.  Correct.

13  Q.  Including Scotty Z?

14  A.  Correct.

15  Q.  And you would see him there on occasion?

16  A.  Yes, sir.

17  Q.  And when you saw him there, you said that he would provide

18  security?

19  A.  Correct.

20  Q.  Okay.  And security to you meant that Scotty Z would sort

21  of protect the perimeter?

22  A.  Correct.  He kept an eye out.

23  Q.  Okay.  And that was important to people who were inside the

24  club, right?

25  A.  Pardon me?

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

1    Q.  That was important?

2    A.  Yes.

3    Q.  That would allow the people inside the club to drink,

4    party, have fun, and feel safe?

5    A.  Yes.

6    Q.  From outside interference?

7    A.  Yes.

8    Q.  Okay.  Now, you were never really, really close to Scotty

9    Z, were you?

10   A.  No, sir.

11   Q.  You knew who he was?

12   A.  Yes, sir.

13   Q.  Considered him to be a good guy?

14   A.  Yes, sir.

15   Q.  And then you told the jury, when Mr. Straus was questioning

16   you, about a trial that Scotty Z was involved in, correct?

17   A.  Yes, sir.

18   Q.  Now, in that trial, at that time, you knew that Scotty Z

19   was in jail, right?

20   A.  Yes, sir.

21   Q.  And did you go to see Scotty Z while he was in jail, while

22   this case was pending?

23   A.  No, sir.

24   Q.  Did you write him?

25   A.  Yes, sir.

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

1   Q.  Okay.  Did you talk to him on the phone?

2   A.  No, sir.

3   Q.  Okay.  Did Scotty Z ever say to you, I want you to come to

4   my trial?

5   A.  No, sir.

6   Q.  All right.  So the decision for you to go to his trial was

7   for you to support Scotty Z in the trial?

8   A.  Repeat that?

9   Q.  You wanted to support Scotty Z?

10  A.  Yes, I did.

11  Q.  Okay.  And that was your decision, correct?

12  A.  No, sir.

13  Q.  You mean somebody put a gun to your head and said go to

14  trial and --

15  A.  No.

16  Q.  No.  You did that unwillingly.  You went to the trial

17  because you were forced to go to the trial?

18  A.  Not forced to go to trial.

19  Q.  Did you do it because you wanted to?

20  A.  I did it because we were told to.

21  Q.  Okay.  And who else was told to go to the trial?

22  A.  Numerous members.  There was different members for

23  different days.

24  Q.  I'm asking for a name, please.

25  A.  Fast Eddie.

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

1   Q.  Fast Eddie.  Did he go to the trial?

2   A.  Yes.

3   Q.  Who else?

4   A.  Iron Mike.

5   Q.  Iron Mike.  Who else?

6   A.  Rockin' Ronnie.

7   Q.  Who else?

8   A.  Me.

9   Q.  You?  Who else?

10  A.  Cookie.

11  Q.  Who else?

12  A.  Stevo.

13  Q.  Who else?

14  A.  You got me there, because it changed.  Sometimes I didn't

15  make every single appointment for the court, but I was there

16  for a bunch of them.  So there could have been others guys.

17  Q.  When was it that you went to the trial?

18  A.  (No response.)

19  Q.  What was the date?

20  A.  I don't have a clue.

21  Q.  You have no clue.  What month?

22  A.  It's been a long time.

23  Q.  Excuse me?

24  A.  It's been a long time ago.

25  Q.  I understand.  What month was it?

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

1   A.  I don't remember.

2   Q.  What day was it?

3   A.  I don't remember.

4   Q.  What year was it?

5   A.  I don't remember.

6   Q.  What judge was it?

7   A.  I don't remember.

8   Q.  Male or female judge?

9   A.  Male.  I believe.

10  Q.  A male judge?

11  A.  I believe.

12  Q.  You don't know.

13  A.  No, I don't remember.  It's been, it's been ten years.

14  Q.  Black or white?

15  A.  Don't care.

16  Q.  I didn't ask you if you cared.

17  A.  I don't know.

18  Q.  You don't know.

19      What about the prosecutor?  Male or female?

20  A.  I don't remember.

21  Q.  Black or white?

22  A.  I don't remember.

23  Q.  What about the defense lawyers?

24  A.  I don't remember.

25  Q.  Black or white?

1   A.  Don't remember.

2   Q.  Where did you sit?

3   A.  In a chair.

4   Q.  In a chair?

5       They have chairs for people in the audience?

6   A.  Sure.

7   Q.  No kidding.  Not benches?

8   A.  I sat down on a sitting device.  How does that sound?

9   Q.  A sitting device?

10  A.  Yes.

11  Q.  That you can't even remember if it was a chair or a bench.

12  You mean they gave you a special chair because you're so

13  important?

14      THE COURT:  You know, Mr. Daly, I think that that

15  verges over the line into argument --

16      MR. DALY:  Thank you.

17      THE COURT:  -- and characterization.

18  BY MR. DALY:

19  Q.  Where did you sit in the chair?

20  A.  To where I can see the witness.

21  Q.  Well, that doesn't help us.  Were you in the first row?

22  Second row?  Third row?

23  A.  I don't recall.

24  Q.  You don't remember?  How many people were there?

25  A.  Didn't count.

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

1   Q.  I'm sorry?

2   A.  I didn't count.

3   Q.  More than 20?  Less than 20?

4   A.  Like I said, I didn't count.

5   Q.  I didn't ask you if you were counting.  I'm asking --

6   A.  You asked me a number.

7   Q.  I asked -- excuse me.  One person at a time.

8           Can you give us an approximation?

9   A.  No.

10  Q.  More than ten?  Less than ten?

11  A.  I didn't count.

12  Q.  More than 20?  Less than 20?

13  A.  I didn't count.

14  Q.  Were you the only person there?

15  A.  No.

16  Q.  Are you sure you were there?

17  A.  I'm positive I was there.

18  Q.  Were you using drugs at the time?

19  A.  No.

20  Q.  Oh, this is one of your periods of abstinence?

21  A.  Yes, sir.

22  Q.  Were you drinking?

23  A.  No, sir.

24  Q.  No drugs, no alcohol, we don't know when, and you show up

25  in court, right?

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY                    139

1    A.  Yes, sir.

2    Q.  What floor did you go to?

3    A.  I don't remember.

4    Q.  Did you know even what building you were in?

5    A.  I was in the courthouse.

6    Q.  Well, there's a lot of courthouses in the state of

7    Michigan.

8    A.  Yes.  Do you know where all of them are?

9    Q.  I do.  Do you?

10   A.  No, because I don't frequent them.

11   Q.  Because you weren't there?

12            MR. STRAUS:  Judge, I think this is argumentative.

13            THE COURT:  I agree.

14            MR. STRAUS:  I think the volume is kind of loud, too.

15            MR. DALY:  Thank you.

16            THE COURT:  That may be more a matter of personal --

17            MR. DALY:  Preference.

18            THE COURT:  -- style.

19            MR. DALY:  Yes.  Thank you.

20   BY MR. DALY:

21   Q.  Were there police officers in the courtroom?

22   A.  Bailiffs, I guess you call them.

23   Q.  How many?

24   A.  Don't recall.

25   Q.  Cameras in the courtroom?

1   A.  Don't recall.

2   Q.  Were they keeping an eye on you?

3   A.  To my knowledge, no.

4   Q.  None of them came up and said to you, "Quit doing what

5   you're doing"?

6   A.  No.

7   Q.  Are you sure you were there?

8   A.  I'm positive I was there.

9   Q.  The person that you mentioned who was a witness was a

10  witness by the name of Monkey?

11  A.  Correct.

12  Q.  Did you know him before you came to court?

13  A.  No, sir.

14  Q.  Never seen him before?

15  A.  No, sir.

16  Q.  Didn't know he was a member of the Devils Diciples?

17  A.  I knew he was a member.

18  Q.  Did you know what chapter he was a member of?

19  A.  Wasn't.

20  Q.  I'm sorry?

21  A.  I wasn't aware of which member.  I thought it was the west

22  side, as far as I knew.

23  Q.  Monkey was a member, as far as you knew, of the west side

24  chapter?

25  A.  Correct.

2:11-cr-20129-RHC-MAR  Doc # 1098  Filed 11/16/14  Pg 141 of 220  Pg ID 9022
JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - CROSS BY MR. DALY

141

1    Q.  Never met him before?

2    A.  No.

3    Q.  And you were there to give him the, the stare, right?

4    A.  Yes.

5    Q.  Did you say anything to him?

6    A.  No, sir.

7    Q.  Did he say anything to you?

8    A.  No, sir.

9    Q.  Nothing happened, right?

10   A.  No, sir.

11   Q.  In all of the times that you were interviewed by the FBI,

12   you never mentioned this incident about being in court to them;

13   isn't that right?

14   A.  I don't recall.

15   Q.  Yeah, you don't recall.

16       Actually, the first time you ever said anything about

17   Scotty Z was when you spoke to the government lawyers, right?

18   Recently?

19   A.  (No response.)

20   Q.  Like in the last few days?

21   A.  No.

22   Q.  No?

23   A.  I'm not sure.

24   Q.  You don't know?

25   A.  I'm not sure I said.  I didn't say I didn't know.  I said

1    I'm not sure.

2    Q.  I'm sorry?

3    A.  I said I'm not sure.

4    Q.  You didn't say anything about it in front of the grand

5    jury, did you?

6    A.  It wasn't brought up.

7    Q.  They didn't ask you about it and you didn't offer it,

8    right?

9    A.  Correct.  The grand jury, I didn't need to bring that up.

10   Q.  Now, we know that back in February of 2006, that you were

11   in front of Judge Zatkoff and you testified.  We know about

12   that, right?

13   A.  Correct.

14   Q.  And we know that you lied under oath, correct?

15   A.  Correct.

16   Q.  And we also know that after you testified, that there was

17   contact with Ms. Castano, correct?

18   A.  Yes.

19   Q.  And she asked you to testify again.  We know about that.

20   A.  Correct.

21   Q.  Okay.  In that respect, do you agree to testify again if

22   you receive certain financial benefit, right?

23   A.  I didn't agree to it.

24   Q.  Yes.  What you said is, if you give me certain things of

25   financial benefit, I will testify?

 1   A.  No.

 2   Q.  She's --

 3   A.  No.

 4   Q.  No?

 5   A.  I said it's going to cost.

 6   Q.  Okay.

 7   A.  There was no saying I would do it.  I said it's going to

 8   cost $15,000 and a new motorcycle.

 9   Q.  So you put the demand on the table, $15,000, new

10   motorcycle, and I will come to court and lie under oath again?

11   A.  No, sir.  I did not say that sentence whatsoever.

12   Q.  Okay.  Something close to that?

13   A.  No, sir.  I did not say -- I didn't agree, I didn't say I

14   would.  I said it was going to cost $15,000 and another

15   motorcycle.

16   Q.  So for $15,000 and another motorcycle, you would lie under

17   oath again, correct?

18   A.  I was being facetious.  I wasn't coming back up there

19   again.

20   Q.  Is that what you said?

21   A.  No.  I did not say I would come up and testify again.  That

22   never came out of my mouth.

23   Q.  Okay.  You were being facetious --

24   A.  Yeah.

25   Q.  -- meaning you were just making -- I'm sorry.  One person

1    at a time.

2            Being facetious means you were just, like, making it

3    up?

4    A.   No.

5    Q.   The government lawyers and the government agents know that

6    you have committed perjury, correct?

7    A.   Correct.

8    Q.   And have you ever been charged with perjury?

9    A.   No.

10   Q.   But they've called you as a witness here, correct?

11   A.   Correct.

12   Q.   Would you agree that the stakes for you here are higher

13   than when you testified in Mr. Castano's trial?

14   A.   Meaning?

15   Q.   Meaning that when you testified in Castano's trial, it was

16   for financial gain, but here, it's for your personal freedom,

17   correct?

18   A.   Let me say one thing.

19   Q.   No.  Please answer that question.

20   A.   I can't answer that without saying one thing.

21   Q.   That question was posed to you as a yes or no.  And if you

22   can't answer that, I'll ask it in a different way.

23   A.   That would be better.

24   Q.   In the Castano trial, you lied under oath for financial

25   gain; you've agreed to that.

1   A.  Correct.

2   Q.  Correct?

3           Here, you're testifying for a different reason, which

4   has to do with your personal freedom, that is, to stay out of

5   prison, correct?

6   A.  Correct.

7   Q.  Right.  Your personal freedom in staying out of prison is

8   more important than money, correct?

9   A.  Correct.

10  Q.  And if you had a choice between lying and going to prison,

11  what would you choose?

12  A.  I would tell the truth.

13  Q.  Oh, you would tell the truth rather than going to prison.

14  That's what you're telling the jury, right?

15  A.  Yeah.  I'm not -- I'm not going to sit here and lie to try

16  and not go to prison.

17          THE COURT:  Any other cross-examination?  Mr. Daly is

18  obviously concluded.  Anything else that is new?

19                      CROSS-EXAMINATION

20  BY MR. KRAIZMAN:

21  Q.  Mr. McFadden, I just have a few questions.

22  A.  Yes, sir.

23  Q.  In an effort to persuade Stella Herron to testify and lie

24  at the Victor Castano trial, did you head-butt her and say,

25  "You will do that"?

1   A.  No, sir.

2   Q.  Did you head-butt her at that time?

3   A.  No, sir.

4          MR. KRAIZMAN:  I have no further questions.

5          THE COURT:  Any redirect examination?

6          MR. STRAUS:  Yes, your Honor.

7                    REDIRECT EXAMINATION

8   BY MR. STRAUS:

9   Q.  Good morning, Mr. McFadden.

10  A.  Good morning.

11  Q.  Mr. McFadden, when you were under cross-examination, you

12  were asked a series of questions about your cooperation

13  agreement, correct?

14  A.  Correct.

15  Q.  And you were asked about whether or not you had the ability

16  to speak to defense counsel, or defendants even, under your

17  cooperation agreement, correct?

18  A.  Pardon me?  I didn't catch that the right way.

19  Q.  You were asked a series of questions about whether or not

20  you can talk to defendants or their attorneys without the

21  permission of the Government.

22  A.  Correct.

23  Q.  And is it your understanding that you can testify -- you

24  can speak to defendants or defendants without the permission of

25  the Government, correct?

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - REDIRECT BY MR. STRAUS

1   A.  Correct.

2   Q.  And isn't it also true that in your cooperation agreement,

3   it says specifically, after the language cited by Mr. Satawa,

4   "Defendant is not prevented in any way from providing truthful

5   information helpful to the defense of any person"?

6           Do you remember that?

7   A.  Correct.

8   Q.  Sir, I'm going to show you what I've premarked as proposed

9   Government's Exhibit 65-44.

10          MR. STRAUS:  Judge, I've approached the witness.

11  BY MR. STRAUS:

12  Q.  Ask you to take a look at the last page.

13  A.  This page, last page on this?

14  Q.  Yes.

15          MR. SATAWA:  Your Honor, do we get to know what it is?

16          THE COURT:  In due course.  I don't know what the

17  purpose is at the moment, but you may continue.

18  BY MR. STRAUS:

19  Q.  Do you see your signature on the back page of that

20  document?

21  A.  Yes, sir, I do.

22  Q.  And do you -- and if you look at page -- do you recognize

23  that document?

24  A.  Yes, sir.

25  Q.  Is that a document you signed?

1  A.  Yes, sir.

2  Q.  Is there a whole bunch of other signatures on that

3  document?

4  A.  Yes, sir.

5  Q.  Directing your attention to the beginning of that document,

6  do you recognize the title of that document?

7  A.  Cooperation Agreement.

8  Q.  Cooperation Agreement.

9  A.  Yes, sir.

10  Q.  And is that your cooperation agreement?

11  A.  (No response.)

12  Q.  Are you the defendant on the front page of that?

13  A.  Yes, sir.

14          MR. STRAUS:  Your Honor, at this time the Government

15  would move into evidence 65-44.

16          MR. DALY:  May we see that, please?

17          MR. SABBOTA:  May we see that for a minute, please?

18          THE COURT:  You don't have it?

19          MR. DALY:  We don't have it in our possession right

20  now.

21          THE COURT:  You can see it.

22          MR. STRAUS:  They have been provided this document,

23  your Honor.

24          THE COURT:  Earlier?

25          MR. STRAUS:  Yes, your Honor.

 1             THE COURT:  But not today.

 2             MR. SABBOTA:  Not today.

 3             MR. DALY:  Not today.

 4        (Brief pause.)

 5             THE COURT:  Any basis for an objection --

 6             MR. DALY:  Yes.

 7             THE COURT:  -- thus far?

 8             MR. DALY:  Yes.

 9             MR. SATAWA:  Your Honor, on behalf of Mr. Vandiver, I

10   would have no problem with the admission of any of the

11   cooperation agreements, with certain portions redacted that

12   have been the subject of other side bars and issues talked and

13   spoken about outside the presence of the jury.  As to the

14   document itself, I have no objection.

15             THE COURT:  If it's, if it's generic, there should not

16   be any difficulty.

17             MS. STOUT:  I have --

18             THE COURT:  I don't know if it is or not.

19             MS. STOUT:  I don't have an objection to any document,

20   the form document.  But I have an objection to the misleading

21   nature of this.  And this would be something I have to say at

22   side bar or when, when everyone is done.  So I'd ask that the

23   Court reserve the ruling because of the misleading nature.

24             THE COURT:  Well, I -- it's either, it's either the

25   document purported as such or it's not.  It's either the signed

1  cooperation agreement or it's something else, it seems to me.

2  If it is, then it's, it's certainly been, it's certainly been

3  explored extensively on cross-examination.

4      MS. STOUT:  It may lead to a collateral matter, your

5  Honor, where I need to recall a witness to explain what

6  happened with that particular witness.  And I don't know that

7  we want to turn this into a collateral matter, but I think it

8  would have to.

9      MR. STRAUS:  It strikes the Government, the

10  Government, your Honor, this is somewhat *Giglio*.  It has been

11  explored extensively.  It has been read into the -- it has been

12  --

13      THE COURT:  Portions of it.

14      MR. STRAUS:  You're correct.

15      THE COURT:  I'm pretty strongly inclined to receive

16  it, but I'll reserve the ruling unless you need to use the

17  document or some portion of it, which you can do irrespective

18  of admitting it, it seems to me.  So perhaps there's more to be

19  said before I make a final determination.

20      MR. DALY:  Yes, please.

21      MR. SABBOTA:  Yes.  We ask that you reserve, your

22  Honor, please.

23      THE COURT:  I'll reserve.  Do you want to proceed with

24  further questions on the document or on other matters?

25      MR. STRAUS:  No, your Honor.

1       THE COURT:  All right.

2       MR. STRAUS:  So the Government Exhibit 65-44 is not

3  received into evidence.

4       THE COURT:  It's been offered and it's pending,

5  pending review.

6       MR. STRAUS:  All right.

7  BY MR. STRAUS:

8  Q.  Mr. McFadden, you were asked a series of questions, you

9  were asked a series of questions about crimes you had

10  committed, of being a liar, perjurer, a thief, correct?

11  A.  Yes, sir.

12  Q.  And when you admitted that you had been a liar in the past,

13  were you a proud member of the Devils Diciples at the time you

14  lied under oath?

15  A.  When I, when I -- yes, I was.

16  Q.  Okay.  And when you committed perjury in front of Judge

17  Zatkoff, were you a proud patched member of the Devils Diciples

18  at that time?

19  A.  Yes, I was.

20       MS. STOUT:  Objection to "proud member."  We don't

21  need that adjective.

22       THE COURT:  I think the question can be broken down

23  about membership and pride, I suppose.

24       MR. STRAUS:  Your Honor, I'll lay a foundation.

25  BY MR. STRAUS:

1    Q.  During the time you were a member of the Port Huron

2    chapter, and the Anniston chapter, for lack of a better term,

3    were you really being into a Devils Diciple?

4    A.  Yes, I was.

5    Q.  Any doubts over that period of time?

6    A.  No, sir.

7    Q.  Fairly loyal supporter of the Devils Diciples?

8    A.  Very loyal.

9    Q.  Your brothers?

10   A.  My brothers were my brothers.

11   Q.  And so when you, so when you were asked about being a liar,

12   the times you lied, that was when you were a supporting, proud

13   member of the Devils Diciples?

14   A.  Yes, I was.

15   Q.  And when you were a thief, you were a proud, supporting

16   member of the Devils Diciples?

17   A.  Yes, I was.

18   Q.  And when you committed these acts of thievery, you were

19   supported by other proud supporting members of the Devils

20   Diciples?

21   A.  Yes, I was.

22   Q.  And when you sold, at times when you sold drugs, not at all

23   times, you were a proud supporting member of the Devils

24   Diciples?

25   A.  Yes, I was.

1  Q.  And when you purchased drugs from other proud supporting

2  members of the Devils Diciples, they were proud members of the

3  Devils Diciples?

4  A.  Yes, yes, sir, they were.

5  Q.  And when you carried four firearms, you were a proud member

6  of the Devils Diciples at the time?

7  A.  Yes, I was.

8  Q.  Now, you were also asked about methamphetamines that

9  were -- at the time you got into your motorcycle accident,

10  correct?

11  A.  Yes.

12  Q.  You don't dispute the fact that you were selling

13  methamphetamines at that point in time, were you?

14  A.  No.

15  Q.  And you also testified under cross-examination that at

16  least Rockin' Ronnie and Gun Control, when they came down as

17  part of that goon squad, to use your term, they were nice to

18  you?

19  A.  Sure.

20  Q.  Did that evolve over time?

21  A.  Yes.

22  Q.  And you think -- do you believe in hindsight this niceness

23  at first was some kind of lure to get you to somewhere else?

24  A.  Yes, sir, I do.

25        MR. SATAWA:  Objection.  Leading.

2:11-cr-20129-RHC-MAR  Doc # 1098  Filed 11/16/14  Pg 154 of 220  Pg ID 9035
JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - REDIRECT BY MR. STRAUS

154

```
 1                  THE COURT:  Sustained.
 2   BY MR. STRAUS:
 3   Q.  You were also asked about Slo and the theft from his
 4   motorcycle shop, correct?
 5   A.  Yes, sir.
 6   Q.  Do you know whether or not that -- do you have any
 7   information whether or not that was an insurance job or not an
 8   insurance job?
 9   A.  I was told it was an insurance job.
10   Q.  You never verified whether it was or not?
11   A.  That was never verified, no.
12   Q.  By the way, before coming here today, did you review your
13   prior grand jury testimony?  Did you ever read any transcripts?
14   A.  No, I haven't.
15   Q.  Did you ever read any of your prior testimony from the
16   trial, way back when?
17   A.  I, I skimmed through it.
18   Q.  All right.  When was that?
19   A.  When I had -- when I came forward and admitted I lied.
20   Q.  Oh, when you testified in the grand jury?
21   A.  I have, I have some of the documents downloaded on my
22   computer.  I've skimmed through them.
23   Q.  All right.  Now, when you were asked a series of questions
24   about Gun Control, and whether or not he had been convicted of
25   any gun crimes.  You -- you're not familiar with whether or not
```

JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - REDIRECT BY MR. STRAUS

1   he even has a criminal history or whether he has a criminal

2   history?

3   A.  Right.

4   Q.  Do you?

5   A.  Right.

6   Q.  You don't know anything about whether or not he's been

7   convicted of any crimes, correct?

8   A.  No, I don't.

9   Q.  One way or the other?

10  A.  Right.

11  Q.  You were also asked a series of questions about these

12  Charlie Brown benefits.

13  A.  Mh-hm.

14  Q.  Are you a diabetic?

15  A.  Yes, sir, I am.

16  Q.  Now, you also, you also hesitated when one of the attorneys

17  asked you a question about these, these runs benefitting

18  everyone.

19  A.  Yes.

20  Q.  And you responded, "Okay."

21        Is that an actual -- is that factually totally

22  accurate, that everyone -- or is there some explanation to that

23  answer?

24  A.  Yes.  You don't do nothing for nothing.

25  Q.  And who are you talking about?  Who doesn't do nothing for

1  nothing?

2  A.  Do you come to work and not make money?

3  Q.  Okay.  Are you talking about other people than the intended

4  beneficiaries of these runs?

5  A.  Correct.

6  Q.  And can you name who those other people are who would be

7  benefitted by these runs?

8  A.  Fat Dog.

9  Q.  Anyone else?

10  A.  Treasurer of the chapter that puts it on.  The chapter

11  itself could be beneficial.

12  Q.  You also testified on cross-examination about being

13  directed or told by Fat Dog to take care of Billy Wadd?

14  A.  Yes, sir.

15  Q.  And I believe you testified that you believe that you had

16  to carry that out?

17  A.  Yes, I did.

18  Q.  But you didn't?

19  A.  Correct.

20  Q.  Do you believe that you could have outright refused Fat

21  Dog's directive to you to take out Billy Wadd?

22  A.  No.

23  Q.  But you just pretended to carry it out?

24  A.  Correct.

25  Q.  Now, you were also -- there was some testimony on

1    cross-examination about prospects.  Prospects, do prospects --

2    they basically have to do whatever they are ordered to do?

3    A.  Correct.

4    Q.  Do they have the ability, if they are a prospect, to say,

5    hey, wait a minute, chapter president, patched member, this

6    isn't in the bylaws.  I'm not supposed to do this?  Do they

7    have that ability to independently --

8    A.  Not quite like that.

9    Q.  All right.  Are they basically directed to do whatever they

10   are told to do?

11   A.  Yes.

12   Q.  And if a prospect was told to hit someone, including a club

13   brother, would they have to carry that out or could they --

14   A.  That's not, that's not happening.

15   Q.  Now, you were also asked a series of questions about didn't

16   you agree to a black eye.  And I believe your testimony was no?

17   A.  No one agrees to a black eye.

18   Q.  Now, but you took the punches, right?

19   A.  Correct.

20   Q.  If you refused to take the punches, what would have

21   happened?

22   A.  I don't know.

23   Q.  Okay.  Would they have just said okay, fine, no problem, or

24   do you think there would have been something else?

25   A.  There would have been more.

 1            MR. DALY:  Objection.  He said he didn't know.

 2            THE COURT:  Overruled.

 3            THE WITNESS:  Ask that question again, please.

 4   BY MR. STRAUS:

 5   Q.  What was your -- you, you testified on cross-examination

 6   that you felt you had to take the punches?

 7   A.  Correct.

 8   Q.  You didn't agree?

 9   A.  Correct.

10   Q.  Why do you believe you had to take the punches?

11   A.  There's a chain of command.  The boss says it has to

12   happen, it has to happen.

13   Q.  And if it doesn't happen?

14   A.  If it doesn't happen properly.

15   Q.  Then what's going to happen?

16   A.  The person that was supposed to give the black eye is

17   getting one.

18   Q.  Okay.  What would happen to the person that was supposed to

19   get the black eye if they refused or ran away?

20   A.  Running away, I don't know.  I never tried to run away.

21   Q.  You were also asked about Scotty Z being a no BS kind of

22   guy?

23   A.  Yeah.

24   Q.  Would he have your back if you got in trouble?

25   A.  Yes, he would.

1  Q.  And would he have your back to the extent, if you got in

2  serious trouble, that he would carry out acts of violence on

3  your behalf?

4        MR. KRAIZMAN:  I'm going to object.  It's speculative.

5  He's asking for what somebody else might do.

6        THE COURT:  Well, it's derived from the impressions

7  that were asked in direct -- in cross-examination.  It's not

8  objectionable.  You can re-cast the question, Mr. Straus.

9        MR. STRAUS:  Re-cast the question.

10  BY MR. STRAUS:

11  Q.  When you say that someone would cover your back, a no BS

12  kind of guy, would that -- is there really any limit to what a

13  person in covering your back would do to protect another

14  member?

15        MR. SABBOTA:  Objection, your Honor.

16        MR. KRAIZMAN:  Objection.  Speculative.

17        THE COURT:  Again, it's asking -- it's derived from

18  questions asked on cross-examination about the characteristics

19  of this individual and others about having your back and

20  supporting and so forth.  I overrule the objection.

21  BY MR. STRAUS:

22  Q.  Someone who is a supportive, no BS kind of guy, would they

23  commit crimes and acts of violence if they had your back?

24        MR. KRAIZMAN:  I'm going to object.  It's speculative.

25        THE COURT:  Yes.

 1              MR. KRAIZMAN:  This was originally brought out on

 2   direct examination.

 3              MR. STRAUS:  Well, that's not exactly --

 4              THE COURT:  Overruled.  Overruled.

 5   BY MR. STRAUS:

 6   Q.  You may answer.

 7   A.  Can you ask that question again?  I have not heard the

 8   whole sentence yet.

 9   Q.  Let me take another crack at it.

10              Mr. McFadden, you had -- there was a series of

11   questions on cross-examination about the qualities of certain

12   members of the west side chapter, correct?

13   A.  Correct.  Correct.

14   Q.  And in particular, there was a series of questions about

15   essentially Scotty Z being a stand-up kind of guy, a no BS kind

16   of guy.  I don't remember the particular language.  Do you

17   remember that?

18   A.  Correct.

19   Q.  That was the thrust of the questioning, correct?

20   A.  Correct.

21   Q.  And as a no BS kind of guy, in a situation, a dangerous

22   situation, where you would need someone, you, Keith McFadden

23   would need someone to have your back, are you telling -- is it,

24   is it your testimony that someone in that position, as you've

25   described in having your back, would be willing to commit acts

1   of violence or crimes to carry that out and protect you?

2   A.  If it needed to be done, yes.

3   Q.  All right.  Now, in terms of security -- you were asked

4   questions about people providing security.

5           Within the club, are there -- does everybody provide

6   security at various events or are there certain select folks

7   that provide security?

8   A.  If it's a chapter event, certain chapters event, that

9   chapter has a security meeting with the other chapter fellers

10  that are coming, warlords, this, that and the other, sergeant

11  at arms, whatever you want to call it.

12          They have a meeting with the national warlord, the

13  chapter warlords, and the chapters that came in to the party.

14  Q.  All right.  And in terms of the selection of security

15  personnel, are there people that are members that are better

16  suited to security and members that are less suited to

17  security?

18  A.  In certain aspects, yes.

19  Q.  Okay.  What kinds of aspects?

20          MR. DALY:  That's all beyond cross.  I would object.

21          THE COURT:  How does this tie to cross?

22          MR. STRAUS:  Mr. Daly asked a series of questions

23  about Scotty Z, Mr. Sutherland, relating to security.  And this

24  amplifies that cross-examination.

25          MR. DALY:  Those questions were initially asked by Mr.

1   Straus about Scotty Z and security.  That's where that came

2   from.  It came from the Government.

3              THE COURT:  Well, that doesn't mean that it wasn't

4   raised as well in cross-examination.  It is properly a part of

5   redirect.

6              Overruled.  Go ahead.

7   BY MR. STRAUS:

8   Q.  What kinds of aspects?  Are some people better suited, some

9   people less?

10  A.  Yeah.  Some people are more attentive to things.  Some

11  people are more aware of their surroundings.

12  Q.  All right.

13  A.  Some people are more diligent.

14  Q.  When you were at Scotty Z's trial, did you -- were you

15  there for anything other than just to stare and intimidate?

16  A.  At the same time I wanted to show him my support.

17  Q.  Club brother?

18  A.  Yes.

19  Q.  You were also -- now, let me direct your attention to April

20  of -- it's May of 2009.  There was a series of questions about

21  you contacting Bill Fleming?

22  A.  Correct.

23  Q.  This was after the threats?

24  A.  Correct.

25  Q.  Now, you came to the Federal Government; we didn't come to

1  you, correct?

2  A.  Correct.

3  Q.  And at that time, you told them that you had been

4  threatened?

5  A.  Correct.

6  Q.  And do you recall sitting down at some later date with Bill

7  Fleming?

8  A.  Yes.  But it wasn't for quite some time.

9  Q.  Okay.  And after that quite some time, did he show you --

10  you were asked a series of questions earlier -- strike that.

11       On cross-examination, you were asked a series of

12  questions about whether or not at some time you talked about

13  Scotty Z, correct?

14  A.  Correct.

15  Q.  And at one of your earliest meetings with Bill Fleming, do

16  you remember being shown a whole bunch of pictures?

17  A.  Yes, I do.

18  Q.  And did you go through all those pictures?

19  A.  Yes, I did.

20  Q.  And did you identify for Special Agent Fleming who those

21  individuals were, if you knew who they were?

22  A.  To my best knowledge, yes.

23  Q.  And do you remember whether or not Scotty Z's picture was

24  in that package?

25  A.  No, I don't.

1  Q.  All right.  And after that time -- when you first met with

2  Special Agent Fleming, did he make any promises to you?

3  A.  No, sir.

4  Q.  Did you have any agreement with the Government at that

5  point in time?

6  A.  No, sir.

7  Q.  By the way, did you have an attorney?

8  A.  No, sir.

9  Q.  And did you later meet with prosecutors?

10  A.  Yes, sir.

11  Q.  Were you told that at some point in time you would be

12  prosecuted?

13  A.  Yes, sir.

14  Q.  And in fact, you came in voluntarily and continued to meet

15  with Special Agent Fleming after you were told you would be

16  prosecuted and there were would be no promises, correct?

17  A.  Correct.

18  Q.  And do you remember testifying in 2010 in the grand jury?

19  A.  Yes, sir.

20  Q.  You were asked a whole bunch of questions on

21  cross-examination about your grand jury testimony, correct?

22  A.  Yes, sir.

23  Q.  And did you have an attorney at that time?

24  A.  No, sir.

25  Q.  You just walked in cold?

1    A.  Yes, sir.

2    Q.  And you testified in the grand jury?

3    A.  Yes, sir.

4    Q.  For a couple hours, it looked like?

5    A.  Yes, sir.

6    Q.  Now, Mr. McFadden, you were asked a series of questions

7    about the crime of perjury.  Were you aware that the crime of

8    perjury carries a five-year maximum penalty?

9    A.  Yes, I was.

10   Q.  But you weren't charged with that, correct?

11   A.  No, sir.

12   Q.  And when you were asked a series of questions about the

13   Government not charging you for past conduct that you talked

14   about with them, do you have any idea whether or not the

15   Government even knew about you, before that point in time, in

16   terms of your criminal activities, or at least the whole extent

17   of your criminal activities?

18   A.  No, I don't.

19   Q.  One way or the other?

20   A.  I don't know if they had any information on me.

21           MR. SATAWA:  Objection.  To quote Mr. Straus, based on

22   this investigation, that's misleading, The question and the

23   answer.

24           MR. STRAUS:  Oh, I think there was a question about

25   whether or not -- there was a series of questions about

```
 1   whether -- suggesting that, that the Government didn't -- or

 2   did know about his activities before he came forward.

 3           THE COURT:  There were a number of questions about

 4   that.  To the extent that there's an objection, I overrule.

 5           MR. STRAUS:  Just one moment, your Honor?

 6      (Brief pause.)

 7   BY MR. STRAUS:

 8   Q.  I want to turn now to your discussions with Mrs. Castano,

 9   or your conversation.

10           You were asked a series of questions about the $15,000

11   and the motorcycle.

12   A.  Yes, sir.

13   Q.  Did you realistically believe that you were going to get

14   $15,000 and a motorcycle --

15   A.  No, sir.

16   Q.  -- from Victor Castano?

17   A.  No, sir.

18           MR. STRAUS:  Just one moment.

19      (Brief pause.)

20   BY MR. STRAUS:

21   Q.  Mr. McFadden, let me ask you one more question:

22           Again, you came, you came to the Government; the

23   Government didn't come to you?

24   A.  Correct.

25   Q.  And is it a fact that you were awarded with, that instead
```

 1  of a five-year felony, you received -- you ended up pleading

 2  guilty to a 40-year felony?

 3  A.  Yes, sir, I did.

 4        MR. SATAWA:  Objection.

 5        MR. DALY:  Judge, objection.  That is not correct,

 6  because the Government knows he was dealing in drugs for a long

 7  period of time, and he faced a much longer sentence than five

 8  years in prison for perjury.  And the Government knows that.

 9        THE COURT:  Is it not -- the question is whether he

10  ended up entering a plea of guilty to a 40-year maximum

11  offense.

12        MR. DALY:  No.  He said a five -- I'm sorry.  I

13  thought that Mr. Straus said that there was a five-year penalty

14  that he was facing and that was it.

15        MR. STRAUS:  That's not what --

16        THE COURT:  No.  That's not what the question was.

17        MR. DALY:  Then I need to turn up my hearing aid,

18  Judge.  I'm sorry.  That's what I heard.

19        THE COURT:  Take what steps may be needed.

20      (Laughter in the courtroom.)

21        MR. DALY:  I'm going to take Sid's hearing aid and put

22  it in my ear, Judge.  Thank you.

23        THE COURT:  Okay.

24        MR. STRAUS:  I think the witness has answered.

25        THE COURT:  I think, I think he has answered.

2:11-cr-20129-RHC-MAR   Doc # 1098   Filed 11/16/14   Pg 168 of 220   Pg ID 9049
JURY TRIAL, VOLUME XVIII - 11/14/2014
KEITH MCFADDEN - REDIRECT BY MR. STRAUS

168

```
 1              MR. STRAUS:  Thank you, your Honor.

 2              THE COURT:  Nothing else?

 3              MR. STRAUS:  Nothing else.

 4              THE COURT:  The witness may step down.  Move the

 5    microphone aside, please.

 6         (Witness excused, 12:22 p.m.)

 7              THE COURT:  Let's take a stretch break while the next

 8    witness is prepared, please.

 9         (Recess taken, 12:22 p.m. - 12:25 p.m.)

10              THE COURT:  Let's come back to order.  Do you have

11    your next witness ready?

12              MS. MOHSIN:  Your Honor, we do have the witness.  We

13    have to get the witness because of an administrative issue, but

14    it's only going to be a few minutes.

15              THE COURT:  The witness is on his way?

16              MS. MOHSIN:  Yes.

17              THE COURT:  We'll continue the recess briefly.  I

18    think.

19         (Brief pause.)

20              THE COURT:  Okay.  We're ready with the next witness,

21    I understand.

22              MR. MAIATICO:  Your Honor, the Government calls to the

23    witness stand Stella Herron.

24              THE COURT:  Let's be seated, please.  Let's be seated

25    please.  Mr. Pitts, be seated please.
```

```
 1            MR. PITTS:  Yes.

 2            THE COURT:  Thank you, sir.

 3       (Witness is sworn.)

 4            THE COURT:  Have a seat up here in this chair, ma'am.

 5            MR. MAIATICO:  Your Honor, for the benefit of the

 6  jury, Ms. Herron's testimony is relevant to part 1, Count 1,

 7  the RICO conspiracy; part 2, Count 1, the conspiracy to suborn

 8  perjury and obstruct justice; part 2, Count 2, the subornation

 9  of perjury; and part 2, Count 3, the obstruction of justice.

10            THE COURT:  Proceed.

11                           STELLA HERRON

12     called as a witness at 12:26 p.m., testified as follows:

13                         DIRECT EXAMINATION

14  BY MR. MAIATICO:

15  Q.  Good afternoon.

16  A.  Good afternoon.

17  Q.  Could you state your name and spell your last name for the

18  court reporter, please?

19            THE COURT:  Move your chair way up, please, move that

20  mic.  And bend the microphone towards you.  Do both of those

21  things, please.

22            THE WITNESS:  Is that good?

23            THE COURT:  That should be good.  Thank you.

24  BY MR. MAIATICO:

25  Q.  I'm going to ask you to speak into the microphone and try
```

```
 1   to keep your voice up.  Okay?

 2   A.  Okay.

 3          MR. MAIATICO:  For her?

 4          MR. STRAUS:  Yes.

 5          MR. MAIATICO:  I changed it earlier.  It's fresh.

 6   BY MR. MAIATICO:

 7   Q.  There's fresh water up there for you, too.

 8   A.  Thank you.

 9   Q.  Can you please state your full name and spell your last

10   name for the court reporter, Ms. Herron?

11   A.  My name is Stella Herron, Stella Ann Herron.  H-E-R-R-O-N.

12   Q.  All right.  And do you go by any sort of nicknames?

13   A.  I had.

14   Q.  Okay.  You do you currently go by any nicknames?

15   A.  I do now, because I dance.  Sort of.

16   Q.  All right.  And what -- let's talk about -- we'll get into

17   your nickname in a second, how about that?

18   A.  That's fine.

19   Q.  Let me talk about currently how are you employed?

20   A.  I'm employed by two different jobs.  I clean a bar, and

21   then I work in a gentlemen's club.

22   Q.  And what you do in the gentlemen's club?

23   A.  I'm an adult entertainer.

24   Q.  All right.  And in what state do you currently live?

25   A.  Florida.
```

```
 1    Q.  All right.  I'm going to take you back to the early 2000s.

 2              At that time, did you have a relationship with a

 3    member of the Devils Diciples Motorcycle Club?

 4    A.  I did.

 5    Q.  And who did you have that relationship with?

 6    A.  Keith McFadden.

 7    Q.  Now, during that time period, did you have a nickname that

 8    you went by?

 9    A.  I did.

10    Q.  And what was that nickname?

11    A.  "Starr".

12    Q.  And Mr. McFadden, did he have a nickname?

13    A.  He did.

14    Q.  What did he go by?

15    A.  Gadget.

16    Q.  Now, about what year did you begin dating Mr. McFadden?

17    A.  It's been so long.  I want to say about 2004.

18    Q.  Okay.  And in what state were you living at that time when

19    you began this relationship?

20    A.  Alabama.

21    Q.  Was Mr. McFadden living in Alabama at the time?

22    A.  No.

23    Q.  Where was he living?

24    A.  Michigan.

25    Q.  And how did you meet Mr. McFadden?
```

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1    A.  I met him during a motorcycle club party.

2    Q.  Okay.  Was that motorcycle club party in Alabama?

3    A.  It was.

4    Q.  Okay.  Was the motorcycle club party, was it affiliated

5    with a certain motorcycle club?

6    A.  I really can't answer that question, because there was a

7    lot of people there.

8    Q.  Okay.  For how long were you and Mr. McFadden together?

9    A.  Oh, several years.  Four or five years.

10   Q.  All right.  And so when you first started dating him, was

11   he a member of the Devils Diciples?

12   A.  He was.

13   Q.  Okay.  Did there come a time -- you said he was in

14   Michigan.  Did there come a time when he moved to be closer to

15   you, or to be in Alabama?

16   A.  To be in Alabama.

17   Q.  Okay.  What was the reason, if you know, why he moved to

18   Alabama?

19   A.  I don't know, really.

20   Q.  Okay.  Now, when he moved to Alabama, was he continuing to

21   be a member of the Devils Diciples Motorcycle Club?

22   A.  He was.

23   Q.  Okay.  And was there a time, then, that you and Mr.

24   McFadden began living together?

25   A.  Yes.

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   Q.  And where was that, that you lived?

2   A.  We lived in a camper in the back of a clubhouse in Alabama.

3   Q.  Okay.  How far was this camper from the clubhouse?

4   A.  Probably 20 feet, I'm thinking.  It's not that far, but not

5   that close.

6   Q.  And this was a clubhouse for the Devils Diciples?

7   A.  Yes.

8   Q.  The clubhouse and the camper, were they are all on the same

9   property?

10  A.  Yes.

11  Q.  And you mentioned it's in Alabama.  Where in Alabama was

12  this?

13  A.  Anniston.

14  Q.  Do you know what -- was this the name of the chapter for

15  the Devils Diciples?

16  A.  They lived in a town Anniston, and they would have Anniston

17  Rockers on the bottom rocker.

18  Q.  Okay.  So at this time, or around this time, were you

19  legally married to Mr. McFadden?

20  A.  No.

21  Q.  Did you consider yourself to be husband and wife?

22  A.  Yes.

23  Q.  And at the beginning of this relationship, did you consider

24  it to be a healthy relationship?

25  A.  It was, beginning.

UNITED STATES vs. SUTHERLAND, et al - 11-20129; 11-20066

1   Q.  Okay.  Did the relationship evolve over time?

2   A.  It did.

3   Q.  Over time, did you consider this to be an unhealthy

4   relationship?

5   A.  Yes.

6   Q.  And did you experience any sort of verbal abuse during this

7   relationship?

8   A.  Yes, I did.

9   Q.  Can you explain what type of verbal abuse you would

10  receive?

11  A.  If I didn't do what he wanted me to, or speak a certain

12  way, or conduct myself a certain way, I would be called a

13  stupid cunt.

14  Q.  Okay.  Now, were you ever called these names by people

15  other than Mr. McFadden?

16  A.  Not to my face, no.

17  Q.  Okay.  Did you -- were you called these names by other

18  Devils Diciples members, indirectly or directly?

19          MS. STOUT:  Asked and answered.

20          THE COURT:  Overruled.

21          THE WITNESS:  What was the question again?

22  BY MR. MAIATICO:

23  Q.  So either indirectly, or you overheard it, or you heard

24  from others, or directly, were you ever called those names by

25  members of the Devils Diciples?

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   A.  If I remember, at times I had.

2   Q.  Okay.  Now, did your relationship with Mr. McFadden -- or

3   during your relationship with him, did you ever experience any

4   sort of physical abuse?

5   A.  Yes.

6   Q.  And what types of abuse did you receive from him?

7   A.  Give me a minute, please?  This is very hard for me to talk

8   about that.

9   Q.  All right.  Take your time, Ms. Herron.

10  A.  I have been choked, punched, kicked.  At times I've had a

11  weapon held to my head.

12  Q.  All right.  Now, Ms. Herron, I know this is tough to talk

13  about.  Take your time.

14          During these periods of time when you would receive

15  this sort of physical abuse, was Mr. McFadden a member of the

16  Devils Diciples?

17  A.  Yes.

18  Q.  I want to ask you about the, the role of women within this

19  club, within the Devils Diciples.  You said during this time,

20  Mr. McFadden was a member?

21  A.  Yes.

22  Q.  Were you provided with a vest that signified your

23  relationship with him during this time?

24  A.  Yes.

25  Q.  Can you explain to the jury what that vest was, what it

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   said?  Can you describe it?

2   A.  It's a vest with "Property of," and at the time it would

3   say "Gadget."  That meant I was his woman.  It signifies to

4   other clubs that I am taken.  It's sort of like a security

5   blanket or a wedding ring.  It just lets them know this woman

6   is mine.

7           And to ask -- answer to your other question, we really

8   don't have any rights in the club.

9   Q.  Okay.  So living with a member of the Devils Diciples,

10  having a "Property of" vest, you believe that you didn't have

11  any rights?

12  A.  Well, no.  You do as you're told.

13  Q.  How would you describe your role in the club?  Was -- would

14  you be able to talk to other members?  Would other members be

15  able to talk to you, that you had this "Property of" vest?

16  A.  Well, yes, casual talk, you know, how are you doing, how

17  is -- how is the family doing.  Like, friendly talk.

18  Q.  Okay.  Were you allowed to go beyond friendly talk with

19  club members?

20  A.  I don't understand your question.

21  Q.  Well, you would have casual conversations.  Could you ever

22  have anything outside of casual conversations with club

23  members?

24  A.  No.

25  Q.  Were you ever allowed to discuss club business --

1   A.   No.

2   Q.   -- with club members?

3        Were you ever allowed to approach other brothers and

4   talk about anything without them first approaching you first?

5   A.   Well, you could as long as it wasn't politics considering

6   the club.

7   Q.   Now, having this "Property of" vest, did you wear that?

8   A.   Yes.

9   Q.   Did you wear it to parties --

10  A.   Yes.

11  Q.   -- where Devils Diciples members were?

12  A.   Yes.

13  Q.   What would wearing that vest mean?  Would it protect you in

14  any sort of way?

15  A.   Yes.

16  Q.   Can you explain that to the jury?

17  A.   Like I said, it's more or less like a wedding ring.  If we

18  was to be at another different motorcycle club house, at their

19  parties, again, it's protection.  More or less again, this is

20  my woman.  And it's the best I can describe it.

21  Q.   Did it protect you from getting hit on by other members?

22  A.   Yes.

23  Q.   Okay.  And what would other members need to do if they

24  wanted to hit on you?

25  A.   They would ask, the language, "the old man."

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   Q.  Okay.  So the old man would be Mr. McFadden?

2   A.  Yes.

3   Q.  What were you referred to as?

4   A.  The old lady.

5   Q.  Okay.  So before approaching you, other clubs members would

6   have to ask Mr. McFadden's permission?

7   A.  Yes.

8   Q.  Did you become aware that other club brothers did approach

9   Mr. McFadden and ask for permission?

10  A.  He would tell me.

11  Q.  What would he tell you?

12  A.  That one of my brothers want to get with you, how do you

13  feel about that.  I didn't like it.  I told him I don't want

14  to.

15  Q.  Okay.  And when you say "get with you," just so we're

16  clear, what does that -- what do you take that to mean?

17  A.  Sexually.

18  Q.  Okay.  Now, during the time period you were living in the

19  camper next to the Devils Diciples clubhouse, did you have a

20  job then?

21  A.  I did.

22  Q.  And what job did you have?

23  A.  I was an adult entertainer, dancing.

24  Q.  Did you work long hours?

25  A.  When I could, yes.

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   Q.  Why did you work long hours?

2   A.  Because I really didn't like living at the clubhouse.

3   Q.  How much money would you earn as an exotic dancer?

4   A.  Oh, it depends on how many customers come in.  I could make

5   anywheres from 100 to 3 to 400s in a night.

6   Q.  Did working long hours allow you to make even more money?

7   A.  Yes.

8   Q.  And what did you do with the money that you earned while

9   working at these clubs?

10  A.  When I would come home from work, I would put my money on a

11  little table next to where he would be sleeping.  And when he

12  would wake up, he would count the money and put it in his

13  pocket.

14  Q.  Did you ever see the money that you earned at these clubs?

15  A.  (No response.)

16  Q.  Did you ever use the money that you earned at these clubs?

17  A.  He would put it in his pocket, pretty much give me a small

18  allowance, and then he would take the bulk of it and --

19  Q.  So who was in charge of that money?

20  A.  Gadget was.

21  Q.  Now, living at the clubhouse and becoming familiar with the

22  Devils Diciples Motorcycle Club, was this a typical

23  arrangement?

24          MR. SATAWA:  Objection.  Your Honor, personal

25  knowledge.

2:11-cr-20129-RHC-MAR  Doc # 1098  Filed 11/16/14  Pg 180 of 220  Pg ID 9061
JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

180

```
 1              THE COURT:  I think the foundation would be required,

 2  sir.

 3  BY MR. MAIATICO:

 4  Q.  Okay.  How long did you live in the camper next to the

 5  Devils Diciples clubhouse?

 6  A.  I really don't remember.  It seems like maybe six months.

 7  It's been so long ago.

 8  Q.  Okay.  And over those months, did you get to know other

 9  members of the Devils Diciples?

10  A.  I have, yes.

11  Q.  And did you get to know their old ladies?

12  A.  Some of them, but not all of them.

13  Q.  Okay.  And did you go to parties at the clubhouse?

14  A.  When I got off work, yes.

15  Q.  Okay.  And did you observe the relationships, the

16  interactions between the Devils Diciples brothers and their old

17  ladies?

18  A.  Yes.

19  Q.  And this idea of Mr. McFadden being in charge of the money,

20  was that a typical relationship between a club brother and old

21  lady?

22  A.  Not always.  Not all of it.  But this was between him and

23  I.

24  Q.  Okay.  Now, I want to talk about a specific individual.

25  Are you familiar with a person named Tatu?
```

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1    A.   I am.

2    Q.   And how are you familiar with Tatu?

3    A.   He lived in another camper in Anniston, Alabama, in the

4    same property, but just a ways from where me and Gadget were.

5    Q.   And was he a member of the Devils Diciples?

6    A.   Yes.

7    Q.   Do you know what his role was within the club?

8    A.   No.

9    Q.   Did you observe him or see him interact with other people

10   at parties?

11   A.   Yes.

12   Q.   And at the clubhouse?

13   A.   Yes.

14   Q.   And would you have conversations with him?

15   A.   From time to time.

16   Q.   And what did you understand -- well, let me ask you this:

17   Are you familiar with the term "club whore"?

18   A.   Yes.

19   Q.   Is that a term that would be used by club brothers?

20   A.   Yes.

21   Q.   Is that different from someone who is a "Property of," who

22   has a vest?

23   A.   It all depends on the old man.

24   Q.   Okay.  Well, let me ask you this:  Mr. McFadden didn't

25   allow other brothers to have sexual favors with you, correct?

1    A.  No.

2    Q.  Okay.  So you would not consider yourself the club whore?

3    A.  No.

4    Q.  Were you aware that there were individuals that were club

5    whores?

6    A.  Yes.

7    Q.  Okay.  And we talked about Tatu.  What was his role with

8    regards to these other women?

9    A.  I wouldn't -- I would observe him at times, when I was in

10   my camper taking a break -- give me a minute, please.  I would

11   observe sometimes -- there was another camper on the grounds.

12   It was used for sexual favors for brothers with a non-"Property

13   of" female.

14          I have seen brothers come in and out of the camper and

15   at times as I'm sitting down in my camper, or just walking past

16   them or whatever, I would see money or something exchanged in

17   hands.

18   Q.  Okay.  And who were the individuals that you would see

19   exchange money?

20   A.  I don't remember names.

21   Q.  Let me ask you this:  Did you ever see Tatu exchange money?

22   A.  A couple times, but I wasn't sure -- like I said, I would

23   see things, would never ask.

24   Q.  Okay.  And based on what you saw, did you understand Tatu

25   to be the one receiving money or providing money?

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   A.  At one time, I seen him receive some.

2   Q.  Okay.  And when you saw him receive that money, is it your

3   understanding it was for what was going on inside of that

4   camper?

5   A.  This particular time, yes, because I was sitting in my

6   camper taking a break.

7   Q.  Okay.  Now, Ms. Herron, do you have a daughter?

8   A.  I do.

9   Q.  Okay.  And during this time period that you were living

10  next to the Devils Diciples clubhouse, how old was your

11  daughter?

12  A.  Seventeen.

13  Q.  Was she living with you then?

14  A.  No.

15  Q.  Did you -- how many times did you bring her around the

16  clubhouse?

17  A.  Twice.

18  Q.  So in the entire time that you were living at the

19  clubhouse, you only brought her around twice?

20  A.  The first time was an emergency.  And her father got

21  injured in a house fire and we went to Birmingham so I can be

22  with her.  And she was with her grandparents.  And they were

23  there all day and all night.  And I took her with me, away from

24  the hospital, so her and I can have a little bit of minute.

25  And she slept with me in the clubhouse.  I didn't leave her

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   alone.

2   Q.  Was there any moment that you ever did not keep her within

3   your sight?

4   A.  No.

5   Q.  So why did you only bring her around two times?

6   A.  I didn't want her around to see this part of living.  I

7   didn't want her to see how I get treated sometimes when things

8   didn't go right or when Gadget would have a bad day or get mad

9   at me because, God forbid, I might have screwed up something.

10  Q.  Just so we're clear, is this a daughter that you had with

11  someone other than --

12  A.  Yes.

13  Q.  -- Gadget?

14  A.  Yes.

15  Q.  Mr. McFadden?

16  A.  Yeah.  That's not her father.

17  Q.  All right.  I want to take a step back and talk about some

18  of your drug use over the years.

19  A.  Okay.

20  Q.  Okay?  Have you ever used illegal drugs?

21  A.  Unfortunately, yes.

22  Q.  Okay.  Let's start with marijuana.  Have you ever used

23  marijuana?

24  A.  Yes.

25  Q.  And take your time.  I see you want to take a sip of water.

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

```
 1              When was the first time you used marijuana?
 2   A.  Oh, 14, 15.
 3   Q.  And is that something that you have continued to use
 4   recreationally over the years?
 5   A.  Yes.
 6   Q.  When was the last time you used marijuana?
 7   A.  Two and a half, three weeks ago.
 8   Q.  Now, what about cocaine?  Have you ever used cocaine?
 9   A.  Yes.
10   Q.  And when was the first time you used cocaine?
11   A.  I was 18.
12   Q.  Is that something that you continued to use recreationally?
13   A.  Recreational, when I was younger, yes.
14   Q.  Okay.  Did there come a time when your cocaine use stopped?
15   A.  Yes.
16   Q.  And what about methamphetamine?
17   A.  (Nodding head.)
18   Q.  When was the first time you used methamphetamine?
19   A.  Twenty-eight.
20   Q.  Okay.  Now, when you were 28 and started using
21   methamphetamine, did you use it often?
22   A.  Very little very often.  Not, not a lot.
23   Q.  Okay.  So you're saying you didn't use it a lot when you
24   were in your late 20's?
25   A.  No.
```

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1  Q.  Did there come a time when you started to use it a lot?

2  A.  Yes.

3  Q.  And when did that start?

4  A.  In my late 30's.

5  Q.  Okay.  And at what -- let me put this in perspective.  At

6  what time did you meet Gadget, meet other members of the Devils

7  Diciples?

8  A.  I don't understand.

9  Q.  How old were you when you met other members of the Devils

10  Diciples and Gadget?

11  A.  Early 40's.

12  Q.  Okay.  So in your early 40's, did you continue to use meth?

13  A.  Yes.

14  Q.  Did you -- how often would you use it?

15  A.  On the weekends when I was working.

16  Q.  Okay.  And who would provide you with the meth when you got

17  into your 40's, you're living in the camper next to the Devils

18  Diciples clubhouse?

19  A.  Nobody provided it.  If Gadget had it on him, he'd put some

20  lines out and ask if I want to do some.

21  Q.  Did you ever purchase meth?

22  A.  No.

23  Q.  Okay.  So every time that you would use meth, it would be

24  provided to you?

25  A.  Yeah.

 1   Q.  Ms. Herron, I want to jump ahead and talk to you about

 2   events that occurred in and around February of 2006.  Okay?

 3          Did there come a time when you traveled from Alabama

 4   where you were living, up to Michigan, for the purpose of

 5   testifying in a trial?

 6   A.  Yes.

 7   Q.  Back in February of 2006 for this trial, who was the

 8   defendant at that trial?

 9   A.  Victor Castano.

10   Q.  Okay.  And did you know Victor Castano at that time you

11   testified?

12   A.  Yes.

13   Q.  Did you know whether he was a member of the Devils

14   Diciples?

15   A.  Yes.

16   Q.  When you testified, was this a state or a federal case?

17   A.  Federal.

18   Q.  And were you aware at the time what Victor was charged with

19   when you testified?

20   A.  Marijuana.

21   Q.  Were you also aware that he was charged with a gun crime?

22   A.  Yes.

23   Q.  So why were you going up to this trial in February of 2006

24   to testify?

25   A.  To say that the weapon was mine.

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1  Q.  Okay.  When you say "the weapon," you're talking about the

2  weapon that Victor was charged with?

3  A.  Yes, sir.

4  Q.  Was this weapon, was this gun, was it, in fact, your gun?

5  A.  No.

6  Q.  Now, how long before the trial did you arrive in Michigan?

7  A.  Three weeks or so before the trial.

8  Q.  And where did you stay when you came to Michigan?

9  A.  With Victor.

10  Q.  Who else stayed with you at Victor's house?

11  A.  Gadget.

12  Q.  And in the weeks before Victor's trial in February of 2006,

13  did you meet with any attorney?

14  A.  I did.

15  Q.  Was this your attorney?

16  A.  No.

17  Q.  Was this someone else's attorney?

18  A.  It was.

19  Q.  Whose was it?

20  A.  Victor's.

21  Q.  Okay.  And in this meeting with Victor's attorney, did you

22  take responsibility for this weapon?

23  A.  I did.

24  Q.  Okay.  In the weeks before Victor's trial, did you also

25  meet with the FBI, Agent Fleming?

1    A.   Yes.

2    Q.   And what did you tell Agent Fleming at that time?

3    A.   That the weapon was mine.

4    Q.   Was the weapon yours?

5    A.   No.

6    Q.   Did there come a time then when you, in fact, testified at

7    Victor's trial?

8    A.   Yes.

9    Q.   And where did the trial take place?

10   A.   Port Huron, Michigan.

11   Q.   And was that in a federal courthouse?

12   A.   Yes.

13   Q.   Do you remember the judge's name?

14   A.   (No response.)

15   Q.   If I told you Judge Zatkoff, does that sound familiar?

16   A.   It does.

17   Q.   Okay.  Now, who brought you to the courthouse that day?

18   A.   Excuse me?

19   Q.   Who brought you to the courthouse that day?  Who did you go

20   with to the courthouse?

21   A.   Victor and Gadget.

22   Q.   Did you arrive together?

23   A.   Yes.

24   Q.   Did you know whether "Gadget," Mr. McFadden, was going to

25   be testifying that day?

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1    A.   Yes.

2    Q.   Do you know if he, in fact, testified?

3    A.   Yes.

4    Q.   Were you there for his testimony?

5    A.   I, I was not in the courtroom, no.

6    Q.   Okay.  Now, when you testified, did Victor's attorney call

7    you to the stand or did someone else call you to the stand?

8    A.   I --

9    Q.   Do you know?

10   A.   -- don't -- no.  No.

11   Q.   Can you describe the circumstances immediately leading up

12   to your testimony?

13   A.   When Gadget got down testifying, I was out in the lobby.  I

14   was told that I may -- may not be needed for me to go

15   downstairs.  And I looked --

16   Q.   I'm going to stop you right there.  Who told you that your

17   testimony may not be needed?

18   A.   Umm --

19   Q.   Was this an attorney?

20   A.   Yes.

21   Q.   Okay.  And what happened after this attorney told you that?

22   A.   I remember walking out of the courthouse, going to my

23   truck, and sitting in my truck.  And not even two minutes

24   later, I was approached by a couple agents telling me to get

25   out of my truck; that I was needed upstairs.  And I went.

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1    Q.  Okay.  When you say "agents," you're referring to

2    government agents?

3    A.  Yes, sir.

4    Q.  Okay.  And you went up and you testified then during that

5    trial?

6    A.  Yes.

7    Q.  Now, before you testified, were you placed under oath?

8    A.  I was.

9    Q.  Okay.  I'm going to ask you some specific questions about

10   your testimony.  During your testimony, do you remember being

11   shown a gun in the courtroom?

12   A.  Yes.

13   Q.  And did you testify that, "That's my gun"?

14   A.  Yes.

15   Q.  Did you testify that you purchased the gun in Alabama?

16   A.  Yes.

17   Q.  Did you testify that you purchased it in spring 2004 at a

18   flea market?

19   A.  Yes.

20   Q.  Did you testify that you were in Michigan in the summer of

21   2004?

22   A.  Yes.

23   Q.  Were you in Michigan in the summer of 2004?

24   A.  No.

25   Q.  Did you testify you were in a truck owned by Mr. Lonsby

1   before Victor's arrest?

2   A.  Yes.

3   Q.  Did you testify you were in that truck out looking for

4   jobs?

5   A.  Yes.

6   Q.  Did you testify that you left this gun in the console of

7   the truck at one point?

8   A.  Yes.

9   Q.  And did you testify that you got drunk and forgot the gun

10  in the truck when you left Michigan?

11  A.  Yes.

12  Q.  Now, were any of those statements that you provided

13  truthful?

14  A.  No.

15  Q.  Let me ask you some questions about why you gave this false

16  testimony.  We're going to take a step back.

17          When did you first find out that Victor Castano got in

18  trouble?

19  A.  (No response.)

20  Q.  Let's start with, where were you living at the time?

21  A.  Alabama.

22  Q.  Okay.  Were you living in that camper?

23  A.  Yes.

24  Q.  Next to the Devils Diciples clubhouse?

25  A.  Yes.

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   Q.   And when did you find out that Victor had gotten in

2   trouble?

3   A.   We were, me and Gadget and some other brothers, were on our

4   way up to Indiana from Alabama.

5   Q.   Okay.  And why -- what was the purpose of you going to

6   Indiana?

7   A.   To the Indiana clubhouse.

8   Q.   Okay.  Was there a national run going on or some sort of

9   party going on?

10  A.   I believe they call it a steak fry.

11  Q.   All right.  And you mentioned you were traveling with

12  Gadget.  Who else were you traveling with?

13  A.   Tatu, I believe Jesus, and I don't remember the other ones.

14  Q.   Okay.  This is the first time you mentioned Jesus.  Is

15  Jesus a member of the Devils Diciples?

16  A.   Yes.

17  Q.   Was everyone that was in your caravan going up to Indiana

18  members of the Devils Diciples?

19  A.   Yes.

20  Q.   Or an old lady?  Or an old lady --

21  A.   Yes, sir.

22  Q.   -- like yourself of the Devils Diciples?

23  A.   Yes.

24  Q.   And how did you travel up there?  Were you in a truck?  On

25  a bike?

1   A.  Me and Gadget were in a truck.

2   Q.  And so tell us when you first learned about -- this is when

3   you learned about Victor getting in trouble.  What did you,

4   what did you learn?  And how did you learn it?

5   A.  Well, we made a pit stop off the highway.  And I learned it

6   from -- after everybody rested up from the pit stop, and I

7   learned it in the truck on the way up to Indiana.

8   Q.  Okay.  And who told you about this?

9   A.  Gadget.

10  Q.  And what did he tell you?

11  A.  He told me that his brother Victor got pulled over and he

12  was being charged with marijuana.

13  Q.  Okay.  Was there any mention of a gun at this time?

14  A.  No.

15  Q.  And so eventually, did you arrive in Indiana?

16  A.  Yes.

17  Q.  Okay.  You said this was some sort of steak fry?

18  A.  Yes.

19  Q.  And it was a party?

20  A.  A weekend party.

21  Q.  Okay.  As the weekend went on, did you learn any more

22  information about Victor?

23  A.  Little bits and pieces here and there, from what Gadget

24  told me.

25  Q.  Was this a hot topic of conversation there?

1    A.  It was, but it wasn't.

2    Q.  Now, are you familiar with an individual by the name of Fat

3    Dog or nickname "Fat Dog"?

4    A.  Yes.

5    Q.  Was Fat Dog at this party?

6    A.  Yes.

7    Q.  And do you know Fat Dog's role in the Devils Diciples?

8    A.  I was told he was the president of the Indiana chapter.

9    Q.  Okay.  You understood him to be some sort of leader?

10   A.  Yes.

11   Q.  Are you familiar with an individual that goes by the name

12   of "Pauli" of the Devils Diciples?

13   A.  Yes.

14   Q.  Was Pauli there in Indiana?

15   A.  I've seen him.

16   Q.  Okay.  Was he at that party that weekend?

17   A.  I really don't remember.

18   Q.  Okay.  So over time, did you find out more information

19   about how Victor got in trouble?

20   A.  Over time, gradually, yes.

21   Q.  Okay.  And you go back to Alabama?

22   A.  Yes.

23   Q.  And was it in Alabama that you learned more information

24   about Victor being pulled over?

25   A.  Yes.

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   Q.  Did you learn whether Victor was stopped walking down the

2   street or pulled over in a vehicle, or anything along those

3   lines?

4   A.  He was pulled over in his vehicle.

5   Q.  Okay.  Do you know if it was a car or a truck?

6   A.  Truck.

7   Q.  That's what you were told?

8   A.  Yes.

9   Q.  And did you eventually learn more information about the

10  charges against him?

11  A.  Gradually, later on.

12  Q.  Okay.  So maybe not in the days?

13  A.  No, not in the days.

14  Q.  Was it months later?

15  A.  Weeks to months later, yes.

16  Q.  Okay.  And what did you learn eventually?

17  A.  I learned eventually that he got pulled over, got busted

18  with some marijuana, and there was a, a firearm found into the

19  vehicle.

20  Q.  Okay.  And who told you this information?

21  A.  Gadget.

22  Q.  Okay.  Do you know where Gadget was getting his information

23  from?

24  A.  Other brothers.

25  Q.  By the way, do you have a permit to carry a gun?

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   A.  I do, but it's expired.

2   Q.  Okay.  And at this time, when you were having these

3   conversations, did you have a -- did you have a permit?

4   A.  It was expired at the time.

5   Q.  It was expired at that time?

6   A.  Mh-hmm.

7   Q.  Was that information that Gadget knew?

8   A.  He knew it was expired, yeah.

9   Q.  Okay.  He also knew that you used to have --

10  A.  Yes.

11  Q.  -- a permit?

12          Now, is that information other brothers knew?

13  A.  If they knew, it's because Gadget told them.

14  Q.  Let me talk about your criminal record at that time.  Did

15  you have any felonies on your criminal record?

16  A.  No.

17  Q.  And was that information that Gadget was aware of?

18  A.  Yes.

19  Q.  And was that information that other brothers were aware of?

20          MR. PITTS:  Foundation, your Honor.

21          THE COURT:  Foundation would be appropriate.

22  BY MR. MAIATICO:

23  Q.  All right.  We'll get to that in a second.  Let me --

24          THE COURT:  Appropriately amplified is what I mean to

25  say.  Go ahead.

1   BY MR. MAIATICO:

2   Q.  We'll talk about that a little bit more in a second.

3         Let me first ask you, these conversations with Gadget,

4   did there come a time where he asked for your assistance or for

5   your help in any way with Victor's charges?

6   A.  Yes, he did.

7   Q.  And what did he say to you?

8   A.  I don't remember the conversation from word to word, but I

9   do know he asked me to step up and say that the firearm was

10  mine.

11  Q.  He asked you to step up and say the firearm was yours?

12  A.  Well, not quite step up, but claim that the firearm was

13  mine.

14  Q.  Okay.  And why would -- why was he asking you to do this?

15  A.  Because, according to him, I had a squeaky-clean record,

16  and if I would get in trouble being lazy and leaving the gun,

17  that I would basically get a slap on the wrist and he would

18  help me get out of jail.

19  Q.  Okay.  And why would it be appropriate for you to help out

20  Victor?

21  A.  Now, I can't answer that question, because then, it was

22  to -- then, to help him out was to help him out to get out of

23  the firearm charge.  He knew that the pot was his, but the

24  weapon was not his.

25  Q.  Okay.  Was this information that you had received from

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   Gadget?

2   A.   Yes.

3   Q.   And information you received from other club brothers?

4   A.   Yes.

5   Q.   Okay.  Now, in the months following this, once Gadget had

6   talked to you about stepping up, or claiming this gun, how did

7   he talk to you about this?  Did he bring this up once or twice?

8   Was it brought up a lot?  Can you describe that?

9   A.   At, at first it was brought -- well, let me explain.  When

10  he asked me if I would take this and claim it was mine, I told

11  him I didn't want to.  It's -- I can't.  It's not mine.  I

12  don't want to lie for something that's not mine.

13          He didn't quite let it go.  It wasn't at first, but he

14  kept putting seeds in my head that it would be good if I helped

15  a brother out.

16  Q.   So at first you were hesitant to help a brother out?

17  A.   Absolutely.

18  Q.   When you're saying "a brother," you're referring to a club

19  brother?

20  A.   Yes.

21  Q.   A member of the Devils Diciples?

22  A.   Yes.

23  Q.   And then what would happen if you continually tried to

24  resist or were hesitant?

25  A.   Well, with Gadget, like I said, he's a mean man.  I started

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

```
 1   getting called names.
 2           MR. PITTS:  What did she say?  I'm sorry.  What was
 3   that part, your Honor?
 4           THE COURT:  I agree.  Would you repeat that, the
 5   beginning of that last answer, please?
 6           THE WITNESS:  Gadget was a mean man.
 7           MR. PITTS:  Mean man.
 8           THE WITNESS:  At first when I contested when him and I
 9   was alone, I didn't want to do this, he would get verbally --
10   BY MR. MAIATICO:
11   Q.  Would he become verbally abusive?
12   A.  Yes.
13   Q.  Okay.  And did there come a time where he became physically
14   abusive?
15   A.  Yes.
16   Q.  And can you describe that?
17   A.  One night, we were in our camper, we were by ourselves in
18   the clubhouse, and he kept talking about the situation with
19   Victor and the gun.  And I knew that him and I was at the
20   clubhouse together in our camper.  And I got a little bit loud
21   with him.  And I told him I didn't want to do it because I'm
22   not going to go to jail for nobody.  I'm not going to make a
23   claim for something that's not mine.  I wasn't raised this way.
24           And he stood up, snapped at me, pretty much
25   bitch-slapped me across the face, and told me how dare I raise
```

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   my voice to him in that manner.  And he wouldn't stop.

2   Q.  Did there come a time where you stopped resisting or

3   hesitating about claiming responsibility for this gun?

4   A.  Yes.

5   Q.  Was Gadget the only person that talked to you about

6   claiming responsibility for this gun?

7   A.  Being as he was my old man, he, he did it.  And --

8   Q.  Let me ask you this.  Take a moment or take a glass of

9   water if you want.

10          So was Gadget doing this on behalf of the club?

11          MR. PITTS:  Foundation, your Honor.

12          THE COURT:  Overruled.

13  BY MR. MAIATICO:

14  Q.  Was Gadget doing this on behalf of the club?

15  A.  Yes.

16  Q.  Did you have conversations with other members of the club

17  regarding taking responsibility for this gun?

18  A.  I didn't have conversations with them.

19  Q.  Okay.  Describe what you mean by that.

20  A.  Um --

21  Q.  When you had conversations with --

22          THE COURT:  There's already a question on the floor,

23  Mr. Maiatico.

24  BY MR. MAIATICO:

25  Q.  Do you need me to rephrase the question?  Do you --

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1    A.  Yes, please.

2    Q.  -- understand the question?

3         When you would have conversations with members of the

4    Devils Diciples about this gun charge, about claiming

5    responsibility --

6         MR. PITTS:  Objection.  She just testified that she

7    didn't have conversations with any members.  And -- I will

8    leave it at that.

9         THE COURT:  The question hasn't yet been formulated.

10   Go back.  Do it again, sir.

11   BY MR. MAIATICO:

12   Q.  When you would talk to other members of the Devils

13   Diciples, would it typically be a two-way conversation or a

14   one-way conversation?

15   A.  Well, when a sister, old lady, would talk to a club

16   brother, like I said, it would be casual talk.  We don't talk

17   about business.

18        But to answer your question, there's been several

19   brothers that would talk to me casual talk.  And apparently

20   Gadget would tell them she will do this.  But just to reinforce

21   it, I -- just different accusations being thrown my way,

22   because I had a daughter.

23   Q.  Okay.  Let me, let me just stop you there for a second,

24   because I want to clarify something.

25        So when initially I said did you have conversations

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   with other members about claiming responsibility for the gun,

2   and you said no.

3   A.  Yeah.

4   Q.  You meant it's because members --

5           MR. PITTS:  Objection.  That's leading, your Honor.

6           MR. SATAWA:  Leading.

7           THE COURT:  Sustained.

8   BY MR. MAIATICO:

9   Q.  Did you mean members would talk to you about this?

10  A.  It would be brought up in conversation.

11  Q.  Okay.  So other members would talk to you about Victor's

12  gun charge, correct?

13  A.  Just small talk.  How can I explain this?  Again, I don't

14  mean to get frustrated here.  When -- oh, how do I explain

15  this?  Just -- I need to breathe.

16      (Brief pause.)

17  BY MR. MAIATICO:

18  Q.  Ms. Herron, let me direct your attention to certain

19  individuals.  You mentioned an individual by the name of Tatu.

20          Now, Tatu, did he talk to you about claiming ownership

21  of this gun?

22  A.  He didn't quite talk to me.  Just --

23  Q.  Explain what you mean by that.

24  A.  Again, during conversations, small talk, and then out of, I

25  could say, I should say, left field, during this time, "do good

 1   for a brother, you're going to help him" at first.

 2   Q.  And now, when Tatu said do good for a brother --

 3   A.  That's what I remember conversations, yeah.

 4   Q.  When he said, "do good for a brother, you can help him,"

 5   what he was he referring to?

 6   A.  I do remember one time because I'm -- I do remember that I

 7   asked him, I says, "I will help a brother out in need," and I

 8   thought he meant something else.  And then it was brought to my

 9   attention about the firearm.  And then he told me, he says,

10   "Gadget told me that you were going to claim this to be yours."

11   Q.  So --

12   A.  And I --

13   Q.  So is Tatu aware of these conversations between you and

14   Gadget about claiming ownership --

15   A.  Yeah.

16   Q.  -- of Victor's gun?

17          Okay.  And so he would talk to you about that?

18   A.  He wouldn't, like, go into detail, but yeah.

19   Q.  Okay.  And did there come a time when Tatu would have

20   additional discussions with you in the context of taking

21   responsibility, or helping out a brother by taking

22   responsibility for this gun?

23   A.  (No response.)

24   Q.  Did he ever threaten you, Ms. Herron?

25   A.  He didn't quite threaten me, because -- there was a lot of

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1    resistance going on.  And now, with me being upset, scared,

2    under the control of Gadget is what I call it, because he,

3    again, is a very abusive, mean man, there was resistance being

4    shown there.  And I guess you could say that they took my

5    weakness.  They used -- they made statements of how pretty my

6    daughter was.

7    Q.  Okay.  And when, when you say "they," who are you referring

8    to?

9    A.  Excuse me.  I mean, well, Gadget made quite a few

10   statements how pretty she was -- is.

11   Q.  Did Tatu ever make these statements?

12   A.  Accusations.

13   Q.  And what did Tatu say about your daughter?

14   A.  She'd be a nice little club whore, bring me in some money.

15   Q.  When Tatu said this to you, did you take that seriously?

16   A.  Yes, I did.

17   Q.  What did you think would happen if you didn't step up for a

18   brother?

19   A.  At that time, I was scared.  I don't know what's going to

20   happen.  I didn't know if -- I could take the beatings at the

21   time.

22   Q.  Now, are you familiar with an individual that goes by the

23   name Gun Control?

24   A.  Yeah.

25   Q.  Based on conversations that you had with Gun Control and

1    other brothers, was Gun Control aware that you were going to

2    step up for a brother?

3    A.  Yes.

4    Q.  Did Gun Control, did Gun Control ever talk to you or say

5    anything to you about your daughter?

6    A.  Yes, he did.

7    Q.  What did he say to you?

8    A.  "That pretty little thing will look good at the end of my

9    dick."

10   Q.  Did you take those words seriously, Ms. Herron?

11   A.  I did.

12   Q.  All right.  So, Ms. Herron, in the months following, after

13   you were asked to step up for a brother, did you ever talk to

14   Fat Dog or did Fat Dog ever talk to you about Victor's gun

15   charge?

16   A.  I do remember him talking with me briefly, small talk.  And

17   then he, he told me, he says, "I, I heard you're going to help

18   a brother out."

19   Q.  So Fat Dog said, "I heard you're going to help a brother

20   out"?

21   A.  Yeah.

22   Q.  Did this occur -- go ahead.

23   A.  Yeah.  That was -- yeah.

24   Q.  And did this occur over the phone or at a party?

25   A.  At a party.

1   Q.  Okay.  And was this a two-way conversation, or was this a

2   one-way conversation?

3   A.  It was a two-way conversation.

4   Q.  Okay.  And what else did Fat Dog say to you?

5   A.  "It's my way" -- excuse me.  I'm getting overwhelmed right

6   now.

7   Q.  Take your time.

8   A.  I don't remember word for word, because it's been a long

9   time.

10  Q.  Okay.  Without giving us a word-for-word, what did Fat

11  Dog -- what was the topic of Fat Dog's talk with you?

12  A.  It's basically, I heard Gadget told me you was going to

13  help a brother out.  And I don't remember word for word of

14  everything else being said.

15  Q.  Okay.  In this conversation or talk with Fat Dog, did the

16  topic of your criminal history come up?

17  A.  I have a squeaky-clean record.

18  Q.  Is that something that Fat Dog said to you?

19  A.  I remember him saying that to me, yeah.

20  Q.  Now, over time then, while you're down in Alabama, did you

21  continue -- did brothers continue to talk to you about taking

22  ownership of this gun, claiming this gun?

23  A.  Gadget was the primary one after I said -- I decided to go

24  ahead and do it because I couldn't take -- I couldn't take it

25  no more.

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   Q.   And did there come a time when you stopped resisting?

2   A.   Yes.

3   Q.   Okay.  And did you agree then that you would testify?

4   A.   Yes.

5   Q.   And after you agreed to testify, how did you come up with

6   the story that you told at trial?

7   A.   Actually, to be honest with you, Gadget was the one who

8   came to me to -- with the story to tell.

9   Q.   Okay.  And were other club brothers aware of this story?

10  A.   Yes.

11  Q.   Okay.  Who were some of the other brothers that were aware

12  of this story?

13  A.   Victor was aware of it.  Pretty -- I want to say pretty

14  much all of the Alabama chapter knew about it.

15          MR. PITTS:  May we have a foundation, your Honor, for

16  the basis of this knowledge?

17          THE COURT:  I think it's been sufficiently explained.

18  Overruled.

19  BY MR. MAIATICO:

20  Q.   So you say basically the whole Alabama chapter knew?

21  A.   Yeah.

22  Q.   Was Gun Control a member of the Alabama chapter?

23  A.   Yes.

24  Q.   Dino?

25  A.   Yes.

1   Q.  Tatu?

2   A.  Yes.

3   Q.  A member of the Alabama chapter, he knew?

4   A.  Yes.

5   Q.  Jesus, was he a member of the Alabama chapter?

6   A.  Yes.

7   Q.  And did he know?

8   A.  Yes.

9   Q.  Now, you mentioned Victor.  So did Victor himself ever come

10  to Alabama before the trial?

11  A.  I do remember seeing him there once.

12  Q.  Okay.  And when he came to Alabama, where did you see him?

13  A.  At the clubhouse.

14  Q.  At the clubhouse?

15        Did Victor talk to you at all?

16  A.  He did in mine and Gadget's camper.

17  Q.  And what did Victor say to you, if anything?

18  A.  "Just make the story believable."

19  Q.  All right.  I want to take you to the time you traveled up

20  to Michigan.  You said you had gone up there about three weeks

21  before the trial?

22  A.  Yes.

23  Q.  Is that correct?

24        And you said you had stayed with Victor?

25  A.  Yes.

1    Q.  Now, during that time that you stayed at Victor's house,

2    are you continuing to have conversations, or are brothers

3    continuing to talk to you about your testimony?

4    A.  Yes.  In, you know, Victor's private house, after dinner,

5    of course, he's nervous about the situation with the gun.  And

6    at sometimes, he'll, he'll want to talk to Gadget, and Gadget

7    would tell me to go to my room, or our room and then they would

8    talk.

9           And then there was times that there were

10   conversations, in these weeks that we were staying there, that

11   they did talk, that Gadget and Victor did talk to me about the

12   firearm.

13   Q.  Okay.  So those times that you and Gadget and Victor would

14   talk about the firearm, what would they say to you?

15   A.  Gadget would help me refresh what I'm supposed to say.

16   Like, how do I explain this?  Do your homework.  You know,

17   memory, remember what to say with questions that may come up.

18   Q.  And did Victor help out in any way?

19   A.  He just sat and listened.

20   Q.  Okay.  And based on your understanding, Victor knew that

21   wasn't your gun, correct?

22   A.  Correct.

23   Q.  Now, did you overhear conversations?  You were told you

24   were -- you told us that you would go -- be sent back to your

25   room.  Would you overhear conversations that happened between

 1  brothers at the house?

 2  A.  Sometimes, yes.

 3  Q.  And what did you overhear?

 4  A.  One point in time, I heard Victor tell Gadget, "Her story

 5  is not going to be believable."

 6  Q.  Okay.  Now, were you supposed to be overhearing

 7  conversations?

 8  A.  No.

 9  Q.  What would happen if --

10  A.  If Gadget knew that I heard some of these -- their

11  conversation or any other conversation, I don't think I would

12  be sitting here right now, to be honest with you.

13  Q.  So did there come a time when Pauli came over to Victor's

14  house in these weeks before the trial?

15  A.  I do remember seeing him there one time.  I -- yeah.

16  Q.  And who was Pauli there to meet with?

17  A.  I was of the understanding he was there to visit Victor and

18  Gadget.

19  Q.  Okay.  Did Pauli talk to you at all during that visit to

20  Victor's house?

21  A.  Not that I can remember.

22  Q.  Did you overhear any conversations between Pauli and

23  Victor --

24  A.  And Victor.

25  Q.  -- or Gadget?

1  A.  Yes.  Again, with Pauli being there, and Victor and Gadget

2  there, was starting to talk business again, I was told to go up

3  to my room.

4  Q.  Okay.  And what business did Pauli talk about with Victor

5  and Gadget?

6  A.  The firearm.

7  Q.  This was Victor's firearm?

8  A.  Well --

9  Q.  Or Victor's gun charge?

10  A.  Yes.

11  Q.  And this was about your testimony?

12  A.  What I heard, little bit of what I overheard, yes.

13  Q.  Okay.  Did there come a time in these weeks leading up to

14  the trial that you visited Pauli's house?

15  A.  I did.  Well, I didn't, but me and Gadget did.

16  Q.  Okay.

17  A.  Excuse me.  Gadget and I.

18  Q.  All right.  And what was the purpose of going over to

19  Pauli's house?

20  A.  Gadget wanted to check on him.  He was in bad health.

21  Q.  And during the time that Gadget went over and checked on

22  him, because Pauli was in bad health, did you overhear any

23  conversations that Gadget and Pauli had?

24  A.  I was told to kick rocks, because him and Pauli were

25  talking.  And when I was in the house, I was told to "kick

1   rocks," meaning leave the house so me and my brother can talk

2   business.

3   Q.  And before you were told to kick rocks, what was the

4   conversation evolving to?

5   A.  Victor.

6   Q.  Was it about Victor's trial?

7   A.  Yes.

8   Q.  Was it about your testimony?

9   A.  Yes.

10  Q.  So, Ms. Herron, after you testified at the trial, did you

11  learn whether Victor was convicted of the charges?

12  A.  Yes.

13  Q.  After the trial, did you and Gadget stay in Michigan?

14  A.  Yes.

15  Q.  And for how long?

16  A.  (No response.)

17  Q.  Was it a brief time?  A long time?

18  A.  Seven months or so.

19  Q.  Okay.  Did there come a point where Gadget left Michigan?

20  A.  Yes.

21  Q.  And why did he leave Michigan?

22  A.  He went to Florida to take care of a traffic charge and he

23  wound up in jail.

24  Q.  Okay.  Well, why did you stay in Michigan?

25  A.  I was stranded there.

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   Q.  Did you have any --

2           MR. SABBOTA:  I'm sorry.  I didn't hear the answer.

3           THE WITNESS:  I was stranded there.  I had no money.

4           MR. SABBOTA:  Thank you.

5   BY MR. MAIATICO:

6   Q.  Did you become aware, at any time, if Gadget remained a

7   member of the Devils Diciples or got kicked out of the club?

8   A.  He got kicked out of the club when he was in jail in

9   Florida.

10  Q.  How did you learn that?

11  A.  I learned that through two other club brothers coming

12  looking for his property, his property patch, his patch, and

13  his motorcycle.

14  Q.  Okay.  And during this period of time, were you still

15  living in Michigan?

16  A.  Yes.

17  Q.  Where were you staying at that time?

18  A.  At the time, I was staying with my girlfriend, Rhonda, who

19  passed away of bad health.  But I was visiting his kids and his

20  kids' mother at the time.

21  Q.  All right.

22          THE COURT:  We're wrapping up in five minutes, sir.

23          MR. MAIATICO:  Okay.  I have about five minutes more.

24          THE COURT:  Thank you.

25  BY MR. MAIATICO:

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   Q.  So you said that a couple club brothers came by.  And what

2   were those club brothers looking for?

3   A.  His vest, his property vest, and his motorcycle.

4   Q.  Okay.  And who were those club brothers that were looking

5   for that?

6   A.  Excuse me?

7   Q.  Who was looking for that?  Who were these club brothers?

8   A.  Little Joe and Pockets.

9   Q.  Now, Ms. Herron, were you offered anything in return for

10  traveling up to Michigan and testifying at this trial?

11  A.  I wasn't offered anything.  Gadget told me on the way up to

12  Michigan that Victor was going to put money in Gadget's pockets

13  for the time that we were up there for the trial because I was

14  not working up here.  And that was --

15  Q.  So do you understand that your expenses would be paid for?

16  A.  That's what Gadget told me on the way up here, yes.

17  Q.  Okay.  And who was going to provide that, those expenses?

18  A.  I asked him; he said Victor.

19  Q.  Okay.  Now, did you ever see any money --

20  A.  No.

21  Q.  -- in return for your testimony?

22  A.  No.

23  Q.  Now, while you were at Victor's house in the weeks leading

24  up to the testimony, did you observe -- well, let me ask you

25  this:  Did you smoke marijuana at any point during that time?

1   A.  Yes.

2   Q.  Did you smoke a lot of marijuana during that time?

3   A.  Yes.

4   Q.  Who provided the marijuana?

5   A.  Victor.

6   Q.  And did you observe Victor and Gadget exchange anything

7   during your time before the trial?

8   A.  I saw Gadget having some marijuana in his hands, a bag of

9   marijuana in his hands, coming out of Victor's house.  We both

10  were coming out of his house.  When we got in the truck, Gadget

11  say, "Look what my brother gave me."

12  Q.  And how much marijuana did he have?

13  A.  I want to--

14  Q.  Can you explain it in terms of the size?

15  A.  I want to say it looked like an ounce.

16  Q.  And how big is an ounce?

17  A.  It depends on what the, what the marijuana is like.

18  Anywhere -- it's a sandwich baggie, anywheres from like that to

19  like that.  (Indicating.)

20  Q.  All right.  So you're talking about maybe a foot by --

21  A.  No.  Like a sandwich baggie almost full to the top would be

22  an ounce, and half full would be a half ounce.

23  Q.  Okay.  So the size of a sandwich baggie?

24  A.  Yeah.

25  Q.  Ms. Herron, were you nervous about testifying today?

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   A.   I am.

2   Q.   Why is that?

3   A.   Because I'm still scared of the Devils Diciples.

4   Q.   Now, you mentioned some individuals during the course of

5   your testimony.  I'm going to ask you to look around in the

6   courtroom and see if you recognize any of them.

7           You mentioned an individual by the name of Pauli.  I'm

8   going to ask you to stand up.  Do you see Pauli in the

9   courtroom today?

10  A.   I don't.  I don't see him.  I don't.

11  Q.   Okay.

12  A.   And it's been a long time since I seen him.

13  Q.   You mentioned an individual by the name of Fat Dog.  Do you

14  see Fat Dog in the courtroom today?

15  A.   I do.

16  Q.   And can you point him out and mention an article of

17  clothing that he's wearing?

18  A.   Excuse me.  I -- I believe it's him with the white collar

19  and black sweater.

20          MR. MAIATICO:  Okay.  For the record, she's identified

21  the defendant, your Honor.

22          THE COURT:  Noted.

23  BY MR. MAIATICO:

24  Q.   And finally, Gun Control, do you recognize an individual by

25  the name of Gun Control in the courtroom today?

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1   A.  I do.

2   Q.  And can you point him out and mention an article of

3   clothing that he's wearing?

4   A.  He's wearing, like, a beige sweater.

5         MR. MAIATICO:  For the record, the witness has

6   identified Mr. Vandiver.

7         THE COURT:  Noted.

8         MR. MAIATICO:  One moment, your Honor.

9         Your Honor, perhaps this is a good time to stop.  I

10  believe I may have a few other questions.

11        THE COURT:  Very well.  We're going to prepare to

12  recess for the weekend, ladies and gentlemen.  If you'll put

13  your books and materials away in the jury room and secure them.

14        We haven't recessed yet.

15        MR. SABBOTA:  Oh, I'm sorry.

16        THE COURT:  Thank you.  You can be seated.

17        Put your books and materials away in the jury room,

18  secure them for the weekend.  Please recall that my admonition

19  still is in effect with regard to speaking about your

20  impressions of the case, the attorneys, the witnesses, so on

21  and so forth.  You can continue to make your own individual

22  notes here, or otherwise.

23        And as I said to you at the beginning and during jury

24  selection, as far as I'm concerned, when the case is over, you

25  can write a book about your experience if you wish, talk to

JURY TRIAL, VOLUME XVIII - 11/14/2014
STELLA HERRON - DIRECT BY MR. MAIATICO

1    anybody that you want to, but not during trial.

2          During trial, there's no reading, research, writing,

3    don't allow anybody to communicate with you, to communicate

4    with no one else about your impressions of the case as it's

5    ongoing and maintain that standard when you're with your fellow

6    jurors, please.

7          Thou shalt not Google remains the order of the day on

8    any of these various things you've heard about.

9          All right.  Folks, you can be excused and go to the

10   jury room.  And we'll stand in recess until Monday morning.

11         COURT REPORTER:  All rise.

12      (Jury out, 1:31 p.m.)

13         COURT REPORTER:  Court is in recess.

14      (Proceedings concluded, 1:31 p.m.)

15

16                          *      *      *

17

18

19

20

21

22

23

24

25

1

2                        **CERTIFICATE OF REPORTER**

3

4              As a Federal Official Court Reporter for the United

5    States District Court, appointed pursuant to provisions

6    of Title 28, United States Code, Section 753, I do hereby

7    certify that the foregoing is a correct transcript of

8    the proceedings in the above-entitled cause on the date

9    hereinbefore set forth.

10

11

12                        Dated this 15th day of November, 2014.

13

14              s/ Christin E. Russell
                 Christin E. Russell
15               RMR, CRR, FCRR, CSR
                 Federal Official Court Reporter
16

17

18

19

20

21

22

23

24

25